**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORP.,

      Plaintiff,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant.

---

**AT&T CORP.'S OPPOSITION TO MOTION TO DISMISS [PUBLIC VERSION]**

---

      Plaintiff AT&T Corp. ("AT&T") hereby opposes the motion of defendant Level 3 Communications, LLC ("Level 3") to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) (Doc. 14).

## INTRODUCTION

      Level 3's jurisdictional motion attacks a strawman of its own creation. Most of the authority Level 3 cites concerns the ripeness of challenges to agency action. But AT&T has sued no agency, and its claims attack no agency action. AT&T's claims against a private party for breach of contract and violations of the Federal Communications Act are plainly ripe.

      In an effort to show otherwise, Level 3 argues that AT&T has sued prematurely for breach of contractual duties that are contingent on future events. This is true only if Level 3's reading of the contract is correct and AT&T's reading is wrong. But it is the parties' very disagreement over the meaning of the contract that gives rise to a ripe dispute, and a court cannot interpret disputed contract terms in order to decide that it *lacks jurisdiction* over that dispute. This Court can resolve

1

the dispute only by *exercising* its jurisdiction and interpreting the contract.

Moreover, Level 3's merits argument is wrong. The parties executed their Release and Settlement Agreement (the "Agreement") (Doc. 15-1) to resolve an ongoing dispute over the rates Level 3 can charge for services it performs for calls that are routed, in part, over the Internet—so-called "over the top" Voice over Internet Protocol ("VoIP") calls. The parties executed the Agreement in May 2015, shortly after AT&T had appealed a decision of the Federal Communications Commission ("FCC") that allowed carriers like Level 3 to charge the disputed rates. Although AT&T's appeal was pending, it agreed to pay Level 3 over ███████ for past charges billed at the contested rates, and to continue to pay the disputed rates from June 2015 until the D.C. Circuit issued an order that "overturned" the FCC's decision "in whole." In exchange for this compromise by AT&T, Level 3 agreed that, if the D.C. Circuit issued such an order, Level 3 would refund ██████ of the charges it imposed between June 2015 and the date the D.C. Circuit's order became final, and to charge AT&T rates "in compliance with [the] terms of that [Final Appellate] order."

The events that triggered Level 3's refund and rate-adjustment obligations under the Agreement have occurred. In November 2016, the FCC decision was "overturned" in whole by the D.C. Circuit, which vacated, and thus nullified, the FCC's decision. *AT&T Corp. v. FCC*, 841 F.3d 1047 (D.C. Cir. 2016). The judgment of the D.C. Circuit became a "Final Appellate Order" a few months later when the mandate issued and the time for seeking review in the Supreme Court expired.

Level 3 has breached the Agreement by failing to provide AT&T the required refund and failing to adjust its rates. Its claim that these duties are contingent on some later final action by *the*

2

*FCC* is belied by the plain terms of the Agreement. Level 3's reading of the Agreement would also create the very "uncertainty, expense, and delay" that the Agreement was designed to avoid.

The other dispute raised in AT&T's complaint is also clearly ripe. AT&T alleges that, since the D.C. Circuit's nullification of the FCC order, Level 3 is obligated by federal law to bill AT&T a lower rate. As noted, however, Level 3 continues to bill AT&T a higher rate. This dispute is ripe—indeed, Level 3 concedes as much, by filing counterclaims (which Level 3 presumably believes are ripe) to recover amounts that it claims AT&T has unlawfully withheld.  Mot. at n.4. Any future order the FCC may issue concerning the rates that carriers like Level 3 can charge for the types of services at issue in this case would have prospective effect only, and has no bearing on the parties' ripe dispute over the rates Level 3 is and has been charging since May 2017.

## BACKGROUND

As the following overview explains, this dispute concerns the rates that local carriers, such as Level 3, can charge long-distance carriers, such as AT&T, for calls that use VoIP technology.

**Traditional and VoIP Calls And Associated Charges.** A traditional long-distance call travels from the caller's premises (such as a home or office) over a local carrier's "local loops" to its "end-office," where the call is connected to trunks that carry it to the caller's long-distance provider. The long-distance provider then delivers it (directly or indirectly) to the local carrier that serves the called party. This local carrier, in turn, transports the call to one of its end-offices, where the call is placed on the local loop that connects to the called party's premises. *See* Compl. ¶¶ 12, 15; *see also AT&T*, 841 F.3d at 1049-50 (cited in Compl., ¶ 36).

