**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

    Plaintiff,

v.

LEVEL 3 COMMUNICATIONS, LLC,

    Defendant.

---

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

---

Defendant, Level 3 Communications, LLC ("Level 3" or "Defendant"), respectfully submits this Reply in support of its Motion to Dismiss the Complaint of AT&T Corporation ("AT&T") pursuant to FED. R. CIV. P. 12(b)(1) (Dkt. No. 14).

**INTRODUCTION**

As noted in Level 3's Motion, the "prudential ripeness doctrine" requires the Court to "balance the fitness of the issue for judicial review with the hardship to the parties from withholding review." *United States v. Bennett*, 823 F.3d 1316, 1326 (10th Cir. 2016); *see also* Motion at 10. This in turn requires the Court to consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967) ("*Abbott*

*Labs*") (abrogated on other grounds)).  A claim is not ripe which "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–81 (1985)).  And even where judicial intervention would "probably not inappropriately interfere with further administrative action," courts apply the ripeness doctrine as a matter of prudence if they "would benefit from further factual development of the issues presented." *Utah v. U.S. Dep't of the Interior*, 210 F.3d 1193, 1197 (10th Cir. 2000).

Here, as shown in Level 3's Motion, the *Abbott Labs* criteria are all present.  AT&T thus fails to carry its burden "to provide evidence establishing that the issues are ripe for review." *Park Lake Res. Liab. Co. v. U.S. Dep't of Agr.*, 197 F.3d 448, 450 (10th Cir. 1999).  Its claims therefore must be dismissed as unripe.

## I. THIS COURT CAN AND SHOULD DETERMINE THAT AT&T'S CLAIMS ARE NOT RIPE FOR ADJUDICATION.

AT&T's Opposition first resists the premise of the prudential ripeness doctrine, contending, without citing any authority in support, that "a court cannot interpret disputed contract terms in order to decide that it *lacks jurisdiction* over that dispute." *Opposition* at 1 (emphasis added).  To the contrary, "a court always has jurisdiction to determine its own jurisdiction." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 (1998).  Thus, by necessity, "[a] court has the jurisdiction to determine whether contractual conditions precedent . . . have been fulfilled." *Anagnostopoulos v. Union Tpk. Mgmt. Corp.*, 300 A.D.2d 393, 394, 751 N.Y.S.2d 762 (2002) (noting that question of whether parties have complied with duties made conditions precedent to arbitration by the parties' agreement "is a question for threshold judicial resolution").

Indeed, courts regularly review the terms of a contract to determine whether breach of contract claims are premised on as-of-yet unfulfilled contingencies and dismiss such claims as unripe without hesitation.  For example, in *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003) ("*Duane Reade I*"), the court dismissed two breach of contract claims as unripe where plaintiff had not yet filed proofs of losses, a condition precedent to raising the contractual claims.  And even after the plaintiff filed these proofs, the court dismissed the contract claims as unripe *again* when the plaintiff failed to submit valuation aspects of the claim to an appraiser, another condition precedent to filing the complaint.  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 279 F. Supp. 2d 235, 236 n.1 (S.D.N.Y. 2003) ("*Duane Reade II*").  And in *Brooklyn Hosp. Ctr. v. Westport Ins. Corp.*, No. 03 CIV. 5190 (BSJ), 2004 WL 868208, at *3 (S.D.N.Y. Apr. 21, 2004), the court dismissed unripe breach of contract claims upon finding that the plaintiff was required, but failed to submit a sworn proof of loss statement pursuant to its insurance policy.  Each of these cases has a common theme:  the court was required to interpret the contract at issue to determine whether the complained-of rights were contingent upon future events that had not yet taken place, and upon doing so dismissed the claims as unripe.  That this Court must do so here is no obstacle for reaching the same result.

AT&T responds to this point by claiming that "contract claims can be unripe when contract provisions *that are not in dispute* create pre-conditions to liability," conversely suggesting that such claims cannot be unripe if those same provisions are disputed. *Opposition* at 10 (emphasis in original).  But as noted above, the Court's jurisdiction to determine its jurisdiction by necessity gives the Court the authority to take whatever action is reasonably

3

necessary to determine whether it has jurisdiction over an action.  This includes, as necessary, determining issues of law such as whether a contract exists (*see, e.g., United Steelworkers of Am., AFL-CIO v. Rome Indus., Inc.*, 437 F.2d 881, 882 (5th Cir. 1970)), and what it means, even when the terms of the contract are disputed (*see, e.g., Warren v. Fox Family Worldwide, Inc.*, 171 F. Supp. 2d 1057, 1063 (C.D. Cal. 2001) ("proper interpretation of a contract is a matter of law for the court to decide"; thus, even where the parties "dispute[] the[] meaning and the[] enforceability" of the parties' contracts, "the court may properly consider them under Rule 12(b)(1)").

