# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORP.,

    Plaintiff,

v.

LEVEL 3 COMMUNICATIONS, LLC,

    Defendant.

## AT&T CORP.'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff AT&T Corp. ("AT&T"), pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby submits the following objections and responses to Defendant Level 3 Communications, LLC's ("Level 3") First Set of Interrogatories (the "Interrogatories"):

### GENERAL OBJECTIONS

The following objections are made to each of the Interrogatories and are incorporated by reference into the response to each Interrogatory made below.

1.    AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent they seek to impose obligations beyond those prescribed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Colorado, the Court's Scheduling Order (Doc. 55), applicable Civil Practice Standards, and other applicable law.

2.    AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent that they seek information that is protected from disclosure by the

1

attorney-client privilege, the work-product doctrine, and/or any other applicable privilege or protection from disclosure. Specifically, and without limitation, AT&T objects to each and every Interrogatory to the extent each seeks information concerning any confidential communications between or among current or former AT&T employees and counsel for AT&T or their agents relating to counsel's provision of legal advice to AT&T, including relating to counsel's investigation or investigations related to the subject matter of the Action, and counsel's work product related thereto. AT&T will not include any such information in response to any Interrogatory. Further, AT&T does not intend to, and expressly does not, waive any such privileges or protections in answering or otherwise responding to these Interrogatories. The inadvertent disclosure of any privileged or otherwise protected information shall not be deemed or construed to constitute a waiver of any applicable privilege, doctrine, or immunity.

3. AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent that they seek confidential or proprietary business information or personal confidential information. Any such responsive, non-privileged information will be provided pursuant to, and subject to, the Stipulated Protective Order entered by the Court in this Action.

4. AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent that they seek information that is not available to AT&T.

5. AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent that they seek information that is publicly available to, or already in the possession of, Level 3 or its counsel. AT&T further objects to such discovery on the grounds that it is unduly burdensome and harassing.

6. AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent they: (a) are overly broad; (b) are impermissibly vague and ambiguous and fail to describe with particularity the information sought; (c) seek information that is not relevant to the claim or defense of either party to this Action; (d) are not reasonably calculated to lead to the discovery of admissible evidence; (e) disproportionate to the needs of the case; and/or (f) impose undue burdens that outweigh any probative value the information may have in this Action.

7. AT&T objects to the Interrogatories, together with their accompanying Definitions and Instructions, to the extent that they imply the existence of facts or circumstances that do not exist, and to the extent that they purport to require AT&T to set forth or state legal conclusions. In providing these responses and objections, AT&T does not admit the factual or legal premise of any of the Interrogatories.

8. AT&T objects to the Interrogatories, together with their accompanying Instructions and Definitions, to the extent they request information for all or unlimited time periods.

9. AT&T objects to the Interrogatories, together with their accompanying Instructions and Definitions, to the extent they ask AT&T to provide information that AT&T does not maintain in the ordinary course of business, and/or that would require AT&T to undertake unduly burdensome efforts to respond. AT&T will restrict its responses to information that is reasonably available to it, including from existing documents or records.

10. Any information provided by AT&T in response to the Interrogatories is made on the basis of information available to AT&T at the time of gathering responsive materials or information, within the limits of, and subject to, AT&T's general and specific objections to the

3

Interrogatories, together with their accompanying Instructions and Definitions.  AT&T reserves the right to supplement or modify its responses and objections to the Interrogatories if additional information becomes available, known, and/or understood.

11. The fact that AT&T is willing to provide responsive information to any particular Interrogatory does not constitute an admission or acknowledgement that the Interrogatory is proper, that the information it seeks is within the proper bounds of discovery, or that other requests for similar information will be treated in similar fashion.

12. AT&T's responses in these Interrogatories are provided on behalf of AT&T Corp., the plaintiff and counterclaim-defendant in this case, and not any other affiliates of AT&T.

13. AT&T objects, in part, to the time period covered by the Interrogatories.  Under the Settlement Agreement, the parties executed mutual releases, which became effective on or around June 1, 2015.  Certain information prior to that time would be relevant to some of the issues in dispute.  However, the parties' current billing dispute concerns only charges after the date of the releases, and thus some other information prior to the releases may not be relevant.  Accordingly, AT&T objects to a general time period of January 1, 2014, that applies as a default to all Interrogatories.

