1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
      Case No. 18-cv-00112-RM-MEH
 3    _____

 4    AT&T CORP.,

 5         Plaintiff/Counter Defendant,

 6    vs.

 7    LEVEL 3 COMMUNICATIONS, LLC,

 8         Defendant/Counter Claimant.
      _____
 9

10            Proceedings before MICHAEL E. HEGARTY, United

11    States Magistrate Judge, United States District Court for the

12    District of Colorado, commencing at 10:33 a.m., June 10,

13    2019, in the United States Courthouse, Denver, Colorado.

14    _____

15            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17    _____

18                        APPEARANCES

19            MICHAEL HUNSEDER and REBECCA DeCOOK, Attorneys at

20    Law, appearing for the Plaintiff.

21            CHARLES STEESE, Attorney at Law, appearing

22    for the Defendant.

23    _____

24                     STATUS CONFERENCE

25
```

2

1                    P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3       proceedings are herein transcribed, pursuant to order of

4       counsel.)

5              THE COURT:  All right.  Case Number 18-cv-112, AT&T

6       Corporation vs. Level 3 Communications, LLC.  Go ahead and

7       make your appearances, please, starting with the plaintiff.

8              MS. DeCook:  Rebecca DeCook (inaudible).

9              THE COURT:  Thank you.

10             MR. HUNSEDER:  And I'm Michael Hunseder, Sidley

11      Austin, on behalf of AT&T.

12             THE COURT:  Thank you.

13             MR. STEESE:  And Chuck Steese on behalf of Level 3.

14             THE COURT:  Haven't we had another Level 3 case or

15      is this the one?

16             MR. STEESE:  This is the one that I'm aware of, but

17      that doesn't mean that Your Honor hasn't had another.  Only

18      one I've had in front of you, Your Honor.

19             THE COURT:  Okay, you guys can be seated.  Have we

20      been in court?

21             MR. STEESE:  I'm sorry, sir?

22             THE COURT:  Have we been in court together?

23             MR. STEESE:  We have.

24             THE COURT:  What did we do?

25             MR. STEESE:  We simply set a schedule at the time,

3

1    Your Honor, and in March the parties were working to try and

2    resolve the matter and we stayed the case for a period of

3    time to see if we could reach resolution.

4            The parties have yet to reach resolution in full,

5    and as a result, we're here to begin resuming the case, set a

6    schedule for the remainder of the case, et cetera.

7            THE COURT:  So it's stayed at the moment?

8            MR. STEESE:  It is currently stayed, yes, Your

9    Honor.

10           THE COURT:  Since what date?

11           MR. STEESE:  About March 25, I believe.

12           THE COURT:  All right.  So let me get a -- let me

13   summarize or represent to you what I understand.  There was a

14   settlement contingent on some decision out of Washington; is

15   that right?

16           MR. STEESE:  Correct.

17           THE COURT:  And that decision came down in whose

18   favor, which of you?

19           MR. HUNSEDER:  In AT&T's favor.

20           THE COURT:  AT&T's favor.

21           MR. HUNSEDER:  The D.C. circuit decision.

22           THE COURT:  And if that were to happen, there was

23   supposed to be some refund of money.  Does that sound right?

24           MR. HUNSEDER:  That's our view certainly, yes.

25           THE COURT:  Well, is that what the agreement says?

4

1           MR. HUNSEDER:  Yes, it does.

2           THE COURT:  Do you agree that that's what the

3      agreement says, in most vague terms?

4           MR. STEESE:  Your Honor, not completely.  The

5      question is whether the D.C. circuit opinion was final or

6      not.  The D.C. circuit remanded for further work by the FCC.

7      We had a motion to dismiss their claims.  Your Honor granted

8      them in an R and R that went up to Judge Moore.  Judge Moore

9      granted our motion in part and denied it in part.

10          And so we still have the breach of contract action

11     pending, and in addition, we have Level 3's counterclaims

12     pending at this point in time, Your Honor.

13          THE COURT:  Is that -- the breach of contract, is

14     that diversity?

15          MR. STEESE:  I don't recall.  I have it right here,

16     Your Honor.

