
1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
    Case No. 18-cv-00112-RM-MEH
 3  _____

 4  AT&T CORP.,

 5       Plaintiff/Counter Defendant,

 6  vs.

 7  LEVEL 3 COMMUNICATIONS, LLC,

 8       Defendant/Counter Claimant.
    _____
 9

10         Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 12:31 p.m., August 1,

13  2019, in the United States Courthouse, Denver, Colorado.

14  _____

15         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                          APPEARANCES

19         MICHAEL HUNSEDER, Attorney at Law, appearing

20  for the Plaintiff.

21         CHARLES STEESE and DOUGLAS MARSH, Attorneys at Law,

22  appearing for the Defendant.

23  _____

24              TELEPHONIC DISCOVERY CONFERENCE

25
```

2

```
 1                    P R O C E E D I N G S
 2            (Whereupon, the within electronically recorded
 3   proceedings are herein transcribed, pursuant to order of
 4   counsel.)
 5            THE COURT:  Good afternoon.  Case Number 18-cv-112,
 6   AT&T Corp vs. Level 3, et al.  Your appearances, please,
 7   starting with the plaintiff.
 8            MR. HUNSEDER:  Mike --
 9            THE COURT:  Go ahead.
10            MR. HUNSEDER:  Mike -- sorry, I was on the -- I
11   apologize.  This is Michael Hunseder of Sidley Austin for
12   AT&T.  I'm also appearing for the counterclaim defendant,
13   TCG.  And with me is my colleague Justin Benson.
14            THE COURT:  Okay, thank you.
15            MR. STEESE:  And, Your Honor, this is Chuck Steese
16   from Armstrong Teasdale on behalf of Level 3, and with me is
17   my colleague Doug Marsh.
18            THE COURT:  Okay, thank you.  Let me start by
19   asking the question:  Companies like AT&T, Level 3, I guess,
20   charge tariffs; is that correct?
21            MR. STEESE:  We have tariffs that have charges in
22   them, yes.
23            THE COURT:  Right.  And who drafts the language of
24   the tariff?
25            MR. STEESE:  Whoever -- whatever carrier it is
```

3

1  that -- whose tariff it is.  In the case here, we're talking
2  about AT&T and TCG tariffs, they would have been the drafter
3  of those tariffs unilaterally.
4          THE COURT:  Okay.  So I guess someone is going to
5  have to convince me that it's inappropriate for one party to
6  a dispute involving tariffs to ask the other party what do
7  you believe you're entitled to do under your own tariff.
8  That's not an interpretation of the law; it's an
9  interpretation of their tariff.
10          Now, whether their interpretation is consistent
11 with the law, that is the kind of question that I wouldn't
12 allow; but simply to have the application in fact of a
13 party's tariff, I can't see the impropriety of that sort of
14 line of question, so someone is going to have to convince me
15 of that.
16          MR. STEESE:  Your Honor, I'm not going to try and
17 convince you of that.  Obviously that is our position, and so
18 I will defer to Mr. Hunseder to let him address that, and, if
19 necessary, I'll respond, if that's acceptable.
20          MR. HUNSEDER:  Yes, this is Mr. Hunseder for AT&T
21 and TCG.  And I think we've laid out essentially two grounds,
22 and so I think the first one which you are here to disagree
23 with, which is that, in our view, the interpretation of a
24 tariff, and I think the topic explicitly calls for legal
25 interpretation by (inaudible).  It is a matter of law for the

1  Court, and to the extent, though, that there are technical
2  policy issues that the Court can't resolve, then the FCC or
3  some more appropriate agency would have to be consulted on
4  that.
5           The second ground, however, is that as to our
6  tariffs and whether they permit these charges at issue, there
7  is really no live dispute as to that, because we're saying
8  that under the rules of the FCC, if we billed those charges,
9  we want to pay them back regardless of what the tariff says.
10 And so there is no issue as -- there is no live issue as to
11 the meaning of the tariff.  There might be an issue as to the
12 amount of the charges.  It has nothing to do with the
13 language of the tariff.  It's very generic and just, here are
14 the charges.
15          So I think it's our position on the second ground
16 that there really just isn't a live issue as to what our
17 tariffs mean because we're not suggesting -- we're suggesting
18 that any charges on over-the-top voice calling that were
19 billed were billed in error and we're willing to credit them.
20          THE COURT:  Well, here is what I -- here is what I
21 see again is an area of permissible testimony, and we can
22 have a discussion, but somebody has a tariff.  Whether that's
23 permissible tariff under the FCC rules, that's an issue
24 that's left to Courts or the FTC -- FCC to decide; but how,
25 in fact, the entity that's imposing the tariffs is

1  interpreting those and therefore charging how it's doing
2  that, do you charge for this, do you charge for that under
3  your tariff, that is a fact issue, not an interpretation of
4  the law, not even asking for that party to have a legal
5  interpretation, although presumably they try to do only what
6  is legal in all circumstances, but how are you interpreting
7  your own rules.
8         I mean, this happens all the time.  Insurance
9  companies -- we get so much insurance litigation here, and
10 insurance companies have policies that are extensive, and
11 always in insurance litigation the topic of how are you
12 implementing your policies, do you believe you can do this,
13 do you believe you can exclude coverage for that under your
14 policy, are you excluding coverage, is always a relevant
15 topic.
16        So I don't agree that it's a legal interpretation,
17 although I agree that you're trying to comply with the law
18 presumably when you draft the tariff and when you implement a
19 tariff, but at the same time I assume there have been
20 decisions at some point by some Court or the FCC that, in
21 fact, some entity was not complying with the law in its
22 charges.  Hasn't that happened probably numerous times?
23        MR. HUNSEDER:  Yes, Your Honor.
24        THE COURT:  Okay.  So that's a different issue,
25 although part and parcel I agree, but I can't segregate

1  those.  I can't -- there is no fine enough knife for me to
2  cut those apart, but I think that it is relevant potentially
3  in this case, at least for purposes of the discovery, for one
4  party to ask another party:  How are you charging?  Do you
5  charge for this and where is that in your tariff?  Those are
6  kind of questions that I think should be pretty commonplace
7  in this sort of lawsuit.  Maybe I'm wrong.  I mean, I don't
8  handle a lot of these.  I've had maybe five or six, and
9  honestly FCC interpretations and statements and rules end up
10 deciding the cases more often than a judge does sitting out
11 in the hinterlands.
12         But anyway, that's what I'm thinking, and again
13 I'll hear from Mr. Hunseder, how is that not appropriate?
14         MR. HUNSEDER:  Well, I guess what I'm saying is, to
15 go back to your insurance example, this is a case, I think,
16 where the insurance company is saying -- if the insurance
17 company says, You're right, insured, we agree to cover you
18 for damage and we think the damage is X and here we're
19 willing to issue a credit.  And there is no question in this
20 case as to what the policy means because the insurer has
21 said, Yes, we'll cover it.
22         And by the same token here, AT&T and TCG are
23 saying, Look, there is no question under the rules that, as
24 to the factual matter, we obviously -- AT&T and TCG have
25 taken the position since 2011 that on over-the-top calls and

