1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
    Case No. 18-cv-00112-RM-MEH
3   _____

4   AT&T CORP.,

5        Plaintiff/Counter Defendant,

6   vs.

7   LEVEL 3 COMMUNICATIONS, LLC,

8        Defendant/Counter Claimant.

9   _____

10           Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 1:32 p.m., April 13,

13  2020, in the United States Courthouse, Denver, Colorado.

14  _____

15           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                        APPEARANCES

19           JUSTIN BENSON, MICHAEL HUNSEDER and MICHAEL WARDEN,

20  Attorneys at Law, appearing for the Plaintiff.

21           CHARLES STEESE and DOUGLAS MARSH, Attorneys at Law,

22  appearing for the Defendant.

23  _____

24                    DISCOVERY CONFERENCE

25
```

2

```
 1              P R O C E E D I N G S
 2          (Whereupon, the within electronically recorded
 3   proceedings are herein transcribed, pursuant to order of
 4   counsel.)
 5          THE COURT:  Good afternoon, Case Number 18-cv-112,
 6   AT&T Corp. vs. Level 3.  Make your appearances, please.
 7          MR. BENSON:  Good afternoon, Your Honor.  Justin
 8   Benson, Sidley Austin, LLP, on behalf of AT&T Corp.  Along
 9   with me on the line is my colleagues Michael Warden and
10   Michael Hunseder, both of Sidley Austin.
11          THE COURT:  Thank you.
12          MR. STEESE:  And, Your Honor, this is Chuck Steese
13   and with me is my colleague Doug Marsh on behalf of the
14   defendants and counterclaimants Level 3 entities.
15          THE COURT:  Okay, thank you.  So, let's see,
16   Mr. Benson, are you going to start?
17          MR. BENSON:  Sure, Your Honor, thank you.
18          As you know from the parties' joint e-mail on April
19   3, parties currently have two disputes related to expert
20   discovery.  The parties dispute whether Level 3 should be
21   able to take the deposition of AT&T's expert, Dr. Pen Fautz
22   (ph) more than once.  Parties also dispute whether Level 3's
23   nonreporting expert disclosures are adequate and meet the
24   requirements of Rule 26.
25          THE COURT:  Okay.
```

1          MR. BENSON:  Just a summary quick of where we are

2    with the litigation and the dispute.

3          The dispute between AT&T and Level 3 over how much

4    Level 3 should have billed over AT&T for over-the-top flow

5    traffic.  This past December, the SEC unequivocally held that

6    OTT traffic must be billed at lower tandem switching rates

7    rather than higher end-office access switching rates.

8          Two issues implicated by the disclosures of expert

9    opinion witnesses here:  What are the volume of Level 3's

10   traffic billed to AT&T is OTT and what is the amount owed

11   based on the amounts Level 3 has billed and the amounts that

12   AT&T has withheld?

13         Level 3 has designated two employees to offer

14   expert opinion testimony, Ms. Jennifer Torres (ph) on Level

15   3's purported damages, and Andrew McClure (ph) on the

16   percentage of Level 3's traffic that is purportedly OTT.

17   Level 3's disclosures are governed by Rule 26(a)(2)(c).

18         While Level 3's employee experts are not required

19   to provide a third, long expert witness report, they still

20   must provide an adequate disclosure as required by the rule.

21   Instead of doing so, Level 3 has provided a single sentence

22   for each expert, plus a spreadsheet.

23         Conversely, AT&T's expert provided a comprehensive

24   Rule 26(a)(2)(b) report.  Despite this fact, Level 3 has

25   taken the remarkable position that it has provided enough

4

1    information and that AT&T has failed to provide adequate

2    information under the respective disclosures of Rule 26.

3    Level 3 is wrong on both points.

4            With Your Honor's permission, I think it makes

5    sense to first discuss the dispute over whether Level 3

6    should be able to take the deposition of AT&T's expert more

7    than once.

8            THE COURT:  Okay.

9            MR. BENSON:  Okay.  Your Honor, AT&T's position is

10   is that Dr. Fautz should be deposed once either before or

11   after the exchange of rebuttal reports.  In our collective

12   experience, experts are deposed once, not twice, and they're

13   typically deposed after rebuttal reports.

14           If Level 3's position was correct, parties would

15   always be able to take two depositions of an individual

16   expert; however, the federal rules do not support Level 3's

17   position.  Rather, Rule 30 of the Federal Rules of Civil

18   Procedure make clear that the default under the rule is that

19   witnesses should only be deposed once.  This makes since

20   especially in the context of expert depositions.  So it's

21   expensive and burdensome to make an expert witness available

22   for deposition and the cost and burden will only be more

23   severe during the current public health emergency.

24           Court scheduling order in this case has

25   consistently contemplated that depositions were to occur once

5

1   rebuttal disclosures are made.  For example, the initial

2   scheduling order in this case set the deadline for expert

3   depositions for approximately one month after the deadline

4   for rebuttal expert disclosures.

5           This schedule contemplates depositions occurring

6   after rebuttal disclosures in order to avoid the need for two

7   depositions.  Federal rules contain no requirement that an

8   expert be disclosed prior to rebuttal disclosures.  Level 3

9   could take a deposition of AT&T's expert prior to rebuttal

10  disclosures or that Level 3 should only get one opportunity

11  to depose AT&T's expert.

12          THE COURT:  Okay.  Hard to argue with all that, but

13  give it a shot.

14          MR. STEESE:  I'll give you a little introduction

15  here, Your Honor, and I think it would be helpful here to

