# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00112-RM

AT&T CORP.,

 Plaintiff/Counter Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

 Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNCATIONS, INC., and WILTEL COMMUNICATIONS, LLC

 Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.

 Counterclaim Defendant

---

## EXPERT REPORT OF PENN PFAUTZ

---

 I, Penn Pfautz, under penalty of perjury, hereby swear and affirm the following based on personal knowledge:

### WITNESS BACKGROUND

1.  I am a self-employed independent consultant. My business address is 10692 Vista Del Agua Way, San Diego, California 92121.  I received a B.A. in Psychology from Antioch College in 1973 and an M.S. (1975) and Ph.D (1980) in Experimental Psychology from Yale University.  After serving as a Visiting Instructor at Purdue University, I joined Bell Labs as a

1

Highly Confidential - Attorney's Eyes Only

Member of the Technical Staff in 1980.  Following Divestiture of the Bell System I worked for various AT&T companies in a several different areas.  From 2004 until my retirement from AT&T at the end of 2017, I was a Technical Consultant/Director in AT&T Access Management focusing on next generation network interconnection strategy in addition to consulting on network access and numbering issues.  I have filed testimony and/or appeared in regulatory proceedings on matters involving network design and network operations in several cases at state regulatory commissions, including California, Delaware, Illinois, Indiana, New Hampshire, and Texas.  My resume is attached as Exhibit PP-1.  I am being compensated at the rate of $250 per hour plus out of pocket expenses on an as-incurred basis.

## SUMMARY OF OPINIONS

2.      I have been asked by AT&T Corp. ("AT&T") and Teleport Communications Group, Inc. ("TCG") to assess various methods for identifying and billing charges associated with a type of telephone call, known as "over-the-top" Voice over Internet Protocol ("VoIP") calls.  The charges involve a service known as "switched access service," which a local carrier can sometimes bill to a long distance carrier on certain long distance calls.

3.      In this case, AT&T contends that it has been overcharged by Level 3 Communications, LLC ("Level 3") for these over-the-top VoIP calls for which Level 3 bills switched access services to AT&T.  In turn, Level 3 and some of its affiliates (collectively, "Level 3") claim that they have been overcharged by AT&T and TCG on over-the-top VoIP calls for which TCG bills switched access services to Level 3.

4.      The Federal Communications Commission ("FCC") issued rules to address the appropriate switched access charges on over-the-top VoIP calls, and it recently issued an order addressing those rules.  As explained below, it is my understanding that the FCC has generally prohibited local carriers from billing a particular type of switched access charge—called local or

2

Highly Confidential - Attorney's Eyes Only

"end office" switching—on over-the-top VoIP calls, where the local carrier does not route the call to or from the premises of an end user. The local carrier can usually bill a different type of switched access charge—known as a tandem switching charge—on over-the-top VoIP calls.

5.      Local carriers, however, cannot always readily distinguish between over-the-top VoIP calls and other types of calls. In order to bill accurately, local carriers can use a variety of methods to identify and track over-the-top VoIP calls. In some cases, the local carriers will examine data about some of their calls, and attempt to develop a "factor" for use in billing over-the-top VoIP calls. In general, when such factors are used, the process for developing the factor should be documented, and able to be replicated or verified by the other party.

6.      ***Level 3's Charges To AT&T***. I have reviewed Level 3's methodology for identifying over-the-top VoIP calls, which Level 3 conducted in 2017. My opinion is that the method Level 3 used to estimate the over-the-top VoIP traffic of unaffiliated third party VoIP providers was unreasonable. Further, Level 3's methodology almost certainly understated the proportion of that traffic billed by Level 3.

7.      Level 3 serves ordinary business customers, but it also partners with unaffiliated providers of retail over-the-top VoIP calling services. Level 3's methodology looked at its customer base in certain periods, and examined the total number of minutes of traffic for which it billed end office switching. It then attempted to estimate the percentage of those minutes that involved over-the-top VoIP calling by identifying the customers that it believed handled over-the-top VoIP calls. For this method to produce an accurate factor for over-the-top VoIP calls, the measurements (*e.g.*, the overall end office switching minutes and the number of minutes associated with over-the-top VoIP calling) need to be accurate. However, as described below, I found significant problems with the measurements.

