# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| AT&T CORPORATION, | ) Civil Action File No.: |
| Plaintiff, | ) 18-cv-00112-RM-MEH |
| vs. | ) |
| LEVEL 3 COMMUNICATIONS, LLC, | ) |
| Defendant. | ) |
| _____ | ) |

NON-CONFIDENTIAL PORTION

CONFIDENTIAL ATTORNEYS' EYES ONLY BOUND SEPARATELY

PAGE 148

PAGES 206-214

DEPOSITION OF PENN L. PFAUTZ, PH.D.

VIRTUAL ZOOM

TUESDAY, APRIL 28, 2020

Reported by:

ASHALA TYLOR, CSR #2436, CLR, CRR, RPR

JOB NO. 4083362

PAGES 1 - 236

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3
 4   AT&T CORPORATION,            ) Civil Action File No.:
 5            Plaintiff,          ) 18-cv-00112-RM-MEH
 6         vs.                    )
 7   LEVEL 3 COMMUNICATIONS, LLC, )
 8            Defendant.          )
 9   _____)
10
11
12
13
14
15
16      Deposition of PENN L. PFAUTZ, PH.D., taken via
17   Zoom videoconference commencing at 8:08 a.m. (PST), and
18   ending at 3:05 p.m., on Tuesday, April 28, 2020, before
19   Ashala Tylor, CSR No. 2436, RPR, CRR, CLR.
20
21
22
23
24
25
```

```
                                                          Page 3

 1     APPEARANCES OF COUNSEL:
 2     On behalf of Plaintiff:
 3          SIDLEY AUSTIN LLP
 4          BY:   JUSTIN A. BENSON, ESQ.
 5                MICHAEL J. HUNSEDER, ESQ.
 6          1501 K Street, N.W.
 7          Washington, D.C.   20005
 8          202.736.8757
 9          jbenson@sidley.com
10          mhunseder@sidley.com
11
12     On behalf of the Defendant:
13          ARMSTRONG TEASDALE LLP
14          BY:   CHUCK STEESE, ESQ.
15                DOUG N. MARSH, ESQ.
16          4643 South Ulster Street, Suite 800
17          Denver, Colorado   80237
18          720.200.0676
19          csteese@armstrongteasdale.com
20
21
22     Also Present:
23          Mark Hesse
24
25
```

Page 4

| | | |
|---|---|---|
| 1 | INDEX | |
| 2 | WITNESS           EXAMINATION BY | PAGE |
| 3 | PENN L. PFAUTZ, PH.D. | |
| 4 | Mr. Steese | 7, 124 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 111 | Document titled "In the Matter of Connect America Fund" from Westlaw | 66 |
| Exhibit 112 | Defendant/Counterclaimants' Supplemental Rule 26(a)(2)(C) Disclosure | 134 |
| Exhibit 113 | Defendant/Counterclaimants' Supplemental Rule 26(a)(2) Disclosure | 156 |

Page 5

