**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM

AT&T CORP.,

  Plaintiff/Counter Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

  Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNCATIONS, INC., and WILTEL COMMUNICATIONS, LLC

  Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.

  Counterclaim Defendant

---

**AT&T & TCG'S *DAUBERT* MOTION TO EXCLUDE CERTAIN TESTIMONY OF
ANDREW MCCLURE**

---

Plaintiff/Counterclaim Defendant AT&T Corp. and Counterclaim Defendant Teleport
Communications Group (collectively, "AT&T"), by and through undersigned counsel,
respectively move this Court to exclude certain testimony of Andrew McClure pursuant to Federal
Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).
Pursuant to D. Colo. LCivR. 7.1, counsel for AT&T conferred with counsel for

Defendant/Counterclaimant Level 3 Communications, LLC ("Level 3") in good faith regarding this motion. Level 3 informed AT&T that it opposes this motion.

Level 3 has disclosed that Mr. McClure intends to offer opinion testimony regarding a methodology he used to estimate the percentage of Level 3's overall traffic sent to AT&T that is a type of telephone call known as "over-the-top Voice over Internet Protocol" ("OTT-VoIP"). Mr. McClure's methodology involved a purported examination of the OTT-VoIP percentage of selected companies that partner with Level 3 to offer VoIP calling, and his overall percent of Level 3's OTT-VoIP traffic aggregates the data from these companies.

Mr. McClure concedes that the "only way to find out" these companies' "percent OTT is to reach out to the customer and ask for its percent OTT." Ex. 1, Level 3 Resp. Discl. ¶ 5 (May 15, 2020). Yet, Mr. McClure's methods for reaching out to the companies were deeply flawed, wholly unreliable, and his testimony as to the percentage of OTT-VoIP traffic therefore should be excluded.

*First*, although Mr. McClure purported to determine the percent OTT-VoIP for the period since January 2019, during that period he contacted only *one* of the over 400 companies from which Level 3 was sent traffic. He made no effort at any time to contact many of Level 3's own customers, and other customers' OTT-VoIP percentages were based on stale and out-of-date contacts that Mr. McClure made in 2017.

*Second*, the efforts he made to contact companies in 2017 were woefully inadequate. Mr. McClure did not directly ask Level 3's customers for (or ask his Level 3 colleagues with the customer relationship for assistance in requesting) actual records or other data showing the customer's percentage of OTT-VoIP calls. Rather, he estimated the customers' percentage based

2

on "click-to-chat" sessions using the customers' websites with unknown persons.  During his click-to-chat sessions, Mr. McClure did nothing to ensure that the responses he received were accurate—indeed, he was not even aware of the identity or job responsibilities of the persons with whom he was chatting, and he conceded that their responses were *not* "reliable."  Ex. 2, McClure Deposition at 60:11–20 (August 29, 2019) ("McClure 2019 Dep.").

*Third,* Mr. McClure created *no* documentation of his efforts to solicit information for the companies' percentage of OTT-VoIP.  Rather, he simply provided conclusory estimates that he conceded were impossible to verify—even by another Level 3 employee.  Ex. 3, McClure Expert Deposition at 201:7–16 (June 11, 2020) ("McClure 2020 Ex. Dep.").[1]  But industry practice for other types of estimates, as well Level 3's own tariff, requires that such estimates should be based upon "verifiable information."  Level 3 Tariff, § 3.4.6.e.–f; *see id.* §§ 3.4.5, 3.4.10.  Mr. McClure's methodology is unverifiable and inconsistent with industry practice.  It is well-established—and Mr. McClure concedes—that it is impermissible simply to take the word of a testifying expert.  *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (it is impermissible to rely on an opinion supported "only by the *ipse dixit* of the expert."); *see also* Resp. Discl. ¶ 23, McClure 2020 Ex. Dep. at 199:15 to 202:6.  Yet, that is precisely what Level 3 seeks to do.

*Fourth*, if McClure were testifying solely in his capacity as a Level 3 employee, there is no question that he would be unable to rely on the out-of-court hearsay statements of Level 3's customers to support his conclusion regarding Level 3's OTT-VoIP percentage.  *See* Fed. R. Evid.

