# EXHIBIT 2

Confidential - Attorneys' Eyes Only

Page 1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
    _____
 3                                )
    AT&T CORP.,                   )
 4                                )
    Plaintiff,                    )
 5                                )
    vs.                           )  Case No.
 6                                )  18-cv-00112-RM
    LEVEL 3 COMMUNICATIONS,       )
 7  LLC,                          )
                                  )
 8  Defendant.                    )
    _____)
 9
10
11
            ** CONFIDENTIAL - ATTORNEYS' EYES ONLY **
12
13
14
15     30(b)(6) DEPOSITION OF LEVEL 3 COMMUNICATIONS
16          THROUGH ITS DESIGNATED REPRESENTATIVE
17                    ANDREW McCLURE
18                   Denver, Colorado
19                   August 29, 2019
20
21
22
23  Reported by:
24  MELANIE L. GIAMARCO, RMR, CRR, RPR, CSR
25  JOB NO.:  166466
```

Confidential - Attorneys' Eyes Only

Page 12

1            A. McClure
2       Q.  Does Level 3 have any process in place
3  to make sure that it accurately bills over-the-top
4  VoIP --
5       MR. STEESE:  Objection.
6       Q.  -- access charges?
7       MR. STEESE:  I thought you were finished.
8  Apologies.
9       Objection to form.
10      A.  We do not have an industry standard for
11  measuring that's approved by the FCC, so we have
12  our own methodology that we -- we have used for
13  this case.
14      Q.  Is that methodology only used for AT&T?
15      A.  Correct.
16      Q.  You haven't used it for any other
17  interexchange carriers?
18      A.  No.
19      Q.  Are you developing any other methodology
20  at Level 3?
21      A.  No.
22      Q.  Do you have any plans to develop another
23  methodology?
24      A.  No.
25      Q.  Now, let me go back through some of your

Confidential - Attorneys' Eyes Only

Page 59

1          A. McClure

2          A.  No.

3          Q.  So I think you referred earlier to some
4    customer interviews; is that correct?

5          A.  Correct.

6          Q.  How many customers did you speak with?
7    Withdrawn.

8              Did you conduct all the interviews yourself?

9          A.  I communicated myself, yes.  It was me.

10         Q.  Was it via e-mail?

11         A.  Click-to-chat, sometimes a phone
12    conversation.

13         Q.  What's a click-to-chat?

14         A.  You go to a company's website.
15    Oftentimes they have a sales representative that
16    will answer questions.

17         Q.  So different scenario.
18             If I go on Callaway used golf clubs, and
19    there's a little thing to chat, I can chat with
20    somebody?

21         A.  Yeah.

22         Q.  That's the same concept?

23         A.  Same concept.

24         Q.  And so you said you did phone
25    interviews, right?

Confidential - Attorneys' Eyes Only

Page 60

1               A. McClure
2          A.  Yes.
3          Q.  And you did click-to-chat; is that
4     right?
5          A.  Yes.
6          Q.  And did you do any other form of
7     communication with customers for purposes --
8          A.  No.
9          Q.  -- of this spreadsheet?
10         A.  No, I did not.
11         Q.  And so when you did the click-to-chat,
12    do you know with whom you were speaking, or
13    chatting?
14         A.  Not always, no.
15         Q.  Do you know where that person was in the
16    organization?
17         A.  No, I do not.
18         Q.  Do you know whether that person was
19    reliable?
20         A.  No.
21         Q.  And is there any record of the
22    click-to-chats?
23         A.  Not that I have, no.
24         Q.  Did you create any notes as you went
25    along?

Confidential - Attorneys' Eyes Only

Page 61

1              A. McClure

2         A. I entered them in the spreadsheet as I
3    went down the list.
4         Q. And so the click-to-chat, did you ever
5    take a screen shot of it?
6         A. No.
7         Q. Did you ever create any work papers for
8    purposes of creating this spreadsheet?
9         A. No.
10        Q. Did you understand that there was an
11   ongoing dispute between AT&T and Level 3 regarding
12   the over-the-top billing?
13        A. I did understand that there was a
14   potential for a dispute, yes.
15        Q. And did you go about conducting these
16   interviews purposefully in a way that wouldn't
17   create a record?
18        A. No.
19        Q. Did anyone ever tell you to try to
20   preserve information that you got from the
21   customers?
22        A. No.
23        Q. So when you did the click-to-chat, which
24   customers did you do click-to-chat with?
25        A. I don't remember which ones would be

Confidential - Attorneys' Eyes Only

Page 62

1  A. McClure
2  click-to-chat versus a phone conversation.
3  Q. And so when you did the click-to-chat,
4  what question or questions did you ask?
5  A. I asked him if they had an
6  application-based voice service that was offered.
