**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

      Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

      Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

      Counterclaim Defendant.

---

## MOTION FOR SUMMARY JUDGMENT

      Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), respectfully move the Court for summary judgment as to Counts I, II, and IV of their Counterclaims (ECF No. 124) and for each remaining claim raised by AT&T Corporation ("AT&T") in its Complaint (ECF No. 1). In support of this Motion, Level 3 states as follows:

**I.**       **INTRODUCTION**

      For a decade, the telecommunications industry has wrestled with the appropriate

compensation level for Over-The-Top Voice over Internet Protocol ("OTT") calls—specifically, whether end office switched access charges do or do not apply to such traffic. In February 2015, the Federal Communications Commission ("FCC") held that end office charges apply to OTT traffic. MSUMF ¶ 2. On appeal from the FCC's decision, the D.C. Circuit Court of Appeals found that the FCC did not sufficiently disclose the reasoning for its decision and therefore "vacate[d] and remand[ed] the order to the Commission for further explanation." MSUMF ¶ 27. The FCC issued its decision "on remand" in December 2019, changing course from its earlier position and determining that end office charges were *not* permitted on OTT calls. MSUMF ¶ 30.

Shortly after the FCC's 2015 decision, Level 3 and AT&T entered into a Settlement Agreement that required AT&T to pay end office charges to Level 3 for all telephone calls originating from a Level 3 telephone number, even if it was an OTT call. MSUMF ¶¶ 4–5 (hereinafter "Settlement Agreement" or "Agreement"). To account for the pending appeal, the Parties agreed that AT&T must continue paying these charges unless and until the FCC's order was overturned "and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review." MSUMF ¶ 5. If and when that happened, Level 3 was required to refund fifty percent of the charges "to the extent they should not have been charged in accordance with the Final Appellate Order," and Level 3 would thereafter bill and AT&T would pay for OTT traffic "in compliance with terms of that order." *Id*.

One question presented in this case is when the order became "final." Level 3 claims it became final on February 19, 2020, because no one appealed the FCC's December 2019 Order on Remand. AT&T claims it became final in May 2017 because the D.C. Circuit's decision was not appealed to the Supreme Court. The Agreement does not permit AT&T's interpretation. The

D.C. Circuit's opinion provided no guidance regarding whether carriers could or could not bill end office charges on OTT calls; thus, Level 3 could not refund 50 percent because it did not know what, if anything to refund, and could not bill "in compliance with" the order for the same reason. Only after the December 2019 FCC's Order on Remand were these questions answered.

Despite the lack of clarity, in 2017 AT&T took matters into its own hands and started to withhold payment on 65 percent of Level 3's end office charges. MSUMF ¶ 43. The 65-percent figure was not based on any calculation; indeed, AT&T readily admits it had no idea what percentage of Level 3's traffic is OTT. MSUMF ¶¶ 34–39.[1] To establish that AT&T was over-withholding, Level 3 provided an analysis to AT&T showing that ██ percent of its originating traffic was OTT. MSUMF ¶ 44. AT&T continued to withhold 65 percent nonetheless. Indeed, since January 2019, AT&T has withheld more than 100 percent of the end office charges assessed by Level 3. MSUMF ¶ 46. In this lawsuit, Level 3 has analyzed its traffic from January 2019 to the present—the traffic remaining at issue in this case—and determined that ██ percent is OTT. MSUMF ¶ 50. AT&T retained an expert to challenge this analysis; however, even taking his challenges into account, no more than ██ percent of Level 3's traffic is OTT. MSUMF ¶ 65. To focus the dispute, Level 3 asks the Court to evaluate the undisputed evidence and find that Level 3's OTT percentage on calls to AT&T is ██ percent or less.

Finally, over the course of this dispute, Level 3 raised concerns about AT&T's own traffic, and identified products where AT&T was billing Level 3 end office charges on OTT

---

[1] Level 3's tariff requires AT&T to pay invoiced charges unless it raises a dispute containing "[d]etails sufficient to identify the specific amount(s) and item(s) in dispute." MSUMF ¶ 80. AT&T impermissibly attempts to shift the burden to Level 3 to prove the validity of the charges, when in reality AT&T must pay the invoices unless it establishes a charge is incorrectly billed.

calls. AT&T has since come to recognize that AT&T itself—through its billing partner and affiliate Teleport Communications Group, Inc. ("TCG")—is billing end office charges on OTT calls. MSUMF ¶¶ 75–76. Instead of conducting a comprehensive analysis like Level 3, AT&T evaluated only one aspect of its customer's calling and found that 2.13 percent of its traffic was OTT. MSUMF ¶¶ 76–77. AT&T and TCG billed end office charges on these calls in violation of the FCC's Order on Remand and therefore violated Section 201(b) of the Communications Act.

Level 3 therefore moves for summary judgment on liability on Counts I, II, and IV of its Counterclaims (for breach of contract, declaratory relief, and violation of Section 201(b) (ECF No. 124 ¶¶ 60–80, 95–101), and on AT&T's parallel claims for breach of contract and declaratory relief (ECF No. 1, claims One and Three).[2]

## II.     PROCEDURAL AND FACTUAL BACKGROUND

### A.     IN FEBRUARY 2015, THE FCC FOUND THAT LECS MAY ASSESS END OFFICE CHARGES ON OTT CALLS.

There has been a long-running industry-wide dispute over whether local exchange carriers ("LECs") can assess end office charges on OTT calls. *See, e.g., Teliax, Inc. v. AT&T*, 2017 WL 3839459, *2 (D. Colo. Sept. 1, 2017). OTT calls are those that originate over a third-party internet connection, and do not traverse the LEC's last mile facilities. FCC's Order on Remand at ¶¶ 3–4. Historically, AT&T argued that IXCs were *not* required to pay these charges, and withheld payment on those charges to LECs such as Level 3. MSUMF ¶ 4. In February 2015, the FCC rejected AT&T's contention, determining that LECs could assess end office charges on OTT traffic. *See In the Matter of Connect Am. Fund*, 30 FCC Rcd. 1587, ¶¶ 7, 16–18

---

[2] The Parties are attempting to negotiate a stipulation on the damages to which Level 3 would be entitled depending on whose legal theories prevail. While the work continues, thus far, they have been unable to do so. This Motion therefore seeks judgment only as to liability.

