**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

      Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

      Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

      Counterclaim Defendant.

---

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

---

    Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), respectfully submit their Statement of Material Undisputed Facts in support of their Motion for Summary Judgment ("SMUF").

            \*       \*       \*

| | Moving Party's Statement of Undisputed Material Facts ("MSUMF") and Supporting Evidence | Opposing Party's Response and Additional Facts ("OSUMF") and Supporting Evidence | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| | **Parties** | | |
| 1. | Level 3 Communications, LLC ("Level 3"), AT&T Corp. (AT&T), and Teleport Communications Group, Inc. ("TCG") are all Competitive Local Exchange Carriers, or CLECs. *See* ECF No. 124 ¶¶ 15, 17, 18; ECF No. 128 ¶¶ 15, 17, 18. | | |
| | **2015 Settlement Agreement** | | |
| 2. | In a February 11, 2015 Declaratory Ruling, the FCC determined that local exchange carriers could assess end office switched access charges on over-the-top Voice over Internet Protocol (hereinafter "OTT") traffic. *See Connect America Fund*, WC Docket No. 10-90, et al., Declaratory Ruling, FCC 15-14 (rel. Feb. 11, 2015) (hereinafter "2015 OTT Declaratory Ruling"); *Exhibit 1* at 1, third whereas clause. | | |
| 3. | Level 3's interstate access tariff specifically defines "End Office Access Service" to include OTT-VoIP traffic and states that Level 3 is entitled to assess end office access charges on such traffic, stating as follows:<br><br>End Office Access Service: For the purpose of this tariff, End Office Access Service shall mean: . . . (2) The routing of interexchange | | |

| | | | |
|---|---|---|---|
| | telecommunications traffic to or from the called party's premises, either directly or via contractual or other arrangements with an affiliated or unaffiliated entity, regardless of the specific functions provided or facilities used; or . . . (4) The origination and termination of interexchange telecommunications traffic to any end user, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as defined in 47 U.S.C. § 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. § 153(36), that does not itself seek to collect reciprocal compensation charges prescribed by this subpart for that traffic, regardless of the specific functions provided or facilities used.<br><br>*Exhibit 2* (Level 3 Tariff F.C.C. No. 4) § 1 ("End Office Access Service"). | | |
| 4. | In May 2015, Level 3 and AT&T entered into a "Release and Settlement Agreement" (hereinafter "Agreement"). *See Exhibit 1*. One purpose of the Agreement was to resolve an ongoing dispute between the parties regarding the applicability of tariffed end office switched access charges to OTT traffic. *See Exhibit 1* at 1, second and third whereas clauses. | | |
| 5. | Section 1(a) of the Agreement resolved the OTT dispute between Level 3 and AT&T in pertinent part as follows:<br><br>    (i) In settlement of the OTT Dispute AT&T | | |

| | agrees to pay Level 3 the following: | | |
|---|---|---|---|
| | (A) Within fifteen business days of the Effective Date, [specific number excluded], which is seventy-five percent (75%) of the usage and late payment charges billed by Level 3 for the traffic exchanged by the Parties through March 2015 that is the subject of the OTT Dispute ("OTT Settlement Amount"). . . . The Parties recognize that due to invoice cycles and billing requirements, the calculation of usage and late payment charges included in the total amount of charges identified in this Section 1(a)(i)(A) may vary from the actual amount owed once all billing is complete. As a result, the Parties agree that the amount due for April and May 2015 usage may be subject to an adjustment to reflect the appropriate value. | | |
| | (B) No later than thirty (30) days after the receipt of Level 3's invoice for traffic exchanged from April 1 through May 31, 2015, seventy-five percent (75%) of the amount of the switched access usage charges for traffic that is the subject of the Dispute billed by Level 3, which has historically been approximately sixty-five percent (65%) of overall billing for end office switching ("April-May Supplemental Settlement Amount"). AT&T will transmit the April-May Supplemental Settlement Amount to the Level 3 account designated to receive | | |

switched access payments using the Parties' standard process for switched access payments.

     *   *   *

(ii) For switched access traffic exchanged by the Parties beginning on June 1, 2015, AT&T shall pay Level 3 its applicable switched access tariffed rate for OTT traffic, pursuant to the terms of the OTT Declaratory Order. For avoidance of doubt, this Settlement Agreement shall not prohibit AT&T from disputing Level 3's billing for switched access traffic for reasons unrelated to the requirements of the OTT Declaratory Order, including but not limited to disputes regarding volumes or applicable rates.

