# EXHIBIT 4

Page 1

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLORADO

3

4    AT&T CORPORATION,              ) Civil Action File No.:

5              Plaintiff,           ) 18-cv-00112-RM-MEH

6          vs.                      )

7    LEVEL 3 COMMUNICATIONS, LLC,   )

8              Defendant.           )

9    _____)

10

11                 NON-CONFIDENTIAL PORTION

12   CONFIDENTIAL ATTORNEYS' EYES ONLY BOUND SEPARATELY

13                        PAGE 148

14                     PAGES 206-214

15

16        DEPOSITION OF PENN L. PFAUTZ, PH.D.

17                     VIRTUAL ZOOM

18                 TUESDAY, APRIL 28, 2020

19

20

21   Reported by:

22   ASHALA TYLOR, CSR #2436, CLR, CRR, RPR

23   JOB NO. 4083362

24

25   PAGES 1 - 236

Page 2

1                UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3

4    AT&T CORPORATION,            ) Civil Action File No.:

5              Plaintiff,         ) 18-cv-00112-RM-MEH

6          vs.                    )

7    LEVEL 3 COMMUNICATIONS, LLC, )

8              Defendant.         )

9    _____)

10

11

12

13

14

15

16        Deposition of PENN L. PFAUTZ, PH.D., taken via

17   Zoom videoconference commencing at 8:08 a.m. (PST), and

18   ending at 3:05 p.m., on Tuesday, April 28, 2020, before

19   Ashala Tylor, CSR No. 2436, RPR, CRR, CLR.

20

21

22

23

24

25

Page 3

1    APPEARANCES OF COUNSEL:

2    On behalf of Plaintiff:

3            SIDLEY AUSTIN LLP

4            BY:  JUSTIN A. BENSON, ESQ.

5                 MICHAEL J. HUNSEDER, ESQ.

6            1501 K Street, N.W.

7            Washington, D.C.  20005

8            202.736.8757

9            jbenson@sidley.com

10           mhunseder@sidley.com

11

12   On behalf of the Defendant:

13           ARMSTRONG TEASDALE LLP

14           BY:  CHUCK STEESE, ESQ.

15                DOUG N. MARSH, ESQ.

16           4643 South Ulster Street, Suite 800

17           Denver, Colorado  80237

18           720.200.0676

19           csteese@armstrongteasdale.com

20

21

22   Also Present:

23           Mark Hesse

24

25

Page 29

1    is.  No one has asked me to draft a report or said

2    what, you know, it should cover.  But I'm just aware

3    that I might need to do that.

4         Q.   Have you looked at Mr. McClure's initial

5    disclosure and studied it in any detail?

6         A.   I have looked at the initial disclosure,

7    principally Exhibit 2.

8         Q.   Got it.

9              If you look at -- and we are going to mark

10   your entirety of your expert disclosure, which

11   includes the report as well as PP-1 through PP-9 as

12   Exhibit 110.

13                        (Exhibit 110 was marked for

14                        identification and attached

15                        hereto.)

16   BY MR. STEESE:

17        Q.   And for purposes of questioning, if I'm

18   looking at an attachment to your report, example,

19   PP-6, I'll just call it PP-6.

20             Is that acceptable to you, Dr. Pfautz?

21        A.   Yes, I think I understand that.

22        Q.   Okay.  So if you look at your expert

23   report, which is Exhibit 110, you did not calculate

24   a percent OTT for Level 3, correct?

25        A.   That is correct.

Page 47

1   in lieu of end office charges if it's an OTT call?

2           MR. BENSON:  Objection.  Calls for a legal

3   conclusion.

4           THE WITNESS:  My sense is the answer is

5   yes.

6   BY MR. STEESE:

7      Q.   All right.  Turning to paragraph 5 of your

8   report, which is Exhibit 110.  Are you there, sir?

9      A.   Yes, I am.

10     Q.   Your report recognizes that LECs cannot

11  readily distinguish between OTT calls and

12  traditional calls, correct?

13     A.   Well, to be clear, my report says they

14  cannot always do that.  There are circumstances

15  which I believe to incorporate, you know, a major

16  amount of the traffic, perhaps a predominant, where

17  it is possible to distinguish.

18     Q.   How?

19     A.   Well, in one case, if you know that you

20  have a facility out to the real end customer, then

21  you know you're facilities-based and you're not over

22  the top.  On the other hand, if you are connecting

23  to an entity that is basically in the business of

24  providing OTT service to other parties, then you

25  know that you're -- that all that traffic is over

Page 48

1    the top.  And I think that's kind of reflected in

2    the data that I saw from Mr. McClure.

3        Q.   Okay.  So let me make sure I understand

4    there, and I'm going to break this into two

5    categories:  The facilities-based category 1 and the

6    100 percent OTT-based category 2.

7             Are you with me in concept?

8        A.   I believe so.

9        Q.   So we'll talk about the first circumstance

10   where the local exchange carrier -- here, Level 3 --

11   provisions facilities all the way out to the

12   end-user premises.

13            Are you with me in concept there?

14       A.   Yes.

15       Q.   Those calls 100 percent of the time are

16   not -- strike that.  I'll say it better.

17            In those calls, 100 percent of the time

18   you can bill end office charges, correct?

19       A.   Yes.

20       Q.   And to the extent that you know someone

21   that is connected to you -- and I'll use Vonage as

22   the classic example here -- and you know that they

23   are a 100 percent OTT provider, meaning they are a

24   provider of voice telephony services; they never

25   provision facilities out to any end-user customer;

Page 49

```
 1    they are always using a third party Internet

 2    connection to deliver the calls; and 100 percent of

 3    the time that is an OTT call and end office charges

 4    do not apply, correct?

 5         A.   That is my understanding.

 6         Q.   You cut out there.  Can you say that

 7    again?

 8         A.   That is correct.  That's my understanding.

 9         Q.   And just so you know, there is times -- I

10    don't know if the court reporter heard the same

11    thing -- your voice just disappeared for a second.

12    I could see your lips move, but I couldn't hear you.

13    That's just a glitch in the connection.

14              So if that ever happens in reverse, tell

15    me to repeat the question, please.

16         A.   Okay.  All right.

17         Q.   So it's these other categories that are

18    where you cannot readily distinguish if it's an OTT

19    call, correct?

20         A.   I think that's largely true.

21         Q.   There's nothing in the call detail record

22    that identifies a call as OTT, correct?

23         A.   Yes.  I believe all parties agree there is

24    nothing in the signaling stream that provides that

25    identification.
```

Page 51

1    on beyond that facility?

2            I mean, if -- if all the calls just end

3    there where the facility ends, then, clearly, that's

4    the facility's base service.  You have an enterprise

5    customer like that.

6            It is more complicated where you may be

7    dealing with an entity that, in turn, is providing

8    service to other entities which may or may not at

9    first blush look like a enterprise to the LEC; and

10   then there are cases where you go to an enterprise

11   premises but the enterprise may do things behind

12   that premises that the LEC is not aware of.

13           Now, that's going to be probably the

14   hardest one to address, and the way that you'd

15   address that, you'd have to go to that enterprise

16   customer and get them to provide data.

17           If it's a case of an entity that offers

18   service in a variety of ways to other parties,

19   sometimes over the top and sometimes by providing a

20   facility, then, again, you need that entity to

21   provide you with data that will let you estimate how

22   much is really over the top versus not.

23   BY MR. STEESE:

24       Q.   But when you say "there are a variety of

25   methods," quote/unquote, the methods that you're

Page 52

1    talking about for this category of OTT calling that

2    is not readily distinguishable requires you to go to

3    the customer and ask the customer what percentage of

4    your calling is OTT, correct?

5                MR. BENSON:  Objection.

6                THE WITNESS:  In -- in --

7                MR. BENSON:  Go ahead, Penn.

8                THE WITNESS:  Yes.  In those complicated

9    cases, yes.

10   BY MR. STEESE:

11        Q.   And there is no other way available in the

12   marketplace today other than going to the customer

13   to ask the customer for that information, correct?

14               MR. BENSON:  Objection.

15               THE WITNESS:  Not that I'm aware of in the

16   cases that we are talking about.

17   BY MR. STEESE:

18        Q.   And based on the input provided by the

19   customer, you would apply that factor, if you will,

20   to that customer's call volume and use that factor

21   to determine what percentage of that customer's

22   calling should be billed end office charges and

23   which should be -- should not be billed end office

24   charges, correct?

