# EXHIBIT 5

CONFIDENTIAL

Page 1

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO
2        CIVIL ACTION NO. 18-cv-00112-RM-MEH

3

   AT&T CORPORATION,                  :
4                                     :
                    Plaintiff,        :
5                                     :
             vs.                      :
6                                     :
   LEVEL 3 COMMUNICATIONS, LLC,       :
7                                     :
                    Defendant.        :

8

9

10              Deposition of KIMBERLY MEOLA
11   taken in the above-entitled matter before
12   Suzanne J. Stotz, a Certified Court Reporter
13   (License No. 30XI00184500) and Notary Public of
14   the State of New Jersey, taken at the offices
15   of AT&T, One AT&T Way, Bedminster, New Jersey
16   07921, on Thursday, February 7, 2019,
17   commencing at 1:36 p.m.

18

19

20

21

22   Job No. CS3213054

23

24

25

CONFIDENTIAL

Page 2

```
1    A P P E A R A N C E S:
2
3         SIDLEY AUSTIN, LLP
          BY:  MICHAEL J. HUNSEDER, ESQ., and
4              JUSTIN A. BENSON, ESQ.
          1501 K Street, N.W.
5         Washington, D.C. 20005
          (202) 736-8236
6         (202) 736-8757
          mhunseder@sidley.com
7         jbenson@sidley.com
          Attorneys for the Plaintiff
8
9
          ARMSTRONG TEASDALE, LLP
10        BY:  CHARLES W. STEESE, ESQ.
          4643 South Ulster Street, Suite 800
11        Denver, Colorado 80237
          (720) 200-0676
12        csteese@armstrongteasdale.com
          Attorneys for the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 13

