Confidential Under the Protective Order

Page 1

1

2           UNITES STATES DISTRICT COURT

3           FOR THE DISTRICT OF COLORADO

4  _____
                                    )
5  AT&T CORP.,                      )
                                    )
6         Plaintiff,                )  Case No.
                                    )  18-CV-00112-RM
7  vs.                              )
                                    )
8  LEVEL 3 COMMUNICATIONS, LLC,     )
                                    )
9         Defendant.                )
   _____)

10

11      *CONFIDENTIAL UNDER THE PROTECTIVE ORDER*

12            DEPOSITION OF MIKE RIEDERER

13               Broomfield, Colorado

14                November 8, 2019

15

16

17

18

19

20

21

22

23  Reported by:
    MARJORIE R. DAUSTER, RMR, CRR
24  JOB NO. 171542

25

TSG Reporting - Worldwide - 877-702-9580

Confidential Under the Protective Order

Page 2

```
 1
 2
 3                NOVEMBER 8, 2019
 4                  9:07 A.M.
 5
 6       Deposition of MIKE RIEDERER, held at Level
 7   3 Communications, LLC, 1025 Eldorado Boulevard,
 8   Broomfield, Colorado 80021, before Marjorie R.
 9   Dauster, Registered Merit Reporter, Registered
10   Professional Reporter, Certified Realtime
11   Reporter, and Notary Public.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential Under the Protective Order

Page 3

1                    Riederer

2  A P P E A R A N C E S:

3         SIDLEY AUSTIN

4         Attorneys for Plaintiff

5              1501 K Street, N.W.

6              Washington, D.C. 20005

7         BY:  MICHAEL WARDEN, ESQ.

8              JOSH MOORE, ESQ.

9

10        ARMSTRONG TEASDALE

11        Attorneys for Defendant

12             4643 South Ulster Street

13             Denver, Colorado 80237

14        BY:  CHARLES STEESE, ESQ.

15

16        Also present:

17             Carmel Gill, CenturyLink

18

19

20

21

22

23

24

25

Confidential Under the Protective Order

Page 5

1                    Riederer
2       A.   Yeah.
3       Q.   And that's an oath just like an oath
4  as if we were in a court of law.
5       A.   Yes.
6       Q.   And I'm going to be asking you a
7  series of questions today.  If you don't
8  understand any of my questions, let me know and
9  I'll rephrase them.  Is that okay?
10      A.   Okay.
11      Q.   And if you answer them, I'm going to
12 assume that you understood my questions.  Is
13 that fair?
14      A.   Sure.
15      Q.   And if we can just make sure we go one
16 at a time.  I'll try not to interrupt you.  You
17 try not to interrupt me.  It makes it easier for
18 the court reporter.
19           Any reason we shouldn't proceed with
20 the deposition today?
21      A.   No.
22      Q.   Can you state your current position at
23 Level 3.  Is it Level 3 or CenturyLink?
24      A.   We're CenturyLink.
25      Q.   Okay.  What's your current position at

Confidential Under the Protective Order

Page 6

1                    Riederer
2   CenturyLink?
3       A.    I'm senior vice president of network
4   planning and access management.
5       Q.    How long have you held that position?
6       A.    My current role has been two years.
7       Q.    When did you start working for
8   Level 3?
9       A.    Level 3 in 1997.
10      Q.    And are you a college graduate?
11      A.    I am.
12      Q.    What year did you graduate and from
13  what school and what degree?
14      A.    1993 or -- '3.  1993.  And I went to
15  Arizona State, and I have a degree in
16  construction management.
17      Q.    And you started at Level 3 right out
18  of college?
19      A.    Correct.
20            Oh, sorry.  When you say that, I
21  actually have my time bridged from a former
22  subsidiary that isn't associated with Level 3
23  but the management was.  So they bridged my
24  time.  So, actually, I started in -- right from
25  college into MFS --

Confidential Under the Protective Order

Page 20

1                    Riederer

2   other -- Bill Hague in the bigger meeting.

3        Q.    And was that meeting in an AT&T
4   facility?

5        A.    It was.

6        Q.    Approximately how long did it last?

7        A.    I don't remember.

8        Q.    Was it in and out same day?  I mean,
9   did you fly in and then fly out in the same day?

10       A.    I don't remember.

11       Q.    Okay.  Fair enough.

12             Do you remember anything that was
13  discussed at the meeting about OTT?

14             MR. STEESE:  Objection.  Form.
15  Foundation.

16             Which meeting?

17       Q.    Do you know what meeting I'm talking
18  about?  The meeting in Dallas at AT&T that we've
19  been talking about, was anything discussed at
20  that meeting about OTT?

21             MR. STEESE:  I'll say same objections
22     but --

23       A.    In the larger meeting, there was no
24  reference to OTT.

25       Q.    Okay.

Confidential Under the Protective Order

Page 21

1                        Riederer

2      A.   The larger meeting was broader

3 discussion around disputes across the areas I

4 mentioned earlier.

5      Q.   And was there a smaller meeting?

6      A.   There was.

7      Q.   Who attended from Level 3 in the

8 smaller meeting?

9      A.   There was a breakout meeting specific

10 to broader voice -- broader voice topics.

11     Q.   Okay.

12     A.   And in that was Bill Hague and then

13 George Sloan.

14     Q.   And who from Level 3?

15     A.   Myself.

16     Q.   Just you?

17     A.   Yeah.

18     Q.   Had you met or spoken to Bill Hague

19 before this meeting, that is, the broader

20 meeting or the smaller meeting?

21     A.   Not that I recall.

22     Q.   What about George Sloan?  Had you met

23 him prior to that meeting?

24     A.   Not that I recall.

25     Q.   Was Mr. Sloan in the larger meeting or

Confidential Under the Protective Order

Page 25

1                    Riederer

2      Q.    So based on this, do you believe
3   that -- withdrawn.
4            Is this the breakout meeting that you
5   just testified about?
6            MR. STEESE:  Objection to form.
7      A.    This is part of the reference to a
8   portion of the breakout meeting, yes.
9      Q.    Okay.  So do you believe that that
10  meeting was May 7th, 2015, based on what you're
11  seeing here today?
12     A.    I'll assume based on the email.
13     Q.    Fair enough.
14           And you responded to the email on the
15  first page, that is Mr. Sloan's May 7th email,
16  with an email the next day, May 8th.  Do you see
17  that?
18     A.    It has my name on it, yes.
19     Q.    Do you have any reason to doubt that
20  you sent this?
21     A.    No.
22     Q.    Do you remember this email?
23     A.    From 2015, no.
24     Q.    How many emails do you get a day
25  approximately?

Confidential Under the Protective Order

Page 46

1                    Riederer

2    the concept reflected in Number 5 that was

3    discussed with AT&T at any point prior to

4    execution of the settlement agreement?

5        A.    No.

6        Q.    Okay.  Let's look at Item 6.  And I'm

7    just going to read this into the record.

8              "If AT&T wins its FCC appeal, L3 will

9    refund 50% of the disputed charges beginning

10   with June 2015 through the date of a final

11   ruling, either from the Court of Appeals or, if

12   remanded, by the FCC ruling."

13             Did I read that correctly?

14       A.    It appears so.

15       Q.    Okay.  And do you see where it says "a

16   final ruling, either from the Court of Appeals

17   or, if remanded, by the FCC ruling"?

18       A.    I do.

19       Q.    And so what was your understanding, if

20   any -- withdrawn.

21             Was this Topic 6, at least the

22   concept, discussed in the breakout meeting?

23       A.    It was.

24       Q.    What do you remember being discussed

25   about that?

TSG Reporting - Worldwide - 877-702-9580

Confidential Under the Protective Order

Page 47

1                       Riederer

2       A.   As I said earlier, the concept was if

3    the FCC ruled a certain way in how billing

4    should happen, that impacted whether the

5    go-forward rate changed or not.

6       Q.   And is that discussion, as best you

7    recall, reflected in this clause, "if remanded,

8    by the FCC ruling"?

9       A.   Again, you're asking me to opine on

10   something I'm not skilled to speak to.

11      Q.   I'm just asking for your recollection,

12   sir.  If you have a recollection --

13      A.   I don't have a recollection.

14      Q.   Okay.  So you do see that this refers

15   to a final ruling from the Court of Appeals;

16   right?

17           MR. STEESE:  Objection.  Misstates the

18       document.

19      Q.   I'm going to break this clause down.

20           Do you see that it refers to "a final

21   ruling, either from the Court of Appeals" -- do

22   you see that?

23      A.   I see that.

24      Q.   And then it refers to a final ruling,

25   "if remanded, by the FCC ruling."  Do you see

Confidential Under the Protective Order

Page 48

