# EXHIBIT 11

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2          CIVIL ACTION NO. 18-cv-00112-RM-MEH
3

AT&T CORPORATION,                    :
4                                        :
                     Plaintiff,      :
5                                        :
             vs.                     :
6                                        :
LEVEL 3 COMMUNICATIONS, LLC,         :
7                                        :
                     Defendant.      :
8

9

10              Deposition of ARDELL BURGESS
11   taken in the above-entitled matter before
12   Suzanne J. Stotz, a Certified Court Reporter
13   (License No. 30XI00184500) and Notary Public of
14   the State of New Jersey, taken at the offices
15   of AT&T, One AT&T Way, Bedminster, New Jersey
16   07921, on Friday, February 8, 2019, commencing
17   at 9:01 a.m.
18

19

20

21   Job No. CS3213055
22

23

24

25

CONFIDENTIAL

Page 2

1    A P P E A R A N C E S:

2

3         SIDLEY AUSTIN, LLP
          BY:  MICHAEL J. HUNSEDER, ESQ., and
4              JOSH MOORE, ESQ.
          1501 K Street, N.W.
5         Washington, D.C. 20005
          (202) 736-8236
6         (202) 737-8432
          mhunseder@sidley.com
7         joshua.moore@sidley.com
          Attorneys for the Plaintiff

8

9

          ARMSTRONG TEASDALE, LLP
10        BY:  CHARLES W. STEESE, ESQ.
          4643 South Ulster Street, Suite 800
11        Denver, Colorado 80237
          (720) 200-0676
12        csteese@armstrongteasdale.com
          Attorneys for the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 11

1    representative for a particular topic.

2                 Do you understand that?

3         A.    I do.

4                 MR. HUNSEDER:  And I'll just note

5         for the record, again, there's a -- I

6         don't think there's a personal deposition

7         notice; but obviously, we're going to

8         accommodate that and you allow you to do

9         that in the interest of not bringing back

10        Mr. Burgess a second time.

11                MR. STEESE:  That was agreed the

12        upon --

13                MR. HUNSEDER:  Exactly.

14                (Whereupon, Exhibit No. AT&T 1,

15        Notice of Rule 30(b)(6) Deposition, was

16        previously marked for identification.)

17   BY MR. STEESE:

18        Q.    So if you look at Exhibit Number 1

19   briefly, Exhibit Number 1 is the topics for the

20   corporate deposition.  And if you turn to

21   page 5, it says in Category 3, "The complete

22   factual basis for your claim that 65% of

23   Level 3's applicable traffic since execution of

24   the Settlement Agreement consists of OTT-VoIP

25   calls."

CONFIDENTIAL

Page 12

1          We understand you are here to talk

2     about that category in a corporate capacity is

3     that true?

4          A.    That's true.

5               MR. STEESE:  Counsel, I don't think

6          that he's here for any other category; is

7          that accurate?

8               MR. HUNSEDER:  No, no.  I think

9          he's here for other categories.

10              MR. STEESE:  What other categories?

11              MR. HUNSEDER:  Four, five, six,

12         seven, and eight.

13              MR. STEESE:  Okay.

14              MR. HUNSEDER:  I thought there was

15         an e-mail exchange as to this.

16              MR. STEESE:  I thought there was

17         too, but I might have misinterpreted it.

18         So thank you for that.

19    BY MR. STEESE:

20         Q.    Is that accurate four, five, six

21    seven, and eight, as your counsel has just

22    said?

23         A.    That's correct.

24         Q.    Okay.  Perfect.  Good to know.

25              You can set that aside, Exhibit

CONFIDENTIAL

Page 68

1    BY MR. STEESE:

2         Q.    And you can see that this is from,

3    upper right, it says March of 2017 there for

4    Form 477.

5              Do you see that?

6         A.    I do.

7         Q.    And the Bates numbers are the

8    little numbers at the bottom of the page,

9    bottom right; and I use the last three numbers

10   because it's easier.

11             So if you turn to Bates '028, it's

12   the back side of page.

