# EXHIBIT 22

Case No. 1:18-cv-00112-RM-MEH   Document 152-23   filed 06/29/20   USDC Colorado   pg 2 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

2019 WL 7018968 (F.C.C.)

Federal Communications Commission (F.C.C.)
Order on Remand and Declaratory Ruling

IN THE MATTER OF CONNECT AMERICA FUND DEVELOPING
A UNIFIED INTERCARRIER COMPENSATION REGIME

WC Docket No. 10-90
CC Docket No. 01-92
FCC 19-131
Released: December 17, 2019
Adopted: December 12, 2019

***1** By the Commission: Chairman Pai and Commissioner O'Rielly issuing separate statements; Commissioners Rosenworcel and Starks concurring and issuing separate statements.

**I. INTRODUCTION**

1. One of the foundational missions of the Commission is to ensure that communications networks are available to Americans throughout the country. And for decades, the Commission has indirectly subsidized the deployment and expansion of local voice telephone networks through its intercarrier compensation system. These rules allowed, for example, local exchange carriers (or LECs) to collect end office switching charges or charges recovered from long-distance carriers (known as interexchange carriers or IXCs) for terminating long-distance calls to the LECs' local customers.

2. Calls were traditionally delivered over the legacy system of interconnected voice telephone networks known as the public-switched telephone network, or PSTN. For nearly the last decade, the Commission has worked to facilitate the efficient transition from traditional legacy voice networks to modern Internet Protocol-based networks. In 2011, the Commission recognized that, as a consequence of the transition to these IP-based networks and services, consumers were increasingly purchasing Voice over Internet Protocol (VoIP) services. As a result, voice telephone traffic increasingly originates or terminates in IP format, but is also exchanged over PSTN facilities. To address the growing VoIP-PSTN traffic, and as part of its commitment to promoting investment in and deployment of IP networks, the Commission adopted the VoIP Symmetry Rule, which "permit[s] a LEC to charge the relevant intercarrier compensation for functions performed by it and/or by its retail VoIP partner, regardless of whether the functions performed or the technology used correspond precisely to those used under a traditional ... architecture." [1]

3. Several years later, the Commission offered an interpretation of the VoIP Symmetry Rule that allowed LECs that partner with over-the-top VoIP providers to collect end office switching charges on their VoIP-PSTN traffic. [2] This *2015 Declaratory Ruling* was immediately challenged, vacated by the United States Court of Appeals for the District of Columbia Circuit (the D.C. Circuit), and remanded to the Commission for further consideration. [3] We also have under consideration a Petition for Declaratory Ruling filed by CenturyLink seeking to have the Commission reaffirm the *2015 Declaratory Ruling*. [4]

4. To provide certainty to carriers, promote the deployment of modern all-IP networks, and advance competition in the voice services market, we now clarify our interpretation of the VoIP symmetry rule and reaffirm our commitment to well-established Commission precedent that takes account of the functions a LEC or its VoIP provider partner are actually performing. Accordingly, we interpret our VoIP Symmetry Rule to permit LECs to assess end office switched access charges only if the LEC or its VoIP partner provides a physical connection to the last-mile facilities used to serve an end user. If neither the LEC nor its VoIP provider partner provides such physical connection to the last-mile facilities used to serve the end user, the VoIP-

LEC partnership is not providing the functional equivalent of end office switched access and the LEC may not assess end office switched access charges.

**II. BACKGROUND**

 ***2**  5. From the start of the IP transition, it has created regulatory uncertainty. In early 2011, the Commission resolved a formal complaint brought by AT&T alleging that YMax Communications Corp., a competitive LEC, was improperly assessing switched access charges for voice services it provided in conjunction with its partner magicJack, LP. [5] magicJack provided consumers "the ability to use the Internet to make and receive calls throughout most of North America" through a device—the eponymous "magicJack"—that plugged into a computer's USB port and a telephone jack "into which an ordinary landline telephone can be plugged." [6] Customers had to "separately procure high speed Internet access service from a third-party ISP in order to use the magicJack device to place or receive calls." [7] YMax provided access to numbers and to the PSTN for magicJack's customers, but "did not provide any physical transmission facilities" connecting YMax to the premises of any non-carriers/non-Internet Service Provider (ISP) persons or entities. [8] In its complaint, AT&T alleged that YMax violated the Communications Act of 1934, as amended, by assessing switched access charges not authorized by its tariff, because YMax did not provide services such as "Switched Access Service" or "End Office Switched Access" to "end users" as defined in its tariff. [9]

6. The Commission examined the YMax tariff provisions in question "according to their common meaning in the industry." [10] The Commission held that the terms "termination" of "End User station loops" and "end user lines" have well-established meanings within the telecommunications industry, in Commission orders, and in court decisions. [11] In all of those contexts, the terms generally refer to a physical transmission facility that provides a point-to-point connection between an individual home or business and a telephone company office. [12] The Commission held that YMax was not providing "end office switched access" because it did not provide a "physical transmission facility that provides a point-to-point connection." [13] In reaching its decision, the Commission rejected YMax's argument that it was providing "virtual loops" via the customer's Internet access. [14]

7. In the *Transformation Order*, the Commission recognized that its approach to intercarrier compensation needed to evolve along with changing technologies and network functions, [15] and adopted a prospective transitional intercarrier compensation framework for VoIP-PSTN traffic, [16] or "traffic exchanged over PSTN facilities that originates and/or terminates in IP format." [17] The Commission adopted a "symmetric" framework, [18] reasoning that such an approach best balanced its policy goals of encouraging migration to an all-IP network, reducing intercarrier compensation disputes, providing greater certainty to the industry regarding intercarrier compensation revenue streams, avoiding marketplace distortions and arbitrage that could arise from an asymmetrical approach to compensation, and advancing competitive and technological neutrality. [19]

 ***3**  8. Specifically, the VoIP Symmetry Rule "permit[s] a LEC to charge the relevant intercarrier compensation for functions performed by it and/or by its retail VoIP partner, regardless of whether the functions performed, or the technology used correspond precisely to those used under a traditional TDM (time division multiplexing) architecture." [20]

9. In 2012, YMax sought clarification about "the minimum functionality required" for a competitive LEC to collect full access for VoIP-PSTN traffic pursuant to the then-new VoIP Symmetry Rule. [21] YMax asserted that the Commission should affirm that "a LEC is performing the functional equivalent of ILEC access service ... whenever it is providing telephone numbers and some portion of the interconnection with the PSTN, and regardless of how or by whom the last-mile transmission is provided." [22] The Wireline Competition Bureau rejected YMax's arguments and explained that "?although access services might functionally be accomplished in different ways ... the right to [assess] charge[s] [pursuant to the VoIP Symmetry Rule] does not extend to functions not performed by the LEC or its retail VoIP service provider partner."' [23] The Bureau explained that YMax's

Case No. 1:18-cv-00112-RM-MEH Document 152-23 filed 06/29/20 USDC Colorado pg 4 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

interpretation could lead to double billing and that the Commission was careful to "prevent double billing and charging for functions not actually provided." [24] As a result, the Bureau rejected YMax's proposed rule interpretation. [25]

