# EXHIBIT 23

CONFIDENTIAL

1                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF COLORADO

2

3    _____
                                    )
     AT&T CORP.,                    )
4                                   )
     Plaintiff,                     )
5                                   )
     vs.                            )   Case No.
6                                   )   18-cv-00112-RM
     LEVEL 3 COMMUNICATIONS,        )
7    LLC,                           )
                                    )
8    Defendant.                     )
     _____)

9

10

11

                      ** CONFIDENTIAL **

12

13

14        30(b)(6) DEPOSITION OF LEVEL 3 COMMUNICATIONS

15           THROUGH ITS DESIGNATED REPRESENTATIVE

16                      JENNIFER TORRES

17                      Denver, Colorado

18                      August 28, 2019

19

20

21

22

23   Reported by:

24   MELANIE L. GIAMARCO, RMR, CRR, RPR, CSR

25   JOB NO.:  166465

CONFIDENTIAL

Page 2

1                    J. Torres

2                  August 28, 2019

3                     9:43 a.m.

4

5          30(b)(6) DEPOSITION OF LEVEL 3

6   COMMUNICATIONS THROUGH ITS DESIGNATED

7   REPRESENTATIVE JENNIFER TORRES, taken by the

8   Plaintiff, held at the law offices of Moye White,

9   1400 Sixteenth Street, 16 Market Square, Denver,

10  Colorado, before Melanie L. Giamarco, a Registered

11  Professional Reporter, Registered Merit Reporter,

12  Certified Realtime Reporter and Notary Public of

13  the State of Colorado.

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

1                       J. Torres
2      APPEARANCES:
3      SIDLEY AUSTIN
       Attorneys for Plaintiff:
4              1501 K Street, N.W.
               Washington, D.C.  20005
5      BY:   JUSTIN BENSON, ESQ.
               MICHAEL WARDEN, ESQ.
6
7      ARMSTRONG TEASDALE
       Attorneys for Defendant:
8              4643 South Ulster Street
               Denver, Colorado  80237
9      BY:   CHARLES STEESE, ESQ.
               DOUGLAS MARSH, ESQ.
10
11
       ALSO PRESENT:
12
               Carmel Gill, CenturyLink
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 18

1               J. Torres

2   have the court reporter mark our first exhibit,

3   which will be Level 3 Exhibit 1, and then show it

4   to the witness.  And I have what appears before me

5   to be AT&T Corp.'s Notice of Rule 30(b)(6)

6   Deposition.

7           (Exhibit 1 was marked for identification.)

8           Q.  Ms. Torres, have you seen this before,

9   this document?  Take a second to look at it, if you

10  need to.

11          A.  (Document reviewed.)  I have not seen

12  this particular document.

13          Q.  Okay.  Do you understand that Level 3,

14  your company, has designated you as with a

15  Rule 30(b)(6) deponent for today's deposition?

16          A.  Yes.

17          Q.  What does that mean to you?

18          A.  I don't know specifically.

19          Q.  I'm sorry.  You said you don't know

20  specifically?

21          So if you could flip to what's marked as

22  page 6 on that document, just so we're on the same

23  page, it says "Topics for Deposition" at the top.

24          A.  Yes.

25          Q.  Level 3's counsel has . . .

CONFIDENTIAL

Page 19

1          J. Torres

2          Have you ever seen this portion of the

3    deposition notice before?

4          A.  I have not.

5          Q.  Have you seen what's marked as Topic

6    Number 1 before?

7          A.  Let me read it.

8          Q.  Okay.

9          A.  (Document reviewed.)  Okay.  What -- I'm

10   sorry.  Can you ask your question again?

11         Q.  Just wanted to see if you've seen these

12   topics before, the list.  And it's going to be --

13   number 2 is the one that you've been designated as,

14   but I just want to see if you've seen this list

15   before.

16         A.  I have seen this list in a different

17   document layout.

18         Q.  Okay.  So take a look now at Topic 2,

19   which is what I understand one of the topics that

20   you've been designated to answer questions about

21   today.

