**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

      Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

      Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

      Counterclaim Defendant.

---

**RESPONSE TO AT&T & TCG'S MOTION TO**
**EXCLUDE CERTAIN TESTIMONY OF ANDREW McCLURE**

---

      Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), respectfully respond in opposition to the Motion of AT&T and TCG (collectively, "AT&T") to Exclude Certain Testimony of Andrew McClure (ECF No. 141).

**I.**      **BACKGROUND**

      As extensively briefed elsewhere, this action involves end office switched access charges assessed on OTT-VoIP traffic. Level 3 and AT&T entered into a Settlement Agreement in 2015

that required AT&T to pay Level 3's end office charges on OTT traffic unless and until an FCC order instructing that such charges were valid was overturned "and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review." *See* ECF No. 151-4 (MSJ Ex. 1—2015 Settlement Agreement) § 1(a)(iv). If and when that happened, Level 3 would refund ███████ of the charges "to the extent they should not have been charged in accordance with the Final Appellate Order," and the Parties would thereafter bill and pay for traffic "in compliance with the terms of that order." *Id.*

Such an order has now been issued—though the parties dispute when that occurred, which in turn means the parties disagree on when the refund duty came into being. What is not disputed, however, is that AT&T is entitled to a refund only to the extent the traffic at issue was OTT. *See* ECF No. 151-7 (MSJ Ex. 11—A. Burgess Depo.) at 208:24–209:6; ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 2(a); ECF No. 152-6 (MSJ Ex. 5—K. Meola Depo.) at 207:12–23 & 213:23–215:6. End office switched access charges assessed on non-OTT calls are undisputedly valid; likewise, the Settlement Agreement expressly permits Level 3 to bill end office switched access charges on all such calls with a Level 3 telephone number. *See* ECF NO. 152-6 (MSJ Ex. 5—K. Meola Depo.) at 211:4–24; ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 10.

This raises the question of how much of Level 3's traffic was OTT. AT&T has suggested that 65 percent of Level 3's traffic is OTT, based on a provision of the Settlement Agreement stating that "the amount of the switched access usage charges for traffic that is the subject of the Dispute billed by Level 3 . . . has historically been approximately sixty-five percent (65%) of overall billing for end office switching." *See* ECF No. 151-4 (MSJ Ex. 1—Settlement

Agreement) § 1(a)(i)(B). But AT&T admits it has no facts to show that Level 3 traffic was ever 65 percent OTT. *See* ECF No. 151-7 (MSJ Ex. 11—A. Burgess Depo.) at 124:3–11.[1] According to both parties, the purpose of the 65 percent figure in the 2015 Settlement Agreement was not to establish that Level 3's traffic was 65 percent OTT, but rather to recognize that AT&T had historically disputed and withheld 65 percent of Level 3's end office switched access charges, and that the parties had used this percentage as a reference point in the past. *See* ECF No. 151-7 (MSJ Ex. 11—A. Burgess Depo.) at 10:9–24 & 154:16–155:12; ECF No. 152-24 (MSJ Ex. 23— J. Torres Depo.) at 50:23–54:9. As all parties acknowledge, by signing the Agreement, Level 3 was not claiming that, as of May 2015, 65 percent of its end office billings were for OTT traffic. ECF No. 151-7 (MSJ Ex. 11—A. Burgess Depo.) at 122:5–16; ECF No. 152-24 (MSJ Ex. 23—J. Torres Depo.) at 48:11–49:6.

Nevertheless, AT&T started to withhold 65 percent of Level 3's end office charges in 2017. *See* ECF No. 151-7 (MSJ Ex. 11—A. Burgess Depo.) at 134:3–12; ECF No. 152-21 (MSJ Ex. 20—J. Torres Depo.) at 318:25–319:16. In fact, AT&T's withholdings in 2019 and 2020 exceed Level 3's total end office billings. *See* ECF No. 151-19 (MSJ Ex. 28—Declaration of M. Kellow) ¶ 6. In every circumstance, therefore, AT&T has over-withheld millions of dollars, and AT&T owes payment to Level 3, not the other way around. *See id.* ¶ 8.

