# EXHIBIT A

## To Declaration of Charles W. Steese

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF COLORADO
 3
 4   AT&T CORPORATION,              ) Civil Action File No.:
 5            Plaintiff,            ) 18-cv-00112-RM-MEH
 6       vs.                        )
 7   LEVEL 3 COMMUNICATIONS, LLC,   )
 8            Defendant.            )
 9   _____ )
10
11             NON-CONFIDENTIAL PORTION
12   CONFIDENTIAL ATTORNEYS' EYES ONLY BOUND SEPARATELY
13                    PAGE 148
14                   PAGES 206-214
15
16        DEPOSITION OF PENN L. PFAUTZ, PH.D.
17                   VIRTUAL ZOOM
18              TUESDAY, APRIL 28, 2020
19
20
21   Reported by:
22   ASHALA TYLOR, CSR #2436, CLR, CRR, RPR
23   JOB NO. 4083362
24
25   PAGES 1 - 236
```

Page 2

1               UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF COLORADO
3
4   AT&T CORPORATION,              ) Civil Action File No.:
5           Plaintiff,             ) 18-cv-00112-RM-MEH
6       vs.                        )
7   LEVEL 3 COMMUNICATIONS, LLC,   )
8           Defendant.             )
9   _____)
10
11
12
13
14
15
16      Deposition of PENN L. PFAUTZ, PH.D., taken via
17   Zoom videoconference commencing at 8:08 a.m. (PST), and
18   ending at 3:05 p.m., on Tuesday, April 28, 2020, before
19   Ashala Tylor, CSR No. 2436, RPR, CRR, CLR.
20
21
22
23
24
25

Page 3

1  APPEARANCES OF COUNSEL:
2  On behalf of Plaintiff:
3      SIDLEY AUSTIN LLP
4      BY:  JUSTIN A. BENSON, ESQ.
5           MICHAEL J. HUNSEDER, ESQ.
6      1501 K Street, N.W.
7      Washington, D.C.  20005
8      202.736.8757
9      jbenson@sidley.com
10     mhunseder@sidley.com
11
12 On behalf of the Defendant:
13     ARMSTRONG TEASDALE LLP
14     BY:  CHUCK STEESE, ESQ.
15          DOUG N. MARSH, ESQ.
16     4643 South Ulster Street, Suite 800
17     Denver, Colorado  80237
18     720.200.0676
19     csteese@armstrongteasdale.com
20
21
22 Also Present:
23     Mark Hesse
24
25

Page 74

1    Q.   So form -- I'm fast-forwarding and I'll
2    get back to this later.  But one of the issues that
3    you suggest is use data from Form 477s as the basis
4    for determining a customer's percent OTT, correct?
5    A.   That's correct.
6    Q.   But are you aware that AT&T subpoenaed
7    four of Level 3's customers for Form 477s?
8    A.   I am.
9    Q.   Are you aware that two of them said we
10   don't have Form 477s?
11   A.   I'm aware of that.
12   Q.   So the Form 477 is not going to exist for
13   certainly every customer that is potentially
14   providing OTT-esque service, correct?
15   A.   There's an interesting question there.
16       So in theory, any voice subscriptions
17   should be indicated on some party on 477.  Now, you
18   know, there may be complexities about who is
19   responsible for the 477 with respect to a particular
20   telephone number.  And there may be some cases where
21   it's hard to get a 477.
22       But in my mind, the fact that in some
23   cases there was a problem doesn't indicate that it
24   might be -- doesn't indicate that it would not be,
25   generally speaking, a viable technique.

Page 79

1  BY MR. STEESE:
2      Q.  And so you know that Form 477s alone are
3  going to be inadequate to create percentage OTT
4  factor, correct?
5          MR. BENSON:  Objection.
6          THE WITNESS:  Can I answer?
7  BY MR. STEESE:
8      Q.  Yes.
9      A.  Yeah.  So I know they may be imperfect.  I
10 don't know whether they are inadequate.
11     Q.  And looking at -- you said data must be
12 verifiable.  If a Form 477 is not available and you
13 don't have the telephone numbers from your customer
14 identifying which TNs are or are not OTT, what
15 data -- what other data in your mind might be
16 verifiable?
17         MR. BENSON:  Objection.
18         Go ahead, Penn.
19         THE WITNESS:  So I haven't thought a lot
20 beyond that.  I think that in some of these cases
21 you will need to get data from customers, whether
22 that is via 477, which may be a generally acceptable
23 approach, although not perfect, or TN data, or some
24 other information that could be verified.  And I
25 can't say exactly what that was.  Perhaps you can

Page 80

1    query, ask for a certification of information.
2    BY MR. STEESE:
3        Q.   Okay.  So I was trying to get beyond TNs,
4    where you say OTT-specific TNs, and I'm trying to
5    get beyond the 477s.  And your answer talked about
6    both of them.
7            I'm saying, other than those two areas,
8    what other types of verifiable information could you
9    get?  And what you're saying is ask them for a
10   certification?
11       A.   That -- that would be, I guess, what's
12   left is asking a customer to certify, you know, what
13   their percentage of OTT is.
14       Q.   Is there anything else that you can think
15   of as you sit here?
16       A.   Not as I sit here.
17       Q.   And so if that category of information
18   would rely upon the customer providing you accurate
19   information as an input, that then would be put into
20   your system to determine when you could and could
21   not bill end office charges, correct?
22       A.   That's -- that's -- that's why we have
23   lawyers, to make sure that people stand behind the
24   assertions that they make.  And that, in principle,
25   I think entities have to have some information on