**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

       Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

       Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

       Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

       Counterclaim Defendant.

---

**AT&T & TCG'S RESPONSE AND ADDITIONAL FACTS AND SUPPORTING
EVIDENCE**

---

       Plaintiff/Counterclaim Defendant AT&T Corp. and Counterclaim Defendant Teleport
Communications Group (collectively, "AT&T"), by and through undersigned counsel,
respectfully submits this Response and Additional Facts and Supporting Evidence ("OSMUF")
in support of its Opposition to Defendants/Counterclaimant Level 3 Communications, LLC;
Broadwing Communications, LLC; Global Crossing Telecommunications, Inc.; and Wiltel
Communications, LLC's Motion for Summary Judgment (ECF No. 152).

                  *      *      *

| | Moving Party's Statement of Undisputed Material Facts ("MSUMF") and Supporting Evidence | Opposing Party's Response and Additional Facts ("OSUMF") and Supporting Evidence | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| | **Parties** | | |
| 1. | Level 3 Communications, LLC ("Level 3"), AT&T Corp. (AT&T), and Teleport Communications Group, Inc. ("TCG") are all Competitive Local Exchange Carriers, or CLECs. *See* ECF No. 124 ¶¶ 15, 17, 18; ECF No. 128 ¶¶ 15, 17, 18. | Undisputed as to Level 3 and TCG. AT&T Corp. is primarily an interexchange carrier; it has one tariff for a highly specialized access service but Level 3 does not claim and has adduced no evidence that it was billed by AT&T under this tariff.  ECF No. 128, AT&T Amended Answer, ¶ 49. | |
| | **2015 Settlement Agreement** | | |
| 2. | In a February 11, 2015 Declaratory Ruling, the FCC determined that local exchange carriers could assess end office switched access charges on over-the-top Voice over Internet Protocol (hereinafter "OTT") traffic. *See Connect America Fund*, WC Docket No. 10-90, et al., Declaratory Ruling, FCC 15-14 (rel. Feb. 11, 2015) (hereinafter "2015 OTT Declaratory Ruling"); *Exhibit 1* at 1, third whereas clause. | Undisputed. | |
| 3. | Level 3's interstate access tariff specifically defines "End Office Access Service" to include OTT-VoIP traffic and states that Level 3 is entitled to assess end office access charges on such traffic, stating as follows:<br><br>End Office Access Service: For the purpose of | Undisputed as to the language in Level 3's tariff.  Disputed as to the claim that the tariff entitles Level 3 to assess end office access charges on OTT VoIP traffic.  *See* ECF 149, AT&T Mot. For Sum. Jud. Part I.  Level 3's tariff | |

| | | |
|---|---|---|
| | this tariff, End Office Access Service shall mean: . . . (2) The routing of interexchange telecommunications traffic to or from the called party's premises, either directly or via contractual or other arrangements with an affiliated or unaffiliated entity, regardless of the specific functions provided or facilities used; or . . . (4) The origination and termination of interexchange telecommunications traffic to any end user, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as defined in 47 U.S.C. § 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. § 153(36), that does not itself seek to collect reciprocal compensation charges prescribed by this subpart for that traffic, regardless of the specific functions provided or facilities used.<br><br>*Exhibit 2* (Level 3 Tariff F.C.C. No. 4) § 1 ("End Office Access Service"). | mirrors the language of the FCC's rules. *See* 47 C.F.R. §§ 51.903(d), 51.913(b). The FCC has interpreted its rules to prohibit end office charges on OTT VoIP calls, and so this same language in Level 3's tariff also prohibits end office charges on OTT VoIP traffic.  *See* Order on Remand and Declaratory Ruling, *In the Matter of Connect America Fund*, 34 FCC Rcd 12692, ¶ 4 (Dec. 17, 2019). | |
| 4. | In May 2015, Level 3 and AT&T entered into a "Release and Settlement Agreement" (hereinafter "Agreement"). *See Exhibit 1*. One purpose of the Agreement was to resolve an ongoing dispute between the parties regarding the applicability of tariffed end office switched access charges to OTT traffic. *See Exhibit 1* at 1, second and third whereas clauses. | Undisputed, as to charges prior to June 1, 2015. | |
| 5. | Section 1(a) of the Agreement resolved the OTT dispute between Level 3 and AT&T in pertinent | Undisputed as to the accuracy of the language quoted from the Parties' 2015 | |

| | | |
|---|---|---|
| part as follows:<br><br>(i) In settlement of the OTT Dispute AT&T agrees to pay Level 3 the following:<br><br>(A) Within fifteen business days of the Effective Date, [specific number excluded], which is seventy-five percent (75%) of the usage and late payment charges billed by Level 3 for the traffic exchanged by the Parties through March 2015 that is the subject of the OTT Dispute ("OTT Settlement Amount"). . . . The Parties recognize that due to invoice cycles and billing requirements, the calculation of usage and late payment charges included in the total amount of charges identified in this Section 1(a)(i)(A) may vary from the actual amount owed once all billing is complete. As a result, the Parties agree that the amount due for April and May 2015 usage may be subject to an adjustment to reflect the appropriate value.<br><br>(B) No later than thirty (30) days after the receipt of Level 3's invoice for traffic exchanged from April 1 through May 31, 2015, seventy-five percent (75%) of the amount of the switched access usage charges for traffic that is the subject of the Dispute billed by Level 3, which has historically been approximately sixty-five percent (65%) of overall billing for end office switching ("April-May Supplemental Settlement Amount"). AT&T will transmit the April- | Agreement.  Disputed, as to the fact that only Section 1(a) of the Agreement resolved the OTT dispute; in fact, the entire Agreement affects the parties' resolution of the dispute.  *See* ECF 15-1, 2015 Agreement, at 6. | |

May Supplemental Settlement Amount to the Level 3 account designated to receive switched access payments using the Parties' standard process for switched access payments.

*       *       *

(ii) For switched access traffic exchanged by the Parties beginning on June 1, 2015, AT&T shall pay Level 3 its applicable switched access tariffed rate for OTT traffic, pursuant to the terms of the OTT Declaratory Order. For avoidance of doubt, this Settlement Agreement shall not prohibit AT&T from disputing Level 3's billing for switched access traffic for reasons unrelated to the requirements of the OTT Declaratory Order, including but not limited to disputes regarding volumes or applicable rates.

(iii) Beginning June 1, 2015, Level 3 shall not bill AT&T for any end office switched access charge elements for domestic OTT traffic that does not originate from a calling party number or does not terminate to a called party number (together with calling party number "CPN") that is assigned by Level 3 and for which Level 3 is designated as the provider in the Number Portability Administration Center ('NPAC') database ("Non-Level 3 CPN OTT Calls"). For avoidance of doubt, the Parties agree that Level 3 will continue to bill AT&T full switched access charges on domestic traffic that originates with or terminates to Level 3

| | | |
|---|---|---|
| | assigned CPN.<br><br>(iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review ("Final Appellate Order"), Level 3 will refund, within 30 days, ████████ of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.<br><br>*See Exhibit 1* § 1(a). | |
| 6. | New York Law governs interpretation of the 2015 Settlement Agreement. *See Exhibit 1* § 5. | This sentence contains characterizations and legal conclusions, not material assertions of fact.  However, it is undisputed that the Parties' 2015 |

