# EXHIBIT B

CONFIDENTIAL

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2        CIVIL ACTION NO. 18-cv-00112-RM-MEH
3
    AT&T CORPORATION,                :
4                                    :
                 Plaintiff,           :
5                                    :
             vs.                      :
6                                    :
    LEVEL 3 COMMUNICATIONS, LLC,     :
7                                    :
                 Defendant.           :
8
9
10           Deposition of KIMBERLY MEOLA
11  taken in the above-entitled matter before
12  Suzanne J. Stotz, a Certified Court Reporter
13  (License No. 30XI00184500) and Notary Public of
14  the State of New Jersey, taken at the offices
15  of AT&T, One AT&T Way, Bedminster, New Jersey
16  07921, on Thursday, February 7, 2019,
17  commencing at 1:36 p.m.
18
19
20
21
22  Job No. CS3213054
23
24
25

CONFIDENTIAL

Page 2

```
 1    A P P E A R A N C E S:
 2
 3         SIDLEY AUSTIN, LLP
           BY:  MICHAEL J. HUNSEDER, ESQ., and
 4              JUSTIN A. BENSON, ESQ.
           1501 K Street, N.W.
 5         Washington, D.C. 20005
           (202) 736-8236
 6         (202) 736-8757
           mhunseder@sidley.com
 7         jbenson@sidley.com
           Attorneys for the Plaintiff
 8
 9
           ARMSTRONG TEASDALE, LLP
10         BY:  CHARLES W. STEESE, ESQ.
           4643 South Ulster Street, Suite 800
11         Denver, Colorado 80237
           (720) 200-0676
12         csteese@armstrongteasdale.com
           Attorneys for the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 75

1       yes.
2           Q.   So now let's look at Exhibit 5.
3                (Whereupon, Exhibit No. AT&T 5,
4           E-mail correspondence, Bates numbered
5           ATT_PROD_0011593 through ATT_PROD_0011596,
6           was marked for identification.)
7       BY MR. STEESE:
8           Q.   And you see this is an e-mail,
9       cover e-mail from February of 2014.
10               Do you see that?
11          A.   Yes.
12          Q.   So it's a little bit later.  And if
13      you look in here, it's talking about a 2013
14      dispute financials.  That's really not my
15      interest.  It's just there's different dates.
16      2014, then it's talking about 2013.
17               But my interest really is right
18      under the words that say, "Level 3 Over-the-Top
19      VoIP dispute."  And it says, "In 2011 AT&T
20      disputed Level 3 local switching access bills
21      associated with Over-the-Top VoIP provider
22      services, e.g. ███████, ███████ et cetera."
23               Do you see that?
24          A.   Yes, I see that.
25          Q.   So here it suggests at least that

CONFIDENTIAL

Page 76

1    the first AT&T dispute with Level 3 over OTT
2    was in 2011.
3            Does that sound like it's probable,
4    possible?  Does this help refresh recollection?
5    Any of the above?
6        A.    Yeah, that sounds possible.
7        Q.    Okay.
8        A.    I mean, it makes sense with the
9    prior document because there were already
10   dollars that were in dispute in August of 2012.
11   So yes, that's the ballpark that I recollected.
12       Q.    Okay.  Exactly.  I'm just trying to
13   get back to dates.
14       A.    Yeah.
15       Q.    So then if you go down to the fifth
16   bullet, it says, "AT&T agreed to pay ■ percent
17   of their end-office billing and ■ percent of
18   all other usage charges rendered by Level 3 as
19   part of the Settlement Agreement through the
20   end of 2013."
21           Do you see that?
22       A.    Yes, I see that.
23       Q.    Were you aware that Level 3 and
24   AT&T had entered into a Settlement Agreement in
25   2013?

1         MR. HUNSEDER: At the time?
2         MR. STEESE: At the time.
3         THE WITNESS: He was new to the
4    organization, very new. He was VP of, I
5    think it was global access.
6    BY MR. STEESE:
7         Q.   So in terms of hierarchy, he would
8    have been higher than you?
9         A.   He was one level higher than me,
10   yes.
11        Q.   So you're an executive director?  I
12   don't know the hierarchy, so I'm guessing.
13        A.   That might have been my name at the
14   time. Right now I'm an AVP versus George being
15   a VP, assistant vice-president.
