# EXHIBIT L

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 18-cv-00112-RM-MEH

AT&T CORPORATION, :
 :
 Plaintiff, :
 :
 vs. :
 :
LEVEL 3 COMMUNICATIONS, LLC, :
 :
 Defendant. :

Deposition of ARDELL BURGESS taken in the above-entitled matter before Suzanne J. Stotz, a Certified Court Reporter (License No. 30XI00184500) and Notary Public of the State of New Jersey, taken at the offices of AT&T, One AT&T Way, Bedminster, New Jersey 07921, on Friday, February 8, 2019, commencing at 9:01 a.m.

Job No. CS3213055

Veritext Legal Solutions
800-567-8658                                     973-410-4098

CONFIDENTIAL

Page 2

1  A P P E A R A N C E S:
2
3          SIDLEY AUSTIN, LLP
           BY:  MICHAEL J. HUNSEDER, ESQ., and
4               JOSH MOORE, ESQ.
           1501 K Street, N.W.
5          Washington, D.C. 20005
           (202) 736-8236
6          (202) 737-8432
           mhunseder@sidley.com
7          joshua.moore@sidley.com
           Attorneys for the Plaintiff
8
9
           ARMSTRONG TEASDALE, LLP
10         BY:  CHARLES W. STEESE, ESQ.
           4643 South Ulster Street, Suite 800
11         Denver, Colorado 80237
           (720) 200-0676
12         csteese@armstrongteasdale.com
           Attorneys for the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 69

```
 1         A.    It's very boring.   ███.
 2         Q.    So your understanding of the number
 3   of OTT subscriptions that Level 3 had is, at
 4   least by this Form 477, inaccurate, correct?
 5               MR. HUNSEDER:  Object to the form.
 6               THE WITNESS:  Help me do it again,
 7      or do it again.
 8   BY MR. STEESE:
 9         Q.    I'll ask it this way:  You thought
10   Level 3 had direct OTT subscriptions, correct?
11         A.    Correct.
12         Q.    This document would suggest
13   otherwise, correct?
14         A.    That would be the impression.
15         Q.    So let's just talk about wholesale
16   arrangements for a moment, high level.
17         A.    Okay.
18         Q.    So we were talking about ████████
19   and ████████ having direct OTT subscriptions
20   where they know -- I'm giving this particular
21   end user an OTT subscription.  So I know the
22   telephone number assigned to this particular
23   end user is or is not OTT, correct?
24         A.    Right.  They'd have to correlate
25   the actual connectivity with that end user.
```

CONFIDENTIAL

Page 87

```
 1        A.      Oh, this one.  Right on the top.
 2        Q.      Exhibit 4, and this is an e-mail
 3   from you to others from August of 2012.
 4                Do you see that?
 5        A.      I do.
 6        Q.      And there is an attachment on the
 7   back side, and it's an update from August of
 8   2012.  If you look in the opening paragraph, it
 9   says, basically, Level 3 has been assigning
10   telephone numbers to a number of OTT providers,
11   including        .
12                Do you see that?
13        A.      Yes.
14        Q.      And it says underneath that, "AT&T
15   estimates that at least 65% of Level 3 Federal
16   and State port and local switching charges are
17   associated with Over-the-Top Service Provider
18   volumes."
19                Do you see that?
20        A.      Yes.
21        Q.      And so the 65 percent was an AT&T
22   estimate, at least in 2012, correct?
23        A.      It was a negotiated -- the result
24   of a discussion with Level 3 as it related to
25   some of the research we had done relative to
```

1    percent of telephone numbers that seemed to be
2    assignable by Level 3.
3            Initially, the discussions at that
4    point in time with Andrea Pierantozzi -- and I
5    don't know how to spell her last name.
6        Q.    That's all right.
7        A.    And Mack Green were minimally -- we
8    believe that there was a lot more OTT traffic
9    relative to what we saw in terms of our Secret
10   Shopper type work.  And in some of those
11   results over from 2010, 2011, 2012 we kind of
12   aggregated and basically said, when I look at
13   the total number of available -- number
14   availability associated what Level 3 assigns to
15   some of those Over-the-Top providers, it runs
16   in the ████████████████ range whenever we did
17   that type of thing.
18           So as we discussed our dispute with
19   Pierantozzi and Green at that point in time,
20   the discussion morphed to, well, if it's not
21   95-percent Level 3 and it's something else,
22   what is it.  Banter went back and forth a
23   little bit.  And then we essentially suggested,
24   based upon our Secret Shopper work, it could be
25   at least 65 percent.  And the answer was that's

