# EXHIBIT S

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

AT&T CORPORATION,            ) Civil Action File No.:
         Plaintiff,          ) 18-cv-00112-RM-MEH
   vs.                       )
LEVEL 3 COMMUNICATIONS, LLC, )
         Defendant.          )
_____)

NON-CONFIDENTIAL PORTION

CONFIDENTIAL ATTORNEYS' EYES ONLY BOUND SEPARATELY

PAGE 148

PAGES 206-214

DEPOSITION OF PENN L. PFAUTZ, PH.D.

VIRTUAL ZOOM

TUESDAY, APRIL 28, 2020

Reported by:

ASHALA TYLOR, CSR #2436, CLR, CRR, RPR

JOB NO. 4083362

PAGES 1 - 236

Page 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| AT&T CORPORATION, | ) Civil Action File No.: |
|     Plaintiff, | ) 18-cv-00112-RM-MEH |
| vs. | ) |
| LEVEL 3 COMMUNICATIONS, LLC, | ) |
|     Defendant. | ) |
| _____ | ) |

Deposition of PENN L. PFAUTZ, PH.D., taken via Zoom videoconference commencing at 8:08 a.m. (PST), and ending at 3:05 p.m., on Tuesday, April 28, 2020, before Ashala Tylor, CSR No. 2436, RPR, CRR, CLR.

Page 3

1  APPEARANCES OF COUNSEL:
2  On behalf of Plaintiff:
3      SIDLEY AUSTIN LLP
4      BY:  JUSTIN A. BENSON, ESQ.
5           MICHAEL J. HUNSEDER, ESQ.
6      1501 K Street, N.W.
7      Washington, D.C.  20005
8      202.736.8757
9      jbenson@sidley.com
10     mhunseder@sidley.com
11
12 On behalf of the Defendant:
13     ARMSTRONG TEASDALE LLP
14     BY:  CHUCK STEESE, ESQ.
15          DOUG N. MARSH, ESQ.
16     4643 South Ulster Street, Suite 800
17     Denver, Colorado  80237
18     720.200.0676
19     csteese@armstrongteasdale.com
20
21
22 Also Present:
23     Mark Hesse
24
25

Page 59

1   made an attempt to create a factor and there may
2   well have been others that -- that attempted to.  It
3   seems to me that -- that AT&T tried to assess how
4   much OTT they had.
5             So, you know, whether or not there was a
6   clear legal situation, which, you know, I can't
7   really speak to, it seems like carriers were aware
8   of that and -- and made some attempts to -- to deal
9   with that.
10  BY MR. STEESE:
11      Q.   Are you aware -- first of all, are you
12  aware of any carrier other than AT&T and Level 3
13  before December 2019 that had created a percent OTT
14  factor?
15      A.   I can't say that I am.
16      Q.   Are you aware that AT&T developed an OTT
17  factor between April and June of 2019 because of the
18  lawsuit that -- the claims -- that Level 3 brought
19  against it in this case?
20      A.   I'm --
21           MR. BENSON:  Objection.
22           THE WITNESS:  Sorry.
23           MR. BENSON:  Go ahead.
24           THE WITNESS:  I'm not aware of the
25  chronology of that work.

Page 106

1    A.   I am.
2    Q.   Would that be an OTT call?
3    A.   Well, I think that it might because I
4    think of the actual deaf or hard of hearing user who
5    is paying this customer of Level 3 for service or if
6    the FCC is maybe reimbursing that entity for the
7    service provided to these customers; but I think of
8    the ultimate end user as the person who is at the
9    other end of the Internet connection and is, you
10   know, essentially making that call, originating that
11   call.
12        I realize people may have different views
13   on this, but that is my take on that situation.
14   Q.   So what has AT&T done to see if any of its
15   enterprise class customers are doing things like
16   that?  And that is employing -- allowing their own
17   customers to call in to their functional PBX VoIP
18   application server -- whatever you want to call
19   it -- and then transmit the calls over the SIP trunk
20   physical facilities -- whatever it might be -- to
21   AT&T's end office switch.  What has it done to
22   determine whether the customer is using the
23   facilities in this fashion as opposed to a product
24   that AT&T has created for itself to be used in a
25   particular way?

