# EXHIBIT T

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

    Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

    Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC,

    Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

    Counterclaim Defendant.

**DEFENDANT/COUNTERCLAIMANTS'**
**CONFIDENTIAL RESPONSIVE RULE 26(a)(2)(C) DISCLOSURE**

Defendant/Counterclaimant Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), by and through its counsel, hereby submit the following responsive disclosure of Andrew McClure pursuant to Federal Rule of Civil Procedure 26(a)(2).

Andrew McClure has reviewed the March 16, 2020 report of Dr. Penn Pfautz, listened in on Dr. Pfautz's April 28, 2020 deposition, reviewed that deposition, and, having done so, provides the following responsive opinions.

1.  The purpose of my expert testimony is to calculate percent OTT as contemplated in the 2015 Settlement Agreement between Level 3 and AT&T. Specifically, sections 1(a)(iiii) and (iv) of that Agreement state:

    > (iii) Beginning June 1, 2015, Level 3 shall not bill AT&T for any end office switched access charge elements for domestic OTT traffic that does not originate from a calling party number or does not terminate to a called party number (together with calling party number "CPN") that is assigned by Level 3 and for which Level 3 is designated as the provider in the Number Portability Administration Center ('NPAC') database ("Non-Level 3 CPN OTT Calls"). For avoidance of doubt, the Parties agree that Level 3 will continue to bill AT&T full switched access charges on domestic traffic that originates with or terminates to Level 3 assigned CPN.

    > (iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review ("Final Appellate Order"), Level 3 will refund, within 30 days, ▮▮▮▮▮▮▮▮▮▮ of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.

2.  These provisions contain two key concepts that I want to highlight:

    a.  "Disputed OTT charges" means the percent of Level 3's OTT traffic that is actually OTT (as defined by the FCC) as of the time of the billing. AT&T and Level 3 reached

2

    an agreement on OTT traffic billed by Level 3 to AT&T through December 31, 2018. As a result, I am calculating a percent OTT for traffic billed by Level 3 to AT&T from January 1, 2019 forward for use with the 2015 Settlement Agreement.

    b. The 2015 Settlement Agreement states that Level 3 is permitted to "bill AT&T full switched access charges on domestic traffic that originates with or terminates to Level 3 assigned CPN." Thus, Level 3 can bill AT&T switched access on all calls originated on a Level 3 TN.

3. Dr. Pfautz stated that his objective was to "assess various methods for identifying and billing charges associated with a type of telephone call, known as "over-the-top" Voice over Internet Protocol ("OTT VoIP" or "OTT") calls. Report ¶ 2. He also stated that "the method AT&T/TCG used to estimate over-the-top VoIP traffic is reasonable." *Id*. at ¶ 8.

    a. Dr. Pfautz relied on AT&T's statement that AT&T did not have enterprise class carriers that performed carrier-like functions, and therefore assumed that these enterprise class customers had 0% OTT unless they had obtained what he referred to as "Nomadic TNs" from AT&T. Report at ¶ 46; Depo. at 222–223.

    b. Yet Dr. Pfautz suggested that if Level 3 did the same thing he would "push back" and say "that's not good enough. I need to have more information." Depo. at 224:19–225:17. Dr. Pfautz holds Level 3 to a higher standard than AT&T for calculating percent OTT.

    c. In my opinion, it is improper to hold Level 3 to a higher standard than for AT&T. Both carriers should use a similar methodology to calculate percent OTT.

3

4.	Dr. Pfautz did not calculate a percent OTT for Level 3.  Depo. at 29. AT&T has a few documents (Pfautz Depo. Exhibits 4, 6, 7, 36) that comment upon Level 3's percent OTT. I agree with Dr. Pfautz that none of AT&T's documents calculate a percent OTT or utilize a methodology to calculate percent OTT. Depo. at 181-192. I am therefore the only person in this lawsuit who has calculated a percent OTT as contemplated by the 2015 Settlement Agreement.

5.	Dr. Pfautz stated that "Local carriers . . . cannot always readily distinguish between over-the-top VoIP calls and other types of calls." Report at ¶ 5. In his deposition, Dr. Pfautz testified that there were two situations where one could determine percent OTT: (a) companies known to be 100% OTT providers such as ████ (where end office charges do not apply); and (b) enterprise class customers where the carrier (here Level 3) provisioned a facility to the end user's premises (where end office charges always apply).  Depo. at 47–49.  Other than in these two scenarios, Dr. Pfautz testified that the only way to find out that customer's percent OTT is to reach out to the customer and ask for its percent OTT.  *Id*. at 51-52, 138. I agree with Dr. Pfautz on these points.

