**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

    Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

    Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

    Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

    Counterclaim Defendant.

---

**LEVEL 3'S RESPONSE TO AT&T'S MOTION
TO REINSTATE COUNTS II AND III OF ITS COMPLAINT**

---

Defendant/Counterclaimant Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), respectfully submits their Response to AT&T's Motion to Reinstate Counts II and III of its Complaint and for Leave to Amend/Supplement its Complaint (ECF No. 147).

AT&T waited until well after the Court-ordered deadline to move for leave to amend. Even though the FCC issued the decision on which AT&T bases its motion in December 2019, AT&T waited over six months to bring its motion until after discovery closed and as the parties were in the midst of briefing summary judgment motions. It cannot show good cause for this delay, nor does it even try. The claims it seeks to reinstate would be subject to dismissal in any event: the charges at issue were assessed pursuant to the parties' written agreement and AT&T, which owes far more to Level 3 than it must be credited, cannot show that it was damaged.

AT&T's motion therefore must be denied.

## I. INTRODUCTION

Level 3 and AT&T entered into a Release and Settlement Agreement ("Agreement") in May 2015. *See* ECF No. 1. This Agreement was an effort to resolve a long-running dispute between the parties as to whether it was permissible for Level 3 to bill AT&T end office charges on OTT traffic. The Agreement came shortly after the FCC issued its Declaratory Ruling in 2015, which authorized the billing of end-office charges on OTT VoIP calls. *See* ECF No. 76. As briefed extensively elsewhere, the Agreement required AT&T to pay Level 3's end office charges on OTT traffic at tariff rates unless and until an FCC order reversing course, instructing that such charges could not be assessed "and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review." *See* ECF No. 151-4 (MSJ Ex. 1—2015 Settlement Agreement) § 1(a)(iv). If and when that happened, Level 3 would refund a portion of the charges "to the extent they should not have been charged in accordance with the Final Appellate Order," and the Parties would thereafter bill and pay for traffic "in compliance with the terms of that order." *Id*.

In 2017, the D.C. Circuit issued an order reversing the FCC's 2015 declaratory ruling and remanding for further consideration of whether the FCC's rules permitted end office charges on OTT traffic. AT&T filed this lawsuit in January 2018, before the FCC issued its Order on Remand, claiming a violation of Section 201(b) of the Communications Act and the Agreement and seeking a declaration that AT&T was no longer obligated to pay OTT VoIP charges. *See* ECF No. 14. The Court dismissed AT&T's Communications Act claim, finding that "the claim is not fit for judicial resolution. Simply put, the FCC is surely in a better position than this Court to determine what is consistent with its own rules." ECF No. 76 at 18. Similarly, the Court dismissed AT&T's Count III for declaratory judgment "to the extent it is premised upon alleged violations of the FCC's rules." *Id.* at 20.

In December 2019, the FCC issued a final ruling on remand. *See* 34 FCC Rcd. 12692. The FCC stated that it would "permit LECs to assess end office switched access charges only if the LEC or its VoIP partner provides a physical connection to the last-mile facilities used to serve an end user. If neither the LEC nor its VoIP provider partner provides such physical connection to the last-mile facilities used to serve the end user, the VoIP-LEC partnership is not providing the functional equivalent of end office switched access and the LEC may not assess end office switched access charges." *Id.* ¶ 4.

Six months after the FCC issued a final ruling,[1] well after the Court's deadline for amending the pleadings has passed (*see* ECF No. 55) and after fact and expert discovery had closed, AT&T moved to reinstate its previously dismissed claims. As an initial matter, AT&T does not show good cause for its six-month delay in filing its motion. Furthermore, the proposed

---

[1] Because no one appealed the FCC's December 2019 Order, it became "final" in February 2020.

amendments would be futile, as the claims cannot survive legal scrutiny. Under the FCC's permissive detariffing regime, the parties may enter into agreements governing the exchange of traffic to assess access charges above tariff rates rather than be subject to regulation under the Communications Act. Here, the parties' relationship is governed by such a written agreement, a creature of state law, and the claims AT&T attempts to raise under the Communications Act are displaced by the contract with Level 3 into which it willfully entered. In addition, while Level 3 is attempting to calculate the amount for which AT&T should be credited for past end office charges on OTT traffic, all of the evidence shows that AT&T has withheld far more in end office charges on non-OTT traffic than Level 3 charged on OTT traffic. AT&T therefore cannot establish that it was damaged by Level 3's charges.

