**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

  *Plaintiff/Counterclaim Defendant,*

v.

LEVEL 3 COMMUNICATIONS, LLC,

  *Defendant/Counterclaimant,*

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

  *Counterclaimants,*

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

  *Counterclaim Defendant.*

---

**RESPONSE TO AT&T'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

  Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), respectfully respond in opposition to the Motion for Partial Summary Judgment filed by Plaintiff/Counterclaim Defendant AT&T Corp. ("AT&T") (ECF No. 149).

**I.**   **INTRODUCTION**

  The key question in this case is how much AT&T should have paid Level 3 for end office switched access charges on traffic originating from Level 3 telephone numbers. This question

raises two others in turn. The first question is whether a provision in the Parties' 2015 Settlement Agreement requiring Level 3 to refund a portion of the charges was triggered on February 19, 2020—following a decision by the FCC that such charges could not be assessed on OTT traffic—or earlier, following an order by the D.C. Circuit that did not determine whether such charges should not have been charged, but merely remanded to the FCC for further deliberation. The second question is how much of Level 3's traffic was OTT, such that it would be subject to the refund provision (whenever that provision was triggered). There is no question, however, that AT&T is required to pay all of Level 3's end office charges on all non-OTT traffic originating from a Level 3 telephone number.

As set forth in Level 3's Motion for Summary Judgment (ECF No. 152), the first question must be answered in Level 3's favor. The plain language of the Settlement Agreement requires Level 3 to make the partial refund only to the extent that it was determined the charges "should not have been charged." OSUMF ¶ 15 (citing ECF No. 150-4 (hereinafter "2015 Settlement Agreement" or "Agreement") § 1(a)(iv)). The D.C. Circuit's remand order did no such thing, as AT&T itself admits. Thus, the Order from the D.C. Circuit could not have been the "final" order contemplated in the Agreement. Only in 2019 did the FCC finally decide that certain charges "should not have been charged"; only then did the obligation to make the partial refund arise. Any other construction of the Agreement would contradict its plain language, would read entire clauses out of the Agreement, would undermine the parties' stated intentions in negotiating the Agreement, and would violate the filed-rate doctrine.

The second question—probably the more important one—even more clearly cuts in Level 3's favor. AT&T has dramatically overestimated the percentage of OTT traffic originating from

Level 3 telephone numbers. In fact, AT&T withheld payment of more than 100% of all Level 3 end office charges. As a result, AT&T has withheld payment of end office charges on huge volumes of **non**-OTT calls, which AT&T acknowledges it must pay. Even under AT&T's interpretation of the Settlement Agreement on when the final order issued, AT&T would be entitled only to a slightly larger credit on the amount it owes Level 3. In other words, no matter how one interprets the 2015 Settlement Agreement, AT&T owes Level 3 millions of dollars.

The Court should therefore deny AT&T's Motion, and grant Level 3's parallel motion. Level 3 further requests that the Court specifically find that A&T has no evidence that Level 3's percentage of OTT traffic is no higher than 21 percent—a finding that will likely allow the parties to resolve the remainder of the dispute between them without further Court intervention.[1]

## II.        PROCEDURAL AND FACTUAL BACKGROUND

As noted in Level 3's Motion for Summary Judgment (ECF No. 152), the parties executed a Settlement Agreement in mid-2015. OSUMF ¶ 4. That Agreement required AT&T to pay tariffed end office charges *on all telephone calls* originating from a Level 3 telephone number, even if it was an OTT call. OSUMF ¶ 14. The Agreement also obligated AT&T to pay end office charges on OTT calls unless and until the FCC's 2015 Declaratory Order determining that such charges were proper was overturned, "and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review." OSUMF ¶ 15. If and when that happened, Level 3 would refund a portion of the charges—but if the FCC's order were overturned only in part, the charges would be refunded only "to the extent they should not have

---

[1] Indeed, Level 3's damages analysis in this case is premised upon a 21 percent OTT factor, not the 16 percent factor calculated by Level 3. This was done in an effort to eliminate disputes between the parties so they can reach resolution. *See* OSUMF ¶ 54.

been charged in accordance with the Final Appellate Order," and Level 3 would thereafter bill and AT&T would pay for OTT traffic "in compliance with terms of that order." *Id.*

These provisions were the focus of specific negotiations between the parties. The reason was simple: in February 2015, the FCC issued a Declaratory Order finding that end office charges applied to OTT calls, and AT&T had appealed that decision to the D.C. Circuit Court of Appeals. OSUMF ¶ 19. Initially, the parties disagreed on how to handle AT&T's pending appeal: AT&T wanted to be able to recover all of its charges if it ultimately succeeded, while Level 3 wanted a settlement agreement to be a final resolution of the matter. *See* OSUMF ¶ 24. The provisions that ended up in the 2015 Settlement Agreement were a compromise between these two positions, providing that Level 3 would refund the OTT charges in part, but only when and to the extent it was determined that those charges "should not have been charged," with charges thereafter to be assessed "in compliance with the terms of that order." OSUMF ¶ 15. This means that, if the anticipated decision by the D.C. Circuit did not determine whether the charges "should not have been charged" or provide terms with which to comply going forward, but instead remanded to the FCC to decide those questions, the refund duty could not arise. In that circumstance (which is exactly what happened), the "applicable order on appeal" could not "become final" and be "no longer subject to further appeal or other judicial review" until after the FCC completed the remand.

