**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM

AT&T CORP.,

      Plaintiff/Counter Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNCATIONS, INC., and WILTEL COMMUNICATIONS, LLC

      Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.

      Counterclaim Defendant

---

**LEVEL 3's RESPONSE AND ADDITIONAL FACTS AND SUPPORTING EVIDENCE
IN OPPOSITION TO AT&T's MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Defendants/Counterclaimant Level 3 Communications, LLC; Broadwing Communications, LLC; Global Crossing Telecommunications, Inc.; and Wiltel Communications, LLC ("Level 3"), by and through undersigned counsel, respectfully submits this Response and Additional Facts and Supporting Evidence ("OSUMF") in Opposition to Defendant AT&T Corp. ("AT&T")'s Motion for Summary Judgment.

| | Moving Party's Statement of Undisputed Material Facts ("MSUMF") and Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence ("OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 1. | Level 3's business model has long included partnering with retail providers of VoIP calling services. Ex. 1, Aug. 29, 2019 Deposition of A. McClure at 53:24 – 54:3. | Disputed. The referenced testimony does not support the assertion. The testimony states that "as our co-providers have matured, they've started owning more and more percentage of their TNs (i.e., telephone numbers)." | |
| 2. | AT&T disputed and withheld 65% of Level 3's billed end office access charges. *See* Ex. 2, Feb. 8, 2019 Deposition of A. Burgess at 133:21-134:2. | Disputed in part.<br><br>AT&T historically disputed and withheld 65 percent of Level 3's end office switched access charges. *See* ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess Depo.) at 130:9–24 & 154:16–155:12; ECF No. 152-24 (Level 3 MSJ *Exhibit 23*) (J. Torres 8-28-19 Depo.) at 50:23–54:9.<br><br>AT&T continued to withhold 65 percent of Level 3's end office charges even after Level 3 stopped billing end office charges on terminating calls, which the FCC's Transformation Order required to occur in July 2017, and as a result has | |

| | | | |
|---|---|---|---|
| | | withheld millions of dollars each year from Level 3. *See* ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess Depo.) at 200:23–201:23.<br><br>Throughout 2019 and 2020, AT&T withheld more than Level 3's total end office billings each month. *See* ECF No. 151-19 (Level 3 MSJ *Exhibit 28*) (Declaration of M. Kellow) ¶ 6. | |
| 3. | Level 3's tariff permits customers to withhold disputed bills.  *See* Ex. 3, Level 3's Tariff at § 4.9(1). | Disputed as incomplete.    Section 4.9(1) states: "The Customer may dispute a bill in good faith only by written notice to the Company. Unless such notice is received within 90 days …, the bill statement shall be deemed to be correct and payable in full by Customer. Any Customer who has a dispute shall be advised by the Company that the Customer may file a formal or informal complaint with the Commission. Such claim must identify in detail the basis for the dispute,   and   if   the   Customer withholds disputed amounts, it must identify the account number under which the bill has been rendered, the date of the bill, and the specific items on the bill being disputed to permit | |

| | | | |
|---|---|---|---|
| | | the Company to investigate the merits of the dispute.<br><br>This provision does not permit a customer like AT&T to withhold more than it is disputing, or amounts it cannot justify as disputing, both of which occurred here.  See OSUMF ¶ 2. | |
| 4. | AT&T and Level 3 entered into a Release and Settlement Agreement on April 27, 2015 (the "2015 Agreement").  *See* Ex. 4, ECF No. 15-1 (A true and correct copy of the 2015 Agreement was previously filed with the Court). | Admit. | |
| 5. | The Parties agreed in the 2015 Agreement that Level 3's percentage of OTT VoIP traffic was historically 65%. *See* Ex. 4 at § 1(a)(i)(B). | Disputed.  The actual text of the Agreement states that 65 percent is "the amount of the switched access usage charges for traffic that is the subject of the Disputed billed by Level 3"—i.e., that AT&T had disputed 65 percent of Level 3's charges, not that 65 percent of Level 3's charges were OTT.<br><br>The provision at issue reads as follows:<br><br>    No later than thirty (30) days after the receipt of Level 3's invoice for | |

| | | | |
|---|---|---|---|
| | | traffic exchanged from April 1 through May 31, 2015, seventy-five percent (75%) of the ***amount of the switched access usage charges for traffic that is the subject of the Dispute billed by Level 3, which has historically been approximately sixty-five percent (65%) of overall billing for end office switching*** ("April-May Supplemental Settlement Amount"). AT&T will transmit the April-May Supplemental Settlement Amount to the Level 3 account designated to receive switched access payments using the Parties' standard process for switched access payments.<br><br>(Emphasis added.)<br><br>Both Level 3 and AT&T designated a 30(b)(6) witness to discuss the intent of the 65 percent factor referenced in Section 1(a)(i)(B) of the Agreement: AT&T designated Mr. Ardell Burgess (*see* ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess Depo.) at 11:14–12:4), and Level 3 designated Ms. Jennifer Torres (*see* ECF No. 152-24 (Level 3 MSJ | |

*Exhibit 23*) (J. Torres 8-28-19 Depo.) at 18:13–21:13).

