# EXHIBIT 1

# In The Matter Of:

*AT&T Corporation v.*
*Level 3 Communications, LLC*

---

*Andrew McClure*
*June 11, 2020*
*Confidential*

---



*Min-U-Script® with Word Index*

**Confidential**

                                                                          1

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
----------------------------------------------X
AT&T CORPORATION,

         Plaintiff/Counterclaim Defendant,

              v.

LEVEL 3 COMMUNICATIONS, LLC.,

         Defendant/Counterclaimant,

              and

BROADWING COMMUNICATIONS, LLC, GLOBAL
CROSSING TELECOMMUNICATIONS, INC., and
WILTEL COMMUNICATIONS, LLC.

         Counterclaimants,

              v.

TELEPORT COMMUNICATIONS GROUP, INC.

         Counterclaim Defendant.
----------------------------------------------X
              ***CONFIDENTIAL***


     DEPOSITION OF ANDREW McCLURE

           Thursday, June 11, 2020




Reported by:

Rebecca Schaumloffel, CLR, RPR, CCR-NJ

Job No:  2020-86250
```

**Confidential**

2

3        June 11, 2020

4         11:08 a.m.

8           Deposition of ANDREW McCLURE, held
9       remotely via Webex, before Rebecca
10      Schaumloffel, a Certified Livenote Reporter,
11      Registered Professional Reporter, Certified
12      Court Reporter of New Jersey, and Notary
13      Public of the States of New York, New Jersey,
14      Delaware, and Pennsylvania.

Confidential

3

A P P E A R A N C E S:

    SIDLEY AUSTIN
        Attorneys for the Plaintiff
        1501 K. Street, N.W.
        Washington, D.C. 20005
        BY:  MICHAEL HUNSEDER, ESQ.
            JUSTIN BENSON, ESQ.
            JOSH MOORE, ESQ.

    ARMSTRONG TEASDALE
        Attorneys for the Defendant
        4643 South Ulster Street
        Denver, Colorado 80202
        BY:  CHARLES STEESE, ESQ.

    ALSO PRESENT:

        Mark W. Lewis, Esq., AT&T

        Christian Ruiz, Lexitas

        *        *        *

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | A. MCCLURE                                                   |
| 12:35PM  | 2  | -- IM them.  Sometimes would be voice                        |
| 12:35PM  | 3  | conversation.  I went onto their websites and                |
| 12:35PM  | 4  | tried to investigate them, figure out if they                |
| 12:35PM  | 5  | were advertising an application-based product                |
| 12:35PM  | 6  | that could be used, it would create no OTT                   |
| 12:35PM  | 7  | call, and then I would reach out to them and                 |
| 12:35PM  | 8  | ask them, you know, what kind of percentages                 |
| 12:35PM  | 9  | of your customers use this application versus                |
| 12:35PM  | 10 | the traditional type of, you know,                           |
| 12:35PM  | 11 | TDM-dedicated circuit to a PBX and, in                       |
| 12:35PM  | 12 | general, that was my process, was to try to                  |
| 12:35PM  | 13 | investigate like that.                                       |
| 12:35PM  | 14 | Q.   And in the answer that you just                         |
| 12:35PM  | 15 | gave, the process that you are talking about,                |
| 12:35PM  | 16 | did you do that in 2017 only?                                |
| 12:36PM  | 17 | A.   Correct.                                                |
| 12:36PM  | 18 | Q.   So none of the numbers in column                        |
| 12:36PM  | 19 | E, in Exhibit 63, are the result of inquiries                |
| 12:36PM  | 20 | that you made in 2020 or 2019?                               |
| 12:36PM  | 21 | A.   I made no inquiries because we                          |
| 12:36PM  | 22 | couldn't agree upon a standardized process.                  |
| 12:36PM  | 23 | The industry hasn't come to a standardized                   |
