**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM

AT&T CORP.,

    Plaintiff/Counter Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

    Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING TELECOMMUNCATIONS, INC., and WILTEL COMMUNICATIONS, LLC

    Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.

    Counterclaim Defendant

---

**AT&T & TCG'S REPLY IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE
CERTAIN TESTIMONY OF ANDREW MCCLURE**

---

Plaintiff/Counterclaim Defendant AT&T Corp. and Counterclaim Defendant Teleport Communications Group, Inc. (collectively, "AT&T"), by and through undersigned counsel, submit this reply brief in support of its *Daubert* Motion to Exclude Certain Testimony of Andrew McClure (ECF No. 141) (the "*Daubert* Motion").

**INTRODUCTION**

Level 3 does not even attempt to defend the serious flaws in the methodology of its

employee expert, Andrew McClure—nor could it.[1]  Instead, Level 3 argues that those errors have no serious impact on the disputed facts in this litigation.  However, as explained below, this is simply not true.  Indeed, Level 3 categorically misrepresents AT&T's *Daubert* Motion by claiming that AT&T's "critique of Mr. McClure's analysis is remarkably narrow."  ECF No. 165, Level 3 Opp. at 5.  In reality, the errors that AT&T identified in McClure's analysis affect the vast ▮ of the minutes that McClure analyzed and on which he is opining.  *See infra* pp. 3-5.  Further, and contrary to Level 3's contention (*see* Level 3 Opp. at 15), McClure did not use the "best evidence" available to determine Level 3's OTT-VoIP percentage; rather, he made a series of unwarranted assumptions based on unreliable data *from 2017* to determine Level 3's *current* OTT-VoIP percentage.  Moreover, Level 3 lacks any documentation to allow the fact-finder to verify McClure's conclusory estimates.  For these reasons, McClure's expert opinions should be excluded.

**ARGUMENT**

**I.    MCCLURE'S ANALYSIS IS WHOLLY UNRELIABLE AND UNVERFIABLE.**

It is telling that Level 3 does not attempt to explain why McClure's methodology for determining Level 3's OTT-VoIP percentage or the inputs that he used are reliable, nor does Level 3 attempt to explain why his expert opinion testimony based on his flawed analysis is admissible.  Instead, Level 3 spends the majority of its opposition characterizing AT&T's objections to McClure's testimony as "narrow," "discrete," and "limited."  Level 3 Opp. at 5, 11.  Level 3 is

---

[1] The term "Level 3" collectively refers to Defendant/Counterclaimant Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC.

2

wrong—McClure's entire analysis for determining Level 3's OTT-VoIP percentage is unreliable, and as such, Level 3 should be precluded from introducing McClure's expert opinion testimony.

Despite Level 3's claim that the flaws AT&T has identified in McClure's analysis have "no meaningful impact," AT&T has described a series of problems with McClure's methodology and inputs that affect the vast ▉ of the end office minutes charged to AT&T. In order to illustrate the broad problems with McClure's analysis, the following table lists the top 25 customers, in terms of volumes of minutes of traffic, drawn from Level 3's expert disclosure of McClure's opinions. These 25 customers represent ▉ of the total end office minutes that Level 3 charged AT&T.[2]



---

[2] This table is a summary of Level 3's expert disclosure, *see* Fed. R. Evid. 1006, and the disclosure is found in the record at ECF No. 151-25. If the Court requires a more readable (or "native") version of this disclosure, AT&T can provide it on request. AT&T provides a summary to simplify matters, because Level 3's disclosure includes data for another 400+ customers (but which amount to only about ▉ of the traffic). AT&T's criticisms of McClure's analysis of the top 25 customers would apply to virtually all of the other 400+ customers.



The critical issue relates to McClure's estimate—which Level 3 seeks to offer as an expert opinion—of each customer's "%OTT," namely, the third column in the table. Neither Level 3 nor McClure have provided any evidence, beyond McClure's impermissible *ipse dixit* assertions, to support the OTT percentage listed for <u>any</u> of these customers. And the reason for this lack of evidence is simple—there is none. *See* ECF No. 141-2, McClure 2019 Depo., 60:21–61:9.

