**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

    Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

    Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

    Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

    Counterclaim Defendant.

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), respectfully submit this Reply in support of their Motion for Summary Judgment (ECF No. 152).

Level 3 presented undisputed evidence showing its calling to AT&T is no more than ▇% OTT. AT&T spends pages and pages of responsive factual assertions claiming that Level 3's process for calculating OTT percentage is unreliable; however, the ▇% OTT calculation is premised on assuming every disputed fact in AT&T's favor. AT&T has not presented one shred

of evidence that Level 3's OTT percentage is more than ▮%. The Court should enter an order finding that Level 3's OTT percentage was at most ▮%. While Level 3 believes its actual OTT percentage is lower, creating the impression there is a fact issue for trial, the Court need not resolve this dispute at this stage. For purposes of summary judgment, Level 3's damages analysis is premised on a ▮% OTT factor. If the Court resolves the dispute as Level 3 requests in this Motion, it would likely be unnecessary to address whether it is even lower than that at trial.

The undisputed facts also show Level 3's interpretation of the Settlement Agreement is the only one that conforms to the plain language of the text, the Term Sheet that formed the basis of the Agreement, and the filed-rate doctrine. Finally, AT&T acknowledges that TCG has billed Level 3 end office charges on OTT calls. Level 3 is therefore entitled to judgment on its Communications Act claim as well as its attorney's fees.

Level 3 respectfully requests that the Court grant its Motion.

## I.   AT&T'S STATEMENT OF FACTS FAILS TO IDENTIFY EVIDENCE SHOWING GENUINE ISSUES OF MATERIAL FACT.

At the outset it is necessary to address significant shortcomings in AT&T and TCG's statement of facts ("OSUMF"). Under this Court's Practice Standards, the respondent's separate statement of undisputed material facts must state whether a fact is "disputed" or "undisputed," and "set forth the evidence that supports the position that the fact is controverted." Practice Standards (Civil) Section (IV)(C)(2)(d)(2). This is consistent with the requirements of Rule 56 that "[a] party asserting that a fact cannot be or is genuinely disputed ***must support the assertion***," either by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1) (emphasis

added); *see also 1–800–Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (once the moving party demonstrates the absence of a genuine dispute of material fact, "the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial") (quoting *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002)).

As to each of the three major issues in dispute—(1) when a decision becomes final per the Settlement Agreement; (2) how to interpret the 65% language in the Settlement Agreement; and (3) Level 3's OTT percentage—AT&T fails to set forth evidence contradicting Level 3's undisputed factual assertions. To give just a few examples:

***When a decision becomes "final" per the Agreement***: In paragraph 17 of Level 3's MSUMF, Level 3 cites testimony from an AT&T witness acknowledging that, of the six points set forth in the May 8, 2015 term sheet outlining the construct of what would later become the 2015 Settlement Agreement, points one through five were all encapsulated in concept in the Agreement. AT&T "disputes" this statement with an assertion that "the 2015 Settlement Agreement, not the term sheet, represented the final agreement between the parties." OSUMF ¶ 17. This is legal argument inappropriate in an OSUMF. Neither this statement, nor any evidence AT&T cites, addresses Level 3's factual assertion.

***How to interpret the 65% language in the Agreement***: In paragraph 38 of Level 3's MSUMF, Level 3 cites testimony from both AT&T and Level 3's 30(b)(6) witnesses recognizing that by signing the Agreement, Level 3 was not claiming that, as of May 2015, 65% of its end office billings were for OTT traffic. In response, AT&T does not respond to the factual assertions about the intent of the provision, but cites to testimony from Level 3's witness who

3

was asked to merely read the contractual language on the record.

AT&T's failures abound when attempting to challenge *the 21% OTT facto*r:

- AT&T's expert, Dr. Penn Pfautz, identified specific entities as "examples" of Level 3 customers for which they question Andrew McClure's determination that the customer had zero percent OTT. *See, e.g.*, OSUMF ¶¶ 57, 63. AT&T apparently believes there are other customers categorized at zero percent that should have had a higher percentage, but AT&T presents no countervailing evidence, and its expert admitted he had no such evidence.

