**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

       Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

       Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

       Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

       Counterclaim Defendant.

---

## LEVEL 3'S REPLY AND SUPPORTING EVIDENCE

       Defendants/Counterclaimant Level 3 Communications, LLC; Broadwing Communications, LLC; Global Crossing Telecommunications, Inc.; and Wiltel Communications, LLC's respectfully submit their Reply and Supporting Evidence in support of their Motion for Summary Judgment (ECF No. 152).

       \*     \*     \*

| | Moving Party's Statement of Undisputed Material Facts ("MSUMF") and Supporting Evidence | Opposing Party's Response and Additional Facts ("OSUMF") and Supporting Evidence | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| | **Parties** | | |
| 1. | Level 3 Communications, LLC ("Level 3"), AT&T Corp. (AT&T), and Teleport Communications Group, Inc. ("TCG") are all Competitive Local Exchange Carriers, or CLECs. *See* ECF No. 124 ¶¶ 15, 17, 18; ECF No. 128 ¶¶ 15, 17, 18. | Undisputed as to Level 3 and TCG. AT&T Corp. is primarily an interexchange carrier; it has one tariff for a highly specialized access service but Level 3 does not claim and has adduced no evidence that it was billed by AT&T under this tariff. ECF No. 128, AT&T Amended Answer, ¶ 49. | Disputed as to AT&T. AT&T does not deny it is a CLEC; it claims it is "primarily" an interexchange carrier. In its amended answer, AT&T admitted that it acts as a LEC "in some instances." ECF No. 128 ¶ 17. |
| | **2015 Settlement Agreement** | | |
| 2. | In a February 11, 2015 Declaratory Ruling, the FCC determined that local exchange carriers could assess end office switched access charges on over-the-top Voice over Internet Protocol (hereinafter "OTT") traffic. *See Connect America Fund*, WC Docket No. 10-90, et al., Declaratory Ruling, FCC 15-14 (rel. Feb. 11, 2015) (hereinafter "2015 OTT Declaratory Ruling"); *Exhibit 1* at 1, third whereas clause. | Undisputed. | |
| 3. | Level 3's interstate access tariff specifically defines "End Office Access Service" to include OTT-VoIP traffic and states that Level 3 is entitled to assess end office access charges on such traffic, stating as follows:<br><br>    End Office Access Service: For the purpose of | Undisputed as to the language in Level 3's tariff. Disputed as to the claim that the tariff entitles Level 3 to assess end office access charges on OTT VoIP traffic. *See* ECF 149, AT&T Mot. For Sum. Jud. Part I. Level 3's tariff mirrors | Dispute the portion AT&T disputes. AT&T misstates Level 3's tariff. Level 3's tariff defines end office access service more broadly than the FCC Rules. Specifically, the tariff's definition contains each of the three forms of end office access service identified in 47 C.F.R. § 51.903(1) through (3). But it also includes a fourth form NOT listed in the FCC's definitions: |

| | | | |
|---|---|---|---|
| | this tariff, End Office Access Service shall mean: . . . (2) The routing of interexchange telecommunications traffic to or from the called party's premises, either directly or via contractual or other arrangements with an affiliated or unaffiliated entity, regardless of the specific functions provided or facilities used; or . . . (4) The origination and termination of interexchange telecommunications traffic to any end user, either directly or via a contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as defined in 47 U.S.C. § 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. § 153(36), that does not itself seek to collect reciprocal compensation prescribed by this subpart for that traffic, regardless of the specific functions provided or facilities used. *Exhibit 2* (Level 3 Tariff F.C.C. No. 4) § 1 ("End Office Access Service"). | the language of the FCC's rules. *See* 47 C.F.R. §§ 51.903(d), 51.913(b). The FCC has interpreted its rules to prohibit end office charges on OTT VoIP calls, and so this same language in Level 3's tariff also prohibits end office charges on OTT VoIP traffic. *See* Order on Remand and Declaratory Ruling, *In the Matter of Connect America Fund*, 34 FCC Rcd 12692, ¶ 4 (Dec. 17, 2019). | The origination and termination of interexchange telecommunications traffic to any end user, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as defined in 47 U.S.C. § 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. § 153(36), that does not itself seek to collect reciprocal compensation charges prescribed by this subpart for that traffic, regardless of the specific functions provided or facilities used. *MSJ Exhibit 2* (ECF No. 152-3) § 1, First Revised Page 6.1. This definition expressly includes OTT-VoIP traffic. |
| 4. | In May 2015, Level 3 and AT&T entered into a "Release and Settlement Agreement" (hereinafter "Agreement"). *See Exhibit 1.* One purpose of the Agreement was to resolve an ongoing dispute between the parties regarding the applicability of tariffed end office switched access charges to OTT traffic. *See Exhibit 1* at 1, second and third whereas clauses. | Undisputed, as to charges prior to June 1, 2015. | It is not clear if AT&T is agreeing with the assertion or limiting it. If its intent is to limit Level 3's factual assertion, AT&T does not put forward evidence to refute the actual evidence submitted by Level 3. Instead, it sets forth a completely different fact. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting **sufficient, contradictory evidence** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 |

| | | | |
|---|---|---|---|
| | | | F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. |
| 5. | Section 1(a) of the Agreement resolved the OTT dispute between Level 3 and AT&T in pertinent part as follows:<br><br>(i) In settlement of the OTT Dispute AT&T agrees to pay Level 3 the following:<br><br>(A) Within fifteen business days of the Effective Date, [specific number excluded], which is seventy-five percent (75%) of the usage and late payment charges billed by Level 3 for the traffic exchanged by the Parties through March 2015 that is the subject of the OTT Dispute ("OTT Settlement Amount"). . . . The Parties recognize that due to invoice cycles and billing requirements, the calculation of usage and late payment charges included in the total amount of charges identified in this Section 1(a)(i)(A) may vary from the actual amount owed once all billing is complete. As a result, the Parties agree that the amount due for April and May 2015 usage may be subject to an adjustment to reflect the appropriate value.<br><br>(B) No later than thirty (30) days after the | Undisputed as to the accuracy of the language quoted from the Parties' 2015 Agreement. Disputed, as to the fact that only Section 1(a) of the Agreement resolved the OTT dispute; in fact, the entire Agreement affects the parties' resolution of the dispute. *See* ECF 15-1, 2015 Agreement, at 6. | Disputed insofar as AT&T suggests that every provision of the Agreement goes to OTT, as it plainly does not. *See Exhibit 1.* |

| | | |
|---|---|---|
| | receipt of Level 3's invoice for traffic exchanged from April 1 through May 31, 2015, seventy-five percent (75%) of the amount of the switched access usage charges for traffic that is the subject of the Dispute billed by Level 3, which has historically been approximately sixty-five percent (65%) of overall billing for end office switching ("April-May Supplemental Settlement Amount"). AT&T will transmit the April-May Supplemental Settlement Amount to the Level 3 account designated to receive switched access payments using the Parties' standard process for switched access payments.<br><br>\*     \*     \*<br><br>(ii) For switched access traffic exchanged by the Parties beginning on June 1, 2015, AT&T shall pay Level 3 its applicable switched access tariffed rate for OTT traffic, pursuant to the terms of the OTT Declaratory Order. For avoidance of doubt, this Settlement Agreement shall not prohibit AT&T from disputing Level 3's billing for switched access traffic for reasons unrelated to the requirements of the OTT Declaratory Order, including but not limited to disputes regarding volumes or applicable rates.<br><br>(iii) Beginning June 1, 2015, Level 3 shall not bill AT&T for any end office switched access charge elements for domestic OTT traffic that does not originate from a calling party number | | |

or does not terminate to a called party number (together with calling party number "CPN") that is assigned by Level 3 and for which Level 3 is designated as the provider in the Number Portability Administration Center ('NPAC') database ("Non-Level 3 CPN OTT Calls"). For avoidance of doubt, the Parties agree that Level 3 will continue to bill AT&T full switched access charges on domestic traffic that originates with or terminates to Level 3 assigned CPN.

(iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review ("Final Appellate Order"), Level 3 will refund, within 30 days,  of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order. Further, the Parties agree that

| | | | |
|---|---|---|---|
| | any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.<br><br>*See Exhibit 1* § 1(a). | | |
| 6. | New York Law governs interpretation of the 2015 Settlement Agreement. *See Exhibit 1* § 5. | This sentence contains characterizations and legal conclusions, not material assertions of fact. However, it is undisputed that the Parties' 2015 Agreement states that it "shall be construed in accordance with and be governed by the laws of the State of New York, not including its choice of law principles." ECF No. 15-1, 2015 Settlement Agreement, at 6. | AT&T does not dispute the substance of the allegation. |
| 7. | AT&T and Level 3 entered into a separate settlement agreement that changed the June 1, 2015 date in Sections (1)(a)(ii), 1(a)(iii) and 1(a)(iv) to January 1, 2019. Thus, for purposes of Level 3's traffic, only traffic from January 1, 2019 and after is at issue. *See Exhibit 3* (Declaration of Charles W. Steese) ¶ 38. | Disputed as to the first sentence. The 2019 Agreement does not purport to affect any change to the contractual language of the Parties' 2015 Agreement. Rather, the 2019 Agreement provides that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"<br>*See* Exhibit A, 2019 Agreement, at 7–8. Undisputed as to the second sentence. | AT&T does not dispute the substance of the allegation. Level 3 does not dispute the second sentence of AT&T's assertion. |
| 8. | In its *Connect America Fund* Order, the FCC determined that end office charges on all terminating traffic would be billed at $0.00 per | Undisputed as to the second sentence. Disputed as to the first sentence as it contains characterizations and legal | AT&T does not dispute the substance of the allegation. Level 3 does not dispute the manner in which AT&T describes the allegation. |

| | | |
|---|---|---|
| minute from July 2017 onward. *See In the Matter of Connect Am. Fund*, 26 FCC Rcd. 17663, at *205 (2011). As a result, in this lawsuit Level 3's OTT percentage only impacts its originating traffic. *See Exhibit 4* (P. Pfautz Depo.) at 124:15–125:14. | conclusions, not material assertions of fact; it is also only partially correct: under the FCC's default transition pricing rules, the default rate for terminating end office access service went to zero in about July 2017 for price cap local exchange carriers ("LECs") and competitive LECs that benchmark to price cap LECs (but not rate-of-return carriers). *See* In re Connect America Order, 26 FCC Rcd. 17663, ¶ 801 (2011). | |
| | **Negotiation of Agreement** | |
| 9. | Around April 2015, after the FCC issued its 2015 OTT Declaratory Ruling, Level 3 and AT&T initiated negotiations in an attempt to resolve the OTT dispute. *See Exhibit 5* (K. Meola Depo.) at 111:14–114:19; *Exhibit 6* (K. Meola Depo. Ex. 10). | Disputed. Level 3 and AT&T had been negotiating an attempted resolution to the OTT dispute for "many years" prior to the 2015 OTT Declaratory Ruling. Exhibit B, Meola Depo., at 112:9-25. | Disputed in part. Ms. Meola testified that while discussions had been ongoing for many years, "we really started to have serious discussions was when Bill [Hague] got engaged, and that was in the May [2015] time frame." *See MSJ Exhibit 5* (ECF No. 152-6) K. Meola Depo.) at 111:14–114:19; *MSJ Exhibit 6* (ECF No. 152-7) (K. Meola Depo. Ex. 10). |
| 10. | On April 15, 2015, Level 3 sent an email to AT&T expressing disagreement on the parties' respective positions on the impact of an appeal on the finality of the settlement the parties were negotiating, stating as follows:<br><br>I think the biggest business item worth covering today is the proposed concept of settlement of OTT, with the condition that the appeal would over -ride whatever we agree. Initially, we see that as simply a transfer of | Undisputed. | |

| | | | |
|---|---|---|---|
| | retro and prospective reserved /unrecognized monies from AT &T to Level 3, and held in escrow (conceptually at least) until the appeal is concluded. We're not clear that this approach will really solve much for either party at this stage given the subsequent uncertainty? Our preference therefore, would be full and final settlement - we should discuss whether that is an option here and/or whether we're missing any potential benefit from your original proposal.<br><br>*See Exhibit 7* (K. Meola Depo. Ex. 14) at ATT_PROD_0011781; *Exhibit 5* (K. Meola Depo.) at 136:5–137:12. | | |
| 11. | On May 7, 2015, Mike Riederer, Senior Vice President of Network Planning for Level 3 (*see Exhibit 8* (M. Riederer Depo.) at 5:22–6:4) met in Dallas, Texas with George Sloan, AT&T's Vice President Global Connection Management (*see Exhibit 9* (G. Sloan Depo.) at 18:22–20:19), as well as Mr. Sloan's boss, William Hauge (*id.* at 19:6–14), to discuss, among other things, the OTT dispute between Level 3 and AT&T. *See Exhibit 8* (M. Riederer Depo.) at 20:17–21:17 & 25:9–21); *Exhibit 9* (G. Sloan Depo.) at 19:6–20:18; *Exhibit 10* (K. Meola Depo. Ex. 18) at CTL_0004196 (verifying meeting on May 7, 2015); *Exhibit 11* (A. Burgess Depo.) at 110:10–111:3 (Sloan and Hague were "the assigned … officers to negotiate the settlement" with Level 3). | Undisputed. | |
| 12. | On May 7, 2015, Mr. Sloan sent an email to Kim | Undisputed, although the emphases do | |

