# EXHIBIT 35

CONFIDENTIAL

Page 1

1         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2         CIVIL ACTION NO. 18-cv-00112-RM-MEH
3
     AT&T CORPORATION,                :
4                                     :
                 Plaintiff,            :
5                                     :
              vs.                      :
6                                     :
     LEVEL 3 COMMUNICATIONS, LLC,     :
7                                     :
                 Defendant.            :
8
9
10              Deposition of KIMBERLY MEOLA
11   taken in the above-entitled matter before
12   Suzanne J. Stotz, a Certified Court Reporter
13   (License No. 30XI00184500) and Notary Public of
14   the State of New Jersey, taken at the offices
15   of AT&T, One AT&T Way, Bedminster, New Jersey
16   07921, on Thursday, February 7, 2019,
17   commencing at 1:36 p.m.
18
19
20
21
22   Job No. CS3213054
23
24
25

CONFIDENTIAL

Page 2

```
 1    A P P E A R A N C E S:
 2
 3         SIDLEY AUSTIN, LLP
           BY:  MICHAEL J. HUNSEDER, ESQ., and
 4              JUSTIN A. BENSON, ESQ.
           1501 K Street, N.W.
 5         Washington, D.C. 20005
           (202) 736-8236
 6         (202) 736-8757
           mhunseder@sidley.com
 7         jbenson@sidley.com
           Attorneys for the Plaintiff
 8
 9
           ARMSTRONG TEASDALE, LLP
10         BY:  CHARLES W. STEESE, ESQ.
           4643 South Ulster Street, Suite 800
11         Denver, Colorado 80237
           (720) 200-0676
12         csteese@armstrongteasdale.com
           Attorneys for the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 203

1   next draft of refinements to your red log.
2            Do you see that?
3       A.   Yes.
4       Q.   Let's look at this language.  It's
5   Bates '211.  So --
6       A.   Yes.
7       Q.   And I'm looking at (i)(B), if you
8   will, (a)(i)(B); and there's language added
9   that says, "...which has historically- been
10  approximately sixty-five percent (65%) of
11  overall billing for end-office switching."
12           Do you see that?
13      A.   Yes.
14      Q.   So this language was added by
15  Level 3, correct?
16      A.   It appears that way.  It's blue.
17      Q.   Do you recall any specific requests
18  by AT&T to include this language?
19      A.   I remember the discussion that we
20  needed to get this done quickly.  The e-mail
21  talks about all the other things that were
22  going on.  And the reconciliation to bring this
23  current through the end of May was not
24  something that we could do quickly because the
25  billing is delayed a month.

CONFIDENTIAL

Page 204

1      And so there was a concept that we
2  had to -- we were going to settle what we knew,
3  and that was the payment in A.  And then B was
4  we were going to take the April -- it was April
5  and May.
6      Q.   And apply the 65-percent factor to
7  it, correct?
8      A.   And apply the 65-percent factor to
9  it, yes.  Which was intended to be -- you know,
10 everything in the past it was at a hundred or,
11 you know, we took the 75 percent of the
12 payment, which was 100 percent of the end
13 office.  But going forward, we were going to
14 use the 65 percent.
15      So that's -- it was being separated
16 out because that was the most current; and
17 that's what we were going to utilize as a
18 gauge.
19      Q.   Okay.  When you say "going
20 forward," you mean for April and May, correct?
21 April and May, before the June 1, 2015, date,
22 you were going to use a 65 percent for those
23 two months, correct?
24      A.   In this clause, yes; but the
25 conversation -- you asked me was there a

CONFIDENTIAL

Page 205

1  conversation.  Was this was the best number
2  that we had agreed upon.  And the conversation
3  was centered around we'll use it here; but if
4  we need it, you know, later, this is the
5  factor, which is why we didn't use 75 percent
6  here.  We used 65-percent OTT factor versus
7  total billing at 75 paid.
8       Q.   Who told you that?
9       A.   It was our ongoing discussion
10 between the teams.
11      Q.   You told me everything was
12 memorialized in writing.  I've seen nothing to
13 that effect.
14           What memorializes that in writing?
15      A.   I can't say that it was
16 memorialized in writing, but I think that was
17 the intent of this language, the fact that it
18 was separated out as two different time
19 periods.
20      Q.   Okay. Let's --
21      A.   The language was put into the
22 contract again.  This was provided by Level 3,
23 so I think that memorializes it.
24      Q.   But it doesn't saying anything
25 about going forward, does it?

CONFIDENTIAL

Page 206

1    A.    It doesn't say anything about going
2    forward, but this was specifically for the
3    going forward.  It was the portion that wasn't
4    billed yet.
5    Q.    For April and May billings?
6    A.    Yes.
7    Q.    But beyond May of 2015, does it say
8    we're going to apply 65 percent to that going
9    forward?
10   A.    Well, no, because the terms said we
11   were paying 100 percent.  The 65 would only be
12   applied if you had the appeal overturned.
13   Q.    Does it say that?
14   A.    It says that we will pay
15   100 percent, yes.  That's one of our terms.
16   Q.    No.  That wasn't my question.
17         Does it say the 65 percent is the
18   factor you're going to apply if you are
19   successful in having a final order?
20   A.    No, it does not say that here.
21   Q.    Okay.  And let's look at subfour,
22   the next page, the blue line.  It says, "...if
23   the OTT Declaratory Order is overturned in part
24   and not in whole, then Level 3 will only be
25   required to refund OTT charges to the extent

CONFIDENTIAL

Page 266

