# EXHIBIT 37

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
 3
 4    AT&T CORPORATION,            )   Civil Action No.
                                   )   18-cv-00112-RM-MEH
 5                                 )
                   Plaintiff,      )
 6                                 )
         -vs-                      )   DEPOSITION OF:
 7                                 )
      LEVEL 3 COMMUNICATIONS,      )   CRAIG ROBERT JOHN
 8    LLC,                         )
                                   )
 9                 Defendant.      )
                                   )
10
      _____
11
12
13              TRANSCRIPT of the stenographic notes of
14    the proceedings in the above-entitled matter, as
15    taken by and before LINDA M. JORRITSMA, a Certified
16    Court Reporter and Notary Public of the State of New
17    Jersey, held at the office of AT&T CORPORATION, One
18    AT&T Way, Bedminster, New Jersey, on Friday,
19    September 13, 2019, commencing at 10:51 a.m.
20
21
22
23
24
25    Job No. CS3495719
```

```
                                                         Page 2

 1   A P P E A R A N C E S:
 2    SIDLEY AUSTIN LLP
      BY: JUSTIN A. BENSON, ESQ.
 3        JOSH MOORE, ESQ.
      1501 K Street, N.W.
 4    Washington, DC 20005
      201-736-8757
 5    jbenson@sidley.com
      joshua.more@sidley.com
 6    Attorneys for Plaintiff
 7
      ARMSTRONG TEASDALE LLP
 8    BY: CHARLES W. STEESE, ESQ.
          DOUGLAS N. MARSH, ESQ.
 9    4643 South Ulster Street
      Suite 800
10    Denver, Colorado 80237
      720-722-7199
11    csteese@ArmstrongTeasdale.com
      dmarsh@ArmstrongTeasdale.com
12    Attorneys for Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25
```

John - by Mr. Marsh

Page 45

1    Q.    Anybody else?
2    A.    No, other than myself and my management.
3    Q.    And that's what I'm getting at.  Your
4  management, does that include anybody other than
5  Ardell?
6    A.    And whoever Ardell would have reported
7  to at the time, yes.  My management, I mean, the
8  chain of command.
9    Q.    Got it.  Understood.
10         Looking in the middle of that second
11 checkmark where it says, "AT&T estimates that at
12 least 65 percent of Level 3 Federal and State port
13 and local switching charges are associated with
14 Over-The-Top service provider volumes."
15   A.    Um-hum.
16   Q.    Do you see that?
17   A.    Yes.
18   Q.    Were you involved in coming up with that
19 65 percent estimate?
20   A.    Yes.
21   Q.    What did you do in helping come up with
22 that 65 percent estimate?
23   A.    We looked at the -- those entities that
24 provide Over-The-Top VoIP services, sell those to
25 consumers or businesses, and attempted to ascertain

John - by Mr. Marsh

Page 48

1   about how many providers you looked at during that
2   time frame?
3        A.    I'm going to say roughly ten.  That's my
4   recollection.  It could have been more, it could have
5   been less.  But my guess is roughly ten.
6        Q.    So let me just make sure I understand
7   the process.
8        A.    Um-hum.
9        Q.    So please correct me if I'm making
10  mistakes here.  But what I understood you to say is
11  you were looking for information from these providers
12  of OTT-VoIP and say, here are your telephone numbers,
13  you providers of OTT-VoIP.
14       A.    Yes.
15       Q.    And Level 3 has such-and-such percentage
16  of your telephone numbers.  Is that accurate?
17       A.    Yes.
18       Q.    And that's the data that you would use
19  to come up with this estimate that about 65 percent
20  of Level 3's traffic was OTT-VoIP.
21       A.    Yes.
22       Q.    Is there any other data that you used to
23  come up with that estimate?
24       A.    No.
25       Q.    So let me ask you this:  When you go

1   look for the telephone numbers that are owned by
2   Level 3, and for that many telephone numbers are
3   being provided to those OTT-VoIP carriers, what does
4   that tell you about the volumes of Level 3's
5   non-OTT-VoIP calls?
6              THE WITNESS:  Could you repeat the
7   question?
8              MR. MARSH:  Madam Court Reporter, could
9   you please?
10             (Whereupon, the court reporter reads as
11  requested.)
12       A.    Well, when you look at -- when you look
13  at these providers' websites, obviously you're only
14  looking at -- you're only attempting to ascertain to
15  whom Level 3 provides OTT service to.  It wouldn't
16  tell you anything particularly about non-OTT
17  services.
18       Q.    So for example, Level 3 -- I'm making up
19  this number, this isn't the right number.  Let's say
20  that Level 3 has 30 percent of Vonage's telephone
21  numbers.
22       A.    Um-hum.
23       Q.    But Level 3 might have zero other
24  telephone numbers, as far as that tells you.  It
25  might have the same number of telephone numbers as

John - by Mr. Marsh

Page 50

1   what it gave to Vonage.  It may have two or three
2   times more.  That won't tell us anything about
3   non-OTT-VoIP.  Correct?
4              MR. BENSON:  Object to form.
5       A.     The data wouldn't, but your question was
6   specifically about data.  And the data certainly
7   wouldn't, but I mean, that certainly wasn't the only
8   source of information that we had available to us.
9       Q.     And then that's what I'm getting at.
10  What is the other information you're looking at?
11      A.     The other information is discussions
12  that we had with Level 3 personnel at the time
13  relative to the percentage of the traffic that was
14  Over-The-Top VoIP.
15      Q.     Okay.  Discussions with Level 3
16  employees.  What else?
17      A.     There's nothing else.
18      Q.     Did you have those discussions with
19  Level 3 personnel?
20      A.     I was a part of discussions with
21  Level 3, yes.
22      Q.     What did they say that led you to
23  believe -- or that informed this estimate?
24             MR. BENSON:  Object to form.
25             MR. MARSH:  What's wrong with the form?

John - by Mr. Marsh

Page 53

1  answered.
2      A.    I don't recall if there's anything else,
3  no.
4      Q.    Now, these discussions with Andrea
5  Parentozzi and Matt Green -- did I get those names
6  right?
7      A.    Yes.
8      Q.    This is in regard to you raising the
9  concept of whether or not AT&T should have to pay
10 these charges.  Correct?
11     A.    I don't recall exactly what the context
12 of the discussion was, but that's probably -- that's
13 probably true.  But I, you know, we had many
14 discussions with Level 3, so I'm not going to say any
15 one discussion we discussed the dispute, or did we
16 just discuss the percentage of Over-The-Top VoIP, or
17 both.  I'm not -- I don't recall specifically what
18 the pattern of the discussion was because there were
19 so many of them.
20     Q.    So it's possible at least some of these
21 discussions, they would have been in the context of
22 AT&T raising a dispute saying, we don't think we have
23 to pay these charges --
24     A.    Yes.
25     Q.    -- either in whole or in part.