# EXHIBIT 40

Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3

4    AT&T CORPORATION,            ) Civil Action File No.:

5              Plaintiff,         ) 18-cv-00112-RM-MEH

6          vs.                    )

7    LEVEL 3 COMMUNICATIONS, LLC, )

8              Defendant.         )

9    _____)

10

11             NON-CONFIDENTIAL PORTION

12   CONFIDENTIAL ATTORNEYS' EYES ONLY BOUND SEPARATELY

13                   PAGE 148

14                PAGES 206-214

15

16        DEPOSITION OF PENN L. PFAUTZ, PH.D.

17                 VIRTUAL ZOOM

18             TUESDAY, APRIL 28, 2020

19

20

21   Reported by:

22   ASHALA TYLOR, CSR #2436, CLR, CRR, RPR

23   JOB NO. 4083362

24

25   PAGES 1 - 236

Page 2

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLORADO

3

4    AT&T CORPORATION,              ) Civil Action File No.:

5              Plaintiff,           ) 18-cv-00112-RM-MEH

6         vs.                       )

7    LEVEL 3 COMMUNICATIONS, LLC,   )

8              Defendant.           )

9    _____)

10

11

12

13

14

15

16        Deposition of PENN L. PFAUTZ, PH.D., taken via

17   Zoom videoconference commencing at 8:08 a.m. (PST), and

18   ending at 3:05 p.m., on Tuesday, April 28, 2020, before

19   Ashala Tylor, CSR No. 2436, RPR, CRR, CLR.

20

21

22

23

24

25

Page 3

1    APPEARANCES OF COUNSEL:

2    On behalf of Plaintiff:

3            SIDLEY AUSTIN LLP

4            BY:  JUSTIN A. BENSON, ESQ.

5                 MICHAEL J. HUNSEDER, ESQ.

6            1501 K Street, N.W.

7            Washington, D.C.  20005

8            202.736.8757

9            jbenson@sidley.com

10           mhunseder@sidley.com

11

12   On behalf of the Defendant:

13           ARMSTRONG TEASDALE LLP

14           BY:  CHUCK STEESE, ESQ.

15                DOUG N. MARSH, ESQ.

16           4643 South Ulster Street, Suite 800

17           Denver, Colorado  80237

18           720.200.0676

19           csteese@armstrongteasdale.com

20

21

22   Also Present:

23           Mark Hesse

24

25

1      Q.   So form -- I'm fast-forwarding and I'll

2  get back to this later.  But one of the issues that

3  you suggest is use data from Form 477s as the basis

4  for determining a customer's percent OTT, correct?

5      A.   That's correct.

6      Q.   But are you aware that AT&T subpoenaed

7  four of Level 3's customers for Form 477s?

8      A.   I am.

9      Q.   Are you aware that two of them said we

10  don't have Form 477s?

11      A.   I'm aware of that.

12      Q.   So the Form 477 is not going to exist for

13  certainly every customer that is potentially

14  providing OTT-esque service, correct?

15      A.   There's an interesting question there.

16          So in theory, any voice subscriptions

17  should be indicated on some party on 477.  Now, you

18  know, there may be complexities about who is

19  responsible for the 477 with respect to a particular

20  telephone number.  And there may be some cases where

21  it's hard to get a 477.

22          But in my mind, the fact that in some

23  cases there was a problem doesn't indicate that it

24  might be -- doesn't indicate that it would not be,

25  generally speaking, a viable technique.

```
                                              Page 75
 1        Q.   Okay.  In the future, I'm talking about --
 2        A.   I'm sorry, Chuck, I'm missing what you
 3   were saying.  I didn't quite hear it.
 4        Q.   Fair enough.  I said I'm not talking about
 5   theoretically.  I'm talking about what's available
 6   in the marketplace today.  Maybe the Form 477s down
 7   the road will -- there will be a process that is
 8   created that that becomes viable.  But today, there
 9   are many OTT subscriptions that are not delineated
10   on 477s, true?
11             MR. BENSON:  Objection.
12             THE WITNESS:  I don't know that.
13   BY MR. STEESE:
14        Q.   Do you know if they -- do you -- as you
15   sit here today, do you have any idea what percentage
16   of OTT subscriptions are or are not contained in
17   477s?
18        A.   I don't.
19        Q.   Are you finished?
20        A.   Yes.
21        Q.   Okay.  Do you know if it's more than
22   50 percent of the subscriptions?
23        A.   Since I don't have access to other
24   carriers' Form 477s, I can't comment on that.
25        Q.   Do you know if it's more than 40 percent?
```

Page 76

1          A.    Since I do not have access to carriers'

2     Form 477s, I cannot comment on that.

3          Q.    Do you know if it's more than 2 percent?

4          A.    Since I do not have access to carriers'

5     477s, I can't comment on that.

6          Q.    So as you sit here today, you don't know

7     if data contained in Form 477s today is or is not a

8     viable method for determining percent OTT, correct?

