IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

    Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

    Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

    Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

    Counterclaim Defendant.

**SURREPLY TO AT&T & TCG'S MOTION TO
EXCLUDE CERTAIN TESTIMONY OF ANDREW McCLURE**

Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), respectfully submit this Surreply in opposition to the Motion of AT&T and TCG (collectively, "AT&T") to Exclude Certain Testimony of Andrew McClure (ECF No. 141).

AT&T either misunderstands or misrepresents Mr. McClure's opinions, especially insofar as he testifies that, even after construing every possible doubt in AT&T's favor, the percentage of Level 3's OTT traffic could be no higher than ▮. Level 3 submits this surreply

in order to correct the clear inaccuracies contained in AT&T's reply brief.

I. ARGUMENT

AT&T claims its disputes "affect the vast majority of the end office minutes charged to AT&T." ECF No. 175 at 3. In reality, AT&T only raises two issues affecting a limited amount of charges: (1) the process by which Mr. McClure reached out to customers in 2017 to identify their OTT percentage, and (2) the purported absence of explanation for testifying that "NULL" traffic is 0% OTT. AT&T's description of both of these issues is demonstrably wrong.

A. AT&T'S CHALLENGES ON MR. MCCLURE'S 2017 DATA-GATHERING PROCESS GO TO ONLY A SMALL FRACTION OF THE CHARGES AT ISSUE, AND DO NOT FACTOR INTO THE ▮ CALCULATION AT ALL.

On the first issue, AT&T fundamentally misunderstands the limited impact of Mr. McClure's 2017 analysis on his 2020 calculations, apparently believing that Mr. McClure used information from click-to-chat sessions to estimate the OTT percentage on "each Level 3 customer." ECF No. 175 at 4; *see also id.* at 9 (claiming the ▮ calculation is based on "little more than a euphemism for McClure's reliance on the same unverifiable 2017 click-to-chat sessions"), 14 ("McClure's methodology for determining Level 3's current OTT-VoIP percentage relies solely on the unverifiable hearsay gathered in 2017"). That is just not true. In fact, the ▮ figure does not use any data from 2017 at all.[1]

---

[1] Indeed, even in 2017 Mr. McClure did not contact every Level 3 customer. Specifically, in 2017, Mr. McClure's first step was to investigate the customers volume by "looking at the[ir] website" and "trying to determine if . . . they had some sort of application-based [nomadic] capability." *Exhibit B* (McClure 2020-06-11 Dep.) at 106:12–20 (note that the word "nomadic" appears in the transcript as "pneumatic," but "nomadic" was the actual word used in the deposition). If the web search showed the customer had some sort of nomadic capability, he would have "reached out to them" and "asked for what percentage of their customers work remotely" to determine their OTT percentage. *Id.* at 125:22–126:10. If this initial web search did not suggest the customer had some sort of nomadic capability (or suggested that the customer

2

Mr. McClure described in detail how he calculated the ▮ figure in his recent declaration, ECF No. 151-21. As shown therein, Mr. McClure analyzed each and every Level 3 customer that had up to ▮ million minutes of traffic, and if that customer could carry any OTT traffic, with a few exceptions,[2] Mr. McClure assumed the customer was 100% OTT. ECF No. 151-21 ¶¶ 17–21. In contrast, the chart in AT&T's Reply brief only considers customers with ▮ million minutes or more. ECF No. 175 at 3–4. Thus, in 2020, Mr. McClure individually analyzed each customer in AT&T's chart and many more.

As Mr. McClure explained in his Declaration, Mr. McClure's individual analysis of Level 3's customers placed each customer into one of eight categories:

1. Cable customers, for which Mr. McClure assumed a ▮% OTT factor (a number AT&T does not challenge, and which is too high anyway). ECF No. 151-21 ¶ 20(b).

2. ▮▮▮▮▮▮, for which Mr. McClure assumed a ▮% OTT factor. *Id.* ¶ 20(c). AT&T expressly accepts that calculation. ECF No. 175 at 6.

