# EXHIBIT 2

Page 1

1             UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

    _____
3                                    )
    AT&T CORP.,                      )
4                                    )
    Plaintiff,                       )
5                                    )
    vs.                              ) Case No.
6                                    ) 18-cv-00112-RM
    LEVEL 3 COMMUNICATIONS,          )
7   LLC,                             )
                                     )
8   Defendant.                       )
    _____)
9
10
11
                    ** CONFIDENTIAL **
12
13
14      30(b)(6) DEPOSITION OF LEVEL 3 COMMUNICATIONS
15           THROUGH ITS DESIGNATED REPRESENTATIVE
16                      JENNIFER TORRES
17                     Denver, Colorado
18                     August 28, 2019
19
20
21
22
23  Reported by:
24  MELANIE L. GIAMARCO, RMR, CRR, RPR, CSR
25  JOB NO.:  166465

CONFIDENTIAL

Page 2

1              J. Torres

2            August 28, 2019

3              9:43 a.m.

4

5       30(b)(6) DEPOSITION OF LEVEL 3

6  COMMUNICATIONS THROUGH ITS DESIGNATED

7  REPRESENTATIVE JENNIFER TORRES, taken by the

8  Plaintiff, held at the law offices of Moye White,

9  1400 Sixteenth Street, 16 Market Square, Denver,

10 Colorado, before Melanie L. Giamarco, a Registered

11 Professional Reporter, Registered Merit Reporter,

12 Certified Realtime Reporter and Notary Public of

13 the State of Colorado.

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

1                J. Torres
2    APPEARANCES:
3    SIDLEY AUSTIN
     Attorneys for Plaintiff:
4         1501 K Street, N.W.
          Washington, D.C. 20005
5    BY:  JUSTIN BENSON, ESQ.
          MICHAEL WARDEN, ESQ.
6
7    ARMSTRONG TEASDALE
     Attorneys for Defendant:
8         4643 South Ulster Street
          Denver, Colorado 80237
9    BY:  CHARLES STEESE, ESQ.
          DOUGLAS MARSH, ESQ.
10
11
     ALSO PRESENT:
12
          Carmel Gill, CenturyLink
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 9

1              J. Torres

2           P R O C E E D I N G S

3             JENNIFER TORRES,

4  after having been first duly sworn in the above

5  cause, was examined and testified as follows:

6                EXAMINATION

7  BY MR. BENSON:

8       Q.  Good morning, Ms. Torres.  My name is

9  Justin Benson with the law firm of Sidley Austin,

10 LLP.  I sit in Washington, DC.  With me today is my

11 colleague, Mike Warden, who is also with the law

12 firm of Sidley Austin.  I, along with Mike,

13 represent AT&T and TCG, which is Teleport

14 Communications Group, in a lawsuit which Level 3

15 filed here in the District Court of Colorado.

16      Do you understand that you're now under

17 oath?

18      A.  I do.

19      Q.  Okay.  Do you understand that your

20 testimony here today is the same as if it were in

21 court?

22      A.  I do.

23      Q.  Have you ever given a deposition or

24 other testimony under oath?

25      A.  I have not.

CONFIDENTIAL

Page 53

1          J. Torres

2          Q. And so Level -- AT&T was not paying for
3  65 percent of the invoices that were being sent by
4  Level 3. Is that what was happening?
5          A. There was much more short-paid balances
6  than just that. AT&T was very good at short-paying
7  invoices and not being clear about why they were
8  short-paying invoices.
9          When we were settling this OTT topic, we had
10 been told on a couple occasions via a written
11 letter that AT&T was short paying 65 percent for
12 OTT. So the 65 percent was what we were assuming
13 some of the short-paid balances were towards OTT in
14 the amount of 65 percent. There were other
15 outstanding balances that AT&T had not paid as
16 well.
17         Q. But for other disputes?
18         A. We didn't know. We didn't have disputes
19 filed, and so, to us, it was just a short-paid
20 balance in whole.
21         Q. So how -- I just want to ask a direct
22 question.
23         How did Level 3 arrive at the 65 percent?
24 And I may know the answer, but just say.
25         A. We arrived at 65 percent because that

