# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| AT&T CORPORATION, ) | Civil Action No. |
| ) | 18-cv-00112-RM-MEH |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | DEPOSITION OF: |
| ) | |
| LEVEL 3 COMMUNICATIONS, ) | ALISON MILLER |
| LLC, ) | |
| ) | |
| ) | |
| Defendant. ) | |

_____

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before LINDA M. JORRITSMA, a Certified Court Reporter and Notary Public of the State of New Jersey, held at the office of AT&T CORPORATION, One AT&T Way, Bedminster, New Jersey, on Thursday, September 12, 2019, commencing at 9:06 a.m.

Job No. CS3495724

Page 2

```
 1   A P P E A R A N C E S:
 2
 3    SIDLEY AUSTIN LLP
      BY: JUSTIN A. BENSON, ESQ.
 4        JOSH MOORE, ESQ.
      1501 K Street, N.W.
 5    Washington, DC 20005
      201-736-8757
 6    jbenson@sidley.com
      joshua.more@sidley.com
 7    Attorneys for Plaintiff
 8
 9    ARMSTRONG TEASDALE LLP
      BY: CHARLES W. STEESE, ESQ.
10        DOUGLAS N. MARSH, ESQ.
      4643 South Ulster Street
11    Suite 800
      Denver, Colorado 80237
12    720-722-7199
      csteese@ArmstrongTeasdale.com
13    dmarsh@ArmstrongTeasdale.com
      Attorneys for Defendant
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1   ALISON MILLER, residing at 3 Walker Drive,
2   Hillsborough, New Jersey 08844, having been duly
3   sworn by the Notary Public, testified as follows:
4   DIRECT EXAMINATION BY MR. STEESE:
5        Q.    I'm going to ask you to state your name
6   for the record.
7        A.    Alison Miller.
8        Q.    I know you just did that.  And what's
9   your work address?
10       A.    One AT&T Way, Bedminster, New Jersey
11  07921.
12       Q.    Have you ever been deposed before,
13  Ms. Miller?
14       A.    Yes.
15       Q.    Approximately how many times?
16       A.    Once.
17       Q.    And in what type of case was the other
18  deposition?
19       A.    Dispute.
20       Q.    A what?
21       A.    A dispute.
22       Q.    A dispute.  What type of dispute?
23       A.    8YY aggregation.
24       Q.    Who was the opposing party?
25       A.    Teliax.

Miller - by Mr. Steese

Page 6

1    Q.    Okay.  Given that you've been deposed
2    before, and I'm sure your counsel has gone over it
3    with you, there's some rules of the road here that
4    will make things move quickly.
5          One, you understand you're under oath
6    here today?
7    A.    Yes.
8    Q.    And you're expected to tell the truth?
9    A.    Yes.
10   Q.    You have to answer audibly, which you're
11   doing, and so please continue to do so.  Head nods,
12   "um-hums," things of that kind are difficult for the
13   court reporter to get down.  Do you understand?
14   A.    Yes.
15   Q.    It's important to let me finish asking
16   the question before you begin answering, and that I
17   give you the same courtesy in return so the court
18   reporter can get everything down.  Do you understand?
19   A.    Yes.
20   Q.    If a question is confusing to you in any
21   way, let me know what's confusing and I'll do my best
22   to rephrase so you understand the question.  Will you
23   do that?
24   A.    Yes.
25   Q.    If you answer the question, I will

Miller - by Mr. Steese

Page 12

```
 1         Q.    Okay.  So I have 2002 to about 2004.
 2   Does that sound right?
 3         A.    Yes.
 4         Q.    Okay.  What's the next job you had at
 5   AT&T Corp.?
 6         A.    Switched access, lead carrier relations
 7   manager.
 8         Q.    And what were -- how long did you have
 9   this job?
10         A.    This is my current job.
11         Q.    So you've had this job for about
12   15 years?
13         A.    The same title, yes.  Same type role,
14   yes.
15         Q.    Have your responsibilities changed over
16   time?
17         A.    No.
18         Q.    So why don't you describe your
19   responsibilities as lead carrier relations manager.
20         A.    I manage the switched access expenses,
21   domestic, associated with originating and terminating
22   access to and from AT&T's IXC.
23         Q.    Do you focus on ILECs or CLECs, or both?
24         A.    Both.
25         Q.    Do you have authority to decide whether
```

1   have it in my head.
2        A.   Yeah, my understanding of an OTT call is
3   when a VoIP service provider provides a service to an
4   end-user where the physical connection is not
5   provided by that VoIP service provider, but rather
6   the end-user accesses that service with a broadband
7   connection from a third-party.
8        Q.   Thank you for indulging me there.  I was
9   thinking one thing and you meant something else.
10            So now you used the term "broadband
11  connection" instead of internet connection.  Is there
12  a reason?
13       A.   Internet could potentially be more
14  limiting.
15       Q.   How so?
16       A.   I am not the subject matter expert on
17  OTT, but my understanding is broadband could be used
18  in a broader sense, where internet might refer to a
19  specific protocol.
20       Q.   Okay.  When, approximately -- and all
21  I'm looking for is year at this point in time.  When,
22  approximately, did you first get involved with the
23  OTT dispute with Level 3?
24       A.   In 2016.
25       Q.   Approximately when, post or pre -- so

Miller - by Mr. Steese

Page 19

```
 1   this is post-settlement agreement.
 2        A.    Yes.
 3        Q.    So you had no involvement in the
 4   negotiation of that settlement agreement.
 5        A.    Correct.
 6        Q.    Did you do -- strike that.
 7              When you first become involved, what
 8   role do you have with the OTT dispute with Level 3?
 9   What's your function?
10        A.    I don't understand the question.
11        Q.    Okay.  You understood when you got
12   involved in this OTT dispute with Level 3 that there
13   was some history associated with it.  Correct?
14        A.    Yes.
15        Q.    And so given that others had been
16   responsible for managing the OTT dispute with Level 3
17   in the past, what was your designated role going to
18   be in 2016 given that you were coming in in the
19   middle of the process?
20        A.    In 2016 when I was working with Level 3,
21   there were several disputes that I was managing with
22   Level 3.  OTT was one of those disputes that became
23   some -- a dispute that we were working on and trying
24   to close out.
25        Q.    And because of that, you inherited it
```

Miller - by Mr. Steese

Page 84

1  continuation of the e-mail.  The print is odd.  But
2  in the middle it says, "OTT 65 percent versus
3  13 percent analysis."
4           Do you see that?
5      A.   Yes.
6      Q.   And at this point in time, late 2017,
7  you, on behalf of AT&T, are trying to work with
8  Level 3 to figure out what its percent of OTT is.
9  Correct?
10     A.   Yes.
11     Q.   And AT&T at this point in time, 2017, is
12 withholding 65 percent of the end-office charges,
13 assuming they're associated with OTT.  Correct?
14     A.   Yes.
15     Q.   And that has continued even to this
16 date.  Correct?
17     A.   Yes.
18     Q.   Do you have any evidence that the actual
19 OTT percent was ever 65 percent?
20          MR. BENSON:  Object to form.
21     A.   I have the 2015 settlement which
22 established a baseline percentage of 65 percent.
23     Q.   Do you have anything else?
24     A.   I do not.
25     Q.   Are you the -- if I use "owner of this