**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

    Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

    Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

    Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

    Counterclaim Defendant.

**LEVEL 3'S RESPONSE IN OPPOSITION TO AT&T'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF LEVEL 3'S CLAIMED LATE PAYMENT CHARGES OR, IN THE ALTERNATIVE, AT&T MOTION TO STRIKE**

    The Settlement Agreement is perfectly clear: Until a final decision issued stating that carriers should bill over-the-top VoIP calls differently than traditional calls, AT&T was required to pay Level 3 full tariffed rates for OTT traffic. AT&T would be entitled to a partial refund of these charges only if a final order later determined that Level 3 should not have billed certain rate elements on OTT traffic. In other words, the Settlement Agreement required AT&T to pay Level 3 the charges in its Tariff, which includes late payment charges.

The applicable Tariff[1] sets forth usage-based charges for end office switched access services, on which AT&T erroneously withheld payment both because it began withholding before the partial refund provisions took effect and because it dramatically overestimated the amount of Level 3's end office charges on OTT traffic. The Tariff also sets forth charges that apply if "any portion of the payment is received by [Level 3] after the date due." Ex. A at 4-1 § 4.2.6. If that happens, "then a late payment penalty shall be due" in the amount of "the portion of the payment not received by the date due, net of taxes, not compounded, multiplied by a monthly late factor of 1.5%." *Id.*

The Settlement Agreement requires AT&T to "pay Level 3 its applicable switched access tariffed rate for OTT traffic." ECF No. 15-1 at 3 § 1(a)(ii). The plain meaning of this language requires AT&T to pay all Tariffed rates—which includes both the usage charges and the late payment charges, assessed at a rate of 1.5 percent per month. Both categories of charges are included in the OTT Dispute as that dispute is defined by the Tariff. And both are included among the Tariffed rates AT&T agreed to pay. AT&T's attempt to shirk this obligation by parsing the late payment charges out of the word "rate" is both impermissible and illogical—impermissible, because the filed-rate doctrine does not allow AT&T to receive preferential treatment exempting it from obligations that apply to every other customer under the Tariff; and illogical, because there is no way Level 3 would agree to let AT&T withhold millions of dollars of payments with no threat of reprisal.

---

[1] The Tariff AT&T attached to its Motion, ECF No. 206-4, is not the correct Tariff. Effective December 12, 2018—before the damages period in this action began—Level 3's Tariff FCC No. 4 was canceled, and replaced with the CenturyLink Competing Operating Companies Tariff FCC No. 4. *See* Ex. B; Ex. A. But there do not appear to be any material differences in the language of the respective Tariffs.

AT&T is required to pay the late payment charges, whether as direct damages in breach of AT&T's obligations under the Agreement or as a form of prejudgment interest. Evidence regarding these charges is therefore relevant and admissible. AT&T's Motion should be denied.

## I. BACKGROUND

By now the Court is no doubt all too familiar with the history of this dispute. In December 2019, the FCC decided that LECs cannot assess end office switched access charges on OTT-VoIP calls. *See Connect America Fund Developing a Unified Intercarrier Compensation Regime, Order on Remand and Declaratory Ruling*, WC Docket No. 10-90 et al., FCC 19-131, 2019 WL 7018968, at ¶ 1 (rel. Dec. 17, 2019) (the "December 2019 OTT Order"). But before that, it had decided, in its 2015 OTT Declaratory Order, that end office switched access charges *do* apply to OTT-VoIP calls. See ECF No. 204 at 2 (citing *Connect America Fund*, WC Docket No. 10-90 et al., CC Docket No. 01-92, Declaratory Ruling, 30 FCC Rcd. 1587, 1588, ¶ 2 (2015) ("OTT Declaratory Order")). In May 2015, while AT&T's appeal of the 2015 OTT Declaratory Order was pending, the parties entered into the 2015 Settlement Agreement, "which allowed Defendant to continue assessing end office charges for certain OTT traffic, subject to a partial refund in the event the OTT Declaratory Order was 'overturned, either in whole or in part.'" *Id.* (quoting Settlement Agreement (ECF No. 15-1) at 3, ¶ (iv)).

