# EXHIBIT I

CONFIDENTIAL

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3
      CASE NO.  18-CV-00112-RM-MEH
 4
 5    AT&T CORPORATION,
 6           Plaintiff/Counterclaim Defendant,
 7    vs.
 8    LEVEL 3 COMMUNICATIONS, LLC,
 9              Defendant/Counterclaimant.
10    And
11    CROADWING COMMUNICATIONS, LLC, et al.,
12              Counterclaimants,
13    vs.
14    TELEPORT COMMUNICATIONS GROUP, INC.,
15              Counterclaim Defendant.
16
17                    DEPOSITION
18                       OF
19                   MARC CATHEY
20                November 21, 2019
21
22    Taken Before:  Kelly Jackson, ACCR,
23                and Notary Public
```

CONFIDENTIAL

Page 2

1           A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      MR. MICHAEL J. HUNSEDER
5      Sidley Austin, LLP
6      1501 K. ST NW
7      Washington, DC 20005
8
9  FOR THE DEFENDANT:
10     MR. CHARLES W. STEESE
11     Armstrong Teasdale, LLP
12     4643 South Ulster Street
13     Suite 800
14     Denver, Colorado  80237
15
16
17
18
19
20
21
22
23

Page 3

1              I N D E X
2
3  EXAMINATION BY MR. STEESE                   6
4           E X H I B I T S
5  DEFENDANT'S EXHIBIT 93                     34
6      Notice of Deposition
7  DEFENDANT'S EXHIBIT 94                     34
8      Notice of Deposition
9  DEFENDANT'S EXHIBIT 95                     37
10     Deposition Prep
11 DEFENDANT'S EXHIBIT 96                     45
12     Answers to Interrogatories
13 DEFENDANT'S EXHIBIT 97                     61
14     Snapshot of Calls
15 DEFENDANT'S EXHIBIT 98                     76
16     Collaboration and Conferencing
17 DEFENDANT'S EXHIBIT 99                     76
18     Voice and Collaboration
19 DEFENDANT'S EXHIBIT 100                    97
20     IP Flexible Reach
21 DEFENDANT'S EXHIBIT 101                   116
22     Handwritten Notes
23

Page 4

1  DEFENDANT'S EXHIBIT 102                   136
2      SIP Trunking
3  DEFENDANT'S EXHIBIT 103                   138
4      Apple at Work
5  DEFENDANT'S EXHIBIT 104                   165
6      TCG Access Tariff
7  DEFENDANT'S EXHIBIT 105                   165
8      AT&T Corp Access Tariff
9  DEFENDANT'S EXHIBIT 106                   165
10     CenturyLink Competitive Operating Companies Tariff
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 5

1           I, Kelly Jackson, a Registered Professional
2  Reporter of Birmingham, Alabama, and a Notary Public
3  for the State of Alabama, acting as Commissioner,
4  certify that on this date, pursuant to the Rules of
5  Civil Procedure and the foregoing stipulation of
6  counsel, there came before me at AT&T, 3196 Highway 280
7  East, Birmingham, Alabama, on November 21st, 2019,
8  commencing at 9:00 a.m., MARC CATHEY, witness in the
9  above cause, for oral examination, whereupon the
10 following proceedings were had:
11
12             MARC CATHEY,
13          being first duly sworn, was
14          examined and testified as follows:
15
16 EXAMINATION BY MR. STEESE:
17     Q.   Can you please state your full name?
18     A.   It is Marcus Benton Cathey, C-a-t-h-e-y.
19     Q.   Pronounce that last name one more time.
20 I want to make sure I pronounce it correctly.
21     A.   It is Cathey.
22     Q.   What is your business address, Mr. Cathey?
23     A.   3196 Highway 280 East.

2 (Pages 2 - 5)

Veritext Legal Solutions
800-567-8658                                                               973-410-4098

Page 6

1  Q.  That is in Birmingham?
2  A.  Yes.
3  Q.  Mr. Cathey, have you ever had your
4  deposition taken before?
5  A.  I have.
6  Q.  Approximately how many times?
7  A.  Probably three or four.
8  Q.  I am confident then that not only
9  you know the rules from your counsel but from
10 before, but we will go over them very briefly.
11 You understand you are under oath here today
12 and expected to tell the truth?
13 A.  I do.
14 Q.  You understand it is important that
15 you answer audibly so the court reporter can
16 hear you.  Head nods and uh-huhs are difficult
17 for her to get down.  So please answer audibly
18 to the best of your ability.  Is that
19 acceptable?
