# EXHIBIT J

CONFIDENTIAL

Page 1

1        IN THE UNITED STATES DISTRICT CIRCUIT
2           FOR THE DISTRICT OF COLORADO
3
4    CIVIL ACTION NO: 18-cv-00112-RM-MEH
5
6    AT&T CORPORATION,
7         Plaintiff/Counterclaim Defendant,
8    vs.
9    LEVEL 3 COMMUNICATIONS, LLC,
10        Defendant/Counterclaimant.
11   And
12   CROADWING COMMUNICATIONS, LLC, GLOBAL
13   CROSSING TELECOMMUNICATIONS, INC, and
14   WILTEL COMMUNICATIONS, LLC,
15        Counterclaimants,
16   V.
17   TELEPORT COMMUNICATIONS GROUP, INC.,
18        Counterclaim Defendant.
19
20   DEPOSITION OF: MARC CATHEY
     DATE: February 11, 2020
21   TIME: 11:02 a.m.
     PLACE: AT&T Data Center, 1876 Data Drive
22       Hoover, Alabama 35244
     BEFORE: Jennifer Madaris, CCR, RPR
23   Job No. CS3969039

|  | Page 2 |  | Page 4 |
|---|---|---|---|
| 1 | Deposition of MARC CATHEY called as a | 1 | MARC CATHEY |
| 2 | witness by the Defendants, before Jennifer | 2 | having been first duly sworn, was examined and |
| 3 | Madaris, Certified Court Reporter for the State of | 3 | testified as follows: |
| 4 | Alabama, with principal offices in Jefferson | 4 | |
| 5 | County, commencing at 11:02 a.m., on the 11th day | 5 | EXAMINATION BY MR. STEESE: |
| 6 | of February, 2020, at 1876 Data Drive, Hoover, | 6 | |
| 7 | Alabama 35244. | 7 |     Q.    So please state your name for the |
| 8 |  | 8 | record. |
| 9 | A P P E A R A N C E S | 9 |     A.    It's Marc Cathey. |
| 10 |  | 10 |     Q.    ==And Mr. Cathey, I have deposed you== |
| 11 | APPEARING ON BEHALF OF THE PLAINTIFF: | 11 | ==earlier, and this is continuation of that,== |
| 12 |   SIDLEY AUSTIN | 12 | ==correct?== |
| 13 |   Mr. Justin A. Benson | 13 |     A.    ==That's correct==. |
| 14 |   Mr. Michael J. Hunseder | 14 |     Q.    All right. |
| 15 |   1501 K St. NW | 15 |         MR. STEESE:  Madam Court Reporter, we |
| 16 |   Washington, DC 20005 | 16 | have four exhibits.  I'm only going to mark the |
| 17 |  | 17 | first three.  And I believe the next exhibit is |
| 18 | APPEARING ON BEHALF OF THE DEFENDANTS: | 18 | 107.  So if you can mark the first one, which are |
| 19 |   ARMSTRONG TEASDALE | 19 | his handwritten notes, as Exhibit 107.  Then |
| 20 |   Mr. Charles W. Steese | 20 | there's a two-page typed summary.  If you could |
| 21 |   4643 South Ulster Street | 21 | mark that as 108.  And then there is -- why don't |
| 22 |   Suite 800 | 22 | we just start with those two.  That's not true.  A |
| 23 |   Denver, Colorado 80237 | 23 | third one is a decision from the Federal |

