**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM

AT&T CORP.,

 Plaintiff/Counter Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

 Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

 Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.

 Counterclaim Defendant

---

**AT&T REPLY IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EVIDENCE OF LEVEL 3'S CLAIMED LATE PAYMENT CHARGES, OR,
IN THE ALTERNATIVE, AT&T MOTION TO STRIKE**

---

Plaintiff/Counterclaim Defendant AT&T Corp. ("AT&T"), by and through undersigned counsel, submits this reply brief in support of its motion in limine to exclude evidence that Defendant/Counterclaimant Level 3 Communications, LLC ("Level 3") (AT&T and Level 3, collectively the "Parties") intends to introduce in support of a claim for damages that are not recoverable pursuant to its breach of contract claim in this litigation, or in the alternative, strike such damages (the "Motion") (ECF No. 207).

1

## INTRODUCTION

Level 3 asserts a breach of contract claim against AT&T for end-office switching access charges based on the Parties' 2015 Release and Settlement Agreement ("Agreement"). ECF No. 124, ¶¶ 60–71. In its Motion, AT&T demonstrated that the plain language and structure of the Agreement does not allow Level 3 to recover Tariff-based 18% per annum late payment penalties as damages for its breach of contract claim.[1] AT&T recognizes that motions *in limine* in a trial before the Court may be atypical. Here, however, because Level 3 has sought damages (late payment penalties) that are not available for breach of the Agreement, the Court should not allow Level 3 to waste the Court and the Parties' time and resources presenting any argument or evidence on late payment penalties. Granting the Motion will streamline the fact-finding portion of these proceedings and avoid prejudice to AT&T, which should not have to defend against a claim for damages that are not available under the law.

In its Response in Opposition to the Motion (the "Response" or "Resp."), Level 3 makes three arguments in an attempt to convince the Court to read Tariff-based late payment penalties into the Agreement. None of these arguments addresses the central flaw in Level 3's position—at no time in these proceedings (trial or post-trial) will Level 3 be able to collect any damages based on its Tariff. Moreover, none of Level 3's arguments suggests that determining whether late penalties are available as damages for breach of the Agreement depends on the weighing of the

---

[1] AT&T could find no public record of the purported cancellation of Level 3's tariff. However, as Level 3 admits, there are no material differences between the Level 3 Tariff F.C.C. No. 4 cited in AT&T's Motion and the CenturyLink Competitive Operating Companies Tariff F.C.C. No. 4 (the "Tariff") cited here. *See* Ex. 1 to the Decl. of Justin A. Benson.

2

credibility of any testimony. Therefore, evidence of damages based solely on the Tariff—late payment penalties—should not be presented at trial.

*First,* such evidence should be excluded because the Agreement does not provide for recovery of such charges. Although parties to a contract can choose to include late payment provisions in a contract, AT&T and Level 3 did not do so in the Agreement. Therefore, rather than rely on the text of the Agreement, Level 3 argues that the Court should read Tariff-based late payment charges into that contract for a supposed deterrent effect. *See, e.g.*, ECF No. 219, Resp. at 2 ("there is no way Level 3 would agree to let AT&T withhold millions of dollars of payments with no threat of reprisal"); *id.* at 6 ("Otherwise, AT&T could withhold payment with impunity"). This Court should reject Level 3's policy-based arguments to rewrite the Agreement by reading penalty charges into it.

*Second*, Level 3 asserts that the filed-rate doctrine "requires AT&T to follow the terms of the Tariff," Resp. at 8, and therefore it can recover late payment charges. This is wrong. The filed-rate doctrine applies to claims arising under a tariff, not a claim pursuant to an unfiled contract like the Agreement.

*Third*, although Level 3 argues it is entitled to prejudgment interest under New York law, that question is irrelevant to the separate question of whether Level 3 should be permitted to present evidence of late payment penalties at a damages trial. AT&T's motion does not relate to prejudgment interest, which may appropriately be considered *post*-trial and—even then—is discretionary (and should not be awarded here). Level 3's pivot to a prejudgment interest argument is nevertheless telling, as it reflects its own tacit acknowledgement of the inescapable conclusion

3

that its damages for breach of the Agreement cannot include late penalties, whether that issue is decided before, during, or after trial.

