**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM

AT&T CORP.,

      *Plaintiff/Counter Defendant,*

v.

LEVEL 3 COMMUNICATIONS, LLC,

      *Defendant/Counterclaimant,*

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC

      *Counterclaimants,*

v.

TELEPORT COMMUNICATIONS GROUP, INC.

      *Counterclaim Defendant.*

---

**AT&T/TCG'S PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDERS**

---

      Plaintiff/Counter-Defendant AT&T Corp. and Counterclaim Defendant Teleport
Communications Group, Inc. ("TCG"), by and through undersigned counsel, pursuant to the
Court's Orders Setting Case for Trial (ECF Nos. 201, 251, 254), respectfully submits these
proposed findings of fact, conclusions of law, and orders.

I.      **BACKGROUND**

This case involves a long-running dispute between AT&T Corp. ("AT&T") and Level 3 Communications, LLC ("Level 3") (collectively, the "Parties") as to whether Level 3 may charge AT&T local (or end-office) switching on over-the-top ("OTT") Voice over Internet Protocol ("VoIP") calls. Based on this Court's order on summary judgment and certain agreements of the Parties, the principal issue for trial involved how much Level 3 is owed for amounts that AT&T withheld on end-office switching charges in breach of a 2015 Release and Settlement Agreement ("2015 Agreement") pursuant to Count I of Level 3's Amended Counterclaims. For purposes of trial, Level 3 served as the plaintiff.

The Court makes the following findings of fact and conclusions of law and enters the following orders after hearing testimony and receiving evidence at a two-day bench trial in this matter on July 14-15, 2021

II.     **FINDINGS OF FACT**

To the extent that any conclusions of law are deemed to be findings of fact, they are incorporated herein by reference as findings of fact.

A.      **The Parties, Switched Access Services, And The Dispute Regarding End-Office Switched Access Services**

1.      AT&T is a provider of long distance telephone services, known as an Interexchange Carrier or "IXC," for purposes of this case. Level 3 is a type of local telephone carrier known as a "competitive local exchange carrier" or "CLEC".

2.      Local telephone carriers like Level 3 provide switched access service to long distance carriers like AT&T when callers place long distance calls. Switched access service is used to complete a long distance call to a called party ("terminating" switched access) or to begin

2

a long distance call from a calling party ("originating" switched access).  Local carriers, including Level 3, bill the long distance carriers like AT&T different rates for different components of switched access services, known as "rate elements."  These rate elements for switched access services include end-office switching, tandem switching, and transport functions, among others. *E.g.*, 47 C.F.R. § 61.26(a)(3)(i).  In general, end-office switching involves switching calls on and off of "last-mile" facilities connected to callers; tandem switching is switching that sends calls between other switches; and transport hauls calls from one location to another.

3.      Level 3 regularly provides and bills AT&T for different rate elements, including end-office switching, tandem switching, and transport functions, amongst others.  End-office switching is the switched access service at issue in this litigation.  In particular, these end-office switching services are for "originating" access service (*i.e.*, long distance calls placed by callers and then sent to AT&T for routing).

4.      Level 3 provides switched access services based on filed tariffs or written negotiated contracts. *Transformation Order*, ¶ 812; 47 C.F.R. § 51.905(a).  The 2015 Agreement, discussed *infra*, covering end-office switching on OTT VoIP calls, is one example of a negotiated commercial contract between AT&T and Level 3.

5.      In recent years, telephone calls, including long distance calls, increasingly are being placed using VoIP technology, rather than the traditional circuit-based telephone network.  In 2011, the FCC put in place rules that govern the charges that can be billed on VoIP calls.  47 C.F.R. § 51.913; *Transformation Order*, ¶ 944.

6.      AT&T and Level 3 have had a long-running dispute as to how those FCC rules apply to a type of VoIP calling known as "over-the-top" VoIP ("OTT VoIP").  There are two types

of VoIP calls.  The first is a "facilities-based" VoIP service call, where the caller obtains a high-speed broadband connection from the local telephone carrier or a partner of the local carrier, and uses that broadband connection to place VoIP service calls.  The second is "over-the-top" VoIP, where callers use a VoIP calling service, but separately purchase high-speed broadband service from a third party.

7.      Level 3 claimed that the FCC's rules allowed it to bill end-office switching access charges on OTT VoIP calls, most of which it carried and transmitted to AT&T through arrangements made with OTT VoIP service providers.  AT&T disagreed that end-office switching charges were proper on such calls.

8.      In 2015, the FCC issued an order agreeing with Level 3's position.  *See* Declaratory Ruling, *Connect America Fund*, 30 FCC Rcd. 1587 (2015); *see also* ECF No. 204 at 2.  AT&T petitioned for review of that decision in the United States Court of Appeals for the District of Columbia Circuit.  *Id.*

**B.      The Parties' 2015 Settlement Agreement.**

9.      While that appeal was pending, AT&T and Level 3 entered into the 2015 Agreement.  That agreement addressed three separate billing disputes between the Parties, including (1) the dispute over end-office switching charges on OTT VoIP calls; (2) a "Tandem Dispute;" and (3) a "DEOT Billing Dispute."  *See* ECF No. 15-1, at 1–2. The resolution of the dispute relating to the OTT VoIP calls is the only relevant issue in this proceeding.

10.      With regard to the end-office switching dispute on OTT VoIP calls, the 2015 Agreement reflects three separate time periods:  (i) the period preceding execution of the 2015

Agreement, (ii) the period between execution of the 2015 Agreement and the issuance of a "Final Appellate Order," and (iii) the period after a "Final Appellate Order." *See id.* at 2–3.

11.     First, for the pre-Agreement period, which was included in Section 1(a)(i)(A), the Parties agreed that, "[i]n settlement of the OTT Dispute,"[1] AT&T would pay Level 3 approximately $15 million, "which is seventy-five percent (75%) of the usage and *late payment charges* billed by Level 3 for the traffic exchanged by the Parties through March 2015 that is the subject of the OTT Dispute." *Id.* at § 1(a)(i)-(i)(A) (emphasis added).  The same section recognized that "the calculation of usage and *late payment* charges included in the total amount of charges identified in this Section 1(a)(i)(A) may vary from the actual amount owed once all billing is complete." *Id.* (emphasis added).  This provision of the Agreement thus expressly provides for the payment of late payment charges, which are distinct from usage charges.

