**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 18-cv-00112-RM-MEH

AT&T CORP.,

      Plaintiff / Counter Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant / Counter Claimant,

and

BROADWING COMMUNICATIONS, LLC,
GLOBAL CROSSING TELECOMMUNICATIONS, INC., and
WILTEL COMMUNICATIONS, LLC,

      Counter Claimants,
v.

TELEPORT COMMUNICATIONS GROUP, INC.,

      Counter Defendant.

---

**LEVEL 3'S PROPOSED
FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

---

A bench trial in this matter was held before the Court from July 14 through 16, 2021. After the trial, the Court took the matter under advisement. Having reviewed the evidence presented, applicable law, and arguments of counsel, the Court now enters its Findings of Fact, Conclusions of Law, and Order.

**FINDINGS OF FACT**

To the extent that any conclusions of law are deemed to be findings of fact, they are incorporated herein by reference as findings of fact.

**I.  BACKGROUND**

1.      This is a dispute between two groups of telecommunications companies: Level 3 Communications, LLC ("Level 3") and its affiliates (Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC) on the one hand, and AT&T Corp., Inc. and its affiliate Teleport Communications Group, Inc. ("TCG") on the other.

2.      Both sides of the dispute act as both a local exchange carrier ("LEC") that provides local exchange services that allow end users to make and receive telephone calls, and as an interexchange carrier ("IXC"), commonly known as a long-distance carrier. For purposes of his dispute, Level 3 and TCG are the LECs, and AT&T, Broadwing, Global Crossing and Wiltel are the IXCs.

3.      When LECs hand off traffic originated by end users to IXCs, they typically assess "switched access charges" to the IXC under access tariffs the LECs have on file with the Federal Communications Commission ("FCC") (for interstate calling).

4.      Historically, telecommunications carriers exchanged calls through the public switched telephone network ("PSTN") utilizing a protocol known as time-division multiplexing ("TDM"). However, over the last several years, more and more calls are being transmitted via Voice over Internet Protocol ("VoIP") technology, instead of via TDM technology.

5.      There are two different types of VoIP calling: "facilities-based" VoIP, in which

the VoIP provider owns or leases the physical infrastructure connected to the end user's premises, thus completing the "last mile" of the call; and "over-the-top" VoIP ("OTT-VoIP," or "OTT"), in which the VoIP provider connects the call to the customer's end user through an internet connection provided by a third-party internet service provider ("ISP").

6.     The parties' disputes concern the application of tariffed charges in connecting OTT-VoIP traffic.

7.     For about a decade, the telecommunications industry has grappled with how VoIP calling fits in the tangled web of regulations governing intercarrier compensation. Back in 2015, the FCC ruled that end office switched access charges apply to OTT-VoIP. *See Connect America Fund*, WC Docket No. 10-90 et al., CC Docket No. 01-92, Declaratory Ruling, 30 FCC Rcd. 1587, 1588, ¶ 2 (2015) ("2015 OTT Declaratory Order") (Ex. A-4).

8.     But in December 2016, the United States Court of Appeals for the District of Columbia Circuit vacated and remanded the 2015 OTT Declaratory Order. *AT&T Corp. v. FCC*, 841 F.3d 1047, 1058 (D.C. Cir. 2016) (Ex. A-5).

9.     On remand, the FCC issued its decision in *Connect America Fund Developing a Unified Intercarrier Compensation Regime, Order on Remand and Declaratory Ruling*, WC Docket No. 10-90 et al., FCC 19-131 at ¶ 1 (rel. Dec. 17, 2019) ("December 2019 OTT Order") (Ex. A-6). In that decision the FCC determined that a LEC can assess end office charges "*only if* the LEC or its [voice over internet provider] partner provides a physical connection to the last-mile facilities used to serve the end user." *Id*. at ¶ 4 (emphasis added). This decision made clear that end office charges did not apply to OTT-VoIP calls, and otherwise "le[ft] carriers to determine the appropriate compensation for [their] services in accordance with their agreements

and applicable tariffs." *Id.* ¶ 23 n.65.

## II. THE PARTIES' CLAIMS.

10.     Both sides of this dispute have been on both sides of this issue. AT&T, in its capacity as an IXC, has challenged end office charges assessed by Level 3, acting in its capacity as a LEC (specifically, as a competitive local exchange carrier, or "CLEC"). At the same time, Level 3 and its affiliates challenged end office charges assessed by TCG in its capacity as a CLEC. (*See* Stipulation No. 1). The Court first discusses the disputes concerning Level 3's charges to AT&T, and then treats TCG's charges to Level 3.

11.     After the FCC issued its 2015 OTT Declaratory Order, AT&T and Level 3 entered into a Settlement Agreement to resolve what the Agreement referred to as the "OTT Dispute." (Ex. A-1). AT&T had been withholding payments from Level 3, claiming that 65% of Level 3's calling was OTT. (Ex. A-1, ¶ 1(a)(i)(B)).

12.     The Settlement Agreement defined the "OTT Dispute" as "AT&T has (i) disputed and not paid certain Level 3 end office switching charges, as set forth in more detail in Exhibit A, on traffic originating from and/or terminating to the local exchange service end-user customers served by providers of over-the-top voice over Internet protocol ("OTT") services. . . ." Ex. A-1, second *Whereas* Clause.

13.     Exhibit A to the Settlement Agreement contains a list of charges totaling $20,483,518.40, which it describes as "Total OTT Dispute." It is undeniable that this amount includes late payment charges ("LPCs"), because 75% of the Total OTT Dispute is $15,362,638.80, which AT&T agreed to pay Level 3, and the Agreement states this amount includes LPCs. (Ex. A-1, ¶ 1(a)(i)(A)). During trial, Level 3 witnesses also testified that the

$20.483 million also included over-withholding because AT&T's mechanized systems could not differentiate between end office charges and tandem charges. Thus, the parties have always called the amounts AT&T was withholding for the OTT Dispute to be "end office switching", which includes end office charges, the tandem charges AT&T could not differentiate, and LPCs.

14.     The Settlement Agreement attempted to reach a "full and final settlement" of the OTT Dispute by treating three distinct periods. First, for the period predating its execution, the Agreement resolved Level 3's claims for historical damages by requiring AT&T to pay a fixed percentage "of the usage and late payment charges billed by Level 3 for the traffic exchanged by the Parties through March 2015 that is the subject of the OTT Dispute." *Id.* § 1(a)(i).

15.     Second, for the period following its execution, the Agreement required AT&T to "pay Level 3 its applicable switched access tariffed rate for OTT traffic, pursuant to the terms of the OTT Declaratory Order," for "switched access traffic exchanged by the Parties beginning on June 1, 2015." *Id.* § 1(a)(ii). In other words, because the FCC had, at that time, determined that all tariff charges applied to OTT traffic, AT&T was required to pay full tariff rates.

16.     However, at that time, AT&T was appealing the FCC's 2015 OTT Declaratory Order. In light of that pending appeal, AT&T and Level 3 agreed that Level 3 would issue a partial refund to AT&T in the event that the 2015 OTT Declaratory Order was "overturned, either in whole or in part" and a "Final Appellate Order" issued determining that the end office charges "should not have been charged." *Id.*§ 1(a)(iv).

