# EXHIBIT V

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM

AT&T CORP.,

      Plaintiff/Counter Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNCATIONS, INC., and WILTEL COMMUNICATIONS, LLC

      Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.

      Counterclaim Defendant

---

**EXPERT REBUTTAL REPORT OF PENN PFAUTZ**

---

      I, Penn Pfautz, under penalty of perjury, hereby swear and affirm the following based on

personal knowledge:

**BACKGROUND**

      1.      On March 16, 2020, Defendant/Counterclaimant Level 3 Communications, LLC

and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications,

Inc., and WilTel Communications, LLC (collectively, "Level 3") made a Rule 26(a)(2) Disclosure,

which stated that Level 3 will use Andrew McClure as a witness at trial to present evidence under

PLAINTIFF'S EXHIBIT
**58**
18-CV-0112

Exhibit 58  Page 1 of 26

Federal Rule of Evidence 702, 703, or 705 (the "March 16 Disclosure"). The March 16 Disclosure, along with its Exhibit No. 2, are attached to this report as PP-10.

2.      Level 3 also said that Mr. McClure would testify regarding Level 3's percent OTT since January 1, 2019. Exhibit 2 to the March 16 Disclosure is an Excel spreadsheet that purports to contain an estimate of Level 3's originating End Office Minutes of Use ("MoU") and its OTT MoU for 2019 through February 2020.

3.      On April 22, 2020, Level 3 made a Supplemental Rule 26(a)(2)(C) Disclosure. Level 3 made further clarifications regarding Mr. McClure's anticipated testimony in its Supplemental Disclosure (the "April 22 Disclosure" and together with the March 16 Disclosure, the "Level 3 Disclosure"). Level 3's April 22 Supplemental Disclosure is attached to this report as PP-11.

4.      I have been asked by AT&T Corp. ("AT&T") and Teleport Communications Group, Inc. ("TCG") to respond to the Level 3 Disclosure. On March 16, I provided an expert report in this matter (the "Initial Report"), and I am incorporating by reference the opinions contained in the Initial Report. As before, I am being compensated at the rate of $250 per hour plus out of pocket expenses on an as-incurred basis.

## SUMMARY OF OPINIONS

5.      I have been asked by AT&T and TCG to assess the methodology disclosed in the Level 3 Disclosure that Level 3 used for identifying and billing charges associated with a type of telephone call, known as "over-the-top" Voice over Internet Protocol ("VoIP") calls. The charges involve a service known as "switched access service," which a local carrier can sometimes bill to a long distance carrier on certain long distance calls.

6.      In this case, AT&T contends that it has been overcharged by Level 3 for these over-the-top VoIP calls for which Level 3 bills switched access services to AT&T. In turn, Level 3

Exhibit 58  Page 2 of 26

claims that it has been overcharged by AT&T and TCG on over-the-top VoIP calls for which TCG bills switched access services to Level 3.

7.     As explained in the Initial Report, it is my understanding that the FCC has generally prohibited local carriers from billing a particular type of switched access charge—called local or "end office" switching—on over-the-top VoIP calls, where neither the local carrier nor its VoIP partner routes the call to or from the premises of an end user.  The local carrier can usually bill a different type of switched access charge—known as a tandem switching charge—on over-the-top VoIP calls.

8.     I further explained in the Initial Report that local carriers cannot always readily distinguish between over-the-top VoIP calls and other types of calls.  In order to bill accurately, local carriers can use a variety of methods to identify and track over-the-top VoIP calls.  In some cases, the local carriers will examine data about some of their calls, and attempt to develop a "factor" for use in billing over-the-top VoIP calls.  In general, when such factors are used, the process for developing the factor should be documented, and able to be replicated or verified by the other party.  In this regard, I note that Level 3's tariff provides, with respect to another VoIP factor used for billing, that the factor "shall be based on information such as the number of the Customer's retail VoIP subscriptions in the state (e.g. as reported on F.C.C. Form 477), traffic studies, actual call detail or other relevant and verifiable information which will be provided to the Company upon request."  Level 3 Communications, LLC, Tariff F.C.C. No. 4, § 3.4.6.

