# EXHIBIT NN

CONFIDENTIAL

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2         CIVIL ACTION NO. 18-cv-00112-RM-MEH
3
   AT&T CORPORATION,                  :
4                                     :
                 Plaintiff,           :
5                                     :
              vs.                     :
6                                     :
   LEVEL 3 COMMUNICATIONS, LLC,       :
7                                     :
                 Defendant.           :
8
9
10            Deposition of ARDELL BURGESS
11   taken in the above-entitled matter before
12   Suzanne J. Stotz, a Certified Court Reporter
13   (License No. 30XI00184500) and Notary Public of
14   the State of New Jersey, taken at the offices
15   of AT&T, One AT&T Way, Bedminster, New Jersey
16   07921, on Friday, February 8, 2019, commencing
17   at 9:01 a.m.
18
19
20
21   Job No. CS3213055
22
23
24
25
```

CONFIDENTIAL

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   SIDLEY AUSTIN, LLP
       BY:  MICHAEL J. HUNSEDER, ESQ., and
 4          JOSH MOORE, ESQ.
       1501 K Street, N.W.
 5     Washington, D.C. 20005
       (202) 736-8236
 6     (202) 737-8432
       mhunseder@sidley.com
 7     joshua.moore@sidley.com
       Attorneys for the Plaintiff
 8
 9
     ARMSTRONG TEASDALE, LLP
10     BY:  CHARLES W. STEESE, ESQ.
       4643 South Ulster Street, Suite 800
11     Denver, Colorado 80237
       (720) 200-0676
12     csteese@armstrongteasdale.com
       Attorneys for the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3        EXAMINATION
 4                       Page No.
 5   ARDELL BURGESS
 6     BY MR. STEESE              9
 7
 8
 9        E X H I B I T S
10
11   Exhibit
        Name    Description        Page No.
12
     *AT&T 1   Notice of Rule 30(b)(6)   11
13        Deposition
14   *AT&T 2   AT&T Corp.'s Objections   33
          and Responses to
15        Defendant's First Set of
          Interrogatories
16
     *AT&T 3   AT&T brochure          63
17
     *AT&T 30  Form 477, Bates numbered  67
18        CTL_0012007 through
          CTL_0012031
19
     *AT&T 4   E-mail correspondence,    86
20        Bates numbered
          ATT_PROD_0011427 through
21        ATT_PROD_0011429
22   *AT&T 5   E-mail correspondence,    97
          Bates numbered
23        ATT_PROD_0011593 through
          ATT_PROD_0011596
24
25
```

Page 4

```
 1          I N D E X (Continued)
 2
 3        E X H I B I T S (Continued)
 4   Exhibit
        Name    Description        Page No.
 5
     *AT&T 6   Release and Settlement    98
 6        Agreement
 7   *AT&T 7   E-mail correspondence,   101
          Bates numbered
 8        ATT_PROD_0011460 through
          ATT_PROD_0011462
 9
     *AT&T 8   Federal Communications   103
10        Commission Declaratory
          Ruling adopted February
11        2, 2015, released
          February 11, 2015
12
     *AT&T 11  E-mail correspondence,   105
13        Bates numbered
          ATT_PROD_0011773
14
     *AT&T 18  E-mail correspondence    109
15        with attachment, Bates
          number CTL_0004195
16        through CTL_0004199
17   *AT&T 20  E-mail correspondence,   113
          Bates numbered
18        ATT_PROD_0011854
19   *AT&T 22  E-mail correspondence    115
          with attachment, Bates
20        numbered CTL_0012906
          through CTL_0012915
21
     *AT&T 21  Release and Settlement   116
22        Agreement
23   *AT&T 23  E-mail correspondence    117
          with attachment, Bates
24        numbered CTL_0012891
          through CTL_0012904
25
```

