# EXHIBIT OO

```
                                                              Page 1

 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2

 3
      AT&T CORPORATION,          )    Civil Action No.
 4                               )    18-cv-00112-RM-MEH
                                 )
 5                               )
                 Plaintiff,      )
 6                               )
           -vs-                  )    DEPOSITION OF:
 7                               )
      LEVEL 3 COMMUNICATIONS,    )    CRAIG ROBERT JOHN
 8    LLC,                       )
                                 )
 9               Defendant.      )
                                 )
10
      _____
11

12
             TRANSCRIPT of the stenographic notes of
13
      the proceedings in the above-entitled matter, as
14
      taken by and before LINDA M. JORRITSMA, a Certified
15
      Court Reporter and Notary Public of the State of New
16
      Jersey, held at the office of AT&T CORPORATION, One
17
      AT&T Way, Bedminster, New Jersey, on Friday,
18
      September 13, 2019, commencing at 10:51 a.m.
19

20

21

22

23

24
25    Job No. CS3495719
```

Page 2

```
 1  A P P E A R A N C E S:
 2  SIDLEY AUSTIN LLP
      BY: JUSTIN A. BENSON, ESQ.
 3      JOSH MOORE, ESQ.
      1501 K Street, N.W.
 4    Washington, DC 20005
      201-736-8757
 5    jbenson@sidley.com
      joshua.more@sidley.com
 6    Attorneys for Plaintiff
 7
      ARMSTRONG TEASDALE LLP
 8    BY: CHARLES W. STEESE, ESQ.
          DOUGLAS N. MARSH, ESQ.
 9    4643 South Ulster Street
      Suite 800
10    Denver, Colorado 80237
      720-722-7199
11    csteese@ArmstrongTeasdale.com
      dmarsh@ArmstrongTeasdale.com
12    Attorneys for Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  WITNESS:                        PAGE
 3  CRAIG ROBERT JOHN
      BY MR. MARSH                     5
 4    BY MR. BENSON                  143
      BY MR. MARSH                   147
 5
 6
 7           E X H I B I T S
      (Exhibits retained by Court Reporter.)
 8
      No.     Description              Page
 9
      AT&T-88    LinkedIn Profile of John Craig    10
10
      AT&T-2     Previously Marked       26
11
      AT&T-72    Previously Marked       31
12
      AT&T-5     Previously Marked       39
13
      AT&T-4     Previously Marked       42
14
      AT&T-89    E-Mail String, ATT_PROD_0012776 -  54
15             ATT_PROD_0012777
16  AT&T-7     Previously Marked       65
17  AT&T-6     Previously Marked       67
18  AT&T-30    Previously Marked       76
19  AT&T-35    Previously Marked       77
20  AT&T-36    Previously Marked       89
21  AT&T-10    Previously Marked       96
22  AT&T-13    Previously Marked      101
23  AT&T-14    Previously Marked      105
24
25
```

Page 4

```
 1          EXHIBITS, continued
 2
      AT&T-15     Previously Marked      106
 3
      AT&T-17     Previously Marked      109
 4
      AT&T-19     Previously Marked      115
 5
      AT&T-22     Previously Marked      118
 6
      AT&T-90     E-Mail String, ATT_PROD_0014102     131
 7
      AT&T-91     Draft Release and Settlement    132
 8             Agreement, ATT_PROD_0014103 -
               ATT_PROD_0014111
 9
      AT&T-23     Previously Marked      138
10
      AT&T-21     Previously Marked      144
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1  CRAIG ROBERT JOHN, office address at One AT&T Way,
 2  Bedminster, New Jersey, Office 4A-125, having been
 3  duly sworn by the Notary Public, testified as
 4  follows:
 5  DIRECT EXAMINATION BY MR. MARSH:
 6      Q.   Good morning, Mr. John.
 7      A.   Hi.
 8      Q.   We met just a second ago, but just for
 9  the record, my name is Doug Marsh and I'm counsel for
10  Level 3 Communications.
11          Mr. John, have you had your deposition
12  taken before?
13      A.   Yes.
14      Q.   How many times?
15      A.   Let's see.  In the course of my
16  employment with AT&T, I think it's three or four
17  times, as I recall.
18      Q.   And have they all been matters involving
19  AT&T in your work with AT&T?
20      A.   Yes.
21      Q.   So they've been issues with
22  telecommunications dispute, billing disputes,
23  et cetera?
24      A.   Yes.
25      Q.   All right.  So that's helpful for me to
```

