# EXHIBIT SS

CONFIDENTIAL

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2        CIVIL ACTION NO. 18-cv-00112-RM-MEH
3
    AT&T CORPORATION,              :
4                                  :
                Plaintiff,          :
5                                  :
            vs.                    :
6                                  :
    LEVEL 3 COMMUNICATIONS, LLC,   :
7                                  :
                Defendant.          :
8
9
10            Deposition of KIMBERLY MEOLA
11  taken in the above-entitled matter before
12  Suzanne J. Stotz, a Certified Court Reporter
13  (License No. 30XI00184500) and Notary Public of
14  the State of New Jersey, taken at the offices
15  of AT&T, One AT&T Way, Bedminster, New Jersey
16  07921, on Thursday, February 7, 2019,
17  commencing at 1:36 p.m.
18
19
20
21
22  Job No. CS3213054
23
24
25
```

CONFIDENTIAL

Page 2

1  APPEARANCES:
2
3  SIDLEY AUSTIN, LLP
       BY:  MICHAEL J. HUNSEDER, ESQ., and
4          JUSTIN A. BENSON, ESQ.
       1501 K Street, N.W.
5      Washington, D.C. 20005
       (202) 736-8236
6      (202) 736-8757
       mhunseder@sidley.com
7      jbenson@sidley.com
       Attorneys for the Plaintiff
8
9
       ARMSTRONG TEASDALE, LLP
10       BY:  CHARLES W. STEESE, ESQ.
       4643 South Ulster Street, Suite 800
11     Denver, Colorado 80237
       (720) 200-0676
12     csteese@armstrongteasdale.com
       Attorneys for the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           I N D E X
2
3       EXAMINATION
4              Page No.
5  KIMBERLY MEOLA
6    BY MR. STEESE            10
7
8
9           E X H I B I T S
10
11 Exhibit
    Name    Description       Page No.
12
   AT&T 1   Notice of Rule 30(b)(6)   12
13         Deposition
14 AT&T 2   AT&T Corp.'s Objections and   16
           Responses to Defendant's
15         First Set of
           Interrogatories
16
   AT&T 3   AT&T brochure           44
17
   AT&T 4   E-mail correspondence,   70
18         Bates numbered
           ATT_PROD_0011427 through
19         ATT_PROD_0011429
20 AT&T 5   E-mail correspondence,   75
           Bates numbered
21         ATT_PROD_0011593 through
           ATT_PROD_0011596
22
   AT&T 6   Release and Settlement   78
23         Agreement
24 AT&T 7   E-mail correspondence,   85
           Bates numbered
25         ATT_PROD_0011460 through
           ATT_PROD_0011462

Page 4

1           I N D E X (Continued)
2
3        E X H I B I T S (Continued)
4  Exhibit
    Name    Description       Page No.
5
   AT&T 8   Federal Communications   93
6          Commission Declaratory
           Ruling adopted February 2,
7          2015, released February 11,
           2015
8
   AT&T 9   E-mail correspondence,    94
9          Bates numbered
           ATT_PROD_0011766
10
   AT&T 10  E-mail correspondence with   111
11         attachment, Bates numbered
           ATT PROD 0011771 through
12         ATT PROD 0011772
13 AT&T 11  E-mail correspondence,    117
           Bates numbered
14         ATT_PROD_0011773
15 AT&T 12  E-mail correspondence with   123
           attachment, Bates numbered
16         CTL_0012877 through
           CTL_0012879
17
   AT&T 13  E-mail correspondence,    130
18         Bates number
           ATT_PROD_0011778 through
19         ATT_PROD_0011779
20 AT&T 14  E-mail correspondence,    134
           Bates numbered
21         ATT_PROD_0011781 through
           ATT_PROD_0011782
22
   AT&T 15  E-mail correspondence with   137
23         attachment, Bates numbered
           ATT_PROD_0011795 through
24         ATT_PROD_0011798
25

Page 5

1           I N D E X (Continued)
2
3        E X H I B I T S (Continued)
4  Exhibit
    Name    Description       Page No.
5
   AT&T 16  E-mail correspondence,    143
6          Bates numbered
           ATT_PROD_0011808
7
   AT&T 17  E-mail correspondence,    146
8          Bates numbered
           ATT_PROD_0011826
9
   AT&T 18  E-mail correspondence with   148
10         attachment, Bates number
           CTL_0004195 through
11         CTL_0004199
12 AT&T 19  E-mail correspondence with   154
           attachment, Bates numbered
13         CTL_0011324 through
           CTL_0011326
14
   AT&T 20  E-mail correspondence,    168
15         Bates numbered
           ATT_PROD_0011854
16
   AT&T 21  Release and Settlement    180
17         Agreement
18 AT&T 22  E-mail correspondence with   184
           attachment, Bates numbered
19         CTL_0012906 through
           CTL_0012915
20
   AT&T 23  E-mail correspondence with   186
21         attachment, Bates numbered
           CTL_0012891 through
22         CTL_0012904
23 AT&T 24  E-mail correspondence with   202
           attachment, Bates numbered
24         CTL_0004208 through
           CTL_0004226
25

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

```
 1          I N D E X (Continued)
 2
 3          E X H I B I T S (Continued)
 4   Exhibit
       Name    Description          Page No.
 5
     AT&T 25  E-mail correspondence with   208
 6       attachment, Bates numbered
         CTL_0016303 through
 7       CTL_0016320
 8   AT&T 26  Decision from the United    216
         States Court of Appeals for
 9       the District of Columbia
         Circuit, decided
10       November 18, 2016
11   AT&T 27  E-mail correspondence,      232
         Bates numbered
12       ATT_PROD_0010564
13   AT&T 28  E-mail correspondence,      244
         Bates numbered
14       ATT_PROD_0010604 through
         ATT_PROD_0010606
15
     AT&T 29  E-mail correspondence,      245
16       Bates numbered
         ATT_PROD_0003636
17
     AT&T 30  Form 477, Bates numbered    247
18       CTL_0012007 through
         CTL_0012031
19
     AT&T 31  E-mail correspondence,      252
20       Bates numbered
         ATT_PROD_0003786
21
     AT&T 32  E-mail correspondence with  259
22       attachment, Bates numbered
         CTL_0003828
23
     AT&T 33  E-mail correspondence,      263
24       Bates numbered CTL_0014078
         through CTL_0014078
25
```

Page 7

