# EXHIBIT TT

Page 1

1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLORADO

3

4       AT&T CORPORATION,                ) Civil Action File No.:

5                   Plaintiff,           ) 18-cv-00112-RM-MEH

6             vs.                        )

7       LEVEL 3 COMMUNICATIONS, LLC,     )

8                   Defendant.           )

9       _____ )

10

11                   NON-CONFIDENTIAL PORTION

12      CONFIDENTIAL ATTORNEYS' EYES ONLY BOUND SEPARATELY

13                          PAGE 148

14                        PAGES 206-214

15

16           DEPOSITION OF PENN L. PFAUTZ, PH.D.

17                       VIRTUAL ZOOM

18                 TUESDAY, APRIL 28, 2020

19

20

21      Reported by:

22      ASHALA TYLOR, CSR #2436, CLR, CRR, RPR

23      JOB NO. 4083362

24

25      PAGES 1 - 236

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLORADO
 3
 4   AT&T CORPORATION,        ) Civil Action File No.:
 5        Plaintiff,    ) 18-cv-00112-RM-MEH
 6      vs.             )
 7   LEVEL 3 COMMUNICATIONS, LLC,  )
 8        Defendant.    )
 9   _____)
10
11
12
13
14
15
16      Deposition of PENN L. PFAUTZ, PH.D., taken via
17   Zoom videoconference commencing at 8:08 a.m. (PST), and
18   ending at 3:05 p.m., on Tuesday, April 28, 2020, before
19   Ashala Tylor, CSR No. 2436, RPR, CRR, CLR.
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2   On behalf of Plaintiff:
 3      SIDLEY AUSTIN LLP
 4      BY:  JUSTIN A. BENSON, ESQ.
 5         MICHAEL J. HUNSEDER, ESQ.
 6      1501 K Street, N.W.
 7      Washington, D.C.  20005
 8      202.736.8757
 9      jbenson@sidley.com
10      mhunseder@sidley.com
11
12   On behalf of the Defendant:
13      ARMSTRONG TEASDALE LLP
14      BY:  CHUCK STEESE, ESQ.
15         DOUG N. MARSH, ESQ.
16      4643 South Ulster Street, Suite 800
17      Denver, Colorado  80237
18      720.200.0676
19      csteese@armstrongteasdale.com
20
21
22   Also Present:
23      Mark Hesse
24
25
```

Page 4

```
 1              I N D E X
 2   WITNESS       EXAMINATION BY          PAGE
 3   PENN L. PFAUTZ, PH.D.
 4      Mr. Steese         7, 124
 5
 6
 7
 8            E X H I B I T S
 9
10
11   NO.         DESCRIPTION          PAGE
12
13
14
15   Exhibit 111   Document titled "In the Matter   66
16              of Connect America Fund" from
17              Westlaw
18
19   Exhibit 112   Defendant/Counterclaimants'   134
20              Supplemental Rule 26(a)(2)(C)
21              Disclosure
22
23   Exhibit 113   Defendant/Counterclaimants'   156
24              Supplemental Rule 26(a)(2)
25              Disclosure
```

Page 5

