IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 18-cv-00112-RM-MEH

AT&T CORP.,

    Plaintiff / Counter Defendant,

v.

LEVEL 3 COMMUNICATIONS, LLC,

    Defendant / Counter Claimant,

and

BROADWING COMMUNICATIONS, LLC,
GLOBAL CROSSING TELECOMMUNICATIONS, INC., and
WILTEL COMMUNICATIONS, LLC,

    Counter Claimants,

v.

TELEPORT COMMUNICATIONS GROUP, INC.,

    Counter Defendant.

---

### LEVEL 3'S TRIAL BRIEF

As all parties acknowledge, it is now settled that AT&T breached the parties' 2015 Settlement Agreement by withholding payment from Level 3 on the OTT Dispute the Agreement was supposed to resolve. The two principal questions remaining for trial are (1) how much did AT&T withhold on the OTT Dispute, and (2) do late payment charges ("LPCs") or statutory interest apply to the amounts AT&T withheld.

The evidence will show that through May 2021, AT&T withheld $8,217,434 (Ex. A-52, Col. J), when it should have withheld only $795,279 (*id.* at Col. K). The reason: AT&T's mechanized dispute process cannot distinguish between charges Level 3 assesses for use of its tandem switches—which AT&T acknowledges it should pay—and those it assesses for use of end office switches. To compound the problem, AT&T withheld 65% of these charges when, at best, only 21% of Level 3's calling was OTT. Given that AT&T improperly withheld payment on $7.4 million of tariff charges, the filed-rate doctrine obligates AT&T to pay tariffed LPCs on these withholdings. While AT&T claims LPCs are inappropriate, this argument is belied by the fact that when AT&T entered into the Settlement Agreement (Ex. A-1), it agreed to pay Level 3 LPCs. If LPCs were not mandatory, AT&T would not have willingly agreed to pay them to get a dispute resolved. Thus, through May 2021, AT&T owes Level 3 $2,095,536 in LPCs (Ex. A-52, Col. I) for total damages of $9,517,690 (*id.* at Col. L), with additional damages accruing each month.[1] Level 3 respectfully requests that the Court award it these damages, and order AT&T to stop withholding payments from Level 3 for OTT calling going forward.

## I. THE SETTLEMENT AGREEMENT REQUIRED AT&T TO PAY THE CHARGES IT WITHHELD FOR THE OTT DISPUTE.

In 2015, the parties executed a Settlement Agreement in an effort to resolve what they called the "OTT Dispute." Ex. A-1. The Agreement defined the "OTT Dispute" by reference to the fact that AT&T had "disputed and not paid Level 3 end office switching charges, as set forth in more detail in [an accompanying exhibit], on traffic originating from and/or terminating to the local exchange service end-user customers served by providers of over-the-top voice over

---

[1] The parties have stipulated that these damages should be reduced by $517,147. This number does not change month to month.

Internet protocol ('OTT') services." *Id.* at 1. In the Agreement, AT&T agreed to pay a percentage of the "usage and late payment charges billed by Level 3 for the traffic exchanged by the Parties through March 2015 that is the subject of the OTT Dispute." *Id.* § 1(a)(i)(A). AT&T also agreed to "pay Level 3 its applicable switched access tariffed rate for OTT traffic" thereafter. *Id.* § 1(a)(ii). The Agreement also spelled out the partial refund provisions that were the focus of the Court's March 25, 2021 Order (ECF No. 204). *See id.* § 1(a)(iv).

As the Court held, this refund provision did not take effect until the FCC's December 2019 OTT Order became final on February 19, 2020, well after AT&T resumed withholding for the OTT Dispute. AT&T also overestimated the amount of Level 3's traffic that was OTT, which this Court held to be no more than 21%. Compounding that breach, AT&T withheld far more than 65% of the end office charges Level 3 actually assessed. AT&T thus breached the Agreement by withholding too early and withholding too much. The principal fact question for trial is exactly how much AT&T over-withheld from Level 3 on the OTT Dispute.