Local carriers charge long-distance carriers for performing these functions, known as "switched access services," at FCC-regulated rates. There are different rates for using trunks

(transport services), switches that connect trunks to other switches ("tandem" charges), and end-office (or "local") switches. Historically, end-office switching has been the most expensive of these rates, because of the investment-intensive nature of the local equipment and facilities involved and the limited economies of scale associated with these "last-mile" facilities. Compl. ¶¶ 14-16; *see also AT&T*, 841 F.3d at 1056.

In contrast to calls over the traditional telephone network, VoIP calls are routed in part over the Internet. Thus, if a caller using AT&T's long-distance service places a long-distance call to a VoIP subscriber, the originating local carrier delivers the call to AT&T, which then delivers it (again, often indirectly) to the VoIP provider and/or its local carrier partner at some intermediate point. There, the call is converted to Internet Protocol format and routed over the Internet to the VoIP subscriber. *AT&T*, 841 F.3d at 1050-51.

Importantly, there are two types of VoIP providers. A "facilities-based" VoIP provider, such as a cable company like Comcast, provides "last-mile" facilities for high-speed Internet service that connect directly to a home or business. Thus, for a long-distance call to a Comcast VoIP customer, the call is routed and arrives at a Comcast router, which delivers it to the Comcast last-mile facilities that connect to the called party's home or business. By contrast, an "over-the-top" VoIP provider, like Vonage, does not provide this last-mile connection to a subscriber. Instead, that subscriber must purchase that last-mile connection separately from an Internet service provider, such as Comcast. Vonage's service thus rides "over the top" of the facilities of the Internet provider, which actually delivers the call to the subscriber. *See id.*; Compl. ¶¶ 17-19.

Prior to 2011, the charges, if any, that could be billed for VoIP calls were unclear. In its

"*Transformation Order*,"[1] the FCC allowed local carriers to charge for services they or their VoIP partners actually provide, at rates equal to access services provided by "incumbent" local carriers (like CenturyLink). *Id.* ¶ 944; 47 C.F.R. § 51.913. A local carrier and its VoIP partner need not perform precisely the same services as an incumbent, but can charge for performing the "functional equivalent" of those services. *See* 47 C.F.R. §§ 51.903(d), (i); 51.913(b).

**The Dispute Over Access Charges For Over-the-Top Calls.**  No one disputes that, under these rules, ***facilities-based*** VoIP providers can charge for end-office switching. These providers route calls onto the last-mile facilities that connect to subscribers, a process functionally equivalent to the service performed by incumbent carriers when they place calls onto the local loops at end-offices. *AT&T*, 841 F.3d at 1050-51. In over-the-top service, however, local carriers and their VoIP partners perform no function equivalent to end office switching. *See id.* at 1051, 1054; Compl. ¶¶ 2, 22, 38, 81. Rather, they dump calls on the public Internet hundreds or even thousands of miles away from the called party, relying on the over-the-top VoIP subscriber's Internet provider to route the call onto the facilities connected to that subscriber. *See AT&T*, 841 F.3d at 1051, 1054, 1056. The limited functions that over-the-top VoIP providers and their LEC partners perform in routing calls to the Internet are, at best, equivalent to tandem switching, which is traditionally less expensive. *See id.* Consequently, AT&T paid tandem rates for this traffic, while some local carriers such as Level 3 insisted they could charge more expensive end-office switching rates.

By a 3 to 2 vote, the FCC issued an order in 2015 that purported to clarify its 2011 rules, and authorize end-office access charges on over-the-top calls.  *Connect America Fund*, 30 FCC

---

[1] *Connect America Fund*, 26 FCC Rcd. 17663, ¶¶ 933-71 (2011) ("*Transformation Order*"), *pets. for review denied sub nom. In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014).

Rcd. 1587 (2015) ("*OTT Declaratory Order*"). One of the dissenters, now the FCC Chairman, disagreed, explaining agency "precedent makes clear … that transmitting calls . . . for routing over the Internet is not the functional equivalent of end office switching." Pai Statement, 30 FCC Rcd. at 1615-16.  AT&T filed a petition for review in the D.C. Circuit on March 21, 2015. Compl. ¶ 24.

**The Parties' Contract.** During the pendency of AT&T's appeal, the parties executed the Agreement "to compromise and settle" their dispute concerning the proper rates for over-the-top VoIP calls (as well as another dispute not relevant here). *See* Agreement at 2. The settlement covered four time periods. *First,* AT&T agreed to pay Level 3 over ████████, or "████████ of the usage and late payment charges billed by Level 3 for" over-the-top traffic from 2011 through March 2015. *Id.* at 2, § 1(a)(i)(A). *Second*, AT&T agreed to pay ████████ of the amount to be invoiced by Level 3 for such traffic exchanged between April 1 and May 31, 2015. *Id.* at 2, § 1(a)(i)(B). The payments for these two periods were not contingent upon the outcome of AT&T's appeal, and Level 3's charges for over-the-top traffic exchanged through May 31, 2015 are not in dispute.