Here, there is no material factual dispute to be resolved:  all parties acknowledge the events underlying Level 3's Motion, including AT&T's transmission of the term sheet, the execution of the Settlement Agreement, the entry of the D.C. Circuit's opinion, etc.  All that remains is the legal question of whether these events give rise to a ripe dispute over which the Court should exercise jurisdiction.  Thus, the Court can—and should—dismiss AT&T's claims as unripe because they are premised on contingencies that have not yet occurred.

## II.   THE PARTIES' SETTLEMENT AGREEMENT EXPRESSLY CONDITIONS THE RIGHTS AND OBLIGATIONS ON WHICH AT&T'S CONTRACT CLAIMS ARE BASED ON CONTINGENCIES THAT ARE YET TO OCCUR.

AT&T next attempts to resist the plain meaning of the parties' Settlement Agreement, specifically contending with the language premising certain rights and obligations on the condition that "the applicable order on appeal becomes final and is no longer subject to further judicial review." *Opposition* at 11.  As shown in Level 3's Motion, the Settlement Agreement plainly contemplates that the "final" order giving rise to these duties is one that definitively settles the legal question at issue in the then-pending appellate case:  whether it is permissible

4

under the FCC's 2011 rules to assess end-office switching access charges on OTT-VoIP traffic. This is validated by the fact that the Agreement states that "any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with the terms of that order." Dkt. 15-1 at 3, § 1(a)(iv). It is impossible to bill "in compliance with" the order until the decision about *what a carrier can bill* for OTT VoIP traffic is determined.

The D.C. Circuit's 2016 order did not settle this question, or establish terms regarding this traffic with which the parties could comply. Instead, it remanded the question to the FCC for further consideration. If on remand the FCC once again determines that end-office switching access charges on OTT-VoIP traffic are permissible, AT&T would be able to appeal that determination just as it did before, and the case would once again be subject to judicial review. Thus, the issue is still subject to additional and future judicial review. Because the legal question underlying the action before the D.C. Circuit has not been resolved, the D.C. Circuit's 2016 order cannot constitute the "final" order the parties contemplated.

To suggest otherwise would inevitably lead to such an absurd outcome that even AT&T disavows it. Again, the Settlement Agreement provides that any billing and payments for OTT-VoIP traffic exchanged after the "final" order becomes "final" "shall be in compliance with the terms of that order." Dkt. 15-1 at 3 (Settlement Agreement, § 1(a)(iv)). Under AT&T's argument, the D.C. Circuit's 2016 order, which it claims constituted the "final" order the Settlement Agreement calls for, forbade Level 3 from assessing end-office switching access charges on OTT-VoIP traffic (even though it expressly remanded that very question to the FCC). *See Opposition* at 16–17. If this argument were correct, Level 3 could not assess end-office switching charges for OTT-VoIP traffic if the FCC once again determines on remand that such

5

charges are legitimate, or even if the D.C. Circuit, on a second appeal, were to affirm this decision: Level 3 would be obligated by contract to comply with the terms of the 2016 order, not the order that definitively settled the underlying legal issue.

To its credit, AT&T recognizes the absurdity of this outcome and admits that Level 3 *could* assess such charges if the FCC so authorizes. *See Opposition* at 17.[1] But in doing so, AT&T also acknowledges that the terms of the D.C. Circuit's Order "authorize further agency proceedings," *id.*, and thus concedes that the legal question is in fact subject to further review, including future appellate review. The Settlement Agreement defines the "final" order as one that is "***no longer*** subject to further appeal or other judicial review." Dkt. 15-1 at 3 (emphasis added). Thus, the D.C. Circuit's order cannot be the "final" order.