## INTERROGATORIES

### INTERROGATORY NO. 6:

Describe with specificity the methods any of your LEC affiliates use (or, if they have changed over time, have used) to calculate or estimate the percentage of traffic transmitted over their network(s) that is OTT-VoIP traffic. If the process has changed over time, describe when and why the process changed.

### RESPONSE TO INTERROGATORY NO. 6:

AT&T objects to this Interrogatory on the grounds and to the extent that it is irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case. There are no claims in this case concerning services provided by AT&T or any affiliate of AT&T in their capacities as LECs. In particular, Level 3 has asserted no claim that AT&T (or any AT&T affiliate) has improperly billed Level 3 for AT&T-provided services in connection with OTT-VoIP calls. Rather, this case involves Level 3's provision of services to AT&T, and AT&T is a customer, not a provider of access services.

Subject to and without waiving this objection and its General Objections, AT&T states that, at this juncture, in its capacity as a LEC, AT&T is not aware of any partnerships it has with retail providers of OTT-VoIP calling services, and, as a consequence, AT&T in its capacity as a LEC neither originates OTT-VoIP calls that are exchanged in TDM format nor terminates OTT-VoIP calls that are exchanged in TDM format. When AT&T, acting in its capacity as a LEC, bills access services, AT&T therefore does not need to use methods to identify percentage of traffic that is OTT-VoIP traffic.

5

**INTERROGATORY NO. 7:**

Describe with specificity whether and how Your LEC affiliates bill (or, if their practices have changed over time, have billed) end-office switching charges on OTT-VoIP traffic. If the process has changed over time, describe when and why the process changed.

**RESPONSE TO INTERROGATORY NO. 7:**

AT&T objects to this Interrogatory on the grounds and to the extent that it is irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case. There are no claims in this case concerning services provided by AT&T or any affiliate of AT&T in their capacities as LECs. In particular, Level 3 has asserted no claim that AT&T (or any AT&T affiliate) has improperly billed Level 3 for AT&T-provided services in connection with OTT-VoIP calls. Rather, this case involves Level 3's provision of services to AT&T, and AT&T is a customer, not a provider of access services.

Subject to and without waiving this objection and its General Objections, AT&T states that, at this juncture, in its capacity as a LEC, AT&T is not aware of any partnerships it has with retail providers of OTT-VoIP calling services, and, as a consequence, AT&T in its capacity as a LEC neither originates OTT-VoIP calls that are exchanged in TDM format nor terminates OTT-VoIP calls that are exchanged in TDM format. When AT&T, acting in its capacity as a LEC, bills access services, AT&T therefore does not bill for OTT-VoIP traffic.

6

**INTERROGATORY NO. 8:**

Describe with specificity the methods You use (or, if they have changed over time, have used) in Your capacity as an IXC to determine what percentage of traffic that a LEC delivers to you that originated OTT-VoIP, or that you deliver to a LEC that will terminate OTT-VoIP. If the process has changed over time, describe when and why the process changed.

**RESPONSE TO INTERROGATORY NO. 8:**

AT&T objects to this Interrogatory on the grounds and to the extent that it is irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case. There are no claims in this case concerning services provided by LECs other than Level 3, and thus the methods AT&T may use to ascertain the percentage of OTT-VoIP traffic originated or terminated by another LEC is not relevant.

Subject to this objection and without waiving its General Objections, AT&T states that it is ultimately the responsibility of the LEC billing access charges to demonstrate that the charges it has billed to AT&T are consistent with the terms of the LEC's tariffs and the FCC's rules, including the FCC's rules on OTT-VoIP calls. Accordingly, when a LEC partners with a provider of OTT-VoIP calls and bills access charges on those calls, it is the LEC's responsibility to establish that it has properly determined the percentage of OTT VoIP calls. To evaluate whether a LEC has properly billed AT&T for OTT VoIP calls, AT&T will examine several factors, including but not limited to the LEC's overall volume of traffic, any established practice between AT&T and the LEC, and/or AT&T's existing knowledge of the LEC's business plan. Further, AT&T generally will request a LEC (when AT&T knows or has reason to believe the LEC is engaged in billing for access on OTT-VoIP calls) for various information and business records to ascertain the percentage of a LEC's traffic that is OTT-VoIP. Such information can include call detail records,

7

the LEC's Form 477, and/or any internal studies or analysis conducted by the LEC. Further, AT&T has performed, and will periodically perform, its own analysis of over-the-top VoIP calling providers by placing test calls that indicate which LECs have telephone numbers associated with the over-the-top VoIP calling providers. As to these analyses, AT&T will produce business records in response to Level 3's Document Requests, and will identify the business records responsive to this Interrogatory.