17          THE COURT:  Is there a federal claim in the case

18     remaining?

19          MR. HUNSEDER:  There is a declaratory judgment

20     claim remaining, although it's on the agreement, so I think

21     it is diversity.

22          THE COURT:  Are you diverse?

23          MR. STEESE:  The answer is yes --

24          MR. HUNSEDER:  Yes.

25          MR. STEESE:  -- there is diversity.

1          THE COURT:  Okay, all right.  So you said it was

2    remanded.  Has anything been done on remand?

3          MR. STEESE:  There is a lot going on at the FCC

4    right now on remand, Your Honor.  There is a lot of suspicion

5    that something is going to be coming out of the FCC soon, but

6    that is yet to occur.

7          THE COURT:  Okay.  Is there a copy of the agreement

8    in the record?

9          MR. HUNSEDER:  The 2015 agreement?  Yes, there is.

10         THE COURT:  What is it?  Where is it?

11         MR. STEESE:  We attached it to our motion to

12   dismiss, Your Honor.

13         THE COURT:  And do you happen to know the docket

14   number for that?

15         MR. STEESE:  Docket Number 14, I believe.

16         THE COURT:  14 or 45?  45 is First Motion to

17   Dismiss by defendant Level 3.  Does that sound right?

18         MR. STEESE:  Yes, Your Honor, but at the same time

19   I'm looking at the motion to dismiss and it looks like Docket

20   Number 14.

21         THE COURT:  Okay.

22         MR. STEESE:  No.

23         THE COURT:  I don't know why 45 is titled First

24   Motion to Dismiss and it was March of 2018 public version --

25   there you go.  So you must have some trade secrets or

1    something.

2              MR. STEESE:  Correct.  And Judge Moore thought

3    there was too much redacted and asked us to minimize the

4    redaction, so we refiled in March.

5              THE COURT:  Okay.  And what is the -- which number

6    is the agreement then?  Is it attached to a declaration?  So

7    it's probably releasing settlement agreement?

8              MR. STEESE:  That's it, Your Honor.

9              THE COURT:  Could you point to the operative

10   language, please.

11             MR. STEESE:  The operative language is in

12   section -- I do not have the agreement in front of me.  The

13   attached -- it's section 4A.

14             MR. HUNSEDER:  It's section 1.A.4.  It's also

15   quoted on page 7 of Judge Moore's order, opinion and order,

16   which is Document 76.

17             THE COURT:  1.A.4?

18             MR. HUNSEDER:  Yes.

19             THE COURT:  Although the parties agree that the

20   settlement agreement has ended; is that correct?

21             MR. HUNSEDER:  Correct.

22             THE COURT:  To be a full and final settlement of

23   all disputes and balances associated with OTT traffic,

24   parties also recognize (inaudible) OTT appeal.  Therefore, in

25   the event the OTT declaratory order is overturned, either in

1    full or in part, and the applicable order on appeal becomes

2    final, it is no longer subject to further appeal or other

3    judicial review, Level 3 will refund.

4            All right, so let's have a discussion here.  That

5    has nothing to do with administrative proceedings.  The fact

6    that the word "judicial review" or "appeal," that's up.  So

7    unless there was a cert filed, which I suspect there wasn't.

8    Was there a cert petition filed?

9            MR. STEESE:  There was no cert petition filed.

10           THE COURT:  So at the time, where was the case?

11           MR. STEESE:  Your Honor, respectfully, this is

12   dealt with in Judge Moore's opinion.  There is specific

13   documentation sent to AT&T as part of the negotiations that

14   the interpretation of this provision meant upon remand to the

15   FCC would be part of the final decision.

16           In addition, the opinion says -- excuse me, the

17   contract says not once, but twice, that the rates that would

18   be charged would be those in conformance with the case on

19   appeal.  The case on appeal set no rates for the case because

20   there was no rates that could be set.  It sent the case back

21   for the purpose of looking at this point.  And so all of this

22   has been dealt with in Judge Moore's decision and he says

23   it's a factual question that we need to assess as part of the

24   case.

25           THE COURT:  What is the amount at issue in this