```
 1    office charges aren't appropriate, and to the extent those
 2    are mistakenly billed, we'll refund it.
 3               And so what the tariff does or doesn't say on that
 4    issue, in my mind, is kind of moot for the reasons that there
 5    is no reason to ask the insured -- the insurer what its
 6    policy says if it's saying that it will cover the damage.
 7               THE COURT:  True that, but I don't think Mr. Steese
 8    agrees with what you're saying.  Do you, Mr. Steese?
 9               MR. STEESE:  I do not.  There is a hole that they
10    say is $11,000 limited to a couple of small items and we
11    think it's much larger than that and we want to go through
12    the various scenarios with them and say, Is this covered by
13    your tariff, where is it covered by your tariff, you bill for
14    this, et cetera, just like Your Honor has anticipated we
15    would be asking.  That's exactly what we plan to do.
16               THE COURT:  Right, but I'm not going to let you
17    ask, then, do you believe that's consistent with the FCC's
18    rules, okay.
19               MR. STEESE:  That's not my plan, Your Honor, but I
20    understand, thank you.
21               THE COURT:  All right, yeah, I'll permit that line
22    of questions.  Was there -- that only covers -- that covered
23    two of the topics, but there is two other topics?
24               MR. STEESE:  That's correct, Your Honor.  That
25    covers three of the topics and there is two left, correct.
```

8

1        THE COURT:  And I tinted it by AT&T's argument more
2   as I understood it, but why don't you, Mr. Steese, go ahead
3   and you address those.
4        MR. STEESE:  If you look at these other topics, the
5   topics are framed in terms of using the FCC rules, and maybe
6   that was the inappropriate way for us to address it.
7        It's really going through the following, and I'll
8   just use a scenario as an example.  We put forward a scenario
9   a commonplace network architecture where you have -- you're
10  delivering calls to a particular customer in a particular way
11  and ask basically the questions we just went through about
12  the tariff:  Is this covered; when this call hits the
13  network, how does it use the switch; is the switch performing
14  this function, is it performing this function, because in the
15  end, we think that that will you will in part determining
16  whether or not the tariffs do or do not cover the calls.
17        And so in order to determine whether the call
18  scenario in question is indeed covered by the tariffs, we
19  need to understand how that call scenario is utilizing their
20  network, how is it utilizing the switch, when is it utilizing
21  the switch, how is it different from this other scenario.
22        THE COURT:  So are you asking.
23        MR. STEESE:  So it's truly a factual question.
24        THE COURT:  Hold on a second.  Are you asking
25  technology questions then?