16  understand a bit of background and that is, as Mr. Benson

17  correctly said, this case concerns the billing of

18  over-the-top traffic and how much AT&T has paid or not paid

19  Level 3.  And AT&T has withheld payment to the tune of about

20  $9 million way over withholding.

21          And here we have two experts, Mr. McClure and

22  Ms. Torres.  Mr. McClure and Ms. Torres have already both

23  been deposed twice, both as fact witnesses and 30(b)

24  witnesses.  And so as an introduction to the overall picture,

25  that gets to our expert disclosures.

1          In terms of deposing people twice, because it's not

2    Level 3's intention to depose the expert twice, we've made

3    that point to AT&T's counsel many, many times.  What they

4    effectively told us in our meet-and-confer call was -- what I

5    told them, if he changes his opinions, then it's just like a

6    deposition of a witness who comes in, and in their correction

7    sheet to the deposition, they instead of just saying we

8    misspelled both X word, they say this is wrong, this is wrong

9    and this is wrong.  They've had that happen several times,

10   and in no circumstances you have the right to depose the

11   person about their changes.

12          All I've said is I fully believe that we're going

13   to be able to depose this person one time barring something

14   extraordinary that's hard to contemplate, but they wanted to

15   (inaudible) me to one deposition irrespective of what their

16   witness did.

17          And here, for example, the witness -- their

18   witness -- and I do not know how to pronounce his last name,

19   but I'm going to say Dr. Fautz (ph), I believe that's

20   correct.  Dr. Fautz's response to an earlier disclosure of

21   Mr. Andrew McClure that they deposed Mr. McClure about

22   selectively for 12-ish hours, and all Mr. McClure did was

23   update his disclosure.

24          So we have a very detailed explanation of

25   Mr. McClure's opinions, bases for his opinions already, and

1  so all Mr. McClure did was update his spreadsheet.  So I

2  should be able to depose him with a very high degree of

3  confidence that a -- I'll only need to depose him one time,

4  but if after the deposition he changes his opinion and says

5  now they're X instead of Y, I should be able to depose him

6  not a second time, but as to how his opinions have changed

7  and why, and that's all.  Do I anticipate that?  I do not.

8           So, Your Honor, the reason we need the deposition

9  of Mr. Fautz now is that we have not argued that his expert

10  disclosure was inadequate as Mr. Benson said.  What we said

11  is, there are several pieces of his expert disclosure that

12  leave open to question exactly what it is that he needs, and

13  for us to provide a meaningful responsive disclosure, which

14  is due on April 24, we need to depose him so Mr. McClure can

15  take his thoughts into consideration, something that AT&T

16  had, but several -- two depositions of Mr. McClure, so they

17  have the ability to respond to Mr. McClure's thoughts,

18  something we don't have because with some of the materials in

19  his disclosure, we've opened several questions about what he

20  needs.

21           So we think we only need to depose him once, and

22  barring something that would be quite rare, we will only

23  depose him once.

24           THE COURT:  Yeah, I don't think I -- I think you're

25  both right and there is nothing perfectly inconsistent with

1    what either of you said, so I don't know where the -- I don't

2    know what you want me to decide.  It doesn't sound like a

3    ripe issue at the moment.

4              MR. STEESE:  Your Honor, what AT&T is saying is

5    that if I depose the witness before the expert disclosure

6    deadline, that I am precluded from even seeking leave to

7    depose him a second time, and I said that's not fair.

8              THE COURT:  Well, wait a second.

9              MR. STEESE:  And so --

10             THE COURT:  Wait.  Mr. Steese, right?

11             MR. STEESE:  Yes, Your Honor.

12             THE COURT:  No one can foreclose you from seeking

13   leave to do something except me, so don't worry about it.

14             MR. STEESE:  That's fair then, Your Honor.

15             THE COURT:  Okay.

16             MR. STEESE:  The only other point, Your Honor, then

17   is they told me that they would not make him available unless

18   I gave them assurance that under no circumstances would I

19   seek leave.  And so I just need an authorization from Your

20   Honor telling AT&T to make him available in advance under the

21   circumstances that we described.

22             THE COURT:  Yeah, I'm not going to guess --

23             MR. BENSON:  Your Honor.

24             THE COURT:  Hold on a second.  Before you speak, I

25   want you to know something.  I'm not going to guess all the

1   circumstances that might happen.  So if Mr. Steese just

2   accurately represented your position, your position is just

3   wrong.  So I would like you to clarify if he did not

4   accurately represent your position.

5          MR. BENSON:  Your Honor, it's AT&T's position that

6   we will make Dr. Fautz available prior to the rebuttal

7   disclosure deadline.  We've said that to counsel for Level 3,

8   that's the position that we're taking today.  Dr. Fautz will

9   be made available for the deposition -- or the rebuttal

10  disclosures are due, excuse me.

11         What we have said is that Level 3 should not have

12  the opportunity to depose Dr. Fautz twice.  They should have

13  one opportunity to do so.  Of course, the rebuttal

14  disclosures will include new information; that happens in

15  every single case.  And if Level 3 wants to take the risk

16  that it's going to depose AT&T's expert prior to rebuttal