Highly Confidential - Attorney's Eyes Only

8.    ***AT&T/TCG's Charges To Level 3.***  I have also considered how AT&T/TCG have billed Level 3 for switched access services on over-the-top VoIP calls.  My opinion is that the method AT&T/TCG used to estimate over-the-top VoIP traffic is reasonable.



4

Highly Confidential - Attorney's Eyes Only

## MATERIALS CONSIDERED

12.     In performing my assignment and developing my opinions, I relied upon my years of experience in the telecommunications industry, including my experience with switched access charges.  I also reviewed various decisions by the FCC and the courts, as well as the tariffs of Level 3.  In addition, I examined and relied on a variety of materials specific to this case.  These include various legal pleadings, discovery responses, deposition testimony by witnesses for Level 3 and for AT&T/TCG, and various documents produced by Level 3, by AT&T/TCG, and by some third parties.

13.     In particular, to review Level 3's methodology for identifying over-the-top VoIP calling, I examined in detail various spreadsheets created by Level 3.  These are marked as Exhibits PP-2 and PP-3.  Likewise, for the AT&T/TCG methodology for identifying over-the-top VoIP calling, I examined in detail spreadsheets created by AT&T/TCG.  These are marked as Exhibits PP-4 and PP-5.[1]

## BACKGROUND

14.     ***Switched Access Service***.  The charges at issue in this case are switched access charges.  Switched access charges are a form of compensation between a local exchange carrier ("LEC") and long distance carrier (also known as an interexchange carrier or "IXC").  Traditionally, when the customer of an IXC placed or received a long distance call, the call would

---

[1] Because of the large size of the exhibits PP-2, PP-3, PP-4 and PP-5, I am not attaching them to this report, but I understand that these exhibits have been previously produced in this case with the following identification numbers: PP-2—CTL_0003829; PP-3—CTL_0014135; PP-4—ATT_PROD_0014675; PP-5—ATT_PROD_0014682.

Highly Confidential - Attorney's Eyes Only

first travel from the customer's home or business over the local network of the LEC, which would then hand the call off (sometimes via another LEC) to the IXC. The IXC would carry the call over its network, and would often hand the call off to a LEC, which would then complete the call to the called party.

15.     Under a system regulated by the FCC, the LECs traditionally could bill the IXCs for switched access service, for the functions associated with carrying the long distance call over the LECs' networks. In the example above, the first LEC would bill the IXC for "originating" access service; the second LEC would bill the IXC for "terminating" access service.

16.     The access services of LECs are typically divided into segments, known as "rate elements." Traditionally, one of the most expensive rate elements was associated with "end office switching." End offices are switches that typically are used to connect calls directly to the home or business of the LEC's customers, over wires or fibers known as "loops" that run between the end office and the customer's premises. In short, the end office and the loop provide "last-mile" connectivity to an end user, *i.e.*, a home or business.

17.     The other most relevant rate element for switched access service is known as tandem switching. A tandem switch is a switch that does not connect directly to end users, and instead it connects calls between switches. For example, a caller from one part of the city may dial a caller on the other side of the city. A LEC would use end office switches to serve the two callers, and might use a tandem switch to connect the two end offices. Likewise, on a long distance call, the IXC may connect first with a tandem switch, and then the LEC's tandem switch routes the call over trunks to the end office serving the caller. In short, tandem switching typically provides an intermediate function.

Highly Confidential - Attorney's Eyes Only

18.     It is my understanding that, under longstanding rules of the FCC that apply to traditional calls, end office charges are not appropriate when a local carrier like Level 3 does not originate or terminate calls to end users.  When a local carrier does not originate or terminate a call to its own end users, and instead merely passes a call from another local carrier's end user to a long distance carrier, then tandem switching charges are appropriate.  *Access Charge Reform*, 19 FCC Rcd. 9104 (2004), ¶ 21 (the appropriate rate for billing "is the end office switching rate when a competitive LEC originates or terminates calls to end-users and the tandem switching rate when a competitive LEC passes calls between two other carriers").