```
 1    E X H I B I T S (continued)
 2    NO.              DESCRIPTION                                    PAGE
 3    Exhibit 114      Document titled "61.26                          204
 4                     Tariffing of Competitive
 5                     Interstate Switched Exchange"
 6
 7
 8
 9
10
11
12
13
14    EXHIBITS MARKED IN PRIOR DEPOSITIONS:
15    NO.              DESCRIPTION                                    PAGE
16    Exhibit 4        Ardel Burgess Email                             181
17
18    Exhibit 6        Release and Settlement Agreement                182
19
20    Exhibit 7        Email chain, top one from                       185
21                     Kimberly Meola
22
23    Exhibit 21       Release and Settlement Agreement                193
24
25    Exhibit 36       A pdf entitled Exhibit 36                       149
```

Page 6

| | | |
|---|---|---|
| 1 | E X H I B I T S (continued) | |
| 2 | NO.              DESCRIPTION | PAGE |
| 3 | Exhibit 36     Craig John email | 186 |
| 5 | Exhibit 109    Order on Remand and Declaratory | 64 |
| 6 |                Ruling | |

INFORMATION REQUESTED

(None)

QUESTIONS INSTRUCTED NOT TO ANSWER

PAGE 27, LINE 20

PAGE 30, LINE 1

Page 23

1  A.  I did.
2  Q.  Did you review AT&T's complaint?
3  A.  I believe I did.
4  Q.  Did you review Level 3's amended answer
5  and counterclaims?
6  A.  I think.  But, again, I -- I -- you know,
7  beyond orienting myself on the issues, I tended to
8  just focus on so what -- what was the process that I
9  was asked to evaluate and how that worked.  So that
10 was really what, you know, I saw as my charge, and I
11 focused on the things that were most relevant to
12 that.
13      Not being a lawyer, I didn't spend a lot
14 of time on the details of the back and forth.
15 Q.  Did you review the contract, the 2015
16 settlement agreement, between Level 3 and AT&T which
17 is the subject of this lawsuit?
18 A.  I think I did peruse that, yes.
19 Q.  When you were reviewing depositions, did
20 you get all of the exhibits to those depositions and
21 review those as you went through the depositions?
22 A.  Yes.
23 Q.  And you did all that in 30 to 40ish hours?
24 A.  Yeah.  That's -- that's my memory.  I try
25 to when I -- you know, be careful about not, you

Page 127

1  Mr. McClure's new spreadsheet, which was Exhibit 2
2  to the March 2020 disclosures, is it still true that
3  you're accepting as accurate the minutes of use that
4  he puts forward?
5       A.   Well, I had some issues understanding
6  exactly what was in that spreadsheet.  And, again, I
7  accepted those minutes of use, you know, as
8  accurate, you know, with the appropriate caveats
9  that I called out in my report, that there's some
10 carriers that I wondered about.  But basically I
11 think that -- that, you know, I'm accepting that
12 Level 3 has collected minutes for the customers that
13 they say they've collected them for.
14      Q.   And you certainly have no contrary
15 evidence, correct?
16      A.   I do not.
17      Q.   So looking at paragraph 38 of Exhibit 110,
18 you say "I have questions about the inclusion in
19 all" -- I think it means "of all of the MOU certain
20 customers as involving calls for Level 3."
21           That sentence, that's a -- I think there
22 might be a typo in there.  But I'm focused on that
23 sentence, where you wonder whether or not Level 3
24 should be including certain MOUs in its end of -- in
25 its end office charges, correct?

Page 128

1    A.   Right, right.
2    Q.   That particular question that you're
3  raising in paragraph 38, though, is not an OTT
4  question.  That's a question of whether you think
5  those minutes should be included for other reasons;
6  is that true?
7    A.   That's correct.
8    Q.   Some of the companies that you're raising
9  issues with are cable companies, Comcast, Cable One,
10 Time Warner, et cetera, correct?
11   A.   That's correct.
12   Q.   These are Level 3 telephone numbers that
13 Level 3 is billing for, correct?
14   A.   Well, that's one of the things I'd like to
15 be sure that I understand what the relationships are
16 between the carriers and the network arrangements.
17        As I said, I don't know that there's a
18 problem here, but I was sort of surprised to see
19 that Level 3 maintained that it was supplying
20 telephone numbers to those entities which I usually
21 think of as facilities based in getting their own
22 numbers, and also I think of them as providing
23 generally their own end office facilities.  And so
24 that made me, you know, ask the question.  I don't
25 have an answer to the question.

Page 129

1    Q.   Okay.  I don't know if you answered my
2    question.  My question was simple.
3         Level 3 is only billing for its own
4    telephone numbers, correct?
5         MR. BENSON:  Objection.  Calls for
6    speculation.
7    BY MR. STEESE:
8    Q.   I'll retract that and ask it better.
9         To your knowledge, Level 3 is only billing
10   end office charges on calls associated with
11   originating over one of its own TNs, correct?
12        MR. BENSON:  Same objection.
13        THE WITNESS:  So my answer to that is
14   Level 3 should only be doing that, but I had some
15   question -- was that, in fact, what was going on
16   given that I wouldn't have expected that those
17   entities were even necessarily using Level 3 TNs.
18        If, in fact, they are using Level 3 TNs
19   and Level 3 is the only carrier that's billing for
20   those, then that may be fine.  Again, I raised a
21   question rather than drew a conclusion.
22   BY MR. STEESE:
23   Q.   And you have no contrary evidence that
24   these calls for which Level 3 is billing are not
25   associated with its own TNs, correct?

Page 130

1    A.    As I said, I have no dispositive evidence
2    that something improper is going on here.
3    Q.    And you have no evidence of any double
4    billing, correct?
5    A.    That's correct.
6    Q.    The historical dispute that dates back
7    before 2015, one of the issues AT -- are you aware
8    that one of the issues AT&T raised was that Level 3
9    was billing end office charges on calls that did not
10   have a Level 3 telephone number associated with
11   them?
12   A.    I have a vague recollection of that, but I
13   wouldn't swear to it.
14   Q.    Are you aware that the Level 3 AT&T
15   settlement agreement from 2015 obligated Level 3 to
16   only bill end office charges on calls associated
17   with its own telephone numbers?
18   A.    I think that's my recollection.
19   Q.    Do you know whether or not AT&T -- strike
20   that.
21         Are you aware whether or not it's a common
22   practice for AT&T to dispute end office charges for
23   any carrier if they are billing end office charges
24   and it is not their TN?
25   A.    I think I recall that there were some

Page 132

1    traditional facilities-based carriers, and I'm
2    differentiating from cable companies, and you raised
3    One Communications, Inteliquent, Cincinnati Bell,
4    and others, correct?
5             (Reporter clarification.)
6         Q.   -- One Communications, Inteliquent,
7    Cincinnati Bell, and others, correct?
8         A.   That's correct.
9         Q.   Same questions with respect to this
10   category of calling, your concern is not OTT,
11   correct?
12        A.   That's correct.
13        Q.   Your concern here is, is there double
14   billing going on, correct?
15        A.   Correct.
16        Q.   And do you have any evidence that double
17   billing is going on?
18        A.   No, I do not.
19        Q.   And if these are indeed Level 3 TNs, you
20   would expect the same thing.  You would expect that
21   AT&T would be able to identify those and keep from
22   paying double charges if, for some reason, double
23   billing had occurred?
24        A.   As before, I would expect they might but I
25   really don't have any information whether that's a

Page 201

1   THE WITNESS:  Could you read a little bit
2   more from the beginning?  I'll see where I left off.
3                   (The record was read by the
4                   court reporter, as requested)
5   THE WITNESS:  And the -- I forgot what I
6   was going to say, but -- let me try to restate it
7   again.
8           I view my assignment as evaluate the
9   process Level 3 used to estimated OTT.  I did not
10  particularly say based on this order or whatever.
11  It was, you know, the process, was what I was
12  focused on.
13          I understood that the companies had agreed
14  to a certain settlement framework that -- you know,
15  who owed who how much of what, depending on some
16  other circumstances.  But those circumstances were
17  beyond, you know, what I was evaluating.
18  BY MR. STEESE:
19      Q.   So did you look at the settlement
20  agreement subparens 3 and 4 at all for purposes of
21  creating your expert report?
22      A.   I -- I looked at them really just in terms
23  of, okay, I understand what was the back and forth
24  between the companies.  Beyond that, didn't really
25  figure into the report.

Page 202