---

[1] The final transcript of Mr. McClure's most recent June 11, 2020 deposition was not yet available at the time of filing of the present motion.  Therefore, citations are made to the rough transcript of the deposition.  AT&T will file a copy of the final transcript once it is available.

701(a) ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception . . . .").  Level 3 cannot properly rely on an expert in order to place rank hearsay before the Court.  In this regard, McClure performed no expert analysis on the data provided during the click-to-chat sessions; rather, he merely used the data to calculate a percentage.

For these reasons, Mr. McClure should be excluded from providing testimony regarding Level 3's OTT-VoIP percentage.[2]

## BACKGROUND

As the following overview explains, Level 3 billed AT&T certain "access charges"—known as "end office" access charges—on the long distance traffic sent by Level 3 to AT&T.  The Federal Communications Commission ("FCC"), however, has now definitively determined that local carriers like Level 3 cannot bill end office charges on calls that use OTT-VoIP technology to connect to calling parties.[3]  Accordingly, a critical issue in dispute is to ascertain the percentage of Level 3's total traffic sent by AT&T that consists of OTT-VoIP calls, and for which Level 3 improperly billed end office charges to AT&T.  McClure claims to have developed a method that estimates the percentage of Level 3's traffic billed to AT&T that uses OTT-VoIP technology.

---

[2] AT&T recognizes that in cases like this one involving bench trials, a court has greater leeway to admit questionable evidence because the court can weigh its persuasive value.  *Ramos v. Banner Health*, 426 F. Supp. 3d 815, 820 (D. Colo. 2019).  Nevertheless, *Daubert* standards "must still be met," *id.*, and courts in this District have recently excluded expert testimony in a bench trial.  *See, e.g.*, *Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134 (D. Colo. 2019).  This Court's ruling on the admissibility of Mr. McClure's opinions is very likely to affect the scope as well as "the expense and effort of a[ny] trial." *Id.* at 1141 n.4.  This is because McClure's opinion appears to be the only evidence that Level 3 will offer on its OTT-VoIP percentage.  To the extent that McClure's opinion is not admissible, AT&T would be entitled to summary judgment on this point, which would make a trial unnecessary.

[3] Order On Remand and Declaratory Ruling, *In the Matter of Connect America Fund*, 34 FCC Rcd 12692 (Dec. 17, 2019) ("*2019 Declaratory Ruling*").

**Traditional and VoIP Calls and Associated Charges.** Long distance calls traditionally traveled from the caller's premises (such as a home or office) over a local carrier's "local loops" to the carrier's "end-office," where the call is connected to trunks that carry it either to other switches or directly to the caller's long-distance provider. The long-distance provider then delivers the call over its network (directly or indirectly) to the local carrier that serves the called party. *See AT&T Corp. v. FCC*, 841 F.3d 1047, 1049–50 (D.C. Cir. 2016).

Local carriers charge long distance carriers for performing these functions, known as "switched access services," at FCC-regulated rates. There are different rates that apply depending on the function performed by the local carrier. As relevant here, "end office" charges (also known as "local switching" charges) generally apply when the local carrier takes a call from a calling party, carries it over the loop, and switches the call at the carrier's end office. "Tandem" charges apply when the local carrier provides an intermediate function, such as passing a call from an end office switch via an intermediate switch to another carrier. Historically, end-office switching has been more expensive than tandem rates. *See id.* at 1056.

In contrast to calls over the traditional telephone network, VoIP calls are routed in part over the Internet.[4] VoIP calls and providers of those calls can be divided into two types. A "facilities-based" VoIP provider, such as a cable company like Comcast, provides "last-mile" facilities for high-speed Internet service that connect directly to a home or business. *See id.* at 1050–51. Thus, for a long-distance call to a Comcast VoIP customer, the call is routed and arrives

---

[4] Thus, if a caller using AT&T's long-distance service places a long-distance call to a VoIP subscriber, the originating local carrier delivers the call to AT&T, which then delivers it (again, often indirectly) to the VoIP provider and/or its local carrier partner at some intermediate point. There, the call is converted to Internet Protocol format and routed over the Internet to the VoIP subscriber. *AT&T*, 841 F.3d at 1050–51.