7  Looking at the websites, I usually knew. And then
8  my questions were to how much was sold of that
9  particular product, and how much were adopting the
10 newer technology versus the old.
11 MR. WARDEN: Can I have that answer read
12 back, please?
13 (The last answer was read back.)
14 Q. And you say how much was sold for that
15 particular product. What do you mean by how much?
16 A. My questions were really based upon I
17 thought that the way that I was asking the
18 questions to these people was that I thought I
19 would get a very conservative answer. They're
20 trying to sell their new technology, what they're
21 investing their capital in, so they would give me
22 maybe a high percentage. They would err on the
23 side of, "Oh, well, we sell 60 to 70 percent of
24 this." And that was kind of my thought process of
25 kind of the answers that I would get.

Confidential - Attorneys' Eyes Only

Page 69

1                    A. McClure

2       That's my fault.

3              So in these chats that you're doing with
4       customers --

5              A.  Gotcha.

6              Q.  -- any other questions that you asked
7       that you haven't already told me about?

8              A.  I don't recall.  I'm sure there are
9       others that I've asked, but they might have been
10      one-off scenarios based upon a particular customer
11      and their subset of, you know, what they provided,
12      or what affiliates they had.

13             Q.  And how -- when you were doing the
14      chats -- let me do it this way.

15             How many customers do you believe you
16      contacted via chat?

17             A.  I don't recall the exact number, chat
18      versus phone calls, but I recall that it was
19      probably heavily weighted towards the chat windows.

20             Q.  And how many customers overall did you
21      contact?

22             A.  I believe it was somewhere between 33
23      and 40.

24             Q.  And the majority of the 33 to 40 were
25      chats?

Confidential - Attorneys' Eyes Only

Page 70

1  A. McClure

2  A.  Correct.

3  Q.  And of those chats, how many responders,
4  if I can call it that, person on the other end of
5  the chat, were able to answer the question right
6  away versus saying, "I don't know," or, "I'll have
7  to get back to you"?

8  A.  The ones that responded -- sorry.  Your
9  question was how many.  I don't recall how many.
10 The ones that responded that they didn't know,
11 oftentimes, then, I would use the contact.  They
12 would refer me to somebody to contact.  And then I
13 would end up calling the contact, the corporate
14 contact.

15 Q.  When you were doing the chat, did you
16 have any idea where the person on the other end of
17 the chat line was within your customer's
18 organization?

19 A.  Not in their customer's organization.
20 Is that what you mean?

21 Q.  Yeah.  Were they sales? service?
22 interns?  Were they onshore? offshore?

23 A.  Yeah, I don't know.

24 Q.  Were they third-party providers?  That
25 is, you know, were they at a location outside the

Confidential - Attorneys' Eyes Only

Page 71

1           A. McClure
2    United States?  Do you know any of that?
3           A.  No.
4           Q.  And so how did you select the -- I'm
5    just going to say approximately 35.  Is that okay?
6           A.  Sure.
7           Q.  How did you select the approximately 35
8    customers to contact?
9           A.  I did the top end-office MOUs.
10          Q.  So I have Exhibit 29A on the screen.
11   And I believe I have sorted it by MOU in column K.
12   Do you see that?
13          A.  Yep.
14          Q.  From the highest to the lowest.  And at
15   least on this screen, it looks like there are
16   around 19 customers, although some of them are
17   repeats.
18          Can you tell, looking at this, which of
19   these customers, if any, on this first screen, rows
20   2 through 20, you contacted?
21          A.  No.  I would filter by column J.
22          Q.  Is that better?  I've now filtered by
23   column J, end-office minutes of use.
24          A.  And then if you could, "Usage Period,"
25   select the greatest usage period, select

Confidential - Attorneys' Eyes Only

Page 163

1              A. McClure

2     percent.

3           And I guess my question is, what's this 95

4     percent reflect?  What does that mean?

5           A.  So I'm being conservative at 90 percent,

6     but if you actually do the math, I looked at -- for

7     July, there were 340 million minutes of use.  I

8     looked at 330.  So I remember doing the estimate

9     roughly in my head, thinking it was close to 95

10    percent.

11          Q.  So in the next-to-last paragraph, the

12    first sentence reads, "Our estimates of OTT have

13    gone from 65 percent to 13 percent as our

14    understanding of what constitutes OTT has evolved";

15    do you see that?

16          A.  Yes.

17          Q.  So what did you mean when you said, "Our

18    estimates for OTT have gone from 65 to 13 percent?"

19          A.  The number 65 percent was the term that

20    he had said AT&T had said our traffic was, 65

21    percent.  That was what I was told.

22          Q.  And that's why you put the 65 percent in

23    there?

24          A.  Yeah.

25          Q.  No other reason?