(2015) (the "OTT Declaratory Order"); MSUMF ¶ 2.

**B.   DURING APPEAL OF THE OTT DECLARATORY ORDER, AT&T AGREED TO PAY LEVEL 3 END OFFICE CHARGES ON OTT CALLS UNLESS AND UNTIL IT WAS DECIDED SUCH CHARGES "SHOULD NOT HAVE BEEN CHARGED."**

In April 2015, Level 3 and AT&T initiated negotiations to resolve their dispute regarding OTT charges. MSUMF ¶ 9. During these negotiations, Level 3 sent an email to AT&T disagreeing with AT&T's proposal that if AT&T should succeed on its then-pending appeal of the OTT Declaratory Order, AT&T would be entitled to a full refund of end office charges:

> I think the biggest business item worth covering today is the proposed concept of settlement of OTT, with the condition that the appeal would over-ride whatever we agree. Initially, we see that as simply a transfer of retro and prospective reserved/unrecognized monies from AT&T to Level 3, and held in escrow (conceptually at least) until the appeal is concluded. We're not clear that this approach will really solve much for either party at this stage given the subsequent uncertainty[.] Our preference therefore, would be full and final settlement.

MSUMF ¶ 10. Shortly thereafter, Level 3 and AT&T held discussions between senior-level management about the OTT dispute. MSUMF ¶ 11. In attendance was George Sloan, AT&T's Vice President of Global Connection Management, and Mike Riederer, Level 3's Senior Vice President of Network Planning. MSUMF ¶ 11. After the meeting, Mr. Sloan sent an email to Kim Meola, the AT&T employee responsible for the OTT dispute, which "captured the construct of the OTT/Tandem deal we agreed to with L3 today." MSUMF ¶ 12. This construct stated, among other things, that "[i]f AT&T wins its FCC appeal, AT&T can only clawback 50% of the disputed amount starting June 2015 *through the date of the FCC ruling.*" MSUMF ¶ 12 (emphasis added). Mr. Sloan delegated responsibility for drafting a term sheet to Kim Meola—AT&T's subject matter expert—and her team, which included lawyers. MSUMF ¶¶ 15–16.

The next day, Mr. Sloan sent Level 3 a term sheet that listed six terms which he

represented as AT&T's "attempt to capture our agreement construct." MSUMF ¶ 14. AT&T admits that the first five points from the term sheet were encapsulated in the Agreement in concept. MSUMF ¶ 17. The sixth term listed in the email stated "If AT&T wins its FCC appeal, L3 will refund 50% of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals or, if remanded, by the FCC ruling." MSUMF ¶ 14. This point number six, according to Mr. Riederer, reflected the parties' agreement that, if the FCC changed the way that companies could bill for OTT traffic, then that would impact the forward-looking aspect of the settlement agreement. MSUMF ¶ 18. No one at AT&T had any discussions with anyone at Level 3 indicating that AT&T's intent for the Settlement Agreement was different or changed from that reflected in the May 8, 2015 term sheet. MSUMF ¶ 19.

On May 11, 2015, Level 3 sent a draft of a proposed Settlement Agreement to AT&T. MSUMF ¶ 22. The following day, two members of Ms. Meola's team created an internal draft of a settlement agreement to send back to Level 3. MSUMF ¶ 23. That draft, which was never sent to Level 3, contained a provision in Section 1(a)(iv) stating:

> Level 3 will refund fifty percent (50%) of the disputed OTT charges beginning with June 2015 usage through the date on which such order becomes final either from the Court of Appeals or, if remanded, by the FCC ruling, and is no longer subject to further appeal or other review.

MSUMF ¶ 23. On May 15, AT&T returned a redlined draft of the Agreement to Level 3. The revised Section 1(a)(iv) read as follows, with italicized and bolded language added by AT&T:

> For any OTT usage prior to June 2015, Although the Parties agree that this settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. ***Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part***, the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review, Level 3 will refund within 30 days, fifty percent (50%) of the disputed

> OTT charges beginning with June 2015 usage- traffic through the date on which such order becomes final and is no longer subject to further appeal or other judicial review. ***Further, the Parties agree that any billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order.***

MSUMF ¶ 24. Level 3 sent AT&T its proposed edits on May 21, 2015. Its modifications to

Section 1(a)(iv) are italicized and bolded below:

> Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review Level 3 will refund, within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; ***provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order***. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.

MSUMF ¶ 25. This is the version of Section 1(a)(iv) that was contained in the Release and

Settlement Agreement the parties executed in May 2015. MSUMF ¶ 5.

## C.   THE COURT OF APPEALS REMANDED WITHOUT ISSUING A "FINAL" ORDER.

In November 2016, the D.C. Circuit "vacated and remanded the Declaratory Ruling."