(iii) Beginning June 1, 2015, Level 3 shall not bill AT&T for any end office switched access charge elements for domestic OTT traffic that does not originate from a calling party number or does not terminate to a called party number (together with calling party number "CPN") that is assigned by Level 3 and for which Level 3 is designated as the provider in the Number Portability Administration Center ('NPAC') database ("Non-Level 3 CPN OTT Calls"). For avoidance of doubt, the Parties agree that Level 3 will continue to bill AT&T full switched access charges on domestic traffic that originates with or terminates to Level 3 assigned CPN.

(iv) Although the Parties agree that this

|  | | | |
|---|---|---|---|
|  | Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review ("Final Appellate Order"), Level 3 will refund, within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.<br><br>*See Exhibit 1* § 1(a). | | |
| 6. | New York Law governs interpretation of the 2015 Settlement Agreement. *See Exhibit 1* § 5. | | |
| 7. | AT&T and Level 3 entered into a separate settlement agreement that changed the June 1, 2015 date in Sections (1)(a)(ii), 1(a)(iii) and | | |

| | | | |
|---|---|---|---|
| | 1(a)(iv) to January 1, 2019. Thus, for purposes of Level 3's traffic, only traffic from January 1, 2019 and after is at issue. *See Exhibit 3* (Declaration of Charles W. Steese) ¶ 38. | | |
| 8. | In its *Connect America Fund* Order, the FCC determined that end office charges on all terminating traffic would be billed at $0.00 per minute from July 2017 onward. *See In the Matter of Connect Am. Fund*, 26 FCC Rcd. 17663, at *205 (2011). As a result, in this lawsuit Level 3's OTT percentage only impacts its originating traffic. *See Exhibit 4* (P. Pfautz Depo.) at 124:15–125:14. | | |
| | **Negotiation of Agreement** | | |
| 9. | Around April 2015, after the FCC issued its 2015 OTT Declaratory Ruling, Level 3 and AT&T initiated negotiations in an attempt to resolve the OTT dispute. *See Exhibit 5* (K. Meola Depo.) at 111:14–114:19; *Exhibit 6* (K. Meola Depo. Ex. 10). | | |
| 10. | On April 15, 2015, Level 3 sent an email to AT&T expressing disagreement on the parties' respective positions on the impact of an appeal on the finality of the settlement the parties were negotiating, stating as follows:<br><br>I think the biggest business item worth covering today is the proposed concept of settlement of OTT, with the condition that the appeal would over -ride whatever we agree. | | |

|  | | | |
|---|---|---|---|
|  | Initially, we see that as simply a transfer of retro and prospective reserved /unrecognized monies from AT &T to Level 3, and held in escrow (conceptually at least) until the appeal is concluded. We're not clear that this approach will really solve much for either party at this stage given the subsequent uncertainty? Our preference therefore, would be full and final settlement - we should discuss whether that is an option here and/or whether we're missing any potential benefit from your original proposal.<br><br>*See Exhibit 7* (K. Meola Depo. Ex. 14) at ATT_PROD_0011781; *Exhibit 5* (K. Meola Depo.) at 136:5–137:12. | | |
| 11. | On May 7, 2015, Mike Riederer, Senior Vice President of Network Planning for Level 3 (*see Exhibit 8* (M. Riederer Depo.) at 5:22–6:4) met in Dallas, Texas with George Sloan, AT&T's Vice President Global Connection Management (*see Exhibit 9* (G. Sloan Depo.) at 18:22–20:19), as well as Mr. Sloan's boss, William Hauge (*id.* at 19:6–14), to discuss, among other things, the OTT dispute between Level 3 and AT&T. *See Exhibit 8* (M. Riederer Depo.) at 20:17–21:17 & 25:9–21); *Exhibit 9* (G. Sloan Depo.) at 19:6–20:18; *Exhibit 10* (K. Meola Depo. Ex. 18) at CTL_0004196 (verifying meeting on May 7, 2015); *Exhibit 11* (A. Burgess Depo.) at 110:10–111:3 (Sloan and Hague were "the assigned … officers to negotiate the settlement" with Level 3). | | |

| | |
|---|---|
| 12. | On May 7, 2015, Mr. Sloan sent an email to Kim Meola—the person at AT&T responsible for the OTT dispute—which stated the following with respect to the OTT dispute: |

Kim:

Thanks for stepping out of LWD today to help. Below **I've captured the construct of the OTT/Tandem deal we agreed to with L3 today. I'd appreciate you doing two things: (a) Double check that this deal works for you, and (b) please have the appropriate attorney review/enhance the language. I want to send this construct language over to Mike Riederer Friday AM**.