25               MR. BENSON:  Objection.

1     must be some way of dealing with that and excluding

2     those calls.  And whether that's -- you know,

3     obviously, it was an issue of legal contention.  But

4     the fact that if that was the ultimate regulatory

5     conclusion that was come to that there would need to

6     be some way of dealing with it, whether a factor or

7     otherwise, I think that's been out there, you know,

8     longer.

9              I mean, let's face it, this lawsuit has

10    been around for a while.  And looking at that, one

11    would say, "Well, if it comes out one way, you're

12    certainly are going to need a way to do this."

13    BY MR. STEESE:

14        Q.   Okay.  Are you aware of any carrier --

15             (Reporter clarification.)

16             MR. BENSON:  We lost you, Chuck.

17    BY MR. STEESE:

18        Q.   Are you aware of any carrier in the

19    industry that has created a percent OTT factor

20    before December of 2019?

21             MR. BENSON:  Objection.  Calls for

22    speculation.

23             Go ahead.

24             THE WITNESS:  Yeah.  You know, I do recall

25    that what I was reading was that actually Level 3

Page 59

1    made an attempt to create a factor and there may

2    well have been others that -- that attempted to.  It

3    seems to me that -- that AT&T tried to assess how

4    much OTT they had.

5              So, you know, whether or not there was a

6    clear legal situation, which, you know, I can't

7    really speak to, it seems like carriers were aware

8    of that and -- and made some attempts to -- to deal

9    with that.

10   BY MR. STEESE:

11       Q.   Are you aware -- first of all, are you

12   aware of any carrier other than AT&T and Level 3

13   before December 2019 that had created a percent OTT

14   factor?

15       A.   I can't say that I am.

16       Q.   Are you aware that AT&T developed an OTT

17   factor between April and June of 2019 because of the

18   lawsuit that -- the claims -- that Level 3 brought

19   against it in this case?

20       A.   I'm --

21            MR. BENSON:  Objection.

22            THE WITNESS:  Sorry.

23            MR. BENSON:  Go ahead.

24            THE WITNESS:  I'm not aware of the

25   chronology of that work.

Page 101

1        MR. BENSON:  Calls for a legal conclusion.

2   Objection.

3        Go ahead, Penn.

4        THE WITNESS:  Okay.  Not being a lawyer, I

5   would say that theoretically those -- those nomadic

6   calls, which at least to the degree to which they do

7   not route through the point that the facilities

8   terminate to so that they go -- get in some other

9   way not traversing that facility, I would say that

10  those are over-the-top calls and to the degree that

11  they could be identified, end office local switching

12  should not be charged on those calls.

13  BY MR. STEESE:

14      Q.   So it's not the provisioning of facilities

15  in and of itself that's a factor.  It's whether the

16  facilities that are all the way out to the end

17  user's premises are the facilities over which the

18  call flows that determines whether or not end office

19  switching does or does not apply?

20       MR. BENSON:  Same objection.

21       Go ahead.

22       THE WITNESS:  As a nonlegal person, I

23  would say I would agree with that.

24  BY MR. STEESE:

25      Q.   And so if you look at Level 3 now.  We're

Page 104

1    BY MR. STEESE:

2        Q.   So how can you so readily say they don't

3    have any relationships with any VoIP customers?

4    VoIP carrier customers to use that terminology

5    consistently.

6        A.   I say that because my understanding is

7    AT&T did try to understand what products they have

8    that might be used in -- in ways that would generate

9    OTT calling, and they came to some conclusion.  So I

10   rely on that stuff rather than anything that I

11   intended today.

12       Q.   Okay.  Well, let's -- let's press on that

13   because I think you're going to readily admit that,

14   once you hear this, you know this isn't true.

15           So let's assume that your wholesale

16   customer -- strike that.

17           Let's assume that your enterprise class

18   customer has a VoIP application server that they use

19   for their own employees as a -- it looks like a

20   functional PBX.

21           Are you with me in concept?

22       A.   I think so.

23       Q.   And what they do is they enable their

24   employees at that destination or otherwise to bring

25   calls into this hub and then deliver those calls

Page 105

1    over the SIP trunk or whatever kind of facility you

2    have in place that goes to the end office.

3             Are you with me in concept?

4        A.   Yes.

5        Q.   In that circumstance because it's the

6    enterprise class customer's employees, then, in your

7    view, end office switching charges would apply,

8    correct?

9        A.   Yes.

10       Q.   So now let's change the scenario only ever

11   so slightly, and that is this particular customer,

12   their business model is serving the deaf population

13   and they have deployed within their own VoIP

14   application server the capability to allow deaf

15   people to -- to interact on the telephone more

16   readily.

17            Are you with me in concept?

18       A.   I am.

19       Q.   So now what they do is they sell a product

20   to customers and they say, "We want you to use our

21   product and those calls will be from wherever remote

22   locations and they'll come into this hub which then

23   is connecting over the SIP trunk going to my end

24   office trunk and then going out to the world."

25            Are you with me?

Page 106

1          A.    I am.

2          Q.    Would that be an OTT call?

3          A.    Well, I think that it might because I

4    think of the actual deaf or hard of hearing user who

5    is paying this customer of Level 3 for service or if

6    the FCC is maybe reimbursing that entity for the

7    service provided to these customers; but I think of

8    the ultimate end user as the person who is at the

9    other end of the Internet connection and is, you

10   know, essentially making that call, originating that

11   call.

12          I realize people may have different views

13   on this, but that is my take on that situation.

14          Q.    So what has AT&T done to see if any of its

15   enterprise class customers are doing things like

16   that?  And that is employing -- allowing their own

17   customers to call in to their functional PBX VoIP

18   application server -- whatever you want to call

19   it -- and then transmit the calls over the SIP trunk

20   physical facilities -- whatever it might be -- to

21   AT&T's end office switch.  What has it done to

22   determine whether the customer is using the

23   facilities in this fashion as opposed to a product

24   that AT&T has created for itself to be used in a

25   particular way?

```
                                              Page 107
 1              MR. BENSON:  Objection.  Form.
 2              Go ahead.
 3              THE WITNESS:  Yeah.  I don't know what
 4    AT&T has done in that regard.
 5              I want to be clear:  The scenario that
 6    we're talking about when we say "customer," I assume
 7    you mean the nominally enterprise customer of
 8    Level 3 as opposed to the end user who is a party
 9    that's paying that nominally enterprise entity
10    that's really acting as a carrier in this case.
11    BY MR. STEESE:
12        Q.   My question wasn't -- you're right except
13    for you said Level 3 and I'm saying AT&T.
14        A.   Okay.  Fair enough.  My -- my bad.  Yes.
15              I don't know what AT&T has specifically
16    done to assess whether that is going on with some
17    customers.
18        Q.   And in order to do that, AT&T would need
19    to look at each and every one of its enterprise
20    class customers one by one by one determine what
21    their business plan is, see if they themselves
22    deploy any OTT calling for people that are not their
23    employees to make that assessment, correct?
24              MR. BENSON:  Objection.
25              THE WITNESS:  I don't --
```

                                                        Page 108

1              THE REPORTER:  I'm sorry, objection?

2              MR. BENSON:  Form.

3              Go ahead.

4              THE WITNESS:  I don't know that because I

5      don't know in detail the kind of service agreements

6      that those customers have with AT&T, whether there's

7      anything in those agreements about potential resale

8      and things like that.  So it's possible that they

9      would need to do that to determine that.  It's also

10     possible there may be something in the agreement.

11     And I just simply don't know.

12     BY MR. STEESE:

13         Q.   And you say that you talked to I'm

14     assuming Mr. Cathey, and Mr. Cathey identified

15     products that AT&T had and whether or not those

16     products, such as Collaborate, created the potential

17     for OTT calling, correct?

18         A.   That's correct.

19         Q.   But you have not inquired or found out

20     whether or not they did a search to determine

21     whether its enterprise class customers were doing

22     something to sell what amounts to an extension of

23     the telephone network to its own customers, to the

24     enterprise class customers' own customers, correct?

25             MR. BENSON:  Objection.  Form.

1          THE WITNESS:  No, I did not.

2    BY MR. STEESE:

3       Q.   And you have no idea whether or not any of

4    AT&T's enterprise class customers are doing that one

5    way or the other, do you?

6       A.   I don't have any information on that, yes.

7       Q.   And in order for AT&T's methodology for

8    calculating OTT percent to be reasonable, to use

9    your terminology, shouldn't they look to see who

10   their enterprise class customers are and how they're

11   using the service before opining that their

12   methodology for calculating percent OTT is

13   reasonable because they have just ignored altogether

14   this potentiality?