```
 1              MR. STEESE:  This is also a
 2      personal deposition.
 3              MR. HUNSEDER:  But there's no
 4      notice?
 5              MR. STEESE:  There is no notice.
 6              MR. HUNSEDER:  Okay.
 7   BY MR. STEESE:
 8      Q.    And if you look at Exhibit
 9   Number 1, this is the corporate portion of the
10   notice.
11              Do you see that?
12      A.    Do what?  I'm sorry, could you
13   repeat that?
14      Q.    This is the notice of the corporate
15   deposition for which you're here for a portion
16   of.
17              Do you understand that?
18      A.    Yes.
19      Q.    And if you look at page 5, Topics 1
20   and 2, I understand that you are going to be
21   testifying here today on those two particular
22   subjects as far as the corporate deposition is
23   concerned; is that correct?
24      A.    May I ask Mike a question?
25      Q.    Sure.
```

CONFIDENTIAL

Page 14

1           THE WITNESS:  I don't know Douglas

2      Marsh.

3           MR. HUNSEDER:  That's just to

4      identify this document.

5           THE WITNESS:  Okay.  Yes.  This

6      document, yes, I am.

7   BY MR. STEESE:

8      Q.     Absolutely fine.  So you're here

9   for Categories 1 and 2?

10     A.     Yes, I am.

11          MR. STEESE:  And now, Counsel, I'm

12     going to ask you, those are the only

13     topics she is here for with respect to the

14     corporate deposition?

15          MR. HUNSEDER:  Correct.

16          MR. STEESE:  Perfect.

17   BY MR. STEESE:

18     Q.     And so you're here in the -- to

19   represent AT&T to talk about discussions that

20   led to the Settlement Agreement that was

21   executed in 2015 with Level 3, correct?

22     A.     Yes.

23     Q.     And you're also here to talk about

24   one particular document that was part of those

25   negotiations sent by Mr. Sloan to Mr. Riederer

CONFIDENTIAL

Page 15

1    on May 8, correct?

2         A.    Yes.

3         Q.    All right.  Do you understand that

4    the portions of your testimony, those that

5    relate to Categories 1 and 2 are binding on

6    AT&T?

7         A.    Yes, I do.

8         Q.    Do you understand that -- let me

9    ask it differently.

10            What did you do to prepare for your

11   testimony with respect to Categories 1 and 2?

12        A.    I read both of these documents.  I

13   spent a little bit of time with counsel.  I

14   reviewed some other e-mails that may or may not

15   have been associated with these documents.

16        Q.    Did you contact anyone else at AT&T

17   to ask them their recollections about these

18   subjects?

19        A.    I spoke with Ardell Burgess on a

20   different subject but not on these two

21   subjects.  Otherwise, no, I did not.

22        Q.    When you spoke with Mr. Burgess,

23   was counsel present?

24        A.    No.

25        Q.    What did you speak to Mr. Burgess

CONFIDENTIAL

Page 61

1    negotiation.

2              Do you see that?  I'm paraphrasing

3    after that?

4         A.    Yes.

5         Q.    And if you look at the answer which

6    continues on to page 5 -- excuse me, page 6, it

7    says, "Look at the documents."

8         A.    Uh-huh.

9         Q.    So my question to you is, was

10   every -- okay.  I'm going to differentiate

11   here.

12             You call up your contact at

13   Level 3, whoever it is and say, John Doe, do

14   you have time to chat.

15             I don't have time to chat right

16   now.  Can we talk in an hour and a half?

17             That sounds good.

18             I'm not talking about that.  I'm

19   talking about real discussions where

20   substantive things are exchanged.

21             Do you understand the difference?

22        A.    Yes, I do.

23        Q.    Perfect.

24             Was every single substantive call

25   that you had with Level 3 about the

CONFIDENTIAL

Page 62

1    negotiations memorialized in some way in

2    writing?

3        A.    Every call that I had was

4    memorialized, yes.  If I had conversations, I

5    would document, what I called my drafting

6    notes, of that call.

7        Q.    Where did those documents go?  I

8    mean, do you have some file or some kind of

9    system on your computer where you memorialized

10   it?

11       A.    If it was a major dispute and it

12   was in the process of being settled, it

13   would -- I would have sent it to my team to

14   inform them.  I would have copied the legal

15   team to inform them.  And then I would put it

16   in my -- to inform them or to ask them for

17   guidance.

18            Most often, everything we do, we

19   have to check with legal.  And then I would put

20   it in a folder in my computer by company name.

21       Q.    Okay.  So in these communications

22   would be, it sounds like -- I'm being general.

23   And if this general is not fair, tell me --

24   generally, two categories of information.

25            One, I had a call with John Doe.

CONFIDENTIAL

Page 110

1          MR. HUNSEDER:  At the time?

2          MR. STEESE:  At the time.

3          THE WITNESS:  He was new to the

4     organization, very new.  He was VP of, I

5     think it was global access.

6  BY MR. STEESE:

7     Q.     So in terms of hierarchy, he would

8  have been higher than you?

9     A.     He was one level higher than me,

10  yes.

11     Q.     So you're an executive director?  I

12  don't know the hierarchy, so I'm guessing.

13     A.     That might have been my name at the

14  time.  Right now I'm an AVP versus George being

15  a VP, assistant vice-president.

16     Q.     I knew EVP, but I didn't know AVP?

17     A.     It'll change again.

18     Q.     All right.  So in terms of the,

19  again, you are now -- I'm going to ask you this

20  question in your corporate capacity for AT&T --

21  charged with answering the question for the

22  company --

23     A.     Uh-huh.

24     Q.     Because it relates to negotiations.

25          The discussions that AT&T had with

CONFIDENTIAL

Page 111

1    Level 3 verbally, are they memorialized in

2    written documents in one place or another that

3    have been produced to us?  Let me strike that,

4    produced to us because you won't know.