```
 1                    Riederer
 2   that?
 3       A.    I see that.
 4       Q.    And is that component, "if
 5   remanded" -- withdrawn.
 6             Is that concept, the final ruling, if
 7   remanded by the FCC ruling, is that something
 8   that you claim was discussed at the sub-meeting
 9   in Dallas?
10             MR. STEESE:  Objection.  Calls for a
11       legal conclusion.  Asked and answered.
12       A.    I'll answer what I said earlier.  The
13   concept was if the FCC changed the way -- ruled
14   on the way something was supposed to be billed
15   or not be billed, that was the concept, period.
16       Q.    Got it.
17             And so that concept is reflected in
18   paragraph number 6; is that right?
19       A.    I'm not a lawyer to be able to say
20   whether that is or not.
21       Q.    I'm just asking you to read it.  I'm
22   not asking for a legal opinion.
23             When you read it, is that concept that
24   you say was discussed at the breakout meeting
25   about the FCC ruling reflected in Item 6?
```

Confidential Under the Protective Order

Page 49

 1                 Riederer

 2       MR. STEESE:  Objection.  Asked and
 3  answered.  Foundation.  Calls for a legal
 4  opinion.
 5       Please answer if you can.
 6       MR. WARDEN:  These are speaking
 7  objections, Chuck, and you know better.
 8  A.   I can only state what I said earlier,
 9  which is I'm not skilled enough to read it one
10  way or the other that you're trying to look for.
11       I'm just stating specifically in my
12  interpretation from the meeting, we had
13  expressed that if the FCC changed its ruling on
14  how billing was to happen, this was supposed to
15  be a reflection of that.
16  Q.   And Item 6 was a reflection of that;
17  right?
18       MR. STEESE:  Objection.  Form.
19  Foundation.  Asked and answered.
20  A.   The concept, as I understand it,
21  again, is if the FCC changed it and said that it
22  should be billed differently, the concept was
23  supposed to be reflected here.
24  Q.   Okay. And from your perspective, is
25  that concept reflected here in Item 6?

TSG Reporting - Worldwide - 877-702-9580