13        A.    You've created page numbers,

14   haven't you?

15        Q.    I have not.  This is the way

16   lawyers work so we can actually be on the same

17   page.

18             (Discussion held off the record.)

19             THE WITNESS:  I have it.

20   BY MR. STEESE:

21        Q.    Do you see where it says,

22   "Over-the-Top subscriptions by state and end

23   user type"; and it goes through all of these

24   different states?  And how many OTT subscribers

25   does it list for Level 3?

CONFIDENTIAL

Page 69

1          A.     It's very boring.  Zero.

2          Q.     So your understanding of the number

3     of OTT subscriptions that Level 3 had is, at

4     least by this Form 477, inaccurate, correct?

5               MR. HUNSEDER:  Object to the form.

6               THE WITNESS:  Help me do it again,

7          or do it again.

8     BY MR. STEESE:

9          Q.     I'll ask it this way:  You thought

10    Level 3 had direct OTT subscriptions, correct?

11         A.     Correct.

12         Q.     This document would suggest

13    otherwise, correct?

14         A.     That would be the impression.

15         Q.     So let's just talk about wholesale

16    arrangements for a moment, high level.

17         A.     Okay.

18         Q.     So we were talking about Broadvox

19    and Bandwidth having direct OTT subscriptions

20    where they know -- I'm giving this particular

21    end user an OTT subscription.  So I know the

22    telephone number assigned to this particular

23    end user is or is not OTT, correct?

24         A.     Right.  They'd have to correlate

25    the actual connectivity with that end user.

CONFIDENTIAL

Page 99

1    direct you to the top, you can see this is an

2    agreement between Level 3 entities and AT&T

3    entities.

4              Do you see that?

5        A.    Yes.

6        Q.    And if you turn to the very back

7    page, do you see that is this is from July 3 of

8    2013?

9        A.    Yes.

10       Q.    So now if we look at Section 2.16,

11   which is on page 8 of the Settlement

12   Agreement --

13             MR. STEESE:  And by the way, just

14        so you know, this is not showing, Mike, as

15        a produced document.  I have since found

16        that this has been produced already with a

17        Bates number on it just so you know.

18             MR. HUNSEDER:  Obviously, there's

19        no objection to the use here.

20             MR. STEESE:  Okay.

21   BY MR. STEESE:

22       Q.    And so we look at Section 2.15, it

23   is page 8; and you can see right above that it

24   says, Over-the-Top/End-Office-2013 Interim

25   Agreement."

CONFIDENTIAL

Page 100

1          Do you see that?

2     A.      I do.

3     Q.      If you go down to 2.16, second

4  sentence, it says, and I quote, "Because the

5  parties had been unable to determine the volume

6  of Level 3 traffic that was OTT prior to the

7  Effective Date of this Settlement Agreement,

8  Level 3 and AT&T agree that for the period

9  January 13 through December 2013, 65% of the

10 end office traffic billed to AT&T CORP by

11 Level 3 is OTT provider traffic."

12          Do you see that?

13    A.      I do.

14    Q.      Were you involved in negotiating or

15 creating this 65 percent?

16    A.      Not that I recall.

17    Q.      Do you see where it says, "Because

18 the parties have been unable to determine the

19 volume"?

20    A.      Yes.

21    Q.      Is that an accurate statement as of

22 this point in time, 2013:  We don't know what

23 the volume is, so we're just going to use this

24 as an assumption?

25    A.      Yes.

CONFIDENTIAL

Page 110

1      A.      Got it.

2      Q.      I'm going back here (indicating),

3  but it has those funky e-mail addresses, which

4  makes it hard to see.  It says GS --

5      A.      Oh, I see.  Okay.  Yeah, George

6  Sloan.  Okay.  The AT&T IDs.  Yes, I've got it.

7  Correct.  Thank you.

8      Q.      And Mr. Sloan and Mr. Hague

9  received this e-mail.

10          What was your understanding of how

11  they were involved in negotiating this

12  agreement, if at all?