10. In the *2015 Declaratory Ruling*, the Commission reviewed the precedent establishing that the hallmark of end office switching is the connection of trunks to lines and concluded that "the cases cited ... are distinguishable from the facts before us or have been superseded by the changes adopted in the *USF/ICC ... Transformation Order*." [26] The Commission focused instead on what it described as the "critical functions" of switched access in the traditional TDM network and compared them to key physical switching functions in the IP network. [27] Based on this review, the Commission determined that it should allow an "equal application of the [VoIP Symmetry] rule" to all types of VoIP services and allow both facilities-based and over-the-top VoIP providers or their LEC partners to collect end office switching charges on VoIP-PSTN traffic. [28]

11. AT&T appealed the *2015 Declaratory Ruling*, arguing that services provided by over-the-top VoIP-LEC partnerships do not constitute the functional equivalent of end office switching services because end office switched access involves a physical connection between the LEC and the last-mile facilities used to serve an end user. [29] On appeal, the D.C. Circuit rejected as arbitrary and capricious the Commission's attempt to omit the physical connection of lines and trunks from the necessary functions of end office switching because it left the Commission unable to distinguish between end office and tandem switching. [30] The court also found that the Commission had not successfully rebutted the commonly understood meaning of end office switching, as discussed in *YMax I*. As the court explained, "*YMax I* represents the Commission's apparent understanding of the 'commonly understood meaning[]' of end office switching around the time of the *Transformation Order*." [31] The court further explained that *YMax I*, as well as earlier guidance dating back to the 1990s, "appear to identify end-office switching as supplying actual or physical interconnection." [32] The court determined that "[t]he ruling's only explanation for why interconnection is "not require[d]' is that, in VoIP—PSTN calls, 'the customer is separately paying for [the] broadband connection .... That the customer is paying for the broadband interconnection doesn't support the conclusion that interconnection is unnecessary for end-office switching—it merely indicates that it is provided by a party other than a VoIP-LEC." [33]

*4 12. After the court remanded the *2015 Declaratory Ruling*, CenturyLink submitted a Petition for a Declaratory Ruling, urging the Commission to issue a declaratory ruling regarding the appropriate intercarrier compensation for over-the-top VoIP-LEC traffic to and from the PSTN and reaffirm the conclusions of the *2015 Declaratory Ruling* regarding the correct interpretation of the VoIP Symmetry Rule. [34] CenturyLink argues that the *Remand Order* does not decide the correct interpretation of the VoIP Symmetry Rule in relation to over-the-top VoIP traffic, and requests that the Commission "complete the remand" from the court and "resolve the underlying dispute as to the proper interpretation" of the VoIP Symmetry Rule. [35] AT&T and Verizon disagree. [36] AT&T, for example, asserts that "there is no merit to CenturyLink's effort to sideswipe the text of the 2011 rules, [and] the decades of precedent establishing the meaning and application of those rules to over-the-top VoIP traffic." [37]

13. Litigation and other disputes regarding access charges related to the VoIP Symmetry Rule continue. [38] In its Petition, CenturyLink details ongoing litigation regarding the interpretation of the VoIP Symmetry Rule. [39] According to O1 Communications and Peerless Network, the *Remand Order* "has resulted in disputes between local exchange carriers ... and interexchange carriers ..., primarily AT&T and Verizon, over the appropriate compensation for over-the-top VoIP traffic." [40] Peerless also alleges that several large interexchange carriers "not only refuse to pay access charges on [over-the-top] VoIP traffic, but invented new disputes for access charges they had previously paid, resulting in a claimed 'claw back' of prior payments." [41] According to AT&T, two district courts issued rulings regarding access disputes arising under the VoIP Symmetry Rule and "both district courts stayed or vacated their decisions" after the release of the *Remand Order*. [42]

### III. DISCUSSION

14. Upon consideration of the record in this proceeding and consistent with Commission precedent, we reaffirm the long-standing definition of what constitutes "end office switching": A VoIP-LEC partnership that interconnects a call with a customer's last-mile facility performs the functional equivalent of end office switching and may charge for that functionality. By contrast, a VoIP provider, or a VoIP-LEC partnership, that transmits calls to an unaffiliated ISP for routing over the Internet does not provide the functional equivalent of end office switching, and may not impose an end office switching access charge on IXCs that receive or deliver traffic to or from the VoIP-LEC partnership.[43] Today's ruling provides carriers with certainty and predictability about the applicability of the VoIP Symmetry Rule, while helping to resolve past disputes.

**\*5** 15. In reaching our conclusion, we also conclude that the *2015 Declaratory Ruling* failed to properly interpret the VoIP Symmetry Rule in light of the commonly understood meaning of end office switching. Commission precedent is clear that a physical connection to the last-mile facilities used to serve an end user is the key characteristic of end office switching, and absent such physical connection, a VoIP-LEC partnership is not performing the functional equivalent of end office switching.[44] Accordingly, on remand, we decline to follow the interpretation of the VoIP Symmetry Rule adopted by the Commission in the *2015 Declaratory Ruling* and deny the CenturyLink Petition for a Declaratory Ruling in this regard.

16. The Commission has historically analyzed end office switching in the context of regulating traditional voice services. The Commission has consistently recognized that interconnection is a hallmark of end office switching, and that interconnection involves connecting "subscriber line to subscriber line or subscriber line to trunk."[45] As the D.C. Circuit and commenters explain, prior Commission and Bureau orders demonstrate that the Commission has always understood physical interconnection to be the hallmark of end office switching.[46] As AT&T points out, "all of the relevant precedents from the Commission and courts ... uniformly provide that the core and distinguishing function of an end office switch is the interconnection of calls on trunks to and from last-mile customer loop facilities."[47] In particular, as the D.C. Circuit observed, *YMax I* reveals the commonly understood meaning of end office switching at the time of the *Transformation Order*, which is directly relevant to our application of the functional equivalency evaluation under our traditional test: The Commission clearly held that YMax was not providing "end office switched access" because it did not provide a "physical transmission facility that provides a point-to-point connection."[48]

17. We thus conclude that a physical interconnection continues to be the critical and defining characteristic of end office switching. LECs and their VoIP provider partners merely transmitting calls to unaffiliated ISPs for routing over the public Internet are not performing this essential function of end office switching. In adopting the VoIP Symmetry Rule in 2011, the Commission demonstrated no intention to rethink that key aspect of end office switching. Therefore, we decline to continue pursuing the Commission's misguided decision in 2015 to depart from this well-understood interpretation of end office switching. Returning to that historical understanding in our application of the VoIP Symmetry Rule here also fully addresses the D.C. Circuit's concerns with the *2015 Declaratory Ruling*.[49]

**\*6** 18. In adopting the VoIP Symmetry Rule, the Commission reaffirmed its practice of determining whether a carrier can impose access charges by considering whether the service being provided is functionally equivalent to a service for which LECs have been allowed to impose access charges. As the Commission explained, "under the Commission's historical approach in the access charge context, when relying on tariffs, LECs have been permitted to charge access charges to the extent that they are providing the functions at issue."[50] Although the Commission did not expressly discuss physical connections, it used the traditional test, and re-codified it, in order to clarify that a LEC could collect access charges when it transmitted a call using a format other than TDM (such as IP); and that a LEC could collect access charges for functions performed not only by itself but also by its VoIP partner.[51]

19. Our interpretation is consistent with the Commission's statement in the *Transformation Order* that a LEC can charge for functions it or its VoIP provider partner perform even if they do not "'correspond precisely to those used under a traditional