22         You've seen that language before?

23         A.  (Document reviewed.)  I've seen that

24   topic, yes.

25         Q.  Okay.  You had mentioned a different

CONFIDENTIAL

Page 20

1          J. Torres

2   document format.

3          Can you describe that a little bit?

4          A.  It was a document that had similar

5   topics, and then it just had who was going to be

6   speaking to those topics within the paragraph.

7          Q.  I understand.  And you said "similar."

8          Was it paraphrased, the topic, or was it an

9   exact quotation?

10         A.  I don't know if they were the exact

11  statements in this document, but it was --

12         MR. STEESE:  I'll be helpful here.

13         MR. BENSON:  Okay.

14         MR. STEESE:  We provided objections, and in

15  addition to the objections, we identified the names

16  of the people that would be testifying.  I think

17  that's what she's talking about so we don't have to

18  spend time unnecessarily on that.

19         MR. BENSON:  Okay.

20         Q.  Well, let's just skip ahead to Topic 8.

21  And I just want to make sure that you've taken a

22  look at that.  That's another one that your counsel

23  has designated you as being the deponent for.

24         Does that look familiar to you?

25         A.  Yes, it does look familiar.

CONFIDENTIAL

Page 21

1          J. Torres

2     Q.   And Topic 9?

3     A.   Yes.

4     Q.   Are you prepared to give testimony on

5  Level 3's behalf on these topics today?

6     A.   I am.  Can I ask one clarification

7  point?

8     Q.   Sure.

9     A.   On Topic 2, it states, "and Level 3's

10 decision to agree to that figure."  And I want to

11 make clear that Level 3 has never agreed with that

12 65 percent figure.  So I just want to make sure

13 that that's clear in that statement.

14    Q.   Okay, Ms. Torres, thank you.  These are

15 the topics that we are prepared to discuss today.

16 We'll have some questions about that, but . . .

17    A.   Okay.

18    Q.   Did you know that Level 3 has designated

19 Mr. Andrew McClure to answer questions regarding

20 the other topics?

21    A.   Yes.

22    Q.   Did you discuss this deposition notice

23 with Mr. McClure?

24    A.   Very briefly.

25    Q.   In person?

CONFIDENTIAL

Page 37

1                       J. Torres

2    before?

3            A.   I have.

4            Q.   Did you review it to prepare for today?

5            A.   I did.

6            Q.   Just for foundational purposes, can you

7    flip to page -- we'll use the top court-filing

8    document information, page 10 of 17.

9            A.   Okay.

10           Q.   And do you see that Level 3 and AT&T

11   both executed this document in May of 2015?  Is

12   that correct?

13           A.   That is correct.

14           Q.   And just for simplicity's sake, I'm

15   going to refer to this as the 2015 settlement

16   agreement.  Does that make sense?

17           A.   It does.

18           Q.   Generally, what was the settlement

19   agreement about, Ms. Torres?

20           MR. STEESE:  Objection; form, foundation.

21           Q.   You can answer the question.

22           A.   Generally, it was about outstanding

23   disputes with AT&T from Level 3 billing.

24           Q.   By executing the agreement back in

25   May of 2015, did Level 3 understand that it was

CONFIDENTIAL

Page 38

1                        J. Torres

2   agreeing to the terms of the settlement agreement?

3           MR. STEESE:  Objection to form; calls for a

4   legal conclusion.

5           Q.  You can answer the question.

6           A.  The business decided -- the business

7   knew that they were agreeing to this, yes.

8           Q.  And everything in the agreement was

9   agreed to by Level 3; is that correct?

10          MR. STEESE:  Same objection.

11          A.  Yes.

12          Q.  Does that include what is on page 2 of

13  17 in the paragraph that has a capital B next to

14  it, the language "which has historically been

15  approximately sixty-five percent of overall billing

16  for end office switching"?  Does that agree -- was

17  that agreed to by Level 3?