To determine what AT&T should have been paying Level 3, and the credit to which AT&T is now entitled (and what AT&T now owes Level 3 due to its significant over-

---

[1] This 65 percent figure traces its origins back to a 2013 Settlement Agreement that assumed 65 percent of Level 3's traffic was OTT because the parties "had been unable to determine the volume of Level 3 traffic that was OTT." *See* ECF No. 151-15 (MSJ Ex. 24—K. Meola Depo. Ex. 6) (2013 Settlement Agreement) § 2.16; *see also* ECF No. 151-7 (MSJ Ex. 11—A. Burgess Depo.) at 99:22–100:25 (admitting that AT&T did not know Level 3's OTT percentage).

withholding), Andrew McClure, [2] an employee of Level 3, calculated the percentage of Level 3's traffic that was OTT since January 1, 2019.[3] To do this, Mr. McClure identified all minutes of use for Level 3 telephone numbers ("TNs") for which Level 3 assessed end office charges to AT&T since January 2019, the beginning of the damages period. *See* ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 10. He then assigned to each customer an OTT percentage factor, ranging from zero percent to one hundred percent, based on how much of the customer's traffic is OTT.

As AT&T's own expert acknowledges, identifying the OTT percentage of a customer's traffic is not always a straightforward exercise: "Local carriers . . . cannot always readily distinguish between over-the-top VoIP calls and other types of calls." ECF No. 152–33 (MSJ Ex. 30—P. Pfautz Opening Disclosure) ¶ 5; ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 5. For some customers, it is known that one hundred percent of their traffic is OTT, and so end office charges would not apply to any of their traffic. Many of Level 3's customers are also enterprise class customers, where Level 3 provisioned a facility to the end user's premises; in such cases, AT&T agrees that end office charges always apply. *See* ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 5; ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 47:10–49:25. Other than in these two scenarios, as AT&T's own expert also acknowledges, the only way to find out a customer's OTT percentage is to reach out to the

---

[2] Mr. McClure is both an expert and fact witness. In fact, he was deposed three times in this case—as an individual fact witness, as a 30(b)(6) witness, and as an expert witness. *See* ECF No. 151-31 (MSJ Ex. 29—Declaration of Andrew McClure) ¶ 8.

[3] The parties entered into a separate settlement agreement that resolved claims for damages relating to Level 3's billings to AT&T prior to January 1, 2019. *See* ECF No. 152-1, MSUMF ¶ 7.

customer and ask. ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 51:24–52:16, 138:15–22.

Mr. McClure did just that in 2017 as part of efforts predating this lawsuit to determine Level 3's OTT percentage, reaching out to customers whose traffic potentially included some OTT traffic to ask how much of their traffic was OTT. This allowed Mr. McClure to determine an OTT factor for these customers.[4] In 2020, Mr. McClure compared that factor to the total minutes of traffic for the customer and using those two data points determined that Level 3's overall OTT traffic percentage is █ percent. *See* ECF No. 151-25 (MSJ Ex. 32—Exhibit 2 to Level 3's Rule 26(a)(2)(C) Disclosure).

AT&T's critique of Mr. McClure's analysis is remarkably narrow. Unsurprisingly, AT&T does not complain where Mr. McClure assigned an OTT factor of 100%, assuming all traffic associated with that customer was OTT. AT&T also acknowledges that it is appropriate to assume that zero percent of enterprise-class customers' traffic is OTT.[5] The "biggest concern"

---

[4] In 2020—after the FCC's decision finding that end office charges did not apply to OTT traffic—Mr. McClure did not reach out to customers again because customers have no obligation to provide this information to Level 3, or any other carrier for that matter. *See* ECF No. 151-16 (MSJ Ex. 25—McClure Dec) ¶¶ 6–7. The industry has not yet determined how or even whether customers must calculate this information. *Id.* As will be explained later in the brief, Mr. McClure did reach out to one large customer who refused to provide its OTT percentage because it was not required to do so. *See infra* app. 16–17.