6

| | | | |
|---|---|---|---|
| | | Agreement states that it "shall be construed in accordance with and be governed by the laws of the State of New York, not including its choice of law principles." ECF No. 15-1, 2015 Settlement Agreement, at 6. | |
| 7. | AT&T and Level 3 entered into a separate settlement agreement that changed the June 1, 2015 date in Sections (1)(a)(ii), 1(a)(iii) and 1(a)(iv) to January 1, 2019. Thus, for purposes of Level 3's traffic, only traffic from January 1, 2019 and after is at issue. *See Exhibit 3* (Declaration of Charles W. Steese) ¶ 38. | Disputed as to the first sentence.  The 2019 Agreement does not purport to affect any change to the contractual language of the Parties' 2015 Agreement.  Rather, the 2019 Agreement provides that "███████████████████████████████████████████████████████████████████████████████." *See* Exhibit A, 2019 Agreement, at 7–8. Undisputed as to the second sentence. | |
| 8. | In its *Connect America Fund* Order, the FCC determined that end office charges on all terminating traffic would be billed at $0.00 per minute from July 2017 onward. *See In the Matter of Connect Am. Fund*, 26 FCC Rcd. 17663, at *205 (2011). As a result, in this lawsuit Level 3's OTT percentage only impacts its originating traffic. *See Exhibit 4* (P. Pfautz Depo.) at 124:15–125:14. | Undisputed as to the second sentence. Disputed as to the first sentence as it contains characterizations and legal conclusions, not material assertions of fact; it is also only partially correct: under the FCC's default transition pricing rules, the default rate for terminating end office access service went to zero in about July 2017 for price cap local exchange carriers ("LECs") and competitive LECs that benchmark to price cap LECs (but not rate-of-return carriers).  *See* In re Connect America | |

| | | Order, 26 FCC Rcd. 17663, ¶ 801 (2011). | |
|---|---|---|---|
| | **Negotiation of Agreement** | | |
| 9. | Around April 2015, after the FCC issued its 2015 OTT Declaratory Ruling, Level 3 and AT&T initiated negotiations in an attempt to resolve the OTT dispute. *See Exhibit 5* (K. Meola Depo.) at 111:14–114:19; *Exhibit 6* (K. Meola Depo. Ex. 10). | Disputed.  Level 3 and AT&T had been negotiating an attempted resolution to the OTT dispute for "many years" prior to the 2015 OTT Declaratory Ruling. Exhibit B, Meola Depo., at 112:9-25. | |
| 10. | On April 15, 2015, Level 3 sent an email to AT&T expressing disagreement on the parties' respective positions on the impact of an appeal on the finality of the settlement the parties were negotiating, stating as follows:<br><br>I think the biggest business item worth covering today is the proposed concept of settlement of OTT, with the condition that the appeal would over -ride whatever we agree. Initially, we see that as simply a transfer of retro and prospective reserved /unrecognized monies from AT &T to Level 3, and held in escrow (conceptually at least) until the appeal is concluded. We're not clear that this approach will really solve much for either party at this stage given the subsequent uncertainty? Our preference therefore, would be full and final settlement - we should discuss whether that is an option here and/or whether we're missing any potential benefit from your original proposal. | Undisputed. | |

| | | | |
|---|---|---|---|
| | *See Exhibit 7* (K. Meola Depo. Ex. 14) at ATT_PROD_0011781; *Exhibit 5* (K. Meola Depo.) at 136:5–137:12. | | |
| 11. | On May 7, 2015, Mike Riederer, Senior Vice President of Network Planning for Level 3 (*see Exhibit 8* (M. Riederer Depo.) at 5:22–6:4) met in Dallas, Texas with George Sloan, AT&T's Vice President Global Connection Management (*see Exhibit 9* (G. Sloan Depo.) at 18:22–20:19), as well as Mr. Sloan's boss, William Hauge (*id.* at 19:6–14), to discuss, among other things, the OTT dispute between Level 3 and AT&T. *See Exhibit 8* (M. Riederer Depo.) at 20:17–21:17 & 25:9–21); *Exhibit 9* (G. Sloan Depo.) at 19:6–20:18; *Exhibit 10* (K. Meola Depo. Ex. 18) at CTL_0004196 (verifying meeting on May 7, 2015); *Exhibit 11* (A. Burgess Depo.) at 110:10–111:3 (Sloan and Hague were "the assigned … officers to negotiate the settlement" with Level 3). | Undisputed. | |
| 12. | On May 7, 2015, Mr. Sloan sent an email to Kim Meola—the person at AT&T responsible for the OTT dispute—which stated the following with respect to the OTT dispute:<br><br>Kim:<br><br>Thanks for stepping out of LWD today to help. Below ***I've captured the construct of the OTT/ Tandem deal we agreed to with L3 today. I'd appreciate you doing two things: (a) Double check that this deal works for you, and (b) please have the appropriate attorney review/enhance the language. I want to send*** | Undisputed, although the emphases do not appear in the email. | |

| | | |
|---|---|---|
| | *this construct language over to Mike Riederer Friday AM*.<br><br>(1) AT&T agrees to pay 75% of L3's retrospective claims on OTT and Tandem through the end of May 2015. ACTION: I'll set up some time with us and Mike Riederer tomorrow to run through the math on the late payments together. Our intent is to pay in the 25% range as discussed.<br><br>(2) Regardless of whether AT&T wins or loses its FCC appeal, neither AT&T or L3 can clawback additional amounts for OTT/Tandem claims for any period prior to June 2015.<br><br>(3) If AT&T wins its FCC appeal, AT&T can only clawback ▇ of the disputed amount starting June 2015 *through the date of the FCC ruling.*<br><br>(4) AT&T and L3 agree to pricing that is 75% of L3's asking price (need help with this language) for Tandem moving forward.<br><br>*See Exhibit 12* (G. Sloan Depo. Ex. 20) at AT&T 0011854 (emphasis added). | | |
| 13. | Mr. Sloan testified that he does his best to be "accurate and complete in the materials he sends in emails." *See Exhibit 9* (G. Sloan Depo.) at 20:22–21:2. | Undisputed. | |
| 14. | On May 8, 2015, George Sloan sent Mike Riederer an email captioned "Settlement Proposal – | Undisputed, although the emphasis does not appear in the email. | |

Confidential." With respect to the OTT dispute, the email stated:

Here is our attempt to capture our agreement construct. Two items you will notice: (a) The late fees are separated out. I know you guys don't want it recorded this way. If the math works out, Monday morning, I'll support the flat 75%. (b) The team added an additional item they believe is closed and can be formalized in this document. I look forward to discussing more Monday morning. I'll have Kim Meola with me from John Nolan's team. Thanks. George

\*\*\*

Settlement Terms - OTT Dispute

(1) AT&T agrees to pay 75% of L3's retrospective claims on OTT for usage incurred through the end of May 2015. Note: Billed usage does not include LPCs.

(2) AT&T agrees to pay 25% of the LPCs associated with OTT usage billed through end of May 2015.

(3) AT&T agrees to pay L3 full switched access per the Level3 tariffs for both originating and terminating OTT traffic on a prospective basis for June 2015 usage forward.

(4) On a prospective basis, beginning with June 2015, Level 3 will not bill any EO elements associated with domestic originated OTT 8YY traffic not reflecting a Level 3 owned CPN or

|  | | |  |
|---|---|---|
|  | CPNLess traffic that is not served by a Level 3 end office. Level 3 will continue to bill full switched access on Level 3 owned TNs.<br><br>(5) For any usage prior to June 2015, the settlement is a full and final settlement of all disputes and balances regardless of whether AT&T wins or loses its FCC appeal.<br><br>(6) ***If AT&T wins its FCC appeal, L3 will refund ▮ of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals or, if remanded, by the FCC ruling.***<br><br>*See Exhibit 13* (K. Meola Depo. Ex. 19) at CTL 11324–26 (emphasis added). |  |  |
| 15. | Mr. Sloan delegated responsibility for drafting the term sheet referenced in Paragraph 17 to Kim Meola and her team. *See Exhibit 9* (G. Sloan Depo.) at 53:6–54:15 & 56:7–22; *Exhibit 5* (K. Meola Depo.) at 161:5–162:8. | Undisputed. |  |
| 16. | AT&T had its legal department involved in the negotiations of the OTT dispute. *See Exhibit 5* (K. Meola Depo.) at 174:3–177:6 & 187:2–10. | Undisputed. |  |
| 17. | Points one through five in the May 8, 2015 term sheet are all encapsulated in concept in the Agreement. *See Exhibit 5* (K. Meola Depo.) at 162:23–165:6. | Disputed, except to the extent that AT&T agrees that point six in the May 8, 2015 term sheet is not included in the final 2015 Agreement.  Exhibit B, Meola Depo., at 165:13-166:15; Exhibit D, Sloan Depo., at 76:1-77:4.  The 2015 Settlement Agreement, not the term |  |