16        Q.   I knew EVP, but I didn't know AVP?
17        A.   It'll change again.
18        Q.   All right. So in terms of the,
19   again, you are now -- I'm going to ask you this
20   question in your corporate capacity for AT&T --
21   charged with answering the question for the
22   company --
23        A.   Uh-huh.
24        Q.   Because it relates to negotiations.
25             The discussions that AT&T had with

CONFIDENTIAL

Page 111

1   Level 3 verbally, are they memorialized in
2   written documents in one place or another that
3   have been produced to us?  Let me strike that,
4   produced to us because you won't know.
5           Have they been memorialized in
6   documents one play or another?
7       A.   I am not aware of any conversations
8   that were not memorialized.
9           And just to be clear, you're
10  talking specifically about OTT again, right?
11      Q.   A hundred percent.
12      A.   Yes.  I'm not aware.  I would have
13  been a part of those, yes.
14      Q.   Let me show you what I'm marking as
15  Exhibit 10.
16          (Whereupon, Exhibit No. AT&T 10,
17      E-mail correspondence with attachment,
18      Bates numbered ATT PROD 0011771 through
19      ATT PROD 0011772, was marked for
20      identification.)
21  BY MR. STEESE:
22      Q.   And Exhibit 10 is dated April 9 of
23  2015.  And you can see its sent to Level 3.
24      A.   Uh-huh.
25      Q.   And it says, "Confidential

CONFIDENTIAL

Page 112

1  Settlement Offer Pursuant to Rule 408."  So
2  basically this is settlement discussions.
3       A.    Yes.
4       Q.    Do you see that?
5       A.    Yes, I do.
6       Q.    And one of the items that it talks
7  about is the OTT dispute.
8            Do you see that?
9       A.    I see OTT dispute, yes.
10      Q.    This is not -- I'm not a gotcha
11 guy.
12      A.    Uh-huh.
13      Q.    So we talked about when the
14 discussions for the settlement began, and you
15 said you thought early May.  This document is
16 April of 2015.  So it's a little bit earlier
17 than that.
18           Do you consider this part of the
19 settlement discussions, or is this something
20 separate?
21      A.    We had ongoing discussions with
22 Level 3.  We were making offers for many years.
23 But the real milestone that brought the 2015
24 settlement to a head was the executive
25 escalation.

1    regardless of whether AT&T wins or loses its
2    FCC appeal."
3            Do you see that?
4        A.    Yes.
5        Q.    And that concept was in the
6    Settlement Agreement, correct?
7            MR. HUNSEDER:  Object to the form.
8    BY MR. STEESE:
9        Q.    This is the prior to June 2015, not
10   post.
11       A.    Yes, you're correct.  Thank you for
12   the clarification.
13       Q.    And then Item Number 6 says, "If
14   AT&T wins its FCC appeal, L3 will refund ▇ of
15   the disputed charges beginning with June 2015
16   through the date of a final ruling, either from
17   the Court of Appeals or, from remanded, by the
18   FCC ruling."
19           Do you see that?
20       A.    Yes.
21       Q.    And that concept ends the
22   Settlement Agreement, correct?
23       A.    Generally it does.  There's some
24   modifications.
25       Q.    What modifications do you see?

CONFIDENTIAL

Page 166

1  A. Am I able to reference the
2  contract, or do you want me to --
3  Q. I'm just looking for concepts.
4  A. Generally. So this was written --
5  drafted again by George, and what was always
6  our intent was, you know, we want a date
7  certain to resolve the issue. And so we were
8  triggering off of the appeal at the FCC.
9  This "if remanded, by the FCC
10  ruling," was never the intent; and that was
11  removed in the final document.
12  Q. Was it ever in the document at all?
13  A. I don't believe so. I mean, it was
14  in term sheets. I'll call this a term sheet;
15  but in the settlement document itself, no.
16  Q. Was there ever any discussion to
17  Level 3 saying, we didn't mean the remand?
18  A. No. I think it was just the
19  wording that was used for lack of
20  understanding. And when we went back and I was
21  able to -- this was, again, the day that I was
22  out and flying back. When I was able to, you
23  know, focus some time, this was a guide. We
24  were able to get the right language that was