CONFIDENTIAL

Page 89

1    a reasonable number.
2         Q.    By who?
3         A.    Andrea Pierantozzi and Mack Green.
4         Q.    Okay.  So I'm going to get back to
5    this in just a second.
6         A.    Sure.
7         Q.    But I want to make sure I
8    understand.
9         A.    Uh-huh.
10        Q.    You said that you were generally
11   familiar with traffic pumping from years ago,
12   correct?
13        A.    Years ago?
14        Q.    From 2007, started in Iowa and
15   continued.
16        A.    Yeah, I have an appreciation for
17   it, yes.
18        Q.    Okay.  So were you aware that these
19   local exchange carriers in Iowa, South Dakota,
20   Minnesota, wherever they were, they were taking
21   telephone number blocks and assigning them to
22   the free conferencings of the world and to
23   others like that that were then using those for
24   what we're calling traffic pumping or access
25   stimulation?

CONFIDENTIAL

Page 133

1  dispute position related to OTT.  And in the
2  midst of, basically, trying to negotiate and
3  value, if you will, some type of settlement on
4  a, I think as I recall, on a past and -- you
5  know, from the settlement date forward.
6            So we were doing a number of
7  sensitivities around, okay, or around the
8  notion that can we settle this issue, what
9  would be the valuation.  There was a series of
10 disputes between our two firms, between AT&T
11 and Level 3, that were being looked at --
12      Q.    Together?
13      A.    -- en suite, yeah, together and
14 seeking to try and move to a position where the
15 dispute could be, you know, resolved based upon
16 different, you know, financial triggers.
17      Q.    I'm only focused on OTT.
18      A.    Okay.
19      Q.    I'm not focused on the other
20 disputes that Level 3 and AT&T may have.
21            So, again, your role in the OTT
22 portion is?
23      A.    Was on -- maintaining the ongoing
24 dispute position and withholding action
25 relative to the 65-percent position and doing

CONFIDENTIAL

Page 134

1   some analytics around the billing associated
2   with that position.
3       Q.   So after the D.C. Circuit opinion
4   issued, at some point in time has AT&T started
5   to withhold monies again from Level 3?
6       A.   To the best of my recollection,
7   yes.
8       Q.   Is it based upon the 65 percent?
9       A.   Yes.
10      Q.   And is it still based upon the
11  65 percent?
12      A.   Yes.
13      Q.   So when you say "maintaining the
14  position," you mean maintaining the position
15  that 65 percent of Level 3's end-office
16  switching charges are associated with OTT?
17      A.   Until -- yes.  Until data is
18  provided that suggests it's something other
19  than that.
20      Q.   That suggests it or proves it in
21  your mind?
22      A.   Ideally proves it in my mind.
23      Q.   Let's look at Exhibit Number 27.
24
25

CONFIDENTIAL

Page 225

1     A.    Correct.
2     Q.    If that's true, why didn't you take
3  the time to ask, are we doing the same thing;
4  are we billing end-office charges on these
5  calls that I'm disputing when another carrier
6  does it?  Why didn't you do that?
7           MR. HUNSEDER:  Object to the form
8       and lacks foundation.
9           THE WITNESS:  In the past, it's my
10      understanding that we weren't in that type
11      of business.  And as a result of -- and
12      then recently as a result of this
13      litigation, I became made aware, as you
14      can see, that we had something called
15      Collaborate.
16          I read the service guide about, you
17      know, the customer could bring their own
18      or provide it from a third-party; and then
19      that was the extent of basically my
20      research at this point in time.
21          I haven't done any further
22      investigation in terms of the other side
23      of the business because I'm on the cost
24      side and not the product side or revenue
25      side.

```
 1                    C E R T I F I C A T E
                                                    Page 268
 2

 3

 4              I, SUZANNE J. STOTZ, a Certified

 5     Court Reporter, Certified Realtime Reporter,

 6     Registered Professional Reporter, and Notary

 7     Public in and for the State of New Jersey, do

 8     hereby certify that the foregoing is a true and

 9     accurate transcript of the stenographic

10     above-captioned matter.

11

12

13              _____, CCR, RPR, CRR

14              SUZANNE J. STOTZ, CCR, RPR, CRR

15              LICENSE NO. 30XI00184500

16

17

18     DATED: DATE, 2019

19

20

21     NOTE: THE CERTIFICATE APPENDED TO THIS

22     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION

23     OF THE SAME BY ANY MEANS, UNLESS UNDER THE

24     DIRECT CONTROL AND/OR DIRECTION OF THE

25     CERTIFYING COURT REPORTER.
```