Page 107

1              MR. BENSON:  Objection.  Form.
2              Go ahead.
3              THE WITNESS:  Yeah.  I don't know what
4    AT&T has done in that regard.
5              I want to be clear:  The scenario that
6    we're talking about when we say "customer," I assume
7    you mean the nominally enterprise customer of
8    Level 3 as opposed to the end user who is a party
9    that's paying that nominally enterprise entity
10   that's really acting as a carrier in this case.
11   BY MR. STEESE:
12        Q.   My question wasn't -- you're right except
13   for you said Level 3 and I'm saying AT&T.
14        A.   Okay.  Fair enough.  My -- my bad.  Yes.
15             I don't know what AT&T has specifically
16   done to assess whether that is going on with some
17   customers.
18        Q.   And in order to do that, AT&T would need
19   to look at each and every one of its enterprise
20   class customers one by one by one determine what
21   their business plan is, see if they themselves
22   deploy any OTT calling for people that are not their
23   employees to make that assessment, correct?
24             MR. BENSON:  Objection.
25             THE WITNESS:  I don't --

1   conclusion.
2           But go ahead, Penn.
3           THE WITNESS: Yeah, I would conclude that
4   if that is -- is so, then -- then those would be
5   eligible for end office switching.
6   BY MR. STEESE:
7       Q.   All right.  Let's focus on these three
8   entities that you focused on where you said some --
9   strike that.
10          Let's focus on the three entities: ▮▮▮
11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that you had issue with
12  that were identified as zero.
13          Are you with me, sir?
14      A.   Yes, I am.
15      Q.   All right.  So let's look at Exhibit PP-7
16  from Exhibit 110.
17          Let me know when you are there, sir.
18      A.   I'm getting it.  It's coming up.
19      Q.   Take your time.
20      A.   I'm there.
21      Q.   And this particular document relates to
22  ▮▮▮, correct?
23      A.   Right.
24      Q.   And if you turn to page 3 of 4 of the pdf,
25  there is materials on the very top that says ▮▮▮

Page 152

1   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2   ▓▓▓▓▓▓▓▓▓▓▓▓"  Do you see that?

3       A.   Not yet.  I'm looking for it.

4       Q.   Very top.

5       A.   You said which page?

6       Q.   If you look at the pdf, it's page 3 of 4.

7       A.   Okay.  Pdf, page 3.  Yes.

8       Q.   All right.  And if you look at the far
9   right entitled "Connectivity," it says "Connect your
10  sites to ▓▓▓▓ with over-the-top, enhanced OTT,
11  private connectivity, or SD-WAN."  Do you see that?

12      A.   I do see that.

13      Q.   What is SD-WAN?

14      A.   I'm not sure exactly what SD -- WAN is
15  wide area network.  I'm not sure what SD-WAN is in
16  this case.

17      Q.   But WAN -- a WAN connection tends to be
18  using existing facilities, correct?

19      A.   It may or may not.

20      Q.   Define why you say it may or may not if
21  it's a WAN connection.

22      A.   Because a WAN connection could be a
23  connection that already exists or it could be --
24  maybe I misunderstand your question.

25           A WAN I do think of as facilities-based.

```
                                                       Page 153

 1     However, I don't know whether it was there before
 2     the customer got the service or was something that
 3     they had installed.
 4          Q.   I understand now.  I was asking if it was
 5     facilities-based.  So thank you.
 6               But if the WAN facilities are provided by
 7     █████ then the calls going over the WAN connection
 8     could have end office charges associated with them,
 9     correct?
10          A.   Yes.
11               MR. BENSON:  Objection.  Calls for a legal
12     conclusion.
13               But go ahead, Penn.
14               THE WITNESS:  Yes, I would say from a
15     technical perspective, yes.
16               (Off the record discussion.)
17               MR. BENSON:  Yeah, Penn has been echoing.
18     I'm not sure -- and now I am.
19               MR. STEESE:  Justin, if you --
20               MR. BENSON:  It's all me.
21               Let me go on mute for one second and see
22     if that helps.
23               Is that better?
24               MR. STEESE:  Yes, for me it is.
25               (Off the record discussion.)
```