6.	Dr. Pfautz stated that input from the customer on its percent OTT must be verifiable. Report at ¶ 5.  On this point, I disagree. The FCC issued its OTT decision in December 2019. Normally, when factors are created (such as PIU or PVU), the industry comes together to determine how carriers should calculate the factors. Here, as Dr. Pfautz recognizes (Depo. at 61), that has yet to occur, and may never occur. Dr. Pfautz recognizes that CDRs and Form 477s are inadequate. There is no process in place informing customers how to calculate their percent OTT. Thus, demanding "verifiable" information is an exercise in futility. There is no way to obtain "verifiable" information.

4

7. Dr. Pfautz suggested that OTT specific TNs or Form 477s might be useful for obtaining verifiable information. Depo. at 74. Level 3 does not have this information and has no way to compel customers to provide it. In the absence of this information, Dr. Pfautz testified that carriers could ask customers to "certify" that the information they provide is accurate. Depo. at 79-80. However, unless or until there is industry consensus or an FCC mandate, as Dr. Pfautz recognizes, customers have no obligation to provide this information. Depo. at 81-85.

8. Just as Dr. Pfautz (Depo. at 58–59), I am unaware of any carrier in the industry that has created a percent OTT other than Level 3 and, recently, AT&T. I created one on behalf of Level 3 in 2017 in an effort to resolve a dispute with AT&T. I updated that analysis in March 2020. In contrast, Ms. Janice Gallagher created a percent OTT focused only on AT&T products that permitted what Dr. Pfautz called "nomadic TNs" in mid-2019. I know this based on a review of the properties in the spreadsheets created by Ms. Gallagher. *See, e.g.,* Exhibit 79 to Gallagher and Pfautz depositions.

9. Dr. Pfautz focused on three specific inputs into my original OTT percentage calculation: "the end office minutes of use (Column J), the percentage of Level 3 TNs (Column F), and the percentage of OTT (Column N)." Report at ¶ 33. I will address each in turn.

10. The Minutes of Use (MOU) calculations in my March 16, 2020 disclosure are based on actual minutes that Level 3 sent to CABs to AT&T each month and for which it billed end office charges. Level 3 bills AT&T end office charges only on originating calls with a Level 3 TN. Dr. Pfautz questioned whether Level 3 had authority to bill end office charges on calls with Level 3 TNs that were also associated with a cable company or another carrier. Report at ¶¶ 38-40;

5

Depo. at 127-133. As explained above, the Settlement Agreement gave Level 3 the right to bill end office charges on calls associated with its own TNs.

11. Dr. Pfautz seems to recognize that the percentage of TNs associated with a particular Level 3 customer is no longer an issue. Depo. at 136-137. As explained in a supplemental disclosure: "AT&T asked how Level 3 calculated the percentage of each customer's TNs that Level 3 owned. Instead of estimating this percentage, as Level 3 did in the past, Mr. McClure used actual CDRs to determine (a) what calls were associated with Level 3 TNs, and (b) the specific wholesale customer associated with each specific Level 3 TN."

12. Dr. Pfautz testified that his "biggest concern" is the method that I used to obtain percent OTT from Level 3 customers  Depo. at 141.  I have three responses to this issue.

   a. First, I used the best method available to me at the time that would not disrupt Level 3's business relationship with the customer. If asked to do the same thing today, I would use similar methods unless or until the FCC mandates or the industry agrees upon a process to calculate percent OTT.

   b. Second, Dr. Pfautz did not attempt to validate my data.

   c. Third, the percentages that I obtained from customers have very little impact on Level 3's percent OTT. With one exception, customers that perform carrier like functions are identified in my March 16, 2020 disclosure with a percent OTT higher than 0%. The one exception (            ) implemented nomadic TNs after 2017. Approximately 2% of            TNs are nomadic. As such, I included a two percent OTT for            . My March 16, 2020 disclosure allows one to modify a particular customer's percent OTT, and the spreadsheet will automatically recalculate

6

Level 3's overall percent OTT. If I were to assume that 100% of the TNs associated with the customers believed to have a carrier function are 100% (other than ▬ and cable companies where this assumption is improper), Level 3's OTT percent goes from ▬ to ▬. Thus, the "central aspect" of Dr. Pfautz's disclosure (Depo. at 212-213) has an immaterial impact on Level 3's percent OTT.

13. Dr. Pfautz also takes issue with three entities that I reported as 0% OTT: ▬▬▬. At the time I performed my original analysis, I believed these were traditional enterprise class customers with no OTT calling capability. Dr. Pfautz takes issue with this assumption.

   a. Dr. Pfautz was willing to accept that 100% of AT&T's enterprise class customers had no OTT calling based on representations from AT&T, without performing any independent research, claiming Level 3 had not raised such questions. Depo. at 215-229.

      i. Dr. Pfautz is wrong. *See, e.g.,* Gallagher Depo at 54-56.

      ii. Dr. Pfautz testified that if Level 3 signs up a customer as a regular enterprise class customer it may be appropriate to assume they are 0% OTT, as Dr. Pfautz did for AT&T. Depo. at 176-180.

   b. Level 3 no longer has a relationship with ▬▬ where Level 3 provides ▬▬ with TNs and bills end office access charges. As such, concern about ▬▬ has no bearing on data from 2019 forward.

   c. I take serious issue with Dr. Pfautz's claim that Sorenson is an OTT provider. Dr. Pfautz is not sure about whether ▬ provides OTT calling. Depo. at 105-106.