For all of these reasons, AT&T's motion must be denied.

## II. AT&T CANNOT SHOW GOOD CAUSE FOR THE AMENDMENT.

This Court issued a Scheduling Order in which it set October 1, 2018 as the deadline for amendment of pleadings. *See* ECF No. 55 ¶ 9(a). There has since been no amendment to this provision of the Scheduling Order. Therefore, AT&T's attempt to amend its pleading at this late stage―well past the Court's deadline for doing so―is subject to Fed. R. Civ. P. 16(b), which requires that AT&T establish good cause for amendment. "When a party seeks to amend a pleading after the scheduling deadline for doing so, the application of Rule 16(b)'s good-cause standard is not optional." *Bauer v. Crete Carriers Corp.*, No. 1:18-cv-01536-PAC-SKC, 2019 WL 7290939, at *3 (D. Colo. Nov. 1, 2019) (quoting *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709 (8th Cir. 2008)). "To permit district courts to consider motions to amend pleadings under Rule 15(a) without regard to Rule 16(b) 'would render scheduling orders meaningless and

4

effectively … read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.'" *Id.*

"Rule 16(b)'s 'good cause' standard is much different than the more lenient standard contained in Rule 15(a). Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." *Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 687 (D. Colo. 2000) (quoting *Dilmar Oil Co., Inc., v. Federated Mut. Ins. Co.*, 986 F.Supp. 959, 980 (D.S.C. 1997)). "To demonstrate good cause pursuant to Rule 16, [the movant] must 'show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay.'" *Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Intrawest ULC,* No. 13-CV-00079-PAB-KMT, 2015 WL 1361117, at *2 (D. Colo. Oct. 7, 2015) (quoting *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 n. 4 (10th Cir. 2006)).

AT&T cannot meet the heightened good cause standard of Rule 16(b) because it has not been diligent in seeking to amend its claims, nor has it provided an adequate (or any) explanation for its delay. The FCC issued its clarifying Order on Remand on December 17, 2019. *See* 34 FCC Rcd. 12692. AT&T moved to reinstate its claims on the purported basis of such clarification on June 29, 2020 (s*ee* ECF No. 147), more than six months later. AT&T pays only lip service to Rule 16(b) with a footnote acknowledging that it must show good cause for seeking the modification, and claiming as a basis for its motion that the "underlying law" has changed. ECF No. 147 at 4, n.4. But it does not attempt to explain why it waited six months to bring its motion, after discovery closed and as the parties are in the midst of briefing their summary

5

judgment motions. Because AT&T does not even attempt to explain its delay, it fails to satisfy its burden of proving diligence or good cause for amendment, and its motion should be denied for that reason alone.

Though the Court need not (and cannot) consider AT&T's Motion under Rule 15(a) in light of AT&T's failure to show good cause under 16(b), AT&T's Motion fails even under the more lenient standard. "The court may deny a motion to amend based on undue delay." *Intrawest ULC*, 2015 WL 13614117, at *3 (citing *Minter*, 451 F.3d at 1205). "'The longer the delay, the more likely the motion to amend will be denied' because of the burdens placed on the opposing party and the court." *Id*. "There is no absolute right to amend a complaint, and in exercising its discretion under Rule 15(a), the court will be guided by considerations of efficiency." *Id*.