AT&T's own correspondence confirms this understanding. Following negotiations with Level 3 Senior Vice President of Network Planning Mike Riederer to resolve the OTT dispute, AT&T vice-president George Sloan sent an email to Kim Meola, the AT&T employee responsible for the OTT dispute, explaining terms which "captured the construct of the

OTT/Tandem deal we agreed to with L3 today." OSUMF ¶ 12. This construct stated, among other things, that "[i]f AT&T wins its FCC appeal, AT&T can only clawback 50% of the disputed amount starting June 2015 ***through the date of the FCC ruling.***" OSUMF ¶ 25 (emphasis added). The next day, Mr. Sloan sent Level 3 a term sheet that listed six terms which Mr. Sloan represented as AT&T's "attempt to capture our agreement construct." OSUMF ¶ 26. AT&T admits that the first five points from the term sheet were encapsulated in the Agreement in concept. OSUMF ¶ 27. The sixth term listed in the email stated "If AT&T wins its FCC appeal, L3 will refund 50% of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals or, if remanded, by the FCC ruling." OSUMF ¶ 26. This point number six, according to Mr. Riederer, reflected the parties' agreement that, if the FCC changed the way that companies could bill for OTT traffic, then that would impact the forward- looking aspect of the settlement agreement. OSUMF ¶ 28. No one at AT&T had any discussions with anyone at Level 3 indicating that AT&T's intent for the Settlement Agreement was different or changed from that reflected in the May 8, 2015 term sheet. OSUMF ¶ 29.

The parties then exchanged drafts of the Agreement over the course of May 2015. The course of negotiation over the language of the Agreement shows key additions made by both parties consistent with the understanding that a ruling would not be "final" until there was a decision regarding whether the end office charges "should not have been charged" and terms that dictated how to bill on OTT calls. First, on May 15, AT&T returned a redlined draft of the Agreement to Level 3 that red as follows, with italicized and bolded language added by AT&T:

> For any OTT usage prior to June 2015, Although the Parties agree that this settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. ***Therefore, in the event the OTT***

> ***Declaratory Order is overturned, either in whole or in part***, the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review, Level 3 will refund within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 usage- traffic through the date on which such order becomes final and is no longer subject to further appeal or other judicial review. ***Further, the Parties agree that any billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order.***

OSUMF ¶ 30. Level 3 then sent AT&T its proposed edits on May 21, 2015, with modifications italicized and bolded below:

> Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review Level 3 will refund, within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; ***provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order***. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.

OSUMF ¶ 31. This is the version of Section 1(a)(iv) that was contained in the Release and Settlement Agreement the parties executed in May 2015. OSUMF ¶ 15.

In November 2016, the D.C. Circuit "vacated and remanded the Declaratory Ruling." *AT&T Corp. v. FCC*, 841 F.3d 1047 (D.C. Cir. 2016). But it did not determine whether LECs could or could not assess end office charges on OTT calls, and thus overturned the decision only "in part." Instead, it found that "the Declaratory Ruling does not disclose the Commission's reasoning with the requisite clarity to enable us to sustain its conclusion," and "vacate[d] and remand[ed] the order to the Commission for further explanation." *Id.* at 1049. In remanding, the

6

D.C. Circuit made clear that the underlying administrative action was still ongoing and undecided, and even contemplated additional potential litigation following a subsequent FCC order addressing this same administrative action, *i.e.*, "whether the local carrier and its VoIP partner were performing the functional equivalent of end office switching on over-the-top VoIP calls." *Id.*

The FCC did not complete the remand from the D.C. Circuit until December 17, 2019, when it issued what it referred to as its "Order on Remand." 2019 WL 7018968, at *10. In its Order on Remand, the FCC "clarif[ied]" its "interpretation of the VoIP symmetry rule" to "permit LECs to assess end office switched access charges only if the LEC or its VoIP partner provides a physical connection to the last-mile facilities used to serve an end user." *Id.* at *1. No appeal of this decision was filed; thus, the FCC's Order on Remand became final by operation of law on February 19, 2020. It is this decision that triggered Level 3's partial refund obligation.

Yet AT&T did not wait for this final instruction. Instead, taking matters into its own hands, AT&T began withholding payment on 65 percent of Level 3's end office charges in mid-2017. OSUMF ¶ 6. This was unlawful not only because AT&T was obligated to pay 100 percent of Level 3's end office charges until a "final" order issued, but also because AT&T dramatically overestimated the amount of Level 3's OTT traffic. Now that a final decision has issued, the Agreement only requires Level 3 to refund 50 percent of the charges Level 3 should not have assessed on ***actual*** OTT calling. OSUMF ¶ 5. The Agreement permits Level 3 to bill, and requires AT&T to pay end office charges on all non-OTT calls that originate from a Level 3 telephone number. OSUMF ¶ 32.