In July 2013, AT&T and Level 3 entered into a separate written agreement, which was only in effect during calendar year 2013 and stated:
Because the Parties had been unable to determine the volume of Level 3 traffic that was OTT prior to the Effective Date of this Settlement Agreement, Level 3 and AT&T agree that for the period January 2013 through December 2013, 65% of the end office traffic billed to AT&T CORP by Level 3 is OTT provider traffic.

*See* ECF No. 151-15 (Level 3 MSJ *Exhibit 24*) (K. Meola Depo. Ex. 6) § 2.16.

AT&T admits that at the time it entered into the 2013 agreement it did not know Level 3's OTT percentage. *See* ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess Depo.) at 99:22–100:25.

The 2015 Agreement stated that 75

|  |  | percent of all end office billings through June 2015 would be paid; however, at the time the Agreement was executed, two months of billings still needed to be reconciled. *See* ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess Depo.) at 120:14–121:19; ECF No. 152-24 (Level 3 MSJ *Exhibit 23*) (J. Torres 8-28-19 Depo.) at 37:24–38:20 & 70:24–73:23. The 65 percent provision only concerned what needed to be paid for April and May 2015 billings. *See id.; see also* ECF No. 152-6 (Level 3 MSJ *Exhibit 5*) (K. Meola Depo.) at 205:24–206:20. |  |
|  |  | By signing the Agreement, Level 3 was not claiming that, as of May 2015, 65 percent of its end office billings were for OTT traffic. ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess Depo.) at 122:5–16; ECF No. 152-24 (Level 3 MSJ *Exhibit 23*) (J. Torres 8-28-19 Depo.) at 48:11–49:6. |  |
|  |  | AT&T admits it has no facts to show that Level 3's OTT percentage was ever 65 percent. *See* ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess |  |

Depo.) at 124:3–11.

The purpose of the 65 percent in the Agreement was to establish that AT&T had historically disputed and withheld 65 percent of Level 3's end office switched access charges, and that the parties had used this percentage as a reference point in the past. *See* ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess Depo.) at 130:9–24 & 154:16–155:12; ECF No. 152-24 (Level 3 MSJ *Exhibit 23*) (J. Torres 8-28-19 Depo.) at 50:23–54:9.

Under the Agreement, Section 1(a)(iv) requires Level 3 to refund 50 percent of the actual OTT calling. *See* ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess Depo.) at 208:24–209:6; ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Response Disclosure) ¶ 2(a); ECF No. 152-6 (Level 3 MSJ *Exhibit 5*) (K. Meola Depo.) at 207:12–23 & 213:23–215:6; *see also* ECF No. 151-7 (Level 3 MSJ *Exhibit 11*) (A. Burgess Depo.) at 239:21–240:5 (acknowledging if Level 3's actual OTT percentage is less than 65%,

| | | that AT&T has over withheld). | |
|---|---|---|---|
| 6. | After Level 3 declined to provide AT&T's refund, AT&T began withholding approximately 65% of Level 3's end office access service charges relating to OTT-VoIP calls. Ex. 2 at 134:3-9. | Admit. | |
| 7. | Level 3 claimed that its OTT-VoIP percentage had dropped to 13% of its total VoIP traffic. *See* Ex. 5, Nov. 18, 2019 Deposition of A. McClure at 91:5-12. | Admit that in 2016 through July 2017, Mr. Andrew McClure of Level 3 found that approximately 13 percent of Level 3's originating calling was OTT, while 27 percent of its terminating traffic (which is no longer at issue) was OTT. *See* Ex. B (August 29, 2019 A. McClure Depo.) at 52:18–23, and 80:25–81:18; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 44. | |
| 8. | AT&T and Level 3 entered into a Confidential Release and Settlement Agreement on June 27, 2019 (the "2019 Agreement"). *See* Ex. 6 (A true and correct copy of relevant excerpts from the 2019 Agreement). | Admit. | |
| 9. | The 2019 Agreement provides that "all claims for amounts due or refunds due for traffic invoiced by Level 3 to AT&T through December | Admit. | |