| 12:36PM  | 24 | process.  The FCC hasn't given a standardized                |
| 12:36PM  | 25 | process, and I felt that it was, A, would be                 |

62

1         A. MCCLURE

12:36PM  2    burdensome on the customer's relationship
12:36PM  3    with us, and I also felt that if AT&T
12:36PM  4    couldn't agree to a method that I was going
12:36PM  5    to use, then it seemed like extra work that
12:36PM  6    wouldn't necessarily result in a result that
12:36PM  7    we can agree on.
12:36PM  8              MR. HUNSEDER:  Could the Court
12:37PM  9         Reporter just read that back, please.
12:37PM  10             (Record read.)
12:37PM  11        Q.   Earlier, Mr. McClure, you
12:37PM  12   testified that when -- that a Level 3 will
12:38PM  13   ask wholesale customers for PIUs for purposes
12:38PM  14   of taxation; is that correct?
12:38PM  15        A.   Correct.
12:38PM  16        Q.   And is that burdensome on those
12:38PM  17   wholesale customers?
12:38PM  18        A.   It's required and it's industry
12:38PM  19   standard.  So whether a customer comes to
12:38PM  20   Level 3 or AT&T, they are going to be
12:38PM  21   required to provide those same factors.
12:38PM  22        Q.   So that's an industry standard
12:38PM  23   with respect to PIU, correct?
12:38PM  24        A.   Correct.
12:38PM  25        Q.   And did you consider whether that

|  |  |
|---|---|
| 1 | A. MCCLURE |
| 2 | ***AFTERNOON SESSION*** |
| 02:29PM 3 | BY MR. HUNSEDER: |
| 02:29PM 4 | Q.   All right, Mr. McClure, before the |
| 02:29PM 5 | break we were talking a little bit about |
| 02:29PM 6 | ▅▅▅▅ and your conversations with |
| 02:29PM 7 | Mr. Stocker. |
| 02:29PM 8 | Do you recall that? |
| 02:29PM 9 | A.   I do. |
| 02:29PM 10 | Q.   And my question is this, you have |
| 02:29PM 11 | in Exhibit 63 the spreadsheet.  You have the |
| 02:29PM 12 | ▅▅▅▅ OTT percentage as ▅▅; is that |
| 02:29PM 13 | correct? |
| 02:29PM 14 | A.   Correct. |
| 02:29PM 15 | Q.   And that's -- we will get into |
| 02:29PM 16 | this a lot more detail in a minute, but |
| 02:29PM 17 | that's your estimate based on a variety of |
| 02:29PM 18 | sources; is that right, or based on |
| 02:29PM 19 | information that you considered, correct, |
| 02:29PM 20 | that's your estimate? |
| 02:29PM 21 | A.   That is not my estimate.  That is |
| 02:29PM 22 | the estimate coming from ▅▅▅▅. |
| 02:30PM 23 | Q.   And how did it come from |
| 02:30PM 24 | ▅▅▅▅? |
| 02:30PM 25 | A.   I believe Ed Stocker provided us |

|  |  |  |
|---|---|---|
|  | 1 | A. MCCLURE |
| 02:30PM | 2 | an estimate early on of ▓. |
| 02:30PM | 3 | Q.   This number was from your -- was |
| 02:30PM | 4 | carried forward from your 2017 analysis? |
| 02:30PM | 5 | A.   Correct. |
| 02:30PM | 6 | Q.   Do you recall whether it was |
| 02:30PM | 7 | through what you described earlier, your |
| 02:30PM | 8 | prior deposition, Click to Chat? |
| 02:30PM | 9 | A.   I don't recall if ▓▓▓▓ was |
| 02:30PM | 10 | Click to Chat or if ▓▓▓▓ was provided by |
| 02:30PM | 11 | Ed Stocker at the time.  So Ed Stocker having |
| 02:30PM | 12 | -- sorry, so Ed Stocker having knowledge of |
| 02:30PM | 13 | the customer set, his customer set, he did |
| 02:30PM | 14 | have knowledge of certain customers that he |
| 02:30PM | 15 | did give as ▓▓ or, you know, if he knew a |
| 02:30PM | 16 | percentage, he gave it. |
| 02:30PM | 17 | Q.   And in 2017, when you put together |
| 02:31PM | 18 | the 2017 analysis, was Mr. Stocker employed |
| 02:31PM | 19 | at Level 3 at that time? |
| 02:31PM | 20 | A.   He was. |
| 02:31PM | 21 | Q.   So what you are saying is your |
| 02:31PM | 22 | recollection that he provided a specific |
| 02:31PM | 23 | number for ▓▓▓▓ while he was employed at |
| 02:31PM | 24 | Level 3? |
| 02:31PM | 25 | A.   That's my recollection. |