As AT&T explained, *see* ECF No. 141, *Daubert* Mot. at 8-9, in 2017, McClure estimated the current OTT-VoIP percentage (*i.e.*, the "%OTT") for each customer by relying largely on the "click-to-chat" feature included on the companies' websites.[3] McClure used the information provided by these unknown and unreliable persons during the click-to-chat sessions that he had *in 2017* to estimate *the current* percentage of the call volumes of each Level 3 customer that were OTT-VoIP. *See* ECF No. 141-2 at 60:11–61:9. McClure then used those 2017 figures to determine the percentage of the total volume of minutes billed by Level 3 to AT&T that were OTT-VoIP since January, 2019. McClure retained no documentation as to any of these click-to-chat sessions, and it is thus not possible for anyone (even at Level 3) to compare his "%OTT" estimate with any

---

[3] McClure testified at his deposition that while he spoke to some customers on the telephone, his methodology was "heavily weighted" to the use of the "click-to-chat" feature. *See* ECF No. 141-2 at 69:15–70:2.

documentation about these customers and the types of calls they send to Level 3 (and which Level 3 in turn bills AT&T for end office access).  *See* Exhibit 1, McClure 2020 Depo., at 107:22-108:6, 207:12-21.  Level 3 concedes that contacting its customers is a necessary step to determine its own OTT-VoIP percentage.  *See* Level 3 Opp. at 4–5.  However, McClure contacted only one Level 3 customer, ▮▮▮▮▮, when he attempted to determine Level 3's current OTT-VoIP percentage, and then simply decided not to contact any of Level 3's 466 other customers based on his interaction with a former Level 3 employee now at ▮▮▮▮▮.  *See* Exhibit 1, McClure 2020 Depo., 194:5-13.  As such, McClure's conclusions regarding Level 3's customers' OTT-VoIP percentage (i.e. the "OTT%" column") are seriously flawed, affect the vast ▮▮▮▮▮ of end-office minutes billed to AT&T, and Level 3 fails to adequately respond to these flaws.

*First,* Level 3 does not attempt to justify or explain why McClure has continued to rely on the click-to-chat sessions he conducted with nameless individuals in 2017 to assign the *current* OTT percentage for each of Level 3's customers.  *See* ECF No. 141-5 at 5 ("The percentages in the disclosure are the same as those contained in the 2017 spreadsheet.").[4]  However, neither Level 3 nor McClure provide any legitimate reason for failing to even attempt to gather evidence regarding Level 3's customers' current OTT-VoIP percentage.  Indeed, Level 3 acknowledges that

---

[4] Instead, Level 3 attempts to obfuscate by pointing to AT&T's reliance on language from the Parties' 2015 Agreement regarding Level 3's historical OTT-VoIP percentage.  *See* Level 3 Opp. at 16.  That historical OTT-VoIP percentage was determined by the parties' agreement, and parties are permitted under the FCC's rules to reach negotiated agreements on matters like OTT-VoIP percentage.  *See Order on Remand and Declaratory Ruling, In the Matter of Connect America Fund,* 34 FCC Rcd 12692, n.62 (Dec. 17, 2019) ("*2019 Declaratory Order*"); *In re Connect America Order*, 26 FCC Rcd. 17663, ¶¶ 961-63 & n.1996 (2011) ("*Transformation Order*").  The parties' agreement represents the "best available" evidence on what Level 3's percentage of OTT-VoIP traffic is.  However, AT&T does not seek to exclude McClure's expert opinion testimony based on language from the 2015 Agreement.  Therefore, it is irrelevant for purposes of the instant motion whether AT&T has relied on language that Level 3 agreed to.

McClure "did not reach out to customers again because customers have no obligation to provide this information to Level 3." Level 3 Opp. at 5 n.4. This is despite the fact that McClure has asserted that the primary way to determine a customers' OTT-VoIP percentage "is to reach out to the customer and ask for its percent OTT." ECF No. 141-1, Level 3 Responsive Rule 26(a)(2)(C) Disclosure at ¶ 5. What Level 3 does not say is that without any evidence at all, other than McClure's *ipse dixit* assumptions, McClure conveniently chose to assign ▮ OTT-VoIP traffic to 19 of its 25 largest customers (or ▮ of the total minutes). McClure's undocumented and unsupported assumptions, therefore, have a significant impact on Level 3's overall OTT-VoIP percentage, despite Level 3's assertions to the contrary

*Second*, AT&T's challenges are applicable to the vast ▮ of the end-office minutes billed to AT&T. Level 3 attempts to minimize the serious flaws in McClure's analysis by arguing that "the percentages that Mr. McClure obtained from customers had effectively no impact on Level 3's percent OTT," and that "[i]f Mr. McClure assumed that ▮ percent of the calling associated with customers he reached out to was OTT, Level 3's OTT percentage would only increase from ▮ percent to ▮ percent." Level 3 Opp. at 6. Level 3 further attempts to minimize the problems with McClure's analysis by claiming that "[m]any of [its] customers are . . . enterprise class customers." *Id.* at 4. Level 3's assertions on both points are demonstrably false, and the Court only needs to reference the chart included above to see why.