- Level 3 and Mr. McClure address each of AT&T's "examples," either to show that traffic was not OTT or to treat it as 100% OTT for purposes of summary judgment. *See* MSUMF ¶¶ 60–61, 64–65. AT&T responds with a mere assertion that it "continues to dispute" the 0% categorizations—yet AT&T presents no evidence to support its argument.[1]

- In paragraph 65 of Level 3's MSUMF, Level 3 notes that, when assuming each disputed fact on a specific customer's OTT percentage in AT&T's favor and assuming the customer to have 100% OTT calling, Level 3's OTT percentage increases to just ▮%. In response, AT&T asserts that "Level 3's OTT percentage is not ▮ given that Mr. McClure's analysis is unreliable"—yet the only aspects of Mr. McClure's analysis AT&T challenges as unreliable is the process he used in 2017 to gather data from individual customers, which does not factor into the ▮ figure at all. RSUMF ¶ 64. That Level 3's OTT percentage rose

---

[1] In OSUMF ¶ 64, AT&T attaches a webpage from a customer named ▮. Mr. McClure addressed this customer in his declaration, showing that all of this customer's traffic is brought to the last-mile facilities Level 3 provides, and thus is appropriately categorized as 0% OTT. ECF No. 151-21 ¶ 11. AT&T presents nothing to explain why ▮ traffic should be considered OTT. Moreover, AT&T acknowledges that when calls are routed over Level 3's last mile facilities, end office charges are appropriate (i.e., the call is not OTT). *See* OSUMF ¶ 60.

4

to ▇% after assuming every doubt in AT&T's favor is a matter of simple mathematics as to which AT&T raises no countervailing evidence.

AT&T's process of facially claiming a fact is disputed is inadequate as a matter of law. AT&T must respond to Level 3's evidence with "specific facts showing that there is a genuine issue." *1–800–Contacts, Inc.*, 722 F.3d at 1242. Consistent with the instructions in the Court's Practice Standards Section (IV)(C)(2)(e)(2), Level 3 identifies with particularity the bases on which it contests AT&T's disputes of Level 3's recitation of undisputed material facts in Level 3's Reply and Supporting Evidence ("RSUMF"), including additional supporting evidence as necessary. As shown therein, whether because the evidence AT&T cites fails to address a given factual statement or because AT&T simply fails to cite rebutting evidence at all, AT&T's attempts to refute Level 3's statement of undisputed material facts raise no genuine issue of material fact or preclude Level 3's entitlement to summary judgment.

II.  **THERE IS NO EVIDENCE LEVEL 3'S OTT PERCENTAGE IS OR EVER WAS MORE THAN ▇%; THUS, AT&T HAS OVER-WITHHELD PAYMENT ON VALID END OFFICE CHARGES.**

While the exact percentage of Level 3's OTT traffic is unclear, there is no evidence, and thus no genuine issue, that it is higher than ▇%. AT&T has therefore dramatically over-withheld payment on the end-office charges billed by Level 3.[2]

---

[2] AT&T claims that 65% of Level 3's traffic is OTT based on a misreading of the contract language. The ▇% calculation is not the only evidence showing this 65% figure is grossly overstated. In addition, just under half of Level 3's traffic falls into three clear categories: (a) Level 3's own traffic; (b) a Level 3 network incapable of supporting OTT calling; and (c) ▇▇, which has only ▇ OTT. MSUMF ¶ 62; RSUMF ¶ 86. AT&T disputes only (b), claiming Mr. McClure merely assumed that the OTT traffic for this network was incapable of supporting OTT calling. OSUMF ¶ 62. But AT&T provides no evidence to suggest that this traffic—identified as "NULL" in Level 3's expert disclosures—is capable of being OTT. RSUMF ¶ 62; *see also* ECF No. 159-1 (McClure Dec. in Support of Level 3's Response to AT&T's Motion to

AT&T acknowledges its withholdings are "based on the view that approximately 65% of Level 3's end office charges were for OTT VoIP calls." ECF No. 161-1 at 17. However, AT&T's witnesses acknowledge that any refund from Level 3 must be based on Level 3's ***actual*** percentage of OTT traffic, not the 65% figure. MSUMF ¶ 41. AT&T's witness also acknowledges having no facts that Level 3's OTT percentage was ever 65%. MSUMF ¶ 39. The 65% figure has no bearing in reality.