| | | |
|---|---|---|
| | Meola—the person at AT&T responsible for the OTT dispute—which stated the following with respect to the OTT dispute:<br><br>Kim:<br><br>Thanks for stepping out of LWD today to help. Below ***I've captured the construct of the OTT/Tandem deal we agreed to with L3 today. I'd appreciate you doing two things: (a) Double check that this deal works for you, and (b) please have the appropriate attorney review/enhance the language. I want to send this construct language over to Mike Riederer Friday AM***.<br><br>(1) AT&T agrees to pay 75% of L3's retrospective claims on OTT and Tandem through the end of May 2015. ACTION: I'll set up some time with us and Mike Riederer tomorrow to run through the math on the late payments together. Our intent is to pay in the 25% range as discussed.<br><br>(2) Regardless of whether AT&T wins or loses its FCC appeal, neither AT&T or L3 can clawback additional amounts for OTT/Tandem claims for any period prior to June 2015.<br><br>(3) If AT&T wins its FCC appeal, AT&T can only clawback ▮ of the disputed amount starting June 2015 ***through the date of the FCC ruling.***<br><br>(4) AT&T and L3 agree to pricing that is 75% of L3's asking price (need help with | not appear in the email. | |

| | | | |
|---|---|---|---|
| | this language) for Tandem moving forward.<br><br>*See Exhibit 12* (G. Sloan Depo. Ex. 20) at AT&T 0011854 (emphasis added). | | |
| 13. | Mr. Sloan testified that he does his best to be "accurate and complete in the materials he sends in emails." *See Exhibit 9* (G. Sloan Depo.) at 20:22–21:2. | Undisputed. | |
| 14. | On May 8, 2015, George Sloan sent Mike Riederer an email captioned "Settlement Proposal – Confidential." With respect to the OTT dispute, the email stated:<br><br>Here is our attempt to capture our agreement construct. Two items you will notice: (a) The late fees are separated out. I know you guys don't want it recorded this way. If the math works out, Monday morning, I'll support the flat 75%. (b) The team added an additional item they believe is closed and can be formalized in this document. I look forward to discussing more Monday morning. I'll have Kim Meola with me from John Nolan's team. Thanks. George<br><br>***<br><br>Settlement Terms - OTT Dispute<br><br>(1) AT&T agrees to pay 75% of L3's retrospective claims on OTT for usage incurred through the end of May 2015. Note: Billed usage does not include LPCs.<br><br>(2) AT&T agrees to pay 25% of the LPCs | Undisputed, although the emphasis does not appear in the email. | |

| | | | |
|---|---|---|---|
| | associated with OTT usage billed through end of May 2015.<br><br>(3) AT&T agrees to pay L3 full switched access per the Level3 tariffs for both originating and terminating OTT traffic on a prospective basis for June 2015 usage forward.<br><br>(4) On a prospective basis, beginning with June 2015, Level 3 will not bill any EO elements associated with domestic originated OTT 8YY traffic not reflecting a Level 3 owned CPN or CPNLess traffic that is not served by a Level 3 end office. Level 3 will continue to bill full switched access on Level 3 owned TNs.<br><br>(5) For any usage prior to June 2015, the settlement is a full and final settlement of all disputes and balances regardless of whether AT&T wins or loses its FCC appeal.<br><br>(6) ***If AT&T wins its FCC appeal, L3 will refund ▮▮ of the disputed charges beginning with June 2015 through the date of a final ruling, either from the Court of Appeals or, if remanded, by the FCC ruling.***<br><br>*See Exhibit 13* (K. Meola Depo. Ex. 19) at CTL 11324–26 (emphasis added). | | |
| 15. | Mr. Sloan delegated responsibility for drafting the term sheet referenced in Paragraph 17 to Kim Meola and her team. *See Exhibit 9* (G. Sloan Depo.) at 53:6–54:15 & 56:7–22; *Exhibit 5* (K. Meola Depo.) at 161:5–162:8. | Undisputed. | |

| | | |
|---|---|---|
| 16. | AT&T had its legal department involved in the negotiations of the OTT dispute. *See Exhibit 5* (K. Meola Depo.) at 174:3–177:6 & 187:2–10. | Undisputed. | |
| 17. | Points one through five in the May 8, 2015 term sheet are all encapsulated in concept in the Agreement. *See Exhibit 5* (K. Meola Depo.) at 162:23–165:6. | Disputed, except to the extent that AT&T agrees that point six in the May 8, 2015 term sheet is not included in the final 2015 Agreement. Exhibit B, Meola Depo., at 165:13-166:15; Exhibit D, Sloan Depo., at 76:1-77:4. The 2015 Settlement Agreement, not the term sheet, represented the final agreement between the parties and contained the entire agreement regarding the OTT dispute. ECF 15-1, 2015 Settlement Agreement, at 6 ("This Agreement is the entire and complete agreement of the Parties regarding the subject matter hereof…. All prior discussions and negotiations regarding the Disputes have been, and are, merged and integrated into, and are superseded by, this Agreement."); Exhibit C, Torres Depo., at 254:24-255:22; Exhibit D, Sloan Depo., at 76:1-77:4. | AT&T does not put forward evidence to refute the actual evidence submitted by Level 3. Instead, it sets forth a completely different fact. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting **sufficient, contradictory evidence** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. In addition, the deposition testimony AT&T cites of Ms. Torres supports Level 3's factual assertion insofar as it states that the settlement agreement incorporates all six points in the term sheet at a "high level." <br><br> Level 3 does not dispute that the Settlement Agreement contains the language referenced in AT&T's factual assertion. |
| 18. | In deposition, Mike Riederer testified that point number six in the May 8, 2015 term sheet reflected the parties' agreement that if the FCC changed the way that companies could bill for OTT traffic, then that would impact the forward looking aspect of the settlement agreement. *See Exhibit 8* (M. Riederer Depo.) at 46:21–49:23. | Disputed. Mr. Riederer did not "have a recollection" and answered "I don't know" when asked whether point six in the May 8, 2015 term sheet reflected the parties agreement that if the FCC changed the way that companies could bill for OTT traffic going forward. *See* | Disputed. Nothing in the AT&T OSUMF ¶ 18 contradicts the assertion in MSUMF ¶ 18. Mr. Riederer, who was involved in the discussions over the term sheet, testified exactly as set forth in MSUMF ¶ 18: <br><br> Q. And so that concept is reflected in paragraph number 6; is that right? <br> A. I'm not a lawyer to be able to say whether that is or not. |

| | | | |
|---|---|---|---|
| | | Exhibit E, Riederer Depo., at 46:21–50:23. In any event, point number six from the term sheet is not reflected in the 2015 Agreement, which was actually executed by the Parties. Exhibit F, John Depo., at 143:8-146:25; ECF 15-1, 2015 Agreement, at 6. | Q. I'm just asking you to read it. I'm not asking for a legal opinion. When you read it, is that concept that you say was discussed at the breakout meeting about the FCC ruling reflected in Item 6? A. I can only state what I said earlier, which is I'm not skilled enough to read it one way or the other that you're trying to look for. I'm just stating specifically in my interpretation from the meeting, we had expressed that if the FCC changed its ruling on how billing was to happen, this was supposed to be a reflection of that. Q. And Item 6 was a reflection of that; right? MR. STEESE: Objection. Form. Foundation. Asked and answered. A. The concept, as I understand it, again, is if the FCC changed it and said that it should be billed differently, the concept was supposed to be reflected here. *See MSJ Exhibit 8* (ECF No. 152-9) (M. Riederer Depo.) at 48:17–49:23. |
| 19. | No one at AT&T had any discussions with anyone at Level 3 indicating that AT&T's intent for the Settlement Agreement was different or changed from that reflected in item number six in the May 8, 2015 term sheet. *See Exhibit 5* (K. Meola Depo.) at 167:14–168:3. | Disputed. AT&T and Level 3 exchanged redlined versions of the 2015 Settlement Agreement. Exhibit H, Meola Depo. Ex. 23; Exhibit I, Meola Depo. Ex. 24; Exhibit B, Meola Depo., at 198:19-199:14. The initial draft of the Agreement, which was drafted by Level 3, did not contain language that was similar to point 6 of the term sheet. *See* Exhibit J, Meola Depo. Ex. 22, at CTL0012908. Nor did later drafts exchanged between the parties include the language of point 6 in the term sheet. *See* Exhibit H, Meola Depo. Ex. | Disputed. AT&T's factual assertion ignores the testimony of Ms. Meola, who was AT&T's 30(b)(6) witness on negotiations over the contract (*MSJ Exhibit 5* (ECF No. 152-6) (K. Meola Depo.) at 13:19–15:7), which states: Q. Did you ever have any discussion yourself with Level 3 about this sentence or words to the effect of, we didn't mean remanded; that's not—that was not our intention? A. During this time period? Q. Any time period during the settlement discussions. A. Settlement discussions, like, into 2017 after— Q. No. Leading up to the entry of the Settlement Agreement. A. Oh, no, no. It was put in here. It was redlined, and it was corrected. I don't recall a discussion on it. |

| | | | |
|---|---|---|---|
| | | 23, at CTL_0012895; Exhibit I, Meola Depo. Ex. 24, at CTL_0004212; *compare* Exhibit G, John Depo. Exs. 90, 91 (internal AT&T draft not sent to Level 3), at AT&T_PROD_0014104. The Parties' did not intend to implement item number 6 in the term sheet and the Parties' intent was thus reflected in the words of the 2015 Agreement, which both parties accepted *See* Exhibit B, Meola Depo., at 205:9-23; Exhibit K, Torres 8-19-2019 Depo., at 50:14-22; ECF 15-1, 2015 Agreement, at 6. | *See MSJ Exhibit 5* (ECF No. 152-6) (K. Meola Depo.) at 167:14–168:3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting **sufficient, contradictory evidence** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. In addition, the deposition testimony

Level 3 disputes AT&T's position that "drafts exchanged between the parties" did not include this concept for the reasons set forth in MSUMF ¶¶ 24–25. The language AT&T cites for this proposition—Meola Depo. at 205:9–23—does not concern item no. 6 in the term sheet; it concerns the 65% language in a wholly separate provision of the agreement. *See Exhibit 35* (Meola Depo.) at 203:17–206:20. Thus it has no bearing on this factual assertion.

Likewise, the testimony from Ms. Torres does not support AT&T's position. She too is discussing the 65% language in a separate contractual provision. When discussing section point of item 6 in the term sheet and section (1)(a)(iv) of the agreement, Ms. Torres made plain that the point was that Level 3 could continue to bill as it had (i.e., end office charges on OTT calls) until "there is a change in law that instructs us how to bill OTT |

<table>
<tr>
<td></td>
<td></td>
<td></td>
<td>differently than how we had been billing prior, that Level 3 would be in compliance with whatever the new rules were, and that we would credit AT&T ▮ percent of any disputed charges from the date of this settlement to when that new law was decided." <em>Exhibit</em> 36 (Torres 12/19/19 Depo.) at 257:12–258:11; <em>see also id.</em> 296:13–297:8 (explaining the contract with similar wording).</td>
</tr>
<tr>
<td>20.</td>
<td>Kim Meola, who was AT&T's 30(b)(6) witness responsible for testifying about negotiating terms of the Agreement, stated that "serious discussions" about resolving the OTT dispute did not occur until May 2015 when Mr. Hague got involved on behalf of AT&T. <em>See Exhibit 5</em> (K. Meola Depo.) at 13:19–15:7 (identifying subjects on which Ms. Meola is corporate representative); <em>id.</em> at 112:21–113:19.</td>
<td>Undisputed.</td>
<td></td>
</tr>
<tr>
<td>21.</td>
<td>On May 10, 2015, George Sloan—who had tried to keep late payment charges to ▮—sent an email to Ms. Meola stating:

I agreed to 75% of payments due for OTT /Tandem through end of May including paying 75% on the late payments which Riederer commits will be no more than ▮. Although we were hoping to pay somewhere less than the 75% on the late payments he made this a really big deal Friday PM and was about to derail the peering deal.