```
1        Q.    So what makes you say that for OTT
2   factor, it has to be agreed upon or you revert
3   back to 65 percent?
4        A.    What else would you use.  If you
5   don't have any other factor data, you use the
6   latest information that you have.  I'm not sure
7   what you're suggesting.
8        Q.    Isn't it true that Level 3 has been
9   providing you with data upon data upon data,
10  and you've just rejected the data?
11            MR. HUNSEDER:  Objection.
12            THE WITNESS:  No.  That's not
13       factual.  They've provided us a number to
14       say it's 15 percent, but they've given us
15       no justification for how it went from 65
16       to 15 percent or 14 percent or 46 percent
17       or 26 percent as it bounced all over the
18       place.
19            So there's been no data provided
20       behind that that would help us to validate
21       any of those numbers.
22  BY MR. STEESE:
23       Q.    So you feel you -- AT&T feels like
24  they can unilaterally just project that data
25  and say it's 65 percent?
```

CONFIDENTIAL

Page 267

1         MR. HUNSEDER:  Objection.  That
2     mischaracterizes the testimony.
3         THE WITNESS:  There's no data to
4     reject.  It hasn't been provided.
5  BY MR. STEESE:
6     Q.    I didn't ask that.  I didn't say
7  the data.  I said if when they provide you a
8  factor, unless there's data that you feel you
9  can justify or verify, you feel you can reject
10 it and say I'm not going to apply that.
11        MR. HUNSEDER:  Objection.
12    Mischaracterizes the testimony.
13        THE WITNESS:  I think it's
14    reasonable to believe if you have a
15    significant swing from 65 percent to
16    10 percent, 13 percent, yes, there should
17    be some validation of that.  Yes, I do.
18 BY MR. STEESE:
19    Q.    And to the extent --
20    A.    It's not the honor system.  It's
21 trying to figure out what the right answer is.
22    Q.    And to the extent that Level 3
23 pulled -- contacted it's customers, its
24 wholesale customers and that constituted
25 95 percent of their traffic and said what

CONFIDENTIAL

Page 268

1     percentage of your traffic is OTT and --
2          A.    That's what they said, yes.
3          Q.    And they gathered that data and
4     created a factor based upon what their own
5     customers told them, is that a reasonable
6     approach for creating a factor going forward?
7               MR. HUNSEDER:  Object to form.
8               THE WITNESS:  I don't know if
9          that's reasonable without any validation.
10         We don't have any fact and data to that.
11         It could mean anything.  I don't have a
12         way to validate that.
13    BY MR. STEESE:
14         Q.    Why do you have to have the ability
15    to validate it?
16              MR. HUNSEDER:  Objection.  Asked
17         and answered.
18              THE WITNESS:  It's significant
19         deviation from what was last agreed upon,
20         and it has a significant implication on
21         the payments.
22    BY MR. STEESE:
23         Q.    And so you believe AT&T can just
24    say, we know you did that.  We know you got
25    gathered the data but -- let me ask it this