9               MR. BENSON:   Objection.

10              THE WITNESS:   What I know is that it

11    should be, and in some cases, it will definitely

12    work.   And that's why I suggested it in my report.

13    I have no evidence that anyone has data to the

14    contrary.

15    BY MR. STEESE:

16         Q.    Oh, yes, you do, because you know two

17    companies -- one of which is bandwidth.com, which is

18    one of the largest OTT providers in the nation --

19    that they don't submit Form 477s; you know that for

20    a fact, don't you?

21              MR. BENSON:   Objection.

22              Go ahead.

23              THE WITNESS:   So I -- yes, I know.   And I

24    sort of wonder to the degree that their TNs come

25    from Level 3, why Level 3 isn't filing a 477 for

Page 78

1          A.    Go ahead.

2          Q.    I'm sorry.  I thought you were finished.

3     Please.

4          A.    No, I am finished.

5          Q.    And so you don't know what percentage of

6     bandwidth.com's telephone numbers are associated

7     with Level 3 versus bandwidth's own TNs versus some

8     other carrier's TN, correct?

9          A.    I think that there was a number associated

10    with Level 3 in the spreadsheet.  Since I don't have

11    that -- you know, I'm not looking at that right now,

12    I can't tell you what that number was.

13         Q.    But that's in -- that's 2017 data as

14    opposed to 2019, which is what we're focused on,

15    correct?

16         A.    That was the data that was made available

17    to me at the time.  It's the only data about percent

18    Level 3 TNs that I have, so --

19         Q.    But my simple question is, so you know

20    that there is one large OTT provider, bandwidth.com,

21    that at least for some percentage of its OTT

22    subscriptions, there is no Form 477 filed with

23    respect to that, correct?

24         A.    I do.

25              MR. BENSON:  Object to form.

```
                                              Page 79
 1    BY MR. STEESE:
 2         Q.   And so you know that Form 477s alone are
 3    going to be inadequate to create percentage OTT
 4    factor, correct?
 5              MR. BENSON:  Objection.
 6              THE WITNESS:  Can I answer?
 7    BY MR. STEESE:
 8         Q.   Yes.
 9         A.   Yeah.  So I know they may be imperfect.  I
10    don't know whether they are inadequate.
11         Q.   And looking at -- you said data must be
12    verifiable.  If a Form 477 is not available and you
13    don't have the telephone numbers from your customer
14    identifying which TNs are or are not OTT, what
15    data -- what other data in your mind might be
16    verifiable?
17              MR. BENSON:  Objection.
18              Go ahead, Penn.
19              THE WITNESS:  So I haven't thought a lot
20    beyond that.  I think that in some of these cases
21    you will need to get data from customers, whether
22    that is via 477, which may be a generally acceptable
23    approach, although not perfect, or TN data, or some
24    other information that could be verified.  And I
25    can't say exactly what that was.  Perhaps you can
```

Page 80

1    query, ask for a certification of information.

2    BY MR. STEESE:

3        Q.   Okay.  So I was trying to get beyond TNs,

4    where you say OTT-specific TNs, and I'm trying to

5    get beyond the 477s.  And your answer talked about

6    both of them.

7             I'm saying, other than those two areas,

8    what other types of verifiable information could you

9    get?  And what you're saying is ask them for a

10   certification?

11       A.   That -- that would be, I guess, what's

12   left is asking a customer to certify, you know, what

13   their percentage of OTT is.

14       Q.   Is there anything else that you can think

15   of as you sit here?

16       A.   Not as I sit here.

17       Q.   And so if that category of information

18   would rely upon the customer providing you accurate

19   information as an input, that then would be put into

20   your system to determine when you could and could

21   not bill end office charges, correct?

22       A.   That's -- that's -- that's why we have

23   lawyers, to make sure that people stand behind the

24   assertions that they make.  And that, in principle,

25   I think entities have to have some information on

Page 94

1    meaning facilities out to their premises, et cetera,

2    by definition that means, as ordinary customers are

3    increasing, percent OTT is going down, correct?

4         A.   Assuming that the, quote, carrier

5    customers aren't also increasing in volume.  I

6    simply don't -- don't have information about those

7    trends.

8         Q.   And you know Level 3 does not have its own

9    direct OTT product because its Form 477 shows zero

10   OTT subscriptions, correct?

11        A.   That's my understanding.  I can't claim,

12   you know, intimate familiarity with Level 3's

13   product offer.

14        Q.   So if you look at Level 3's ordinary

15   business customers -- I want to ask a few questions

16   because if you look, for example, at paragraph 28.

17   We were there earlier.

18        A.   Right.  I'm going there.  Not there yet.

19             Okay.  Yes.

20        Q.   And paragraph 28 says, "It's my

21   understanding that, in December 2019, the FCC issued

22   another order this time stating that LEC could

23   assess end office switching charges only if the LEC

24   or its VoIP partner provides a physical connection

25   to the last mile facilities used to serve an end

Veritext Legal Solutions

800-567-8658                                              973-410-4098

Page 142

1    Q.   Okay.  Let's look at page 16 of

2   Exhibit 110, and you identify three companies:

3   Fuze, FreedomVoice, and Sorenson that had been

4   identified as zero percent OTT that, from your

5   perspective, should not be zero percent OTT,

6   correct?