3. Other enterprise class customers. *Id.* at 20(d). As noted below, AT&T itself agrees it is appropriate to bill end office charges on calls from enterprise customers, and Mr. McClure confirmed that these customers have essentially no nomadic telephone numbers (and thus, no OTT).

4. "NULL" traffic, which constitutes Level 3's network known to serve enterprise class

---

was an OTT provider), rather than reach out to the customer, he would insert 0% or 100%, respectively, for OTT. *See, e.g., id.* at 126:10–18, 185:9–22. As shown herein, this is also what he did in his 2020 analysis, with the exception that, rather than reach out to the individual customers, Mr. McClure assumes a 100% OTT factor for all of the customers that have OTT-capable products.

[2] The exceptions are cable companies and ▮▮▮▮▮▮, as Mr. McClure explained in his Declaration. ECF No. 151-21 at 20(b), (c).

customers and is incapable of having OTT or nomadic telephone numbers. *Id.* ¶ 20(d).

5. Traditional facilities-based carriers that use Level 3 telephone numbers. *Id.* AT&T's own expert agreed that there is no concern or evidence that traffic to these customers is OTT. *See Exhibit A* (Pfautz Dep.) at 131:24–131:12; 168:15–19, 169:17–18.

6. Level 3 entities, which Level 3 knows have no OTT traffic. ECF No. 151-21 ¶ 20(d).

7. Wholesale customers, which Mr. McClure analyzed by looking at their web sites and, if they did not offer products with OTT capability, inserted a 0% OTT factor. *Id.*

8. All remaining customers, including each customer Mr. McClure contacted in 2017 and which stated they had some OTT traffic. For each of these, Mr. McClure assumes for summary judgment purposes an OTT factor of 100%. *Id.* ¶ 20(a).

9. There is arguably a ninth category, comprising the roughly 1% of calls for which there is a "broken call record" and it is uncertain which customer owns that telephone number. *See Exhibit B* (McClure 2020-06-11 Dep.) at 85:2–21, 138:20–140:22. For that reason, none of the data Mr. McClure gathered in 2017 pertains to this traffic, and nowhere in AT&T's Motion or Reply does it challenge the categorization of these calls at 0%.

Thus, the data-gathering process that forms the basis of AT&T's complaints plays no role in the ▮% calculation. For each customer to which Mr. McClure reached out in 2017, if they told him they had the potential to carry any OTT traffic, the ▮ OTT calculation is premised on 100% of their traffic being OTT.[3] For all other customers, Mr. McClure analyzed them individually

---

[3] AT&T claims "neither Level 3 nor McClure provide any legitimate reason for failing to even attempt to gather evidence regarding Level 3's customers' current OTT-VoIP percentage." ECF No. 175 at 5. However, Mr. McClure's assumption, for summary judgment purposes, that these customers' traffic is entirely OTT is much more favorable to AT&T.

4

*again*, and if they could carry OTT traffic, the ▇ factor is premised on the assumption that 100% of their traffic is OTT. The 2017 data does not impact this calculation at all; any purported flaws in that data are assumed away in AT&T's favor.

AT&T claims that Mr. McClure did not explain how he was able to make an "exact calculation" for Wells Fargo, or why he didn't make such an "exact calculation" for other enterprise class customers. ECF No. 175 at 7. This too is simply wrong. As he explained in his deposition, Mr. McClure calculated ▇▇▇▇▇ calling was OTT because ▇ of its telephone numbers were nomadic. *See Exhibit B* (McClure 2020-06-11 Dep.) at 155:11–17. For all other enterprise class customers, Mr. McClure explained that they were assigned a 0% factor because they had essentially no nomadic telephone numbers:

> Q. … Then going back to Exhibit 69, number 2, so the adjustment that you described there of using a percentage of mobility base deployed TNs, did you do that for all enterprise customers or just for ▇▇▇▇?
>
> A. I did that for the top 100 customers. There is some very small ones if I—that may not have showed up as anything greater, just because it was below .5%. So they could have been rounded down. But, in general, the assumptions were still the same with mobility TNs that we had for the original document which was when a TN was—had the capability for [nomadic] use, I assigned 100% OTT to the traffic for that TN. Now, that is most likely not true, but I think that that is a conservative way to approach that.
>
> Q. Let me just understand because I am not sure I am following.
>
> A. Sure.
>
> Q. For any of the enterprise customers that are listed in Exhibit 63, you examined whether they had mobility based TNs?
>
> A. I took the telephone numbers for enterprise customers and bounced them to our billing system to see if it had mobility. If they had mobility, they were marked as so, and then the usage that those TNs had would have been marked as OTT. In some cases, it wasn't enough to change the percentage even though they had a mobility TN. The TN might not have made, you know, ten calls or 100 calls a month and didn't register. So there is some, you know, obviously, we are going to

5

>  dollars here so when you are talking about small volumes of TNs making telephone numbers, likely it doesn't round to a dollar.

*Id.* at 156:25-158:16. AT&T acknowledges that end office charges are appropriate for calls to enterprise class customers, unless the telephone number is nomadic. ECF No. 175 at 6; ECF No. 152-5 (MSJ Ex. 4—P. Pfautz Depo.) at 47:10–49:25. Mr. McClure calculated OTT percentage for enterprise customers using this very assumption, treating traffic on numbers with no nomadic capability as being 0% OTT. Thus, AT&T's claim that he did not consider whether other enterprise class customers had any OTT traffic is inaccurate.

AT&T claims that merely referencing its chart of Level 3's top 25 customers to disprove Level 3's statement that the percentages Mr. McClure obtained from customers in 2017 had effectively no impact on Level 3's percent OTT. ECF No. 175 at 6. But when one correctly understands how Mr. McClure calculated the ▮% figure, the opposite is true. AT&T's chart is reproduced on the following page, with an additional column referencing the nine different categories described above:

6



\* Mr. McClure assumed this customer to have 100% OTT for purposes of his ▇% calculation. *See* ECF No. 151-21 ¶ 20(a).[4]

Again, the only category of customer Mr. McClure would have contacted in 2017 is #8—but instead of contacting them again or relying on the information they provided in 2017, he simply assumed they have 100% OTT calling. Thus, for purposes of the ▇% calculation, AT&T's claim that Mr. McClure continues to rely on the 2017 data (*see* ECF No. 175 at 5) is

---

[4] Notably, when one adds the end office minutes for each entity assumed to have 100% traffic and the prorated portion of end office minutes for entities assumed to have at least some OTT, the collective percentage of OTT volume for Level 3's top 25 customers is less than 23%. This number declines to 21 percent after taking into consideration Level 3's customers with more than ▇ million minutes of traffic but less than ▇ million minutes of traffic, as there are more enterprise class customers in this group.

false—as is its claim that this issue is "applicable to the vast majority of the end-office minutes billed to AT&T." *Id.* at 6. The 2017 data—the cornerstone of AT&T's *Daubert* motion—would come into play only if necessary to determine Level 3's OTT percentage between the range of ▮% and ▮%. Here, Level 3 assumes this issue entirely in AT&T's favor and even bases its damages calculation on this higher percentage. AT&T's complaints about the 2017 are utterly immaterial to the ▮% calculation.

**B.     MR. MCCLURE EXPLAINED IN DETAIL WHY "NULL" TRAFFIC IS 0% OTT.**

AT&T also maintains its complaints as to the categorization of "NULL" traffic, which constitutes approximately 27% of the minutes of use for which Level 3 assessed AT&T end office charges. *See* ECF No. 151-25 (MSJ Ex. 32—Exhibit 2 to Level 3's Rule 26(a)(2)(C) Disclosure). But AT&T's only complaint as to this "NULL" traffic is the notion that Mr. McClure supposedly has not provided supporting documentation. *See* ECF No. 9–10. It offers no substantive challenge either to Mr. McClure's opinion or the method by which he arrived at it—except, possibly, to question whether it is appropriate to assume that enterprise customers have no OTT, which is an assumption AT&T not only approves but also makes in evaluating its own traffic. *See* ECF No. 152-5 at 47:10–49:25, 215:3–229:23; *see also* ECF No. 159 at 5 n.5.