CONFIDENTIAL

Page 54

1         J. Torres
2  was the dispute we received from AT&T that we need
3  to be able to settle.
4         Q.  So Level 3 accepted the 65 percent that
5  had been proposed by AT&T?
6         A.  Level 3 used the 65 percent as a
7  framework to know what settlement had to be based
8  off so we could tell AT&T how much money had to be
9  paid to close out this dispute.
10        Q.  You mentioned a written letter.  Can you
11 give a little detail about that?
12        A.  There was a letter received from Level 3
13 by AT&T informing us that there was an OTT dispute,
14 and that they were estimating that 65 percent of
15 our traffic was OTT in nature.
16        Q.  I just want to make sure.
17        Level 3 received the letter that was from
18 AT&T?
19        A.  Correct.  Yes.
20        Q.  Do you know when that letter was
21 received?
22        A.  That was the original information that
23 we received in that 2011-2012 time frame.
24        Q.  Have you seen that letter recently?
25        A.  I believe it was one that I did look at

CONFIDENTIAL

Page 55

1                    J. Torres

2      in my e-mails.  I don't recall which setting and

3      where I looked at it, but I did look at it briefly.

4           Q.  Do you know who it was from?

5           A.  I do not recall the name of who it was

6      from.

7           Q.  Do you know who it was addressed to at

8      Level 3?

9           A.  I do not.

10          Q.  So in agreeing to the historical

11     approximate 65 percent of overall billing for

12     end-office switching, did Level 3 consider any

13     data?

14          A.  The data used was the short-paid

15     balances along with the information from AT&T that

16     65 percent of the short -- their estimate was 65

17     percent over traffic was for AT&T, and they were

18     paying that amount of the invoices.  That was the

19     data used.

20          Q.  So no internal Level 3 call data?

21          A.  The call data won't have any type of

22     weight on what AT&T is short paying.

23          Q.  Okay.  So we can discuss that in a bit,

24     but so -- but did Level 3 review any call data,

25     whether it's helpful or not?

CONFIDENTIAL

Page 113

1                  J. Torres

2 trying to make sure I have it straight in my

3 mind -- you added that language because AT&T had

4 said that it was 65 percent?

5        MR. STEESE: Objection; form.

6        A. AT&T had historically been disputing 65

7 percent of our end-office charges as OTT, yes.

8        Q. And so Level 3 added the language into

9 the document because of AT&T's disputes?

10       A. We added the language for settling the

11 one-month period that this particular paragraph is

12 referencing in alignment with AT&T's past behavior

13 so that AT&T knew exactly how much we expected for

14 payment on this one month, yes.

15       Q. So it had no basis in fact as to what

16 Level 3's OTT percentage of its total traffic was?

17       A. Correct.

18       Q. When is the first time that Level 3 came

19 to the view that the source of the 65 percent

20 number was AT&T and not Level 3?

21       A. The initial onset of the communication

22 of AT&T to Level 3.

23       Q. So back in the 2011-2012 time period?

24       A. Yes.

25       Q. Who at Level 3 had that view?

CONFIDENTIAL

Page 181

1   J. Torres
2   anywhere from that 26 percent number down,
3   depending on what direction and what time you're
4   looking at it.
5        Q.  I think we're done with this document,
6   Ms. Torres.  You can set it aside.
7        MR. BENSON:  I'm now going to have the next
8   document marked by the court reporter.
9        And please show this to the witness.
10       (Exhibit 23 was marked for identification.)
11       Q.  Ms. Torres, you've been shown what's
12  been marked as Level 3 Exhibit 23.  You'll see that
13  it's an e-mail from yourself, dated November 1st,
14  2017, and it's to Ms. Meola, Mr. Burgess and
15  Ms. Miller.
16       The subject line is "OTT Proposal
17  Information"; is that correct?
18       A.  Yes.
19       Q.  It's a short e-mail.  Why don't you just
20  take a moment to review it.
21       A.  (Document reviewed.)
22       MR. STEESE:  I'll have a standing objection
23  on this exhibit.
24       MR. BENSON:  Again, AT&T disagrees with the
25  objection, but we'll note it.