The Settlement Agreement was the parties' attempt to reach "a full and final settlement" of the "OTT Dispute." ECF No. 15-1 at 3m § 1(a)(iv). The Agreement defined the "OTT Dispute" by referring to AT&T's disputing and withholding of "certain Level 3 end office switching charges, as set forth in more detail in Exhibit A, on traffic originating from and/or terminating to the local exchange service end-user customers served by providers of over-the-top

3

voice over Internet Protocol ('OTT') services." *Id.* at 1. The Agreement's Exhibit A listed outstanding receivables associated with Level 3's billing account numbers ("BANs"). *See id.* at 11–17. Those outstanding amounts included both unpaid usage-based charges **and late payment charges** arising from the failure to pay the usage charges. *See* Dec. Ex. C at 3. Thus, the Agreement includes late payment charges as part of the OTT Dispute, specifically including them in the "Level 3 end office switching charges" AT&T had disputed and withheld.

The Agreement attempted to resolve the OTT Dispute with provisions applying to three distinct time periods. First, for the period predating its execution, the Agreement resolved Level 3's claims for historical damages by requiring AT&T to pay a fixed percentage "of the usage and late payment charges billed by Level 3 for the traffic exchanged by the Parties through March 2015 that is the subject of the OTT Dispute." ECF No. 15-1 at 2, § 1(a)(i).

Second, for the period following its execution, the Agreement required AT&T to "pay Level 3 its applicable switched access tariffed rate for OTT traffic, pursuant to the terms of the *OTT Declaratory Order*," for "switched access traffic exchanged by the Parties beginning on June 1, 2015." ECF No. 15-1 at 3 § 1(a)(ii). In other words, because the FCC had determined that all tariff charges applied to OTT traffic, AT&T was required to pay tariff rates unless or until a final order issue stating otherwise. This requirement was subject to a partial refund provision which to date has been the primary focus of this case, and which required Level 3 to issue a partial refund of AT&T's payments if it were later determined that the charges "should not have been charged." *Id.* at 3 § 1(a)(iv). The Court's summary judgment order, ECF No. 204, essentially resolved the disputes over this provision in Level 3's favor, determining that AT&T is entitled only "to a fifty percent refund for end office switching charges assessed during the

relevant period (January 1, 2019 to February 19, 2020), during which time the OTT percentage did not exceed 21 percent." ECF No. 204 at 12.

Finally, the Agreement discussed a third period that would begin after the "Final Appellate Order" became "final." If a "Final Appellate Order" were ever entered, "the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order." *Id.* The December 2019 OTT Order, once entered, made clear that carriers could not assess end office charges on OTT traffic, and otherwise "le[ft] carriers to determine the appropriate compensation for [their] services in accordance with their agreements and applicable tariffs." *December 2019 OTT Order*, 2019 WL 7018968, ¶ 23 n.65.

The crux of the entire Settlement Agreement can be summarized this way: In 2015, The FCC stated that full Tariff charges applied to OTT calls. AT&T was required to pay Tariff rates unless or until the FCC found otherwise. In other words, the Agreement was designed to enforce the plain language of Level 3's Tariff unless the FCC found that OTT calls were no longer subject to full tariff rates. AT&T breached its obligations under the Agreement by refusing to pay the applicable Tariffed rates. Not only did AT&T begin withholding charges well before February 19, 2020, it also dramatically overestimated the amount of Level 3's end office charges on OTT traffic, and consequently, the refund to which it was entitled.[2] Level 3 is entitled to damages in the amount of what AT&T should have been paying under the Tariff, minus the partial refund. All parties agree that AT&T must pay substantial damages, in the millions of

---

[2] For detail about AT&T's intentional over-withholding, see Level 3's response to AT&T's Motion *in Limine* to Exclude Evidence of Level 3's Damages Claim, filed contemporaneously herewith.

dollars, to Level 3.