20 A.  Sure.
21 Q.  It is also important that you let me
22 finish asking the question and that I do my
23 best to let you finish answering so we have

Page 7

1  clear questions and answers.  Can we do our
2  best to try to respect each other speaking?
3  A.  Sure.
4  Q.  If a question is confusing in any
5  way, let me know, I will rephrase it, and we
6  will make sure we are on the same page.  Is
7  that acceptable?
8  A.  Absolutely.
9  Q.  If you answer a question, I am going
10 to presume you understood it, is that fair?
11 A.  Sure.
12 Q.  If you need to break for any reason,
13 I will just ask that the question that is
14 pending be answered, and then we will take the
15 break if you need to go to the rest room or
16 whatever.  Okay?
17 A.  Okay.
18 Q.  Why don't you briefly tell me the
19 other three or four matters in which you were
20 deposed, just high level what your role was?
21 A.  We had a number of issues with
22 CLEC's very early on in my career with
23 BellSouth, and they were fraudulently doing

Page 8

1  various things to the company's assets, and I
2  had to testify and take a couple of depositions
3  against those.
4  Q.  In that type of case?
5  A.  In that type of case.
6  Q.  Were they switched access related
7  cases?
8  A.  No.  It was more on local services,
9  CLEC services.
10 Q.  Were these in the unbundling
11 situations?
12 A.  Resale, bundling.
13 Q.  Were those cases pending in courts,
14 or were they in front of a commission, do you
15 know?
16 A.  One was in front of a commission and
17 two in front of courts.
18 Q.  Which commission?
19 A.  Florida.
20 Q.  Do you remember what courts?
21 A.  No, not off the top of my head.
22 District Court, I believe.
23 Q.  Were you an expert in any of those,

Page 9

1  or were you a fact witness?
2  A.  I believe I was a fact witness in at
3  least one of them, maybe two.  It has been a
4  number of years.
5  Q.  That was my last question on the
6  subject.  Approximately when were these
7  depositions?
8  A.  Thirteen, fourteen years ago.  It
9  has been a long time.
10 Q.  Can you give me your educational
11 background after high school?
12 A.  It is pretty short.  I went to
13 Baylor University.  Graduated with a bachelor
14 of science degree.
15 Q.  Bachelor of science in?
16 A.  Political science.
17 Q.  When did you get that degree?
18 A.  In 1977.
19 Q.  That is a long working career.  I
20 don't need to go through the whole thing.  Why
21 don't you tell me when you first came to the
22 telecommunications industry?
23 A.  I was in -- it was in '78.  Pretty

3 (Pages 6 - 9)

Page 10

1  much right out of college.  I had one other
2  job, not in telecom.  And started actually here
3  in Alabama.
4      Q.   With AT&T, what became AT&T?
5      A.   Yes.  South Central Bell at the
6  time.  So I have been from South Central Bell
7  to BellSouth to AT&T.  I have been in --
8  started customer service residents, consumer
9  services.
10     Q.   Pause for a second.  I am going to
11  get a question in here.  So at a very, very
12  high level then, take me as you were about to
13  through the various roles you have had in your
14  forty year --
15     A.   Forty-one.
16     Q.   At the AT&T companies.
17     A.   At the AT&T, BellSouth?
18     Q.   Meaning what becomes AT&T.
19     A.   So I started in consumer.  And from
20  there, I went into public telephones and
21  actually sold public telephones back when they
22  were actually a pretty big business.  And from
23  there, I moved into the carrier services group.

Page 11

1      Q.   When was that approximately?
2      A.   Probably twenty-eight years ago,
3  somewhere in there.
4      Q.   Twenty-eight years ago, so that
5  would be 1991-ish, somewhere in there, early
6  '90's?
7      A.   Yes.  Probably around in there.  I
8  have been in the carrier services a long time,
9  product management specifically.  Handled
10  switched access for BellSouth.  From there I
11  moved into CLEC sales.  It was right after the
12  Telecom Act came out.  We were performing a
13  group to sell to these new CLEC's.  I ran a
14  sales division that actually sold services to
15  them like CenturyLink.  Was in that for a
16  number of years.
17     Q.   Is that it?
18     A.   No.  From that I went to -- when
19  AT&T acquired BellSouth about eleven years
20  ago, I have a very unique role in that I try to
21  resolve large billing disagreements with our
22  carrier customers like CenturyLink.