|  | Page 3 |  | Page 5 |
|---|---|---|---|
| 1 |         I N D E X | 1 | Communications Commission.  If you can mark that |
| 2 |  | 2 | as 109. |
| 3 |                 PAGE | 3 |  |
| 4 | Mr. Steese              4 | 4 |         (Whereupon, Defendant's Exhibits 107, |
| 5 |  | 5 |         108, and 109 were marked and copies |
| 6 |  | 6 |         of same are attached hereto.) |
| 7 |       E X H I B I T S | 7 |  |
| 8 | Defendant's 107             5 | 8 |     Q.    (BY MR. STEESE)  Mr. Cathey, do you |
| 9 |     Handwritten notes | 9 | have those three documents in front of you? |
| 10 | Defendant's 108             5 | 10 |     A.    I do. |
| 11 |     Typed notes | 11 |     Q.    Perfect.  I'm going to start off with |
| 12 | Defendant's 109             5 | 12 | Exhibit 107 and 108.  And my question is general, |
| 13 |     Decision by the Federal Communications | 13 | and I'm going to ask what you did to prepare.  And |
| 14 | Commission | 14 | if what you did to prepare is summarized on |
| 15 |  | 15 | Exhibit 108, please tell me that. |
| 16 |  | 16 |     A.    I prepared by talking to my |
| 17 |  | 17 | colleagues in various different organizations in |
| 18 |  | 18 | order to prepare for this deposition.  And the |
| 19 |  | 19 | summary in 108 is reflective of those |
| 20 |  | 20 | conversations at a high level. |
| 21 |  | 21 |     Q.    Did you do anything else to prepare, |
| 22 |  | 22 | other than what's reflected on Exhibit 108? |
| 23 |  | 23 |     A.    I went back and retook a training |

Page 6

1 course on voice services. It was an internal
2 course for AT&T just to get kind of a broader
3 understanding of how we were approaching the
4 retail marketplace.
5   Q.   Got it. Did you meet at all with
6 your legal counsel, just yes or no, in addition to
7 those meetings that are reflected on Exhibit 108?
8   A.   Yes.
9   Q.   And approximately how many times?
10   A.   I probably had two conversations
11 outside of these, what I'd call, product specific
12 calls with inhouse counsel.
13   Q.   You had two discussions with inhouse
14 counsel?
15   A.   That's correct.
16   Q.   And which lawyers or lawyer was this?
17   A.   Debbie Waldbaum and Letty Friesen.
18   Q.   Friesen, right.
19   A.   Friesen, yeah.
20   Q.   Got it. And that was -- so both of
21 these conversations were with Ms. Waldbaum and Ms.
22 Friesen?
23   A.   One was with Ms. Waldbaum. The other

Page 7

1 one was with Ms. Friesen.
2   Q.   Got it. Did you have any discussions
3 with outside counsel, Mr. Benson or Mr. Hunseder,
4 outside of that identified in Exhibit 108?
5   A.   I talked to Mr. Benson yesterday. He
6 came in town, and I talked with him.
7   Q.   How long did you speak with Mr.
8 Benson yesterday?
9   A.   Probably about an hour and a half.
10   Q.   How long was each conversation with
11 the -- first of all, how long was the conversation
12 with Ms. Waldbaum approximately?
13   A.   Maybe 30 minutes.
14   Q.   What about Ms. Friesen?
15   A.   30 minutes probably. They were quick
16 calls.
17   Q.   All right. Did you review your prior
18 deposition transcript in preparation for today as
19 well?
20   A.   I did.
21   Q.   Were there any other documents that
22 you reviewed other than those reflected in Exhibit
23 108 to prepare for today's deposition?

Page 8

1   A.   No.
2   Q.   Did you look at any of the prior
3 deposition exhibits that were used during the
4 course of the deposition last time?
5   A.   I did look at the interrogatories for
6 the call flows.
7   Q.   Got it. Approximately how much time
8 in total? It's hard to tell -- did you -- just
9 estimate -- I'll say this better.
10       Approximately how much time in total
11 do you estimate it took you to prepare for your
12 deposition since the last deposition took place?
13   A.   Maybe three hours, four maybe.
14   Q.   In total?
15   A.   Yeah. Well, maybe four or five now
16 that I'm thinking about it.
17   Q.   Because you said you met with lawyers
18 for 2.5 hours?
19   A.   Yeah.
20   Q.   So only another hour and a half in
21 total for all these calls?
22   A.   Some of them were very quick, you
23 know, I'm probably saying five or six minutes.