## ARGUMENT

I.  **AT&T's Motion In Limine Seeks Only To Exclude Irrelevant Evidence Not Supported by Level 3's Pleadings.**

A motion in limine "enable[s] the court 'to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Michael v. Rocky Mountain Festivals, Inc.*, No. 1:16-cv-02969-SKC, 2019 WL 10011881, at *1 (D. Colo. July 19, 2019) (quoting *United States v. Cline*, 188 F. Supp. 2d 1287, 1291 (D. Kan. 2002)). Here, Level 3 should be precluded from presenting any evidence or argument related to late payment charges at trial because such amounts are not recoverable as damages for breach of the Agreement. *See Howard v. Bank of Am., N.A.*, No. CV 04-2196-PHX-ECV, 2006 WL 1816993, at *2 (D. Ariz. June 29, 2006) (prohibiting plaintiff from "present[ing] evidence of or argu[ing] for damages not specifically requested in the complaint."); *Saiz v. Cty. Of Bernalillo*, No. 07-790 JAP/LFG, 2008 WL 11409996, at *2 (D.N.M. July 22, 2008).

Nor does AT&T's Motion require the Court to make "fact-bound determinations dependent upon the character of the evidence introduced at trial." *See* Resp. at 7 (quoting *United States v. Mejia-Alarcon*, 995 F.2d 982, 987 (10th Cir. 1993)). Instead, AT&T's Motion raises "evidentiary issues [that] are akin to questions of law," and thus can be properly and "finally decided in a pretrial hearing" on a motion in limine. *Mejia-Alarcon*, 995 F.2d at 987. The fact that the Agreement does not incorporate the entirety of the Tariff or any of its late payment charges is apparent without any need for "fact-bound determinations," and drawing that conclusion does not rely "upon the

4

character of the other evidence [that will be] admitted at trial." *See Mejia-Alarcon*, 995 F.2d at 987 (finding that motion in limine presented an "evidentiary issue[] akin to a question of law"). The only evidence the Court need consider is the text of the Agreement itself, which, as explained in AT&T's Motion and below, definitively excludes any mention of late payment charges from the provisions on which Level 3's counterclaim rests.

### A. The Agreement Only Required AT&T To Pay Level 3's "Applicable Switched Access Tariffed Rate," Not Tariffed Late Payment Charges.

In the Agreement, the Parties agreed that AT&T would pay Level 3's "applicable switched access tariffed *rate*." That "rate" does not include late payment charges. Given that the Agreement is the "entire and complete agreement of the Parties" and fully integrated, *see* ECF No. 15-1 at 6, Level 3's attempt to seek Tariff-based late payment damages is improper, and any evidence regarding such charges should be excluded as irrelevant to the issue before the Court.

As noted in AT&T's Motion, courts look to "the intent of the parties" to discern a contract's meaning. *Slatt v. Slatt*, 477 N.E.2d 1099, 1100 (N.Y. 1985). Where, as here, their intention "is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used." *Id.* "The best evidence of what parties to a written agreement intend is what they say in their writing," *Slamow v. Del Col*, 594 N.E.2d 918, 919 (N.Y. 1992), and, thus, "if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014). Critically, "when certain language is omitted from a provision but placed in other provisions, it must be assumed that the omission was intentional." *Sterling Inv. Servs., Inc. v. 1155 Nobo Assocs., LLC*, 818 N.Y.S.2d 513, 516 (N.Y. App. Div. 2006); *see also U.S. Fid. & Guar. Co. v. Annunziata*, 492 N.E.2d 1206, 1208 (N.Y. 1986).

5

In the Agreement, the Parties agreed AT&T would pay Level 3 its "applicable switched access tariffed *rate* for OTT traffic." ECF No. 15-1, Agreement, at § 1(a)(ii). Despite the gymnastics Level 3 goes through to argue otherwise, the phrase "applicable switched access tariffed rate" does not include late payment charges. Level 3 acknowledges, as it must, that "late payment charges" are not mentioned in this operative provision of the Agreement. Resp. at 12–13.