12.     For the period between the execution of the 2015 Agreement and the issuance of a "Final Appellate Order," the Parties agreed, in Section 1(a)(ii), that "[f]or switched access traffic exchanged by the Parties beginning on June 1, 2015, AT&T shall pay Level 3 its applicable switched access tariffed rate for OTT traffic, pursuant to the terms of the OTT Declaratory Order." *Id.*  Relevant to this proceeding, the Settlement Agreement also provided, "[f]or avoidance of doubt, this Settlement Agreement shall not prohibit AT&T from disputing Level 3's billing for switched access traffic for reasons unrelated to the requirements of the OTT Declaratory Order, including but not limited to disputes regarding volumes or applicable rates." *Id.* at § 1(a)(ii).  This

---

[1] As relevant here, the "OTT Dispute" in the 2015 Agreement referred to the following:  "in the course of Level 3's provision of switched access services to AT&T, AT&T has (i) disputed and not paid certain Level 3 end office switching charges . . . on traffic originating from and/or terminating to the local exchange service end-user customers served by providers of over-the-top voice over Internet protocol . . . services."  ECF No. 15-1, at 1.

provision applied until the issuance of a "Final Appellate Order," which was in recognition of AT&T's pending appeal of the FCC's 2015 Order.

13.     Third, after the "Final Appellate Order," the Parties agreed in Section 1(a)(iv) that "Level 3 [would] refund, within 30 days, fifty percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order.  Further, the Parties agree that "any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order."  *Id.* at § 1(a)(iv).

14.     Notably, and in contrast to Section 1(a)(i)(A), neither Section 1(a)(ii) nor Section 1(a)(iv) references or even mentions any obligation to pay late payment charges or penalties.

15.     The 2015 Agreement between the Parties is a fully integrated agreement and is governed by New York law.  *Id.* at 6 ("This Agreement is the entire and complete agreement of the Parties regarding the subject matter hereof."); *see also id.* ("All prior discussions and negotiations regarding the Disputes have been, and are, merged and integrated into, and are superseded by, this Agreement.").[2]

---

[2] The 2015 Agreement provides that it shall be construed in accordance with and governed by the laws of the State of New York.  ECF No. 15-1, at 6.

C.   **The Parties' Dispute After The *AT&T* Decision.**

16.   On November 18, 2016, AT&T prevailed on its petition for review, and the FCC's 2015 order was vacated and remanded.   *AT&T Corp. v. FCC*, 841 F.3d 1047 (D.C. Cir. 2016) ("*AT&T*").   Level 3 declined to appeal the DC Circuit's decision, which became final on May 8, 2017.

17.   From AT&T's perspective, two things followed from its position that the DC Circuit's decision constituted a "Final Appellate Order" within the meaning of the 2015 Agreement.   First, AT&T asserted that Level 3 owed AT&T a 50% refund of the OTT end-office switching charges that AT&T had paid Level 3 from the June 2015 date of the 2015 Agreement through the May 21, 2017 date on which the D.C. Circuit's decision became final.   Because AT&T had paid Level 3 $16.6 million in end-office charges that AT&T believed was associated with OTT traffic, AT&T believed that Level 3 owed AT&T a refund of 50% of that amount or $8.3 million. Second, because AT&T believed that Level 3 could no longer bill for end-office switching on OTT calls because of the finality of the D.C. Circuit decision, AT&T asserted that the parties needed to agree on what percentage of end-office switching charges related to OTT calls.[3]

18.   The parties attempted to reach a negotiated resolution of these issues in the summer of 2017.   When those efforts failed, in August 2017, AT&T began withholding 65% of Level 3's billed end-office switching charges.   AT&T's position was that 65% withholding was appropriate because the 2015 Agreement reflected that 65% of Level 3's traffic historically was OTT VoIP. AT&T thus paid 35% of Level 3's billed end-office switching charges.   *See* AT&T Ex. 6 (AT&T

---

[3] As discussed below, the Court concluded that the *AT&T* decision was not a "final appellate order" as contemplated by the 2015 Agreement because it did not give the Parties sufficient guidance to determine which end-office charges should not have been charged under the FCC's rules.   *See* ECF No. 204, at 7.

employee directing payment of 35% "in order to care for our OTT dispute."). AT&T did not withhold any payments for tandem switching services based on the OTT dispute.

19.     Although the parties continued to dispute the appropriate amount of end-office charges related to OTT calls, the Parties reached a Confidential Release and Settlement Agreement in 2019 (the "2019 Agreement") that resolved the Parties' OTT VoIP billing disputes through December 31, 2018.  Thus, to the extent that Level 3 raised issues at trial regarding the $8.3 million referenced above or the $300,000 per month or any other amounts that AT&T withheld prior to January 1, 2019, those amounts and issues associated with them are not relevant.  Rather, the dispute before the Court relates to end-office switching charges levied by Level 3 between January 1, 2019 through the date of trial.

20.     The 2019 Agreement also addressed a total of 21 disputes between the Parties, with some fully resolved and some (like the issue of the 2015 Agreement) left open.

21.     On December 17, 2019, the FCC issued an "Order on Remand and Declaratory Ruling," 2019 WL 7018968 (2019) (the "2019 Declaratory Ruling"). The FCC's 2019 Declaratory Ruling clarified that, under the FCC's rules on VoIP that it issued in 2011, end-office switching access charges do not apply to OTT VoIP calls.  The FCC's ruling applied retroactively.  *2019 Declaratory Ruling*, ¶ 26.

22.     Neither Level 3 nor any other party appealed the *2019 Declaratory Ruling*, and it became final and non-appealable on February 19, 2020.  Nevertheless, after this date, Level 3 continued to bill AT&T end-office switching charges on all of its traffic, even the traffic that Level 3 conceded consisted of OTT VoIP calls.

**D.     The Parties' Lawsuit.**

23.     AT&T filed this action alleging, *inter alia*, that Level 3 breached the 2015 Agreement by unlawfully billing AT&T end-office switching charges on OTT VoIP calls.  ECF No. 1.

24.     Level 3 counterclaimed.  Count I of Level 3's Amended Counterclaims alleged a breach of contract claim based on the 2015 Agreement.  ECF No. 124.  That Count alleged that AT&T "remains obligated to pay Level 3 end office switching access charges," and recognized that "AT&T withholds payment on 65% of the end office switching charges." *Id.* ¶¶ 64, 68.  For damages, Level 3 sought "payment in full of all end office switching access charges owed by AT&T." *Id.* ¶ 70.  This is the only claim that the Parties tried, and Level 3's damage claim is limited to recovery of amounts for end-office switching charges on non-OTT calls.[4]  Because the 2019 Agreement resolved all payment issues regarding the Parties' OTT VoIP billing disputes through December 31, 2018, only end-office switching charges on traffic from January 1, 2019 and after is at issue.