17.     The third period would begin if and when it was later determined that end office charges no longer applied to OTT calling. If that happened, Level 3 and AT&T agreed "that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final

shall be in compliance with terms of that order." *Id*.

18.     Though the Settlement Agreement was intended to effect a final resolution of the OTT Dispute, the dispute resurfaced after the D.C. Circuit issued its November 2016 Order remanding to the FCC. AT&T resumed withholding payment on Level 3's charges in mid-2017, claiming that the D.C. Circuit's Order was the "Final Appellate Order" the Settlement Agreement contemplated and that Level 3 therefore was required to cease assessing end office charges on OTT-VoIP traffic.

19.     AT&T also filed its Complaint in this action, bringing claims against Level 3 alleging that Level 3 had breached the Settlement Agreement (Count I) by continuing to assess end office charges on OTT-VoIP traffic, as well as seeking declaratory relief (Count III). (A claim for violations of the Communications Act, Count II, was dismissed. *See* ECF No. 76.)

20.     Level 3, in turn, brought counterclaims alleging that AT&T breached the Settlement Agreement by withholding payment on the OTT Dispute (Count I) and likewise seeking declaratory relief affirming its view of the Agreement (Count II).

21.     As part of a broader settlement agreement, AT&T and Level 3 reached a partial settlement which resolved all billing and payment issues regarding OTT-VoIP billing disputes through December 31, 2018 as to Level 3's bills to AT&T. Thus, for purposes of claims relating to Level 3's traffic to AT&T, only traffic from January 1, 2019 and after is at issue. (Stipulation No. 11).

22.     At the same time AT&T was disputing and withholding payment on Level 3's charges, its affiliate, TCG, was also assessing end office charges on OTT-VoIP traffic. (Exs. A-52, A-53). These charges date as far back as October 2016. (Ex. A-53).

23.     Level 3 began disputing and withholding payment on TCG's end office charges in August 2019. TCG did not realize it was assessing end office charges on OTT-VoIP calls until Level 3 brought that fact to its attention in this action. (Exs. A-38, A-39). TCG thereafter adjusted its billing by submitting billing credits to Level 3 to account for at least some end office charges for OTT-VoIP traffic. (*See* Stipulation No. 13).

24.     Level 3's counterclaims include claims against TCG for violating Section 3 of the Communications Act by assessing charges not permitted by TCG's tariff (Count III); for violating Section 201(b) by assessing end office charges on OTT-VoIP traffic in violation of FCC rules (Count IV); and for breaching its tariff by assessing end office charges not permitted by the tariff (Count V), as well as seeking associated declaratory relief (Count VI).

III.   **MATTERS RESOLVED ON SUMMARY JUDGMENT AND REMAINING FOR TRIAL.**

25.     The claims relating to Level 3's charges to AT&T raised two primary legal and factual issues. The first issue concerned competing interpretations of the Settlement Agreement. Level 3 contended the refund provision of the Settlement Agreement took effect on February 19, 2020, when the December 2019 OTT Order became final, while AT&T argued this happened much earlier, after the DC Circuit entered its 2016 Order. The second issue concerned the percentage of Level 3's traffic that was OTT; AT&T claimed that was as high as 65 percent, while Level 3 contended that it was no higher than 21 percent.

26.     The Court resolved both issues on Level 3's Motion for Partial Summary Judgment. On the first issue, the Court found that "the D.C. Circuit's decision, standing alone, cannot operate as the 'Final Appellate Order' contemplated by the settlement agreement" and that "because the D.C. Circuit's decision remanded the OTT Declaratory Order, it did not

'become final' for purposes of the settlement agreement, until the FCC issued the 2019 Declaratory Ruling and that ruling was 'no longer subject to further appeal or other judicial review." ECF No. 204 at 7. Therefore, the partial refund required under the Agreement did not become due until February 19, 2020. *Id.* The Court therefore found that Level 3 was "entitled to partial summary judgment as well as declaratory relief on the issue of its liability under the Settlement Agreement." *Id.*

27.     On the second issue, the Court found "there is no genuine issue as to whether the OTT percentage exceeded 21 percent," and awarded Level 3 "partial summary judgment and declaratory relief on this issue as well." *Id.* at 8.

28.     Level 3 has agreed that it will accept a 21% OTT percentage in this lawsuit.

29.     All parties agree that AT&T withheld payment from Level 3 for the OTT Dispute, but disagree on the amount AT&T withheld. AT&T claims it intended to withhold 65 percent of Level 3's end office charges. But Level 3 contends that AT&T's mechanized systems for payment could not determine exactly the amount of Level 3's end office charges, and as a result, AT&T actually withheld much more than 65 percent of those charges for the OTT Dispute. Level 3 calculates its damages by identifying the total amount AT&T withheld for the Dispute, including late payment charges, calculating a credit for end office charges on the portion of its traffic that is OTT (21%), and adding certain tandem charges to be assessed in lieu of the forgone end office charges.

30.     Meanwhile, AT&T contends that Level 3's damages are limited solely to end office charges. It therefore calculates Level 3's damages by looking to the total number of end office charges Level 3 assessed and multiplying that figure by 65 percent, which is what AT&T

claims it withheld for the OTT Dispute. Other withholdings beyond this amount, AT&T contends, were for different, unrelated disputes. AT&T also contends that it does not have to pay late payment charges. AT&T does stipulate to the inclusion of the tandem add-back charges, in the amount of $323,536.79 (*see* Stipulation No. 14).

31.     As it concerns TCG's charges to Level 3 and Level 3's affiliates, the parties stipulated that a portion of TCG's traffic is OTT VoIP; that TCG was billing end office charges on these calls; that Level 3 disputed these charges and withheld a portion of end office charges; and that TCG adjusted its billing to Level 3 to account for at least some end office charges for OTT VoIP charges. They further stipulated that Level 3 withheld $517,147.23 in payments charged by TCG in excess of the credit TCG extended, and that Level 3 will not contest the reduction of $517,147.23 in any final amount of damages awarded to Level 3. *See* Stipulation No. 13.

32.     Level 3 contends that TCG's unlawful assessment of end office charges on OTT calls violated the Communications Act, and that because this action was required to correct those unlawful charges, Level 3 is entitled to recover its attorney's fees expended in securing that result. TCG counters that Level 3 is not entitled to recover its attorney's fees.

**IV.    THE EVIDENCE PRESENTED AT TRIAL SHOWED THAT AT&T WITHHELD PAYMENT FOR THE OTT DISPUTE IN EXCESS OF LEVEL 3'S END OFFICE CHARGES.**

33.     Level 3 employee Jennifer Torres, Senior Director for Business Operations for Level 3, appeared at trial as both a fact and non-retained expert witness. She testified concerning the methodology she created for calculating Level 3's damages, presented in the form of a spreadsheet initially presented in March 2020, and since supplemented to include charges and withholdings for additional months. (Ex. A-25).

9

34.     Level 3 witness Melissa Kellow, a Billing Manager for Level 3, testified on her contribution to Level 3's damages calculations. Ms. Kellow worked closely with Ms. Torres in gathering information from the invoices that Level 3 submitted to AT&T, and AT&T's partial payments to Level 3. This data was inserted into the damages model used by Mrs. Torres.