9.     ***Level 3's Charges To AT&T***.   In the Initial Report, I reviewed Level 3's methodology for identifying over-the-top VoIP calls, which Level 3 conducted in 2017.  I explained that in my opinion the method Level 3 used to estimate the over-the-top VoIP traffic of

Exhibit 58  Page 3 of 26

unaffiliated third party VoIP providers was unreasonable.  I further explained that Level 3's methodology almost certainly understated the proportion of that traffic billed by Level 3.

10.    I have now reviewed Level 3's methodology, as disclosed in the Level 3 Disclosure, for identifying over-the-top VoIP calls, which Level 3 apparently conducted in the beginning of 2020 (the "Methodology").  My opinion has not changed.  The Methodology, which Mr. McClure used to estimate the over-the-top VoIP traffic of unaffiliated third party VoIP providers, is unreasonable and almost certainly understates the proportion of that traffic billed by Level 3.

11.    Level 3 continues to serve ordinary business customers, and it also continues to partner with unaffiliated providers of retail over-the-top VoIP calling services.  The Methodology looked at Level 3's customer base in certain periods, and examined the total number of minutes of traffic for which Level 3 billed end office switching.  The Methodology then attempted to estimate the percentage of those minutes that involved over-the-top VoIP calling by identifying the customers that it believed handled over-the-top VoIP calls.  For this method to produce an accurate factor for over-the-top VoIP calls, the measurements (*e.g.*, the overall end office switching minutes and the number of minutes associated with over-the-top VoIP calling) need to be accurate.  However, as described below, I found significant problems with these measurements.

12.    ***AT&T/TCG's Charges To Level 3.***  The Level 3 Disclosure does not provide any opinion regarding AT&T's methodology for estimating its over-the-top VoIP traffic.  Accordingly, my opinion continues to be that the method AT&T/TCG used to estimate its over-the-top VoIP traffic is reasonable.

## MATERIALS CONSIDERED

13.    In performing my assignment and developing my opinions, I relied upon my years of experience in the telecommunications industry, including my experience with switched access charges.  In order to review Level 3's methodology for identifying over-the-top VoIP calling, I

Exhibit 58  Page 4 of 26

reviewed the Level 3 Disclosure and I examined the spreadsheet attached to the Level 3 Disclosure as Exhibit 2.  I also reviewed a Level 3 tariff, which I discuss below.

## ASSESSMENT AND OPINIONS REGARDING LEVEL 3'S METHODOLOGY FOR IDENTIFYING OVER-THE-TOP VoIP CALLS

14.    ***Description of Level 3 Estimates of Over-the-Top VoIP.***  Mr. McClure is expected to testify regarding an analysis that Level 3 conducted of its over-the-top VoIP traffic in or around the beginning of 2020.  Level 3 examined their traffic on a month by month basis, from January 2019 through February 2020.  As explained in more detail below, what Level 3 attempted to do was to measure the total number of calls and minutes of use for each customer, and for which Level 3 billed AT&T for end office switched access services.  Level 3 then attempted to determine which of these customers were involved in over-the-top VoIP calling, and to develop an estimate for each such customer of the percentage of traffic that Level 3 believed consisted of over-the-top VoIP calling.  This led to an estimate of the total number of minutes Level 3 billed to AT&T that involved over-the-top VoIP calling.  Level 3 developed a factor by dividing that total number of estimated over-the-top VoIP calling minutes of use by the total number of end office minutes of use.

15.    Level 3's calculations in the periods it examined ultimately led to a factor of between 14% and 19%, and resulted in an average factor of 16%.