Page 5

```
 1          I N D E X (Continued)
 2
 3        E X H I B I T S (Continued)
 4   Exhibit
        Name    Description        Page No.
 5
     *AT&T 24  E-mail correspondence    118
 6        with attachment, Bates
          numbered CTL_0004208
 7        through CTL_0004226
 8   AT&T 45   E-mail correspondence,   126
          Bates numbered
 9        ATT_PROD_0012006 through
          ATT_PROD_0012006
10
     *AT&T 26  Decision from the United 131
11        States Court of Appeals
          for the District of
12        Columbia Circuit, decided
          November 18, 2016
13
     *AT&T 27  E-mail correspondence,   135
14        Bates numbered
          ATT_PROD_0010564
15
     *AT&T 28  E-mail correspondence,   142
16        Bates numbered
          ATT_PROD_0010604 through
17        ATT_PROD_0010606
18   *AT&T 29  E-mail correspondence,   145
          Bates numbered
19        ATT_PROD_0003636
20   *AT&T 31  E-mail correspondence,   148
          Bates numbered
21        ATT_PROD_0003786
22   *AT&T 33  E-mail correspondence,   153
          Bates numbered
23        CTL_0014078 through
          CTL_0014078
24
25
```

CONFIDENTIAL

Page 6

```
 1         I N D E X (Continued)
 2
 3         E X H I B I T S (Continued)
 4   Exhibit
       Name    Description          Page No.
 5
     AT&T 46  E-mail correspondence,   161
 6           Bates numbered
             ATT_PROD_0004012 through
 7           ATT_PROD_0004019
 8  *AT&T 36  E-mail correspondence,   163
             Bates numbered
 9           ATT_PROD_0012490 through
             ATT_PROD_0012491
10
    *AT&T 37  E-mail correspondence,   167
11           Bates numbered
             ATT_PROD_0010846 through
12           ATT_PROD_0010847
13  *AT&T 38  E-mail correspondence,   169
             Bates numbered
14           ATT_PROD_0004998 through
             ATT_PROD_0004999
15
     AT&T 47  E-mail correspondence,   183
16           Bates numbered
             ATT_PROD_0005865
17
    *AT&T 40  E-mail correspondence    190
18           with attachment, Bates
             numbered ATT_PROD_0005324
19           through ATT_PROD_0005329
20  *AT&T 39  E-mail correspondence,   193
             Bates numbered
21           CTL_0008305 through
             CTL_0008310
22
    *AT&T 41  E-mail correspondence    196
23           with attachment, Bates
             numbered ATT_PROD_0011096
24           through ATT_PROD_0011097
25
```

Page 7

```
 1         I N D E X (Continued)
 2
 3         E X H I B I T S (Continued)
 4   Exhibit
       Name    Description          Page No.
 5
     AT&T 48  E-mail correspondence    205
 6           with attachment, Bates
             numbered ATT_PROD_0005804
 7           through ATT_PROD_0005805
 8   AT&T 49  E-mail correspondence    207
             with attachment, Bates
 9           numbered ATT_PROD_0005823
             through ATT_PROD_0005815
10
     AT&T 50  E-mail correspondence,   209
11           Bates numbered
             ATT_PROD_0010071 through
12           ATT_PROD_0010072
13  *AT&T 42  E-mail correspondence,   214
             Bates numbered
14           ATT_PROD_0011397 through
             ATT_PRO_0011398
15
    *AT&T 43  E-mail correspondence,   217
16           Bates numbered
             ATT_PROD_0012328 through
17           ATT_PRO_0012331
18   AT&T 44  E-mail correspondence,   219
             Bates numbered
19           ATT_PROD_0011384 through
             ATT_PRO_0011385
20
21
         (*Exhibits previously marked.)
22
23    (Exhibits attached to transcript.)
24
25
```

Page 8

```
 1         I N D E X (Continued)
 2
 3     C O N F I D E N T I A L   T E S I M O N Y
 4
    Page/Line No. Start      Page/Line No. Stop
 5
        252/12                253/20
 6
        254/20                255/8
 7
 8
 9
10
...
25
```