2 (Pages 2 - 5)

John - by Mr. Marsh

Page 6

1  know.  So I'll just briefly review the ground rules
2  so that we're all on the same page, but I understand
3  you have some familiarity.
4          You understand, sir, that you're under
5  oath to tell the truth today?
6      A.   Yes.
7      Q.   And you're doing well so far with verbal
8  responses.  As you know, the court reporter has to
9  type down everything we say, and when we say "um-hum"
10 for "yes" or "um-um" for "no," it makes her job that
11 much harder, so please try, if you can, to give me
12 verbal responses.  No nods, shakes of the head.
13 "Yes" and "no" will be perfect.  Understood?
14     A.   Yes.
15     Q.   Thank you.
16          It's important for us to not speak over
17 one another, so when I ask a question, I will ask you
18 to please let me get to the end of the question; and,
19 in turn, I will do my best to give a complete
20 response when you're done talking so we don't speak
21 over one another.  Is that fair?
22     A.   Yes.
23     Q.   If you don't understand a question,
24 that's fine.  You can certainly ask for clarification
25 if you don't understand.  Is that fair?

Page 7

1      A.   Yes.
2      Q.   And if you answer a question, I will
3  presume that you understood the question.
4      A.   Yes.
5      Q.   Now, as for objections, I will do my
6  best not to ask objectionable questions, but there
7  may be some from time to time.  That's part of the
8  process.  It's very normal.  There may be some
9  instances where your counsel will say that's a matter
10 of privilege and instruct you not to speak; but
11 unless he gives you an instruction not to answer a
12 question, even if he lodges an objection, you'll need
13 to answer the question.  Understood?
14     A.   Yes.
15     Q.   And if you need a break, that's fine,
16 too.  This is not a battle of wills.  Just let me
17 know that you would like to pause for a few minutes
18 and we will take a break.  The only thing, I will ask
19 that you answer any questions that I've asked you
20 before we take that break.  Is that understood?
21     A.   Yes.
22     Q.   Is there any reason that you are not
23 ready and able to testify truthfully today?
24     A.   No.
25     Q.   What did you do to prepare for the

Page 8

1  deposition today?
2      A.   I met with these two gentlemen
3  telephonically and also in person.
4      Q.   How many times did you meet with them?
5      A.   I met with them once over the phone and
6  once in person.
7      Q.   And how long was the meeting over the
8  phone?
9      A.   I think it was about an hour.  I think
10 that's about right.
11     Q.   And in person, how long?
12     A.   About an hour.
13     Q.   Other than your meetings with
14 counsel -- was it just these two, Mr. Benson and
15 Mr. Moore?
16     A.   The meeting in person, yes, was -- the
17 meeting in person was with these two gentlemen.  Over
18 the phone, I think it was also with those two
19 gentlemen; but obviously I couldn't see who was in
20 the room, so if there was someone else in the room,
21 I'm not aware.  I have no knowledge of that.
22     Q.   That's fair.  Did you have any meetings
23 with anybody else to help you prepare for this
24 deposition?
25     A.   No.

Page 9

1      Q.   Did you meet with or talk to or have any
2  communication with Kim Meola?
3      A.   No.
4      Q.   Same question, Ardell Burgess.
5      A.   He mentioned to me that he -- yes, the
6  answer is yes to that question.
7      Q.   What communication did you have with
8  him?
9      A.   He mentioned to me that he was deposed
10 back in February, and that -- that's about it, so
11 that was all he said.
12     Q.   So was this an in-person communication?
13     A.   Yes.
14     Q.   I take it you ran into him in the hall,
15 it wasn't a formal "let's sit down and prepare for
16 this deposition."
17     A.   No, it wasn't a formal meeting or
18 anything of the sort.
19     Q.   Understood.
20          Same question.  Did you meet with, talk
21 to, in preparation for this deposition Alison Miller?
22     A.   No.
23     Q.   Anybody else other than counsel?
24     A.   No.
25          MR. MARSH:  Let's mark this as

3 (Pages 6 - 9)