```
 1          I N D E X (Continued)
 2
 3          E X H I B I T S (Continued)
 4   Exhibit
       Name    Description          Page No.
 5
     AT&T 34  Letter from Deborah         272
 6       Waldbaum to Scott Erickson
         and Edwin Stocker, dated
 7       May 26, 2017
 8   AT&T 35  E-mail correspondence,      275
         Bates numbered
 9       ATT_PROD_0004112 through
         ATT_PROD_0004113
10
     AT&T 36  E-mail correspondence,      277
11       Bates numbered
         ATT_PROD_0012490 through
12       ATT_PROD_0012491
13   AT&T 37  E-mail correspondence,      278
         Bates numbered
14       ATT_PROD_0010846 through
         ATT_PROD_0010847
15
     AT&T 38  E-mail correspondence,      284
16       Bates numbered
         ATT_PROD_0004998 through
17       ATT_PROD_0004999
18   AT&T 39  E-mail correspondence,      297
         Bates numbered CTL_0008305
19       through CTL_0008310
20   AT&T 40  E-mail correspondence with  301
         attachment, Bates numbered
21       ATT_PROD_0005324 through
         ATT_PROD_0005329
22
     AT&T 41  E-mail correspondence with  306
23       attachment, Bates numbered
         ATT_PROD_0011096 through
24       ATT_PROD_0011097
25
```

Page 8

```
 1          I N D E X (Continued)
 2
 3          E X H I B I T S (Continued)
 4   Exhibit
       Name    Description          Page No.
 5
     AT&T 42  E-mail correspondence,      309
 6       Bates numbered
         ATT_PROD_0011397 through
 7       ATT_PRO_0011398
 8   AT&T 43  E-mail correspondence,      311
         Bates numbered
 9       ATT_PROD_0012328 through
         ATT_PRO_0012331
10
     AT&T 44  E-mail correspondence,      314
11       Bates numbered
         ATT_PROD_0011384 through
12       ATT_PRO_0011385
13
14       (Exhibits attached to transcript.)
15
16
         C O N F I D E N T I A L   T E S I M O N Y
17
18   Page/Line No. Start    Page/Line No. Stop
19       269/19                271/2
20
21
22
23
24
25
```

Page 9

```
 1          L I T I G A T I O N   S U P P O R T
 2
 3              R E Q U E S T S
 4
     Request
 5   Number      Description          Page No.
 6   1       Get verifications        17
 7   2       Production of instant    96
             messaging communication
 8
         3   Calendar entries from April    115
 9           through May 2015
10   4       Calendar entries from          116
             February through November
11           2017
12   5       AT&T's analysis of Level 3's   256
             OTT traffic
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 10

1      KIMBERLY MEOLA,
2  having first been duly sworn, was examined and
3  testified as follows:
4              EXAMINATION
5  BY MR. STEESE:
6      Q.   Can you please state your name?
7      A.   Kimberly Meola.
8      Q.   Ms. Meola, what is your business
9  address?
10     A.   1 AT&T Way, Bedminster, New Jersey
11  07921.
12     Q.   Perfect.
13          I'm assuming you've had your
14  deposition taken before?
15     A.   Yes, I have.
16     Q.   Approximately how many times?
17     A.   Five, ten.
18     Q.   Okay.  So you know the general
19  rules, but I'll go over some of them anyway.
20          You understand you're under oath
21  here today?
22     A.   Yes, I do.
23     Q.   You're expected to tell the truth.
24     A.   Yes.  I will.
25     Q.   If a question is unclear, confusing

Page 11

1  in any way, tell me what's confusing; and I'll
2  do my best to rephrase.
3          Do you understand that?
4      A.   Yes.  Terrific.
5      Q.   If you answer, I'm going to a
6  presume you understand the question; is that
7  fair?
8      A.   Question.
9      Q.   Perfect.
10         It's not a test of wills.  So if
11  you need to go to the restroom, let me know.
12  I'll just ask that whatever question is pending
13  is answered, and then we'll absolutely let you
14  take a break.
15         Do you understand?
16     A.   Yes.
17     Q.   The other thing that you're doing
18  very well is head nods, uh-huhs are difficult
19  for the court reporter to take down.  So please
20  try to answer audibly.
21         Do you understand?
22     A.   Yes.
23     Q.   And you're doing, again, well so
24  far.  It's important that I let you finish
25  answering the question and that you let me

Page 12

1  finish asking the question before the other
2  begins talking so the court reporter gets
3  everything down clearly.
4          Do you understand?
5      A.   Yes.
6      Q.   Perfect.
7          All right.  So as I understand it,
8  you're here today both in your personal
9  capacity and in a corporate capacity.
10         Do you understand that?
11     A.   That's my understanding.
12     Q.   All right.  And I'm going to show
13  you what I'm marking as Exhibit Number 1.
14         (Whereupon, Exhibit No. AT&T 1,
15     Notice of Rule 30(b)(6) Deposition, was
16     marked for identification.)
17         MR. STEESE:  And I only brought
18  one.
19         MR. HUNSEDER:  That's fine.
20         Chuck, is there a personal notice
21  or not?
22         MR. STEESE:  No, there's not.
23         MR. HUNSEDER:  I mean, I'm -- I
24  think she's already said she's prepared.
25  I just wanted to ask.

Page 13

1          MR. STEESE:  This is also a
2  personal deposition.
3          MR. HUNSEDER:  But there's no
4  notice?
5          MR. STEESE:  There is no notice.
6          MR. HUNSEDER:  Okay.
7  BY MR. STEESE:
8      Q.   And if you look at Exhibit
9  Number 1, this is the corporate portion of the
10  notice.
11         Do you see that?
12     A.   Do what?  I'm sorry, could you
13  repeat that?
14     Q.   This is the notice of the corporate
15  deposition for which you're here for a portion
16  of.
17         Do you understand that?
18     A.   Yes.
19     Q.   And if you look at page 5, Topics 1
20  and 2, I understand that you are going to be
21  testifying here today on those two particular
22  subjects as far as the corporate deposition is
23  concerned; is that correct?
24     A.   May I ask Mike a question?
25     Q.   Sure.