```
 1   E X H I B I T S (continued)
 2   NO.         DESCRIPTION          PAGE
 3   Exhibit 114   Document titled "61.26        204
 4              Tariffing of Competitive
 5              Interstate Switched Exchange"
 6
 7
 8
 9
10
11
12
13
14   EXHIBITS MARKED IN PRIOR DEPOSITIONS:
15   NO.         DESCRIPTION          PAGE
16   Exhibit 4     Ardel Burgess Email        181
17
18   Exhibit 6     Release and Settlement Agreement   182
19
20   Exhibit 7     Email chain, top one from     185
21              Kimberly Meola
22
23   Exhibit 21    Release and Settlement Agreement  193
24
25   Exhibit 36    A pdf entitled Exhibit 36     149
```

2 (Pages 2 - 5)

Page 6

1  E X H I B I T S (continued)
2  NO.        DESCRIPTION            PAGE
3  Exhibit 36   Craig John email        186
4
5  Exhibit 109   Order on Remand and Declaratory   64
6          Ruling
7
8
9
10
11
12        INFORMATION REQUESTED
13          (None)
14  QUESTIONS INSTRUCTED NOT TO ANSWER
15    PAGE 27, LINE 20
16    PAGE 30, LINE  1
17
18
19
20
21
22
23
24
25

Page 7

1         Tuesday, April 28, 2020
2            8:08 a.m.
3            --o0o--
4
5       PENN L. PFAUTZ, PH.D.,
6  being first duly sworn or affirmed to testify
7  to the truth, the whole truth, and nothing but
8  the truth, was examined and testified as follows:
9          EXAMINATION
10  BY MR. STEESE:
11    Q.  Dr. Pfautz, my name is Chuck Steese.  I'm
12  joined with my colleague Doug Marsh, and we
13  represent the Level 3 and the Level 3 subsidiaries
14  in a lawsuit against AT&T.
15       Welcome.  Can you please state your full
16  name?
17    A.  Penn Pfautz.
18    Q.  And what is your business address?
19    A.  10692 Vista Del Agua, spelled A-G-U-A, Way
20  in San Diego, California 92121.
21    Q.  How long have you lived in San Diego, sir?
22    A.  A little over -- almost four and a half
23  years.
24    Q.  Have you been deposed before, Dr. Pfautz?
25    A.  Yes.

Page 8

1    Q.  Approximately how many times?
2    A.  Once, I think.
3    Q.  What type of case were you deposed in?
4    A.  It was a case between AT&T and
5  O1 Communications when I was still employed by AT&T.
6    Q.  And what were the issues in that case?
7    A.  Issues about interconnection by O1 to
8  AT&T.
9    Q.  So on the local side, when you use the
10  term "interconnection," that's what that means to
11  me, is that what you're talking --
12    A.  This was actually -- yeah, it was -- I
13  think it was a question of a connection to
14  AT&T Wireless.
15    Q.  And approximately when was this deposition
16  taken?
17    A.  So I'm thinking this was probably 2016.
18    Q.  Were you an expert in that case?
19    A.  I don't believe so.  I think I was the
20  other kind of witness.  I really didn't pay
21  attention to that -- that nicety; but I think that I
22  may have been that -- that other rule, whatever it
23  is.
24    Q.  Fact witness?
25    A.  Yeah.

Page 9

1    Q.  All right.  Since you've been deposed once
2  and I'm sure you've spoken to Mr. Justin and/or
3  Mr. Hunseder, you're going to know the rules, but
4  let me go over them.
5       You understand you're under oath here
6  today, correct, sir?
7    A.  Yes.
8    Q.  And as such, we're expecting you to tell
9  the truth.
10       Is there any reason why you're not going
11  to be able to be truthful here today?
12    A.  No.
13    Q.  It's important during the deposition,
14  especially with a video deposition, for you to let
15  me finish asking the question before you begin
16  answering and for me to give you the same courtesy
17  in return.
18       It's particularly difficult because the
19  body language that you see when you're in a room
20  where you know someone is finished is harder to
21  anticipate via videoconference.
22       Can you please try and do that for me,
23  sir?
24    A.  I will try.
25    Q.  I will try to do the same.

3 (Pages 6 - 9)

Page 14

1      So did you do anything else to prepare
2 other than speaking with in-house and outside
3 counsel to prepare for today?
4     A.   Just reviewed some of the documents and
5 inputs to my report.
6     Q.   So you reviewed your report, correct?
7     A.   Uh-huh.
8     Q.   You have to say "Yes."  That's another --
9     A.   Oh, I'm sorry.  Yes.  Yes.  My bad.
10     Q.   Head nods, uh-huhs, they're difficult for
11 the court reporter to get --
12     A.   Yep.  My apologies.
13     Q.   No problem.  So did you speak to anyone
14 else?  And I'll give a few other names:  Ms. Meola,
15 Mr. Burgess, Ms. Friesen, Ms. Waldbaum.  Did you
16 speak to any of them in terms of preparing for
17 today's deposition?
18     A.   No, I did not.
19     Q.   In terms of documents that you reviewed,
20 other than your expert report, what other documents
21 did you review to prepare for today, if anything?
22     A.   So -- I'm sorry.  So I looked at some of
23 the spreadsheets from Level 3.  We looked at those.
24     I looked at some of the -- proceedings
25 in the case, some FCC orders, a Level 3 tariff.

Page 15

1     Q.   To prepare for the deposition?
2     A.   Yes.
3     Q.   Did you look at Mr. McClure's expert
4 disclosure in this case that he prepared and
5 submitted at the same time you submitted your
6 disclosure?
7     A.   Yes.  I did look at that a little bit.
8     Q.   Did you look at the Level 3 damages
9 disclosure, the calculation of how much was from
10 Level 3's perspective?
11     A.   I just gave it a cursory glance because my
12 understanding of what I'm supposed to do is comment
13 on Level 3's process for estimation, and so I didn't
14 really pay a lot of attention to the dollar numbers.
15 I was more interested in the technical part of
16 trying to estimate the factors.
17     Q.   Got it.  After Mr. McClure submitted his
18 new Excel spreadsheet which is his expert
19 disclosure, he did a -- he created a supplemental
20 document that described some of his methodology.
21     Did you review that?
22     A.   I'm not sure I understand the document
23 that you're referring to.  There were -- there was a
24 document -- pretty soon after the reports were
25 filed, there were two exhibits.  One was a

Page 16

1 spreadsheet -- revised spreadsheet.  The other was,
2 you know, just a -- a -- it was a document.  And
3 then received some other information last Friday
4 that shed some more light on the process.
5     Q.   Got it.  You said you reviewed some of the
6 proceedings in this case.  Did you mean pleadings in
7 this case?
8     A.   Yes.
9     Q.   Documents that --
10     A.   I'm sorry.  That's what I meant.
11     Q.   What documents did you review in --
12     A.   I don't remember exactly which ones.
13     MR. BENSON:  Just give him a quick second
14 to make sure he's done talking so that he can get
15 his question out.
16     THE WITNESS:  Okay.  I'm sorry.
17     MR. BENSON:  That's okay.
18     MR. STEESE:  I thought you were talking to
19 me.
20     MR. BENSON:  No.
21     MR. STEESE:  It could apply equally to me.
22     Q.   So you also said you reviewed the Level 3
23 tariff in preparation for today.  Why did you do
24 that?
25     A.   Okay.  I reviewed a Level 3 tariff because

Page 17

1 I was interested in understanding some of the
2 requirements that Level 3 places on factors provided
3 to them by other companies.
4     Q.   Do you know approximately how many hours
5 you've spent to date acting as an expert on Level --
6 excuse me, on AT&T's behalf?
7     A.   I am thinking it's probably 30 or 40.
8     Q.   From the time you were retained to the
9 drafting of your report to the preparation to today,
10 30 to 40 hours?
11     A.   Yeah.  It may have been -- it may have
12 been a little bit more than that.  I -- you know, I
13 keep track of it in terms of my invoice, but I don't
14 have it all in my head.
15     Q.   And your report says that you're being
16 compensated $250 per hour, correct?
17     A.   That is correct.
18     Q.   If the court agrees with you and denies
19 Level 3's request, is there a success fee or
20 anything like that built into your arrangement?
21     A.   No, there is not.
22     Q.   All right.  Let's talk about now the
23 preparation that -- the work that you did, the
24 people you talked to, in order to get information so
25 you could draft your report.

5 (Pages 14 - 17)

Page 38

1  BY MR. STEESE:
2      Q.  Have you seen data that suggests the
3  other?
4      A.  Not particularly.  Just by general
5  experience, that, you know, either -- if you are an
6  enterprise, you're going to go one way or the other,
7  generally have facilities to something, or you're
8  going to be -- you know, decide to purchase your OTT
9  service.  And so that's -- that is -- that's my
10 impression.
11     Q.  Have you done any work with enterprise
12 class customers to see how frequently they extend
13 the reach beyond the hub to remote locations?
14     A.  No, I have not.
15     Q.  So this is guesswork on your part?
16         MR. BENSON:  Objection.
17         THE WITNESS:  I would not characterize it
18 as guesswork.
19         MR. BENSON:  I objected for the court
20 reporter.
21         Go ahead.
22 BY MR. STEESE:
23     Q.  So what is the basis of your statement?
24 You say "experience."  Where do you gain that
25 experience:  From studying or looking at what?

Page 39

1      A.  Just when I was working for AT&T and in
2  the industry, the kind of things that I saw.
3  That's -- that's really all I can say to you.
4      Q.  If you look at Exhibit 110, paragraph 2 --
5      A.  All right.  Let me -- let me pull that up.
6  My PC goes to sleep here when it's not working.