## II.   LEVEL 3'S DAMAGES THROUGH MAY 2021 TOTAL $9,517,690 AND CONTINUE TO GROW EACH MONTH.

Level 3 has answered that question with exact precision. *See* Exs. A-52 (damages through May 2021) and A-53 (damages through June 2021). Level 3's employee and expert witness Jennifer Torres, using data provided by Level 3 employee Melissa Kellow, will show the Court the difference between what Level 3 has charged and what AT&T has paid for usage-based switched access charges over the relevant period of time. These calculations account for every usage-based dispute AT&T has levied against Level 3's charges, thus showing to the penny the exact amount AT&T withheld for the OTT Dispute. Level 3 has issued proper credits to account for the portion of its traffic that is OTT, and made proper adjustments to account for tandem

3

switching charges the parties agree Level 3 may assess in lieu of end office charges on OTT calls; indeed, neither the OTT credit nor the tandem add-back are contested. Level 3 also calculated the LPCs required under its tariff from AT&T's failure to pay the tariff charges. The resulting figures show that Level 3's damages through May 2021 totals $9,517,690 (Ex. A-52)—an amount that continues to grow as AT&T continues to withhold payment as time passes.

### III. AT&T'S CHALLENGES TO LEVEL 3'S DAMAGES CALCULATIONS FAIL.

AT&T raises two principal challenges to these calculations. First, AT&T contends that it should not be required to pay back all that it withheld for the OTT Dispute (and would have paid had it complied with the Agreement), but instead should have to repay only the portion of its withholding it attributes to specific tariffed elements of end office switched access. Second, AT&T claims it is not required to pay LPCs, which as of May 2021 total $2,095,536. Neither challenge complies with the plain directives of the Settlement Agreement or the law.

#### A. Level 3's Damages Include All Charges the Settlement Agreement Required AT&T to Pay.

AT&T claims that it intended to withhold payment on no more than 65 percent of Level 3's tariffed end office access charges. But that is not what it did. For years, AT&T has known that its mechanized systems could not distinguish end office charges from tandem charges. *See, e.g.*, Ex. A-7 at 4; Ex. A-8 at 5. That inability continues to this day. *See* Exs. 78–81. In fact, the figures AT&T uses in its damages calculations for Level 3's end office minutes of use and charges come from data AT&T obtained only recently, when Level 3 provided the data in this litigation. *Compare* Ex. A-24 (Level 3's March 2021 damages analysis) with Ex. 76 (AT&T's damages analysis). AT&T could not have withheld a specific percentage of Level 3's tariffed end office charges when it never took the time to calculate what charges were end office charges.

4

In reality, AT&T's withholdings for the OTT Dispute far exceed what AT&T claims it meant to withhold, and documents from AT&T show AT&T knew it was over-withholding all along. Since AT&T could not distinguish tandem from end office charges, AT&T withheld payment on all of these charges, well in excess of 65 percent of the end office charges. There are multiple ways Level 3 will prove that this is what AT&T has done:

- First, AT&T's damages calculations simply calculate 65 percent of Level 3's end office charges. Adding 65 percent of certain tandem charges results in a figure that matches almost exactly to Level 3's calculations of AT&T's total withholdings. This holds true even as additional months of charges are added.

- Second, in 2017, there was another dispute between the parties, known as the "LRN Dispute," where AT&T likewise disputed Level 3's end office charges on a different category of traffic. *See* Ex. A-14. Instead of limiting its withholding to end office charges relating to that traffic (which totaled $7.7 million), AT&T over-withheld by over $4 million. The ratio of what AT&T over-withheld for the LRN Dispute matches almost exactly with what it over-withheld for the OTT Dispute. This shows that AT&T is doing with the OTT Dispute the same thing it did in the past with other end office disputes.

- Finally, Exhibit A to the Settlement Agreement identifies charges AT&T withheld from payment as part of the "OTT Dispute" the Agreement was intended to resolve. These unpaid balances—the very withholdings that defined the "OTT Dispute"—included withholdings on payment for both end office and tandem charges.

AT&T thus over-withheld for the OTT Dispute by assuming too high a percentage for Level 3's OTT traffic, and by withholding payment on charges that should have never been withheld for

5

any reason. Had AT&T complied with the Agreement, it would have paid all these charges.

AT&T argues that the difference between what it claims it withheld for the OTT Dispute and what it actually withheld relates to other disputes. The fact that AT&T could not distinguish end office from tandem charges and withheld payment on both shows this cannot be true. AT&T also never identified any dispute besides the OTT Dispute as a basis for these withholdings (though it is required to do so under Level 3's tariff). AT&T's attempt to identify other bases for the withholdings are after-the-fact excuses to justify conduct for which it has no explanation.