*Third*, for the period from June 1, 2015 through the date of the "Final Appellate Order" (as defined in the Agreement), AT&T would pay ████████ of Level 3's end-office switching rate for over-the-top traffic, in accordance with the FCC's *OTT Declaratory Order*. *See* Agreement at 3, § 1(a)(ii) & p. 1. But because of the "pendency of the OTT Appeal," these payments *were* subject to an express right of refund:

> in the event the *OTT Declaratory Order* is *overturned*, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review ("Final Appellate Order"), Level 3 will refund, within 30 days, ████████ of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review.

*Id.* at 3 § 1(a)(iv) (emphasis added). This provision went on to say: "if the *OTT Declaratory Order* is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order." *Id.* *Fourth*, the parties agreed "that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with [the] terms of that order." *Id.*

**The D.C. Circuit Decision.** The D.C. Circuit vacated the *OTT Declaratory Order*, holding that the FCC's reasons for allowing end-office switching charges on over-the-top VoIP calls were "wholly arbitrary." 841 F.3d at 1053-54. The court found that the FCC had failed to explain how, under its 2011 rules, the functions performed on such calls were equivalent to end-office rather than tandem switching. *Id.* at 1052-54. Statements from the FCC's 2011 *Transformation Order* seemed "[o]n their face … to deny an over-the-top provider authority to charge end-office switching rates" *id.* at 1054, and the FCC had elsewhere been "remarkably clear, even emphatic" that local switching entailed interconnection of "tangible connections" to callers, and not placing calls onto the public Internet. *Id.* at 1056. The *OTT Declaratory Order* "falls down in its failure to explain why [the] failure to provide interconnection is not fatal to the claim that [a local carrier and its VoIP partner] provide the functional equivalent of end-office switching." *Id.*

Level 3 and other intervenors in the appeal sought rehearing, which was denied. *See* Orders (Per Curiam), *AT&T Corp. v. FCC*, No. 15-1059 (D.C. Cir. Feb. 6, 2017). Neither the FCC, Level 3, nor any other intervenor sought Supreme Court review of the D.C. Circuit decision.

**Level 3's Breach Of The Contract.** By vacating the *OTT Declaratory Order*, the D.C. Circuit "overturned" it in "whole." Agreement at 3, § 1(a)(iv). The D.C. Circuit's judgment became a "Final Appellate Order" as of May, 2017, after the D.C. Circuit issued its mandate and

7

no party sought Supreme Court review. Nevertheless, Level 3 has not made the required refund and has continued to charge end-office switching rates on over-the-top calls. Compl. ¶¶ 53-57.

AT&T filed this suit alleging that Level 3 has breached its refund and rate-adjustment duties under the contract, and seeking damages as well as declaratory and injunctive relief for those breaches. As alternative grounds as to the rate-adjustment claim, AT&T has sued Level 3 for charging rates on over-the-top traffic that violate federal law.

## ARGUMENT

## I.   AT&T's CONTRACT CLAIMS ARE RIPE.

Level 3 ignores the test for determining when contract disputes are ripe—a test that AT&T's contract claims easily satisfy. Instead, Level 3 argues that the Court should rule that it lacks jurisdiction based on Level 3's disputed reading of the contract terms. That merits-based argument is plainly improper in a Rule 12(b)(1) motion. It is also wrong on its own terms.

### A.   AT&T's Contract Claims Are Ripe, And Level 3 Cannot Show Otherwise By Relying On Its Interpretation Of The Disputed Contract Provision.

In evaluating whether breach-of-contract claims are ripe, the Tenth Circuit considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Salt Lake Tribune Pub. Co. v. Management Planning, Inc.*, 454 F.3d 1128, 1140 (10th Cir. 2006). AT&T's contract claims easily satisfy this test.

First, those claims raise questions of contract interpretation, which are universally recognized as fit for judicial decision, because they are questions of law. *See*, *e.g., Transmission Agency of N. California v. FERC*, 697 Fed. Appx. 11, 13 (D.C. Cir. 2017); *Cobell v. Jewell*, 802 F.3d 12, 21 (D.C. Cir. 2015); *Hartford Fire Ins. Co. v. Peninsula Logistics, Inc.*, No. 6:14-cv-00154, 2014 WL 1416339 at *2 (M.D. Fla. April 11, 2014). Withholding consideration, moreover,

would cause significant hardship to AT&T, which (1) has been denied several million dollars in refunds it is already owed, (2) has been charged excess rates for over-the-top traffic since the Final Appellate Order in May 2017, and (3) absent declaratory relief, will continue to face such charges into the future. Indeed, under Level 3's misguided theory, the events that are supposedly necessary for AT&T's contract claims to ripen "may never occur." Mot. at 9.