AT&T further claims that the D.C. Circuit's order makes clear that end-office switching access charges for OTT-VoIP traffic are not permissible under the FCC's 2011 rules. *See Opposition* at 16–17. But if that were true, why did it bother remanding to the FCC? "'[R]emand is not required when it 'would be an idle and useless formality.'" *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 401 (2d Cir. 2005) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)) (the law "does not require that we convert judicial review of agency action into a ping-pong game"). If the rules' requirements were so clear, the D.C. Circuit could have reversed without remand, and definitively settled the issue on its own. *See Crysler v. Astrue*, 563 F. Supp. 2d 418 (N.D.N.Y. 2008) (noting that reversal without remand is appropriate where "it

---

[1] AT&T also claims that judgment in its favor on its contract claim would render its claim that Level 3 violated federal law moot specifically because Level 3 allegedly "agreed to bill AT&T in compliance with the outcome of the D.C. Circuit order." *Opposition* at 17 n.8. This, of course, could be true only if the D.C. Circuit order made a final determination of what federal law requires. But it did not; instead, it remanded to the FCC to do so.

would serve no useful purpose to remand the matter for further proceedings before the agency"). AT&T's position is particularly vexing given its own admission that the FCC interpreted its 2011 rules as *authorizing* LECs to bill end office switching charges on OTT VoIP traffic. AT&T now claims these are the very rules that *prohibit* LECs from assessing these charges. Nothing about the rules has changed. Obviously it is rational to interpret the rules to permit billing end-office switching: the FCC itself interpreted the rules in this way. Thus, vacating the FCC's 2015 order did not settle the issue. Instead, it placed the parties where they were before the order was entered: questioning whether the FCC's 2011 rules permit billing end-office switching charges for OTT-VoIP traffic. On its first occasion to interpret these rules as to OTT-VoIP traffic, the FCC determined such charges are permissible. It may very well do so again when its gets another opportunity.

But what do the parties do in the meantime? The D.C. Circuit's decision does not pretend to tell the parties what is required of them going forward. This District already recognized as much. *See Teliax, Inc. v. AT&T,* 2017 WL 3839459, *2 (D. Colo. Sept. 1, 2017) ("[T]he issue of whether any services companies like Teliax provide constitute the "functional equivalent" of end-office switching remains an issue the FCC is currently grappling with. Accordingly, … this is an undecided matter that the administrative agency tasked with clarifying this regulatory issue is currently deciding…."). What the D.C. Circuit's remand order makes clear is that further clarification of the parties' obligations under the 2011 rules is still necessary. Only when the FCC takes up the question on remand and settles it—subject to further judicial review, of course—will the parties know what their respective obligations are. It is thus impossible to bill "in compliance with the terms of" the D.C. Circuit's order: the D.C. Circuit

7

supplied no terms with which to comply. AT&T's proposed interpretation simply makes no sense. To adopt it would violate the "well-settled" rule that "courts should interpret contracts to give meaning to all terms rather than adopt an interpretation that renders a provision superfluous or meaningless." *Plumbers, Pipefitters & Apprentices Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire Suppression, Inc.*, 84 F. Supp. 2d 344, 354 (N.D.N.Y. 2000) (citing *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)). The only way to logically interpret the Settlement Agreement, giving meaning to all of the contractual provisions, is as Level 3 has done.

Indeed, there is a tangible irony in AT&T's contention that there is "a ripe dispute between the parties over whether the FCC's 2011 rules permit Level 3 to charge end-office switching rates for over-the-top traffic." *Opposition* at 12. The whole point of the parties' Settlement Agreement was to settle this dispute *without* requiring judicial intervention. As AT&T acknowledges, the agreement was to govern the parties' conduct while the propriety of these charges is being conclusively determined: thus, AT&T agreed "to continue to pay end-office charges despite its ongoing challenge to the legality of those rates." *Id.* at 14. It was particularly important to do so given that, as AT&T acknowledges, the FCC's pending decision on the matter could have "prospective effect only," and thus might not address the legitimacy of charges for traffic occurring before the decision. *Id.* at 3. And so it is not enough to simply point to a live dispute over how to interpret the FCC's rules. The complained-of rights and obligations come to life only when the "ongoing" dispute prompting the settlement in the first place is live no more—and even then, only if the dispute is resolved in AT&T's favor, which, as noted above, may never happen. AT&T cannot circumvent its duties under the agreement and

8

thrust the parties back into the uncertainty the agreement was intended to avoid just because the underlying legal issue has not yet been resolved the way it wishes.