**INTERROGATORY NO. 9:**

Describe with specificity how You, in Your capacity as an IXC, determine (or, if Your practices have changed over time, have determined) what percentage of traffic on your network constitutes OTT-VoIP calls. If the process has changed over time, describe when and why the process changed.

**RESPONSE TO INTERROGATORY NO. 9:**

Subject to and without waiving its General Objections, AT&T states that, as an IXC, it does not bill for switched access services, and thus, apart from verifying the percentage of OTT-VoIP calls originated or terminated by a specific LEC, AT&T has no need to determine and does not determine, on an aggregate basis, the percentage of traffic on AT&T's long distance network that consists of OTT-VoIP calls.

**INTERROGATORY NO. 10:**

Describe with specificity how you believe a carrier such as Level 3, in its capacity as a LEC, can or should calculate for billing purposes what traffic transmitted over its network constitutes OTT-VoIP calls.

**RESPONSE TO INTERROGATORY NO. 10:**

AT&T objects to this Interrogatory on the grounds and to the extent that it is irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case. There are no claims in this case concerning services provided by LECs other than Level 3, and thus how carriers

8

other than Level 3 can or should calculate for billing purposes what traffic transmitted over its network constitutes OTT-VoIP calls is not relevant.

Subject to this objection and without waiving its General Objections, AT&T states that, in this case, the parties have a binding agreement stating that the historic percentage of Level 3's traffic that was OTT-VoIP was approximately 65 percent. Unless and until Level 3 demonstrated with proper documentation that this historic level had changed, Level 3 could and should have (1) issued AT&T the refund that Level 3 had agreed to make, using the 65 percent level, and (2) billed AT&T using that 65 percent level. If Level 3 wished to change the percentage of OTT-VoIP calls that the parties has historically agreed was appropriate and accurate (and that was used to calculate the settlement payment AT&T made to Level 3), Level 3 should have provided AT&T with complete and proper documentation regarding any supposed change in the Level 3 percentage of OTT-VoIP calls. This includes, but is not limited to, call detail records (such as those requested by AT&T), and all documentation that Level 3 had compiled to support its view that the percentage of its OTT-VoIP traffic had changed dramatically.

In this regard, Level 3's own access tariff contains provisions that relate to the "Identification of and Rating of VoIP-PSTN Traffic," including use of a Percent VoIP Usage (PVU) factor supplied to Level 3 by the access customer. Although these tariff provisions are not directly applicable to determining the percentage of OTT-VoIP traffic that Level 3 handles, Level 3's tariff provides for a detailed process of "PVU Factor Verification" by which Level 3 may seek to verify and audit a customer-provided PVU factor, including but not limited to:

(i) a provision allowing Level 3 to request "an overview of the process used to determine the PVU factors, the call detail records, description of the method for determining how the end user originates and terminates calls in IP format, and other information used to determine the Customer's PVU factors furnished to the

9

        Company in order to validate the PVU factors supplied. The Customer shall comply, and shall reasonably supply the requested data and information within 15 days of the Company's request."

(ii)    a provision allowing Level 3 to dispute the customer-provided PVU based on a "review of the requested data and information provided by the Customer," Level 3's "reasonable review of other market information, F.C.C. reports on VoIP lines, such as F.C.C. Form 477 or state level results based on the F.C.C. Local Competition Report or other relevant data," and/or a "change in the reported PVU factor by more than five percentage points from the preceding quarter."

(iii)   A provision allowing Level 3 to initiate periodic audits, paid for by the Customer, to determine the PVU.