8

1    case?

2              MR. STEESE:  I'm sorry.

3              THE COURT:  The amount at issue?

4              MR. STEESE:  That's a great question.  The parties

5    have potentially -- and we resolved a portion of this case.

6    To the extent that a portion of the case is resolved, then

7    the amount in controversy is probably about, to date our

8    estimate is $5 million.  To the extent that it's not

9    resolved, then the amount would probably be about 17 to $18

10   million.  And the parties are, both of us believe, but are

11   not positive because the document is not signed yet, but

12   there is some portion of the case that has been resolved,

13   Your Honor, but that's even at this point unclear to us.

14             THE COURT:  I just don't understand it.  How can

15   you not know that a portion of the case has been resolved?

16             MR. HUNSEDER:  Well, we think there is an agreement

17   in principle.  We think there is a written agreement that was

18   sent back and forth between the parties for weeks ago and it

19   just hasn't been signed.  I think we were prepared to sign.

20             THE COURT:  Was there a mediator involved?

21             MR. HUNSEDER:  No.  This was a private negotiation

22   between the parties.  There were a bunch of -- they

23   negotiated not only on the issues in this case, but on

24   disputes between the parties not at issue.

25             THE COURT:  So do you think you had an agreement

9

1    and you sent it to them and they haven't signed?  Is that

2    where it is?

3              MR. HUNSEDER:  Essentially, yes.  Certainly on the

4    past.

5              THE COURT:  Okay.  And what's your comment on that?

6              MR. STEESE:  Your Honor, as Mr. Hunseder correctly

7    said, it's not this case.  This case is, as I understand it,

8    a tiny piece of the larger pie, and the parties have been

9    negotiating these numerous, numerous disputes between the

10   parties for a period of many, many months.  And there is a

11   question about exactly what is included with respect to this

12   case.

13             There are parts of the case that clearly -- parts

14   not of this case, excuse me, but the disputes between AT&T

15   and Level 3 that have been resolved, but with respect to this

16   particular case, there is a question.

17             And even last week I was in trial, and despite

18   that, I made efforts to find out exactly where we stood.  I

19   talked to client representatives.  We had detailed calls,

20   even if I -- when I was in the midst of trial and it remains

21   unclear.

22             And what does remain clear, Your Honor, is that we

23   believe it's now at the juncture where we should renew this

24   case and get discovery moving in this case again, and we are

25   confident that, in time, the parties are going to have a

1 fulsome understanding of exactly what it is that the parties

2 have resolved, if anything, regarding the dispute here.

3          And the only question is, really from our

4 perspective is, what is the amount in dispute.  Is it simply

5 going to be -- is it going to be the 5ish million dollars as

6 of today or is it going to be the 17 or $18 million, and that

7 is really the issue that remains from our perspective on the

8 settlement agreement, Your Honor.

9          MR. HUNSEDER:  And, Your Honor, I have a somewhat

10 different perspective on that, if I may, which is that if the

11 settlement is entered and signed as to the past, then the

12 settlement is essentially, as I understand it, is anything --

13 any claims by Level 3 -- any claims by AT&T under Level 3's

14 tariff prior to 2019 or under the agreement are resolved.

15          And so if that agreement is signed, you know, the

16 parties are supposed to inform the Court of that and we have

17 to evaluate what remains of the case.  And I think, under

18 Judge Moore's order, there is going to be a significant

19 question as to what things do or do not remain.

20          It's clearly not a full settlement of all claims,

21 but it's certainly a settlement of parts of the claims, and

22 so that's -- we are in somewhat odd procedural posture

23 where -- and again, in March, when we asked for this stay, we

24 did indicate that there was an agreement in principle.  I