```
 1              MR. STEESE:  Correct.
 2              THE COURT:  Functionality?
 3              MR. STEESE:  Exactly, 100 percent.  In this
 4    scenario --
 5              MR. HUNSEDER:  Your Honor, that's --
 6              MR. STEESE:  If I could just finish.  In this
 7    scenario, where does it hit the end-office switch, does it
 8    hit end-office switch, what does the end-office switch
 9    perform, how does it perform those functions, does it do X,
10    does it do Y, those kinds of things, and is it different from
11    this other call scenario.
12              And in those situations, the tariffs and how the
13    tariff language reads could very well impact whether a call
14    is or is not covered by the tariff, but I need to understand
15    the call-flow scenario, how it's impacting the network, what
16    it does, et cetera.
17              MR. HUNSEDER:  May I respond to that?
18              THE COURT:  Yes, please, go ahead.
19              MR. HUNSEDER:  Well, I -- I mean, one, how that
20    explanation in any way relates to the topic that was provided
21    to us I am at a complete loss, to be perfectly frank.  And
22    again, we had a meet and confer on this process, I will
23    agree.  I didn't hear any of this at all until this second.
24              But more importantly, even if that is the position,
25    it sounds to me like Mr. -- I mean, there is a lot -- I'm
```

1    willing to provide the Court with it.  There is a lot of

2    discussion at the FCC going on right now and a lot of filings

3    were made about various call scenarios, and Level 3 and its

4    parent or affiliate, Century Link, asked the FCC to opine on

5    all sorts of different call scenarios.

6            And it sounds to me what Level 3 wants to do is ask

7    about a bunch of abstract questions about how calls are

8    routed and get AT&T's opinion on some advisory question

9    that's not even clearly at issue in this case.

10           And so -- so I still think that just reading the

11   topic that they have put forward -- and I don't think the

12   explanation here really clarifies much, if anything.  If

13   anything, it just makes matters confused.  But I don't see

14   how the topic -- I mean, that is exactly the same issue that

15   the FCC is (inaudible - voice dropped).

16           THE COURT:  Well, I don't -- I guess I didn't hear

17   Level 3 saying they're going to be asking for theories, but

18   the operation of technology in fact.

19           MR. HUNSEDER:  But, again, I guess the question,

20   technology in fact.  I mean, there is all sorts of calls.

21   They're not -- topic doesn't even mention AT&T at all.  It

22   says any local exchange carrier.  That could be anybody in

23   the world.  And, you know, it's not limited to anything

24   respectfully in this case.

25           THE COURT:  Well, but you're not going to be

1    required to provide a witness who can testify about an

2    industry.  You only have to provide a witness who can testify

3    about AT&T's experience, practices and understandings.

4             MR. HUNSEDER:  Well, that's not -- I mean, with all

5    respect, Your Honor, that's not what the topic says and I

6    didn't really hear that in the explanation that I heard

7    today.  I heard, I would like to ask a bunch of generic

8    questions about call-routing scenarios, regardless of whether

9    those call-routing scenarios, in fact, occur in AT&T's

10   network or not.

11            THE COURT:  No.  I would limit it to AT&T's actual

12   transactional experience.

13            MR. STEESE:  And, Your Honor, that's our --

14   obviously we don't know 100 percent of what AT&T does.  We

15   have some good ideas, and so I'm going to ask some different

16   call scenarios and they can tell me, Is this in their

17   network, and if they say, No, I move on.

18            But the whole point is to -- the whole point is to

19   understand how -- and this is -- this is the point, and

20   Mr. Hunseder is -- they were asking theoretical questions, we

21   need to gather evidence that we can provide to an expert so

22   our expert can opine on damages.

23            And when you look at OTT calling, OTT calling is