17  disclosures, that's on Level 3, that's their risk that

18  they're choosing to take.

19         Dr. Fautz's disclosure is thorough, it meets the

20  requirements of the rule, and all of the clarifications that

21  Level 3 included in its filing with the Court on April 10,

22  all that information can be gathered from either the report

23  or Level 3's own analysis that was submitted in 2017 --

24  excuse, the 2017 data that my colleague Mr. Steese has talked

25  about that we deposed Mr. McClure earlier.  That's what

1    Dr. Fautz's report is on.

2           So I just want to make it clear that Level 3 has

3    not said we won't make -- or excuse me, that AT&T won't make

4    Dr. Fautz available prior to rebuttal disclosures, we've said

5    that we will.  However, we don't think that Level 3 should be

6    able to take the deposition twice.

7           THE COURT:  What I heard Mr. Steese say is that he

8    wouldn't do that unless your expert actually changed course,

9    but if he only supplements, clarifies, expands upon or

10   otherwise is consistent with what he said before, there won't

11   be any need for a supplemental deposition, but if he changes

12   his opinion, there might be, and I don't disagree with that.

13          MR. BENSON:  Your Honor, I don't think that we can

14   say for certain what Level 3 -- I mean, what the rebuttal

15   report is going to say to date.  I can say that you know, our

16   position on this matter has been consistent throughout the

17   litigation when it comes to the key issues that are at play,

18   and I think it's up to Level 3 to decide if it wants to take

19   his deposition prior to the rebuttal report or afterwards.

20          Like I said, AT&T is willing to make him available.

21   We don't think, though, that the Court should grant Level 3

22   the ability to take two depositions.  That's all Level 3 --

23   AT&T expects.

24          THE COURT:  I'm not granting anything, I'm not

25   making any ruling whatsoever, but I will tell you that if

1    Level 3 seeks to redepose and I determine that because they

2    made a calculated decision to take the deposition at a

3    premature time, they've waived that right, I'll find that;

4    but if -- on the other hand, if I believe that your expert

5    did something that justifies a supplemental deposition,

6    that's the way I'll rule on that, but I'm not making any

7    ruling at the moment other than you can't make them -- you

8    can't make Level 3 promise that under no circumstances would

9    they ever do something.  That's just -- that's not

10   reasonable, because we don't know the circumstances.

11            I mean, if three months ago you would have said,

12   Hey, Level 3, under no circumstances will you ever seek an

13   extension of time of discovery, well, for goodness sakes,

14   we've just had the most unprecedented experience in this

15   nation's history, I don't know what the future holds, and you

16   don't either, so we can't say exactly what circumstances

17   might present themselves.  Does everybody understand that?

18            MR. BENSON:  Absolutely, Your Honor, thank you.

19            THE COURT:  What else do we have?

20            MR. BENSON:  So, Your Honor, the second issue, if I

21   may, is whether or not Level 3's expert disclosures meet the

22   requirements of Rule 26(a)(2)(c), and we think the answer is

23   clear, that they do not.  Just quickly, Rule 26 (a)(2)(c)

24   requires nonreporting experts like Ms. Torres and Mr. McClure

25   disclose the subject matter on which the witnesses are

12

1  expected to present opinion evidence under Federal Rule of

2  Evidence 702, 703 and 705 and the summary and facts of

3  opinions as to which the witnesses are expected to testify.

4          Your Honor has seen the disclosure that Level 3

5  produced, and you've seen, Your Honor, that Level 3's

6  one-sentence description for each of its experts does not

7  adequately disclose the subject matter that the experts are

8  expected to present evidence on as required by Rule 26.

9          I'll point Your Honor to the disclosure which notes

10  that Ms. Torres regarding, and I emphasize, among other

11  things, Level 3's damages, and I emphasize again, including,

12  but not limited to the contents of Exhibit 1 to its

13  disclosures.  Disclosure further notes that Mr. McClure will

14  testify regarding, among other things, Level 3's percent OTT

15  since January 1, 2019, including, but not limited to the

16  contents of Exhibit 2 to this disclosure.

17          These statements are far too vague and using the

18  phrase "among other things" indicates Level 3's witnesses may

19  seek to offer testimony regarding subject matters that have

20  not been disclosed.

21          I also want to talk a little bit about what

22  Mr. Steese said earlier about the spreadsheets and how AT&T

23  knows exactly what the Level 3 experts are about to testify

24  to, and unfortunately that's wrong.  Yes, AT&T has deposed

25  Mr. McClure and Ms. Torres before, but they were disclosed on

1  different things than what was disclosed with Level 3's

2  expert reports.

3         Mr. McClure has done a number of analyses regarding

4  the OTT percentage and he has been deposed on those; however,

5  Level 3 has attached with the disclosures another spreadsheet

6  that Mr. McClure put together that includes new data and

7  includes major differences from the spreadsheets that were

8  previously deposed upon.  AT&T has no idea what the fact and

9  opinions are underlying that spreadsheet.

10         And the rule and the case law, which AT&T sent

11  along to Your Honor on the 10th, makes it clear that you

12  can't just include a large compilation of information such as

13  spreadsheet or medical records or personnel files without a