19.     ***VoIP Calling***.  Traditionally, voice telephone calls were completed using circuits that were established for each call.  However, advances in technology made it possible for voice calls to be completed using "Internet Protocol" technology—what I have referred to as "VoIP" calls.  Rather than using a single circuit, a VoIP call is divided into many packets, and each packet is routed dynamically, and then "re-assembled."  In general, VoIP calls typically require the callers to have high-speed broadband Internet access and devices that can send and receive VoIP calls (*e.g.*, computers or smartphones); traditional telephone sets cannot ordinarily be used.

20.     VoIP calling can be categorized as either "facilities-based" or "over-the top."  In a facilities-based service, a provider of VoIP calling deploys its own high speed broadband facility to its customer's home or business.  An example would be a cable company or a telephone company that offers a combined package of broadband internet service plus voice calling service.

21.     A provider of over-the-top VoIP calling does not deploy its own high-speed broadband facility to the customer's home or business.  Instead, the over-the-top VoIP provider requires that its customers separately obtain their own high speed broadband internet connection from a third party—such as a cable company.  The over-the-top VoIP provider then typically sells

Highly Confidential - Attorney's Eyes Only

software or other equipment to its customers, and the customers can use the software-equipment, in conjunction with the separately purchased internet broadband facility, to place or receive voice calls.  Vonage is a well-known provider of over-the-top VoIP calling services.

22.     Over-the-top VoIP providers often choose to partner with a LEC when providing voice calling services.  Traditionally, this was in part due to the fact that VoIP providers could not obtain telephone numbers for use by their customers, and the providers partnered with LECs to obtain telephone numbers.  In addition, over-the-top VoIP providers would not necessarily be able to complete calls to callers using traditional telephone equipment that did not use IP facilities but instead used the public switched telephone network ("PSTN").  A partnership with a LEC that is connected to the PSTN would enable such calls to be completed.

23.     *FCC Reform*.  In 2011, the FCC began to reform its rules for switched access services.  My understanding is that the FCC stated that it ultimately would adopt a new system, known as "bill-and-keep" to replace over time the switched access system.  Under bill-and-keep, a carrier "bills" its own customers and "keeps" the revenue, rather than billing other carriers for service when calls are handed off.  Rather than immediately move to bill-and-keep, the FCC adopted a gradual transition.

24.     Under its transition, the end office switching access charges for terminating calls were moved to bill-and-keep as of mid-2017.  What this means is that a LEC no longer bills an IXC for end office switching when completing a long distance call.  Tandem switching access charges remain in place, except in certain circumstances such as when the LEC that owns the end office also owns the tandem switch.  Originating access charges—both end office and tandem switching—have not yet moved to bill-and-keep.

8

Highly Confidential - Attorney's Eyes Only

25.    ***Rules For VoIP Calling***.   In addition to its overall reforms of switched access services, the FCC in 2011 also adopted rules for the appropriate compensation to be paid on VoIP calls that also connected to the PSTN.  As noted above, many retail providers of VoIP calling partnered with LECs.  It was uncertain whether the LECs could properly bill access charges for the work done by the VoIP calling provider, and not by the LEC itself.  In its 2011 rules, it is my understanding that the FCC stated that a LEC could bill for access services, even if the services related to functions performed by the LEC's VoIP calling provider-partner, and not the LEC itself.

26.    For facilities-based VoIP providers and their LEC partners, it is clear that these entities are providing services equivalent to end office switching.  In facilities-based VoIP, the VoIP provider or the LEC would deploy a high-speed broadband facility to the customers' homes or businesses—similar to what occurred with a traditional end office that connects to a home or business using a loop facility.

27.    As I understand it, a dispute arose as to whether end office switching access charges were appropriate for over-the-top VoIP traffic.  AT&T and other companies asserted that end office charges were not appropriate; other companies, including Level 3, claimed that end office charges were appropriate on over-the-top VoIP calling.