```
 1            MR. BENSON:  I just want to say, the
 2   quality of the audio has gotten significantly worse.
 3   I don't know if that's for everybody.
 4            (Off the record discussion.)
 5   BY MR. STEESE:
 6       Q.   Dr. Pfautz, I don't remember your answer;
 7   so forgive me asking the question again.
 8            Did you consider paragraphs 3 and 4 in --
 9   how, if at all, did you consider subparens 3 and 4
10   in terms of your engagement and your role?
11       A.   I don't think they really figured into my
12   role because I saw the role as really being,
13   evaluate the way in which the percentage of OTT was
14   developed.  And, you know, at the point in which I
15   was doing that, that final order from December had
16   not yet come out when I started doing that.
17            So, again, I understood at a high level
18   the business framework to the degree it had been
19   agreed between the two parties, but it didn't really
20   drive what I did in my report.  Obviously one of the
21   things I said was, got to be Level 3 phone numbers,
22   and what issues might relate to that.  But that was
23   something I already was kind of aware of.
24            So I can't say I spent a lot of time
25   looking at this language to decide how to write my
```

Page 203

1  report.
2       Q.  Do you understand that insofar as
3  Level 3's billing is concerned, the dispute in this
4  case concerns both sides claiming breach of contract
5  under the 2015 settlement agreement that is
6  Exhibit 21?
7            MR. BENSON:  Objection to the extent it
8  calls for a legal conclusion regarding the
9  pleadings, but go ahead.
10           THE WITNESS:  I might have a rough
11 understanding that each company is kind of saying
12 that wasn't what we -- that wasn't the deal we had.
13 But, you know, beyond that, again, that wasn't how I
14 was focused.  That's what lawyers are for.
15           MR. STEESE:  Why don't we take a
16 five-minute break.
17           (Recess.)
18 BY MR. STEESE:
19      Q.  So let's go back to the legal authority
20 for just a moment that -- the folder entitled "Legal
21 Authority."
22      A.  Uh-huh, yes.
23      Q.  And if you look at Tab 3 that is entitled
24 "03 61.26 Tariffing of," et cetera, do you see that?
25      A.  I do see that.