5

at a Comcast router, which delivers it to the Comcast last-mile facilities that connect to the called party's home or business.  By contrast, an OTT-VoIP provider, like Vonage, does not provide this last-mile connection to its subscriber.  Rather, that subscriber must purchase that last-mile connection from a separate Internet service provider, again such as Comcast.  Vonage's service thus rides "over the top" of the facilities of the Internet provider, which actually provides the last-mile services that allow the call to be completed to the subscriber.

**Billing Switched Access Charges on OTT-VoIP Calls is Unlawful.**  As part of a broad reform of its access charges rules, the FCC in 2011 issued rules pertaining to charges on VoIP calls.[5]  On VoIP calls, many of the functions to complete calls are being performed by a VoIP provider, rather than a local carrier.  Under the new rules, local carriers were nonetheless permitted to file tariffs and recover for functions performed by their VoIP provider-partners—but not for functions performed by neither the LEC nor its VoIP partner.  *See, e.g., Transformation Order*, ¶ 970; 47 C.F.R. § 51.913(b).

Disputes then arose under the rules as to whether local carriers could bill end office charges on OTT-VoIP calls, or whether the carriers and their VoIP partners were merely providing an intermediate service more akin to tandem switching.  Initially, the FCC issued a Declaratory Ruling that end office charges could be billed on OTT-VoIP calls, but the D.C. Circuit vacated the ruling and remanded.  The D.C. Circuit found that the FCC had failed to explain how the functions performed on OTT-VoIP calls were equivalent to end-office rather than tandem switching.  *AT&T Corp.*, 841 F.3d at 1052–54.

---

[5] *In re Connect America Order*, 26 FCC Rcd. 17663, ¶¶ 1, 933–34 (2011) ("*Transformation Order*").  The FCC refers to this traffic as "VoIP-PSTN" traffic.  *Id.* ¶ 940.

In December, 2019, the FCC on remand issued a subsequent order, in which it made clear that local carriers are *not* allowed to bill end-office switched access charges on OTT-VoIP calls. *In re Connect America Order*, 2019 WL 7018968 ¶ 4, 933–34 (2019) ("*Declaratory Ruling*").[6] Conversely, the FCC held that a local carrier partnering with a facilities-based VoIP provider may charge for end-office switched access. *See id*. ¶ 14. The FCC determined that its new ruling—which construes its 2011 rules—applies retroactively. *Id.* ¶ 26. No parties appealed the FCC's ruling, and it is now final.

**Level 3 and AT&T's Dispute.** Based on its now thoroughly-discredited legal view that it could bill end office switching charges on both facilities-based and OTT-VoIP calls, Level 3 did not contemporaneously develop (*i.e.*, at the time services were provided or billed) any method of distinguishing between the two types of VoIP calls. AT&T, however, disputed and withheld payment of Level 3's overcharges on OTT-VoIP calls. Although AT&T could not determine from its own records what percentage of Level 3's traffic was OTT-VoIP calls, AT&T relied on a prior agreement of the parties providing that the OTT-VoIP traffic " ███████████████████ ████████████████████████ " *See* ECF Doc. 15-1, 2015 Release and Settlement Agreement at 2.

In 2017, after the D.C. Circuit's adverse decision, Level 3 claimed that its position on its percentage of OTT-VoIP traffic had "evolved," and that the percentage was as low as 13%. McClure 2019 Dep. at 163:11–18. Apart from high-level power point presentations, Level 3

---

[6] *See id.* at ¶ 4 ("If neither the LEC nor its VoIP provider partner provides such physical connection to the last-mile facilities used to serve the end user, the VoIP-LEC partnership is not providing the functional equivalent of end office switched access and the LEC may not assess end office switched access charges.").

declined to share with AT&T the detailed information that led to Level 3's dramatic revision to its OTT-VoIP percentage.