*AT&T Corp. v. FCC*, 841 F.3d 1047 (D.C. Cir. 2016); MSUMF ¶ 27. But it did not determine

whether LECs could or could not assess end office charges on OTT calls. MSUMF ¶ 28. Instead,

the court found that "the Declaratory Ruling does not disclose the Commission's reasoning with

the requisite clarity to enable us to sustain its conclusion," and "vacate[d] and remand[ed] the

order to the Commission for further explanation." *Id.* 1049. In remanding, the D.C. Circuit made

clear that the underlying administrative action was still ongoing and undecided, and even

7

anticipated additional potential litigation following a subsequent FCC order addressing this same administrative action, *i.e.*, "whether the local carrier and its VoIP partner were performing the functional equivalent of end office switching on over-the-top VoIP calls." *Id.*

The FCC did not complete the remand from the D.C. Circuit until December 17, 2019, when it issued the 2019 "Order on Remand." 2019 WL 7018968, at *10; MSUMF ¶ 30. In its "Order on Remand," the FCC "clarif[ied]" its "interpretation of the VoIP symmetry rule" to "permit LECs to assess end office switched access charges only if the LEC or its VoIP partner provides a physical connection to the last-mile facilities used to serve an end user." *Id.* at *1. No appeal of this decision was filed; thus, the FCC's Order on Remands became final by operation of law on February 19, 2020. MSUMF ¶ 31.

**D.   AT&T WITHHELD PAYMENT AND BROUGHT THIS ACTION WHILE THE ISSUE OF HOW TO BILL FOR OTT CALLS WAS STILL PENDING BEFORE THE FCC ON REMAND.**

For years before the FCC December 2019 Order on Remand, AT&T withheld payment on 65 percent of Level 3's end office charges claiming they were OTT-related. MSUMF ¶ 43. Withholding anything at all violated the Settlement Agreement, because a "final" order had yet to issue; the D.C. Circuit had merely remanded to the FCC. AT&T also dramatically overestimated Level 3's OTT traffic. Level 3 gave AT&T data in 2017 to show its OTT percent was approximately ▮ percent for originating and ▮ percent for terminating traffic. MSUMF ¶ 44. Yet AT&T continued to withhold at 65 percent of charges. MSUMF ¶ 45. AT&T has thus withheld charges on traditional (i.e., not OTT) calling to the tune of millions of dollars each year. MSUMF ¶ 45. In fact, throughout 2019 and 2020, AT&T withheld more than Level 3's **total** end office billings. MSUMF ¶ 46.

AT&T attempts to justify its withholding of 65 percent of the charges by referring to a

retrospective provision in the Settlement Agreement. That provision states:

> No later than thirty (30) days after the receipt of Level 3's invoice for traffic exchanged from April 1 through May 31, 2015, seventy-five percent (75%) of the amount of the switched access usage charges for traffic that is the subject of the Dispute billed by Level 3, which has historically been approximately sixty-five percent (65%) of overall billing for end office switching ("April-May Supplemental Settlement Amount"). AT&T will transmit the April-May Supplemental Settlement Amount to the Level 3 account designated to receive switched access payments using the Parties' standard process for switched access payments.

MSUMF ¶ 5. That 65-percent figure was mentioned nowhere else in the Agreement, and in particular, not in any aspect of the *prospective* components of the Agreement.

AT&T designated Mr. Ardell Burgess as a 30(b)(6) witness to discuss the intent of the 65-percent factor referenced in this paragraph. MSUMF ¶ 34. Both Mr. Burgess and Level 3's witness on the same subject acknowledged that Level 3 was not claiming 65 percent of its end office billings were for OTT traffic. MSUMF ¶ 38. In fact, AT&T admits that it has no facts that Level 3's OTT percentage was *ever* 65 percent. MSUMF ¶ 39. Rather, the purpose of the 65-percent figure was to establish that AT&T had historically disputed and withheld 65 percent of Level 3's end office switched access charges, and that the parties had used this percentage as a reference point in the past.[3] MSUMF ¶ 40. Thus, the 65-percent figure was simply used to determine how much AT&T had to pay Level 3 for April and May 2015 billings, which were not yet final when the Settlement Agreement was executed in May 2015. MSUMF ¶ 40.

Prospectively, the Agreement requires Level 3 to refund fifty percent of its *actual* OTT calling. MSUMF ¶ 41. The Agreement permits Level 3 to bill end office charges on all non-OTT

---

[3] In July 2013, AT&T and Level 3 entered into a separate agreement that applied only to traffic for calendar year 2013. In that agreement, the parties agreed to consider 65 percent of Level 3's traffic to be OTT because "the Parties had been unable to determine the volume of Level 3 traffic that was OTT prior to the Effective Date of this Settlement Agreement." MSUMF ¶ 35.

calls that originate from a Level 3 telephone number. MSUMF ¶ 42. If Level 3's actual OTT percentage is less than the 65 percent AT&T has withheld, then, as AT&T's witness acknowledges, it has over-withheld. MSUMF ¶ 41.

The evidence confirms that AT&T did just that. Level 3 employee Andrew McClure, using an analysis of calls originated using Level 3 telephone numbers destined for AT&T, calculated Level 3's OTT traffic to be ▮ percent since January 1, 2019, the relevant damages period. MSUMF ¶¶ 50, 54.[4] Neither AT&T nor its expert has ever attempted to calculate an OTT percentage for Level 3. MSUMF ¶¶ 51–52.[5] The few issues AT&T identifies in Mr. McClure's calculations are largely immaterial, affecting his calculations by no more than a few percentage points. MSUMF ¶ 66. Thus, while the exact percentage of Level 3's OTT traffic is a question of fact for trial, under all circumstances, it is clear that (a) Level 3's OTT percentage is ▮ percent or less, and (b) AT&T has dramatically over-withheld and owes Level 3 millions of dollars.