(1) AT&T agrees to pay 75% of L3's retrospective claims on OTT and Tandem through the end of May 2015. ACTION: I'll set up some time with us and Mike Riederer tomorrow to run through the math on the late payments together. Our intent is to pay in the 25% range as discussed.

(2) Regardless of whether AT&T wins or loses its FCC appeal, neither AT&T or L3 can clawback additional amounts for OTT/Tandem claims for any period prior to June 2015.

(3) If AT&T wins its FCC appeal, AT&T can only clawback 50% of the disputed amount starting June 2015 **through the date of the FCC ruling.**

| | | | |
|---|---|---|---|
| | (4) AT&T and L3 agree to pricing that is 75% of L3's asking price (need help with this language) for Tandem moving forward.<br><br>*See Exhibit 12* (G. Sloan Depo. Ex. 20) at AT&T 0011854 (emphasis added). | | |
| 13. | Mr. Sloan testified that he does his best to be "accurate and complete in the materials he sends in emails." *See Exhibit 9* (G. Sloan Depo.) at 20:22–21:2. | | |
| 14. | On May 8, 2015, George Sloan sent Mike Riederer an email captioned "Settlement Proposal – Confidential." With respect to the OTT dispute, the email stated:<br><br>    Here is our attempt to capture our agreement construct. Two items you will notice: (a) The late fees are separated out. I know you guys don't want it recorded this way. If the math works out, Monday morning, I'll support the flat 75%. (b) The team added an additional item they believe is closed and can be formalized in this document. I look forward to discussing more Monday morning. I'll have Kim Meola with me from John Nolan's team. Thanks. George<br><br>    ***<br><br>    Settlement Terms - OTT Dispute<br><br>    (1) AT&T agrees to pay 75% of L3's retrospective claims on OTT for usage incurred through the end of May 2015. Note: Billed | | |

| | | | |
|---|---|---|---|
| | usage does not include LPCs.<br><br>(2) AT&T agrees to pay 25% of the LPCs associated with OTT usage billed through end of May 2015.<br><br>(3) AT&T agrees to pay L3 full switched access per the Level3 tariffs for both originating and terminating OTT traffic on a prospective basis for June 2015 usage forward.<br><br>(4) On a prospective basis, beginning with June 2015, Level 3 will not bill any EO elements associated with domestic originated OTT 8YY traffic not reflecting a Level 3 owned CPN or CPNLess traffic that is not served by a Level 3 end office. Level 3 will continue to bill full switched access on Level 3 owned TNs.<br><br>(5) For any usage prior to June 2015, the settlement is a full and final settlement of all disputes and balances regardless of whether AT&T wins or loses its FCC appeal.<br><br>(6) ***If AT&T wins its FCC appeal, L3 will refund 50% of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals or, if remanded, by the FCC ruling.***<br><br>*See Exhibit 13* (K. Meola Depo. Ex. 19) at CTL 11324–26 (emphasis added). | | |
| 15. | Mr. Sloan delegated responsibility for drafting the term sheet referenced in Paragraph 17 to Kim Meola and her team. *See Exhibit 9* (G. Sloan Depo.) at 53:6–54:15 & 56:7–22; *Exhibit 5* (K. | | |

| | | | |
|---|---|---|---|
| | Meola Depo.) at 161:5–162:8. | | |
| 16. | AT&T had its legal department involved in the negotiations of the OTT dispute. *See Exhibit 5* (K. Meola Depo.) at 174:3–177:6 & 187:2–10. | | |
| 17. | Points one through five in the May 8, 2015 term sheet are all encapsulated in concept in the Agreement. *See Exhibit 5* (K. Meola Depo.) at 162:23–165:6. | | |
| 18. | In deposition, Mike Riederer testified that point number six in the May 8, 2015 term sheet reflected the parties' agreement that if the FCC changed the way that companies could bill for OTT traffic, then that would impact the forward looking aspect of the settlement agreement. *See Exhibit 8* (M. Riederer Depo.) at 46:21–49:23. | | |
| 19. | No one at AT&T had any discussions with anyone at Level 3 indicating that AT&T's intent for the Settlement Agreement was different or changed from that reflected in item number six in the May 8, 2015 term sheet. *See Exhibit 5* (K. Meola Depo.) at 167:14–168:3. | | |
| 20. | Kim Meola, who was AT&T's 30(b)(6) witness responsible for testifying about negotiating terms of the Agreement, stated that "serious discussions" about resolving the OTT dispute did not occur until May 2015 when Mr. Hague got involved on behalf of AT&T. *See Exhibit 5* (K. Meola Depo.) at 13:19–15:7 (identifying subjects on which Ms. Meola is corporate representative); *id.* at 112:21– | | |