15          MR. BENSON:  Same objection.

16          THE WITNESS:  I don't know whether AT&T,

17   in fact, looked at those customers, you know.  My

18   opinion is focused on the -- the actual products

19   that could be OTT and the fact that AT&T made the

20   choice in those cases not to bill for any of that

21   traffic even though some of it is also -- I don't

22   know how much -- some of it is clearly compensable

23   with end office switching.

24          Now, on the other hand, when I looked at

25   Level 3, unless something jumped out at me, I

1    generally accepted that what was purported to be

2    enterprise was indeed an enterprise serving only its

3    own users.

4    BY MR. STEESE:

5         Q.   You had the benefit of being able to look

6    at virtually every enterprise class customer by name

7    and seeing the volume associated with them and

8    making an assessment customer by customer, correct?

9              MR. BENSON:  Objection.

10             THE WITNESS:  I had the ability to look at

11   some of Level 3's customers and sometimes I could

12   try to figure out whether they were engaged in a

13   carrier-like role, yes.

14   BY MR. STEESE:

15        Q.   Did AT&T provide you with a list of the

16   names of its enterprise class customers?

17        A.   No.

18        Q.   And in order to do a comparative analysis,

19   you would need to look at theirs and run through and

20   see if any of them jumped out at you just as you did

21   with Level 3, correct?

22             MR. BENSON:  Objection.  Form.

23             MR. STEESE:  What's wrong with the form?

24             MR. BENSON:  No, if you define what a

25   comparative analysis is, but I don't need to defend

Page 111

1    my objection.

2            MR. STEESE:  You do if I ask.

3            MR. BENSON:  I don't know what authority

4    you have for that, but go ahead.

5    BY MR. STEESE:

6        Q.   So in order -- do you remember the

7    question?

8        A.   Could you repeat the question?

9            MR. STEESE:  Madam Court Reporter, could

10   you read it back, please.

11                   (The record was read by the

12                    court reporter, as requested)

13           MR. BENSON:  Same objection.

14           Go ahead.

15           THE WITNESS:  If I want -- if I wanted to

16   rule out that AT&T had customers they believed to be

17   just enterprise, ordinary enterprise customers, that

18   were in fact acting as carriers, then, yes, I would

19   have needed to do that.

20   BY MR. STEESE:

21       Q.   And so is it appropriate for Level 3 to

22   simply identify those entities that it knows has a

23   carrier-esque function like Vonage and identify

24   those and inquire about their percent of OTT and

25   presume that a vast majority of its customers are

Page 112

1    ordinary customers and create a percent OTT

2    accordingly?

3              MR. BENSON:  Objection.

4              THE WITNESS:  Could you repeat the

5    question?  There was something at the beginning that

6    I'm not sure I caught.

7              MR. STEESE:  Can you read it back, please.

8                        (The record was read by the

9                         court reporter, as requested)

10   BY MR. STEESE:

11       Q.   Okay.  So is it fair for Level 3, when

12   it's creating its percent OTT factor, to identify

13   those customers that it just believes are

14   traditional ordinary business customers and not

15   inquire about their percent OTT and focus on

16   inquiring the percent OTT to those that Level 3 has

17   reason to believe might be providing some

18   carrier-like function?

19             MR. BENSON:  Same objection.

20             Go ahead, Penn.

21             THE WITNESS:  Yeah.  When you use the term

22   "fair," I don't know what -- how I should parse that

23   but --

24             MR. STEESE:  You cut out for a second.

25             Can people hear me?

Page 113

1           THE WITNESS:  Yes.

2           MR. STEESE:  I can't hear you, Dr. Pfautz.

3           THE WITNESS:  Okay.  What I said was I'm

4    not sure how to parse the word --

5           MR. STEESE:  Just one moment.  I

6    apologize.  We're not hearing.

7           Justin, can you --

8           MR. BENSON:  I can hear you, Chuck, and I

9    can hear Dr. Pfautz.

10   BY MR. STEESE:

11        Q.   Dr. Pfautz, can you speak again?

12        A.   Yeah, what I said was --

13        Q.   I can hear you now.  So you just cut

14   out -- our screen went blank and you cut out.  So I

15   apologize.  Please continue.

16        A.   Okay.  So I'm not sure how to interpret

17   "fair" in that context.  I take the point that

18   perhaps there are some AT&T customers that are doing

19   something like that.

20        Q.   So does this aim that Level 3 should

21   inquire of every single enterprise class customer

22   that it does business with and should ask each

23   enterprise class customer what its percent OTT is to

24   come up with its factor?

25        A.   I don't know that that's necessary in

Page 114

1    every case.

2        Q.   Where do you draw the line?  When -- who

3    should we -- who should Level 3 inquire about and

4    who should they not?

5        A.   So my suggestion would be -- now, there

6    are some entities that seem pretty clearly to be

7    enterprise.  If you have somebody who's Wells Fargo,

8    or State Farm, or Blue Cross, you can kind of tell

9    that those are -- and actually in my analysis, I

10   pretty much treat it, okay, so those ones aren't at

11   issue.

12           But I think when you take business on, you

13   kind of know something about the customer.  And so I

14   would hope that there would be some knowledge there.

15       Q.   So you have a customer called vanity.com,

16   or -- I mean there's thousands of customers that

17   aren't going to jump off the pages -- Wells Fargo --

18   and vanity.com says that they want a SIP trunk with,

19   you know, 50 DSO equivalents connecting up to their

20   premises.

21           At what point should you be asking, what's

22   your business model?  How are you using this

23   facility?  And it's just your normal customer that

24   you can't tell because it's not Wells Fargo, it's

25   not the U.S. Government, it's not Microsoft.  How do

Page 115

1    you determine that?

2            MR. BENSON:  Objection.

3            THE WITNESS:  Well, one approach would be

4    to do what Mr. McClure did and say "Let me look at

5    my customers in terms of volume and be rigorous with

6    some set that constitutes the preponderance of

7    traffic."

8    BY MR. STEESE:

9        Q.   Can AT&T do the same?

10       A.   I presume that they could.

11       Q.   I didn't say could they.  I said should

12   they.

13       A.   Should they?  "Should" is an interesting

14   word.

15            I guess I would say probably if they want

16   to be completely assured that they haven't missed

17   something.

18       Q.   Did they?  Did AT&T go out and look at its

19   top 90 percent of volume enterprise class customers

20   and try and assess them on an individualized basis

21   to determine what percent OTT they had?

22       A.   Not that I'm aware of.

23       Q.   And so what you're saying is Level 3's OTT

24   methodology is unreasonable and AT&T's is reasonable

25   even though AT&T only looked at nomadic TNs and

Page 118

1            The obtaining of telephone numbers is
2    nothing unique?  Enterprise class customers get them
3    all the time, correct?
4        A.    That is correct.
5        Q.    The question is, do you, the carrier,
6    whether it be Level 3 or AT&T, know what they're
7    doing with those telephone numbers?  Are they using
8    them for their own enterprise or are they making
9    them available to others to make calls from remote
10   locations?  That's the question, isn't it?
11       A.    That's the question, but if they're --
12   okay.  When you say "making them available to others
13   to make calls from remote locations," are you
14   talking about nomadic service?
15       Q.    No, I'm talking about where your
16   enterprise class customer takes TNs that you've
17   assigned to them and they give them to wholly
18   independent third parties that then make or receive
19   telephone calls from remote locations.  And then the
20   call comes into the hub and then goes over the SIP
21   trunk to your enterprise class customer.
22            The question is, what does your enterprise
23   class customer do with the telephone numbers, how
24   they make them available, if at all, to their
25   customers, correct?

Page 119

1        A.    Correct.

2        Q.    And so what has AT&T ever done, to your

3    knowledge, to determine whether or not its

4    enterprise class customers hands TNs off to its

5    customers to make calls from remote locations?

6        A.    I don't know.

7        Q.    Are you aware if they've done anything?

8        A.    No, no.

9        Q.    From the AT&T percent OTT, your focus was

10   exclusively on nomadic TNs, correct?

11       A.    No, I wouldn't say that.  It was on the

12   products that might have allowed over-the-top

13   calling that didn't require, you know, a facility

14   out to the customer.  It could have a facility but

15   didn't require it.

16       Q.    So I call that nomadic TNs.  So we're

17   talking the same thing.

18            So the unique -- that permitted the

19   customer that got that telephone number to make the

20   telephone call from virtually anywhere without the

21   call traversing the facility that's deployed to the

22   customer, correct?

23       A.    I'm not sure I understood what the

24   question was.  I think I got hung up a little bit on

25   your use of "nomadic," which I was thinking more of

Page 120

1    an add-on capability, but go ahead.