5              Have they been memorialized in

6    documents one play or another?

7         A.    I am not aware of any conversations

8    that were not memorialized.

9              And just to be clear, you're

10   talking specifically about OTT again, right?

11        Q.    A hundred percent.

12        A.    Yes.  I'm not aware.  I would have

13   been a part of those, yes.

14        Q.    Let me show you what I'm marking as

15   Exhibit 10.

16              (Whereupon, Exhibit No. AT&T 10,

17        E-mail correspondence with attachment,

18        Bates numbered ATT PROD 0011771 through

19        ATT PROD 0011772, was marked for

20        identification.)

21   BY MR. STEESE:

22        Q.    And Exhibit 10 is dated April 9 of

23   2015.  And you can see its sent to Level 3.

24        A.    Uh-huh.

25        Q.    And it says, "Confidential

CONFIDENTIAL

Page 112

1    Settlement Offer Pursuant to Rule 408."  So

2    basically this is settlement discussions.

3         A.    Yes.

4         Q.    Do you see that?

5         A.    Yes, I do.

6         Q.    And one of the items that it talks

7    about is the OTT dispute.

8              Do you see that?

9         A.    I see OTT dispute, yes.

10        Q.    This is not -- I'm not a gotcha

11   guy.

12        A.    Uh-huh.

13        Q.    So we talked about when the

14   discussions for the settlement began, and you

15   said you thought early May.  This document is

16   April of 2015.  So it's a little bit earlier

17   than that.

18             Do you consider this part of the

19   settlement discussions, or is this something

20   separate?

21        A.    We had ongoing discussions with

22   Level 3.  We were making offers for many years.

23   But the real milestone that brought the 2015

24   settlement to a head was the executive

25   escalation.

CONFIDENTIAL

Page 113

1          So, you know, there were

2     discussions that my team would continue to

3     pursue associated with this; but as it pertains

4     to, you know, the settlement from 2015, it was

5     really when Bill Hague got engaged.

6          So it could have been go back

7     further than this.  I mean, Ardell could have

8     been talking about this for months before this.

9          Q.    This is the earliest document that

10    I found.  Now, that doesn't mean that my search

11    was 100 percent comprehensive, but I think it

12    was?

13         A.    Yeah.  I said he could have.  There

14    were ongoing discussions, but we didn't make

15    progress quickly.  So where we really started

16    to have serious discussions was when Bill got

17    engaged, and that was in the May time frame.

18    We obviously had some structure to work from at

19    that point.

20         Q.    I'm not good with first names, but

21    you are.  So Bill is?

22         A.    Bill Hague.

23         Q.    Thank you.

24         A.    He was the officer that was called

25    upon to facilitate all of the issues with

CONFIDENTIAL

Page 114

1    Level 3.

2         Q.    If you can try and use last

3    names --

4         A.    Okay.

5         Q.    -- it helps because I don't know

6    these people; you do.

7         A.    Yes, I will.  It's disrespectful

8    sometimes to call them by their last name.

9         Q.    It is not intended to be that.

10   It's intended to communicate to me because

11   there's a bunch of Bills and Bob's and Sues.

12        A.    Yes, I apologize.  I'll be clearer.

13        Q.    Okay.  So I'm just putting that in

14   front of you to get an idea.

15              Does it sound like the discussions

16   that led to the Settlement Agreement could have

17   been around this time forward?

18        A.    Yes, it could have been, yes.  I

19   think that is reasonable.

20        Q.    Okay.  You said you went back and

21   looked at your calendar.

22        A.    Uh-huh.

23        Q.    Do you keep a very detailed

24   calendar that you can look back at even back

25   then and see all the events that are on it?

CONFIDENTIAL

Page 136

1      Q.     And do you think your recall from

2    three years ten months ago is pretty accurate?

3      A.     As accurate as it could be.  It's

4    my recall.

5      Q.     Okay.  So Mr. Ross says, second

6    substantive paragraph, "I think the biggest

7    business item worth covering off today is the

8    proposed concept of settlement of OTT with the

9    condition that the appeal would over-ride

10   whatever we agree.  Initially, we see that as

11   simply a transfer of retro and perspective

12   reserved/unrecognized monies from AT&T to

13   Level 3, and held in escrow (conceptually at

14   least) until the appeal is concluded."

15            Do you see that?

16      A.     I see that.

17      Q.     So were you very much aware that

18   the focus of Level 3 in these discussions was

19   going to be on the impact of that appeal to the

20   Declaratory Ruling action and the impact it

21   would have on the Settlement Agreement?

22            MR. HUNSEDER:  Object to the form.

23            THE WITNESS:  Please repeat.

24   BY MR. STEESE:

25      Q.     Sure.  Were you aware that level --

CONFIDENTIAL

Page 137

1    everything I'm talking about with Settlement

2    Agreement, unless I talk otherwise, is OTT.

3        A.    Okay, yes.

4        Q.    So Level 3's biggest concern on the

5    OTT portion of the settlement was the impact

6    that the appeal might have on the finality of

7    the Settlement Agreement that the parties were

8    entering into.

9             Do you recall that?

10       A.    I don't recall that that was their

11   biggest concern, but that was one of the

12   concerns.

13       Q.    Okay.  We'll go through this

14   exhibit, and then we'll take a quick break

15   again, give the court reporter a break.

16             (Whereupon, Exhibit No. AT&T 15,

17        E-mail correspondence with attachment,

18        Bates numbered ATT_PROD_0011795 through

19        ATT_PROD_0011798, was marked for

20        identification.)

21   BY MR. STEESE:

22       Q.    I'm going to show you what I've

23   marked as Exhibit 15.

24             So the last e-mail we looked at was

25   April 15; and now we're to April 24, correct?

CONFIDENTIAL