13      A.      They were the -- George Sloan and

14  who I believe at the time was working for Bill

15  Hague -- were the assigned, if you will,

16  officers as points to negotiate the settlement

17  with their designated representatives on the

18  Level 3 side of the business.

19      Q.      So they were the highest level

20  people on the AT&T side assigned to negotiate

21  the agreement with Level 3?

22      A.      Correct.

23      Q.      And vested with authority to act on

24  behalf of AT&T; is your understanding?

25          MR. HUNSEDER:  Objection.  Calls

CONFIDENTIAL

Page 111

1          for a legal conclusion.

2                    THE WITNESS:  Yeah.  They were my

3          leadership team.

4     BY MR. STEESE:

5          Q.      All right.  Why don't we turn to

6     Bates 198, which is part of the offer.

7          A.      Okay.

8          Q.      And exactly halfway down the page,

9     it's the third open bullet.  It says, "L3 will

10    only bill Tandem switching on a prospective

11    basis associated with domestic originated OTT

12    8YY traffic not reflecting an L3 CPN or such

13    traffic that is CPNLess."

14                   Do you see that?

15         A.      Yes.

16         Q.      Were you involved in any aspect of

17    negotiating this portion of the agreement or

18    supporting this portion of the agreement?

19         A.      The description of what we were

20    looking for was, yeah, it was out of, you know,

21    was out of my team.

22         Q.      It was your team?

23         A.      Yes.

24         Q.      And why was this something that was

25    being emphasized, if you will, by AT&T?

CONFIDENTIAL

Page 120

 1              Do you see that?

 2        A.     Yes.

 3        Q.     All right.  Then for (B), it says,

 4    "No later than thirty (30) days after the

 5    receipt of Level 3's invoice for traffic

 6    exchanged from May 1 through May 31, 2015,

 7    seventy-five percent (75%) of the amount of the

 8    switched access usage charges for traffic that

 9    is the subject of the OTT Dispute billed by

10    Level 3, which has historically been sixty-five

11    percent (65%) of overall billing..." and it

12    continues, correct?

13        A.     Yes.

14        Q.     So that means this provision

15    specifically says, okay, we are going to make

16    sure that we're taking care of billing through

17    June 1 of 2015 because as of June 1 of 2015,

18    all disputes before that are final forever,

19    correct?

20        A.     The state date, yes.

21        Q.     Thank you.  The state date.  I

22    would have used that term, but a lot of people

23    I say that, they say what the heck is that.

24              And so there had to be a process

25    where you knew how much to pay of the bills

CONFIDENTIAL

Page 121

1    that had yet to issue, correct?  They had to

2    bill May time, and they had to bill April time.

3    That was still something that had to be done,

4    correct?

5         A.    Oh, I see.  Yes.  The true-up, if

6    you will, or catch-up, if you will, yes.

7         Q.    And so what AT&T is saying is I'm

8    going to pay 100 percent of the 35 percent

9    we're agreeing is not OTT, correct?

10        A.    Okay.

11        Q.    And we will pay 75 percent of the

12   65 percent that we will presume is OTT,

13   correct?

14        A.    Correct.

15        Q.    For those two months?

16        A.    Correct.

17        Q.    This 65 percent percentage only had

18   applicability to that historic number, correct?

19        A.    Relative to this agreement, yes.

20        Q.    Exactly.  That's all I'm saying.

21              Did you negotiate that term, that

22   65-percent number with Level 3 for this

23   agreement?

24        A.    I did not.

25        Q.    Do you know who did?

CONFIDENTIAL

Page 122

1       A.    I assume -- I can only assume it

2   was Mr. Sloan and --

3       Q.    And Mr. Hague?

4       A.    Yeah.

5       Q.    Do you know whether or not at this

6   point in time, Level 3 is saying, yeah,

7   65 percent of our traffic is OTT or whether

8   they're saying, they're agreeing to pay us a

9   certain amount based on what we see the volumes

10  to be; we're fine with getting that number to

11  resolve the historic dispute?

12          MR. HUNSEDER:   Object to the form.

13  BY MR. STEESE:

14      Q.    Do you know if there was one or the

15  other?