Case No. 1:18-cv-00112-RM-MEH   Document 152-23   filed 06/29/20   USDC Colorado   pg 6 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

TDM architecture.'" [52] That statement underscores the Commission's commitment to considering functional equivalency when looking at different types of network architectures consistent with its historical practice. Where the Commission did choose to depart from its historical approaches in other aspects of its VoIP symmetry analysis, it did so expressly and unambiguously. Most notably, the Commission expressly departed from its historical standard with regard to *which* entity—the LEC or its VoIP provider partner—must be providing the relevant functionality. The Commission made no such indication of its intent to change course in the standard for evaluating what functionality actually was being provided. [53] Instead, in adopting that new approach of allowing either the LEC or its VoIP provider partner to provide the functionally equivalent service, the Commission found clear support in the *YMax I* decision for its pronouncement that the VoIP Symmetry Rule, "do[es] not permit a LEC to charge for functions performed neither by itself or its retail partner." [54] Further, the interpretation of the VoIP Symmetry Rule in this *Order* best advances the policy goals of the *Transformation Order* of "encouraging the deployment of all-IP networks, promoting competition in the voice marketplace, reducing intercarrier compensation disputes, and avoiding marketplace distortions and arbitrage that could arise from an asymmetrical approach to compensation." [55]

**\*7**  20. Our conclusion that the VoIP Symmetry Rule allows recovery of end office switching charges only where the LEC or its VoIP provider partner provides the physical connection furthers the Commission's goal of promoting IP investment, particularly last-mile investment, by rewarding investment in last-mile connections. [56] In contrast to the commonsense notion that linking a LEC's ability to impose end office charges to the provision of connections between lines and trunks by the LEC or its VoIP provider partner (during the transition to bill-and-keep) promotes last-mile investment essential to IP networks, we find the theory for promoting IP networks in the *2015 Declaratory Ruling* to be speculative and insufficiently supported. Indeed, the Commission's conclusion that the *2015 Declaratory Ruling* would promote IP networks and services largely relied on high-level policy statements from the *Transformation Order* about the effects of intercarrier compensation reform, or reform of VoIP intercarrier compensation, more generally. [57] However, the *2015 Declaratory Ruling* did not explain how allowing LECs and their over-the-top VoIP provider partners to recover access charges for functions they are not performing would promote that sort of investment or otherwise advance the Commission's goals.

21. Relatedly, we conclude that that our reading of the VoIP Symmetry Rule is the better interpretation in the overall context of trying to promote competition in the voice marketplace than the approach taken by the Commission in the *2015 Declaratory Ruling*. [58] At best, that approach may have temporarily encouraged voice competition where broadband connections already existed that allowed VoIP providers and their LEC partners to collect access charges during the transition to bill-and-keep. But where no such IP-based last-mile connections existed, the approach adopted in the *2015 Declaratory Ruling* would have discouraged VoIP providers and their LEC partners from building last mile connections, because they could simply recover the same access charges without building last mile connections. [59]

22. We also conclude that because our approach is better aligned with the approach taken by the Commission in the *Transformation Order* and is consistent with the historical functional equivalence test, it provides the more symmetrical approach to access charge compensation and we therefore expect it to advance the *Transformation Order's* goals of reducing market distortions, arbitrage, and compensation disputes. [60] We are unpersuaded by the *2015 Declaratory Ruling*'s concerns about IP-to-IP interconnection negotiations. That ruling framed one set of negotiating parties as in the wrong because they were negotiating from a baseline that presumed an interpretation of the intercarrier compensation rules for VoIP-PSTN traffic that differed from the one the Commission adopted there. [61] Having confirmed the correctness of those parties' understanding of the VoIP Symmetry Rule, however, we do not see the same grounds to criticize their negotiating approach—even assuming *arguendo* that negotiating approach is what is reflected in the characterizations in the *2015 Declaratory Ruling*. Particularly because the VoIP Symmetry Rule does not apply by its terms to IP-to-IP interconnection, we are not persuaded that our clarification of the VoIP Symmetry Rule provided here will have a negative effect on providers' ability to negotiate such agreements, rather than simply clarifying the legal baseline for VoIP-PSTN traffic for both sides to any such negotiation. More generally, our experience persuades us that uncertainty regarding the governing legal rules is the most significant source of

intercarrier compensation disputes, and that once the rules are clarified, parties are able to work out the implementation details in a way that reduces the need for future disputes and litigation. [62]

**\*8** 23. Indeed, in the *Remand Order*, the court vacated the *2015 Declaratory Ruling* based, at least in part, on its concern that the Commission's "new" functional equivalence test had all but erased the distinction between tandem switching and end office switching. [63] We respond to these concerns by reiterating the Commission's longstanding view that end office switching involves the connection of trunks to lines and by clearly declaring that a VoIP provider, or its LEC partner, provides the functional equivalent of end office switching only when it provides a physical connection to the last-mile facilities used to serve an end user. [64] This clarification provides a clear test for functional equivalency in the context of the VoIP Symmetry Rule and provides a bright-line distinction between tandem switching and end office switching for purposes of this rule. [65] It also provides clarity and guidance to those parties involved in the ongoing disputes and litigation regarding the correct interpretation of the VoIP Symmetry Rule as discussed by commenters. [66]

24. Our decision today is fundamentally technologically neutral. As Verizon explains, "distinguishing between facilities-based and over-the top VoIP providers is technology neutral—the different treatment has nothing to do with the providers' choice of technology ... but with the fact that the former are doing work that the latter are not." [67] We agree. The services provided by over-the-top VoIP providers and facilities-based VoIP providers are not functionally equivalent—the latter provides the physical connection to the last-mile facilities used to serve an end user, and the former does not. We thus reject the overbroad suggestion in the *2015 Declaratory Ruling* that "disparate treatment based on technological distinctions between facilities-based and over-the-top providers directly contradicts the advancement of "competitive or technological neutrality." [68] Where there are material technological distinctions, differences in treatment can be appropriate. [69] The reasoning underpinning the *2015 Declaratory Ruling* is circular: It is only by excluding interconnection from the scope of end office switching that the *2015 Declaratory Ruling* could have treated differences between facilities-based and over-the-top VoIP providers as immaterial. Our interpretation "embraces the concept of compensation for new and non-traditional functionality," but not at the expense of a departure from the historical standard for functional equivalency that we find represents the best interpretation of the VoIP Symmetry Rule. [70]

**\*9** 25. In departing from the Commission's interpretation of the VoIP Symmetry Rule in the *2015 Declaratory Ruling*, we are mindful of the fact that "an agency is free to change its mind so long as it supplies 'a reasoned analysis.'" [71] The Supreme Court has observed that there is "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review .... [I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." [72] Relevant precedent holds that we need only "examine the relevant data and articulate a satisfactory explanation for [[our] action," a duty we fully satisfy here. [73] The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." [74] Thus, contrary to CenturyLink's assertion that we cannot or should not depart from the conclusion of the *2015 Declaratory Ruling*, [75] we are "entitled to assess administrative records and evaluate priorities" in light of our current policy judgments as well as in response to a remand order from the court. [76] Indeed, by vacating the *2015 Declaratory Ruling* and remanding the matter to us, the D.C. Circuit required us to reevaluate the Commission's reasoning in the *2015 Declaratory Ruling* and take into the account the weaknesses in that ruling that the D.C. Circuit identified in its opinion. [77]