18          A.  For settlement purposes, to close out

19  two months of billing, we were stating that the

20  historic disputes from AT&T had been 65 percent.

21          Q.  Okay.  We're going to drill in on that

22  language a little bit more, but . . .

23          MR. WARDEN:  Can we take a two-minute break,

24  please, or five minutes?  However long you want.

25          MR. STEESE:  That's fine.

CONFIDENTIAL

Page 48

1        J. Torres

2        Q.  And that began around 2011 or 2012?

3        A.  Yes.

4        Q.  And just to clarify, again, what was

5   your role in 2011, 2012?

6        A.  2011, 2012.  So I was working on our

7   product team and oversaw our voice products and

8   working with our regulatory teams and handling the

9   negotiations between carriers who had disputes on

10  our end-of-carrier compensation bills.

11       Q.  So you were aware of the 2011, 2012,

12  beginning of the disputes from AT&T?

13       A.  Yes.

14       Q.  At that time period, you were aware?

15       A.  At that time.

16       Q.  And then you said -- and we're still

17  talking about the word "historically."

18       So you gave two endpoints.  You said the

19  beginning of the disputes and then to the signing

20  of the settlement agreement in 2015.

21       Is that a correct representation of your

22  testimony?

23       A.  Yes.

24       Q.  So historically, from Level 3's

25  position, means the 2011-2012 time period to the

CONFIDENTIAL

1               J. Torres

2      signing of the settlement agreement?

3          A.  To clarify, we're saying here that the

4      OTT dispute has historically been approximately 65

5      percent.  So yes, the OTT dispute, in that time

6      frame, had been 65 percent.

7          MR. WARDEN:  I'm sorry.  Can I have that

8      question and answer read back, please?

9          MR. STEESE:  Counsel, you're not the person

10     taking the deposition, respectfully.  And you are

11     interjecting inappropriately in the deposition.

12     Your counsel, your colleague, is the one that

13     should be participating, not you.  You're an

14     observer.

15         MR. WARDEN:  Chuck, I will do what I need to

16     do.  I want to have the question and answer read

17     back.  That's all I request.

18         (A discussion was held off the record.)

19         Q.  (By Mr. Benson)  So, Ms. Torres, take a

20     look at the language of the clause that begins

21     before, and read -- if you could read that out for

22     the record, that'd be great.  So it's the first two

23     words of "Seventy-five."

24         A.  I'm sorry.  Can you repeat where you

25     want me to read?

CONFIDENTIAL

Page 50

1              J. Torres

2         Q.  Yeah.  So begin with the first two

3    words, "Seventy-five," which is on the second line

4    of that paragraph.

5         A.  So we're focusing on section B still?

6         Q.  Mm-hmm.  That's correct.

7         A.  So "Seventy-five percent of the amount

8    of the switched access usage charges for traffic

9    that is subject of the OTT Dispute billed by

10   Level 3."

11        Q.  Okay.  So it says, "the amount of the

12   switched access usage charges"; is that correct?

13        A.  Yes.

14        Q.  And then after the comma, it says,

15   "which has historically been approximately

16   sixty-five percent of overall billing for end

17   office switching"; is that correct?

18        MR. STEESE:  Objection; form.

19        A.  That's what the words say, yes.

20        Q.  Are those the words that Level 3 agreed

21   to?

22        A.  Yes.

23        Q.  So now I'd like to ask a little bit

24   about the process that Level 3 did to come to an

25   agreement with AT&T on this language.

CONFIDENTIAL

Page 51

1          J. Torres

2      So, generally, what did Level 3 do to

3  determine that OTT VoIP had been 65 percent of

4  historical billing for end-office switching?

5      MR. STEESE:  Objection; form, foundation,

6  misstates testimony.

7      A.  Level 3 does not -- had never

8  historically, or at this time, believed that OTT

9  traffic was 65 percent of their traffic.

10      Q.  So -- but that unfortunately wasn't the

11  question.

12      What did Level 3 do to agree to this

13  language that we're just discussing now?