[5] It could hardly do otherwise. AT&T's own expert was willing to accept that 100 percent of AT&T's enterprise class customers had no OTT calling based on representations from AT&T, without obtaining the names of AT&T's customers, evaluating those customers, or performing any independent research. *See* ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 215:3–229:23. To calculate its percent OTT, AT&T only evaluated whether the customer had the ability to utilize "nomadic" telephone numbers, meaning make calls from various locations over a third-party internet connection. *See* ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶¶ 3(a), 8; ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 106:14–115:22, 118:5–120:10, 222:8–229:23. AT&T determined that only calls flowing over its BVoIP network could support nomadic telephone calling; as a result, it presumed calling over its traditional network was zero percent OTT. *See* ECF No. 152-36 (MSJ Ex. 33—J. Gallagher Depo.) at 78:18–79:10. AT&T

raised by AT&T's expert about Mr. McClure's OTT analysis—and effectively the only concern raised in its Motion—is the method that Mr. McClure used to gather percent OTT from individual Level 3 customers. ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 141:12–15. But the percentages that Mr. McClure obtained from customers had effectively no impact on Level 3's percent OTT. If Mr. McClure assumed that 100 percent of the calling associated with customers he reached out to was OTT, Level 3's OTT percentage would increase from █ percent to █ percent. ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 12. Indeed, AT&T's complaint has so little impact on the lawsuit that Level 3's damages analysis assumes 100 percent OTT calling for all of these customers. *See* ECF No. 151-19 (MSJ Ex. 28—Declaration of M. Kellow) ¶¶ 7–8.

AT&T's expert also questioned the factor Mr. McClure assigned to certain specific Level 3 customers. Specifically, in in his 2017 analysis, Mr. McClure reported three entities as having zero percent OTT—███████████████. ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 13. Level 3 no longer has a relationship with ████████; as such, the concern about ██████████ has no bearing on data from 2019 forward. *Id.* ¶ 13(b). Mr. McClure also determined that ████████ is not an OTT provider because Level 3 provides ████████ with facilities at ████████ premises, and all calls flow over the facilities Level 3 provisioned and provided to ████████. *See* ECF No. 151-24 (MSJ Ex. 31—A. McClure

---

did not consider the business plan of any of its enterprise class customers, and whether they created the potential for OTT calling. *See* ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 3; ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 106:14–109:6. AT&T's expert concluded that AT&T's method for determining percent OTT was reasonable. *See* ECF No. 151-23 (MSJ Ex. 23—P. Pfautz Opening Report) ¶ 8. It was therefore reasonable for Mr. McClure to make these same assumptions for Level 3's own enterprise class customers.

6-11-2020 Depo.) at 127:12–137:8; ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 13(c). AT&T acknowledges that when calls flow over facilities Level 3 provisioned at the customer's premises to Level 3's end office, end office charges apply. *See* ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 101:14–23; 104:17–105:9. Finally, both parties acknowledge that ███ is not a pure OTT provider. *See* ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 13(d); ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 151:15–154:20.

In addition, in deposition, AT&T asked Mr. McClure about four additional customers: █████████████████████. *See* ECF No. 151-24 (MSJ Ex. 31—A. McClure 6-11-2020 Depo.) at 125:13–126:18; ECF No. 151-31 (MSJ Ex. 29—A. McClure Dec.) ¶ 9. During the deposition, Mr. McClure could not recall the specifics of ██████████████, but explained that ██████ was appropriately classified at zero percent OTT. *See* ECF No. 151-24 (MSJ Ex. 31—A. McClure 6-11-2020 Depo.) at 108:14–21, 11:8–12, 121:15–23. Mr. McClure has since familiarized himself with the other customers, and determined that while ██████ and ███ are appropriately categorized at zero percent OTT, ██████ may have the ability to provide some OTT functions. *See* ECF No. 151-31 (MSJ Ex. 29—A. McClure Dec.) ¶¶ 10–15.

But these issues likewise barely move the needle. To eliminate all of AT&T's stated concerns, after his deposition Mr. McClure re-evaluated all customers who had meaningful minutes of traffic delivered to AT&T and concluded as follows:

> 17. After my June 11, 2020 deposition, I went back and reevaluated all of Level 3's customers through Row 125 to Exhibit 2 to my disclosure, including all customers with up to or over ████████ minutes of traffic. Customers below this level are so small that they do not meaningfully impact percentage OTT. In this review, with one exception, I found the following.



a.   The customers are enterprise class customers (i.e., ███████ ███████) with no nomadic telephone numbers; or

b.   The customers are traditional facilities based providers (i.e., ███████), using Level 3 telephone numbers; or

c.   The customers are wholesale (i.e., ██████████) without any OTT capability.