| | | | |
|---|---|---|---|
| | | sheet, represented the final agreement between the parties and contained the entire agreement regarding the OTT dispute. ECF 15-1, 2015 Settlement Agreement, at 6 ("This Agreement is the entire and complete agreement of the Parties regarding the subject matter hereof…. All prior discussions and negotiations regarding the Disputes have been, and are, merged and integrated into, and are superseded by, this Agreement."); Exhibit C, Torres Depo., at 254:24-255:22; Exhibit D, Sloan Depo., at 76:1-77:4. | |
| 18. | In deposition, Mike Riederer testified that point number six in the May 8, 2015 term sheet reflected the parties' agreement that if the FCC changed the way that companies could bill for OTT traffic, then that would impact the forward looking aspect of the settlement agreement. *See Exhibit 8* (M. Riederer Depo.) at 46:21–49:23. | Disputed.  Mr. Riederer did not "have a recollection" and answered "I don't know" when asked whether point six in the May 8, 2015 term sheet reflected the parties agreement that if the FCC changed the way that companies could bill for OTT traffic going forward. *See* Exhibit E, Riederer Depo., at 46:21–50:23.  In any event, point number six from the term sheet is not reflected in the 2015 Agreement, which was actually executed by the Parties.  Exhibit F, John Depo., at 143:8-146:25; ECF 15-1, 2015 Agreement, at 6. | |
| 19. | No one at AT&T had any discussions with anyone at Level 3 indicating that AT&T's intent for the Settlement Agreement was different or changed from that reflected in item number six in the May | Disputed.  AT&T and Level 3 exchanged redlined versions of the 2015 Settlement Agreement. Exhibit H, Meola Depo. Ex. 23; Exhibit I, Meola | |

| | | |
|---|---|---|
| 8, 2015 term sheet. *See Exhibit 5* (K. Meola Depo.) at 167:14–168:3. | Depo. Ex. 24; Exhibit B, Meola Depo., at 198:19-199:14.  The initial draft of the Agreement, which was drafted by Level 3, did not contain language that was similar to point 6 of the term sheet. *See* Exhibit J, Meola Depo. Ex. 22, at CTL0012908.  Nor did later drafts exchanged between the parties include the language of point 6 in the term sheet.  *See* Exhibit H, Meola Depo. Ex. 23, at CTL_0012895; Exhibit I, Meola Depo. Ex. 24, at CTL_0004212; *compare* Exhibit G, John Depo. Exs. 90, 91 (internal AT&T draft not sent to Level 3), at AT&T_PROD_0014104. The Parties' did not intend to implement item number 6 in the term sheet and the Parties' intent was thus reflected in the words of the 2015 Agreement, which both parties accepted  *See* Exhibit B, Meola Depo., at 205:9-23;  Exhibit K, Torres 8-19-2019 Depo., at 50:14-22; ECF 15-1, 2015 Agreement, at 6. | |
| 20. | Kim Meola, who was AT&T's 30(b)(6) witness responsible for testifying about negotiating terms of the Agreement, stated that "serious discussions" about resolving the OTT dispute did not occur until May 2015 when Mr. Hague got involved on behalf of AT&T. *See Exhibit 5* (K. Meola Depo.) at 13:19–15:7 (identifying subjects on which Ms. Meola is corporate representative); *id.* at 112:21–113:19. | Undisputed. | |

| 21. | On May 10, 2015, George Sloan—who had tried to keep late payment charges to ▮▮—sent an email to Ms. Meola stating: | Undisputed. | |
| | I agreed to 75% of payments due for OTT /Tandem through end of May including paying 75% on the late payments which Riederer commits will be no more than ▮▮▮. Although we were hoping to pay somewhere less than the 75% on the late payments he made this a really big deal Friday PM and was about to derail the peering deal. | | |
| | *Exhibit 14* (G. Sloan Depo. Ex. 92) at ATT_PROD_0011862. | | |
| 22. | On May 11, 2015, Level 3 sent the first draft of a proposed settlement agreement to AT&T. *See Exhibit 15* (K. Meola Depo. Ex. 22) [CTL012906– 15]. | Undisputed. | |
| 23. | On May 12, 2015, two members of Ms. Meola's team—Ardell Burgess and Craig John—created an internal draft of a settlement agreement to send to Level 3. That draft, which was never sent to Level 3, contained the following language in section 1(a)(iv): | Undisputed. | |
| | Level 3 will refund ▮▮▮▮▮▮ of the disputed OTT charges beginning with June 2015 usage through the date on which such order becomes final either from the Court of Appeals or, if remanded, by the FCC ruling, and is no longer subject to further appeal or other | | |

| | | |
|---|---|---|
| | review.<br><br>*See Exhibit 16* (G. Sloan Depo. Exs. 90 and 91) at ATT_PROD_0014104. | | |
| 24. | On May 15, 2015, AT&T sent Level 3 a heavily redlined settlement agreement. Section 1(a)(iv) was re[d]lined to read as follows (with italicized and bolded language added by AT&T):<br><br>(iv)  For any OTT usage prior to June 2015, Although the Parties agree that this settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. ***Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part,*** the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review, Level 3 will refund within 30 days, ███████████ of the disputed OTT charges beginning with June 2015 usage- traffic through the date on which such order becomes final and is no longer subject to further appeal or other judicial review. ***Further, the Parties agree that any billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order.***<br><br>*Exhibit 17* (K. Meola Depo. Ex. 23) at CTL_0012895; *Exhibit 5* (K. Meola Depo.) at 198:19–199:14. | Disputed in part.   Section 1(a)(iv) of the redlined draft agreement AT&T sent to Level 3 on May 15, 2015, read as follows (strikethrough language deleted, underlined language added):<br><br>iv.  ~~For any OTT usage prior to June 2015,~~ Although the Parties agree that this ~~S~~settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. ~~regardless of whether AT&T wins or loses its OTT Appeal.~~ Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, ~~If AT&T wins its OTT Appeal and~~ and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review, Level 3 will refund within 30 days, ███████ ███████ of the disputed OTT charges beginning with June 2015 ~~usage~~ traffic through the date on which such order | |

| | | | |
|---|---|---|---|
| | | becomes final and is no longer subject to further appeal or other judicial review. <u>Further, the Parties agree that any billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order.</u><br><br>Exhibit H, Meola Depo. Ex. 23, at CTL_0012895.  The emphasis does not appear in the draft agreement. | |
| 25. | On May 21, 2015, Level 3 sent AT&T its redlines, which modified section 1(a)(iv) to read as follows (with italicized and bolded language added by Level 3):<br><br>(iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review Level 3 will refund, within 30 days, ▮▮▮▮▮▮▮ of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; ***provided, however, that if the*** | Disputed in part.  Level 3 sent AT&T its redlines, which modified section 1(a)(iv) to read as follows (with italicized and bolded language added by Level 3):<br><br>(iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review ***("Final Appellate Order")*** Level 3 will refund, within 30 days, ▮▮▮▮▮▮▮ of the | |