25  intended.

CONFIDENTIAL

Page 179

1    that was our interpretation at that time, yes.
2         Q.    Okay.  So --
3         A.    I don't want to say it's a legal
4    position, but that was our interpretation.
5         Q.    Fair enough.
6         A.    Uh-huh.
7         Q.    So before the Declaratory Ruling
8    action, there was a very clear difference of
9    view in the industry about whether the rules
10   did or did not permit the billing of end-office
11   charges on OTT calls, correct?
12        A.    I believe that's what led to the
13   Declaratory Order.
14        Q.    So the answer -- is that yes?
15   There was a difference of view in the industry?
16        A.    Yes, I think there was a difference
17   with some carriers, yes.
18        Q.    And I'm confused by your answer.
19              So was there or was there not a
20   difference of view in the industry?
21        A.    You know what, I'm not quite
22   certain, Chuck.  I don't -- I don't know for
23   certain.  I believe that there was.  I think
24   that's what led to the Declaratory Order, but I
25   didn't follow everybody else's comments on the

1    BY MR. STEESE:
2         Q.    Let's look back at Exhibit
3    Number 23, and I'm looking at -- there's a lot
4    of red here.  And it's Bates '894 and '895
5    that -- of the OTT.  Open that up so it's kind
6    of butterflied, if you will.
7         A.    Okay.
8         Q.    I'm doing that now not because I'm
9    going to ask about everything, but just so you
10   don't think I'm hiding anything.  I'm going to
11   focus on this page (indicating).
12        A.    Okay.
13        Q.    Because we're focusing really on
14   terms -- on subfour.
15        A.    Okay.
16        Q.    But I don't want you to think I'm
17   trying to keep anything from you.
18        A.    Thank you.
19        Q.    So if you look at the language of
20   subfour, the final read that, "The Parties
21   agree that any billing and payments for OTT
22   traffic exchanged after such order becomes
23   final shall be in compliance with terms of that
24   order."
25              Do you see that?

1       A.      Yes, I see that.
2       Q.      That language was added by AT&T,
3    correct?
4       A.      I'm not sure, but it's red; so
5    whose version was this?
6       Q.      Look at the front.  It's coming
7    from your lawyer, correct, AT&T's lawyer?
8       A.      No.  This latest is Steve Ross.
9    So -- oh, here's Debbi, but Steve's sending it
10   to -- oh, so he was just sending it internally?
11      Q.      Correct.
12      A.      Okay.  So we would assume red is
13   AT&T.  It is, okay.  So yes, the red is AT&T.
14   And yes, that was our add.
15      Q.      If the final order -- you're
16   looking like you're looking at something.
17      A.      I was just trying to look at what
18   Level 3 had, you know, trying to look at both
19   sides of the blue and the red.
20      Q.      So if a final order doesn't provide
21   any guidance on how carriers should bill for
22   OTT end office, how do you implement that final
23   sentence that AT&T added?
24              MR. HUNSEDER:  Object to the form.
25              THE WITNESS:  I don't know the

CONFIDENTIAL

Page 204

1  And so there was a concept that we
2  had to -- we were going to settle what we knew,
3  and that was the payment in A. And then B was
4  we were going to take the April -- it was April
5  and May.
6  Q. And apply the 65-percent factor to
7  it, correct?
8  A. And apply the 65-percent factor to
9  it, yes. Which was intended to be -- you know,
10 everything in the past it was at a hundred or,
11 you know, we took the 75 percent of the
12 payment, which was 100 percent of the end
13 office. But going forward, we were going to
14 use the 65 percent.
15         So that's -- it was being separated
16 out because that was the most current; and
17 that's what we were going to utilize as a
18 gauge.
19 Q. Okay. When you say "going
20 forward," you mean for April and May, correct?
21 April and May, before the June 1, 2015, date,
22 you were going to use a 65 percent for those
23 two months, correct?
24 A. In this clause, yes; but the
25 conversation -- you asked me was there a

Veritext Legal Solutions
800-567-8658                                    973-410-4098