Page 154

1  MR. STEESE: You went from an OTT call to
2  a WAN connection right there.
3  MR. BENSON: Exactly.
4  BY MR. STEESE:
5  Q. So Dr. Pfautz, what percentage of ▌
6  calls are over WAN versus over OTT, do you know?
7  A. I do not pretend to know that. I merely
8  note that they do offer an OTT functionality, which
9  is why I brought into question their assignment of
10 the value of zero by Mr. McClure.
11 Q. So if you're looking at this data, you
12 have information from the web that says some
13 percentage of calling is OTT and some percentage of
14 calling is not. Then if this is all the information
15 you have, and you're trying to calculate percent
16 OTT, what would you do to try and identify the
17 percent OTT for ▌
18 A. Well, I would not try to calculate that
19 percentage from this information. I would only take
20 away that it's nonzero.
21 Q. What more would you try and do to
22 determine what percent is OTT versus percent not?
23 A. If it were my job to determine that, I
24 would try to contact ▌ and obtain documentation
25 from them about what they believe the percentage is

1  elevates the OTT percentage only to ▇▇▇▇▇▇.  Do
2  you see that?
3      A.  I see that what you did elevated it to
4  ▇▇▇▇▇▇.
5      Q.  Do you have any evidence that the
6  percent -- Level 3's percent OTT is greater than
7  ▇▇▇▇▇▇.
8      A.  I have no specific evidence and made no
9  claim about what the value of the OTT would be
10 properly calculated with verifiable data.
11      I see here you've made some assumptions
12 about which companies should be bumped up.  Again, I
13 don't know that some of those zeros shouldn't be
14 high -- should be above zero.
15      I don't know that some of the cable
16 companies shouldn't be higher since I don't
17 understand all of the arrangements that are going on
18 there.
19      So I understand the math of what you did
20 and the way that it works out, but that's kind of
21 tangential to the focus of my report which was an
22 evaluation of the methodology and its reliability
23 and how I thought that fit in, in terms of what
24 carriers had a right to expect that they were being
25 billed based on a fact.

1   billing by not -- by electing not to bill any of the
2   traffic for those services.
3          And so to the degree -- you know, I never
4   actually discuss a specific estimate of AT&T's over
5   the top percentage or the way in which they do that.
6       Q.   So let's unpack that a little bit and make
7   sure I understand.
8          So you are really not giving an opinion
9   about AT&T's methodology for estimating OTT,
10  correct?
11      A.   Correct.
12      Q.   What you are doing is you're looking at
13  products that have the potential of having nomadic
14  TN and find it's reasonable for AT&T to not bill end
15  office on that category of calling, correct?
16          MR. BENSON:  Objection to the extent that
17  it misstates both the testimony and the report.
18          But go ahead.
19          THE WITNESS:  Yeah.  What I said was that
20  the way in which AT&T decided basically not to bill
21  for services that could include nomadic TNs was a
22  reasonable approach and conservative, in fact.
23  BY MR. STEESE:
24      Q.   But you also -- look in paragraph -- that
25  states -- excuse me, in paragraph 9, "In most cases,

Page 235

CERTIFICATE OF REPORTER

I, ASHALA TYLOR, CSR No. 2436, in and for the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings were made by me using machine shorthand which was thereafter transcribed under my direction; further that the foregoing is an accurate transcription thereof.

That before the completion of the deposition, review of the transcript was not requested.

I further certify that I am neither financially interested in this action nor a relative or employee of any attorney or any of the parties hereto.

In compliance with Section 8016 of the Business and Professions Code, I certify under penalty of perjury that I am a Certified Shorthand Reporter with California License No. 2436 in full force and effect. WITNESS my hand this 30th day of April, 2020.

*[signature]*

Ashala Tylor, CSR #2436, RPR, CRR, CLR