7

    Level 3 provides ▇ with facilities to ▇s premises. ▇ then provides hearing impaired service to its customers. Customers use the capabilities provided by ▇; however, the calls all flow over the facilities Level 3 provisioned and provided to ▇ Level 3 provides end office functionality on all calls to ▇, and as such end office charges apply. In my opinion, there is no difference between ▇ providing this service to customers, as opposed to ▇ providing this service to employees. Dr. Pfautz admits that if this service were provided to employees, end office charges would apply.

  d. I also take serious issue with Dr. Pfautz's claim that I had reason to believe ▇ is an OTT provider. Level 3 obtained ▇ as an enterprise class customer; Level 3 does not have a revenue sharing agreement with ▇ or provide any other service that would indicate ▇ is an OTT provider. I had no reason to suspect that ▇ provided carrier-like functions. AT&T assumes that *all* of its enterprise class customers do not provide carrier-like functions. Depo. at 106-115, 118-12. Dr. Pfautz recognizes, that the ▇ website describes that ▇ provides services via SD-WAN and OTT. Exhibit PP-7 and Depo. at 151-152. Dr. Pfautz recognizes that calls delivered over SD-WAN are not OTT calls. Depo. at 152-154. Thus, ▇ is not a pure OTT provider. Neither I nor Dr. Pfautz has any information about what percent of ▇ calls are OTT enabled, or even if any of ▇ calls are OTT enabled. Dr. Pfautz did not contact any customer, let alone ▇, to ask for its percentage OTT.

14. In addition, even if you assume that 100% of ▇ and ▇ calls are OTT, that only raises Level 3's percent OTT to ▇ (even when you maintain all of the adjustments

8

referenced above). Dr. Pfautz admitted in deposition that he did not have any evidence that Level 3's percent OTT is greater than ▇ . Depo. at 173-175.

15. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



   a. Sending subpoenas to all of Level 3's own customers would be incredibly burdensome and would put a strain on Level 3's customer relationships.

   b. ████████████████████████████████████████████████

16. In my opinion, from January 1, 2019 forward, ▇ of Level 3's calling is OTT. I stand by the calculations set forth in my March 16, 2020 Excel Spreadsheet. However, even if you take all of Dr. Pfautz's stated concerns into consideration, Level 3's percent OTT only goes to ▇ .

17. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

9

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██  ████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

19.     Dr. Pfautz also stated that he was "not aware and have seen no documentation showing that AT&T has partnered with any unaffiliated retail provider of over-the-top VoIP calling services." Report at ¶ 51. Dr. Pfautz also testified that he read the deposition of Mr. Marc Cathey. Depo. at 21. Had he read this deposition carefully, he should have seen Cathey Exhibit 97, which is a list of calls volumes showing that AT&T delivers calls for many other carriers including ████████████████, two known OTT providers.

20.     I gathered the data depicted in Cathey Exhibit 97.  In addition, I have verified that there are times when AT&T is billing end office charges on these calls. Thus, we have evidence showing AT&T is doing the very thing it told Dr. Pfautz it was not doing. Dr. Pfautz should have done actual analysis on AT&T's customer base and billing patterns before concluding that "the method AT&T/TCG used to estimate over the top VoIP traffic is reasonable".  Report at ¶ 8.

21.     I also contacted Ed Stocker of ████████ and verified that [Begin Confidential] ████████████████████████████████████████████████ [End Confidential]

10

22. 

23. In my opinion, it is improper to simply take AT&T's word for its percent OTT.

24. I understand AT&T may direct Dr. Pfautz or another expert to issue a rebuttal report to address the analysis I provided on March 16, 2020. I expressly reserve the right to supplement this report to address any opinions or analyses provided in any rebuttal reports.

11

Respectfully submitted this 15th day of May, 2020.

            By: /s/ *Charles W. Steese*

               Charles W. Steese, #26924
               Douglas N. Marsh, #45964
               Armstrong Teasdale LLP
               4643 South Ulster Street, Suite 800
               Denver, Colorado 80237
               Telephone: (720) 200-0676

               csteese@armstrongteasdale.com
               dmarsh@armstrongteasdale.com

           *Attorneys for Defendant/Counterclaimants*

**CERTIFICATE OF SERVICE**

I, Charles W. Steese, hereby certify that on May 15, 2020, I emailed the foregoing document upon the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael J. Hunseder
Justin A. Benson
Michael D. Warden
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com
Email: mwarden@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

/s/ *Charles W. Steese*
Charles W. Steese