Despite AT&T's contention to the contrary, reinstating its claims after the deadline to amend and after the close of discovery, as the parties are in the midst of briefing their summary judgment motions, would inevitably cause undue burden and prejudice to Level 3. This case has proceeded before this Court for over two years, and the Parties have been litigating on the basis of this Court's Orders, including its Order of September 18, 2018 in which the Court dismissed AT&T's statutory claims and made clear the importance that the parties be "as efficient as possible in presenting any future arguments." ECF No. 76 at 21. Since the FCC issued its decision in December 2019, the parties conducted three depositions, during which Level 3 would have asked questions about AT&T's 201(b) claims had they been a part of the action. Therefore, AT&T's attempt to amend fails even under the more lenient Rule 15(a) standard—and all the more so because it does not even attempt to show that it was diligent in seeking the amendment, such that there is no "good cause" for the delay under Rule 16(b).

6

### III. AT&T'S CLAIMS ARE FUTILE BECAUSE THE PARTIES' RELATIONSHIP IS CONTROLLED BY THEIR DETARIFFED WRITTEN AGREEMENT.

The Motion also fails for another reason: the claims AT&T seeks to reinstate would be subject to dismissal and the requested amendment would be futile. Leave to amend under Rule 15(a) "does not apply where an amendment obviously would be futile." *Arkansas-Platte & Gulf P'ship v. Dow Chem. Co.*, 886 F. Supp. 762, 765 (D. Colo. 1995) (citing *Frank v. U.S. West*, 3 F.3d 1357, 1365 (10th Cir. 1993)). "Where a complaint, as amended, would be subject to dismissal, leave to amend need not be granted." *Id.* Because the parties entered into a written agreement that governs the assessment of the charges at issue, and because (as it works out) AT&T agreed to pay higher than tariff rates, AT&T has no claim that Level 3 violated the Communications Act. Having entered into a detariffed agreement to pay charges that under any circumstances would be at or above tariff rates, the charges at issue are not subject to FCC regulation or claims under the Communications Act.

#### A. The Agreement Constitutes a Proper Billing Arrangement under the FCC's Permissive Detariffing Regime.

Under the FCC's permissive detariffing regime, a CLEC—such as Level 3—has two means by which to assess interstate access charges: via a filed tariff, or via a negotiated agreement. *See In the Matter of Hyperion Telecom., Inc.*, 12 FCC Rcd. 8596, at ¶ 27 (1997). "CLEC access rates that are at or below the benchmark that we set will be presumed to be just and reasonable and CLECs may impose them by tariff. Above the benchmark, CLEC access services will be mandatorily detariffed, so CLECs must negotiate higher rates with the IXCs." *In re Access Charge Reform*, 16 FCC Rcd. 9923, ¶ 3 (2001) ("Seventh Report"). With this approach, "IXCs (i.e., long distance carriers like AT&T) will know that, whatever the source or

destination of their access traffic, they will be assured a rate that is either within the benchmark zone of reasonableness *or is one to which they have agreed in negotiations*." *Id.* ¶ 42 (emphasis added). That is the case here. Under the Agreement, AT&T agreed to pay tariff rates if end office charges applied to OTT calls, or get refunded for part of the calling through a date certain if the FCC changed course and determined that OTT calls were not subject to end office charges. Thus, AT&T agreed that, in the event that the FCC changed course on the applicability of end office charges to OTT traffic—as it did here—AT&T would pay *above* tariff rates, pursuant to an agreement with Level 3 which the FCC has expressly detariffed.