AT&T references a provision from the 2015 Settlement Agreement as its basis for

withholding 65 percent of Level 3's end office charges. This provision reads:

> No later than thirty (30) days after the receipt of Level 3's invoice for traffic exchanged from April 1 through May 31, 2015, seventy-five percent (75%) of the **_amount of the switched access usage charges for traffic that is the subject of the Dispute billed by Level 3, which has historically been approximately sixty-five percent (65%) of overall billing for end office switching_** ("April-May Supplemental Settlement Amount"). AT&T will transmit the April-May Supplemental Settlement Amount to the Level 3 account designated to receive switched access payments using the Parties' standard process for switched access payments.

OSUMF ¶ 5.

This provision has nothing to do with Level 3's actual OTT percentage in 2017 and after. By its plain terms, this provision only relates to "the amount of the switched access usage charges for traffic that is the subject of the Dispute." In other words, the language acknowledges that AT&T had historically disputed 65 percent of Level 3's end office charges, not that 65 percent of Level 3's traffic was OTT. In fact, both AT&T and Level designated 30(b)(6) witnesses to testify on their behalf on the intent of the 65-percent factor referenced in this paragraph. Both AT&T's and Level 3's witnesses alike confirm that this provision was not meant to suggest that 65 percent of Level 3's end office billings were **_actually_** for OTT traffic. OSUMF ¶ 5. Indeed, AT&T's designated witness admitted that AT&T has no facts showing that Level 3's OTT percentage was ever 65 percent. _Id._ Instead, the provision meant that AT&T had historically disputed 65 percent of Level 3's end office billings, and as a result, the 65-percent figure was used solely to determine how much AT&T had to pay Level 3 for April and May 2015 billings, which were not yet final when the Settlement Agreement was executed in May 2015. _Id._ AT&T's own 30(b)(6) witness, testifying as its representative on this very subject, thus disclaims the basis of AT&T's position on the meaning of this provision in the Agreement.

All the evidence confirms that Level 3's traffic is significantly less than 65 percent OTT. Level 3 gave AT&T data in 2017 showing its OTT percent was approximately █ percent for originating traffic and █ percent for terminating traffic (which is no longer at issue). OSUMF ¶ 7. In 2020, as part of this litigation, Level 3 employee Andrew McClure updated his 2017 analysis and analyzed all calls originating from a Level 3 telephone numbers destined for AT&T. That analysis showed that █ percent of Level 3's traffic since January 1, 2019 (the relevant damages period) was OTT. OSUMF ¶¶ 33.

Neither AT&T nor its expert has ever attempted to calculate an OTT percentage for Level 3. OSUMF ¶¶ 34–35. The few issues AT&T identifies in Mr. McClure's calculations are largely immaterial, affecting his calculations by only a few percentage points. OSUMF ¶ 38. AT&T retained an expert to challenge this analysis; however, even taking all of his challenges into account and assuming all questions in AT&T's favor, no more than █ percent of Level 3's traffic is OTT. OSUMF ¶ 47. AT&T has withheld payment on more than 100 percent of Level 3's end office charges this during the relevant period. OSUMF ¶ 55. Thus, AT&T withheld payment on end office charges on huge volume of calls it acknowledges are not OTT.

While the exact percentage of Level 3's OTT traffic is a question of fact for trial, under all circumstances, the undisputed evidence makes it clear that (a) Level 3's OTT percentage is 21 percent or less, and (b) AT&T has dramatically over-withheld, and consequently owes Level 3 millions of dollars. To focus the dispute, Level 3 asks the Court to evaluate the undisputed evidence and find that Level 3's OTT percentage on calls to AT&T is █ percent or less.[2]

---

[2] There is not, and never has been, a dispute as to whether Level 3 could continue to assess end office charges on OTT traffic once the FCC determined that such charges were not permissible and judicial review of that decision had been exhausted. Thus, this aspect of the dispute is not a

III.    **ARGUMENT**

Since the FCC issued its 2019 Order on Remand—and, indeed, since before this litigation

began—Level 3 has presented AT&T with data showing that AT&T has dramatically over-

estimated the amount of Level 3's OTT traffic. Rather than cooperate with Level 3's efforts to

identify the OTT percentage for Level 3 (as well as for AT&T), AT&T brought this action,

claiming it was entitled to withhold end office charges at a rate far exceeding Level 3's actual

OTT percentage. With no evidence to support its withholding at these exorbitant rates, AT&T's

claims necessarily fail. That the partial-refund provisions of the 2015 Agreement came into being

in February 2020 rather than in mid-2017 only makes matters worse for AT&T. AT&T's Motion

therefore must be denied.

A.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine dispute of material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem. Coal Co., Inc.*, 41 F.3d 567,

569–70 (10th Cir. 1994). A factual dispute is "material" if it might affect the outcome under the

governing law, and "genuine" if the evidence is such that a reasonable jury could return a verdict

for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The moving party may carry its initial burden either by producing affirmative evidence

negating an essential element of the nonmoving party's claim, or by showing that the nonmoving

---

live controversy for which declaratory judgment is warranted. Indeed, Level 3's damages
analysis is premised on providing AT&T with a complete refund of 21 percent of its end office
charges from February 19, 2020—the date the FCC's decision became final—forward. OSUMF
¶ 54. The Court need only determine (a) whether there is any evidence that Level 3's OTT
percentage is above 21 percent, and (b) when the refund provisions were triggered. This should
provide the parties all they need to calculate the necessary credit.

party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Once the moving party demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to identify admissible evidence which demonstrates a genuine dispute of material fact. *See 1–800–Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013).