| | | |
|---|---|---|
| | 31, 2018 are settled and released with respect to the OTT-VoIP Compensation Dispute." *See* Ex. 6 at pp. 7-8. | |
| 10. | The 2019 Agreement provides that the "OTT-VoIP Compensation Dispute shall continue to be an Ongoing Dispute," which means that the Dispute "will not be resolved for certain traffic and services . . . provided from January 1, 2019 forward." *See* Ex. 6 at pp. 4, 8. | Admit. |
| 11. | Level 3 and its VoIP partners rely on third party public internet connections to carry calls from the calling party to AT&T and other long distance companies. *See* Ex. 1 at 65:18-24 | Disputed. The referenced testimony does not support the assertion. The testimony states that it's a potential that customers use a third-party broadband provider for their broadband connection. It states nothing about whether calls flow over this this third-party connection. |
| 12. | Level 3's tariff permits charges for local switching (or end office) services in certain circumstances. *See* Ex. 3 at §§ 15.1.1.1 - 15.1.1.2 | Admit, but the referenced section is incomplete. *See also* Section 1.1, page 1.3 (definition of "End Office Access Service"), page 1.4 (definition of "End User"), page 1.6 (definition of "Local Switch, Local Switching"), and Sections 14.1, 14.2.1, and 14.2.9.4.2. |

| 13. | Level 3's tariff defines end office access service co-extensively with the FCC's rules.  *See* Ex. 3 at § 1, First Revised page 6.1. | Disputed. Level 3's tariff defines end office access service more broadly than do the FCC Rules. Specifically, the tariff's definition contains each of the three forms of end office access service identified in 47 C.F.R. § 51.903(1) through (3). But it also includes a fourth form NOT listed in the FCC's definitions: "The origination and termination of interexchange telecommunications traffic to any end user, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as defined in 47 U.S.C. § 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. § 153(36), that does not itself seek to collect reciprocal compensation charges prescribed by this subpart for that traffic, regardless of the specific functions provided or facilities used." ECF No. 148-5 at § 1, First Revised Page 6.1. This definition expressly includes OTT-VoIP traffic. | |
| 14. | The 2015 Agreement provides that Level 3 may bill, and AT&T shall pay, Level's "applicable switched access tariffed rate for OTT traffic, | Disputed as incomplete.  The section reads: "For switched access traffic exchanged by the Parties beginning on June 1, 2015, AT&T shall pay | |

| | | | |
|---|---|---|---|
| | pursuant to the terms of the OTT Declaratory Order." Ex. 4 at § 1(a)(ii). | Level 3 its applicable switched access tariffed rate for OTT traffic, pursuant to the terms of the OTT Declaratory Order. For avoidance of doubt, this Settlement Agreement shall not prohibit AT&T from disputing Level 3's billing for switched access traffic for reasons unrelated to the requirements of the OTT Declaratory Order, including but not limited to disputes regarding volumes or applicable rates." | |
| 15. | The 2015 Agreement provides that "any billing and payments for OTT traffic exchanged after such Final Appellate order becomes final shall be in compliance with terms of that order." Ex. 4 at § 1(a)(iv). | Disputed as incomplete. AT&T tries to segregate Section 1(a)(iv) of the Agreement into three segments (MSUMF ¶¶ 15–16 and 18), and even then omits key language. The provision reads:<br><br>(iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal | |

| | | | |
|---|---|---|---|
| | | becomes final and is no longer subject to further appeal or other judicial review ("Final Appellate Order"), Level 3 will refund, within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order. | |
| 16. | The 2015 Agreement provides that Level 3 should provide a 50% refund "beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is | Disputed as incomplete.  AT&T tries to segregate Section 1(a)(iv) of the Agreement   into   three   segments (MSUMF ¶¶ 15–16 & 18), and even then   omits   key   language.   The | |

| | no longer subject to further appeal or other judicial review." Ex. 4 at § 1(a)(iv). | provision reads:<br><br>(iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review ("Final Appellate Order"), Level 3 will refund, within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| | | been charged in accordance with the Final Appellate Order. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order. | |
| 17. | The 2015 Agreement provides that it shall be construed in accordance with and governed by the laws of the State of New York.  Ex. 4 at § 5. | Admit. | |
| 18. | The 2015 Agreement defines the term "Final Appellate Order" to mean the order that could "overturn[]" the "*OTT Declaratory Order*" either in whole or in part, once that "applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review."  Ex. 4 at § 1(a)(iv). | Disputed as incomplete.  AT&T tries to segregate Section 1(a)(iv) of the Agreement  into three segments (MSUMF ¶¶ 15–16 and 18), and even then omits key language.  The provision reads:<br><br>(iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal | |

| | | becomes final and is no longer subject to further appeal or other judicial review ("Final Appellate Order"), Level 3 will refund, within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order. | |
|---|---|---|---|
| 19. | The 2015 Agreement defines the term "OTT Declaratory Order" as "a Declaratory Ruling released on February 11, 2015, see Connect | Admit. | |

| | | |
|---|---|---|
| | America Fund, WC Docket No. 10-90, et al. Declaratory Ruling FCC 15-14 (released Feb. 11, 2015)." Ex. 4 at p. 1. | |
| 20. | The 2015 Agreement defines the term "OTT Appeal" to mean "the Petition for Review of the *OTT Declaratory Order* [filed by AT&T] with the United States Court of Appeals for the District of Columbia Circuit." Ex. 4 at p.1. | Disputed. The Agreement states: "on March 21, 2015, AT&T filed **_a_** Petition for Review of the OTT Declaratory Order with the United States Court of Appeals for the District of Columbia Circuit (the "OTT Appeal") (emphasis added). | |
| 21. | The parties drafted a Term Sheet prior to executing the 2015 Agreement. *See* Ex. 7, ECF No. 15-2 (A true and correct copy of the Term Sheet was previously filed with the Court). | Disputed. AT&T drafted the term sheet—not Level 3. On May 8, 2015, George Sloan sent Mike Riederer an email captioned "Settlement Proposal – Confidential." With respect to the OTT dispute, the email stated:<br><br>Here is our attempt to capture our agreement construct. Two items you will notice: (a) The late fees are separated out. I know you guys don't want it recorded this way. If the math works out, Monday morning, I'll support the flat 75%. (b) The team added an additional item they believe is closed and can be formalized in this document. I look forward to discussing more Monday morning. I'll have Kim Meola with me from John Nolan's | |

team. Thanks. George

***

Settlement Terms - OTT Dispute

(1) AT&T agrees to pay 75% of L3's retrospective claims on OTT for usage incurred through the end of May 2015. Note: Billed usage does not include LPCs.

(2) AT&T agrees to pay 25% of the LPCs associated with OTT usage billed through end of May 2015.

(3) AT&T agrees to pay L3 full switched access per the Level3 tariffs for both originating and terminating OTT traffic on a prospective basis for June 2015 usage forward.

(4) On a prospective basis, beginning with June 2015, Level 3 will not bill any EO elements associated with domestic originated OTT 8YY traffic not reflecting a Level 3 owned CPN or CPNLess traffic that is not served by a Level 3 end office. Level 3 will continue to bill full switched access on Level 3 owned TNs.

| | | | |
|---|---|---|---|
| | | (5) For any usage prior to June 2015, the settlement is a full and final settlement of all disputes and balances regardless of whether AT&T wins or loses its FCC appeal.<br><br>(6) ***If AT&T wins its FCC appeal, L3 will refund 50% of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals or, if remanded, by the FCC ruling.***<br><br>*See* ECF No. 151-9 (Level 3 MSJ *Exhibit 13*) (K. Meola Depo. Ex. 19) at CTL 11324–26 (emphasis added). | |
| 22. | The Parties agreed that historically 65% of Level 3's end office charges to AT&T were for OTT VoIP calls. *See* Ex. 4 at § 1(a)(i)(B); Ex. 8, Aug 28, 2019 Deposition of J. Torres at 50:14-22. | Disputed.   This assertion is also contained in MSUMF ¶ 5.  Disputed for the same reasons as set forth in OSUMF ¶ 5. | |
| 23. | Andrew McClure's estimates of the OTT VoIP percentages of Level 3's customers are not verifiable by anyone at Level 3.  *See* Ex. 9, June 11, 2020 Deposition of A. McClure at 207:12-21. | Disputed as contrary to the record evidence. Mr. McClure testified that his percentages were created in 2017, and there would be no way to verify the percentages in 2020 unless you used 2017 data and contacted the same people as he contacted in 2017. | |