```
 1              A. MCCLURE
 2    these customers a questionnaire to say what's
 3    your OTT, then I could come back and plug it
 4    in and put it in.
 5         Q.   So apart from -- so let me ask
 6    this, do you have any documentation in your
 7    possession that corroborates the figure in
 8    column E that ████████ is █?
 9         A.   I do not.
10         Q.   Going back, did you review your
11    2017 -- strike that.
12              Did you review your prior
13    deposition testimony in this case in
14    preparation for this deposition?
15         A.   I may have at a high level, but I
16    don't recall.
17         Q.   Okay.  In general, I think, you --
18    so in 2017, when you did the review of, I
19    think you said the top 90% of minutes; is
20    that fair?
21         A.   Yes.
22         Q.   You have no documentation from
23    that analysis or investigation, correct?  I
24    mean, you did not have at the time and you
25    still do not have; is that correct?
```

```
                                                                  108
           1                    A. MCCLURE
03:12PM    2          A.    Correct.  Just the click to chats
03:12PM    3    and the calls, and there is some notes that I
03:13PM    4    wrote down for certain customers, I believe,
03:13PM    5       ▌    might have been one and there might have
03:13PM    6    been a couple others.
03:13PM    7          Q.    And you were -- again, you were
03:13PM    8    questioned at length on that.  I don't want
03:13PM    9    to redo that.
03:13PM   10                As far as you can recall, your
03:13PM   11    testimony was accurate at the time; is that
03:13PM   12    fair?
03:13PM   13          A.    Yes.
03:13PM   14          Q.    So going to line 8, there is a
03:13PM   15    company    ▌      , and do you have an
03:13PM   16    understanding of what they do, Mr. McClure?
03:13PM   17          A.    I do not.
03:14PM   18          Q.    Do you know if you considered them
03:14PM   19    an enterprise or wholesale customer?
03:14PM   20          A.    I don't have any recollection or
03:14PM   21    knowledge of them.
03:14PM   22          Q.    Again, you don't have any
03:14PM   23    documentation in your possession as to the  ▌
03:14PM   24    figure in column E; is that correct, other
03:14PM   25    than this spreadsheet?
```

143

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | A. MCCLURE                                             |
| 04:09PM  | 2  | know, you can get this, you don't need our             |
| 04:09PM  | 3  | Internet, and they are stating it.  Most of            |
| 04:09PM  | 4  | these customers that, you know, we reviewed            |
| 04:09PM  | 5  | and that I have reviewed in the past, if they          |
| 04:10PM  | 6  | offer it and they offer fixed VoIP, which is           |
| 04:10PM  | 7  | in here, that tells me that it's not their             |
| 04:10PM  | 8  | whole business.  It's a part of their                  |
| 04:10PM  | 9  | business and, typically, when you are                  |
| 04:10PM  | 10 | offering that, there is licensed costs to              |
| 04:10PM  | 11 | have those mobility.  There is extra costs.            |
| 04:10PM  | 12 | So you charge that.                                    |
| 04:10PM  | 13 |            So customers typically only adopt           |
| 04:10PM  | 14 | that or take that if they really need it and           |
| 04:10PM  | 15 | if it's a value to them.  So without -- you            |
| 04:10PM  | 16 | know, again, I am not this customer, but if            |
| 04:10PM  | 17 | there was a document that I could give them            |
| 04:10PM  | 18 | and say you have to fill this out, the FCC,            |
| 04:10PM  | 19 | the whole industry requires this from all              |
| 04:10PM  | 20 | customers, then I would absolutely do that,            |
| 04:10PM  | 21 | yes.                                                   |
| 04:10PM  | 22 |       Q.    All right.  But in your                    |
| 04:10PM  | 23 | spreadsheet and your opinion today is that             |
| 04:10PM  | 24 | it's ███, correct?                                     |
| 04:10PM  | 25 |       A.    According to the original 2017            |

144

|         |    |                                           |
|---------|----|-------------------------------------------|
|         | 1  | A. MCCLURE                                |
| 04:10PM | 2  | research for whatever reason, that is --  |
| 04:10PM | 3  | whether it was, didn't have the volume or |
| 04:11PM | 4  | whether it is they -- that at the time they |
| 04:11PM | 5  | didn't have that service or that this web |
| 04:11PM | 6  | page wasn't there, I can't speak to it, but, |
| 04:11PM | 7  | yes.                                      |
| 04:11PM | 8  |       Q.   Right.  What I'm saying is in  |
| 04:11PM | 9  | 2020, when you put together this spreadsheet |
| 04:11PM | 10 | and entered ■, you didn't make the inquiry. |
| 04:11PM | 11 | So it's possible that it could be ■, right, |
| 04:11PM | 12 | that's what you are saying?               |
| 04:11PM | 13 |       A.   Right, it's possible that it could |
| 04:11PM | 14 | be, yes.                                  |
| 04:11PM | 15 |       Q.   But it's also possible it could be |
| 04:11PM | 16 | 90% and you didn't ask; is that fair?     |
| 04:11PM | 17 |       A.   That is completely fair.  And that |
| 04:11PM | 18 | would be true with all of the ones that are |
| 04:11PM | 19 | --                                        |
| 04:11PM | 20 |       Q.   ■?                             |
| 04:11PM | 21 |       A.   Or even stated at ■ or ■ or ■. |
| 04:11PM | 22 | Those are all from 2017.                  |
| 04:11PM | 23 |       Q.   And they all could have gone up or |
| 04:11PM | 24 | down is what you are saying?              |
| 04:11PM | 25 |       A.   Exactly.  And the original stance |