While AT&T agrees that it is reasonable to assume that ▮ customers are generally unlikely to have substantial OTT-VoIP traffic unless they are known to be purchasing and using a calling product that relies on OTT-VoIP technology, there is only ▮ such ▮ customer—▮—among Level 3's top ▮ customers. *See supra* 3-4. As such, Level 3's ▮

6

customers do not represent the *vast* ▇▇▇▇ of end office minutes charged to AT&T. Rather, the remainder of Level 3's largest customers are not ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. It is these ▇▇▇▇ customers, for which McClure continues to assume have ▇▇ OTT-VoIP traffic, that represent the vast ▇▇▇▇ of the end-office minutes billed to AT&T. And if McClure had actually made an effort to determine those customers' current OTT traffic, Level 3's OTT-VoIP percentage would undoubtedly increase. *See* Exhibit 1, McClure 2020 Depo., 143:22-145:4 (McClure conceded in deposition that it was "completely fair" that since 2017, the percentage of OTT-VoIP traffic for "all" of these customers could have increased, even dramatically). Moreover, despite claiming that determining a customer's OTT-VoIP percentage is "not always a straightforward exercise," Level 3 Opp. at 4, McClure was able to make an "exact calculation" and assign ▇▇▇▇ an OTT-VoIP percentage of ▇▇ percent. *See* Level 3 Opp. at 8.[5] McClure does not explain how he was able to make an "exact calculation" for ▇▇▇▇, and more importantly, he does not explain why he didn't make such an "exact calculation" for the other customers that represent the ▇▇▇▇ of Level 3's end office minutes billed to AT&T.

AT&T thus challenges all of the end-office minutes associated with the customers in the chart above—except for those non-OTT-VoIP minutes billed for ▇▇▇▇ and the customers that McClure assigned ▇▇ OTT-VoIP. In other words, AT&T's criticisms of McClure's methodology apply to approximately ▇▇ of the ▇▇▇▇ end-office mintutes associated with the top 25 customers (or all but ▇▇▇▇ end-office minutes). It is clear, therefore, that AT&T's

---

[5] It is curious that McClure was able to conduct an "exact calculation" of an enterprise customer like ▇▇▇▇, but has chosen to rely on stale information from 2017 to determine the OTT-VoIP percentage of the customers that are most likely to have significant volumes of OTT-VoIP traffic.

challenge to McClure's methodology is not "remarkably narrow" as Level 3 claims, Level 3 Opp. at 5; and Level 3 provides no reliable evidence to establish why it was reasonable for McClure to assume that [REDACTED] of the top [REDACTED] customers have [REDACTED] OTT-VoIP traffic. If McClure had actually determined those [REDACTED] customers' actual OTT-VoIP percentage, Level 3's overall OTT-VoIP percentage would undoubtedly increase. See Exhibit 1, McClure 2020 Depo., 143:22-145:4.

*Third*, Level 3 misleadingly insinuates that AT&T's effort to provide a representative sample of the flaws inherent in McClure's analysis are the only such flaws that exist. See Level 3 Opp. at 6-9. Level 3 is wrong. AT&T's expert has been consistent—each of the inputs in McClure's analysis are based a process that "does not inspire confidence and is flawed." *See e.g.*, ECF No. 144, Dr. Pfautz Report, ¶ 42. In fact, AT&T's expert has made clear that his report highlights "*prominent examples*" of Level 3 customers "where there is reason to believe significant OTT calling may exist." *Id.* ¶ 43. Indeed, Level 3 acknowledges that McClure found flaws in his *own* analysis and inputs, and that at least [REDACTED] customers McClure assumed had [REDACTED] OTT-VoIP traffic do in fact have OTT-VoIP traffic. See Level 3 Opp. at 7-8 (describing [REDACTED] and [REDACTED]). Accordingly, Level 3's attempt to explain away the flaws identified with McClure's analysis rings hollow.