AT&T claims that it used the 65% figure "because the 2015 Agreement itself specifically provides that OTT-VoIP traffic 'has historically been approximately sixty-five percent (65%) of overall billing for end office switching.'" ECF No. 161-1 at 17; *see also* OSUMF ¶ 39. This position is baseless, for at least three reasons.

First, AT&T's description of the Agreement is incorrect, and is based on an incomplete quote of the Agreement. A full reading of this provision shows that it refers to "the amount of the switched access usage charges for traffic that is the subject of the Dispute billed by Level 3, which has historically been approximately sixty-five percent (65%) of overall billing for end office switching." MSUMF ¶ 5. This provision does ***not*** say that Level 3's traffic has historically been 65% OTT; it says that "traffic that is the subject of the Dispute"—i.e., what AT&T had disputed—had historically been 65%. AT&T's own 30(b)(6) witness acknowledged as much. MSUMF ¶ 40. AT&T's attempt to extrapolate from this provision an agreement that 65% of Level 3's traffic is OTT misreads the text, and contradicts admissions from its own witness.[3]

---

Exclude Certain Testimony of Andrew McClure) ¶¶ 7–12 (describing in detail how Mr. McClure determined that "NULL" traffic was incapable of supporting OTT traffic).

[3] Similarly, in its OSUMF, AT&T claims that "[b]y signing the 2015 Agreement, Level 3 agreed that its OTT percentage was historically 65%," citing to the testimony of Level 3 employee

6

Second, the reference to the 65% figure in the Agreement applies to the *retrospective* component of the Agreement, concerning what needed to be paid for billings in April and May 2015—not the *prospective* component, under which AT&T's refund would be based. AT&T's 30(b)(6) witness again acknowledges this point. MSUMF ¶¶ 37, 40. Nowhere does the Agreement apply this 65% figure to its prospective provisions, or suggest what percentage of payment AT&T could withhold if the refund provisions ever came into play.

Finally, AT&T itself argues that data from *2017* is too stale be useful in determining "Level 3's *current* OTT percentage" (i.e., January 2019 forward). ECF No. 161-1 at 19. Yet the Agreement was executed in *2015*—two years earlier. The "historical" 65% figure is even older than that, and emanates from an agreement the parties executed in *2013*—but only for settlement purposes, in the *absence of proof* on what Level 3's OTT percentage was. MSUMF ¶¶ 35–36. Whatever meaning can be drawn from the 65% figure as to what AT&T "historically" disputed lends no significance to "Level 3's *current* OTT percentage." ECF No. 161-1 at 19.

The undisputed evidence shows Level 3's *actual* OTT percentage is a fraction of AT&T's unsupported 65% estimate. The only party that even tried to calculate Level 3's *actual* OTT percentage is Level 3, through the analysis of Andrew McClure. *See* MSUMF ¶ 51. AT&T's criticisms of this analysis miss the mark for many reasons, as detailed in Level 3's response to AT&T's *Daubert* Motion. *See* ECF No. 159. Most importantly for purposes of

---

Jennifer Torres. *See, e.g.*, OSUMF ¶ 40. In the portion of the transcript AT&T cites, however, Ms. Torres does nothing more than acknowledge the words of the Agreement—which, as shown above, say something very different than what AT&T takes them to mean. In reality, as Ms. Torres made clear, "Level 3 does not—had never historically, or at this time, believed that OTT traffic was 65% of their traffic." *See* RSUMF ¶ 40. Rather, that 65% figure was "what we were being told was short paid"; "AT&T was short paying 65% for OTT. So the 65% was what we were assuming some of the short-paid balances were toward OTT." *Id.*

7

summary judgment, AT&T's resistance here is aimed exclusively at the process Mr. McClure used to gather data from Level 3 customers in 2017. *See* ECF No. 161-1 at 4, 19–20; OSUMF ¶ 87. But *none of this data* has *any* effect on the ▆% figure. MSUMF ¶ 56.