<em>Exhibit 14</em> (G. Sloan Depo. Ex. 92) at ATT_PROD_0011862.</td>
<td>Undisputed.</td>
<td></td>
</tr>
</table>

| | | | |
|---|---|---|---|
| 22. | On May 11, 2015, Level 3 sent the first draft of a proposed settlement agreement to AT&T. *See Exhibit 15* (K. Meola Depo. Ex. 22) [CTL012906–15]. | Undisputed. | |
| 23. | On May 12, 2015, two members of Ms. Meola's team—Ardell Burgess and Craig John—created an internal draft of a settlement agreement to send to Level 3. That draft, which was never sent to Level 3, contained the following language in section 1(a)(iv): <br><br> Level 3 will refund ███████████ of the disputed OTT charges beginning with June 2015 usage through the date on which such order becomes final either from the Court of Appeals or, if remanded, by the FCC ruling, and is no longer subject to further appeal or other review. <br><br> *See Exhibit 16* (G. Sloan Depo. Exs. 90 and 91) at ATT_PROD_0014104. | Undisputed. | |
| 24. | On May 15, 2015, AT&T sent Level 3 a heavily redlined settlement agreement. Section 1(a)(iv) was re[d]lined to read as follows (with italicized and bolded language added by AT&T): <br><br> (iv) For any OTT usage prior to June 2015, Although the Parties agree that this settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. ***Therefore, in the event the*** | Disputed in part. Section 1(a)(iv) of the redlined draft agreement AT&T sent to Level 3 on May 15, 2015, read as follows (strikethrough language deleted, underlined language added): <br><br> iv.  ~~For any OTT usage prior to June 2015,~~ Although the Parties agree that this <u>S</u>~~s~~ettlement <u>Agreement</u> is <u>intended to be</u> a full and final settlement of all disputes and balances <u>associated with OTT</u> | Undisputed |

|  |  |  |
|---|---|---|
| | ***OTT Declaratory Order is overturned, either in whole or in part***, the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review, Level 3 will refund within 30 days, ███████ of the disputed OTT charges beginning with June 2015 usage- traffic through the date on which such order becomes final and is no longer subject to further appeal or other judicial review. ***Further, the Parties agree that any billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order.***<br><br>*Exhibit 17* (K. Meola Depo. Ex. 23) at CTL_0012895; *Exhibit 5* (K. Meola Depo.) at 198:19–199:14. | traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. ~~regardless of whether AT&T wins or loses its OTT Appeal.~~ Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, ~~If AT&T wins its OTT Appeal and~~ and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review, Level 3 will refund within 30 days, ███ ███████ of the disputed OTT charges beginning with June 2015 ~~usage~~ traffic through the date ~~on~~ which such order becomes final and is no longer subject to further appeal or other judicial review. Further, the Parties agree that any billing and payments for OTT traffic exchanged after such order becomes final shall be in compliance with terms of that order.<br><br>Exhibit H, Meola Depo. Ex. 23, at CTL_0012895. The emphasis does not appear in the draft agreement. | |
| 25. | On May 21, 2015, Level 3 sent AT&T its redlines, which modified section 1(a)(iv) to read as follows | Disputed in part. Level 3 sent AT&T its redlines, which modified section | Undisputed |

| | | |
|---|---|---|
| | (with italicized and bolded language added by Level 3):<br><br>  (iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review **Level 3 will refund, within 30 days,** ▬▬▬ of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; *provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order.* Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order.<br><br>*See Exhibit 18* (K. Meola Depo. Ex. 24) at CTL_004212. | 1(a)(iv) to read as follows (with italicized and bolded language added by Level 3):<br><br>  (iv) Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review *("Final Appellate Order")* **Level 3 will refund,** within 30 days, ▬▬▬ of the disputed OTT charges beginning with June 2015 traffic through the date on which such *Final Appellate Or*der becomes final and is no longer subject to further appeal or other judicial review; *provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order.* Further, the Parties agree that any billing and payments for OTT traffic exchanged after such *Final* | |

| | | | |
|---|---|---|---|
| | | *Appellate O*rder becomes final shall be in compliance with terms of that order.<br><br>*See* Exhibit I, Meola Depo. Ex. 24, at CTL_004212. The emphasis does not appear in the draft agreement. | |
| 26. | All of Ms. Meola's verbal communications with Level 3 regarding negotiating the OTT dispute were memorialized in writing. *See Exhibit 5* (K. Meola Depo.) at 61:24–62:6; *id.* at 110:25–111:8. | Disputed. Ms. Meola is "not aware" of any conversations that were not memorialized in writing. Exhibit B, Meola Depo., at 110:25–111:8. | Undisputed that Ms. Meola testified in this manner, but AT&T's statement makes Level 3's point. As Ms. Meola is AT&T's 30(b)((6) witness on contract negotiations (MSUMF ¶ 20, OSUMF ¶ 20), if Ms. Meola is unaware of any conversations, AT&T has no evidence of any verbal communications not memorialized in writing. *See Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.,* 497 F.3d 1135, 1146 (10th Cir. 2007) (corporations must "make available as many persons as necessary to give 'complete, knowledgeable, and binding answers' on the corporation's behalf"); *White v. Wal-Mart Stores East, L.P.,* No. 5:18-CV-00034-TBR-LLK, 2018 WL 5083891, at *3 (W.D. Ky. Oct. 18, 2018) ("[T]he Rule 30(b)(6) witness … presents the corporation's 'position' on the topic"); *State Farm Mut. Auto Ins. Co. v. New Horizont, Inc.,* 250 F.R.D. 203, 212 (E.D. Pa. 2008) ("[T]he testimony of the Rule 30(b)(6) designee is deemed to be the testimony of the corporation itself"). |
| 27. | In November 2016, the D.C. Circuit Court of Appeals issued a decision on appeal from the FCC's OTT Declaratory Order. *See Exhibit 19* (K. Meola Depo. Ex. 26). In that decision, the D.C. Circuit Court of Appeals found that the FCC did not sufficiently disclose the reasoning for its decision and therefore "vacate[d] and remand[ed] the order to the Commission for further explanation." *Id.* | Disputed in part. The second sentence contains characterizations and legal conclusions, not material assertions of fact. The D.C Circuit found the FCC's ruling "wholly arbitrary;" the FCC's reasoning was inconsistent with passages in the *Transformation Order* and with other FCC rulings addressing OTT-VoIP services *See AT&T Corp. v.* | Disputed in part. AT&T's description of other holdings by the D.C. Circuit in its Order may be set aside for the simple reason that they do not refute MSUMF ¶ 27. They are also inaccurate. The D.C. Circuit did not say that the ruling in its entirety was "wholly arbitrary"; it said a certain aspect of the ruling would be wholly arbitrary "without more"—which is why it referred the matter to the FCC "for further explanation." *MSJ Exhibit 19* (ECF No. 152-20) at 5, 13.<br><br>The second sentence of Level 3's statement accurately states |

| | | | |
|---|---|---|---|
| | | *FCC*, 841 F.3d 1047, 1053–54 (D.C. Cir. 2016). | (and quotes directly from) the D.C. Circuit's opinion. *See MSJ Exhibit 19* (ECF No. 152-20) at 5 (" In the end, we find that the Declaratory Ruling does not disclose the Commission's reasoning with the requisite clarity to enable us to sustain its conclusion. . . . We therefore vacate and remand the order to the Commission for further explanation."). |
| 28. | The D.C. Circuit did not determine whether LECs could or could not assess end office charges on OTT calls. *See Exhibit 19* (K. Meola Depo. Ex. 26); *Exhibit 11* (A. Burgess Depo.) at 125:17–21; *Exhibit 20* (J. Torres 12-19-19 Depo.) at 265:5–9. | Disputed. This paragraph contains characterizations and legal conclusions, not material assertions of fact. It also misstates the ruling of the D.C. Circuit, which vacated and heavily criticized the FCC's decision. *See AT&T Corp. v. FCC*, 841 F.3d 1047, 1056 (D.C. Cir. 2016). Further, the D.C. Circuit found that the FCC's decision was "wholly arbitrary," (and inconsistent with passages in the *Transformation Order* and with other FCC rulings addressing OTT-VoIP services), and squarely rejected the only rationale the FCC (or Level 3) has articulated for concluding that OTT-VoIP providers perform a function equivalent to the functions performed in end-office switching. *Id.* at 1053–56. In light of the D.C. Circuit's decision, no carrier could assess end office charges on OTT VoIP traffic unless the FCC articulated a lawful and non-arbitrary rationale for those charges—which never happened. *See* ECF No. 149, AT&T Mot. For Sum. Jud. at 14 n.14. | Disputed in part. Nothing AT&T says in its OSUMF addresses Level 3's MSUMF ¶ 28, or the admissions of AT&T's 30(b)(6) witnesses conceding the truth of that statement. It is thus undisputed that the D.C. Circuit did not determine whether LECs could or could not assess end office charges on OTT calls.<br><br>The D.C. Circuit did not say that the ruling in its entirety was "wholly arbitrary"; it said a certain aspect of the ruling would be wholly arbitrary "without more"—which is why it referred the matter to the FCC "for further explanation." *MSJ Exhibit 19* (ECF No. 152-20) at 5, 13.<br><br>Furthermore, as this Court acknowledged before the FCC issued its 2019 Order on Remand, "no one knows what is 'consistent[]' with the 2011 FCC rules. . . . [T]he matter is still open as to what is or is not consistent with the Transformation Order." ECF No. 82 at 16. Thus, the FCC's 2015 decision, though vacated, was not entirely overturned; uncertainty still remained as to what the 2011 rules required and whether the FCC, on remand, would reach its previous conclusion. AT&T's response to MSUMF ¶ 28 ignores all of this. |

| | | | |
|---|---|---|---|
| 29. | On May 11, 2018, CenturyLink filed a petition for declaratory ruling with the FCC asking the FCC to find that end office switched access charges applied to OTT traffic. *See Exhibit 21* (CenturyLink Petition for Declaratory Ruling). | Undisputed. | |
| 30. | On December 17, 2019, the FCC issued an "Order on Remand and Declaratory Ruling" specifically stating, among other things, that the decision was issued to comply with the remand back from the September 8, 2016 D.C. Circuit Court of Appeals' decision. *See* Order on Remand, 2019 WL 7018968, *Exhibit 22* ¶ 3. In this decision on remand, the FCC clarified that end office switched access charges do not apply to OTT calls. *Id.* ¶ 24. | Disputed in part. This paragraph contains characterizations and legal conclusions, not material assertions of fact. The last sentence is undisputed. | Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support for its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting *sufficient, contradictory evidence* which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. |
| 31. | No one appealed the FCC's December 17, 2019 OTT order, which became final by operation of law on February 19, 2020. *See Exhibit 3* (Declaration of Charles W. Steese) ¶ 25. | Undisputed. | |
| 32. | Ms. Meola, AT&T's 30(b)(6) witness on the intent of the Agreement, testified that before the FCC's 2015 OTT Declaratory Ruling, there was a difference of view in the industry about whether OTT calls were subject to end office switched access charges. *Exhibit 5* (K. Meola Depo.) at 179:7–13. | Disputed. Ms. Meola testified that she did not know if there was a difference of view in the industry about whether OTT calls were subject to end office switched access charges. Exhibit B, Meola Depo., at 179:18–25. | Disputed, Mrs. Meola testified at least three times that while she is "not certain," she believes there was a difference of view in the industry about the applicability of end office charges to OTT calls. *MSJ Exhibit 5* (ECF No. 152-6) (K. Meola Depo.) at 179:7–180:1. |

| | | | |
|---|---|---|---|
| 33. | Ms. Meola also testified that if, on remand, the FCC affirmed that end office charges applied to OTT calls, then AT&T believed that Level 3 must still rebate ███████ of the charges associated with OTT calls pursuant to section 1(a)(iv). *Exhibit 5* (K. Meola Depo.) at 194:24–195:23. | Undisputed. | |
| | **Meaning of 65% Factor in Agreement** | | |
| 34. | Both Level 3 and AT&T designated a 30(b)(6) witness to discuss the intent of the 65 percent factor referenced in Section 1(a)(i)(B) of the Agreement: AT&T designated Mr. Ardell Burgess (*see Exhibit 11* (A. Burgess Depo.) at 11:14–12:4), and Level 3 designated Ms. Jennifer Torres (*see Exhibit 23* (J. Torres 8-28-19 Depo.) at 18:13–21:13). | Undisputed. | |
| 35. | In July 2013, AT&T and Level 3 entered into a separate written agreement, which was only in effect during calendar year 2013 and stated:<br><br>Because the Parties had been unable to determine the volume of Level 3 traffic that was OTT prior to the Effective Date of this Settlement Agreement, Level 3 and AT&T agree that for the period January 2013 through December 2013, 65% of the end office traffic billed to AT&T CORP by Level 3 is OTT provider traffic.<br><br>*See Exhibit 24* (K. Meola Depo. Ex. 6) § 2.16. | Undisputed. | |
| 36. | AT&T admits that at the time it entered into the | Disputed.  AT&T estimated that Level | Disputed.  AT&T does not address the specific factual assertion |

| | | |
|---|---|---|
| 2013 agreement it did not know Level 3's OTT percentage. *See Exhibit 11* (A. Burgess Depo.) at 99:22–100:25. | 3's percentage of OTT was 65% as of 2012. *See* Exhibit L, Burgess Depo., at 87:21-89:1. | set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.

AT&T's statement in response to MSUMF ¶ 36 addresses an estimate from 2012, not when AT&T entered into the agreement in 2013. The very testimony AT&T cited supports Level 3's factual assertion, where AT&T's 30(b)(6) witness called the 65% a "negotiated number."