7    A.   That is correct.

8    Q.   And I'm breaking the spreadsheet into two

9   buckets, if you will.  One, those that are below the

10  line, if you will -- they're all zeros -- and the

11  second is those above the line, those that have some

12  percentage of OTT.

13        Are you tracking with me, sir?

14   A.   Are you saying -- so you're sorting the

15  spreadsheet?

16   Q.   I'm not sorting it.  I'm just

17  differentiating into two buckets:  Those that had

18  some percentage OTT and those that were zero.

19   A.   Okay.

20   Q.   And so these are the three companies that

21  had zero that you took issue with, correct?

22   A.   Those are some of the -- those are --

23  those are some that I looked at that I thought there

24  was a clear issue with.  I won't say those are the

25  only ones that might have an issue.

```
                                            Page 143
 1        Q.   What other ones have an issue that were
 2    zero?
 3        A.   I don't particularly recall.  I mean, my
 4    interest was just in looking and seeing if there
 5    were things that sounded; so I can't give you a
 6    quantitative -- or name at this point particular
 7    other customers.
 8        Q.   And so they're -- your report does not
 9    identify any others, correct?
10        A.   No, it does not.
11        Q.   And so the only three that you align on
12    for purposes of your report are those three,
13    correct?
14        A.   Those are the ones that I'm relying on
15    for -- well, okay, depends on what -- what I'm
16    relying on it for.
17             I rely on those of examples that came back
18    that were listed as zero and there's reason to
19    believe that they're not a zero.  It's not the only
20    companies that identified deficiencies with.
21        Q.   That -- that -- I thought my question was
22    specific to those that were zero; so we're on the
23    same page.
24             I'll get to -- I'll get to 8x8 in a
25    minute.  I'm not excluding it.
```

Page 144

1      A.    All right.

2      Q.    So as you sit here today, can you identify

3    any other company that was identified at zero in his

4    2017 report that you thought should not be at zero?

5           MR. BENSON:  Objection.  Asked and

6    answered.

7           But go ahead, Penn.

8           THE WITNESS:  I can't point to any that I

9    can be sure about.  I also can't assert that these

10   are the only ones that may have a problem.

11          These were ones which it seemed clear to

12   me there was -- was an issue based on just a cursory

13   look at them.

14   BY MR. STEESE:

15      Q.    Okay.  In looking at Mr. McClure's

16   March 2020 spreadsheets, did you identify any

17   companies other than Fuze, FreedomVoice, or Sorenson

18   that were at zero in that document that you thought

19   should not be at zero?

20      A.    So I haven't really done an exhaustive

21   analysis of that document at this point.

22      Q.    That wasn't my question, if you've done an

23   exhaustive analysis.

24          My question is, have you identified any

25   that were at zero that you thought should not be at

Page 145

1    zero other than the three that are in your -- this

2    document?

3         A.   I can't recall having done so.

4         Q.   Have you done any research from the time

5    you got Mr. McClure's March 2020 spreadsheet until

6    now to look at any of the companies that are

7    identified at zero in that spreadsheet that you had

8    not previously researched and identified in

9    Exhibit 110?

10        A.   I may have looked at some -- I'm sorry.

11        Q.   You can go.  Please proceed.

12             MR. BENSON:  Did you freeze, Penn?

13             THE WITNESS:  Am I frozen?

14             MR. BENSON:  Okay.  Yeah.  There was no --

15   I'm sorry.  Maybe the court reporter should read

16   that back, but go ahead.

17             (Off the record discussion.)

18                    (The record was read by the

19                     court reporter, as requested)

20             THE WITNESS:  I may have.

21   BY MR. STEESE:

22        Q.   And what do you recall doing?  Name

23   companies by name, please.

24        A.   I don't recall any.

25        Q.   Not even one?

Page 146

1      A.    No.

2      Q.    Do you recall identifying any others,

3  while you can't remember their name, that you

4  thought had problems like any of those you

5  identified with Fuze, FreedomVoice, and Sorenson?

6      A.    I think there might have been one or two

7  that were questionable.  Again, I didn't come to a

8  conclusion.

9      Q.    Even if you didn't come to a conclusion,

10  identify those that you have questions about.

11      A.    I can't recall any particular names at

12  this point.  I did not spend a lot of time doing

13  that.  I was more trying to understand the details

14  of the new spreadsheet.

15      Q.    And then looking at now what I -- I call

16  below the line is zero, above the line is some OTT.

17  (Indicating.)

18          So the company you identified as having a

19  concern about that Mr. McClure identified as having

20  some OTT is 8x8 where Level 3 identified it as

21  75 percent and you thought it should be 100 percent,

22  correct?

23      A.    That's correct.

24      Q.    And you based that on the 477s that AT&T

25  obtained via subpoena in this case, correct?