AT&T's challenge is wrong in any event. Both in his deposition and as part of Level 3's response to AT&T's *Daubert* motion, Mr. McClure explained in full detail how he determined that the "NULL" traffic could not include OTT traffic. *See* ECF No. 159-1 (McClure Dec.) ¶¶ 8–12, 159-2 (Exhibit A to McClure Dec.—excerpts of 2020-06-11 McClure Deposition) at 82:25–91:17. This analysis, as Mr. McClure explained, involved running searches or "queries" against Level 3's database, a process that was "easily repeatable." ECF No. 141-3 at 88:22–89:6. This

process revealed that the "NULL" traffic came from network trunk groups associated with older legacy Level 3 networks, incapable of OTT traffic not only because they serve enterprise-class customers but also because they are TDM circuit-switched networks. ECF No. 159-1 ¶¶ 8–9. TDM, or "time-division multiplexing," is a type of telephony protocol distinct from VoIP (or "Voice over Internet Protocol"), of which OTT calls are a subset; thus, the TDM switches cannot carry OTT traffic. To clarify this technical discussion, Mr. McClure also provided a declaration, which explains these facts in a more easy-to-understand fashion. ECF No. 159-1 (McClure Dec.) ¶¶ 8–12. This is more than enough information to show Mr. McClure's methods and establish that he has "reliably applied" "reliable principles and methods" to the "facts of the case" such that his opinions on the NULL traffic being 0% OTT may be admitted.[5]

## II. CONCLUSION

Mr. McClure's analysis is the only evidence anyone has tried to put forward on Level 3's actual OTT percentage. AT&T's challenges to that analysis, when correctly understood, affect the calculation by only a few percentage points, and do not affect at all the conclusion that Level 3's OTT percentage cannot be higher than 21%. His opinions are relevant, reliable, and useful.

Respectfully submitted this 5th day of August, 2020.

By:   /s/ *Charles W. Steese*
Charles W. Steese, #26924
Douglas N. Marsh, #45964
Armstrong Teasdale LLP

---

[5] As Level 3 noted in its Response, "[t]his District has accepted expert testimony in almost an identical circumstance in the past without issue or concern." ECF No. 159 at 14 (citing *Manchester Place HOA, Inc. v. Owners Ins. Co.*, 2017 WL 11096225, at *3–4 (D. Colo. 2017) (expert who "did not keep any record of the particular line items on which he excluded pricing information from a particular database" nevertheless "established that he used reliable principles and methods to develop his opinion" by stating he made his determination "using a database he considers to be reliable"). AT&T did not even cite this case, let alone attempt to address it.

                                4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

*Attorneys for Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC*

10

**CERTIFICATE OF SERVICE**

  I, Charles W. Steese, hereby certify that on August 5, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

  Rebecca B. DeCook
  Andrew T. Flynn
  Moye White LLP
  1400 16th Street, 6th Floor
  Denver, CO 80202-1027
  becky.decook@moyewhite.com
  andrew.flynn@moyewhite.com

  Michael D. Warden
  Michael J. Hunseder
  Justin A. Benson
  Joshua W. Moore
  SIDLEY AUSTIN LLP
  1501 K ST NW
  Washington, DC 20005
  Telephone: (202) 736-8000
  E-mail: mwarden@sidley.com
  E-mail: mhunseder@sidley.com
  E-mail: jbenson@sidley.com
  E-mail: joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

                /s/ *Charles W. Steese*
                Charles W. Steese