## II. ARGUMENT

AT&T contends that evidence on the late payment charges should be precluded, erroneously claiming it has no possible relevance to the action. *See* ECF No. 207 at 5. AT&T is wrong. The Settlement Agreement specifically requires AT&T to pay all applicable Tariff rates, one of which is late payment charges, on amounts AT&T unjustifiably withheld. Otherwise, AT&T could withhold payment with impunity, offering no compensation for Level 3's loss of the use of money it was entitled to receive and facing no consequences for the millions of dollars AT&T was required, but refused, to pay. The Settlement Agreement does not, and could not, exempt AT&T from these Tariff obligations, which apply to every other customer of Level 3's Tariffed services. The Court therefore should require AT&T to pay the late payment charges, whether as direct damages arising from AT&T's breach or as prejudgment interest.

### A. AT&T's Motion *in Limine* Improperly Seeks Substantive Legal Relief.

"'A motion in limine is a request for guidance by the court regarding an evidentiary question,' which the court may provide at its discretion to aid the parties in formulating trial strategy." *Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir. 1995) (quoting *United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983)). "An *in limine* motion is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to support a particular claim or defense, because that is the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards." *Colorado Ctr. for Healing Touch, Inc. v. Healing Touch Int'l, Inc.*, No. 14-CV-00313-MJW, 2017 WL 11550572, at *4 (D. Colo. Jan. 3, 2017) (quoting *Dry Clean Super Ctr., Inc. v. Kwik Indus., Inc.*, No. 08-CV-00578-WJM-CBS, 2012 WL 503510, at

6

\*4 (D. Colo. Feb. 15, 2012)).

"[A] court is almost always better situated during the actual trial to assess the value and utility of evidence. For this reason, some courts defer making *in limine* rulings unless the evidence is clearly inadmissible on all potential grounds." *Martensen v. Koch*, No. 13-CV-02411-REB-CBS, 2015 WL 514913, at \*2 (D. Colo. Feb. 6, 2015).[3] Thus, "fact-bound determinations dependent upon the character of the evidence introduced at trial" are not issues that can be finally decided at a pretrial hearing. *United States v. Mejia-Alarcon*, 995 F.2d 982, 987 (10th Cir. 1993); *see also* Practice Standards (Civil), Judge Raymond P. Moore § I.L ("Motions *in limine* are discouraged when the motion is evidence-driven and cannot be resolved until evidence is presented at trial, or when trial is to the Court. Instead, the issue can be flagged in a trial brief.").

AT&T's motion, though offered "[i]n the guise of a motion *in limine*," is in substance "a new motion for summary judgment." *Dry Clean Super Ctr., Inc.*, 2012 WL 503510, at \*5. Its purpose is not to preclude evidence beyond the scope of Level 3's claims, but to limit the scope

---

[3] That is what makes AT&T's *limine* motions different from Level 3's motion to preclude expert testimony and opinions disclosed after the discovery deadlines passed. Courts frequently grant motions *in limine* to exclude expert testimony, including for violations of the Rule 26 disclosure requirements; in those instances, it is plain that such testimony could never be admissible. *See, e.g., Henkel v. Albertsons, LLC*, No. 14-CV-02217-CMA-MJW, 2015 WL 4538651, at \*4 (D. Colo. July 28, 2015) (granting motion *in limine* to preclude testimony of expert as to "opinions not disclosed in his expert report under Fed. R. Civ. Pro. 26(b)"); *A.H. ex rel. Hadjih v. Evenflo Co.*, No. 10-CV-02435-RBJ-KMT, 2012 WL 5389772, at \*1 (D. Colo. Nov. 3, 2012) (granting *limine* motion to preclude expert testimony; "Any expert testimony not completely disclosed in full compliance with Rule 26(a)(2) by those deadlines will not be admitted absent agreement of the parties. The Court specifically directs counsel not to attempt to offer expert opinions that have not been completely and timely disclosed."); *see also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party *is not allowed to use that information or witness* to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.") (emphasis added).