23     Q.   You have been doing that ever since?

Page 12

1      A.   Yes.  For about the last ten or
2  eleven years.
3      Q.   So were you involved in the 271
4  proceedings?
5      A.   On the periphery.
6      Q.   That was my introduction to telecom.
7  So let's talk a little bit -- get a few more
8  details.  You went into carrier services in the
9  early '90's or thereabouts.  You said you did
10  product management, switched access and
11  CLEC sales are the three things I put down.
12  Why don't you describe your product management
13  role, specifically what kinds of products?
14     A.   Initially was switched access.  We
15  went through a long term transport restructure,
16  LTR, if you remember that acronym.  Had to
17  implement that, caused a lot of rate
18  changes, rate restructures.  From that, I took
19  on special access as well.  So I had product
20  management for all switched and special access.
21          At the time the Telecom Act came
22  out, we had to productize all of these new
23  services that the FCC created.  So we basically

Page 13

1  stopped doing all normal product development
2  work, and I put all of my teams working on
3  developing all these uni-local exchange
4  services that we were ordered to provide to the
5  CLEC's.  So we created those products.  We
6  productized them, developed the operational
7  processes around all of those services.  And
8  from there I went into the sales organization
9  to actually sell some of those services to the
10  CLEC's.
11     Q.   During this time frame, did you have
12  a team of people reporting to you?
13     A.   Yes.
14     Q.   Approximately how large was your
15  team?  If it fluctuated, give me a range.
16     A.   It fluctuated.  Probably the maximum
17  people I had in my group was about a hundred.
18  That was a mixture of employees and
19  contractors.
20     Q.   That was from the early '90's
21  through the early 2000's?
22     A.   Yes. It fluctuated some.  Of
23  course, as you know, if you had been in this

Page 18

1  up, they were trying to set their switches up,
2  interconnect those switches into the local
3  networks.  Some CLEC's were pretty savvy in
4  that, and others there was a very bumpy ride.
5  So I spent most of my time involved in
6  escalations usually around us not meeting
7  certain due dates or they believed we were
8  causing them network issues that may have end
9  up being their fault.  It was one of these
10 prove me kind of things.  But there was a lot
11 of customer relationships, a lot of billing
12 issues that I had to be involved with, which
13 kind of set the stage for the job I have right
14 now, which is handling these large billing
15 disagreements.
16     Q.  And so this CLEC sales role
17 continued through 2008 when AT&T acquired
18 BellSouth?
19     A.  That's correct.
20     Q.  When AT&T acquired BellSouth, have
21 you been in this resolve large billing disputes
22 with large carrier customer role that entire
23 time?

Page 19

1     A.  For about a year after they acquired
2  BellSouth, I still did basically what I did
3  before at BellSouth in the sales organization,
4  but I moved from there to the role I have now.
5  So about a year after the merger, I was still
6  in sales to primarily CLEC's and from there, I
7  moved in the position I have today.
8     Q.  What is your title today?
9     A.  I am assistant vice president of
10 corporate strategy for wholesale and partner
11 solutions.
12     Q.  That sounded like a line from My
13 Cousin Vinnie.  Do you remember the guy that
14 talks about he is from the FBI?
15     A.  Yes.
16     Q.  It sounded like that.  Maybe my
17 brain was still there.  So why don't you say
18 that one more time?
19     A.  I didn't pick my own title.
20     Q.  Assistant VP?
21     A.  Of corporate strategy for wholesale
22 and partner solutions.
23     Q.  That is a mouthful.

Page 20

1     A.  It is a lot to write down.
2     Q.  Have your job duties stayed pretty
3  much the same since around 2009?
4     A.  Yes.
5     Q.  Why don't you describe those duties?
6     A.  Well, I am the guy that keeps these
7  people from having to be involved hopefully to
8  get issues resolved with our customers.  We
9  have a large amount of billing that we exchange
10 with customers such as your client, and even a
11 little bit of disagreement over some of the
12 accuracy of the billing or the value of the
13 billing that we are providing.  It creates big
14 dollar values over time in terms of
15 disagreements.  And I work with people like
16 Gary Black, you may be familiar with, in
17 carrier services for CenturyLink to try to
18 arrive at a settlement where both parties feel
19 like we fairly have looked at the issues and
20 divided up those disagreements where we can
21 resolve them in a financial manner outside of
22 having to go to a court or to the commission.
23     Q.  Do you have a team of people?

Page 21

1     A.  No.  It is just me.
2     Q.  Just you.  Obviously you can't
3  resolve every carrier dispute because as we
4  know there are lots of them?