Page 9

1 It's hard for me to put it all together, Mr.
2 Steese, but maybe six hours. You know, I don't
3 know what time and everything.
4   Q.   And you know the rules. I'm not
5 going to go over the rules again. I'll say this:
6 It is particularly hard on a video deposition let
7 alone in a telephone deposition to not speak over
8 each other. I can promise you I will do my best,
9 and I will apologize now for the times I speak
10 over you. I just can't see the body language that
11 you normally can, so I'll try to do that now.
12   A.   I'll try to do the same.
13   Q.   Perfect. Did you review FCC's OTT
14 order, which is Exhibit 109, in advance of today?
15   A.   No, I did not.
16   Q.   You've never reviewed it?
17   A.   No.
18   Q.   Just yes or no. I'm not going to ask
19 you. Did you speak to anyone about the contents
20 of it?
21   A.   Yes.
22   Q.   Without talking about what was
23 discussed, can you tell me with whom it was

3 (Pages 6 - 9)

Page 10

1  discussed?
2       A.    I spoke with our outside counsel
3  about kind of a high level summary of the order.
4       Q.    Anyone else?
5       A.    There were other inhouse counsels on
6  that telephone, but, you know, again, it was just
7  pretty much the highlights of the order itself.
8  Nothing specific.
9       Q.    When we spoke last time, you told me
10  that part of your job was reviewing FCC decisions
11  periodically --
12       A.    Yes.
13       Q.    -- towards that effect.  Do you
14  recall that?
15       A.    Yes, I do.
16       Q.    Is there any reason why you did not
17  review the OTT order in advance of this
18  deposition?
19             MR. BENSON:  I'll just instruct the
20  witness, if that makes you divulge any privilege
21  information, I'll instruct you not to answer.  But
22  if you can, go ahead without doing that.
23       A.    I mean, other than getting high level

Page 11

1  summary, I didn't see the need to go into detail
2  to analyze the order itself.
3       Q.    (BY MR. STEESE)  Given that part of
4  the questions in -- for today are the products
5  that are, A, OTT; and, B, for which AT&T assesses
6  end office switching on them; and given that the
7  FCC order defines what calls are, OTT calls for
8  which end office switching can or cannot be
9  assessed, it seems particularly relevant to your
10  testimony.  You disagree with that?
11             MR. BENSON:  Objection.  Calls for
12  legal conclusion.
13       A.    I'm not sure how to answer that.
14       Q.    (BY MR. STEESE)  You do recognize
15  you're here today to identify the products of --
16  among -- I'm not trying to say only.  But one of
17  the reasons you're here today is to talk about
18  AT&T's products that are over the top or OTT,
19  correct?
20       A.    Correct.
21       Q.    And you are aware that the FCC's
22  decision defines what is and is not OTT, correct?
23       A.    That's what I understand.

Page 12

1       Q.    And one of the reasons you're here
2  today is to identify the OTT products on which
3  AT&T assesses end office switching, correct?
4       A.    That's correct.
5       Q.    And this FCC decision defines when
6  parties can assess end office switching on OTT
7  products, correct?
8             MR. BENSON:  Objection.  Calls for a
9  legal conclusion.
10       A.    I understand from the summary that it
11  does, that I was provided.
12       Q.    (BY MR. STEESE)  So given that OTT --
13  the FCC's OTT decision relates specifically to two
14  of the subjects for which you are here, you didn't
15  see it as particularly relevant?  Help me
16  understand why.
17             MR. BENSON:  Objection.  Calls for a
18  legal conclusion.
19       A.    We planned to have a broad review of
20  the order in more specific detail.  And we're
21  trying to identify the correct parties in order to
22  do that, and they haven't all been identified yet.
23       Q.    (BY MR. STEESE)  So if I'm

Page 13

1  interpreting it correctly, then what that means
2  is, sure, it's relevant to the underlying
3  discussion here for today.  But because AT&T has
4  not had an opportunity to get all of its advocacy
5  in place relating to the decision, it was
6  premature for you to talk about it; is that fair?
7             MR. BENSON:  Object to form.
8       A.    Yes.
9       Q.    (BY MR. STEESE) All right.  Let's go
10  to your notes which is Exhibit 107.
11       A.    Okay.
12       Q.    And I remember this from last time.
13  I struggled to read your notes.
14       A.    Yes.
15             MR. BENSON:  As did I, Chuck.
16       Q.    (BY MR. STEESE)  And so I'm going to
17  have you turn to Page 9, and I'm going to try and
18  focus on some areas of particularly -- particular
19  interest to me.  And I'm just going to have you
20  read Page 9 to the best of your ability to me
21  because I was struggling.
22       A.    Okay.  Hold on.  Let me number the
23  pages real quick and I'll -- got it.