On the other hand, multiple other provisions in the Agreement *do* explicitly mention late payment charges. *See id.* at §§ 1(a)(i)-(i)(A), 1(b)(i), 1(c). Level 3 tries to argue that, because the terms "rates" and "late payment charges" are never used in the *same* provision, "rates" includes "late payment charges." Resp. at 13. Tellingly, Level 3 cites no law in support of its strained reading. Indeed, Level's misguided approach to contract interpretation is flatly inconsistent with principles of New York law that looks to whether "language is omitted from [one] provision but placed in other provisions"—not whether one provision includes both of the terms at issue and then draws a distinction between them. *See Sterling Inv. Servs.*, 818 N.Y.S.2d at 516 (language used in one section of a contract could not be used to interpret another section of the contract that used different phrasing).

B.  **Even Under Level 3's View Of The Agreement, Level 3's Argument Fails.**

Even under Level 3's strained view, the Agreement cannot be read to do what Level 3 wants. Under its view, there are three distinct time periods governed by the Agreement. They are: (i) the period preceding execution of the Agreement, (ii) the period between execution of the Agreement and the issuance of a "Final Appellate Order", and (iii) the period after a "Final Appellate Order." Resp. at 4–5, 13–14. Using this as a framework, Level 3 then points to Exhibit

6

A to the Agreement. Resp. at 3–4, 13. Exhibit A "listed the outstanding account receivable for a list of billing account numbers through April 2015." Resp. at 13. And because "[t]hose outstanding amounts included both usage charges and late payment charges," voila, "late payment charges are, and always have been, part and parcel of the OTT Dispute." Resp. at 13.

Level 3 is wrong. In making these logical leaps, Level 3 ignores its own framework that the Agreement divided the world into three distinct time periods—(i) pre-Agreement, (ii) post-Agreement/pre-Final Appellate Order, and (iii) post-Final Appellate Order. Specifically, as Level 3 admits, Exhibit A only includes usage and late payment charges "*through April 2015*." Resp. at 13 (emphasis added). In other words, the amounts in Exhibit A include late payment charges for the pre-Agreement period and that time period alone.

That section is also the only part of the Agreement that mentions "late payment charges" in the context of the OTT dispute. *See* Agreement, § 1(a)(i)(A). Conversely, the *forward-looking* provision of the Agreement (*i.e.*, the subject of Level 3's counterclaim)—Section 1(a)(ii)—says nothing about late payment charges. *See* Agreement, § 1(a)(ii) (establishing what AT&T will pay "[f]or switched access traffic exchanged by the Parties *beginning on June 1, 2015*") (emphasis added). And, neither Section 1(a)(ii) nor Section 1(a)(iv) reference Exhibit A at all. *See id.* at §§ 1(a)(ii), 1(a)(iv) (addressing time period "after [the] Final Appellate Order becomes final"). Thus, although the Agreement does contemplate late payment charges for prior periods (when Level 3 was billing pursuant to its Tariff rather than an agreement), the Parties agreed that an "obligation to pay late payment charges," Resp. at 13, extended only to the obligation to pay late payment charges before the April 2015 execution of the Agreement, and no further. Accordingly, late

7

payment penalties are outside the scope of Level 3's counterclaim and are not relevant to the issues to be tried.

### C. Level 3's Argument That Tariffed Late Payment Charges Should Be Read Into The Agreement Is Inconsistent With The Tariff Itself.