25.     Although Level 3 provides AT&T with many other types of switched access services (including tandem switching and transport services pursuant to Level 3's Tariff), Level 3 did not assert any claims in this proceeding to recover for any amounts relating to those services, including, for example, a collection action to recover under its tariffs.  Level 3's Counterclaim only seeks end-office switching charges owed under the 2015 Agreement.

---

[4] Level 3, along with three of its affiliates, included five other counts against AT&T and TCG.  Counts II and VI are requests for declaratory relief, but these two count have been mooted by the Court's summary judgment order (Count II) and the FCC's 2019 Order (Count VI).  Counts III, IV and V allege that AT&T and TCG have violated the Communications Act and their tariffs by billing Level 3 and its affiliates for end-office switching on OTT VoIP calls.  These latter three counts are discussed below.

26.     In discovery, Level 3 made a variety of disclosures regarding its alleged damages in this case—one set in fact discovery and a second, different set of disclosures after fact discovery closed.  First, in its April 30, 2018 initial disclosures and pursuant to the requirement in Fed. R. Civ. P. 26(a)(1)(A)(iii) that a party provide a "computation of each category of damages claimed," Level 3 disclosed:  "Level 3 seeks payment of end-office switching access charges on all minutes of OTT-VoIP traffic delivered to Level 3 by AT&T since the execution of the parties' Settlement Agreement. AT&T has been withholding payment of these charges since mid-2017."  Level 3 reaffirmed that limitation in its July 18, 2018 interrogatory answers: "Level 3 hereby incorporates [its] . . . Rule 26(a)(1) disclosures . . . . Level 3 further states that its damages consist of the end-office switching access charges AT&T has wrongfully withheld and for which AT&T improperly claims a right to a refund."  On January 3, 2020, Level 3 provided a supplemental Rule 26(a)(1) disclosure, where it re-affirmed that "Level 3 seeks payment of end-office switching access charges on all minutes of OTT-VoIP traffic delivered to Level 3 by AT&T since the execution of the parties' Settlement Agreement. AT&T has been withholding payment of these charges since mid-2017."  Through January 2020, Level 3 consistently asserted that it was only seeking damages for end-office switching.  Indeed, in Level 3's April 2020 Rule 26(a)(2)(C) disclosure, Level 3 made clear that the 2015 Settlement Agreement "obligated AT&T to pay all end office charges until a final decision issued changing the way Level 3 could bill end office charges on OTT calls."

E.     **The Court's Summary Judgment Order And The Remaining Issues Addressed At Trial.**

27.     On March 25, 2021 this Court ruled on the Parties' respective summary judgment motions.  ECF No. 204.  Among other things, this Court ruled that the percentage of Level 3's end-office switching charges associated with VoIP calls did not exceed 21 percent between

January 1, 2019 and February 20, 2020.  Summary Judgment Order ("Order"), ECF No. 204 at 12.

Moreover, this Court found that "pursuant to the settlement agreement, [AT&T] is entitled to a

fifty percent refund for end office switching charges assessed during the relevant period (January

1, 2019 to February 19, 2020)." *Id.*

28.      As a consequence of these rulings, the principal issue remaining for trial was

determination of the damages due to Level 3 based on its breach of contract Counterclaim for end-

office switching charges that Level 3 contends AT&T improperly withheld under the 2015

Agreement.  Also at issue was the question of whether Level 3 may collect late payment penalties

under the 2015 Agreement using the penalty rate found in Level 3's switched access Tariff.

**F.      Billings and Withholding on End-Office Switching Under the 2015
Agreement.**

29.      Because the Court has now ruled that no more than 21% of Level 3's end-office

traffic is OTT VoIP and the FCC has determined that carriers cannot charge for OTT traffic, the

Court has determined that AT&T was obligated to pay Level 3 all of its billed end-office switched

access charges minus the 21% OTT VoIP traffic during the relevant time period.[5]

30.      Because AT&T withheld 65% (not 21%) of Level 3's end-office charges and paid

35% up until shortly after the Court's Order, AT&T over-withheld on Level 3's end-office

switched access charges.  Therefore, under the Court's summary judgment ruling, AT&T is

required to pay Level 3 the difference between what it paid in end-office charges and what Level

3 properly billed under the Court's Order.

---

[5] Level 3 accepts for purposes of trial that its OTT VoIP traffic is 21% of total volumes.  *See* Level 3 Motion in Limine to Exclude AT&T Witnesses, ECF No. 205, at 3 n.1.

31.     AT&T argues that any recovery should be calculated only from the amount of end-office switching charges that AT&T has over-withheld.  On the other hand, Level 3 argues that the damages should be the difference between what Level 3 billed for all switched access services and what AT&T has paid for all switched access services, after certain adjustments.  Level 3 claims that AT&T's 65% withholding applied not just to end-office switching charges but other charges, including tandem switching charges, and that Level 3 is entitled to recover all those charges in this action because they relate to the OTT dispute.

32.     Level 3's damages calculation starts with the total amount Level 3 billed for all switched access services to AT&T from January 1, 2019 (with an invoice date of February 2019) to May 2021 ($56,443,943), subtracts out what AT&T paid Level 3 for all switched access services ($37,933,697), and concludes that it is owed the difference between what AT&T has paid for all switched access services and what Level 3 billed.

33.     Level 3's damage theory seeks recovery of amounts not in its breach of contract claim and is based on speculative and unreliable evidence.  Indeed, it is evident from (1) Level 3's own counterclaim ("Level 3 is entitled to damages in an amount to be determined at trial for payment in full of all end-office switching charges owed by AT&T on over-the-top VoIP calls" (ECF No. 124 § 70).  Thus, Level 3's current contention that AT&T was also withholding payment of *other* charges because of the dispute on OTT VoIP calls is not supported by its pleading.