35.     The step-by-step method Ms. Torres applied to calculate Level 3's damages is as follows:

a.  First, she identified all usage-based charges that Level 3 assessed to AT&T through its tariff[1] on a month-by month basis for each month during the damages period. These are listed in Column B of the spreadsheet's "AR Summary" tab.

b.  Next, she subtracted amounts associated with an unrelated "DEOT" dispute (listed in Columns C and D) that was resolved by a separate agreement (*see* Ex. 2).

c.  Then she identified the partial payments AT&T made on Level 3's invoices (Column F), which, when subtracted from the total charges, shows a balance due to Level 3 (Column G). Because the DEOT dispute and the OTT dispute were the only usage-based disputes AT&T had raised with Level 3, this balance was the amounts AT&T withheld associated with the OTT Dispute.

d.  Ms. Torres determined from this outstanding balance the amount of LPCs, as required under Level 3's Tariff (Ex. A-3 § 4.9(1), (2)). This calculation includes a correction that accounts for the 2019 Settlement Agreement, such that LPCs are

_____

[1] The Tariff Level 3 uses is the CenturyLink Competitive Operating Companies' Tariff F.C.C. No. 4 (Ex. A-3).

calculated solely for unpaid charges beginning in January 2019. With this adjustment, the total LPCs are $1,984,204.

e. Ms. Torres also calculated an OTT credit based on a 21-percent OTT-VoIP factor and a 50-percent refund through the date that the FCC's December 2019 OTT Order became final. The credit for Level 3's OTT charges totaled $1,207,516.03.

f. Ms. Torres then included an add-back for tandem charges the parties agreed could be assessed in lieu of the end office charges. The amount of this add-back was $323,536.79. With this tandem add-back, the total net OTT credit is $883,979.24 (Columns E and K) ($1,207,516.03 minus $323,536.79).

g. The total balance due (Column G), minus the net OTT credit (Columns E and K) and late payment charges removed to account for the 2019 Settlement Agreement (Column H), is $9,303,001.

h. Ms. Torres also subtracted the amount of $517,147 to account for the parties' stipulation as to Level 3's claims against TCG. *See* Stipulation No. 14.

i. The resulting total damages are $8,785,853.

**V.    THE EVIDENCE DOES NOT SUPPORT AT&T'S CONTENTION THAT IT WITHHELD NO MORE THAN 65 PERCENT OF LEVEL 3'S END OFFICE CHARGES, OR THAT IT WITHHELD PAYMENTS FOR OTHER, UNRELATED DISPUTES.**

36.    AT&T does not dispute Level 3's data on the total amount of its end office charges. However, AT&T employee Alison Miller asserted that AT&T had withheld no more than 65 percent of Level 3's actual end office charges for the OTT Dispute, and that all withholdings above and beyond this 65-percent threshold were for other, unrelated disputes. For the following reasons, the Court does not find this position credible.

37. First, for reasons discussed in further detail in its Conclusions of Law, the Court finds that AT&T violated Federal Rules of Civil Procedure 16(b), 26(a)(1), and 26(a)(2) by failing to disclose that Ms. Miller's testimony would include these opinions. The Court may therefore preclude this testimony as a sanction for these violations.

38. Even if the Court were to consider AT&T's assertion, it would reject it as unpersuasive. The facts show that AT&T stated it did not know the exact amount of Level 3's end office charges, and thus could not have been withholding exactly 65 percent of those charges. The evidence instead shows that AT&T withheld far more than this for the OTT Dispute, and does not support the suggestion that AT&T withheld amounts above this threshold for other, unrelated reasons.

39. In 2017, when Level 3 asked AT&T to explain the amounts it was disputing and withholding for the OTT Dispute, Ms. Miller acknowledged that "[i]t is not possible to exactly match the withholding for the Level 3 entity billing to a specific dispute," which she attributed "to the fact that Level 3 is billing both tandem and end office on the same BAN [billing account number]." (Ex. A-8 at 5). That is because "AT&T's mechanized payment system does not have the ability to recognize the difference between L3's billing that is associated with operating as a tandem vs. the billing associated with L3 operating as an EO [end office] when both are included on the same BAN." (Ex. A-7 at 4). AT&T therefore had "additional offsets due to the format of the L3 invoices that were allocated towards the . . . OTT dispute." (Ex. A-7 at 1).

40. Similarly, on an earlier dispute involving end office charges, Ms. Miller stated "there is withholding above the current dispute value . . . due to: 1) Level 3's billing containing both EO and tandem billing on same BAN, which complicated the mechanized rate based

withholding, and 2) AT&T and Level 3 . . . agreeing that the EO/CPN withholding would not be corrected in our payment systems until such time as the issue was fully corrected." (Ex. A-8 at 3).

41.     Ms. Miller thus acknowledged that she did not know exactly how much Level 3 billed in end office charges, and that she knew AT&T's mechanized system withholding for the OTT Dispute included both end office and tandem charges.

42.     AT&T's inability to utilize its mechanized process to determine the exact amount of Level 3's end office charges continues to this day.

43.     The parties agree that, through January 2021, Level 3 assessed approximately $7.5 million in end office charges. (Compare Ex. A-24 with Ex. 17). After subtracting late payment charges and amounts attributable to the DEOT dispute, Level 3 determined that AT&T withheld $7.82 million in payment from Level 3 through January 2021, all of which was attributable to the only remaining dispute, the OTT Dispute. (Ex. A-24). But AT&T, now claiming to have withheld only 65 percent of end office charges, states that it withheld only $4.884 million—a difference of $2.936 million. (Ex. 17).

44.     The entire $2.9 million delta appears to be a result of the fact that AT&T also withheld 65 percent of payment on Level 3's tandem charges—the very charges AT&T said its mechanized system could not differentiate. As Ms. Torres showed in her testimony, the sum of the tandem switching and transport charges Level 3 assessed between January 2019 and January 2021 (i.e., LTT and LTTAN rate elements) is $4,486,058. 65 percent of this amount is $2,915,937—a 99.3% match with the entire difference between Level 3's damages calculation and AT&T's. (*See* Exs. A-20, A-21).

45.     Performing this same analysis with updated data that include charges assessed through April 2021 shows a similarly strong match of 96.7%. *Id.*

46.     There is also a strong correlation between the payments AT&T over-withheld on an unrelated dispute involving end office charges from 2017, further confirming that AT&T's withholdings for the OTT Dispute include tandem charges. In that earlier dispute, the inability of AT&T's "mechanized payment process" to differentiate between end office and tandem charges caused it to over-withhold by 34.5 percent. (Ex. A-14 at 5). As Ms. Torres observed in her testimony, this is almost exactly the same ratio (a 97 percent match) between 65 percent of Level 3's end office charges and the amount AT&T actually withheld for the OTT Dispute. *Id.* This confirms that AT&T's method for identifying and withholding payment for end office charges is unchanged, and that AT&T's mechanized process *still* cannot tell what end office charges Level 3 has assessed.

47.     This refutes the assumption on which Ms. Miller's opinions fundamentally depend: that AT&T was able to tell all along exactly what Level 3's end office charges were, and that AT&T withheld exactly 65 percent of that amount—no more, no less—for the OTT Dispute. The notion that AT&T had been withholding exactly 65 percent of the end office charges all along is not credible. This leaves AT&T's damages calculations with no foundation.