16.    ***Description of Level 3's Spreadsheets Used To Estimate the Factor.***  The Level 3 estimates of OTT minutes of use as provided in the spreadsheet attached to Exhibit PP-10 are computed as follows.  As shown below, which is an excerpt from the "OTT Summary 2019 to Current" tab in Exhibit PP-10, Column C shows the total End Office Minutes of Use

5

| Orig TG Customer | Sum of CDR | Sum of MOU | Sum of Rev | % OTT | OTT MOU | OTT Revenue |
|---|---|---|---|---|---|---|
| Intermedia.Net, Inc. | 23,432,858 | 152,991,453 | $314,084 | 100% | 152,991,453 | $314,084 |
| Bandwidth Inc. | 31,350,078 | 153,624,645 | $282,985 | 85% | 130,580,949 | $240,538 |
| Star2Star Communications, Llc | 9,905,428 | 57,590,755 | $107,918 | 100% | 57,590,755 | $107,918 |
| 8x8, Inc. | 2,964,928 | 18,548,590 | $38,474 | 75% | 13,911,442 | $28,855 |
| Wells Fargo | 21,361,916 | 406,952,928 | $714,478 | 2% | 6,104,294 | $10,717 |
| Momentum Telecom Inc | 1,985,048 | 6,324,624 | $10,294 | 100% | 6,324,624 | $10,294 |

("Sum of MOU") for Level 3 customers. The end office minutes in Column C are multiplied by the "OTT %" shown in Column E, which as described below, is a Level 3 estimate, resulting in the estimate of the over-the-top VoIP minutes carried by Level 3—those minutes which are at issue here in Column F.

17.     The accuracy of Level 3's estimates of OTT traffic depends crucially on three factors: the end office minutes of use , identifying calls that were completed using Level 3 TNs, and the percentage of OTT.  If the estimates of the percentage of over-the-top VoIP traffic for Level 3's customers are not accurate—for example, if they are too low—then the total number of over-the-the top VoIP minutes of use (the numerator used in calculating the factor) will be understated, and the resulting factor will be too low.  Likewise, the end office minutes of use are not accurate (for example, if they are too high), then the denominator used in calculating the factor will be too high, and the resulting factor would be too low.

18.     The Level 3 Disclosure states that Mr. McClure used actual Call Detail Records to determine (a) what calls were associated with Level 3 TNs, and (b) the specific wholesale customer associated with each specific Level 3 TN.  This process addresses the concerns contained in my Initial Report regarding Level 3's apparent failure to consult Call Detail Records to determine the percent of Level 3 TN factors, and instead, relying on estimates.

19.     According to the Level 3 Disclosure, the "OTT Percentage" figure was developed as follows.  Level 3 set its own internal traffic to 0 percent OTT.  The Level 3 Disclosure indicates that in 2017, Mr. McClure contacted the wholesale customers with the largest volume of MOUs

Exhibit 58  Page 6 of 26

based on 2017 volumes, and using those percentages, he calculated the average OTT percentage for wholesale customers, and applied that OTT average percentage to the remaining wholesale customers.  The Level 3 Disclosure further indicates that Mr. McClure went through the same exercise in 2020, and used the same percentages obtained from customers in 2017, and obtained an average OTT percentage for wholesale customers of 16%.

20.     The Level 3 Disclosure also explains that for enterprise class customers – specifically Wells Fargo – the percentage of mobility based deployed TNs by Level 3 was used to calculate its OTT percentage.  Using this method, Level 3 assigned Wells Fargo with a 5% OTT value.

21.     ***Assessment of Level 3 Methodology—End Office Minutes of Use.***  In the analysis of the data provided by Level 3, I have accepted as accurate the numbers in Column C, "Sum of MOU."  This appears to represent the number of minutes of use that Level 3 billed the End Office Local Switching element to AT&T associated with the customer listed in Column A.  This should involve a relatively straightforward determination, but, to the extent that this data is incorrect, then that would be significant, because this MOU data is a starting point for the Level 3 factor analysis.