Page 9

```
 1         A R D E L L   B U R G E S S,
 2   having first been duly sworn, was examined and
 3   testified as follows:
 4              EXAMINATION
 5   BY MR. STEESE:
 6     Q.   Can you please state your name.
 7     A.   Ardell Burgess.
 8     Q.   And your business address.
 9     A.   One AT&T Way, Bedminster,
10   New Jersey 07921, I believe.
11     Q.   Have you had your deposition taken
12   before?
13     A.   Yes.
14     Q.   Approximately how many times?
15     A.   In different matters?
16     Q.   Yes.
17     A.   About three, I believe.
18     Q.   Okay.  So you know the rules.  I'll
19   go over them quickly.
20          You understand you're under oath
21   and expected to tell the truth?  You have to
22   answer verbally.
23     A.   Oh, yes.
24     Q.   There's the next rule.  You can't
25   shake your head.
```

CONFIDENTIAL

Page 66

1  numbers.  "AT&T IP Flexible Reach supports both
2  local and Virtual Telephone Numbers (VTNs).
3  VTNs enable you to assign a telephone number
4  from virtually anywhere, to a phone that is not
5  physically located within your location's local
6  calling area.  You can establish local
7  visibility within that calling area."
8       Do you see that?
9    A.   I do.
10   Q.   That sounds like OTT, doesn't it?
11   A.   No, not if it's associated with the
12 IP Flex Reach that was described above as, you
13 know, enabled by a physical connection to
14 AT&T's Dedicated Internet Service.
15   Q.   So you think that this is just
16 going over the AT&T Internet service?
17   A.   Yes.
18   Q.   Why do you say that?
19   A.   I'm just reading above what you
20 cited, the IP VPN foundation supported by
21 Dedicated Internet Service and AT&T VPN
22 services.
23   Q.   All right.  Let's transition away
24 from OTT generically.
25   A.   Are you done with this one?

Page 67

1    Q.   Yes.
2    A.   Okay.
3    Q.   And I am going to -- do you know
4  what a Form 477 is?
5    A.   I'm aware of it, yes.
6    Q.   Do you know what kind of data is
7  inserted in the Form 477s?
8    A.   I just have a general appreciation
9  for the type of data.
10   Q.   Do you know that the number of OTT
11 subscriptions that a carrier has is contained
12 within the 477s?
13   A.   That's one of the categories, yes.
14   Q.   Does -- how many -- do you know how
15 many OTT subscriptions VoIP -- strike that.
16       Do you know how many OTT
17 subscriptions Level 3 has?
18   A.   I do not.
19   Q.   Why don't you turn to Exhibit 30
20 quickly.
21       (Whereupon, Exhibit No. AT&T 30,
22   Form 477, Bates numbered CTL_0012007
23   through CTL_0012031, was previously marked
24   for identification.)
25

Page 68

1  BY MR. STEESE:
2    Q.   And you can see that this is from,
3  upper right, it says March of 2017 there for
4  Form 477.
5       Do you see that?
6    A.   I do.
7    Q.   And the Bates numbers are the
8  little numbers at the bottom of the page,
9  bottom right; and I use the last three numbers
10 because it's easier.
11      So if you turn to Bates '028, it's
12 the back side of page.
13   A.   You've created page numbers,
14 haven't you?
15   Q.   I have not.  This is the way
16 lawyers work so we can actually be on the same
17 page.
18      (Discussion held off the record.)
19      THE WITNESS:  I have it.
20 BY MR. STEESE:
21   Q.   Do you see where it says,
22 "Over-the-Top subscriptions by state and end
23 user type"; and it goes through all of these
24 different states?  And how many OTT subscribers
25 does it list for Level 3?