John - by Mr. Marsh

Page 90

1  whatever percent of their numbers are Level 3
2  numbers, secret shopper studies is what you use to
3  describe that.  Is that correct?
4     A.   Yes.
5     Q.   Does -- do secret shopper studies entail
6  more than that?
7     A.   No.
8     Q.   Then turning to that next page.  And we
9  see two -- we see three columns.  Column 1 is the
10 name of the VoIP provider.  Column 2 is the
11 name -- it's listed "Percent Telephone Numbers 2015."
12 Column 3 is, "Percent Telephone Numbers 2017."
13         Do you see that?
14    A.   Yes.
15    Q.   So there are at least two times that you
16 did this secret shopper study to try to determine
17 what percentage of those VoIP providers' numbers were
18 Level 3 numbers.  Is that correct?
19    A.   Yes.
20    Q.   Do you recall if there are any other
21 instances where you did this?
22    A.   Yes.
23    Q.   How many other times?
24    A.   I can't recall exactly how many other
25 times.

Page 91

1     Q.   Would it have been more than ten?
2     A.   Possibly.
3     Q.   More than 20?
4     A.   I don't know if it would have been as
5  many as 20.
6     Q.   So somewhere between ten and 20 times
7  you did this secret shopper study.
8     A.   Perhaps, yes.
9     Q.   Now, you say "perhaps," and I don't want
10 to beat you up too much on it because I recognize
11 time has passed.  Any chance that it's fewer than
12 ten?
13    A.   It could be fewer than ten, yes.
14    Q.   Fewer than five?
15    A.   I don't believe so, no.  But, again, if
16 I -- I don't recall the exact number of times.
17    Q.   That's fair.  And like I say, I
18 recognize time has passed.  I'm just trying to get an
19 idea.
20         How -- let me ask this about the process
21 of doing these secret shopper studies.
22    A.   Um-hum.
23    Q.   So how many people are involved when you
24 do a secret shopper study?  I know you mentioned that
25 you would delegate work to some other people.

Page 92

1     A.   Yes.
2     Q.   Let's be specific.  Let's talk about
3  2017.  If you can recall, how many people would have
4  been involved in the secret shopper study you did in
5  2017?
6     A.   I don't know exactly how many people
7  would have been involved.
8     Q.   Would it have been two?
9     A.   Could have been that many of people,
10 yes.
11    Q.   Could it have been five?
12    A.   It could have been that number of
13 people, yes.
14    Q.   Could it have been ten?
15    A.   It could have been that number of
16 people, yes.
17    Q.   Could it have been 20?
18    A.   It could have been that number of
19 people, yes.
20    Q.   So who was involved in doing this secret
21 shopper study?
22    A.   The secret shopper studies are -- we
23 have a contractor we use to do it.  Consultancy, if
24 you will.
25    Q.   What's the name of the contractor?

Page 93

1     A.   Accenture.
2     Q.   Is that the team in Mumbai?
3     A.   Yes, that is correct.
4     Q.   So I take it, then, when you want to do
5  a secret shopper study, you turn -- or at least in
6  2017 -- we'll focus on this specific instance -- you
7  turn to Accenture in Mumbai and say, I want to do
8  another secret shopper study, go give me the numbers.
9  They come back with the numbers.  That's broadly
10 speaking --
11    A.   They collect the data and provide the
12 results to me.
13    Q.   Do you know what steps they undertake in
14 order to collect that data?
15    A.   Yes.  They look at the -- they look at
16 these particular Over-The-Top VoIP providers'
17 websites where you can -- where customers can
18 potentially subscribe to service.  They go through
19 the subscription process up to the point where if one
20 wants to -- needs to obtain a telephone number, a
21 list of telephone numbers are presented, and then
22 they look at the -- then they collect the data
23 relative to the telephone numbers and they provide
24 the results to me of that -- of that data work.
25    Q.   Now, between the steps of asking for the

24 (Pages 90 - 93)

John - by Mr. Marsh

Page 142

1    MR. MARSH: Bates number 12895.
2    A.   I see that.
3    Q.   Do you see the last edit on the bottom
4  that says, "Further, the parties agree that any
5  billing and payments"...
6         Do you see that language?
7    A.   Yes, I see that.  The last sentence in
8  paragraph (iv), 12895.  I see that, yes.
9    Q.   Do you recall being involved in any
10 discussion of the edits being made to this paragraph
11 before it was sent back to Level 3?
12        MR. BENSON:  I instruct the witness if
13 that involved any privileged information not to
14 answer; but otherwise, you can answer.
15        MR. MARSH:  All I'm asking for is his
16 involvement.  I don't think that covers privileged
17 information.
18        MR. BENSON:  My instruction is my
19 instruction.  But go ahead and answer if you think
20 you can.
21   A.   I don't recall any specific discussion.
22 Might have been involved in a discussion.  I may have
23 been, but I don't recall.  And I don't remember if it
24 involved a privileged discussion with an attorney or
25 not, if it, in fact, did happen.