4 (Pages 10 - 13)

Veritext Legal Solutions
800-567-8658                                                      973-410-4098

CONFIDENTIAL

Page 110

```
 1        MR. HUNSEDER:  At the time?
 2        MR. STEESE:  At the time.
 3        THE WITNESS:  He was new to the
 4    organization, very new.  He was VP of, I
 5    think it was global access.
 6  BY MR. STEESE:
 7    Q.    So in terms of hierarchy, he would
 8  have been higher than you?
 9    A.    He was one level higher than me,
10  yes.
11    Q.    So you're an executive director?  I
12  don't know the hierarchy, so I'm guessing.
13    A.    That might have been my name at the
14  time.  Right now I'm an AVP versus George being
15  a VP, assistant vice-president.
16    Q.    I knew EVP, but I didn't know AVP?
17    A.    It'll change again.
18    Q.    All right.  So in terms of the,
19  again, you are now -- I'm going to ask you this
20  question in your corporate capacity for AT&T --
21  charged with answering the question for the
22  company --
23    A.    Uh-huh.
24    Q.    Because it relates to negotiations.
25         The discussions that AT&T had with
```

Page 111

```
 1  Level 3 verbally, are they memorialized in
 2  written documents in one place or another that
 3  have been produced to us?  Let me strike that,
 4  produced to us because you won't know.
 5         Have they been memorialized in
 6  documents one play or another?
 7    A.    I am not aware of any conversations
 8  that were not memorialized.
 9         And just to be clear, you're
10  talking specifically about OTT again, right?
11    Q.    A hundred percent.
12    A.    Yes.  I'm not aware.  I would have
13  been a part of those, yes.
14    Q.    Let me show you what I'm marking as
15  Exhibit 10.
16         (Whereupon, Exhibit No. AT&T 10,
17    E-mail correspondence with attachment,
18    Bates numbered ATT PROD 0011771 through
19    ATT PROD 0011772, was marked for
20    identification.)
21  BY MR. STEESE:
22    Q.    And Exhibit 10 is dated April 9 of
23  2015.  And you can see its sent to Level 3.
24    A.    Uh-huh.
25    Q.    And it says, "Confidential
```

Page 112

```
 1  Settlement Offer Pursuant to Rule 408."  So
 2  basically this is settlement discussions.
 3    A.    Yes.
 4    Q.    Do you see that?
 5    A.    Yes, I do.
 6    Q.    And one of the items that it talks
 7  about is the OTT dispute.
 8         Do you see that?
 9    A.    I see OTT dispute, yes.
10    Q.    This is not -- I'm not a gotcha
11  guy.
12    A.    Uh-huh.
13    Q.    So we talked about when the
14  discussions for the settlement began, and you
15  said you thought early May.  This document is
16  April of 2015.  So it's a little bit earlier
17  than that.
18         Do you consider this part of the
19  settlement discussions, or is this something
20  separate?
21    A.    We had ongoing discussions with
22  Level 3.  We were making offers for many years.
23  But the real milestone that brought the 2015
24  settlement to a head was the executive
25  escalation.
```

Page 113

```
 1         So, you know, there were
 2  discussions that my team would continue to
 3  pursue associated with this; but as it pertains
 4  to, you know, the settlement from 2015, it was
 5  really when Bill Hague got engaged.
 6         So it could have been go back
 7  further than this.  I mean, Ardell could have
 8  been talking about this for months before this.
 9    Q.    This is the earliest document that
10  I found.  Now, that doesn't mean that my search
11  was 100 percent comprehensive, but I think it
12  was?
13    A.    Yeah.  I said he could have.  There
14  were ongoing discussions, but we didn't make
15  progress quickly.  So where we really started
16  to have serious discussions was when Bill got
17  engaged, and that was in the May time frame.
18  We obviously had some structure to work from at
19  that point.
20    Q.    I'm not good with first names, but
21  you are.  So Bill is?
22    A.    Bill Hague.
23    Q.    Thank you.
24    A.    He was the officer that was called
25  upon to facilitate all of the issues with
```

Veritext Legal Solutions
800-567-8658                                             973-410-4098

CONFIDENTIAL

Page 162

1  on the call, were you?
2  A. I was on the call, yes.
3  Q. Oh, I thought you said the people
4  from AT&T were Mr. Hague and Mr. Sloan.  I
5  didn't hear you say yourself.
6  A. No, no.  Along with me.  They
7  pulled me out of this pilot to be part of this
8  discussion.
9  Q. Okay.  Thank you for that.
10     And from Level 3, you said
11 Mr. Riederer and you didn't know who else?
12 A. I don't recall who from Level 3 was
13 there.  I know Mr. Riederer was there, though,
14 that day.  He was delivering a message.  You
15 know, I think he was, again, more of a
16 middleman than actually working the issue.
17 Q. All right.  So now let's turn the
18 page --
19 A. Yep.
20 Q. -- to Bates '325 of Exhibit
21 Number 19.
22 A. Yes.
23 Q. Item Number 1, it says, "AT&T
24 agrees to pay 75% of L3's retrospective claims
25 on OTT for usage incurred through the end of

Page 163

1  May 2015," not including late payment charges.
2     Do you see that?
3  A. Yes.
4  Q. And that ends up in the actual
5  Settlement Agreement, correct?
6     MR. HUNSEDER:  Object to the form.
7  BY MR. STEESE:
8  Q. That general term.
9  A. I think the late payment charges
10 were included in the settlement at 75 percent.
11 Q. Are you sure about that?
12 A. I'm not sure, but I could reference
13 the document.  I'm pretty sure it was
14 75 percent of that total.
15 Q. Okay.  Item Number 2 says, "AT&T
16 agrees to pay 25% of the LPCs associated with
17 OTT usage billed through the end of May 2015."
18    You think that was 75 percent?
19 A. I think it was combined in the
20 agreement, yes.
21 Q. Then item Number 3 says, "AT&T
22 agrees to pay L3 full switched access per the
23 Level 3 tariffs for both originating and
24 terminating OTT traffic on a prospective basis
25 for June 2015 usage forward."