7         So which one is that in a PP?
8      Q.  No, this is just your report, paragraph 2.
9      A.  Okay.  I've got to pull that report up.
10        And this is a pdf file, right?
11     Q.  This is your report, sir.
12     A.  Yeah, I know.  I'm having some technical
13 difficulties here opening it.  I want to make sure
14 I'm trying the right file.
15     Q.  It's entitled "Pfautz Expert Report."
16     A.  Okay.  Yeah, I know.  I'm trying to get it
17 from the attachments, the downloads.  I don't know
18 why that is not -- not letting me open it up.  I see
19 the things here.  I see the file names and --
20     Q.  I'm giving you the names of the --
21         THE REPORTER:  I'm sorry, Mr. Steese,
22 repeat that, please.
23 BY MR. STEESE:
24     Q.  I'm giving you the names of the documents
25 that were forwarded to you, and the pdf is entitled

Page 40

1  "Pfautz Expert Report."
2      A.  Yeah, I -- I'm working through the thing.
3  I thought it had downloaded it already.  But
4  apparently it just downloaded the page that shows
5  the documents; so I'm trying to get it to download
6  now.
7      Q.  Okay.
8      A.  And it's going kind of slow.
9      Q.  Why don't we go ahead and take a
10 five-minute break now and you can see if you can get
11 that.  Is that okay, Dr. Pfautz?
12     A.  That's okay.
13         MR. STEESE:  We'll just keep the line
14 open, obviously.
15         THE WITNESS:  Yes.
16         (Recess.)
17 BY MR. STEESE:
18     Q.  So I was asking you, Dr. Pfautz, to look
19 at paragraph 2 to your expert report.  Are you
20 there, sir?
21     A.  Yes.  This is the one that begins "I have
22 been asked"?
23     Q.  Yes, exactly.  You're actually getting to
24 it.
25         The focus of your report is to both assess

Page 41

1  various methods for identifying and billing charges
2  associated with the type of call known as "over the
3  top."  That's what you have been asked to do.
4  That's what you're tasked with in this report,
5  correct?
6      A.  Correct.
7      Q.  And your opinions are that AT&T's
8  methodology is reasonable, correct?
9      A.  Correct.
10     Q.  And that Level 3 is not reasonable for
11 various reasons that you articulate in your report,
12 correct?
13     A.  That is correct.
14     Q.  And that's the full scope of the opinions
15 that you offer, correct?
16         MR. BENSON:  Objection.
17         THE WITNESS:  I -- I think so, as I
18 understand it, unless there's a subtlety there that
19 I missed.
20 BY MR. STEESE:
21     Q.  That was not a trick question, just so you
22 know.
23         All right.  And if you look at paragraph 3
24 it says "AT&T contends that it has been
25 overcharged."  And what is the factual basis for

11 (Pages 38 - 41)

Page 58

1  must be some way of dealing with that and excluding
2  those calls.  And whether that's -- you know,
3  obviously, it was an issue of legal contention.  But
4  the fact that if that was the ultimate regulatory
5  conclusion that was come to that there would need to
6  be some way of dealing with it, whether a factor or
7  otherwise, I think that's been out there, you know,
8  longer.
9          I mean, let's face it, this lawsuit has
10 been around for a while.  And looking at that, one
11 would say, "Well, if it comes out one way, you're
12 certainly are going to need a way to do this."
13 BY MR. STEESE:
14     Q.  Okay.  Are you aware of any carrier --
15         (Reporter clarification.)
16         MR. BENSON:  We lost you, Chuck.
17 BY MR. STEESE:
18     Q.  Are you aware of any carrier in the
19 industry that has created a percent OTT factor
20 before December of 2019?
21         MR. BENSON:  Objection.  Calls for
22 speculation.
23         Go ahead.
24         THE WITNESS:  Yeah.  You know, I do recall
25 that what I was reading was that actually Level 3

Page 59

1  made an attempt to create a factor and there may
2  well have been others that -- that attempted to.  It
3  seems to me that -- that AT&T tried to assess how
4  much OTT they had.
5          So, you know, whether or not there was a
6  clear legal situation, which, you know, I can't
7  really speak to, it seems like carriers were aware
8  of that and -- and made some attempts to -- to deal
9  with that.
10 BY MR. STEESE:
11     Q.  Are you aware -- first of all, are you
12 aware of any carrier other than AT&T and Level 3
13 before December 2019 that had created a percent OTT
14 factor?
15     A.  I can't say that I am.
16     Q.  Are you aware that AT&T developed an OTT
17 factor between April and June of 2019 because of the
18 lawsuit that -- the claims -- that Level 3 brought
19 against it in this case?
20     A.  I'm --
21         MR. BENSON:  Objection.
22         THE WITNESS:  Sorry.
23         MR. BENSON:  Go ahead.
24         THE WITNESS:  I'm not aware of the
25 chronology of that work.

Page 60

1  BY MR. STEESE:
2      Q.  You know that Ms. Gallagher created the
3  factor, correct?
4      A.  That is --
5          MR. BENSON:  Objection.  Lacks foundation.
6          Go ahead, Penn.
7          THE WITNESS:  It seems that Ms. Gallagher
8  was involved in coming up with a number.  Yes.  I am
9  aware of that.
10 BY MR. STEESE:
11     Q.  Have you looked at the dates of the
12 spreadsheets and seen April to June 2019 gathering
13 the data and doing the calculations?
14         MR. BENSON:  Objection.  We don't know
15 what spreadsheets you're talking about, Chuck.
16         MR. STEESE:  Sure he does, and so do you
17 because they were exhibits to her deposition which
18 he said he reviewed.
19         THE WITNESS:  So I have reviewed -- looked
20 at some of those spreadsheets.  I did not spend a
21 lot of time with them.
22 BY MR. STEESE:
23     Q.  And Level 3 developed an OTT factor
24 because of the dispute between Level 3 and AT&T,
25 correct?

Page 61

1          MR. BENSON:  Objection.  Calls for
2  speculation.
3          Go ahead, Penn.
4          THE WITNESS:  I don't know if that's the
5  only context in which Level 3 developed a factor.
6  BY MR. STEESE:
7      Q.  Is that your understanding?
8          MR. BENSON:  Same objection.
9          THE WITNESS:  I -- again, I would say I
10 don't know exactly what level -- what -- if this was
11 the only thing that motivated Level 3.  I know that
12 obviously this was -- was part of it.  But whether
13 there was anything else, I just have to plead
14 ignorance.
15 BY MR. STEESE:
16     Q.  At this point in time, is there any
17 industry consensus about how to create percent OTTs?
18         MR. BENSON:  Objection.
19         THE WITNESS:  Not that I am aware of.
20 BY MR. STEESE:
21     Q.  So going back now to the PLU and the PIU,
22 were you involved in the process when these factors
23 were first coming into existence?
24     A.  No, I was not.
25     Q.  Are you aware one way or the other that

16 (Pages 58 - 61)

Page 90

1  whether they want to take on the burdens of managing
2  their own numbers and whether they want to take on
3  the burden of connecting to the legacy
4  infrastructure themselves.
5  BY MR. STEESE:
6      Q.  And if the LEC -- here, Level 3 -- is only
7  billing for its own telephone numbers, given these
8  two facts, don't you see how the percent OTT might
9  be going down for Level 3?
10      MR. BENSON:  Objection.
11      THE WITNESS:  Yeah.  I mean, it might be,
12  but then there could be other things.  It might not.
13      So I -- I can't say what -- what the --
14  the answer to that.  I can see the possibility.  I
15  can't conclude that that is what has happened.
16      MR. STEESE:  We can take our break now.
17      THE WITNESS:  When should we come back?
18      (Off the record discussion.)
19      MR. STEESE:  We'll come back 11:20, my
20  time; 10:20 your time.
21      (Recess.)
22  BY MR. STEESE:
23      Q.  All right.  Go back to your report,
24  Exhibit 110, paragraph 6.
25      A.  Okay.  Let me get there.  You said

Page 91

1  paragraph 10?
2      Q.  6.
3      A.  6.  Okay.  Just a second.  Go back up.
4  Yes.  I am there.
5      Q.  All right.  In that paragraph -- and I'm
6  paraphrasing just to kind of get you on track -- you
7  basically say the method Level 3 used to determine
8  its percent OTT is unreasonable and "almost
9  certainly understated" its percent OTT, correct?
10      A.  That's what I said.
11      Q.  Are the reasons for that opinion spelled
12  out in your report?
13      A.  I hope so.
14      Q.  Is there any reason for those views that
15  you have, as you sit here today, that have not been
16  spelled out in this report?
17      A.  I don't think so.
18      Q.  Okay.  The same is true of AT&T.  You say
19  AT&T's method is reasonable.
20      Is the reason that you came to -- are the
21  reasons that you came to that conclusion spelled out
22  in your report?
23      A.  Yes.
24      Q.  Are there any reasons why you believe
25  AT&T's methodology is reasonable that are not

Page 92

1  spelled out in your report?
2      A.  I don't believe so.
3      Q.  All right.  Paragraph 7 of your report --
4  and I'm going to continue -- I'll continue to use
5  paragraph numbers just before I ask a question to
6  orient you.  Sometimes the questions are general
7  enough where you won't need to look, but if you feel
8  you need to look, please take your time.  It's not a
9  rush.  Understand?
10      A.  I understand.
11      Q.  Okay.  Perfect.  In paragraph 7, you
12  recognize that Level 3 serves business customers,
13  correct?
14      A.  Ordinary business customers.
15      Q.  You cut out for a second.  Say that again?
16      A.  I'm saying, yes, ordinary business