And so AT&T argues that it does not *need* an explanation: Level 3's damages, AT&T claims, are limited to end office charges, such that Level 3 cannot recover what AT&T has withheld for the OTT Dispute if the withholdings relate to other charges such as tandem charges. That argument ignores the clear terms of the Settlement Agreement. The Agreement defines "OTT Dispute" by reference to "end office switching charges" on which AT&T withheld payment, as listed in detail in the accompanying exhibit. *See* Ex. A-1 at 1. These withholdings included all amounts AT&T withheld for the dispute, which, as Level 3's witnesses will show, included payments for tariffed charges for both end office and tandem switched access. Thus, the "end office switching charges" the Settlement Agreement identifies as comprising the "OTT Dispute" include everything AT&T withheld on the basis that it was not required to pay end office charges for OTT traffic. There is no support for the distinction AT&T tries to draw.

In sum, AT&T withheld the charges at issue for the OTT Dispute. Had it complied with the Settlement Agreement it would have paid those charges. It breached the Agreement by failing to pay the charges, and those withholdings are therefore included in Level 3's damages. All Level 3 seeks in this case is an award in the amounts AT&T withheld from payment on the

OTT Dispute that it should not have withheld. This is fundamentally fair and in compliance with the Settlement Agreement that AT&T knowingly breached.

### B. AT&T Must Pay Late Payment Charges ("LPCs") on Amounts it Wrongfully Withheld.

Second, AT&T claims it is not required to pay LPCs, which as of May 2021 total $2,095,536. But the plain language of the Settlement Agreement required AT&T to pay all tariffed rates—including both usage charges and LPCs. Ex. A-1, § 4.2.6. AT&T's claims that the parties agreed not to make the tariffed rate subject to the late-payment provisions of the Tariff would afford AT&T preferential treatment, exempting AT&T from provisions of the Tariff that apply to all other customers that purchase services under the Tariff. The Agreement says nothing of the sort. In fact, the opposite is true: the Settlement Agreement expressly includes late payment charges within the scope of the OTT Dispute.[2] Furthermore, the filed-rate doctrine does not allow such preferential treatment. The Communications Act expressly states that Level 3 cannot "charge, demand, collect, or receive a greater or less or different compensation . . . than the charges specified in the schedule then in effect." 47 U.S.C. § 203(c). The Settlement Agreement thus does not, and could not, excuse AT&T from its obligations under the Tariff.

In addition, under New York law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y. C.P.L.R. 5001(a). New York law applies a nine-percent default rate, but that default rate may be displaced by any rate "provided by statute." N.Y. C.P.L.R. 5004. Under the filed-rate doctrine, "tariffs have the force and effect of a

---

[2] Exhibit A contains a list of charges totaling $20,483,518.40, which it describes as "Total OTT Dispute." It is undeniable that this amount includes late payment charges, because 75% of the Total OTT Dispute is $15,362,638.80, which AT&T agreed to pay Level 3, and the Agreement specifically states includes LPCs. Ex. A-1, ¶ 1(a)(i)(A).

7

federal statute." *Delaware & Hudson Ry. Co. v. Offset Paperback Mfrs., Inc.*, 126 F.3d 426, 427 (2d Cir. 1997). In addition, if the applicable contract provides a different rate, that rate "is the correct rate of prejudgment interest." *Oldcastle Precast, Inc. v. Liberty Mut. Ins. Co.*, 838 F. App'x 649, 651 (2d Cir. 2021). The tariff, which defines the parties' relationship, sets a rate for late payment charges of 1.5 percent per month, or eighteen percent per annum. *See* Ex. A-3 § 4.2.6. AT&T therefore must pay LPCs at this rate (or at least the otherwise applicable nine-percent rate), whether the LPCs are considered direct damages or a form of interest.

### IV. AT&T's Affiliate Improperly Assessed End Office Charges on OTT Traffic.

Finally, Level 3's claims include claims against AT&T's affiliate, TCG, which was itself assessing end office charges on OTT calling in violation of the recent FCC's December 2019 OTT decision and which the FCC made retroactive.

The Parties' stipulations resolve most of the factual issues underlying these claims. Level 3 began withholding partial payment to TCG in July 2019 on the grounds that TCG was assessing end office charges on OTT calls. *See* ECF No. 262 at 16 (Stipulation No. 13). TCG acknowledges that, until Level 3 filed these counterclaims and raised these disputes, TCG was not aware that it was assessing end office charges on OTT calls. *Id.* (Stipulation No. 14). Level 3's counterclaims caused AT&T and TCG to conduct an investigation, during which they discovered that AT&T had two OTT services on which TCG assesses end office charge. *Id.*; *see also* Ex. A-57 (deposition of A. Burgess). TCG therefore needed to issue credits—again, a fact AT&T and TCG would have never known but for Level 3's counterclaims. TCG thus began issuing credits for calls associated with these two services in 2019. *Id.* Rather than contest whether other AT&T or TCG calls were also OTT, Level 3 agreed that the final award of

8

damages it receives from AT&T under Count I of its breach of contract counterclaim may be reduced by the difference between the credits TCG issued and what Level 3 withheld in payment: $517,147.23. *Id.* (Stipulation No. 15).