Ignoring these issues, Level 3 argues that this suit is unripe because its refund and rate-adjustment duties are triggered only if the FCC issues an additional final determination that end-office switching rates do not apply to over-the-top traffic—something that has not yet occurred. Mot. at 15-20. But this is a pure merits argument—*i.e.*, that Level 3's disputed reading of the contract is correct and AT&T's reading is wrong. Level 3 cites no authority for the illogical proposition that a court can *resolve* the merits of a contract dispute as a basis for concluding that *lacks jurisdiction* over that very dispute. Instead, the few contract-related cases Level 3 cites show that a dispute between parties over the meaning of contract terms *establishes* a ripe controversy.[2] For example, *Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349 (S.D.N.Y. 2007), held that, under New York law (which governs here), "[a] breach of contract case … is ripe immediately upon the [alleged] breach." *Id.* at 357 (brackets in original; emphasis added). Similarly, in *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665 (9th Cir. 2005), a dispute was ripe even before

---

[2] Many other cases recognize that disputes over the meaning of a contract create ripe controversies. *See Peninsula Logistics*, 2014 WL 1416339 at *2 (dispute over insurer's indemnification obligations "turned on the interpretation of the policy, and *was therefore* ripe for declaratory relief prior to the resolution of the underlying case" against insured) (emphasis added); *Davis v. Farmers Ins. Co., Inc.*, No. 4:17-cv-1191, 2017 WL 4758887 at *3 (E.D. Mo. Oct. 20, 2017) (coverage dispute ripe where insurer "denied coverage based on its reading of the Policy" and the "only remaining task [was] contract interpretation").

an alleged breach occurred, because "the parties have always disagreed as to what [the contract] means; the dispute has measurable financial consequences; and the parties have always known that the dispute would eventually need resolution." *Id.* at 671.

Contrary to Level 3's claim, *see* Mot. at 16, the decision in *Duane Reade, Inc. v. St. Paul Fire & Mar. Ins. Co.*, 261 F. Supp. 2d 293 (S.D.N.Y. 2003), does not show otherwise. There, the parties disputed the period of time that plaintiff's insurance policy covered business-interruption losses. *Id.* at 294. The court concluded that plaintiff's *damages* claims were unripe, because it was "undisputed" that the plaintiff had not filed a proof of loss as a precondition for payment of insurance proceeds. *Id.* at 295. But the claims for declaratory relief were ripe, because there was a dispute over the policy's scope of coverage. *Id. Duane Reade* illustrates merely that contract claims can be unripe when contract provisions *that are not in dispute* create pre-conditions to liability. Here, the parties dispute the meaning of provisions that govern the timing of Level 3's obligations. That dispute creates a ripe controversy, and the proper way for resolving it is a motion for judgment on the pleadings or for summary judgment, both of which involve an exercise of jurisdiction. The dispute cannot be resolved in a Rule 12(b)(1) motion contesting the Court's jurisdiction.[3]

### B.      Level 3's Interpretation Of The Disputed Provision Is Plainly Wrong.

Even if it were proper to interpret the contract to decide jurisdiction—and it is not—Level 3's motion still fails.  Level 3 is effectively arguing that the Court should re-write the contract so

---

[3] *See Remington v. Newbridge Securities Corp.*, No. 13-cv-60384, 2013 WL 4496504 at *3 (S.D. Fla. Aug. 20, 2013) (court "may not engage in contract interpretation at the motion to dismiss stage. [Such] arguments are appropriate for summary judgment"); *cf. Yellowbird Bus Co. v. Lexington Ins.*, 2010 WL 2766987 at *3-*9 (E.D. Pa. July 12, 2010) (declining to dismiss claims as unripe under Rule 12(b)(1), but dismissing under Rule 12(b)(6) because the contract's meaning was plain). Level 3 has not moved to dismiss under Rule 12(b)(6), nor could it. It relies on evidence that is outside the complaint, and barred by the contract's integration clause. *See infra* at 16-17.