If there were any question as to the Settlement Agreement's meaning, the term sheet AT&T sent to Level 3 to memorialize the parties' understanding of their agreement disposes of it. The term sheet provides: "If AT&T wins its FCC appeal, L3 will refund 50% of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals *or, if remanded, by the FCC ruling*." Dkt. 15-2 at 1 (emphasis added). Though AT&T carries the burden "to provide evidence establishing that the issues are ripe for review" (*Park Lake Res. Liab. Co.*, 197 F.3d at 450), it provided no evidence with its Opposition—and in particular, nothing to suggest that the parties discarded the intended meaning of a "final" order as expressed in the term sheet in favor of some other meaning. It is thus uncontested that the term sheet "capture[s the parties'] agreement construct" (Dkt. No. 15-3 at 2) and that the Settlement Agreement is an expression of the parties' agreement as set forth in the term sheet.

In the face of this uncontested evidence, AT&T makes the only argument it can: it asks the Court, under the parol evidence rule, to ignore it. *Opposition* at 13. But the parol evidence rule applies only where "the language of the written contract is clear and unambiguous." *Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 213 (S.D.N.Y. 2003). As shown above, the Settlement Agreement is at the very least "susceptible" to the "reasonable interpretation" that a "final" order does not simply remand to the FCC, but decides the underlying legal issue. *NRT New York, LLC v. Harding*, 131 A.D.3d 952, 954 (N.Y. App. Div. 2015). Indeed, it is susceptible to no other; the interpretation AT&T proposes must be rejected as "absurd . . . or contrary to the reasonable expectations of the parties." *In re Lipper*

9

*Holdings, LLC*, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003). The term sheet thus confirms what the plain language of the Settlement Agreement not only allows, but requires: a "final" order giving rise to the duties of which AT&T complains would settle the legal question at issue, and the D.C. Circuit's 2016 order remanding to the FCC does not constitute such an order.[2]

In sum, the D.C. Circuit's order does not settle the underlying question of whether it is appropriate for carriers to bill end-office switching access charges on OTT VoIP traffic. Thus, no "final" order as contemplated by the parties has yet been entered. Indeed, on remand, the FCC may very well abide by its prior decision and supply sufficient reasoning for its decision, as the D.C. Circuit requested, to sustain its decision on appeal. Given the real possibility that the FCC and D.C. Circuit will affirm the propriety of billing these charges, the contingent event on which AT&T's contract claims depend may never occur. Furthermore, as a multi-billion dollar corporation, AT&T cannot be heard to complain that it will suffer any hardship waiting for the legal issues underlying its claims to be resolved. Having shown neither "the fitness of the issues for judicial decision" nor "hardship to the parties of withholding court consideration" (*Salt Lake Tribune Pub. Co. v. Management Planning, Inc.*, 454 F.3d 1128, 1140 (10th Cir. 2006)), AT&T fails to carry its burden of showing that its contract claims are ripe for consideration. Therefore, they should be dismissed.

---

[2] AT&T also notes that the term sheet was sent subject to Fed. R. Evid. 408, and claims that this rule "bars the use of settlement offers as evidence." *Opposition* at 13 n.7. But Rule 408 applies only where settlement offers are used "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Here, the term sheet is not used as evidence that AT&T is obligated under the FCC's 2011 rules to pay end-office switching access charges on OTT-VoIP calls, but to show what the parties understood their settlement agreement, the terms of which were spelled out in the term sheet, to mean.

### III. AT&T'S STATUTORY CLAIMS WOULD INTERFERE WITH ONGOING ADMINISTRATIVE ACTION.

For similar reasons, AT&T's statutory claims are also unripe. Rather than attempt "to decide what services if any performed by over-the-top VoIP–LEC providers constitute the 'functional equivalent' of the end-office switching"—a task "judges with no technical background in telecommunications are ill-prepared [to decide] when compared to the FCC" (*Teliax, Inc.*, 2017 WL 3839459, at \*3), the Court should dismiss this claim as unripe under the doctrine of prudential ripeness.