Under Level 3's tariff, when a customer provides a PVU factor that Level 3 uses to bill access services, Level 3 has provided itself with extensive rights to promptly obtain, review, and audit the customer's business records. In the circumstances here, where Level 3 owes AT&T a refund and should bill AT&T according to the percentage of OTT-VoIP traffic that Level 3 handles, then AT&T has have similar rights to promptly obtain, review, and audit Level 3's business records. However, Level 3 has failed to provide AT&T with the relevant types of business records.

**INTERROGATORY NO. 11:**

Describe in detail the functionality of local end-office switching.

**RESPONSE TO INTERROGATORY NO. 11:**

AT&T objects to this interrogatory to the extent that it is overly broad. AT&T has presented, in various filings in courts and at the Federal Communications Commission, AT&T's positions as to the functionality of local end office switching, and refers Level 3 to those filings for a complete explanation of AT&T's position.

Subject to and without waiving its General Objections, AT&T states that, in general, the core functionality of an end office switch, and the function that distinguishes end office switches

10

from other switches and central office equipment, has consistently been defined as interconnection, which is the actual connection of subscriber lines and trunks, *i.e.*, taking commingled calls off of trunks, and selecting and placing a particular call for a particular end user onto the dedicated loop facilities that directly connect the end office switch to the end user's premises. Both courts and the FCC have consistently recognized that an end office switch is equipment designed to establish connections among end user lines and between end user lines and trunks. Further, the tariff of Level 3's affiliate, Qwest Corporation d/b/a CenturyLink, Tariff F.C.C. No. 11—like the tariffs of other incumbent LECs—provides that an end office switch is a "switching system where Telephone Exchange Service customer station loops are terminated for purposes of interconnection to trunks." In short, it has long been established in the industry that the core and distinguishing function of an end office switch is interconnection, which is taking calls from trunks and placing them on end user loop facilities (and vice-versa). On OTT-VoIP calls, Level 3 and its retail VoIP calling partners do not provide interconnection, and thus do not provide end office switching, or the functional equivalent of end office switching.

AT&T also hereby incorporates the following materials, which further explain the function of an end office switch: (1) Letter of D. Lawson, to M. Dortch, CC Docket No. 96-45, *et al.*, (January 17, 2013); (2) Opening Brief of Petitioner, *AT&T Corp. v. FCC*, No. 15-1059 (D.C. Cir., filed July 30, 2015); (3) Reply Brief of Petitioner *AT&T Corp. v. FCC*, No. 15-1059 (D.C. Cir., filed November 19, 2015); (4) Opinion, *AT&T Corp. v. FCC*, 841 F.3d 1047 (D.C. Cir. 2016); (5) Dissenting Statement of Commissioner Ajit Pai, 30 FCC Rcd. 1615 (2015) ("what is the IP equivalent of end office switching? Our precedent makes clear that it is the interconnection of calls with last-mile facilities"); (6) Dissenting Statement of Commissioner Michael O'Rielly, 30 FCC

11

Rcd. 1620 (2015) ("we know that the defining feature of end office switching is the actual connection of subscriber lines and trunks").

Dated: June 11, 2018

Respectfully Submitted,

/s/ Michael J. Hunseder
Rebecca B. DeCook, #14590
Andrew T. Flynn, #43843
MOYE WHITE LLP
1400 16th Street, 6th Floor
Denver, Colorado 80202-1027
Telephone: (303) 292-2900
E-mail: becky.decook@moyewhite.com
E-mail: andrew.flynn@moyewhite.com

Michael D. Warden
Michael J. Hunseder
Justin A. Benson
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mwarden@sidley.com
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

## CERTIFICATE OF SERVICE

I, Justin A. Benson, hereby certify that on June 11, 2018, I served the foregoing document upon the following via email and U.S. mail:

Charles W. Steese, #26924
Douglas N. Marsh, #45964
Martin J. Estevao, #46260
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
Email: csteese@armstrongteasdale.com
Email: dmarsh@armstrongteasdale.com
Email: mestevao@armstrongteasdale.com

*Attorneys for Defendant Level 3 Communications, LLC*

/s/ Justin A. Benson
Justin A. Benson
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, D.C. 20005
Telephone: (202) 736-8000
E-mail: jbenson@sidley.com

*Attorney for Plaintiff AT&T Corp.*