25 think there is still an agreement in principle as to this

11

1    past period.

2            THE COURT:  Can you just tell me why there is so

3    much litigation in this field all the time, please.

4            MR. STEESE:  I can take a cut at that and I'm sure

5    Mr. Hunseder will jump in.

6            Your Honor, when you look at the exchange of

7    traffic, you exchange billions of minutes a month.

8            THE COURT:  Yeah, I know.

9            MR. STEESE:  And the smallest amounts of dispute,

10   because it's applied to billions of minutes, ends up to be

11   very large sums of money, and --

12           THE COURT:  But that means people are making a lot

13   of dough.  If the smallest dispute is a lot of money, the

14   undisputed part is a ton of money; isn't that right?

15           MR. STEESE:  But the problem is --

16           THE COURT:  Is that right?

17           MR. STEESE:  Not completely, no, Your Honor.

18           THE COURT:  Why?  If the smallest dispute, a

19   fraction of the traffic results in a lot of money, then all

20   that other stuff that's not in dispute must be a whole lot of

21   money.

22           MR. STEESE:  The issue is, is that we are both

23   payers and receivers of the dollars between us.

24           THE COURT:  Right.

25           MR. STEESE:  And so when you look at the very large

1    carriers, the difference between profitability and

2    nonprofitability, I think in both party's perspectives, is

3    really dictated by very small points and -- and so the answer

4    is that there really is an understanding that we're both in

5    customer and vendor relationships.  There is very significant

6    attempts to try and resolve issues in advance and at the same

7    time there is a very real understanding that the dollars can

8    be significant going out of your pocket, and so it puts

9    people in a position where they have disputes such as this.

10           In addition, in this particular case, Your Honor,

11   when you look at OTT traffic, the network is changing, and as

12   the network transformation from the old time division

13   multiplexing traditional telephone calls to not only

14   voice-over Internet protocol, but to now calls being

15   transmitted over third-party wires, the questions that are

16   raging in the industry are, Do we pay for that, and if so,

17   how do we pay for that and what do we pay for that?  And

18   there are a number of disputes around this very subject.

19           And so this is a subject that this is not the only

20   such dispute.  There is a few in this district and there is

21   several other places, and this is laying the groundwork for

22   the way that people are going to be charging things going

23   forward.

24           THE COURT:  Isn't it usually the case that the big

25   fish in the pond thinks that the little fish is trying to get

13

1    around what they owe?  Is that kind of just overgeneralizing,

2    but accurate?

3         MR. HUNSEDER:  That's overgeneralizing I think a

4    little bit.  In this case we're both pretty big fish, and I

5    think, from our perspective, though -- I mean, where I would

6    put the blame in some ways, not the blame, but the issue is,

7    the FCC has these rules, and obviously we think that under

8    those rules, they're providing a very limited service in the

9    middle of the call and they're only entitled to a limited

10   amount of conversation, and the FCC just hasn't clarified

11   what its rules meant.  They did in 2015 and that decision was

12   vacated, has no legal effect.

13        And so we're back in the position that we've been,

14   you know, for several years of what is the right amount to

15   pay for these services.  And Level 3's corporate parent,

16   Century Link, went into the FCC and asked last year, Please

17   give us guidance on what your rules mean and how much we

18   should pay and bill for these services, and the parties just

19   don't have answers to those questions.  And again, a lot of

20   money is piling up with that, but that is sort of the -- the

21   rub is that no one -- the FCC isn't willing to rule and the

22   Court is not wanting to jump in and rule on top of the FCC.

23        THE COURT:  Which Court?  The Supreme Court?

24        MR. HUNSEDER:  This Court, meaning Judge Moore,

25   indicated that he would not decide what the rules meant.