24   unlike any other type of calling in the network where

25   calculation of how much of it is a network has done through

1  not an identification of exact numbers of calls, but through

2  a series of assumptions.  And I need to get facts to support

3  what those assumptions are so we can put forward our expert

4  analysis and that is my sole purposing here.

5          MR. HUNSEDER:  Well, and may I address that?  This

6  is Mr. Hunseder.  I mean, to be perfectly frank, I mean, we

7  are willing to provide, and indeed we offered to provide

8  already testimony from our people on the products that we

9  think are over-the-top and how it's routed and whether it's

10 over-the-top and to what extent.

11         But like I said, I -- as I sit here today and based

12 on what I'm reading in their deposition topic, based on the

13 discussion today -- and again, obviously after I read this

14 transcript, but it's very difficult to understand, at least

15 for me, how AT&T is going to provide a knowledgeable person

16 about call scenarios without knowing what call scenarios are

17 going to be asked.

18         And like I said, if we -- we've identified to

19 Mr. Steese a couple of weeks ago new products that we think

20 do have an over-the-top calling, and I'm not suggesting that

21 we wouldn't provide testimony on those two products.

22         What I -- I guess where I get a little gray is what

23 else is being asked then if not -- and I don't have a view --

24 I don't have an understanding of what the topic is because

25 obviously -- I mean, just to be frank, we are far afield from

1   the topic that's listed in paragraph 14 and 15 of the notice,

2   and it's just hard to provide my client with the guidance

3   that they need to get a witness educated on the topic because

4   it's just very vague what's being asked.

5           THE COURT:  Well, let me pull the actual language

6   up.  I'm not even sure, was I provided with --

7           MR. STEESE:  It was Attachment Number 1 to our

8   letter, Your Honor.

9           THE COURT:  Okay, I've got it.  So --

10          MR. HUNSEDER:  And it's quoted on page 2 of our

11  letter in footnote 1 of our letter.

12          THE COURT:  Well, I'll tell you what:  I mean, I

13  don't want to spin our wheels excessively here, but if

14  Mr. Steese wants to redraft these in light of the discussion

15  today, I think that would be better, because I think we're

16  all a little bit more informed than we were half an hour ago.

17          So do you want to give that a shot, Mr. Steese?

18          MR. STEESE:  Happy to do that, Your Honor.

19          THE COURT:  Okay, why don't you do that.  When is

20  this deposition noticed for?

21          MR. STEESE:  Your Honor, we're working through --

22  there is a number of witnesses and what we're trying to do is

23  make sure that we -- before I travel all the way to New

24  Jersey, or wherever the AT&T witnesses are, that we

25  understand the scope of this.  So in order to get the right

14

 1   witnesses at the table we needed to know that we could do

 2   this before we set the physical date.

 3            THE COURT:  All right.  Do you think it will be at

 4   least weeks away?

 5            MR. STEESE:  I anticipate.  What do you think, Mr.

 6   Hunseder?

 7            MR. HUNSEDER:  I would agree with that.

 8            THE COURT:  Okay.  So I'll be gone for roughly the

 9   first two weeks of August starting next week.  That's fine.

10   So why don't you draft -- redraft the language, submit it to

11   Mr. Hunseder.  If you need to set up another one of these

12   calls, give me about a day's notice to read through the

13   materials that you might submit and then we'll do this again.

14   Okay?

15            MR. STEESE:  Thank you, Your Honor.

16            MR. HUNSEDER:  Thank you, Your Honor.

17            THE COURT:  All right.  Thank you, guys.  Take

18   care.

19            (Whereupon, the within hearing was then in

20   conclusion at 12:51 p.m.)

21

22

23

24

25

15

1              TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                    August 15, 2019

8    Signature of Transcriber          Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25