14  summary of those.  That doesn't meet the requirements of the

15  rule and it's not an adequate substitute.

16         Same goes for Ms. Torres's damages spreadsheet,

17  which was attached as Exhibit 1 to the disclosure.  That's

18  not an adequate summary for what our (inaudible) should be

19  the facts and the opinions that she's going to give regarding

20  Level 3's damages.

21         There is a number of things on that spreadsheet,

22  and my colleagues and I have spent significant time going

23  over the spreadsheet with significant things in there that we

24  have no way of understanding what are the facts that underlie

25  that spreadsheet and what are the opinions that underlie it.

1   It doesn't substitute for a summary; it's a spreadsheet, it's

2   compilation of information, not a summary of the facts and

3   opinions that she is going to testify to.

4           So it's AT&T's position that both -- they haven't

5   done an adequate job explaining the subject matters that are

6   going to be testified and the facts and the opinions that are

7   going to be testified to.

8           THE COURT:  Okay.

9           MR. STEESE:  Your Honor, thank you.

10          I'm going to move past one issue here very briefly

11  and that is the one sentence in the disclosure, and AT&T

12  forwarded several cases to you.  It has one of those

13  particular cases.  The Green Earth case said that they were

14  going to have an expert that was going to opine on the

15  appropriate disciplinary action to be taken in a particular

16  case and that was (inaudible).

17          And so here we have disclosed one witness on

18  calculating the OTT, over-the-top factor, Mr. McClure, and

19  one witness to discuss damages, Ms. Torres.  And if you look

20  at the disclosure, we've identified their subject.  I

21  encourage Your Honor to -- I've opened a spreadsheet and I'll

22  start off with Exhibit 1.  Does Your Honor have those that we

23  forwarded on Friday, a week ago?

24          THE COURT:  Well, I -- I don't know if I have -- is

25  it an Excel spreadsheet?

15

 1          MR. STEESE:  Yes, Your Honor, and it was entitled

 2    "Exhibit 1."

 3          THE COURT:  I mean, I have something attached that

 4    my staff printed off called an FAMART Mach Mediation --

 5    M-A-C-H, mediation.  That's not what you're talking about, is

 6    it?

 7          MR. STEESE:  It is not, Your Honor.  I can talk

 8    this through, and I think it's very helpful to look at the

 9    spreadsheet.  Exhibit 1 is Ms. Torres's Excel spreadsheet --

10          THE COURT:  Well, I -- hold on, I need to try -- I

11    need to look at that, so will you tell Jen back there I need

12    a copy of that.  I don't have the same access on the bench

13    that I have back at chambers, but I might be able to pull

14    this thing up.

15          MR. STEESE:  And, Your Honor, while you're waiting

16    for that, I misquoted.  It was not the Green Earth case, it

17    was the Nicastle (ph) case.  I just referenced the wrong

18    case, I apologize.

19          THE COURT:  Okay.  Yeah, I'm going to look in our

20    inbox.  What date was it sent?

21          MR. STEESE:  It was a week ago Friday, so I believe

22    that was the 3rd.

23          MR. BENSON:  That's right, Mr. Steese, it was April

24    3, the joint filing.

25          THE COURT:  All right, so I see -- who was it from?

16

1          MR. STEESE:  Douglas Marsh, my colleague who is on

2     the phone with me.

3          THE COURT:  Okay, so I see that.  And it's -- okay,

4     I have it.

5          MR. STEESE:  So Exhibit 1 --

6          THE COURT:  I have it opened here.

7          MR. STEESE:  -- that we were talking about.

8          THE COURT:  Yeah, go ahead, I have it opened.

9          MR. STEESE:  There is two tabs at the bottom.  One

10    is entitled Credit and Debit and the other is AR Summary.

11         THE COURT:  Okay, I see that.

12         MR. STEESE:  And if you look at the credit and

13    debits analysis here, Your Honor, there is -- there is two

14    questions here:  How much money has AT&T withheld and how

15    much of an adjustment needs to be made to the amount that

16    they've withheld because some of this traffic is

17    over-the-top, and as Mr. Benson correctly said, in December

18    of 2019, the FCC issued a ruling, a final decision on how

19    to -- to analyze or bill for this traffic.

20         And when you look at the Credit and Debit tab,

21    column A here, this is the building, February 2019, March

22    2019, et cetera.  And you look at the next column, race ID,

23    those are the race elements that Level 3 is billing for,

24    EOCTP is end office common trunk port, EOLS is end office

25    local switching.  Those are the rate elements that the FCC

17

1     issued their decision about.

2              Then you look -- the next column is how many

3     minutes of use were billed.  And so you can see exactly the

4     exact data -- and I could go through every single --

5              THE COURT:  No, no, yeah, I don't need you to do

6     that.  All I need to hear from you is that she's not going to

7     testify to anything other than the contents of this

8     spreadsheet and how she came to those numbers.

9              MR. STEESE:  And the answer is that is true in

10    theory.  Some of these months could continue because we have

11    ongoing damages, but beyond that, that's what she's going to

12    testify to.

13             If you look at the AR Summary tab, you can look at,

14    again these are the amounts that AT&T withheld, and the same

15    thing is true, this is what she's going to be testifying to,

16    these are what her opinions are about from a damages

17    perspective.

18             And so we have tried to outline in great detail --

19             THE COURT:  No, okay, don't make a federal case out