28.    In 2015, it is my understanding that the FCC issued an order ruling that end office charges were appropriate on over-the-top VoIP calls, but that order was overturned on appeal.  It is also my understanding that, in December 2019, the FCC issued another order, this time stating that LECs could assess end office switching access charges "only if the LEC or its VoIP partner provides a physical connection to the last-mile facilities used to serve an end user."  Order, FCC 19-131, 34 FCC Rcd. 12692 (2019).  Based on this Order, it is my understanding that end office

9

charges are not appropriate on over-the-top VoIP calls, because on such calls the end user must separately obtain a high speed broadband connection.

29.      The FCC also noted that in some cases there could be disagreements as to whether a particular call did, or did not involve, over-the-top VoIP calling, but found that in most cases "the two can be distinguished with relative ease."  Order, para. 23, n.62.  If that was not possible, the FCC stated that "providers may choose to use a variety of different methods to identify and track compensable VoIP-PSTN traffic for billing purposes."  *Id.*  The FCC cited a discussion in a prior order, and in that order it stated that carriers could require other "carriers delivering traffic for termination to identify the percentage of traffic" governed by the FCC's VoIP rules, and to support those figures with traffic studies or other reasonable analyses that are subject to audit.  *Id.* para. 23 n.62; *Connect America Fund et al.,* FCC 11-161, 26 FCC Rcd 17663, para. 963 (2011). The FCC in its 2011 order also noted that such a framework is used in some cases to distinguish between interstate and intrastate traffic—what is known in the industry as a "percent of interstate use" or "PIU" factor.

## ASSESSMENT AND OPINIONS REGARDING THE PARTIES' METHODOLOGIES FOR IDENTIFYING OVER-THE-TOP VoIP CALLS

30.      ***Description of Level 3 Estimates of Over-the-Top VoIP.***  Level 3 conducted an analysis of its over-the-top VoIP traffic in or around 2017.  They examined their traffic at four time periods, the latest being July, 2017.  As explained in more detail below, what Level 3 attempted to do was to measure the total number of calls and minutes of use for each customer, and for which Level 3 billed AT&T for end office switched access services.  Level 3 then attempted to determine which of these customers were involved in over-the-top VoIP calling, and to develop an estimate for each such customer of the percentage of traffic that Level 3 believed consisted of over-the-top VoIP calling.  This led to an estimate of the total number of minutes Level 3 billed to

Highly Confidential - Attorney's Eyes Only

AT&T that involved over-the-top VoIP calling. Level 3 developed a factor by dividing that total number of estimated over-the-top VoIP calling minutes of use by the total number of end office minutes of use.

31.     Level 3's calculations in the periods it examined ultimately led to a factor of between 13% and 26%. Level 3's analysis examined both terminating and originating switched access services. However, because the terminating end office switched access rate was transitioned to bill-and-keep as of mid-2017, after that date, the focus would be on the originating end office access charges, and the percentage of originating traffic that consists of over-the-top VoIP calls.

32.     ***Description of Level 3's Spreadsheets Used To Estimate the Factor.*** The Level 3 estimates of OTT minutes of use as provided in spreadsheets Exhibit PP-2 and Exhibit PP-3 are computed as follows. First, as shown below, which is an excerpt from the "ATT EO OTT Usag" tab in Exhibit PP-3, Column J shows the End Office Minutes of Use ("EO MOU") for Level 3 customers. This number is derived by multiplying total Minutes of Use ("MOU") recorded by Level 3 to or from AT&T (shown in Column K) by the "Percent Level 3" shown in Column F.[2] This calculation is necessary because only calls to or from telephone numbers provided by Level 3 are subject to end office switching charges by Level 3. Second, end office minutes are multiplied by the "OTT %" shown in Column L, which as described below is a Level 3 estimate, resulting in the estimate of the over-the-top VoIP minutes carried by Level 3—those minutes which are at issue here in Column M.

---

[2] Outbound minutes from Level 3 customers' end users terminating to AT&T end users are tallied separately from those involving calls originating from Level 3 customers' end users and terminating to toll free (8YY) numbers handled by AT&T. Given the completion of terminating switched access reform, only charges for 8YY MOU are at issue.