After this lawsuit was filed, AT&T obtained the back-up information in discovery, and deposed a Level 3-designated corporate representative—which was Mr. McClure. Mr. McClure testified that, to evaluate the percentage of OTT-VoIP calling, Level 3 examined the volumes of calls to and from its customers. If a particular customer was believed to be a provider of VoIP calling (which in Level 3's view was a small subset of its customers), Mr. McClure estimated what percentage of calls for that customer Level 3 believed were OTT-VoIP. At deposition, Mr. McClure testified that as to these estimates, although he had some telephone calls with customers, his methodology was "heavily weighted" to the use of "click-to-chat" features commonly included on the companies' websites.[7] As Mr. McClure testified, he did not know much, if anything, about the person responding to his questions about the customer's OTT-VoIP calling:

> Q. And so when you did the click-to-chat, do you know with whom you were speaking, or chatting?
>
> A. Not always, no.
>
> Q. Do you know where that person was in the organization?
>
> A. No, I do not.
>
> ***Q. Do you know whether that person was reliable?***
>
> ***A. No.*** [8]

---

[7] McClure 2019 Dep. 69:15 to 70:2. During his deposition, McClure explained that a click-to-chat function is on "a company's website," and that "oftentimes [company websites] have a sales representative that will answer questions." *Id*. at 59:13–16.

[8] *Id*. at 60:11–20 (emphasis added). *See id*. at 70:15 to 71:3 ("Q. When you were doing the chat, did you have any idea where the person on the other end of the chat line was within your customer's organization? A. Not in their customer's organization. Is that what you mean? Q. Yeah. Were they sales? service? interns? Were they onshore? offshore? A. Yeah, I don't know. Q. Were they third-party providers? That is, you know, were they at a location outside the United States? Do you know any of that? A. No.").

Apart from the single figure of his estimate of the OTT-VoIP percentage for the customer, Mr. McClure has *no* documentation relating to these customer interactions that formed Level 3's percentage of OTT-VoIP calls:

> Q. And is there any record of the click-to-chats?
>
> A. Not that I have, no.
>
> Q. Did you create any notes as you went along?
>
> A. I entered them in the spreadsheet as I went down the list.
>
> Q. And so the click-to-chat, did you ever take a screen shot of it?
>
> A. No.
>
> Q. Did you ever create any work papers for purposes of creating this spreadsheet?
>
> A. No.[9]

Using the information provided by these unknown persons during these unrecorded click-to-chat sessions, McClure estimated the percentage of the call volumes of each Level 3-identified customer that were OTT-VoIP.  He then used those figures to determine the percentage of the total volume of minutes billed by Level 3 to AT&T that were OTT-VoIP.

**McClure's Expected Testimony.**  On March 16 and May 15, 2020 Level 3 designated Mr. McClure as an employee-expert to offer opinion testimony pursuant to Rule 26(a)(2)(C). McClure is expected to testify regarding Level 3's methodology for determining the percentage of Level 3's traffic that is OTT-VoIP.  *See* Ex. 4, Level 3 Discl. at 2.  Level 3's Rule 26(a)(2)(C) disclosure makes clear that McClure has not changed his methodology in relevant part since his deposition.  *See* Ex. 5, Level 3 Suppl. Discl. ¶ 1 ("The percentages in the disclosure are the same

---

[9] McClure 2019 Dep. 60:21 to 61:6.

as those contained in the 2017 spreadsheet.").[10]  McClure's methodology has led him to conclude that Level 3's OTT-VoIP percentage is 16%.  McClure is expected to testify that the 16% figure should be used to determine the amounts that AT&T should pay back to Level 3.  AT&T contends that this percentage greatly underestimates Level 3's OTT-VoIP percentage, and that McClure's estimate is a product of an unreliable methodology.

**McClure's Expert Deposition.**   On June 11, 2020, Mr. McClure was deposed in his capacity as Level 3's non-reporting expert.  During his deposition, Mr. McClure confirmed that he made "no inquiries" to update the data provided during his 2017 click-to-chat session to calculate the relevant percentages in 2020.  *See* McClure 2020 Ex. Dep. at 60:2–9.  Rather, than take any steps to verify whether the data he was relying on was correct and not stale, Mr. McClure took no action, concluding that it would be too "burdensome on the customer's relationship" with Level 3. *Id.* at 60:14–15.  In fact, Mr. McClure contacted a single customer, and was told that the customer would not provide information about its OTT percentage.  *Id.* at 63:12–20.[11]  However, Mr. McClure did not ask any other customers whether the 2017 information was presently correct— indeed, Mr. McClure did not ask *anyone* whether the 2017 information was *ever* correct.  *Id.* at 188:6–14.  Mr. McClure also re-confirmed that he had no documentation for any of the OTT percentages he estimated.  *See id*. at 104:14–22.