**E.    AT&T HAS ITSELF ASSESSED LEVEL 3 UNLAWFUL END OFFICE CHARGES.**

---

[4] AT&T and Level 3 entered into a separate settlement agreement that changed the June 1, 2015 date in Sections (1)(a)(ii), 1(a)(iii) and 1(a)(iv) to January 1, 2019. Thus, for purposes of Level 3's traffic, only traffic from January 1, 2019 and after is at issue. MSUMF ¶ 7. In addition, because the FCC eliminated end office charges on all terminating traffic from July 2017 onward, this lawsuit only concerns Level 3's originating traffic. MSUMF ¶ 8.

[5] AT&T retained an expert, Dr. Penn Pfautz, to review Mr. McClure's analysis. Dr. Pfautz's "biggest concern" about this analysis concerns the methods used to gather OTT percentages from individual Level 3 customers. MSUMF ¶ 55. But this concern has very little impact on Level 3's percent OTT. If Level 3 assumes that 100 percent of the calling for customers it originally identified as having some OTT functionality, Level 3's OTT percentage would rise from ▮ to ▮ percent. MSUMF ¶ 56. Dr. Pfautz also identified a few specific customers Mr. McClure had identified as having no OTT traffic and expressed concerns about that identification. MSUMF ¶¶ 57, 63. For the few of those customers that continue to have a relationship with Level 3 and could even possibly have OTT traffic, even assuming *all* of their traffic is OTT, Level 3's OTT percent would rise no higher than ▮ percent. MSUMF ¶ 65. Dr. Pfautz admits that he does not have any evidence that Level 3's percent OTT is any higher than ▮ percent. MSUMF ¶ 66.

During the time AT&T has been arguing that Level 3's end office charges on OTT traffic is unlawful, AT&T, through its affiliate TCG, has assessed those exact charges to Level 3. AT&T initially denied this, claiming it did not assess end office charges on any OTT calling. MSUMF ¶¶ 73–74. But Level 3's lawsuit and discovery prompted AT&T to review its practices and AT&T discovered that it *did* have OTT calling on its network. MSUMF ¶ 75. Specifically, AT&T's affiliate TCG has assessed Level 3 and its affiliates end office charges on OTT calling. MSUMF ¶ 76. AT&T/TCG admits that just over two percent of its calls are OTT. MSUMF ¶ 77.[6] AT&T acknowledges both that TCG assessed these charges and that it should not have done so, even issuing credits for some past charges. MSUMF ¶ 78. However, after issuing credits for such traffic in mid-2019, TCG has not issued any credits since. MSUMF ¶¶ 78–79.

III.    ARGUMENT

AT&T's sole remaining claims are its claim for breach of contract and its claim for declaratory judgment (to the extent it is premised on the Settlement Agreement). *See* ECF No. 76. Through these claims, AT&T asks the Court to require Level 3 to refund AT&T amounts AT&T claims under AT&T's interpretation of the Settlement Agreement. Level 3's Counterclaims Counts One and Two are mirror images of AT&T's claims; Level 3 seeks damages for amounts AT&T improperly withheld in violation of the Settlement Agreement. In addition, Count IV of the Counterclaims asserts that AT&T and TCG violated Section 201(b) of the Communications Act by billing Level 3 end office charges on OTT traffic.

AT&T's refusal to pay end office charges prior to February 19, 2020, when the "applicable order on appeal" became "final," breached the Settlement Agreement. AT&T also

---

[6] Level 3 believes this number is significantly higher—but that is a matter for another day.

breached the Settlement Agreement by withholding far more from Level 3 than any interpretation of the Agreement might justify. Finally, AT&T and TCG violated Section 201(b) of the Communications Act by assessing Level 3 end office charges on OTT traffic in violation of the FCC's Order on Remand.

## A.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem. Coal Co., Inc.*, 41 F.3d 567, 569–70 (10th Cir. 1994). A factual dispute is "material" only if it might affect the outcome under the governing law, and "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Once the moving party demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to identify admissible evidence which demonstrates a genuine dispute of material fact. *See 1–800– Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013).

## B.   THE CONDITIONS TRIGGERING THE REFUND PROVISIONS OF THE SETTLEMENT AGREEMENT WERE NOT SATISFIED UNTIL FEBRUARY 19, 2020.

The Settlement Agreement requires AT&T to pay the tariffed end office charges unless and until "the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review."

MSUMF ¶ 5. At that point, Level 3 would "be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order," and "any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with the terms of that order." MSUMF ¶ 5. Thus, under the plain language of the Agreement, Level 3 could not be required to refund any OTT charges until an order was entered that determined what "should not have been charged" on OTT calls, which did not happen until the FCC completed its Order on Remand in December 2019. Construing the Agreement to find that a final order issued in mid-2017 would eviscerate several provisions of the Settlement Agreement and would also violate the filed-rate doctrine.