| | | | |
|---|---|---|---|
| | 113:19. | | |
| 21. | On May 10, 2015, George Sloan—who had tried to keep late payment charges to 25%—sent an email to Ms. Meola stating:<br><br>I agreed to 75% of payments due for OTT /Tandem through end of May including paying 75% on the late payments which Riederer commits will be no more than ████. Although we were hoping to pay somewhere less than the 75% on the late payments he made this a really big deal Friday PM and was about to derail the peering deal.<br><br>*Exhibit 14* (G. Sloan Depo. Ex. 92) at ATT_PROD_0011862. | | |
| 22. | On May 11, 2015, Level 3 sent the first draft of a proposed settlement agreement to AT&T. *See Exhibit 15* (K. Meola Depo. Ex. 22) [CTL012906–15]. | | |
| 23. | On May 12, 2015, two members of Ms. Meola's team—Ardell Burgess and Craig John—created an internal draft of a settlement agreement to send to Level 3. That draft, which was never sent to Level 3, contained the following language in section 1(a)(iv):<br><br>Level 3 will refund fifty percent (50%) of the disputed OTT charges beginning with June 2015 usage through the date on which such order becomes final either from the Court of Appeals or, if remanded, by the FCC ruling, and | | |

| | | | |
|---|---|---|---|
| | is no longer subject to further appeal or other review. | | |
| | *See Exhibit 16* (G. Sloan Depo. Exs. 90 and 91) at ATT_PROD_0014104. | | |
| 24. | On May 15, 2015, AT&T sent Level 3 a heavily redlined settlement agreement. Section 1(a)(iv) was relined to read as follows (with italicized and bolded language added by AT&T): | | |
| | (iv)  For any OTT usage prior to June 2015, Although the Parties agree that this settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. ***Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part***, the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review, Level 3 will refund within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 usage- traffic through the date on which such order becomes final and is no longer subject to further appeal or other judicial review. ***Further, the Parties agree that any billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order.*** | | |
| | *Exhibit 17* (K. Meola Depo. Ex. 23) at CTL_0012895; *Exhibit 5* (K. Meola Depo.) at | | |

| | | | |
|---|---|---|---|
| | 198:19–199:14. | | |
| 25. | On May 21, 2015, Level 3 sent AT&T its redlines, which modified section 1(a)(iv) to read as follows (with italicized and bolded language added by Level 3):<br><br>(iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review Level 3 will refund, within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; ***provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order***. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.<br><br>*See Exhibit 18* (K. Meola Depo. Ex. 24) at | | |

| | | | |
|---|---|---|---|
| | CTL_004212. | | |
| 26. | All of Ms. Meola's verbal communications with Level 3 regarding negotiating the OTT dispute were memorialized in writing. *See Exhibit 5* (K. Meola Depo.) at 61:24–62:6; *id.* at 110:25–111:8. | | |
| 27. | In November 2016, the D.C. Circuit Court of Appeals issued a decision on appeal from the FCC's OTT Declaratory Order. *See Exhibit 19* (K. Meola Depo. Ex. 26). In that decision, the D.C. Circuit Court of Appeals found that the FCC did not sufficiently disclose the reasoning for its decision and therefore "vacate[d] and remand[ed] the order to the Commission for further explanation." *Id.* | | |
| 28. | The D.C. Circuit did not determine whether LECs could or could not assess end office charges on OTT calls. *See Exhibit 19* (K. Meola Depo. Ex. 26); *Exhibit 11* (A. Burgess Depo.) at 125:17–21; *Exhibit 20* (J. Torres 12-19-19 Depo.) at 265:5–9. | | |
| 29. | On May 11, 2018, CenturyLink filed a petition for declaratory ruling with the FCC asking the FCC to find that end office switched access charges applied to OTT traffic. *See Exhibit 21* (CenturyLink Petition for Declaratory Ruling). | | |
| 30. | On December 17, 2019, the FCC issued an "Order on Remand and Declaratory Ruling" specifically stating, among other things, that the decision was issued to comply with the remand back from the September 8, 2016 D.C. Circuit Court of Appeals' | | |