2         Q.   So your focus was exclusively on products

3    that would permit a customer to make calls from

4    locations that did not require the call to be

5    delivered over the facility that AT&T deployed to

6    the end-user's premises, correct?

7         A.   Yes.

8         Q.   And those two products are Collaborate and

9    HVS, correct?

10        A.   That's correct.

11        Q.   And your report says that AT&T was

12   conservative insofar as they presumed that

13   100 percent of those calls is over the top, correct?

14        A.   I said they were conservative in that for

15   those services -- services, excuse me -- they

16   decided they would forego billing end office for all

17   of the traffic rather than try to segregate out what

18   was and wasn't over the top.

19        Q.   Fair enough.  So have you given any

20   thought to -- strike that.  I'll ask some

21   foundational questions first.

22             If the customer is making -- strike that.

23             If the customer with Collaborate as the

24   product is making the call from its traditional

25   office that has the facilities from AT&T going out

Page 124

1                    Tuesday, April 28, 2020

2                         12:02 p.m.

3

4                    EXAMINATION (resumed)

5    BY MR. STEESE:

6         Q.   So let's transition now to Level 3's

7    specific methodology for calculating OTT.

8              If you look at your report, Exhibit 110 --

9         A.   Okay.  I'm getting rid of the screen

10   saver.  Just a second.

11        Q.   It begins on page 10, paragraph 30, and

12   then goes for five or six pages.

13        A.   Okay.  I'm there.

14        Q.   Just a few preliminaries.

15             Were you aware, Dr. Pfautz, that

16   originally the 2015 settlement agreement focused on

17   OTT factors from June 1, 2015, and after?

18        A.   I think so.  I don't remember the detailed

19   terms of the agreement.

20        Q.   Are you aware that AT&T and Level 3 have

21   entered into a subsequent settlement agreement

22   whereby the issues in this case are now January 1,

23   2019, forward for Level 3's track?

24        A.   Yes.

25             THE REPORTER:  Level 3's -- I'm sorry,

Page 125

1    Counsel, the last part?

2            MR. STEESE:  January 1, 2019, forward for

3    Level 3's track.

4            MR. BENSON:  And I lodged an objection,

5    but go ahead.

6    BY MR. STEESE:

7        Q.   So given that, end office charges went to

8    zero on the terminating side effective July of 2017,

9    correct?

10       A.   I think that's the right date.  I'm not --

11       Q.   But for purposes of this report, we're

12   looking at originating January 1, 2019, and after,

13   correct?

14       A.   That's my understanding.

15       Q.   Perfect.  And when you look at the issues

16   that you raised with respect to Level 3's

17   methodology, you focused in on three particular

18   inputs:  1, the number of end office minutes,

19   correct?

20       A.   Yes.

21       Q.   2, the percentage of Level 3's telephone

22   numbers for a particular carrier customer like

23   Vonage, correct?

24       A.   Correct.

25       Q.   And number 3 was the manner in which

Page 129

1          Q.   Okay.  I don't know if you answered my

2     question.  My question was simple.

3               Level 3 is only billing for its own

4     telephone numbers, correct?

5               MR. BENSON:  Objection.  Calls for

6     speculation.

7     BY MR. STEESE:

8          Q.   I'll retract that and ask it better.

9               To your knowledge, Level 3 is only billing

10    end office charges on calls associated with

11    originating over one of its own TNs, correct?

12              MR. BENSON:  Same objection.

13              THE WITNESS:  So my answer to that is

14    Level 3 should only be doing that, but I had some

15    question -- was that, in fact, what was going on

16    given that I wouldn't have expected that those

17    entities were even necessarily using Level 3 TNs.

18              If, in fact, they are using Level 3 TNs

19    and Level 3 is the only carrier that's billing for

20    those, then that may be fine.  Again, I raised a

21    question rather than drew a conclusion.

22    BY MR. STEESE:

23         Q.   And you have no contrary evidence that

24    these calls for which Level 3 is billing are not

25    associated with its own TNs, correct?

Page 130

1          A.   As I said, I have no dispositive evidence

2     that something improper is going on here.

3          Q.   And you have no evidence of any double

4     billing, correct?

5          A.   That's correct.

6          Q.   The historical dispute that dates back

7     before 2015, one of the issues AT -- are you aware

8     that one of the issues AT&T raised was that Level 3

9     was billing end office charges on calls that did not

10    have a Level 3 telephone number associated with

11    them?

12         A.   I have a vague recollection of that, but I

13    wouldn't swear to it.

14         Q.   Are you aware that the Level 3 AT&T

15    settlement agreement from 2015 obligated Level 3 to

16    only bill end office charges on calls associated

17    with its own telephone numbers?

18         A.   I think that's my recollection.

19         Q.   Do you know whether or not AT&T -- strike

20    that.

21              Are you aware whether or not it's a common

22    practice for AT&T to dispute end office charges for

23    any carrier if they are billing end office charges

24    and it is not their TN?

25         A.   I think I recall that there were some

1          Q.   And in 2017, there certainly was no

2     obligation by carriers or carrier customers to track

3     percent OTT, to your knowledge, was there?

4               MR. BENSON:  Objection.  Calls for a legal

5     conclusion.

6               Go ahead, Penn.

7               THE WITNESS:  Yeah.  I'm not a lawyer.  I

8     can't say legally in terms of the dispute.

9               I mean, if carriers are disputing

10    something, then there's an expectation that people

11    are going to figure out what the appropriate thing

12    is and come to an agreement.  And when they can't,

13    that's why we're here.

14    BY MR. STEESE:

15         Q.   What processes were available in the

16    latter half of 2017 to calculate percent OTT for an

17    individual customer that did not entail going to the

18    customer and asking for information?

19         A.   I don't know exactly what was available in

20    2017.  I think, as we've discussed, that outside of

21    the fairly clear-cut cases, it does require getting

22    some information from the customer.

23         Q.   To your knowledge, was there any

24    obligation for customers to disclose this percent

25    OTT to local exchange carriers like Level 3 in the

```
                                                  Page 141
 1    coming up with something like a factor that's going
 2    to drive dollars.
 3    BY MR. STEESE:
 4         Q.   Is it you take issue with the -- well,
 5    strike that.
 6              There's two pieces to this puzzle:  One is
 7    you identify the customers you're going to contact;
 8    and then, two, after you've identified them, you get
 9    information from these customers that you determined
10    you should contact, correct?
11         A.   Yes.
12         Q.   And you take issue with his recording, the
13    way he -- the people he talked to and et cetera,
14    correct?
15         A.   Yes.  That's my big -- biggest concern.
16         Q.   Do you take issue with the process he went
17    through to identify the customers that he should
18    speak to?
19         A.   I don't know all the details of that.  I
20    think the -- you know, the idea that he would take a
21    set that represented the majority of the traffic,
22    that sort of makes sense.
23              I don't know beyond that what other pieces
24    went into his selection.  At least I'm not confident
25    that I can remember that.
```

Page 151

1   conclusion.

2            But go ahead, Penn.

3            THE WITNESS:  Yeah, I would conclude that

4   if that is -- is so, then -- then those would be

5   eligible for end office switching.

6   BY MR. STEESE:

7       Q.   All right.  Let's focus on these three

8   entities that you focused on where you said some --

9   strike that.

10           Let's focus on the three entities:  Fuze,

11  FreedomVoice and Sorenson that you had issue with

12  that were identified as zero.

13           Are you with me, sir?

14      A.   Yes, I am.

15      Q.   All right.  So let's look at Exhibit PP-7

16  from Exhibit 110.

17           Let me know when you are there, sir.

18      A.   I'm getting it.  It's coming up.

19      Q.   Take your time.

20      A.   I'm there.

21      Q.   And this particular document relates to

22  Fuze, correct?

23      A.   Right.

24      Q.   And if you turn to page 3 of 4 of the pdf,

25  there is materials on the very top that says "Fuze

Page 152

1    Data, Fuze Data REST APIs, Devices, and

2    Connectivity."  Do you see that?

3        A.   Not yet.  I'm looking for it.

4        Q.   Very top.

5        A.   You said which page?

6        Q.   If you look at the pdf, it's page 3 of 4.

7        A.   Okay.  Pdf, page 3.  Yes.

8        Q.   All right.  And if you look at the far

9    right entitled "Connectivity," it says "Connect your

10   sites to Fuze with over-the-top, enhanced OTT,

11   private connectivity, or SD-WAN."  Do you see that?