Page 161

1          Q.     So there's two separate disputes

2     that they're discussing in this.  One is OTT,

3     and one is Tandem, correct?

4          A.     Yes, in this document.

5          Q.     Okay.  And this comes, the exact

6     same day as the e-mail from Mr. Riederer just a

7     few hours later, correct?  That's Exhibit 18.

8          A.     Yes.

9          Q.     So did Mr. Sloan have a discussion

10    with Mr. Riederer, a verbal discussion?

11         A.     Yes, he did.

12         Q.     And in that telephone call, did

13    Mr.  Riederer -- who else was on the call?

14         A.     I believe Bill Hague was on the

15    call, and I don't recall the people from

16    Level 3 that were there; but that would be all.

17         Q.     So the only people from the AT&T

18    side, Mr. Hague and Mr. Sloan?

19         A.     Yes.  And I don't think Mr. Hague

20    was on the whole time.

21         Q.     Why do you say that?

22         A.     Because he told me, Kim, you got

23    this.  And he had other things to do.

24         Q.     That doesn't mean he wasn't on the

25    phone call the whole time because you weren't

CONFIDENTIAL

Page 162

1    on the call, were you?

2         A.    I was on the call, yes.

3         Q.    Oh, I thought you said the people

4    from AT&T were Mr. Hague and Mr. Sloan.  I

5    didn't hear you say yourself.

6         A.    No, no.  Along with me.  They

7    pulled me out of this pilot to be part of this

8    discussion.

9         Q.    Okay.  Thank you for that.

10              And from Level 3, you said

11   Mr. Riederer and you didn't know who else?

12        A.    I don't recall who from Level 3 was

13   there.  I know Mr. Riederer was there, though,

14   that day.  He was delivering a message.  You

15   know, I think he was, again, more of a

16   middleman than actually working the issue.

17        Q.    All right.  So now let's turn the

18   page --

19        A.    Yep.

20        Q.    -- to Bates '325 of Exhibit

21   Number 19.

22        A.    Yes.

23        Q.    Item Number 1, it says, "AT&T

24   agrees to pay 75% of L3's retrospective claims

25   on OTT for usage incurred through the end of

CONFIDENTIAL

Page 163

1   May 2015," not including late payment charges.

2           Do you see that?

3       A.      Yes.

4       Q.      And that ends up in the actual

5   Settlement Agreement, correct?

6               MR. HUNSEDER:   Object to the form.

7   BY MR. STEESE:

8       Q.      That general term.

9       A.      I think the late payment charges

10  were included in the settlement at 75 percent.

11      Q.      Are you sure about that?

12      A.      I'm not sure, but I could reference

13  the document.  I'm pretty sure it was

14  75 percent of that total.

15      Q.      Okay.  Item Number 2 says, "AT&T

16  agrees to pay 25% of the LPCs associated with

17  OTT usage billed through the end of May 2015."

18              You think that was 75 percent?

19      A.      I think it was combined in the

20  agreement, yes.

21      Q.      Then item Number 3 says, "AT&T

22  agrees to pay L3 full switched access per the

23  Level 3 tariffs for both originating and

24  terminating OTT traffic on a prospective basis

25  for June 2015 usage forward."

CONFIDENTIAL

Page 164

1          Do you see that?

2     A.     Yes, I see that.

3     Q.     That was incorporated into the

4  Settlement Agreement, correct?

5     A.     I don't know if it was precisely,

6  but the concept, yes.

7     Q.     That's all I'm asking is concept.

8     A.     Yes.

9     Q.     Yep.

10          Number 4, "On a prospective basis,

11  beginning with June 2015, Level 3 will not bill

12  any EO elements associated with domestic

13  originated OTT 8YY traffic not reflecting a

14  Level 3 owned CPN or CPNLess traffic that is

15  not served by a Level 3 end office.  Level 3

16  will continue to bill full switched access on

17  Level 3 owned TNs."

18          Do you see that?

19     A.     Yes, I see that.

20     Q.     And that concept ends up in the

21  Settlement Agreement, yes?

22     A.     Generally, yes, it does.

23     Q.     Item Number 5, "For any usage prior

24  to June 2015, the settlement is a full and

25  final settlement of all disputes and balances

CONFIDENTIAL

Page 165

1    regardless of whether AT&T wins or loses its

2    FCC appeal."

3            Do you see that?

4        A.    Yes.

5        Q.    And that concept was in the

6    Settlement Agreement, correct?

7            MR. HUNSEDER:   Object to the form.

8    BY MR. STEESE:

9        Q.    This is the prior to June 2015, not

10   post.

11       A.    Yes, you're correct.   Thank you for

12   the clarification.

13       Q.    And then Item Number 6 says, "If

14   AT&T wins its FCC appeal, L3 will refund 50% of

15   the disputed charges beginning with June 2015

16   through the date of a final ruling, either from

17   the Court of Appeals or, from remanded, by the

18   FCC ruling."

19           Do you see that?

20       A.    Yes.

21       Q.    And that concept ends the

22   Settlement Agreement, correct?

23       A.    Generally it does.   There's some

24   modifications.

25       Q.    What modifications do you see?

CONFIDENTIAL

Page 167

1      Q.     Are you aware that Level 3's

2    interpretation all along has been if there's a

3    remand, it's not full and final?

4      A.     No, I'm not aware of that at all.

5    The contract doesn't say that.

6      Q.     The contract does say that we

7    believe.

8           MR. HUNSEDER:  Objection.  I mean,

9        the contract speaks for itself.

10           THE WITNESS:  Yeah.  I can't speak

11        to that.  I don't know what Level 3's

12        belief is.

13    BY MR. STEESE:

14      Q.     Did you ever have any discussion

15    yourself with Level 3 about this sentence or

16    words to the effect of, we didn't mean

17    remanded; that's not -- that was not our

18    intention?

19      A.     During this time period?

20      Q.     Any time period during the

21    settlement discussions.

22      A.     Settlement discussions, like, into

23    2017 after --

24      Q.     No.  Leading up to the entry of the

25    Settlement Agreement.

CONFIDENTIAL

Page 168