16      A.    I don't.  I can only reference back

17  to when Pierantozzi and Mack Green basically

18  said that was a reasonable number.  And from

19  that point forward, we've always maintained

20  that position, understanding that if you can

21  tell me if it's something else or demonstrate

22  to me it's something else, I'm happy to

23  entertain.  But that supporting data has never

24  been, you know, provided to refute the

25  65 percent.

CONFIDENTIAL

Page 124

1       A.      My offering of at least 65 percent

2   was based upon that, correct.

3       Q.      And so you don't know if there was

4   ever a time, even early on, where 65 percent of

5   the minutes of use were OTT?  It could be

6   higher; it could be lower.  You just don't

7   know?

8       A.      From an absolute factual basis or,

9   yeah, here are the minutes.  Here's how they're

10  related to facility-based or

11  non-facility-based, that's correct.

12      Q.      You only had this indicator of

13  telephone numbers as the basis to create an

14  estimate?

15      A.      Correct.

16      Q.      So now we're going back to the

17  final agreement, which I think is in front of

18  you, Exhibit 21.  And the --

19      A.      Yes.

20      Q.      And the language that we were

21  talking about -- sorry, for the interruption

22  there -- in (i)(A) and (B), that 65 percent on

23  Bates '564 --

24      A.      Yes.  Let me --

25      Q.      That language that was proposed by

CONFIDENTIAL

Page 125

1    Level 3 ends up to be the language being

2    proposed in this -- or being accepted, if you

3    will, in the final agreement, correct?

4         A.    Correct.

5         Q.    Okay.  So this agreement is

6    executed.  AT&T appeals.  The D.C. Circuit

7    vacates and remands back to the FCC, correct?

8         A.    It's my understanding, yes.

9         Q.    When the FCC got the remand back --

10   strike that.  I'll say it easier.

11             Are you familiar with the content

12   of the D.C. Circuit opinion at a high level?

13        A.    At a very high level.

14        Q.    Fair enough.  Do you know whether

15   the D.C. Circuit prescribed the rate -- let

16   me -- I'll say it better.

17             Do you know whether the D.C.

18   Circuit specifically said OTT carriers can bill

19   end-office switching on OTTs or whether they

20   cannot; do you know?

21        A.    I do not know.

22        Q.    Okay.  My first new exhibit for

23   you.

24        A.    I'm exited.

25        Q.    A new sticker just for you.

CONFIDENTIAL

Page 130

1    number had one purpose and one purpose only,

2    and that was for the two months to get AT&T and

3    Level 3 to the state date to identify the

4    number that the parties would presume was OTT

5    during those two months, correct?

6              MR. HUNSEDER:  Object to the form.

7         It calls for a legal conclusion.

8              But you can answer.

9              THE WITNESS:  The 65 percent

10        correlates to dollars withheld.

11   BY MR. STEESE:

12        Q.    Up to that point in time?

13        A.    Up to that -- up to that point in

14   time and would be representative of those

15   dollars withheld and instructing to pay,

16   obviously, based on the settlement, 75 percent

17   of --

18        Q.    Those withheld dollars?

19        A.    Correct.

20        Q.    And that was the only purpose for

21   that 65 percent up to that state date, correct?

22              MR. HUNSEDER:  Same objection.

23              THE WITNESS:  As it relates to the

24        settlement, correct.

25

CONFIDENTIAL

Page 134

1    some analytics around the billing associated

2    with that position.

3         Q.     So after the D.C. Circuit opinion

4    issued, at some point in time has AT&T started

5    to withhold monies again from Level 3?

6         A.     To the best of my recollection,

7    yes.

8         Q.     Is it based upon the 65 percent?

9         A.     Yes.

10        Q.     And is it still based upon the

11   65 percent?

12        A.     Yes.

13        Q.     So when you say "maintaining the

14   position," you mean maintaining the position

15   that 65 percent of Level 3's end-office

16   switching charges are associated with OTT?

17        A.     Until -- yes.  Until data is

18   provided that suggests it's something other

19   than that.