26. In the interest of further clarity, we find that this Declaratory Ruling should have retroactive effect. As a general matter, declaratory rulings are adjudicatory and are presumed to have retroactive effect. [78] Clarifying the law and applying that clarification to past behavior are routine functions of adjudications. [79] As various commenters point out, the applicability of the VoIP Symmetry Rule has not been clear. [80] This retroactive clarification is necessary to provide clarity on the meaning of the VoIP Symmetry Rule. As such, we reject the assertion that the interpretation of the VoIP Symmetry Rule adopted in this

Case No. 1:18-cv-00112-RM-MEH   Document 152-23   filed 06/29/20   USDC Colorado   pg 8 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

Order may not be applied retroactively because such interpretation would result in "manifest injustice" and that our revised interpretation of the VoIP Symmetry Rule may be applied only prospectively. [81] Instead, retroactivity is necessary to prevent an undue hardship being worked upon those parties who properly interpreted the VoIP Symmetry Rule and have been in disputes ever since.

## IV. ORDERING CLAUSES

**\*10**  27. Accordingly, IT IS ORDERED that, pursuant to sections 4(i), 201, 202, and 251 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 201, 202, and 251, and sections 1.1 and 1.2 of the Commission's rules, 47 CFR §§ 1.1, 1.2, this Order on Remand and Declaratory Ruling in WC Docket No. 10-90 and CC Docket No. 01-92 IS ADOPTED.

28. IT IS FURTHER ORDERED that the Petition of CenturyLink for a Declaratory Ruling filed May 11, 2018 is DENIED.

29. IT IS FURTHER ORDERED that, pursuant to section 1.103 of the Commission's rules, 47 CFR § 1.103, this Order on Remand and Declaratory Ruling SHALL BE EFFECTIVE upon release.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

### STATEMENT OF CHAIRMAN AJIT PAI

Re: *Connect America Fund*, WC Docket No. 10-90; *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92.

When consumers pick up their phones to make a call and dial the number of a friend or loved one on the other side of the country, they probably don't think about whether their call is being carried on traditional copper wires and physical switches on one hand, or sent as packets over modern Internet Protocol-based networks on the other. They don't think about how that call might be routed and handed off between multiple carriers before it's delivered to the person on the other end of the call or how those companies get paid for doing the work of delivering that call to its destination. And they certainly don't think about the tangled web of regulations known as intercarrier compensation.

One of those regulations permits the local phone company to charge a long-distance carrier for terminating a long-distance call to a customer on the local carrier's network. In 2011, the Commission adopted a rule to put increasingly popular VoIP providers on equal footing with traditional providers by allowing them to collect those charges if they're performing the same function. And in 2015, the Commission, in a party-line decision from which I dissented, tried to expand the interpretation of that rule to cover all VoIP providers, so that even those who were not actually providing the physical connection or doing the work of switching a call would get compensated. Shortly after, the D.C. Circuit overturned the Commission's Order. So today we address the court's concerns and bring our interpretation of the 2011 rule back in line with years of Commission and telecommunications industry practice.

This might seem like an arcane and weedy matter, and it is. But it's also important. By limiting intercarrier compensation charges to companies that are actually providing a physical connection, we're ensuring that our rules provide an incentive to build out networks and continue the transition from traditional copper networks to modern IP-based networks that will support continued future innovation.

I'd like to thank our expert staff that contributed their deep, technical knowledge of voice telephone regulations to this item, including Irina Asoskov, Susan Bahr, Aaron Garza, Lisa Hone, Rhonda Lien, Kris Monteith, and Gil Strobel of the Wireline

Case No. 1:18-cv-00112-RM-MEH   Document 152-23   filed 06/29/20   USDC Colorado   pg 9 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

Competition Bureau; Lisa Griffin and Rosemary McEnery of the Enforcement Bureau; and Marcus Maher, Richard Mallen, and Linda Oliver of the Office of General Counsel.

### STATEMENT OF COMMISSIONER MICHAEL O'RIELLY

Re: *Connect America Fund*, WC Docket No. 10-90; *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92.

The reasoning in this Order on Remand is undoubtedly correct: as firmly established by Commission precedent, the defining feature of end office switching in a TDM network, or the functional equivalent thereof, is the act of physical interconnection of subscriber loops and trunks. Since over-the-top VoIP providers do not actually interconnect with the last-mile network to a customer's home, they are not entitled to collect access charges for performing that function. This Order creates certainty by completing the D.C. Circuit's remand and rejecting a previous Commission's flawed interpretation of the VoIP symmetry rule. I fully support the action we take.

At the same time, the issue of whether over-the-top VoIP providers may assess end office switching charges ought to be kept in perspective. End office switching charges will finish transitioning to bill-and-keep in 2020, and while the Declaratory Ruling should help in resolving certain ongoing litigation, the item's effect will be largely retroactive. I look forward to further reforms to shift the entire intercarrier compensation universe to bill-and-keep and a day when the Commission and the industry will no longer be saddled with this regulatory anachronism.

### CONCURRING STATEMENT OF COMMISSIONER JESSICA ROSENWORCEL

Re: *Connect America Fund*, WC Docket No. 10-90; *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92.

With this decision we take up the Byzantine topic of our rules governing compensation for the exchange of network traffic. Specifically, we address the application of the so-called VoIP symmetry rule when the traffic exchange involves an over-the-top VoIP service on the terminating end of a call.

Four years ago, the agency took up this very same topic and found that the VoIP symmetry rule did not require a competitive carrier or its over-the-top VoIP partner to provide a physical last-mile facility to the VoIP provider's end user customers in order to provide the functional equivalent of end office switching. I believe that was the correct call because it advanced the goal of facilitating the IP transition and reduced incentives for arbitrage.

However, since then the court has spoken. It handed our prior ruling back and urged us to try again. While I would have preferred that this agency expand its work to justify our prior decision, I am mindful that the court left us with little room to maneuver. Accordingly, I acknowledge that in this decision we change course and on that I respectfully concur.

### CONCURRING STATEMENT OF COMMISSIONER GEOFFREY STARKS

Re: *Connect America Fund*, WC Docket No. 10-90; *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92.

Over the last decade, the FCC has taken numerous steps, including the 2011 Transformation Order, to update its rules to support the transition to IP-based networks. During that time, we have repeatedly recognized that many of the technical distinctions in our rules are no longer relevant and may impede the IP transition. The 2015 Declaratory Ruling underlying today's action was adopted to help ensure that those rule changes promoted and protected competition.

While I recognize that the D.C. Circuit's decision narrowed our policy options, I have concerns about the approach the Commission has taken today. To that end, I will concur. Today's decision purports to advance competition in the voice services

Case No. 1:18-cv-00112-RM-MEH   Document 152-23   filed 06/29/20   USDC Colorado   pg 10 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

market, but it is more likely to deter competition by disadvantaging over-the-top VoIP providers. In many recent decisions, the Commission has proceeded as if our work to promote competition is done. The facts on the ground make clear that isn't true. We must continue to support competitive choices that promote better service and lower prices for American consumers.

### STATEMENT OF CHAIRMAN AJIT PAI

Re: *Connect America Fund*, WC Docket No. 10-90; *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92.