14      MR. STEESE:  Okay.  I'm going to object on

15  attorney-client -- to the extent that calls for

16  client communications if the inclusion of this

17  relates to communications with counsel.  I think

18  you meant something else, but your question

19  suggests that it -- or very directly implies that

20  it would require a discussion of counsel -- require

21  a description of a discussion with counsel, better

22  said.  So I'm going to instruct her not to answer.

23  But I think the question you're asking is one she

24  can answer.  It was just said poorly.

25      Q.  I think we can just generally state that

CONFIDENTIAL

Page 52

1                           J. Torres

2    I'm not asking for privileged communications

3    between your counsel, your in-house counsel or your

4    outside counsel.

5            All I'm asking is, what did Level 3 do to

6    come to an agreement on this 65 percent?  And

7    that's not asking for, Did you ask your counsel is

8    this okay to agree to?  It's asking, What were the

9    mechanics that Level 3 undertook to come to this

10   percentage?

11           A.  Well, this percentage was only being

12   used for settlement purposes.

13           Q.  Okay.  So did Level 3 not do anything to

14   come to a number that was being used for settlement

15   purposes?

16           A.  We were using numbers that the disputes

17   had been based off of that AT&T had told us, so it

18   was a familiar number to AT&T.  It was what we were

19   being told was short paid, and so it was the number

20   we had to use to come to an agreement and a

21   settlement.

22           Q.  So let's just unpack that a little bit.

23           Short paid.  What does that mean?

24           A.  AT&T was not paying Level 3 for invoices

25   rendered.

CONFIDENTIAL

Page 53

                        J. Torres

1

2      Q.   And so Level -- AT&T was not paying for

3   65 percent of the invoices that were being sent by

4   Level 3.  Is that what was happening?

5      A.   There was much more short-paid balances

6   than just that.  AT&T was very good at short-paying

7   invoices and not being clear about why they were

8   short-paying invoices.

9      When we were settling this OTT topic, we had

10  been told on a couple occasions via a written

11  letter that AT&T was short paying 65 percent for

12  OTT.  So the 65 percent was what we were assuming

13  some of the short-paid balances were towards OTT in

14  the amount of 65 percent.  There were other

15  outstanding balances that AT&T had not paid as

16  well.

17     Q.   But for other disputes?

18     A.   We didn't know.  We didn't have disputes

19  filed, and so, to us, it was just a short-paid

20  balance in whole.

21     Q.   So how -- I just want to ask a direct

22  question.

23     How did Level 3 arrive at the 65 percent?

24  And I may know the answer, but just say.

25     A.   We arrived at 65 percent because that

CONFIDENTIAL

Page 54

1                          J. Torres

2     was the dispute we received from AT&T that we need

3     to be able to settle.

4          Q.  So Level 3 accepted the 65 percent that

5     had been proposed by AT&T?

6          A.  Level 3 used the 65 percent as a

7     framework to know what settlement had to be based

8     off so we could tell AT&T how much money had to be

9     paid to close out this dispute.

10         Q.  You mentioned a written letter.  Can you

11    give a little detail about that?

12         A.  There was a letter received from Level 3

13    by AT&T informing us that there was an OTT dispute,

14    and that they were estimating that 65 percent of

15    our traffic was OTT in nature.

16         Q.  I just want to make sure.

17         Level 3 received the letter that was from

18    AT&T?

19         A.  Correct.  Yes.

20         Q.  Do you know when that letter was

21    received?

22         A.  That was the original information that

23    we received in that 2011-2012 time frame.

24         Q.  Have you seen that letter recently?

25         A.  I believe it was one that I did look at

CONFIDENTIAL

Page 70

                              J. Torres

1

2    the 65 percent figure, AT&T would be withholding a

3    substantial sum of money from Level 3?

4         MR. STEESE:  Objection; form.

5         A.  When you say Level 3 agreed to 65

6    percent, where are you speaking to that Level 3

7    agreed to that?