18.   The exception is ███████████. In re-reviewing this customer, I have concluded that they are an OTT provider. I will assume that 100 percent of is ██████ traffic OTT. Upon making this correction, Level 3's OTT percentage stays at █ percent.

19.   Even if I assumed that one hundred percent of the traffic of ██████, ████████████ was OTT, that would raise Level 3's OTT percent to █ percent.

20.   Furthermore, even if I assumed every possible doubt in AT&T's favor, Level 3's OTT traffic would still be a fraction of what AT&T claims it is. Specifically, if I assume the following percentages of traffic for the following categories of customers,

a.   **100 percent** for all customers previously assumed to have at least ██ percent OTT or a larger percentage of OTT, plus ████

b.   ██████ for cable customers, an assumption which, as I explained in my deposition, is too high because they are facilities based providers principally serving residential customers, and even business customers use nomadic telephone numbers less than 2 percent of the time (*see* McClure 6-11-2020 Depo. at 109:14–110:5);

c.   ██████ for ██████ is an exact calculation; and,

d.   **0 percent** for all remaining customers, who are either enterprise class customers for whom AT&T agrees it is reasonable to assume zero percent OTT; wholesale customers whom I have evaluated to have 0 percent OTT; facilities-based carriers who use Level 3 telephone numbers; Level 3 entities known to have no OTT; or is identified as "NULL", which constitutes Level 3's network known to serve enterprise class customers and is incapable of having OTT or nomadic telephone numbers.

21.     Making each of those assumptions, Level 3's percent OTT would raise from ▮ percent to ▮ percent.

*See* ECF No. 151-31 (MSJ Ex. 29—A. McClure Dec.) ¶¶ 17–21. AT&T's own expert admitted in deposition that he did not have any evidence that Level 3's percent OTT is greater than ▮ percent. *See* ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 173:10–175:10; 176:7–16. Once again, these additional AT&T complaints have so little impact on the lawsuit that Level 3's damages analysis assumes a ▮ percent OTT factor, instead of the ▮ percent calculated by Mr. McClure. *See* ECF No. 151-19 (MSJ Ex. 28—Declaration of M. Kellow) ¶¶ 7–8.

AT&T has a few documents that comment upon Level 3's percent OTT, but AT&T's own expert acknowledges that none of these documents calculate a percent OTT or utilize an appropriate methodology to calculate Level 3's percent OTT. ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 4; ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 181:25–192:14. AT&T's expert did not even attempt to calculate a percent OTT for Level 3. ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 29:22–25. Mr. McClure is therefore the only person in this lawsuit who has calculated a percent OTT for Level 3 traffic as contemplated by the 2015 Settlement Agreement. *See* ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 4. Other than Level 3 and AT&T (which attempted to calculate its OTT percentage in mid-2019 as part of this case), no other carriers in the telecommunications industry have attempted to identify the percentage of its traffic that is OTT. ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 8; ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 58:18–59:15.

Given the narrow focus of AT&T's Motion on an immaterial issue affecting only a small percentage of Level 3's traffic—and especially where no one else has even tried to calculate Level 3's OTT percentage and in a case that will be tried to the Court—Mr. McClure's testimony

will be useful to the Court in evaluating the issues before it. His opinions therefore should be admitted.

## II.      ARGUMENT

### A.   STANDARD OF REVIEW

Federal Rule of Evidence 702 permits an expert witness to "testify in the form of an opinion or otherwise" where his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," so long as "the testimony is based on sufficient facts or data" and is "the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case."

"While expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)). The proponent of the testimony "need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community." *Dodge*, 328 F.3d at 1222 (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). "Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." *Dodge*, 328 F.3d at 1222.

As AT&T acknowledges, moreover (*see* Motion at 2 n.1), "the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Attorney Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). Thus, a district court has the discretion to apply a more "relaxed" *Daubert*

standard when expert testimony is offered at a bench trial. *Ramos v. Banner Health*, 426 F. Supp. 3d 815, 820 (D. Colo. 2019); *see also David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012)). "Where the gatekeeper and the factfinder are one—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).