| | | |
|---|---|---|
| | ***OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order***. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.<br><br>*See Exhibit 18* (K. Meola Depo. Ex. 24) at CTL_004212. | disputed OTT charges beginning with June 2015 traffic through the date on which such ***Final Appellate O***rder becomes final and is no longer subject to further appeal or other judicial review; ***provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order***. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such ***Final Appellate O***rder becomes final shall be in compliance with terms of that order.<br><br>*See* Exhibit I, Meola Depo. Ex. 24, at CTL_004212.  The emphasis does not appear in the draft agreement. | |
| 26. | All of Ms. Meola's verbal communications with Level 3 regarding negotiating the OTT dispute were memorialized in writing. *See Exhibit 5* (K. Meola Depo.) at 61:24–62:6; *id.* at 110:25–111:8. | Disputed.  Ms. Meola is "not aware" of any conversations that were not memorialized.  Exhibit B, Meola Depo., at 110:25–111:8. | |
| 27. | In November 2016, the D.C. Circuit Court of Appeals issued a decision on appeal from the FCC's OTT Declaratory Order. *See Exhibit 19* (K. Meola Depo. Ex. 26). In that decision, the D.C. Circuit Court of Appeals found that the FCC did not sufficiently disclose the reasoning for its | Disputed in part.  The second sentence contains characterizations and legal conclusions, not material assertions of fact.  The D.C Circuit found the FCC's ruling "wholly arbitrary;" the FCC's reasoning was inconsistent with | |

| | | |
|---|---|---|
| | decision and therefore "vacate[d] and remand[ed] the order to the Commission for further explanation." *Id*. | passages in the *Transformation Order* and with other FCC rulings addressing OTT-VoIP services *See AT&T Corp. v. FCC*, 841 F.3d 1047, 1053–54 (D.C. Cir. 2016). | |
| 28. | The D.C. Circuit did not determine whether LECs could or could not assess end office charges on OTT calls. *See Exhibit 19* (K. Meola Depo. Ex. 26); *Exhibit 11* (A. Burgess Depo.) at 125:17–21; *Exhibit 20* (J. Torres 12-19-19 Depo.) at 265:5–9. | Disputed. This paragraph contains characterizations and legal conclusions, not material assertions of fact.  It also misstates the ruling of the D.C. Circuit, which vacated and heavily criticized the FCC's decision.   *See AT&T Corp. v. FCC*, 841 F.3d 1047, 1056 (D.C. Cir. 2016).  Further, the D.C. Circuit found that the FCC's decision was "wholly arbitrary," (and inconsistent with passages in the *Transformation Order* and with other FCC rulings addressing OTT-VoIP services), and squarely rejected the only rationale the FCC (or Level 3) has articulated for concluding that OTT-VoIP providers perform a function equivalent to the functions performed in end-office switching.  *Id.* at 1053–56.  In light of the D.C. Circuit's decision, no carrier could assess end office charges on OTT VoIP traffic unless the FCC articulated a lawful and non-arbitrary rationale for those charges—which never happened. *See* ECF No. 149, AT&T Mot. For Sum. Jud. at 14 n.14. | |

| | | | |
|---|---|---|---|
| 29. | On May 11, 2018, CenturyLink filed a petition for declaratory ruling with the FCC asking the FCC to find that end office switched access charges applied to OTT traffic. *See Exhibit 21* (CenturyLink Petition for Declaratory Ruling). | Undisputed. | |
| 30. | On December 17, 2019, the FCC issued an "Order on Remand and Declaratory Ruling" specifically stating, among other things, that the decision was issued to comply with the remand back from the September 8, 2016 D.C. Circuit Court of Appeals' decision. *See* Order on Remand, 2019 WL 7018968, *Exhibit 22* ¶ 3. In this decision on remand, the FCC clarified that end office switched access charges do not apply to OTT calls. *Id.* ¶ 24. | Disputed in part. This paragraph contains characterizations and legal conclusions, not material assertions of fact.  The last sentence is undisputed. | |
| 31. | No one appealed the FCC's December 17, 2019 OTT order, which became final by operation of law on February 19, 2020. *See Exhibit 3* (Declaration of Charles W. Steese) ¶ 25. | Undisputed. | |
| 32. | Ms. Meola, AT&T's 30(b)(6) witness on the intent of the Agreement, testified that before the FCC's 2015 OTT Declaratory Ruling, there was a difference of view in the industry about whether OTT calls were subject to end office switched access charges. *Exhibit 5* (K. Meola Depo.) at 179:7–13. | Disputed. Ms. Meola testified that she did not know if there was a difference of view in the industry about whether OTT calls were subject to end office switched access charges.  Exhibit B, Meola Depo., at 179:18–25. | |
| 33. | Ms. Meola also testified that if, on remand, the FCC affirmed that end office charges applied to OTT calls, then AT&T believed that Level 3 must still rebate ▓▓▓▓ of the charges associated | Undisputed. | |

|  | with OTT calls pursuant to section 1(a)(iv). *Exhibit 5* (K. Meola Depo.) at 194:24–195:23. |  |  |
|---|---|---|---|
|  | **Meaning of 65% Factor in Agreement** |  |  |
| 34. | Both Level 3 and AT&T designated a 30(b)(6) witness to discuss the intent of the 65 percent factor referenced in Section 1(a)(i)(B) of the Agreement: AT&T designated Mr. Ardell Burgess (*see Exhibit 11* (A. Burgess Depo.) at 11:14–12:4), and Level 3 designated Ms. Jennifer Torres (*see Exhibit 23* (J. Torres 8-28-19 Depo.) at 18:13–21:13). | Undisputed. |  |
| 35. | In July 2013, AT&T and Level 3 entered into a separate written agreement, which was only in effect during calendar year 2013 and stated:<br><br>Because the Parties had been unable to determine the volume of Level 3 traffic that was OTT prior to the Effective Date of this Settlement Agreement, Level 3 and AT&T agree that for the period January 2013 through December 2013, 65% of the end office traffic billed to AT&T CORP by Level 3 is OTT provider traffic.<br><br>*See Exhibit 24* (K. Meola Depo. Ex. 6) § 2.16. | Undisputed. |  |
| 36. | AT&T admits that at the time it entered into the 2013 agreement it did not know Level 3's OTT percentage. *See Exhibit 11* (A. Burgess Depo.) at 99:22–100:25. | Disputed.  AT&T estimated that Level 3's percentage of OTT was 65% as of 2012.  *See* Exhibit L, Burgess Depo., at 87:21-89:1. |  |
| 37. | The 2015 Agreement stated that 75 percent of all | Disputed as to the second sentence.  The |  |

| | | |
|---|---|---|
| | end office billings through June 2015 would be paid; however, at the time the Agreement was executed, two months of billings still needed to be reconciled. *See Exhibit 11* (A. Burgess Depo.) at 120:14–121:19; *Exhibit 23* (J. Torres 8-28-19 Depo.) at 37:24–38:20 & 70:24–73:23. The 65 percent provision only concerned what needed to be paid for April and May 2015 billings. *See id.; see also Exhibit 5* (K. Meola Depo.) at 205:24–206:20. | 65% figure referred to Level 3's percentage of OTT and was not constrained to April and May 2015 billings.  Exhibit B., Meola Depo., at 204:8-18.  Level agreed that their OTT percentage had "historically been approximately sixty-five percent of overall billing for end office switching."  Exhibit K, Torres 8-19-2019 Depo., at 50:14-22. | |
| 38. | By signing the Agreement, Level 3 was not claiming that, as of May 2015, 65 percent of its end office billings were for OTT traffic. *Exhibit 11* (A. Burgess Depo.) at 122:5–16; *Exhibit 23* (J. Torres 8-28-19 Depo.) at 48:11–49:6. | Disputed.  By signing the 2015 Agreement, Level 3 agreed that its OTT percentage was historically 65%.  Exhibit K, Torres Depo., at 50:14-22; ECF No 15-1, 2015 Settlement Agreement, at 2.  AT&T's intent in agreeing to the 65% number was to use it prospectively.  Exhibit B, Meola Depo., at 204:13-18. | |
| 39. | AT&T admits it has no facts to show that Level 3's OTT percentage was ever 65 percent. *See Exhibit 11* (A. Burgess Depo.) at 124:3–11. | Disputed.  AT&T conducted studies that demonstrated that Level 3's OTT percentage was between ██% and ██%.  Exhibit L, Burgess Depo., at 87:21-88:17.  Further, the parties historically agreed that Level 3's OTT percentage was 65%—and because the FCC's rules permit agreement between carriers on such matters, *e.g.*, 47 C.F.R. § 51.905(a); Order on Remand and Declaratory Ruling*, In the Matter of Connect America Fund*, 34 FCC Rcd 12692, n.62 (Dec. 17, 2019); In re | |