```
 1   conversation.  Was this was the best number
 2   that we had agreed upon.  And the conversation
 3   was centered around we'll use it here; but if
 4   we need it, you know, later, this is the
 5   factor, which is why we didn't use 75 percent
 6   here.  We used 65-percent OTT factor versus
 7   total billing at 75 paid.
 8        Q.   Who told you that?
 9        A.   It was our ongoing discussion
10   between the teams.
11        Q.   You told me everything was
12   memorialized in writing.  I've seen nothing to
13   that effect.
14             What memorializes that in writing?
15        A.   I can't say that it was
16   memorialized in writing, but I think that was
17   the intent of this language, the fact that it
18   was separated out as two different time
19   periods.
20        Q.   Okay.  Let's --
21        A.   The language was put into the
22   contract again.  This was provided by Level 3,
23   so I think that memorializes it.
24        Q.   But it doesn't saying anything
25   about going forward, does it?
```

CONFIDENTIAL

Page 257

1    A.    Yes.
2    Q.    And is that based on a 65-percent
3    factor?
4    A.    I believe, yes.
5    Q.    And then it says, final sentence,
6    "Until Level 3 conforms its billing to the
7    current status of the law, AT&T will modify its
8    payment to reflect the appropriate level of OTT
9    traffic and ensure accurate compensation."
10         Do you see that?
11   A.    Yes.
12   Q.    So AT&T is withholding payment for
13   what it believes is OTT traffic on Level 3's
14   network?
15   A.    Based upon the last agreed-upon
16   factor, yes.
17   Q.    So 65 percent?
18   A.    Yes.
19   Q.    From even through today?
20   A.    I'm not sure, but I would assume
21   yes.  I don't know that anything's changed on
22   that.
23   Q.    This discussion first started in
24   2017, correct, this discussion somewhere in
25   2017?

CONFIDENTIAL

Page 264

1   view, that this isn't a final decision,
2   correct, in paragraph 1?  And I'm not going to
3   read the whole thing.
4         A.    Yeah, he's kind of saying that,
5   yeah.
6         Q.    And he also says, the final
7   sentence of that first paragraph, the
8   Settlement Agreement does not say the refund is
9   pegged at 65 percent.  It only says there
10  should be a refund based on disputed OTT
11  charges.
12              So you would agree with him on that
13  point?  Whatever the real OTT number is, that's
14  what should be refunded in your theory,
15  correct?
16        A.    The 65 percent is the agreed-upon
17  factor until such time that we agree on a new
18  factor.  So yes, if we agree on a new factor,
19  from that point forward, that would be the
20  disputed value.  That would be the amount we
21  would use.
22        Q.    You think that there's an
23  agreed-upon factor to use that prospectively
24  into 2017 in the Settlement Agreement?
25        A.    I think 65 percent still exists

Page 265

1    today in absence of a replacement of that
2    factor.  What else would you use?  That's the
3    industry practice.
4         Q.    Oh, so the whole point is as long
5    as you dispute a factor, then you can continue
6    to dispute factor and dispute factor; and
7    that's factor another carrier is stuck with?
8         A.    No.
9               MR. HUNSEDER:  Objection.
10              THE WITNESS:  No, not at all.  I
11       mean, the fact is that it has to be agreed
12       upon.  And if the fact and data isn't
13       provided to come up with a new factor,
14       there's nothing else to work with.  So you
15       work with what you have until such time
16       that there's a new factor.
17   BY MR. STEESE:
18        Q.    So you think that PIU factors have
19   to be agreed upon or they're not --
20        A.    I don't know about PIU factors.
21   I'm not familiar --
22        Q.    Do you know that PVU factors, do
23   they have to be agreed upon or they're not
24   enforcement?
25        A.    I don't know about PVU.

1       Q.      So what makes you say that for OTT
2    factor, it has to be agreed upon or you revert
3    back to 65 percent?
4       A.      What else would you use.  If you
5    don't have any other factor data, you use the
6    latest information that you have.  I'm not sure
7    what you're suggesting.
8       Q.      Isn't it true that Level 3 has been
9    providing you with data upon data upon data,
10   and you've just rejected the data?
11              MR. HUNSEDER:  Objection.
12              THE WITNESS:  No.  That's not
13         factual.  They've provided us a number to
14         say it's ■ percent, but they've given us
15         no justification for how it went from 65
16         to ■ percent or ■ percent or ■ percent
17         or ■ percent as it bounced all over the
18         place.
19              So there's been no data provided
20         behind that that would help us to validate
21         any of those numbers.
22   BY MR. STEESE:
23      Q.      So you feel you -- AT&T feels like
24   they can unilaterally just project that data
25   and say it's 65 percent?

```
 1                  C E R T I F I C A T E
                    ─────────────────────              Page 324
 2

 3

 4              I, SUZANNE J. STOTZ, a Certified

 5   Court Reporter, Certified Realtime Reporter,

 6   Registered Professional Reporter, and Notary

 7   Public in and for the State of New Jersey, do

 8   hereby certify that the foregoing is a true and

 9   accurate transcript of the stenographic

10   above-captioned matter.

11

12
                    _Suzanne S____, CCR, RPR, CRR
13

14              SUZANNE J. STOTZ, CCR, RPR, CRR

15              LICENSE NO. 30XI00184500

16

17

18   DATED:  DATE, 2019

19

20

21   NOTE:  THE CERTIFICATE APPENDED TO THIS

22   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION

23   OF THE SAME BY ANY MEANS, UNLESS UNDER THE

24   DIRECT CONTROL AND/OR DIRECTION OF THE

25   CERTIFYING COURT REPORTER.
```