The FCC has specified that "the Communications Act does not govern [] issues, such as contract formation and breach of contract, that arise in a detariffed environment." *In the Matter of Policy & Rules Concerning the Interstate, Interexchange Marketplace*, 12 FCC Rcd. 15014, ¶ 77 (1997). "Congress has vested the [FCC] only with the authority to address allegations of actions taken 'in contravention of' the Communications Act," and a state law claim, such as for breach of contract, "by definition, does not arise under or state a violation of the Communications Act." *CallerID4u, Inc. v. MCI Commc'ns Servs. Inc.*, 880 F.3d 1048, 1060 (9th Cir. 2018) (quoting *All Am. Tel. Co. Inc. v. FCC*, 867 F.3d 81, 94 (D.C. Cir. 2017)). "As stated in the Second Report and Order, consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime." *Id.* (citing *Policy and Rules Concerning the Interstate, Interexchange Marketplace*, 11 FCC Rcd. 20730 (1996) ("Second Report and Order")). "[W]hen interstate, domestic, interexchange services are completely detariffed, consumers will be able to take advantage of remedies provided by state consumer protection laws and contract law against

8

abusive practices." *Second Report and Order*, 11 FCC Rcd. 20730, ¶ 5.

Numerous federal courts agree, recognizing that breach of contract claims rising in a detariffed environment are not subject to FCC regulation. *See, e.g., In re Universal Serv. Fund Tel. Billing Practices Litig.*, 300 F.Supp.2d 1107, 1145–46 (D. Kan. 2003) (finding that "the FCC specifically anticipated that such breach of contract claims would no longer be barred by federal law," and such claims are "not preempted by the FCA"); *Ramette v. AT&T Corp.*, 812 N.E.2d 504, 513 (Ill. App. 2004) (recognizing the FCC's clear statement that the Act does not govern breach of contract in a detariffed environment).

Here, the Parties entered in a negotiated contract where AT&T agreed to pay higher than tariff rates. The Parties are bound to the terms of that Agreement. The charges at issue were assessed pursuant to the Agreement, which constitutes a permissive detariffed arrangement not governed by the Communications Act or subject to regulation by the FCC. AT&T acknowledges as much in its summary judgment briefing. *See* ECF No. 149 at 7–8 n.8 (asserting that the filed-rate doctrine (which is incorporated into the Communications Act—*see* 47 U.S.C. § 203) "has no effect on the result here" because "it can be appropriate for a local carrier to file a tariff but also negotiate an agreement for intercarrier compensation"). Because the Communications Act does not govern issues arising from the parties' detariffed Agreement, AT&T can state no claim rising under the Communications Act.

### B. The Filed-Rate Doctrine Does Not Preclude Detariffed Agreements that Call for Charges Above Benchmark Rates.

The Court has previously asked whether the filed-rate doctrine prohibits Level 3 from assessing rates above those in its tariff, even by an agreement which the parties mutually negotiated and to which they voluntarily agreed. *See* ECF No. 76 at 22–25. However, the filed-

rate doctrine only prohibits a LEC from "agree[ing] to bill other IXCs *below-tariff* rates while charging [the IXC] tariff rates for the same service." ECF No. 151-2 at 16–17 (emphasis added) (citing *Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, No. CV 10-490 (MJD/SER), 2017 WL 4618277, at *25 (D. Minn. Mar. 31, 2017); *aff'd*, 905 F.3d 1068 (8th Cir. 2018); *All Am. Tel. Co. v. AT&T Corp.*, 26 FCC Rcd. 723, 732 n.47 (2011)). Such arrangements would permit CLECs to assess rates not available to other customers, thereby violating the filed-rate doctrine's principle of non-discrimination.[2]

By contrast, the FCC expressly permits CLECs to "negotiate higher rates with the IXCs," such that CLECs may "negotiate access service arrangements with IXCs at any mutually agreed upon rate." Seventh Report, 16 FCC Rcd. 9923, ¶¶ 3–4. Indeed, as noted by this Court, "a CLEC (like plaintiff) could set rates either through a filed tariff that did not exceed a benchmark rate set