**B.    AT&T DRAMATICALLY OVER-WITHHELD PAYMENTS ON END OFFICE CHARGES.**

For all of the parties' discussion on the question of how to interpret what constitutes a "final" order under the 2015 Settlement Agreement, far more turns on the question of how much of Level 3's traffic is OTT. AT&T acknowledges that it must pay end office charges on any calls originating from a Level 3 telephone number that are not OTT. OSUMF ¶ 5. AT&T also insists that it is entitled to withhold up to 65 percent of Level 3's end office charges even though its own 30(b)(6) witness admits that AT&T has no evidence Level 3's OTT percentage was ever as high as 65 percent (and in fact, AT&T withheld more than 100 percent of Level 3's end office charges during the relevant damages period). *Id.* The 65-percent figure is a number the parties used in 2013 for settlement purposes in the absence of proof as to Level 3's actual percentage of OTT traffic. *Id.* This percentage has no bearing in reality, and never has. *Id.* All the evidence shows that AT&T has withheld far more on end office charges than Level 3's actual OTT percentage justifies. Thus, no matter when the refund provision was triggered, AT&T has improperly withheld payment to Level 3 on valid charges and owes Level 3 millions of dollars.

As noted above, Level 3 employee Andrew McClure determined that ■ percent of Level 3's calls to AT&T were OTT calls. OSUMF ¶ 33. AT&T has attempted to challenge Mr. McClure's opinions, focusing its contention on what its expert described as his "biggest

concern": namely, how Mr. McClure gathered information from certain Level 3 customers to identify the amount of their traffic that was OTT. OSUMF ¶ 37. In fact, this is the only concern AT&T identifies in its summary judgment motion, and the only substantive concern AT&T identified in its *Daubert* Motion (ECF No. 141).

As detailed in Level 3's Response to AT&T's *Daubert* Motion (ECF No. 157), however, what few issues AT&T identifies with the process of reaching out to Level 3's customers are immaterial. Unsurprisingly, AT&T takes no issue where Mr. McClure assumed a given customer's traffic was 100 percent OTT. Nor does AT&T object to Mr. McClure's assumption that zero percent of enterprise-class customers' traffic is OTT—an assumption AT&T's own expert makes in evaluating AT&T's traffic. OSUMF ¶¶ 49, 52. Assuming that 100 percent of the calling on customers Mr. McClure reached out to (other than cable companies and ███████, which AT&T does not take issue with) were 100 percent OTT, this would only raise Level 3's OTT percentage from ██████ percent. OSUMF ¶ 38. In fact, in his rebuttal disclosure and in declarations filed with this Court, Level 3 has construed every possible doubt in AT&T's favor, eliminating information gathered from customer contacts altogether, and still Level 3's OTT traffic would be a fraction of what AT&T claims. Specifically, Mr. McClure assumed as follows:

- Every customer previously assumed to have at least some OTT traffic (other than cable companies and ██████, which AT&T does not take issue with) had 100 percent OTT traffic.

- AT&T's expert identified three customers who he believed might have OTT traffic. Mr. McClure analyzed each, and if there was a possibility of any OTT traffic for a given customer, he assumed they had 100 percent OTT traffic.

- In deposition, AT&T identified a few additional customers and asked about them. Mr. McClure analyzed each as well as (of his own volition) scores of additional customers. If there was a possibility of OTT traffic for any of these customers, Mr. McClure assumed they had 100 percent OTT traffic.

- In his review of Level 3's top customers (i.e., those with up to or over 2.4 million minutes of traffic), Mr. McClure identified one customer that is an OTT provider, and assumed that 100 percent of its traffic is OTT.

OSUMF ¶ 47. Yet even when making all of these assumptions, construing each question in AT&T's favor and removing altogether any information gathered in the process of contacting individual customers, the total percentage of Level 3's OTT traffic only went up to █ percent. *Id.* AT&T's own expert acknowledges having no evidence that the percentage is higher than that. OSUMF ¶¶ 48.[3] In stark contrast, 47 percent of Level 3's traffic is its own traffic, is for ██████ ██████ (which has a quantifiable OTT percentage of 2 percent), or is carried on a network that is incapable of handling OTT calls. OSUMF ¶ 44. These numbers alone make it patently clear that AT&T's 65 percent number is grossly overstated. Given these facts, Level 3 presented a damages analysis premised on a 21 percent OTT factor, and even with this figure AT&T owed Level 3 over $6 million. OSUMF ¶ 54.