| | | | |
|---|---|---|---|
| | | *See* Ex. A (June 11, 2020 Deposition of Andrew McClure) at 202:17–207:21. | |
| 24. | | On April 15, 2015, Level 3 sent an email to AT&T expressing disagreement on the parties' respective positions on the impact of an appeal on the finality of the settlement the parties were negotiating, stating as follows:<br><br>I think the biggest business item worth covering today is the proposed concept of settlement of OTT, with the condition that the appeal would over -ride whatever we agree. Initially, we see that as simply a transfer of retro and prospective reserved /unrecognized monies from AT &T to Level 3, and held in escrow (conceptually at least) until the appeal is concluded. We're not clear that this approach will really solve much for either party at this stage given the subsequent uncertainty? Our preference therefore, would be full and final settlement - we should discuss whether that is an option here | |

| | | | |
|---|---|---|---|
| | | and/or whether we're missing any potential benefit from your original proposal.<br><br>*See* ECF No. 152-8 (Level 3 MSJ *Exhibit 7*) (K. Meola Depo. Ex. 14) at ATT_PROD_0011781; ECF No. 152-6 (Level 3 MSJ *Exhibit 5*) (K. Meola Depo.) at 136:5–137:12; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 10. | |
| 25. | | On May 7, 2015, Mr. Sloan sent an email to Kim Meola—the person at AT&T responsible for the OTT dispute—which stated the following with respect to the OTT dispute:<br><br>Kim:<br><br>Thanks for stepping out of LWD today to help. Below ***I've captured the construct of the OTT/ Tandem deal we agreed to with L3 today. I'd appreciate you doing two things: (a) Double check that this deal works for you, and (b) please have the appropriate attorney review/enhance the language. I want to send this construct language over to Mike Riederer Friday AM***. | |

| | | | |
|---|---|---|---|
| | | (1) AT&T agrees to pay 75% of L3's retrospective claims on OTT and Tandem through the end of May 2015. ACTION: I'll set up some time with us and Mike Riederer tomorrow to run through the math on the late payments together. Our intent is to pay in the 25% range as discussed.<br><br>(2) Regardless of whether AT&T wins or loses its FCC appeal, neither AT&T or L3 can clawback additional amounts for OTT/Tandem claims for any period prior to June 2015.<br><br>(3) If AT&T wins its FCC appeal, AT&T can only clawback 50% of the disputed amount starting June 2015 ***through the date of the FCC ruling.***<br><br>(4) AT&T and L3 agree to pricing that is 75% of L3's asking price (need help with this language) for Tandem moving forward.<br><br>*See* ECF No. 151-8 (Level 3 MSJ | |

| | | | |
|---|---|---|---|
| | | *Exhibit 12*) (G. Sloan Depo. Ex. 20) at AT&T 0011854 (emphasis added); *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 12. | |
| 26. | | On May 8, 2015, George Sloan sent Mike Riederer an email captioned "Settlement Proposal – Confidential." With respect to the OTT dispute, the email stated:<br><br>Here is our attempt to capture our agreement construct. Two items you will notice: (a) The late fees are separated out. I know you guys don't want it recorded this way. If the math works out, Monday morning, I'll support the flat 75%. (b) The team added an additional item they believe is closed and can be formalized in this document. I look forward to discussing more Monday morning. I'll have Kim Meola with me from John Nolan's team. Thanks. George<br><br>\*\*\*<br><br>Settlement Terms - OTT Dispute<br><br>(1) AT&T agrees to pay 75% of L3's retrospective claims on OTT for usage incurred through the end | |

|  |  | of May 2015. Note: Billed usage does not include LPCs. |  |
|  |  | (2) AT&T agrees to pay 25% of the LPCs associated with OTT usage billed through end of May 2015. |  |
|  |  | (3) AT&T agrees to pay L3 full switched access per the Level3 tariffs for both originating and terminating OTT traffic on a prospective basis for June 2015 usage forward. |  |
|  |  | (4) On a prospective basis, beginning with June 2015, Level 3 will not bill any EO elements associated with domestic originated OTT 8YY traffic not reflecting a Level 3 owned CPN or CPNLess traffic that is not served by a Level 3 end office. Level 3 will continue to bill full switched access on Level 3 owned TNs. |  |
|  |  | (5) For any usage prior to June 2015, the settlement is a full and final settlement of all disputes and balances regardless of whether AT&T wins or loses its FCC appeal. |  |
|  |  | (6) *If AT&T wins its FCC appeal,* |  |