```
                                                              145
     1                       A. MCCLURE
04:11PM   2     was based upon application, not connectivity
04:11PM   3     to the customer.  So, again, some could go
04:11PM   4     down and you are right, some could go up.
04:12PM   5             Q.   A couple more questions and we
04:12PM   6     will -- up on number 21, ███████████
04:12PM   7     ███████████████.
04:12PM   8             Do you have any idea what they
04:12PM   9     are?
04:12PM  10             A.   I recall looking at them, but I
04:12PM  11     don't recall what it is.
04:12PM  12             Q.   Hypothetically, if they were --
04:12PM  13     sorry, didn't mean to interrupt your answer.
04:12PM  14     I apologize.
04:12PM  15             A.   No, go ahead.
04:12PM  16             Q.   Were you finished?  Okay.
04:12PM  17     Hypothetically, I looked at them.  I think
04:12PM  18     they are a ███████████.  Hypothetically, if
04:12PM  19     they were a ███████████, would it be
04:12PM  20     appropriate to give them a ██ figure like
04:12PM  21     █████ -- like ███████████.
04:12PM  22             A.   If they have --
04:12PM  23             Q.   In row 10.
04:12PM  24             A.   ███████████ and Row 10 was research
04:12PM  25     because their volume was significant at the
```

```
                    1                    A. MCCLURE
05:28PM     2      him to actually give me a number or to give
05:28PM     3      me, you know, ask me more questions or -- but
05:28PM     4      I was surprised that I didn't get anything.
05:28PM     5              Q.   And so but you were talking to a
05:28PM     6      person who is familiar with the dispute
05:28PM     7      between AT&T and Level 3 and indeed has given
05:28PM     8      testimony in this matter, right?  But you
05:28PM     9      didn't ask anyone outside of Level 3 or you
05:28PM    10      didn't ask any of the other 466 customers on
05:28PM    11      Exhibit 63, you asked one person; is that
05:28PM    12      correct?
05:28PM    13              A.   That is correct.
05:28PM    14              Q.   Okay.  Let me go to Page 9,
05:29PM    15      paragraph 15.
05:29PM    16              A.   Yes.
05:29PM    17              Q.   And there you are talking about
05:29PM    18      the Form 477.
05:29PM    19                   Do you see that?
05:29PM    20              A.   Yes.
05:29PM    21              Q.   And you say you "have no idea
05:29PM    22      what, if any, providers actually submit Form
05:29PM    23      477s," correct?
05:29PM    24              A.   Correct.
05:29PM    25              Q.   Again, you didn't ask any of the
```

```
           1                A. MCCLURE

05:32PM    2      Have you looked at the Form 477s to see if

05:32PM    3      there is any information about the number of

05:32PM    4      over-the-top subscriptions by an entity

05:32PM    5      that's a retail VoIP provider, like a

05:32PM    6      ███████, for example?

05:32PM    7           A.   I did not.

05:32PM    8           Q.   And I am not asking did you look

05:32PM    9      at ███████ Form 477, I am asking have you

05:33PM   10      looked at the Form 477 to determine whether

05:33PM   11      there is data requested about the number of

05:33PM   12      over-the-top subscriptions?

05:33PM   13           A.   I don't remember seeing the

05:33PM   14      over-the-top subscriptions field in 477.

05:33PM   15           Q.   And if there is such information,

05:33PM   16      would that be potentially relevant to your

05:33PM   17      calculations in your spreadsheet such as

05:33PM   18      Exhibit 63?