*Fourth,* McClure's decision to "re-evaluate[]" Level 3's OTT-VoIP percentage by "assum[ing] away every complaint AT&T raises about Mr. McClure's process in AT&T's favor," *see* Level 3 Opp. at 7, 11, is not accurate and is unavailing.[6] It is no surprise that McClure's purported "re-evaluation" led Level 3's OTT-VoIP percentage to increase from [REDACTED] percent to only

---

[6] This "re-evaluation" occurred *after* AT&T deposed McClure, and after the close of expert discovery, and AT&T has had no opportunity to question him about his changes.

█ percent. *Id.* at 11. Putting aside the fact that Level 3's attempt to "re-evaluate[]" its OTT-VoIP percentage continues to be based on nothing more that McClure's assertions, Level 3 commits the same fundamental error that has plagued McClure's analysis from the beginning—it assumes "█ customers whom [McClure] evaluated . . . have █ percent OTT." *Id.* at 8. However, this is little more than a euphemism for McClure's reliance on the same unverifiable 2017 click-to-chat sessions that he conducted with nameless individuals associated somehow with Level 3's customers. McClure's "assumptions," therefore, should not be allowed to form the basis of expert opinion testimony.

*Fifth*, Level 3's explanation for McClure's decision to assign the "█" customer a █ OTT-VoIP percentage is likewise unavailing. The "█" customer represents approximately █ of the total end-office minutes billed to AT&T. For this reason, McClure's unsupported assertions regarding the "█" customer are particularly important. Indeed, the "█" customer is emblematic of the unreliability of McClure's so-called "expert" opinion. In Level 3's view, the Court should just accept McClure's word that the "█" customer "represents aspects of Level 3's legacy network that (a) serve enterprise customers, and (b) are incapable of carrying OTT traffic." *Id.* at 12 (citing McClure Deposition). However, McClure has provided absolutely no documentation to verify or support his assertion that not a single minute of the over █ minutes of end-office traffic billed to AT&T by the "█" customer is OTT-VoIP. For this reason, no one—not Level 3, AT&T, or the Court—will be able to verify whether a portion of these minutes are actually OTT-VoIP. Furthermore, even assuming that McClure is correct and the "█" customer represents "enterprise customers," McClure has already acknowledged that at least one enterprise customer—█—has OTT-VoIP traffic. As such, it is not

9

unreasonable to assume that at least some of the end-office traffic associated with the "███" customer is OTT-VoIP. Given the volume of minutes associated with the "███" customer, any unaccounted for OTT-VoIP traffic associated with the "███" customer could have a significant impact on Level 3's overall OTT-VoIP percentage. Yet, McClure does not provide a single document that would allow anyone to verify his assertions that the "███" customer has ██ OTT-VoIP traffic.

      Finally, Level 3's attempt to defend McClure's wholly inadequate analysis by claiming that *AT&T* was required to calculate Level 3's OTT-VoIP percentage is disingenuous at best. Level 3 does not explain why that is relevant to determine the reliability and admissibility of McClure's flawed expert opinion. Rather, Level 3 simply asserts that McClure is the "only person in this lawsuit who has calculated a percent OTT for Level 3 traffic . . . ." Level 3 Opp. at 9. What Level 3 does not say is that, as explained above and in the *Daubert* Motion, McClure's calculation is based on a wholly unreliable methodology that remains unverifiable to this day. For these reasons, the Court should grant AT&T's *Daubert* Motion and preclude McClure from providing expert testimony regarding Level 3's current OTT-VoIP percentage.

## II. MCCLURE'S ANALYSIS WAS NOT BASED ON THE BEST AVAILABLE EVIDENCE

      Contrary to Level 3's assertions, McClure's analysis of Level 3's current OTT-VoIP percentage was not based "on the best evidence available." Level 3 Opp. at 15. In fact, his assumptions were based on basically no evidence at all. *See* Exhibit 1, McClure 2020 Depo., 61:14-21. McClure made no effort to determine whether the 2017 data he relied on was correct—indeed, he conceded his "click-to-chat" conversations could have been with unreliable persons. ECF No. 141-2, McClure 2019 Depo., 60:11-20. And, even as to these unreliable assumptions,