Mr. McClure described in detail how he arrived at the ▆% figure. This involved an analysis of every challenge AT&T has levied, including an individualized assessment of each Level 3 customer about which AT&T raised questions either in expert reports or deposition, which is seven customers in all. *See MSJ Exhibit 25* (ECF No. 151-16) ¶ 13; *MSJ Exhibit 29* (ECF No. 151-21) ¶¶ 9. One of these—▆▆▆▆▆—is no longer a Level 3 customer, and so does not affect the OTT percentage. MSUMF ¶ 58. For purposes of summary judgment Mr. McClure treats two others—▆▆ and ▆▆▆—as having 100% OTT. MSUMF ¶ 65. The remaining four—▆▆▆, ▆▆, ▆▆▆, and ▆▆—are appropriately classified at 0% OTT because: (a) AT&T acknowledges that when calls flow over facilities Level 3 provisioned at the customer's premises to Level 3's end office, even if people connect to those hub facilities via a third-party internet connection from remote locations, end office charges apply (MSUMF ¶ 60); (b) the undisputed evidence shows that calls to ▆▆▆ and ▆▆ flow over facilities Level 3 provisioned to the customers' premises (MSUMF ¶ 61 (▆▆▆); RSUMF ¶ 61 (▆▆)); (c) AT&T cites no evidence to challenge Mr. McClure's conclusion that ▆▆▆ is appropriately classified at 0% OTT (RSUMF ¶ 61); and (d) ▆▆ is an enterprise class customer (for which AT&T acknowledges end office charges apply) (MSUMF ¶ 49; RSUMF ¶ 61). Thus, for every individual customer about which AT&T raised issues, Level 3 has either presented evidence showing the challenge is baseless (and AT&T has presented no countervailing evidence) or assumed that customer had 100% OTT calling (which is a dramatic overestimation).

Mr. McClure did not stop there, however. He also evaluated every Level 3 customer with at least 2.4 million minutes of traffic; below this level, customers "are so small that they do not meaningfully impact percentage OTT." RSUMF ¶ 64. In conducting this review, Mr. McClure identified only one additional customer that could have some OTT traffic, and instead of creating an OTT percentage he assumed that 100% of its traffic was OTT. *See id.* Even with this and each other question construed in AT&T's favor, Level 3's OTT percentage only increases from ▮% to ▮%. MSUMF ¶ 65. Again, the 2017 data-gathering process—the only aspect of Mr. McClure's testimony AT&T challenges here—***plays no role*** in the calculation of the ▮% figure.

Where exactly Level 3's OTT percentage falls within the range of ▮ to ▮% is technically disputed. But there is no evidence or genuine issue that it is any higher than ▮%—a fact AT&T's own expert acknowledges. MSUMF ¶¶ 65–66. For that reason, Level 3's damages analysis is based on this ▮% figure. RSUMF ¶ 72; *see* RSUMF ¶¶ 46, 72.

### III. THE CONDITIONS TRIGGERING THE REFUND PROVISIONS OF THE AGREEMENT WERE NOT SATISFIED UNTIL FEBRUARY 19, 2020.

AT&T's opposition to Level 3's Motion as to the interpretation of the 2015 Agreement relies principally on a misreading of the Court's September 18, 2018 Order, which AT&T suggests rejected Level 3's position. *See* ECF No. 161-1 at 5–6. That is just not true. The Court found only that it could not resolve the dispute one way or the other on a motion to dismiss. *See* ECF No. 76 at 10. In fact, the Court expressly acknowledged that "whether the 'applicable order on appeal' was final could itself be a condition that had not yet occurred"—just as the Magistrate Judge had found. ECF No. 76 at 10.