Level 3 disputes AT&T's 65% estimate from 2012 for still other reasons. In making this estimate, AT&T contacted "roughly ten" OTT-VoIP providers and found that Level 3 provided a certain percentage of their phone numbers; this is the only data that AT&T used to come up with its 65% estimate. *See Exhibit 37* (Craig John Depo.) at 48:9–24. But as the very person who came up with the 65% estimate acknowledged (*see id.* at 45:10–20), such data gives no information at all about how many telephone numbers Level 3 had with non-OTT providers, such that it is impossible to compare the OTT volume with non-OTT volume, in the form of a percentage or otherwise. *See id.* at 49:23–50:5; 53:16–21. |

| 37. | The 2015 Agreement stated that 75 percent of all end office billings through June 2015 would be paid; however, at the time the Agreement was executed, two months of billings still needed to be reconciled. *See Exhibit 11* (A. Burgess Depo.) at 120:14–121:19; *Exhibit 23* (J. Torres 8-28-19 Depo.) at 37:24–38:20 & 70:24–73:23. The 65 percent provision only concerned what needed to be paid for April and May 2015 billings. *See id.; see also Exhibit 5* (K. Meola Depo.) at 205:24–206:20. | Disputed as to the second sentence. The 65% figure referred to Level 3's percentage of OTT and was not constrained to April and May 2015 billings. Exhibit B., Meola Depo., at 204:8-18. Level agreed that their OTT percentage had "historically been approximately sixty-five percent of overall billing for end office switching." Exhibit K, Torres 8-19-2019 Depo., at 50:14-22. | Level 3 contests AT&T's dispute as to the second sentence. The evidence AT&T puts forward does not support its dispute. The deposition testimony of Ms. Torres referenced by AT&T simply is AT&T reading the contractual language to Ms. Torres. Both Ms. Torres (Level 3's 30(b)(6) witness on the meaning of this provision) and Ardell Burgess (AT&T's 30(b)(6) witness on this language) testified that the purpose of the 65% number in the Agreement was to establish that AT&T had historically disputed and withheld 65% of Level 3's end office switched access charges, and that the parties had used this percentage as a reference point in the past. *See MSJ Exhibit 11* (ECF No. 152-12) (A. Burgess Depo.) at 130:9–24 & 154:16–155:12; *MSJ Exhibit 23* (ECF No. 152-24) (J. Torres 8-28-19 Depo.) at 50:23–54:9.<br><br>AT&T tries to create a factual dispute by disregarding the testimony of its 30(b)(6) witness on the meaning of the 65% language in the agreement. This is improper. *See Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. CIV.A. 06-4262, 2009 WL 2242380, at *9 (E.D. La. July 24, 2009) ("a party cannot adduce additional evidence to rebut the testimony of its Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony, and there is no explanation for the difference … In addition, it is abundantly clear that courts … will not, without explanation, allow a party to create an issue of material fact and survive summary judgment merely by submitting evidence that contradicts its earlier deposition testimony."); *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007) (30(b)(6) witness gives "'complete, knowledgeable, and binding answers' on the corporation's behalf"). |
| 38. | By signing the Agreement, Level 3 was not claiming that, as of May 2015, 65 percent of its | Disputed. By signing the 2015 Agreement, Level 3 agreed that its OTT | Disputed. The evidence AT&T puts forward does not support its dispute. The deposition testimony of Ms. Torres referenced by |

| | | | |
|---|---|---|---|
| | end office billings were for OTT traffic. *Exhibit 11* (A. Burgess Depo.) at 122:5–16; *Exhibit 23* (J. Torres 8-28-19 Depo.) at 48:11–49:6. | percentage was historically 65%. Exhibit K, Torres Depo., at 50:14-22; ECF No 15-1, 2015 Settlement Agreement, at 2. AT&T's intent in agreeing to the 65% number was to use it prospectively. Exhibit B, Meola Depo., at 204:13-18. | AT&T simply is AT&T reading the contractual language to Ms. Torres. Both Ms. Torres (Level 3's 30(b)(6) witness on the meaning of this provision) and Ardell Burgess (AT&T's 30(b)(6) witness on this language), testified that the purpose of the 65% in the Agreement was to establish that AT&T had historically disputed and withheld 65% of Level 3's end office switched access charges, and that the parties had used this percentage as a reference point in the past. *See MSJ Exhibit 11* (ECF No. 152-12) (A. Burgess Depo.) at 130:9–24 & 154:16–155:12; *MSJ Exhibit 23* (ECF No. 152-24) (J. Torres 8-28-19 Depo.) at 50:23–54:9. AT&T tries to create a factual dispute by disregarding the testimony of its 30(b)(6) witness on the meaning of the 65% language in the agreement. This is improper. *See Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. CIV.A. 06-4262, 2009 WL 2242380, at *9 (E.D. La. July 24, 2009) ("a party cannot adduce additional evidence to rebut the testimony of its Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony, and there is no explanation for the difference … In addition, it is abundantly clear that courts … will not, without explanation, allow a party to create an issue of material fact and survive summary judgment merely by submitting evidence that contradicts its earlier deposition testimony."); *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007) (30(b)(6) witness gives "'complete, knowledgeable, and binding answers' on the corporation's behalf"). |
| 39. | AT&T admits it has no facts to show that Level 3's OTT percentage was ever 65 percent. *See Exhibit 11* (A. Burgess Depo.) at 124:3–11. | Disputed. AT&T conducted studies that demonstrated that Level 3's OTT percentage was between ██% and ██%. Exhibit L, Burgess Depo., at 87:21-88:17. Further, the parties historically agreed that Level 3's OTT percentage | Disputed. AT&T's referenced testimony does not support its factual assertion. The very testimony AT&T cited supports Level 3's factual assertion, where AT&T's 30(b)(6) witness called the 65% a "negotiated number." <br><br> The parties did not agree that Level had 65% OTT in the settlement agreement. As stated in MSUMF ¶ 38, both AT&T |

| | | | |
|---|---|---|---|
| | | was 65%—and because the FCC's rules permit agreement between carriers on such matters, *e.g.*, 47 C.F.R. § 51.905(a); Order on Remand and Declaratory Ruling, *In the Matter of Connect America Fund*, 34 FCC Rcd 12692, n.62 (Dec. 17, 2019); In re Connect America Order, 26 FCC Rcd. 17663, ¶¶ 960-61, 963-64 & n.1996 (2011), the parties' historic agreements as to Level 3's OTT percentage are itself facts showing that the Level 3 OTT percentage *was* 65%. | and Level 3's 30(b)(6) witnesses recognize that by signing the Agreement, Level 3 was not claiming that, as of May 2015, 65% of its end office billings were for OTT traffic. *MSJ Exhibit 11* (ECF No. 152-12) (A. Burgess Depo.) at 122:5–16; *MSJ Exhibit 23* (ECF No. 152-24) (J. Torres 8-28-19 Depo.) at 48:11–49:6.

Level 3 disputes AT&T's 65% estimate from 2012 for still other reasons. In making this estimate, AT&T contacted "roughly ten" OTT-VoIP providers and found that Level 3 provided a certain percentage of their phone numbers; this is the only data that AT&T used to come up with its 65% estimate. *See Exhibit 37* (Craig John Depo.) at 48:9–24. But as the very person who came up with the 65% estimate acknowledged (*see id.* at 45:10–20), such data gives no information at all about how many telephone numbers Level 3 had with non-OTT providers, such that it is impossible to compare the OTT volume with non-OTT volume, in the form of a percentage or otherwise. *See id.* at 49:23–50:5; 53:16–21. |
| 40. | The purpose of the 65 percent in the Agreement was to establish that AT&T had historically disputed and withheld 65 percent of Level 3's end office switched access charges, and that the parties had used this percentage as a reference point in the past. *See Exhibit 11* (A. Burgess Depo.) at 130:9–24 & 154:16–155:12; *Exhibit 23* (J. Torres 8-28-19 Depo.) at 50:23–54:9. | Disputed in part. By signing the 2015 Agreement, Level 3 agreed that its OTT percentage was historically 65%. Exhibit K, Torres Depo., at 50:14-22. AT&T's intent in agreeing to the 65% number was to use it prospectively. Exhibit B, Meola Depo., at 204:13-18. | Disputed. The evidence AT&T puts forward does not support its dispute. The deposition testimony of Ms. Torres referenced by AT&T simply is AT&T reading the contractual language to Ms. Torres. Both Ms. Torres (Level 3's 30(b)(6) witness on the meaning of this provision) and Ardell Burgess (AT&T's 30(b)(6) witness on this language), testified that the purpose of the 65% in the Agreement was to establish that AT&T had historically disputed and withheld 65% of Level 3's end office switched access charges, and that the parties had used this percentage as a reference point in the past. *See MSJ Exhibit 11* (ECF No. 152-12) (A. Burgess Depo.) at 130:9–24 & 154:16–155:12; *MSJ Exhibit 23* (ECF No. 152-24) (J. Torres 8-28-19 Depo.) at 50:23–54:9 (testifying, *inter alia*, "Level 3 does not—had never historically, or at this time, believed that OTT traffic was 65 percent of their traffic"; the 65% figure was "what we |

| | | |
|---|---|---|
| | | were being told was short paid"; and "AT&T was short paying 65 percent for OTT. So the 65% was what we were assuming some of the short-paid balances were toward OTT.").<br><br>AT&T tries to create a factual dispute by disregarding the testimony of its 30(b)(6) witness on the meaning of the 65% language in the agreement. This is improper. *See Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. CIV.A. 06-4262, 2009 WL 2242380, at *9 (E.D. La. July 24, 2009) ("a party cannot adduce additional evidence to rebut the testimony of its Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony, and there is no explanation for the difference … In addition, it is abundantly clear that courts … will not, without explanation, allow a party to create an issue of material fact and survive summary judgment merely by submitting evidence that contradicts its earlier deposition testimony."); *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007) (30(b)(6) witness gives "'complete, knowledgeable, and binding answers' on the corporation's behalf"). |
| 41. | Under the Agreement, Section 1(a)(iv) requires Level 3 to refund ▮▮▮▮ of the actual OTT calling. *See Exhibit 11* (A. Burgess Depo.) at 208:24–209:6; *Exhibit 25* (A. McClure Response Disclosure) ¶ 2(a); *Exhibit 5* (K. Meola Depo.) at 207:12–23 & 213:23–215:6; *see also Exhibit 11* (A. Burgess Depo.) at 239:21–240:5 (acknowledging if Level 3's actual OTT percentage is less than 65%, that AT&T has over withheld). | Disputed. This paragraph contains characterizations and legal conclusions, not material assertions of fact. It also misstates the 2015 Agreement. The Agreement states that Level 3 must refund ▮▮▮▮ of the "disputed OTT charges." ECF No. 15-1, 2015 Settlement Agreement, at 3. AT&T has disputed 65% of OTT charges. *See* Exhibit L, Burgess Depo., at 133:21–134:12; Exhibit C, Torres 12-19-2019 Depo., at 318:25–319:16. | Disputed. AT&T puts forward a positon on the meaning of "disputed OTT charges" that is contrary to the testimony of AT&T's own witnesses. The language AT&T references from Ms. Torres does not support the factual assertion; Ms. Torres simply testified that she saw language in the settlement agreement. Mr. Burgess simply testified that, after the DC Circuit opinion, AT&T started to withhold payment on 65% of Level 3's end office shares. However, Mr. Burgess admitted that Level 3 only had to refund 50% of its *actual* OTT billings. *See MSJ Exhibit 11* (ECF No. 152-12) (A. Burgess Depo.) at 208:24–209:6.<br><br>Level 3 does not dispute that, in 2017, AT&T withheld payment on at least 65% of Level 3's end office charges, and that by |

|   |   |   | 2020, AT&T withheld payment on more than 100% of Level 3's end office charges. *See* MSUMF ¶¶ 45–46. |
|---|---|---|---|
| 42. | The Agreement permits Level 3 to bill end office switched access charges on all non-OTT calls with a Level 3 telephone number. *See Exhibit 5* (K. Meola Depo.) at 211:4–24; *Exhibit 25* (A. McClure Response Disclosure) ¶ 10. | Disputed. This paragraph contains characterizations and legal conclusions, not material assertions of fact. It also misstates the 2015 Agreement, which only permits Level 3 to bill "full switched access charges on domestic traffic that originates with or terminates to Level 3 assigned CPN." ECF No. 15-1, 2015 Settlement Agreement, at 3. | Disputed. AT&T quotes the very contract language that witnesses from both parties testified meant that Level 3 could bill end office switched access charges on all non-OTT calls with a Level 3 telephone number. *See MSJ Exhibit 5* (ECF No. 152-6) (K. Meola Depo.) at 211:4–24; *MSJ Exhibit 25* (ECF No. 151-16) (A. McClure Response Disclosure) ¶ 10. |
| 43. | In mid-2017, after the D.C. Circuit Court of Appeals decision, AT&T started to withhold 65 percent of Level 3's end office charges again. *See Exhibit 11* (A. Burgess Depo.) at 134:3–12; *Exhibit 20* (J. Torres 12-19-19 Depo.) at 318:25–319:16. | Undisputed. |   |
| 44. | In 2017, Level 3 gave AT&T data to show its OTT percentage was approximately ▉ percent originating and ▉ percent terminating. *See Exhibit 26* (J. Torres Depo. Ex. 23) at ATT_PROD_0005865; *Exhibit 27* (A. McClure 8-29-19 Depo.) at 80:15–82:14; *see also Exhibit 11* (A. Burgess Depo.) at 135:6–136:23. | Disputed. Level 3's data was unreliable and therefore did not in fact show its OTT percentage was ▉ percent originating and ▉ percent terminating. Exhibit M, Dr. Pfautz Expert Report, at ¶ 37–50; Exhibit N, McClure Depo., at 60:1-61:22. Further, Level 3 did not provide all of the data underlying its claims, despite AT&T's request (and industry practice including Level 3's tariff). *See* Exhibit B, Meola Depo., at 266:8-21. | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting **sufficient, contradictory evidence** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine |

| | | dispute exists. AT&T does not dispute that Level 3 provided them with these data; instead, it puts forward evidence that it chose not to believe the facts Level 3 put forward. |
|---|---|---|
| | | The testimony AT&T pus forward from Mr. McClure does not show the data was unreliable. It simply describes his method for gathering OTT percentages. Likewise, Ms. Meola referenced testimony does not state that Level 3 did not provide data, but instead that AT&T could not verify the data provided. *See Exhibit 35* (Meola Depo.) at 266:23–268:12. |
| 45. | AT&T continued to withhold 65 percent of Level 3's end office charges even after Level 3 stopped billing end office charges on terminating calls, which the FCC's Transformation Order required to occur in July 2017, and as a result has withheld ▮▮▮▮▮▮▮▮ each year from Level 3. *See Exhibit 11* (A. Burgess Depo.) at 200:23–201:23. | Disputed. Level 3's Exhibit 11 does not support MSUMF No. 45. AT&T has continued to withhold 65% of OTT VoIP charges as the last agreed-upon factor until Level 3 can demonstrate its OTT traffic is not 65%. Exhibit B, Meola Depo., at 257:12-18, 264:16-265:16. | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting **sufficient, contradictory evidence** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. The testimony AT&T puts forward supports Level 3's factual assertion that AT&T continued to withhold 65% of charges even after terminating charges went to zero. |
| | | To the extent AT&T is suggesting that the parties agreed that 65% of Level 3's traffic was OTT, both 30(b)(6) witnesses testified that this was not the intent of the agreement. *See* MSUMF ¶¶ 38–41. |

| 46. | Throughout 2019 and 2020, AT&T withheld more than Level 3's total end office billings each month. *See Exhibit 28* (Declaration of M. Kellow) ¶ 6. | Disputed. AT&T disputes Level 3's total end office billings number, which AT&T believes is too high. *See* Exhibit O, AT&T Rule 26(e) Disclosure, at 2-3. Furthermore, the parties have other unrelated disputes as to end office charges billed by Level 3, which has affected AT&T's total withholdings, and Level 3's analysis does not take account of all payments made by AT&T. *Id.* AT&T's intention was to withhold 65% of end office billings for the OTT dispute. Exhibit L, Burgess Depo., at 134:3-12. | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. |
| | | | The testimony AT&T puts forward supports Level 3's factual assertion. AT&T states that its "intention" was to withhold 65% of billings. Likewise Exhibit O is not authenticated or sworn to and as a result, it cannot be used to support a factual assertion. Fed. R. Civ. P. 56(c)(2); *Sherwin-williams Co. v. Performance Auto Body, Inc.*, No. EDCV1300428VAPSPX, 2014 WL 12558844, at *3 (C.D. Cal. Jan. 29, 2014) ("[U]nauthenticated [e]xhibits … cannot serve as evidentiary support for the factual assertions raised in SUF"). |
| | **Calculation of OTT Percentage** | | |
| 47. | Level 3 does not have any direct OTT subscriptions. *See Exhibit 11* (A. Burgess Depo.) at 68:21–69:14. | Disputed. Level 3's Exhibit 11 does not support MSUMF No. 47. Level 3 proffered its Form 477 as proof that it had no direct OTT subscriptions and Mr. Burgess only agreed that the Form 477 suggested that. *See* Exhibit L, | Disputed. AT&T does not put forward evidence that Level 3 has direct OTT subscriptions. Testimony is legion that Level 3 has no such subscriptions. *See, e.g., Exhibit 38* (J. Torres 8-28-19 Depo.) at 96:17–99:5, 143:3–19; *Exhibit 39* (J. Torres Depo. Ex. 6); *Exhibit 40* (Pfautz Depo.) at 94:8–13 (AT&T's expert's "understanding" is that Level 3 does not have OTT |

| | | Burgess Depo., at 69:2-14. Level 3 has provided no direct proof that it does not have any direct OTT subscriptions. | subscriptions). |
|---|---|---|---|
| 48. | "Local carriers . . . cannot always readily distinguish between over-the-top VoIP calls and other types of calls." *Exhibit 30* (P. Pfautz Opening Disclosure) ¶ 5; *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 5. | Undisputed; however, the FCC has stated that "because of the fundamentally different physical arrangements between facilities-based and over-the-top VoIP services, the two can be distinguished with relative ease". Order on Remand and Declaratory Ruling, *In the Matter of Connect America Fund*, 34 FCC Rcd 12692, n.62 (Dec. 17, 2019). | Disputed as to AT&T's qualification. While the FCC order states that "between facilities-based and over-the-top VoIP services, the two can be distinguished with relative ease," both AT&T's expert and Level 3's expert testified that this is untrue. *Exhibit 30* (P. Pfautz Opening Disclosure) ¶ 5; *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 5. Indeed, AT&T admitted as much by stating this assertion was undisputed. |
| 49. | Except where (a) companies are known to be 100% OTT providers such as ██████ (where end office charges do not apply), or (b) customers are enterprise class customers where the carrier provisioned a facility to the end user's premises (where end office charges always apply), the only way to find out a customer's OTT percentage is to reach out to the customer and ask. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 5; *Exhibit 4* (P. Pfautz Depo.) at 47:10–49:25, 51:24–52:16, 138:15–22. | Disputed in part. A customer's OTT percentage could be determined in numerous ways, including by referencing the percentage of OTT subscriptions reported to the FCC. Exhibit M, Dr. Pfautz Expert Report, ¶ 46–47; *see also* Order on Remand and Declaratory Ruling, *In the Matter of Connect America Fund*, 34 FCC Rcd 12692, n.62 (Dec. 17, 2019); In re Connect America Order, 26 FCC Rcd. 17663, ¶¶ 963-64 (2011). | Dispute insofar as AT&T's disputes. AT&T's statement is contrary to the testimony of both parties' experts. In addition, in deposition, AT&T's expert admitted that Form 477s—which contain percent OTT subscriptions—are inadequate to determine percent OTT. *See Exhibit 40* (Pfautz Depo.) at 78:19–80:1; *see also id.* at 75:14–76:5 (not even sure if 2% of customers completed 477s). In that testimony, Dr. Pfautz testified that "in some cases, you will need to get data from customers, whether that is via 477 . . . or some other information." Indeed, the only way to get a Form 477 is to ask the customer for it (if they even have it at all). *Id.* at 74:6–11 (AT&T subpoenaed 477s from 4 Level 3 customers, and two did not have them; subpoenaed 477s because they must be obtained from customer). |
| 50. | Level 3 employee Andrew McClure calculated Level 3's percent OTT to be ██████ since January 1, 2019. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 16. | Disputed. Mr. McClure used the same flawed analysis to conduct his 2019 analysis as he did in 2017. Exhibit P, Level 3 Suppl. Discl., at 5 ¶ 1; Exhibit Q, McClure 6-11-2020 Depo., at 59:22- | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This |

| | | | |
|---|---|---|---|
| | | 60:18; Exhibit R, Dr. Pfautz Rebuttal Report, at ¶ 27. He did not re-contact any customers to determine if their OTT percentage had changed since 2017. Exhibit Q, McClure Depo., at 154:7-18, 204:10-25, 207:17-21. His OTT calculation is therefore flawed. *See* Exhibit R, Dr. Pfautz Rebuttal Report, at ¶¶ 10, 19, 27. | is done by presenting **sufficient, contradictory evidence** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. AT&T does not dispute that Level 3 provided them with calculations showing ▇ OTT; instead, it puts forward evidence that it chose not to believe the OTT factor Level 3 put forward. AT&T's argument that it believes Mr. McClure's analysis is flawed is addressed (and contradicted) in MSUMF ¶¶ 55–66. |
| 51. | AT&T's expert, Dr. Penn Pfautz, did not calculate a percent OTT for Level 3. *Exhibit 4* (P. Pfautz. Depo.) at 29:22–25. | Undisputed. | |
| 52. | AT&T has a few documents that comment upon Level 3's percent OTT, but none of AT&T's documents calculate a percent OTT or utilize an appropriate methodology to calculate percent OTT. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 4; *Exhibit 4* (P. Pfautz Depo.) at 181:25–192:14. | Disputed. This statement of material fact is vague and the materials cited by Level 3 do not support MSUMF No. 52. AT&T has conducted several studies that show Level 3's OTT percentage. *See* Exhibit L, Burgess Depo., at 87:21 - 88:17; Exhibit F, John Depo., at 90:15-21. By signing the 2015 Agreement, Level 3 agreed that its OTT percentage was historically 65%. Exhibit K, Torres Depo., at 50:14-22. | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting **sufficient, contradictory evidence** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has |

| | | |
|---|---|---|
| | | thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>AT&T instead cites to estimates, which AT&T's own expert admits do not calculate a percent OTT. *MSJ Exhibit 4* (ECF No. 152-5) (P. Pfautz Depo.) at 181:25–192:14.<br><br>As stated many times, by signing the agreement, Level 3 did not agree that it had 65% OTT as both its 30(b)(6) witness, and AT&T's 30(b)(6) witness testified. See MSUMF and OSUMF ¶¶ 38–41.<br><br>Level 3 disputes AT&T's 65% estimate from 2012 for still other reasons. In making this estimate, AT&T contacted "roughly ten" OTT-VoIP providers and found that Level 3 provided a certain percentage of their phone numbers; this is the only data that AT&T used to come up with its 65% estimate. *See Exhibit 37* (Craig John Depo.) at 48:9–24. But as the very person who came up with the 65% estimate acknowledged (*see id.* at 45:10–20), such data gives no information at all about how many telephone numbers Level 3 had with non-OTT providers, such that it is impossible to compare the OTT volume with non-OTT volume, in the form of a percentage or otherwise. *See id.* at 49:23–50:5; 53:16–21. |
| 53. | The only carriers in the industry that are known to have created a percent OTT are Level 3 and, in mid-2019, AT&T. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 8; *Exhibit 4* (P. Pfautz Depo.) at 58:18–59:15. | Disputed. This is speculation and not a material statement of fact. Furthermore, the cited material does not support MSUMF No. 53. Both Dr. Pfautz and Mr. McClure stated they were not aware of any other carrier in the industry who has created a percent OTT, not that there were none. Ex. S, Dr. Pfautz Depo., at 59:11-15; Exhibit T, McClure Resp. Discl., at ¶ 8. | AT&T's factual assertion confirms that Level 3's factual assertion is undisputed. Both experts testified they were "unaware" of any other carriers who have calculated percent OTT, thus, these are the only carriers in the industry "known to have created a percent OTT." |

| 54. | Level 3's OTT analysis is based on calling originated using Level 3 telephone numbers, and destined for AT&T. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 10; *Exhibit 4* (P. Pfautz Depo.) at 129:9–130:5 (AT&T has no contrary evidence). | Undisputed. | |
| --- | --- | --- | --- |
| 55. | Dr. Pfautz testified that his "biggest concern" about Level 3's OTT analysis is the method that Level 3's expert (Andrew McClure) used to gather percent OTT from individual Level 3 customers. *Exhibit 4* (P. Pfautz Depo.) at 141:12–15. | Undisputed. | |
| 56. | The percentages that Mr. McClure obtained from customers had very little impact on Level 3's percent OTT; if Mr. McClure assumed that 100 percent of the calling associated with customers Mr. McClure believed to have some OTT calling is OTT, Level 3's OTT percentage would rise from ▮▮▮▮▮▮▮▮. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 12. | Disputed. This is not a material fact, but rather a conditional opinion. In any event, McClure's methodology and opinions are unreliable. Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50; Exhibit R, Dr. Pfautz Rebuttal Report, at ¶¶ 10, 19, 27. Among other issues, Mr. McClure's opinion as to which Level 3 customers "have some OTT calling" is unreliable because, during the period at issue, he only sought that information from one Level 3 customer, and sought no information as to several hundred other customers. Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50; Exhibit Q, McClure 6-11-2020 Depo., at 193:8-19. | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>AT&T does not address the assertion at all. The factual assertion states that if Mr. McClure assumed all customers who he assumed had some OTT calling (i.e., those with ▮▮ OTT calling or above), were 100% OTT calling, the OTT percentage increases by two percentage points. This assertion is a |

| | | | |
|---|---|---|---|
| | | | mathematical certainty incapable of genuine dispute—and AT&T raises no issue as to this mathematical calculation. AT&T's argument that it believes Mr. McClure's analysis is flawed is addressed (and contradicted) in MSUMF ¶¶ 57–66. |
| 57. | Dr. Pfautz took issue with three entities that Mr. McClure reported in 2017 as having 0 percent OTT: ███████████. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13. | Disputed. Dr. Pfautz only used ███████████ as "examples" to demonstrate how Mr. McClure's analysis was flawed. Exhibit M, Dr. Pfautz Expert Report, at ¶ 42-46. On Mr. McClure's disclosure, there were numerous entities and the vast majority of those entities are listed as having no OTT VoIP traffic, even though Level 3 had procured no information about those entities' OTT traffic during the period disclosed in Mr. McClure's disclosure. *Id.* ¶¶ 37-50; Exhibit Q, McClure Depo., at 193:8-19. | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>While Dr. Pfautz cited these as "examples" in his disclosure, in deposition, he admitted that he had not identified any other entities that may be suspect. *Exhibit 40* (Pfautz Depo.) at 142:1–145:3; 146:2–8. Thus, AT&T does not have evidence challenging entities other than these three. |
| 58. | Level 3 no longer has a relationship with ██████; as such, the concern about ██████ has no bearing on data from 2019 forward. *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13(b). | Disputed. The concern regarding ██████ is an example of what is wrong with Level 3's analysis and therefore the concern has a bearing on the data from 2019 forward. Exhibit M, Dr. Pfautz Expert Report, at ¶ 44. Indeed, to the extent Level 3 concedes | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the |