of Level 3's claims to excuse AT&T from paying Tariffed late payment charges as part of the damages it must pay Level 3. The Motion is thus procedurally improper, being brought well after the deadline for dispositive motions and without utilizing the procedural safeguards afforded by Rule 56. It can be denied for that reason alone. *See id.* (party seeking to preclude opponent from raising a particular claim or defense "should not have filed a motion *in limine* on the eve of trial, but instead should have filed a summary judgment motion pursuant to Federal Rule of Civil Procedure 56. . . . The Court will not allow Defendants to circumvent its practice standards and the Rules of Civil Procedure by raising a substantive legal issue in a motion *in limine*.") (quoting *Provident Life & Acc. Ins. Co. v. Adie*, 176 F.R.D. 246, 250 (E.D. Mich. 1997)).

The Motion fails on the merits as well.

### B. The Settlement Agreement Requires AT&T to Follow the Terms of the Tariff, as Required by the Filed-Rate Doctrine.

The Settlement Agreement plainly instructs that AT&T must abide by the Tariff, and pay the Tariffed charges as the FCC said it had to do. Only if it was later determined that those charges should not have been charged would AT&T be relieved, in part, of this obligation—and AT&T agreed that it would follow the Tariff thereafter as well. To follow the Tariff, AT&T had to pay all Tariffed charges—including late payment charges.

This is exactly what the Communications Act requires. There is no such thing as selective treatment when it comes to filed tariffs; *all* customers must follow *all* tariffed requirements, without exception. AT&T's claim that the Settlement Agreement excused AT&T from being subject to the Tariff's late-payment provisions is thus not just unsupported—it is also impermissible. AT&T once again effectively claims to have procured for itself discriminatory treatment, excusing itself from paying charges required by the Tariff even while other parties are

bound by those same Tariff provisions. Such discrimination is antithetical to the filed-rate doctrine, and this interpretation therefore must be rejected. *See United States v. Brye*, 146 F.3d 1207, 1211 (10th Cir. 1998) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms . . . is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect") (quoting Restatement (Second) of Contracts § 203(a) (1979)).

"The filed-rate doctrine, or filed-tariff doctrine, provides that the rate of the carrier duly filed is the only lawful charge, and deviation from it is not permitted upon any pretext." *Qwest Corp. v. AT&T Corp.*, 479 F.3d 1206, 1210 (10th Cir. 2007) (quoting *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990)) (internal quotations omitted). "The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Marcus v. AT&T Corp.*, 138 F.3d 46, 59 (2d Cir. 1998) (quoting *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922)). The doctrine "makes clear that the tariff on file sets the rate that is to be charged—no more, no less, no negotiation allowed." *Qwest Corp.*, 479 F.3d at 1210.

The doctrine reflects the judiciary's inability to remedy purported injuries without discriminating against "similarly situated non-suing customers" that continue to pay the original, purportedly unlawful rates. *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir. 1994) (citing *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 163–64 (1922)). "The doctrine admits of few exceptions: 'This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress.'" *Qwest*, 479 F.3d at 1210 (quoting *Maislin Indus.*, 497 U.S. at 127).[4]

---

[4] As noted in Level 3's Motion for Summary Judgment, the FCC, acting under authority granted in 47 U.S.C. § 203(b)(2), allows CLECs, "as an alternative to tariffing," to "negotiate and enter into an agreement with an IXC to charge rates higher than those [otherwise] permitted." ECF No.