5     A.  A lot of them.
6     Q.  So is there a certain category of
7  dispute that you are responsible for?
8     A.  All of them.
9     Q.  At what point does Mr. Cathey get
10 involved?
11    A.  Usually -- certainly I don't do this
12 job by myself.  I work in relationship with a
13 lot of different organizations, primarily the
14 billing teams that actually render the bills to
15 the customers.  And when you disagree with a
16 charge, there is a process we use to open a
17 dispute up.  If they are not able to resolve
18 that and it becomes of a sufficient dollar
19 value risk, then I get involved and attempt to
20 negotiate a resolution to that.
21        Sometimes it is providing more
22 information to my counterparts, and sometimes
23 you agree and you will close those disputes and

Page 22

1  pay them back.  Other times you may not agree,
2  and we will have to take measures to try to
3  resolve those.  And often times it results in
4  an annual settlement that we do with your
5  client, for instance, but I do that with other
6  customers as well.
7      Q.   Help me to understand.  There was a
8  settlement agreement that was reached between
9  Level 3 and AT&T regarding this dispute that
10  took us -- for part of the dispute through
11  December 31 of 2018?
12      A.   That's correct.
13      Q.   You are familiar with that?
14      A.   Uh-huh.
15      Q.   You have to say yes.
16      A.   Yes.
17      Q.   Were you involved in that?
18      A.   I was involved on the flipside of
19  that.  That settlement was actually with our
20  buy side purchasing services from you.
21      Q.   Our sale side?
22      A.   Your sale side.  At the same time I
23  was negotiating to resolve an equal value of

Page 23

1  disputes that you had against our billing.  And
2  so those settlements actually got signed at the
3  same time.  I didn't actually negotiate your
4  settlement, but they certainly were both
5  leveraged together in coming to a conclusion.
6  In other words, one wouldn't have gotten done
7  without the other.  I did the flipside of their
8  settlement for AT&T.
9      Q.   You said there is a certain dollar
10  threshold.  What is the certain dollar
11  threshold for you?
12      A.   It really depends.  It is really
13  based on the growth of a particular issue.  In
14  other words, an issue may start out fairly
15  small, but if we know it is going to continue
16  to be a source of disagreement, then typically
17  I will get involved earlier on in that to keep
18  it from growing too big versus one that is a
19  one and done type issue, which may be more of a
20  significant value.  It really depends on the --
21  I guess the facts around whatever the
22  disagreement issue is between the parties.
23      Q.   Given that your role is involved in

Page 24

1  I will call them lingering issues, ones that
2  can perpetuate.
3      A.   Sure.
4      Q.   Do you have to review FCC decisions
5  and become familiar with those decisions as
6  part of your role?
7      A.   Sure.
8      Q.   Is that a regular thing, or is that
9  episodic?
10      A.   Typically we will look -- most of
11  our services or many of our services today are
12  non regulated.  They are in guide books or
13  contracts.  So probably less emphasis on the
14  tariff type thing.  More issues I am involved
15  now are individual contract type of
16  disagreements.  But certainly in the past FCC
17  decisions were important, the FCC tariffs,
18  interpretations of what the wordings meant, all
19  of those kinds of things.
20      Q.   One of the issues we are here to
21  discuss is Over the Top billing, correct?
22      A.   That's correct.
23      Q.   If I use the acronym OTT, will that

Page 25

1  have meaning to you?
2      A.   Yes.
3      Q.   There have been various decisions
4  relating to OTT that have issued out of the FCC
5  starting since late 2011 with a transformation
6  order.  Is reviewing those decisions something
7  you have done to keep abreast of this issue?
8      A.   I have as it relates to this
9  particular case.  I typically don't get
10  involved until a dispute arises from a
11  customer.  In this case your client actually
12  filed disputes.  So that's when I became
13  involved having knowledge about this particular
14  issue.
15      Q.   So it was with the submission of
16  formal dispute notices in the middle of this
17  particular year that you got involved in the
18  OTT issue with CenturyLink, slash, Level 3?
19      A.   That's correct.
20      Q.   At that point in time, that is when
21  you started to review the various orders
22  relating to OTT?
23      A.   Yes.

Page 34

```
 1              (Short recess.)
 2
 3      (Whereupon, Defendant's Exhibit 93 was
 4      marked for identification and copy of
 5      same attached hereto.)