Page 74

1  which ones did you not?
2      A.   Give me a second.  AccessMyLAN, I did
3  look at that one.  Maximizing your WAN.  I mean,
4  we talked generally about the Wide Area Network or
5  the WANs but not specific.  I'm not sure about the
6  Cloud based apps.  Mobile Reach.
7      Q.   Did you find -- I'm sorry.  Go ahead.
8      A.   Mobile Reach, I did not look at.  You
9  know, some of these services may have changed
10 names through their lifecycle.  So it may be that
11 I, you know, investigated the service but maybe
12 they're called something different now.
13     Q.   So let me ask a broad question then.
14 What, if anything, did you do to try and identify
15 products for which -- strike that.
16          What, if anything, did you do to try
17 and identify AT&T products for which there is the
18 potential that it's an OTT call that it carries
19 and for which they would bill or not bill end
20 office access?  Just broad, big picture.
21     A.   Okay.  When we talked to all these
22 various -- and these people are product managers
23 supporting different services that AT&T offers to

Page 75

1  the retail environment.  And pretty much every one
2  of them, after we gave a general description of
3  the particular litigation and your claims against
4  AT&T, is we asked them generally were they aware
5  of other products.  So, you know, in no case did
6  anyone say, yes, there is something else that's
7  missing here that is being used for OTT.  Now,
8  could we may have missed an obscure service, you
9  know, I can't comment on that.  But these are the
10 people that, you know, are -- live day in and day
11 out with these particular services.  If AT&T had a
12 service, especially one that had any significant
13 amount of usage, I think it would have come out.
14     Q.   And I'm not trying to be
15 argumentative here, so I'm going to push back a
16 little.  At the beginning of this lawsuit, we were
17 told there were no products, and there clearly
18 are:  Collaborate and HVS.  And I don't know what
19 it took to prompt that.  But AT&T thought there
20 were none.  So do you feel confident as you sit
21 here that if there are any other OTT products for
22 which AT&T is billing end office access that the
23 volume of the calling is very, very small?

Page 76

1      A.   That would be my assumption or I
2  think we would have identified those by now with
3  as many people we've talked to.
4      Q.   From this, have -- strike that.
5  Before we get there.  The BVoIP network,
6  generally.  In the BVoIP network, is that the only
7  network that has the potential to assess end
8  office charges on the OTT -- on OTT calls by
9  Collaborate and HVS?
10     A.   Yes.  To my knowledge, it is.
11     Q.   Do you know what -- roughly, what
12 percentage of the AT&T, the ATC, TCG, the minutes
13 are on the BVoIP network?
14     A.   I do not.
15     Q.   Okay.  Have you -- I've asked this
16 and forgive me, I don't recall your answer.  We
17 talked about that an OTT call, you -- and this is
18 truly an OTT call.  On an OTT call, you're not
19 suppose to, going forward in light of the FCC's
20 recent decisions, bill end office charges on an
21 OTT call, correct?
22          MR. BENSON:  Objection.  Calls for a
23 legal conclusion.

Page 77

1      A.   That's my --
2      Q.   (BY MR. STEESE)  Is that your
3  understanding?
4      A.   That's my understanding.
5      Q.   Is it your understanding that
6  whomever is providing that switching functionality
7  if it's not end office can bill tandem switching
8  for it instead?
9          MR. BENSON:  Same objection.
10     A.   That's my assumption.
11     Q.   (BY MR. STEESE)  Have you talked to
12 anyone about that point, whether you can assess
13 tandem switching in lieu?
14     A.   Other than generally with the
15 attorneys, no.
16     Q.   Okay.  You are aware, however, that
17 when AT&T looked at its volume of calling; that
18 is, Collaborate and HVS, that it looked at the
19 credits to give, it subtracted end office
20 switching but it added in tandem switching
21 functions.  You're aware of that, correct?
22     A.   I am.
23     Q.   So the way AT&T is managing this