Level 3 argues there is "no support for th[e] selective and self-serving distinction" between "rates" referenced in Section 1(a)(ii) of the Agreement—which AT&T agreed to pay—and "the late payment charges referenced in [Section 1(a)(i)(A)]." Resp. at 13. Yet, Level 3 fails to note that the "distinction" is made by the Tariff itself, which (unlike the Agreement) Level 3 unilaterally drafted. The Tariff clearly identifies "rates" in Section 15 as a term and concept distinct from "late payment pentalt[ies]" in Sections 4.2.6 and 4.9(4). Section 15, sets forth "Rates and Charges." *See* Tariff, § 15. Section 15 includes, among other things, the "Rates for Switched Access Service," *id.* at § 15.1, the different "Rates and Charges" applicable to individual switched access services, *id.* at § 15.1.3, and "Local End Office Switching Rates," *id.* at § 15.1.3.4.2. On the other hand, late payment charges are found in another, wholly-separate section of Level 3's Tariff. *See id.* at §§ 4.2.6; 4.9(4) (addressing "late payment pentalt[ies]").[2]

Had the Parties intended to incorporate Level 3's entire Tariff and/or Section 4's late payment penalties into the Agreement, they could have done so. But they did not. Because "[t]he best evidence of what parties to a written agreement intend is what they say in their writing," *Slamow*, 594 N.E.2d at 919, late payment penalties are *not* part of the "applicable switched access tariffed *rate[s]*," that AT&T agreed to pay in the Agreement. *See* Agreement, § 1(a)(ii) (emphasis

---

[2] Although the Tariff clearly distinguishes between rates and late payment charges, if the Tariff were ambiguous, it is well-settled that any ambiguity in a tariff is construed against the drafter, *i.e.*, Level 3. *See, e.g.*, *AT&T v. Alpine Commc'ns*, 27 FCC Rcd 11511, ¶ 27 (2012) (citing authorities). Thus, to prevail here, Level 3 must show that its Tariff *unambiguously* equates late payment charges and rates. It does not do so.

8

added). These penalties, therefore, are not recoverable pursuant to Level 3's breach of contract claim. As such, evidence related to late payment penalties under Section 4 of the Tariff are irrelevant to Level 3's breach of contract claim, and therefore should be excluded from trial or struck from Level 3's damages claim. *See Godfrey v. CSAA Fire & Cas. Ins. Co.*, CIV-19-00329-JD, 2020 WL 1056306, at *1–5 (W.D. Okla. Mar. 4, 2020) (granting defendants' motions in limine to exclude irrelevant evidence).

## II.  The Filed-Rate Doctrine Does Not Apply To This Case.

Level 3 next contends that the Agreement *must* incorporate Level 3's Tariff because otherwise the parties would be in violation of the filed-rate doctrine. *See* Resp. at 8. This claim is meritless. The filed-rate doctrine is derived from the Communications Act's tariffing provision in 47 U.S.C. § 203. In relying on the filed-rate doctrine argument, Level 3 is simply recycling an argument it raised earlier in this litigation. *See* ECF No. 170, Level 3 Resp. to AT&T's Mot. for Par. Sum. J., at 15–20. Level 3's argument was misguided then, and it remains so now, for the simple reason that the filed-rate doctrine is applicable to services that a carrier provides pursuant to a tariff but *not* applicable to services provided pursuant to an unfiled agreement, like the Agreement here. Level 3 cites no cases holding otherwise. Because this is a breach of contract case on the unfiled Agreement, the filed tariff doctrine is not applicable.

Although local carriers like Level 3 traditionally were required to provide access services exclusively through validly-filed tariffs, in the late 1990s and early 2000s, Congress and the Federal Communications Commission ("FCC") changed the law to allow provision of access services by either a lawful tariff or a negotiated written (but unfiled) agreement. *See CallerID4U v. MCI Commc'ns*, 880 F.3d 1048, 1052-60 (9th Cir. 2018) (detailing regulatory history). Then,

9

in 2011, the FCC issued new rules re-affirming that carriers could provide service either via written agreements or under tariffs that comply with FCC rate regulations; these rules also expressly and comprehensively regulated the OTT calls that are the basis of the dispute here. The new rules set "default" rates for access services, and included OTT-VoIP calls into this framework; the FCC's rules also allowed local carriers like Level 3 to file these default rates in tariffs. *See Transformation Order*, 26 FCC Rcd 17663, ¶¶ 800-01, 933, 944 (2011); *see also* 47 C.F.R. § 51.905(a) ("rates set forth in this section are default rates."). The FCC's rules, however, also explicitly permitted carriers to enter into negotiated agreements that provided for "different" rates. *Id.*; *Transformation Order*, ¶¶ 812, 933, 944, 960-61. The FCC explained that, although "carriers typically tariff their access charges, . . . carriers remain free to enter into negotiated agreements that differ from the default rates established." *Transformation Order*, ¶ 812. The FCC emphasized that "[n]otwithstanding any other provision of the Commission's rules, telecommunications carriers may agree to rates different from the default rates." 47 C.F.R. § 51.905(a); *see also Transformation Order*, ¶ 828.