34.     Level 3's damages theory is also not supported by the evidence presented at trial.  Level 3 points to a series of emails from June and July 2017 and then a later statement attributed to Kim Meola of AT&T in 2018 to support its arguments that AT&T was over-withholding payment for more than end-office charges based on the OTT dispute.  As an initial matter, any

statements about amounts disputed or withheld by AT&T are irrelevant because the 2019 Agreement resolved all disputes regarding the Parties' OTT VoIP billing disputes through December 31, 2018.  Thus, the amount of charges that AT&T withheld and disputed before January 1, 2019 is not relevant.

35.    Even if the Court were to consider these statements, they are not probative of what AT&T withheld after January 1, 2019.  First, the emails from June/July 2017 that Level 3 claims show that AT&T withheld on both OTT VoIP and tandem switched access were sent before AT&T even began withholding for OTT VoIP in August 2017.  *See* Level 3 Ex. 8 at 3 ("There was no withholding action taken for the OTT dispute.").  Level 3 argues that these emails show that AT&T's inability to distinguish between end-office and tandem billing on Level 3's billing account numbers ("BANs") led AT&T to over-withhold on another dispute, the EO/CPN dispute. It then argues that this inability to distinguish between the end-office and tandem billing on Level 3's BANs was also the cause of AT&T over-withholding on the OTT VoIP dispute.  These emails do not show that AT&T's inability to distinguish between end-office and tandem billing would cause AT&T to over-withhold on the OTT dispute two years later.  They also do not show that AT&T's withholding on the EO/CPN dispute was in any way related to AT&T's withholding on OTT VoIP calls.  Rather, as explained below, the Court finds that AT&T withheld 65% on Level 3's end-office charges for the OTT VoIP dispute once it started withholding on the OTT VoIP dispute in August 2017.  *See* AT&T Ex. 6.

36.    Second, Level 3 points to two August 2018 statements it attributes to Ms. Meola. As an initial matter, one of these statements is inadmissible hearsay.  *See* Level 3 Ex. 27.1.  While the statement is attributed to Ms. Meola, the evidence that Level 3 relies on is an out-of-court

statement by Edwin Stocker, a Level 3 employee, which purports to recount what Ms. Meola said during a meeting.  Even if the Court were to consider Mr. Stocker's statements, they are not probative of amounts AT&T withheld on the OTT dispute during the relevant period.  Assuming AT&T was withholding $300,000 of end-office charges from Level 3 per month before August 2018, the email would not prove that AT&T was withholding $300,000 per month after January 1, 2019.  Level 3's own evidence shows that end-office switching volume has declined after that date.  AT&T also presented evidence that the volume of end-office local switching minutes has decreased significantly for the time-period remaining in dispute (*i.e.*, January 2019 to the present).  As such, the monthly amounts that AT&T withheld based on the OTT dispute for the time period that is relevant for this litigation (January 2019 to the present) is significantly less, and comports with AT&T withholding 65% of end-office charges billed by Level 3.

37.     In summary, the Court rejects Level 3's damages theory.  When Level 3 billed the other switched access services to AT&T, AT&T disputed some of those charges and withheld payment for reasons other than the OTT dispute.  The amounts withheld for these other access services were not related to end-office switching charges or AT&T's withholding of 65% on those charges.  The evidence does not support Level 3's contention that AT&T withheld 65% of any of Level 3's switched access services other than end-office switching.  Rather, to the extent AT&T withheld amounts billed for switched access services other than end-office switching, any disputes regarding those other services are outside the scope of Level 3's Counterclaims and not before the Court.

38.     The Court concludes that the amount that AT&T over-withheld on end-office switching is as follows[6]:

    a.     Both Parties agree that between January 1, 2019 (with an invoice date of February 2019) and May 2021, Level 3 billed AT&T $8,253,700 in end-office switched access charges.

    b.     During this same period, under the Court's Order, both Parties also agree that Level 3 overbilled AT&T $1,244,055 in OTT VoIP charges, or 21% of their total end-office traffic.  Both Parties further agree that AT&T is entitled to a OTT credit of $1,244,055.[7]

    c.     In this period, then, Level 3 could have properly billed AT&T end-office switching charges of $7,009,644, which is the amount it actually billed less the OTT credit.

    d.     Between January 1, 2019 and May 2021 (as in other prior periods), AT&T withheld 65% of the end-office switching charges that Level 3 billed, and paid Level 3 35% of their end-office traffic, or $2,888,795.

    e.     In this same period, AT&T therefore owes Level 3 $4,120,849 for unpaid end-office switching charges billed between January 1, 2019 and May 2021.[8]

---

[6] These and other amounts reflected in Level 3 Exhibit 25 are materially consistent with AT&T's records.

[7] For purposes of this case only, the Parties agree that Level 3 is permitted to bill an additional tandem charge in lieu of the improperly billed end-office charges, and that these tandem charges are about $332,941 between January 1, 2019 and May 2021.

[8] As noted above, AT&T and Level 3 have stipulated to the $517,147 credit Level 3 owes Counterclaim Defendant TCG.  This credit is not reflected in the damages analysis above.

G.      **Facts Relevant To Attorneys' Fees.**

39.      In these proceedings, Level 3 also sought to try the issue of its entitlement to attorneys' fees under Section 206 of the Communications Act for one of its claims.  Level 3 does not assert that it is entitled to attorneys' fees under Count I of its counterclaims, which is a breach of agreement claim; the agreement does not provide for attorneys' fees for a party prevailing on a breach of agreement claim, and thus the ordinary rule—that attorneys' fees are unavailable—applies to Count I.

40.      As noted below, whether a party is entitled to attorneys' fees under the Act is not a matter for trial, but should be raised as part of a post-trial petition for costs and fees.  Nevertheless, the Court addresses the evidence offered by Level 3 below.

41.      Level 3, along with three affiliates, brought Counterclaims against AT&T (later naming an AT&T affiliate, Teleport Communications Group ("TCG")), alleging that AT&T/TCG violated the Communications Act by billing Level 3 and its three affiliates end-office switching on OTT VoIP calls.  The initial Counterclaims against AT&T were filed on March 21, 2018, and TCG was added as a party via an amendment filed on October 7, 2019.

42.      In July 2019, Level 3 and its affiliates notified TCG that they would be withholding partial payments on the end-office switching charges billed by TCG, on the grounds that the withheld payments related to OTT VoIP calls.  The payments withheld were about 10% of the total end-office switching charges.

43.      TCG billed end-office switching access charges on various calling services provided by AT&T, but, until the Level 3 Counterclaims and disputes filed by Level 3 and its affiliates, TCG was not aware that any of the AT&T calling services involved OTT VoIP calls.