48.     The Court further rejects the assumption that AT&T withheld payments on charges beyond 65 percent of the end office charges pursuant to other, unrelated disputes. This assumption is not credible not only because AT&T did not know the exact amount of Level 3's end office charges, but also because AT&T never disclosed any such disputes until March 2021, when it first suggested to Level 3 that there were "multiple reasons, aside from the OTT-VoIP

14

issue being litigated, why AT&T's payments to Level 3 have differed from amounts billed." (Ex. A-26). Some of the "new" reasons articulated by AT&T are not billing disputes at all; they are merely complaints about the format of Level 3's invoices. *Id.* at 3. Other reasons AT&T suggests for the withholdings raise billing issues that apply only after March 2020, with no application to withholdings dating back to the beginning of the damages period in January 2019. *Id.* Most importantly, AT&T had never identified the non-OTT disputes as a basis for withholding prior to March 2021; thus, the Court finds that, as a matter of fact, they could not have been a reason for the historical withholdings separate from the OTT dispute. *Id.*

49.     Further confirming this finding, AT&T's failure to identify these purportedly unrelated disputes earlier violate not only Rules 16(b) and 26(a) and (e), but also Level 3's Tariff. The Tariff requires customers such as AT&T to promptly identify the basis for the dispute in full detail: "The Customer may dispute a bill in good faith only by written notice to the Company." (Ex. A-3 § 4.9(1)). The tariff also spells out the information that a disputing customer must provide in the written notice, including, among other things:

- "*A clear explanation of the basis of the dispute*, including what the Customer believes is incorrect (e.g., nonrecurring charge; mileage; circuit identification) and the reason why the Customer believes the bill is incorrect (e.g., monthly rate billed not same as in tariff; facility not ordered; service not received)";

- "The exact dollar amount in dispute";

- "The universal service order code(s) (USOCs) and/or rate element associated with the service"; and

- "*Details sufficient to identify the specific amount(s) and item(s) in dispute*."

*Id.* § 4.9(2) (emphasis added).

50.     The notion that AT&T had been withholding payment on these charges for these unrelated reasons, none of which it identified as required under Level 3's Tariff, is not credible. Had AT&T been withholding payment for other, unrelated disputes, AT&T would have, and should have, identified those other disputes. It did not.

51.     For these reasons, the Court rejects AT&T's contention that it withheld amounts beyond 65 percent pursuant to other, unrelated disputes. AT&T appears to have created this argument as an after-the-fact justification for its excessive withholding. The Court instead finds that all of AT&T's withholdings on Level 3's usage-based charges were withheld under the Settlement Agreement as a direct result of the OTT Dispute.

52.     As stated in Paragraph 13 above, this is validated by the Settlement Agreement itself, which defined the OTT Dispute as including all payments AT&T withheld on the claimed basis that it was not obligated to pay end office charges on OTT traffic. As the Settlement Agreement shows, the parties have always called the amounts AT&T was withholding for the OTT Dispute "end office switching", and those amounts have always included end office charges, the tandem charges AT&T could not differentiate, and LPCs.

**VI.     THE EVIDENCE SHOWS THAT TCG ASSESSED UNLAWFUL END OFFICE CHARGES TO LEVEL 3, AND EXTENDED CREDITS ONLY AFTER LEVEL 3 BROUGHT ITS CLAIMS.**

53.     The parties stipulated that a portion of TCG's traffic is OTT-VoIP; that TCG was billing end office charges on these calls; that Level 3 disputed and withheld payment on a portion of these charges; and that TCG adjusted its billing to Level 3 to account for at least some end office charges for OTT-VoIP traffic. (Stipulation No. 13). As the testimony of AT&T employees Ardell Burgess, Janice Gallagher, and Marc Cathey shows, TCG realized it was charging end

office on OTT-VoIP only after Level 3 brought its claims, and then began issuing a credit. (*See also* Exs. 47, 78).

54.     As set forth in its damages disclosures, Level 3 withheld $517,147.23 in payments charged by TCG in excess of the credit TCG extended. For purposes of calculation of damages, Level 3 agreed it would not contest the reduction of $517,147.23 in any final amount of damages awarded to Level 3. (Stipulation No. 13).

## CONCLUSIONS OF LAW

To the extent that any findings of fact are deemed to be conclusions of law, they are incorporated herein by reference as conclusions of law.

### I.     CLAIMS FOR LEVEL 3 CHARGES AND BREACH OF SETTLEMENT AGREEMENT.

The Settlement Agreement is governed by New York Law. (Ex. A-1 § 5). Under New York law, to prevail on a breach of contract claim, a litigant must show (1) the existence of an agreement, (2) its own adequate performance, (3) breach of contract by the other party, and (4) damages. *See Harsco Corp. v. Segui*, 91 F.3d 337 348 (2d Cir. 1996).

In light of the Court's Summary Judgment Order (ECF No. 204), each of these elements is established. The only remaining question is the extent of Level 3's damages.

"Damages awarded in a breach of contract action should place a plaintiff in the same position as it would have been if the agreement had not been violated." *Chen v. Wen Fang Wang*, 177 A.D.3d 694, 695 (N.Y. App. Div. 2019) (quoting *R & I Elecs. v. Neuman*, 66 A.D.2d 836, 837 (N.Y. App. Div. 1978)). A party's recovery for breach of contract includes "general damages which are the natural and probable consequence of the breach." *Brody Truck Rental, Inc. v. Country Wide Ins. Co.*, 277 A.D.2d 125, 125 (N.Y. App. Div. 2000). Also within the

scope of recovery are "damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed." *Lauricella v. LC Apartments, LLC*, 173 A.D.3d 1821, 1821 (N.Y. App. Div. 2019).

Ms. Torres's step-by-step method for calculating damages provides a useful template for the Court to follow. The Court therefore walks through Ms. Torres's methodology and addresses the issues raised at each step.

### A.  Level 3's Damages Include All Charges Withheld for the OTT Dispute.

The initial step of Ms. Torres's damages methodology was to identify the usage-based charges Level 3 assessed—minus charges associated with an unrelated DEOT dispute—and AT&T's withholdings on those charges. Because the DEOT dispute and the OTT dispute were the only usage-based disputes AT&T had raised with Level 3, the difference between Level 3's charges and AT&T's payments, minus amounts associated with the DEOT dispute, are the amounts AT&T withheld associated with the OTT dispute.

AT&T complains that the amount of these withholdings exceed the end office charges that Level 3 was entitled to assess, and that Level 3's recovery should be capped at 65 percent of its end office charges—even though its withholdings for the OTT Dispute exceed that amount. The Court rejects AT&T's position for the following reasons.

First, the Court concludes that all amounts AT&T withheld are within the scope of the OTT Dispute as contemplated by the parties when they negotiated the 2015 Settlement Agreement, and are therefore subject to Level 3's breach of contract claim. As the Settlement Agreement shows, the parties have always called the amounts AT&T was withholding for the OTT Dispute "end office switching", and those amounts have always included end office

charges, the tandem charges AT&T could not differentiate, and LPCs.