22.     I do, however, continue to have questions about the inclusion in the Sum of  MOU certain customers as involving calls for which Level 3 billed AT&T end office switching charges. As I noted in the Initial Report, to the extent Level 3 is merely passing calls from one carrier's end users to a long distance carrier like AT&T, then Level 3 should not ordinarily be billing end office switching charges at all.  Column C indicates the total number of MOU passed to AT&T.  A number of the customers listed in column A appear to be facilities-based carriers that, based on my experience, would have their own end user customers.  For example, customers included in Column A, and for which Level 3 appears to have billed end office switching charges, are Comcast,

Exhibit 58  Page 7 of 26

Cable One and CSC Holdings, which is associated with Altice USA. These are cable companies, and cable companies often provide facilities-based telephone services to end users.

23.     Likewise, other customers included in Column A, are facilities-based carriers like One Communications, Inteliquent, Cincinnati Bell, Qwest, Blue Ridge Communications, and wireless carriers like Commnet Wireless and TelCel, and Level 3 has billed AT&T end office access charges associated with these carriers. If these cable companies or carriers are originating calls from their own end users over their own facilities, and then forwarding them to Level 3 so that Level 3 can route them onto AT&T, then I question whether Level 3 should be billing AT&T end office charges at all even where the telephone number belongs to Level 3. This would certainly be improper if these carriers or cable companies are themselves billing AT&T end office switching charges on these calls.

24.     As I explained in the Initial Report, to the extent this is occurring, then the total number of end office switching minutes is inflated, resulting in more charges to AT&T. I am not aware of any data or documentation as to these cable companies or carriers, or as to the arrangements under which Level 3 provides the end office functions for some of these carriers' traffic. I am also not aware of material that shows why Level 3 included these carriers and cable companies on the list of customers, and why Level 3 billed AT&T for end office switching charges on calls associated with these carrier-customers. Absent more information, I cannot conclude with certainty that Level 3's end office charges associated with these customers are improper, but it raises questions, and I reserve the right to revise my opinion and report if further information comes to light. My concerns regarding this issue, as expressed in the Initial Report, remain present.

25.     ***Assessment of Level 3 Methodology—Percent of Level 3's Telephone Numbers.*** In my Initial Report, I explained that I had serious concerns with Level 3's methodology for

Exhibit 58  Page 8 of 26

determining the percent of Level 3's telephone numbers.  I noted that the Call Detail Records ("CDRs") in Level 3's systems should contain the numbers used on the calls for which End Office minutes might be billed, and that Level 3 should thus be able to determine what percentage of the TNs making potentially billable calls belong to Level 3, since Level 3 clearly knows its own numbers.  The Level 3 Disclosures indicate that Level 3 consulted CDR data to determine the what calls were associated with Level 3 TNs, and the specific wholesale customer associated with each specific Level 3 TN.  This method appears to be reasonable.

26.     For purposes of this Rebuttal Report, I have relied on the Level 3 Disclosure, and have assumed that Level 3's methodology only includes MOUs associated with Level 3 TNs.  Of course, if this assumption is incorrect, Level 3's analysis as contained in the Level 3 Disclosure is flawed for an additional reason, as I explained in the Initial Report.

27.     ***Assessment of Level 3 Methodology—Percent OTT.***  My conclusions regarding Level 3's process for estimating Percent OTT have not changed.  Level 3's methodology is flawed, and I am not confident that it accurately depicts Level 3's OTT percentage.  Level 3 has not changed how it determined the percentage of OTT for each of its customers.  As before, Level 3 used the data from 2017, which were developed by contacting or examining the websites of the Level 3 customers associated with the top 90% of end office minutes and inquiring about the percentage of OTT traffic.  I continue to have serious concerns with the ways in which Level 3 contacted its customers to determine the percentage of their traffic that is OTT.  Level 3 still does not state who was contacted at each company, what organization they were part of, or what knowledge they might be expected to have with respect to the question being asked.  There is simply no documentation in the Level 3 Disclosures (or anywhere else, as far as I am aware) that allows for these percentages to be verified.  It is not reasonable to base a factor on information that

Exhibit 58  Page 9 of 26

cannot be verified.  *See* Level 3 Tariff (the factor "shall be based on . . . relevant and verifiable information").