Page 69

1    A.   It's very boring.  Zero.
2    Q.   So your understanding of the number
3  of OTT subscriptions that Level 3 had is, at
4  least by this Form 477, inaccurate, correct?
5       MR. HUNSEDER:  Object to the form.
6       THE WITNESS:  Help me do it again,
7    or do it again.
8  BY MR. STEESE:
9    Q.   I'll ask it this way:  You thought
10 Level 3 had direct OTT subscriptions, correct?
11   A.   Correct.
12   Q.   This document would suggest
13 otherwise, correct?
14   A.   That would be the impression.
15   Q.   So let's just talk about wholesale
16 arrangements for a moment, high level.
17   A.   Okay.
18   Q.   So we were talking about Broadvox
19 and Bandwidth having direct OTT subscriptions
20 where they know -- I'm giving this particular
21 end user an OTT subscription.  So I know the
22 telephone number assigned to this particular
23 end user is or is not OTT, correct?
24   A.   Right.  They'd have to correlate
25 the actual connectivity with that end user.

Veritext Legal Solutions
800-567-8658                                        973-410-4098

CONFIDENTIAL

Page 86

1  A.   Traditional carriers, yeah.
2  Q.   And since then, these OTT providers
3  have then been able to start getting their own
4  telephone numbers, correct?
5  A.   Correct.
6  Q.   When did that occur approximately,
7  the ability to get their own numbers?
8       MR. HUNSEDER:  Object to the form.
9       THE WITNESS:  I don't recall.
10 BY MR. STEESE:
11 Q.   A couple of years?
12 A.   In the last few years, yeah.  It's
13 relatively new in the broad scheme of...
14 Q.   All right.  Let me show you what
15 I'm marking as Exhibit 4.
16      (Whereupon, Exhibit No. AT&T 4,
17 E-mail correspondence, Bates numbered
18 ATT_PROD_0011427 through ATT_PROD_0011429,
19 was previously marked for identification.)
20      MR. HUNSEDER:  I'm sorry, which
21 number?
22      MR. STEESE:  Four.
23      THE WITNESS:  Oh, is it here?
24 BY MR. STEESE:
25 Q.   Yes.

Page 87

1  A.   Oh, this one.  Right on the top.
2  Q.   Exhibit 4, and this is an e-mail
3  from you to others from August of 2012.
4       Do you see that?
5  A.   I do.
6  Q.   And there is an attachment on the
7  back side, and it's an update from August of
8  2012.  If you look in the opening paragraph, it
9  says, basically, Level 3 has been assigning
10 telephone numbers to a number of OTT providers,
11 including Vonage.
12      Do you see that?
13 A.   Yes.
14 Q.   And it says underneath that, "AT&T
15 estimates that at least 65% of Level 3 Federal
16 and State port and local switching charges are
17 associated with Over-the-Top Service Provider
18 volumes."
19      Do you see that?
20 A.   Yes.
21 Q.   And so the 65 percent was an AT&T
22 estimate, at least in 2012, correct?
23 A.   It was a negotiated -- the result
24 of a discussion with Level 3 as it related to
25 some of the research we had done relative to

Page 88

1  percent of telephone numbers that seemed to be
2  assignable by Level 3.
3       Initially, the discussions at that
4  point in time with Andrea Pierantozzi -- and I
5  don't know how to spell her last name.
6  Q.   That's all right.
7  A.   And Mack Green were minimally -- we
8  believe that there was a lot more OTT traffic
9  relative to what we saw in terms of our Secret
10 Shopper type work.  And in some of those
11 results over from 2010, 2011, 2012 we kind of
12 aggregated and basically said, when I look at
13 the total number of available -- number
14 availability associated what Level 3 assigns to
15 some of those Over-the-Top providers, it runs
16 in the 63-to-68-percent range whenever we did
17 that type of thing.
18      So as we discussed our dispute with
19 Pierantozzi and Green at that point in time,
20 the discussion morphed to, well, if it's not
21 95-percent Level 3 and it's something else,
22 what is it.  Banter went back and forth a
23 little bit.  And then we essentially suggested,
24 based upon our Secret Shopper work, it could be
25 at least 65 percent.  And the answer was that's