Page 143

1         MR. BENSON:  Can we take a quick pause?
2         MR. MARSH:  I'll do you one better.  I
3  think that's going to have to be it.
4         MR. BENSON:  Okay.  Can I have two or
5  three minutes to cross the witness?
6         MR. MARSH:  Go for it.
7  CROSS-EXAMINATION BY MR. BENSON:
8    Q.   Mr. John, can you please turn to
9  Bates -- it's the second sheet from what is AT&T
10 Exhibit 19.  So it's the one that Mr. Marsh asked you
11 to take out of the binder.
12        So it's Bates 11325.  Can you read at the
13 very bottom of the document, the language at the
14 bottom of this page?  It's the very small print, and
15 I apologize that it's small.
16   A.   Okay.  The entire text?
17   Q.   If you can.
18   A.   "This is not an offer or proposal
19 capable of acceptance and is instead provided for
20 conceptual purposes only.  A final proposal may not
21 include all items referenced in this document and
22 neither party is under any obligation to propose or
23 agree to any of the terms, conditions, or structures
24 present in the document.  This document does not
25 cover all terms and conditions that may be included

Page 144

1  in a final proposal or in any final agreement.  No
2  terms are binding until a final formal written
3  agreement mutually executed by the parties."
4    Q.   Okay.  Thank you.
5         Can you please turn to what's been
6  marked previously as AT&T Exhibit 21, please?  So I
7  think that's 21 in your binder, Mr. John.
8         (AT&T-21, Previously Marked, was
9  introduced.)
10        This document appears to be what's a
11 Release and Settlement Agreement.  Is that what's
12 stamped at the top of the first page?
13   A.   Yes.
14   Q.   Okay.  Can you flip to the page that is
15 Bates numbered 1572?  It's the tenth page of the
16 document, so a little bit before where you are.
17   A.   Um-hum.
18   Q.   You see that this has been executed by a
19 representative from Level 3?  I believe it's Mike
20 Riederer?  Is that correct?
21   A.   Yes.
22   Q.   Do you see that this document has been
23 executed by a representative of AT&T?  I believe it's
24 Kim Meola.  Is that correct?
25   A.   Correct, yes.

Page 145

1    Q.   You see these are both dated in May of
2  2015?
3    A.   Yes.
4    Q.   Okay.
5         If you can turn to Bates No. 1565,
6  please, page 3 of the document.
7    A.   Yes, I'm there.
8    Q.   Could you look at subparagraph Roman
9  (iv).  Do you see that?  It begins with the word
10 "although."
11   A.   Yes.
12   Q.   Can you read for the record the final
13 sentence of that paragraph?
14   A.   "Further, the parties agree that any
15 billing and payments for OTT traffic exchanged after
16 such final Appellate order becomes final shall be in
17 compliance with the terms of that order."
18   Q.   Okay.
19        Can you also read the language that
20 begins with the word "therefore."  So I believe it's
21 the second sentence of that paragraph.
22   A.   Um-hum.  "Therefore, in the event the
23 OTT Declaratory Order is overturned, either in whole
24 or in part, and the applicable order on appeal
25 becomes final and is no longer subject to further