Page 164

1  Do you see that?
2  A. Yes, I see that.
3  Q. That was incorporated into the
4  Settlement Agreement, correct?
5  A. I don't know if it was precisely,
6  but the concept, yes.
7  Q. That's all I'm asking is concept.
8  A. Yes.
9  Q. Yep.
10    Number 4, "On a prospective basis,
11 beginning with June 2015, Level 3 will not bill
12 any EO elements associated with domestic
13 originated OTT 8YY traffic not reflecting a
14 Level 3 owned CPN or CPNLess traffic that is
15 not served by a Level 3 end office.  Level 3
16 will continue to bill full switched access on
17 Level 3 owned TNs."
18    Do you see that?
19 A. Yes, I see that.
20 Q. And that concept ends up in the
21 Settlement Agreement, yes?
22 A. Generally, yes, it does.
23 Q. Item Number 5, "For any usage prior
24 to June 2015, the settlement is a full and
25 final settlement of all disputes and balances

Page 165

1  regardless of whether AT&T wins or loses its
2  FCC appeal."
3     Do you see that?
4  A. Yes.
5  Q. And that concept was in the
6  Settlement Agreement, correct?
7     MR. HUNSEDER:  Object to the form.
8  BY MR. STEESE:
9  Q. This is the prior to June 2015, not
10 post.
11 A. Yes, you're correct.  Thank you for
12 the clarification.
13 Q. And then Item Number 6 says, "If
14 AT&T wins its FCC appeal, L3 will refund 50% of
15 the disputed charges beginning with June 2015
16 through the date of a final ruling, either from
17 the Court of Appeals or, from remanded, by the
18 FCC ruling."
19    Do you see that?
20 A. Yes.
21 Q. And that concept ends the
22 Settlement Agreement, correct?
23 A. Generally it does.  There's some
24 modifications.
25 Q. What modifications do you see?

Page 166

1   A.   Am I able to reference the
2   contract, or do you want me to --
3   Q.   I'm just looking for concepts.
4   A.   Generally.  So this was written --
5   drafted again by George, and what was always
6   our intent was, you know, we want a date
7   certain to resolve the issue.  And so we were
8   triggering off of the appeal at the FCC.
9          This "if remanded, by the FCC
10  ruling," was never the intent; and that was
11  removed in the final document.
12  Q.   Was it ever in the document at all?
13  A.   I don't believe so.  I mean, it was
14  in term sheets.  I'll call this a term sheet;
15  but in the settlement document itself, no.
16  Q.   Was there ever any discussion to
17  Level 3 saying, we didn't mean the remand?
18  A.   No.  I think it was just the
19  wording that was used for lack of
20  understanding.  And when we went back and I was
21  able to -- this was, again, the day that I was
22  out and flying back.  When I was able to, you
23  know, focus some time, this was a guide.  We
24  were able to get the right language that was
25  intended.

Page 167

1   Q.   Are you aware that Level 3's
2   interpretation all along has been if there's a
3   remand, it's not full and final?
4   A.   No, I'm not aware of that at all.
5   The contract doesn't say that.
6   Q.   The contract does say that we
7   believe.
8          MR. HUNSEDER:  Objection.  I mean,
9       the contract speaks for itself.
10         THE WITNESS:  Yeah.  I can't speak
11      to that.  I don't know what Level 3's
12      belief is.
13  BY MR. STEESE:
14  Q.   Did you ever have any discussion
15  yourself with Level 3 about this sentence or
16  words to the effect of, we didn't mean
17  remanded; that's not -- that was not our
18  intention?
19  A.   During this time period?
20  Q.   Any time period during the
21  settlement discussions.
22  A.   Settlement discussions, like, into
23  2017 after --
24  Q.   No.  Leading up to the entry of the
25  Settlement Agreement.

Page 168

1   A.   Oh, no, no.  It was put in here.
2   It was redlined, and it was corrected.  I don't
3   recall a discussion on it.
4   Q.   Okay.  Keep this out.
5          So here is Exhibit 20.
6          (Whereupon, Exhibit No. AT&T 20,
7       E-mail correspondence, Bates numbered
8       ATT_PROD_0011854, was marked for
9       identification.)
10  BY MR. STEESE:
11  Q.   Exhibit 20, an e-mail exchange
12  between you and Mr. Sloan.
13  A.   Yes.  This was his him documenting
14  the conversation.
15  Q.   Exactly.  And so this is -- no.
16  Look at the date.  The date is May 7.
17  A.   Uh-huh.
18  Q.   And then the e-mail back to you was
19  May 8.
20  A.   Right.
21  Q.   So it's the day before this term
22  sheet.
23         Do you see that?
24  A.   Yes.
25  Q.   Okay.  So let's look at the e-mail

Page 169

1   from George.  And let's look at his e-mail to
2   you.
3   A.   Uh-huh.
4   Q.   And it says, "...I've captured the
5   construct of the OTT/Tandem deal we agreed to
6   with L3 today."
7          Do you see he still uses the term
8   "OTT/Tandem deal"?
9   A.   Well, he says OTT and Tandem deal
10  there.
11  Q.   It says OTT slash.
12  A.   I am looking at something
13  different, sir.  I am looking at the subject
14  here, "OTT and Tandem deal," so...
15  Q.   I'm just looking at the language,
16  "Below I've captured the construct of the
17  OTT/Tandem deal we agreed to with L3 today."
18         Do you see that?
19  A.   I do see that.
20  Q.   So the OTT/Tandem is language he
21  continues to use into this document too,
22  correct?
23  A.   Again, his lack of understanding,
24  yes.
25  Q.   Then if you look at Item Number 1

CONFIDENTIAL

Page 178

1  are entitled to do this.  Look at these
2  paragraphs.
3        Do you remember words to that
4  effect?
5     A.    I don't recall Level 3 taking that
6  action.
7     Q.    Do you recall a number of carriers
8  in the industry saying that about the
9  transformation order, that it gave them the
10 right to --
11    A.    I remember YMAX doing that, asking
12 for a clarification.
13    Q.    And AT&T is saying no, you're not
14 entitled to do that; you're not entitled to
15 bill end-office switching, correct?
16    A.    Saying to who?
17    Q.    To anyone that's billing end-office
18 switching on OTT can't do it.  That's not what
19 the rules permit.  That was the AT&T legal
20 position, correct?
21    A.    Yes, that was --
22    Q.    Pre transformation -- I mean,
23 excuse me, pre-Declaratory Ruling Order.
24 That's what I'm focusing on.
25    A.    Yes.  You cannot bill at that --