17  customers.
18      Q.  Do you -- if you -- I'm going to
19  categorize ordinary business customers apart from
20  what I'll call carrier customers.
21      Are you with me in concept?
22      A.  Yes, I am.
23      Q.  And I would include Vonage in carrier
24  customers even though it's not a common carrier as
25  the term is defined.  I just want to make sure we're

Page 93

1  on the same page.
2      Are you with me?
3      A.  Yes, I am.
4      Q.  So if I use "ordinary customers" and
5  "carrier customers" for several questions, will you
6  know what I'm talking about?
7      A.  I think that I will.
8      Q.  Okay.  Perfect.
9      Are you aware of the growth that Level 3
10  has experienced with its ordinary business customers
11  over the course of the last four or five years?
12      MR. BENSON:  Objection.  Foundation.
13      Go ahead, Penn.
14      THE WITNESS:  No, no.
15  BY MR. STEESE:
16      Q.  Would you be surprised at all to learn
17  that the percentage -- not percentage -- the volume
18  of ordinary business customers that they serve has
19  gone up -- I won't say exponentially but something
20  close to it over the last several years?
21      A.  I don't know about exponentially.  I have
22  not been tracking market shares and things like
23  that.
24      Q.  But to the extent that the percentage of
25  Level 3's ordinary business customers is increasing,

24 (Pages 90 - 93)

Page 106

1    A.  I am.
2    Q.  Would that be an OTT call?
3    A.  Well, I think that it might because I
4  think of the actual deaf or hard of hearing user who
5  is paying this customer of Level 3 for service or if
6  the FCC is maybe reimbursing that entity for the
7  service provided to these customers; but I think of
8  the ultimate end user as the person who is at the
9  other end of the Internet connection and is, you
10  know, essentially making that call, originating that
11  call.
12        I realize people may have different views
13  on this, but that is my take on that situation.
14    Q.  So what has AT&T done to see if any of its
15  enterprise class customers are doing things like
16  that?  And that is employing -- allowing their own
17  customers to call in to their functional PBX VoIP
18  application server -- whatever you want to call
19  it -- and then transmit the calls over the SIP trunk
20  physical facilities -- whatever it might be -- to
21  AT&T's end office switch.  What has it done to
22  determine whether the customer is using the
23  facilities in this fashion as opposed to a product
24  that AT&T has created for itself to be used in a
25  particular way?

Page 107

1        MR. BENSON:  Objection.  Form.
2        Go ahead.
3        THE WITNESS:  Yeah.  I don't know what
4  AT&T has done in that regard.
5        I want to be clear:  The scenario that
6  we're talking about when we say "customer," I assume
7  you mean the nominally enterprise customer of
8  Level 3 as opposed to the end user who is a party
9  that's paying that nominally enterprise entity
10  that's really acting as a carrier in this case.
11  BY MR. STEESE:
12    Q.  My question wasn't -- you're right except
13  for you said Level 3 and I'm saying AT&T.
14    A.  Okay.  Fair enough.  My -- my bad.  Yes.
15        I don't know what AT&T has specifically
16  done to assess whether that is going on with some
17  customers.
18    Q.  And in order to do that, AT&T would need
19  to look at each and every one of its enterprise
20  class customers one by one determine what
21  their business plan is, see if they themselves
22  deploy any OTT calling for people that are not their
23  employees to make that assessment, correct?
24        MR. BENSON:  Objection.
25        THE WITNESS:  I don't --

Page 108

1        THE REPORTER:  I'm sorry, objection?
2        MR. BENSON:  Form.
3        Go ahead.
4        THE WITNESS:  I don't know that because I
5  don't know in detail the kind of service agreements
6  that those customers have with AT&T, whether there's
7  anything in those agreements about potential resale
8  and things like that.  So it's possible that they
9  would need to do that to determine that.  It's also
10  possible there may be something in the agreement.
11  And I just simply don't know.
12  BY MR. STEESE:
13    Q.  And you say that you talked to I'm
14  assuming Mr. Cathey, and Mr. Cathey identified
15  products that AT&T had and whether or not those
16  products, such as Collaborate, created the potential
17  for OTT calling, correct?
18    A.  That's correct.
19    Q.  But you have not inquired or found out
20  whether or not they did a search to determine
21  whether its enterprise class customers were doing
22  something to sell what amounts to an extension of
23  the telephone network to its own customers, to the
24  enterprise class customers' own customers, correct?
25        MR. BENSON:  Objection.  Form.

Page 109

1        THE WITNESS:  No, I did not.
2  BY MR. STEESE:
3    Q.  And you have no idea whether or not any of
4  AT&T's enterprise class customers are doing that one
5  way or the other, do you?
6    A.  I don't have any information on that, yes.
7    Q.  And in order for AT&T's methodology for
8  calculating OTT percent to be reasonable, to use
9  your terminology, shouldn't they look to see who
10  their enterprise class customers are and how they're
11  using the service before opining that their
12  methodology for calculating percent OTT is
13  reasonable because they have just ignored altogether
14  this potentiality?
15        MR. BENSON:  Same objection.
16        THE WITNESS:  I don't know whether AT&T,
17  in fact, looked at those customers, you know.  My
18  opinion is focused on the -- the actual products
19  that could be OTT and the fact that AT&T made the
20  choice in those cases not to bill for any of that
21  traffic even though some of it is also -- I don't
22  know how much -- some of it is clearly compensable
23  with end office switching.
24        Now, on the other hand, when I looked at
25  Level 3, unless something jumped out at me, I

28 (Pages 106 - 109)

Page 130

1    A.   As I said, I have no dispositive evidence
2  that something improper is going on here.
3    Q.   And you have no evidence of any double
4  billing, correct?
5    A.   That's correct.
6    Q.   The historical dispute that dates back
7  before 2015, one of the issues AT -- are you aware
8  that one of the issues AT&T raised was that Level 3
9  was billing end office charges on calls that did not
10  have a Level 3 telephone number associated with
11  them?
12    A.   I have a vague recollection of that, but I
13  wouldn't swear to it.
14    Q.   Are you aware that the Level 3 AT&T
15  settlement agreement from 2015 obligated Level 3 to
16  only bill end office charges on calls associated
17  with its own telephone numbers?
18    A.   I think that's my recollection.
19    Q.   Do you know whether or not AT&T -- strike
20  that.
21       Are you aware whether or not it's a common
22  practice for AT&T to dispute end office charges for
23  any carrier if they are billing end office charges
24  and it is not their TN?
25    A.   I think I recall that there were some

Page 131

1  cases where that went on.  Not from this current
2  thing, but that's my recollection.
3    Q.   And so if AT&T has a practice of billing,
4  disputing, and not paying end office charges to a
5  carrier where it's not their TN, even if one of
6  these cable companies were to mistakenly bill for a
7  call where it's not their TN, the left -- the AT&T
8  process would be to dispute and not pay those
9  charges, correct?
10    A.   If they identified that's what's going on,
11  I believe that's what they would do.
12    Q.   So even if there was a mistake and double
13  billing occurred, AT&T's internal process should
14  catch it and prevent double pay, correct?
15    A.   I can't swear that that would be the case.
16  I would hope that that would be the case, but I
17  don't know the degree to which that was part of the
18  complete normal process or if that was only done
19  when there were some concerns.  That's just, again,
20  I don't know what the operational situation was.
21    Q.   You would expect that to be true.  You
22  just don't know if it is?
23    A.   That's correct.
24    Q.   Looking at paragraph 39, you raised
25  similar issues with respect to what I'll call

Page 132

1  traditional facilities-based carriers, and I'm
2  differentiating from cable companies, and you raised
3  One Communications, Inteliquent, Cincinnati Bell,
4  and others, correct?
5       (Reporter clarification.)
6    Q.   -- One Communications, Inteliquent,
7  Cincinnati Bell, and others, correct?
8    A.   That's correct.
9    Q.   Same questions with respect to this
10  category of calling, your concern is not OTT,
11  correct?
12    A.   That's correct.
13    Q.   Your concern here is, is there double
14  billing going on, correct?
15    A.   Correct.
16    Q.   And do you have any evidence that double
17  billing is going on?
18    A.   No, I do not.
19    Q.   And if these are indeed Level 3 TNs, you
20  would expect the same thing.  You would expect that
21  AT&T would be able to identify those and keep from
22  paying double charges if, for some reason, double
23  billing had occurred.
24    A.   As before, I would expect they might but I
25  really don't have any information whether that's a

Page 133

1  routine part of their process.
2    Q.   Let's now turn to paragraph 41 on page 15
3  of Exhibit 110.
4       Are you there, sir?
5    A.   I am.
6    Q.   And this particular paragraph, you raised