Level 3 is entitled to attorney's fees expended as part of these efforts. Under 47 U.S.C. § 206, anyone injured by a common carrier's unlawful practices is entitled to the resulting damages "together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery." Level 3 had to bring this litigation to compel TCG to stop assessing these unlawful charges. But for this lawsuit, TCG would not have even realized it was billing end office charges on OTT calls. *See* Exs. A-47, A-48. There was also period of years where Level 3 paid the charges before disputing them and withholding payment. Ex. A-32. These payments establish that Level 3 was injured by TCG's unlawful practices and is entitled to an award of attorney's fees. *See Douglas v. Talk Am., Inc.*, No. CV0603809GAFRCX, 2010 WL 11508339, at *5 (C.D. Cal. Oct. 19, 2010) ("Because of this violation, Plaintiff had to pay additional fees in his monthly phone bill. Therefore, Plaintiff has sufficiently proven that he has sustained damages in consequence of the Section 201(b) violation").

## V. EVIDENTIARY ISSUES THAT MAY ARISE AT TRIAL.

As this Court determined, AT&T witness Allison Miller may testify as a fact witness, but not as an expert witness. *See* ECF No. 263. This ruling will preclude Ms. Miller from offering at least two different kinds of opinions beyond the scope of lay testimony. First, a fact witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . rationally based on

9

the witness's perception." Fed. R. Evid. 701. "[I]f the opinion is based, even in part, on matters perceived by other agents and relayed to the witness, her opinion may be rejected." Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6254 (2d ed.). In numerous instances it will be clear that Ms. Miller's testimony is founded not on her own perception, but on data provided by others. This testimony exceeds the scope of permissible lay testimony and should be excluded.

Second, a fact witness's testimony, even when rationally based on the witness's perception, must not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). This rule "ensures that a party will not evade the expert witness disclosure requirements . . . by simply calling an expert witness in the guise of a layperson." Fed. R. Evid. 701, Notes of Advisory Committee on Proposed Rules; *see also U.S. v. Kelsey*, 917 F.3d 740, 746–47 (D.C. Cir. 2019) (DNA analyst permitted to testify about physical work performed in taking samples, loading them into analyzer, and transmitting data to expert; analyst "testified as one of multiple lay witnesses who accounted for the chain of custody and physical processing of the DNA evidence, as distinct from its expert analysis").

## CONCLUSION

Level 3 respectfully requests that the Court order that judgment in favor of Level 3 be entered against AT&T in the amount of $9,517,690, an amount to be supplemented to include additional withholdings by AT&T on charges and late payment charges on these withholdings on invoices for June 2021 and thereafter. Level 3 also requests that the Court order AT&T to stop withholding payments from Level 3 for OTT calling. Finally, Level 3 requests that judgment be entered in favor of Level 3 against TCG, and that TCG be ordered to compensate Level 3 for its reasonable attorney's fees and costs in an amount to be determined following trial.

Respectfully submitted this 7th day of July, 2021.

By: /s/ *Charles W. Steese*
Charles W. Steese, #26924
Douglas N. Marsh, #45964
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com

*Attorneys for Defendant/Counterclaimants Level 3 Communications, LLC, Broadwing Communications, LLC, Global Crossing Telecommunications, Inc., and WilTel Communications, LLC*

## CERTIFICATE OF SERVICE

I, Charles W. Steese, hereby certify that on July 7, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Rebecca B. DeCook
Andrew T. Flynn
Moye White LLP
1400 16th Street, 6th Floor
Denver, CO 80202-1027
becky.decook@moyewhite.com
andrew.flynn@moyewhite.com

Michael D. Warden
Michael J. Hunseder
Justin A. Benson
Joshua W. Moore
SIDLEY AUSTIN LLP
1501 K ST NW
Washington, DC 20005
Telephone: (202) 736-8000
mwarden@sidley.com
mhunseder@sidley.com
jbenson@sidley.com
joshua.moore@sidley.com

*Attorneys for Plaintiff AT&T Corp.*

/s/ *Charles W. Steese*
Charles W. Steese

1