that, while AT&T was bound to make a substantial settlement payment to Level 3, Level 3's own contractual duties to refund and properly bill AT&T "may never occur." Mot. at 9. That interpretation of the Agreement is untenable. The contract terms governing Level 3's refund and rate-adjustment duties have clear meanings that are flatly inconsistent with the interpretation Level 3 advances as a basis for dismissing the complaint. Level 3's reliance on inaccurate paraphrases and the supposed "absurd results" that flow from the contract's plain meaning do not remotely show otherwise.[4]

### 1. Level 3's Refund Duty.

The triggering events for Level 3's refund duty are [1] that "the *OTT Declaratory Order* is overturned … in whole … and [2] the applicable order on appeal becomes final and is no longer subject to further judicial review ('Final Appellate Order')." Agreement at 3, § 1(a)(iv). The requirement that the *OTT Declaratory Order* be "overturned … in whole" plainly refers to an appellate decision that *vacates* the *OTT Declaratory Order.* "To 'vacate' . . . means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'" *Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983) (citation omitted). A judicial decision that "annuls[s]" and "void[s]" an agency order indisputably "overturn[s]" that order "*in whole.*"

The requirement that the "applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review," Agreement at 3, § 1(a)(iv), has an equally plain and

---

[4] Because the meaning of the Agreement is clear, AT&T intends shortly to file a partial summary judgment motion. By resolving the liability issues, AT&T's forthcoming motion will focus the litigation and discovery on damages issues.

unambiguous meaning. An appellate court's *judgment* is the "applicable order on appeal," because it is the court's judgment that would "overturn[] the *OTT Declaratory Order*." Indeed, the D.C. Circuit's judgment ordered that "the Declaratory Ruling [be] vacated and remanded." *AT&T*, 841 F.3d at 1056. An appellate judgment becomes "final" when the court issues its mandate.[5] And, that judgment is "no longer subject to further appeal or other judicial review" when the period for seeking Supreme Court review expires. Under the plain terms of the contract, therefore, Level 3's refund duty was triggered in May, 2017—90 days after the D.C. Circuit denied rehearing and the period for seeking Supreme Court review expired. *See* Sup.Ct. R. 13.

Level 3's contrary interpretation has no support in the language of the Agreement, which is why Level 3 repeatedly relies on inaccurate—and inconsistent—paraphrases to rewrite its plain meaning. Level 3 claims that its refund duty is not triggered unless and until an "*FCC decision* to permit billing such charges was overturned by a 'final' decision *and* 'no longer subject to judicial review.'" Mot. at 6 (emphasis added). The contract, however, does not refer to the finality of any FCC decision, and it is bizarre to refer to an *agency* decision that has been *overturned* as a "Final *Appellate* Order." Level 3 elsewhere claims that its duty is triggered by a "'final' decision— whether from the Court of Appeals or from the FCC—[that] … definitively determine[s] whether end-office switching charges appl[y]" to over-the-top calls. *Id.* Under this equally illogical formulation, either an agency or a court decision constitutes a Final *Appellate* Order.

---

[5] *See Uline v. Uline*, 205 F.2d 870, 871-72 (D.C. Cir. 1953) (despite issuance of opinion and judgment, lower court judgment was "still in effect, our mandate not having issued"). Level 3 cites cases holding that a remand *by a district court* to an agency is not final. Mot. at 12-13. These cases are irrelevant: they concern the finality of district court decisions under 28 U.S.C. §§ 1291, 1292, 1295—statutes that have no bearing on the finality of *circuit court* judgments.

Not only are both paraphrases illogical, they ignore the import of the phrase "applicable order *on appeal*."  *See* Agreement at 3, § 1(a)(iv) (emphasis added); *see also Vill. of Hamburg v. Am. Ref-Fuel Co.*, 727 N.Y.S.2d 843, 846 (N.Y. App. Div. 2001) (courts must give "[e]ffect and meaning . . . to every term of the contract") (quotation marks omitted). Level 3 implies that "applicable order on appeal" refers to an appeal of some *future* FCC order, issued on remand, that determines the proper charges for over-the-top calls. But in the preceding sentence, the parties "recognize the pendency of the OTT Appeal." Agreement at 3, § 1(a)(iv). The relevant "order *on appeal*," therefore, is an order issued on the appeal of the "*OTT Declaratory Order*," not some unspecified future FCC order that may become the subject of a different appeal.[6]

Unable to tie its reading to the contract's language, Level 3 repeatedly invokes a "Term Sheet" exchanged weeks before the contract was executed. *See* Mot. at 6, 15, 19.[7] This document, however, cannot be considered because the Agreement expressly provides that "[a]ll prior discussions and negotiations regarding the Disputes have been and are, merged and *integrated* into, *and are superseded by*, this Agreement." Agreement at 6, § 3 (emphasis added). The Term Sheet is impermissible parol evidence, and this Court should disregard it. *See Marine Midland Bank v. Thurlow*, 425 N.E.2d 805, 807 (N.Y. 1981) ("[W]here the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior

---

[6] The D.C. Circuit treats agency remands "as terminated cases, and any appeal from a remanded rule is treated as a new case and sent to a randomly selected panel." P. Wald, *Regulation at Risk: Are Courts Part of the Solution or Most of the Problem?*, 67 S. Cal. L. Rev. 621, 640-41 (1994).