"The issue of whether any services companies like [Level 3] provide constitute the 'functional equivalent' of end-office switching remains an issue the FCC is currently grappling with." *Id.* at \*2. AT&T's suggestion that the FCC might simply abide by its 2011 rules—whatever those rules require—without further considering the issue of OTT-VoIP billing (*Opposition* at 19) is thus unsupported: in fact, the FCC is already considering the issue. And AT&T knows it: not only is AT&T a party to the *Teliax* case, but one of its current counsel represented it in the *Teliax* matter. *See id.*

The ripeness doctrine therefore applies here to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and . . . to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *San Juan Citizens All.*, 654 F.3d at 1046 (citing *Abbott Labs*, 387 U.S. at 148–49); see also, e.g., *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 670 (9th Cir. 2005) ("The *Abbott Labs* . . . standards find their roots in cases involving administrative agencies and recognize that judicial action should be restrained when other political branches have acted ***or***

11

*will act*.") (emphasis added).³  As AT&T is well aware, the FCC is currently considering the question on which its statutory claims are premised.  This Court therefore should dismiss this action and await the further clarification the FCC will provide once it decides pending issues.

**IV.   UNLIKE AT&T'S CLAIMS, LEVEL 3'S COUNTERCLAIMS ARE NOT CONTINGENT UPON FUTURE EVENTS.**

Finally, AT&T suggests that Level 3 "tacitly acknowledges" that AT&T's statutory claims are ripe by filing counterclaims to recover damages caused by AT&T's failure to abide by the terms of the parties' contract.  *Opposition* at 19.  Nothing could be further from the truth.  Level 3 brings two counterclaims:  one, for the recovery of tariff charges AT&T agreed to pay under the Settlement Agreement and has withheld to date; and the other, for a declaratory judgment that AT&T remains bound under the Settlement Agreement to continue paying charges at the full tariff rate.  Thus, unlike AT&T's claims, both of Level 3's counterclaims rise from the parties' Settlement Agreement, not statute.  *See* Level 3's Counterclaims (Dkt. 38) ¶¶ 36, 46, 48, 55.  Nor do Level 3's counterclaims depend upon future contingent events, as do AT&T's claims.  To the contrary, Level 3's counterclaims are premised on duties AT&T owed upon of the execution of the Settlement Agreement, and continues to owe to this day.  Unless and until an order is entered determining that OTT-VoIP traffic is not subject to end-office switching access

---

³ AT&T hints at the possibility that this Court might refer this matter to the FCC to decide whether under its 2011 rules billing end-office switching access charges for OTT-VoIP is appropriate. *Opposition* at 19.  It is not clear how a referral would help AT&T in this suit against Level 3.  That is, AT&T's lawsuit is premature because the FCC has not acted on the remand from the DC Circuit.  Even if, following referral, the FCC were to reverse itself and agree with AT&T on the underlying legal issue, that still would not change the fact that this lawsuit, filed *before* the FCC has done so, is premature. Nevertheless, Level 3 does hope the FCC takes action on the remand, and is open to working with AT&T to obtain such a decision from the FCC to through an appropriate procedural vehicle.  A referral of this action to the FCC is not necessary to effectuate that procedural vehicle.

charges—an order that may never be entered, if the FCC abides by its 2015 decision—AT&T is obligated under the Settlement Agreement to pay such charges at the tariffed rates.

Nothing about Level 3's counterclaims offers any support for the notion that AT&T's statutory claims are ripe for review. AT&T's statutory claims concern duties that may arise if the FCC decides the underlying legal question in their favor; Level 3's contract claims concern the duties AT&T owes Level 3 until that day comes—if it ever comes.

Until then, AT&T owes Level 3 millions of dollars on charges it agreed to pay under the Settlement Agreement. Not only does it refuse to pay those charges, but it also brings claims of its own in an effort to leverage a more favorable outcome and in an effort to evade its financial obligations. Here, however, the vehicle it has chosen to execute this strategy is fatally flawed, for the claims it raises depend upon contingencies that have yet to occur and may never occur. Its claims are therefore unripe for adjudication.

## CONCLUSION

For the foregoing reasons, Defendant Level 3 Communications, LLC respectfully moves the Court to dismiss the Complaint in its entirety.

Respectfully submitted this 4th day of April, 2018.

By: /s/ Charles W. Steese
Charles W. Steese, #26924
Douglas N. Marsh, #45964
Martin J. Estevao, #46260
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676

csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com
mestevao@armstrongteasdale.com

*Attorneys for Defendant*
*Level 3 Communications, LLC*

## CERTIFICATE OF SERVICE

I, Charles W. Steese, hereby certify that on April 4, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
Telephone: (303) 292-2900
E-mail: becky.decook@moyewhite.com
E-mail: andrew.flynn@moyewhite.com

Michael J. Hunseder
Justin A. Benson
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

/s/ Charles W. Steese
Charles W. Steese