14

1        THE COURT:  The decisions at a district court level

2  are nothing.  I mean, is it the Court of Appeals who aren't

3  doing their job in the judicial system?  Is it the Supreme

4  Court is not taking cases?

5        MR. HUNSEDER:  No, no.  I think it's back in the

6  FCC's court now --

7        THE COURT:  Okay.

8        MR. HUNSEDER:  -- because it was remanded, as Chuck

9  indicated, but it was also vacated.  And so it really is up

10  to the FCC to say --

11        THE COURT:  And how long has it been in their

12  court?

13        MR. HUNSEDER:  Well, it was remanded in November

14  2016, and then I think Mr. Steese's client parent, Century

15  Link, asked them to resolve it in a formal petition because

16  they hadn't acted sometime last year in 2018.

17        THE COURT:  And are they subject to mandamus?

18        MR. HUNSEDER:  They are subject to mandamus.  As

19  you know, the standards for that are pretty high.

20        MR. STEESE:  Your Honor --

21        THE COURT:  Well, I don't like to see government

22  dropping the ball in any sense, and if the FCC is not doing

23  their job, somebody has got to tell them to do their job, but

24  I mean, I can't do anything like that.  I just am trying to

25  understand the nature of the dispute.

1          MR. STEESE:  And there really is a couple of

2     different issues here, and Mr. Hunseder is correct that there

3     is this dispute raging at the FCC.  We think that the issues

4     in front of this Court are issues that are traditionally

5     resolved by Court's interpretations of contracts,

6     interpretations of the tariff, whether we have claims against

7     AT&T that they are billing us for these exact same services.

8     I know they -- one of their different entity is the one doing

9     it, but that their tariffs doesn't cover it, our tariffs do.

10          So at this point I don't think that we don't need

11     to resolve the biggest issue of what is the FCC going to do

12     and when they're going to do it, because if I had that

13     answer, I would definitely be prepared to bring it to Your

14     Honor; but at the same time, to the extent that we can get

15     back on track, we can start getting discovery moving again.

16     The parties -- Mr. Hunseder and I have known each other

17     for -- and Ms. DeCook too -- probably 20 years and we have

18     been on the same side of the equation sometimes and on the

19     opposite side many times.  We work very professionally and

20     will with each other.

21          And so at this point in time, we are just looking

22     to try and get the case back on track in a manner that seems

23     to make sense to Your Honor.  And we have exchanged a

24     proposed schedule, but AT&T would like a little bit of time

25     to vet that with their client.

1           I thought, to the extent that we can get a new

2     schedule put in front of Your Honor by the end of the week,

3     if that's acceptable to Mr. Hunseder, that that would be

4     something that we could -- that would allow the parties to

5     begin moving forward in earnest.

6           THE COURT:  What is the most -- what is the pending

7     motion to amend?  Is that still pending?

8           MR. STEESE:  We filed a motion to amend

9     counterclaims, Your Honor, and that just has never been ruled

10    on, and it was unopposed.

11          MR. HUNSEDER:  Yeah, it's unopposed.

12          THE COURT:  Okay.  Will you have Judge Moore

13    refer -- see if Judge Moore will refer that to me?

14          MR. HUNSEDER:  And I think there is going to be,

15    though, a subsequent forthcoming amendment.

16          THE COURT:  Docket 78.

17          MR. STEESE:  And, Your Honor, there is going to be

18    one --

19          THE COURT:  Well, would you like to withdraw that

20    one if there is going to be even something further?

21          MR. STEESE:  I don't think we'll withdraw it, but I

22    don't think you need to ask Judge Moore to do it, because

23    we're going to move to amend and make one additional change.

24    AT&T has a number of entities.  The entity that they claim is

25    doing this is called TCG.  We thought it was a different

1   entity that was doing it, so we're formally amending this to

2   add the correct AT&T entity.

3           THE COURT:  Right.