20    of it if you don't need to.  So as I read it, although I'll

21    listen to what Mr. Benson says, that is -- the subject matter

22    is damages and the summary of the facts is this -- she's not

23    pointing to a whole bunch of documents, she's pointing to a

24    fairly concise analysis of exactly how Level 3 is arriving at

25    its damages, so at least superficially I think it's fine, but

18

1    I need to hear from Mr. Benson.

2            MR. BENSON:  Your Honor --

3            MR. STEESE:  Just one minute, Mr. Benson, I

4    apologize, because I would like to look at Mr. McClure's

5    spreadsheet too, and that was Exhibit 2.  It's a very large

6    spreadsheet.

7            MR. BENSON:  If I may, Mr. Steese, I would like to

8    respond to the -- on Exhibit 1, if Your Honor would permit

9    that.

10           THE COURT:  Let's do it one at a time.

11           MR. STEESE:  Okay.

12           THE COURT:  That's what I'm interested in.

13           MR. STEESE:  Okay, no problem.

14           MR. BENSON:  Okay, thank you.

15           Your Honor, just one point first off to make.  You

16   know, Mr. Steese just gave a five-minute explanation of the

17   spreadsheet and that's not included in the disclosures,

18   right.  I think one of the reasons behind the rule is that

19   the parties are entitled to get a summary of any facts and

20   opinions that are going to be testified to so that they can

21   adequately prepare for both deposition and trial, so that

22   wasn't provided.  It was provided earlier at this hearing.

23           THE COURT:  Wait a second.  Tell me one thing you

24   just heard that you didn't know before.

25           MR. BENSON:  Well, for one, I mean, there are these

19

1    acronyms here that could mean a number of things.  I think

2    that's one thing.  Another thing, and I would like to point

3    out in column F, Your Honor, there is 50 percent of OTT

4    credit.  Underlying that we believe is an opinion that

5    Ms. Torres will give regarding as to why it's 50 percent and

6    not some other percentage.  We have no way of knowing what

7    facts have led Level 3 to put 50 percent of OTT credit

8    whereas not 75 or 100 percent as AT&T believes is the correct

9    number under the settlement agreement for 2015.

10          THE COURT:  Okay.  You're saying that 50 percent is

11   not something that in this industry is typical?  It's just

12   subject to somebody's opinion?

13          MR. BENSON:  Absolutely, Your Honor, that was 100

14   percent the point.

15          And then in AR Summary tab, Your Honor, if you take

16   a look at that one, in column C and D, there are rate

17   elements that have literally nothing to do with the matter at

18   hand here, the litigation, DEOT usage credits and debits,

19   DEOT LPC credits.  AT&T, and we have spent time looking at

20   this spreadsheet, is not sure why these columns are in this

21   spreadsheet when it comes to damages.  We are entitled to

22   know under the rule what are the facts and opinions that led

23   Ms. Torres to include this in her spreadsheet.

24          Another example -- and we've spent time, counsel

25   for  AT&T trying to figure out how columns H and G were

20

1   calculated.  If you hover over -- and, you know, I'm not a

2   spreadsheet person, Your Honor, and I'm not sure if you are,

3   but if you hover over column G, row 2, you can see the

4   formula, there is a number that appears there.  We do not

5   know where that number comes from.  We do not know -- AT&T

6   does not know what facts underlie that calculation.

7           Further, AT&T doesn't know why it appears that late

8   payment charges are not included in column J, the total

9   damages.  That is an opinion and a fact that we are entitled

10  by the rule to a summary as to why that decision was made.

11          This is a spreadsheet, it's not a summary, and the

12  case law, I believe it's Nicastle makes clear that a summary

13  is needed, not just a citation to a large body of information

14  which is included in the spreadsheet.  So (inaudible) Exhibit

15  1 and we can talk about Exhibit 2 separately, but that's

16  AT&T's position on this issue, Your Honor.

17          THE COURT:  Okay, but you'll agree with me then,

18  absent those few things that you said -- that you say, and

19  I'll accept your representation in good faith that you didn't

20  understand the acronyms, the OTT percentage rationale and the

21  DEOT usage credit debits, if you had -- if you had understood

22  everything on these spreadsheets, I guess you wouldn't be

23  having this conversation; is that correct?

24          MR. BENSON:  Actually, Your Honor, I don't think

25  that's the case.  I think -- I think the case law in the

1    District of Colorado is clear that citation to records or

2    large body of information, and it would be our argument that

3    this is a large body of information, (inaudible) information,

4    is not sufficient, it's not a summary that's required under

5    the rule.  You know, it's one thing to say that we understand

6    the spreadsheet, but it's another to be provided with a

7    disclosure that the rule requires.

8              THE COURT:  Right, but she's not citing to

9    anything, she's including it.  I mean, she's providing it,

10   right?  She didn't cite to some other document that is

11   already in the record or some compilation of documents.

12   She -- she included this spreadsheet with her disclosure.  Am

13   I misunderstanding that?

14             MR. BENSON:  No, you're absolutely correct, Your

15   Honor, and I think that makes the point for us, that this is

16   a spreadsheet that was tacked on to the disclosure which is

17   one sentence and says that the subject matter will be, among

18   other things, damages.  That's no a summary certainly, it's