Highly Confidential - Attorney's Eyes Only

| D | E | F | G | H | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|
| CUSTOMER_NAME | End Office Level 3 | Percent Level 3 | IXC_TG_TYP | IXC | CDR | EO MOU | MOU | OTT % | OTT Usage |
| Sprint - Alt Tandem | | 0% | TANDEM CONNECT | ATT IXC | 53039874 | - | 262,722,894.58 | 0.00% | - |
| Comcast Corporation | | 5% | TANDEM CONNECT | ATT IXC | 10956332 | 1,885,192.36 | 37,703,847.28 | 5.00% | 94,260 |
| Wide Voice, LLC | | 0% | TANDEM CONNECT | ATT IXC | 4133269 | | 27,532,257.20 | 100.00% | - |
| Level 3 Communications fT | | 100% | TANDEM CONNECT | ATT IXC | 8518222 | 24,525,708.07 | 24,525,708.07 | 50.00% | 12,262,854 |

33.     The accuracy of Level 3's estimates of OTT traffic thus depend crucially on three factors: the end office minutes of use (Column J), the percentage of Level 3 TNs (Column F), and the percentage of OTT (Column N).  If the estimates of the percentage of over-the-top VoIP traffic for Level 3's customers are not accurate—for example, if they are too low—then the total number of over-the-the top VoIP minutes of use (the numerator used in calculating the factor) will be understated, and the resulting factor will be too low.  Likewise, if either the percentage of Level 3 telephone numbers or the end office minutes of use is not accurate (for example, if they are too high), then the denominator used in calculating the factor will be too high, and the resulting factor would be too low.

34.     The determination of each of the numbers in these columns was described in the deposition of Andrew McClure, who I understand was testifying on behalf of Level 3 as to the creation of these spreadsheets.   Mr. McClure testified that he had no knowledge of how the percentage of Level 3 Telephone Numbers ("TN") factors were developed.  *See* Exhibit PP-6 at 47:14–48:22.  He stated that the estimate in Column F of the Percent Level 3 TN was provided by another Level 3 employee, Ed Stocker.  *See* Exhibit PP-6 at 43:9–16.

35.     Mr. Stocker testified that he provided the Percent Level 3 TN factors to McClure based on the estimates provided by the sales director for each customer.  It remains unclear whether the sales directors gathered any data or performed any calculations to derive the estimates or whether the estimates were just based on their impressions.

36.     The "OTT Percentage" figure was developed by Mr. McClure.  He did so by contacting or examining the websites of the Level 3 customers associated with the top 90% of end

12

Highly Confidential - Attorney's Eyes Only

office minutes and inquiring about the percentage of OTT traffic, at least in those cases where the customer's business model was not otherwise believed to be entirely OTT.  The resulting figure was then applied to all end office traffic. Contacts were made by using "click-to-chat" on customer websites or by phone call.  No notes were taken, and no documents were created, beyond the percentage entered into the spreadsheet, which was sometimes rounded up.  The position and responsibilities of the party responding to Mr. McClure's query within the customer organization was not known to Mr. McClure.

37.     ***Assessment of Level 3 Methodology—End Office Minutes of Use.***  In the analysis of the data provided by Level 3, I have accepted as accurate the numbers in Column J, "EO MOU." This appears to represent the number of minutes of use that Level 3 billed the End Office Local Switching element to AT&T associated with the customer listed in Column D.  This should involve a relatively straightforward determination, but, to the extent Column J is not a straightforward application of the "Percent Level 3 TN" figure to the MOU data in Column K, then that would be significant, because this MOU data is a starting point for the Level 3 factor analysis.