---

[10] Level 3's disclosures indicate that McClure did make certain changes to his methodology first used in 2017 to determine Level 3's OTT-VoIP percentage.  AT&T disputes but does not challenge in this motion those aspects of the methodology.  Nevertheless, and as will be explained more fully below, McClure's methodology remains unreliable and, as such, his testimony should be excluded.

[11] Mr. McClure contacted a former Level 3 employee, ████████, who is now an employee at ████████████. McClure 2020 Ex. Dep. at 63:12–20.  ████████ is familiar with this litigation; in fact, he was previously deposed. *Id.* at 188:6–14.  The one customer Mr. McClure chose to contact is someone who played a role in designing the methodology that is at issue in this motion and is not representative.  *Id.* at 73:23 to 74:3.

10

**LEGAL STANDARD**

Rule 702 of the Federal Rules of Evidence provides, in relevant part, that a "witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if . . . the testimony is the product of reliable principles and methods." Fed. R. Evid. 702(c). The Supreme Court has made clear that "under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

After determining that the witness is qualified to offer expert opinion testimony, "the court must [then] determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* The Supreme Court has provided four nonexclusive factors for trial courts to consider when assessing reliability:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002) (citing *Daubert*, 509 U.S. at 590). Under *Daubert*, "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999) (internal quotation marks omitted). It is critical that the district court determine "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id.* at 783 (internal quotation marks omitted). Further, "[n]othing in either *Daubert* or the Federal

11

Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co*, 522 U.S. at 146.

## ARGUMENT

## I. MCCLURE'S METHODOLOGY FOR DETERMINING LEVEL 3'S OTT PERCENTAGE IS UNRELIABLE

McClure's methodology for determining Level 3's OTT-VoIP percentage is unreliable and, as such, any testimony that McClure intends to give regarding Level 3's OTT-VoIP percentage should be excluded. Rather than design a process that would allow Level 3 to determine its actual OTT-VoIP percentage, McClure has chosen to rely on unsubstantiated information. Further, McClure's methodology is not documented with proper records, nor is it verifiable. For these reasons, it is inherently unreliable, and any resulting testimony should be excluded.

### A. McClure did not contact Level 3's customers to determine Level 3's 2019/2020 OTT percentage.

Level 3's supplemental expert disclosure makes clear that McClure has continued to rely on the unreliable data he gathered in 2017 to develop the spreadsheet attached as Exhibit 2 to Level 3's disclosure. *See* Level 3 Suppl. Discl. ¶ 1 ("The percentages in the disclosure are the same as those contained in the 2017 spreadsheet."); *see also* McClure 2020 Ex. Dep. at 60:2–9. As such, McClure's data is not only unreliable—it is woefully out of date. Even if Level 3's OTT-VoIP calculation was reliable—which it is not—McClure's testimony will be based on data that is at least three years old. As such, the data used by McClure cannot reliably support McClure's testimony regarding Level 3's *current* OTT-VoIP percentage. McClure 2020 Ex. Dep. at 60:2–9.

Perhaps most striking is that McClure decided to forgo contacting additional Level 3 customers based on a single interaction with a former Level 3 employee who now works at one of Level 3's customers.  *See id.* at 63:12–20.  McClure failed to speak with or otherwise contact even one of Level 3's 466 other customers to determine whether he would be able to receive more reliable information to calculate Level 3's OTT-VoIP percentage.  *Id.* at 188:6–14.  If McClure were actually interested in designing a methodology that could produce a reliable estimate of Level 3's OTT-VoIP percentage, he would have contacted additional customers.  However, McClure choose to continue to base his calculations on the unverifiable information received during the 2017 click-to-chat sessions, which renders his expected testimony unreliable and, therefore, inadmissible.