### 1. Level 3's Interpretation is the Only One that Gives a Legal Meaning to All of the Agreements' Terms.

Under New York law, which governs the Agreement's interpretation (*see* MSUMF ¶ 6), "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Willsey v. Gjuraj*, 65 A.D.3d 1228, 1229–30 (N.Y. App. Div. 2009) (citations omitted). Thus, "when interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach *a practical interpretation* of the expressions of the parties so that their reasonable expectations will be realized." *G3-Purves St., LLC v. Thomson Purves, LLC*, 101 A.D.3d 37, 40 (N.Y. App. Div. 2012)) (emphasis added) (citations and quotation marks omitted). "In analyzing contractual text, a court need not turn a blind eye to context. Rather, a court should accord [contractual] language its plain meaning giving due consideration to the surrounding circumstances [and] apparent purpose which the parties sought to accomplish." *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) (citations and internal quotation marks omitted). In

addition, "Courts should, if possible, interpret a contract so that its terms will not be illegal." *United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996) (quoting *Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979, 984 (9th Cir. 1995)); *see also United States v. Brye*, 146 F.3d 1207, 1211 (10th Cir. 1998) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms . . . is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect") (quoting Restatement (Second) of Contracts § 203(a) (1979)).

Under the plain meaning of the Settlement Agreement, the "applicable order on appeal" is not "final" where it remands to the FCC for further deliberations. Recognizing that "[r]emands to administrative agencies" merely "mark a continuation of the case," courts broadly recognize that remand orders "are not generally considered final decisions." *Caesar v. West*, 195 F.3d 1373, 1374 (Fed. Cir. 1999); *see also Klees-Wallace v. Fed. Commc'ns Comm'n*, 815 F.3d 805, 808 (Fed. Cir. 2016) ("[A]n order remanding a matter to an administrative agency for further findings and proceedings is not final.") (quoting *Cabot Corp. v. United States*, 788 F.2d 1539, 1542 (Fed. Cir. 1986)); *Miami Tribe of Oklahoma*, 656 F.3d at 1139 (10th Cir. 2011) ("remand by a district court to an administrative agency for further proceedings . . . it is not a final decision."). "Where a matter is remitted to an administrative agency for further action and the agency has the power and duty to exercise discretion or to make an independent record, its function remains quasi-judicial and the order is not final." *Schreck v. Wyman*, 39 A.D.2d 809, 809 (N.Y. App. Div. 1972). Thus, the D.C. Circuit Order remanding to the FCC was not a "final" order. The condition of finality was satisfied only after the FCC completed the remand.

That the parties did not consider a remand order to be a "final" decision is further demonstrated by language in the Settlement Agreement showing what the Parties expected to do

once there was a "final" order, and what terms and instructions a "final" order would supply. Under the Agreement, "Level 3 [would] only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order." MSUMF ¶ 5. The Agreement also instructed that the Parties coordinate "billing and payments for OTT traffic . . . in compliance with terms of that order." *Id.* The D.C. Circuit Opinion remanding to the FCC does none of the things the Parties required a "final" order would do. It provided no "terms" with which the Parties' billing and payment practices could be "in compliance," and, critically, it did not determine that the OTT charges "should not have been charged"—a condition necessary to determining what charges, if any, must be refunded. By vacating the 2015 OTT Declaratory Order, the D.C. Circuit Opinion simply returned the Parties to "a world in which the Declaratory Ruling never existed"—one governed solely by the "2011 FCC rules." ECF No. 82 at 15. After the D.C. Circuit Opinion, as was also true before the 2015 OTT Declaratory Order, some parties claimed the OTT charges were lawful, and others not. MSUMF ¶ 33. Though the D.C. Circuit did not accept the reasoning the FCC offered as to why the charges could be charged, on the fundamental question of whether the OTT charges "should not have been charged," MSUMF ¶ 5, the D.C. Circuit Opinion is silent, leaving that issue for later resolution on remand.

This lack of resolution was widely acknowledged, including, in multiple cases, by this Court. *See Teliax*, 2017 WL 3839459, *2 ("[T]he issue of whether any services companies like Teliax provide constitute the 'functional equivalent' of end office switching remains an issue the FCC is currently grappling with."); ECF No. 82 at 16 ("In a nutshell, no one knows what is 'consistent[]' with the 2011 FCC rules. . . . [T]he matter is still open as to what is or is not consistent with the Transformation Order."). The FCC itself acknowledged in the 2019 Order on

Remand that "the applicability of the VoIP Symmetry Rule has not been clear" and that "retroactive clarification is necessary to provide clarity on the meaning of the VoIP Symmetry Rule." Order on Remand, 2019 WL 7018968, at *9. Thus, the D.C. Circuit Opinion did not say whether end office charges should not be assessed on OTT calls. Under the Agreement, Level 3 was "only . . . required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order." Given the D.C. Circuit Opinion's silence on whether the charges "should not have been charged," it could not have triggered a duty to refund.

AT&T may argue that end office charges should not have been assessed pursuant to the 2011 Transformation Order, as clarified by the 2019 Order on Remand (which the FCC gave retroactive effect). But neither the 2011 Order nor the 2019 Order helps AT&T. The Settlement Agreement required a 50 percent refund to the extent the OTT charges "should not have been charged in accordance with *the Final Appellate Order*." MSUMF ¶ 5 (emphasis added). If AT&T believes the D.C. Circuit Opinion was "final" as of May 2017, its entitlement to refunds must rise from the terms provided *in that order*—not a different order issued before or since.

Level 3's construction of the Settlement Agreement is also the only construction that comports with the filed-rate doctrine. "The filed-rate doctrine, or filed-tariff doctrine, provides that the rate of the carrier duly filed is the only lawful charge, and deviation from it is not permitted upon any pretext." *Qwest Corp. v. AT&T Corp.*, 479 F.3d 1206, 1210 (10th Cir. 2007) (quoting *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990)) (internal quotations omitted). The doctrine reflects the judiciary's inability to remedy purported injuries without discriminating against "similarly situated non-suing customers" that continue to pay the original, purportedly unlawful rates. *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir.