| | | | |
|---|---|---|---|
| | decision. *See* Order on Remand, 2019 WL 7018968, *Exhibit 22* ¶ 3. In this decision on remand, the FCC clarified that end office switched access charges do not apply to OTT calls. *Id.* ¶ 24. | | |
| 31. | No one appealed the FCC's December 17, 2019 OTT order, which became final by operation of law on February 19, 2020. *See Exhibit 3* (Declaration of Charles W. Steese) ¶ 25. | | |
| 32. | Ms. Meola, AT&T's 30(b)(6) witness on the intent of the Agreement, testified that before the FCC's 2015 OTT Declaratory Ruling, there was a difference of view in the industry about whether OTT calls were subject to end office switched access charges. *Exhibit 5* (K. Meola Depo.) at 179:7–13. | | |
| 33. | Ms. Meola also testified that if, on remand, the FCC affirmed that end office charges applied to OTT calls, then AT&T believed that Level 3 must still rebate 50 percent of the charges associated with OTT calls pursuant to section 1(a)(iv). *Exhibit 5* (K. Meola Depo.) at 194:24–195:23. | | |
| | **Meaning of 65% Factor in Agreement** | | |
| 34. | Both Level 3 and AT&T designated a 30(b)(6) witness to discuss the intent of the 65 percent factor referenced in Section 1(a)(i)(B) of the Agreement: AT&T designated Mr. Ardell Burgess (*see Exhibit 11* (A. Burgess Depo.) at 11:14–12:4), and Level 3 designated Ms. Jennifer Torres (*see Exhibit 23* (J. Torres 8-28-19 Depo.) at 18:13– | | |

| | | | |
|---|---|---|---|
| | 21:13). | | |
| 35. | In July 2013, AT&T and Level 3 entered into a separate written agreement, which was only in effect during calendar year 2013 and stated:<br><br>Because the Parties had been unable to determine the volume of Level 3 traffic that was OTT prior to the Effective Date of this Settlement Agreement, Level 3 and AT&T agree that for the period January 2013 through December 2013, 65% of the end office traffic billed to AT&T CORP by Level 3 is OTT provider traffic.<br><br>*See Exhibit 24* (K. Meola Depo. Ex. 6) § 2.16. | | |
| 36. | AT&T admits that at the time it entered into the 2013 agreement it did not know Level 3's OTT percentage. *See Exhibit 11* (A. Burgess Depo.) at 99:22–100:25. | | |
| 37. | The 2015 Agreement stated that 75 percent of all end office billings through June 2015 would be paid; however, at the time the Agreement was executed, two months of billings still needed to be reconciled. *See Exhibit 11* (A. Burgess Depo.) at 120:14–121:19; *Exhibit 23* (J. Torres 8-28-19 Depo.) at 37:24–38:20 & 70:24–73:23. The 65 percent provision only concerned what needed to be paid for April and May 2015 billings. *See id.; see also Exhibit 5* (K. Meola Depo.) at 205:24–206:20. | | |

| 38. | By signing the Agreement, Level 3 was not claiming that, as of May 2015, 65 percent of its end office billings were for OTT traffic. *Exhibit 11* (A. Burgess Depo.) at 122:5–16; *Exhibit 23* (J. Torres 8-28-19 Depo.) at 48:11–49:6. | | |
|---|---|---|---|
| 39. | AT&T admits it has no facts to show that Level 3's OTT percentage was ever 65 percent. *See Exhibit 11* (A. Burgess Depo.) at 124:3–11. | | |
| 40. | The purpose of the 65 percent in the Agreement was to establish that AT&T had historically disputed and withheld 65 percent of Level 3's end office switched access charges, and that the parties had used this percentage as a reference point in the past. *See Exhibit 11* (A. Burgess Depo.) at 130:9–24 & 154:16–155:12; *Exhibit 23* (J. Torres 8-28-19 Depo.) at 50:23–54:9. | | |
| 41. | Under the Agreement, Section 1(a)(iv) requires Level 3 to refund 50 percent of the actual OTT calling. *See Exhibit 11* (A. Burgess Depo.) at 208:24–209:6; *Exhibit 25* (A. McClure Response Disclosure) ¶ 2(a); *Exhibit 5* (K. Meola Depo.) at 207:12–23 & 213:23–215:6; *see also Exhibit 11* (A. Burgess Depo.) at 239:21–240:5 (acknowledging if Level 3's actual OTT percentage is less than 65%, that AT&T has over withheld). | | |
| 42. | The Agreement permits Level 3 to bill end office switched access charges on all non-OTT calls with a Level 3 telephone number. *See Exhibit 5* (K. | | |