12       A.   I do see that.

13       Q.   What is SD-WAN?

14       A.   I'm not sure exactly what SD -- WAN is

15   wide area network.  I'm not sure what SD-WAN is in

16   this case.

17       Q.   But WAN -- a WAN connection tends to be

18   using existing facilities, correct?

19       A.   It may or may not.

20       Q.   Define why you say it may or may not if

21   it's a WAN connection.

22       A.   Because a WAN connection could be a

23   connection that already exists or it could be --

24   maybe I misunderstand your question.

25            A WAN I do think of as facilities-based.

Page 153

1    However, I don't know whether it was there before

2    the customer got the service or was something that

3    they had installed.

4        Q.   I understand now.  I was asking if it was

5    facilities-based.  So thank you.

6            But if the WAN facilities are provided by

7    Fuze, then the calls going over the WAN connection

8    could have end office charges associated with them,

9    correct?

10       A.   Yes.

11           MR. BENSON:  Objection.  Calls for a legal

12   conclusion.

13           But go ahead, Penn.

14           THE WITNESS:  Yes, I would say from a

15   technical perspective, yes.

16           (Off the record discussion.)

17           MR. BENSON:  Yeah, Penn has been echoing.

18   I'm not sure -- and now I am.

19           MR. STEESE:  Justin, if you --

20           MR. BENSON:  It's all me.

21           Let me go on mute for one second and see

22   if that helps.

23           Is that better?

24           MR. STEESE:  Yes, for me it is.

25           (Off the record discussion.)

Page 154

1          MR. STEESE:  You went from an OTT call to
2     a WAN connection right there.
3          MR. BENSON:  Exactly.
4     BY MR. STEESE:
5          Q.   So Dr. Pfautz, what percentage of Fuze's
6     calls are over WAN versus over OTT, do you know?
7          A.   I do not pretend to know that.  I merely
8     note that they do offer an OTT functionality, which
9     is why I brought into question their assignment of
10    the value of zero by Mr. McClure.
11         Q.   So if you're looking at this data, you
12    have information from the web that says some
13    percentage of calling is OTT and some percentage of
14    calling is not.  Then if this is all the information
15    you have, and you're trying to calculate percent
16    OTT, what would you do to try and identify the
17    percent OTT for Fuze?
18         A.   Well, I would not try to calculate that
19    percentage from this information.  I would only take
20    away that it's nonzero.
21         Q.   What more would you try and do to
22    determine what percent is OTT versus percent not?
23         A.   If it were my job to determine that, I
24    would try to contact Fuze and obtain documentation
25    from them about what they believe the percentage is

1    Q.   The rest are relatively small numbers.

2         So the one thing that happens with this

3    spreadsheet is when you go through and change the

4    percentages, do you see how it automatically changes

5    the percentage OTT?

6    A.   I guess so, yeah.  I think that's the way

7    it was set up.

8         Again, I did not spend a lot of time with

9    this spreadsheet; so I'll take your word for it.

10   Q.   Do you see where making every adjustment

11   that you've wanted so far that it's 19 percent?  Do

12   you see that?

13   A.   I see that -- well, you said every

14   adjustment that I wanted.  I want to be clear --

15   Q.   I'll retract that question.

16        Every adjustment that you identified as a

17   problem in your report on a customer-specific basis,

18   it raises it to 19 percent.  Do you see that?

19   A.   I see that.

20   Q.   So what I'm going to do now is change

21   everything up top above the zeros to 100 except

22   Wells Fargo and the cable providers because they're

23   facilities-based.

24        Do you see that I changed everything

25   except for the couple of cable companies and

Page 174

1    Wells Fargo to 100 percent?  Do you see that?

2          A.    I can see that.

3                MR. BENSON:  So objection.  I just want to

4    make clear:  We have disclosed that Mr. Pfautz --

5    Dr. Pfautz, excuse me, is going to be providing

6    testimony regarding his initial report.

7                This is treading, I think, close to a line

8    where we're getting to a point where we're talking

9    about materials that he has not considered in order

10   to put out his opinion and what he's going to

11   testify as to.

12               So I think -- I just want to make aware

13   that AT&T's position is that this is getting close

14   to where we would draw the line as to what's within

15   the scope and what's not within the scope of

16   relevance here.

17               MR. STEESE:  I completely disagree with

18   that, but that's okay.

19         Q.    Do you see, having made 100 percent of the

20   above the line, meaning those that are identified as

21   potential OTT providers, making them all 100 percent

22   except for the cable companies and Wells Fargo and

23   adjusting Fuze and Sorenson to 100 percent -- the

24   two companies that you've identified in your report

25   that were at zero that gave you concern -- it

Page 175

1    elevates the OTT percentage only to 21 percent?  Do

2    you see that?

3         A.   I see that what you did elevated it to

4    21 percent.

5         Q.   Do you have any evidence that the

6    percent -- Level 3's percent OTT is greater than

7    21 percent?

8         A.   I have no specific evidence and made no

9    claim about what the value of the OTT would be

10   properly calculated with verifiable data.

11        I see here you've made some assumptions

12   about which companies should be bumped up.  Again, I

13   don't know that some of those zeros shouldn't be

14   high -- should be above zero.

15        I don't know that some of the cable

16   companies shouldn't be higher since I don't

17   understand all of the arrangements that are going on

18   there.

19        So I understand the math of what you did

20   and the way that it works out, but that's kind of

21   tangential to the focus of my report which was an

22   evaluation of the methodology and its reliability

23   and how I thought that fit in, in terms of what

24   carriers had a right to expect that they were being

25   billed based on a fact.

Page 176

1        Q.   Okay.  So let's change the cable companies

2    to 100 percent to...

3             MR. BENSON:  I think -- so we're going to

4    have a standing objection to this line of

5    questioning, but that's fine.

6    BY MR. STEESE:

7        Q.   Do you see that I changed the cable

8    companies to 100 percent?  That changes the OTT to

9    23 percent.

10            So given -- do you have any evidence that

11   Level 3's percent OTT is greater than 23 percent?

12       A.   I have no evidence of that.  But I have no

13   evidence that it's 23 percent or lower because,

14   again, as I indicated, you know, you've made some

15   assumptions here in this analysis, and I'm afraid I

16   can't necessarily agree with this.

17       Q.   What assumptions do you think have been

18   made?

19       A.   You made the assumption that anything that

20   I couldn't dispositively show as above zero that was

21   shown as zero remained zero.

22       Q.   But you've also made the assumption, sir,

23   that 100 percent of AT&T's enterprise class

24   customers are at zero.

25            So why are you unwilling to accept that

1   Exhibits," there's a few exhibits underneath that,

2   that all of which are previously marked as

3   Exhibits 4, 6, 7, 21, 30, and 36.

4             Do you see that?

5        A.   I have to get there again.  Okay.

6   Which -- which is this?

7        Q.   Meola deposition exhibits.

8        A.   Okay.

9        Q.   And there are six pdfs.  Do you see that?

10       A.   Yes, I do.

11       Q.   Perfect.  Why don't you open Exhibit 4 and

12   turn to page -- the second page of the pdf.

13       A.   Okay.  I think I'm there.

14            (Off the record discussion.)

15                 (Exhibit 4 previously marked for

16                  identification was attached

17                  hereto.)

18            THE WITNESS:  Now, let me be sure.  This

19   begins at the top of the page.  It says "Level 3

20   Dispute Update August 8, 2012"?

21   BY MR. STEESE:

22       Q.   That's the one.  You're perfect, sir.

23   Thank you.

24       A.   Okay.

25       Q.   So you can see the date.  That's the first

Page 182

1    thing.  August of 2012.

2          Do you see that?

3       A.   Yes.

4       Q.   And in the second caret down below, it

5    says "AT&T estimates that at least 65 percent of

6    Level 3's basically local switching charges are

7    associated with over the top."

8          Do you see that?

9       A.   I do.

10      Q.   So that's, from what you can see, an

11   estimation, not a calculation, correct?

12      A.   That's how I would have to read it.  It

13   says "estimate."

14      Q.   Okay.  Let's look at Exhibit 6, which is

15   entitled "Release and Estimate Agreement."

16          MR. STEESE:  And all of these -- Madam

17   Court Reporter, all of these earlier exhibits are

18   previously marked; so this is Exhibit 6.

19                    (Exhibit 6 previously marked for

20                     identification was attached

21                     hereto.)

22   BY MR. STEESE:

23      Q.   Do you have that open, sir?

24      A.   I do.

25      Q.   And if you turn to page 8 of 20 of the

Page 183

1    pdf --

2         A.   Scrolling on down.   Okay.   I'm on page 8

3    of the pdf.