```
 1        A.    Oh, no, no.  It was put in here.

 2   It was redlined, and it was corrected.  I don't

 3   recall a discussion on it.

 4        Q.    Okay.  Keep this out.

 5              So here is Exhibit 20.

 6              (Whereupon, Exhibit No. AT&T 20,

 7         E-mail correspondence, Bates numbered

 8         ATT_PROD_0011854, was marked for

 9         identification.)

10   BY MR. STEESE:

11        Q.    Exhibit 20, an e-mail exchange

12   between you and Mr. Sloan.

13        A.    Yes.  This was his him documenting

14   the conversation.

15        Q.    Exactly.  And so this is -- no.

16   Look at the date.  The date is May 7.

17        A.    Uh-huh.

18        Q.    And then the e-mail back to you was

19   May 8.

20        A.    Right.

21        Q.    So it's the day before this term

22   sheet.

23              Do you see that?

24        A.    Yes.

25        Q.    Okay.  So let's look at the e-mail
```

CONFIDENTIAL

Page 174

1    learned from Mr. Hunseder in the last year.

2         A.    Uh-huh.

3         Q.    I'm asking you at the time in May

4    of 2015, what was your understanding of what

5    would have happened if the D.C. Circuit

6    remanded the case to the FCC?  Did you have an

7    understanding then?

8         A.    At that point in time, no, I would

9    not have.  We were intending to key off of the

10   FCC appeal.  So no, I would not have.  It was

11   after the fact that I would have become more

12   aware of what remand meant.

13        Q.    So you didn't know whether or not

14   what Mr. -- at the time you didn't know if what

15   Mr. Sloan was saying accurately summarized the

16   expectation or didn't, did you?

17             MR. HUNSEDER:  Objection.

18             THE WITNESS:  I knew exactly what

19        he was.  I was a part of the discussion.

20        I verbalized it to him, and he put it on

21        paper.  So it was the intent to key off of

22        the appeal.  That was the action we were

23        investing time and money in, and that was

24        the answer that we were expecting to get.

25        That as all that we were looking to get.

CONFIDENTIAL

Page 175

1    BY MR. STEESE:

2        Q.    So if -- I'll get to that later.

3        A.    Okay.

4        Q.    So when he put in here in Exhibit

5    Number 19 "or if remanded by the FCC ruling" --

6        A.    Yes.

7        Q.    -- at the time, May of 2015, you

8    would not have known what that meant, correct?

9        A.    I don't believe I did.  I think it

10   was well after that that the remand came into

11   effect.  I don't have a recollection of a

12   remand that I would have been involved with at

13   that point.

14       Q.    That's not my question.  My

15   question's different.

16             I'm asking not if the remand had

17   happened.

18       A.    Uh-huh.

19       Q.    I'm saying when he puts in "or if

20   remanded by the FCC ruling," the meaning of

21   what that could mean down the road because

22   you're looking towards the future, this is a

23   future prospective event.  You wouldn't have

24   known what that even meant at the time, would

25   you?

CONFIDENTIAL

Page 176

1       A.    I'm saying that I hadn't been

2   involved in anything that was remanded.  So the

3   process was probably not clear to me until

4   afterwards about what that meant.

5            So I would have stricken that and

6   said no, I don't know what that means.  That's

7   not our intent here.  We're just keying off the

8   work that we're doing on the appeal.

9       Q.    If you don't know what it means,

10   how do you know it's not your intent?

11       A.    Because it was just over the FCC

12   appeal.  There was nothing else that was

13   needed.

14            Now, this obviously, if it went

15   out, it was looked at by a lawyer.  So -- I

16   can't say where it came from or not, but the

17   legal team would have looked at any order or

18   any offer that's gone out.

19       Q.    So legal would have looked at this?

20       A.    Sure.

21       Q.    And sent it out under the legal

22   approval?

23       A.    Sent it out under legal approval?

24       Q.    It would have gone to -- I'll say

25   it differently.

CONFIDENTIAL

Page 177

1              It would have gone out to Level 3

2     having had AT&T legal approval?

3         A.    I suspect, yes.  I mean, we would

4     normally have them look at our proposals and

5     term sheets before we send things out for any

6     big issues, yes.

7         Q.    Okay.  So let me ask the

8     question -- these questions now.  Move away

9     from these agreements, term sheets for a

10    minute.

11             Before the Declaratory Ruling

12    action by the FCC, so before the February 2015

13    decision -- are you with me in time?

14        A.    Yes.

15        Q.    There were a number of carriers,

16    Level 3 included --

17        A.    Uh-huh.

18        Q.    -- that were billing end-office

19    charges on OTT calls, correct?

20        A.    Yes.  Before that point?