20        Q.     That suggests it or proves it in

21   your mind?

22        A.     Ideally proves it in my mind.

23        Q.     Let's look at Exhibit Number 27.

24

25

CONFIDENTIAL

Page 135

1              (Whereupon, Exhibit No. AT&T 27,

2        E-mail correspondence, Bates numbered

3        ATT_PROD_0010564, was previously marked

4        for identification.)

5    BY MR. STEESE:

6        Q.     And Exhibit Number 27 is from

7    e-mail exchanges with Level 3 from March of '17

8    and then an internal e-mail or two at the top,

9    correct?

10       A.     Correct.

11       Q.     And so this is a few months after

12   the D.C. Circuit opinion, correct, which was

13   November of '16?

14       A.     Right.  This is a year later

15   almost.

16       Q.     No.  Just three, four months.

17       A.     Oh, I'm sorry, yes, correct.

18       Q.     And Mr. Ross, do you know Mr. Ross?

19       A.     I -- yeah, I spoke to him several

20   times on the phone but not daily interaction.

21   I know the name.

22       Q.     And what kind of things have you

23   discussed with Mr. Ross?

24       A.     At a very high level, just our OTT

25   position; and there were a number of other, as

CONFIDENTIAL

Page 136

1    we said other disputes, you know, that we had

2    taken positions on.  But that was the extent of

3    it.  It was more high level versus direct

4    negotiation back and forth.

5         Q.    High level to support the ongoing

6    settlement discussions?

7         A.    The ongoing negotiations, yeah.

8         Q.    The ongoing negotiations that were

9    intended to try and achieve a settlement?

10        A.    Correct.

11        Q.    Was -- in the calls that you've had

12   with Mr. Ross, do you believe it's clear to

13   both you and he that what you're trying to do

14   is see if you can find common ground that can

15   be the basis of a potential future commercial

16   arrangement?

17        A.    I believe so, yes.

18        Q.    Okay.  All right.  So we look at

19   Mr. Ross's e-mail at the bottom; and he says,

20   "The initial evaluation that we have done

21   suggests OTT traffic is <20%."

22              Do you see that?

23        A.    Yes.

24        Q.    And Ms. Miller up top makes a

25   comment about the 20 percent and suggests

CONFIDENTIAL

Page 154

1        Q.      And Mr. Stocker in May of '17

2    says -- and I'm paraphrasing.  All of this I'm

3    paraphrasing.  When I get to a quote that

4    matters, I'll mention it.

5        A.      Okay.

6        Q.      But it says the Settlement

7    Agreement says Level 3 will refund 50 percent

8    if the FCC's decision is overturned.  It was

9    simply remanded.  And so we don't think the

10   Settlement Agreement is -- has the -- the

11   trigger has occurred yet or words to that

12   effect, correct?

13       A.      Correct.

14       Q.      And then he continues, and I want

15   to focus on the 65 percent.

16               "While Section 1(i)(B) of the

17   settlement says that OTT traffic has

18   historically been 65%...that doesn't mean

19   that's what it is now or even what it has been

20   going back to June 2015."

21               Do you agree with that?

22       A.      It's certainly a possibility.

23       Q.      It was just a number tossed in --

24   that was poorly said.  I'll say it better.

25               It was a number that was included

CONFIDENTIAL

Page 155

1    because that 65 percent had been historically

2    negotiated and was in that 2013 agreement, and

3    it was a number that the parties had used as a

4    reference point in the past, correct?

5              MR. HUNSEDER:  Object to the form.

6              Go ahead.

7              THE WITNESS:  Yes, with the caveat

8         is continually looking for any

9         substantiating data that says it's

10        something other than that, which had not

11        been provided since, you know, since we

12        established it back in 2012.