When consumers pick up their phones to make a call and dial the number of a friend or loved one on the other side of the country, they probably don't think about whether their call is being carried on traditional copper wires and physical switches on one hand, or sent as packets over modern Internet Protocol-based networks on the other. They don't think about how that call might be routed and handed off between multiple carriers before it's delivered to the person on the other end of the call or how those companies get paid for doing the work of delivering that call to its destination. And they certainly don't think about the tangled web of regulations known as intercarrier compensation.

One of those regulations permits the local phone company to charge a long-distance carrier for terminating a long-distance call to a customer on the local carrier's network. In 2011, the Commission adopted a rule to put increasingly popular VoIP providers on equal footing with traditional providers by allowing them to collect those charges if they're performing the same function. And in 2015, the Commission, in a party-line decision from which I dissented, tried to expand the interpretation of that rule to cover all VoIP providers, so that even those who were not actually providing the physical connection or doing the work of switching a call would get compensated. Shortly after, the D.C. Circuit overturned the Commission's Order. So today we address the court's concerns and bring our interpretation of the 2011 rule back in line with years of Commission and telecommunications industry practice.

This might seem like an arcane and weedy matter, and it is. But it's also important. By limiting intercarrier compensation charges to companies that are actually providing a physical connection, we're ensuring that our rules provide an incentive to build out networks and continue the transition from traditional copper networks to modern IP-based networks that will support continued future innovation.

I'd like to thank our expert staff that contributed their deep, technical knowledge of voice telephone regulations to this item, including Irina Asoskov, Susan Bahr, Aaron Garza, Lisa Hone, Rhonda Lien, Kris Monteith, and Gil Strobel of the Wireline Competition Bureau; Lisa Griffin and Rosemary McEnery of the Enforcement Bureau; and Marcus Maher, Richard Mallen, and Linda Oliver of the Office of General Counsel.

### STATEMENT OF COMMISSIONER MICHAEL O'RIELLY

Re: *Connect America Fund*, WC Docket No. 10-90; *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92.

The reasoning in this Order on Remand is undoubtedly correct: as firmly established by Commission precedent, the defining feature of end office switching in a TDM network, or the functional equivalent thereof, is the act of physical interconnection of subscriber loops and trunks. Since over-the-top VoIP providers do not actually interconnect with the last-mile network to a customer's home, they are not entitled to collect access charges for performing that function. This Order creates certainty by completing the D.C. Circuit's remand and rejecting a previous Commission's flawed interpretation of the VoIP symmetry rule. I fully support the action we take.

At the same time, the issue of whether over-the-top VoIP providers may assess end office switching charges ought to be kept in perspective. End office switching charges will finish transitioning to bill-and-keep in 2020, and while the Declaratory Ruling should help in resolving certain ongoing litigation, the item's effect will be largely retroactive. I look forward to further reforms

Case No. 1:18-cv-00112-RM-MEH Document 152-23 filed 06/29/20 USDC Colorado pg 11 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

to shift the entire intercarrier compensation universe to bill-and-keep and a day when the Commission and the industry will no longer be saddled with this regulatory anachronism.

### CONCURRING STATEMENT OF COMMISSIONER JESSICA ROSENWORCEL

Re: *Connect America Fund*, WC Docket No. 10-90; *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92.

With this decision we take up the Byzantine topic of our rules governing compensation for the exchange of network traffic. Specifically, we address the application of the so-called VoIP symmetry rule when the traffic exchange involves an over-the-top VoIP service on the terminating end of a call.

Four years ago, the agency took up this very same topic and found that the VoIP symmetry rule did not require a competitive carrier or its over-the-top VoIP partner to provide a physical last-mile facility to the VoIP provider's end user customers in order to provide the functional equivalent of end office switching. I believe that was the correct call because it advanced the goal of facilitating the IP transition and reduced incentives for arbitrage.

However, since then the court has spoken. It handed our prior ruling back and urged us to try again. While I would have preferred that this agency expand its work to justify our prior decision, I am mindful that the court left us with little room to maneuver. Accordingly, I acknowledge that in this decision we change course and on that I respectfully concur.

### CONCURRING STATEMENT OF COMMISSIONER GEOFFREY STARKS

Re: *Connect America Fund*, WC Docket No. 10-90; *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92.

Over the last decade, the FCC has taken numerous steps, including the 2011 Transformation Order, to update its rules to support the transition to IP-based networks. During that time, we have repeatedly recognized that many of the technical distinctions in our rules are no longer relevant and may impede the IP transition. The 2015 Declaratory Ruling underlying today's action was adopted to help ensure that those rule changes promoted and protected competition.

While I recognize that the D.C. Circuit's decision narrowed our policy options, I have concerns about the approach the Commission has taken today. To that end, I will concur. Today's decision purports to advance competition in the voice services market, but it is more likely to deter competition by disadvantaging over-the-top VoIP providers. In many recent decisions, the Commission has proceeded as if our work to promote competition is done. The facts on the ground make clear that isn't true. We must continue to support competitive choices that promote better service and lower prices for American consumers.

### Footnotes

| | |
|---|---|
| 1 | *Connect America Fund et al.*, WC Docket No. 10-90 et al., Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 17663, 18026-27, para. 970 (2011) (*Transformation Order*), *aff'd, In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 2050, and 135 S. Ct. 2072 (2015). |
| 2 | *Connect America Fund et al.*, WC Docket No. 10-90, CC Docket No. 01-92, Declaratory Ruling, 30 FCC Rcd 1587, 1588, para. 2 (2015) (*2015 Declaratory Ruling*). |
| 3 | *AT&T Corp. v. FCC*, 841 F.3d 1047, 1048 (D.C. Cir. 2016) (*Remand Order*). |
| 4 | Petition of CenturyLink for a Declaratory Ruling, WC Docket No. 10-90, CC Docket No. 01-92 (filed May 11, 2018), https://ecfsapi.fcc.gov/file/10511048922449/CTLPetitionDeclaratory(FINAL5-11-18).pdf (CenturyLink Petition). |
| 5 | *AT&T Corp. v. YMax Communications Corp.*, File No. EB-10-MD-005, Memorandum Opinion and Order, 26 FCC Rcd 5742 (2011) (*YMax I*). |
| 6 | *YMax I*, 26 FCC Rcd at 5744, para. 4. |

Case No. 1:18-cv-00112-RM-MEH Document 152-23 filed 06/29/20 USDC Colorado pg 12 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

7    *YMax I*, 26 FCC Rcd at 5745, para. 5. The complaint notes that "magicJack ... relies on YMax to obtain telephone numbers and interconnection to the public switched telephone network ('PSTN') for magicJack purchasers." *Id.* at 5744, para. 4.

8    *YMax I*, 26 FCC Rcd at 5743-44, para. 3.

9    *YMax I*, 26 FCC Rcd at 5748, para. 13.

10   *YMax I*, 26 FCC Rcd at 5756, para. 38.

11   *Id.* at 26 FCC Rcd at 5748-49, paras. 13-14.