8         Q.  The language in the settlement agreement

9    in paragraph B on page 2.

10        A.  Okay.  So just to be clear, Level 3 was

11   agreeing that AT&T would pay 75 percent of a

12   historically disputed balance to make sure that we

13   could close only two months of billing.

14        Q.  Ms. Torres, does the word "balance"

15   appear in paragraph B?

16        A.  The word "balance" does not, no.

17        Q.  Okay.  Take yourself back to the 2015

18   time period.

19        Did Level 3 understand that, at the time, it

20   might not have recovered any funds withheld by AT&T

21   because the FCC may have ruled against Level 3 in

22   terms of the OTT dispute?

23        A.  Can you ask your question again?

24        Q.  Sure.  As you know, Level 3 and AT&T had

25   a dispute about whether or not it could -- Level 3

CONFIDENTIAL

1          J. Torres

2     could charge AT&T for switch-access charges and

3     office charges, excuse me, on OTT traffic in 2015.

4     Based on this settlement agreement, AT&T was going

5     to continue to withhold sums of money.

6          Did Level 3 understand that?

7          MR. STEESE:  Objection; form, misstates the

8     document.

9          A.  The document actually says AT&T will pay

10    the money going forward.

11         Q.  Other portions of the document talk

12    about going-forward fees; is that correct?

13         A.  Let me review the document.

14         (Document reviewed.)  If I look at section

15    1(a) and go into section (ii), so it says, "For

16    switched-access traffic exchanged by the Parties

17    beginning on June 1, 2015, AT&T shall pay Level 3

18    its applicable switched access tariffed rate for

19    OTT traffic, pursuant to the terms of the OTT

20    Declaratory Order."

21         Q.  And then the next sentence?

22         A.  "For avoidance of doubt, this Settlement

23    Agreement shall not prohibit AT&T from disputing

24    Level 3's billing for switched-access traffic for

25    reasons unrelated to the requirements of OTT

CONFIDENTIAL

Page 72

1                    J. Torres

2    Declaratory Order, including but not limited to

3    disputes regarding volumes or applicable rates."

4        Q.  Okay.  With all of these questions and

5    this discussion in mind, I just want to clarify

6    what Level 3's position is.

7            Is Level 3's position -- and if I

8    mischaracterize Level 3's position, feel free to

9    let me know -- that the 65 percent figure contained

10   in the settlement agreement was never actually

11   supported by any data?

12       A.  That is correct.

13       Q.  Would you say -- or is it Level 3's

14   position that the 65 percent was a reasonable

15   estimate of the OTT traffic?

16       A.  We never believed it was a reasonable

17   estimate of the OTT traffic.

18       Q.  Why would Level 3 agree to include this

19   language if it never believed that it was a

20   reasonable estimate?

21       MR. STEESE:  I'm going to instruct the

22   witness not to answer that question to the extent

23   it would require communication with counsel.

24           Otherwise, you can answer the question.

25       A.  For settlement purposes, we needed to

CONFIDENTIAL

Page 73

1                      J. Torres

2    have a framework between the two companies to

3    understand what would be paid and what would be

4    credited in order to be able to settle balances

5    through a certain date and everybody -- you know,

6    have it be final.

7         And so by us using "65 percent" in the

8    settlement language, it was common language to

9    AT&T.  It was -- you know, we were trying to look

10   at it from their perspective to be able to

11   understand how we could establish the framework for

12   payment.  So we were agreeing to use 65 percent as

13   a settlement number to establish framework for

14   paying -- for a payment from AT&T to Level 3.

15        Q.  Was that framework just for historical

16   amounts?

17        A.  Well, as you can see in the document,

18   the 65 percent that we put in the document was to

19   be only to close the two particular months of

20   billing, and that was the basis for putting 65

21   percent in that paragraph, for the historic stuff.

22   We based it off the historic short-paid amounts and

23   communications that AT&T had given us.

24        Q.  So all of AT&T-provided data and numbers

25   and positions, not any of Level 3's independent