**B.     AT&T'S NARROW OBJECTION TO DISCRETE ASPECTS OF MR. MCCLURE'S OPINIONS DO NOT JUSTIFY THE RELIEF AT&T HAS REQUESTED.**

AT&T requests that Mr. McClure be altogether "excluded from providing testimony regarding Level 3's OTT-VoIP percentage." Motion at 4. Yet the objections they raise concern only a small aspect of his testimony on OTT-VoIP percentage, focusing almost entirely on the process Mr. McClure used to determine the OTT percentage when he reached out to customers and asked for their percent OTT. If one assumes away every complaint AT&T raises about Mr. McClure's process in AT&T's favor, the result would be only a modest increase in Level 3's OTT traffic from ██ percent to ██ percent. In any event, as to these customers, AT&T's expert acknowledges that the only way to find out their percent OTT is to reach out and ask for it. ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 51:24–52:16, 138:15–22. That is exactly what Mr. McClure did. Thus, even the limited challenge AT&T raises fails: Mr. McClure based his conclusions on the best available information.

AT&T asks the Court to exclude the testimony of an individual who will appear as a fact witness in any event, based on challenges that are not only baseless, but also go to only a tiny fraction of the traffic at issue. Given that Mr. McClure will offer both fact and expert testimony to which AT&T's Motion offers no challenge whatsoever, the Court cannot simply preclude his testimony on OTT percentage altogether, as AT&T requests. Furthermore, given that this case

will be tried by the Court rather than a jury, even if the Court considered any of AT&T's concerns as worthy of its consideration, it should still hear Mr. McClure's testimony in its entirety and make any necessary decisions based on actual testimony, not a motion.

Level 3 therefore respectfully requests that the Court deny AT&T's Motion. Indeed, as Level 3 requested in its Motion for Summary Judgment, Level 3 asks that this Court find, based on the undisputed evidence, that Level 3's OTT percentage is no higher than 21 percent.

## C.   AT&T's Challenge on "NULL" Traffic is Baseless.

Tucked in the middle of AT&T's critique of Mr. McClure's customer contacting is a single paragraph referring to "NULL" customers, which represent ████████ of the ████████ minutes of use for which Level 3 assessed AT&T end office charges (or approximately ██ percent). *See* ECF No. 151-25 (MSJ Ex. 32—Exhibit 2 to Level 3's Rule 26(a)(2)(C) Disclosure). NULL represents aspects of Level 3's legacy network that (a) serve enterprise class customers, and (b) are incapable of carrying OTT traffic. *See* 6-11-2020 Deposition of Andrew McClure (attached as Exhibit A to Declaration of Andrew McClure ("Dec.") at 92:5–93:2. This is exactly what AT&T has done in calculating its own percent OTT.  AT&T determined that only calls that flow over its "BVoIP" network were capable of carrying OTT calls. *See* ECF No. 152-36 (MSJ Ex. 33—J. Gallagher Dep.) at 78:18–79:10.  As a result, AT&T determined that calls over its legacy networks—its functional NULL network—were zero percent OTT. This is exactly what Mr. McClure did.

Attached hereto is an additional declaration from Mr. McClure, which explains how he determined that none of the NULL network traffic could have been OTT:

> 6.     For many of these calls, an individual customer originates calls over a known facility, or trunk group. For each instance where a specific customer was

associated with a trunk group, I identified the exact number of calls and related minutes of use on a customer-by-customer basis.

7.     When a call was not associated with an individual customer, I collected these calls into one category which I called "NULL."  The minutes of use associated with the NULL and individual customer categories combined accounted for over 99 percent of Level 3's traffic to AT&T.

8.     To determine whether any "NULL" traffic was OTT, I ran queries against the database so I could identify where that traffic was coming from. After going through the largest trunk groups constituting 90 percent of the "NULL" traffic, I determined that they were network trunk groups associated with older legacy Level 3 networks—*i.e.*, networks Level 3 had acquired such as Time Warner, Global Crossing, or WilTel.

9.     The vast majority of these trunk groups are TDM circuit-switched networks, and are almost exclusively (over 99 percent) used for enterprise-class customers. As such, these networks are not capable of hosting "nomadic" telephone numbers or originating OTT traffic. As such, this traffic is appropriately classified as zero percent OTT.