| | | | |
|---|---|---|---|
| | | Connect America Order, 26 FCC Rcd. 17663, ¶¶ 960-61, 963-64 & n.1996 (2011), the parties' historic agreements as to Level 3's OTT percentage are itself facts showing that the Level 3 OTT percentage *was* 65%. | |
| 40. | The purpose of the 65 percent in the Agreement was to establish that AT&T had historically disputed and withheld 65 percent of Level 3's end office switched access charges, and that the parties had used this percentage as a reference point in the past. *See Exhibit 11* (A. Burgess Depo.) at 130:9–24 & 154:16–155:12; *Exhibit 23* (J. Torres 8-28-19 Depo.) at 50:23–54:9. | Disputed in part. By signing the 2015 Agreement, Level 3 agreed that its OTT percentage was historically 65%. Exhibit K, Torres Depo., at 50:14-22. AT&T's intent in agreeing to the 65% number was to use it prospectively. Exhibit B, Meola Depo., at 204:13-18. | |
| 41. | Under the Agreement, Section 1(a)(iv) requires Level 3 to refund ▇▇▇▇ of the actual OTT calling. *See Exhibit 11* (A. Burgess Depo.) at 208:24–209:6; *Exhibit 25* (A. McClure Response Disclosure) ¶ 2(a); *Exhibit 5* (K. Meola Depo.) at 207:12–23 & 213:23–215:6; *see also Exhibit 11* (A. Burgess Depo.) at 239:21–240:5 (acknowledging if Level 3's actual OTT percentage is less than 65%, that AT&T has over withheld). | Disputed. This paragraph contains characterizations and legal conclusions, not material assertions of fact. It also misstates the 2015 Agreement. The Agreement states that Level 3 must refund ▇▇▇ of the "disputed OTT charges." ECF No. 15-1, 2015 Settlement Agreement, at 3. AT&T has disputed 65% of OTT charges. *See* Exhibit L, Burgess Depo., at 133:21–134:12; Exhibit C, Torres 12-19-2019 Depo., at 318:25–319:16. | |
| 42. | The Agreement permits Level 3 to bill end office switched access charges on all non-OTT calls with a Level 3 telephone number. *See Exhibit 5* (K. Meola Depo.) at 211:4–24; *Exhibit 25* (A. | Disputed. This paragraph contains characterizations and legal conclusions, not material assertions of fact. It also misstates the 2015 Agreement, which only permits Level 3 to bill "full | |

| | | | |
|---|---|---|---|
| | McClure Response Disclosure) ¶ 10. | switched access charges on domestic traffic that originates with or terminates to Level 3 assigned CPN."  ECF No. 15-1, 2015 Settlement Agreement, at 3. | |
| 43. | In mid-2017, after the D.C. Circuit Court of Appeals decision, AT&T started to withhold 65 percent of Level 3's end office charges again. *See Exhibit 11* (A. Burgess Depo.) at 134:3–12; *Exhibit 20* (J. Torres 12-19-19 Depo.) at 318:25–319:16. | Undisputed. | |
| 44. | In 2017, Level 3 gave AT&T data to show its OTT percentage was approximately ▇ percent originating and ▇ percent terminating. *See Exhibit 26* (J. Torres Depo. Ex. 23) at ATT_PROD_0005865; *Exhibit 27* (A. McClure 8-29-19 Depo.) at 80:15–82:14; *see also Exhibit 11* (A. Burgess Depo.) at 135:6–136:23. | Disputed.  Level 3's data was unreliable and therefore did not in fact show its OTT percentage was ▇ percent originating and ▇ percent terminating. Exhibit M, Dr. Pfautz Expert Report, at ¶ 37–50; Exhibit N, McClure Depo., at 60:1-61:22.  Further, Level 3 did not provide all of the data underlying its claims, despite AT&T's request (and industry practice including Level 3's tariff).  *See* Exhibit B, Meola Depo., at 266:8-21. | |
| 45. | AT&T continued to withhold 65 percent of Level 3's end office charges even after Level 3 stopped billing end office charges on terminating calls, which the FCC's Transformation Order required to occur in July 2017, and as a result has withheld ▇▇▇▇▇▇ each year from Level 3. *See Exhibit 11* (A. Burgess Depo.) at 200:23–201:23. | Disputed.  Level 3's Exhibit 11 does not support MSUMF No. 45.  AT&T has continued to withhold 65% of OTT VoIP charges as the last agreed-upon factor until Level 3 can demonstrate its OTT traffic is not 65%.  Exhibit B, Meola Depo., at 257:12-18, 264:16-265:16. | |

| 46. | Throughout 2019 and 2020, AT&T withheld more than Level 3's total end office billings each month. *See Exhibit 28* (Declaration of M. Kellow) ¶ 6. | Disputed.  AT&T disputes Level 3's total end office billings number, which AT&T believes is too high.  *See* Exhibit O, AT&T Rule 26(e) Disclosure, at 2-3.  Furthermore, the parties have other unrelated disputes as to end office charges billed by Level 3, which has affected AT&T's total withholdings, and Level 3's analysis does not take account of all payments made by AT&T.  *Id.*  AT&T's intention was to withhold 65% of end office billings for the OTT dispute.  Exhibit L, Burgess Depo., at 134:3-12. | |
| --- | --- | --- | --- |
| | **Calculation of OTT Percentage** | | |
| 47. | Level 3 does not have any direct OTT subscriptions. *See Exhibit 11* (A. Burgess Depo.) at 68:21–69:14. | Disputed.   Level 3's Exhibit 11 does not support MSUMF No. 47.  Level 3 proffered its Form 477 as proof that it had no direct OTT subscriptions and Mr. Burgess only agreed that the Form 477 suggested that.  *See* Exhibit L, Burgess Depo., at 69:2-14.  Level 3 has provided no direct proof that it does not have any direct OTT subscriptions. | |
| 48. | "Local carriers . . . cannot always readily distinguish between over-the-top VoIP calls and other types of calls." *Exhibit 30* (P. Pfautz Opening Disclosure) ¶ 5; *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 5. | Undisputed; however, the FCC has stated that "because of the fundamentally different physical arrangements between facilities-based and over-the-top VoIP services, the two can be distinguished with relative ease". | |

| | | | |
|---|---|---|---|
| | | Order on Remand and Declaratory Ruling, *In the Matter of Connect America Fund*, 34 FCC Rcd 12692, n.62 (Dec. 17, 2019). | |
| 49. | Except where (a) companies are known to be 100% OTT providers such as ███ (where end office charges do not apply), or (b) customers are enterprise class customers where the carrier provisioned a facility to the end user's premises (where end office charges always apply), the only way to find out a customer's OTT percentage is to reach out to the customer and ask. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 5; *Exhibit 4* (P. Pfautz Depo.) at 47:10–49:25,  51:24–52:16, 138:15–22. | Disputed in part.  A customer's OTT percentage could be determined in numerous ways, including by referencing the percentage of OTT subscriptions reported to the FCC. Exhibit M, Dr. Pfautz Expert Report, ¶ 46–47; *see also* Order on Remand and Declaratory Ruling, *In the Matter of Connect America Fund*, 34 FCC Rcd 12692, n.62 (Dec. 17, 2019); In re Connect America Order, 26 FCC Rcd. 17663, ¶¶ 963-64 (2011). | |
| 50. | Level 3 employee Andrew McClure calculated Level 3's percent OTT to be ██ percent since January 1, 2019. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 16. | Disputed.  Mr. McClure used the same flawed analysis to conduct his 2019 analysis as he did in 2017.  Exhibit P, Level 3 Suppl. Discl., at 5 ¶ 1; Exhibit Q, McClure 6-11-2020 Depo., at 59:22-60:18;  Exhibit R, Dr. Pfautz Rebuttal Report, at ¶ 27.  He did not re-contact any customers to determine if their OTT percentage had changed since 2017. Exhibit Q, McClure Depo., at 154:7-18, 204:10-25, 207:17-21.   His OTT calculation is therefore flawed.  *See* Exhibit R, Dr. Pfautz Rebuttal Report, at ¶¶ 10, 19, 27. | |