---

[2] Many tariffs allow carriers to make individualized arrangements with customers on the basis of their particularized circumstances, notwithstanding the individual rate element in the tariff. The way this usually occurs is that an IXC obtains a series of services such as facilities and numerous tariffed and non-tariffed services for fees negotiated by and set by the contract. But the hallmark of these types of arrangements—including individual case basis ("ICB") arrangements, "letter tariffs," "contract tariffs," and others—is that the treatment being afforded to one customer is also available to other similarly situated customers. *See, e.g., In the Matter of the Application Filed by Kmc Data, LLC for a Certificate of Pub. Convenience & Necessity to Provide Resold Intrastate Interexchange Telecomm. Servs. in Alaska*, No. 4, 2006 WL 280583, at *11 (Jan. 18, 2006) (holding that special contracts, such as ICB arrangements, must be filed with the FCC subject to the FCC's revision and approval, and made available to all similarly situated customers because "[a] main reason for these requirements is to ensure that the special contract is not used as a means to provide an unreasonable preference to a customer."); *Global Access Ltd. v. AT&T Corp.*, 978 F. Supp. 1068, 1074 (S.D. Fla. 1997) (citing *Competition in the Interstate Interexchange Marketplace*, 6 FCC Rcd. 5880, ¶¶ 91, 102 (1991) ("The filed rate doctrine's principle of non-discrimination is furthered [by the contract tariff regime] because the filed contract tariffs become public information, and the carrier offering such terms is bound by them in negotiating with other customers.")). Here, AT&T is claiming that it is entitled to obtain preferential rates on an individual rate element that no other IXC could obtain. This is a classic example of a filed-rate doctrine violation. *See, e.g., Qwest Commc'ns Co., LLC*, 2017 WL 4618277, at *25.

by the FCC, *or*, in order to charge rates higher than the benchmark, a negotiated contract with an IXC." ECF No. 76 at 23 (citing *AT&T Servs. Inc. v. Great Lakes Comnet, Inc.,* 30 FCC Rcd 2586, 2588–89 (2015)). In other words, AT&T's agreement to pay ***more*** than what the FCC might hold the tariff would permit Level 3 to charge does ***not*** violate the filed-rate doctrine, because the agreement constitutes a "negotiated contract between a CLEC and an IXC," as recognized by the Court. *Id.;* Seventh Report, 16 FCC Rcd. 9923, ¶¶ 3–4 (citing *Connect Insured Tel., Inc. v. Qwest Long Distance, Inc.*, No. 3:10-CV-1897-D, 2012 WL 2995063, at *2 (N.D. Tex. July 23, 2012)).

The Agreement is structured such that the charges AT&T agreed to pay would always be at least the tariff rate—possibly more, depending on the outcome of the ultimate remand to the FCC—***but never less***. Under the Agreement, AT&T agreed to pay charges equal to the rates set forth in Level 3's tariff going forward unless and until it was determined that the OTT charges "should not have been charged." *Id.* at 18. If the FCC subsequently determined that the charges were appropriate, AT&T would continue to pay charges at the tariffed rate. *Id*. But if the FCC later determined the charges should not have been charged, then AT&T would receive a refund of those charges—but only a partial refund, allowing Level 3 to keep at least some charges that "should not have been charged" had they been assessed under the tariff rather than the Agreement. *Id.* Either way, at no point would AT&T pay less than what would have been required under the tariff and FCC rules. *Id.*

The Agreement thus comports with the underlying rationale of the filed-rate doctrine, which is to prevent discriminatory, preferential treatment among customers. *See, e.g., AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998) ("This rule is undeniably strict and it

11

obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce ***in order to prevent unjust discrimination***.") (emphasis added); *In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace*, 14 FCC Rcd. 6004, 6005 (1999) ("When a single carrier dominated the interstate, interexchange market, tariffing was an effective tool for ensuring compliance with various common carrier requirements, including rules that require nondiscrimination among customers."); *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015) (filed-rate doctrine is "grounded" on rationale "that litigation should not become a means for certain ratepayers to obtain preferential rates (the principle of nondiscrimination") (internal quotations omitted)).