As the foregoing demonstrates, AT&T's assertion that Mr. McClure's testimony is the only evidence of Level 3's OTT percentage (ECF No. 149 at 23) is false. The calculation of OTT

---

[3] AT&T mistakenly asserts that Level 3 concedes that its OTT traffic "is at least 21% of traffic." ECF No. 149 at 12. The evidence actually shows that Level 3's OTT percentage is ***no higher*** than 21 percent; that number is a ceiling, not a floor. In reaching the 21-percent figure, moreover, Level 3 made every possible assumption in AT&T's favor. The actual percentage is almost certainly even lower than that, though that is an issue for another day.

percentage is based on a customer-by-customer review of information from Level 3's database, which showed that all customers who had meaningful minutes of traffic to AT&T were either enterprise-class customers with no nomadic telephone numbers, traditional facilities-based providers using Level 3 telephone numbers, or wholesale customers without any OTT capability (with one exception, for which it was assumed all of that customer's traffic was OTT). *See* OSUMF ¶ 47. In fact, the sole aspect of Mr. McClure's testimony AT&T criticizes in its summary judgment motion—the process of reaching out to individual customers—does not factor into the ███████ figure at all. *See id*. AT&T thus raises no genuine issue as to whether Level 3's OTT could possibly exceed █ percent.

Notably, AT&T does not even attempt to offer its own calculation of Level 3's OTT traffic; it places all of its eggs in one basket, resting its entire argument on Level 3's OTT percentage on its construction of the 65-percent language in the Agreement. As a result, there is no evidence—not from the Agreement, not from its witnesses, and not from anywhere else— that Level 3's OTT percentage could possibly be above █ percent. Thus, while the exact percentage of Level 3's OTT traffic is the subject of factual dispute, Level 3 asks the Court to enter a finding that Level 3's percentage of OTT traffic is in any event no higher than █ percent.

With answers to the question of how little of Level 3's traffic is OTT—or, at least, knowing that it is in no event more than █ percent—the significance of the other question—how to interpret the Settlement Agreement's refund provision—deflates to the point of collapse. When the Agreement is correctly construed, AT&T is entitled to a credit for fifty percent of the

end office charges (████████████████)[4] on Level 3's actual OTT traffic between January 1, 2019 and February 18, 2020, and 100 percent of end office charges (███████████████████ ████) on Level 3's actual OTT traffic thereafter. Under Level 3's calculations, the credit to which AT&T is entitled for end office charges amounts to $██████ through April 2020. OSUMF ¶ 54. Under AT&T's interpretation of the Agreement, AT&T would be also credited for the remaining fifty percent of charges up to February 18, 2020; this would result in some modest increase to the credit to be made. But Level 3's numbers show that AT&T withheld over ████ ████████ from Level 3 excluding late payment charges—far in excess of any credit AT&T would be entitled to receive under any interpretation of the Agreement. OSUMF ¶ 54. No matter whose interpretation of the Agreement is correct, AT&T has withheld payment from Level 3 far in excess of the modest credit to which it would be entitled. To balance the ledger, payment is required from AT&T—not Level 3. OSUMF ¶ 54.

## C.   THE CONDITIONS TRIGGERING THE REFUND PROVISIONS OF THE SETTLEMENT AGREEMENT WERE NOT SATISFIED UNTIL FEBRUARY 19, 2020.

AT&T's interpretation of the 2015 Settlement Agreement is also incorrect. Under the correct interpretation, AT&T is entitled only to a credit for half of its payments for OTT traffic from January 1, 2019 to February 18, 2020, and 100 percent of these charges thereafter.

### 1. Level 3 Assessed End Office Charges to AT&T Consistent with the Parties' 2015 Settlement Agreement.

AT&T's argument that Level 3 violated either the FCC's rules or its tariff in assessing the charges is mistaken, because the parties entered into a separate agreement under which

---

[4] █████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████

AT&T agreed to pay the charges. Section 203 of the Communications Act, which codifies the filed-rate doctrine (*see Cincinnati Bell Tel. Co. v. Allnet Commc'n Servs.*, Inc., 17 F.3d 921, 924 n.4 (6th Cir. 1994)), requires LECs to file tariffs and adhere to those tariffs, unless the FCC issues a decision detariffing a particular area of service. 47 U.S.C. § 203(b)(2). Under the FCC's "permissive detariffing" regime, "a CLEC has two means by which to charge for interstate access services": it "may tariff interstate access charges," or, "as an alternative to tariffing, a CLEC may negotiate and enter into an agreement with an IXC to charge rates higher than those [otherwise] permitted." *Teliax, Inc. v. Verizon Servs. Corp.*, No. 18-CV-00104-RM-MEH, 2018 WL 3729518, at *4 (D. Colo. Aug. 6, 2018) (citing *CallerID4u, Inc. v. MCI Communications Services Inc.*, 880 F.3d 1048 (9th Cir. 2018)); ECF No. 76 at 23 (noting that CLEC "could set rates either through a filed tariff that did not exceed a benchmark rate set by the FCC, *or*, in order to charge rates higher than the benchmark, a negotiated contract with an IXC.").

Because the filed-rate doctrine, also known as the "filed-tariff doctrine," does not apply to these detariffed agreements, an agreement under which AT&T would pay **more** than what the FCC ultimately decided the tariff would permit Level 3 to charge does **not** violate FCC rules, the filed-rate doctrine, or even the tariff itself.[5] *See Connect Insured Tel., Inc. v. Qwest Long*

---

[5] To the extent AT&T argues that Level 3 has violated the Communications Act or its tariffs, such arguments are not properly before this Court because the Court already dismissed AT&T's claim that Level 3 violated Section 201(b) of the Communications Act. Though AT&T attempts to reinstate those claims, its motion to do so must be denied for all the reasons Level 3 sets forth in its contemporaneously filed response to AT&T's motion for leave to amend its Complaint.