| | | | |
|---|---|---|---|
| | | ***L3 will refund 50% of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals or, if remanded, by the FCC ruling.***<br><br>*See* ECF No. 151-9 (Level 3 MSJ *Exhibit 13*) (K. Meola Depo. Ex. 19) at CTL 11324–26 (emphasis added); *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 14. | |
| 27. | | Points one through five in the May 8, 2015 term sheet are all encapsulated in concept in the Agreement. *See* ECF No. 152-6 (Level 3 MSJ *Exhibit 5*) (K. Meola Depo.) at 162:23–165:6; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 17. | |
| 28. | | In deposition, Mike Riederer testified that point number six in the May 8, 2015 term sheet reflected the parties' agreement that if the FCC changed the way that companies could bill for OTT traffic, then that would impact the forward looking aspect of the settlement agreement. *See* ECF No. 152-9 (Level 3 MSJ *Exhibit 8*) (M. Riederer Depo.) at 46:21–49:23; *see* | |

| | | | |
|---|---|---|---|
| | | *also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 18. | |
| 29. | | No one at AT&T had any discussions with anyone at Level 3 indicating that AT&T's intent for the Settlement Agreement was different or changed from that reflected in item number six in the May 8, 2015 term sheet. *See* ECF No. 152-6 (Level 3 MSJ *Exhibit 5*) (K. Meola Depo.) at 167:14–168:3; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 18. | |
| 30. | | On May 15, 2015, AT&T sent Level 3 a heavily redlined settlement agreement. Section 1(a)(iv) was relined to read as follows (with italicized and bolded language added by AT&T): | |
| | | (iv)  For any OTT usage prior to June 2015, Although the Parties agree that this settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. ***Therefore, in the event the OTT*** | |

| | | | |
|---|---|---|---|
| | | ***Declaratory Order is overturned, either in whole or in part***, the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review, Level 3 will refund within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 usage-traffic through the date on which such order becomes final and is no longer subject to further appeal or other judicial review. ***Further, the Parties agree that any billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order.***<br><br>ECF No. 151-13 (Level 3 MSJ *Exhibit 17*) (K. Meola Depo. Ex. 23) at CTL_0012895; ECF No. 152-6 (Level 3 MSJ *Exhibit 5*) (K. Meola Depo.) at 198:19–199:14; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 24. | |
| 31. | | On May 21, 2015, Level 3 sent AT&T its redlines, which modified section 1(a)(iv) to read as follows (with italicized and bolded language | |

| | | added by Level 3): | |
| | | (iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review Level 3 will refund, within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; ***provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with*** | |

| | | | |
|---|---|---|---|
| | | ***the Final Appellate Order***. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.<br><br>*See* ECF No. 151-14 (Level 3 MSJ *Exhibit 18*) (K. Meola Depo. Ex. 24) at CTL_004212; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 25. | |
| 32. | | The 2015 Settlement Agreement permits Level 3 to bill end office switched access charges on all non-OTT calls with a Level 3 telephone number. *See* ECF No. 152-6 (Level 3 MSJ *Exhibit 5*) (K. Meola Depo.) at 211:4–24; ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Response Disclosure) ¶ 10; *see also* ECF No. 151-3 (Level 3 Statement of Undisputed Material Fact) ¶ 42. | |
| 33. | | Level 3 employee Andrew McClure calculated Level 3's percent OTT to be 16 percent since January 1, 2019. ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Responsive Disclosure) ¶ 16; *see also* ECF No. 151-3 (Level 3's Statement of | |

| | | | |
|---|---|---|---|
| | | Undisputed Material Facts) ¶ 50. | |
| 34. | | AT&T's expert, Dr. Penn Pfautz, did not calculate a percent OTT for Level 3. ECF No. 152-5 (Level 3 MSJ *Exhibit 4*) (P. Pfautz. Depo.) at 29:22–25; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 51. | |
| 35. | | AT&T has a few documents that comment upon Level 3's percent OTT, but none of AT&T's documents calculate a percent OTT or utilize an appropriate methodology to calculate percent OTT. ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Responsive Disclosure) ¶ 4; *Exhibit 4* (P. Pfautz Depo.) at 181:25–192:14; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 52. | |
| 36. | | Level 3's OTT analysis is based on calling originated using Level 3 telephone numbers, and destined for AT&T. ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Responsive Disclosure) ¶ 10; ECF No. 152-5 (Level 3 MSJ *Exhibit 4*) (P. Pfautz Depo.) at 129:9–130:5 (AT&T has no contrary evidence); *see also* ECF No. 151-3 (Level 3's | |