05:33PM   19           A.   Having a subscription would be

05:33PM   20      similar to having paid for mobility by a TN,

05:33PM   21      right?  So, yes, it would say that, yes,

05:33PM   22      there is the potential for OTT, but it

05:33PM   23      doesn't necessarily constitute that if you

05:33PM   24      are measuring it by that telephone number

05:33PM   25      that it would mean that it would be, you
```

|   |   |
|---|---|
| | 1    A. MCCLURE |
| 05:34PM | 2    know, all of the minutes or none of the |
| 05:34PM | 3    minutes or very small amount of the minutes. |
| 05:34PM | 4           So, again, I don't know that this |
| 05:34PM | 5    Form can give you the information that we are |
| 05:34PM | 6    looking for. |
| 05:34PM | 7        Q.   But in your view, that Form -- |
| 05:34PM | 8    that kind of information would be inferior to |
| 05:34PM | 9    doing some sort of Click to Chat with the |
| 05:34PM | 10   carrier customer of Level 3? |
| 05:34PM | 11       A.   I think it it's a good starting |
| 05:34PM | 12   point. |
| 05:34PM | 13       Q.   Sorry.  Could you say that again? |
| 05:34PM | 14       A.   I think that it would be a good |
| 05:34PM | 15   starting point as well as looking at a |
| 05:34PM | 16   customer's website to determine if they are |
| 05:34PM | 17   offering that type of subscription or that |
| 05:34PM | 18   type of product but, again, if this Form had |
| 05:34PM | 19   been filled out four years ago or earlier, |
| 05:34PM | 20   this one is February 2019, if it was old |
| 05:35PM | 21   enough, right, if the idea or the concept of |
| 05:35PM | 22   over-the-top, the idea or the concept of what |
| 05:35PM | 23   over-the-top meant before clarification might |
| 05:35PM | 24   change what they think that that data means. |
| 05:35PM | 25           MR. HUNSEDER:  Can I have that |

207

|  |  |  |
|---|---|---|
|  | 1 | A. MCCLURE |
| 05:48PM | 2 | something where a customer like ▮▮▮ or ▮▮▮▮ |
| 05:48PM | 3 | or ▮▮▮▮▮▮ could come back and say this is |
| 05:48PM | 4 | our OTT given this information or given the |
| 05:48PM | 5 | understanding of what constitutes OTT and you |
| 05:48PM | 6 | were given that and I could take that same |
| 05:48PM | 7 | information and ask them, then I think that |
| 05:48PM | 8 | that's acceptable if the industry agrees to |
| 05:49PM | 9 | the question and the stated purpose of it. |
| 05:49PM | 10 | But, again, it's -- you know, those are |
| 05:49PM | 11 | hypotheticals. |
| 05:49PM | 12 | Q. Well, let me ask the question this |
| 05:49PM | 13 | way: Suppose, Mr. McClure, you accept your |
| 05:49PM | 14 | dream job and go off to work for whoever in |
| 05:49PM | 15 | whatever country and you are no longer |