McClure made no effort to update them for the period in dispute because he was concerned that it would be too "burdensome on the customer's relationship" with Level 3.  Exhibit 1, McClure 2020 Depo., at 61:18-62:2.  In other words, McClure did not conduct an analysis of Level 3's *current* OTT-VoIP percentage that can form the basis of an admissible expert opinion.  Instead, McClure choose to contact one Level 3 customer—███████.  McClure allegedly spoke to ███████ a former Level 3 employee who played a central role in designing McClure's methodology, and is ███████████████████.  *See id.* at 64:24-65:3; *see also* Level 3 Opp. at 17.  It is not at all surprising that ██████ "flatly refused the request" to provide information, Level 3 Opp. at 17, as ██████ is familiar with this litigation; in fact, he was previously deposed.  Exhibit 1, McClure 2020 Depo., at 194:5-13.  ██████ played a key role in designing the methodology that is at issue in this motion and is not representative.  Indeed, in 2017, while still employed at Level 3, ██████ provided the ██ OTT figure that McClure has continued to use for ███████.  *See id.* at 75:4 to 76:25; *see also supra* 3-4 (table).

Putting aside the obviously unrepresentative nature of McClure's singular attempt to gather current data from ███████, Level 3 acknowledges that McClure only contacted "one customer in 2019."  Level 3 Opp. at 16.  What Level 3 does not explain is how that single contact somehow is evidence that McClure "used the best method available to him . . . ." *Id.* at 17 (internal brackets omitted).  Indeed, Level 3 provides no explanation for why McClure did not send the "small questionnaire" that it had developed and sent to ███████ to any of its other ██ customers.  Perhaps, McClure recognized that such an effort would lead to a reliable estimate of Level 3's OTT-VoIP percentage that was significantly higher than the percentage calculated using unreliable data from 2017.  For this additional reason, McClure's testimony clearly does not meet the

11

standards required by Rule 702 of the Federal Rules of Evidence, and as such, he should not be allowed to provide expert opinion testimony regarding Level 3's OTT-VoIP percentage.[7]

### III. LEVEL 3 DOES NOT PROVIDE ANY EVIDENCE THAT AN EXPERT IN THE TELECOMMUNCATIONS FIELD WOULD RELY ON UNVERFIABLE HEARSAY.

Level 3 does not explain why McClure should be allowed to provide expert opinion testimony that is based almost exclusively on inadmissible and unverifiable hearsay. Instead, Level 3 declares that AT&T's insistence that McClure rely on evidence that would be relied upon by other telecommunications experts in the field is somehow a "logical fallacy." Level 3 Opp. at 18. However, AT&T's argument is simple, and it certainly is not a "logical fallacy"—McClure relied on unverifiable out-of-court statements to prove the truth of the OTT-VoIP percentages that he assigned to Level 3's customers. *See* ECF No. 141-2 at 60:11-20, 70:15-71:3. Indeed, McClure has no records that would allow this Court to assess the reliability of his communications with Level 3's customers. *See id.* at 60:21-61:22; *see also* Exhibit 1, McClure 2020 Depo., 214:17-20. Accordingly, the Federal Rules of Evidence do not permit McClure to provide expert opinion testimony unless other experts in the telecommunications field would also rely on such normally inadmissible hearsay. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993).

---

[7] Level 3 notes that McClure will also appear as a fact witness in this litigation and appears to argue that, as a result, the *Daubert* Motion should be denied. *See* Level 3 Opp. at 11. Level 3 is incorrect. First, McClure's analysis, which is the product of his unreliable methodology, was disclosed as part of Level 3's Rule 26(a)(2)(C) disclosure. Second, as explained in both the *Daubert* Motion and below, McClure has no evidence beyond inadmissible hearsay regarding Level 3's customers' OTT-VoIP percentage. ECF 141, AT&T *Daubert* Motion, at 17-19. As such, he will be unable to provide any testimony—whether fact or expert opinion—regarding Level 3's current OTT-VoIP percentage.