The plain language of the Agreement confirms Level 3's interpretation: the parties did not consider the "applicable order on appeal" to be "final" and "no longer subject to further

appeal or other judicial review" if it merely remanded to the FCC for further consideration. MSUMF ¶ 5. Indeed, under the Agreement, "Level 3 [would] only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order,"[4] and "any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with the terms of that order." MSUMF ¶ 5. The D.C. Circuit Opinion did not determine that end office switched access charges "should not have been charged," and did not decide how to bill on OTT calls going forward. Instead of rejecting the FCC's conclusion and overturning it in its entirety, the D.C. Circuit remanded to the FCC for further explanation, leaving open the possibility that the FCC could still arrive at its previous conclusion. Only after the FCC completed its Order on Remand in December 2019, determining the charges "should not have been charged," did the refund provisions take effect.

AT&T claims it "strains credulity" to believe that it would agree to pay end office rates "while waiting for the FCC to issue an order." ECF No. 161-1 at 10. Yet that is exactly the agreement struck in negotiations between AT&T Vice President George Sloan and Level 3's Senior Vice President Mike Riederer. MSUMF ¶¶ 11–14. AT&T responds to this evidence the only way it can: it asks the Court to ignore it, either by holding that the contract clearly and unambiguously favors AT&T's reading (which it does not) or by adopting the circular reasoning that context cannot inform interpretation of a contract unless that context is included in the contract. ECF No. 161-1 at 14–16. Nothing AT&T says contradicts the undisputed evidence that

---

[4] AT&T somehow claims the condition that charges would be refunded only to the extent it was determined that the charges "should not have been charged" "has nothing to do with the refund issue." ECF No. 161-1 at 9. One need only read the provision in its entirety to dispense with that notion: it expressly states that "Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order." MSUMF ¶ 5.

(a) prior to executing the agreement, all parties understood that the refund provisions would not come into effect until the FCC completed any remand; and (b) no one ever asked that the agreement on this point be changed, or said anything to acknowledge it was being changed. MSUMF ¶ 19. The Court cannot ignore this context. *See In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) ("In analyzing contractual text, a court need not turn a blind eye to context. Rather, a court should accord language its plain meaning giving due consideration to the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.").

Ultimately, what Mr. Sloan agreed to is the exact compromise the parties struck. Rather than refunding all OTT charges—as AT&T originally requested—or allowing Level 3 to keep all OTT charges—as Level desired—the parties agreed that Level 3 would refund ■% of the charges if and when it was determined the charges "should not have been charged." *See* MSUMF ¶ 10. It is hardly unfathomable that AT&T might compromise its position to resolve a dispute, nor unreasonable to insist it be held to its agreement.

The alternative AT&T suggests—that Level 3 agreed it would refund and stop billing the OTT charges even when neither the FCC nor any Court had found the charges "should not have been charged"—is even less credible. In fact, such an agreement would be illegal: "the law does not permit a LEC . . . to agree to bill other IXCs *below-tariff* rates while charging [the IXC] tariff rates for the same service." *Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, No. CV 10-490 (MJD/SER), 2017 WL 4618277, at *25 (D. Minn. Mar. 31, 2017); *aff'd*, 905 F.3d 1068 (8th Cir. 2018); *see also All Am. Tel. Co. v. AT&T Corp.*, 26 FCC Rcd. 723, 732 n.47 (2011). AT&T claims that the cases Level 3 cites "apply to time periods that pre-date the FCC's 2011 transitional pricing rules." ECF No. 161-1 at 12–13. But numerous cases entered post-2011