| | | that material it gathered in 2017 "has no bearing on data from 2019 forward," then Level 3 is implicitly conceding that Mr. McClure's analysis of 2017 data is stale and no longer reliable. | responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. |
| | | | Further, information about ███████ has no bearing from 2019 onward not because data from 2017 is not generally reliable, but because in this instance one former Level 3 customer is no longer a Level 3 customer and therefore no longer has any impact on Level 3's OTT percentage. |
| 59. | Both Level 3 and AT&T recognize that ███ is not a pure OTT provider (*Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13(d); *Exhibit 4* (P. Pfautz Depo.) at 151:15–154:20); nonetheless, for summary judgment, Level 3 will assume that 100 percent of ███ calls are OTT. | Disputed. AT&T does not know if ███ is a pure OTT provider or not. Exhibit S, Dr. Pfautz Depo., at 151:15–154:20 ("Q. So Dr. Pfautz, what percentage of ███ calls are over WAN versus over OTT, do you know?" "A. I do not pretend to know that."). | While AT&T claims it disputes this assertion, it does not have any contravening evidence by its own admission. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. |
| 60. | AT&T acknowledges that when calls flow over | Undisputed. | |



| | | |
|---|---|---|
| | facilities Level 3 provisioned at the customer's premises to Level 3's end office, even if people connect to those hub facilities via a third-party internet connection from remote locations, end office charges apply. *See Exhibit 4* (P. Pfautz Depo.) at 101:14–23; 104:17–105:9. | | |
| 61. | Andrew McClure determined that ▮▮▮ is not an OTT provider because Level 3 provides ▮▮▮ with facilities at ▮▮▮ premises, and all calls flow over the facilities Level 3 provisioned and provided to ▮▮▮. *Exhibit 31* (A. McClure 6-11-2020 Depo.) at 127:12–137:8; *Exhibit 25* (A. McClure Responsive Disclosure) ¶ 13(c). | Disputed. ▮▮▮ is an OTT provider because the connection to ▮▮▮ end users is over-the-top. Exhibit M, Dr. Pfautz Expert Report, at ¶ 45; Exhibit S, Dr. Pfautz Depo., at 106:3-11; Exhibit U, McClure Depo. ▮▮▮, at 2. | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>Level 3 and Mr. McClure demonstrated that Level 3 provides ▮▮▮ with facilities at ▮▮▮ premises, and all calls flow over the facilities Level 3 provisioned to ▮▮▮. *MSJ Exhibit 31* (ECF No. 151-24) (A. McClure 6-11-2020 Depo.) at 127:12–137:8; *MSJ Exhibit 25* (ECF No. 151-16) (A. McClure Responsive Disclosure) ¶ 13(c); *MSJ Exhibit 29* (ECF No. 151-21) ¶ 16. AT&T did not dispute this aspect of MUSUF ¶ 61. It simply said ▮▮▮ customers calls are OTT, without describing how calls get to ▮▮▮ or contesting the proffered evidence on this point. Mr. McClure's testimony on how calls get to ▮▮▮ is thus undisputed. Then, AT&T's admission of |

| | | |
|---|---|---|
| | | MUSUF ¶ 60 ends the inquiry: where AT&T's expert admitted that when calls flow over Level 3's facilities, and AT&T fails to dispute evidence that this is the case with calls to ▮▮▮▮▮, these are not OTT calls and end office charges apply. |
| 62. | ▮▮▮▮▮ percent of Level 3's traffic falls into three clear categories: (a) Level 3's own traffic; (b) a Level 3 network incapable of supporting OTT calling; and (c) ▮▮▮▮▮. *See Exhibit 32* (Exhibit 2 to Level 3's Rule 26(a)(2)(C) Disclosure; *Exhibit 29* (Declaration of Andrew McClure) ¶ 6). | Disputed as to (b). Mr. McClure did not investigate whether Level 3's own traffic could support OTT, but rather made an "assumption" that the OTT percentage was ▮▮. Exhibit Q, A. McClure 6-11-2020 Depo., at 91:18–92:21. McClure has no documentation that Level 3's network is incapable of supporting OTT traffic. *Id.* | Disputed. AT&T's evidence does not support its assertion. None of the referenced testimony challenges Mr. McClure's assertion that none of the traffic identified as "NULL" is capable of being OTT. *See also* ECF No. 159-1 (Declaration of Andrew McClure in Support of Level 3's Response to AT&T & TCG's Motion to Exclude Certain Testimony of Andrew McClure) ¶¶ 7–12 (describing in detail how Mr. McClure determined that "NULL" traffic was incapable of supporting OTT traffic). |
| 63. | In deposition, AT&T asked <u>Mr. McClure about four additional customers:</u> ▮▮▮▮▮ ▮▮▮▮▮. *See Exhibit 31* (A. McClure 6/11/2020 Depo.) 125:13–126:18; *Exhibit 29* (A. McClure Dec.) ¶ 9. | Undisputed; however, as noted above, questions as to these four entities were examples—of the hundreds of entities on Mr. McClure's disclosure, there are many entities that Mr. McClure listed as having zero OTT VoIP traffic, yet Mr. McClure did not conduct any analysis for the period in question as to whether these entities in fact carried over-the-top traffic. Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50; Exhibit Q, McClure 6-11-2020 Depo. at 193:8-19. The materials on the websites of these four entities were examples in which the entities stated they were providing over-the-top services. *See id.* 121:15–126:18 | AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>While Dr. Pfautz cited these as "examples" in his disclosure, in deposition, he admitted that he had not identified any other entities that may be suspect. *Exhibit 40* (Pfautz Depo.) at 142:1– |



| | | |
|---|---|---|
| | | 145:3; 146:2–8. Thus, AT&T does not have evidence challenging entities other than these three. |
| 64. | While Mr. McClure could not recall the specifics of ██████████ during his expert deposition, Mr. McClure has since familiarized himself with those customers, and determined that while ██████████ are appropriately categorized at zero percent OTT, ██████ may have the ability to provide some OTT functions. As a result, for purposes of this summary judgment motion, Level 3 will assume Coredial is 100% OTT. *See Exhibit 31* (A. McClure 6/11/2020 Depo.) at 108:14–21, 114:8–12, 121:15–23; *Exhibit 29* (A. McClure Dec.) ¶¶ 10–15. | Disputed in part. AT&T is unable to verify or respond to what Level 3 did after Mr. McClure's deposition. AT&T continues to dispute that ██████ ██████████, and other entities on the spreadsheet, are appropriately categorized as having OTT. Exhibit Q, McClure Depo., at 121:15–126:18; Exhibit V, McClure 6-11-2020 Depo. ██████████ | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting **sufficient, contradictory evidence** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. AT&T cannot simply says it "continues to dispute" without specific factual references. Its own expert could have analyzed the same data and responded in his expert disclosures, but chose not to. <br><br> As stated in Mr. McClure's declaration, Mr. McClure has "studied ██████ in detail, and conclude[d] that none of ██████ traffic is OTT" because "██████ provides hosted PBX traffic, meaning that all ██████ traffic is brought to its PBX or virtual PBX, and thus all of Evolve IP's traffic traverses Level 3's last mile facilities." *MSJ Ex. 29* (ECF No. 151-21) ¶ 11. "██████ is not a telecommunications provider; it is a manufacturer of service assurance, testing, and monitoring equipment," and therefore, "it is appropriate to list ██████ as having zero percent OTT." *MSJ Ex. 29* (ECF No. 151-21) ¶ 13. "██████ is a customer experience service provider, not a telecom or OTT provider," and in fact is "a Level 3 enterprise class |



| | | |
|---|---|---|
| | | customer"; thus, "it is appropriate to list ▇ as having zero percent OTT." *Id.* ¶ 15.<br><br>Mr. McClure also evaluated every single Level 3 customer with up to or more than 2.4 million minutes of traffic; below this level, Mr. McClure explained, customers "are so small that they do not meaningfully impact percentage OTT." *See* ECF No. 151-31 ¶ 17. In this review, with only one exception, he found each customer Level 3 characterized has having 0% OTT as falling in one of three categories: (a) they were enterprise class customers with no nomadic telephone numbers; (b) they were traditional facilities-based providers using Level 3 telephone numbers; or (c) they were wholesale customers without any OTT capability. *Id.* The sole exception is ▇▇▇▇▇▇ which Mr. McClure concluded on review is an OTT provider and so assumed that 100 percent of its traffic is OTT. *Id.* ¶ 18. Thus, the zero-percent categorization for all remaining entities is appropriate, and AT&T offers no evidence suggesting otherwise. |
| 65. | Using the percentages referenced in the paragraphs above—i.e., assuming 100 percent of the traffic of ▇▇▇▇▇▇ is OTT—and additionally assuming a 100 percent OTT factor for ▇▇▇▇▇▇ Level 3's OTT percentage would increase to ▇ percent. *See Exhibit 29* (A. McClure Dec.) ¶¶ 17–21. | Disputed. This is not a material statement of fact, but a conditional opinion. In any event, Level 3's OTT percentage is not ▇ percent given that Mr. McClure's analysis is unreliable. *See* Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50; Exhibit R, Dr. Pfautz Rebuttal Report, at ¶¶ 10, 19, 27. Among other issues, Mr. McClure's opinion as to which Level 3 customers have some OTT calling is unreliable because, during the period at issue, he only sought that information from one Level 3 customer, and sought no information as to several hundred other | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. |

| | | customers. Exhibit M, Dr. Pfautz Expert Report, at ¶¶ 37-50; Exhibit Q, McClure Depo., at 193:8-19 | AT&T does not address the assertion at all. The factual assertion states that if Mr. McClure assumed all customers who he assumed had some OTT calling (i.e., those with ██% OTT calling or above), were 100% OTT calling, the OTT percentage increases by two percentage points. This assertion is a mathematical certainty incapable of genuine dispute—and AT&T raises no issue as to this mathematical calculation. AT&T's argument that it believes Mr. McClure's analysis is flawed is addressed (and contradicted) in MSUMF ¶¶ 57–66.<br><br>Finally, while Dr, Pfautz cited "example" customers in his disclosure, in deposition, he admitted that he had not identified any other entities that may be suspect. *Exhibit 40* (Pfautz Depo.) at 142:1–145:3; 146:2–8. Thus, AT&T does not have evidence challenging entities other than these three. |
| 66. | Dr. Pfautz admitted in deposition that he did not have any evidence that Level 3's percent OTT is greater than ██. *See Exhibit 4* (P. Pfautz Depo.) at 173:10–175:10; 176:7–16. | Disputed. Dr. Pfautz did not form an opinion on Level 3's OTT percentage because Level 3 had failed to provide verifiable data to be able to form any opinion. Exhibit S, Dr. Pfautz Depo., at 175:5-25. Further, given the serious flaws in Level 3's methodology, Level 3 "almost certainly understated the proportion of [OTT] traffic billed." Exhibit M, Dr. Pfautz Expert Report, at ¶ 6. | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting *sufficient, contradictory evidence* which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>While Dr, Pfautz cited "example" customers in his disclosure, in deposition, he admitted that he had not identified any other entities that may be suspect. *Exhibit 40* (Pfautz Depo.) at 142:1– |

| | | |
|---|---|---|
| | | 145:3; 146:2–8. Thus, AT&T does not have evidence challenging entities other than these three.<br><br>Moreover, while Dr. Pfautz's expert disclosure states that Level 3's OTT percentage was almost certainly understated," that was based on Level 3's OTT percentage of ▇%. In deposition, he admitted he had no evidence that the percentage was above ▇%. *See MSJ Exhibit 4* (ECF No. 152-5) (P. Pfautz Depo.) at 173:10–175:10; 176:7–16. |
| 67. | Dr. Pfautz assumed that 100 percent of AT&T's enterprise class customers had no OTT calling based on representations from AT&T, without obtaining the names of AT&T's customers, evaluating those customers, or performing any independent research. *See Exhibit 4* (P. Pfautz Depo.) at 215:3–229:23. | Disputed. Dr. Pfautz did not assume 100 percent of AT&T's enterprise class customers had no OTT calling, but rather he looked at products that have the potential of having nomadic TN and found it was reasonable for AT&T to not bill end office on that category of calling. Exhibit S, Dr. Pfautz Depo., at 216:8-22 | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>There are two ways a Level 3 call can be OTT: (1) the call can delivered via a nomadic telephone number (*see MSJ Exhibit 29* (ECF No. 151-21) (McClure Dec.) ¶ 17, or (2) the customer can create scenarios such that the call can flow over a third-party connection (*id.* ¶ 18). To determine the latter, one must get customer specific information. *See, e.g.,* MUSUF ¶ 64. Level 3's factual assertion concerns the second point, but AT&T only addressed the first point. In so doing, AT&T confirmed the |