Numerous cases considering the issue have concluded that the filed-rate doctrine applies not only to usage-based charges, but late payment charges as well (which also further shows that late payment charges are considered among the Tariff's filed rates). *See*, *e.g.*, *S. New England Tel. Co. v. Glob. Naps, Inc.*, No. 3:04-CV-2075 (JCH), 2008 WL 534745, at *4 (D. Conn. Feb. 25, 2008) (noting that the filed-rate doctrine "guarantees that 'a carrier is entitled to receive the full tariff rate,'" and therefore holding that a LEC was "entitled to prejudgment interest, in the form of late payment charges as required under the Tariff") (quoting *Delta Traffic Service, Inc. v. APPCO Paper & Plastics Corp.*, 931 F.2d 5, 5 (2d Cir. 1991)); *Cincinnati Bell Tel. Co. v. Allnet Commc'n Servs., Inc.*, 17 F.3d 921, 925 (6th Cir. 1994) (reversing decision to award late payment fee of only 6%, when the filed tariff stated that the carrier was entitled to 18%; "Because CBT's filed tariff controls the amount of interest due in this case, see 47 U.S.C. § 203(c), an award different from this amount was inappropriate. The FCC has the power to determine that rate to be unreasonable, but until it does, the parties are bound by the lawfully filed tariff."); *see also AT&T Commc'ns of CA v. Pac-W. Telecomm, Inc.*, No. C 06 07271 JSW, 2007 WL 1114037, at *2 (N.D. Cal. Apr. 13, 2007) (instructing that "if AT&T fails to make a

---

152 at 17 (quoting *Teliax, Inc. v. AT&T*, 2017 WL 3839459, *2 (D. Colo. Sept. 1, 2017)). But "the law does not permit a LEC . . . to agree to bill other IXCs **below-tariff** rates while charging [an IXC] tariff rates for the same service." *Id.* (emphasis added) (quoting *Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, No. CV 10-490 (MJD/SER), 2017 WL 4618277, at *25 (D. Minn. Mar. 31, 2017)); *see also All Am. Tel. Co. v. AT&T Corp.*, 26 FCC Rcd. 723, 732 n.47 (2011).

That is why the Settlement Agreement could allow Level 3 and AT&T to enter into an agreement whereby AT&T paid Tariffed rates until it was conclusively established that those charges should not have been charged, and thereafter pay Tariffed charges as required by the later order. Under this arrangement, AT&T would pay either the Tariffed rate, or some amount above it— but never below the Tariffed rate, which would have given it preferential treatment in violation of the filed-rate doctrine.

timely payment, it shall be subject to the interest rate called for by the Pac-West tariff," as "it would alter the legal obligations to the parties if [the Court] allowed AT&T to avoid an interest rate that it would be otherwise required to pay for these delinquent payments"); *WorldCom, Inc. v. Voice Plus Int'l, Inc.*, No. 97 CIV. 8265 (DLC), 2000 WL 12146, at *2 (S.D.N.Y. Jan. 6, 2000) (finding Plaintiff was entitled to prejudgment interest at the rate set forth in "the Tariff [Plaintiff] filed with the FCC").[5]

AT&T's claims that the parties agreed not to make the tariffed rate subject to the late-payment provisions of the Tariff would afford AT&T preferential treatment, exempting AT&T from provisions of the Tariff that apply to all other customers that purchase services under the Tariff. The filed-rate doctrine does not allow this preferential treatment. The construction AT&T proposes therefore fails not only because the text does not support it, but also because the law does not permit it.

---

[5] *Haxtun Tel. Co. v. AT&T Corp.*, 57 F. App'x 355, 360 (10th Cir. 2003), suggested that a district court has discretion to determine whether a party is entitled to an award of prejudgment interest notwithstanding that the filed tariff doctrine forbids a carrier from charging or receiving a greater or lesser charge than that specified in its tariff. That case, an unpublished decision from nearly twenty years ago (*see* Fed. R. App. P. 32.1), has not been cited by any case Level 3 can find for the proposition that the filed-rate doctrine does not apply to late payment charges required under a tariff. To the contrary, the only case to cite *Haxtun* in connection with that proposition (*S. New England Tel. Co.*, 2008 WL 534745, at *4) rejected it as unpersuasive, instead finding that the filed-rate doctrine required payment of tariffed late payment charges.