 6
 7      Q.  Let me show you what I am marking as
 8  Exhibit Number 93.  Exhibit Number 93 is an
 9  amended Rule 30(b)6 deposition notice for TCG.
10  On pages five through seven, there is a series
11  of topics.  Have you seen this document before?
12      A.  Yes, I have.
13
14      (Whereupon, Defendant's Exhibit 94 was
15      marked for identification and copy of
16      same attached hereto.)
17
18      Q.  Let me show you what I am marking as
19  Exhibit Number 94, which is an amended Rule
20  30(b)6 deposition notice for AT&T Corp. Are you
21  familiar with this document?
22      A.  Yes.
23      Q.  Do you understand that you are here
```

Page 35

```
 1  today as a corporate witness for TCG and AT&T?
 2      A.  I understand that.
 3      Q.  The parties, and, Mr. Hunseder,
 4  correct me if I am wrong, have agreed that many
 5  of the topics overlap and that the answers for
 6  TCG and AT&T on the various topics that are the
 7  same would be the same irrespective of whether
 8  I was asking them for TCG or AT&T, do you agree
 9  with that?
10      A.  Yes.
11      Q.  Have I correctly stated so I only
12  need to ask questions one time?
13          MR. HUNSEDER:  You only need to ask
14  questions one time.  The one thing I want to
15  make clear is it is not the case that if an
16  access chart was billed, it was billed by one
17  or either party.  I think most or all -- our
18  position is most or all of the charges at issue
19  were billed by TCG and not AT&T Corp. I assume
20  you weren't meaning to get a stipulation on
21  that.  I think what you are referring to as
22  sort of again the topics are overlapping and
23  that he is here -- we are not here to say that
```

Page 36

```
 1  he is only answering questions for AT&T and not
 2  TCG or vice-versa.
 3      Q.  Let's look first at Exhibit 93.
 4          MR. STEESE:  And, Counsel, I am
 5  happy for you instead of the witness to tell me
 6  the specific topics that he is here for in the
 7  TCG depo notice.
 8          MR. HUNSEDER:  I think he is here
 9  for all the TCG subject to our objections, but
10  essentially all of them.
11          MR. STEESE:  If we look at the AT&T
12  depo notice, same thing and, Counsel, I don't
13  mind if you tell me even on the AT&T depo
14  notice which --
15          MR. HUNSEDER:  On the AT&T, I think
16  we are starting at nine and going through
17  seventeen.  Fourteen through seventeen are the
18  subject of the magistrate judge's ruling.
19  Obviously we are here subject to that.  But
20  those are the topics.
21          MR. STEESE:  There were parallel
22  topics in the TCG notice as well.  I am not
23  going to be asking about the functionally
```

Page 37

```
 1  equivalence arguments.
 2      Q.  So I am now going to mark if you can
 3  hand me your copy of this that you made copies
 4  of today.  I will mark that formally as an
 5  exhibit.  And, Counsel, I am assuming you have
 6  a copy of this one already.
 7
 8      (Whereupon, Defendant's Exhibit 95 was
 9      marked for identification and copy of
10      same attached hereto.)
11
12      Q.  This is Exhibit 95.  And Exhibit 95,
13  Mr. Cathey, you created this document, correct?
14      A.  No, I did not.
15      Q.  Who created it?
16      A.  Counsel created it.
17      Q.  At your direction?
18      A.  Yes.
19      Q.  The content of this document is your
20  content, they formally typed it up?
21      A.  That's correct.
22      Q.  Is everything contained in Exhibit
23  95 accurate?
```

Page 66

1  Q. I didn't understand that. What do
2  you mean by that?
3  A. In other words, we wouldn't charge
4  the end user access for that wireless call.
5  Q. When you say you wouldn't charge the
6  end user access, do you mean you wouldn't
7  charge the IXC access?
8  A. Yes.
9  Q. Are you aware of any processes that
10 AT&T has in place to identify such calls?
11     MR. HUNSEDER: Object to the form
12 and foundation and scope.
13 A. I am not aware.
14 Q. OTT generally, and before I get
15 there, I am going to talk about another issue
16 and I will acknowledge the next few questions
17 are not technically within the scope, but they
18 are to create foundation for the call. Are you
19 aware in the 2005 to 2012-ish, and where in
20 there, I don't know, time frame, there was push
21 by the industry to create something called the
22 JIP factor, jurisdictional parameters, so you
23 could determine whether a wireless call was

Page 67

1  interMTA or intraMTA?