|  | Page 78 |  | Page 80 |
|---|---|---|---|
| 1 | issue on its own for the OTT calling it has in its | 1 | way to the end user.  Irrespective of whether it's |
| 2 | network, it is not billing end office switching | 2 | your TN, you can bill end office functions; is |
| 3 | but it is billing tandem switching, correct -- | 3 | that your understanding? |
| 4 |      A.    That's correct. | 4 |         MR. BENSON:  Objection to form. |
| 5 |      Q.    -- functionally? | 5 | Calls for a legal conclusion. |
| 6 |      A.    Yes. | 6 |         I'm not sure what the difference |
| 7 |      Q.    So based upon that, do you presume | 7 | between understanding and interpretation is, but |
| 8 | that's the right way to proceed? | 8 | you can try. |
| 9 |         MR. BENSON:  Objection.  Calls for | 9 |      A.    I think there's two things.  One is, |
| 10 | speculation and a legal conclusion. | 10 | are we entitled to bill for those functions.  And |
| 11 |      A.    Again, we haven't done a full | 11 | two is, are the way our switches are set up to |
| 12 | analysis of the order in terms of the impact, and | 12 | recognize an AT&T number as an AT&T end user, |
| 13 | we're evaluating that.  And I can't tell you that | 13 | would we bill access for that particular scenario. |
| 14 | precisely yet. | 14 | So I think there's two different situations.  It's |
| 15 |      Q.    (BY MR. STEESE)  Okay.  Just a few | 15 | whether or not -- |
| 16 | more points here, and then I'm going to look over | 16 |      Q.    (BY MR. STEESE)  That's an absolutely |
| 17 | my notes.  Last we spoke, and you referenced words | 17 | fair point.  Let's talk about each of those |
| 18 | to this effect today but I'll admit it was | 18 | separately.  And what I think you told me is AT&T |
| 19 | fleeting.  You suggested that you can only bill | 19 | has designed its network so it does not bill for |
| 20 | end office switching on your own telephone | 20 | those calls -- charges on those calls, correct? |
| 21 | numbers.  Do you recall that generally? | 21 |      A.    Yes. |
| 22 |      A.    Yes. | 22 |      Q.    But the question is:  Would it be |
| 23 |      Q.    And then today I asked some | 23 | theoretically possible to bill legitimately?  Do |
|  | Page 79 |  | Page 81 |
| 1 | questions, and I'll give you some examples.  One, | 1 | you have an understanding one way or the other in |
| 2 | it's a cable company, but the cable company | 2 | that scenario? |
| 3 | doesn't have a tariff so you're billing the end | 3 |         MR. BENSON:  Object to form. |
| 4 | office.  And because they're not, that would be | 4 |      A.    It would just be my opinion on as it |
| 5 | where you're billing and it's not an OTT call.  Do | 5 | would relate to an order that I haven't read in |
| 6 | you remember that scenario? | 6 | detail on whether or not AT&T would be entitled to |
| 7 |      A.    I remember saying that I wasn't aware | 7 | bill for those functions if it was not providing |
| 8 | of any situations like that. | 8 | the TN.  I mean, I can give you an opinion.  And |
| 9 |      Q.    You were not aware of that for AT&T, | 9 | that is, if we are providing those last mile |
| 10 | but you were aware that that was theoretical | 10 | connections, then I would think we would have the |
| 11 | potential? | 11 | right to bill it.  Now whether or not we actually |
| 12 |      A.    Sure. | 12 | in practicality would, I'm not sure.  I don't |
| 13 |      Q.    That's what I thought I heard you | 13 | believe we would. |
| 14 | say. | 14 |      Q.    (BY MR. STEESE)  Fair enough.  Do you |
| 15 |      A.    Yes. | 15 | still have your deposition in front of you, sir? |
| 16 |      Q.    And so the big question is -- and | 16 |      A.    Yeah, I do. |
| 17 | again, I'm not looking for your interpretation of | 17 |      Q.    If you turn to Page 33, please.  And |
| 18 | the order.  I'm looking for your understanding. | 18 | I have to get there myself so forgive me. |
| 19 | But in reality, is it -- it's not the TN that | 19 |      A.    Okay. |
| 20 | determines whether or not you bill end office | 20 |      Q.    And if you -- this is in the very |
| 21 | switching.  It's the functions you perform, | 21 | beginning.  And I'm asking you who did you speak |
| 22 | meaning if you are performing the end office | 22 | with to prepare for your original deposition.  In |
| 23 | switching function and the facilities go all the | 23 | Line 8 and 9, you said -- and just above that, you |