Put plainly, AT&T and Level 3 were allowed to vary the default rates that AT&T would pay for the end-office switched access services provided by Level 3. As a result, AT&T and Level 3 reached a perfectly permissible de-tariffed arrangement—the Agreement. *See Transformation Order*, ¶ 812 n.1524 ("the framework we adopt today encourages carriers to enter into contracts *in lieu of the tariffing framework*.") (emphasis added). As Level 3 previously noted in this case, "the filed-rate doctrine . . . does not apply to . . . detariffed agreements." ECF No. 170, at 16. That is indeed the law. *See CallerID4U*, 880 F.3d at 1063 ("a CLEC remains subject to § 203 and the filed rate doctrine *unless it negotiates an agreement*.") (emphasis added); *Teliax, Inc. v. Verizon*

10

*Servs. Corp.*, No. 18-CV-00104-RM-MEH, 2018 WL 3729518, at *5 (D. Colo. Aug. 6, 2018) (Moore, J.) (noting that "because the plaintiff [in *CallerID4U*] did *not* negotiate a contract, it remained subject to . . . the filed-rate doctrine.") (emphasis added).  In other words, the filed-rate doctrine has no relevance to Level 3's breach of contract claim.

Not only are Level 3's attempts to invoke the filed-rate doctrine irrelevant, they are also completely one-sided.  If the Agreement incorporated Level 3's Tariff in whole because the filed-rate doctrine condoned of no other result, then Level 3 could not have successfully relied on the Agreement to retain 50% of its end-office switching overcharges through February 2020.  Absent the Agreement, and under its Tariff, Level 3 would have been obligated to make a full refund.  *See* Order on Remand and Declaratory Ruling, *In the Matter of Connect America Fund*, 34 FCC Rcd. 12692, ¶¶ 4, 26 (2019).  Level 3 cannot have it both ways:  it cannot retain half of the overcharges based on its view that the Agreement trumps its Tariff, and then claim the Tariff trumps the Agreement when it comes to late payment penalties.  Unsurprisingly, Level 3's lengthy discussion of the filed-rate doctrine makes no mention of this glaring inconsistency.

## III.     Level 3 Is Not Entitled To Prejudgment Interest.

Finally, Level 3 attempts to recharacterize its late penalty claim as a request for prejudgment interest under New York law.  *See* Resp. at 15.  Regardless of whether Level 3 is ultimately entitled to prejudgment interest after the Court determines damages, evidence regarding Tariff late payment charges is irrelevant to Level 3's breach of contract claim and should be excluded from the trial.[3]

---

[3] Level 3 is wrong that New York law requires prejudgment interest be awarded for a breach of contract.  Courts have discretion to determine whether the award of prejudgment internet is appropriate given the particular facts of each case.  *See GE Funding Cap. Mkt. Servs., Inc. v. Nebraska Inv. Fin. Auth.*, 767 F. App'x 110, 115 (2d Cir. 2019)