After conducting an investigation, TCG and AT&T identified two AT&T services that offered customers the capability of making calls either using facilities-based VoIP or OTT VoIP.  AT&T and TCG could not determine what percentage of calls consisted of OTT VoIP, but conservatively decided to assume that all of the calls for these two services were OTT VoIP, and TCG then began issuing credits for the calls associated with these two services.  In all, under Level 3's damages calculation, the OTT VoIP percentage on the TCG end-office switching charges was 0.554 percent. As noted above, after considering the amounts withheld by Level 3, and the credits issued by TCG, the Parties agree that Level 3 and its three affiliates over-withheld end-office switching charges, and they owe TCG about $517,147.

44.     Level 3 asserts attorneys' fees under the Communications Act by referencing the fact that the Parties agree that TCG is owed a credit from Level 3 based on the Communications Act.  However, Level 3 and its three affiliates have not recovered any damages from either TCG or AT&T under the Communications Act.  Rather, Level 3 and its affiliates owe moneys to TCG under the Communications Act.  The damages discussed above that the Court has determined Level 3 is entitled to recover from AT&T all arise out of Count I of Level 3's Counterclaim, which is a breach of contract claim, not a claim under the Communications Act.

## III.   CONCLUSIONS OF LAW

To the extent that any findings of fact are deemed to be conclusions of law, they are incorporated herein by reference as conclusions of law.

### A.     This Case Relates Only To End-Office Switching Charges; Other Access Services Between The Parties Are Not Before This Court

Count I of the Amended Counterclaims of Level 3 ("Counterclaim") is a breach of contract claim for recovery of amounts owed by AT&T for end-office switching charges based on the 2015

Agreement.  *See* ECF No. 124, Level 3 Counterclaim ¶¶ 60–71.  The Counterclaim is unambiguous:  it is limited only to end-office switching charges.

Level 3's damages analysis includes late payment charges of $2,095,536.  These late payment charges are based on an 18% per annum rate, which Level 3 draws from Section 4 of its switched access Tariff.

The Counterclaim is governed by New York law.  *See* Order at 5; *see also* ECF No. 167 at ¶ 6; ECF No. 15-1 at 6.

Under New York law, Level 3 "must prove that [AT&T's] breach directly and proximately caused [its] damages."  *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004); *see also Carco Grp., Inc. v. Maconachy,* 383 F. App'x 73, 75 (2d Cir. 2010) ("Damages for breach of contract must be directly and proximately caused by the breach.") (internal quotation marks omitted).  Level 3's damages must, therefore, be limited to those that were directly and proximately caused by AT&T's breach of the 2015 Agreement, namely the amount that AT&T over-withheld on end-office switching.

Based on a plain reading of Level 3's Counterclaim and the 2015 Agreement, Level 3 alleged only claims based on end-office switching charges.  Level 3's pleading does not assert that AT&T owes Level 3 damages for other switched access services provided by Level 3 (or on the basis of other billing disputes for those services).  Rather, Level 3 pled that it was "AT&T's failure to pay . . . end-office switching access charges [that] directly and proximately caused and continues to cause Level 3 to suffer damage and loss."  ECF No. 124, ¶ 69.

Moreover, in fact discovery, Level 3 unambiguously and expressly stated that it was seeking damages only for end-office switching charges.  The Parties did not engage in fact

discovery on charges for any other switched access services (or any other disputes for any other switched access services), other than end-office switching charges.[9]   Although Level 3 presented "expert opinion" testimony that its damages included charges it billed for other access services,[10] Level 3 never disclosed that during fact discovery or otherwise moved to amend its Counterclaim to support this theory, including by adding a collection action claim, which is the proper type of claim to collect unpaid charges under a tariff.

Accordingly, Level 3 may collect damages only for unpaid end-office access switching charges, based on the breach of the 2015 Agreement and may not recover charges for other switched access services, such as tandem switching and transport.

The Court agrees with AT&T that, under the Court's summary judgment order, the damages arising as result of the breach of contract are straightforward.   Level 3's damages are for

---

[9] The 2015 Agreement also cannot serve as a basis for recovery of charges withheld by AT&T for disputes unrelated to end-office switching because, on its face, the 2015 Agreement specifically allows AT&T to withhold charges for non-OTT VoIP calls.  ECF No. 15-1, at § (1)(a)(ii) ("[f]or avoidance of doubt, this Settlement Agreement *shall not prohibit AT&T from disputing Level 3's billing for switched access traffic for reasons unrelated to the requirements of the OTT Declaratory Order*, including but not limited to disputes regarding volumes or applicable rates.") (emphasis added).

[10] In a pre-trial motion in limine, Level 3 sought to exclude an AT&T employee—Alison Miller—from testifying as to AT&T's damages analysis.  ECF No. 205.  Although Level 3 argued that Ms. Miller's testimony constituted improperly and untimely disclosed expert opinion, *see id.*; Fed. R. Civ. P. 26, this Court agrees with AT&T that the substance of Ms. Miller's testimony—namely, the amount of money Level 3 billed, and AT&T paid and withheld, for end-office switching charges—was factual in nature.  Nonetheless, this Court need not determine whether such testimony was factual or expert in nature because, in any event, Level 3 was not prejudiced by AT&T's disclosure.  *See Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (establishing 4-part test to determine if a Rule 26(a) violation is justified or harmless).  Under the *Woodworker's Supply* factors, *first*, Level 3 was neither prejudiced nor surprised by Ms. Miller's testimony because Level 3 was aware of her role in the OTT dispute since before this litigation began and the substance of her testimony was disclosed in May 2020.  *Second*, any prejudice could have been cured had Level 3 accepted AT&T's offer to depose Ms. Miller before trial (Level 3 did not accept the offer).  *Third*, allowing Ms. Miller to testify did not disrupt the trial and, in fact, aided this Court in reaching its conclusions.  That is because Ms. Miller presented AT&T's views on damages, and thus Level 3's testimony on that central issue did not go unanswered.  And, *fourth*, because the Parties expressly agreed to delay discovery on damages, AT&T did not act in bad faith in waiting to disclose Ms. Miller.

end-office switching services, and both Parties agree that in the relevant period, Level 3 billed about $8.25 million in end-office charges.