Next, as noted above, the Court concludes that AT&T failed to timely disclose Ms. Miller's opinions on AT&T's damages calculations. In particular, AT&T failed to timely disclose the fundamental assumptions that AT&T withheld payment on the end office charges at the rate of exactly 65 percent, and that all other withholdings were pursuant to other, unrelated disputes. The Court therefore precludes those opinions as a sanction for the late disclosure under Rule 37(c).

"A party violates Rule 26 by failing to disclose witnesses prior to the close of discovery, which effectively forecloses the opposing party from conducting discovery on the supplemental disclosures." *White v. Deere & Co.*, No. 13-CV-02173-PAB-NYW, 2016 WL 525911, at *1 (D. Colo. Feb. 10, 2016); *see also Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, No. 05-CV-02084-PSFCBS, 2007 WL 1613352, at *1 (D. Colo. June 1, 2007) ("The failure to disclose witnesses prior to the close of discovery, which effectively forecloses the opposing party from conducting discovery on the supplemental disclosures, constitutes a violation of Rule 26."). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In addition, Fed. R. Civ. P. 16 "requires that the court set a time for completion of discovery and authorizes various other orders affecting the scope, timing and extent of discovery and disclosures." *Anderson v. Seven Falls Co.*, No. 12-CV-01490-RM-CBS, 2013 WL 3771300, at *6 (D. Colo. July 18, 2013) (quoting Advisory Committee Notes to 1993 Amendments to Fed.

R. Civ. P. 26(f)). "Rule 16(b) provides that a scheduling order 'may be modified only for good cause and with the judge's consent.'" *Id.* at *7 (citing *Cassirer v. San Miguel County Board of County Commissioners*, 2009 WL 1844326, *5–6 (D. Colo. June 23, 2009)). This "good cause" standard "does not focus on the bad faith of the movant or the prejudice to the opposing party," but "focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." *Ingle v. Dryer*, Civ. No. 07-cv-00428-LTB-CBS, 2008 WL 1744337, at *1 (D. Colo. Apr. 11, 2008).

Rule 37(b)(2) gives the Court express authority to prohibit a party from "introducing designated matters in evidence" for failing to comply with a court order, such as the Court's order mandating expert disclosures by a date certain. *See, e.g., Benson v. State Farm Mut. Auto. Ins. Co.*, No. 19-CV-2502-RM-NYW, 2021 WL 1229709, at 3 (D. Colo. Mar. 15, 2021) (precluding expert testimony under Rule 37(c)(1) where expert disclosure "was made . . . well after the deadline for disclosure of experts . . . the deadline for the close of discovery of June 29, 2020 . . . and the deadline for Daubert motions pursuant to Rule 702 of June 29, 2020").

Level 3 first disclosed Ms. Torres's damages methodology in March 2020. AT&T responded to this disclosure on May 15, 2020. (Ex. 10). In this response, AT&T specifically stated that "AT&T is not providing rebuttal expert disclosure in response to Ms. Torres," but was instead "providing a supplemental disclosure that set forth the areas of disagreement." (Ex. 13). The "areas of disagreement" AT&T identified were limited to the following:

    a.   the specific figures used for total charges and payments;

    b.   the inclusion of prejudgment interest or late penalty charges;

    c.   the method for calculating the OTT factor (a dispute later resolved by the Court

on summary judgment); and

    d.   the method for calculating a tandem add-back.

(Ex. 13 and attachment thereto).

The Court finds nothing in AT&T's May 2020 disclosures to suggest that AT&T took any issue with the structure of Level 3's damages methodology; that AT&T believed it withheld payment on exactly 65 percent of Level 3's end office charges; that AT&T had disputed usage-based charges on any grounds other than the DEOT and OTT Disputes; or that any amounts above and beyond 65 percent of Level 3's end office charges were withheld pursuant to any dispute other than the DEOT and OTT Disputes. The only fact questions AT&T identified concerned the accuracy of the specific figures Level 3 used—not whether using those figures, once corrected, was appropriate.

If AT&T had other "areas of disagreement" with Ms. Torres's damages disclosure, under Rule 26(e) AT&T was required to disclose them. It did not do so until March 12, 2021, when it sent a letter to counsel for Level 3 asserting, for the first time, that the withholdings beyond 65 percent of Level 3's end office charges were for other disputes. (Ex. A-26). The Court finds that the failure to make this disclosure until March 2021, well after the close of discovery, violated Rule 26.

AT&T contends that Ms. Miller's testimony is offered in her capacity as a fact witness, not an expert witness, such that it was not required for AT&T to disclose her opinions under Rule 26(a)(2). The Court likewise rejects this argument. AT&T makes clear that the starting point for Ms. Miller's opinions are data provided by Level 3—specifically, the exact figures reflecting Level 3's end office charges—of which Ms. Miller calculates 65 percent and asserts

that this is the precise amount of damages AT&T withheld for the OTT Dispute. Her opinions thus are not based on her personal knowledge, as is necessary for testimony offered by a fact witness under Rule of Evidence 701.

In fact, Ms. Miller could not have had personal knowledge of the exact amount of Level 3's end office charges. As shown above, Ms. Miller previously acknowledged that, for AT&T, "[i]t is not possible to exactly match the withholding for the Level 3 entity billing to a specific dispute," which she attributed "to the fact that Level 3 is billing both tandem and end office on the same BAN [billing account number]." (Ex. A-8 at 5). That is because "AT&T's mechanized payment system does not have the ability to recognize the difference between L3's billing that is associated with operating as a tandem vs. the billing associated with L3 operating as an EO [end office] when both are included on the same BAN." (Ex. A-7 at 4).

Ms. Miller thus has no personal knowledge of what Level 3's end office charges were, and no personal knowledge of what a specific percentage of those charges were, much less what AT&T's withholdings were relative to Level 3's end office charges. The only way to lay foundation for the testimony AT&T intends for Ms. Miller to give is to supply her with additional facts or data under Fed. R. Evid. 702—which is exactly what AT&T says it has done. Ms. Miller's opinions therefore are not offered as fact testimony, and should have been disclosed as part of expert discovery.

Though the Court finds Ms. Miller's opinions are expert, not lay opinions, the Court further notes that AT&T did not disclose the subject of Ms. Miller's fact testimony in its Rule 26(a)(1) disclosures. (Ex. 24). Thus, AT&T violated Rule 26(a) whether one considers Ms. Miller to be a fact or an expert witness.

Characterizing Ms. Miller as a fact witness also does nothing to correct the inaccurate, and incomplete nature of AT&T's May 2020 disclosure. The limited "areas of disagreement" AT&T identified with Ms. Torres's damages methodology did not include the fundamental bases underlying Ms. Miller's opinions now. Any other "areas of disagreement" were required to be disclosed under Rule 26(e). AT&T's failed to do so until well after the applicable deadlines. Thus, AT&T's belated disclosures violated Rule 26(a) and Rule 26(e).