28.     In addition to the concerns raised in the Initial Report regarding Level 3's process for estimating the OTT Percentage, which are expressly incorporated into to this Rebuttal Report (as the methodology has not changed), I have further concerns regarding the methodology described in the Level 3 Disclosure.

29.     First, the procedure for estimating a default OTT percentage value for new wholesale customers uses a denominator based on total MoU for all customers (including Enterprise, Wholesale, and Internal Level 3) rather than the total MoU for just the 2017 wholesale customers.  The 16% default OTT value is apparently estimated by summing the OTT minutes for 2017 wholesale customers (using the 2017 OTT percent factors) and then dividing by the total 2019-2020 MoUs *for all customers*, as opposed to the total 2019-2020 MoU for the 2017 wholesale customers.  Because the new wholesale customers are, of course, wholesale customers, it would be more reasonable to use a factor associated with other wholesale customers, and not all customers.  It is reasonable to expect that these new wholesale customers would have over-the-top calling patterns that approximate other wholesale customers rather than all of the other types of customers in Level 3's customer base.  If the latter approach had been used, the average wholesale OTT percentage factor would have been 82% rather than 16%.  Without further explanation, I cannot be sure that Level 3's decision to use the former procedure was appropriate.

30.     Second, the Level 3 Disclosure provides no information about how Level 3 identified new wholesale customers, versus enterprise customers.  This distinction is important for the reasons explained above.

Exhibit 58  Page 10 of 26

31.     Third, the Level 3 Disclosure continues to include customers that are likely to have OTT traffic listed as having 0% OTT.  For example, Fuze Inc. is shown to have 0% OTT. However, Fuze Inc.'s website states: "Connect your sites to Fuze with over-the-top, enhanced OTT, private connectivity, or SD-WAN…"  Exhibit PP-7.

32.     Finally, the Level 3 Disclosure includes customers in Column A such as "NULL," "Internal Enterprise VoIP," and "Unknown."    However, nothing in the Level 3 Disclosures explains what is meant by these terms, and why they exist.  These entries have significant MoUs, and as a result, they play a large role in determining the overall OTT % factor.  Without additional information, I question why these customers were assigned a 0% OTT value.  It seems unreasonable to assume that these customers are 0% OTT, when it is just as likely that these customers could in fact have 100% OTT traffic.

33.     It is also important to reiterate that Level 3's own tariff requires customers to provide the kinds of documentation and verifiability when developing PVU factors that was not provided with the Level 3 Disclosure.[2]  More specifically, Level 3's tariff states that

> Both the Customer provided originating PVU and the terminating PVU shall be based on information such as the number of the Customer's retail VoIP subscriptions in the state (e.g. as reported on F.C.C. Form 477), traffic studies, actual call detail or other relevant and verifiable information which will be provided to the Company upon request.

The tariff goes on to provide for a detailed PVU "Factor Verification Process."  See Section 3.4.10.  Under this process, Level 3 can request

> an overview of the process used to determine the PVU factors, the call detail records, description of the method for determining how the end user originates and terminates calls in IP format, and other information used to determine the Customer's PVU factors furnished to the Company in order to validate the PVU factors supplied.

---

[2] The relevant pages from Level 3's tariff are attached as Exhibit PP-12.

Exhibit 58  Page 11 of 26

Level 3's tariff then provides that it may dispute the factor based on the customer data and information, Level 3's "reasonable review of other market information, F.C.C. reports on VoIP lines, such as F.C.C. Form 477 or state level results based on the F.C.C. Local Competition Report or other relevant data." It also provides that any change in the factor of "more than five percentage points" can provide the basis for a dispute.