Page 89

1  a reasonable number.
2  Q.   By who?
3  A.   Andrea Pierantozzi and Mack Green.
4  Q.   Okay.  So I'm going to get back to
5  this in just a second.
6  A.   Sure.
7  Q.   But I want to make sure I
8  understand.
9  A.   Uh-huh.
10 Q.   You said that you were generally
11 familiar with traffic pumping from years ago,
12 correct?
13 A.   Years ago?
14 Q.   From 2007, started in Iowa and
15 continued.
16 A.   Yeah, I have an appreciation for
17 it, yes.
18 Q.   Okay.  So were you aware that these
19 local exchange carriers in Iowa, South Dakota,
20 Minnesota, wherever they were, they were taking
21 telephone number blocks and assigning them to
22 the free conferencings of the world and to
23 others like that that were then using those for
24 what we're calling traffic pumping or access
25 stimulation?

23 (Pages 86 - 89)

CONFIDENTIAL

Page 130

1  number had one purpose and one purpose only,
2  and that was for the two months to get AT&T and
3  Level 3 to the state date to identify the
4  number that the parties would presume was OTT
5  during those two months, correct?
6          MR. HUNSEDER:  Object to the form.
7      It calls for a legal conclusion.
8          But you can answer.
9          THE WITNESS:  The 65 percent
10     correlates to dollars withheld.
11 BY MR. STEESE:
12     Q.   Up to that point in time?
13     A.   Up to that -- up to that point in
14 time and would be representative of those
15 dollars withheld and instructing to pay,
16 obviously, based on the settlement, 75 percent
17 of --
18     Q.   Those withheld dollars?
19     A.   Correct.
20     Q.   And that was the only purpose for
21 that 65 percent up to that state date, correct?
22         MR. HUNSEDER:  Same objection.
23         THE WITNESS:  As it relates to the
24     settlement, correct.
25

Page 131

1  BY MR. STEESE:
2      Q.   That's all I need, yes.
3      A.   Okay.
4      Q.   Thank you.
5          All right.  So now, if you want to
6  look -- we can go forward a couple of exhibits
7  to 26.
8          (Whereupon, Exhibit No. AT&T 26,
9      Decision from the United States Court of
10     Appeals for the District of Columbia
11     Circuit, decided November 18, 2016, was
12     previously marked for identification.)
13 BY MR. STEESE:
14     Q.   And you can see that this is the
15 D.C. Circuit opinion, and it's November of
16 2016.  Again, just to get a date reference in
17 your mind.
18         Do you see that?
19     A.   Uh-huh, yes, I do.
20     Q.   Okay.  So the D.C. Circuit opinion
21 issues in November of '16.  At some point after
22 that, Level 3 and AT&T renew discussions about
23 the impact, if any, of this D.C. Circuit
24 opinion on the Settlement Agreement itself,
25 correct?

Page 132

1      A.   I would characterize that as the
2  ongoing dispute associated with OTT not
3  directly relating to the Settlement Agreement.
4      Q.   Okay.  And so do you recall
5  approximately when these discussions renewed?
6  And that's why I gave you that date November
7  of '16?
8      A.   Oh, I see.
9      Q.   Is it days later?  Is it months
10 later?  Do you recall?
11     A.   I don't recall.
12     Q.   What role have you had in those
13 post D.C. Circuit exchanges with Level 3?
14     A.   To the best of my recollection --
15 do the question again.  I want to make sure
16 I --
17     Q.   Sure.  After the D.C. Circuit
18 opinion comes down, you said there's been
19 renewed discussions about the OTT dispute you
20 had with Level 3.
21     A.   Correct.
22     Q.   What has been your role in those
23 ongoing discussions?
24     A.   Okay.  So essentially, to the best
25 of my recollection, I was maintaining our