John - by Mr. Benson

| Page 146 | Page 148 |
|---|---|
| 1  appeal or other judicial review" -- | 1      J U R A T |
| 2     Q.   That's good.  Does the word "FCC" appear | 2 |
| 3  in that sentence? | 3       I DO HEREBY CERTIFY that I have read the |
| 4     A.   No. | 4  foregoing transcript and I certify that it is true |
| 5     Q.   Okay. | 5  and correct to the best of my knowledge. |
| 6          And then let's look to Bates 1568, which | 6 |
| 7  is page 6.  Do you see subparagraph 3?  What does the | 7 |
| 8  bold language say? | 8 |
| 9     A.   "Entire Agreement Regarding the | 9 |
| 10 Disputes." | 10          CRAIG ROBERT JOHN |
| 11    Q.   What does the first sentence of that | 11 |
| 12 paragraph say? | 12 |
| 13    A.   "This agreement is the entire and | 13 |
| 14 complete agreement of the parties regarding the | 14 |
| 15 subject matter hereof." | 15  SWORN AND SUBSCRIBED |
| 16    Q.   Okay.  And what does the language that | 16 |
| 17 begins with the word "there" say? | 17  BEFORE ME ON THIS |
| 18    A.   "There are no oral or written collateral | 18  DAY OF          2019. |
| 19 agreements." | 19 |
| 20    Q.   And please read for the record the final | 20      Notary Public of the State of |
| 21 sentence in this paragraph. | 21 |
| 22    A.   "All prior discussions and negotiations | 22 |
| 23 regarding the disputes have been and are merged and | 23 |
| 24 integrated into and are superseded by this | 24 |
| 25 agreement." | 25 |

| Page 147 | Page 149 |
|---|---|
| 1          MR. BENSON:  That's all the questions I | 1  ATTACH TO DEPOSITION OF:  CRAIG ROBERT JOHN |
| 2  have for the witness. | 2  IN THE MATTER OF:  AT&T v. LEVEL 3 COMMUNICATIONS |
| 3  REDIRECT EXAMINATION BY MR. MARSH: | 3  DATE TAKEN:   Friday, September 13, 2019 |
| 4     Q.   One follow-up question, Mr. John. | 4        E R R A T A   S H E E T |
| 5     A.   Um-hum. | 5     I wish to make the following changes, for the following reasons: |
| 6     Q.   You do not recall being involved in | 6  PAGE LINE: |
| 7  discussions of any changes or edits made to that | 7  ____ ____ CHANGE:_____ REASON:_____ |
| 8  bullet point other than the ones we've discussed | 8  ____ ____ CHANGE:_____ REASON:_____ |
| 9  today.  Is that true? | 9  ____ ____ CHANGE:_____ REASON:_____ |
| 10    A.   I do not, no. | 10 ____ ____ CHANGE:_____ REASON:_____ |
| 11         MR. MARSH:  That will be all. | 11 ____ ____ CHANGE:_____ REASON:_____ |
| 12         (The deposition concluded at 3:34 p.m.) | 12 ____ ____ CHANGE:_____ REASON:_____ |
| 13 | 13 ____ ____ CHANGE:_____ REASON:_____ |
| 14 | 14 ____ ____ CHANGE:_____ REASON:_____ |
| 15 | 15 ____ ____ CHANGE:_____ REASON:_____ |
| 16 | 16 ____ ____ CHANGE:_____ REASON:_____ |
| 17 | 17 ____ ____ CHANGE:_____ REASON:_____ |
| 18 | 18 ____ ____ CHANGE:_____ REASON:_____ |
| 19 | 19 ____ ____ CHANGE:_____ REASON:_____ |
| 20 | 20 ____ ____ CHANGE:_____ REASON:_____ |
| 21 | 21 ____ ____ CHANGE:_____ REASON:_____ |
| 22 | 22 ____ ____ CHANGE:_____ REASON:_____ |
| 23 | 23 ____ ____ CHANGE:_____ REASON:_____ |
| 24 | 24 ____ ____ CHANGE:_____ REASON:_____ |
| 25 | 25 |

38 (Pages 146 - 149)

Page 150

```
 1                CERTIFICATE
 2
 3       I, LINDA M. JORRITSMA, a Notary Public and
 4   Certified Court Reporter of the State of New Jersey,
 5   License No. 30XI00099500, do hereby certify that
 6   prior to the commencement of the examination, CRAID
 7   ROBERT JOHN was duly sworn by me to testify the
 8   truth, the whole truth and nothing but the truth.
 9       I DO FURTHER CERTIFY that the foregoing is a
10   true and accurate transcript of the testimony as
11   taken stenographically by and before me at the time,
12   place and on the date hereinbefore set forth.
13       I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of any
15   of the parties to this action, and that I am neither
16   a relative nor employee of such attorney or counsel,
17   and that I am not financially interested in the
18   action.
19
20   Linda M. Jorritsma
21   _____
22   Notary Public of the State of New Jersey
23   My Commission expires December 14, 2023
24
25   Dated:  September 22, 2019
```

39 (Page 150)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.