Page 179

1  that was our interpretation at that time, yes.
2     Q.    Okay.  So --
3     A.    I don't want to say it's a legal
4  position, but that was our interpretation.
5     Q.    Fair enough.
6     A.    Uh-huh.
7     Q.    So before the Declaratory Ruling
8  action, there was a very clear difference of
9  view in the industry about whether the rules
10 did or did not permit the billing of end-office
11 charges on OTT calls, correct?
12    A.    I believe that's what led to the
13 Declaratory Order.
14    Q.    So the answer -- is that yes?
15 There was a difference of view in the industry?
16    A.    Yes, I think there was a difference
17 with some carriers, yes.
18    Q.    And I'm confused by your answer.
19       So was there or was there not a
20 difference of view in the industry?
21    A.    You know what, I'm not quite
22 certain, Chuck.  I don't -- I don't know for
23 certain.  I believe that there was.  I think
24 that's what led to the Declaratory Order, but I
25 didn't follow everybody else's comments on the

Page 180

1  subject.
2     Q.    Okay.  I'm going to go out of order
3  for a minute.  I'm going to go back and go
4  through some drafts, but I'm going to do one
5  thing beforehand.
6     A.    Sure.
7     Q.    I'm going to hand you the final
8  Settlement Agreement.
9     A.    Yes.
10       (Whereupon, Exhibit No. AT&T 21,
11    Release and Settlement Agreement, was
12    marked for identification.)
13 BY MR. STEESE:
14    Q.    And this is Exhibit Number 21.
15    A.    Okay.
16    Q.    Do you recognize this as the final
17 Settlement Agreement executed between Level 3
18 and AT&T towards the end of May of 2015?
19    A.    Yes.
20    Q.    And you signed this on behalf of
21 AT&T, correct?
22    A.    Yes, I did.
23    Q.    All right.  So let's look at
24 page '565, Bates '565.
25    A.    Uh-huh.

Page 181

1     Q.    Subparen iv.
2     A.    Yes.
3     Q.    Final sentence, "Further the
4  Parties agree that any billing and payments for
5  OTT traffic exchanged after such Final
6  Appellate Order becomes final shall be in
7  compliance with terms of that order."
8        Do you see that?
9     A.    Yes.
10    Q.    Did the D.C. Circuit opinion tell
11 the industry what it could bill -- strike that.
12       I'll ask this:  Do you have an
13 understanding of whether the D.C. Circuit
14 opinion told the industry what they could bill
15 on OTT calls going forward?
16       MR. HUNSEDER:  Object to the form.
17    Asking for a legal conclusion.
18       THE WITNESS:  Are you to the
19    February 2015 Declaratory Order?
20 BY MR. STEESE:
21    Q.    No.  The D.C. Circuit Court of
22 Appeals' opinion which you thought is the final
23 order.
24    A.    Which was November 2017?
25    Q.    '16, '16.

46 (Pages 178 - 181)

CONFIDENTIAL

Page 198

1  BY MR. STEESE:
2      Q.    Let's look back at Exhibit
3  Number 23, and I'm looking at -- there's a lot
4  of red here.  And it's Bates '894 and '895
5  that -- of the OTT.  Open that up so it's kind
6  of butterflied, if you will.
7      A.    Okay.
8      Q.    I'm doing that now not because I'm
9  going to ask about everything, but just so you
10 don't think I'm hiding anything.  I'm going to
11 focus on this page (indicating).
12     A.    Okay.
13     Q.    Because we're focusing really on
14 terms -- on subfour.
15     A.    Okay.
16     Q.    But I don't want you to think I'm
17 trying to keep anything from you.
18     A.    Thank you.
19     Q.    So if you look at the language of
20 subfour, the final read that, "The Parties
21 agree that any billing and payments for OTT
22 traffic exchanged after such order becomes
23 final shall be in compliance with terms of that
24 order."
25           Do you see that?

Page 199

1      A.    Yes, I see that.
2      Q.    That language was added by AT&T,
3  correct?
4      A.    I'm not sure, but it's red; so
5  whose version was this?
6      Q.    Look at the front.  It's coming
7  from your lawyer, correct, AT&T's lawyer?
8      A.    No.  This latest is Steve Ross.
9  So -- oh, here's Debbi, but Steve's sending it
10 to -- oh, so he was just sending it internally?
11     Q.    Correct.
12     A.    Okay.  So we would assume red is
13 AT&T.  It is, okay.  So yes, the red is AT&T.
14 And yes, that was our add.
15     Q.    If the final order -- you're
16 looking like you're looking at something.
17     A.    I was just trying to look at what
18 Level 3 had, you know, trying to look at both
19 sides of the blue and the red.
20     Q.    So if a final order doesn't provide
21 any guidance on how carriers should bill for
22 OTT end office, how do you implement that final
23 sentence that AT&T added?
24           MR. HUNSEDER:  Object to the form.
25           THE WITNESS:  I don't know the

Page 200

1  answer to that.
2  BY MR. STEESE:
3      Q.    So in the role you're in --
4      A.    Uh-huh.
5      Q.    -- if I understood it correctly,
6  you deal with access.  So you're dealing with
7  access issues of all types, correct?
8      A.    Switched access of all types, yes.
9      Q.    Thank you.  That's what I meant.
10 So even better.
11           And switched access is guided not
12 only -- how you implement it is guided by the
13 FCC and state regulatory commissions or at
14 least has been historically for many years,
15 correct?
16     A.    Yes.
17     Q.    And so in order to know what you
18 can do, your group has to be able to read
19 decisions issued by regulatory bodies, whether
20 it be the FCC or state commissions and
21 implement their decisions, correct?
22     A.    Yes.  With the help of legal, yes.
23     Q.    But --
24     A.    We're not lawyers.
25     Q.    But compliance is -- with