7  concerns about the way that Level 3 originally
8  calculated percent of telephone numbers associated
9  with various carrier customers, correct?
10    A.   That's correct.
11    Q.   I would like to mark -- strike that.
12       Before we get there, so if I'm
13  understanding paragraph 41 correctly, what you
14  believe Level 3 should do is look at individual call
15  detail records, figure out the volume of traffic
16  associated with each TN, identify which customer is
17  associated with that telephone number, and that way
18  eliminate this estimate of percentage TNs
19  altogether.  That would be the best practice,
20  correct?
21    A.   That is correct.
22    Q.   And if Level 3 did that, your concern on
23  this point would go away, correct?
24    A.   If I understood you correctly, if Level 3
25  just pulled the minutes associated with the numbers

34 (Pages 130 - 133)

Page 138

1    Q.   And in 2017, there certainly was no
2  obligation by carriers or carrier customers to track
3  percent OTT, to your knowledge, was there?
4        MR. BENSON:  Objection.  Calls for a legal
5  conclusion.
6        Go ahead, Penn.
7        THE WITNESS:  Yeah.  I'm not a lawyer.  I
8  can't say legally in terms of the dispute.
9        I mean, if carriers are disputing
10  something, then there's an expectation that people
11  are going to figure out what the appropriate thing
12  is and come to an agreement.  And when they can't,
13  that's why we're here.
14  BY MR. STEESE:
15    Q.   What processes were available in the
16  latter half of 2017 to calculate percent OTT for an
17  individual customer that did not entail going to the
18  customer and asking for information?
19    A.   I don't know exactly what was available in
20  2017.  I think, as we've discussed, that outside of
21  the fairly clear-cut cases, it does require getting
22  some information from the customer.
23    Q.   To your knowledge, was there any
24  obligation for customers to disclose this percent
25  OTT to local exchange carriers like Level 3 in the

Page 139

1  second half of 2017?
2    A.   I simply don't know what service
3  agreements may have existed and whether, you know,
4  they would cover something or not.  I'm not aware of
5  a formal, say, FCC requirement specifically in that
6  regard, if that's your question.
7        MR. BENSON:  I just want to make sure my
8  objection got caught.
9        THE REPORTER:  No.  I did not hear your
10  objection.
11        MR. BENSON:  Okay.  Just objection.
12  That's fine.
13        (Off the record discussion.)
14  BY MR. STEESE:
15    Q.   One of the things that you recognized was
16  when Mr. McClure would go out and get data from some
17  carrier customers, sometimes he would adjust those
18  factors, correct?
19    A.   I believe that's what he said in his
20  deposition.
21    Q.   But he always adjusted them upward, to be
22  higher, correct?
23        MR. BENSON:  Objection.
24        THE WITNESS:  I don't recall.
25        MR. STEESE:  I'm sorry.  You talked -- did

Page 140

1  you --
2        MR. BENSON:  Objection.
3        But go ahead, Penn.
4        THE WITNESS:  Okay.
5        I don't recall exactly.  I think that may
6  have been the case.
7  BY MR. STEESE:
8    Q.   So Mr. McClure went to the carrier
9  customers, as he needed to, to calculate percent
10  OTT.  What you take issue with was basically he
11  didn't get a verification about percent OTT,
12  correct?
13        MR. BENSON:  Objection.  Misstates the
14  report.
15        But go ahead.
16        THE WITNESS:  Yeah.  My objection was the
17  methodology in which he approached the customers and
18  the lack of any documentation of those approaches
19  even to the level of what -- whoever he managed to
20  communicate with told him versus the upward
21  adjustment that he suggests he made in some point.
22        So it's a total black box to me.  I
23  don't -- there's just nothing there other than what
24  he put in the spreadsheet.  That's not my
25  understanding of the usual practice when you're

Page 141

1  coming up with something like a factor that's going
2  to drive dollars.
3  BY MR. STEESE:
4    Q.   Is it you take issue with the -- well,
5  strike that.
6        There's two pieces to this puzzle:  One is
7  you identify the customers you're going to contact;
8  and then, two, after you've identified them, you get
9  information from these customers that you determined
10  you should contact, correct?
11    A.   Yes.
12    Q.   And you take issue with his recording, the
13  way he -- the people he talked to and et cetera,
14  correct?
15    A.   Yes.  That's my big -- biggest concern.
16    Q.   Do you take issue with the process he went
17  through to identify the customers that he should
18  speak to?
19    A.   I don't know all the details of that.  I
20  think the -- you know, the idea that he would take a
21  set that represented the majority of the traffic,
22  that sort of makes sense.
23        I don't know beyond that what other pieces
24  went into his selection.  At least I'm not confident
25  that I can remember that.

36 (Pages 138 - 141)

Page 142

1    Q.  Okay.  Let's look at page 16 of
2  Exhibit 110, and you identify three companies:
3  Fuze, FreedomVoice, and Sorenson that had been
4  identified as zero percent OTT that, from your
5  perspective, should not be zero percent OTT,
6  correct?
7    A.  That is correct.
8    Q.  And I'm breaking the spreadsheet into two
9  buckets, if you will.  One, those that are below the
10  line, if you will -- they're all zeros -- and the
11  second is those above the line, those that have some
12  percentage of OTT.
13        Are you tracking with me, sir?
14    A.  Are you saying -- so you're sorting the
15  spreadsheet?
16    Q.  I'm not sorting it.  I'm just
17  differentiating into two buckets:  Those that had
18  some percentage OTT and those that were zero.
19    A.  Okay.
20    Q.  And so these are the three companies that
21  had zero that you took issue with, correct?
22    A.  Those are some of the -- those are --
23  those are some that I looked at that I thought there
24  was a clear issue with.  I won't say those are the
25  only ones that might have an issue.

Page 143

1    Q.  What other ones have an issue that were
2  zero?
3    A.  I don't particularly recall.  I mean, my
4  interest was just in looking and seeing if there
5  were things that sounded; so I can't give you a
6  quantitative -- or name at this point particular
7  other customers.
8    Q.  And so they're -- your report does not
9  identify any others, correct?
10    A.  No, it does not.
11    Q.  And so the only three that you align on
12  for purposes of your report are those three,
13  correct?
14    A.  Those are the ones that I'm relying on
15  for -- well, okay, depends on what -- what I'm
16  relying on it for.
17        I rely on those of those examples that came back
18  that were listed as zero and there's reason to
19  believe that they're not a zero.  It's not the only
20  companies that identified deficiencies with.
21    Q.  That -- that -- I thought my question was
22  specific to those that were zero; so we're on the
23  same page.
24        I'll get to -- I'll get to 8x8 in a
25  minute.  I'm not excluding it.

Page 144

1    A.  All right.
2    Q.  So as you sit here today, can you identify
3  any other company that was identified at zero in his
4  2017 report that you thought should be at zero?
5        MR. BENSON:  Objection.  Asked and
6  answered.
7        But go ahead, Penn.
8        THE WITNESS:  I can't point to any that I
9  can be sure about.  I also can't assert that these
10  are the only ones that may have a problem.
11        These were ones which it seemed clear to
12  me there was -- was an issue based on just a cursory
13  look at them.
14  BY MR. STEESE:
15    Q.  Okay.  In looking at Mr. McClure's
16  March 2020 spreadsheets, did you identify any
17  companies other than Fuze, FreedomVoice, or Sorenson
18  that were at zero in that document that you thought
19  should not be at zero?
20    A.  So I haven't really done an exhaustive
21  analysis of that document at this point.
22    Q.  That wasn't my question, if you've done an
23  exhaustive analysis.
24        My question is, have you identified any
25  that were at zero that you thought should not be at

Page 145

1  zero other than the three that are in your -- this
2  document?
3    A.  I can't recall having done so.
4    Q.  Have you done any research from the time
5  you got Mr. McClure's March 2020 spreadsheet until
6  now to look at any of the companies that are
7  identified at zero in that spreadsheet that you had
8  not previously researched and identified in
9  Exhibit 110?
10    A.  I may have looked at some -- I'm sorry.
11    Q.  You can go.  Please proceed.
12        MR. BENSON:  Did you freeze, Penn?
13        THE WITNESS:  Am I frozen?
14        MR. BENSON:  Okay.  Yeah.  There was no --
15  I'm sorry.  Maybe the court reporter should read
16  that back, but go ahead.
17        (Off the record discussion.)
18        (The record was read by the
19        court reporter, as requested)
20        THE WITNESS:  I may have.
21  BY MR. STEESE:
22    Q.  And what do you recall doing?  Name
23  companies by name, please.
24    A.  I don't recall any.
25    Q.  Not even one?

37 (Pages 142 - 145)

Page 150

1 they sell.  8x8 stated that they still likely have
2 25 to 30 percent of their customers using direct
3 connections to an existing PBX or older
4 infrastructure.  The company's target market is
5 cloud and mobile solutions, but still have customers