[7] This document states that it is a "CONFIDENTIAL SETTLEMENT OFFER" subject to Federal Rule of Evidence 408, Ex. 2 to Marsh Decl. (Doc. 15-2),—a rule that bars the use of settlement offers as evidence. The Term Sheet itself states, moreover, that it is "not an offer or proposal capable of acceptance," and that the final agreement "may not include all items referenced in this document." *Id.*

or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing."); *Law Debenture Trust v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).

In all events, the document undercuts Level 3's interpretation. It shows that the parties knew how to tie Level 3's refund duty to a "final ruling, either from the Court of Appeals or, if remanded, by the FCC," Ex. 2, Marsh Decl. (Doc. 15-2). Ultimately, however, the parties used very different language that tied Level 3's obligation to a final D.C. Circuit judgment overturning the *OTT Declaratory Order* in whole, not to judicial disposition of a different FCC order in a later appeal.

Nor is it "absurd" that Level 3 "must refund ▮▮▮▮ of the OTT VoIP charges … *even if [on remand] the FCC later determines that these charges are lawful.*" Mot. at 18 (emphasis in original). The Agreement reflects a compromise by both parties: AT&T agreed to pay Level 3 most of its charges prior to June, 2015, and to continue to pay end-office charges despite its ongoing challenge to the legality of those rates. In exchange, Level 3 agreed to refund ▮▮▮▮ the amounts billed after May 2015 if AT&T prevailed on its challenge and the *OTT Declaratory Order* were overturned in whole. Such a compromise is entirely rational. If, on remand, the FCC were to re-adopt its interpretation of the 2011 rules (assuming it can articulate a valid rationale), Level 3 can resume charging end-office rates. The Agreement, however, resolves any uncertainty about the validity of rates charged between May 2015 and the finality of a D.C. Circuit decision vacating the *OTT Declaratory Order*, by "splitting the baby" and requiring a ▮▮▮▮ refund.

In the end, it is Level 3's interpretation that makes no sense. The parties entered into the contract "to avoid further uncertainty, expense and delay." Agreement at 3, § 1(a)(iv). Yet, under Level 3's reading, AT&T not only gave up its right to recover ▮▮▮▮ of the end-office

14

switching rates it paid prior to the *OTT Declaratory Order*, it also agreed to pay those charges indefinitely (or perhaps in perpetuity) even if it won its appeal and the D.C. Circuit nullified the FCC's decision permitting such charges, with no right to any refund. *See* Mot. at 9 (stating that the trigger for Level 3's refund and rate-adjustment obligations—*i.e.*, a "'final decision' … that conclusively resolves the question of billing for OTT VoIP calls"—has not "occurred yet" and "*may never occur*") (emphasis added). What is absurd is the idea that a party seeking to avoid further uncertainty and delay would agree to pay over ███████ to settle the retrospective aspect of its claim, yet at the same time would agree to an open-ended condition precedent on its right to a refund if it won its appeal. Interpreting the contract in accordance with its plain meaning avoids this absurdity, and effectuates the parties' clearly expressed desire to avoid uncertainty, expense and delay. *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1278 (2d Cir. 1989) ("court is not required to find the language ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning'").

## 2. Level 3's Rate-Adjustment Duty.

The language governing Level 3's rate-adjustment duty is equally clear. The parties agreed "that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with the terms of that order." Agreement at 3, § 1(a)(iv). For the reasons just discussed, the Final Appellate Order is the D.C. Circuit's final and no-longer-reviewable judgment vacating the *OTT Declaratory Order*. Thus, the Agreement required that, as of May, 2017, Level 3's rates for over-the-top traffic had to comply with the terms of the D.C. Circuit's judgment. And that judgment precludes charging end-office rates for such traffic.