4           MR. STEESE:  And so --

5           THE COURT:  But 78 hasn't been ruled on.  It's not

6   going to be ruled on unless you file the document either

7   withdrawing it or I -- or the Court issues an order

8   adjudicating it.

9           MR. STEESE:  The parties -- the parties have been

10  operating under the guise that that's part of the case, and

11  until my new -- until the new document is filed, I prefer

12  that -- I will put in the motion we're withdrawing that other

13  one when we make the filing.

14          THE COURT:  Okay.

15          MR. STEESE:  But I prefer not to withdraw it at

16  this point in time until I make that filing.

17          THE COURT:  When are you going to do that?

18          MR. STEESE:  I -- next week.

19          THE COURT:  Okay, next week is fine.  So make clear

20  that you -- you put in two documents at the same time:  One,

21  withdrawing Docket 78 and, two, filing I guess an amended

22  motion, okay?

23          MR. STEESE:  That sounds fine, Your Honor.

24          THE COURT:  All right.  Now, was -- is March the

25  first stay that you had in this case?

18

1           MR. HUNSEDER:  It is, yeah.

2           THE COURT:  So technically you already had 11

3    months of discovery?  Because I entered the scheduling order

4    in April of 2018 and the stay came in March of 2019, right?

5           MR. STEESE:  Your Honor, that's correct.  There was

6    huge volumes of documents that were exchanged between the

7    parties, and the depositions began in earnest in February,

8    and then the parties stopped, because as of late February,

9    early March, it became apparent that the parties were trying

10   to resolve things.  And so at this point in time we have a

11   few depositions remaining on our side, AT&T has not started

12   their depositions yet, and in addition, we have some

13   outstanding written discovery.  So --

14          THE COURT:  Okay.  So what are you asking from me?

15          MR. HUNSEDER:  Well, I think we would like -- as I

16   said -- as Mr. Steese said, he proposed a schedule to us.  I

17   just got that this morning.  I would like to talk to my

18   client as to what is an appropriate amount of time.

19          I do think they're -- again, if the case had

20   settled and there was a signed written agreement, there

21   probably wouldn't be much discovery left.

22          THE COURT:  But maybe it has.

23          MR. HUNSEDER:  Well, exactly.  And so that's why

24   I'm saying, it's a little bit of an odd posture and that's

25   why I would like to consult with the clients a little bit on

1    the schedule because --

2              THE COURT:  Sure.

3              MR. HUNSEDER:  -- if there is an agreement in

4    principle to settle everything prior to 2019, well, then

5    obviously there is no need to have depositions about things

6    that occurred in 2015.

7              THE COURT:  Right, but this is an ongoing

8    accumulation of damages to somebody; is that what you --

9              MR. HUNSEDER:  It is on ongoing, but in Judge

10   Moore's opinion, he has -- and in a related case involving

11   Teliax, a party called Teliax, versus MCI, it's very similar

12   situated, the judge basically said, I don't want to decide

13   the going forward because I want to wait for the FCC.

14             So that's why I say, if there is an executed

15   agreement, then it's not clear what the judge is or is not

16   going to decide --

17             THE COURT:  Okay.

18             MR. HUNSEDER:  -- in light of his ruling and

19   related ruling in Teliax.

20             THE COURT:  All right.  So is it unfair for me to

21   order you to make a decision by Friday to tell them whether

22   there is or is not an agreement?  Is that unfair?

23             MR. STEESE:  I would -- very respectfully, Your

24   Honor, I would say yes, because like I said, this is -- this

25   is 5 percent of an enormous agreement that's trying to avoid

1    litigation just like this.  You said, Why is there so much

2    litigation like this?  All those other cases are not in a

3    posture where they're in court.  They're trying to avoid the

4    need to file actions in court.  And so the answer is, I can

5    go back and get clarification, but I can't get assurance that

6    there will be a signed agreement by Friday.