19   one sentence.  And then it cites to including, but not

20   limited to Exhibit 1.

21             THE COURT:  Right.  Well, I agree with you in the

22   sense that you can't say "among other things."  As far as I'm

23   concerned, Ms. Torres is going to be able to testify about

24   damages, that's it.  If there is another subject matter she

25   wants to testify about, that has to be disclosed.  That's

1   pretty basic.

2            But I mean, I agree that a summary -- obviously I

3   agree that a summary of the facts and opinions is necessary.

4   And by the way, I don't think there is a policy or practice

5   in this district.  I think you probably found some cases in

6   the district, but, you know, there should be some kind of

7   uniform standard nationwide on how Rule 26(a)(2) is applied.

8   So I would just like to do whatever the best practice is, not

9   what other people in this district have done.

10           So I agree with you, let's apply the law and read

11  it in its normal understanding of the words that are used, a

12  summary of the facts and opinions to which the witness is

13  expected to testify.

14           Now, if these bold numbers are her opinions as to

15  what the damages are, well, those are opinions and I think

16  those were properly and adequately disclosed, but if there is

17  some calculation methodology that has gone into it that you

18  don't understand and that it would be beneficial to

19  understand in advance of a deposition so that you can

20  adequately prepare, that I agree with.  So I need to know

21  exactly what you need.

22           I mean, just to say it's not enough is not going to

23  move the ball appropriately, in my view.  I don't want to get

24  back together with you guys if I don't have to.  So tell me

25  exactly what you believe should be provided and I'll hear

1   from Mr. Steese and then we'll see what has to be done.

2           MR. BENSON:  Thank you, Your Honor.  So I think

3   primarily, at least on Exhibit 1, column F, the opinions and

4   facts underlie why it's a 50 percent credit and not some

5   other percentage I think is a primary one.

6           THE COURT:  Okay.

7           MR. BENSON:  That's on the Credit and Debit.  On

8   the AR Summary, Your Honor, again, I think column C and D, we

9   are unclear as to why that has been included, so we would

10  like to know why the facts and the opinions that underlie the

11  inclusion of column C and D.  Those are two main issues.

12          Column G and H, again, we're unclear as to how --

13  and you know, there was no acronym that's being provided.  We

14  can surmise that LPC is late payment charge, but, you know, I

15  would leave it to Mr. Steese to correct me if I'm incorrect,

16  but we're unclear how column G was calculated.  We don't know

17  what facts underlie column G.  It appears to be a formula

18  that is column D plus some number.  We don't know what that

19  had number is, Your Honor.  And so that as a result affects

20  column H.  We're not sure what the balance due less LPC

21  because we don't understand how column G was calculated.

22          Finally, you see in column G -- J, excuse me, it's

23  the balance due, column F, plus column I, OTT net credit.

24  Well, we assume that OTT net credit is tied back to the

25  credit and debit tab.  We're not exactly sure.  And we're not

1   exactly sure because we don't understand why the late payment

2   credit or charges were not included in J.

3          So as you can see, there is some confusion, we're

4   making a good faith effort to understand the spreadsheet, but

5   there is significant confusion because we don't have a

6   summary of it, Your Honor.

7          THE COURT:  Okay.  Well, J is definitely, as you

8   can see the formula, F2 plus I2.  You know that, right?

9          MR. BENSON:  That's right, Your Honor.  And the

10  confusion lies with -- and this is we believe an opinion that

11  Level 3 will take, but we're not sure, why H was not

12  included -- or excuse me, G, why total OTT, late payment

13  charges, and how H was arrived at, but that's where the

14  confusion lies on that point, Your Honor.

15         THE COURT:  Okay, I understand.  Mr. Steese.

16         MR. STEESE:  Yes.  A couple things, Your Honor.

17  One is we encourage this very kind of discussion and had it

18  with respect to Mr. McClure's disclosure, and AT&T then told

19  us they weren't going to tell us what they wanted clarified,

20  which was odd to me.

21         In terms of the 50 percent, the contract itself

22  between AT&T and Level 3 specifically says 50 percent will be

23  refunded.  So 50 percent comes directly from the written

24  contract between the parties.

25         THE COURT:  Oh, wait a second, but Mr. -- hold on,

1  Mr. Steese.  It's clear that Mr. Benson wants your expert to

2  say these things and not just hear it from you on the phone.

3  So don't you agree that this is kind of the minimal, not

4  burdensome explanation that you could give in, say, a kind of

5  a letter update from your expert?

6         MR. STEESE:  The answer is absolutely, and we said

7  we would be willing to do that.  The notion that they're not

8  understanding is interesting, especially given that it's in a

9  contract, but we had said all along we would be willing to do

10  that, but they said they weren't willing to help us cure the

11  problems and that they thought this was inadequate even with

12  those additional written disclosures and so we had no choice

13  but to come to Your Honor, we apologize for that.

14         But sure, we would be happy to put together a few

15  sentences for Ms. Torres to spell that out.

16         THE COURT:  Right, but even when -- even when an

17  expert is testifying something that maybe you guys could