38.     I do, however, have questions about the inclusion in all of the MOU certain customers as involving calls for which Level 3 billed AT&T end office switching charges.  As noted above, to the extent Level 3 is merely passing calls from one carrier's end users to a long distance carrier like AT&T, then Level 3 should not ordinarily be billing end office switching charges at all.  Column K indicates the total number of MOU passed to AT&T.  A number of the customers listed in column D appear to be facilities-based carriers that, based on my experience, would have their own end user customers.  For example, customers included in Column D, and for which Level 3 appears to have billed end office switching charges, are Comcast, Cable One, Time

13

Warner Cable, and CSC Holdings, which is associated with Altice USA.  These are cable companies, and cable companies often provide facilities-based telephone services to end users.

39.     Likewise, other customers included in Column D, are facilities-based carriers like One Communications, Inteliquent, Cincinnati Bell, Qwest, Blue Ridge Communications, and wireless carriers like Commnet Wireless and TelCel, and Level 3 has billed AT&T end office access charges associated with these carriers.  If these cable companies or carriers are originating calls from their own end users over their own facilities, and then forwarding them to Level 3 so that Level 3 can route them onto AT&T, then I question whether Level 3 should be billing AT&T end office charges at all even where the telephone number belongs to Level 3.  This would certainly be improper if these carriers or cable companies are themselves billing AT&T end office switching charges on these calls.

40.     To the extent this is occurring, then the total number of end office switching minutes is inflated, resulting in more charges to AT&T.  I am not aware of any data or documentation as to these cable companies or carriers, or as to the arrangements under which Level 3 provides the end office functions for some of these carriers' traffic.  I am also not aware of material that shows why Level 3 included these carriers and cable companies on the list of customers, and why Level 3 billed AT&T for end office switching charges on calls associated with these carrier-customers.  Absent more information, I cannot conclude with certainty that Level 3's end office charges associated with these customers are improper, but it raises questions, and I reserve the right to revise my opinion and report if further information comes to light.  I would note that in earlier exchanges with AT&T it was determined that Level 3 was including charges for wireless minutes which are not eligible for end office switched access services, and those minutes were removed by Level 3.

Highly Confidential - Attorney's Eyes Only

41. ***Assessment of Level 3 Methodology—Percent of Level 3's Telephone Numbers.*** I also have serious issues with Level 3's methodology for determining the figure in Column F, the percent of Level 3's telephone numbers.  The process used for deriving these figures is opaque. We only know that the estimates came from Level 3 Product Management, not how they were developed.  It is in principle possible to come up with a precise number. The Call Detail Records ("CDRs") in Level 3's systems should contain the numbers used on the calls for which End Office minutes might be billed. Level 3 should thus be able to determine what percentage of the TNs making potentially billable calls belong to Level 3, since Level 3 clearly knows its own numbers and number identity is, moreover, available via standard industry databases, such as the Local Exchange Routing Guide ("LERG") and Number Portability Administration Center (NPAC) to which Level 3 has access.  Indeed, it should be possible to determine the corresponding number of minutes of use rather than use a factor.  If an exhaustive analysis is deemed too burdensome then an appropriate sampling methodology could be employed to determine a factor.

42. ***Assessment of Level 3 Methodology—Percent OTT.***  In my opinion, the process described for estimating Percent OTT does not inspire confidence and is flawed. A set of customer contacts were made, but Level 3 followed no documented process and retained no information other than bare estimates.  *See* Exhibit PP-6 at 59:3–61:22.   Level 3's representatives acknowledged that in some cases these estimates were adjusted by Mr. McClure and Mr. Stocker. *See* Exhibit PP-6 at 148:2–18.  Level 3 does not know who was contacted at each company, what organization they were part of, or what knowledge they might be expected to have with respect to the question being asked.  It is far from clear that the respondents researched the issue within their companies before responding.  When asked if Level 3 sales representatives were queried for

15

Highly Confidential - Attorney's Eyes Only

information they might have had about customers' business models and the percentage of OTT calling, Mr. McClure replied in the negative.  Exhibit PP-6 at 139:20–140:4.

43.      Further, there are customer entries shown in Column L as 0% OTT in the spreadsheets where there is reason to believe significant OTT calling may exist.  Prominent examples include Fuze Inc. whose website  states "Connect your sites to Fuze with over-the-top, enhanced OTT, private connectivity, or SD-WAN…"  Exhibit PP-7.