**B.      McClure's click-to-chat sessions are not reliable and are completely out-of-date.**

As explained above, McClure relied on click-to-chat sessions with Level 3's customers to determine their respective OTT-VoIP percentages.  However, click-to-chat sessions are not reliable for the purposes at issue here, and the data that McClure collected using this method is not reliable.  Rather than obtaining formal documentation, or contacting employees at Level 3's customers who would be expected to be knowledgeable about their respective OTT-VoIP percentages, such as network operations engineers or sales representatives, McClure relied heavily on the click-to-chat sessions.  McClure did nothing to determine whom he was communicating with during these click-to-chat sessions.  He did nothing to determine the employment role of the person he was chatting with, whether the responses he received were from someone who would have reason to know the OTT-VoIP percentage, and whether the information he received was

13

reliable.  McClure 2019 Dep. 60:3–20.  In fact, it is not clear whether McClure even confirmed that he was communicating with employees of the Level 3 customers—it is entirely possible that he was chatting with someone from a third-party staffing agency or even software programed to respond to click-to-chat inquiries.  For these reasons, McClure's expert testimony regarding the OTT-VoIP percentage of Level 3's customers will not be based on reliable data.  In turn, McClure's expert testimony regarding Level 3's OTT-VoIP percentage, which depends on the customer specific data, will be unreliable.

McClure's methodology was designed not to develop a reliable calculation of Level 3's OTT-VoIP percentage but rather, was intended to avoid having to seek reliable information from personnel at Level 3's customers who actually would have a reason to know the relevant OTT-VoIP percentage.  McClure's decision to rely on click-to-chat, rather than to contact someone at each of Level 3's customers who would have reliable information, was motivated by business concerns. *See* Resp. Discl. ¶ 12.a (McClure "used the best method available to me at the time that *would not disrupt Level 3's business relationship with the customer*" (emphasis added)); *see also* McClure 2020 Ex. Dep. at 60:14–15.  Therefore, McClure has described his own methodology as not one designed to gather reliable data—as is required by the Federal Rules of Evidence for expert testimony—but to protect Level 3's business relationships.  For this reason, McClure's testimony is not reliable, and should not be admitted.

### C. McClure created no documentation of the OTT-VoIP percentages of Level 3's customers, and those percentages cannot be verified.

McClure's expert testimony should be excluded for an additional reason.  McClure has no records that memorialize his click-to-chat conversations, nor does he know which Level 3

customers were contacted in this way.  McClure 2019 Dep. at 60:21 to 61:9; 61:23 to 62:2.  In fact, McClure conceded during his deposition that it would be impossible for anyone, including other Level 3 employees, to verify the numbers that he used to calculate Level 3's OTT-VoIP percentage.  McClure 2020 Ex. Dep. at 201:7–16.  McClure's expert opinion cannot be verified, and for this reason, it should be excluded.

McClure's failure to keep records relating to his calculation of Level 3's OTT-VoIP percentage is relevant for an additional reason.  McClure's methodology includes a reference to a customer labeled as "NULL."  *See id.* at 80:6–10.  The NULL customer represents a very large portion of the minutes relevant to McClure's calculation (over 25% of the total), and McClure claims to have designed a process that led him to determine that the NULL customer's OTT-VoIP percentage is zero.  *See id.* at 86:6–25.  This determination has an outsize effect on Level 3's overall OTT-VoIP percentage.  Nevertheless, McClure retained <u>no</u> records from his examination of this customer category.  *See id.* at 88:22 to 89:6.  Level 3's view that AT&T and the Court should simply accept McClure's word is improper.

In sum, McClure's failure to gather reliable and verifiable data reflecting Level 3's customer's OTT-VoIP traffic percentage is crucial to understanding why his expert testimony must be excluded.  As explained above, McClure relied on the information provided by Level 3's customers regarding their own OTT-VoIP percentages to determine Level 3's OTT-VoIP percentage.  Level 3 has indicated that it intends to use its OTT-VoIP percentage to determine the percentage of traffic that can be assessed end-office switched access charges.  Therefore, McClure's decision to use unreliable and unverifiable data calls into question the reliability of the central portion of his expert testimony—the amount of traffic for which Level 3 could lawfully

bill AT&T Switched Access charges.  For this reason, McClure's testimony does not meet the standard of Rule 702, and it should be excluded.  *Mooring Capital Fund, LLC v. Knight*, 388 F. App'x 814, 820 (10th Cir. 2010) (citing *General Elec. Co.* 522 U.S. at 146).