1994) (citing *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 163–64 (1922)). "The doctrine admits of few exceptions: 'This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress.'" *Qwest*, 479 F.3d at 1210 (quoting *Maislin Indus.*, 497 U.S. at 127).

One such exception is available to CLECs such as the parties here. MSUMF ¶ 1. The Communications Act codified the filed-rate doctrine in 47 U.S.C. § 203. *See Cincinnati Bell Tel. Co. v. Allnet Commc'n Servs.*, Inc., 17 F.3d 921, 924 n.4 (6th Cir. 1994). Section 203 requires LECs to file tariffs and adhere to those tariffs, unless the FCC issues a decision detariffing a particular area of service. 47 U.S.C. § 203(b)(2). Under the FCC's "permissive detariffing" regime, "a CLEC has two means by which to charge for interstate access services": it "may tariff interstate access charges," or, "as an alternative to tariffing, a CLEC may negotiate and enter into an agreement with an IXC to charge rates higher than those [otherwise] permitted." *Teliax*, 2018 WL 3729518, at *3 (citing *CallerID4u, Inc. v. MCI Communications Services Inc.*, 880 F.3d 1048 (9th Cir. 2018)). Because the filed-rate doctrine does not apply to these detariffed agreements, an agreement under which AT&T would pay ***more*** than what the FCC ultimately decided the tariff would permit Level 3 to charge does ***not*** violate the filed-rate doctrine. *See Connect Insured Tel., Inc. v. Qwest Long Distance, Inc.*, No. 3:10-CV-1897-D, 2012 WL 2995063, at *2 (N.D. Tex. July 23, 2012) (citing *Qwest Commc'ns Co., LLC v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd. 8332, 8335 (2011)). However, "the law does not permit a LEC . . . to agree to bill other IXCs ***below-tariff*** rates while charging [the IXC] tariff rates for the same service." *See, e.g., Qwest Commc'ns, LLC v. Free Conferencing Corp.*, No. CV 10-490 (MJD/SER), 2017 WL 4618277, at *25 (D. Minn. Mar. 31, 2017); *aff'd*, 905 F.3d 1068 (8th Cir.

2018); *All Am. Tel. Co. v. AT&T Corp.*, 26 FCC Rcd. 723, 732 n.47 (2011). In other words, CLECs may enter into agreements to assess ***above***-tariff rates, but not ***below***-tariff rates.

Level 3's interpretation of the Settlement Agreement is the only one that complies with these mandates. Under its interpretation, when the parties entered into the Agreement, AT&T agreed to pay tariffed rates going forward until it was determined whether the OTT charges "should not have been charged." If the FCC determined the charges were appropriate, AT&T would continue paying the tariffed charges, and thus would continue complying with the requirements of the tariff and the filed-rate doctrine. If the FCC determined the charges should ***not*** have been charged, then AT&T would receive a partial refund of those charges, yet at no point paying ***less*** than what was permitted under the FCC's rules. No matter which way the FCC ruled, Level 3's interpretation of the Settlement Agreement complied with the filed-rate doctrine.

AT&T cannot say the same. Under its interpretation, Level 3 would have been required to refund half of the charges it had assessed up to the entry of the D.C. Circuit Order—even if on remand the FCC determined that end office charges ***were*** permissible on OTT calls (as it had already done in 2015). MSUMF ¶ 33. All the while, the charges would still be listed in Level 3's tariff, and other IXCs would be obligated to pay the full tariffed rate for the same services. MSUMF ¶ 3. This would violate the filed-rate doctrine's prohibition against collusion and discrimination. *See Qwest Commc'ns Co.*, LLC, 2017 WL 4618277, at *25. The Settlement Agreement did not and could not procure for AT&T this disparate treatment. Instead, it ensured AT&T's compliance with the tariff and FCC rules at all times.

The fact that the FCC eventually decided the charges should not have been charged does not affect this point. The whole purpose of this provision of the Agreement was to address the

uncertainty on what would come of the appeal, and whether it would ultimately be decided that the charges should or should not have been charged. Hindsight is unhelpful in construing provisions into which the parties entered specifically because they lacked the benefit of that hindsight. As of the time the parties entered the Agreement, they understood the charges might ultimately be approved or disapproved (whether in whole or in part). Irrespective of the outcome, Level 3's interpretation of the Agreement complied with the filed-rate doctrine and gave legal meaning to all of the Agreement's terms. In contrast, AT&T's interpretation would not.

In sum, because the D.C. Circuit Opinion provided no terms as to billing and payment for OTT traffic with which to comply or instructions as to whether the OTT charges "should not have been charged," it triggered no obligation for Level 3 to refund any part of the charges. This duty arose only when the FCC finally provided those terms and instructions. Only Level 3's interpretation of the Agreement complies with the filed-rate doctrine. Thus, it is the only permissible interpretation this Court can consider.[7]

## 2. The Parties' Negotiations Confirm the Refund Duty did not Arise until the FCC Issued its Decision on Remand.

AT&T will likely argue that its proposed interpretation of the Agreement is a plausible construction. However, "[i]f the terms of the complete written contract are unclear, ambiguous or contradictory . . . the parol evidence rule permits the consideration of [extrinsic] evidence in order to ascertain the true meaning of the terms." *Mun. Capital Appreciation Partners, I, L.P. v.*

---

[7] The Court previously asked whether 47 U.S.C. § 407(j) answers the question of whether the D.C. Circuit Order has become "final." ECF No. 82 at 21, n.17. Level 3 believes this to be a reference to Section 402(j). The answer is "no": the plain language of the Settlement Agreement and the context make plain that the order would not be "final" if it merely remanded to the FCC. *See also* 47 U.S.C. § 402(h), which discusses the Commission's duties on remand and acknowledges the possibility of additional proceedings, not only to review the judgment but also to give effect thereto (as happened here; *see* Order on Remand, 2019 WL 7018968, ¶ 14).