| | | | |
|---|---|---|---|
| | Meola Depo.) at 211:4–24; *Exhibit 25* (A. McClure Response Disclosure) ¶ 10. | | |
| 43. | In mid-2017, after the D.C. Circuit Court of Appeals decision, AT&T started to withhold 65 percent of Level 3's end office charges again. *See Exhibit 11* (A. Burgess Depo.) at 134:3–12; *Exhibit 20* (J. Torres 12-19-19 Depo.) at 318:25–319:16. | | |
| 44. | In 2017, Level 3 gave AT&T data to show its OTT percentage was approximately ■ percent originating and ■ percent terminating. *See Exhibit 26* (J. Torres Depo. Ex. 23) at ATT_PROD_0005865; *Exhibit 27* (A. McClure 8-29-19 Depo.) at 80:15–82:14; *see also Exhibit 11* (A. Burgess Depo.) at 135:6–136:23. | | |
| 45. | AT&T continued to withhold 65 percent of Level 3's end office charges even after Level 3 stopped billing end office charges on terminating calls, which the FCC's Transformation Order required to occur in July 2017, and as a result has withheld millions of dollars each year from Level 3. *See Exhibit 11* (A. Burgess Depo.) at 200:23–201:23. | | |
| 46. | Throughout 2019 and 2020, AT&T withheld more than Level 3's total end office billings each month. *See Exhibit 28* (Declaration of M. Kellow) ¶ 6. | | |
| **Calculation of OTT Percentage** | | | |
| 47. | Level 3 does not have any direct OTT subscriptions. *See Exhibit 11* (A. Burgess Depo.) | | |

| | | | |
|---|---|---|---|
| | at 68:21–69:14. | | |
| 48. | "Local carriers . . . cannot always readily distinguish between over-the-top VoIP calls and other types of calls." *Exhibit 30* (P. Pfautz Opening Disclosure) ¶ 5; *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 5. | | |
| 49. | Except where (a) companies are known to be 100% OTT providers such as ▮▮▮▮ (where end office charges do not apply), or (b) customers are enterprise class customers where the carrier provisioned a facility to the end user's premises (where end office charges always apply), the only way to find out a customer's OTT percentage is to reach out to the customer and ask. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 5; *Exhibit 4* (P. Pfautz Depo.) at 47:10–49:25,  51:24–52:16, 138:15–22. | | |
| 50. | Level 3 employee Andrew McClure calculated Level 3's percent OTT to be ▮ percent since January 1, 2019. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 16. | | |
| 51. | AT&T's expert, Dr. Penn Pfautz, did not calculate a percent OTT for Level 3. *Exhibit 4* (P. Pfautz. Depo.) at 29:22–25. | | |
| 52. | AT&T has a few documents that comment upon Level 3's percent OTT, but none of AT&T's documents calculate a percent OTT or utilize an appropriate methodology to calculate percent OTT. *Exhibit 25* (A. McClure Responsive | | |

| | | | |
|---|---|---|---|
| | Disclosure) ¶ 4; *Exhibit 4* (P. Pfautz Depo.) at 181:25–192:14. | | |
| 53. | The only carriers in the industry that are known to have created a percent OTT are Level 3 and, in mid-2019, AT&T. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 8; *Exhibit 4* (P. Pfautz Depo.) at 58:18–59:15. | | |
| 54. | Level 3's OTT analysis is based on calling originated using Level 3 telephone numbers, and destined for AT&T. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 10; *Exhibit 4* (P. Pfautz Depo.) at 129:9–130:5 (AT&T has no contrary evidence). | | |
| 55. | Dr. Pfautz testified that his "biggest concern" about Level 3's OTT analysis is the method that Level 3's expert (Andrew McClure) used to gather percent OTT from individual Level 3 customers. *Exhibit 4* (P. Pfautz Depo.) at 141:12–15. | | |
| 56. | The percentages that Mr. McClure obtained from customers had very little impact on Level 3's percent OTT; if Mr. McClure assumed that 100 percent of the calling associated with customers Mr. McClure believed to have some OTT calling is OTT, Level 3's OTT percentage would rise from ▮ percent to ▮ percent. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 12. | | |
| 57. | Dr. Pfautz took issue with three entities that Mr. McClure reported in 2017 as having 0 percent OTT: ▮▮▮▮▮▮▮▮▮▮▮▮. *Exhibit* | | |