4         Q.   Do you see where in the middle it says, C,

5    "Over-the-Top/End-Office 2013 Interim Agreement"?

6         A.   I see that.

7         Q.   In section 2.16, do you see in the second

8    sentence, four lines down, it says "Because the

9    parties had been unable to determine the volume of

10   Level 3 traffic that was OTT prior to the effective

11   date of the settlement agreement, Level 3 and AT&T

12   agree for a certain period 65 percent of the end

13   office traffic billed by Level 3 is OTT provider

14   traffic"?

15            Do you see that?

16        A.   I do see it.

17        Q.   So in this particular document which is

18   for 2013, the parties are just entering into an

19   agreement saying we'll presume that 65 percent of

20   the traffic is OTT because we don't know how to

21   calculate it, correct?

22            MR. BENSON:   Objection.

23            THE WITNESS:   That seems to be --

24            (Simultaneous speakers.)

25            (Reporter clarification.)

```
                                            Page 184

 1              MR. BENSON:  Objection.  Objection to

 2     the -- objection to the extent it misstates the

 3     exhibit.

 4              Go ahead, Penn.

 5              MR. STEESE:  The court reporter had a

 6     question.

 7              (Off the record discussion.)

 8              THE WITNESS:  Is there a question for me?

 9     BY MR. STEESE:

10         Q.   The question was for you.  And you -- and

11     I just went through and said in 2013, since the

12     parties were unable to determine percent OTT, they

13     simply entered into agreement to make an assumption

14     of what it was, correct?

15         A.   The --

16              MR. BENSON:  Same objection.

17              THE WITNESS:  Yeah.  The --

18              MR. BENSON:  Penn.

19              Same objection.

20              Go ahead, Penn.

21              THE WITNESS:  Yeah.  I mean, that's what

22     the document says is that they have agreed on that

23     level.

24     BY MR. STEESE:

25         Q.   So have you seen anything between these
```

Page 185

1    two exhibits that show that AT&T has calculated a

2    percent OTT for Level 3 traffic?

3         A.   If you mean in a -- not in these

4    certainly.

5         Q.   Okay.  Let's turn to Exhibit Number 7.

6                   (Exhibit 7 previously marked for

7                    identification was attached

8                    hereto.)

9         MR. STEESE:  Again, previously marked,

10   Madam Court Reporter.

11        Q.   And if you look at page 2 of 3 of the pdf,

12   do you see where this document is talking about

13   over-the-top calling?

14        A.   Yeah.

15        Q.   And if you turn to page 3 of 3 of

16   Exhibit 7, Shaun Nix of AT&T says, "It appears that

17   your spreadsheet resolves any existing claims at

18   65/35"; is that correct?"

19             Answer:  "Yes.  There is not" -- I think

20   he means "nothing" -- "scientific about this other

21   than the feedback that Ed Miles provided for a

22   suggestion."

23             Do you see that?

24        A.   I do see that.

25        Q.   So once again, an estimate but no

Page 186

1      calculation by AT&T about percent OTT, correct?

2                 MR. BENSON:  Objection.  Form.

3      Foundation.

4                 Go ahead, Penn.

5                 THE WITNESS:  That is what is on the page

6      there, yeah.

7      BY MR. STEESE:

8          Q.   From what you've seen on the page --

9      strike that.  I'll ask a basic question.

10                 Your expert disclosure is about

11     identifying proper methodologies to calculate

12     percent OTT, correct?

13         A.   That's correct.

14         Q.   Have you seen anything in Exhibits 4, 6,

15     and 7 that identify a proper methodology for

16     calculating percent OTT of Level 3's traffic?

17         A.   No.  They seem to be about settling on an

18     agreed number between companies.  Didn't touch on

19     the issue of a process.

20         Q.   Okay.  Let's pull that out and open

21     exhibit previously marked 36.

22                           (Exhibit 36 previously marked

23                            for identification was attached

24                            hereto.)

25     BY MR. STEESE:

Page 187

1          Q.   Let me know when you have that open, sir.

2          A.   I do.

3          Q.   And do you see this is an email from

4    Craig John of AT&T to Mr. Burgess and Ms. Meola?

5          A.   I see that.

6          Q.   And are you aware that Mr. John is a

7    person that provides or does secret shopper studies

8    for AT&T?

9          A.   Yeah, I think so.

10         Q.   Now, if you look at the second page of

11   Exhibit 36 -- and this is from the mid-2017 time

12   frame -- Mr. John is making an assumption of

13   Level 3's percent OTT because of telephone numbers

14   that Level 3 has assigned to a number of -- I'll

15   call them carrier customers identified on page 2.

16              Do you see that?

17              MR. BENSON:  Objection.  Foundation.

18              THE WITNESS:  Yes.

19              MR. BENSON:  Go ahead.

20   BY MR. STEESE:

21         Q.   Dr. Pfautz, your answer?

22         A.   Yeah, I see what's on the page.  I don't

23   know what assumptions went into this.  I'm not

24   familiar with the details of the studies that

25   Mr. John did.

Page 188

1          Q.   Okay.  If you look at page 2 -- I had to

2     blow it up because it was tiny on my page until I

3     blew it up.  Do you see eFax on the left and then

4     Vonage --

5               (Reporter clarification.)

6          Q.   -- EFax and then Vonage and then VoIP.com

7     on the top?  Do you see them?

8          A.   I see them.

9          Q.   Are you aware that if you look at

10    Andrew McClure's spreadsheet from 2020, the one we

11    were looking at earlier just marked as Exhibit 113,

12    the only company that still has relationship with

13    Level 3 on this document is Vonage?

14               MR. BENSON:  Objection.  Foundation.

15               But go ahead.

16               THE WITNESS:  That -- it appears to be the

17    case.

18               Again, you know, there's a set of

19    companies here.  Yes.  Vonage is the one that I

20    recall from the -- the 2020 spreadsheet.

21    BY MR. STEESE:

22          Q.   So let's take a look at your 2017

23    spreadsheet that you looked at and evaluated for

24    Mr. McClure.

25               So if you go to Exhibit 110 and you go

1    to -- I don't care if you choose PP-2 or PP-3.

2          A.    Let me go to 110.  Let me go back to 110.

3                Which PP do you want me to pick?  I'll

4    pick whichever.

5          Q.    Either PP-2 or 3.  I was going to say you

6    pick whichever one you want and I'll use that one.

7    They are very similar.

8                Let's do PP-3.

9          A.    Okay.  That's good.  That's what I had my

10   cursor on.

11         Q.    There you go.  And it's going to take a

12   second for me to open it.

13         A.    Yes.  Indeed it will.

14         Q.    If you look at the third tab of the Excel

15   spreadsheet entitled "AT&T End Office OTT Usage," do

16   you see that?

17         A.    Yes.  I have that before me now.

18         Q.    And you look at Vonage which is row 8.  Do

19   you see that?

20         A.    I do.

21         Q.    Do you see row 8 for Vonage in the

22   mid-2017 time frame had 18.5 million minutes?  Do

23   you see that?

24         A.    I do.

25         Q.    Okay.  Just remember that in your mind --

Page 190

1    18.5 million.

2             And now I'm going to share screen again,

3    and I am going to look at Exhibit 113.  And we look

4    at Vonage, and you see Vonage here.  Do you see it,

5    sir?

6        A.    Yes.

7        Q.    How many minutes does it have for this

8    time frame for the entirety of January 2019 all the

9    way to March of 2020?

10       A.    It looks like it -- but if I'm reading it

11   correctly, it's 125,000.

12       Q.    So it goes from 18.5 million minutes for a

13   portion of a year to 125,000 minutes for more than

14   an entire year, correct?

15       A.    I think -- I mean, again, I don't have

16   that spreadsheet before me in the sense of having

17   gone through it, especially the 2020 data.

18            I'm assuming that is the only, you know,

19   entry for Vonage.  I know that, in some of the

20   previous spreadsheets, some companies had multiple

21   entries.  But I will take your word for it.

22       Q.    That's a fair point.  I haven't looked for

23   that.  So let's look because I don't believe there's

24   more, but it could be a little more.

25       A.    It may be fine.  I don't know.  I simply

Page 191

1    don't know.

2         Q.    There is another with 3,000 minutes.  I

3    did not notice that.  My apologies, sir.

4         A.    Okay.

5         Q.    So there's actually a few others, but

6    they're all small.  I'm now finished.  So certainly

7    less than a million minutes.