21        Q.    And Level 3 -- tell me if you

22    recall this -- Level 3 pointed to language in

23    the, I call it the Connect America Fund or the

24    transformation or whatever you want to call

25    it -- they pointed to that and they said, we

CONFIDENTIAL

Page 179

1    that was our interpretation at that time, yes.

2         Q.    Okay.  So --

3         A.    I don't want to say it's a legal

4    position, but that was our interpretation.

5         Q.    Fair enough.

6         A.    Uh-huh.

7         Q.    So before the Declaratory Ruling

8    action, there was a very clear difference of

9    view in the industry about whether the rules

10   did or did not permit the billing of end-office

11   charges on OTT calls, correct?

12        A.    I believe that's what led to the

13   Declaratory Order.

14        Q.    So the answer -- is that yes?

15   There was a difference of view in the industry?

16        A.    Yes, I think there was a difference

17   with some carriers, yes.

18        Q.    And I'm confused by your answer.

19             So was there or was there not a

20   difference of view in the industry?

21        A.    You know what, I'm not quite

22   certain, Chuck.  I don't -- I don't know for

23   certain.  I believe that there was.  I think

24   that's what led to the Declaratory Order, but I

25   didn't follow everybody else's comments on the

CONFIDENTIAL

Page 187

1    BY MR. STEESE:

2         Q.    A few days later, AT&T sends its

3    markup, correct?

4         A.    It looks like Debbie sent this on

5    my behalf.  She's our attorney.  So I guess it

6    was in legal review.

7         Q.    And who is Debbie?

8         A.    She's our in-house counsel.  And I

9    believe Rick Thayer was Level 3's attorney at

10   the time.

11        Q.    And so this is going to Ted Price,

12   though, right?

13        A.    It was sent to Ted Price, yes.

14        Q.    Did you understand he was their

15   attorney too?

16        A.    I had not recalled that actually.

17   I knew he was involved, but I had not worked

18   with him otherwise.  It had always been others.

19   I believe that's probably because he was the

20   wholesale attorney.  Again, this was two-sided.

21        Q.    So okay.  So now, let's look at

22   page 1 before we get to the markup.  There's an

23   e-mail from Ms. Waldbaum that in the fourth

24   bullet [sic] there's some funky indents, it

25   looks like.  It's computer code it looks

CONFIDENTIAL

Page 194

1    a new declaratory action going in front of the

2    FCC asking them to rule basically on, now that

3    this has been remanded, decide this issue

4    again; are you aware of that?

5         A.    Yes.  It's a new issue that's been

6    brought up, yes.

7         Q.    Okay.  So now let's assume the

8    following because we don't know what the FCC is

9    going to do, do we, in that decision?

10        A.    No, we don't know.

11        Q.    Okay.  So let's assume that the FCC

12   says LECs can bill end-office switching on OTT

13   calls just like they did in the original

14   declaratory action.

15              Are you with me in concept?  I know

16   this is just a concept.

17        A.    Yes, I'm with you.

18        Q.    Okay.  Does Level 3 still have to

19   refund that 50 percent?

20        A.    Yes.

21        Q.    Okay.  So have you heard of

22   something called the File Great Doctrine?

23        A.    Yes.

24        Q.    Are you aware that carriers are

25   obligated to bill tariff charges if they have a

CONFIDENTIAL

Page 195

1    tariff on a particular issue?

2         A.     Generally, yes.

3         Q.     Are you aware generally --

4         A.     If it doesn't violate a law.

5         Q.     Fair enough.  Are you generally

6    aware that parties are precluded from entering

7    into contracts that give one carrier

8    preferential treatment over a tariff rate?

9              MR. HUNSEDER:  Objection.  Calls

10        for a legal conclusion, and I don't think

11        it states the law.

12             THE WITNESS:  No, I'm not aware of

13        that as all.

14   BY MR. STEESE:

15        Q.     So to the extent that -- I'll ask

16   it this way:  To the extent that your

17   interpretation is correct, that even if the FCC

18   issues a new Declaratory Ruling saying these

19   charges are appropriate, Level 3 must still

20   refund that money back, correct?  That's your

21   position?

22        A.     Based on the terms of the

23   Settlement Agreement, yes.

24        Q.     And then Level 3 would be billing

25   tariff -- would have been billing tariff

CONFIDENTIAL

Page 198

1      BY MR. STEESE:

2          Q.      Let's look back at Exhibit

3      Number 23, and I'm looking at -- there's a lot

4      of red here.  And it's Bates '894 and '895

5      that -- of the OTT.  Open that up so it's kind

6      of butterflied, if you will.

7          A.      Okay.

8          Q.      I'm doing that now not because I'm

9      going to ask about everything, but just so you