13   BY MR. STEESE:

14        Q.    Okay.  And then the next paragraph

15   says, "Level 3 would be interested in

16   understanding the data used by AT&T to

17   calculate the OTT traffic volumes on the

18   Level 3 network.  Level 3 completed a detailed

19   analysis of the post-settlement OTT traffic,

20   using 4 separate sample months, beginning

21   immediately after the settlement and spaced 6

22   months apart.  While different than the OTT

23   settlement percentage, this data established,

24   at a customer level, the actual OTT traffic %

25   billing end-office charges.  The data looked,"

CONFIDENTIAL

Page 200

1   don't know if the average is accurate, but yes.

2          Q.     Okay.  The other thing you can see

3   is that the 22 percent in; 16, January of '16

4   seems like it's kind of off the line.  It seems

5   like a slight upward trend from 28 percent.

6                 Do you see that for terminating?

7          A.     Oh, for terminating.  28 to 22?

8          Q.     It goes 28 to 30.  So 28 -- so it's

9   a slight uptick over time.

10         A.     Got it.

11         Q.     A slight uptick?

12         A.     Correct.

13         Q.     And if you look at originating,

14  it's a slight uptick, correct?

15         A.     Correct.

16         Q.     And so what you're seeing here in

17  this data -- again, I'm not asking you to say

18  it's true.  That's not my question.

19                But just looking at this data, the

20  data shows percentage increasing slightly over

21  time from 15, correct?

22         A.     I see an increase, yes.

23         Q.     All right.  So now one thing you

24  said earlier was AT&T continues to withhold

25  65 percent, correct?

CONFIDENTIAL

Page 201

1          A.      Uh-huh, yes.

2          Q.      You -- have you done any analysis,

3     new analysis since July of '17 to justify that

4     percentage?

5          A.      We've -- I don't recall when we did

6     the -- we did, I believe -- I believe it was

7     toward the latter part of '17, we did another

8     Secret Shopper, you know, test.

9          Q.      Okay.  You realize, don't you, that

10    July of 2017 the FCC's transformation order set

11    terminating rates to zero?

12         A.      Correct.

13         Q.      So the only place that Level 3

14    could even possibly be charging you end office

15    is on originating?

16         A.      Correct.

17         Q.      Have you looked to see how the

18    volume of OTT calls on originating only might

19    impact the analysis?

20         A.      I personally have not done that.

21    Perhaps my team has.  I don't know.

22         Q.      But you're not aware of it?

23         A.      Correct.

24         Q.      Again, assuming the data in Exhibit

25    Number 32 is correct, do you see that the

CONFIDENTIAL

Page 202

1    percentage OTT originating is roughly half of

2    the terminating number?

3         A.     From a percentage, absolute

4    percentage perspective, yes.

5         Q.     And indeed, the volume of minutes

6    is even significantly reduced?

7         A.     Correct.

8              MR. HUNSEDER:  Again, you're not

9         asking him to assume the truth of this.

10             MR. STEESE:  I said that before.

11             MR. HUNSEDER:  I just want to make

12        sure we're still on the same page.  I

13        think we are.

14   BY MR. STEESE:

15        Q.     Do you know if the data contained

16   in Exhibit 32 is accurate?

17        A.     I do not.

18        Q.     Do you know if it's inaccurate?

19        A.     I do not.

20        Q.     Why didn't -- withholding 65

21   percent of a bill is a significant percentage,

22   isn't it?

23             MR. HUNSEDER:  Object to the form.

24             THE WITNESS:  I'm not sure what

25        you're comparing to, but...

CONFIDENTIAL

Page 203

1    BY MR. STEESE:

2         Q.      It's millions of dollars -- it

3    amounts to millions of dollars a year, correct,

4    for Level 3?

5         A.      Certainly, yeah.

6         Q.      And when AT&T knows that there's

7    been a significant change in the regulatory

8    landscape that directly impacts what here

9    Level 3 can charge, what justifies AT&T

10   continuing to withhold 65 percent when it has

11   no idea if that 65 percent is going to

12   translate the same into originating only?

13              MR. HUNSEDER:  Object to the form

14        and lacks foundation.

15              THE WITNESS:  As I said before, I'm

16        simply looking for the data to disqualify

17        the 65 percent.