12   *See id.* at 5756, para. 39 ( citing *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 489-90 (2002) (stating that the "local loop," which runs from "local switches" and terminates at "terminal points in individual houses and businesses" is "traditionally ...made of copper wire, though fiber-optic cable is also used")); *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Deployment of Wireline Services Offering Advanced Telecommunications Capability*, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd 16978, 17111-12, paras. 214-16 (2003) (describing a "local loop" as "copper cable pairs" or "fiber-optic cable" that "connect[s] customers directly to a central office" and establishes "one direct connection or transmission path to each customer premises"); *see also id.* at 17102, para. 197 n.620 (stating "the local loop network element is a transmission facility between a distribution frame (or its equivalent) in an incumbent LEC central office and the loop demarcation point at an end-user customer premises"); *AT&T Corp., MCI Telecommunications Corp., Bell Atlantic Pennsylvania*, File No. E-95-006 et al., Memorandum Opinion and Order, 14 FCC Rcd 556, 559, para. 4 (1998), ("A common line, sometimes called a 'local loop,' connects an end user's home or business to a LEC central office. A characteristic feature of a common line is that it enables the end user to complete local as well as interstate and foreign calls.") (footnotes omitted), *recon. denied*, 15 FCC Rcd 7467 (2000); Newton's Telecom Dictionary 477 (19 ed. 2003) (defining "loop" as "the pair of wires that winds its way from the central office to the telephone set or system at the customer's office, home or factory, *i.e.*, 'premises' in telephones").

13   *YMax I*, 26 FCC Rcd at 5757, para. 41.

14   *YMax I*, 26 FCC Rcd at 5758-59, para. 44 ("In essence, YMax contends that the entire worldwide Internet—from a Called/Calling Party's premises through the network of the Called/Calling Party's ISP, through the networks of other ISPs, up to and including the connection YMax purchases from its own ISPs ... comprises a 'virtual' loop that terminates at the equipment it collocates ... of indeterminate length and configuration .... If this exchange of packets over the Internet is a 'virtual loop,' then so too is the entire public switched telephone network—and the term 'loop' has lost all meaning.").

15   *See Transformation Order*, 26 FCC Rcd at 17670, paras. 10-11.

16   *See id.* at 18026-27, para. 970; *see also* 47 CFR §§ 51.913, 61.26(f). Specifically, this framework established default intercarrier compensation rates for toll VoIP-PSTN traffic equal to interstate access rates and default intercarrier compensation rates for other VoIP-PSTN traffic at otherwise applicable reciprocal compensation rates. *See Transformation Order*, 26 FCC Rcd at 18008, para. 944.

17   *Transformation Order*, 26 FCC Rcd at 18006-07, para. 941 (internal citations omitted). The Commission specified that the term "VoIP-PSTN" related to "whether the exchange of traffic between a LEC and another carrier occurs in Time-Division Multiplexing (TDM) format (and not in IP format), without specifying the technology used to perform the functions subject to the associated intercarrier compensation charges." *Id.* at 18005-06, para. 940.

18   *Transformation Order*, 26 FCC Rcd at 18026-28, paras. 970-71.

19   *Id.* at 18009-13, paras. 946-53.

20   *Id.* at 18026-27, para. 970. The VoIP Symmetry Rule specifies that, "a local exchange carrier shall be entitled to assess and collect the full Access Reciprocal Compensation charges prescribed by this subpart that are set forth in a local exchange carrier's interstate or intrastate tariff for the access services defined in § 51.903 regardless of whether the local exchange carrier itself delivers such traffic to the called party's premises or delivers the call to the called party's premises via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as defined in 47 U.S.C. 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. 153(36), that does not itself seek to collect Access Reciprocal Compensation charges prescribed by this subpart for that traffic." 47 CFR § 51.913(b). Among the categories of services defined in section 51.903 is End Office Access Services, which are defined as "the switching of access traffic at the carrier's end office switch and the delivery to or from of such traffic to the called party's premises." Local switching is one of the rate elements of End Office Access Charges, whereas there are separate common line charges that recover, as a general matter, the costs associated with the physical loop and line port. *Id.* §§ 51.903(d)(3), 54.901, 69.104, 69.106, 69.152-54.

21   Letter from John B. Messenger, VP-Legal & Regulatory, YMax, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90 et al., at 3-4 (filed Feb. 6, 2012).

22   *Id.* at 1.

23   *Connect America Fund et al.*, WC Docket No. 10-90 et al., Order, 27 FCC Rcd 2142, 2144, para. 4 (WCB 2012) (*YMax II*).

Case No. 1:18-cv-00112-RM-MEH Document 152-23 filed 06/29/20 USDC Colorado pg 13 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

| | |
|---|---|
| 24 | *YMax II*, 27 FCC Rcd at 2144, para. 4 (citing *Transformation Order*, 26 FCC Rcd at 18026-27, para. 970). |
| 25 | *YMax II*, 27 FCC Rcd at 2144, para. 5. |
| 26 | *2015 Declaratory Ruling*, 30 FCC Rcd at 1604, para. 32. |
| 27 | *2015 Declaratory Ruling*, 30 FCC Rcd at 1600-01, paras. 27-28. |
| 28 | *2015 Declaratory Ruling*, 30 FCC Rcd at 1598, para. 23. |
| 29 | *Remand Order*, 841 F.3d at 1051-52. |
| 30 | *Remand Order*, 841 F.3d at 1051-54. |
| 31 | *Remand Order*, 841 F.3d at 1056. |
| 32 | *Remand Order*, 841 F.3d at 1052, 1056. |
| 33 | *Remand Order*, 841 F.3d at 1056. |
| 34 | CenturyLink Petition at 2-3. The Commission sought and received comments on CenturyLink's petition. *See* Pleading Cycle Established for CenturyLink Petition for Declaratory Ruling, WC Docket No. 10-90; CC Docket No. 01-92, Public Notice, 33 FCC Rcd 4954 (WCB 2018). Unless otherwise noted, all comments cited herein are responsive to this Public Notice. |
| 35 | CenturyLink Petition at 1-2. |
| 36 | AT&T Comments at ii, 20-23; AT&T Reply at 6-8; Verizon Comments at 5-7. |
| 37 | AT&T Comments at ii, 20-23. |
| 38 | *See, e.g.*, Letter from Curtis L. Groves, Associate General Counsel, Federal Regulatory and Legal Affairs, Verizon, to Ms. Marlene Dortch, Secretary, FCC, WC Docket No. 10-90 et al., at 3 (filed Nov. 28, 2018) ("In the two years since the D.C. Circuit vacated and remanded the 2015 VoIP Declaratory Ruling, disputes related to over-the-top VoIP traffic have proliferated, generating litigation in the courts, at state regulatory commissions, and at this Commission." (internal citations omitted)); *see also* Teliax Reply at 15; Verizon Reply at 2. |
| 39 | CenturyLink Petition at 3-4. |
| 40 | O1/Peerless Comments at 1-2. |
| 41 | O1/Peerless Comments at 3. |
| 42 | AT&T Reply at 12 n.22. |
| 43 | *See* 47 CFR § 51.913(b) ("This rule does not permit a local exchange carrier to charge for functions not performed ...."). |
| 44 | *Petitions for Reconsideration and Applications for Review of RAO 21*, Order on Reconsideration, AAD 92-86, 12 FCC Rcd 10061, 10066-67, para. 11 (1997) (*RAO Reconsideration Order*). The Responsible Accounting Officer (RAO) decisions consist of a Common Carrier Bureau letter providing cost accounting guidance for remote switching equipment, and a subsequent Commission-level reconsideration order of the letter. *Classification of Remote Central Office Equipment*, Letter Order, Responsible Accounting Officer, 7 FCC Rcd 5205 (CCB 1992). *RAO Reconsideration Order*, 12 FCC Rcd at 10066-67, para. 11; *YMax I*, 26 FCC Rcd at 5758, para. 43. |
| 45 | *RAO Reconsideration Order*, 12 FCC Rcd at 10066-67, para. 11 & n.27. |
| 46 | *Remand Order*, 841 F.3d at 1056; *see also* AT&T Comments at 1, 4-6; Verizon Comments at 4-5. |
| 47 | AT&T Comments at 2 (asserting that "longstanding terms of CenturyLink's own access tariff" also support the conclusion that the defining characteristic of end office switching is the connection of trunks to last-mile loop facilities). |
| 48 | *See YMax I*, 26 FCC Rcd at 5757, para. 41. |
| 49 | *See, e.g., Remand Order*, 841 F.3d at 1053-54 (holding that without interpreting the connection of lines and trunks to be part of end office switching, the Commission's functional equivalence analysis fails to distinguish between end office switching and tandem switching); *id.* at 1056 (holding that because the *YMax I* decision "represents the Commission's apparent understanding of the 'commonly understood meaning[]' of end-office switching around the time of the *Transformation Order*" and that understanding required end office switching to include interconnection, that "presents an additional problem with the Commission's attempted application of the *Transformation Order*'s functional equivalence standard"); *id.* (holding that if the Commission were to "cast off interconnection" as a requirement of end office switching it would need "to provide some distinctive 'functional equivalence' criterion in its place," but the *2015 Declaratory Ruling* failed to do so). |
| 50 | *Transformation Order*, 26 FCC Rcd at 18026, para. 970. |
| 51 | *Transformation Order*, 26 FCC Rcd at 18026-28, paras. 970-71. |
| 52 | *Transformation Order*, 26 FCC Rcd at 18026-27, para. 970. We thus find no basis for the assertion in the *2015 Declaratory Ruling* that that language from the *Transformation Order* demonstrated that the Commission adopted a new functional equivalence test. *2015 Declaratory Ruling*, 30 FCC Rcd at 1590, para. 6. |
| 53 | Our unwillingness to so quickly assume a change in policy as the *2015 Declaratory Ruling* did likewise accords with an agency's general administrative law obligation to acknowledge and explain changes in course. *See, e.g., CBS Corp. v. FCC*, 785 F.3d 699, 708 |