Dec. ¶¶ 6–9. Mr. McClure described these facts in great technical detail in his deposition. *See id.* ¶ 10, Exhibit A.

In other words, Mr. McClure gathered a huge data set of all of the calls with a Level 3 TN that was delivered to AT&T since January 1, 2019.  He then studied that data by running searches or "queries" against the data to validate his findings. From that analysis, he determined that the NULL category was Level 3's legacy network serving enterprise class customers, was incapable of supporting nomadic calling,[6] and thus could not support OTT calling. He also acknowledged that his analysis was "easily repeatable." ECF No. 141-3 at 88:22–89:6.

Given the detailed description of the facts and data on which his testimony is based and the "reliable principles and methods" Mr. McClure used, the Court need not "simply accept

---

[6] In the deposition, the court reporter inaccurately transcribed the word "nomadic" as "pneumatic."

McClure's word," as AT&T insinuates. Motion at 15. This District has accepted expert testimony in almost an identical circumstance in the past without issue or concern. *Manchester Place HOA, Inc. v. Owners Ins. Co.*, 2017 WL 11096225, at *3–4 (D. Colo. 2017) (expert who "did not keep any record of the particular line items on which he excluded pricing information from a particular database" nevertheless "established that he used reliable principles and methods to develop his opinion" by stating he made his determination "using a database he considers to be reliable"). There is more than enough information setting forth Mr. McClure's methods and showing the Court that Mr. McClure has "reliably applied" these "reliable principles and methods" to the "facts of the case" such that his testimony on the NULL traffic may be admitted. Fed. R. Evid. 702.[7]

### D. MR. MCCLURE'S OPINIONS ON THE OTT PERCENTAGE OF THE CUSTOMERS HE CONTACTED, WHICH ARE A SMALL PORTION OF LEVEL 3'S OVERALL TRAFFIC, ARE BASED ON THE BEST AVAILABLE EVIDENCE.

Other than this baseless challenge to the NULL set, AT&T's Motion focuses exclusively on the customers to which Mr. McClure reached out to ask what percentage of their traffic was OTT. As described above, this has no meaningful impact on Mr. McClure's analysis. If Level 3 assumes that 100 percent of the calling associated with these customer's calling is OTT—as Mr. McClure did in his rebuttal report—Level 3's OTT percentage would increase from █ percent to █ percent. ECF No. 151-31 (MSJ Ex. 29—A. McClure Dec.) ¶ 19. Thus, the heart of AT&T's

---

[7] This is particularly so given that Mr. McClure is a non-retained expert, whose opinions were disclosed under Fed. R. Civ. P. 26(b)(2)(C). Disclosure of a *retained* expert requires a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness," and "any exhibits that will be used to summarize or support" the witness's opinions. Fed. R. Civ. P. 26(b)(2)(B). The disclosure of a *non-retained* expert, by contrast, need only state "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(b)(2)(C).

Motion has no material impact on the case at all.

AT&T's challenge fails for more fundamental reasons: Mr. McClure's methods for determining the OTT percentage for this small fraction of Level 3's traffic were appropriate—and, indeed, based on the best evidence available.

AT&T argues that provisions of Level 3's own tariff regarding "another VoIP factor used for billing"—also known as "percentage VoIP usage," or "PVU"—requires this PVU factor to be based on "verifiable" information from certain FCC forms 477, traffic studies, or actual call detail information. Motion at 16. In the OTT context, however, finding such "verifiable" information is easier said than done. As Mr. McClure observed, "[t]he FCC issued its OTT decision in December 2019. Normally, when factors are created (such as PIU or PVU), the industry comes together to determine how carriers should calculate the factors. Here . . . that has yet to occur, and may never occur." ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 6. Thus, to determine the extent to which Level 3's traffic is OTT, as AT&T's own expert acknowledges, Level 3 has no alternative but to ask customers to voluntarily provide it—which the customers are under no obligation to do. ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 51:24–52:16, 81:3–15, 138:15–22.