| 51. | AT&T's expert, Dr. Penn Pfautz, did not calculate a percent OTT for Level 3. *Exhibit 4* (P. Pfautz. Depo.) at 29:22–25. | Undisputed. | |
|---|---|---|---|
| 52. | AT&T has a few documents that comment upon Level 3's percent OTT, but none of AT&T's documents calculate a percent OTT or utilize an appropriate methodology to calculate percent OTT. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 4; *Exhibit 4* (P. Pfautz Depo.) at 181:25–192:14. | Disputed.  This statement of material fact is vague and the materials cited by Level 3 do not support MSUMF No. 52.  AT&T has conducted several studies that show Level 3's OTT percentage. *See* Exhibit L, Burgess Depo., at 87:21 - 88:17; Exhibit F, John Depo., at 90:15-21.   By signing the 2015 Agreement, Level 3 agreed that its OTT percentage was historically 65%.  Exhibit K, Torres Depo., at 50:14-22. | |
| 53. | The only carriers in the industry that are known to have created a percent OTT are Level 3 and, in mid-2019, AT&T. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 8; *Exhibit 4* (P. Pfautz Depo.) at 58:18–59:15. | Disputed.  This is speculation and not a material statement of fact.  Furthermore, the cited material does not support MSUMF No. 53.  Both Dr. Pfautz and Mr. McClure stated they were not aware of any other carrier in the industry who has created a percent OTT, not that there were none.  Ex. S, Dr. Pfautz Depo., at 59:11-15; Exhibit T, McClure Resp. Discl., at ¶ 8. | |
| 54. | Level 3's OTT analysis is based on calling originated using Level 3 telephone numbers, and destined for AT&T. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 10; *Exhibit 4* (P. Pfautz Depo.) at 129:9–130:5 (AT&T has no contrary evidence). | Undisputed. | |

| | | |
|---|---|---|
| 55. | Dr. Pfautz testified that his "biggest concern" about Level 3's OTT analysis is the method that Level 3's expert (Andrew McClure) used to gather percent OTT from individual Level 3 customers. *Exhibit 4* (P. Pfautz Depo.) at 141:12–15. | Undisputed. | |
| 56. | The percentages that Mr. McClure obtained from customers had very little impact on Level 3's percent OTT; if Mr. McClure assumed that 100 percent of the calling associated with customers Mr. McClure believed to have some OTT calling is OTT, Level 3's OTT percentage would rise from ▮ percent to ▮ percent. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 12. | Disputed. This is not a material fact, but rather a conditional opinion. In any event, McClure's methodology and opinions are unreliable. Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50; Exhibit R, Dr. Pfautz Rebuttal Report, at ¶¶ 10, 19, 27. Among other issues, Mr. McClure's opinion as to which Level 3 customers "have some OTT calling" is unreliable because, during the period at issue, he only sought that information from one Level 3 customer, and sought no information as to several hundred other customers. Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50; Exhibit Q., McClure 6-11-2020 Depo., at 193:8-19. | |
| 57. | Dr. Pfautz took issue with three entities that Mr. McClure reported in 2017 as having 0 percent OTT: ▮▮▮▮▮. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13. | Disputed. Dr. Pfautz only used ▮▮▮▮▮ as "examples" to demonstrate how Mr. McClure's analysis was flawed. Exhibit M, Dr. Pfautz Expert Report, at ¶ 42-46. On Mr. McClure's disclosure, there were numerous entities and the vast majority of those entities are listed as having no OTT VoIP traffic, even though Level 3 had procured no | |

| | | | |
|---|---|---|---|
| | | information about those entities' OTT traffic during the period disclosed in Mr. McClure's disclosure. *Id.* ¶¶ 37-50; Exhibit Q, McClure Depo., at 193:8-19. | |
| 58. | Level 3 no longer has a relationship with ████ ; as such, the concern about ████████ has no bearing on data from 2019 forward. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13(b). | Disputed.  The concern regarding ████████ is an example of what is wrong with Level 3's analysis and therefore the concern has a bearing on the data from 2019 forward.  Exhibit M, Dr. Pfautz Expert Report, at ¶ 44. Indeed, to the extent Level 3 concedes that material it gathered in 2017 "has no bearing on data from 2019 forward," then Level 3 is implicitly conceding that Mr. McClure's analysis of 2017 data is stale and no longer reliable. | |
| 59. | Both Level 3 and AT&T recognize that ████ is not a pure OTT provider (*Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13(d); *Exhibit 4* (P. Pfautz Depo.) at 151:15–154:20); nonetheless, for summary judgment, Level 3 will assume that 100 percent of ████ calls are OTT. | Disputed. AT&T does not know if ████ is a pure OTT provider or not.  Exhibit S, Dr. Pfautz Depo., at 151:15–154:20 ("Q. So Dr. Pfautz, what percentage of calls are over WAN versus over OTT, do you know?" "A. I do not pretend to know that."). | |
| 60. | AT&T acknowledges that when calls flow over facilities Level 3 provisioned at the customer's premises to Level 3's end office, even if people connect to those hub facilities via a third-party internet connection from remote locations, end office charges apply. *See Exhibit 4* (P. Pfautz Depo.) at 101:14–23; 104:17–105:9. | Undisputed. | |

| 61. | Andrew McClure determined that ███████ is not an OTT provider because Level 3 provides ███████ with facilities at ███████ premises, and all calls flow over the facilities Level 3 provisioned and provided to ██████. *Exhibit 31* (A. McClure 6-11-2020 Depo.) at 127:12–137:8; *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13(c). | Disputed. ███████ is an OTT provider because the connection to ███████ end users is over-the-top.  Exhibit M, Dr. Pfautz Expert Report, at ¶ 45; Exhibit S, Dr. Pfautz Depo., at 106:3-11; Exhibit U, McClure Depo. Exhibit 66 (███████ Website Printout), at 2. | |
| --- | --- | --- | --- |
| 62. | ███████ percent of Level 3's traffic falls into three clear categories: (a) Level 3's own traffic; (b) a Level 3 network incapable of supporting OTT calling; and (c) ███████. *See Exhibit 32* (Exhibit 2 to Level 3's Rule 26(a)(2)(C) Disclosure; *Exhibit 29* (Declaration of Andrew McClure) ¶ 6). | Disputed as to (b).  Mr. McClure did not investigate whether Level 3's own traffic could support OTT, but rather made an "assumption" that the OTT percentage was ██.  Exhibit Q, A. McClure 6-11-2020 Depo., at 91:18-92:21.  McClure has no documentation that Level 3's network is incapable of supporting OTT traffic.  *Id.* | |
| 63. | In deposition, AT&T asked Mr. McClure about four additional customers: ██████, ██████, ██████, and ██████. *See Exhibit 31* (A. McClure 6/11/2020 Depo.) 125:13–126:18; *Exhibit 29* (A. McClure Dec.) ¶ 9. | Undisputed; however, as noted above, questions as to these four entities were examples—of the hundreds of entities on Mr. McClure's disclosure, there are many entities that Mr. McClure listed as having zero OTT VoIP traffic, yet Mr. McClure did not conduct any analysis for the period in question as to whether these entities in fact carried over-the-top traffic.   Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50; Exhibit Q, McClure 6-11-2020 Depo., at 193:8-19.  The materials on the websites of these four entities were examples in which the | |