Therefore, the Agreement complies with the filed-rate doctrine and its underlying purpose no matter how the FCC would eventually determine the propriety of end office charges on OTT traffic. If such charges were permissible, AT&T would have been paying the appropriate rates all along; if not, then AT&T would have paid a rate above the tariff rate, as allowed under the FCC's detariffing regime. But under no circumstances would AT&T pay rates below those set forth in the tariff. Thus, the Agreement complies with the filed-rate doctrine and is not subject to FCC regulation. AT&T therefore fails to state a claim for an alleged violation of the Act.

### IV. AT&T'S STATUTORY CLAIMS ARE FUTILE BECAUSE IT CANNOT PROVE REQUISITE DAMAGES.

AT&T's Section 201(b) claim, if added, would fail for yet another independent reason: AT&T cannot show that it was damaged. "Communications Act language links § 201(b) to § 207, which authorizes any person 'damaged' by a violation of § 201(b) to bring a lawsuit to recover *damages* in federal court." *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 47 (2007) (emphasis added). Similarly, "[i]t is well established

that a complainant in a Section 208 complaint proceeding has the burden of establishing both a violation of the Act, or Commission rule or orders and ***actual damages suffered*** in consequence of such violations." *In the Matter of New Valley Corp. v. Pac. Bell*, 8 FCC Rcd. 8126, ¶ 8, n. 20 (citing Sec. 208 Complaints Alleging Violations of the Commission's Rate of Return Prescription for the 1987 – 1988 Monitoring Period, 8 FCC Rcd. 1876, 1880 (1993)).

Since 2017, AT&T withheld payment on a vast majority of Level 3's end office charges. *See* ECF No. 151-2 at 3. Indeed, since January 2019, AT&T has withheld more than 100 percent of the end office charges assessed by Level 3. *Id.* Level 3 has presented analysis to AT&T showing that the percentage of its traffic that is OTT is relatively small, even taking ATT's challenges into account and construing every possible doubt in AT&T's favor. *Id.* Therefore, AT&T has grossly and unlawfully over-withheld payment for end office charges. Even if 65 percent of Level 3's calls were OTT—and they most certainly are not—AT&T has over-withheld from Level 3.

Despite this fact, AT&T continues to assert that it is entitled to damages, likely because it is required to do so in order to maintain a claim under Section 201(b) of the Communications Act. This assertion is baseless. Level 3 presumes that the basis of this assertion is that Level 3 cannot bill end office charges on OTT calls after February 19, 2020, the date the FCC's decision barring such charges became final. However, Level 3 has already addressed this issue too. Level 3's damages analysis in this case shows a 100 percent refund of all of the end office charges associated with OTT traffic since February 19, 2020—the date the FCC's remand order became final. *See* ECF No. 151-19 (MSJ Ex. 28—Declaration of Melissa L. Kellow) ¶ 7 ("I calculated the total end office charges for each month . . . assuming that . . . ***Level 3 must refund 100***

13

*percent of the end office charges from February 19, 2020 and thereafter*) (emphasis added). Because AT&T has grossly over-withheld payment to Level 3 for lawful, non-OTT charges, and because Level 3 has agreed to credit AT&T for all end office charges on OTT traffic after the FCC's remand became final, AT&T has no claim for damages. Without damages, AT&T's claims under the Communications Act fail for this reason too.

## V. CONCLUSION

For the reasons stated above, Level 3 respectfully requests that the Court deny AT&T's motion in its entirety.

Respectfully submitted this 20th day of July, 2020.

By: /s/ *Charles W. Steese*
Charles W. Steese, #26924
Douglas N. Marsh, #45964
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

*Attorneys for Defendant/Counterclaimants Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC*

14

## CERTIFICATE OF SERVICE

I, Charles W. Steese, hereby certify that on July 20, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael D. Warden
Michael J. Hunseder
Justin A. Benson
Joshua W. Moore
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
mwarden@sidley.com
mhunseder@sidley.com
jbenson@sidley.com
joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

/s/ *Charles W. Steese*
Charles W. Steese