AT&T's assertion that Level 3's tariff defines end office access service co-extensively with the FCC's rules (MSUMF ¶ 13) is also false. The tariff's definition contains each of the three forms of end office access service identified in 47 C.F.R. § 51.903(1) through (3). But it also includes a fourth form NOT listed in the FCC's definitions: "The origination and termination of interexchange telecommunications traffic to any end user, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as

*Distance, Inc.*, No. 3:10-CV-1897-D, 2012 WL 2995063, at *2 (N.D. Tex. July 23, 2012) (citing *Qwest Commc'ns Co., LLC v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd. 8332, 8335 (2011)); ECF No. 76 at 23 ("in order to charge rates higher than the benchmark," CLEC may enter into "a negotiated contract with an IXC.").

AT&T acknowledges that the filed-rate doctrine does not prevent agreements to assess charges even where the CLEC has also filed a tariff. *See* ECF No. 149 at 7–8, n.8. To the extent AT&T implies that it can enter into an exclusive contract with a CLEC (here Level 3) procuring preferential below-tariff rates unavailable to all other customers, however, it is mistaken. To prevent discriminatory treatment, "the law does not permit a LEC . . . to agree to bill other IXCs *below-tariff* rates while charging [the IXC] tariff rates for the same service." *See, e.g., Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, No. CV 10-490 (MJD/SER), 2017 WL 4618277, at *25 (D. Minn. Mar. 31, 2017); *aff'd*, 905 F.3d 1068 (8th Cir. 2018); *All Am. Tel. Co. v. AT&T Corp.*, 26 FCC Rcd. 723, 732 n.47 (2011); ECF No. 76 at 24 n.21 ("whether the rate set in the Settlement Agreement is a rate 'higher than those permitted under the benchmark rule' . . . appears to be a requirement for parties to enter into a negotiated contract in the first place. . . . Otherwise, parties could negotiate contracts for a rate *below* the benchmark, which would 'affect the rate for services once a tariff has been filed.'"). In other words, CLECs may enter into agreements to assess *above*-tariff rates, but an agreement to assess *below*-tariff rates not available

---

defined in 47 U.S.C. § 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. § 153(36), that does not itself seek to collect reciprocal compensation charges prescribed by this subpart for that traffic, regardless of the specific functions provided or facilities used." OSUMF ¶ 13. This definition expressly includes OTT-VoIP traffic. This is an additional reason that the charges do not violate the terms of Level 3's tariff.

to other customers is forbidden.[6]

Level 3's interpretation of the Settlement Agreement complies with these mandates perfectly. When the parties entered into the 2015 Settlement Agreement, AT&T agreed to pay rates equal to those in Level 3's tariff going forward unless and until it was determined that the OTT charges "should not have been charged." If, on remand, the FCC determined the charges were appropriate, AT&T would continue paying the tariffed rates, and thus would continue complying with the requirements of the filed-rate doctrine. If the FCC determined the charges should ***not*** have been charged—which would mean the "benchmark" rate was actually zero, whether or not anyone knew that beforehand—then AT&T would receive a partial refund of those charges, yet at no point paying ***less*** than what was permitted under the FCC's rules. In other words, what AT&T agreed to pay might have been ***above*** the tariff rate, or it might have

---

[6] Many tariffs allow carriers to make individualized arrangements with customers on the basis of their particularized circumstances, notwithstanding the individual rate element in the tariff. The way this usually occurs is that an IXC obtains a series of services such as facilities and numerous tariffed and non-tariffed services for fees negotiated by and set by the contract. But the hallmark of these types of arrangements—including individual case basis ("ICB") arrangements, "letter tariffs," "contract tariffs," and others—is that the treatment being afforded to one customer is also available to other similarly situated customers. *See, e.g., In the Matter of the Application Filed by Kmc Data, LLC for a Certificate of Pub. Convenience & Necessity to Provide Resold Intrastate Interexchange Telecomm. Servs. in Alaska*, No. 4, 2006 WL 280583, at *11 (Jan. 18, 2006) (holding that special contracts, such as ICB arrangements, must be filed with the FCC subject to the FCC's revision and approval, and made available to all similarly situated customers because "[a] main reason for these requirements is to ensure that the special contract is not used as a means to provide an unreasonable preference to a customer."); *Global Access Ltd. v. AT&T Corp.*, 978 F. Supp. 1068, 1074 (S.D. Fla. 1997) (citing *Competition in the Interstate Interexchange Marketplace*, 6 FCC Rcd. 5880, ¶¶ 91, 102 (1991) ("The filed rate doctrine's principle of non-discrimination is furthered [by the contract tariff regime] because the filed contract tariffs become public information, and the carrier offering such terms is bound by them in negotiating with other customers."). Here, AT&T is claiming that it is entitled to obtain preferential rates on an individual rate element that no other IXC could obtain. This is a classic example of a filed-rate doctrine violation. *See, e.g., Qwest Commc'ns Co., LLC*, 2017 WL 4618277, at *25.

been the *same* as the tariff rate, but under no circumstance would it be *below* the tariff rate. No matter which way the FCC ruled, Level 3's interpretation of the Settlement Agreement complies with the filed-rate doctrine.[7]