| | | | |
|---|---|---|---|
| | | Statement of Undisputed Material Facts) ¶ 54. | |
| 37. | | Dr. Pfautz testified that his "biggest concern" about Level 3's OTT analysis is the method that Level 3's expert (Andrew McClure) used to gather percent OTT from individual Level 3 customers. ECF No. 152-5 (Level 3 MSJ *Exhibit 4*) (P. Pfautz Depo.) at 141:12–15; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 55. | |
| 38. | | The percentages that Mr. McClure obtained from customers had very little impact on Level 3's percent OTT; if Mr. McClure assumed that 100 percent of the calling associated with customers Mr. McClure believed to have some OTT calling is OTT, Level 3's OTT percentage would rise from ▮ percent to ▮ percent. ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Responsive Disclosure) ¶ 12; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 56. | |
| 39. | | Dr. Pfautz took issue with three entities that Mr. McClure reported in 2017 as having 0 percent OTT: ▮▮▮▮▮▮▮▮▮▮▮▮▮. ECF No. 151-16 (Level 3 MSJ | |

| | | | |
|---|---|---|---|
| | | *Exhibit 25*) (A. McClure Responsive Disclosure) ¶ 13; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 57. | |
| 40. | | Level 3 no longer has a relationship with ███████ as such, the concern about ███████████ has no bearing on data from 2019 forward. ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Responsive Disclosure) ¶ 13(b) *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 58. | |
| 41. | | Both Level 3 and AT&T recognize that ███ is not a pure OTT provider. ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Responsive Disclosure) ¶ 13(d); 152-5 (Level 3 MSJ *Exhibit 4*) (P. Pfautz Depo.) at 151:15–154:20. Nonetheless, for summary judgment, Level 3 will assume that 100 percent of ██████ calls are OTT. *See also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 59 | |
| 42. | | AT&T acknowledges that when calls flow over facilities Level 3 provisioned at the customer's premises to Level 3's end office, even if people connect to those hub facilities via a third-party internet | |

| | | | |
|---|---|---|---|
| | | connection from remote locations, end office charges apply. *See* ECF No. 152-5 (Level 3 MSJ *Exhibit 4*) (P. Pfautz Depo.) at 101:14–23; 104:17–105:9; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 60. | |
| 43. | | Andrew McClure determined that ▉▉▉▉ is not an OTT provider because Level 3 provides ▉▉▉▉ with facilities at ▉▉▉▉ premises, and all calls flow over the facilities Level 3 provisioned and provided to ▉▉▉▉. ECF No. 151-24 (Level 3 MSJ *Exhibit 31*) (A. McClure 6-11-2020 Depo.) at 127:12–137:8; 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Responsive Disclosure) ¶ 13(c); *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 61. | |
| 44. | | Forty-seven percent of Level 3's traffic falls into three clear categories: (a) Level 3's own traffic; (b) a Level 3 network incapable of supporting OTT calling; and (c) ▉▉▉▉. *See* ECF No. 151-25 (Level 3 MSJ *Exhibit 32*) (Exhibit 2 to Level 3's Rule 26(a)(2)(C) Disclosure; ECF No. 151-21 (Level 3 MSJ *Exhibit 29*) (Declaration of | |

| | | | |
|---|---|---|---|
| | | Andrew McClure) ¶ 6); *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 62. | |
| 45. | | In deposition, AT&T asked Mr. McClure about four additional customers: ███ and ███. *See* ECF No. 151-24 (Level 3 MSJ *Exhibit 31*) (A. McClure 6/11/2020 Depo.) 125:13–126:18; ECF No. 151-21 (Level 3 MSJ *Exhibit 29*) (A. McClure Dec.) ¶ 9; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 63. | |
| 46. | | While Mr. McClure could not recall the specifics of ███ ███, and ███ during his expert deposition, Mr. McClure has since familiarized himself with those customers, and determined that while ███ and ███ are appropriately categorized at zero percent OTT, ███ may have the ability to provide some OTT functions. As a result, for purposes of this summary judgment motion, Level 3 will assume ███ is 100% OTT. *See* ECF No. 151-24 (Level 3 MSJ *Exhibit 31*) (A. McClure 6/11/2020 Depo.) at 108:14–21, 114:8–12, 121:15–23; ECF No. 151- | |

| | | | |
|---|---|---|---|
| | | 21 (Level 3 MSJ *Exhibit 29*) (A. McClure Dec.) ¶¶ 10–15; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 64. | |
| 47. | | Using the percentages referenced in the paragraphs above, and making the following assumptions after reevaluating all of Level 3's customers through Row 125 to Exhibit 2 to his disclosure, including all customers with up to or over 2.4 million minutes of traffic:<br><br>• Every customer previously assumed to have at least some OTT had 100 percent OTT traffic.<br>• AT&T's expert identified three customers who he believed might have OTT traffic. Mr. McClure analyzed each, and if there was a possibility of any OTT traffic, he assumed they had 100 percent OTT traffic.<br>• In deposition, AT&T identified a few additional customers and asked about them. Mr. McClure analyzed each as well as (of his own volition) scores of additional customers. If there was a possibility of OTT traffic for any of these customers, Mr. McClure assumed they had 100 percent | |