| 05:49PM | 16 | available to testify on behalf of Level 3. |
| 05:49PM | 17 | Is there anyone else at Level 3 |
| 05:49PM | 18 | that can replicate what you do to determine |
| 05:49PM | 19 | the percent of OTT in column E? |
| 05:49PM | 20 | A. Not unless they went back to 2017 |
| 05:50PM | 21 | and contacted the same people, no. |
| 05:50PM | 22 | Q. A couple quick questions back on |
| 05:50PM | 23 | Exhibit 63 that I want to take care of before |
| 05:50PM | 24 | we adjourn. |
| 05:50PM | 25 | I want to ask you, this is again |

214

| | |
|---|---|
| 1 | A. MCCLURE |
| 05:58PM 2 | Q. Is that correct?  Do you consider |
| 05:58PM 3 | that an outlier, let me say that? |
| 05:58PM 4 | A. Yes, I did see that as an outlier, |
| 05:58PM 5 | and I did investigate that.  There was some |
| 05:58PM 6 | usage that I was not able to obtain that |
| 05:58PM 7 | build.  I believed that it was out of period. |
| 05:59PM 8 | I don't recall the exact reason why it was |
| 05:59PM 9 | off, but I believe that usage that build |
| 05:59PM 10 | might have been out of period and, hence, the |
| 05:59PM 11 | difference between -- the difference between |
| 05:59PM 12 | the invoice and what I collected. |
| 05:59PM 13 | Q. And then the last, I think the |
| 05:59PM 14 | last tab is Journal 2019, and is this just |
| 05:59PM 15 | the detailed backup of the -- from the bills? |
| 05:59PM 16 | A. Correct. |
| 05:59PM 17 | Q. Okay.  Other than these tabs in |
| 05:59PM 18 | the spreadsheet, did you create any other |
| 05:59PM 19 | work papers in creating Exhibit 63? |
| 05:59PM 20 | A. No, I did not. |
| 05:59PM 21 | MR. HUNSEDER:  Let me take a |
| 05:59PM 22 | short break, and then we can hopefully |
| 05:59PM 23 | adjourn pretty quickly after that. |
| 05:59PM 24 | (Whereupon, a recess was held.) |
| 06:07PM 25 | MR. HUNSEDER:  I don't have any |

Confidential

```
                                                          224
 1

 2          C E R T I F I C A T E

 3

 4      STATE OF NEW YORK     )
                          :  SS.:
 5      COUNTY OF NASSAU      )

 6

 7           I, REBECCA SCHAUMLOFFEL, a Notary

 8      Public for and within the State of New York,

 9      do hereby certify:

10           That the witness whose examination

11      is hereinbefore set forth was duly sworn and

12      that such examination is a true record of the

13      testimony given by that witness.

14           I further certify that I am not

15      related to any of the parties to this action

16      by blood or by marriage and that I am in no

17      way interested in the outcome of this matter.

18           IN WITNESS WHEREOF, I have hereunto

19      set my hand this 21st day of June

20      _____     [signature]

21              REBECCA SCHAUMLOFFEL

22

23

24

25
```