Level 3 does not even attempt to show that telecommunications experts would rely on McClure's unverifiable click-to-chat sessions to determine customers' OTT-VoIP percentages. Rather, Level 3 proclaims that "no one else in the industry known to either party is even trying to determine OTT percentage." Level 3 Opp. at 18. But Level 3 misses the point— telecommunications experts determine VoIP factors all the time, *see, e.g.*, *Transformation Order*, ¶ 962, and the methodologies that are used to calculate those factors must be verifiable.[8] Indeed, Level 3's own tariff makes clear that an analogous VoIP factor used for billing "shall be based on information such as the number of the Customer's retail VoIP subscriptions in the state (e.g. as reported on F.C.C. Form 477), traffic studies, actual call detail or other relevant *and verifiable information* which will be provided to the Company upon request." Level 3 Communications, LLC, Tariff F.C.C. No. 4, § 3.4.6(e) (emphasis added). Level 3's only response is that process in its *own tariff* for determining the VoIP factor complies "with developed industry standards." Level 3 Opp. at 18-19. Level 3 doesn't explain, however, why those "industry standards" would not serve as a reasonable starting point for determining its OTT-VoIP percentage.

Instead, Level 3 continues to maintain that McClure "used the best information available . . . ." *Id.* at 19. However, this is just not the case. In fact, "[t]he most accurate [method] would be to have customers identify which Level 3 provided telephone numbers are used for OTT and then query the Level 3 systems to determine the associated minutes of use." ECF No. 144, Dr.

---

[8] *See, e.g., In the Matter of Determination of Interstate and Intrastate Usage of Feature Group A and Feature Group B Access Service*, 4 FCC Rcd. 8448, ¶¶ 2, 7, 11, & 15 (1989); *In the Matter of MCI Telecomm. Corp. Determination of Interstate and Intrastate Usage*, 59 Rad. Reg. 2d (P & F) 631, 1985 WL 260140, *3 (F.C.C. Nov. 13, 1985) (when factors are used for billing, carriers should be allowed to review, *inter alia*, "call detail records for the purpose of verification" and to further their "legitimate interest in the accuracy of the [other] carrier's usage estimates").

Pfautz Report at ¶ 46.  McClure could have also referred to the FCC Form 477, which contains the number of OTT subscriptions reported by its wholesale customers to the FCC.  Level 3's tariff makes clear that the Form 477 is to be referenced when determining an analogous VoIP factor, and McClure acknowledge that the Form 477 would allow for an estimate of Level 3's customers' OTT-VoIP percentage.  Exhibit 1, McClure 2020 Depo., 197:8-198:12.  Despite this, McClure's methodology for determining Level 3's current OTT-VoIP percentage relies solely on unverifiable hearsay gathered in 2017.  As noted in the *Daubert* Motion, McClure's methodology would not satisfy the requirements of Level 3's own tariff; therefore, it is difficult to imagine that his methodology would gain acceptance among telecommunications experts.  *See Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-CV-02516-WJM-KLM, 2014 WL 4651643, at *7 (D. Colo. Sept. 18, 2014) ("The Court finds it difficult to believe that a qualified expert could credibly testify that anonymous online comments are the type of evidence that is typically relied upon by an expert in their field.").  Given that the undocumented, unverified hearsay that McClure has relied upon for his "expert" analysis would undoubtedly be inadmissible if Level 3 attempted to present it directly, Level 3's designation of McClure as a purported "expert" does not allow Level 3 to rely on this faulty evidence where, as here, Level 3 is unable to show that such evidence would be used by experts in the telecommunications industry.  For this additional reason, McClure's testimony regarding Level 3's OTT-VoIP percentage should be excluded.  *See Daubert*, 509 U.S. at 595.

## CONCLUSION

For the foregoing reasons, the Court should grant AT&T's Motion to Exclude Certain Testimony of Andrew McClure.

14

Respectfully submitted this 30th day of July, 2020.

By: /s/ Justin A. Benson

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael J. Hunseder
Michael D. Warden
Justin A. Benson
Joshua W. Moore
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
mhunseder@sidley.com
mwarden@sidley.com
jbenson@sidley.com
joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp.
and Counterclaim Defendant Teleport
Communications Group*

## CERTIFICATE OF SERVICE

I, Justin A. Benson, hereby certify that on July 30, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Charles W. Steese, #26924
Douglas N. Marsh, #45964
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
Email: csteese@armstrongteasdale.com
Email: dmarsh@armstrongteasdale.com

*Attorneys for Defendant Level 3 Communications, LLC*

/s/ Justin A. Benson
Justin A. Benson
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: jbenson@sidley.com

*Attorney for Plaintiff AT&T Corp. and Counterclaim Defendant Teleport Communications Group*