affirm this principle. *See*, *e.g.*, *All Am. Tel. Co., Inc. v. AT&T Corp.*, 328 F. Supp. 3d 342, 365 (S.D.N.Y. 2018); *AT&T Corp. v. Aventure Commc'n Tech., LLC*, 207 F. Supp. 3d 962, 981 (S.D. Iowa 2016); *Qwest v. Free Conferencing*, 2017 WL 4618277, at *22.[5] AT&T claims to have procured for itself discriminatory treatment on an individual rate element, excusing it from paying charges at tariff rates while other parties would continue to pay those same charges, before the FCC determined the rate element "should not have been charged." In fact, AT&T claims it would have been entitled to the refund, and excused from paying the charges, even if the FCC later held the charges were valid all along. MSUMF ¶ 33. Such discrimination is antithetical to the filed-rate doctrine, rendering AT&T's interpretation unenforceable. *See United States v. Brye*, 146 F.3d 1207, 1211 (10th Cir. 1998) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms . . . is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect") (quoting Restatement (Second) of Contracts § 203(a) (1979)).

AT&T's attempt to evade this outcome relies on heavy doses of hindsight, effectively grafting the FCC's 2019 Order on Remand into the D.C. Circuit's 2016 Order and the FCC's 2011 Transformation Order to pretend it was clear the OTT charges were prohibited all along. *See* ECF No. 161-1 at 11–12. As AT&T admits, however, the D.C. Circuit's 2016 order merely "had the effect of reinstating the [2011] *Transformation Order*." *Id.* at 11. And as this Court

---

[5] AT&T's attempt to distinguish *Qwest Corp. v. AT&T Corp.*, 479 F.3d 1206 (10th Cir. 2007), also misfires. In *Qwest*, where there was a question as to which of two tariffs was the applicable tariff governing the parties' relationship, the Tenth Circuit determined that the filed-rate doctrine did not preclude "the good faith settlement of a dispute regarding a federal tariff's applicability in the first instance." *Id.* at 1211. Here, by contrast, there is no question of "which of two rates apply" (*id.*); Level 3's access tariff is the only tariff that has ever been at issue.

acknowledged before the FCC issued its 2019 Order on Remand, "no one knows what is 'consistent[]' with the 2011 FCC rules. . . . [T]he matter is still open as to what is or is not consistent with the Transformation Order." ECF No. 82 at 16. Thus, the 2015 decision, though vacated, was not entirely overturned; uncertainty still remained as to what the 2011 rules required and whether the FCC, on remand, would reach its previous conclusion. The whole point of the Agreement was to address this uncertainty; it did so by instructing AT&T to continue paying the charges unless and until it was determined they "should not have been charged." AT&T's attempt to divorce the Agreement from the surrounding context should be rejected.

AT&T's reliance on the 2019 Order on Remand is telling for yet another reason. The 2015 Agreement required a refund to the extent the OTT charges "should not have been charged in accordance with *the Final Appellate Order*," while future billing "shall be in compliance with terms *of that order*." MSUMF ¶ 5 (emphasis added). If the D.C. Circuit Opinion was "final" as of May 2017, the terms showing that the charges "should not have been charged" and with which future billing "shall be in compliance" must come *from that order*. Yet AT&T does not, and cannot, rely on the 2016 D.C. Circuit Opinion on its own; to reach its preferred outcome, it has to incorporate the 2019 Order's decision on whether the OTT charges are appropriate. Only when the FCC issued the 2019 Order on Remand, which fully overturned the 2015 decision, was there any finality that the charges at issue "should not have been charged" or terms with which to comply going forward. Then, and only then, could the refund provisions take effect.

In sum, the plain language of the Agreement, the surrounding context, and the requirements of the filed-rate doctrine each prohibits AT&T's interpretation of the Agreement.