| | | factual assertion. |
|---|---|---|
| 68. | To calculate its percent OTT, AT&T only evaluated whether the customer had the ability to utilize "nomadic" telephone numbers, meaning make calls from various locations over a third-party internet connection. *See Exhibit 25* (A. McClure Responsive Disclosure) ¶¶ 3, 8; *Exhibit 4* (P. Pfautz Depo.) at 106:14–115:22, 118:5–120:10, 222:8–229:23. | Disputed. Dr. Pfautz did not assume 100 percent of AT&T's enterprise class customers had no OTT calling, but rather he determined that the way in which AT&T decided not to bill for services that could include nomadic TNs was a reasonable and conservative approach. Exhibit S, Dr. Pfautz Depo., at 216:8-22 | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>There are two ways a Level 3 call can be OTT: (1) the call can delivered via a nomadic telephone number (*see MSJ Exhibit 29* (ECF No. 151-21) (McClure Dec.) ¶ 17, or (2) the customer can create scenarios such that the call can flow over a third-party connection (*id.* ¶ 18). To determine the latter, one must get customer specific information. *See, e.g.,* MUSUF ¶ 64. Level 3's factual assertion concerns the second point, but AT&T only addressed the first point. In so doing, AT&T confirmed the factual assertion. |
| 69. | AT&T determined that only calls flowing over its BVoIP network could support nomadic telephone calling; as a result, it presumed calling over its traditional network was zero percent OTT. *See Exhibit 33* (J. Gallagher Depo. Vol. I) at 78:18–79:10. | Undisputed | |

| 70. | AT&T did not consider the business plan of any of its enterprise class customers, and whether they created the potential for OTT calling. *See Exhibit 25* (A. McClure Responsive Disclosure) ¶ 3; *Exhibit 4* (Pfautz Depo.) at 106:14–109:6. | Disputed. The cited material does not support MSUMF No. 70. Dr. Pfautz did not know whether AT&T considered the business plan of any of its enterprise class customers. Exhibit S, Dr. Pfautz Depo. at 106:14–107:17; Exhibit T, McClure Resp. Discl., at ¶ 3 (relying on Dr. Pfautz's deposition testimony). | While AT&T claims this assertion is disputed, AT&T's factual assertion confirms the point. AT&T is using Dr. Pfautz to confirm its method of calculating OTT percentage is reasonable (*see* MUSUF ¶ 71), and Dr. Pfautz has no idea whether AT&T evaluated individual customers or not, and Dr. Pfautz did not consider AT&T's individual customers either. *MSJ Exhibit 4* (ECF No. 152-5) (Pfautz Depo.) at 108:19–109:1. Thus, according to Dr. Pfautz, he need not know whether AT&T's customers create the potential for OTT calling before determining that AT&T's method for calculating its OTT percentage was reasonable. This is contrary to his method for analyzing Level 3. *Id.* at 109:7–113:9. |
| --- | --- | --- | --- |
| 71. | Dr. Pfautz—AT&T's expert—concluded that AT&T's method for determining percent OTT was reasonable. *Exhibit 30* (P. Pfautz Opening Report) ¶ 8. | Undisputed. | |
| 72. | Under Level 3's calculations: (a) AT&T is entitled to a credit for end office charges of ▮▮▮▮ through April 2020, and (b) AT&T has withheld over ▮▮▮▮ from Level 3 for the OTT dispute. *See Exhibit 28* (M. Kellow Dec.) ¶¶ 7–8. | Disputed. AT&T and Level 3 are currently in dispute over the total number of Level 3's end office billings to AT&T. *See* Exhibit O, AT&T Rule 26(e) Discl., at 2-3. Level 3 itself acknowledges that the damages calculation are in dispute. ECF 151-2, Level 3 Mot. For Sum. Jud. at 23 n.9 ("The parties are working on trying to resolve their differences in damages calculations."). Moreover, AT&T disputes the assumptions as to legal and factual issues that underlie Level 3's calculations. | Disputed. AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting **sufficient, contradictory evidence** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists. |

|   |   |   |
|---|---|---|
|   |   | While the parties are working through final damages numbers, AT&T cannot create a factual dispute with Exhibit O, which is not authenticated or sworn to and as a result, it cannot be used to support a factual assertion. *See* Fed. R. Civ. P. 56(c)(2); *Sherwin-williams Co. v. Performance Auto Body, Inc.*, No. EDCV1300428VAPSPX, 2014 WL 12558844, at *3 (C.D. Cal. Jan. 29, 2014) ("[U]nauthenticated [e]xhibits … cannot serve as evidentiary support for the factual assertions raised in SUF"). |
| | **AT&T Billed Level 3 End Office Charges on OTT Calls** | |
| 73. | When AT&T brought its claims against Level 3, it did not know whether it or TCG had any OTT traffic, and had not even started the process of reviewing its own practices to determine whether or not it was billing IXCs end-office charges on OTT calling. *Exhibit 11* (A. Burgess Depo.) at 227:14–228:3; *Exhibit 5* (K. Meola Depo.) at 318:14–15. | Disputed in part. AT&T did not have an easy way to determine which calls were placed using an AT&T broadband facility, and which calls were placed using a third party broadband connection. Exhibit W, Gallagher Dec., at ¶ 4. For these reasons, and because the volumes of traffic on these two products were relatively small, TCG elected to treat all of these calls for these two products as though they involved OTT VoIP calls. *Id.* TCG has since addressed the issue. *Id.* at ¶¶ 4, 5, 6. | AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.

Nothing A&T says in its OSUMF ¶ 73, or the supporting evidence, goes to AT&T's knowledge ***at the time AT&T brought its claims against Level 3***, or suggests any review of its own practices it performed to determine whether or not it was billing IXCs end office charges on OTT calling. Instead, it cites evidence as to what it did ***after*** Level 3 brought its counterclaims. In fact, in its response to Level 3's Motion, |

| | | |
|---|---|---|
| | | AT&T acknowledges elsewhere that it did not address this issue or make the election to treat the volume of calls as OTT until July 2019. *See* ECF No. 161-1 at 22; *see also* OSUMF ¶ 90. Level 3's MSUFM ¶ 73 is therefore undisputed. |
| 74. | From the outset of the case, when Level 3 alleged that either AT&T or its affiliates also assessed end-office charges on OTT calls, AT&T originally denied those allegations. *See* ECF No. 53 ¶¶ 13–14; ECF No. 86 ¶¶ 17–20; ECF No. 98-1 at 3. | Disputed. AT&T denied that AT&T Corp. assessed end-office charges on OTT calls. *See* ECF No. 53 ¶¶ 13–14; ECF No. 86 ¶¶ 17–20. AT&T Corp. does not assess end-office charges on OTT calls; rather, TCG, a separate entity, does. ECF No. 98-1 at 3. Level 3 did not add TCG as a party until June of 2019. *See* ECF. No. 98. | While AT&T claims this assertion is disputed, AT&T's factual assertion confirms the point. In its Counterclaims, Level 3 asserted that AT&T operates both as an IXC and a LEC (ECF No. 38 ¶ 9) and in that capacity assessed end office charges on OTT calls to IXCs including Level 3 (*id.* ¶¶ 13–14). AT&T made no distinction on the basis of the conduct of itself versus its affiliates; it simply denied that "it has acted as a LEC as relevant to the disputes in this case and thus denies the allegations." ECF No. 53 ¶¶ 13–14. In September 2018, Level 3 Amended its Counterclaims, asserting among other things that AT&T offers a cloud-based telephony service known as "███████████" which it describes as an "Over-The-Top solution" that "will work on any internet connection," and thus connects at least a portion of its traffic through third-party ISPs without providing the "last mile" of calls. ECF No. 84 ¶¶ 18–19. In October 2018, AT&T admitted that it offers a retail service known as ████████████, but denied the allegations regarding the description on the website, that it connected at least some calls through third-party ISPs, or that it assessed end office charges on such calls. ECF No. 86 ¶¶ 18–19. |
| 75. | Level 3's lawsuit and discovery prompted AT&T to learn that it had OTT calling on its network. *See Exhibit 11* (A. Burgess Depo.) at 224:23–225:25) | Disputed as to AT&T and undisputed that Mr. Burgess, who is on the "the cost side and not the product side or revenue side," was unaware that TCG billed end office charges on OTT. Exhibit L, Burgess Depo., at 225:2-25. | AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 |

| | | |
|---|---|---|
| | | F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>AT&T simply states, without offering any evidence to support its dispute, that it disputes Level 3's statement as to AT&T. Because AT&T provides no evidence to contradict Level 3's statement as to AT&T, it is undisputed that Level 3's lawsuit and discovery prompted AT&T to learn that it had OTT calling on its network.<br><br>In addition, the 30(b)(6) witness that AT&T and TCG designated to testify on their behalf regarding AT&T's OTT charges, Janice W. Gallagher, also acknowledges that she "learned in about 2019"—after this lawsuit began and Level 3 filed its Counterclaims—"that AT&T offered a product—known as ▮▮▮▮—that allowed AT&T's customers in at least some circumstances to place calls using broadband connections Ultimately, after an investigation into a number of VoIP products offered by AT&T, TCG learned of one other similar product, called ▮▮▮▮▮▮ or ▮▮▮ which allows callers to place OTT VoIP calls." Exhibit W ( ECF No. 167-23), Declaration of Janice Gallagher ¶ 3. Thus, even on the "product side or revenue side," AT&T and TCG learned that it had OTT calling on its network only after Level 3's lawsuit and discovery prompted it to so learn. |
| 76. | AT&T later found that TCG—the company that billed switched access charges for AT&T—was billing Level 3 end office switched access charges on two products: ▮▮▮▮▮▮▮▮. *See* | Undisputed to the extent that Level 3 is not arguing that AT&T is unable to bill end office switched access charges on | AT&T does not address the specific factual assertion set forth by Level 3. Pursuant to Fed. R. Civ. P. 56(c), D.C.COLO.LCivR 56.1(a), and this Court's Practice Standards, AT&T must cite to evidentiary support of its factual position that a particular |

| | | | |
|---|---|---|---|
| | *Exhibit 33* (J. Gallagher Depo. Vol. I) at 34:20–25. | ■■■■■■■ | MSUMF is the subject of genuine dispute. "This is done by presenting ***sufficient, contradictory evidence*** which, if presented at trial, would allow a jury to return a verdict in the responding party's favor." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002) (emphasis added). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)). AT&T has failed to identify sufficient, contradictory evidence supporting its dispute, and has thus failed to meet its burden of demonstrating that a genuine dispute exists.<br><br>In addition, the 30(b)(6) witness that AT&T and TCG designated to testify on their behalf regarding AT&T's OTT charges, Janice W. Gallagher, also acknowledges that she "learned in about 2019"—after this lawsuit began and Level 3 filed its Counterclaims—"that AT&T offered a product—known as ■■■■■—that allowed AT&T's customers in at least some circumstances to place calls using broadband connections Ultimately, after an investigation into a number of VoIP products offered by AT&T, TCG learned of one other similar product, called ■■■■■■■■ or ■■■ which allows callers to place OTT VoIP calls." Exhibit W ( ECF No. 167-23), Declaration of Janice Gallagher ¶ 3. Thus, even on the "product side or revenue side," AT&T and TCG learned that it had OTT calling on its network only after Level 3's lawsuit and discovery prompted it to so learn. |
| 77. | AT&T/TCG admits that ■■■ percent of calls on its BVoIP network constitutes OTT calling. *See Exhibit 34* (J. Gallagher Depo. Vol. II) at 129:14–18. | Disputed. While AT&T uses the ■■■ percent figure to generate credits, this figure likely overestimates the amount of OTT calling. Exhibit W, Gallagher Dec., at ¶¶ 4, 6. | Undisputed for purposes of this motion only. |

| 78. | In July, August, and September 2019, AT&T issued Level 3 other credits but did not specify what those credits were for. *See Exhibit 28* (M. Kellow Dec.) ¶ 9. | Disputed. In July, August, and September 2019, AT&T/TCG issued Level 3 credits for OTT calling. Exhibit W, Gallagher Dec., at ¶ 7. The credits were specified on TCG's bills, initially being labeled as "Adjustment Of VoIP Usage" under the "Detail of Adjustments" section for the July and August of 2019 bills and then labeled as "Adjustment Of VoIP Usage" under the "Detail of Other Charges and Credits" section for the September 2019 bills. *Id.* | Disputed in part. While AT&T has continued to provide some credits, Level 3's damages analysis shows that AT&T has not credited appropriate amounts. *See MSJ Exhibit 28* (ECF No. 151-19) (M. Kellow Dec.); *Exhibit 43* (M. Kellow Dec.) |
|---|---|---|---|
| 79. | Since September 2019, AT&T has not credited Level 3, Broadwing and Global Crossing anything for OTT calling. *See Exhibit 28* (M. Kellow Dec.) ¶ 10. | Disputed. AT&T/TCG has continued to credit Level 3, Broadwing and Global Crossing for OTT calling since September 2019 in a section of the TCG bill entitled "Detail of Other Charges and Credits," with a new label of "Adjustment Of ▬▬▬▬▬ Usage." Exhibit W, Gallagher Dec., at ¶ 7. | Disputed in part. While AT&T has continued to provide some credits, Level 3's damages analysis shows that AT&T has not credited appropriate amounts. *See MSJ Exhibit 28* (ECF No. 151-19) (M. Kellow Dec.); *Exhibit 43* (M. Kellow Dec.) |
| 80. | Level 3's interstate access tariff specifically requires customers to pay the invoices they receive unless they dispute the invoice, and must include in the dispute "[d]etails sufficient to identify the specific amount(s) and item(s) in dispute." *Exhibit 2* (Level 3 Interstate Access Tariff F.C.C. No. 4) §§ 2.1.3, 2.8.5, 3.1.1, 4.9(2). | Disputed. This paragraph contains characterizations and legal conclusions, not material assertions of fact. Undisputed as to the language in the tariff. AT&T properly disputed Level 3's charges—indeed, AT&T has been doing so since at least 2011. Exhibit B, Meola Depo., 75:12-76:2. | Undisputed for purposes of this motion only. |
| 81. | | Level 3 believed that the order on | Disputed. AT&T is misrepresenting the document. In deposition, |