In any event, the Court need not take any position in tension with *Haxtun*. Even *Haxtun* acknowledged that "the actual rate of interest was determined by the filed tariff"; it merely held that the district court retained discretion whether to award prejudgment interest. *Haxtun*, 57 F. App'x at 360. Though that holding is questionable—a decision not to award interest is effectively a decision to award interest at a rate of zero percent, contrary to the instruction of the tariff—it does not apply here, where, as discussed below, New York law mandates an award of prejudgment interest on Level 3's action for breach of contract. Nor does *Haxtun* or any other authority AT&T cites suggest the Court cannot exercise its discretion to award Level 3 interest at the rate specified in the Tariff; indeed, the authorities cited above show the Court should do so.

### C. The Settlement Agreement Requires AT&T to Pay Level 3's Tariff Rates, which Include Late Payment Charges.

AT&T's attempt to wriggle out from under the Tariff's requirements also fails on its face. Though AT&T acknowledges that the Court has determined it failed to abide by one part of the Tariff, AT&T contends that the Agreement exempted it from complying with another. Specifically, AT&T's argument is that the "applicable switched access tariffed rate," as used in Section 1(a)(ii) of the Settlement Agreement, does not include late payment charges assessed under Level 3's Tariff. *See* ECF No. 207 at 6. But the plain text of the Agreement does not do what AT&T wants it to do.

"As with any contract, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning." *Essex Ins. Co. v. Laruccia Const., Inc.*, 71 A.D.3d 818, 819 (N.Y. App. Div. 2010) (quoting *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007)). The plain and ordinary meaning of the word "rate" is, simply, the "amount paid or charged for a good or service." RATE, Black's Law Dictionary (11th ed. 2019). The Tariff rate for switched access services includes the usage-based charges specific to the underlying functions and, in the event the usage-based charges are not paid on time, late payment charges, assessed at the rate of 1.5 percent per month. Ex. A § 4.2.6. The plain meaning of the term "tariffed rate" thus applies to all Tariffed charges—including both usage and late payment charges.

AT&T argues that Section 1(a)(ii) of the Settlement Agreement, which refers to the "applicable switched access tariffed rate," does not specifically identify late payment charges even though other provisions of the Agreement do, such that late payment charges must have been intentionally omitted from Section 1(a)(ii). *See* ECF No. 207 at 7. AT&T cites, for example, Section 1(a)(i)(A), wherein AT&T agreed to pay a percentage "of the usage and *late*

12

*payment charges* billed by Level 3 for the traffic exchanged by the Parties through March 2015 that is the subject of the OTT dispute." ECF No. 207 at 7 (emphasis added by AT&T).

Yet neither in this paragraph nor anywhere else does the Settlement Agreement distinguish or treat separately late payment charges and *rates*. For example, Section 1(a)(i)(A) discusses both "late payment charges" and "usage" charges, but *never* uses the term "rate." Conversely, Section 1(a)(ii) refers to the "applicable switched access tariffed rate," but *never* uses the term "usage" or "late payment charges." AT&T argues that "applicable switched access tariff rate" somehow includes the usage charges referenced in Section 1(a)(i)(A), but excludes the late payment charges referenced in that same section. There is no support for this selective and self-serving distinction. The "applicable switched access tariff rate" includes both usage *and* late payment charges when a carrier fails to pay as the Tariff requires.

Indeed, in attempting to resolve the OTT Dispute, the Settlement Agreement consistently required AT&T to pay all the Tariff's charges, including both usage and late payment charges. In defining the "OTT Dispute," the Settlement Agreement referred to certain disputed charges "set forth in more detail in Exhibit A," which listed the outstanding account receivable for a list of billing account numbers through April 2015. ECF No. 15-1 at 1, 11–17. Those outstanding amounts included both usage charges and late payment charges. *See* Ex. C at 3. The late payment charges are, and always have been, part and parcel of the OTT Dispute.