2  A. Yes.
3  Q. It didn't work very well, did it?
4  A. No.
5  Q. One of the problems with wireless
6  calling is they are mobile. So it is hard to
7  tell if a call is I will call it local wireless
8  or a long distance wireless, correct?
9  A. That's correct.
10 Q. As a result, you can't look at a
11 CDR and say that is interMTA or that is
12 intraMTA, correct?
13 A. That's correct.
14 Q. The same issue -- you have the same
15 problem with OTT, don't you?
16 A. Yes.
17 Q. You can't look at a CDR and say that
18 is an OTT call or that is not an OTT call,
19 correct?
20 A. Correct.
21 Q. Instead -- strike that. When you
22 are looking at OTT calls, does AT&T have a
23 process to identify the OTT calls in its

Page 68

1  network?
2      MR. HUNSEDER: Object to the form.
3  Vague and ambiguous. Go ahead.
4  A. Not that I am aware of.
5  Q. Do you have any idea what percentage
6  of calling is OTT within AT&T's network?
7  A. No.
8  Q. When I say AT&T's network, I am
9  including TCG and AT&T. Were you answering the
10 questions accordingly?
11 A. Yes, I was.
12 Q. I thought so. When I spoke with
13 Ms. Gallagher, Ms. Gallagher used the term the
14 BVoIP network.
15 A. That's correct.
16 Q. Are you familiar with that network
17 generally?
18 A. I am.
19 Q. Are there other VoIP networks other
20 than BVoIP?
21     MR. HUNSEDER: Object to the form.
22 Foundation.
23 Q. For AT&T?

Page 69

1      MR. STEESE: What is the objection?
2      MR. HUNSEDER: When you say
3  networks, I don't know --
4  Q. I am trying to make sure I get the
5  total package -- if you have different names
6  for aspects of your network, I am trying to
7  make sure I have the full scope.
8  A. I am not aware of any other VoIP
9  services other than Business VoIP, BVoIP.
10 Q. So can OTT calls be delivered over
11 any network other than the BVoIP network to
12 your knowledge?
13     MR. HUNSEDER: Again, I am not sure
14 there is a foundation as to what a BVoIP
15 network is.
16 Q. I will ask a foundation question.
17 The BVoIP network is a network of TCG, correct?
18 A. That's correct.
19 Q. And AT&T tracks calls over what it
20 titles the BVoIP network, correct?
21 A. I don't know that it is a network
22 per se as it is a call type.
23 Q. I will get back to that then. So is

Page 106

1 fathom a guess.
2     Q.  Is there anyone in the industry that
3 you know that you could go to to say have you
4 tracked this?
5     A.  I assume there is probably somebody
6 that might have an answer.  I don't know who
7 they would be right now to be honest with you.
8     Q.  So let's assume that -- is it
9 rational for -- I will ask it differently.
10 Should a telephone company have to contact
11 every individual customer of IP Flex to say how
12 often are your people there versus out and they
13 go seventy-five percent for one, a hundred
14 percent for another, twelve percent for
15 another, and you have to write that in and
16 apply it customer by customer, doesn't that
17 sound like an enormous task that is
18 unrealistic?
19     A.  I would think so.
20     Q.  So is there -- let's assume the
21 following.  Let's assume that you went to a
22 couple of large enterprise class customers who
23 -- let me back up.  I came in and you gave me a

Page 107

1 badge today, correct?
2     A.  Yes.
3     Q.  You have a badge here, correct?  He
4 is holding up his badge.  And when you go
5 through doors, you have to enter, you have to
6 touch that badge on the door, correct?
7     A.  Right.
8     Q.  Do you know if your H.R. department
9 tracks the individual employees and whether
10 they are coming in and out over the course of a
11 day?
12         MR. HUNSEDER:  Objection.  Scope.
13     A.  Honestly I don't know.  They may be.
14     Q.  Let's assume that you go to a couple
15 of enterprise class customers that you think
16 are relatively representative of modern world,
17 if you will, and you find out that in these
18 businesses, and I am truly making up the
19 number, eighty-seven percent of the time they
20 are in the office, thirteen percent of the time
21 when they are working, they are not.  Are you
22 with me in concept?
23     A.  Yes.

Page 108

1     Q.  You look and say, okay, eighty-seven
2 percent.  I am going to use these data points,
3 and I am going to apply an eighty-seven percent
4 factor to my IP Flex and my Collaborate or
5 whatever to say that this is rational overlay,
6 I am trying to account for it the best way I
7 can, does that sound rational to you?