All the cases cited by Level 3 to support its prejudgment interest argument are miles apart from the facts of this dispute. For example, in *Oldcastle Precast, Inc. v. Liberty Mut. Ins. Co.*, 838 F. App'x 649, 651 (2d Cir. 2021), the Second Circuit noted that "when a contract provides for interest to be paid at a specified rate [then] the contract rate of interest, rather than the statutory rate" governs. (quoting *Eur. Am. Bank v. Peddlers Pond Holding Corp.*, 586 N.Y.S.2d 637 (N.Y. App. Div. 1992)). The panel emphasized that the agreement between the parties set a rate of interest on "unpaid balances under the Contract" and the parties went out of their way to "explicitly . . . change the interest rate from 1.5 percent to 0.5 percent." *Id.* Only under such clear contractual language did the panel conclude "the parties intended for a 0.5 percent prejudgment monthly interest rate to apply." *Id.* at 652. No such evidence or intent exists here, and the Agreement says nothing about the amount of interest either of the Parties would pay on unpaid balances. Level 3's toothless argument to the contrary—that "AT&T agreed to be subject to the Tariff's rate for late payment charges," Resp. at 15—fails for the same reasons it fails above. Namely, had the Parties wanted to incorporate Level 3's entire Tariff into the Agreement—including Section 4's late payment penalties—they could have easily done so. They did not.

And Level 3's policy arguments for prejudgment interest are likewise unavailing, and, in typical fashion, revert to papering over the fact that Level 3 could have brought a tariff collection action had it wanted.[4] In other words, Level 3 is wrong both as a matter of law and policy.

---

(collecting cases). "New York courts accordingly have looked to the economic realities of a given case to avoid conferring windfalls in the form of prejudgment interest." *Id.* Under New York law, the "statutory interest rate is 9% per annum." *In re FKF 3, LLC*, No. 13 CIV. 3601 (JCM), 2018 WL 5292131, at *16 (S.D.N.Y. Oct. 24, 2018) (citing N.Y. C.P.L.R. § 5004). Thus, after trial, *if* the Court determines prejudgment interest should be awarded, the rate would be at 9% per annum–not at the 18% per annum provided for in the Tariff for late payment penalties.

[4] Specifically, Level 3 claims that failing to award prejudgment interest would "exempt AT&T from the late payment provisions" and incentivize AT&T "to withhold with impunity." Resp. at 17. First, as explained in AT&T's Motion

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion and exclude all evidence and argument of late payment penalties, or in the alternative, its motion to strike.

Respectfully submitted this 25th day of May, 2021.

|  |  |
|---|---|
|  | By: /s/ Justin A. Benson |
| Michael J. Hunseder<br>Michael D. Warden<br>Justin A. Benson<br>Joshua W. Moore<br>SIDLEY AUSTIN LLP<br>1501 K ST NW<br>Washington, DC 20005<br>Telephone: (202) 736-8000<br>mhunseder@sidley.com<br>mwarden@sidley.com<br>jbenson@sidley.com<br>joshua.moore@sidley.com<br><br>*Attorneys for Plaintiff AT&T Corp. and Counterclaim Defendant Teleport Communications Group* | Rebecca B. DeCook<br>Andrew T. Flynn<br>Moye White LLP<br>1400 16th Street, 6th Floor<br>Denver, CO 80202-1027<br>becky.decook@moyewhite.com<br>andrew.flynn@moyewhite.com<br><br>Angela C. Zambrano<br>SIDLEY AUSTIN LLP<br>2021 McKinney Avenue<br>Suite 2000<br>Dallas, TX 75201<br>Telephone: (214) 981-3300<br>angela.zambrano@sidley.com |

---

and above, there are no "late payment provisions" in the Agreement aside from those which relate to periods irrelevant to the issues before the Court in this litigation. *See supra* pp. 6–8. Second, properly-pled collections actions were, are, and will be available to disincentivize carriers from "shirk[ing]," Resp. at 2, their payment obligations under telecommunications tariffs whether Level 3 is improperly able to seek Tariff late payment charges here.

13

## CERTIFICATE OF SERVICE

I, Justin A. Benson, hereby certify that on May 25, 2021 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Charles W. Steese, #26924
Douglas N. Marsh, #45964
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
Email: csteese@armstrongteasdale.com
Email: dmarsh@armstrongteasdale.com

*Attorneys for Defendant Level 3 Communications, LLC*

/s/ Justin A. Benson
Justin A. Benson
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: jbenson@sidley.com

*Attorney for Plaintiff AT&T Corp. and Counterclaim Defendant Teleport Communications Group*