It is also undisputed that, in the relevant period and until very recently, Level 3 made no adjustments to its end-office switching charges to account for its OTT VoIP traffic. In other words, even though Level 3 concedes that 21% of its traffic is OTT VoIP, Level 3 never reduced its end-office charges to account for this traffic—even after the FCC issued its *Declaratory Ruling*. Instead, as part of its damages calculations, Level 3 calculated an OTT credit to reflect these overcharges. The Parties also do not dispute the amount of this OTT credit: it is $1,244,055.

Thus, during the period at issue, the amount that Level 3 properly could have billed for end-office switching charges (which is also undisputed) is the difference between its actual end-office charges and the OTT credit: about $7.009 million.

There is a dispute between the Parties as to how much AT&T withheld and paid for the end-office switching services that Level 3 billed in the relevant period. However, the dispute is not difficult to resolve.

AT&T asserts, and provided testimony, that it withheld 65% and paid 35%. These payments reflected AT&T's consistent position throughout the Parties' dispute, which was that 65% was the historic amount of Level 3's OTT VoIP traffic. The Court on summary judgment rejected AT&T's claim that this was the appropriate percentage, but that nevertheless is the amount that AT&T withheld.

Level 3 now argues, and offered testimony, that it says shows that AT&T withheld more than 65% on end-office switching charges. The Court does not find Level 3's contentions to be supported by the record. In any event, even if AT&T were withholding 65% of Level 3 tandem

switching charges, Level 3 cannot recover those amounts in this action under its Counterclaim based upon the 2015 Settlement Agreement, which only encompassed end office switching, and not tandem, charges..   The Court therefore agrees with AT&T that in the relevant period, AT&T paid 35% of the total end-office switching charges billed by Level 3, which is about $2.889 million.

The Court thus calculates damages of "all end-office switching access charges owed by AT&T" (Counterclaim, ECF No. 124, ¶ 70) as follows:  Level 3 billed about $8.25 million in end-office switching charges.  It properly could have billed about $7.009 million in end-office switching charges under the orders of the Court and the FCC.  AT&T paid Level 3 about $2.889 million in end-office charges.  That means that all of the end-office switching charges owed by AT&T under the 2015 Agreement is $4,120,849.

Level 3's damages calculation is wrong and inflated.  Level 3 errs by starting at the wrong point.  It asserts that it billed AT&T about $56.4 million, but this amount is for all switched access services, not merely end-office switching.  For the reasons stated above, this is the wrong starting point because Level 3's claim is for end-office switching services.

Level 3's calculation also gives AT&T credit for about $37.9 million in payments (as well as additional credits that it concedes it owes to AT&T under another settlement not at issue in this case), but these payments are for all switched access services Level 3 billed, not just end-office switching.  The problem with Level 3's approach is that it includes amounts it charged for access services other than end-office switching.  To the extent that the Parties have other billing disputes about those other access services, any amounts owed are not within the scope of this case and Level 3's damages are therefore overstated.  Level 3 contends that AT&T never identified any other billing disputes other than the ones reflected in Level 3's damages calculations.  But there is

evidence that the Parties had other disputes; and, in any event, because this case is about only end-office switching, any purported failure to identify disputes about tandem or other non-end office charges is irrelevant.

**B.   Level 3 Cannot Collect Late Payment Charges Based On Its Tariff-Based Provisions For Late Payment Charges, Because This Is An Action For Breach Of Contract.**

Level 3 also seeks "late payment charges."  Whether Level 3 can recover late payment charges rests on whether the contract under which Level 3 sues—namely, the 2015 Agreement—obligated AT&T to pay late payment charges.  If the 2015 Agreement does not provide Level 3 this right, then late payment charges cannot be recovered as damages for breach of the 2015 Agreement.  Although Level 3's tariff provides for late payment charges, the tariff's requirement are not at issue in this case.  Level 3 did not assert any claim under its tariffs in this action.[11]

Because the Court concludes that AT&T and Level 3 did not include late payment charges as a component of the "rate" AT&T agreed to pay under the 2015 Agreement, Level 3 cannot recover late payment charges under its breach of contract claim.

Under New York law, courts look to "the intent of the parties" to discern a contract's meaning.  *Slatt v. Slatt*, 477 N.E.2d 1099, 1100 (N.Y. 1985).  "Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used."  *Id.*  "[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the

---

[11]  *See, e.g.*, *Connect Insured Tel. v. Qwest Long Distance*, No. 3:10–CV–1897–D, 2012 WL 2995063, at *13 (N.D. Tex. July 23, 2012) ("a collection action . . . seeks damages in the total amount of tariffed charges [a carrier] is allegedly owed in accordance with its tariff."); *Iowa Network Services v. Level 3 Communications*, No. 15–cv–00698–REB–MJW, 2015 WL 9900239, at *2 (D. Colo. July 21, 2015) (Level 3 does not "dispute that an action can be brought to enforce the tariff").  Thus, whether Level 3's *Tariff* would entitle Level 3 to late payment charges is not relevant to the issue before the Court.

omission." *Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014). Further, "accepted canons of contract construction" instruct that "when certain language is omitted from a provision but placed in other provisions, it must be assumed that the omission was intentional." *Sterling Inv. Servs., Inc. v. 1155 Nobo Assocs.*, LLC, 818 N.Y.S.2d 513, 516 (N.Y. App. Div. 2006); *see also U.S. Fid. & Guar. Co. v. Annunziata*, 492 N.E.2d 1206, 1208 (N.Y. 1986); *Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 310 (2d Cir. 2016).

Here, what AT&T and Level 3 said in the 2015 Agreement is clear. That is, they agreed that AT&T would pay Level 3 its "applicable switched access tariffed *rate* for OTT traffic." ECF No. 15-1, at § 1(a)(ii) (emphasis added). That the phrase "applicable switched access tariffed rate" does not include late payment charges is evident from the fact that the 2015 Agreement *does* specifically mention "late payment charges" but it does so in other clauses that are not applicable to this litigation—in other words, it does so in provisions on which Level 3's breach of contract claim is not based. *See, e.g. id.* at § 1(a)(i)-(i)(A).[12]

Conversely, the provision under which Level 3 now seeks damages does not mention late payment charges; it refers only to "rates." *Id.* at § 1(a)(ii). In other words, AT&T and Level 3 omitted the term "late payment charges" from the contract provision relating to future payments for OTT traffic but placed the same phrase in another provision only three paragraphs earlier. "[I]t must be assumed that the omission was intentional," and that, therefore, the Parties sought to

---

[12] For example, in a provision describing the settlement of the Parties' then-existing dispute, the 2015 Agreement states that "[i]n settlement of the OTT Dispute AT&T agrees to pay Level 3 . . . [approximately $15 million] which is seventy-five percent (75%) of the usage and *late payment charges* billed by Level 3 for the traffic exchanged by the Parties through March 2015 that is the subject of the OTT Dispute." *Id.* at § 1(a)(i)-(i)(A) (emphasis added). The same provision continues: "The Parties recognize that . . . the calculation of usage and *late payment charges* included in the total amount of charges identified in this Section 1(a)(i)(A) may vary from the actual amount owed once all billing is complete." *Id.* (emphasis added).

exclude Level 3's tariffed late payment penalties from the post-June 2015 aspects of their agreement. *See Sterling Inv. Servs.*, 818 N.Y.S.2d at 516.