The Court further finds that AT&T shows no good cause for why it failed to make these disclosures earlier, when they were required. AT&T knew the "nature and scope" of Level 3's witnesses and damages theory, and therefore "was capable of making an informed decision regarding a rebuttal expert," but instead made a "tactical decision" not to address damages in a timely manner; such "an ill-advised decision 'hardly constitutes good cause' under Rule 16(b)." *Anderson v. Seven Falls Co.*, No. 12-CV-01490-RM-CBS, 2013 WL 3771300, at *9 (D. Colo. July 18, 2013). Because AT&T's untimely disclosure violated Rule 16(b), in the absence of good cause for this violation, the Court need not determine whether those violations caused Level 3 to suffer prejudice. *See Ingle v. Dryer*, Civ. No. 07-cv-00428-LTB-CBS, 2008 WL 1744337, at *1 (D. Colo. Apr. 11, 2008).

Nevertheless, the Court finds AT&T's violations are inherently prejudicial. Not only was Level 3 unable to conduct expert discovery to analyze and contest Ms. Miller's claims, but the belated contention that some of the withholdings at issue were for other, unrelated disputes raise statute of limitations issues. Section 415 of the Communications Act contains a two-year statute of limitations (47 U.S.C. § 415), which means that AT&T's concealing the purported reasons for its withholding would—according to AT&T—leave Level 3 with no ability to recover hundreds

of thousands of tariffed charges that are more than two years old. AT&T suggested that it withheld these charges for previously undisclosed reasons only after the statute of limitations on a portion of Level 3's claims had run. The prejudice to Level 3 is obvious.

The Court therefore excludes the arguments and evidence that AT&T withheld payments beyond 65 percent of end office charges for other, unrelated disputes due to AT&T's violations of Rules 16(b) and 26(a) and (e). As discussed in further detail in the Court's findings of fact, even though the Court precludes Ms. Miller's opinions under Rule 37(e) as a sanction for AT&T's violations, even if it were to consider these opinions, the Court would still reject them as not credible. AT&T makes much of the fact that Level 3 answered an interrogatory stating that it wanted its "end office switching" charges as damages. AT&T tries to limit this to end office charges. The Court is not persuaded. The Settlement Agreement itself defines the "OTT Dispute" as being worth $20,483,518.40. This amount clearly included not only end office charges, but also tandem charges that AT&T could not distinguish from end office charges, and late payment charges—each of which the Agreement included in its collective definition of "end office switching." Thus, in this case, seeking "end office switching" charges under the Settlement Agreement is tantamount to seeking all of these damages the Settlement Agreement included in the scope of the OTT Dispute.

Even more importantly, AT&T admits that it withheld amounts from Level 3 under the guise of end office charges, included tandem charges because AT&T's mechanized process for withholding payments could not differentiate between these two categories of charges. The Settlement Agreement contemplated the payment of full tandem charges. AT&T cannot withhold charges under the agreement, and then claim Level 3 cannot recover the amounts because of how

AT&T characterized the withholdings.

Level 3 is entitled to recover the full amount AT&T withheld under the Settlement Agreement.

### B.  Level 3's Damages Properly Include Late Payment Charges.

Next, the Court concludes that late payment charges are properly included in Level 3's damages. The plain language of the Settlement Agreement required AT&T to pay all Tariffed rates—which includes both usage charges and late payment charges. Once again, the Agreement defined as within the scope of the OTT Dispute all amounts AT&T withheld. (Ex. A-1 at 1). These outstanding balances included for both usage-based charges and late payment charges. (Ex. A-29). The recovery of late payment charges has always been contemplated by the Settlement Agreement.

To find otherwise would violate the filed-rate doctrine, as incorporated into the Communications Act. "The filed-rate doctrine, or filed-tariff doctrine, provides that the rate of the carrier duly filed is the only lawful charge, and deviation from it is not permitted upon any pretext." *Qwest Corp. v. AT&T Corp.*, 479 F.3d 1206, 1210 (10th Cir. 2007) (quoting *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990)) (internal quotations omitted). "The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Marcus v. AT&T Corp.*, 138 F.3d 46, 59 (2d Cir. 1998) (quoting *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922)). The doctrine "makes clear that the tariff on file sets the rate that is to be charged—no more, no less, no negotiation allowed." *Qwest Corp.*, 479 F.3d at 1210.

The doctrine reflects the judiciary's inability to remedy purported injuries without

discriminating against "similarly situated non-suing customers" that continue to pay the original, purportedly unlawful rates. *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir. 1994) (citing *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 163–64 (1922)). "The doctrine admits of few exceptions: 'This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress.'" *Qwest*, 479 F.3d at 1210 (quoting *Maislin Indus.*, 497 U.S. at 127).

Numerous cases considering the issue have concluded that the filed-rate doctrine applies not only to usage-based charges, but late payment charges as well (which also further shows that late payment charges are considered among the Tariff's filed rates). *See, e.g., S. New England Tel. Co. v. Glob. Naps, Inc.*, No. 3:04-CV-2075 (JCH), 2008 WL 534745, at *4 (D. Conn. Feb. 25, 2008) (noting that the filed-rate doctrine "guarantees that 'a carrier is entitled to receive the full tariff rate,'" and therefore holding that a LEC was "entitled to prejudgment interest, in the form of late payment charges as required under the Tariff") (quoting *Delta Traffic Service, Inc. v. APPCO Paper & Plastics Corp.*, 931 F.2d 5, 5 (2d Cir. 1991)); *Cincinnati Bell Tel. Co. v. Allnet Commc'n Servs., Inc.*, 17 F.3d 921, 925 (6th Cir. 1994) (reversing decision to award late payment fee of only 6%, when the filed tariff stated that the carrier was entitled to 18%; "Because CBT's filed tariff controls the amount of interest due in this case, see 47 U.S.C. § 203(c), an award different from this amount was inappropriate. The FCC has the power to determine that rate to be unreasonable, but until it does, the parties are bound by the lawfully filed tariff."); *see also AT&T Commc'ns of CA v. Pac-W. Telecomm, Inc.*, No. C 06 07271 JSW, 2007 WL 1114037, at *2 (N.D. Cal. Apr. 13, 2007) (instructing that "if AT&T fails to make a timely payment, it shall be subject to the interest rate called for by the Pac-West tariff," as "it

would alter the legal obligations to the parties if [the Court] allowed AT&T to avoid an interest rate that it would be otherwise required to pay for these delinquent payments"); *WorldCom, Inc. v. Voice Plus Int'l, Inc.*, No. 97 CIV. 8265 (DLC), 2000 WL 12146, at *2 (S.D.N.Y. Jan. 6, 2000) (finding Plaintiff was entitled to prejudgment interest at the rate set forth in "the Tariff [Plaintiff] filed with the FCC").

AT&T's claims that the parties agreed not to make the tariffed rate subject to the late-payment provisions of the Tariff would afford AT&T preferential treatment, exempting AT&T from provisions of the Tariff that apply to all other customers that purchase services under the Tariff. The filed-rate doctrine does not allow this preferential treatment. The construction AT&T proposes therefore fails not only because the text does not support it, but also because the law does not permit it. The Settlement Agreement does not, and could not, excuse AT&T from its obligations under the Tariff.