34.    It is surprising that, despite the FCC's 2019 Order that clearly establishes that the end office switch rate element may not be applied to OTT calls, Level 3 has not revisited its 2017 OTT percentage estimates, or devised a more rigorous and auditable procedure for estimating OTT traffic.  Given that Level 3 has apparently devised a procedure for reviewing CDRs to determine which MOUs were completed on Level 3 TNs, I question why Level 3 has not been able to take the additional step of contacting its customers to determine which Level 3 TNs, or what percentage of Level 3 TNs, were used for OTT calling.

35.    In sum, the Level 3 Disclosure does not change the opinion that I disclosed in the Initial Report.  Level 3's methodology for determining an overall percent OTT factor continues to be flawed and unreliable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of May, 2020 in San Diego, California.

Penn Pfautz

Subscribed and sworn to before me this 15th day of May, 2020

12

See Attached Certificate

Exhibit 58  Page 12 of 26

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**        GOVERNMENT CODE § 8202

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

1.

2.

3.

4.

5.

6.

_____        _____
*Signature of Document Signer No. 1*        *Signature of Document Signer No. 2 (if any)*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Diego

THOMAS FELL
Notary Public - California
San Diego County
Commission # 2261171
My Comm. Expires Oct 5, 2022

Place Notary Seal Above

Subscribed and sworn to (or affirmed) before me

on this 15 day of May , 20 20,
            *Date*            *Month*        *Year*
by
(1) Penn Loren Pfautz

(and (2)_____ ),
                *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature_____
                    *Signature of Notary Public*

──────────── **OPTIONAL** ────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

**Title or Type of Document:** Expert Rebuttal Report of Penn Pfautz   **Document Date:** May 15, 2020

**Number of Pages:** 12   **Signer(s) Other Than Named Above:** NA

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5910

Exhibit 58  Page 13 of 26

# EXHIBIT PP-10

Exhibit 58  Page 14 of 26

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

      Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC,

      Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

      Counterclaim Defendant.

---

**DEFENDANT/COUNTERCLAIMANTS' RULE 26(a)(2) DISCLOSURE**

---

      Defendant/Counterclaimant Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), by and through its counsel, hereby submits the following disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2).

      Pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), Level 3 states that it will use Jennifer Torres and Andrew McClure as witnesses at trial to present evidence under Federal Rule

Exhibit 58  Page 15 of 26

of Evidence 702, 703, or 705. As neither witness is retained or specially employed to provide expert testimony in this case, and as their duties as the party's employee do not regularly involve giving expert testimony, neither Ms. Torres nor Mr. McClure are required under Federal Rule of Civil Procedure 26(a)(2)(B) to provide a written report.

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), Level 3 states:

Jennifer Torres will testify regarding, among other things, Level 3's damages including but not limited to the contents of Exhibit 1 to this disclosure.

Andrew McClure will testify regarding, among other things, Level 3's percent OTT since January 1, 2019 including but not limited to the contents of Exhibit 2 to this disclosure.

Respectfully submitted this 16th day of March, 2020.

By:     /s/ Charles W. Steese
        Charles W. Steese, #26924
        Douglas N. Marsh, #45964
        Armstrong Teasdale LLP
        4643 South Ulster Street, Suite 800
        Denver, Colorado 80237
        Telephone: (720) 200-0676
        csteese@armstrongteasdale.com
        dmarsh@armstrongteasdale.com

*Attorneys for Defendant/Counterclaimants*

## CERTIFICATE OF SERVICE

I, Douglas N. Marsh, hereby certify that on March 16, 2020, I electronically served the foregoing document upon the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael J. Hunseder
Justin A. Benson
Michael D. Warden
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com
Email: mwarden@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

/s/ Douglas N. Marsh
Douglas N. Marsh

3

Exhibit 58  Page 17 of 26

# EXHIBIT PP-11

Exhibit 58  Page 18 of 26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00112-RM-MEH

AT&T CORPORATION,

      Plaintiff/Counterclaim Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant/Counterclaimant,

and

BROADWING COMMUNICATIONS, LLC, GLOBAL CROSSING
TELECOMMUNICATIONS, INC., and WILTEL COMMUNICATIONS, LLC,

      Counterclaimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

      Counterclaim Defendant.