Page 133

1  dispute position related to OTT.  And in the
2  midst of, basically, trying to negotiate and
3  value, if you will, some type of settlement on
4  a, I think as I recall, on a past and -- you
5  know, from the settlement date forward.
6          So we were doing a number of
7  sensitivities around, okay, or around the
8  notion that can we settle this issue, what
9  would be the valuation.  There was a series of
10 disputes between our two firms, between AT&T
11 and Level 3, that were being looked at --
12     Q.   Together?
13     A.   -- en suite, yeah, together and
14 seeking to try and move to a position where the
15 dispute could be, you know, resolved based upon
16 different, you know, financial triggers.
17     Q.   I'm only focused on OTT.
18     A.   Okay.
19     Q.   I'm not focused on the other
20 disputes that Level 3 and AT&T may have.
21         So, again, your role in the OTT
22 portion is?
23     A.   Was on -- maintaining the ongoing
24 dispute position and withholding action
25 relative to the 65-percent position and doing

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

```
 1  some analytics around the billing associated
 2  with that position.
 3      Q.   So after the D.C. Circuit opinion
 4  issued, at some point in time has AT&T started
 5  to withhold monies again from Level 3?
 6      A.   To the best of my recollection,
 7  yes.
 8      Q.   Is it based upon the 65 percent?
 9      A.   Yes.
10      Q.   And is it still based upon the
11  65 percent?
12      A.   Yes.
13      Q.   So when you say "maintaining the
14  position," you mean maintaining the position
15  that 65 percent of Level 3's end-office
16  switching charges are associated with OTT?
17      A.   Until -- yes.  Until data is
18  provided that suggests it's something other
19  than that.
20      Q.   That suggests it or proves it in
21  your mind?
22      A.   Ideally proves it in my mind.
23      Q.   Let's look at Exhibit Number 27.
24
25
```

Page 135

```
 1          (Whereupon, Exhibit No. AT&T 27,
 2      E-mail correspondence, Bates numbered
 3      ATT_PROD_0010564, was previously marked
 4      for identification.)
 5  BY MR. STEESE:
 6      Q.   And Exhibit Number 27 is from
 7  e-mail exchanges with Level 3 from March of '17
 8  and then an internal e-mail or two at the top,
 9  correct?
10      A.   Correct.
11      Q.   And so this is a few months after
12  the D.C. Circuit opinion, correct, which was
13  November of '16?
14      A.   Right.  This is a year later
15  almost.
16      Q.   No.  Just three, four months.
17      A.   Oh, I'm sorry, yes, correct.
18      Q.   And Mr. Ross, do you know Mr. Ross?
19      A.   I -- yeah, I spoke to him several
20  times on the phone but not daily interaction.
21  I know the name.
22      Q.   And what kind of things have you
23  discussed with Mr. Ross?
24      A.   At a very high level, just our OTT
25  position; and there were a number of other, as
```

Page 136

```
 1  we said other disputes, you know, that we had
 2  taken positions on.  But that was the extent of
 3  it.  It was more high level versus direct
 4  negotiation back and forth.
 5      Q.   High level to support the ongoing
 6  settlement discussions?
 7      A.   The ongoing negotiations, yeah.
 8      Q.   The ongoing negotiations that were
 9  intended to try and achieve a settlement?
10      A.   Correct.
11      Q.   Was -- in the calls that you've had
12  with Mr. Ross, do you believe it's clear to
13  both you and he that what you're trying to do
14  is see if you can find common ground that can
15  be the basis of a potential future commercial
16  arrangement?
17      A.   I believe so, yes.
18      Q.   Okay.  All right.  So we look at
19  Mr. Ross's e-mail at the bottom; and he says,
20  "The initial evaluation that we have done
21  suggests OTT traffic is ‹20%."
22          Do you see that?
23      A.   Yes.
24      Q.   And Ms. Miller up top makes a
25  comment about the 20 percent and suggests
```