Page 201

1  regulatory orders is part of what your group
2  does, correct?
3      A.    Compliance as of -- for instance,
4  the traffic pumping order came out and said you
5  can only charge lowest price cap.  My team
6  would help to ensure carriers are doing that.
7  Not our compliance, but that others are
8  complying because we are the receiver of the
9  bill.
10     Q.    Fair enough.  And that's probably
11 even better said.
12           So when you look at the
13 transformation order when it issues and there's
14 this marrying up of rates and then ratcheting
15 down on the terminating side until it became
16 zero in 2017, that would be something you were
17 implementing to make sure that you were being
18 billed in accordance with the transformation
19 order requirements, correct?
20     A.    My team would help to define what
21 that would look like, provide it to the billing
22 team so that it could be loaded into the system
23 so that payments would be made according to
24 what was appropriate.
25           So it's a partnership across a

Veritext Legal Solutions
800-567-8658                                           973-410-4098

CONFIDENTIAL

Page 202

1  number of organizations.
2     Q.   So compliance with regulatory
3  orders is something that your group does with,
4  as necessary, assistance of legal?
5     A.   And billing, if it's related to
6  switched access, yes.
7     Q.   Okay.  Let me show you what I'm
8  marking as Exhibit Number 24.
9          (Whereupon, Exhibit No. AT&T 24,
10         E-mail correspondence with attachment,
11         Bates numbered CTL_0004208 through
12         CTL_0004226, was marked for
13         identification.)
14 BY MR. STEESE:
15    Q.   And, again, the double staples here
16 is just to attach the attachment.  I don't know
17 why e-mails do this sometimes, all these carets
18 on them.  It's frustrating.  It makes it harder
19 to read.
20    A.   I don't know where to start.
21    Q.   So there's an e-mail halfway down
22 page 1, and you can see this is from Mike
23 Riederer to you.  And it says, "Below is the
24 attached document our lawyer sent to yours."
25         So basically, this is Level 3's

Page 203

1  next draft of refinements to your red log.
2         Do you see that?
3     A.   Yes.
4     Q.   Let's look at this language.  It's
5  Bates '211.  So --
6     A.   Yes.
7     Q.   And I'm looking at (i)(B), if you
8  will, (a)(i)(B); and there's language added
9  that says, "...which has historically- been
10 approximately sixty-five percent (65%) of
11 overall billing for end-office switching."
12        Do you see that?
13    A.   Yes.
14    Q.   So this language was added by
15 Level 3, correct?
16    A.   It appears that way.  It's blue.
17    Q.   Do you recall any specific requests
18 by AT&T to include this language?
19    A.   I remember the discussion that we
20 needed to get this done quickly.  The e-mail
21 talks about all the other things that were
22 going on.  And the reconciliation to bring this
23 current through the end of May was not
24 something that we could do quickly because the
25 billing is delayed a month.

Page 204

1         And so there was a concept that we
2  had to -- we were going to settle what we knew,
3  and that was the payment in A.  And then B was
4  we were going to take the April -- it was April
5  and May.
6     Q.   And apply the 65-percent factor to
7  it, correct?
8     A.   And apply the 65-percent factor to
9  it, yes.  Which was intended to be -- you know,
10 everything in the past it was at a hundred or,
11 you know, we took the 75 percent of the
12 payment, which was 100 percent of the end
13 office.  But going forward, we were going to
14 use the 65 percent.
15        So that's -- it was being separated
16 out because that was the most current; and
17 that's what we were going to utilize as a
18 gauge.
19    Q.   Okay.  When you say "going
20 forward," you mean for April and May, correct?
21 April and May, before the June 1, 2015, date,
22 you were going to use a 65 percent for those
23 two months, correct?
24    A.   In this clause, yes; but the
25 conversation -- you asked me was there a

Page 205

1  conversation.  Was this was the best number
2  that we had agreed upon.  And the conversation
3  was centered around we'll use it here; but if
4  we need it, you know, later, this is the
5  factor, which is why we didn't use 75 percent
6  here.  We used 65-percent OTT factor versus
7  total billing at 75 paid.
8     Q.   Who told you that?
9     A.   It was our ongoing discussion
10 between the teams.
11    Q.   You told me everything was
12 memorialized in writing.  I've seen nothing to
13 that effect.
14        What memorializes that in writing?
15    A.   I can't say that it was
16 memorialized in writing, but I think that was
17 the intent of this language, the fact that it
18 was separated out as two different time
19 periods.
20    Q.   Okay.  Let's --
21    A.   The language was put into the
22 contract again.  This was provided by Level 3,
23 so I think that memorializes it.
24    Q.   But it doesn't saying anything
25 about going forward, does it?

52 (Pages 202 - 205)

CONFIDENTIAL

Page 254

1  information from our market analytical group
2  here at AT&T. They look at the largest OTT
3  providers. They look at the trends of volume.
4      They obviously saw that there was
5  increases across the largest carriers. They do
6  traffic studies. They do Secret Shopper type
7  stuff, and I'm not the expert on that; but
8  certainly Ardell can help you with that.
9      So they look at industry data and
10 watch the trends. And over time we have seen
11 that that traffic has grown.
12    Q.   Okay. But by this time, OTT
13 providers can get their own telephone numbers,
14 correct?
15    A.   I'm not sure exactly around the
16 timing; but not many, if any, had at that
17 point.
18    Q.   And Level 3 is precluded from
19 billing you end-office charges on telephone
20 numbers that are not their own, correct, by the
21 Settlement Agreement?
22    A.   On traditional traffic, yes.
23    Q.   On OTT traffic?
24    A.   From charging us end-office, yes.
25    Q.   That's all I was asking.

Page 255

1     A.   Yes.
2     Q.   So do you -- did anyone do any
3  analysis to see whether or not the telephone
4  numbers that were showing increases were
5  associated with non-Level 3 telephone numbers
6  that Level 3 couldn't bill for?
7     A.   I don't know what analysis was
8  done. I'm not privy to that.
9     Q.   All right. The next sentence says,
10 since the D.C. Circuit opinion -- I'm
11 paraphrasing -- AT&T has performed its own
12 analysis of Level 3's traffic.
13        Do you see that?
14    A.   Yes.
15    Q.   What was done?
16    A.   I'm not sure, but I would think it
17 was a Secret Shopper as I just alluded to.
18    Q.   By Mr. John, Craig John?
19    A.   Craig likely would have done it.
20    Q.   I have to think about that. It
21 seems like I'm calling him the wrong thing.
22    A.   Yes. Mr. John would have likely
23 done that.
24    Q.   So you have not seen that analysis
25 to your knowledge?