6 on older technologies."
7      Do you see that?
8   A.  I do see that.
9   Q.  Do you know if that statement was true in
10 2017?
11      MR. BENSON:  Objection to form.
12      Go ahead.
13      THE WITNESS:  I do not know.
14 BY MR. STEESE:
15   Q.  Do you know if that's true today?
16      MR. BENSON:  Same objection.
17      Go ahead, Penn.
18      THE WITNESS:  Yeah, I don't know.
19 BY MR. STEESE:
20   Q.  To the extent that 8x8 is serving
21 customers via traditional PBXs and the calls are
22 being delivered to customers over those PBXs, end
23 office charges would apply on that type of calling,
24 correct?
25      MR. BENSON:  Objection.  Calls for a legal

Page 151

1 conclusion.
2      But go ahead, Penn.
3      THE WITNESS:  Yeah, I would conclude that
4 if that is -- is so, then -- then those would be
5 eligible for end office switching.
6 BY MR. STEESE:
7   Q.  All right.  Let's focus on these three
8 entities that you focused on where you said some --
9 strike that.
10      Let's focus on the three entities:  Fuze,
11 FreedomVoice and Sorenson that you had issue with
12 that were identified as zero.
13      Are you with me, sir?
14   A.  Yes, I am.
15   Q.  All right.  So let's look at Exhibit PP-7
16 from Exhibit 110.
17      Let me know when you are there, sir.
18   A.  I'm getting it.  It's coming up.
19   Q.  Take your time.
20   A.  I'm there.
21   Q.  And this particular document relates to
22 Fuze, correct?
23   A.  Right.
24   Q.  And if you turn to page 3 of 4 of the pdf,
25 there is materials on the very top that says "Fuze

Page 152

1 Data, Fuze Data REST APIs, Devices, and
2 Connectivity."  Do you see that?
3   A.  Not yet.  I'm looking for it.
4   Q.  Very top.
5   A.  You said which page?
6   Q.  If you look at the pdf, it's page 3 of 4.
7   A.  Okay.  Pdf, page 3.  Yes.
8   Q.  All right.  And if you look at the far
9 right entitled "Connectivity," it says "Connect your
10 sites to Fuze with over-the-top, enhanced OTT,
11 private connectivity, or SD-WAN."  Do you see that?
12   A.  I do see that.
13   Q.  What is SD-WAN?
14   A.  I'm not sure exactly what SD -- WAN is
15 wide area network.  I'm not sure what SD-WAN is in
16 this case.
17   Q.  But WAN -- a WAN connection tends to be
18 using existing facilities, correct?
19   A.  It may or may not.
20   Q.  Define why you say it may or may not if
21 it's a WAN connection.
22   A.  Because a WAN connection could be a
23 connection that already exists or it could be --
24 maybe I misunderstand your question.
25      A WAN I do think of as facilities-based.

Page 153

1 However, I don't know whether it was there before
2 the customer got the service or was something that
3 they had installed.
4   Q.  I understand now.  I was asking if it was
5 facilities-based.  So thank you.
6      But if the WAN facilities are provided by
7 Fuze, then the calls going over the WAN connection
8 could have end office charges associated with them,
9 correct?
10   A.  Yes.
11      MR. BENSON:  Objection.  Calls for a legal
12 conclusion.
13      But go ahead, Penn.
14      THE WITNESS:  Yes, I would say from a
15 technical perspective, yes.
16      (Off the record discussion.)
17      MR. STEESE:  Well, Penn has been echoing.
18 I'm not sure -- and now I am.
19      MR. STEESE:  Justin, if you --
20      MR. BENSON:  It's all me.
21      Let me go on mute for one second and see
22 if that helps.
23      Is that better?
24      MR. STEESE:  Yes, for me it is.
25      (Off the record discussion.)

Page 154

1   MR. STEESE:  You went from an OTT call to
2   a WAN connection right there.
3       MR. BENSON:  Exactly.
4   BY MR. STEESE:
5       Q.  So Dr. Pfautz, what percentage of Fuze's
6   calls are over WAN versus over OTT, do you know?
7       A.  I do not pretend to know that.  I merely
8   note that they do offer an OTT functionality, which
9   is why I brought into question their assignment of
10  the value of zero by Mr. McClure.
11      Q.  So if you're looking at this data, you
12  have information from the web that says some
13  percentage of calling is OTT and some percentage of
14  calling is not.  Then if this is all the information
15  you have, and you're trying to calculate percent
16  OTT, what would you do to try and identify the
17  percent OTT for Fuze?
18      A.  Well, I would not try to calculate that
19  percentage from this information.  I would only take
20  away that it's nonzero.
21      Q.  What more would you try and do to
22  determine what percent is OTT versus percent not?
23      A.  If it were my job to determine that, I
24  would try to contact Fuze and obtain documentation
25  from them about what they believe the percentage is

Page 155

1   to be.
2       Q.  Okay.  Let's turn to FreedomVoice for just
3   a moment.  And I'm going to live on the edge for a
4   second.  Forgive me if this doesn't work.
5       MR. STEESE:  And I'm going to share my
6   screen.  Can you see my screen, everybody?
7       THE WITNESS:  Yeah.
8       MR. BENSON:  We can see your desktop,
9   yeah.
10  BY MR. STEESE:
11      Q.  Okay.  So on the screen is Mr. McClure's
12  March 2020 disclosure.  And we will mark this as
13  Exhibit 113.
14      MR. BENSON:  Chuck, for my clarification
15  sake, are you marking the exhibit, the spreadsheet
16  separately or the entire disclosure?
17      MR. STEESE:  Just the spreadsheet.
18      MR. BENSON:  Okay.
19      THE REPORTER:  Do I have that, Counsel, in
20  what you emailed me?
21      MR. STEESE:  Yes, it's in the folder
22  entitled "McClure and Torres Disclosures," and it's
23  the "McClure Disclosure."  It would be entitled,
24  just to make sure we're on the same page, "Level --
25  "Confidential Level 3 Rule 26(a)(2)(C) Disclosure

Page 156

1   Exhibit 2."  And that becomes Exhibit 113.
2       (Exhibit 113 was marked for
3       identification and attached
4       hereto.)
5   BY MR. STEESE:
6       Q.  I'm assuming that you can see what I'm
7   doing here, Dr. Pfautz, where I am going to do a
8   "find" and I'm going to see if I can find
9   FreedomVoice -- I'm just going to put in "Freedom."
10      Can you see that?
11      A.  Barely.  I see you're entering something,
12  but I can't really -- on my screen it's not very
13  big.  But I'll take your word for it.
14      Q.  And I hit "Freedom," and it says it's
15  nowhere in the new spreadsheet, meaning they're no
16  longer providing call volume at all to Level 3 from
17  2019 or after.
18      Assuming that is true, then your concerns
19  about FreedomVoice would not have any impact on this
20  January -- excuse me -- March 2020 disclosure,
21  correct?
22      A.  If that is true, then the specific concern
23  about FreedomVoice would not apply.
24      When I looked at individual carriers, my
25  attempt was really to get a sense for how much

Page 157

1   reliability I should attribute to the process that
2   Mr. McClure implemented as opposed to necessarily
3   vetting each and every one.  And so I haven't done a
4   lot of individual vetting of the most recent
5   disclosure since my report was submitted.
6       Q.  Okay.  Turning to Sorenson, we briefly
7   discussed them without mentioning their name
8   earlier, correct?  We were talking about they
9   provide hearing impaired-type services, correct?
10      A.  That is correct.
11      Q.  So my question for you is, if Level 3
12  signs up a company -- and I'll say like Sorenson --
13  that unbeknownst to Level 3 is providing some kind
14  of telephony-esque service to its own customer, what
15  duty -- strike that.  "Duty" is the wrong word.
16      What in your view should Level 3 do at the
17  outset to find out which of its enterprise class are
18  providing some kind of telephony-esque function?
19      A.  Well, I would think that at this point in
20  time certainly it might well just ask them that in
21  terms of the service agreement.  I assume that all
22  these services have service agreements.  They were
23  on paper.  That could be a question.  Some
24  companies, I believe, even, you know, prohibit
25  resale service.

40 (Pages 154 - 157)

Page 174

1 Wells Fargo to 100 percent?  Do you see that?
2     A.  I can see that.
3         MR. BENSON:  So objection.  I just want to
4 make clear:  We have disclosed that Mr. Pfautz --
5 Dr. Pfautz, excuse me, is going to be providing
6 testimony regarding his initial report.
7         This is treading, I think, close to a line
8 where we're getting to a point where we're talking
9 about materials that he has not considered in order
10 to put out his opinion and what he's going to
11 testify as to.
12        So I think -- I just want to make aware
13 that AT&T's position is that this is getting close
14 to where we would draw the line as to what's within
15 the scope and what's not within the scope of
16 relevance here.
17        MR. STEESE:  I completely disagree with
18 that, but that's okay.
19    Q.  Do you see, having made 100 percent of the
20 above the line, meaning those that are identified as
21 potential OTT providers, making them all 100 percent
22 except for the cable companies and Wells Fargo and
23 adjusting Fuze and Sorenson to 100 percent -- the
24 two companies that you've identified in your report
25 that were at zero that gave you concern -- it

Page 175

1 elevates the OTT percentage only to 21 percent?  Do
2 you see that?
3     A.  I see that what you did elevated it to
4 21 percent.
5     Q.  Do you have any evidence that the
6 percent -- Level 3's percent OTT is greater than
7 21 percent?
8     A.  I have no specific evidence and made no