When the D.C. Circuit concludes that an agency's justification for its action or decision is

inadequate, the court can remand with or without vacatur, depending on the seriousness of the inadequacies in the agency's reasoning. *See Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150-51 (D.C. Cir. 1993). A D.C. Circuit judgment that remands without vacatur leaves the agency's order in place. *See id.* Thus, if the D.C. Circuit had simply remanded, the *OTT Declaratory Order* would have remained operative, and continued imposition of end-office rates for over-the-top traffic would "be in compliance with the terms of [such an] order."

Instead, however, the D.C. Circuit *vacated* the *OTT Declaratory Order*, thereby nullifying it, then remanded. *See AT&T*, 841 F.3d at 1056. Continuing to charge end-office rates after the court vacated the FCC's order cannot be "in compliance with the terms of" the Final Appellate Order, because it gives no effect to the D.C. Circuit's legally significant decision to vacate.

The court's opinion underscores why continued imposition of end-office rates does not comply with its judgment. The D.C. Circuit did not merely find that the FCC had failed to provide an adequate explanation for its decision. Instead, like dissenting Commissioner Pai, it stressed that the FCC had failed to reconcile the *OTT Declaratory Order* with prior agency precedent and pronouncements, which made clear that the functions performed by VoIP providers and their LEC partners for over-the-top traffic are *not* functionally equivalent to end-office switching. *See AT&T*, 841 F.3d at 1054 (noting statements in the *Transformation Order* that, "[o]n their face … seem to deny an over-the-top provider authority to charge end-office switching rates"); *id.* at 1056 (stressing FCC's "emphatic" statements in a contemporaneous order that local switching entailed interconnection of "tangible connections"). Indeed, by stating that it was difficult to understand "why [the] failure to provide interconnection is not *fatal* to the claim that [a local carrier and its VoIP partner] provide the functional equivalent of end-office switching," *id.* (emphasis added),

16

the D.C. Circuit made clear that, under the FCC's 2011 rules, local carriers could *not* charge end-office rates for over-the-top traffic, and that the court was nullifying the order authorizing such charges because the FCC had failed justify a contrary conclusion. *See also O1 Commc'ns, Inc. v. AT&T*, No. 3:16-cv-1452-VC (N.D. Cal. Dec. 19, 2017), (Doc. 106) Slip op. at 2 (without the *OTT Declaratory Order*, "existing law bars" imposition of end-office rates for over-the-top traffic).

Contrary to Level 3's claims, interpreting this provision in accordance with its plain terms would not mean that, if the FCC later re-authorizes end-office rates for over-the-top traffic, Level 3 would be barred from charging those rates. Mot. at 18. The "terms" of the Final Appellate Order authorize further agency proceedings, and thus would permit Level 3 to charge to end-office rates on over-the-top calls if a later FCC decision authorizes such charges and complies with *AT&T*. By contrast, Level 3's reading gives no meaning to the rate-adjustment sentence in the contract. If on remand, the FCC bars such charges, then Level 3 would be required by FCC rules to stop charging end-office rates, and the rate-adjustment sentence would be superfluous. The very point of that sentence was to ensure that AT&T would derive immediate benefit if, as happened, the D.C. Circuit overturned the *OTT Declaratory Order* "in whole," by vacating that order.

## II.    AT&T'S STATUTORY CLAIM IS RIPE.

AT&T's other claim asserts that, by billing end office switching rates on over-the-top VoIP calls since May 2017 (rather than tandem switching rates), Level 3 is violating not only the parties' contract but also federal law. Compl. ¶¶ 71-85. This alternative statutory claim is also ripe.[8]

---

[8] The FCC's rules allow carriers like Level 3 to charge for access services either pursuant to tariffs or negotiated contracts. *See, e.g.*, 47 C.F.R. § 51.905(a); *Transformation Order*, ¶ 812. Here, in the Agreement, Level 3 agreed to bill AT&T in compliance with the outcome of the D.C. Circuit order. Agreement at 3, § 1(a)(iv). If the Court grants AT&T partial summary judgment on that claim, then AT&T's claim that Level 3 also violated federal law could be moot. At this stage,

Level 3 does not directly address these claims, but argues that the Court lacks jurisdiction because the "FCC is still considering the question of how to properly bill for OTT VoIP calls." Mot. at 8. Level 3's position lacks merit. The FCC already has rules in place that address compensation for *all* VoIP traffic. AT&T and Level 3 currently dispute how those rules apply to over-the-top VoIP calls, and thus what Level 3 may now lawfully bill AT&T; that dispute is ripe, fits squarely within this Court's jurisdiction, and should not be dismissed. The possibility that the FCC may issue further guidance on how to apply its rules to over-the-top VoIP calls does not make the billing dispute unripe or deprive the Court of subject matter jurisdiction.