7             THE COURT:  That's what I'm asking.  I'm asking if

8    there is a deal.  Is there currently a deal and can you

9    provide a status report by Friday so stating?  Just subject

10   to maybe some minor tweaking of language, but whether you

11   believe or not that there is an agreement in principle?

12            MR. STEESE:  Your Honor, if I can ask the Court's

13   indulgence.  I have a hearing tomorrow in Michigan, a closing

14   argument on Thursday and motions for summary judgment

15   responses due Friday.  Is Tuesday next week acceptable?

16            THE COURT:  Or Friday next week I think is fine.

17            MR. STEESE:  Fine.  That will buy me a little bit

18   of time --

19            THE COURT:  Right.

20            MR. STEESE:  -- and it will allow my client time to

21   make sure that they discuss this thoroughly with the very

22   senior people that are in the negotiation phase.

23            THE COURT:  Well, and tell your people this, that

24   this judge is frustrated with all the other people that are

25   blowing you guys off and I'm not going to get in line.  I'm

1    going to be different and I'm not going to blow you off.  I'm

2    going to work hard with you to accomplish things and that's

3    why I want this done so we can get real answers.

4              MR. STEESE:  Okay.

5              THE COURT:  Okay.

6              MR. STEESE:  Okay, I will pass that on, Your Honor.

7              THE COURT:  All right.  The next thing I would like

8    you to do is, if you can, also by that date, submit a

9    stipulated revised schedule.

10             MR. HUNSEDER:  Certainly.

11             THE COURT:  Now, presumptively I would like you to

12   get things wrapped up by the end of this year.  So I would

13   like fact expert discovery closed in 2019 and dispositive

14   motions potentially filed in 2019, if you think you can fit

15   that.

16             So the deadlines you have to be worried about are

17   fact discovery, expert designations -- do you guys do experts

18   in a case like this?

19             MR. STEESE:  Often, Your Honor, yes.

20             THE COURT:  All right.  Expert designations, expert

21   discovery and then dispositive motion deadlines.  Those are

22   the things you need to get back to me on.

23             I don't need any specifics as far as what discovery

24   is left.  I'll leave that to you just to factor in and what

25   time you need.  And then based on what you submit to us, I'll

1  set a final pretrial conference, but it sounds like this will

2  be handled on dispositive motion since it sounds like

3  contract interpretation, and contract interpretation, unless

4  there is some really fact disputes that have to be decided by

5  a jury, is an issue for the Court, as you guys know.

6          MR. STEESE:  We do know and that's a strong

7  possibility in this particular case.  The -- one other

8  question, Your Honor.  I have a four-week trial the entire

9  month of November in Boston.  The schedule that I had

10  proposed, and I'm confident we'll be able to work this

11  through, had dispositive motions next year, but the discovery

12  completed this year.  Is that something that would be

13  acceptable?

14          THE COURT:  Well, early next year.  As long as it's

15  early next year.

16          MR. STEESE:  Okay, fair enough, Your Honor.

17          THE COURT:  But I mean, the thing is, what you've

18  got to understand is -- yeah, so turn the record off.

19          (Discussion off the record.)

20          THE COURT:  All right, so we're on a course here.

21  Do you guys think that you will be able to work out a

22  stipulations schedule?

23          MR. HUNSEDER:  I certainly hope so, yes, Your

24  Honor, thank you.

25          THE COURT:  If you can't, let me know, but

1    otherwise, file something by next Friday, which is the 21st,

2    I think.

3             MR. HUNSEDER:  That's correct.

4             THE COURT:  And we'll work off of that.  Thanks for

5    indulging me as far as the questions that I had.  You know, I

6    have at least one or two others like this right now and it's

7    mind boggling the kinds of volume of data that you have to go

8    through, and discovery is a nightmare in that case because no

9    one can decide on exactly what records show the traffic, you

10   know, and talk about voluminous.