18  figure out is from the contract or something like that, it

19  needs to be put in a form that is usable under the rules of

20  evidence, so an expert disclosure is that sort of form.  So

21  even though it may be information everybody already assumes,

22  it's still appropriate to put that in that sort of an update.

23         So please -- you heard the same thing I did from

24  Mr. Benson.  Would you please just supplement in those minor

25  ways through some kind of letter update of the report, okay.

1          MR. STEESE:  Yes, Your Honor.

2          THE COURT:  All right.  All right, now, I think

3     we're on the next expert, correct?

4          MR. BENSON:  Your Honor, if I could just make one

5     last point on the 50 percent, and I think that this would be

6     helpful for Level 3 for purposes of disclosure.  The 50

7     percent is a disputed issue, Your Honor.  It's AT&T's

8     position that it's 100 percent that is due and that is

9     because of the fact that the the D.C. Circuit issued an opinion

10    and we don't need get into the specifics that became final

11    back in -- many years ago, so just wanted to make that one

12    point, Your Honor.

13         THE COURT:  Understood, but apparently they're

14    taking a little different position, so you probably

15    understand that too, right?

16         MR. BENSON:  Absolutely, Your Honor.

17         THE COURT:  Okay.

18         MR. BENSON:  So if Your Honor -- we can switch to

19    Exhibit 2.

20         THE COURT:  Yeah, but is what I just said, my view

21    of the world equally applicable to Mr. McClure or is his

22    something different?

23         MR. BENSON:  I think the broad themes, Your Honor,

24    are the same, but I would like to make the point, and because

25    Level 3 has made it earlier that because somehow we've

1    already deposed Mr. McClure on, I'll grant, a similar

2    spreadsheet, that that somehow makes this spreadsheet

3    sufficient.  It's over ten tabs long, Your Honor, and I

4    honestly don't think that on the phone with you it would be

5    prudent to go through the various columns and try to make --

6    to tell you what we think needs to be supplemented.

7            And just to make clear, it is true that Level 3

8    asked AT&T to provide a list of what they called

9    clarifications, but I think that that kind of underlines the

10   pointed that we're trying to make, Your Honor, that the rules

11   requires Level 3 to disclose what opinions and facts are

12   going to be at issue.

13           So what we just did, the exercise we just did for

14   the damages spreadsheet was we were telling you what we

15   thought needed to be clarified.  That isn't necessarily us

16   saying that those are the opinions and the facts that the

17   witness is going to provide during testimony.

18           And so when you look at Exhibit 2, which is a

19   significantly larger spreadsheet with ten tabs, you know,

20   it's difficult, if not impossible, for AT&T to somehow

21   anticipate what the facts and opinions are that Level 3's

22   witness is going to offer at deposition or at trial.  That is

23   kinds of the point in which AT&T is trying to make when we --

24   it's not that we didn't want to cooperate with Level 3 and

25   avoid trying to take up the Court's important time, was that

1    we didn't think we were able to do so.  And I think that

2    that's only magnified with Exhibit 2.

3           You know, it is true that we've deposed Mr. McClure

4    on a similar analysis, but that being said, we've never seen

5    this spreadsheet, there are different numbers, there are

6    columns that were included in the prior spreadsheet that are

7    no longer in this spreadsheet.  Level -- AT&T has no way of

8    knowing why those are missing, and those are facts, in AT&T's

9    opinion, and what led Level 3's expert to take the opinion

10   that those facts are no longer relevant to the analysis I

11   think is a sum of our position on Exhibit 2.

12          THE COURT:  Okay.  Well, what I just heard was

13   this:

14          Your view is that their disclosures are inadequate,

15   and their view is we think they're adequate, but you tell us

16   where it's inadequate, and then your view back is, Hey, I

17   don't have to tell you that, that's your job just to do a

18   proper disclosure.  So -- which is fine, I guess, but if you

19   can't work it out, I've got to make the call.

20          And so I think the most efficient way to proceed

21   would be for you to point out specific areas that you

22   seriously do not understand or an explanation of why they did

23   it in a certain way, have that supplemented before your

24   deposition so that you can adequately prepare for the

25   deposition and then that's the same process, except why don't

1    you go ahead and provide those areas where you think it's

2    inadequate specifically in some kind of written format so

3    that they can respond with an update.

4           MR. BENSON:  Okay.  Just so I'm clear, Your Honor,

5    I can give our main points right now?

6           THE COURT:  That's fine, if you can do it in a

7    short time, just like we did the previous one, go ahead.

8           MR. BENSON:  Sure, Your Honor.

9           So one point of clarification that we need, and

10   there may be others and we're happy to supplement them in

11   writing, but frankly, previously Level 3 had a column in its

12   main summary tab that purported to show the percentage of

13   Level 3's telephone numbers that were at issue, and that

14   column is no longer in this spreadsheet as far as we can

15   tell, and we looked in good faith, but as far as we can tell,

16   that is no longer in here.

17          We don't understand why and what facts and opinions

18   led Level 3 to not include that spread -- that column, and