44.      Another example is Freedom Voice, which has a Cloudphone offer that states "Now getting started is a breeze - we ship you the phones ($150+ retail) included with your service, you plug them in to your existing internet connection, and – voila! – you have professional-sounding dial tone and unlimited calling in just minutes."  Exhibit PP-8.

45.      In addition, Sorenson Communications provides Video Relay Service to deaf and hard of hearing customers.  While the connection to Sorenson itself may be facilities based, the connection to Sorenson's end users is over-the-top.

46.      Other approaches than those reported by Mr. McClure to determine the amount of OTT minutes could be employed.  The most accurate would be to have customers identify which Level 3 provided telephone numbers are used for OTT and then query the Level 3 systems to determine the associated minutes of use.  While it is understood that some numbers may only be served by OTT some of the time ("mobility" or "nomadic" as discussed in the McClure deposition), these could be dealt with separately from those that are always OTT-served.

47.      Failing a number-by-number approach, the percentage of OTT traffic for a customer could be estimated from the percentage of OTT subscriptions reported by a wholesale customer to the FCC.  The FCC requires various carriers and certain providers of VoIP calling services to report annually to the FCC information about their VoIP subscriptions, which is

16

provided (under oath) on a "Form 477" report.  Level 3 could have asked its wholesale customers to provide the corresponding total of voice subscriptions and the total of OTT VoIP subscriptions, or just the resulting percentage.  While this approach assumes that traffic is proportional to number of subscriptions, Level 3 has otherwise endorsed this assumption, which is a reasonable one.



49.     For enterprise customers, Level 3 should have an understanding of whether or not they provide the underlying facility to the customer and thus whether the traffic should count as OTT.

50.     Finally, traditional practice in the industry is that where factors are employed, they need to be verifiable and auditable, at least on a sample basis.  As discussed in paragraph 29 above, the FCC expects the entity developing the factor to allow the other party  the ability to verify factors in other contexts.  Level 3, however, provides no documentation of the basis for assigning an OTT factor to a customer, not even a record of the interaction with the customer that produced the result, much less any independent data.

**LEVEL 3 COUNTERCLAIMS AGAINST AT&T/TCG**



17

Highly Confidential - Attorney's Eyes Only



53. Measuring such occasional or partial use of OTT by an enterprise customer with a facilities-based connection to a provider may not be feasible since, as all parties concede, there is no marking of OTT calls in the signaling stream used to make call detail records. Failing that, burdensome reporting by the enterprise customers themselves would be required. Further, in the legacy world, there have always been PBX extensions and remote access capabilities and these have not been seen as changing the ability of a LEC or CLEC to charge end office elements for

Highly Confidential - Attorney's Eyes Only

calls making use of such capabilities. Thus, my opinion would be that, except where the enterprise is really acting as a carrier (such as by providing service to unaffiliated parties over the Internet), calls traversing facilities-based enterprise connections not be considered OTT for billing purposes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16 day of March, 2020 in San Diego, California.

_____
Penn Pfautz

Subscribed and sworn to before me this 16 day of March, 2020

_____
Notary Public

19

Highly Confidential - Attorney's Eyes Only

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**                 GOVERNMENT CODE § 8202

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], not Notary)

1 _____

2 _____

3 _____

4 _____

5 _____

6 _____

Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California

County of _San Diego_

BRENT CARPENTER
Notary Public - California
San Diego County
Commission # 2297059
My Comm. Expires Jul 18, 2023

*Place Notary Seal and/or Stamp Above*

Subscribed and sworn to (or affirmed) before me

on this _16_ day of _March_ , 20_20_ ,
         Date              Month              Year

by _Penn  Pfautz_

(1) _____

(and (2) _____ ).
                    Name(s) of Signer(s)

proved to me on the basis of satisfactory evidence to
be the person(s) who appeared before me.

Signature _____
                        Signature of Notary Public

---

──────── OPTIONAL ────────

*Completing this information can deter alteration of the document or
fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

©2019 National Notary Association

M1304-08 (09/19)

Highly Confidential - Attorney's Eyes Only