## II.   THE TELECOMMUNICATIONS INDUSTRY REQUIRES VOIP FACTORS TO BE RELIABLE AND VERIFIABLE.

McClure's expected testimony does not meet the reliability factors described by the Supreme Court in *Daubert* for an additional reason – experts in the telecommunications industry require that VoIP factors be based on reliable and verifiable data.  As explained above, McClure's process for determining Level 3's customer's OTT-VoIP percentage was neither reliable nor verifiable.  As such, McClure's methodology would attract "only minimal support," if any, within the telecommunications industry, and should therefore "be viewed with skepticism."  *Daubert*, 509 U.S. at 594.

The telecommunications industry is frequently required to develop methodologies for estimating the volumes of different types of telecommunications traffic, and verification of those estimates is a standard industry practice.[12]  In fact, Level 3's own tariff provides, with respect to another VoIP factor used for billing, that the factor "shall be based on information such as the number of the Customer's retail VoIP subscriptions in the state (e.g. as reported on F.C.C. Form 477), traffic studies, actual call detail or other relevant and verifiable information which will be provided to the Company upon request."  Level 3 Communications, LLC, Tariff F.C.C. No. 4, §

---

[12] *See, e.g.*, *In the Matter of Determination of Interstate and Intrastate Usage of Feature Group A and Feature Group B Access Service*, 4 FCC Rcd. 8448, paras. 2, 7, 11, & 15 (1989); *In the Matter of MCI Telecomm. Corp. Determination of Interstate and Intrastate Usage*, 59 Rad. Reg. 2d (P & F) 631, 1985 WL 260140, (F.C.C. Nov. 13, 1985) (when factors are used for billing, carriers should be allowed to review, *inter alia*, "call detail records for the purpose of verification" and to further their "legitimate interest in the accuracy of the [other] carrier's usage estimates").

3.4.6.   Despite this requirement in Level 3's *own tariff*, McClure has designed and executed a methodology that ensures his testimony will be based on data that is entirely unverifiable.  In other words, if McClure were to use his methodology to develop a percentage factor used to bill Level 3, his methodology would not satisfy the requirements of Level 3's own tariff.  It is difficult to see how McClure's methodology, which would not satisfy the requirements of Level 3's own tariff, could gain wide acceptance among experts in the telecommunications field.  McClure's testimony should be excluded for this additional reason.

## III.    MCCLURE'S EXPECTED TESTIMONY IS INADMISSIBLE HEARSAY

McClure's expert opinion should also be excluded because it is based on inadmissible hearsay, and as explained above, experts in the telecommunications industry would not rely on such hearsay to form an opinion as to Level 3's OTT-VoIP percentage.  McClure can provide no evidence that the out-of-court statements procured during his click-to-chat sessions are reliable.  In fact, McClure testified at his deposition that he has no records that would allow this Court to assess the reliability of his communication with Level 3's customers.  McClure 2019 Depo, 60:21 to 61:22; *see also* McClure 2020 Ex. Dep. at 208:6–9 ("Q: Other than these tabs in the spreadsheet, did you create any other work papers in creating [your 2020 analysis]? A: No, I did not.").   For this additional reason, McClure should be excluded from providing expert opinion on Level 3's behalf.

The Federal Rules of Evidence make clear that while experts may rely on facts or data that would not normally be admissible, those facts or data must of the kind that experts in the field would reasonably rely upon.  Hearsay is one type of evidence that is generally inadmissible, unless an exception applies.  *See* Fed. R. Evid. 802.  The Federal Rules of Evidence define hearsay as "a

17

statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  The Supreme Court has explained "that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 703).