*Page*, 181 F. Supp. 2d 379, 391 (S.D.N.Y. 2002) (citations omitted); *see also Stage Club Corp. v. W. Realty Co.*, 212 A.D.2d 458, 459 (N.Y. App. Div. 1995) (extrinsic evidence should not be precluded "to clarify an ambiguity caused by the absence of particulars from the writing, provided that the parol evidence to be introduced does not contradict the written agreement").

Though it is unnecessary to look beyond the plain language of the Settlement Agreement to find that the parties did not consider a remand order to trigger a refund duty, the parties' negotiations confirm that this was the parties' intention. In particular, the Term Sheet AT&T sent to Level 3 specifically states that if the Court of Appeals remanded the FCC's original decision, a refund from Level 3 would be due only after the FCC subsequently issued a final decision. *See* MSUMF ¶ 14 ("If AT&T wins its FCC appeal, L3 will refund 50% of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals *or, if remanded, by the [later] FCC ruling*.") (emphasis added). This term reflected the parties' agreement—as reached in negotiations prior to execution of the Settlement Agreement—that if the FCC changed the way that companies could bill for OTT traffic, then that would impact the forward looking aspect of the Agreement. MSUMF ¶ 18.

AT&T acknowledges that each of the other five points in the term sheet was incorporated into the Settlement Agreement. MSUMF ¶ 17. And no one at AT&T ever had any discussion with anyone at Level 3 to suggest that AT&T's intent for the Settlement Agreement was different or changed from that reflected in the Term Sheet, including item number 6. MSUMF ¶ 19. The edits made to the Settlement Agreement ultimately incorporated that concept that, if the D.C. Circuit remanded, the "final" decision would be issued post-remand. AT&T itself ensured this concept was within the Agreement when it inserted language stating that "any

billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order," MSUMF ¶ 24, and Level 3 acknowledged the point when it added language stating that "Level 3 will only be required to refund the OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order," MSUMF ¶ 25. These provisions ensure that Level 3 would not be required to refund the charges if the question of whether they "should not have been charged" was still pending on remand.

To construe the Agreement to suggest otherwise would frustrate its purpose of addressing the uncertainty of what would come of the appeal. This provision constitutes a compromise between the parties' positions during negotiations; AT&T wished to recover all charges if it was later determined they should not have been charged, while Level 3 wanted the issue to be settled and the dispute retired. MSUMF ¶ 10. With the partial refund provisions, the Parties met in the middle, agreeing to terms that would govern the parties while the uncertainty over whether the charges should have been charged still pervaded, and addressing how the parties would conduct themselves if the question was resolved in AT&T's favor. All parties understood the Settlement Agreement to incorporate the terms listed in the Term Sheet. MSUMF ¶¶ 17–19. And their negotiations over the text of the Agreement confirm this intent, including specific provisions to ensure that Level 3 would be required to refund the OTT charges only to the extent it was determined by the "final" order that the OTT charges "should not have been charged." MSUMF ¶¶ 24–25. Though the language of the Agreement shows as much on its own, these negotiations confirm that the refund duty would arise only once the FCC or the Court determined that the charges should or should not have been charged.

## C.   AT&T DRAMATICALLY OVER-WITHHELD PAYMENTS ON END OFFICE CHARGES.

Because there was no "final" order until January 2020, AT&T could not withhold any end office charges on OTT traffic at all. But its errors do not stop there. In unlawfully withholding payment on these charges, AT&T dramatically overestimated the percentage of Level 3's OTT traffic, and as a result, unlawfully withheld payment on valid charges.

As noted above, Level 3 employee Andrew McClure determined that ▉ percent of Level 3's calls to AT&T were OTT calls. MSUMF ¶ 50. What few issues AT&T identifies with this calculation are immaterial; even assuming all specific issues AT&T takes with these calculations in its favor, the percentage raises to no higher than ▉ percent, and AT&T acknowledges having no evidence that the percentage is higher than that. MSUMF ¶¶ 65–66. Given that, while the exact percentage of Level 3's OTT traffic is the subject of factual dispute, Level 3 asks the Court to enter a finding that Level 3's percentage of OTT traffic is no higher than ▉ percent.[8]

AT&T has claimed the Settlement Agreement sets the level of OTT traffic at 65 percent. But as noted above, the reference to the 65-percent figure in the Agreement applies to the *retrospective* component of the Settlement Agreement—not the *prospective* component, under which AT&T's refund would be based solely on actual OTT traffic. AT&T's own witnesses acknowledge that any refund would be based on Level 3's actual percentage of OTT traffic, not the 65-percent figure. *See* MSUMF ¶ 41. Nor is there any factual evidence to suggest that Level 3's traffic is or ever was 65 percent OTT. The 65-percent figure is a number the parties used in 2013 for settlement purposes in the absence of proof as to Level 3's actual percentage of OTT

---

[8] If the Court were to make such a finding, Level 3 would likely consider it unnecessary to continue on to trial to resolve the parties' dispute as to whether the remaining six percent of Level 3's traffic is not OTT. Such a finding should therefore facilitate the parties' ongoing discussions and resolve a significant factual dispute that has thus far hindered these discussions.

traffic. MSUMF ¶ 36. It has no bearing in reality, and never has. MSUMF ¶ 39.