| | | | |
|---|---|---|---|
| | *25* (A. McClure Responsive Disclosure) ¶ 13. | | |
| 58. | Level 3 no longer has a relationship with ██████ ██████; as such, the concern about ██████████ has no bearing on data from 2019 forward. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13(b). | | |
| 59. | Both Level 3 and AT&T recognize that ████ is not a pure OTT provider (*Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13(d); *Exhibit 4* (P. Pfautz Depo.) at 151:15–154:20); nonetheless, for summary judgment, Level 3 will assume that 100 percent of ██████ calls are OTT. | | |
| 60. | AT&T acknowledges that when calls flow over facilities Level 3 provisioned at the customer's premises to Level 3's end office, even if people connect to those hub facilities via a third-party internet connection from remote locations, end office charges apply. *See Exhibit 4* (P. Pfautz Depo.) at 101:14–23; 104:17–105:9. | | |
| 61. | Andrew McClure determined that ██████ is not an OTT provider because Level 3 provides ████████ with facilities at ████████ premises, and all calls flow over the facilities Level 3 provisioned and provided to ██████. *Exhibit 31* (A. McClure 6-11-2020 Depo.) at 127:12–137:8; *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13(c). | | |
| 62. | Forty-seven percent of Level 3's traffic falls into three clear categories: (a) Level 3's own traffic; (b) a Level 3 network incapable of supporting | | |

| | | | |
|---|---|---|---|
| | OTT calling; and (c) ███████. *See Exhibit 32* (Exhibit 2 to Level 3's Rule 26(a)(2)(C) Disclosure; *Exhibit 29* (Declaration of Andrew McClure) ¶ 6). | | |
| 63. | In deposition, AT&T asked Mr. McClure about four additional customers: ███████, ███████, ███████, and ███████. *See Exhibit 31* (A. McClure 6/11/2020 Depo.) 125:13–126:18; *Exhibit 29* (A. McClure Dec.) ¶ 9. | | |
| 64. | While Mr. McClure could not recall the specifics of ███████, ███████, ███████, and ███████ during his expert deposition, Mr. McClure has since familiarized himself with those customers, and determined that while ███████, and ███████ are appropriately categorized at zero percent OTT, ███████ may have the ability to provide some OTT functions. As a result, for purposes of this summary judgment motion, Level 3 will assume Coredial is 100% OTT. *See Exhibit 31* (A. McClure 6/11/2020 Depo.) at 108:14–21, 114:8–12, 121:15–23; *Exhibit 29* (A. McClure Dec.) ¶¶ 10–15. | | |
| 65. | Using the percentages referenced in the paragraphs above—i.e., assuming 100 percent of the traffic of ███████ and ███████ is OTT—and additionally assuming a 100 percent OTT factor for ███████, Level 3's OTT percentage would increase to ██ percent. *See Exhibit 29* (A. McClure Dec.) ¶¶ 17–21. | | |

| | | | |
|---|---|---|---|
| 66. | Dr. Pfautz admitted in deposition that he did not have any evidence that Level 3's percent OTT is greater than ▮%. *See Exhibit 4* (P. Pfautz Depo.) at 173:10–175:10; 176:7–16. | | |
| 67. | Dr. Pfautz assumed that 100 percent of AT&T's enterprise class customers had no OTT calling based on representations from AT&T, without obtaining the names of AT&T's customers, evaluating those customers, or performing any independent research. *See Exhibit 4* (P. Pfautz Depo.) at 215:3–229:23. | | |
| 68. | To calculate its percent OTT, AT&T only evaluated whether the customer had the ability to utilize "nomadic" telephone numbers, meaning make calls from various locations over a third-party internet connection. *See Exhibit 25* (A. McClure Responsive Disclosure) ¶¶ 3, 8; *Exhibit 4* (P. Pfautz Depo.) at 106:14–115:22, 118:5–120:10, 222:8–229:23. | | |
| 69. | AT&T determined that only calls flowing over its BVoIP network could support nomadic telephone calling; as a result, it presumed calling over its traditional network was zero percent OTT. *See Exhibit 33* (J. Gallagher Depo. Vol. I) at 78:18–79:10. | | |
| 70. | AT&T did not consider the business plan of any of its enterprise class customers, and whether they created the potential for OTT calling. *See Exhibit 25* (A. McClure Responsive Disclosure) ¶ 3; | | |