8              So the volume of minutes that Vonage is

9    sending on to the Level 3 network between 2017 and

10   2019 is dramatically reduced, at least according to

11   these spreadsheets, correct?

12        A.    I would agree according to those

13   spreadsheets that appears to be the case.

14        Q.    So now going back to Exhibit Number 7 --

15   sorry, Exhibit Number 36.

16        A.    Let me make sure I got Exhibit 36.

17              Okay.  I got 36 back.

18        Q.    Given that Vonage is the only one of the

19   companies that is identified in Exhibit 36 with whom

20   Level 3 still has a relationship and Vonage has

21   shrunk to the point of being virtually zero, any

22   secret shopper study that would have been done in

23   2017, at least based on this data, would not bear

24   very much in the 2019 time frame; would you agree

25   with that?

Page 192

1          MR. BENSON:  Objection.  Foundation.

2          Go ahead.

3          THE WITNESS:  So, I mean, the 2017 data

4     was the data that I was provided and I analyzed.

5     What's changed between 2017 and now I don't know.

6     It clearly seems like the carrier said that showing

7     the secret shopper study is less represented in the

8     2020 spreadsheet.  What I don't know is what other

9     carriers may have come in, and things like that.

10          So, yes, I would agree that if you look at

11     those specific companies that were cited in the 2017

12     secret shopper, yes, they appear -- again, appear,

13     you know, from what I can see in those

14     spreadsheets -- to be less important in 2020.

15     BY MR. STEESE:

16          Q.   Part of your job --

17          A.   Can you speak up a little bit, Chuck?  I'm

18     not hearing you.  Sorry, Mr. Steese.

19          Q.   You can call me Chuck.  That's what

20     everyone calls me.  That's okay.  I used to say

21     Mr. Steese was my dad, but now I have enough gray

22     hair where I guess I have become a Mr. Steese.

23          As part of your job at AT&T -- first of

24     all, how long were you at AT&T?  I didn't add it up.

25     Thirty years-plus?

Page 215

1              (Whereupon non-confidential testimony

2                   was resumed.)

3       Q.   One moment.  Look at paragraph 8 of

4    Exhibit 110.

5       A.   Now, what is -- what is -- which one is

6    that?

7       Q.   Your report.

8       A.   Paragraph 8.

9       Q.   Are you there, sir?

10      A.   Yes.

11      Q.   Your -- you say, "My opinion is that the

12   method AT&T/TCG used to estimate over the top VoIP

13   traffic is reasonable."

14              So you actually did give an opinion about

15   the method AT&T used to estimate over the top

16   traffic, correct?

17      A.   I guess you could read it that way.  And

18   I -- in subsequent paragraphs, I tend to clarify

19   what I looked at and what I thought was reasonable.

20   Particularly if you look at paragraph 9 for those

21   services, my opinion is AT&T can properly bill end

22   office switching access service.

23              And then a couple of the products that I

24   said there were questions, and then I thought

25   that -- that AT&T had been reasonable in their

Page 216

1    billing by not -- by electing not to bill any of the

2    traffic for those services.

3            And so to the degree -- you know, I never

4    actually discuss a specific estimate of AT&T's over

5    the top percentage or the way in which they do that.

6        Q.   So let's unpack that a little bit and make

7    sure I understand.

8            So you are really not giving an opinion

9    about AT&T's methodology for estimating OTT,

10   correct?

11       A.   Correct.

12       Q.   What you are doing is you're looking at

13   products that have the potential of having nomadic

14   TN and find it's reasonable for AT&T to not bill end

15   office on that category of calling, correct?

16           MR. BENSON:  Objection to the extent that

17   it misstates both the testimony and the report.

18           But go ahead.

19           THE WITNESS:  Yeah.  What I said was that

20   the way in which AT&T decided basically not to bill

21   for services that could include nomadic TNs was a

22   reasonable approach and conservative, in fact.

23   BY MR. STEESE:

24       Q.   But you also -- look in paragraph -- that

25   states -- excuse me, in paragraph 9, "In most cases,

Page 217

1    AT&T/TCG provide enterprise services by deploying a

2    facility to the premises of the end users, i.e., the

3    enterprise customer.  For those services, my opinion

4    is that AT&T/TCG can properly bill end office

5    switching access service.  This is so even though in

6    some cases it may be possible for an employee of the

7    enterprise customer to obtain remote access and

8    place and receive calls over the enterprise -- AT&T

9    enterprise service."

10           So you give that opinion as well, correct?

11      A.   That's -- you read the words that were in

12   my report.

13      Q.   So when -- so it appears to me in reading

14   your report that what you're saying is if it's an

15   enterprise class customer to whom the carrier --

16   here AT&T -- has deployed facilities and you have no

17   reason to believe that that carrier is providing

18   some telephony-esque service, it's reasonable to

19   bill end office switching on those calls; is that

20   true?

21      A.   That's what I said.

22      Q.   And is it your understanding that AT&T's

23   customers -- enterprise class customers, better

24   said -- you, Dr. Pfautz, have no reason to believe

25   that any of those customers are providing enter- --

1   excuse me -- are providing telephony-esque services

2   and, therefore, it's appropriate for AT&T to bill

3   end office switching on those -- for those

4   enterprise class customers?

5           MR. BENSON:  Objection.  Form.

6           Go ahead.

7           THE WITNESS:  Yes.

8   BY MR. STEESE:

9       Q.   And you make that assumption even though

10  you've never looked at the list of customers that

11  AT&T provides service to?

12      A.   Yes.

13      Q.   And when you look at Level 3, the

14  difference in data you have between Level 3 and AT&T

15  is Level 3 has provided you with a list of its

16  largest customers and the volume of traffic

17  associated with that, correct?

18      A.   Level 3 has provided that.

19      Q.   And your critique of Level 3's methodology

20  is based upon your studying the individual customers

21  to whom Level 3 has a relationship -- with whom

22  Level 3 has a relationship, correct?

23      A.   That's an incomplete characterization.

24  That was a part of it but --

25      Q.   Okay.  No, no.  Fair enough.  I'll stop

Page 219

1    there.  I'm happy with a part of it.

2              MR. BENSON:  Are you done answering, Penn?

3              THE WITNESS:  I am.

4              MR. BENSON:  You didn't answer the

5    question, but go ahead.

6              THE WITNESS:  Oh, oh.  Did -- I was going

7    to say some more, but I thought Mr. Steese didn't

8    want me to say anything more.

9              MR. BENSON:  Well, you're entitled to

10   answer the question.  So if you feel like you need

11   to answer more, you're entitled to do so.  If not,

12   you don't have to.

13             THE WITNESS:  What I wanted to say was

14   that the major focus of my critique was on the

15   process through which Level 3 came up with the

16   estimates of the percent OTT for customers for which

17   there was every reason to believe and Level 3 did

18   believe that OTT was involved.

19             That was probably a bigger part of my

20   critique.  I didn't -- I can't say that I paraded

21   the pieces in my critique, but that was the biggest

22   part rather than the fact that I was able to find

23   some customers that clearly seemed to be engaged in

24   a carrier role rather than just an ordinary

25   enterprise customer.  That was more frosting on the

Page 220

1    cake, additional concern.

2    BY MR. STEESE:

3        Q.   But you've seen that as soon as we

4    identify -- put 100 percent in all of those

5    questionable cases where Level 3 had reason to

6    believe they may be providing some amount of OTT

7    traffic, it only goes to 21 percent OTT, correct?

8             MR. BENSON:  Objection.  Foundation.

9             You know, not looking at the entire

10   spreadsheet, we -- you picked out some customers and

11   you changed the numbers, but you haven't laid the

12   foundation for that.  But that's fine.  Go ahead.

13            MR. STEESE:  I have laid the foundation,

14   very respectfully.  I went through every single one

15   that was not a zero, and other than Wells Fargo made

16   it 100 percent.

17            MR. BENSON:  And then there was -- we can

18   have this debate, but then there's an entire list of

19   customers lower on the spreadsheet that also affect

20   the 21 percent -- or the factor that weren't

21   manipulated.  So I don't think you've laid the

22   foundation, but that's my objection.

23            MR. STEESE:  Again, I'll put on the record

24   Dr. Pfautz just said that if you look at the

25   carriers that Level 3 has "every reason to believe"

Page 221

1    or provide some amount of OTT, his primary issue was

2    with the methodology we used for determining percent

3    OTT.  So everything that's not zero was his focus.

4        Q.   That's what you were just talking about;

5    isn't that true, Dr. Pfautz?

6            MR. BENSON:  I object to that

7    characterization of the testimony, and that's --

8    that's what I'm going to say about that.  That's not

9    what he said, but go ahead.