10     don't think I'm hiding anything.  I'm going to

11     focus on this page (indicating).

12         A.      Okay.

13         Q.      Because we're focusing really on

14     terms -- on subfour.

15         A.      Okay.

16         Q.      But I don't want you to think I'm

17     trying to keep anything from you.

18         A.      Thank you.

19         Q.      So if you look at the language of

20     subfour, the final read that, "The Parties

21     agree that any billing and payments for OTT

22     traffic exchanged after such order becomes

23     final shall be in compliance with terms of that

24     order."

25                 Do you see that?

CONFIDENTIAL

Page 199

1          A.      Yes, I see that.

2          Q.      That language was added by AT&T,

3    correct?

4          A.      I'm not sure, but it's red; so

5    whose version was this?

6          Q.      Look at the front.  It's coming

7    from your lawyer, correct, AT&T's lawyer?

8          A.      No.  This latest is Steve Ross.

9    So -- oh, here's Debbi, but Steve's sending it

10   to -- oh, so he was just sending it internally?

11         Q.      Correct.

12         A.      Okay.  So we would assume red is

13   AT&T.  It is, okay.  So yes, the red is AT&T.

14   And yes, that was our add.

15         Q.      If the final order -- you're

16   looking like you're looking at something.

17         A.      I was just trying to look at what

18   Level 3 had, you know, trying to look at both

19   sides of the blue and the red.

20         Q.      So if a final order doesn't provide

21   any guidance on how carriers should bill for

22   OTT end office, how do you implement that final

23   sentence that AT&T added?

24              MR. HUNSEDER:  Object to the form.

25              THE WITNESS:  I don't know the

CONFIDENTIAL

Page 205

1    conversation.  Was this was the best number

2    that we had agreed upon.  And the conversation

3    was centered around we'll use it here; but if

4    we need it, you know, later, this is the

5    factor, which is why we didn't use 75 percent

6    here.  We used 65-percent OTT factor versus

7    total billing at 75 paid.

8         Q.    Who told you that?

9         A.    It was our ongoing discussion

10   between the teams.

11        Q.    You told me everything was

12   memorialized in writing.  I've seen nothing to

13   that effect.

14              What memorializes that in writing?

15        A.    I can't say that it was

16   memorialized in writing, but I think that was

17   the intent of this language, the fact that it

18   was separated out as two different time

19   periods.

20        Q.    Okay.  Let's --

21        A.    The language was put into the

22   contract again.  This was provided by Level 3,

23   so I think that memorializes it.

24        Q.    But it doesn't saying anything

25   about going forward, does it?

CONFIDENTIAL

Page 206

1          A.     It doesn't say anything about going

2     forward, but this was specifically for the

3     going forward.  It was the portion that wasn't

4     billed yet.

5          Q.     For April and May billings?

6          A.     Yes.

7          Q.     But beyond May of 2015, does it say

8     we're going to apply 65 percent to that going

9     forward?

10          A.     Well, no, because the terms said we

11     were paying 100 percent.  The 65 would only be

12     applied if you had the appeal overturned.

13          Q.     Does it say that?

14          A.     It says that we will pay

15     100 percent, yes.  That's one of our terms.

16          Q.     No.  That wasn't my question.

17               Does it say the 65 percent is the

18     factor you're going to apply if you are

19     successful in having a final order?

20          A.     No, it does not say that here.

21          Q.     Okay.  And let's look at subfour,

22     the next page, the blue line.  It says, "...if

23     the OTT Declaratory Order is overturned in part

24     and not in whole, then Level 3 will only be

25     required to refund OTT charges to the extent

CONFIDENTIAL

Page 207

1    they should not have been charged in accordance

2    with the final appellate order."

3           Do you see that?

4       A.    Yes.

5       Q.    So let's assume the following:

6    Let's assume that in -- I'm just making up a

7    month, and this is a hypothetical -- let's

8    assume that you look at September of 2015, and

9    the percent of OTT is not 65 percent, it's

10   20 percent that month.

11          Are you with me in concept?

12      A.    You don't do a factor on a monthly

13   basis, but in concept, yes.

14      Q.    Okay.  I'm just -- I understand;

15   but nonetheless, if it's 20 percent, you're not

16   being required to refund non-OTT charges, just

17   50 percent of the OTT charges, correct?

18      A.    That's correct.  The non-OTT

19   charges are traditional Level 3 traffic.  And

20   assuming that it was their telephone number for

21   the terms of the agreement, we would pay the

22   non-OTT end office traffic that was never in