18   BY MR. STEESE:

19        Q.      So you're just going to continue to

20   withhold -- I'm not putting this on -- AT&T

21   will continue to withhold 65 percent until it

22   feels it can verify the new number?

23        A.      Correct.

24        Q.      And if -- is there any way you can

25   think of to verify that number if Level 3

CONFIDENTIAL

Page 208

1    BY MR. STEESE:

2        Q.      And he goes through and talks

3    about -- he talks about a number of issues that

4    I'm not -- I'm going to focus on the 65-percent

5    issues with you, which begins under the

6    paragraph with the word "second" towards the

7    bottom of the page.

8        A.      Uh-huh.

9        Q.      It says, "It appears that AT&T's

10   figure of ███ million was calculated on the

11   assumption that 65% of traffic on which Level 3

12   billed end-office switching to AT&T from June

13   2015 to present is OTT traffic.  That is false.

14   AT&T and Level 3 are discussing how we can

15   demonstrate, or simply agree on, the correct

16   percentage of OTT traffic, but that percentage

17   has fallen dramatically from the historical

18   amount of 65%.  You appear to believe that any

19   refund under the OTT Settlement back to June

20   2015 must be based on an assumed 65% OTT

21   factor."

22              Do you see that?

23       A.      I do.

24       Q.      The refund, if I'm understanding

25   you correctly, isn't based -- it should not be

CONFIDENTIAL

Page 209

1    based on 65 percent, per se.  It should be

2    based on whatever percent of the traffic --

3    strike that.

4              It should be based on the actual

5    percentage of OTT traffic, correct?

6         A.    Yes.

7         Q.    And what you're looking for is

8    something that gives AT&T comfort that that

9    percentage is what Level 3 is representing it

10   to be, correct?

11        A.    Correct.

12        Q.    That's all I have for that.  I will

13   show you Exhibit 50.

14              (Whereupon, Exhibit No. AT&T 50,

15        E-mail correspondence, Bates numbered

16        ATT_PROD_0010071 through ATT_PROD_0010072,

17        was marked for identification.)

18   BY MR. STEESE:

19        Q.    Okay.  Exhibit 50 if we turn to

20   Bates '072, which is the second page, there's

21   an e-mail from Ms. Torres to, among others,

22   yourself on November 1 of '17, correct?

23        A.    Correct.

24        Q.    And it's -- the e-mail is to John

25   Nolan, I'm assuming, since he's the first one

CONFIDENTIAL

Page 224

1    BY MR. STEESE:

2         Q.     Okay.  And do you know which AT&T

3    entity offers Collaborate?

4         A.     I can speculate.  I believe it's

5    AT&T IS or AT&T -- I think it might be AT&T

6    Corp.

7         Q.     Okay.  Corp., C-O-R-P?

8         A.     Yes.

9         Q.     I didn't know if you said C-O-R-E?

10        A.     No.  Yes, Corp.

11        Q.     And I think you answered this

12   generally, but I'm going to ask it for

13   Collaborate.

14             When Collaborate is offered by

15   AT&T, whichever AT&T entity it is, and the

16   calls are traversing someone else's ISP

17   connection, does AT&T bill end-office switching

18   charges on those calls?

19             MR. HUNSEDER:  Objection.  Lacks

20        foundation.

21             THE WITNESS:  I don't know.

22   BY MR. STEESE:

23        Q.     You, on behalf of AT&T, are

24   disputing the propriety of end-office charges

25   on OTT calls, correct?

CONFIDENTIAL

Page 225

1          A.      Correct.

2          Q.      If that's true, why didn't you take

3     the time to ask, are we doing the same thing;

4     are we billing end-office charges on these

5     calls that I'm disputing when another carrier

6     does it?  Why didn't you do that?

7               MR. HUNSEDER:  Object to the form

8          and lacks foundation.

9               THE WITNESS:  In the past, it's my

10          understanding that we weren't in that type

11          of business.  And as a result of -- and

12          then recently as a result of this

13          litigation, I became made aware, as you

14          can see, that we had something called

15          Collaborate.

16               I read the service guide about, you

17          know, the customer could bring their own

18          or provide it from a third-party; and then

19          that was the extent of basically my

20          research at this point in time.