| | |
|---|---|
| | (D.C. Cir. 2015) ("When an agency departs from past practice, it 'must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."' (internal quotation marks and citation omitted)). |
| 54 | *Transformation Order*, 26 FCC Rcd at 18026, para. 970. The Commission's later assertion that the VoIP Symmetry Rule superseded or made irrelevant the *YMax I* decision makes no sense in light of the Commission's affirmation of *YMax I* when adopting the VoIP Symmetry Rule. *See 2015 Declaratory Ruling*, 30 FCC Rcd at 1604, para. 32. |
| 55 | *Transformation Order*, 26 FCC Rcd at 18009-13, paras. 946-953. |
| 56 | *See* Verizon Comments at 6 ("CenturyLink points to 'the Commission's preference for structural symmetry,' but that preference supports differentiating facilities-based from [over-the-top] providers due to the difference in investments."). We disagree with CenturyLink's assertion that our actions in this *Order* will provide a "competitive disincentive" to carriers that move to IP-based services and will otherwise hinder the transition to IP. *See* Letter from Joseph C. Cavender, Vice President & Assistant General Counsel, Federal Regulatory Affairs, CenturyLink, to Ms. Marlene H. Dortch, WC Docket No. 10-90 et al., at 6-9 (filed Dec. 4, 2019) (CenturyLink Dec. 4, 2019 *Ex Parte); see also* Letter from Robert H. Jackson, Counsel to Teliax, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 10-90 et al. at 3 (filed Dec. 4, 2019) (Teliax Dec. 4, 2019 *Ex Parte*). To the contrary, the Commission's "intercarrier compensation framework is intended to 'promote investment in and deployment of IP networks,'" and permitting a VoIP-LEC partnership to "mak[e] minimal investments in softswitches and the like and piggy-back[] on the far more extensive investments that facilities-based broadband Internet access providers have made" would contravene that goal. AT&T Comments at 20, citing *Transformation Order*, 26 FCC Rcd at 18025, para. 968. *See also* Letter from Alan Buzacott, Executive Director, Federal Regulatory and Legal Affairs, Verizon, to Marlene H. Dortch, WC Docket No. 10-90 et al., at 1 (filed Nov. 27, 2019). |
| 57 | *See, e.g., 2015 Declaratory Ruling*, 30 FCC Rcd at 1597-98, 1598-99, paras. 22, 24. |
| 58 | *See 2015 Declaratory Ruling*, 30 FCC Rcd at 1597, para. 22. We reject arguments that the continued presence of TDM in some aspects of providers' networks—particularly for 8YY calls—suggests either that we are not serious about promoting IP networks or that our policies in that regard have failed. Teliax Dec. 4, 2019 *Ex Parte* at 1-3. The migration to IP networks necessarily is a transition—not a flash cut—that has been, and remains, ongoing. Additionally, issues related to intercarrier compensation policies in other contexts, such as those related to 8YY calls, are more appropriately taken up in a proceeding where they are at issue. The Commission currently has an open proceeding focusing on intercarrier compensation issues related to the provision of 8YY services. *See 8YY Access Charge Reform*, WC Docket No. 18-156, Further Notice of Proposed Rulemaking, 33 FCC Rcd. 5723 (2018). |
| 59 | Contrary to Teliax's assertion that our interpretation of the VoIP Symmetry Rule discourages competition by treating over-the-top VoIP services differently than facilities-based VoIP services, we find that our approach is technologically neutral. *See* Teliax Dec. 4, 2019 *Ex Parte* at 3, 4-5. Carriers may be compensated for services they actually perform, and, as discussed above, we find that over-the-top VoIP-PSTN partnerships do not perform the functional equivalent of end office switched access. Having explained how the approach we take today aligns with the Commission's long-standing policy goals, we also take issue with Teliax's claim that our policy analysis relies on "high-level ... statements without hard analysis." Teliax Dec. 4, 2019 *Ex Parte* at 4. Moreover, unlike our approach today, the approach the Commission took in the *2015 Declaratory Ruling* was inconsistent with the policy goals set forth in the *Transformation Order*. As a result, while we conclude that our textual justification for our approach—coupled with the fact that it addresses the problems with the *2015 Declaratory Ruling* identified by the court—is a sufficient basis for our decision, we also find that our decision is strengthened by our policy analysis. |
| 60 | *Transformation Order*, 26 FCC Rcd at 17669, para. 9. |
| 61 | *See id.* at 1597-98, 1598-99, 1612-13, paras. 22, 24, 50. |
| 62 | We also disagree with the *2015 Declaratory Ruling's* characterization of the litigation surrounding the VoIP Symmetry Rule as arising because parties could not distinguish between facilities-based and over-the-top VoIP services. *2015 Declaratory Ruling*, 30 FCC Rcd at 1597, para. 22 & n.83; *see also* Letter from Joseph C. Cavender, Vice President & Assistant General Counsel, Federal Regulatory Affairs, CenturyLink, to Ms. Marlene H. Dortch, WC Docket No. 10-90 et al., at 2-5 (filed July 31, 2019); CenturyLink Dec. 4, 2019 *Ex Parte* at 5-6. We agree with AT&T that, because of the fundamentally different physical arrangements between facilities-based and over-the-top VoIP services, the two can be distinguished with relative ease. AT&T Comments at 24-25. We remind parties that, pursuant to the *Transformation Order*, providers may choose to use a variety of different methods to identify and track compensable VoIP-PSTN traffic for billing purposes. *See Transformation Order*, 26 FCC Rcd at 18020-22, para. 963; *see also* AT&T Comments at 24-26. Relatedly, we disagree with CenturyLink that in adopting the *Transformation Order*, the Commission adopted a "safe harbor" for determining what traffic would be subject to the new VoIP-PSTN compensation structure, much less that any such "safe harbor" "necessarily applied end office charges to OTT traffic." *See* Letter from Joseph C. Cavender, Vice President & Assistant General Counsel, Federal Regulatory Affairs, CenturyLink, to Ms. Marlene H. Dortch, WC Docket No. 10-90 et al., at 1-3 (filed May 23, 2019) (citing *Transformation Order*, 26 FCC Rcd at 18021-2, para. 963); CenturyLink Dec. 4, 2019 *Ex Parte* at 3. Rather, the Commission merely suggested various methods providers could use to determine how much traffic was subject to access charges. Nothing in the |