AT&T's own efforts in this very litigation illustrate the problem. In this case, AT&T subpoenaed four of Level 3's customers for Form 477s; two customers did not even have those forms. P. Pfautz Depo. (attached to Declaration of Charles W. Steese ("Steese Dec.") as Exhibit A) at 74:6–11. Given that he could not access the carriers' 477s, even AT&T's expert has no idea what percentage of OTT subscriptions are or are not contained in the Form 477s. *Id.* at 75:14–76:5. As Mr. McClure observed, "[t]here is no process in place informing customers how

to calculate their percent OTT. Thus, demanding 'verifiable' information is an exercise in futility. There is no way to obtain 'verifiable" information.'" ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 6. AT&T's expert agreed: if a Form 477 is not available, and the customer does not affirmatively identify which TNs are or are not OTT, "what's left is asking a customer to certify, you know, what their percentage of OTT is." Steese Dec. Ex. A (P. Pfautz. Depo.) at 79:11–80:16.

AT&T also complains that Level 3 did not contact most of its customers once again in 2019 after doing so two years earlier to obtain updated OTT percentages. Motion at 12. The suggestion that data from 2017 is unreliably stale is a strange one, considering AT&T stakes its entire case on its contention that 65 percent of Level 3's traffic is OTT—a number that derives from a settlement agreement from *2013*. *See* ECF No. 151-15 (MSJ Ex. 24—K. Meola Depo. Ex. 6) (2013 Settlement Agreement) § 2.16. Of course, even back then, AT&T had no idea whether that 65 percent figure was accurate. *See* ECF No. 151-7 (MSJ Ex. 11—A. Burgess Depo.) at 99:22–100:25. And it has no facts now to show that Level 3's OTT percentage was ever 65 percent. *See id.* at 124:3–11. If data from 2017 is "woefully out of date" (Motion at 12), then an even older figure—one that never reflected reality to begin with—is plainly useless.

AT&T nevertheless acknowledges that Level 3 did contact one customer in 2019: ██████. This, importantly, is a major customer. If one looks at the customers that AT&T has raised concerns about (i.e., after removing pure OTT providers, facilities based carriers and NULL traffic), ████████████ minutes of use singlehandedly accounts for approximately █████ of the Level 3 traffic that AT&T challenges. *See* ECF No. 151–25 (MSJ Ex. 32—Exhibit 2 to Level 3's Rule 26(a)(2)(C) Disclosure). Thus, it can hardly be said that

████████ is not representative on the factual question at issue.

Mr. McClure's interaction with ████████ was informative in other ways as well.  Level 3 sent a ████████ employee a small questionnaire, with "maybe two questions, three questions," to make responding to Level 3's request for information on OTT percentages less burdensome. ECF No. 141-3 at 63:6–19. As AT&T acknowledges, the ████████ employee, ███ ████████████████████████ and played a role in designing the methodology at issue. Motion at 10, n.11. With that background, one would expect ████████ to receive Level 3's request for updated information as or more favorably than any other given Level 3 customer. Yet ████████ flatly refused the request. His response, as Mr. McClure described it, was "I'm not going to document anything until I see mandate or something telling me I have to do this because I am concerned what I put down may obligate me in a way that that I'm not understanding." *Id.* at 63:20–25. Even ████████████████, as favorably disposed toward Level 3 as one could reasonably hope any of its customers might be, responded to Level 3's request for information on OTT percentage with hostility. This shows Mr. McClure's concerns about disrupting Level 3's business relationship is more than justified, and lends credence to his assertion that he "used the best method available to [him] at the time that would not disrupt Level 3's business relationship with the customer." ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 12(a).

For all of AT&T's complaints about verifiability, moreover, it is notable that AT&T did not even attempt to validate Mr. McClure's data. Nothing stopped AT&T from doing exactly what Mr. McClure did: contacting the customers to ask what their percentage of OTT traffic was. Yet its only attempt to do so was its subpoenas to customers for their Form 477s—which only confirmed that reliable evidence is not available through that avenue. Mr. McClure thus used the

best evidence that was available to him on this (ultimately insignificant) point.