|  |  |  |  |
|---|---|---|---|
|  |  | entities stated they were providing over-the-top services. *See id.* 121:15–126:18 |  |
| 64. | While Mr. McClure could not recall the specifics of ████, ████, ████, and ████ during his expert deposition, Mr. McClure has since familiarized himself with those customers, and determined that while ████, and ████ are appropriately categorized at zero percent OTT, ████ may have the ability to provide some OTT functions. As a result, for purposes of this summary judgment motion, Level 3 will assume Coredial is 100% OTT. *See Exhibit 31* (A. McClure 6/11/2020 Depo.) at 108:14–21, 114:8–12, 121:15–23; *Exhibit 29* (A. McClure Dec.) ¶¶ 10–15. | Disputed in part.  AT&T is unable to verify or respond to what Level 3 did after Mr. McClure's deposition.  AT&T continues to dispute that ████ ████, and other entities on the spreadsheet, are appropriately categorized as having ██ OTT.  Exhibit Q, McClure Depo., at 121:15–126:18; Exhibit V, McClure 6-11-2020 Depo. Exhibit 64 (████ Website Printout). |  |
| 65. | Using the percentages referenced in the paragraphs above—i.e., assuming 100 percent of the traffic of ████ and ████ is OTT—and additionally assuming a 100 percent OTT factor for ████ Level 3's OTT percentage would increase to ██ percent. *See Exhibit 29* (A. McClure Dec.) ¶¶ 17–21. | Disputed.  This is not a material statement of fact, but a conditional opinion.  In any event, Level 3's OTT percentage is not ██ percent given that Mr. McClure's analysis is unreliable.  *See* Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50;  Exhibit R, Dr. Pfautz Rebuttal Report, at ¶¶ 10, 19, 27.  Among other issues, Mr. McClure's opinion as to which Level 3 customers have some OTT calling is unreliable because, during the period at issue, he only sought that information from one Level 3 customer, and sought no information as to several hundred other customers.   Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50;  Exhibit Q, |  |

| | | McClure Depo., at 193:8-19 | |
|---|---|---|---|
| 66. | Dr. Pfautz admitted in deposition that he did not have any evidence that Level 3's percent OTT is greater than ▇%. *See Exhibit 4* (P. Pfautz Depo.) at 173:10–175:10; 176:7–16. | Disputed.  Dr. Pfautz did not form an opinion on Level 3's OTT percentage because Level 3 had failed to provide verifiable data to be able to form any opinion.  Exhibit S, Dr. Pfautz Depo., at 175:5-25.  Further, given the serious flaws in Level 3's methodology, Level 3 "almost certainly understated the proportion of [OTT] traffic billed." Exhibit M, Dr. Pfautz Expert Report, at ¶ 6. | |
| 67. | Dr. Pfautz assumed that 100 percent of AT&T's enterprise class customers had no OTT calling based on representations from AT&T, without obtaining the names of AT&T's customers, evaluating those customers, or performing any independent research. *See Exhibit 4* (P. Pfautz Depo.) at 215:3–229:23. | Disputed.  Dr. Pfautz did not assume 100 percent of AT&T's enterprise class customers had no OTT calling, but rather he looked at products that have the potential of having nomadic TN and found it was reasonable for AT&T to not bill end office on that category of calling.  Exhibit S, Dr. Pfautz Depo., at 216:8-22 | |
| 68. | To calculate its percent OTT, AT&T only evaluated whether the customer had the ability to utilize "nomadic" telephone numbers, meaning make calls from various locations over a third-party internet connection. *See Exhibit 25* (A. McClure Responsive Disclosure) ¶¶ 3, 8; *Exhibit 4* (P. Pfautz Depo.) at 106:14–115:22, 118:5–120:10, 222:8–229:23. | Disputed.  Dr. Pfautz did not assume 100 percent of AT&T's enterprise class customers had no OTT calling, but rather he determined that the way in which AT&T decided not to bill for services that could include nomadic TNs was a reasonable and conservative approach.  Exhibit S, Dr. Pfautz Depo., at 216:8-22 | |

| 69. | AT&T determined that only calls flowing over its BVoIP network could support nomadic telephone calling; as a result, it presumed calling over its traditional network was zero percent OTT. *See Exhibit 33* (J. Gallagher Depo. Vol. I) at 78:18–79:10. | Undisputed | |
|---|---|---|---|
| 70. | AT&T did not consider the business plan of any of its enterprise class customers, and whether they created the potential for OTT calling. *See Exhibit 25* (A. McClure Responsive Disclosure) ¶ 3; *Exhibit 4* (Pfautz Depo.) at 106:14–109:6. | Disputed.  The cited material does not support MSUMF No. 70.  Dr. Pfautz did not know whether AT&T considered the business plan of any of its enterprise class customers.  Exhibit S, Dr. Pfautz Depo., at 106:14–107:17;  Exhibit T, McClure Resp. Discl., at ¶ 3 (relying on Dr. Pfautz's deposition testimony). | |
| 71. | Dr. Pfautz—AT&T's expert—concluded that AT&T's method for determining percent OTT was reasonable. *Exhibit 30* (P. Pfautz Opening Report) ¶ 8. | Undisputed. | |
| 72. | Under Level 3's calculations: (a) AT&T is entitled to a credit for end office charges of ▮▮▮▮▮ through April 2020, and (b) AT&T has withheld over ▮▮▮▮▮ from Level 3 for the OTT dispute. *See Exhibit 28* (M. Kellow Dec.) ¶¶ 7–8. | Disputed.  AT&T and Level 3 are currently in dispute over the total number of Level 3's end office billings to AT&T.  *See* Exhibit O, AT&T Rule 26(e) Discl., at 2-3.  Level 3 itself acknowledges that the damages calculation are in dispute.  ECF 151-2, Level 3 Mot. For Sum. Jud. at 23 n.9 ("The parties are working on trying to resolve their differences in damages calculations.").  Moreover, AT&T disputes the assumptions as to legal and | |

| | | | |
|---|---|---|---|
| | | factual issues that underlie Level 3's calculations. | |
| | **AT&T Billed Level 3 End Office Charges on OTT Calls** | | |
| 73. | When AT&T brought its claims against Level 3, it did not know whether it or TCG had any OTT traffic, and had not even started the process of reviewing its own practices to determine whether or not it was billing IXCs end-office charges on OTT calling. *Exhibit 11* (A. Burgess Depo.) at 227:14–228:3; *Exhibit 5* (K. Meola Depo.) at 318:14–15. | Disputed in part.  AT&T did not have an easy way to determine which calls were placed using an AT&T broadband facility, and which calls were placed using a third party broadband connection.  Exhibit W, Gallagher Dec., at ¶ 4.  For these reasons, and because the volumes of traffic on these two products were relatively small, TCG elected to treat all of these calls for these two products as though they involved OTT VoIP calls.  *Id.*  TCG has since addressed the issue.  *Id.* at ¶¶ 4, 5, 6. | |
| 74. | From the outset of the case, when Level 3 alleged that either AT&T or its affiliates also assessed end-office charges on OTT calls, AT&T originally denied those allegations. *See* ECF No. 53 ¶¶ 13–14; ECF No. 86 ¶¶ 17–20; ECF No. 98-1 at 3. | Disputed.  AT&T denied that AT&T Corp. assessed end-office charges on OTT calls.  *See* ECF No. 53 ¶¶ 13–14; ECF No. 86 ¶¶ 17–20.  AT&T Corp. does not assess end-office charges on OTT calls; rather, TCG, a separate entity, does.  ECF No. 98-1 at 3.  Level 3 did not add TCG as a party until June of 2019.  *See* ECF. No. 98. | |
| 75. | Level 3's lawsuit and discovery prompted AT&T to learn that it had OTT calling on its network. *See Exhibit 11* (A. Burgess Depo.) at 224:23–225:25) | Disputed as to AT&T and undisputed that Mr. Burgess, who is on the "the cost side and not the product side or revenue side," was unaware that TCG billed end office charges on OTT.  Exhibit L, | |