AT&T's position, by contrast, attempts to secure discriminatorily favorable treatment, in violation of the filed-rate doctrine. Under AT&T's interpretation, Level 3 would have been required to refund half of the charges it had assessed up to the entry of the D.C. Circuit Order—even if on remand the FCC later determined that end office charges *were* permissible on OTT calls (as it had already done in 2015). OSUMF ¶ 56. All the while, the rates would still be listed in Level 3's tariff, and other IXCs would be obligated to pay the full tariffed rate for the same services. This interpretation of the 2015 Settlement Agreement— █████████████████ ███████████████████████████████████████████ — would secure special treatment for AT&T and thereby violate "the filed-rate doctrine's policies of preventing collusion and discrimination." ECF No. 76 at 24 n.21; *see also Qwest Commc'ns Co.*, LLC, 2017 WL 4618277, at *25. The 2015 Settlement Agreement did not and could not procure for AT&T this discriminatory treatment. Read correctly, as Level 3 recommends, the

---

[7] AT&T suggests that the filed-rate doctrine "has no effect on the result here" because "the rates that Level 3 may charge under the 2015 Agreement are *consistent* with its filed tariff rates." ECF No. 149 at 7, n.8 (emphasis in original). Not true. The Agreement specifically provides that, if the refund provisions came into effect, Level 3 could keep half of the charges that "should not have been charged." Thus, if it was subsequently determined that the charges "should not have been charged" (as happened here), the Agreement expressly allows Level 3 to assess and retain charges above the tariff rate. AT&T's suggestion also contradicts the arguments of its 30(b)(6) witness, who claimed Level 3 had an obligation to refund 50 percent of the end office charges in mid-2017, and that AT&T could have retained this refund irrespective of how the FCC ruled on remand—even if the FCC later decided that the charges were valid all along. OSUMF ¶ 56. This, too, would be inconsistent with the filed tariff rates, granting AT&T preferential rates in violation of the filed-rate doctrine.

Agreement ensured that AT&T would comply with FCC rules at all times, no matter what those requirements were determined to be on remand.

To avoid this outcome, AT&T relies heavily on hindsight: as it turns out, the FCC did not reaffirm that the charges were valid, and so AT&T reasons that the "applicable" rate for OTT traffic in Level 3's tariff contemplated by the Agreement turns out to have excluded end office charges. ECF No. 149 at 14. Of course, no one knew that is what would happen at the time, as many courts (including this one) have acknowledged. *See, e.g., Teliax*, 2017 WL 3839459, *2 ("[T]he issue of whether any services companies like Teliax provide constitute the 'functional equivalent' of end office switching remains an issue the FCC is currently grappling with."); ECF No. 82 at 16 ("In a nutshell, no one knows what is 'consistent[]' with the 2011 FCC rules. . . . [T]he matter is still open as to what is or is not consistent with the Transformation Order."). The FCC itself acknowledged in the 2019 Order on Remand that "the applicability of the VoIP Symmetry Rule has not been clear" and that "retroactive clarification is necessary to provide clarity on the meaning of the VoIP Symmetry Rule." Order on Remand, 2019 WL 7018968, at *9. Thus, it was not possible to bill charges "in accordance with the terms of" the D.C. Circuit Order, which, as this Court noted, provided no terms with which to bill charges in accordance.

To overcome this obvious problem, AT&T insinuates that this Court has already rejected Level 3's interpretation of the Agreement. *See* ECF No. 149 at 3–10. It did no such thing. In fact, the Court acknowledged that "whether the 'applicable order on appeal' was final could itself be a condition that had not yet occurred"—which is, "essentially, what the Magistrate Judge found." ECF No. 76 at 10. "Similarly, it is also open to debate on what terms defendant must bill Plaintiff going forward. What is not open to debate is that billing must be 'in accordance with the

terms of [the Final Appellate Order] once that order becomes final." *Id.* at 10 n.6.

That is why AT&T's attempt to rely on the FCC's 2019 decision to backfill its interpretation of the 2016 Order is improper. AT&T claims that "[t]he combined effect of the D.C. Circuit's 2016 decision . . . and the FCC's 2019 Declaratory Ruling" (ECF No. 149 at 14) support its interpretation of the "applicable" rate described in the Agreement as excluding these charges. That argument confirms the whole point: until the FCC issued its 2019 Order on Remand, the 2015 decision was overturned only "in part," and it was impossible to know whether the OTT charges "should not have been charged." The D.C. Circuit's 2016 Order provided no terms as to billing and payment for OTT traffic with which to comply, or instructions as to whether the OTT charges "should not have been charged." Yet the Agreement requires a refund only to the extent the OTT charges "should not have been charged in accordance with the ***Final Appellate Order***"—not a different order entered years later. OSUMF ¶ 15 (emphasis added). AT&T's motion confirms that there was no order determining that the charges "should not have been charged," or providing terms with which future billings were to comply, until the FCC issued its 2019 Order on Remand. Therefore, the refund provisions, which applied only once a decision determined the charges "should not have been charged," did not apply until the FCC's decision on remand became final in February 2020.