| | | | |
|---|---|---|---|
| | | OTT traffic.<br>• In his review of Level 3's top customers (i.e., those with up to or over 2.4 million minutes of traffic), Mr. McClure identified one customer that is an OTT provider, and assumed that 100 percent of its traffic is OTT.<br>Even under these assumptions, Level 3's OTT percentage would increase to ■ percent. *See* ECF No. 151-21 (Level 3 MSJ *Exhibit 29*) (A. McClure Dec.) ¶¶ 17–21; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 65. | |
| 48. | | Dr. Pfautz admitted in deposition that he did not have any evidence that Level 3's percent OTT is greater than ■%. *See* ECF No. 152-5 (Level 3 MSJ *Exhibit 4*) (P. Pfautz Depo.) at 173:10–175:10; 176:7–16; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 66. | |
| 49. | | Dr. Pfautz assumed that 100 percent of AT&T's enterprise class customers had no OTT calling based on representations from AT&T, without obtaining the names of AT&T's customers, evaluating those customers, or performing any independent research. *See* ECF No. | |

| | | | |
|---|---|---|---|
| | | 152-5 (Level 3 MSJ *Exhibit 4*) (P. Pfautz Depo.) at 215:3–229:23; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 67. | |
| 50. | | To calculate its percent OTT, AT&T only evaluated whether the customer had the ability to utilize "nomadic" telephone numbers, meaning make calls from various locations over a third-party internet connection. *See* ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Responsive Disclosure) ¶¶ 3, 8; ECF No. 152-5 (Level 3 MSJ *Exhibit 4*) (P. Pfautz Depo.) at 106:14–115:22, 118:5–120:10, 222:8–229:23; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 68. | |
| 51. | | AT&T determined that only calls flowing over its BVoIP network could support nomadic telephone calling; as a result, it presumed calling over its traditional network was zero percent OTT. *See* ECF No. 152-34 (Level 3 MSJ *Exhibit 33*) (J. Gallagher Depo. Vol. I) at 78:18–79:10; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 69. | |

| | | | |
|---|---|---|---|
| 52. | | AT&T did not consider the business plan of any of its enterprise class customers, and whether they created the potential for OTT calling. *See* ECF No. 151-16 (Level 3 MSJ *Exhibit 25*) (A. McClure Responsive Disclosure) ¶ 3; ECF No. 152-5 *Exhibit 4* (Pfautz Depo.) at 106:14–109:6; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 70. | |
| 53. | | Dr. Pfautz—AT&T's expert—concluded that AT&T's method for determining percent OTT was reasonable. ECF No. 151-23 (Level 3 MSJ *Exhibit 30*) (P. Pfautz Opening Report) ¶ 8; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 71. | |
| 54. | | Under Level 3's calculations, which are premised upon a ▮-percent OTT factor, not the ▮-percent factor, and replacing these refunded OTT minutes with a ▮▮▮▮▮ element instead of end office rate elements (which AT&T agrees is correct): (a) AT&T is entitled to a credit for end office charges of $▮▮▮ through April 2020, and (b) AT&T has withheld over ▮▮▮▮ from Level 3 for the OTT dispute. | |

| | | | |
|---|---|---|---|
| | | *See* ECF No. 151-19 (Level 3 MSJ *Exhibit 28*) (M. Kellow Dec.) ¶¶ 7–8; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 72. | |
| 55. | | Throughout 2019 and 2020, AT&T withheld more than Level 3's total end office billings each month. *See* ECF No. 151-19 (Level 3 MSJ *Exhibit 28*) (Declaration of M. Kellow) ¶ 6; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 46. | |
| 56 | | Ms. Meola, who was AT&T's 30(b0(6) witness on the intent of the 2015 Agreement, testified that if, on remand, the FCC affirmed that end office charges applied to OTT calls, then AT&T believed that Level 3 must still rebate 50 percent of the charges associated with OTT calls pursuant to section 1(a)(iv). ECF No. 152-6 (Level 3 MSJ *Exhibit 5*) (K. Meola Depo.) at 13:19–15:7 (identifying subjects on which Ms. Meola is corporate representative); 194:24–195:23; *see also* ECF No. 151-3 (Level 3's Statement of Undisputed Material Facts) ¶ 33. | |