**IV.   AT&T, THROUGH ITS AFFILIATE TCG, HAS ASSESSED LEVEL 3 UNLAWFUL END OFFICE CHARGES ON OTT CALLS.**

AT&T claims it has credited Level 3 for OTT charges since July 2019, but does not contest that it assessed those charges prior to July 2019. As to the pre-July 2019 charges, AT&T's only defense is that Level 3 has withheld more in access charges than the credit to which it is entitled, and therefore "has incurred no damages." ECF No. 161-1 at 22.[6] But AT&T admits that Level 3 withheld payment on end office charges "***beginning around August 2019***"—***after*** the pre-July 2019 period. ECF No. 161-1 at 22. Thus, unlike AT&T (which at all times in the relevant damages period withheld more on end office charges than any credit to which it may be entitled), there is no question that Level 3 paid end office charges it should not have had to pay for many years. This is particularly true since Level 3's 201(b) claims, which are not subject to the parties' agreement on the damages period, go back two years before Level 3 filed its Amended Counterclaims on September 24, 2018. *See* ECF No. 78. Nor is there any question that Level 3's relief, including credits obtained thus far as well as any damages or attorney's fees the Court may subsequently award, was obtained only by bringing its claims against AT&T. Thus, Level 3 had to expend attorney's fees to obtain its "recovery" and is entitled to compensation for those fees. *See* 47 U.S.C. § 206 (attorney's fees to be fixed "in every case of recovery").

AT&T also asserts that Level 3 would not be entitled to attorney's fees on its Section 201(b) claims because Level 3 would have "*lost*—and AT&T prevailed—on the underlying issue

---

[6] AT&T's contention that a 201(b) claim cannot prevail unless a party has incurred damages is another telling concession. As the Court will recall, AT&T moved to reinstate its previously dismissed 201(b) claim, albeit months after the FCC issued its 2019 Order on Remand. *See* ECF No. 147. In its response, Level 3 noted various reasons why the motion should be denied, including that the motion was futile because (among still other reasons) AT&T would be unable to prove damages given that it had dramatically over-withheld on Level 3's charges. *See* ECF No. 162 at 12–14. Because the undisputed evidence confirms this, upon granting Level 3's Motion for Summary Judgment as to the percentage of its OTT traffic, the Court must also deny AT&T's motion to reinstate its 201(b) claims on grounds of, among other things, futility.

as to whether end office charges on OTT VoIP calls are impermissible under the FCC's rules." ECF No. 161-1 at 23 (emphasis in original). This argument makes no sense. Level 3's 201(b) claim is premised on the allegation that OTT calls are not subject to end office charges—exactly as the FCC found in December 2019. AT&T acknowledges that it (through its affiliate TCG) billed Level 3 end office charges on OTT calls in violation of FCC rules. Level 3 had to bring this counterclaim in order to uncover this fact and obtain recovery. That AT&T now concedes it was billing Level 3 illegally and has provided a refund does not cure the problem. Level 3 is entitled to recover the attorney's fees it expended to identify the problem and obtain this result.[7]

## V.  CONCLUSION

For the reasons stated above, Level 3 respectfully requests that the Court grant summary judgment in its favor, and deny AT&T's parallel motion.

Respectfully submitted this 3rd day of August, 2020.

By:  /s/ *Charles W. Steese*
Charles W. Steese, #26924
Douglas N. Marsh, #45964
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

*Attorneys for Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC*

---

[7] AT&T claims that Level 3's request for attorney's fees does not comply with requirements to "state the amount sought or provide a fair estimate." ECF No. 161-1 at 22. Level 3's legal expenses continue to mount, and in any event, Level 3 currently seeks only a finding as to AT&T's liability, not the specific amounts (which will be sought and determined in due course).

**CERTIFICATE OF SERVICE**

  I, Charles W. Steese, hereby certify that on August 3, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

  Rebecca B. DeCook
  Andrew T. Flynn
  Moye White LLP
  1400 16th Street, 6th Floor
  Denver, CO 80202-1027
  Email: becky.decook@moyewhite.com
  Email: andrew.flynn@moyewhite.com

  Michael D. Warden
  Michael J. Hunseder
  Justin A. Benson
  Joshua W. Moore
  SIDLEY AUSTIN LLP
  1501 K ST NW
  Washington, DC 20005
  Telephone: (202) 736-8000
  E-mail: mwarden@sidley.com
  E-mail: mhunseder@sidley.com
  E-mail: jbenson@sidley.com
  E-mail: joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp. and Counterclaim Defendant Teleport Communications Group, Inc.*

            /s/ *Charles W. Steese*
            Charles W. Steese