| | | | |
|---|---|---|---|
| | | appeal became final in May 2017 when the time expired for Level 3 to appeal the D.C. Circuit decision. Exhibit X, Torres Depo. Exhibit 18, at CTL0002776, 2778 ("The [2015] Settlement specifically states that we credit ▇ of OTT up to the date it becomes final, which is May. It also says that we bill accordingly after the final date."; "May, 8, 2017 was the date the ruling became final and no longer subject to appeal[]") | Ms. Torres testified that AT&T had sent it an email identifying the final ruling as May 8, 2017. *See Exhibit 41* (Exhibit 17 to Torres Dec. 19, 2019 Depo.). Ms. Torres then explained that Exhibit 18—the exhibit referenced in AT&T's OSUMF—was to calculate the potential financial impact to Level 3 based on AT&T's assertion of when the ruling became final. *Exhibit 36* (Torres De. 19, 2019 Depo.) at 325:16–330:23. In deposition, Ms. Torres made plain that a final decision required a determination of how Level 3 was to bill on OTT traffic. *See, e.g., id.* at 233:10–234:5; 258:7–11; 259:19–260:6; 264:20–265:9; 274:6–18; 275:2–23. |
| 82. | | Andrew McClure's 2017 estimates of the OTT VoIP percentages of Level 3's customers are not verifiable by anyone at Level 3. *See* Exhibit Q, McClure Depo., at 207:12-21. | Disputed as contrary to the record evidence. Mr. McClure testified that his percentages were created in 2017, and there would be no way to verify the percentages in 2020 unless you used 2017 data and contacted the same people as he contacted in 2017. *See Exhibit 42* (June 11, 2020 Deposition of Andrew McClure) at 202:17–207:21. |
| 83. | | Andrew McClure did not retain any documentation or other records from his 2017 inquiry into Level 3's OTT VoIP percentages. Exhibit N, McClure Depo., at 60:21-61:22; Exhibit Q, McClure Depo., at 214:17–20 ("Q: Other than these tabs in the spreadsheet, did you create any other work papers in creating [your 2019 analysis]? A: No, I did not."). | Disputed—as noted in the very testimony AT&T cites, Mr. McClure kept a spreadsheet where he documented the customers' responses to his inquiries.<br><br>This fact is immaterial in any event, as Mr. McClure's 2017 inquiry does not factor into the 21-percent calculation of Level 3's OTT percentage. *See MSJ Exhibit 29* (ECF No. 151-21) (McClure Dec.) ¶¶ 17–22; ECF No. 159-1 (Declaration of Andrew McClure in Support of Level 3's Response to AT&T & TCG's Motion to Exclude Certain Testimony of Andrew McClure) ¶¶ 7–12 (describing in detail how Mr. McClure determined that "NULL" traffic was incapable of supporting |

| | | | |
|---|---|---|---|
| | | | OTT traffic). |
| 84. | | Mr. McClure's conceded that it was "completely fair" that since his 2017 analysis, the percentage of OTT VoIP traffic for "all" of the customers could have increased, even dramatically. Exhibit Q, McClure Depo., at 143:22-145:4; Exhibit N, McClure Depo., at 99:14-100:16. | Disputed. This portion of Mr. McClure's testimony does not refer to the OTT percentage for all Level 3's customers, considered collectively, much less suggest that the percentage of all Level 3's customers, collectively, increased (dramatically or otherwise). His testimony is that any one customer's OTT percentage could have gone up or down from what it was in 2017. *See* AT&T's Exhibit Q, McClure Depo., at 144:22–25.<br><br>This fact is immaterial in any event, as Mr. McClure's 2017 inquiry does not factor into the 21-percent calculation of Level 3's OTT percentage. *See MSJ Exhibit 29* (ECF No. 151-21) (McClure Dec.) ¶¶ 17–22; ECF No. 159-1 (Declaration of Andrew McClure in Support of Level 3's Response to AT&T & TCG's Motion to Exclude Certain Testimony of Andrew McClure) ¶¶ 7–12 (describing in detail how Mr. McClure determined that "NULL" traffic was incapable of supporting OTT traffic). |
| 85. | | Mr. McClure had no documentation to support any of the individual percentages for Level 3 customers, including for the many customers listed as ▇ OTT VoIP. Exhibit Q, ▇▇▇ Depo., at 107:5-9; 108:22-109:4; 114:13-21; 115:3-7; 140:19-141:2; Exhibit R, Dr. Pfautz Expert Rebuttal Report, at ¶ 27. | Disputed. *MSJ Exhibit 29* (ECF No. 151-21) ¶¶ 10–22 shows Mr. McClure evaluated each customer's OTT percentage again in 2020. Also disputed because this portion of Mr. McClure's testimony only discusses five individual Level 3 customers (▇▇▇▇▇▇▇▇), and does not support AT&T's assertion that Mr. McClure has no documentation for "any" of the individual percentages for Level 3 customers. Mr. McClure also reviewed information about ▇▇▇, determined that it is possible ▇▇▇ has some (though not 100 percent) OTT, but assumed it has 100 percent OTT nonetheless for purposes of summary judgment. *See MSJ Exhibit 29* (ECF No. 151-21) ¶¶ 14, 19. For ▇▇▇, Mr. McClure likewise assumed 100 percent of its traffic was OTT for summary judgment purposes. *See id.* |

| | | | |
|---|---|---|---|
| | | | ¶ 20(a). Mr. McClure evaluated ███ following his deposition and determined, based on the fact that it is not a telecommunications provider, that it is appropriate to list it as having zero percent OTT. *See id.* ¶ 13. He also reviewed information on ███ and determined that it is a traditional facilities-based provider using Level 3 telephone numbers. *See id.* ¶ 17(b). Finally, ███, which has more than 2.4 million minutes of traffic (*see* ECF No. 151-25 at 2), was included in Mr. McClure's re-evaluation of all of Level 3's customers with up to or more than 2.4 million minutes of traffic, which found (with one exception, for which Mr. McClure assumed 100 percent of its traffic was OTT), that each customer fell into a category for which the assumption of zero percent OTT was appropriate. *See id.* ¶¶ 17–18. |
| 86. | | Despite publicly available information about Level 3's customers showing that those customers appeared to have OTT VoIP traffic, Mr. McClure never re-examined his assumptions from 2017. Exhibit Q, McClure Depo., at 154:7-18, 204:10-25, 207:17-21. Mr. McClure admitted that he did not know if many of the numbers were accurate and he "guessed that it's probably not." *Id.* at 111:21-25 ("I don't know if that number is accurate, the ██. I would guess that it's probably not."); *see also id.* 125:18-127:6; 141:20-142:11; 147:11-148:18. | Disputed as contrary to the record evidence. As Mr. McClure's declaration states:<br><br>17. After my June 11, 2020 deposition, I went back and reevaluated all of Level 3's customers through Row 125 to Exhibit 2 to my disclosure, including all customers with up to or over ███ minutes of traffic. Customers below this level are so small that they do not meaningfully impact percentage OTT. In this review, with one exception, I found the following.<br>  a. The customers are enterprise class customers (i.e., ███ with no nomadic telephone numbers; or<br>  b. The customers are traditional facilities based providers (i.e., ███), using Level 3 telephone numbers; or<br>  c. The customers are wholesale (i.e., ███ ███) without any OTT capability. |

18. The exception is ███████████. In re-reviewing this customer, I have concluded that they are an OTT provider. I will assume that 100 percent of is ███████ traffic OTT. Upon making this correction, Level 3's OTT percentage stays at ██ percent.

19. Even if I assumed that one hundred percent of the traffic of ████████████ and █████████ was OTT, that would raise Level 3's OTT percent to ██ percent.

20. Furthermore, even if I assumed every possible doubt in AT&T's favor, Level 3's OTT traffic would still be a fraction of what AT&T claims it is. Specifically, if I assume the following percentages of traffic for the following categories of customers,

    **a. 100 percent** for all customers previously assumed to have at least ██ percent OTT or a larger percentage of OTT, plus █████████, and █████████;

    **b. 5 percent** for cable customers, an assumption which, as I explained in my deposition, is too high because they are facilities based providers principally serving residential customers, and even business customers use nomadic telephone numbers less than 2 percent of the time (*see* McClure 6-11-2020 Depo. at 109:14–110:5);

    **c. 2 percent** for █████████ is an exact calculation; and,

    **d. 0 percent** for all remaining customers, who are either enterprise class customers for whom AT&T agrees it is reasonable to assume zero percent OTT; wholesale customers whom I have evaluated to have 0 percent OTT; facilities-based carriers who use Level 3 telephone numbers; Level 3 entities known to have no OTT; or is identified as "NULL", which constitutes Level 3's network known to serve enterprise class customers and is incapable of having OTT or nomadic telephone numbers.

21. Making each of those assumptions, Level 3's percent OTT

| | | | |
|---|---|---|---|
| | | | would raise from ██ percent to ██ percent.<br><br>*MSJ Exhibit 29* (ECF No. 151-21) (A. McClure Dec.) ¶¶ 17–22.<br><br>In addition, AT&T's referenced testimony (111:21–25 ("I don't know if that number is accurate, the 0%. I would guess that it's probably not.") only concerns ██, which as stated above is presumed to be 100% OTT. The other deposition citations concern individual customers, which Mr. McClure addressed specifically in his declaration. *MSJ Exhibit 29* (ECF No. 151-21) (A. McClure Dec.) ¶¶ 10–16. |
| 87. | | Mr. McClure's methodology to determine Level 3's OTT percentage is deeply flawed for several reasons, including the failure to query customers during the period in dispute and the use of unreliable and undocumented "click-to-chat" sessions to estimate the OTT VoIP percentages of Level 3's customers. Exhibit Q, McClure Depo., at 59:13-62:2; Exhibit R, Dr. Pfautz Expert Rebuttal Report, at ¶ 27 ("Level 3's methodology is flawed, and I am not confident that it accurately depicts Level 3's OTT percentage."). | Disputed. Level 3's motion for summary judgment does not rely upon any of this evidence. It presumes all such customers are 100% OTT. *See* MUSUF ¶ 56 and RUSUF ¶ 86 (assume "**100 percent** [OTT percentage] for all customers previously assumed to have at least 16 percent OTT or a larger percentage of OTT, plus ████████, and ████████"). |
| 88. | | TCG has stopped billing end office access charges on over-the-top VoIP calls since July 2019. Exhibit W, Gallagher Dec., at ¶ 6. | Disputed. AT&T and TCG have understated its actual OTT volume. *See MSJ Exhibit 28-A* (ECF No. 151-20 (exhibit to Melissa Kellow Declaration calculating damages) at 5; *MSJ Exhibit 25* (ECF No. 151-16 (McClure Responsive Disclosure) ¶ 22. |
| 89. | | Level 3 has over-withheld payment of TCG's billed charges by withholding | Disputed in part. Level 3 paid all AT&T end office charges in |

| | | | |
|---|---|---|---|
| | | ▉ of TCG's and AT&T Corp.'s total end office switching and common trunk port charges (not just business VoIP products), even though TCG only has approximately ▉ OTT. Exhibit W, Gallagher Dec., at ¶¶ 8, 9. Level 3 began withholding this amount on or around August 2019. *Id.* at ¶ 8. | 2016–18. Level 3 admits that for a brief period of time starting in 2019, Level 3 withheld amounts from AT&T for local switching and common trunk port charges, and, for purposes of this motion, as of April 2020 had over-withheld approximately $394,000. This amount is already included in Level 3's damages analysis. *See MSJ Exhibit 28-A* (ECF No. 151-20) (exhibit to Melissa Kellow Declaration calculating damages) at 3. |
| 90. | | Even after TCG issued credits for approximately ▉ of end office charges for the periods prior to July 2019 and within the limitations period, Level 3 will need to pay TCG unpaid end office charges, and TCG will not need to pay any refund because the amount of Level 3's withholding exceeds the amount of any credit. Exhibit W, Gallagher Dec., at ¶¶ 8, 9. | Disputed in part. Level 3 paid all AT&T end office charges in 2016–18. Level 3 admits that for a brief period of time starting in 2019, Level 3 withheld amounts from AT&T for local switching and common trunk port charges, and, for purposes of this motion, as of April 2020 had over-withheld approximately $394,000. This amount is already included in Level 3's damages analysis. *See MSJ Exhibit 28-A* (ECF No. 151-20) (exhibit to Melissa Kellow Declaration calculating damages) at 3. Level 3 denies that no refund is owing, as AT&T owes it over $6.1 million excluding late payment charges. *Id.* |

Respectfully submitted this 3rd day of August, 2020.

By:    <u>/s/ Charles W. Steese</u>
Charles W. Steese, #26924
Douglas N. Marsh, #45964
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

*Attorneys for Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC*

## CERTIFICATE OF SERVICE

I, Charles W. Steese, hereby certify that on August 3, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael D. Warden
Michael J. Hunseder
Justin A. Benson
Joshua W. Moore
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mwarden@sidley.com
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com
E-mail: joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

/s/ Charles W. Steese
Charles W. Steese