An obligation to pay late payment charges has thus always been a part of the Settlement Agreement. As noted above, as to the first period (concerning historical damages that arose prior to the Agreement's execution), AT&T was required to pay a percentage of both "the usage *and* late payment charges billed by Level 3 for the traffic exchanged by the Parties through March

13

2015 that is the subject of the OTT dispute." ECF No. 15-1 at 2, § 1(a)(i)(A) (emphasis added). For the second period (after execution), AT&T was required to pay all applicable rates—making, as noted above, no distinction between usage and late payment charges. *Id.* at 3, § 1(a)(iv). And for the third period, "the Parties agree[d] that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with the terms of that order." *Id.* at 3, § 1(a)(iv). In other words, the parties agreed to do what the FCC said to do for OTT traffic—and in the December 2019 OTT Order, the FCC said to follow the Tariff, which AT&T acknowledges requires late payment charges. *See* December 2019 OTT Order, 2019 WL 7018968, ¶ 23 n.65 ("leav[ing] carriers to determine the appropriate compensation for [their] services in accordance with their agreements and applicable tariffs"). From beginning to end, other than as provided in the partial refund provision, the Settlement Agreement required AT&T to follow the Tariff—the entire Tariff, including the provisions mandating payment of late payment charges.[6]

AT&T's argument is unsupported: the Agreement simply does not say what AT&T claims it says. It requires AT&T to pay *all* the Tariffed rates—the usage charges, as well as the late payment charges.

---

[6] AT&T's attempt to manufacture a distinction between the terms "rate" and "charge" as used in Level 3's Tariff (*see* ECF No. 207 at 8–10) does not help AT&T either. All this analysis shows is that the Tariff uses the terms "rate" and "charge" interchangeably—including when discussing the end office "charges" AT&T admits it must pay. *See, e.g.*, ECF No. 207 at 10 n.4 (acknowledging Tariff references to "End Office switching and port *charges*," "carrier common line *charges*", "*rates* and *charges* . . . set forth in 15.1.3" or "15.1.3.4", and "*charges* [for local connect switched access service]" (language in brackets supplied by AT&T)). One would expect no less given the dictionary meaning of the word "rate" as, simply, the "amount paid or charged for a good or service." RATE, Black's Law Dictionary (11th ed. 2019).

### D. New York Law Requires the Court to Award Prejudgment Interest on Level 3's Breach of Contract Claim.

The late payment charges are required not only under the Tariff but also under New York Law, which as this Court recognized governs the Agreement. *See* ECF No. 204 at 5. "Because the 'awarding of prejudgment interest is considered a question of substantive law,'" "New York law controls any award of prejudgment interest." *Rhodes v. Davis*, 628 F. App'x 787, 792 (2d Cir. 2015) (quoting *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999)). And under New York law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y. C.P.L.R. 5001(a); *see also Rhodes*, 628 F. App'x at 792 (noting that prejudgment interest on a breach of contract action is "mandatory").

The interest rate New York law applies to a breach of contract claim is any rate "provided by statute" (N.Y. C.P.L.R. 5004), unless the parties agreed to a different rate in their contract, in which case, "the rate the parties agreed to in their contract is the correct rate of prejudgment interest." *Oldcastle Precast, Inc. v. Liberty Mut. Ins. Co.*, 838 F. App'x 649, 651 (2d Cir. 2021).