8         MR. HUNSEDER:  Object to the form.
9     A.  I am really in no position to either
10 agree or disagree with what you said.
11     Q.  When you look at things like PIU and
12 PVU and PLU, and there are probably some more
13 U's there that I am missing, but you are
14 generally familiar with those factors, correct?
15     A.  I am.
16     Q.  There is some amount of imprecision
17 associated with those because you are doing the
18 best you can given the data that you have,
19 correct?
20     A.  Yes.
21     Q.  And with OTT, this is a brand new
22 world that we as an industry are going to need
23 to come up with some methodology, if you will,

Page 109

1 to overlay on to calling that cannot be
2 determined whether it is OTT or not, correct?
3     A.  Yes.
4     Q.  Does AT&T have some idea of a
5 process that should be used to calculate OTT?
6     A.  I am not aware if there is.
7     Q.  Is there any process within AT&T
8 today where they are trying to determine it
9 other than for HVS and Collaborate?
10     A.  Not to my knowledge.
11     Q.  Given that AT&T is presuming for
12 HVS and Collaborate that one hundred percent of
13 the calls switched access does not apply to,
14 that is probably not where the industry should
15 end up, is it?
16         MR. HUNSEDER:  Object to the form.
17 That calls for speculation.  It calls for a
18 legal conclusion or an industry conclusion.
19     A.  I think as the traffic becomes more
20 prevalent over time, that the cost benefit
21 analysis will lend itself to us to have more
22 precision in trying to determine what the
23 appropriate factor should be than where we are

28 (Pages 106 - 109)

Page 174

1    A.   I do.
2    Q.   So this is what we were talking
3  about from page eighty-three; is that correct?
4    A.   Correct.
5    Q.   It requires according to the diagram
6  a direct connection to the end user making the
7  call, correct?
8    A.   That's correct.
9    Q.   But what instead of that if there is
10 a cloud there and it goes off over a third
11 party Internet connection, that is not depicted
12 in the diagram, is it?
13   A.   No.
14   Q.   And so how do you know that given --
15 as a general rule, diagrams are intended to
16 depict the elements in a very specific way in a
17 tariff, correct?
18        MR. HUNSEDER:  Objection.  It calls
19 for a legal conclusion and is extremely broad.
20   A.   It is to provide general guidance to
21 the application of the services.
22   Q.   So I am going to walk through -- and
23 this call completion service both contemplates

Page 175

1  routing calls directly to an end office or the
2  alternative routing calls through an access
3  tandem, correct?
4    A.   Correct.
5    Q.   Let's talk about each of those
6  scenarios differently.  If you go through the
7  direct connect, meaning not through the access
8  tandem, are you with me in concept?
9    A.   Yes.
10   Q.   Then you would not bill tandem
11 switching because it would go through an end
12 office, correct?
13   A.   Correct.
14   Q.   Let's assume that it is OTT on the
15 customer side of the call, are you with me?
16   A.   Yes.
17   Q.   And then in that particular
18 circumstance, the end office is acting more as
19 a tandem switch, correct?
20   A.   That's correct.
21   Q.   Would you be able to bill tandem
22 switching on that direct connect then?
23   A.   Yes.

Page 176

1    Q.   So now let's go through alternative
2  number two where you are routing through an
3  access tandem, so the call goes from the wire
4  center to the access tandem to the end office
5  to the customer, are you with me?
6    A.   Right.
7    Q.   In that particular circumstance,
8  again, the end user is being served by OTT, are
9  you with me again?
10   A.   Yes.
11        MR. HUNSEDER:  Object.
12   Q.   Would you be able to bill two tandem
13 switching charges because it went through two
14 functional tandem switches, or would it just be
15 one tandem switching element?
16        MR. HUNSEDER:  Objection to the
17 question in terms of you used the term end
18 user.  I don't think it was very precise in
19 terms of how you used it.
20   Q.   I will start the whole thing again.
21 The call goes to the end office and goes to a
22 person making a call via OTT, are you with me?
23   A.   Yes.

Page 177

1    Q.   In that particular circumstance when
2  it went through the access tandem and so you
3  are using two functional access tandems, one
4  that is truly titled tandem and one that is end
5  office, could you bill two tandem switching
6  functions or just one?
7    A.   I believe we would bill just one end
8  office switching charge on the end office.
9    Q.   Since it is an OTT caller on this
10 side, you wouldn't be billing end office
11 charges, correct, because it is an OTT call?
12   A.   Our credit is to compensate the
13 industry for that, but today we would charge an
14 end office switching charge for that call.