Although this analysis is sufficient to resolve the matter, looking to the Tariff itself only reinforces this conclusion. Like the 2015 Agreement, the Tariff separates "rates," on one hand, and "late payment charges," on the other; and it maintains this distinction by referring to the two distinct concepts in completely different sections of the Tariff. The Tariff makes clear that the term "applicable switched access tariffed *rate*" refers to a specific monetary amount attached to a discrete switched access service, as set forth in Section 15—"Rates and Charges"—of Level 3's Tariff. *See* Tariff, § 15. Then, Section 15.1—"Rates for Switched Access Service"—specifically sets the rates for all switched access services that Level 3 provides, and it clarifies that there are only "three types of rates and charges that apply to Switched Access Service." *Id.* at § 15.1 (late payment penalties are not listed).

Having defined the applicable rate categories, Section 15 of the Tariff further describes the different "rates and charges" applicable to individual switched access services. *Id.* at § 15.1.3. These include, among others, "Local End Office Switching Rates." *Id.* at § 15.1.3.4.2. Despite all the detail included in Section 15, that portion of the Tariff does not mention penalties for late payment. Instead, late payment charges are found in a wholly separate section of Level 3's Tariff. That section is Section 4, entitled "Payment Arrangements." *See id.* at §§ 4.2.6; 4.9(4).[13]

---

[13] The Tariff provides further support for reading the term "rates" narrowly. In its first sentence, the Tariff states that "[t]his Tariff *contains* the regulations *and rates applicable to interstate switched access services*." Tariff at 5 (emphases added); *see also id.* ("The rates and regulations *contained in* this Tariff") (emphasis added). In addition to regulations and rates, the Tariff includes "terms and conditions." *Id.* The most natural reading of these phrases, therefore, is that the Tariff encompasses, but is not co-extensive with, the less inclusive category of "rates." *See id.* at 6 ("When terms used in this tariff are not specifically defined, they are intended to be understood as conveying the meaning they are normally given within the United States telecommunications industry (including with reference to the Commission's rules), or, if no such specific meaning exists, their normal English meaning."). Were it otherwise,

Finally, had the Parties wanted to incorporate Level 3's entire Tariff into the 2015 Agreement—including Section 4's late payment penalties—they could have done so. They could have, for example, specified that "AT&T will pay pursuant to the terms and conditions of Level 3's entire Tariff." They did not. Because "[t]he best evidence of what parties to a written agreement intend is what they say in their writing," *Slamow*, 594 N.E.2d at 919, the Court concludes that late payment penalties, while part of Level 3's Tariff, are *not* part of the "applicable switched access tariffed *rate[s]*," that AT&T agreed to pay in the 2015 Agreement. *See* ECF No. 15-1, at § 1(a)(ii) (emphasis added). As such, Level 3 cannot recover damages for late payment charges in this action.

### C.    The Communications Act And Breach Of Tariff Claims Asserted By Level 3 And Its Affiliates Are Dismissed.

Counts III and IV of the Counterclaims asserted by Level 3 and its affiliates allege violations of Section 201 and 203 of the Communications Act (the "Act").[14] These Sections of the Act can be enforced via a private right of action, brought either in federal district courts or the FCC, as set forth in Sections 206 and 207 of the Act. However, Level 3's claims under these Sections must be dismissed, because such claims require actual damages, and Level 3 in this case agrees that it is entitled to no damages from AT&T or TCG under these Communications Act claims.

---

it would be more natural to say the "Tariff *is* the rates applicable to interstate switched access services." But, the Tariff does not say that. Further, the Tariff maintains the distinction between "rates" and other concepts—including the Tariff as a whole—throughout the document. In doing so, it repeatedly refers to Section 15 for the applicable "rates" for various switched access services. *See* Tariff, § 3.4.6; § 14.1; § 14.2.3.1; § 14.2.3.3; § 10; § 13.3.1; § 13.3.2; § 13.9.1.

[14] Count V is a breach of contract claim, but Level 3 alleges that the contracts are the AT&T/TCG tariffs, so it is not clear how this Count differs at all from Count IV, which alleges a violation of Section 203. Under Section 203, carriers must bill according to their tariffs. In any event, Level 3 fails to explain how TCG or AT&T breached their tariffs—and even if there were a breach, the tariffs do not provide for recovery of attorneys' fees by the customer.

Section 207 authorizes any "person claiming *to be damaged* by any common carrier" to bring suit in federal court or at the FCC, 47 U.S.C. § 207 (emphasis added), and Section 206 provides that, if the carrier violates the Act, then the carrier is "liable to the *person or persons injured thereby* for the full amount of damages sustained in consequence of any such violation," *id.* § 206 (emphasis added).   These Sections of the Act are modelled on the Interstate Commerce Act ("ICA"), and cases under both the ICA and the Communications Act uniformly hold that "a private party seeking relief under Sections 206 and 207 of the Communications Act must 'allege and *prove specific damages* flowing from violations of the Act.'"   *Conboy v. AT&T*, 241 F.3d 242, 250–51 (2d Cir. 2001) (emphasis added) (quoting *In re Communications Satellite Corp.*, 97 F.C.C. 2d 82, 90, at ¶ 24 (1984) (discussing case law)).[15]   Further, under Section 206, a "party seeking damages must prove a *financial loss* that was caused by the alleged violation."   *All American Tel. v. FCC*, 867 F.3d 81, 91–92 (D.C. Cir. 2017) (emphasis added).

In this case, although Level 3 might have properly alleged damages or injury from TCG's charges, the Court finds that Level 3 has not sustained any financial losses resulting in actual injury or damages arising from any violation of the Communications Act.   Level 3 withheld payment for amounts it considered to be for OTT VoIP end-office switching charges, and it has now stipulated that it *owes* TCG about $517,000 for over withholding for such calls (and is entitled to nothing from AT&T on these counts).   Accordingly, Counts III, IV, and V are dismissed.