AT&T claims that the filed-rate doctrine does not apply because the FCC has permitted CLECs to negotiate rates different from those in their tariffs. This claim is also unpersuasive. The FCC, acting under authority granted in 47 U.S.C. § 203(b)(2), allows CLECs, "as an alternative to tariffing," to "negotiate and enter into an agreement with an IXC to charge rates *higher* than those [otherwise] permitted." *Teliax, Inc. v. AT&T*, 2017 WL 3839459, *2 (D. Colo. Sept. 1, 2017) (emphasis added). But "the law does not permit a LEC . . . to agree to bill other IXCs *below-tariff* rates while charging [an IXC] tariff rates for the same service." *Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, No. CV 10-490 (MJD/SER), 2017 WL 4618277, at *25 (D. Minn. Mar. 31, 2017) (emphasis added); *see also All Am. Tel. Co. v. AT&T Corp.*, 26 FCC Rcd. 723, 732 n.47 (2011). Level 3 and AT&T could enter into an agreement

whereby AT&T paid some amount at or above what the Tariff requires. But to enter into an agreement to allow AT&T to pay below-tariff rates—including on traffic exchanged after the Final Appellate Order issued, when both billing and payment was to conform to the requirements of that order (*see* Ex. A-1 § 1(a)(iv))—would afford AT&T discriminatory treatment not available to Level 3's other customers under the tariff. Such preferential treatment is antithetical to the filed-rate doctrine.[2]

The Settlement Agreement itself plainly avoids this result, by simply requiring AT&T to abide by the Tariff. "As with any contract, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning." *Essex Ins. Co. v. Laruccia Const., Inc.*, 71 A.D.3d 818, 819 (N.Y. App. Div. 2010) (quoting *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007)). The plain and ordinary meaning of the word "rate" is, simply, the "amount paid or

---

[2] AT&T also claims that *Haxtun Tel. Co. v. AT&T Corp.*, 57 F. App'x 355, 360 (10th Cir. 2003), suggested that a district court has discretion to determine whether a party is entitled to an award of prejudgment interest notwithstanding that the filed tariff doctrine forbids a carrier from charging or receiving a greater or lesser charge than that specified in its tariff. That case, an unpublished decision from nearly twenty years ago (*see* Fed. R. App. P. 32.1), has not been cited by any case the parties have cited for the proposition that the filed-rate doctrine does not apply to late payment charges required under a tariff. To the contrary, the only case to cite *Haxtun* in connection with that proposition (*S. New England Tel. Co.*, 2008 WL 534745, at *4) rejected it as unpersuasive, instead finding that the filed-rate doctrine required payment of tariffed late payment charges.

But the Court need not take any position even ostensibly in tension with *Haxtun*. Even *Haxtun* acknowledged that "the actual rate of interest was determined by the filed tariff"; it merely held that the district court retained discretion whether to award prejudgment interest. *Haxtun*, 57 F. App'x at 360. To decline to award interest at all is effectively a decision to award interest at a rate of zero percent, contrary to the instruction of the tariff (and, thus, contrary to the holding in *Haxtun*). Moreover, as discussed below, New York law mandates an award of prejudgment interest on Level 3's action for breach of contract. Neither *Haxtun* nor any other authority AT&T cites suggests the Court cannot exercise its discretion to award Level 3 interest at the rate specified in the Tariff; indeed, the authorities cited above, and the Settlement Agreement itself, show the Court should do so.

charged for a good or service." RATE, Black's Law Dictionary (11th ed. 2019). The Tariff rate for switched access services includes the usage-based charges specific to the underlying functions and, in the event the usage-based charges are not paid on time, late payment charges, assessed at the rate of 1.5 percent per month. Ex. A-3 § 4.2.6. The plain meaning of the term "tariffed rate" thus applies to all Tariffed charges—including both usage and late payment charges.

The late payment charges are required not only under the Tariff but also under New York Law. "Because the 'awarding of prejudgment interest is considered a question of substantive law,'" "New York law controls any award of prejudgment interest." *Rhodes v. Davis*, 628 F. App'x 787, 792 (2d Cir. 2015) (quoting *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999)). And under New York law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y. C.P.L.R. 5001(a); see also *Rhodes*, 628 F. App'x at 792 (noting that prejudgment interest on a breach of contract action is "mandatory").

The default interest rate New York law applies to a breach of contract claim is nine percent. N.Y. C.P.L.R. 5004. However, this rate may be displaced by any rate "provided by statute." *Id.* In addition, if the parties agreed to a different rate in their contract, "the rate the parties agreed to in their contract is the correct rate of prejudgment interest." *Oldcastle Precast, Inc. v. Liberty Mut. Ins. Co.*, 838 F. App'x 649, 651 (2d Cir. 2021).

Here, both statute and contract point to the rate set forth in the Tariff. As noted above, AT&T expressly agreed to pay the rates in the Tariff, which establishes a rate of 1.5 percent per month for late payment charges. By agreeing to abide by the Tariff, AT&T agreed to be subject to the Tariff's rate for late payment charges. Indeed, it could do no other: the Communications

Act expressly states that Level 3 cannot "charge, demand, collect, or receive a greater or less or different compensation . . . than the charges specified in the schedule then in effect." 47 U.S.C. § 203(c); *see also Delaware & Hudson Ry. Co. v. Offset Paperback Mfrs., Inc.*, 126 F.3d 426, 427 (2d Cir. 1997) ("tariffs have the force and effect of a federal statute"); *Farley Terminal Co. v. Atchison, T. & S. F. Ry. Co.*, 522 F.2d 1095, 1098 (9th Cir. 1975) ("a tariff, rate, or charge, duly established in accordance with the Act, is the legal rate; it has the force of statute").

Thus, whether under the parties' agreement, a statute, or a tariff with the force of statute, the rate of interest is fixed at the rate specified in Level 3's Tariff. New York law requires the Court to apply it, whether as direct damages directly resulting from AT&T's breach or as mandatory prejudgment interest.

And even if New York law did not require the Court to apply prejudgment interest at the Tariff rate, to the extent the Court may impose prejudgment interest as an exercise of its discretion, it would exercise its discretion to do so. To do otherwise would frustrate the purpose of imposing prejudgment interest, to compensate Level 3 for the harm it suffered by AT&T's withholding of money that should have been paid to Level 3. *See J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 117–18 (2012) ("The principle behind prejudgment interest is that the breaching party should compensate the wronged party for the loss of use of the money.") (citing *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 266 (2011)). It would also encourage AT&T to withhold payments with impunity, facing no threat of reprisal whatsoever and thereby stripping Level 3 of one of the most important safeguards Level 3 has against this kind of misconduct. To exempt AT&T from the late payment provisions would give AT&T no reason at all to comply with its obligations; instead, AT&T would be incentivized to withhold

with impunity, knowing that even if it could not get away with that behavior, AT&T would face no repercussions aside from being forced to pay what it would otherwise be paying all along. That kind of special treatment is unwarranted. Even if the Court had discretion to refuse to impose late payment charges—and it does not—the Court would refuse to do so.

The Court therefore determines that Level 3's damages properly include calculations of prejudgment interest at the Tariff rate of 1.5 percent per month, or $1,984,204.

### C. Level 3's Damages Include Proper Credits for OTT-VoIP Traffic and an Add-back for Tandem Charges.

The next step in calculating damages is calculating the credit for end office charges on OTT-VoIP traffic. For the period beginning January 1, 2019 through February 19, 2020, when the FCC's December 2019 OTT Order became final, Level 3 must give AT&T a credit for half of its end office charges on OTT-VoIP traffic; for the period thereafter, Level 3 must credit AT&T for end office charges on all OTT-VoIP traffic.