---

**DEFENDANT/COUNTERCLAIMANTS'**
**SUPPLEMENTAL RULE 26(a)(2)(C) DISCLOSURE**

---

Defendant/Counterclaimant Level 3 Communications, LLC and Counterclaimants Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC (collectively, "Level 3"), by and through its counsel, hereby submits the following supplemental disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2).

Exhibit 58  Page 19 of 26

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), Level 3 states that it will use Jennifer Torres and Andrew McClure as witnesses at trial to present evidence under Federal Rule of Evidence 702, 703, or 705. As neither witness is retained or specially employed to provide expert testimony in this case, and as their duties as the party's employee do not regularly involve giving expert testimony, neither Ms. Torres nor Mr. McClure are required under Federal Rule of Civil Procedure 26(a)(2)(B) to provide a written report.[1]

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), Level 3 states:

Jennifer Torres will testify as an expert regarding Level 3's damages as described in Exhibit 1 to this disclosure. In addition, with regard to the attached spreadsheet, Level 3 clarifies the following to address AT&T's questions regarding Ms. Torres's expected expert testimony:

1. The "50% of Credit" referenced in Column F of the credit and debit Tab comes directly from Section 1(a)(iv) of the 2015 Level 3/AT&T settlement Agreement which states:

    a. "Although the Parties agree that this Settlement Agreement is intended to be a full and final settlement of all disputes and balances associated with OTT traffic prior to June 1, 2015, the Parties also recognize the pendency of the OTT Appeal. Therefore, in the event the OTT Declaratory Order is overturned, either in whole or in part, and the applicable order on appeal becomes final and is no longer subject to further appeal or other judicial review ("Final Appellate Order"), Level 3 will refund, within 30 days, **fifty**

---

[1] Both Ms. Torres and Mr. McClure have also been designated as fact witnesses under Fed. R. Civ. P. 26(a)(1)(A)(i), and as such may be called upon to present fact testimony not subject to Rules of Evidence 702, 703, or 705, irrespective of whether that testimony is disclosed here.

**percent (50%) of the disputed OTT charges beginning with June 2015 traffic through the date on which such Final Appellate Order becomes final and is no longer subject to further appeal or other judicial review; provided, however, that if the OTT Declaratory Order is overturned in part, and not in whole, then Level 3 will only be required to refund OTT charges to the extent they should not have been charged in accordance with the Final Appellate Order.** Further, the Parties agree that any billing and payments for OTT traffic exchanged after such Final Appellate Order becomes final shall be in compliance with terms of that order." (emphasis added).

    b.  While the Agreement used the date of June 1, 2015 or before, the parties reached another agreement where this date was modified to December 31, 2018.  As such, data from January 1, 2019 and afterwards was used.

2.  AT&T asked where the data from Columns C and D from the AR Summary Tab came from. Level 3 and AT&T had a separate dispute relating to charges Level 3 assessed to AT&T on calls that traversed DEOTs (direct end office transport). As part of the settlement of that dispute, Level 3 issued credits which are identified in Column C. Because Level 3 issued credits, Level 3 adjusted its damages calculation to account for late payment charges ("LPCs") billed by Level 3 associated with the DEOT credits.  It did so based on the pro rata calculation. This pro rata credit is shown in Column D.

3. AT&T asked for an explanation for where the formula in Column G from the AR Summary Tab came from.  It is the total LPCs that Level 3 billed to AT&T, less the LPCs credited for the DEOT dispute.

4. AT&T asked how the number in Column H from the AR Summary Tab was calculated. Column H is the Balance due from Column F less the late payment charges in Column G. This allows one to see damages AT&T caused to Level 3 not associated with LPCs associated with the OTT dispute.