Page 137

```
 1  looking at the Form 477s, correct?
 2      A.   Correct, yes.
 3      Q.   So when we're looking at the
 4  disputes that AT&T has had with others for OTT
 5  issues, and we went through the list.
 6      A.   Uh-huh.
 7      Q.   Did -- was Ms. Miller involved?
 8      A.   No.
 9      Q.   Are you sure?
10      A.   I'm not sure.  No, I'm not sure.
11      Q.   In the other disputes --
12      A.   I switched the workload between my
13  managers, and Craig John is one of my managers.
14  Alison Miller is another one of my managers.
15  So there's a --
16      Q.   Blurring.
17      A.   Blurring.  That's a good word.
18  It's load balancing, you know, anyway.
19      Q.   The hand movements there suggested
20  blurring, so I suggested the word.
21      A.   Okay.
22      Q.   So with respect to these other
23  disputes that you've had, have Form 477s been
24  used so you can look to see the number of OTT
25  subscriptions that they have and compare that
```

35 (Pages 134 - 137)

CONFIDENTIAL

Page 266

1 tariff language?
2  A.   Not directly.
3  Q.   Okay.
4  A.   Is the best answer I can give you.
5      MR. STEESE:  We can go off the
6  record now.
7      (Whereupon, a short break was
8  taken.)
9      MR. STEESE:  I don't have any
10 additional questions for you today.
11     I'm going to keep this deposition
12 open for the reasons that we have talked
13 about, and I'm assuming I'm going to be
14 getting the privilege log today.
15     MR. HUNSEDER:  Yes.
16     MR. STEESE:  To the extent we have
17 any issues, and I am not previewing that
18 we will, it might -- it would be something
19 that I would consider -- and I will just
20 put this on the record -- that we have a
21 brief telephonic, something very short.
22 So that way we're not regathering or doing
23 anything like that.
24     I'm only putting that on the record
25 for you to consider.  I know we've had our

Page 267

1 differences of view on this particular
2 topic.  We don't need to rehash those.
3      MR. HUNSEDER:  Agreed.
4      MR. STEESE:  But with that I, have
5 no other questions at this point in time.
6      MR. HUNSEDER:  And we have no
7 questions for the witness at this time.
8      (The witness is excused.)
9      (Deposition of Ardell Burgess
10 concluded at 3:14 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 268

1    C E R T I F I C A T E
2
3
4     I, SUZANNE J. STOTZ, a Certified
5  Court Reporter, Certified Realtime Reporter,
6  Registered Professional Reporter, and Notary
7  Public in and for the State of New Jersey, do
8  hereby certify that the foregoing is a true and
9  accurate transcript of the stenographic
10 above-captioned matter.
11
12
13     _____
14     SUZANNE J. STOTZ, CCR, RPR, CRR
15     LICENSE NO. 30XI00184500
16
17
18 DATED:  FEBRUARY 25, 2018
19
20
21 NOTE:  THE CERTIFICATE APPENDED TO THIS
22 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23 OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24 DIRECT CONTROL AND/OR DIRECTION OF THE
25 CERTIFYING COURT REPORTER.

68 (Pages 266 - 268)

```
 1                C E R T I F I C A T E

 2

 3

 4             I, SUZANNE J. STOTZ, a Certified

 5   Court Reporter, Certified Realtime Reporter,

 6   Registered Professional Reporter, and Notary

 7   Public in and for the State of New Jersey, do

 8   hereby certify that the foregoing is a true and

 9   accurate transcript of the stenographic

10   above-captioned matter.

11

12

13   _____Suzanne SJ_____, CCR, RPR, CRR

14        SUZANNE J. STOTZ, CCR, RPR, CRR

15        LICENSE NO. 30XI00184500

16

17

18   DATED:  DATE, 2019

19

20

21   NOTE:  THE CERTIFICATE APPENDED TO THIS

22   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION

23   OF THE SAME BY ANY MEANS, UNLESS UNDER THE

24   DIRECT CONTROL AND/OR DIRECTION OF THE

25   CERTIFYING COURT REPORTER.
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.