Page 256

1     A.   It's very possible it was shared
2  with me. It's lines and lines of data, but
3  they would have summarized it to say, this was
4  the before, this was the after, this is what we
5  believe. So I wouldn't have looked at the
6  details. I would have looked at the summary.
7     Q.   So is it in an Excel spreadsheet
8  format; do you know?
9     A.   I'm not sure what format. It's a
10 lot of data. Probably Excel. I'm not certain
11 of that. I don't -- I don't take those
12 spreadsheets anymore. If it doesn't come in
13 summary form, I'm not looking at it.
14    Q.   I might not know what I'm looking
15 at, but I don't think that was provided. So
16 I'm going to make a request that you -- if it's
17 been provided, great; and shame on me for not
18 knowing what it was.
19        (Whereupon, Request No. 5, AT&T's
20    analysis of Level 3's OTT traffic, was
21    made.)
22 BY MR. STEESE:
23    Q.   Then going down a few sentences, it
24 says AT&T believes that Level 3 owes AT&T
25 $8.3 million, correct? Do you see that?

Page 257

1     A.   Yes.
2     Q.   And is that based on a 65-percent
3  factor?
4     A.   I believe, yes.
5     Q.   And then it says, final sentence,
6  "Until Level 3 conforms its billing to the
7  current status of the law, AT&T will modify its
8  payment to reflect the appropriate level of OTT
9  traffic and ensure accurate compensation."
10        Do you see that?
11    A.   Yes.
12    Q.   So AT&T is withholding payment for
13 what it believes is OTT traffic on Level 3's
14 network?
15    A.   Based upon the last agreed-upon
16 factor, yes.
17    Q.   So 65 percent?
18    A.   Yes.
19    Q.   From even through today?
20    A.   I'm not sure, but I would assume
21 yes. I don't know that anything's changed on
22 that.
23    Q.   This discussion first started in
24 2017, correct, this discussion somewhere in
25 2017?

65 (Pages 254 - 257)

Page 262

1  OTT percentages July forward are in the
2  15 percent -- I'm trying to look at the more
3  recent data and say it's higher than the
4  13 percent average since it seems to be going
5  up slightly -- that AT&T is significantly
6  overwithholding if that is a correct data
7  point; isn't that true?
8      MR. HUNSEDER: Object to the form.
9      THE WITNESS: I don't know that for
10     a fact, but the paper would say that. It
11     doesn't make sense that 38 percent would
12     have been in 2015, but Level 3 was
13     agreeable to 65 at that point. So the
14     numbers don't make sense to me.
15  BY MR. STEESE:
16     Q. Do you know when the they gathered
17  this data?
18     A. You said October of '17, but it
19  goes back. I'm just looking at the dates here,
20  July of '15.
21     Q. I'm asking --
22     A. So that was two months after our
23  settlement document.
24     Q. My question's slightly different,
25  excuse me.

Page 263

1      The question is, do you know when
2  they performed these calculations?
3      A. No, I have no idea. I've never
4  seen this before.
5      Q. Let's go back, and we'll see if you
6  haven't seen it before. It's going to take me
7  a little bit, but I'll get there.
8      Let's look at -- now I'm back to
9  chronological. That was out of order. I
10  apologize. I thought it made sense given the
11  comments.
12     A. Okay.
13     Q. Exhibit 33.
14     (Whereupon, Exhibit No. AT&T 33,
15     E-mail correspondence, Bates numbered
16     CTL_0014078 through CTL_0014078, was
17     marked for identification.)
18  BY MR. STEESE:
19     Q. And this is an e-mail from
20  Mr. Stocker to a number of people at AT&T. I'm
21  bad at looking at letters, but I think you're
22  KM, right?
23     A. I am KM.
24     Q. Okay. And Mr. Stocker is saying
25  here in May of '17 that he has a difference of

Page 264

1  view, that this isn't a final decision,
2  correct, in paragraph 1? And I'm not going to
3  read the whole thing.
4      A. Yeah, he's kind of saying that,
5  yeah.
6      Q. And he also says, the final
7  sentence of that first paragraph, the
8  Settlement Agreement does not say the refund is
9  pegged at 65 percent. It only says there
10  should be a refund based on disputed OTT
11  charges.
12      So you would agree with him on that
13  point? Whatever the real OTT number is, that's
14  what should be refunded in your theory,
15  correct?
16     A. The 65 percent is the agreed-upon
17  factor until such time that we agree on a new
18  factor. So yes, if we agree on a new factor,
19  from that point forward, that would be the
20  disputed value. That would be the amount we
21  would use.
22     Q. You think that there's an
23  agreed-upon factor to use that prospectively
24  into 2017 in the Settlement Agreement?
25     A. I think 65 percent still exists

Page 265

1  today in absence of a replacement of that
2  factor. What else would you use? That's the
3  industry practice.
4      Q. Oh, so the whole point is as long
5  as you dispute a factor, then you can continue
6  to dispute factor and dispute factor; and
7  that's factor another carrier is stuck with?
8      A. No.
9      MR. HUNSEDER: Objection.
10     THE WITNESS: No, not at all. I
11     mean, the fact is that it has to be agreed
12     upon. And if the fact and data isn't
13     provided to come up with a new factor,
14     there's nothing else to work with. So you
15     work with what you have until such time
16     that there's a new factor.
17  BY MR. STEESE:
18     Q. So you think that PIU factors have
19  to be agreed upon or they're not --
20     A. I don't know about PIU factors.
21  I'm not familiar --
22     Q. Do you know that PVU factors, do
23  they have to be agreed upon or they're not
24  enforcement?
25     A. I don't know about PVU.

CONFIDENTIAL

Page 266

1  Q.  So what makes you say that for OTT
2  factor, it has to be agreed upon or you revert
3  back to 65 percent?
4  A.  What else would you use.  If you
5  don't have any other factor data, you use the
6  latest information that you have.  I'm not sure
7  what you're suggesting.
8  Q.  Isn't it true that Level 3 has been
9  providing you with data upon data upon data,
10  and you've just rejected the data?
11      MR. HUNSEDER:  Objection.
12      THE WITNESS:  No.  That's not
13  factual.  They've provided us a number to
14  say it's 15 percent, but they've given us
15  no justification for how it went from 65
16  to 15 percent or 14 percent or 46 percent
17  or 26 percent as it bounced all over the
18  place.
19      So there's been no data provided
20  behind that that would help us to validate
21  any of those numbers.
22  BY MR. STEESE:
23  Q.  So you feel you -- AT&T feels like
24  they can unilaterally just project that data
25  and say it's 65 percent?