9 claim about what the value of the OTT would be
10 properly calculated with verifiable data.
11        I see here you've made some assumptions
12 about which companies should be bumped up.  Again, I
13 don't know that some of those zeros shouldn't be
14 high -- should be above zero.
15        I don't know that some of the cable
16 companies shouldn't be higher since I don't
17 understand all of the arrangements that are going on
18 there.
19        So I understand the math of what you did
20 and the way that it works out, but that's kind of
21 tangential to the focus of my report which was an
22 evaluation of the methodology and its reliability
23 and how I thought that fit in, in terms of what
24 carriers had a right to expect that they were being
25 billed based on a fact.

Page 176

1     Q.  Okay.  So let's change the cable companies
2 to 100 percent to...
3         MR. BENSON:  I think -- so we're going to
4 have a standing objection to this line of
5 questioning, but that's fine.
6 BY MR. STEESE:
7     Q.  Do you see that I changed the cable
8 companies to 100 percent?  That changes the OTT to
9 23 percent.
10        So given -- do you have any evidence that
11 Level 3's percent OTT is greater than 23 percent?
12     A.  I have no evidence of that.  But I have no
13 evidence that it's 23 percent or lower because,
14 again, as I indicated, you know, you've made some
15 assumptions here in this analysis, and I'm afraid I
16 can't necessarily agree with this.
17     Q.  What assumptions do you think have been
18 made?
19     A.  You made the assumption that anything that
20 I couldn't dispositively show as above zero that was
21 shown as zero remained zero.
22     Q.  But you've also made the assumption, sir,
23 that 100 percent of AT&T's enterprise class
24 customers are at zero.
25        So why are you unwilling to accept that

Page 177

1 Level 3's enterprise class customers are zero, but
2 you're willing to accept that AT&T's are zero?
3         MR. BENSON:  Objection.  Misstates the
4 testimony.
5         Go ahead.
6         THE WITNESS:  Yeah.  I didn't say I
7 assumed that AT&T's were necessarily at zero.  I
8 don't ever recall saying -- stating that.
9 BY MR. STEESE:
10    Q.  Sure you did because you said AT&T's
11 methodology was reasonable and AT&T assumed that
12 every one of its enterprise class was zero.  So you
13 have, therefore, made the assumption that that's
14 reasonable.
15        So help me understand why it's reasonable
16 for AT&T to create an OTT percentage based on the
17 assumption that its enterprise class are zero, but
18 it's not fair for Level 3 to assume the same?
19        MR. BENSON:  Objection.
20        THE WITNESS:  Well, I --
21        MR. BENSON:  Objection.  Misstates
22 testimony.  Argumentative.
23        And, again, you know, this is -- Level 3
24 could ask these questions after a rebuttal report is
25 out, but this is not -- you know, this is not within

45 (Pages 174 - 177)

Page 198

1 on them. The "OTT traffic" in there confuses me a
2 little bit.
3 BY MR. STEESE:
4     Q.   Okay.  Then if you look at little
5 Roman iv, about halfway down -- a third of the way
6 down, I guess -- "In the event the OTT declaratory
7 order is overturned, either in whole or in part" --
8 dot, dot, dot -- I'm not going to talk about final
9 decision.  I'm not trying to debate that -- it says
10 "Level 3 will refund, within 30 days, 50 percent of
11 the disputed OTT charges beginning with June 2015
12 through the date on such final appellate order
13 becomes final."  Do you see that?
14     A.   I see that.
15     Q.   And so is it your understanding that the
16 reason why you are giving opinions about the proper
17 percent -- strike that.
18          Before we get there, one last question.
19          The very last sentence of Roman iv says
20 "The parties agree that any billing and payments for
21 OTT traffic exchanged after such final appellate
22 order becomes final shall be in compliance with the
23 terms of that order."  Do you see that?
24     A.   I see that.
25     Q.   So from June 1, 2015, to the final order,

Page 199

1 Level 3 has to refund 50 percent end office charges,
2 correct?
3          MR. BENSON:  Objection to the extent that
4 that calls for a legal conclusion.  And this is
5 outside the scope of his report but --
6 BY MR. STEESE:
7     Q.   I'm not talking about what a final order
8 means.  I'm just trying to get to the foundation to
9 ask a question about his opinions.
10          So between 2015 -- June 1, 2015, and the
11 date of the final order, Level 3 would refund
12 50 percent of the disputed OTT charges, correct?
13          MR. BENSON:  Respectfully, same objection,
14 but you can go ahead and answer, Penn.
15          THE WITNESS:  I think that's what it's
16 saying.  You know, I haven't wrestled with this
17 language, but it sounds like that this is what it's
18 saying.
19 BY MR. STEESE:
20     Q.   And after the final order issues, Level 3
21 is supposed to bill end office charges in accordance
22 with the final decision, correct?
23          MR. BENSON:  Objection.  Calls for a legal
24 conclusion.
25 BY MR. STEESE:

Page 200

1     Q.   Is that your understanding?  I'm just
2 reading this right now.
3          MR. BENSON:  Same objection.
4          Go ahead.
5          THE WITNESS:  Yeah, that apparently is
6 what it says.
7 BY MR. STEESE:
8     Q.   So is the reason that you are giving
9 opinions, Dr. Pfautz, on the process for calculating
10 percent OTT to determine what percentage of traffic
11 Level 3 should be billing end office charges on or
12 not on, depending on what category you're talking
13 about, as a result of the FCC's final order?
14          MR. BENSON:  Objection.  Calls for a legal
15 conclusion.
16          You can answer.
17          THE WITNESS:  Okay.  Yeah, I -- I -- I'm
18 not sure I, you know, viewed my assignment as
19 specific, you know.  According to the final order it
20 was, you know, a process where estimating percentage
21 of OTT and denied -- you know, what was my
22 evaluation of Level 3.
23          THE REPORTER:  I'm sorry, I did not get
24 the last part.  I have "estimating the percentage of
25 OTT and denied" --

Page 201

1          THE WITNESS:  Could you read a little bit
2 more from the beginning?  I'll where I left off.
3          (The record was read by the
4           court reporter, as requested)
5          THE WITNESS:  And the -- I forgot what I
6 was going to say, but -- let me try to restate it
7 again.
8     I view my assignment as evaluate the
9 process Level 3 used to estimated OTT.  I did not
10 particularly say based on this order or whatever.
11 It was, you know, the process, was what I was
12 focused on.
13          I understood that the companies had agreed
14 to a certain settlement framework that -- you know,
15 who owed who how much of what, depending on some
16 other circumstances.  But those circumstances were
17 beyond, you know, what I was evaluating.
18 BY MR. STEESE:
19     Q.   So did you look at the settlement
20 agreement subparens 3 and 4 at all for purposes of
21 creating your expert report?
22     A.   I -- I looked at them really just in terms
23 of, okay, I understand what was the back and forth
24 between the companies.  Beyond that, didn't really
25 figure into the report.

51 (Pages 198 - 201)

Page 214

1
2
3
4   (Confidential portion bound under separate cover)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 215

1        (Whereupon non-confidential testimony
2        was resumed.)
3   Q.  One moment.  Look at paragraph 8 of
4   Exhibit 110.
5   A.  Now, what is -- what is -- which one is
6   that?
7   Q.  Your report.
8   A.  Paragraph 8.
9   Q.  Are you there, sir?
10   A.  Yes.
11   Q.  Your -- you say, "My opinion is that the
12   method AT&T/TCG used to estimate over the top VoIP
13   traffic is reasonable."
14        So you actually did give an opinion about
15   the method AT&T used to estimate over the top
16   traffic, correct?
17   A.  I guess you could read it that way.  And
18   I -- in subsequent paragraphs, I tend to clarify
19   what I looked at and what I thought was reasonable.
20   Particularly if you look at paragraph 9 for those
21   services, my opinion is AT&T can properly bill end
22   office switching access service.
23        And then a couple of the products that I
24   said there were questions, and then I thought
25   that -- that AT&T had been reasonable in their

Page 216

1   billing by not -- by electing not to bill any of the
2   traffic for those services.
3        And so to the degree -- you know, I never
4   actually discuss a specific estimate of AT&T's over
5   the top percentage or the way in which they do that.
6   Q.  So let's unpack that a little bit and make
7   sure I understand.
8        So you are really not giving an opinion
9   about AT&T's methodology for estimating OTT,
10   correct?
11   A.  Correct.
12   Q.  What you are doing is you're looking at
13   products that have the potential of having nomadic
14   TN and find it's reasonable for AT&T to not bill end
15   office on that category of calling, correct?
16        MR. BENSON:  Objection to the extent that
17   it misstates both the testimony and the report.
18        But go ahead.
19        THE WITNESS:  Yeah.  What I said was that
20   the way in which AT&T decided basically not to bill
21   for services that could include nomadic TNs was a
22   reasonable approach and conservative, in fact.
23   BY MR. STEESE:
24   Q.  But you also -- look in paragraph -- that
25   states -- excuse me, in paragraph 9, "In most cases,

Page 217