The FCC's 2011 regulations "address the prospective intercarrier compensation obligations associated with VoIP[] traffic." *Transformation Order*, ¶¶ 937-39, 944. Under the FCC 2011 rules, a "VoIP provider and its LEC partner" can "charge for providing the 'functional equivalent' of end-office switching services, or tandem switching services, as the case might be." *AT&T*, 841 F.3d at 1049; *see* 47 C.F.R. §§ 51.903(d), (i); *id.* § 51.913(b); Pai Statement at 1615-16. In the absence of a negotiated contract, the FCC's 2011 rules are the governing federal law on how local carriers should bill on any VoIP calls, including over-the-top VoIP calls.

As noted earlier, the FCC interpreted its 2011 rules to allow end office charges on over-the-top VoIP calls, but the D.C. Circuit vacated that order. There is thus a ripe dispute between the parties over whether the FCC's 2011 rules permit Level 3 to charge end-office switching rates for over-the-top traffic. AT&T alleges that Level 3's bills to AT&T since May 2017 violate these FCC rules, because on over-the-top VoIP calls, neither Level 3 nor its VoIP provider partners provide

---

however, AT&T is entitled to plead that Level 3 violated both the contract and federal law.

the functional equivalence of end office switching access service. Compl. ¶ 80. Indeed, another court has recognized that this very type of dispute is ripe and resolved it by ruling that the FCC's regulations do *not* permit end-office switching charges on over-the-top calls. *O1 Commc'ns, Inc. v. AT&T*, No. 3:16-cv-1452-VC (N.D. Cal. Dec. 19, 2017) (Doc. 106), Slip op. at 2.

Indeed, Level 3 tacitly acknowledges that this claim is ripe by filing counterclaims to recover charges that it billed, and that AT&T declined to pay. Doc. 38. If Level 3 can file a "counterclaim demanding payment of the millions of dollars that AT&T is wrongfully withholding," Mot., at 8 n.4 (Doc. 14), AT&T's claim that Level 3 is overcharging AT&T is equally ripe. This is a classic billing dispute that is "fit for judicial decision."

Contrary to Level 3's argument, the parties' ongoing billing dispute is not unripe merely because the FCC may issue a ruling on remand. Not only has the FCC taken no action on remand, it is not obligated to act, as Level 3 acknowledges. Rather, it could simply leave its 2011 rules in place, and allow courts to resolve any disputes. Further, Level 3's reliance on *Teliax* (Mot. at 2) is also unavailing. The court in *Teliax* did not dismiss either party's claims as unripe, but rather *maintained* jurisdiction over the parties' claims, by staying (rather than dismissing) all claims, and referring the underlying issues to the FCC under the primary jurisdiction doctrine. *Teliax v. AT&T Corp.*, No. 15-cv-01472, 2017 WL 3839459, at *3 (D. Colo. Sept. 1, 2017). AT&T does not believe a referral is necessary given the clarity of the 2011 regulations. *See O1 Commc'ns,* Slip op. at 2; *AT&T*, 841 F.3d at 1052-54 (emphasizing clarity of those rules prior to the *OTT Declaratory Order*). But the mere possibility of such a referral—like the possibility of an FCC order on remand—does not deprive this Court of jurisdiction.

## CONCLUSION

For the foregoing reasons, Level 3's motion to dismiss (Doc. 14)  should be denied.

Dated: March 21, 2018                     Respectfully Submitted,

/s/ Rebecca B. DeCook
Rebecca B. DeCook, #14590
Andrew T. Flynn, #43843
MOYE WHITE LLP
1400 16th Street, 6th Floor
Denver, Colorado 80202-1027
Telephone: (303) 292-2900
E-mail: becky.decook@moyewhite.com
E-mail: andrew.flynn@moyewhite.com

Michael J. Hunseder
Justin A. Benson
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

## CERTIFICATE OF SERVICE

I, Rebecca B. DeCook, hereby certify that on March 21, 2018, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

Charles W. Steese, #26924
Douglas N. Marsh, #45964
Martin J. Estevao, #46260
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
Email: csteese@armstrongteasdale.com
Email: dmarsh@armstrongteasdale.com
Email: mestevao@armstrongteasdale.com

Attorneys for Defendant Level 3
Communications, LLC

/s/ Rebecca B. DeCook
Rebecca B. DeCook, #14590
MOYE WHITE LLP
1400 16th Street, 6th Floor
Denver, Colorado 80202-1027
Telephone: (303) 292-2900
E-mail: becky.decook@moyewhite.com

Attorney for Plaintiff AT&T Corp.