11            So what do you think typical fees in a case like

12   this are?  Is it more or less than a million dollars per

13   side?

14            MR. HUNSEDER:  It's per side.  I would say less,

15   but it's certainly substantial.

16            MR. STEESE:  Significantly less on our side, Your

17   Honor, but I'm not Mr. (inaudible).

18            MR. HUNSEDER:  Chuck is worth every penny.

19            THE COURT:  So, yeah, I mean, I do -- I've always

20   had an interest in trying to have parties pay as little as

21   possible, although with these particular two parties, you

22   know, that's -- that's not a corner -- corner store or

23   anything, is it?

24            MR. HUNSEDER:  No, it is not, from either side.

25            THE COURT:  Okay, understood.  And plus, I suspect

24

1    you believe that the work that you're doing will set the

2    stage for no work in the future because people will come to a

3    decision on how exactly these things are going to be done,

4    right?

5              MR. STEESE:  Your Honor, that actually has been the

6    significant point of discussion between the parties, is AT&T

7    and Level 3 and Century Link have been trying to create a

8    protocol that will be an industry changing protocol, and

9    there has been some movement in that regard, but no consensus

10   yet.

11             THE COURT:  Are you -- so there were deadlines

12   contained in your proposed order?

13             MR. HUNSEDER:  Yeah, and you didn't accept those.

14             THE COURT:  No, no, but is that what you're working

15   off of?

16             MR. STEESE:  Your Honor, some of those dates have

17   come and gone, so we've pushed them out some.

18             THE COURT:  Right.

19             MR. STEESE:  And --

20             THE COURT:  Well, no date has come and gone.  I

21   mean, the earliest date was July 25, 2019 for fact discovery,

22   so -- and the latest date was dispositive motion deadline of

23   January 2020.

24             MR. HUNSEDER:  And from my perspective, those were

25   premised on the view that much of the case would be settled.

1          THE COURT:  Oh, okay.  And we'll know that by next

2     Friday, right?

3          MR. HUNSEDER:  Right.

4          THE COURT:  Anything else I can do for you guys?

5          MR. STEESE:  I have one last question, Your Honor,

6     and that is -- and I'm confident I know the answer from

7     Mr. Hunseder, but I'm going to say it on the record anyway.

8     Normally when there is a stay, dates are extended by the

9     timeframe of the stay.  Both sides have some written

10    discovery outstanding.  I don't want either side to be

11    saying, oh, the timeframes have past, I think that part of

12    the negotiated schedule needs to be dates upon which the

13    parties will be responding to outstanding written discovery.

14         THE COURT:  Well, when was discovery served?

15         MR. STEESE:  In late February and then it was early

16    March.  And so I just wanted to make sure that we agree upon

17    the dates and that we respond on the dates that the parties

18    agree to.  I do not think that will be an issue.

19         MR. HUNSEDER:  I think with counsel we can work

20    that out, and if there is a dispute, obviously we'll bring it

21    to you.

22         THE COURT:  I only want to know about things that

23    are disputed.  I don't care about things that are --

24         MR. HUNSEDER:  Yeah, we will try to minimize those

25    kinds of disputes, obviously.

26

1          THE COURT:  I don't need to know responsive dates

2    for your discovery, but the problem that we do on occasion

3    run into is when everybody thought we had an understanding,

4    and here it is, two or three months later, and nobody has

5    responded to request for admissions and one side thought they

6    had an understanding and this side didn't.  And so whatever

7    understanding you have, please make it in writing, okay.

8          MR. STEESE:  Thank you.

9          MR. HUNSEDER:  Thank you, Your Honor.

10          THE COURT:  All right, take care.

11          (Whereupon, the within hearing was then in

12    conclusion at 11:03 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Dyann Labo                    June 17, 2019

 8    Signature of Transcriber               Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```