19   that column has significant implications for the factor, the

20   percentage of AT&T traffic in that case.  So that's one --

21   one issue.

22          Also another issue, the percentage of OTT, which is

23   in column B on the first tab, there are different percentages

24   that were included here than what was included in the prior

25   spreadsheet, versions of the similar analysis.  So we're

30

1   unclear as to how -- how those percentages were calculated

2   and frankly how did Level 3 get those percentages.

3            We -- in a deposition, Mr. McClure, we were told

4   that they used the check-box features on various customers to

5   ask some unnamed person what the percentage was.  We

6   obviously thought that that was not an adequate way to figure

7   out percentage of OTT, so we're interested to know whether or

8   not they did something else, which is a fact that we would

9   expect it to be summarized.

10           Those are the main points and we're happy to

11  supplement in writing, but that's the main points, Your

12  Honor.

13           THE COURT:  Well, I don't know anything about your

14  litigation and I think I understood it, so go ahead, Mr.

15  Steese.

16           MR. STEESE:  Your Honor, before -- these are two

17  points that we did discuss in our meet and confer and I

18  explained them both already, and so we have two that I'm --

19  that's given in detail.  And so we have no difficulty taking

20  these two items and putting them in a supplemental letter,

21  supplement, as you suggested for Ms. Torres, and doing the

22  same thing for Mr. McClure.

23           THE COURT:  Okay, thank you, excellent response.

24  Anything else we need to do?  Mr. Benson?

25           MR. BENSON:  No, Your Honor, thank you very much

1    for your time.

2              THE COURT:  Thank you, guys.  Hope you guys are

3    healthy.  How about you, Mr. Steese?

4              MR. STEESE:  Thank you.  Nothing more and I hope

5    you're healthy as well, Your Honor.

6              THE COURT:  Well, I don't know how I could get sick

7    when there is nobody in the courthouse, so I'm pretty

8    protected, but -- but I think it is starting -- honestly,

9    it's starting to come home a little bit as I'm now finally

10   hearing about people I know who have gotten this thing and

11   even hearing about a sailor on an aircraft carrier that died.

12             And it's -- I always took it seriously, but

13   honestly thought mostly older people died, and now it's

14   becoming clear that there are just some people who are

15   susceptible to this thing in a way that is very, very

16   dangerous, so I think we're probably doing what we need to

17   do, although it's horrific, but this is a scary thing.  So I

18   don't know.  Do you guys have that same sense?

19             MR. STEESE:  I had a phone call with opposing

20   counsel where he said, unbeknownst to me, he had the virus

21   and he went through two weeks of just horrible health issues,

22   but he is doing fine now.

23             And I will say that I felt the same the last couple

24   of times I've gone to the grocery store for the family, you

25   know, it really puts a lot more caution in your mind than you

32

1    normally have, and everyone needs to be safe and hopefully

2    we'll get through it and we'll learn a lot from it, and hope

3    that this never comes up again.  Hopefully it doesn't, but if

4    it does, we'll know how to handle it well.

5           MR. BENSON:  Your Honor --

6           THE COURT:  Go ahead.

7           MR. BENSON:  -- I would just say, first off, I'm

8    sorry that you found out that you know people that have the

9    illness and, you know, I hope they're okay.  And the same

10   goes for Mr. Steese.

11          You know, I was in Washington, D.C., and I think

12   it's kind of very interesting to see what's going on in the

13   neighborhood in which I live in and, you know, downtown,

14   obviously where our offices are where I'm not going and

15   trying to figure out, you know, what an appropriate thing to

16   do is.  I've been home for six weeks at this point, so it

17   has -- these are very, very extraordinary times, of course,

18   and just best wishes to everybody.

19          If Your Honor may, there is one issue that we

20   haven't talked about in closing.  It's just the timing on the

21   schedule.  I just want to make sure we can maybe discuss that

22   before Your Honor goes off the record.  And, you know, we

23   would just ask that maybe if Your Honor was okay with it,

24   that you would grant us three additional weeks to -- to put

25   the rebuttals because now we anticipate that there will be a

1  deposition there and then the disclosure deadline and then

2  the dispositive motion deadline, and I can provide those

3  dates, if that would help, Your Honor.

4           THE COURT:  No.  I think anything you guys can

5  stipulate to, I'll bless.  Okay?

6           MR. BENSON:  Okay.

7           THE COURT:  I mean, if you guys can arrive at

8  something that's best for the case, then it's best for me as

9  well.  All right?

10          MR. STEESE:  Thank you, Your Honor.

11          THE COURT:  All right, thank you, you guys.  Take

12  care.

13          MR. BENSON:  Okay, hope you have a nice day.  Thank

14  you, bye-bye.

15          (Whereupon, the within hearing was then in

16  conclusion at 2:17 p.m.)

17

18

19

20

21

22

23

24

25

34

1                    TRANSCRIBER'S CERTIFICATION

2      I certify that the foregoing is a correct transcript to the

3      best of my ability to hear and understand the audio recording

4      and based on the quality of the audio recording from the

5      above-entitled matter.

6

7      /s/ Dyann Labo                    April 15, 2020

8      Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25