As explained above, McClure's Level 3 OTT-VoIP percentage is based in key respects on the out-of-court statements made by Level 3's customers.  McClure intends to rely on these out-of-court statements to prove that the OTT-VoIP percentages contained in his analysis are true and correct.  As such, the statements of Level 3's customers during the click-to-chat sessions are textbook hearsay.  *See* Fed. R. Evid. 801(c); *Western Insulation, LP v. Moore*, 242 F. App'x 112, 121 (4th Cir. 2007) (statements of party's customers obtained by party's employees concerning damages were hearsay).  And no hearsay exception applies here.  The business records exception is inapplicable because McClure did not create any record of his click-to-chat communications with Level 3's customers, McClure 2019 Dep. at 60:21 to 61:25, nor are such click-to-chat communications a regular business practice of Level 3, *id.* at 12:14–18 ("Q. Is that methodology only used for AT&T.  A. Correct.  Q. You haven't used it for any other interexchange carriers? A. No.").  Furthermore, there is no suggestion that it was the information provided by Level 3's customers was based on the customers' business records, rather than an uninformed guess as to what the percentage might be.  Because the information regarding the customer's OTT-VoIP percentage came from the customers themselves, the relevant statements would still be inadmissible even if Level 3 maintained records of Mr. McClure's customer contacts, unless Level

3 took some efforts to verify the accuracy of the customers' alleged statements.  *See United States v. McIntyre*, 997 F.2d 687, 700 (10th Cir. 1993) ("If the business entity has adequate verification or other assurance of accuracy of the information provided by the outside person, the exception may still apply.").  However, McClure's deposition testimony makes clear that he took no steps to ensure the accuracy of the data provided during his click-to-chat sessions.  McClure 2019 Dep. at 60:11–23.  This leaves only Mr. McClure's say-so, and that is insufficient to support his opinion testimony.

Given that the Level 3 customer statements are inadmissible hearsay, McClure can only rely on them if they contain facts or data that are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  Fed. R. Evid. 703.  AT&T has no way of testing who participated in the click-to-chat sessions, nor the basis for the information allegedly provided during those sessions.  *See Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-CV-02516-WJM-KLM, 2014 WL 4651643, at *7 (D. Colo. Sept. 18, 2014) (explaining that the inability to test who made comments online supported a finding that the testimony was inadmissible under Rule 703).   Furthermore, as more fully explained above, no telecommunications expert would ever find it reasonable to rely on unverifiable information conveyed during an anonymous click-to-chat session to develop an OTT-VoIP factor.  *See id.* ("The Court finds it difficult to believe that a qualified expert could credibly testify that anonymous online comments are the type of evidence that is typically relied upon by an expert in their field.").  As such, McClure's testimony does not meet the requirements of Rule 703.

**CONCLUSION**

For the reasons described above, McClure's testimony should be excluded.


Respectfully submitted this 15th day of June, 2020.


                                        By: /s/ Justin A. Benson

                                        Rebecca B. DeCook
                                        Andrew T. Flynn
                                        Moye White LLP
                                        1400 16th Street, 6th Floor
                                        Denver, CO 80202-1027
                                        becky.decook@moyewhite.com
                                        andrew.flynn@moyewhite.com

                                        Michael J. Hunseder
                                        Michael D. Warden
                                        Justin A. Benson
                                        Joshua W. Moore
                                        SIDLEY AUSTIN LLP
                                        1501 K ST NW
                                        Washington, DC 20005
                                        Telephone: (202) 736-8000
                                        mhunseder@sidley.com
                                        mwarden@sidley.com
                                        jbenson@sidley.com
                                        joshua.moore@sidley.com

                                        *Attorneys for Plaintiff AT&T Corp. and
                                        Counterclaim Defendant Teleport
                                        Communications Group*

## CERTIFICATE OF SERVICE

I, Justin A. Benson, hereby certify that on June 15, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Charles W. Steese, #26924
Douglas N. Marsh, #45964
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
Email: csteese@armstrongteasdale.com
Email: dmarsh@armstrongteasdale.com

*Attorneys for Defendant Level 3
Communications, LLC*

/s/ Justin A. Benson
Justin A. Benson
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: jbenson@sidley.com

*Attorney for Plaintiff AT&T Corp. and
Counterclaim Defendant Teleport
Communications Group*