AT&T has nevertheless ignored every indication Level 3 has provided to show that its actual percentage of OTT traffic was substantially lower. MSUMF ¶ 44. This resulted in AT&T improperly withholding payment for end office charges, both for OTT traffic and for traditional traffic not subject to the OTT dispute. MSUMF ¶ 45. In fact, AT&T's withholdings in 2019 and 2020 exceed all of Level 3's end office charges for OTT *and* non-OTT traffic. MSUMF ¶ 46.

AT&T has improperly withheld payment on end office charges, even under its misinterpretation of the Settlement Agreement, because it ignored the overwhelming evidence showing Level 3's traffic was a small fraction of its overall traffic. Under the Agreement, AT&T is entitled to a credit for fifty percent of the charges on Level 3's actual OTT traffic between January 1, 2019 and February 18, 2020, and 100 percent of charges on Level 3's actual OTT traffic thereafter. But AT&T has withheld payment from Level 3 far in excess of this modest credit. To balance the ledger, payment is required from AT&T—not Level 3. Under everyone's numbers, AT&T owes Level 3 many millions of dollars.[9] MSUMF ¶ 72.

**D. AT&T, THROUGH ITS AFFILIATE TCG, HAS ASSESSED LEVEL 3 UNLAWFUL END OFFICE CHARGES ON OTT CALLS.**

A cause of action exists for violation of Section 201(b) of the Communications Act where a carrier engages in a practice the FCC has determined to be unjust or unreasonable. *See Connect Insured Tel., Inc. v. Qwest Long Distance, Inc.*, No. 3:10-CV-1897-D, 2012 WL 2995063, at *2 (N.D. Tex. July 23, 2012) (citing *Global Crossing Telecommunications, Inc. v. Metrophones*

---

[9] Under Level 3's calculations, the credit to which AT&T is entitled for end office charges amounts to ▮▮▮▮▮ through April 2020. Despite that, Level 3's numbers show that AT&T withheld over ▮▮▮▮▮ from Level 3. MSUMF ¶ 72. The parties are working on trying to resolve their differences in damages calculations. Either the parties will stipulate as to damages, or the trial will be a damages trial.

*Telecommunications, Inc.*, 550 U.S. 45, 53 (2007)).[10] Here, while AT&T complained of Level 3's end office charges on OTT traffic, AT&T's own affiliate, TCG, assessed Level 3 the very same kinds of charges. MSUMF ¶¶ 75–77. The 2019 Order on Remand, which was given retroactive effect, determined that such charges are improper. MSUMF ¶ 30. When AT&T initially filed its claims against Level 3, it had never investigated whether AT&T was also assessing end office charges on OTT traffic. MSUMF ¶ 73. And when Level 3 initially levied that claim, AT&T denied those allegations. MSUMF ¶ 74. This lawsuit and discovery prompted AT&T to learn that it did have OTT calling on its own network, and that TCG was billing end office charges to Level 3 on OTT calls. MSUMF ¶¶ 75–76. AT&T/TCG now admit that TCG assessed these charges, and that it should not have done so, and even issued credits to Level 3 for these charges in mid-2019. MSUMF ¶ 78. But after assessing credits for some of these charges, TCG continued assessing the charges without issuing Level 3 a corrective credit. MSUMF ¶¶ 78–79. Thus, other credits for these unlawful charges are owed and due to Level 3.

In addition, under 47 U.S.C. § 206, anyone injured by a common carrier's unlawful practices are entitled to the resulting damages "together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery." The purpose of this and similar provisions is "to charge the carrier with the cost and expenses entailed by a failure to pay without suit" and "compensate parties who must initiate suit in order to access the unique enforcement powers of the court." *Am. Tel. & Tel. Co. v. United Artists Payphone Corp.*, 852 F. Supp. 221,

---

[10] Unlike the parties' claims based on the Settlement Agreement, which are limited to damages for traffic exchanged since January 2019, Level 3's 201(b) claims go back to the beginning of the applicable limitations period—two years before Level filed its Amended Counterclaims on September 24, 2018. *See* ECF No. 78.

225 (S.D.N.Y.) (quoting *Meeker v. Lehigh Valley R. Co.*, 236 U.S. 412, 433 (1915)).

AT&T may contend that cases such as *United Artists Payphone Corp.* permit attorney's fees only where the Court has entered an award of damages, and that attorney's fees therefore are not available here because Level 3 seeks billing credits. Such an argument would fail. *See Seeklocal Inc. v. Ameritech Servs. Inc.*, No. 05-C-1212, 2007 WL 1847281, at *1 (E.D. Wis. June 26, 2007) (awarding fees under Section 206 to the "prevailing party" in spite of fact that success was obtained via settlement agreement). Level 3 had to bring this litigation to compel AT&T and TCG to stop assessing these charges and obtain its recovery. Indeed, but for this lawsuit, AT&T would not have even realized it was billing end office charges on OTT calls. Level 3 is therefore entitled to recover the attorney's fees it expended to obtain this result.

## IV.    CONCLUSION

For the reasons stated above, Level 3 respectfully requests that the Court grant summary judgment in its favor.

Respectfully submitted this 29th day of June, 2020.

By:    /s/ Charles W. Steese
Charles W. Steese, #26924
Douglas N. Marsh, #45964
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

*Attorneys for Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Charles W. Steese, hereby certify that on June 29, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael D. Warden
Michael J. Hunseder
Justin A. Benson
Joshua W. Moore
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mwarden@sidley.com
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com
E-mail: joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp. and Counterclaim Defendant Teleport Communications Group, Inc.*

/s/ Charles W. Steese
Charles W. Steese