| | | | |
|---|---|---|---|
| | *Exhibit 4* (Pfautz Depo.) at 106:14–109:6. | | |
| 71. | Dr. Pfautz—AT&T's expert—concluded that AT&T's method for determining percent OTT was reasonable. *Exhibit 30* (P. Pfautz Opening Report) ¶ 8. | | |
| 72. | Under Level 3's calculations: (a) AT&T is entitled to a credit for end office charges of ▮▮▮▮▮ through April 2020, and (b) AT&T has withheld over ▮▮▮▮▮ from Level 3 for the OTT dispute. *See Exhibit 28* (M. Kellow Dec.) ¶¶ 7–8. | | |
| | **AT&T Billed Level 3 End Office Charges on OTT Calls** | | |
| 73. | When AT&T brought its claims against Level 3, it did not know whether it or TCG had any OTT traffic, and had not even started the process of reviewing its own practices to determine whether or not it was billing IXCs end-office charges on OTT calling. *Exhibit 11* (A. Burgess Depo.) at 227:14–228:3; *Exhibit 5* (K. Meola Depo.) at 318:14–15. | | |
| 74. | From the outset of the case, when Level 3 alleged that either AT&T or its affiliates also assessed end-office charges on OTT calls, AT&T originally denied those allegations. *See* ECF No. 53 ¶¶ 13–14; ECF No. 86 ¶¶ 17–20; ECF No. 98-1 at 3. | | |
| 75. | Level 3's lawsuit and discovery prompted AT&T to learn that it had OTT calling on its network. *See Exhibit 11* (A. Burgess Depo.) at 224:23–225:25) | | |

| | | | |
|---|---|---|---|
| 76. | AT&T later found that TCG—the company that billed switched access charges for AT&T—was billing Level 3 end office switched access charges on two products: Collaborate and HVS. *See Exhibit 33* (J. Gallagher Depo. Vol. I) at 34:20–25. | | |
| 77. | AT&T/TCG admits that 2.13 percent of calls on its BVoIP network constitutes OTT calling. *See Exhibit 34* (J. Gallagher Depo. Vol. II) at 129:14–18. | | |
| 78. | In July, August, and September 2019, AT&T issued Level 3 other credits but did not specify what those credits were for. *See Exhibit 28* (M. Kellow Dec.) ¶ 9. | | |
| 79. | Since September 2019, AT&T has not credited Level 3, Broadwing and Global Crossing anything for OTT calling. *See Exhibit 28* (M. Kellow Dec.) ¶ 10. | | |
| 80. | Level 3's interstate access tariff specifically requires customers to pay the invoices they receive unless they dispute the invoice, and must include in the dispute "[d]etails sufficient to identify the specific amount(s) and item(s) in dispute." *Exhibit 2* (Level 3 Interstate Access Tariff F.C.C. No. 4) §§ 2.1.3, 2.8.5, 3.1.1, 4.9(2). | | |

Respectfully submitted this 29th day of June, 2020.

By:    <u>/s/ Charles W. Steese</u>
          Charles W. Steese, #26924
          Douglas N. Marsh, #45964
          Armstrong Teasdale LLP
          4643 South Ulster Street, Suite 800
          Denver, Colorado 80237
          Telephone: (720) 200-0676
          csteese@armstrongteasdale.com
          dmarsh@armstrongteasdale.com

*Attorneys for Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC*

## CERTIFICATE OF SERVICE

I, Charles W. Steese, hereby certify that on June 29, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael D. Warden
Michael J. Hunseder
Justin A. Benson
Joshua W. Moore
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mwarden@sidley.com
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com
E-mail: joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

/s/ Charles W. Steese
Charles W. Steese