10           If there's a question there, which I don't

11   think there was, but just --

12           MR. STEESE:  I asked the question.

13           MR. BENSON:  -- ask the question.

14   BY MR. STEESE:

15       Q.   Dr. Pfautz, your focus was on those

16   customers that you said Level 3 had "every reason to

17   believe" for providing some carrier-like function,

18   correct?

19       A.   That was not quite what I think I said.

20           What I was saying was it was the process

21   of estimation itself that was called into question.

22   There's another issue of was that process carried

23   out for all the customers that it perhaps should

24   have been, and that's a separate issue.  But -- and

25   I can't, you know, comment on, you know, your

Page 222

1    what-ifs making different assumptions.  That isn't

2    where I was focused.

3            I was asked to say what about this process

4    that came up with a factor.  And, you know, that was

5    the opinion that I delivered in my report.

6            You'll note that I did not in my report

7    ever say I think that the percent OTT is X.

8        Q.   I'm trying to focus on AT&T's percentage.

9    And if you look at paragraph 9, you said, "In most

10   cases, AT&T provides" -- and I'm not going to read

11   the whole thing again.  I'll paraphrase.

12           AT&T provides enterprise class customers

13   with a facility, and because they're providing a

14   facility, it's fair to bill end office charges.  And

15   because of that, you testified a moment ago that you

16   thought that was reasonable for them to do, correct?

17       A.   Correct.

18       Q.   And you made that assumption without

19   looking at a single list of customers from AT&T,

20   correct?

21           MR. BENSON:  Objection.  Asked and

22   answered and argumentative.

23           But go ahead.

24           THE WITNESS:  Yes.

25   BY MR. STEESE:

Page 223

1          Q.    I'm just getting that.

2               And so then after that, my question was

3     then if you look at the assumptions that you're

4     making for AT&T to give the opinion that the method

5     they used to determine OTT was reasonable, you don't

6     think you need to look at the over -- at the

7     customer level to determine whether or not

8     individual customers should or should not be billing

9     end office charges on their calling for AT&T,

10    correct?

11               MR. BENSON:  Objection.  Asked and

12    answered.  Form.

13               Go ahead.

14               THE WITNESS:  So I don't think that was

15    exactly what I said.  You know, I relied on the

16    information I had from AT&T that they did not

17    believe they had customers that were turning around

18    and doing that.  If they had said that they did,

19    then I would have said, you need to come up with a

20    percentage.

21               And I did not try to evaluate a

22    methodology for -- that AT&T used for percent OTT

23    because of the decision they had made essentially

24    not to bill what they thought might be OTT.

25

1    BY MR. STEESE:

2        Q.   And if Level 3 had given you a list of

3    customers and said, "These are the ones we think are

4    providing some carrier-like function," and they gave

5    you the ones that were not zero and they said,

6    "Every other one, we believe, is not providing a

7    carrier-like function," would you have found that

8    method reasonable for --

9        A.   I don't want to speculate what I would

10   have done if I had been presented with something

11   different.

12            My understanding is based on what I saw in

13   the depositions.  And, you know, if there's a new

14   proposal, then, you know, at that time if I'm asked

15   to evaluate it, I'll evaluate it.

16       Q.   Well, that's the beauty of being a lawyer

17   and an expert in a deposition.  I get to ask you

18   hypotheticals.

19            And so my question is, if Level 3 had

20   presented you with a spreadsheet that said these are

21   the customers that we think are providing a

22   carrier-like function, everyone else we don't

23   believe is, would you have found their methodology

24   appropriate if Level 3 had said, "All of those that

25   are carrier-like functions, we'll assume they're

Page 225

1    100 percent.  Those that we don't think have a

2    carrier function, we're going to put at zero percent

3    and we're not going to tell you any of those

4    customers that are at zero," would you have found

5    that methodology acceptable?

6              MR. BENSON:  Objection.  Asked and

7    answered.  Form.

8              But go ahead, Penn.

9              THE WITNESS:  Again, you get to ask me

10   hypotheticals, but that doesn't mean that I'm going

11   to give you an answer that I would -- you know, with

12   or without a full investigation.  I mean, that's why

13   I presume I was retained as an expert.

14             And so what I'll tell you is I might or

15   might not depending on the details, and I might push

16   back and say, "No.  That's not good enough.  I need

17   to have some more information."

18             I would never say that carriers can't do

19   that in their exchange with each other.

20   BY MR. STEESE:

21       Q.   Okay.  AT&T told you that they didn't

22   believe any of their enterprise class customers

23   provided carrier-esque functions, and you found that

24   reasonable when they told you that.

25             Why wouldn't that same assumption hold

Page 226

1    true if Level 3 told you that?

2              MR. BENSON:  Objection.  Asked and

3    answered.  Form.

4              Go ahead.

5              THE WITNESS:  I'm not sure that that's

6    actually what Level 3 said to me.

7              What Level -- yeah.  I have not had direct

8    communication with Level 3, but what I read in the

9    depositions was Level 3 made a specific proposal

10   with respect to specific customers that they called

11   out and explained why they came to those decisions.

12   And that methodology, which was what was presented

13   to me, I found to be unreasonable.

14             MR. STEESE:  Move to strike as

15   nonresponsive.

16        Q.   My comment was not about Level 3.  My

17   comment was about AT&T.

18             My question is, why did you find it

19   reasonable for AT&T to tell you that "We don't

20   believe any of our customers are providing

21   carrier-esque functions and so none of that traffic

22   is OTT" -- why did you find it reasonable to rely on

23   AT&T's statement to that effect?

24        A.   I believe you also said "but not Level 3's

25   statement."

Page 227

1          MR. BENSON:  Penn.

2          Objection.  Asked and answered.  Form.

3          Go ahead.

4          THE WITNESS:  Okay.  Okay.

5          MR. BENSON:  Penn, you can answer the

6  question now.

7          THE WITNESS:  Yeah.  What I said was I

8  thought you had asked in comparison to Level 3, and

9  that's why I brought the Level 3 in.

10  BY MR. STEESE:

11      Q.  Well, answer the question I just asked,

12  then.

13          Why is it reasonable -- why was it

14  reasonable for you to take AT&T's word that none of

15  its enterprise class customers provide carrier-esque

16  functions?  Why was it reasonable for you to assume

17  that that was true?

18          MR. BENSON:  Same objection.

19          Go ahead, Penn.

20          THE WITNESS:  I had no evidence to the

21  contrary.

22  BY MR. STEESE:

23      Q.  Did you look for any evidence?

24      A.  No.

25      Q.  Did you ask -- so -- so because they told

1    you and because they didn't provide you with

2    anything that suggested it was incorrect, you

3    assumed it was true?

4            MR. BENSON:  Asked and answered.

5    Objection.

6            Go ahead.

7            THE WITNESS:  Yes.

8    BY MR. STEESE:

9       Q.   Did you look at the deposition of

10   Mr. Cathey where we provided -- I provided to

11   Mr. Cathey documentation that was an exhibit to his

12   deposition showing that AT&T's billing end office

13   charges on bandwidth traffic?

14           MR. BENSON:  Objection.  Asked and

15   answered.

16   BY MR. STEESE:

17      Q.   Did you ever look at that?

18           MR. STEESE:  I've never asked this

19   question.

20           MR. BENSON:  You've absolutely asked

21   whether he's reviewed Marc Cathey's deposition, and

22   he stated the answer to that.

23           But you can answer the question, Penn.

24           THE WITNESS:  I don't recall that

25   specifically.

1    BY MR. STEESE:

2         Q.   If that were true, would that give you

3    pause about the reasonability of your assumption?

4         A.   I'd have to look at the --

5              MR. BENSON:  Objection.  Lacks foundation.

6              But go ahead.

7              THE WITNESS:  I'd have to look at the

8    context.  It might.

9    BY MR. STEESE:

10        Q.   So is there a reason that you're searching

11   to try and find problems to pick at 8 -- excuse

12   me -- Level 3's methodology, but you're willing to

13   assume without looking at any -- in any detail at

14   all at AT&T's claim it's reasonable?

15             MR. BENSON:  Objection.  Asked and

16   answered.  Misstates the testimony.

17             But go ahead.

18             THE WITNESS:  I was specifically asked to

19   look at the Level 3 methodology.

20             For AT&T I was asked if the way they wound

21   up billing was reasonable.  And since they seemed to

22   be excluding lots of billable traffic, to me, that

23   seemed reasonable.

24   BY MR. STEESE:

25        Q.   Are you aware that Level 3 -- we call it