23   dispute.

24      Q.    Okay.  Let's put away Exhibit 24

25   and look at Exhibit 25.

CONFIDENTIAL

Page 211

1    all.  You paid 75 percent, correct?

2         A.    Yes.  We paid per the terms of the

3    agreement.

4         Q.    It says, next sentence, "In the

5    event the OTT Declaratory Order is overturned

6    either in whole or in part and the applicable

7    order on appeal becomes final and is no longer

8    subject to further appeal or other judicial

9    review, Level 3 will refund within 30 days

10   50 percent of the disputed OTT charges,"

11   correct?

12        A.    Yes.

13        Q.    And it continues.  So based on what

14   you said before, if traffic is traditional

15   non-OTT traffic, Level 3 gets to bill full

16   access, and AT&T will pay full access for

17   non-OTT?

18        A.    Yes.  That was not disputed,

19   correct.

20        Q.    But whatever ends up to be OTT,

21   there will be a 50-percent refund, correct?

22        A.    Back to June 1 of 2015.

23        Q.    Correct?

24        A.    Yes.

25        Q.    Thank you.  You said factors don't

CONFIDENTIAL

Page 213

1        A.      Okay.

2        Q.      And it will be because the math is

3    easy.

4        A.      Very good.

5        Q.      So let's assume that from the time

6    of June 1 -- strike that.  Let me back up one

7    more step.

8                Let's assume that we get the final

9    order.  There is -- the final order is what you

10   say it is, whichever it is, it doesn't matter.

11   But from the date of that final order to June 1

12   of '15, there's been $1 million of OTT --

13   excuse me, of switched access billed, not OTT

14   switched access end-office charges.

15               Are you with me?

16       A.      Yes.

17       Q.      And the FCC has changed, of course,

18   says you can't bill.  And if it's 65 percent

19   OTT, then what you would do is say of that

20   million, 650,000 is OTT end-office charges,

21   correct?

22       A.      Uh --

23       Q.      That's why I'm doing the million,

24   it's easy, 65 percent.

25       A.      It -- a dollar might not relate to

CONFIDENTIAL

Page 214

1  a minute.  So you could have 100 telephone

2  numbers.  You could have 60 -- you know, assume

3  65 percent of that; but the minutes would not

4  be representative.

5       Q.     That's not my question.

6       A.     Okay.

7       Q.     I'm trying to be simple.  I'm

8  really trying to be simple here.

9             Let's assume that, again, it's a

10  million dollars in total switched access

11  end-office charges.

12       A.     Okay.

13       Q.     And there truly is 65 percent of

14  the calling is OTT.

15       A.     So $650,000 is attributed with OTT

16  minutes?

17       Q.     Exactly.

18       A.     Okay.

19       Q.     Then that would mean AT&T would get

20  50 percent of that, which would be 325,000,

21  correct?

22       A.     Per the terms of the agreement,

23  that's my understanding.

24       Q.     But if the -- let's change it.

25  Instead of being 65 percent, if the actual OTT

CONFIDENTIAL

Page 215

1    is 30 percent --

2         A.    Yes.

3         Q.    -- then $300,000 would be

4    associated with OTT, and AT&T would be entitled

5    to $150,000, correct?

6         A.    Yes.  That's how the math would

7    work.

8         Q.    I have asked everything around

9    this, but I haven't asked this exact question.

10   So I should have asked this before.  Apologies.

11            The D.C. Circuit opinion that

12   issued in November of '16 -- I want to make

13   sure you're on the right page there.  You're

14   with me?

15        A.    Yes.

16        Q.    You understood that it vacated and

17   remanded, correct?

18        A.    Yes.

19        Q.    That's what you said.

20        A.    Those are the words, yes.

21        Q.    Do you understand that the

22   D.C. Circuit asked the FCC to consider again

23   whether or not end-office switching charges

24   apply to OTT traffic?  Do you have that

25   understanding?

CONFIDENTIAL

Page 318

```
 1    the definition.
 2         Q.    And what is the definition of a
 3    cloud company for AT&T?
 4         A.    I don't know.
 5         Q.    Does AT&T have any OTT?
 6              MR. HUNSEDER:  Objection.  Asked
 7         and answered.
 8              MR. STEESE:  I didn't know if I
 9         asked that.  If I did, I apologize.
10              THE WITNESS:  I don't work in that
11         space.  I don't know what AT&T would have
12         or does not have.
13    BY MR. STEESE:
14         Q.    Does TCG have any OTT?
15         A.    I don't know.
16         Q.    Does your traditional ILECs, the
17    Ameritechs, the BellSouths, the SBCs classic,
18    do they have any OTT?
19         A.    I don't know.
20         Q.    If AT&T is making demands that
21    Level 3 put processes in place to define what
22    is OTT, should AT&T be doing the same itself?
23              MR. HUNSEDER:  Objection.  Lacks
24         foundation.
25              You can answer.
```