21               I haven't done any further

22          investigation in terms of the other side

23          of the business because I'm on the cost

24          side and not the product side or revenue

25          side.

CONFIDENTIAL

Page 227

1    end-office switching access on OTT calls?

2          A.      Uh-huh.

3          Q.      Correct?

4          A.      Correct.

5          Q.      For other carriers?

6          A.      (Witness nodding.)

7          Q.      You learned that AT&T has a

8    product, AT&T Collaborate, which has OTT

9    functionality, correct?

10         A.      Correct.

11         Q.      And you -- if AT&T tries to make

12   sure that it's being consistent --

13         A.      Uh-huh.

14         Q.      -- why weren't you asking the

15   question, what are we doing, when we have these

16   calls, are we or are we not billing end-office

17   charges?  Why wouldn't you do that?

18                MR. HUNSEDER:  Objection.  Lacks

19         foundation.

20                THE WITNESS:  That process has

21         started.

22   BY MR. STEESE:

23         Q.      As of when?

24         A.      Oh, I'm guessing -- I'm guessing.

25   This is a guess.  November, December of last

CONFIDENTIAL

Page 228

1    year.

2         Q.     Okay.  So late '18?

3         A.     Yes.

4         Q.     Are there any other network

5    arrangements, for lack of a better term, that

6    you're aware of that AT&T makes available to

7    customers where there's OTT functionality other

8    than Collaborate?

9         A.     Not that I'm aware of; but one of

10   the questions that's being asked is, you

11   know -- part of the research, right, or the

12   ongoing work that started is, is there anything

13   else.

14        Q.     Well, we've already looked at Skype

15   for Business earlier in the deposition,

16   correct?

17        A.     Uh-huh.

18        Q.     Correct?

19        A.     Correct, yes.

20        Q.     I was just giving you a chance to

21   verbally answer.

22             And Skype for Business is another

23   instance where OTT functionality is a very

24   distinct possibility, correct?

25        A.     It appears so based upon my initial

CONFIDENTIAL

Page 239

1    BY MR. STEESE:

2         Q.      Do you have any idea if it's

3    greater or less than $10 million?

4         A.      I don't.  I don't know.

5         Q.      You didn't make any effort to find

6    out what that was?

7         A.      No, I didn't.

8         Q.      Okay.  And if I understand what you

9    said earlier correctly, that is the 65 percent

10   was something that had historically been

11   applied with Level 3, and so you just continued

12   to use that percentage and are withholding

13   based on that, correct?

14        A.      Correct.

15        Q.      Is there any other evidence that

16   you have to support the percentage of the 65?

17        A.      No.

18            MR. HUNSEDER:  Objection.  Asked

19        and answered.

20   BY MR. STEESE:

21        Q.      To the extent that the actual

22   percentage ends up to be 26 percent through

23   July of 2017 and, say, 15 or so percent after

24   that date -- are you with me in concept?

25        A.      Yes.

CONFIDENTIAL

Page 240

1          Q.      Then AT&T has significantly

2     overwithheld, correct?

3          A.      If we accept that.

4          Q.      Or if the Court accepts that?

5          A.      Either, absolutely.

6          Q.      Looking at Category Number 5, the

7     difference here is the basis in calculation of

8     any damages AT&T claims.  If I understand

9     correctly, it's from the date of the Settlement

10    Agreement, the June 1 date, going forward,

11    of '15 --

12         A.      2015, yeah.

13         Q.      -- through the date when the D.C.

14    Circuit opinion became final, which is some

15    date that I don't recall exactly in 2017, you

16    pay 50 percent of the OTT charges.  And after

17    that date, you should be paying 0 percent of

18    the OTT charges, correct?  Once it became

19    final, you shouldn't be paying any end-office

20    charges associated with OTT?

21         A.      Correct.

22         Q.      Let's assume the following:  You

23    understand that the FCC has had this matter

24    remanded back to them by the D.C. Circuit.  You

25    have some general understanding of that,