Case No. 1:18-cv-00112-RM-MEH   Document 152-23   filed 06/29/20   USDC Colorado   pg 15 of 15

IN THE MATTER OF CONNECT AMERICA FUND..., 2019 WL 7018968...

|   |   |
|---|---|
| | *Transformation Order* implies, let alone states, that providers opting to use these methods were entitled to end office access charges for any or all of their traffic. |
| 63 | *Remand Order*, 841 F.3d at 1052-53 ("[I]t is wholly arbitrary to say (without more) that the call set-up activity of VoIP-LECs is the functional equivalent of end-office switching but (implicitly) *not* the equivalent of tandem switching. Which is it—one, the other, or both?" (emphasis in original)). |
| 64 | Because this physical connection need not "correspond precisely to [[the technologies] used under a traditional TDM architecture," *Transformation Order*, 26 FCC Rcd at 18026-27, para. 970, our approach remains consistent with the *Transformation Order* without the need to jettison pre-*Transformation Order* precedent in the manner of the *2015 Declaratory Ruling. See 2015 Declaratory Ruling*, 30 FCC Rcd at 1600, para. 26 n.98 (citing the *Transformation Order*, 26 FCC Rcd at 18026-27, para. 970, and seeking to disregard prior Commission precedent on that basis). |
| 65 | We reiterate that providers, including over-the-top VoIP-LEC partnerships, may assess access charges for other access services they provide, such as dedicated transport access service or tandem-switched access service, to the extent they provide those services or the functional equivalent thereof. 47 CFR § 51.903(c), (i). Thus, VoIP-LEC partnerships are entitled to collect access charges for tandem switching and transport services, for example, only to the extent that they actually provide those services, or the functional equivalent of those services. *Cf.* Letter from Tamar E. Finn, Counsel to Bandwidth, Inc., to Marlene Dortch, Secretary, FCC, WC Docket No. 10-90 et al., at 2 (filed Dec. 5, 2019); Teliax Dec. 4, 2019 *Ex Parte* at 1. We leave carriers to determine the appropriate compensation for such services in accordance with their agreements and applicable tariffs. |
| 66 | *See, e.g.*, CenturyLink Petition at 3-4; Verizon Comments at 3; Teliax Reply at 15; Verizon Reply at 2. |
| 67 | Verizon Comments at 6. We therefore disagree with CenturyLink's assertion that our decision today runs counter to the technology-neutral approach the Commission took in the *Transformation Order. See* CenturyLink Reply at 2; CenturyLink Petition at 15-18; *see also* Teliax Dec. 4, 2019 *Ex Parte*. |
| 68 | *2015 Declaratory Ruling*, 30 FCC Rcd at 1598, para. 23. |
| 69 | *See, e.g., Business Data Services in an Internet Protocol Environment et al.*, WC Docket No. 16-143 et al., Report and Order, 32 FCC Rcd 3459, 3579-80, para. 284 & n.721 (2017) ("Neither the concept of technology neutrality nor of competitive neutrality requires the Commission to blindly treat all technologies or competitors identically, regardless of similarities or differences."). |
| 70 | *2015 Declaratory Ruling*, 30 FCC Rcd at 1596, para. 20 (citing *Transformation Order*, 26 FCC Rcd at 1813, 18025, 18026-27, paras. 953, 956, 970). |
| 71 | *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 667 (D.C. Cir. 2009) (internal citations omitted). |
| 72 | *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009) (*Fox*) (emphasis in original). |
| 73 | *Fox*, 556 U.S. at 513 (internal quotation marks omitted). |
| 74 | *Domestic Secs., Inc. v. SEC*, 333 F.3d 239, 249 (D.C. Cir. 2003) (internal citations omitted). |
| 75 | *See* CenturyLink Petition at 1-3; *see also* O1/Peerless Comments at 1-3; Teliax Comments at 4. |
| 76 | *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 59 (1983)*; Remand Order*, 841 F.3d at 1049. |
| 77 | *See, e.g., Remand Order*, 841 F.3d at 1049, 1052, 1056. |
| 78 | *See Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 536 (D.C. Circuit 2007) ("[T]here is no question that a declaratory ruling can be a form of adjudication.") (citation omitted) (*Qwest v. FCC*); *id.* at 539 ("We start with the presumption of retroactivity for adjudications."); *see also 2015 Declaratory Ruling*, 30 FCC Rcd at 1608, para. 41 (citing *Qwest v. FCC* and similar precedent). Where the Commission is resolving a matter addressed in a decision previously vacated by a court, a party's "reliance" on the previously vacated decision "is typically not reasonable, ... significantly decreas[ing] concerns about retroactive[ity]." *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1110 (D.C. Cir. 2001) (*Verizon*); *see also Verizon*, 269 F.3d at 1110 (finding that it was reasonable to apply a decision retroactively where "the agency orders on which the [providers] claim to have relied not only had never been judicially confirmed, but were under unceasing challenge before progressively higher legal authorities"); *Verizon*, 269 F.3d at 1111 ("[A] dministrative agencies have greater discretion to impose their rulings retroactively when they do so in response to judicial review, that is, when the purpose of retroactive application is to rectify legal mistakes identified by a federal court."). |
| 79 | *See Qwest v. FCC*, 509 F.3d at 540. |
| 80 | *See, e.g.*, Verizon Comments at 1; AT&T Reply at 10-11 (asserting that "neither O1/Peerless nor any other entity can point to any 'old law' that was "'reasonably clear")D'); AT&T Reply at 13 ("The law was clear that end office charges were not appropriate for over-the-top calls. If anything, it would be manifestly unjust to grant the Petition on a retroactive basis."). |
| 81 | *See* O1/Peerless Comments at 12-16; Bandwidth Reply at 12-17. |

2019 WL 7018968 (F.C.C.)

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.