**E.**   **AS AN EXPERT WITNESS, MR. MCCLURE MAY RELY ON THE KIND OF EVIDENCE ON WHICH EXPERTS IN THE FIELD WOULD RELY.**

AT&T also contends that Mr. McClure's expert opinion should be precluded because it relies on "inadmissible hearsay." Motion at 17. But "Federal Rule of Evidence 703 allows an expert witness to base his testimony upon facts or data that are hearsay, provided that those facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Wilson By & Through Wilson v. Merrell Dow Pharm. Inc.*, 893 F.2d 1149, 1153 (10th Cir. 1990) ("We have interpreted Rule 703 as allowing an expert to reveal the basis of his testimony during direct examination, even if this basis is hearsay, provided that the facts or data underlying his conclusions are of a type reasonably relied upon by others in his field of expertise."). AT&T's contention therefore begs the question, offering the question to be proven—whether Mr. McClure may offer such opinions as an expert—as proof of the question. The Court should reject this logical fallacy.

AT&T's claim that no telecommunications expert would rely on the same kind of information that Mr. McClure relied on also ignores the fact that no one else in the industry known to either party is even trying to determine OTT percentage. At present, besides Level 3, the only known carrier in the field who even tried to calculate its OTT percentage is AT&T, which simply assumed that it did not have any customers that performed carrier-like functions and that it therefore had zero percent OTT unless they had "Nomadic TNs"—which almost certainly underestimates its actual percentage. ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶¶ 3(a), 8, 22. If Level 3 did the same, its percent OTT would be less than one percent. *See* ECF No. 151-16 (MSJ Ex. 25—A. McClure Responsive Disclosure) ¶ 17. And

unlike in the PVU context, where members of the industry comply with developed industry standards to provide information necessary to calculate the PVU factor, in the OTT context, this information simply does not exist at this point in time.[8] Mr. McClure used the best information available to him. "If asked to do the same thing today, I would use similar methods unless or until the FCC mandates or the industry agrees upon a process to calculate percent OTT." ECF No. 151-16 (MSJ Ex. 25—A. McClure Response Disclosure) ¶ 12(a).[9]

F.    CONCLUSION

Mr. McClure's analysis is the only evidence anyone has tried to put forward on Level 3's actual OTT percentage. AT&T's only real challenge to that analysis is essentially immaterial, affecting the calculation by only a few percentage points. At any rate, his opinions are relevant, reliable, and useful. They should be admitted.

Level 3 therefore respectfully requests that AT&T's Motion be denied.

Respectfully submitted this 16th day of July, 2020.

---

[8] It probably never will exist. The FCC is in the process of transitioning its intercarrier compensation regime away from reciprocal compensation, where LECs like Level 3 assess charges to IXCs like AT&T, and toward a "bill-and-keep framework," under which "carriers look first to their subscribers to cover the costs of the network." *In the Matter of Connect America Fund*, 26 FCC Rcd. 17663 ¶ 34 (2011). In fact, the FCC already has issued a notice of proposed rulemaking that will "transition[ ] both inter-and intra-state originating end office . . . charges for 8YY calls to bill-and-keep." *In the Matter of 8YY Access Charge Reform*, 33 FCC Rcd. 5723, 5724 (2018). Literally 100 percent of Level 3's damages are for end office charges on 8YY traffic. It seems unlikely that the industry will go to the trouble of finding ways to calculate OTT percentage in order to verify charges that the FCC appears poised to do away with altogether in the short term.

[9] In fact, Mr. McClure's method for determining the percentage of OTT is substantially the same as the method for determining PVU, replicated as best as possible in the absence of industry standards requiring carriers to provide "verifiable" information. *See* 8-29-19 Deposition of Andrew McClure (Attached to Steese Dec. as Exhibit B) at 47:11–19, 51:6–13.

By:    <u>/s/ *Charles W. Steese*</u>
         Charles W. Steese, #26924
         Douglas N. Marsh, #45964
         Armstrong Teasdale LLP
         4643 South Ulster Street, Suite 800
         Denver, Colorado 80237
         Telephone: (720) 200-0676
         csteese@armstrongteasdale.com
         dmarsh@armstrongteasdale.com

*Attorneys for Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC*

### CERTIFICATE OF SERVICE

I, Charles W. Steese, hereby certify that on July 16, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael D. Warden
Michael J. Hunseder
Justin A. Benson
Joshua W. Moore
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mwarden@sidley.com
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com
E-mail: joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

/s/ *Charles W. Steese*
Charles W. Steese