| | | | |
|---|---|---|---|
| | | Burgess Depo., at 225:2-25. | |
| 76. | AT&T later found that TCG—the company that billed switched access charges for AT&T—was billing Level 3 end office switched access charges on two products: ██████████. *See Exhibit 33* (J. Gallagher Depo. Vol. I) at 34:20–25. | Undisputed to the extent that Level 3 is not arguing that AT&T is unable to bill end office switched access charges on ██████████. | |
| 77. | AT&T/TCG admits that ████ percent of calls on its BVoIP network constitutes OTT calling. *See Exhibit 34* (J. Gallagher Depo. Vol. II) at 129:14–18. | Disputed. While AT&T uses the ████ percent figure to generate credits, this figure likely overestimates the amount of OTT calling. Exhibit W, Gallagher Dec., at ¶¶ 4, 6. | |
| 78. | In July, August, and September 2019, AT&T issued Level 3 other credits but did not specify what those credits were for. *See Exhibit 28* (M. Kellow Dec.) ¶ 9. | Disputed. In July, August, and September 2019, AT&T/TCG issued Level 3 credits for OTT calling. Exhibit W, Gallagher Dec., at ¶ 7. The credits were specified on TCG's bills, initially being labeled as "Adjustment Of VoIP Usage" under the "Detail of Adjustments" section for the July and August of 2019 bills and then labeled as "Adjustment Of VoIP Usage" under the "Detail of Other Charges and Credits" section for the September 2019 bills. *Id.* | |
| 79. | Since September 2019, AT&T has not credited Level 3, Broadwing and Global Crossing anything for OTT calling. *See Exhibit 28* (M. Kellow Dec.) ¶ 10. | Disputed. AT&T/TCG has continued to credit Level 3, Broadwing and Global Crossing for OTT calling since September 2019 in a section of the TCG bill entitled "Detail of Other Charges and Credits," with a new label of "Adjustment Of ██████████ | |

| | | | |
|---|---|---|---|
| | | Usage." Exhibit W, Gallagher Dec., at ¶ 7. | |
| 80. | Level 3's interstate access tariff specifically requires customers to pay the invoices they receive unless they dispute the invoice, and must include in the dispute "[d]etails sufficient to identify the specific amount(s) and item(s) in dispute." *Exhibit 2* (Level 3 Interstate Access Tariff F.C.C. No. 4) §§ 2.1.3, 2.8.5, 3.1.1, 4.9(2). | Disputed. This paragraph contains characterizations and legal conclusions, not material assertions of fact. Undisputed as to the language in the tariff. AT&T properly disputed Level 3's charges—indeed, AT&T has been doing so since at least 2011. Exhibit B, Meola Depo., 75:12-76:2. | |
| 81. | | Level 3 believed that the order on appeal became final in May 2017 when the time expired for Level 3 to appeal the D.C. Circuit decision. Exhibit X, Torres Depo. Exhibit 18, at CTL0002776, 2778 ("The [2015] Settlement specifically states that we credit ▮ of OTT up to the date it becomes final, which is May. It also says that we bill accordingly after the final date."; "May, 8, 2017 was the date the ruling became final and no longer subject to appeal[]") | |
| 82. | | Andrew McClure's 2017 estimates of the OTT VoIP percentages of Level 3's customers are not verifiable by anyone at Level 3. *See* Exhibit Q, McClure Depo., at 207:12-21. | |
| 83. | | Andrew McClure did not retain any documentation or other records from his 2017 inquiry into Level 3's OTT VoIP | |

| | | | |
|---|---|---|---|
| | | percentages.  Exhibit N, McClure Depo., at 60:21-61:22;  Exhibit Q, McClure Depo., at 214:17–20 ("Q: Other than these tabs in the spreadsheet, did you create any other work papers in creating [your 2019 analysis]? A: No, I did not."). | |
| 84. | | Mr. McClure's conceded that it was "completely fair" that since his 2017 analysis, the percentage of OTT VoIP traffic for "all" of the customers could have increased, even dramatically. Exhibit Q, McClure Depo., at 143:22-145:4;  Exhibit N, McClure Depo., at 99:14-100:16. | |
| 85. | | Mr. McClure had no documentation to support any of the individual percentages for Level 3 customers, including for the many customers listed as █ OTT VoIP.  Exhibit Q, McClure Depo., at 107:5-9; 108:22-109:4; 114:13-21; 115:3-7; 140:19-141:2; Exhibit R, Dr. Pfautz Expert Rebuttal Report, at ¶ 27. | |
| 86. | | Despite publicly available information about Level 3's customers showing that those customers appeared to have OTT VoIP traffic, Mr. McClure never re-examined his assumptions from 2017. Exhibit Q, McClure Depo., at 154:7-18, 204:10-25, 207:17-21.  Mr. McClure admitted that he did not know if many of the numbers were accurate and he | |

| | | | |
|---|---|---|---|
| | | "guessed that it's probably not." *Id.* at 111:21-25 ("I don't know if that number is accurate, the ██. I would guess that it's probably not."); *see also id.* 125:18-127:6; 141:20-142:11; 147:11-148:18. | |
| 87. | | Mr. McClure's methodology to determine Level 3's OTT percentage is deeply flawed for several reasons, including the failure to query customers during the period in dispute and the use of unreliable and undocumented "click-to-chat" sessions to estimate the OTT VoIP percentages of Level 3's customers. Exhibit Q, McClure Depo., at 59:13-62:2; Exhibit R, Dr. Pfautz Expert Rebuttal Report, at ¶ 27 ("Level 3's methodology is flawed, and I am not confident that it accurately depicts Level 3's OTT percentage."). | |
| 88. | | TCG has stopped billing end office access charges on over-the-top VoIP calls since July 2019. Exhibit W, Gallagher Dec., at ¶ 6. | |
| 89. | | Level 3 has over-withheld payment of TCG's billed charges by withholding ██ of TCG's and AT&T Corp.'s total end office switching and common trunk port charges (not just business VoIP products), even though TCG only has approximately ██ OTT. Exhibit W, Gallagher Dec., at ¶¶ 8, 9. Level 3 began withholding this amount on or around August 2019. *Id.* at ¶ 8. | |

| | | | |
|---|---|---|---|
| 90. | | Even after TCG issued credits for approximately ▮ of end office charges for the periods prior to July 2019 and within the limitations period, Level 3 will need to pay TCG unpaid end office charges, and TCG will not need to pay any refund because  the amount of Level 3's withholding exceeds the amount of any credit.   Exhibit W, Gallagher Dec., at ¶¶ 8, 9. | |

Respectfully submitted this 20th day of July, 2020.

By:    /s/ Justin A. Benson

             Rebecca B. DeCook
             Andrew T. Flynn
             Moye White LLP
             1400 16th Street, 6th Floor
             Denver, CO 80202-1027
             becky.decook@moyewhite.com
             andrew.flynn@moyewhite.com

             Michael D. Warden
             Michael J. Hunseder
             Justin A. Benson
             Joshua W. Moore
             SIDLEY AUSTIN LLP
             1501 K ST NW
             Washington, DC 20005
             Telephone: (202) 736-8000
             E-mail: mwarden@sidley.com
             E-mail: mhunseder@sidley.com
             E-mail: jbenson@sidley.com
             E-mail: joshua.moore@sidley.com

             *Attorneys for Plaintiff AT&T Corp.*
             *and Counterclaim Defendant*
             *Teleport Communications Group*

## CERTIFICATE OF SERVICE

I, Justin A. Benson, hereby certify that on July 20, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Charles W. Steese, #26924
Douglas N. Marsh, #45964
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

*Attorneys for Level 3 Communications, LLC*

/s/ Justin A. Benson
Justin A. Benson