AT&T's attempt to construe the Agreement in light of what it learned only recently counters the entire reason for the partial refund provision: the parties, lacking that very hindsight, wished to address the uncertainty that came about because they lacked that hindsight. In fact, Level 3 wanted the Agreement to be the final word on the matter, and proposed that the charges be non-refundable no matter what came of the appeal. *See* OSUMF ¶ 24. AT&T, by contrast,

wanted to leave the question entirely open, and sought for a complete refund of all charges in the event it was determined they should not have been charged—which is exactly what AT&T seeks now. *See id.* Instead, the parties agreed to be subject to the partial refund provision. AT&T now seeks to read this provision out of the contract, insisting that, because the FCC finally decided the charges "should not have been charged," they should be refunded in their entirety, just as it sought before. AT&T thus seeks to undo the parties' compromise in order to reinstate its original ask, thereby frustrating the purpose of the Agreement.

Because the D.C. Circuit Opinion provided no terms as to billing and payment for OTT traffic with which to comply or instructions as to whether the OTT charges "should not have been charged," it triggered no obligation for Level 3 to refund any part of the charges. This duty arose only when the FCC finally provided those terms and instructions. Only Level 3's interpretation of the Agreement complies with the filed-rate doctrine. Thus, it is the only permissible interpretation this Court can consider.

### 2. The Parties' Negotiations Confirm the Refund Duty did not Arise until the FCC Issued its Decision on Remand.

AT&T will likely argue that its proposed interpretation of the Agreement is a plausible construction. However, "[i]f the terms of the complete written contract are unclear, ambiguous or contradictory . . . the parol evidence rule permits the consideration of [extrinsic] evidence in order to ascertain the true meaning of the terms." *Mun. Capital Appreciation Partners, I, L.P. v. Page*, 181 F. Supp. 2d 379, 391 (S.D.N.Y. 2002) (citations omitted); *see also Stage Club Corp. v. W. Realty Co.*, 212 A.D.2d 458, 459 (N.Y. App. Div. 1995) (extrinsic evidence should not be precluded "to clarify an ambiguity caused by the absence of particulars from the writing, provided that the parol evidence to be introduced does not contradict the written agreement").

Though it is unnecessary to look beyond the plain language of the Settlement Agreement to find that the parties did not consider a remand order to trigger a refund duty, the parties' negotiations confirm that this was the parties' intention. In particular, the Term Sheet AT&T sent to Level 3 specifically states that if the Court of Appeals remanded the FCC's original decision, a refund from Level 3 would be due only after the FCC subsequently issued a final decision. *See* MSUMF ¶ 14 ("If AT&T wins its FCC appeal, L3 will refund 50% of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals *or, if remanded, by the [later] FCC ruling*.") (emphasis added). This term reflected the parties' agreement—as reached in negotiations prior to execution of the Settlement Agreement—that if the FCC changed the way that companies could bill for OTT traffic, then that would impact the forward looking aspect of the Agreement. OSUMF ¶ 26.

AT&T acknowledges that each of the other five points in the term sheet was incorporated into the 2015 Settlement Agreement. OSUMF ¶ 27. And no one at AT&T ever had any discussion with anyone at Level 3 to suggest that AT&T's intent for the Settlement Agreement was different or changed from that reflected in the Term Sheet, including item number 6. OSUMF ¶ 29. The edits made to the 2015 Settlement Agreement ultimately incorporated that concept that, if the D.C. Circuit remanded, the "final" decision would be issued post-remand. AT&T itself ensured this concept was within the Agreement when it inserted language stating that "any billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order," OSUMF ¶ 30, and Level 3 acknowledged the point when it added language stating that "Level 3 will only be required to refund the OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order,"

OSUMF ¶ 31. These provisions ensure that Level 3 would not be required to refund the charges if the question of whether they "should not have been charged" was still pending on remand.

Though the language of the 2015 Settlement Agreement shows as much on its own, these negotiations confirm that the refund duty would arise only once the FCC or the Court determined that the charges should or should not have been charged and provided terms with which to comply going forward. Until then, there was no "final" order, and the partial refund provisions were not yet in effect.

## IV.      CONCLUSION

For the reasons stated above, Level 3 respectfully requests that the Court deny AT&T's Motion for Summary Judgment and grant Level 3's motion for summary judgment (ECF No 151).

Respectfully submitted this 20th day of July, 2020.

> By:      /s/ *Charles W. Steese*
> Charles W. Steese, #26924
> Douglas N. Marsh, #45964
> Armstrong Teasdale LLP
> 4643 South Ulster Street, Suite 800
> Denver, Colorado 80237
> Telephone: (720) 200-0676
> csteese@armstrongteasdale.com
> dmarsh@armstrongteasdale.com
>
> *Attorneys for Level 3 Communications, LLC and*
> *Counterclaimants Broadwing Communications,*
> *LLC, Global Crossing Telecommunications, Inc.,*
> *and WilTel Communications, LLC*

## CERTIFICATE OF SERVICE

I, Charles W. Steese, hereby certify that on July 20, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael D. Warden
Michael J. Hunseder
Justin A. Benson
Joshua W. Moore
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mwarden@sidley.com
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com
E-mail: joshua.moore@sidley.com

*Attorneys for Plaintiff*

/s/ *Charles W. Steese*
Charles W. Steese