Here, both statute and contract point to the rate set forth in the Tariff. As noted above, AT&T expressly agreed to pay the rates in the Tariff, which establishes a rate of 1.5 percent per month for late payment charges. By agreeing to abide by the Tariff, AT&T agreed to be subject to the Tariff's rate for late payment charges. Indeed, it could do no other: the Communications Act expressly states that Level 3 cannot "charge, demand, collect, or receive a greater or less or different compensation . . . than the charges specified in the schedule then in effect." 47 U.S.C. § 203(c); *see also Delaware & Hudson Ry. Co. v. Offset Paperback Mfrs., Inc.*, 126 F.3d 426, 427 (2d Cir. 1997) ("tariffs have the force and effect of a federal statute"); *Farley Terminal Co. v. Atchison, T. & S. F. Ry. Co.*, 522 F.2d 1095, 1098 (9th Cir. 1975) ("a tariff, rate, or charge,

15

duly established in accordance with the Act, is the legal rate; it has the force of statute"). Thus, whether under the parties' agreement, a statute, or a tariff with the force of statute, the rate of interest is fixed at the rate specified in Level 3's Tariff. New York law requires the Court to apply it.[7]

To do otherwise would frustrate the purpose of imposing prejudgment interest, to compensate Level 3 for the harm it suffered by AT&T's withholding of money that should have been paid to Level 3. *See J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 117–18 (2012) ("The principle behind prejudgment interest is that the breaching party should compensate the wronged party for the loss of use of the money.") (citing *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 266 (2011)). It would also encourage AT&T to continue treating Level 3 and other carriers the way AT&T has acted here. For years, Level 3 has tried to show AT&T that AT&T was withholding far more than it would have been allowed to withhold, even if AT&T's interpretation of the Settlement Agreement was correct. Yet AT&T stubbornly refused to work with Level 3 to resolve the dispute, even though AT&T could never show any evidence to support its position. AT&T thus presented Level 3 with no choice but to accept insulting settlement offers or seek protection from the Court. Now that the Court has not only agreed with Level 3's interpretation of the Agreement but also determined that AT&T had no evidence Level 3's OTT percentage was more than 21 percent, what Level 3 has been saying to AT&T for years has finally been vindicated. But AT&T now asks the Court to relieve AT&T of the consequences of its behavior, and strip Level 3 of one of the most important safeguards Level

---

[7] Where an interest rate is not "otherwise provided by statute" or by the parties' agreement, New York Law applies a default rate of nine percent per annum on breach of contract actions. *See* N.Y. C.P.L.R. 5004. Level 3 is entitled to this interest at a minimum.

3 has against this kind of brazen misconduct. To exempt AT&T from the late payment provisions would give AT&T no reason at all to comply with its obligations; instead, AT&T would be incentivized to withhold with impunity, knowing that even if it could not get away with that behavior, AT&T would face no repercussions aside from being forced to pay what it would otherwise be paying all along. AT&T has done nothing to deserve that kind of special treatment.

Applicable law thus requires that AT&T be required to pay prejudgment interest, at the rate required by statute and the Tariff. Evidence as to those amounts is therefore relevant and admissible.

## III. CONCLUSION

AT&T agreed to follow the Tariff, and to pay the Tariff's rates. This includes late payment charges. AT&T's Motion therefore should be denied.

Respectfully submitted this 18th day of May, 2021.

By: /s/ *Charles W. Steese*
Charles W. Steese, #26924
Douglas N. Marsh, #45964
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

*Attorneys for Defendant/Counterclaimants Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC*

## CERTIFICATE OF SERVICE

I, Charles W. Steese, hereby certify that on May 18, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

    Rebecca B. DeCook
    Andrew T. Flynn
    Moye White LLP
    1400 16th Street, 6th Floor
    Denver, CO 80202-1027
    becky.decook@moyewhite.com
    andrew.flynn@moyewhite.com

    Michael D. Warden
    Michael J. Hunseder
    Justin A. Benson
    Joshua W. Moore
    SIDLEY AUSTIN LLP
    1501 K ST NW
    Washington, DC 20005
    Telephone: (202) 736-8000
    mwarden@sidley.com
    mhunseder@sidley.com
    jbenson@sidley.com
    joshua.moore@sidley.com

    *Attorneys for Plaintiff AT&T Corp.*

    /s/ *Charles W. Steese*
    Charles W. Steese