15   Q.   Are you aware that in the credit
16 calculations that Ms. Gallagher did, that she
17 took out an end office switching charge, but
18 she added back in a tandem switching charge?
19   A.   I am aware of that.
20   Q.   The question is if the call is
21 routed through an access tandem and then to an
22 end office in a circumstance where the call is
23 originated by an OTT caller, would that be one

45 (Pages 174 - 177)

| Page 178 | Page 180 |
|---|---|
| 1  tandem switching charge or two under the new<br>2  methodology employed by AT&T?<br>3      A.  Two.<br>4      Q.  Does the tariff talk about employing<br>5  multiple tandem switching charges to your<br>6  knowledge?<br>7      A.  I am not aware.<br>8      Q.  Why don't you turn to page<br>9  seventy-eight, the very next page.  And there<br>10 are two diagrams that are actually legible<br>11 without me having to stand up.  And the bottom<br>12 line is entitled indirect.  Do you see that?<br>13     A.  I do.<br>14     Q.  And it appears to be showing various<br>15 elements of what can be billed?<br>16     A.  That's correct.<br>17     Q.  And it shows here a call going<br>18 through an access tandem and then through an<br>19 end office off to some party who does not<br>20 subscribe to local service, kind of something<br>21 similar to OTT, correct?<br>22         MR. HUNSEDER:  Objection.<br>23     A.  Yes. | 1  Operating Companies, do you see that?<br>2      A.  Yes.<br>3      Q.  Is AT&T Corp one of the TCG<br>4  operating companies?<br>5      A.  I would say TCG is an affiliate of<br>6  AT&T.<br>7      Q.  That is not my question.<br>8      A.  I don't know.<br>9      Q.  Can you point to any language in the<br>10 TCG tariff that permits TCG to perform access<br>11 billing for AT&T Corp?<br>12         MR. HUNSEDER:  Objection.<br>13 Foundation.<br>14         MR. STEESE:  What is wrong with the<br>15 foundation?<br>16         MR. HUNSEDER:  One, all of this is<br>17 legal -- all of this is legal interpretation in<br>18 my view that is really before the Court.  And<br>19 you are not really asking for the kind of<br>20 question that the judge has said was<br>21 appropriate.  If you want to ask the questions,<br>22 that is fine.  I don't really see anything in<br>23 here about -- it is a TCG tariff.  So it covers |
| Page 179 | Page 181 |
| 1      Q.  In that circumstance it says tandem<br>2  switching at the end office, correct?<br>3      A.  That's right.<br>4      Q.  It doesn't say tandem switching at<br>5  the access tandem, is there a reason for that?<br>6      A.  I am not sure.<br>7      Q.  Other than the two provisions that<br>8  you have pointed out, which is page<br>9  eighty-three, Section 4.12.3(A) and Section<br>10 2.3.3, are there other provisions in the TCG<br>11 tariff that you believe permit based on the<br>12 pure tariff language to bill end office<br>13 switching on OTT calls?<br>14     A.  I am not aware of others.<br>15     Q.  Let's look at the TCG tariff, page<br>16 one, titled page one, which is the third page<br>17 where it says title page.  Do you see that?<br>18     A.  This one right here?<br>19     Q.  Yes, sir.  There is an -- it says<br>20 this tariff sets forth the interstate rates and<br>21 rules applicable to the provision of interstate<br>22 common carrier telecommunication services<br>23 provided by Teleport Communication Group | 1  the access service that TCG provides and that<br>2  is why we are here.  I don't even understand<br>3  the question.  Maybe the question is vague as<br>4  opposed to lacks foundation.<br>5      Q.  Are you aware of whether AT&T Corp<br>6  is covered by the TCG operating company<br>7  moniker?<br>8         MR. HUNSEDER:  Same objections.<br>9      A.  To the extent it is providing<br>10 service to the long distance affiliate, which<br>11 is an AT&T Corp affiliate, then, yes, it would<br>12 apply the same terms to that long distance<br>13 affiliate.  That 288 kick that you saw, ATX, if<br>14 they purchased service through this, they would<br>15 have to be assessed the same rates.<br>16     Q.  Maybe I am not completely<br>17 understanding and that could easily be.  When<br>18 you look at services being provided like<br>19 Collaborate and HVS and Flex, is it TCG that is<br>20 the LEC that offers those services to<br>21 customers, or is it AT&T Corp?<br>22     A.  I would say it is the AT&T<br>23 Communication Services, which is yet another |