---

[15] *See, e.g.*, *Fulfillment Servs. v. United Parcel Serv.*, 528 F.3d 614, 621 (9th Cir. 2008) (the ICA does not "allow suits for abstract violations; to state a claim, a plaintiff must still allege damages as a consequence of the violation"); *Overbrook Farmers Union Coop. v. Missouri Pac. R.R. Co.*, 21 F.3d 360, 364 (10th Cir. 1994) (carrier liability under section 8 of the ICA is limited to "actual damages"); *Beattie v. CenturyTel*, 511 F.3d 554, 565–66 (8th Cir. 2007) (agreeing that "§ 201 is not a strict-liability statute" so a plaintiff "must establish some type of injury to allege a claim under §§ 201 and 206") (quotation omitted); *Alliance Communications Co-op v. Global Crossing*, 663 F.Supp.2d 807, 836 (D.S.D. 2009) (under §§ 201/206, a claim is valid only where "a claimant is injured and sustains damages," and a "refusal to pay" billed charges does not create damage).

**D.      Level 3's Request For Attorneys' Fees Lacks Merit.**

Level 3 seeks to recover attorneys' fees in connection with its claims against TCG. However, this is not a proper issue for trial and should be submitted as part of a post-trial petition for costs and attorneys' fees as required by Local Rule 54.3 and Fed. R. Civ. P. 54(d)(2).  However, even if considered at this time, the Court concludes, Level 3 and its affiliates are not entitled to attorneys' fees.

In seeking attorneys' fees under the Communications Act, Level 3 relies on Section 206, which provides that attorneys' fees are separate from damages and are "part of the costs in the case." 47 U.S.C. § 206.[16]  Level 3 cannot recover attorneys' fees under the Communications Act for two reasons.

First, for the reasons set forth above, the Court has dismissed Level 3's Communications Act claims.  Therefore, Level 3 has not recovered any damages arising from violations of the Communications Act.   Attorneys' fees can be recovered only when a claimant recovers damages. The plain language of Section 206 provides that when a customer shows that a carrier has violated the Communications Act, the customer can also obtain "a reasonable attorney's fee, to be fixed by the court *in every case of recovery.*"  47 U.S.C. § 206 (emphasis added); *see Am. Tel. & Tel. Co. v. United Artists Payphone Corp.*, 852 F. Supp. 221, 222 (S.D.N.Y 1994).  A "case of recovery" is only one in which "damages have been awarded."  *Am. Tel. & Tel. Co. v. United Artists Payphone Corp.*, 852 F. Supp. at 222 (S.D.N.Y.); *see also Sprint v. Crow Creek*, 2017 WL

---

[16] Section 206 provides that "a common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, *together with* a reasonable counsel or attorney's fee."  47 U.S.C. § 206 (emphasis added).  If attorneys' fees were an element of damages, then the provision would more naturally read "damages . . . *including* a reasonable counsel or attorney's fee."  *See also Am. Tel. & Tel. Co. v. United Artists Payphone Corp.*, 852 F. Supp. 221, 222 (S.D.N.Y.) (filing counterclaim specifically for attorneys' fees following favorable FCC resolution).

1194208 (D.S.D. March 30, 2017) (same); *Swain v. AT&T Corp.*, 1997 WL 573464, at *1–2 (N.D. Tex. Sept. 9, 1997) (same).

Here, Level 3 has not recovered any damages from TCG under its Communications Act claims—to the contrary, it is liable to TCG for $517,000 and this amount will be deducted from Level 3's damages to be recovered from AT&T.  And, although Level 3 is recovering damages from AT&T for Count I, for the breach of contract claim, there are no attorneys' fees available for that claim.  *Central Telephone Co. of Virginia, v.  Sprint Commc'ns Co. of Virginia*, 2011 WL 1226001, *5 (E.D. Va. March 30, 2011) (no damages under § 206 for a claim even for a breach of a "federally-recognized" contract).[17]

## Order

WHEREFORE, the Court orders:

Judgment shall enter in favor of the Level 3 Communications on Count I (Breach of Contract).  Judgment shall enter in the amount of $4,120,849.  This amount shall be reduced by $517,147 because Level 3 over-withheld from TCG for amounts it considered to be for OTT VoIP end-office switching charges (*see supra* n.8).  This amount shall be increased by $332,941 to account for the tandem-add back (*see supra* n.7).

---

[17] *Seeklocal*, the case relied on by Level 3, is not persuasive.  There, "[t]he plaintiff, [SeekLocal] . . . filed a petition for attorney's fees and costs related to the prosecution of their complaint against [Amerietch], pursuant to 47 U.S.C. § 206." *Seeklocal Inc. v. Amerietech Servs. Inc.*, No. 05-C-1212, 2007 WL 1847281, at *1 (E.D. Wis. June 26, 2007).  However, the parties later reached a settlement resolving all issues except attorney's fees. *Id.* at *3.  Somewhat inexplicably, "Ameritech noted that there had been no finding of liability in the case, but agreed that it would pay whatever attorney's fees the court deems reasonable." *Id.*  Nor did Americtech "challenge that SeekLocal was a prevailing party." *Id.* at *4.  Thus, even were its analysis persuasive, *Seeklocal* is factually distinguishable from this case.

Respectfully submitted this 25th day of June, 2021.

By: /s/ Justin A. Benson

Michael J. Hunseder
Michael D. Warden
Justin A. Benson
Joshua W. Moore
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
mhunseder@sidley.com
mwarden@sidley.com
jbenson@sidley.com
joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp. and
Counterclaim Defendant Teleport
Communications Group*

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Angela C. Zambrano
SIDLEY AUSTIN LLP
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

## CERTIFICATE OF SERVICE

I, Justin A. Benson, hereby certify that on June 25, 2021 I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

Charles W. Steese, #26924
Douglas N. Marsh, #45964
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
Email: csteese@armstrongteasdale.com
Email: dmarsh@armstrongteasdale.com

*Attorneys for Defendant Level 3*
*Communications, LLC*

/s/ Justin A. Benson
Justin A. Benson
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: jbenson@sidley.com

*Attorney for Plaintiff AT&T Corp. and*
*Counterclaim Defendant Teleport*
*Communications Group*