As noted above, the Court previously determined that Level 3's OTT percentage did not exceed 21 percent, and Level 3 uses that figure in its damages calculations. The parties do not dispute the total amount of Level 3's end office charges to AT&T between January 2019 and April 2021, and do not dispute Ms. Torres's calculation of the total OTT credit due to AT&T, applying the 21-percent factor, in the amount of $1,207,516.03. (Ex. A-25, "Level 3 Billing to ATT" Tab, Column F).

The parties also agree that Level 3 may include tandem charges assessed in lieu of the end office charges Level 3 assessed on OTT-VoIP traffic, and that the amount of this tandem add-back through April 2021 is $323,536.79. (*See* Stipulation No. 14). This is due to the fact that the parties stipulate that Level 3's Tariff contains a provision defining tandem switching as

including situation where Level 3 provides the "functional equivalent" service. (Stipulation No. 3). The Court therefore adds this amount to the total damages to be awarded to Level 3.

After subtracting appropriate credits for end office charges on OTT-VoIP traffic and adding the stipulated tandem add-back, the net credit to be deducted from Level 3's damages is $795,279.

### a. Level 3 Stipulates that its Damages may be Reduced to Account for its Withholdings on its Claims Against TCG.

Finally, Level 3 stipulates that, to resolve any factual issue underlying its claims against TCG (discussed in more detail below), its total damages may be reduced by $517,147. *See* Stipulation No. 14. After subtracting this amount, Level 3's total damages through April 2021 are $8,785,853. (Ex. A-25). This is the total for damages due to Level 3 for charges disputed and withheld through April 2021.

### b. Level 3's Damages Continue to Accrue.

The Court notes that these damages calculations are current through invoices issued for the month of April 2021, which is the most current data Level 3 could present at trial in June 2021. For the months thereafter, through the date of this Order (and beyond), the same analysis and calculations will apply. Within fourteen days of the entry of this Order, Level 3 may file a supplemental damages disclosure to update its damages to include charges assessed and payments withheld after the months included in the calculations presented at trial. These supplemental calculations should follow the same methodology used here, identifying the charges withheld for the OTT Dispute (including late fees), adding a credit for end office on charges for OTT traffic (with the assumption that 21 percent of Level 3's traffic is OTT-VoIP), and including a tandem add-back calculated in the same manner as the tandem add-back Ms.

Torres calculated. In addition, AT&T is ordered to stop all withholding from Level 3 associated with the OTT Dispute.

### D.  CLAIMS FOR TCG CHARGES.

47 U.S.C. § 201(b) instructs that "All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." A cause of action exists for violation of Section 201(b) of the Communications Act where a carrier engages in a practice the FCC has determined to be unjust or unreasonable. *See Connect Insured Tel., Inc. v. Qwest Long Distance, Inc.*, No. 3:10-CV-1897-D, 2012 WL 2995063, at *2 (N.D. Tex. July 23, 2012) (citing *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 550 U.S. 45, 53 (2007)).

In addition, 47 U.S.C. § 203(c) instructs that "no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for [interstate] communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule."

Level 3's claims against TCG present no disputed factual issues. The parties agree that TCG assessed end office charges on OTT-VoIP traffic, until Level 3 levied counterclaims against TCG, at which time, TCG issued credits Level 3 to account for its OTT calling. (*See* Stipulation No. 13; *see also* Exs. A-52, A-53). Thus, TCG engaged in a practice the FCC has

determined to be unreasonable, and assessed charges not permitted under its tariff. This establishes a violation of Section 201(b) and 203(c).

Under 47 U.S.C. § 206, anyone injured by a common carrier's unlawful practices are entitled to the resulting damages "together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery." The purpose of this and similar provisions is "to charge the carrier with the cost and expenses entailed by a failure to pay without suit" and "compensate parties who must initiate suit in order to access the unique enforcement powers of the court." *Am. Tel. & Tel. Co. v. United Artists Payphone Corp.*, 852 F. Supp. 221, 225 (S.D.N.Y.) (quoting *Meeker v. Lehigh Valley R. Co.*, 236 U.S. 412, 433 (1915)).

Level 3 is entitled to an award of attorney's fees pursuant to Section 206. This is so notwithstanding the fact that Level 3 withheld payment on the charges at issue and sought, and received, credits on the charges TCG assessed. *Seeklocal Inc. v. Ameritech Servs. Inc.*, No. 05-C-1212, 2007 WL 1847281, at *1 (E.D. Wis. June 26, 2007) (awarding fees under Section 206 to the "prevailing party" in spite of fact that success was obtained via settlement agreement). Level 3 had to bring this litigation to compel TCG to stop assessing these charges and obtain this result. Indeed, but for this lawsuit, TCG would not have even realized it was billing end office charges on OTT calls. (Exs. A-38, A-39). There was a period of years where Level 3 paid the unlawful end office charges, before Level 3 began disputing and withholding payment of charges. *See Douglas v. Talk Am., Inc.*, No. CV0603809GAFRCX, 2010 WL 11508339, at *5 (C.D. Cal. Oct. 19, 2010) ("Because of this violation, Plaintiff had to pay additional fees in his monthly phone bill. Therefore, Plaintiff has sufficiently proven that he has sustained damages in consequence of the Section 201(b) violation").

34

The Court therefore finds that Level 3 is therefore entitled to recover the attorney's fees it expended to obtain this result. The Court instructs that Level 3 shall, within fourteen days of the entry of this Order, file a petition for an award of attorney's fees setting forth reasonable fees and costs expended in order to prosecute its claims against TCG.

## ORDER

Based on the foregoing, the Court:

1. FINDS in favor of Level 3 and against AT&T on Counts I and III of AT&T's Complaint, and on Counts I and II of Level 3's Counterclaim;

2. ORDERS that judgment in favor of Level 3 be entered against AT&T in the amount of $8,785,853;

3. FURTHER ORDERS that such judgment shall include additional withholdings by AT&T on charges and late payment charges on these withholdings on invoices for May 2021 and thereafter;

4. FURTHER ORDERS Level 3 to submit, within fourteen days of the entry of this Order, a revised schedule of damages include such additional withholdings by AT&T;

5. FINDS in favor of Level 3 and against TCG on Counts III through VI of Level 3's Counterclaims;

6. ORDERS that judgment in favor of Level 3 be entered against TCG on Counts III through VI of Level 3's Counterclaims; and

7. FURTHER ORDERS Level 3 to submit, within fourteen days of the entry of this Order, its Petition for an award of attorney's fees setting forth reasonable fees and

costs expended in order to prosecute its claims against TCG.

IT IS SO ORDERED this _____ day of _____, 2021.


_____
The Honorable Raymond P. Moore
United States District Court Judge

Respectfully submitted by:

Charles W. Steese, #26924
Douglas N. Marsh, #45964
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

*Attorneys for Defendant/*
*Counterclaimant Level 3*
*Communications, LLC and*
*Counterclaimants Broadwing*
*Communications, LLC, Global*
*Crossing Telecommunications, Inc.,*
*and Wiltel Communications, LLC.*