5. AT&T asked where the data from Column I from the AR Summary Tab comes from. It comes directly from the Credit and Debit spreadsheet, which contains the same numbers.

6. AT&T also asked why the calculations in Column J (total damages) from the AR Summary Tab do not subtract amounts in Column G (Total OTT LPC). That is because the Settlement Agreement obligated AT&T to pay Level 3 all end office charges until a final decision issued changing the way Level 3 could bill end office charges on OTT calls.  That did not happen until February 2020.  In addition, AT&T over-withheld payments far in excess of any conceivable OTT traffic billed by Level 3 to AT&T. Thus OTT LPCs are an element of Level 3's damages.

Andrew McClure will testify as an expert regarding Level 3's percent OTT since January 1, 2019 as described in *Exhibit 2* to the original disclosure. In addition, with regard to the attached spreadsheet, Mr. McClure clarifies the following to address AT&T's questions:

4

Exhibit 58  Page 22 of 26

1. AT&T asked where Mr. McClure got his "new customer specific percentages." The percentages in the disclosure are the same as those contained in the 2017 spreadsheet (CTL_0014135), with three notable exceptions:

   a. In light of the FCC's December 2019 OTT decision, Level 3's own internal traffic was calculated at 0 percent OTT.

   b. In 2017, Mr. McClure contacted the wholesale customers with the largest volume of MOUs based on 2017 volumes, and  using those percentages, Mr. McClure calculated the average OTT percentage for wholesale customers, and  applied that OTT average  percentage to the remaining wholesale customers (i.e., to those he did not contact). For his expert report in this case, Mr. McClure went through the same exercise, using the same percentages obtained from customers in 2017, and obtained an average OTT percent for wholesale customers of 16% OTT. For his expert report, Mr. McClure applied that average wholesale OTT percentage of 16% for the customers he had not contacted in 2017.

2. For enterprise class customers—specifically Wells Fargo—Mr. McClure used the percentage of mobility based deployed TNs by Level 3 as a basis for calculating his OTT percentage.

3. AT&T asked how Level 3 calculated the percentage of each customer's TNs that Level 3 owned. Instead of estimating this percentage, as Level 3 did in the past, Mr. McClure used actual CDRs to determine (a) what calls were associated with

Level 3 TNs, and (b) the specific wholesale customer associated with each specific Level 3 TN.

Level 3 reserves the right to have its expert witnesses supplement its disclosures.

Respectfully submitted this 22nd day of April, 2020.

By:     /s/ Charles W. Steese
        Charles W. Steese, #26924
        Douglas N. Marsh, #45964
        Armstrong Teasdale LLP
        4643 South Ulster Street, Suite 800
        Denver, Colorado 80237
        Telephone: (720) 200-0676

        csteese@armstrongteasdale.com
        dmarsh@armstrongteasdale.com

        *Attorneys for Defendant/Counterclaimants*

6

Exhibit 58  Page 24 of 26

## CERTIFICATE OF SERVICE

I, Charles W. Steese, hereby certify that on April 22, 2020, I electronically served the foregoing document upon the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael J. Hunseder
Justin A. Benson
Michael D. Warden
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
E-mail: mhunseder@sidley.com
E-mail: jbenson@sidley.com
Email: mwarden@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

/s/ Charles W. Steese
Charles W. Steese

7

Exhibit 58  Page 25 of 26

## CERTIFICATE OF SERVICE

I, Justin A. Benson, hereby certify that on May 15, 2020, I caused a copy of the foregoing

to be served on counsel for Level 3 et al. by email:

Charles W. Steese, #26924
Douglas N. Marsh, #45964
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
Email: csteese@armstrongteasdale.com
Email: dmarsh@armstrongteasdale.com

*Attorneys for Defendant Level 3*
*Communications, LLC*

<u>/s/ Justin A. Benson</u>
Justin A. Benson
*Attorney for Plaintiff AT&T Corp. and*
*Counterclaim Defendant Teleport*
*Communications Group*

Exhibit 58  Page 26 of 26