Page 267

1      MR. HUNSEDER:  Objection.  That
2  mischaracterizes the testimony.
3      THE WITNESS:  There's no data to
4  reject.  It hasn't been provided.
5  BY MR. STEESE:
6  Q.  I didn't ask that.  I didn't say
7  the data.  I said if when they provide you a
8  factor, unless there's data that you feel you
9  can justify or verify, you feel you can reject
10  it and say I'm not going to apply that.
11      MR. HUNSEDER:  Objection.
12  Mischaracterizes the testimony.
13      THE WITNESS:  I think it's
14  reasonable to believe if you have a
15  significant swing from 65 percent to
16  10 percent, 13 percent, yes, there should
17  be some validation of that.  Yes, I do.
18  BY MR. STEESE:
19  Q.  And to the extent --
20  A.  It's not the honor system.  It's
21  trying to figure out what the right answer is.
22  Q.  And to the extent that Level 3
23  pulled -- contacted it's customers, its
24  wholesale customers and that constituted
25  95 percent of their traffic and said what

Page 268

1  percentage of your traffic is OTT and --
2  A.  That's what they said, yes.
3  Q.  And they gathered that data and
4  created a factor based upon what their own
5  customers told them, is that a reasonable
6  approach for creating a factor going forward?
7      MR. HUNSEDER:  Object to form.
8      THE WITNESS:  I don't know if
9  that's reasonable without any validation.
10  We don't have any fact and data to that.
11  It could mean anything.  I don't have a
12  way to validate that.
13  BY MR. STEESE:
14  Q.  Why do you have to have the ability
15  to validate it?
16      MR. HUNSEDER:  Objection.  Asked
17  and answered.
18      THE WITNESS:  It's significant
19  deviation from what was last agreed upon,
20  and it has a significant implication on
21  the payments.
22  BY MR. STEESE:
23  Q.  And so you believe AT&T can just
24  say, we know you did that.  We know you got
25  gathered the data but -- let me ask it this

Page 269

1  way:  Are you aware of any way to calculate
2  what OTT percentage is if you're serving
3  wholesale customers other than to contact the
4  customers?
5  A.  I'm not the expert on that.
6  Q.  I didn't ask that.  I asked are you
7  aware of any other way.
8  A.  Yes.  Like some other suppliers,
9  they can provide us the information on a
10  monthly basis and differentiate which calls are
11  OTT and which aren't.
12  Q.  Do they serve wholesale
13  customers --
14  A.  Yeah, they do.
15  Q.  -- or do they serve OTT customers
16  themselves?
17  A.  They serve wholesale customers.
18  Q.  Who does that?
19      (Whereupon, the following was
20  deemed confidential:)
21  A.  Inteliquent.
22  Q.  Inteliquent is a Tandem provider.
23      And so do you know -- strike that.
24      Do you use -- what do you use to
25  verify the numbers?

68 (Pages 266 - 269)

CONFIDENTIAL

Page 322

1 Q. So who is the expert at it AT&T?
2 A. I don't know who the expert would
3 be.
4 Q. Is there anyone when you have
5 questions about OTT you go and consult?
6 A. The legal team.
7 Q. Anyone outside the legal team?
8 A. No.
9 Q. So without talking about what
10 guidance you're getting, when you're getting
11 guidance about how to decide what to do with
12 OTT, you don't go to network engineers, you go
13 to legal?
14 A. Yeah. We've defined what we
15 believe OTT is from an access perspective.
16     You're asking me questions from a
17 product perspective. I'm just not familiar
18 with that.
19     So yes, it's -- our definitions
20 have already been defined. And most of the
21 issues that we come up with are legal.
22 Q. Okay.
23     MR. STEESE: For the reasons, I
24 told Mike in an e-mail, I'm not closing
25 the deposition; but for today, we will end

Page 323

1 the deposition.
2     MR. HUNSEDER: Understood.
3     I have no questions for Ms. Meola
4 at this time.
5     THE WITNESS: Thank you.
6     (The witness is excused.)
7     (Deposition of Kimberly Meola
8 concluded at 8:13 p.m.)

Page 324

1     C E R T I F I C A T E
2
3
4     I, SUZANNE J. STOTZ, a Certified
5 Court Reporter, Certified Realtime Reporter,
6 Registered Professional Reporter, and Notary
7 Public in and for the State of New Jersey, do
8 hereby certify that the foregoing is a true and
9 accurate transcript of the stenographic
10 above-captioned matter.
11
12
13     _____
14     SUZANNE J. STOTZ, CCR, RPR, CRR
15     LICENSE NO. 30XI00184500
16
17
18 DATED: FEBRUARY 25, 2019
19
20
21 NOTE: THE CERTIFICATE APPENDED TO THIS
22 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23 OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24 DIRECT CONTROL AND/OR DIRECTION OF THE
25 CERTIFYING COURT REPORTER.

```
 1                    C E R T I F I C A T E

 2

 3

 4                  I, SUZANNE J. STOTZ, a Certified

 5     Court Reporter, Certified Realtime Reporter,

 6     Registered Professional Reporter, and Notary

 7     Public in and for the State of New Jersey, do

 8     hereby certify that the foregoing is a true and

 9     accurate transcript of the stenographic

10     above-captioned matter.

11

12
                    _____
13                   Suzanne S̸, CCR, RPR, CRR

14                   SUZANNE J. STOTZ, CCR, RPR, CRR

15                   LICENSE NO. 30XI00184500

16

17

18     DATED:  DATE, 2019

19

20

21     NOTE:  THE CERTIFICATE APPENDED TO THIS

22     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION

23     OF THE SAME BY ANY MEANS, UNLESS UNDER THE

24     DIRECT CONTROL AND/OR DIRECTION OF THE

25     CERTIFYING COURT REPORTER.
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.