1   AT&T/TCG provide enterprise services by deploying a
2   facility to the premises of the end users, i.e., the
3   enterprise customer.  For those services, my opinion
4   is that AT&T/TCG can properly bill end office
5   switching access service.  This is so even though in
6   some cases it may be possible for an employee of the
7   enterprise customer to obtain remote access and
8   place and receive calls over the enterprise -- AT&T
9   enterprise service."
10        So you give that opinion as well, correct?
11   A.  That's -- you read the words that were in
12   my report.
13   Q.  So when -- so it appears to me in reading
14   your report that what you're saying is if it's an
15   enterprise class customer to whom the carrier --
16   here AT&T -- has deployed facilities and you have no
17   reason to believe that that carrier is providing
18   some telephony-esque service, it's reasonable to
19   bill end office switching on those calls; is that
20   true?
21   A.  That's what I said.
22   Q.  And is it your understanding that AT&T's
23   customers -- enterprise class customers, better
24   said -- you, Dr. Pfautz, have no reason to believe
25   that any of those customers are providing enter- --

55 (Pages 214 - 217)

Page 218

1  excuse me -- are providing telephony-esque services
2  and, therefore, it's appropriate for AT&T to bill
3  end office switching on those -- for those
4  enterprise class customers?
5       MR. BENSON:  Objection.  Form.
6       Go ahead.
7       THE WITNESS:  Yes.
8  BY MR. STEESE:
9       Q.  And you make that assumption even though
10  you've never looked at the list of customers that
11  AT&T provides service to?
12      A.  Yes.
13      Q.  And when you look at Level 3, the
14  difference in data you have between Level 3 and AT&T
15  is Level 3 has provided you with a list of its
16  largest customers and the volume of traffic
17  associated with that, correct?
18      A.  Level 3 has provided that.
19      Q.  And your critique of Level 3's methodology
20  is based upon your studying the individual customers
21  to whom Level 3 has a relationship -- with whom
22  Level 3 has a relationship, correct?
23      A.  That's an incomplete characterization.
24  That was a part of it but --
25      Q.  Okay.  No, no.  Fair enough.  I'll stop

Page 219

1  there.  I'm happy with a part of it.
2       MR. BENSON:  Are you done answering, Penn?
3       THE WITNESS:  I am.
4       MR. BENSON:  You didn't answer the
5  question, but go ahead.
6       THE WITNESS:  Oh, oh.  Did -- I was going
7  to say some more, but I thought Mr. Steese didn't
8  want me to say anything more.
9       MR. BENSON:  Well, you're entitled to
10  answer the question.  So if you feel like you need
11  to answer more, you're entitled to do so.  If not,
12  you don't have to.
13      THE WITNESS:  What I wanted to say was
14  that the major focus of my critique was on the
15  process through which Level 3 came up with the
16  estimates of the percent OTT for customers for which
17  there was every reason to believe and Level 3 did
18  believe that OTT was involved.
19      That was probably a bigger part of my
20  critique.  I didn't -- I can't say that I paraded
21  the pieces in my critique, but that was the biggest
22  part rather than the fact that I was able to find
23  some customers that clearly seemed to be engaged in
24  a carrier role rather than just an ordinary
25  enterprise customer.  That was more frosting on the

Page 220

1  cake, additional concern.
2  BY MR. STEESE:
3       Q.  But you've seen that as soon as we
4  identify -- put 100 percent in all of those
5  questionable cases where Level 3 had reason to
6  believe they may be providing some amount of OTT
7  traffic, it only goes to 21 percent OTT, correct?
8       MR. BENSON:  Objection.  Foundation.
9       You know, not looking at the entire
10  spreadsheet, we -- you picked out some customers and
11  you changed the numbers, but you haven't laid the
12  foundation for that.  But that's fine.  Go ahead.
13      MR. STEESE:  I have laid the foundation,
14  very respectfully.  I went through every single one
15  that was not a zero, and other than Wells Fargo made
16  it 100 percent.
17      MR. BENSON:  And then there was -- we can
18  have this debate, but there's an entire list of
19  customers lower on the spreadsheet that also affect
20  the 21 percent -- or the factor that weren't
21  manipulated.  So I don't think you've laid the
22  foundation, but that's my objection.
23      MR. STEESE:  Again, I'll put on the record
24  Dr. Pfautz just said that if you look at the
25  carriers that Level 3 has "every reason to believe"

Page 221

1  or provide some amount of OTT, his primary issue was
2  with the methodology we used for determining percent
3  OTT.  So everything that's not zero was his focus.
4       Q.  That's what you were just talking about;
5  isn't that true, Dr. Pfautz?
6       MR. BENSON:  I object to that
7  characterization of the testimony, and that's --
8  that's what I'm going to say about that.  That's not
9  what he said, but go ahead.
10      If there's a question there, which I don't
11  think there was, but just --
12      MR. STEESE:  I asked the question.
13      MR. BENSON:  -- ask the question.
14  BY MR. STEESE:
15      Q.  Dr. Pfautz, your focus was on those
16  customers that you said Level 3 had "every reason to
17  believe" for providing some carrier-like function,
18  correct?
19      A.  That was not quite what I think I said.
20  What I was saying was it was the process
21  of estimation itself that was called into question.
22  There's another issue of was that process carried
23  out for all the customers that it perhaps should
24  have been, and that's a separate issue.  But -- and
25  I can't, you know, comment on, you know, your

56 (Pages 218 - 221)

Page 234

1    MR. BENSON:  And I think somehow I got an
2  email for -- with the link; so you should have my
3  email address, but I can give it to you now if you
4  need that.
5    (At the time of 3:05 p.m., the deposition
6    was concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 236

1       Veritext Legal Solutions
2       290 W. Mt. Pleasant Ave. - Suite 3200
        Livingston, New Jersey 07039
3       Toll Free: 800-227-8440  Fax: 973-629-1287
        erratas-cs@veritext.com
4  May 1, 2020
5  Penn Pfautz, Ph.D.
6
   Case Name: AT&T Corporation v. Level 3 Communications, LLC
7
   Veritext Reference Number: 4083362
8
   Witness:  Penn Pfautz     Deposition Date: 4/28/2020
9
   Dear Sir/Madam:
10
   Enclosed you will find a transcript of your deposition.
11
   As the reading and signing have not been expressly
12
   waived, please review the transcript and note any
13
   changes or corrections on the jurat/errata sheet
14
   included, indicating the page, line number, change and
15
   reason for the change. Sign at the bottom of the sheet
16
   in the presence of a notary except in California where
17
   you are signing under penalty of perjury and email
18
   the errata sheet back to us at the address shown above.
19
   If the jurat is not received within thirty days of your receipt of
20
   this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
   Encl.
24  Cc:  Charles Steese, Esq.
25    Justin Benson, Esq.

Page 235

1      CERTIFICATE OF REPORTER
2    I, ASHALA TYLOR, CSR No. 2436, in and for the State
3  of California, do hereby certify:
4    That the foregoing proceedings were taken before me
5  at the time and place herein set forth; that any
6  witnesses in the foregoing proceedings, prior to
7  testifying, were placed under oath; that a verbatim
8  record of the proceedings were made by me using machine
9  shorthand which was thereafter transcribed under my
10  direction; further that the foregoing is an accurate
11  transcription thereof.
12    That before the completion of the deposition,
13  review of the transcript was not requested.
14    I further certify that I am neither financially
15  interested in this action nor a relative or employee of
16  any attorney or any of the parties hereto.
17    In compliance with Section 8016 of the Business and
18  Professions Code, I certify under penalty of perjury
19  that I am a Certified Shorthand Reporter with
20  California License No. 2436 in full force and effect.
21  WITNESS my hand this 30th day of April, 2020.
22
23
24
25    Ashala Tylor, CSR #2436, RPR, CRR, CLR

Page 237

1   AT&T Corporation v. Level 3 Communications, LLC
2        Penn Pfautz
3      E R R A T A
4      - - - - -
5  PAGE  LINE   CHANGE
6  ___ ___ _____
7  Reason:_____
8  ___ ___ _____
9  Reason:_____
10  ___ ___ _____
11  Reason:_____
12  ___ ___ _____
13  Reason:_____
14  ___ ___ _____
15  Reason:_____
16  ___ ___ _____
17  Reason:_____
18  ___ ___ _____
19  Reason:_____
20  ___ ___ _____
21  Reason:_____
22  ___ ___ _____
23  Reason:_____
24  ___ ___ _____
25  4083362

60 (Pages 234 - 237)

Page 238

1   AT&T Corporation v. Level 3 Communications, LLC

2          Penn Pfautz

3      ACKNOWLEDGMENT OF DEPONENT

4          I, _____, do

5   hereby certify that I have read the foregoing

6   pages and that the same is a correct

7   transcription of the answers given by

8   me to the questions therein propounded,

9   except for the corrections or changes in form

10  or substance, if any, noted in the attached

11  Errata Sheet.

12

13  _____      _____

14  DATE            SIGNATURE

15

16

17

18

19

20

21

22

23

24

25  4083362

Veritext Legal Solutions

800-567-8658                                      973-410-4098

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.