# Exhibit 2

1

2          MR. WARDEN:  Your Honor we will be calling Alison

3   Miller who will be testifying remotely, we did a test drive, on

4   Tuesday, afternoon.

5          THE COURT:  I don't really care.  All that I mean by

6   that is it worked on Tuesday it worked to Tuesday, doesn't help

7   me on Thursday.  But what I would tell you is this, I know we

8   started at 1:30, what I want to do is take a break.  I want you

9   to go until -- what we're going -- what I'm going do is I'm

10  going to go until 3 o'clock.  I want you back at five of three,

11  and Ms. Pearson in that five minutes, between five of 3 and 3

12  o'clock, you can try and get the witness on the video.  You can

13  try a little earlier, I just don't want here kind of hanging

14  around looking at an empty courtroom wondering why are all of

15  those people wandering so if we can kind of be back in place,

16  we get err on the line when you get her on the line I come out

17  at 3 o'clock then we will start going from there.

18          MR. STEESE:  One question Your Honor, if you don't

19  mind.  I know how this works with zoom, is the witness going to

20  be able to see exhibits on the screen.  I just don't know.

21          THE COURT:  I have been told that the answer is yes, I

22  have also been told that it might glitch, because, you never

23  know.  So the hope and the expectation is -- yes.

24          MR. WARDEN:  And Your Honor, the witness also has

25  clean exhibit books with her.

1          THE COURT:  Okay.  All right.  Recess.

2          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

3       (Recess at 2:40 p.m.)

4    (In open court at 3:05 p.m.)

5          THE COURT:  Please be seated.  I don't have her on my

6    screen okay.  We're back, before we proceed, I understand,

7    counsel, you want to raise something with me, let me just deal

8    with a couple of things, and that is, on the record my

9    understanding.  My understanding is that obviously, I can see

10   the witness, my understanding is that the witness can see us,

11   however, when an exhibit is put on the screen, she will then

12   not be able to see us, that is not important to me, in the

13   sense of I'm not sure that that poses some impediment going

14   forward.  My understanding is that both sides are aware of

15   this, and I don't have any reason to view this as an issue

16   unless somebody else does.

17         MR. STEESE:  Your Honor I was made aware that she

18   would not be to believe to see us just moments ago from

19   Mr. Warden thank you to him for him explaining it to me.  I

20   much prefer that the person see me and I interact with her in

21   this instance, but this is the COVID age and I will and we will

22   live with it as is.

23         THE COURT:  Was that you were standing for.

24         MR. STEESE:  No, Your Honor I forgot to move the

25   admission of Exhibit 82 into evidence, and I would like to move

1    the admission of 82.

2         *MR. WARDEN:*  No objection.

3         *THE COURT:*  All right.  82 is admitted.  Now,

4    Mr. Warden -- I'm sorry let's go through this as if they were

5    here call your next witness.

6         *MR. WARDEN:*  AT&T calls Alison Miller.

7         *THE COURT:*  All right.  And that is Ms. Miller who is

8    on screen.

9         *THE WITNESS:*  Yes it is.

10        *THE COURT:*  All right.  And Ms. Miller, if you would

11   please take the oath, Ms. Pearson is not on your screen, but

12   you will hear her voice administering the oath to you, so if

13   you would, please.

14        *THE COURTROOM DEPUTY:*  Raise your right hand, please.

15        (**ALISON MILLER** was sworn.)

16        *THE WITNESS:*  I do.

17        *THE COURT:*  All right.  Before we continue, I just

18   want to be clear, counsel should all take great caution to make

19   sure that they give about a one second delay before moving on

20   to the next -- there's a lag here, it's not tremendous but

21   there's a little lag if we are not cognizant of it, what's

22   going to end up happening is we're going to get lost in the

23   lag.  So if we have to make adjustments let's do it I'm not

24   criticizing anybody or anything else, we will just try and deal

25   with it, but I was trying to see how much lag there was,

ALISON MILLER – Direct

1    between when Ms. Pearson was finished and when Ms. Miller

2    answered and I put it at half second to a second something like

3    that.  All right.  All of that is interesting and doesn't

4    advance the ball, Mr. Warden please proceed.

5              MR. WARDEN:  Thank you Your Honor.

6                        **DIRECT EXAMINATION**

7    BY MR. WARDEN:

8    Q    Ms. Miller, where you do to go college?

9    A    I received my bachelors in chemical engineering at Rutgers

10   College of Engineering, and I received my Masters of

11   Telecommunications Management at Stevens Institute of

12   Technology.

13   Q    Where do you work?

14   A    I work at AT&T.

15   Q    How long have you worked there?

16   A    About 22 years.

17   Q    And what is your current position at AT&T?

18   A    Lead carrier relations manager.

19   Q    And how long have you been in that role?

20   A    About 15 years.

21   Q    And in general what are your duties and responsibilities as

22   lead carrier relations manager?

23   A    So my responsibilities are to managed the domestic switch

24   access expenses associated with calls, to and from AT&T, IXC or

25   AT&T the long distance portion, two main functions, the first

ALISON MILLER – Direct

1    is that I review and negotiate commercial arrangements for

2    alternative routing, and the second is that I review and

3    validate bill information against other sources, to verify that

4    that companies are billing AT&T appropriately.

5            If I identify issues with the bills I will open a

6    dispute with the company, and my responsibility includes

7    managing that dispute through resolution.

8    Q    There's been a lot of testimony already, about AT&T's

9    mechanized bill payment invalidation system so I would like to

10   start there.  Does AT&T receive invoices for switched access

11   charges from carriers like Level 3?

12   A    Yes.

13   Q    And how many carriers like Level 3, send invoices to AT&T?

14   A    Over a thousand.

15   Q    And does AT&T have a system to validate and pay all of the

16   invoices it receives?

17   A    Yes we have a mechanized billing validation system.

18   Q    And are you generally familiar with how that system works?

19   A    Yes.

20   Q    And can you just briefly explain it to the Court, please?

21   A    At a very high level --

22           MR. STEESE:  Your Honor if you will recall, Your Honor

23   ruled cannot be an expert, she has to be a fact witness and I

24   think it's important to find out how she knows about the

25   mechanized system and if she truly has personal knowledge or if

ALISON MILLER - Direct

1    someone else has just told her how it works, and she just

2    regurgitating what someone else has said.

3          THE COURT:  All right.  Let's get some more

4    foundation.

5          Q     (By Mr. Warden) Do you have personal knowledge of how

6    the AT&T bill that validation system works

7    A    Yes.  As part -- as I mentioned as part of my role I'm

8    responsible for reviewing and validating billing, and part of

9    the way I do -- or one of the means to do this, is working

10   closely with understanding both the inputs to that mechanized

11   system, as wells the out puts to that system, and you know how

12   those both work, the -- the in puts and outputs.

13   Q    So can you briefly explain that system and how it works for

14   the court?

15   A    Sure.  So, when a bill is rendered to AT&T, the mechanized

16   system will calculate a billed unit cost, compare that to a

17   paid unit cost, and if the billed unit cost is less than or

18   equal to the paid unit cost that bill will be paid in full, if

19   the fill's unit cost is higher than the paid unit cost there

20   will be a correct pay action whereby the portion above the paid

21   unit cost will be offset.

22   Q    So I would like to show you Exhibit 86, please.

23   A    I just -- it's not the full screen but I can see it okay.

24   Q    Okay.  And I just have an inquiry if I may?

25   A    It works.

ALISON MILLER - Direct

1   Q   Okay.  Thank you.  You can see Exhibit 86 Ms. Miller?

2   A   Yes now that is the only thing on my screen, that is

3   correct.

4   Q   And is this a fair depiction of how AT&T calculates paid

5   unit costs?

6   A   Yes.  This is an example of how AT&T would calculate a paid

7   unit cost for an end office billing where a company also owns

8   the tandem switch.

9   Q   And can you explain to the Court, the bucket on the left,

10  and it's components?

11  A   Sure.  So as I said this is an example of an end office

12  call or the paid unit cost calculation based on that.

13          So when you have an end office call, the volumes that

14  can be billed for each element are based on the local switching

15  volumes.  So in this instance, the end office would be

16  associated with -- or the elements for end office billing would

17  be local switching common trunk port and CCL.  Those are the

18  elements in green.  As I said IF this company owns the tandem

19  switch, for the same end office or local switching minute, you

20  can have billing for tandem transport of tandem switching,

21  transport termination and transport facility.  The elements in

22  red.  And for an end office call, there would be a one to one

23  relationship for all of these elements to the volumes of local

24  switching minutes.

25  Q   There is a box in the upper right hand corner, on page unit

ALISON MILLER – Direct

1    costs, can you explain that, please?

2    A    Sure.  So as I just mentioned if it's an end office call,

3    there's a one to one ratio based on the local switching

4    volumes.  So paid unit cost is calculated for this end office

5    call as being the sum of the individual unit costs for each of

6    the elements that I just described in the bucket, so you have

7    the local switching unit cost plus common trunk port unit cost,

8    plus C C L plus tandem switching cost plus transport

9    termination and transport facility cost.

10   Q    What is a a unit cost?

11   A    Unit cost is an experience per minute.

12   Q    And then there are inputs in the lower right hand corner

13   what are those inputs and how are they used?

14   A    So when a come bills, the rates or the unit costs that are

15   appropriate for the billing, have many different inputs to

16   determine the appropriate rates.  The rates can depend on

17   whether AT&T might have a commercial agreement with the

18   company, or if the -- we don't have a commercial agreement then

19   the rates are based on tariff rates.  There are different rates

20   depending on the state, depending on the jurisdiction, whether

21   it be interstate depending on the direction whether originating

22   or terminating and depending on the functionality.  Like I said

23   this example is an end office paid unit cost, you could have a

24   company who bills tandem only, and that would only be the

25   elements the functionality would be billed would be the

ALISON MILLER – Direct

1    elements in red where the volumes would be dependent on the

2    tandem switching volumes.

3            And then you could also have inputs like factors, like

4    a pierce VoIP utilization or percent interstate usage so all of

5    these en puts go in to determining which unit costs are input

6    into the -- the paid unit cost total.

7    Q   And based on that, how are bills validated and paid?

8    A   The bills are -- it bills come in and there is a billed

9    unit cost calculated for the billing.  As I stated if it's an

10   end office call, the volumes are dependent upon the local

11   switching volumes.  So it would be total expense, divided by

12   local switching volumes would be the calculation for the billed

13   unit cost for an end office call.

14   Q   And is a paid unit cost calculated for each of those

15   thousand plus carriers?

16   A   Yes, for each of the thousand plus carriers for each of the

17   states, for each of the jurisdictions for each of the

18   directions, et cetera, yes.

19   Q   What are some of the things that can cause the billed unit

20   cost to be higher than the paid unit cost?

21   A   You can have a scenario where the billing is for the state

22   of Florida, but the company might incorrectly apply the rate

23   associated with a higher market.  You could have where the

24   company applies a higher intrastate rate to an interstate

25   jurisdiction or you could have a scenario -- there's FCC

ALISON MILLER – Direct

1    guidelines and perform activities that determine what is

2    appropriate to be billed.

3           So like current -- right now, companies cannot bill

4    terminating end office.  So you might have a company bill

5    something that is not aligned with the -- the current

6    regulation.

7    Q   And -- and what happens if that occurs?

8    A   If that occurs, and it resulted in a bills unit cost higher

9    than the paid unit cost there would be a correct pay action,

10   and what that would mean is the portion of the bill, that is

11   equal to the paid unit cost would be paid, the portion that is

12   above the paid unit cost would be withheld, based on that did

13   he ever rings y'all of the unit costs times the local switching

14   volumes.

15   Q   And if there's an offset or a withholding, does AT&T

16   provide notice to the carrier?

17   A   Yes.  So what the mechanized system does for a bill month,

18   if any BAN results in a correct pay action in resulting in

19   withholding automated dispute notice is generated and take

20   dispute notice would then be emailed to the company from an

21   AT&T billing company manager.

22   Q   Okay.  We will look at some of those later.  Can we look

23   quickly at Exhibit 87 others in the courtroom have already seen

24   it but I just want to orient you to it, Ms. Miller.  I'm sorry

25   the first page of 87.

ALISON MILLER - Direct

1             MS. ZAMBRANO:  Eighty-six I believe.

2        Q    (By Mr. Warden) There we go.  So, Ms. Miller do you

3    recognize this as a diagram of a traditional telephone call

4    A    I do.

5    Q    So if the end owns the telephone number and the tandem

6    switch, can you just walk the court through an example of a

7    five minute call?

8    A    Sure.  And I will walk the example on the originating

9    access side of the call if you have a call that's originated

10   from the LEC custody me, and it's five minutes, you would have

11   those five minutes going through the LEC end office switch you

12   would have five minutes of all of the elements associated with

13   end office, of billing, then you would have the five minutes

14   going through number two on here which is the tandem transport

15   you would have five minutes billed for those elements then you

16   would have the five minutes going through number three, which

17   is the tandem office switch, you would have five minutes there,

18   then the call would be routed to AT&T to terminate.

19   Q    And can we look at Exhibit8, please.  And before I move oh

20   I would like to offer 86 Your Honor?

21             MR. STEESE:  No objection Your Honor.

22             THE COURT:  Received.

23        Q    (By Mr. Warden) Ms. Miller what does Exhibit 88

24   depict

25   A    So this shows the -- as I mentioned earlier, on the first

ALISON MILLER - Direct

1    slide, when you have an end user call end office call there's a

2    one for one relationship between the local switching volumes,

3    and the other elements that can be billed in this end office

4    call.  So for that five minute call, you see the each of the

5    green ones, end office, the red ones, tandem transport there's

6    mull employer of five to account for the five minutes being

7    billed for each of those elements.

8    Q    And the billed unit costs box on the right can you explain

9    that please?

10   A    Sure.  As I explained when you have -- when the mechanized

11   system sees a bill with local switching, it assumes it's an en

12   office call, and so, the bill is -- the billed unit cost is

13   calculated as total expense divided by local switching minutes

14   so this is just an example showing when you have the end office

15   call and it's five minutes, the five minutes would be applied

16   to the expense per minute or otherwise known as unit costs for

17   all of the end office costs and the transport elements then it

18   would be divided by the five minutes associated with the local

19   switching.

20   Q    And in this example, how much of the bill would be paid?

21   A    In this example, the full bill would be paid.

22   Q    And now, let's look at Exhibit 89, please.  And we've seen

23   this in the courtroom earlier, Ms. Miller, but just generally

24   what does exhibit 89 depict?

25   A    So, Exhibit 89, depicts the example of a competitive tandem

ALISON MILLER - Direct

1    switch, in this scenario it's showing it as Level 3, who does

2    provide competitive tandem service but there are others in the

3    market that do the same, such as Inteliquent is one of them.

4    So what a competitive tandem does is they put rates in the

5    market and try --

6            THE COURT:  All right.  Hold on.  Hold on you.  You

7    cut out for just one second.  Could you go back and -- let's

8    just take it from the the top, rather than me trying to give

9    you a start point.  Go ahead, and tell us what I'm looking at

10   in this example.  It was just a brief period.

11           THE WITNESS:  I apologize.  Okay.  So let -- start

12   from the beginning again, right.

13       Q    (By Mr. Warden) What's 89?

14           THE COURT:  Yeah.

15           THE WITNESS:  Okay.  So this is a diagram that

16   reflects competitive tandem routing arrangement, and in this

17   particular example, it shows Level 3, as the example of the

18   competitive tandem.  There are other competitive tandem service

19   providers out there.  Inteliquent is an example of one of

20   those.  And what a competitive tandem company does is provide

21   rates in the market where they are trying to win the business

22   of other companies so that they send their end user traffic

23   through the Level 3 tandem to get to AT&T.  In this particular

24   scenario, showing the example a cable company acts and carrier

25   Y, so it is the end user customers of cable company X or care

ALISON MILLER - Direct

1   carrier Y, that would route their traffic -- well, the

2   companies would route that end user traffic through the Level 3

3   tandem switch to get to AT&T.

4       Q     (By Mr. Warden) Would those telephone calls traverse

5   Level 3 end office switch that is of cable company X and

6   carrier Y in this example

7   A   They would not.

8   Q   And what does that do with respect to the volume of -- of

9   minutes that traverse over the tandem versus the end office?

10  A   Because the tandem has multiple C LEC connected to it, it

11  is receiving all of that end user traffic, the volumes are much

12  larger than what one would see with just Level 3 and office

13  volumes.  Additionally, because this is a competitive service,

14  the volumes can vary tremendously from month to month,

15  depending upon if Level 3 might have new customers, route

16  through their tandem, or have customers move off of their

17  tandem on to a different tandem.

18  Q   Can we look at Exhibit 90, please.  And Ms. Miller can you

19  describe to the Court, Exhibit 90 and what it depicts?

20  A   Sure.  This is over simplified view using the bucket,

21  showing what I just mentioned where when you have -- a combined

22  billing scenario, when there's five minutes from an end user

23  customer, and there's also the tandem billing thrown in.  In

24  this case it would be hundred minute of third party calls, so a

25  total of 105 minutes, so this is an example of a combined bill

ALISON MILLER - Direct

1  where the end office elements would have five minutes applied

2  to them, and the tandem transport elements, in red, would have

3  105 minutes applied to them, based on the combined tandem

4  switching from the end user customer and from the tandem

5  billing associated with third party tandem calls.

6  Q   So the five is from the end user and the hundred is from

7  the third party tandem calls?

8  A   Right from the end users of the company sending their calls

9  through the third party tandem, correct.

10 Q   And how do most carriers bill AT&T for end user in

11 competitive tandem?

12 A   For those companies that have both end office search and

13 competitive tandem service they bill that on separate bills or

14 they bill those two services separately.

15 Q   Is that on separate BANs billing account numbers?

16 A   Yes.

17 Q   And how does Level 3 do it?

18 A   Level 3 bills it as it shown in this example bucket, in

19 that both the end office billing, and the third party tandem

20 billing is all included on the same BAN or billing account

21 number.

22 Q   And does that combined billing create issues for AT&T's

23 mechanized system?

24 A   Yes.  As I had previously mentioned, it assumes that it's

25 an end office call, so it calculates --

ALISON MILLER - Direct

1          MR. STEESE:  Excuse me --

2     Q    (By Mr. Warden) Excuse me Ms. Miller letter I think

3 it cut out again, if you can start again, let me re-ask the

4 question, does the define billing create issue for his AT&T

5 mechanized system

6 A   Yes, it does.  As I have mentioned previously, when the

7 mechanized system sees local switching in the billing, it

8 assumes the call is an end office call and the bills unit cost

9 is calculated as total expense divided by the volumes of local

10 switching.  So when you look at the billed unit cost

11 calculation for this combined billing, that would, in the numb

12 rate tore, you would have the expense associated with the five

13 minutes applied to the end office, and you would have the

14 hundred five minutes applied to the unit costs for the tandem

15 transport expense but the denominator would still be based on

16 the five local switching minutes.

17          So what this in fact does, is result in a much higher

18 billed unit cost than what would be seen with an end office

19 bill.

20 Q   And so, if -- does AT&T make adjustments to have account

21 for that?

22 A   Yes.  So what I do -- I'm sorry.

23 Q   No go ahead.

24 A   Yes.  So in realizing there's combined billing, that leads

25 to this increased unit cost, there's an adjustment applied to

ALISON MILLER - Direct

1   the paid unit cost calculation, to care for the increase of

2   tandem minutes, and so, what I do is periodically calculate the

3   average billing, at each state, jurisdiction, direction, of

4   tandem and local switching volumes, and calculate a tandem to

5   end office factor.  In this example that factor would be the

6   105 tandem minutes, divided by the five local switching minute

7   so there's 21 to 1 ratio of tandem volumes to local switching

8   volumes that's 2100 percent factor.

9          To care for that, and to try to -- and to alone the

10  paid unit costs to the higher unit costs, based on the combined

11  billing, the paid unit costs applies that 210 percent to the

12  tandem and transport related elements those that are in red.

13  Q   And and is that in the box, that says paid unit cost equal

14  local switching and then there's 21, 2100 percent is that what

15  you are referring to I think it's right there?

16  A   Correct.  Correct that's the paid unit cost calculation as

17  we saw previously, or I explained previously, but with an

18  adjustment to apply a 210 percent factor, to the tandem

19  switching billing.

20  Q   And is that --

21  A   Tandem switching.

22  Q   Is that an actual calculation and how is it done?

23  A   The -- the factor is calculated based on actual billing

24  information, it's an average of the prior quarter.

25  Q   And is it -- is the ratio -- let me -- strike that.

ALISON MILLER – Direct

1       So what are the inputs -- let me do this again.  For

2   how many entries need to be made, for this calculation?

3   A   The calculation needs to be done at the -- for each state,

4   each direction, at each jurisdiction.  So Level 3, you know 50

5   states two directions, two jurisdictions, so 200, sorry it's

6   200 entries or calculations.

7   Q   So if AT&T did not make that adjustment, with the 2100

8   percent ratio, what would be the result?

9   A   If we did not make that adjustment, the billed unit cost

10  would be far higher than the paid unit cost, and so that would

11  result in the correct pay action, withholding a lot more

12  against the bill.

13  Q   And why is that?

14  A   Because the -- the billed unit costs -- billed unit cost is

15  much higher due to the tandem transport expense.

16  Q   Now, you mentioned earlier, that the minutes vary monthly.

17  Does that contribute to withholding the tandem -- the taken

18  deny minutes I should say?

19  A   It can actually go either way.  If Level 3 was to with the

20  business of a new customer which would increase the tandem

21  volumes that could make the ratio in the paid unit costs too

22  low and could result in withholding, but, you know

23  correspondingly, if the Level 3 was to have a customer move

24  away, and have the volumes drop, and be lower than the

25  percentage in there, that could lead to us not correct paying

ALISON MILLER - Direct

1   or not with holding enough.

2           *MR. WARDEN:*  Your Honor I would like to offer 88 and

3   90.

4           *MR. STEESE:*  One moment.  No objection, Your Honor.

5           *THE COURT:*  Received.

6      Q    (By Mr. Warden) Ms. Miller, does this calculation

7   need to be done for any other carriers

8   *A*   No.

9   *Q*   Have you communicated with Level 3, regarding the issues

10  that are created by Level 3's combined bills?

11  *A*   I have.

12  *Q*   What was Level 3's response?

13  *A*   They had responded that they use a billing vendor and that

14  billing vendor would not be able to separate out the

15  competitive tandem from their end office billing.

16  *Q*   So, we've talked a little bit about the mechanized billing

17  system.  Outside of the context of that system, does AT&T know

18  the exact amount of Level 3's switched access charges?

19  *A*   Yes.  After -- once the bills go through the mechanized

20  process, all of the records and details of the bills, the bill

21  date, direction, jurisdiction, elements are housed in an access

22  data warehouse or otherwise known as A D W.

23  *Q*   And do you retrieve data from the A D W system?

24  *A*   I do.

25  *Q*   And how often do you do that?

ALISON MILLER - Direct

1   *A*   Very often as part of my role of managing switched access

2   expense.

3   *Q*   So let's move on always bit to another topic.  I think

4   earlier, you mentioned one of your responsibilities included

5   dispute management.  What, in general is that?

6   *A*   So that is to review billing information, and verifying

7   that a company is billing aligned with reform activities,

8   aligned with state and federal regulations, aligned with how

9   the traffic is actually being routed, and just really looking

10   at the -- the billing and making sure AT&T is being billed

11   appropriately, and if any issues are identified, that's when I

12   would issue a dispute and provide a dispute notification to the

13   company.

14   *Q*   And are there specific carriers for which you managed

15   disputes on behalf of AT&T?

16   *A*   Yes.

17   *Q*   And is Level 3 one of those carriers?

18   *A*   Yes.

19   *Q*   And how long have you managed AT&T's disputes with Level 3?

20   *A*   About five years.

21   *Q*   And when you picked up the Level 3 account, what was the

22   status of the OTT dispute?

23   *A*   When I picked up the account, we were paying the OTT

24   billing in full.

25   *Q*   And why was AT&T doing that?

ALISON MILLER – Direct

1   A    That was -- when I picked up the account it was after the

2   2015 agreement, and that agreement that stated that well --

3   while the appeal was ongoing, AT&T would pay OTT in full.

4   Q    And so, at some point after that time, and after you took

5   on the account, did the AT&T -- I'm sorry did the OTT dispute

6   become active?

7   A    Yes it did.

8   Q    And when was that?

9   A    It was around May of 2017.

10  Q    And why have did have it become active at that point?

11  A    At that point in time, AT&T believed that the appeal had

12  been overturned.

13  Q    The D.C. Circuit decision is that what you are referring

14  to?

15  A    Yes.  Yes.

16  Q    Okay.  And at that point in time, was AT&T withholding any

17  end office charges based on the OTT dispute?

18  A    AT&T was not withholding any end office charges based on

19  the OTT dispute.

20  Q    Let me -- can we pull up Exhibit A 8, please.  And can we

21  go to page three.  Can we just go down a little bit so we can

22  see the -- this we go.

23          So, Ms. Miller do you see that this is a June 29th,

24  2017 email from you to Melissa Kellow, copying others?

25  A    I do.

22

ALISON MILLER - Direct

1    Q    And what, in general is this series of email about?

2    A    As is the case often with Level 3 there were multiple open

3    and ongoing disputes, but during this period in time, there

4    were several that we were -- that we were in the process of

5    reconciling and closing, and so, what this -- these email

6    exchanges was our companies working to reconcile the balances,

7    identify what the balances were associated with the disputes

8    that were being closed and what would remain open.

9    Q    There's been testimony about a sentence in your email, to

10   Ms. Kellow, in the withholding paragraph, that reads, there was

11   no withholding action taken for the OTT dispute, but there is a

12   with holding above the current dispute value, for the EO/CPN

13   issue, due to one Level 3's billing containing both end office

14   EO, and tandem billing on the same BAN which complicated the

15   mechanized base rate withholding, and two, AT&T and Level 3 i e

16   Steve Ross agreeing that the EO/CPN issue would not be correct

17   inned our payment systems until such time as the issue was

18   fully corrected.  Did I read that accurately?

19   A    Yes, you did.

20   Q    So what did you mean when you wrote there is withholding

21   above the current dispute value, for the EO/CPN issue, due to

22   these two issues?

23   A    Well breaking them into separate.  So the first one goes

24   back the example I just provided of the billed unit cost to the

25   paid unit cost.  So the Level 3's billing is combined, the

ALISON MILLER - Direct

1   mechanized process, when it identifies a billed unit cost

2   higher than a paid unit cost and correct pays, that just

3   results in a dollar figure that's withheld.  It cannot and does

4   not align or identify that with holding to any specific

5   dispute.  And so there's multiple underlying reasons, or

6   multiple -- I discussed multiple inputs withholding could have

7   been based on any number of issues that caused that billed unit

8   cost to be higher than the paid unit cost, and then the second

9   explanation, one of the disputes we were resolving at that time

10  was the end office CPN dispute.  When that was still an issue,

11  I applied a factor to have the price sheets, to implement

12  withholding on this issue.  Based on call detail records we had

13  received from Level 3.  Level 3 had believed they corrected the

14  issue, however when we received additional call detail records

15  it was determined that the issue was only partially fixed.

16          So as noted here, the conversation I had with Level 3,

17  and they agreed with, was that I was not going to remove the

18  factor that was being applied to the price sheet, until such

19  time as Level 3 fully corrected the issue.

20  Q   And when you say factor, what do you mean by that?

21  A   A factor is a percentage that can be applied to a certain

22  portion of the billing.  My earlier example I talked about the

23  tandem to end office ratio I would call that a factor too.

24  It's a factor that's applying to tandem and transport in this

25  scenario the end office CPN was a factor that was being applied

ALISON MILLER - Direct

1    to end office billing.

2    Q    So it's a percentage of all end office billing?

3    A    Correct it was a percentage that was applied to the end off

4    billing.

5    Q    And so each if the underlying issue were corrected, in one

6    month if the factor still applied would it result in

7    withholding?

8    A    It would.

9    Q    Now, can you -- can we go to ... Exhibit A 18, please.   And

10   Ms. Miller there's been some testimony about your email of

11   August 29th, 2017, to Ms. Torres who is in the courtroom today,

12   as Level 3's corporate representative, but my question for you

13   is what are these disputes in general, in the left hand side,

14   just very briefly?

15   A    Yeah so as I mentioned there were multiple disputes being

16   reconciled at this point in time intra M T A was it was some in

17   correct billing associated with intra M T A.   DEOT was tandem

18   billing associated with direct and office, 8 YY back bill Level

19   3 billed us for a back bill, and then double billing.   Level 3

20   was billing database queries, that the other company was

21   already billing us database query for.   Connectivity disputes

22   were various disputes associated with the Level 3

23   communications billing, and actually the other entities, Global

24   Crossing Broadwing, et cetera.

25   Q    There's connect disputes, OTT disputes, there's a dispute

ALISON MILLER - Direct

1    value of about 8.64 million, withheld value of 46,056,496 and

2    then a paid and disputed amount.  What was that withheld

3    amount?

4    A    So as previous email had discussed, we had the end office

5    CPN dispute and there was withholding that was above that

6    dispute, attributed to the factor being applied, as well as

7    attributed to a billed versus paid unit cost resulting in

8    offsets.  At this point in time, because we had identified the

9    new OTT dispute, it was determined that we would assign that

10   withholding above the end office CPN, to the OTT dispute.

11   Q    If you needed to reconcile, or determine that four million

12   dollar amount, could you do that?

13   A    Yes.  But it would take a long time, and I would use that

14   ADW data that I talked about I would and I would basically have

15   to look at all of the inputs for the full period of the dispute

16   for all of the multiple states, jurisdiction, directions, et

17   cetera.

18   Q    And then there's a sentence in the AT&T notes, that says

19   additional offsets caused by Level 3 billed format had been

20   call low indicated towards OTT disputes.  What does that mean?

21   A    That's basically, restating what I had just said was that

22   those off debts that four million that was on the end office

23   CPN we then took those dollars, instead of going through trying

24   to find out exactly what caused the withholding, which there

25   were valid disputes in there, instead, decided we have this

26

ALISON MILLER - Direct

1   large dispute where we believed Level 3 owed us, you know

2   credits, and said we would assign that withholding dollars

3   towards that dispute.

4   Q   And so around this point in time -- well withdrawn.  So up

5   to August of 2017, had AT&T withheld anything based on the OTT

6   dispute?

7   A   We had not.

8   Q   And around this point in time, did AT&T begin withholding?

9   A   Yes I directed the withholding to begin in I believe it was

10  August 2017.

11  Q   And did you receive instruction withhold from someone else

12  at AT&T?

13  A   No that was part of my -- owning the relationship, and

14  seeing that Level 3 was not crediting us at the 65 percent, so

15  it was determined to ... I'm sorry.

16  Q   Did you discuss that with Ms. Meola?

17  A   Yes.  Anytime when -- I apologize -- anytime when there are

18  disputes or large issues it is part of the process to you know

19  have discussions with my management, Ardell Burgess, as well as

20  with legal prior to taking any large with holding actions.

21  Q   Can you describe the process for withholding on end office

22  charges based on the OTT dispute, just in general?

23  A   Sure.  So I had previously discussed a factor, and so,

24  because the OTT percentage was believed to be 65 percent for

25  Level 3's traffic, I applied a factor of 35 percent to the end

27

ALISON MILLER – Direct

1   office elements in the price sheet -- in the price sheet that

2   develops the paid unit cost and the 35 percent to say pay at 35

3   percent and thereby withhold 65 percent.

4   Q   Can we pull up Exhibit 36, please.  Ms. Miller what is

5   Exhibit 36 actually if you go to the second page, so you are

6   aware where the emails begin.

7        So what is Exhibit 36?

8   A   I have to just see which one this is, because I remember

9   this as a -- um ... okay.  So this is the May 2017 email at

10  this point in time I had spoken end office --

11       THE COURT:  Hold on one moment please.  Go ahead.

12       MR. STEESE:  I realize that the issue is being

13  discussed here.  This is an internal email, it is hearsay, and

14  so, at this point in time, we would move to have her discuss

15  the issue, if she needs refreshing that's one thing, but it is

16  hearsay, and we would object as such.

17       THE COURT:  All right.  Let's just discuss the issue,

18  and if we need to get to the exhibit -- well --

19       MR. WARDEN:  She authored -- did you author this email

20  at or around the time of May, May and August of 2017.

21  A   Yes these were my emails with my directions to the price

22  sheet team.

23       THE COURT:  I'm going to allow it.  Go ahead.

24       MR. WARDEN:  I offer 36.

25       THE COURT:  He has got an objection hearsay, I

ALISON MILLER - Direct

1   overrule it, I'm allowing it.

2       Q    (By Mr. Warden) Okay, so let's start with the May 8th

3   email at the bottom of the first page, what is that

4   A    Sure.  So, this email -- as I mentioned previously, had an

5   end office CPN dispute that was close to resolution, in May

6   timeframe, I -- we had determined that that issue had been

7   corrected, so this is the email where I directed the price

8   sheet team to remove the factor that had been applied to the

9   end office for that end office CPN dispute.

10  Q    And let me just ask who these people are, I hope I get

11  these names right.  Is sandy mull lick, swam pill calm ably,

12  and arrest del bur guess who are these?

13  A    Well arrest del is my manager, the other members, you

14  mentioned are what I would call the price sheet team, they deal

15  with the price sheets.

16  Q    And let me --

17          MR. STEESE:  I just didn't hear that answer because

18  she cut out for a moment.

19          THE WITNESS:  I'm sorry.

20      Q    (By Mr. Warden) Did you end your answer with price

21  sheet team

22  A    Yes I ended with price sheet -- swab nil, Gerry and Sandeep

23  are part of price sheet team.

24  Q    And directing your attention to the August 7th, email,

25  August 7th, 2017, and this is to the the San deep I need to

29

ALISON MILLER - Direct

1   request another up date to the L ... price sheet to input the

2   EO per ten saying field as 35 percent for all states slash

3   OCNs, in order to care for our OTT dispute.  Attached is the

4   same file as last time, with a new changes, and office

5   percentage highlighted in blue.  Did I read those two sentences

6   accurately.

7   A   Yes, you did.

8   Q   And so what were you telling the price sheet team to do?

9   A   So, this -- this direction as I previously mentioned was

10  related to the OTT dispute where 65 percent of the traffic was

11  associated with OTT, and so this direction was to pay or add a

12  factor into the price sheet for the paid unit cost calculation,

13  that applied at 35 percent towards the end of office elements.

14  Q   And does that therefore withhold -- strike that.  Does that

15  therefore withhold 65 percent from those elements?

16  A   Correct.

17  Q   And there's -- the last sentence refers to an effective

18  date of June 1st, 2015.  What does that mean?

19  A   So sometimes a company might render -- usually when we

20  receive bills from a company in the case of Level 3, their bill

21  will be for the months prior usage however sometimes a company

22  may bill us for usage periods that go back much further, and I

23  think we would call that a back bill.  So what this did was

24  establish that should Level 3 render us billing that had usage

25  up to and including the effective date of the Settlement

ALISON MILLER - Direct

1   Agreement, that that 35 percent calculation would be applied or

2   that -- the unit -- the paid unit cost resulting from that 35

3   percent application would also apply to that -- that billing,

4   for that usage period.

5   Q   Can we go to the attachment A 36, page one of five.  So if

6   you go to the bottom page five he have five it looks like there

7   are 177 rows in this file.  What do those rows represent?

8   A   So these represent the individual inputs for each state

9   direction jurisdiction.  Because it is less than early

10  calculated 200, I believe at this point in time, the inputs

11  that I were providing were for the states that had the top 90

12  percent of the expense.  Sorry I will stop there.

13  Q   And let's look -- is there a way to below up the top row,

14  row number one, and maybe capture that first California entry?

15  Q   Can you see that okay, Ms. Miller?

16  A   Yes.  Thank you.

17  Q   And your email indicated that there was a highlighted

18  column.  What column is that?

19  A   That would be column N.

20  Q   And what does column N represent?

21  A   So column N represents the end office factor of 35 percent,

22  that I had directed in that email.

23  Q   And do any of the other columns represent end office

24  categories let me ask -- let me state that better?

25  A   Okay.

ALISON MILLER – Direct

1    Q    Do any of these other columns fall within the end office

2    category?

3    A    Yes.  So what the end office category does, is it says the

4    35 percent would be applied to the end office elements.  So

5    looking at this, example, the end office elements would fall in

6    columns D through H, and so those would be the C C L, L S is

7    local switching, in for surcharge, Rick tick and common port

8    and you will see there's no information in several of these and

9    that has to do with over the years, with the regulation and

10   reform activities a lot of these elements have where they are

11   no longer billed but they are still in the price sheets.

12   Q    So did the 35 percent apply to those fact -- those columns

13   and elements D through H?

14   A    Correct.  That 35 percent would apply to those columns only

15   in the unit cost calculation.

16   Q    And what are columns I through M, can you just walk us

17   through those, please?

18   A    Sure.  Those would be aligned with the -- we looked at the

19   buckets, the ones that are in red, the tandem and transport.

20   And so with columns I through M, starting with I, that's KMUX,

21   then you have tandem facility, then you tandem facility miles,

22   because tandem facility is actually a per minute, per mile.

23   Then you have tandem termination and tandem switching.

24   Q    Was the 35 percent applied to any of those tandem elements?

25   A    It was not.

ALISON MILLER - Direct

1   Q   In column O there's a transport slash tandem over flow

2   percentage.  Do you see that?

3   A   I do.

4   Q   And it looks like on this first page those percentages

5   range from 2 to 13,166 percent.  What are those?

6   A   So these are as I have reviewed or discussed in one exhibit

7   that had -- this is the tandem to end office ratio.  So this is

8   the resulting output of the calculation to determine the tandem

9   volumes as compared to the local switching volumes.  For this

10   particular state, jurisdiction and direction.

11   Q   And what is it for row two, California, interstate

12   originating?

13   A   That -- that tandem to end office percentage was 418

14   percent.

15   Q   I would like to look at another bucket, if we can, this is

16   Exhibit 92, please.  So, using the California example, and

17   Exhibit 92, can you explain to the Court how these inputs go

18   into the paid unit cost calculation.  Let's start with the 35

19   percent?

20   A   Sure.  If you are look in that top right paid unit cost

21   ratio to adjust for combined billing and then you have the paid

22   unit cost calculation that we looked at previously, but in this

23   case, that 35 percent end office factor that I mentioned, is a

24   employed, and multiplied by the elements that are in the green,

25   the end office elements so the 35 percent is applied multiplied

ALISON MILLER – Direct

1    by the local switching unit cost the common trunk port cost and

2    C C L unit cost.

3    Q   And is that 35 percent applied to any tandem or transport

4    elements?

5    A   It is not.

6    Q   And then there's a 418 percent, in that same box.  Can you

7    just explain to the Court what that -- what that is and what

8    that does?

9    A   Sure.  So this is an example of -- in this particular case,

10   the numbers were 71 tandem minutes to 17 local switching

11   minutes.  Which roughly four to one, or 418 percent of tandem

12   to end office factor for this.  So that 418 pierce would be

13   applied to the elements of the tandem transport, paid

14   calculation.  So the paid unit cost then in addition to the 35

15   percent times the end office, then would add the 418 percent

16   times the tandem switching unit cost, transport termination

17   unit cost, and transport facility unit cost.

18   Q   And then on this, it looks like there's an example of 17

19   minutes from end user customer's calls, and 54 minutes of third

20   party calls, are those just numbers that you calculated, to

21   match the 418 percent?

22   A   Yeah these are purely as an example to show numbers that

23   could get you to the 418 percent.

24   Q   Okay.  Thank you.  I offer 92?

25          MR. STEESE:  No objection.

ALISON MILLER - Direct

1          *THE COURT:*  Received.

2          Q    (By Mr. Warden) Now, I would like to look at -- can

3     you look at Exhibit 82, please.  Can we below that up a little

4     bit.

5     *A*   Thank you.  Any way to make that a little bigger, Robb?

6     You know what, let -- let me try it this way.  82 is in

7     evidence and do we have what was demonstrative 8 at one point

8     in time.

9     *A*   You can't see that because I can see that.

10    *Q*   The thing is --

11         *THE COURT:*  I have got a book.

12         *MR. WARDEN:*  Okay.

13         *THE COURT:*  I can come close to the screen to see it

14    as long as she can see it, I'm fine I assume that each of the

15    lawyers' table have books they can open up the book.  All right

16    we're on the same page.

17         *THE WITNESS:*  As long as you don't mind my leaning in,

18    I can see it.

19         Q    (By Mr. Warden) What is Exhibit 82

20    *A*   So this is just three states that show the example of the

21    OTT percentage as applied to a noncombined bill and then a

22    combined bill by Level 3.

23    *Q*   And what time period does it represent?

24    *A*   So this is for the January 2020 bill date.

25    *Q*   And what states are reflected here?

ALISON MILLER - Direct

1    *A*   So for the noncombined bill, the states are Alaska and

2    Hawaii, and for the combined bill, it's the state of North

3    Carolina.

4    *Q*   Now, you said Alaska and Hawaii are noncombined bills, is

5    that why you selected them?

6    *A*   Yes.  Alaska -- excuse me Alaska and Hawaii are a bit of an

7    anomaly, in that Level 3 only bills end office in those states

8    there's no tandem billing.

9    *Q*   And can you walk us through the Alaska row, please?

10   *A*   Sure.  The first column B, is the OCN which is operating

11   company number, the second column, C is the state, column D is

12   the jurisdiction, and it states all, because this data is

13   consolidate forked the interstate and intrastate jurisdiction

14   on it includes all of it.  Column E is the bill date.  January

15   2020.  Column F and G are both from A D W report, with column

16   F, reflecting the billed originating usage dollars for each of

17   the states.  And column G reflecting the paid originating usage

18   dollars for each of its states.  Column H, calculates the total

19   originating usage that was withheld, by subtracting column G,

20   from column F.

21   *Q*   Let me -- let me stop you there, Ms. Miller.  So, F is the

22   amount that Level 3 billed AT&T?

23   *A*   For the originating usage those would include database

24   query, yes column F is the amount that Level 3 billed AT&T for

25   this bill date.

ALISON MILLER - Direct

1   Q   And is that an actual number that you pulled from the

2   access data warehouse?

3   A   Correct that I -- it comes straight from one of the reports

4   I pulled from the A D W.

5   Q   And then G is the amount of the bill paid, by AT&T, is that

6   correct?

7   A   Correct.

8   Q   And then H is just column F, minus column G?

9   A   Correct.  Billed minus paid so F minus G results in column

10   H which is amount withheld for that bill.

11   Q   And then what is column I?

12   A   So column I is another calculation it's column H divided by

13   column F.  So it calculates the percentage holding as compared

14   to the total amount billed.

15   Q   So that -- in that 65 percent for both Alaska and Hawaii,

16   correct?

17   A   Correct.

18   Q   And that's 65 percent is a calculation of the -- that's

19   derived from the actual amount billed by Level 3 and the actual

20   amount paid by AT&T; is that correct?

21   A   That is correct.

22   Q   Now let's look at North Carolina.  Why did you select North

23   Carolina?

24   A   I just picked one state that was a combined bill.

25   Q   And so can you walk us through, let's take F through H for

ALISON MILLER – Direct

1   North Carolina?

2   A   Okay.  Sure.  So once again, the source of F and G, were

3   from an A D W report, so the amount Level 3 billed for

4   originating usage for North Carolina, was about 34,000 dollars,

5   the amount AT&T paid was about 28,000 dollars, so the

6   difference between those two, is the amount AT&T withheld, that

7   was about 5,500 dollars.

8   Q   And then, what is the calculation in column I?

9   A   So in column I, it's the amount withheld, as compared to

10  the total billed.  So the -- 5,500 dollars divide by 34,000,

11  resulted in us with holding 16 percent of the total billing.

12  Q   And then, there's originating end office billed and

13  originating tandem billed, and then a tandem to end office

14  ratio.  Can you -- end office billing ratio.  Can you explain

15  those three columns please?

16  A   Sure.  Column J column K once again or both from the A D W

17  report, so this now breaks down what the amounts were billed,

18  that 33,000 broken out by what was billed towards end office

19  and what was billed for tandem and transport.  And so there was

20  about 7,000 billed for end office and about 27,000 billed for

21  tandem.  And so, if I did the rash I don't expenses, it shows

22  that the expense for tandem was about four to one, that of the

23  was billed for end office.

24  Q   And that's the equivalent of that rash I don't that's the

25  factor in mechanized billing?

ALISON MILLER - Direct

1   A   It's not an exact equivalent because this based on expenses

2   and that factor is based on volumes, but it's -- it's like the

3   same calculation, or similar.

4   Q   And then once column M, for North Carolina?

5   A   So (What's ease) 8 based on the 65 -- or the 35 percent

6   payment, 65 percent withholding being applied to end office

7   this calculates 65 percent of the end office billing as 4600

8   dollars, roughly, and then.

9   Q   Go ahead I didn't mean to interrupt?

10  A   Sorry.  Column N, the difference between the total withheld

11  and the end office withhold inning column M, and that's called

12  the tandem withholding, or with holding before 65 percent of

13  end office that was about 892 dollars.

14  Q   And is that withholding of 892 dollars caused by the 65

15  percent withholding or the 35 percent payment for OTT dispute?

16  A   No.  That 35 percent only impacts the end office billing.

17  Q   And so that 892.06, is not caused by the OTT dispute?

18  A   That would be -- would have been caused by some other issue

19  or something else that called -- caused the build unit cost to

20  be higher be the paid unit cost but it would not be due to the

21  65 percent -- or 35 percent factor.

22  Q   Let me ask you a couple other questions.  Did AT&T at some

23  point stop withholding on end office charges?

24  A   For OTT, yes.

25  Q   Yes for the OTT dispute.

ALISON MILLER – Direct

1    A    Yes.

2    Q    And when did it do that?

3    A    It was in effect for the June 2021 invoices.

4    Q    And why did AT&T stop withholding the 65 percent?

5    A    During this -- during this entire OTT dispute, Level 3

6    continued to bill hundred percent of the OTT traffic at no

7    point in time did they adjust their bill or provide a credit

8    for any portion of the OTT traffic.  That was up until it was

9    May of this year, when we received a credit for OTT, I believe

10   it went back to the February invoice, and subsequently received

11   credits in arrears for additional months.

12          So once icon firmed that the credits were aligned with

13   the 21 percent OTT and it appeared that Level 3 was now

14   providing the credit due for OTT, that was -- then I directed

15   the factor to be removed, and end office to be paid in full.

16   Q    And so there is no withholding based on the OTT dispute by

17   AT&T, now, is that correct?

18   A    That is correct.

19   Q    Let's switch topics a little bit and take a look at Exhibit

20   A 52?

21          THE COURT:  Let me just make sure I understand

22   something, ma'am, in terms of this credit that appeared in May,

23   that you just testified to, what months, or period, whichever

24   of those temporal factors is better for you, did it cover.

25          THE WITNESS:  I believe it was issued to us in May, or

ALISON MILLER - Direct

1    I received the notification from Diane wood at Level 3 in May,

2    and I believe the credit went back to February bill date I'm

3    not a hundred percent sure but I believe it was back to

4    February bill date.

5              THE COURT:  Of what year.

6              THE WITNESS:  Sorry 2021.

7              THE COURT:  Okay.  That is right.

8         Q    (By Mr. Warden) Ms. Miller, I should have asked you

9    another question, about Exhibit 82 that's 892.06 of tandem

10   withholding.  If you needed to determine what caused that

11   withholding, could you do it

12   A    Yes.  As I had discussed for one or the other examples, I

13   could, but I would have to look for North Carolina for this

14   particular bill date and every element billed, compare it to

15   what the appropriate rates would be and all of the other inputs

16   and determine what led to the billed units costs being above

17   the paid unit costs.

18   Q    So let's go to Exhibit A 52, please.  You have seen Exhibit

19   A 52 before it's a document prepared by level three; is that

20   right?

21   A    Yes.

22   Q    And did you try to reconcile some -- actually can we go to

23   tab two, please.  I'm sorry, let's stick on one did you try to

24   reconcile some of the data on this document with AT&T's own

25   records?

ALISON MILLER - Direct

1          MR. STEESE:  Your Honor I --

2          THE COURT:  Hold on.  Hold on.

3          MR. STEESE:  At this point Your Honor, if she is

4   conducting analysis of our material, this is no longer fact

5   evidence.  This is something that she is doing as an expert to

6   testify at trial.  This is no longer fact, this is expert

7   testimony, which Your Honor excluded.

8          THE COURT:  I'm inclined to agree.

9          MR. WARDEN:  Your Honor.

10          THE COURT:  Yes.

11          MR. WARDEN:  May I be heard.

12          THE COURT:  Yes.

13          MR. WARDEN:  And make a proffer, as well.

14          THE COURT:  You may.

15          MR. WARDEN:  So in James river insurance Tenth Circuit

16   Bryan versus farmers, and then Your Honor's decision that

17   quotes Bryan broad music, what she is going to do, is

18   elementary mathematical operations, that are appropriate for

19   lay opinions, and she will say that these records match AT&T's

20   records.  So yes the calculation is done on this number, but of

21   the 8.2 million dollar difference, there's approximately a

22   20,000 dollar immaterial gap.

23          So, she is doing it a simple mathematical calculation,

24   that results in a document that's already in evidence.

25          THE COURT:  All right.  All right.  I will allow it go

ALISON MILLER - Direct

1    ahead.

2         MR. STEESE:  Your Honor if I can just briefly.

3    Because the whole point here is this is analysis.  This is not

4    something done in the ordinary course of her employment, and

5    this is something that was disclosed to us, in April of 2021,

6    almost a year after it had -- should have been disclosed.  And

7    so, for her to say she was doing analysis, two months before

8    trial and -- this is not part of her normal job and this is

9    true traditional expert testimony, and inappropriate.

10        THE COURT:  Well, it depends on what offer -- what

11   opinions flow from it, whether it is or it isn't but

12   ultimately, if she is going to say that she looked at

13   documents, I will let her look at documents and they either are

14   the same or they are different.  I'm not saying I'm going to

15   let her go on from there and draw all kinds of opinions and

16   conclusions, as to anything.

17        MR. WARDEN:  It's simple math analogous to what --

18        THE COURT:  Let's see the simple math I'm overruling

19   go ahead.

20        MR. STEESE:  Your Honor since I don't stand up

21   contactually can I have a standing objection to this.

22        THE COURT:  Absolutely.  Absolutely.

23   Q    (By Mr. Warden) So back to Exhibit A 92, did you try

24   to reconcile some of the data in this with AT&T's records

25   A    Sure.  Columns, bill date per revenue so this --

ALISON MILLER - Direct

1      MR. STEESE:  Your Honor I'm going to object.  Did she

2   reconcile this is no longer math, this isn't saying one equals

3   one this is doing a reconciliation, and I renew my objection at

4   this point.

5      MR. WARDEN:  Do you want me to use the word

6   comparison.

7      THE COURT:  Yes that's exactly right.

8   Q    (By Mr. Warden) Did you compare these entries on

9   Exhibit 52, with AT&T's own records

10  A   Yes.  So what I did as I stated I had A D W reporting

11  capabilities that can pull up information based on a bill date,

12  element, direction level so what I did is I used my own A D W

13  report --

14      MR. STEESE:  Interrupt again, this is not something

15  that a high schooler could do.  This is something that has

16  requires special knowledge, special expertise special

17  capabilities, special data, exactly what rules 701 through 703

18  say.

19      THE COURT:  Overrule.  Go ahead.

20      THE WITNESS:  Sorry so, I looked at A D W reports

21  which I do almost daily, as part of my role here at AT&T.  And

22  I compared the my report information which of -- to what is

23  shown here, and because our A D W data.

24      THE COURT:  All right.  All right.

25      MR. STEESE:  One last thing, they have not provided us

ALISON MILLER - Direct

1    with any of this data, either.  We don't have any of the data

2    that she allegedly even compared it to, so we can't even

3    challenge her on this Your Honor.

4         *MR. WARDEN:*  Your Honor --

5         *THE COURT:*  Go ahead.

6         *MR. WARDEN:*  Ms. Kellow didn't bring their database in

7    either, I mean there is huge volumes of data that are stored

8    and system generated.

9         *THE COURT:*  Let's just get to the lack of explanation,

10   because -- what's happening here is the more we talk, and I

11   don't mean this to be critical of the witness, she is trying

12   shape her testimony in -- in a way to pick up the things that

13   are going on.  That she actually does this every day and things

14   like that.  What you are asking her is a very simple question

15   did she compare the numbers on this chart with AT&T's numbers?

16   I want to know the answer to that question and then did they

17   match or not, I want to know the answer to that question, and

18   if there's a difference what it was I want to know the answer

19   to that question, and then we're done.

20        So I guess I have asked them.  Did you compare the

21   numbers on the Exhibit in front of you, with AT&T's numbers.

22        *THE WITNESS:*  I compared the volumes at the element

23   level revenue which in our report is expense, and the totals

24   and it aligned with the data from A D W with the exception of

25   about 30,000 dollars.

ALISON MILLER – Direct

1              THE COURT:  Okay.

2          Q      (By Mr. Warden) So, did you total up the -- the

3      column D revenue

4      A    I did, through May 2021.  Sorry 2021.

5      Q    And did you just do that using the excel function?

6      A    Correct.  It's a sum.

7      Q    And then, did you do -- was that for all invoices or just

8      through May?

9      A    For the ... it was for the dispute period in question, the

10     February 2019 through May 2021 period.

11     Q    And did it include June 2021?

12     A    No.

13     Q    Why not?

14     A    The -- well the June -- the last report or the damages we

15     saw that we were reviewing, the paid information wasn't even

16     out yet, plus as I stated we paid end office in full, starting

17     with the June invoices.

18     Q    And did that 8.2 million dollar total match AT&T's records?

19     A    Yes.  With the exception of the roughly 30,000 dollars that

20     did not match.

21     Q    And what does that number represent?

22     A    The 8.2 million dollars represents the total end office

23     billing from Level 3 for the February 2019 bill date through

24     May 2021 bill date.

25              THE COURT:  Do you want to put an objection on the

46
ALISON MILLER – Direct

1    record.

2           *MR. STEESE:*  Your Honor, I find all of this to be

3    expert testimony, and absolutely at this point in time, I'm

4    asking that you strike this testimony, and not consider this

5    testimony, because clearly what has been done is much more than

6    simple math, and especially given that they are doing it with

7    data that was never disclosed, and counsel said well, they

8    didn't have their data warehouse we had summaries of our data

9    we have not seen summaries of their data, they gave us no data,

10   so we have no ability to cross examine on something that was

11   disclosed in April, that concerns expert testimony.

12          *THE COURT:*  What is the area of disagreement, or

13   concern or dispute?

14          *MR. STEESE:*  I don't know if I don't have the data.

15          *MR. WARDEN:*  Your Honor, may I.

16          *THE COURT:*  You may.

17          *MR. WARDEN:*  There is none, because Level 3 had

18   already offered Exhibit 76 and it is in evidence and -- this

19   witness prepared it, she can testify to it.  It's simple math

20   it's not --

21          *THE COURT:*  Enough.  We're done.  Ask question, we're

22   done, and let's move on.

23       Q   (By Mr. Warden) Okay.  Let's just go to Exhibit 76,

24   in evidence.  Ms. Miller, can you explain what this portion of

25   Exhibit 76 is -- well let me ask you this.  Did you perform

ALISON MILLER – Direct

1    these calculations

2    A    Yes.

3    Q    And how did you prepare this?

4    A    This is purely mathematical calculation using the volumes

5    and billing amount for end office as based on what Level 3

6    billed.

7    Q    Can we look at that first grid table, please.  What -- what

8    are these columns?

9    A    The one -- so this is reflective of what Level 3 billed to

10   AT&T for end office traffic.  This is Level 3's own billing

11   data of which when it goes through or system, the outputs in my

12   A D W sees this same data we would expect both to match because

13   this is Level 3's bill data for the end office billing.

14   Q    And then can we -- can you explain what -- I can't see the

15   columns.  There's revenue, and then an OTT what is the revenue

16   column?

17   A    The revenue is what I would call expense but that is the

18   amount billed, and it's broken out by bill date, and end office

19   element.

20   Q    And then there's OTT percentage of 21 percent and then the

21   OTT credit on the right hand column, correct?

22   A    Yes.

23   Q    And can you -- can we blow up the chart on the right.  And

24   so, there's bill date, L 3 end office minutes of use, Level 3

25   amount billed, did you calculate that Level 3 amount billed?

ALISON MILLER - Direct

1   A    Yes, that is the sum of, in the green, if there were

2   multiple elements, on that bill date, it's the sum of those

3   elements the revenue.

4   Q    So those are the sum of the end office revenue elements end

5   office element revenues?

6   A    Right, which in -- is the local switching the common trunk

7   port and the C C L.

8   Q    And what is column L?

9   A    So column L is a calculation and for the period -- see

10  there's two March 20ths there, for the first March 20th,

11  through February 19, it calculates 21 percent, as applied to

12  column K, the end office amount billed, and taking into account

13  the full and finality issue, it cuts that value in half.  From

14  the second March 20, down to May 21, it takes the 21 percent

15  OTT factor and applies it to the end office amount in column K.

16  Q    And then what is the Level 3 end office properly billed?

17  A    So this is the calculation that takes the difference

18  between the amount billed and what was -- cell pay, and what

19  was over charged 20 percent over charge column L.

20  Q    And then column N AT&T withheld EO end office, what is

21  that?

22  A    So, as discussed, the withholding for OTT, was based on the

23  35 percent payment factor, or 65 percent withholding, applied

24  to the end office billing.  So this is a calculation, 65

25  percent, times column K the end office amount billed.

ALISON MILLER – Direct

1   Q   And then, what is column O, AT&T paid EO?

2   A   So this is once again a calculation the difference between

3   the amount billed, column K, and the amount withheld, for end

4   office column N.  So that's the amount paid for end office.

5   Q   And then the final column, column P, what is that?

6   A   That's one again a calculation, a that calculates the

7   difference between column M, Level 3 end office amount properly

8   billed at 21 percent OTT and column O, what was already paid by

9   AT&T for end office.

10  Q   And then there are some totals at the bottom of that chart,

11  is that correct?

12  A   Correct.  Those are sums of all of the entries from

13  February 2019 through May 2021.

14  Q   And can I get Exhibit 93, please.  And can you just -- are

15  those the totals from Exhibit 76?

16  A   Yes these are the sum that is were on the bottom just

17  brought into a different visual.

18  Q   And using this document, can you just very quickly walk the

19  Court through the -- the math that you did here?

20  A   Sure.  So for the period the February 2019 through May

21  2021, Level 3 billed roughly 8.2 million dollars for end office

22  switching, the over charged taking into account the 21 percent

23  the finality issue, was 1.2 million dollars, if I subtract the

24  1.2 from the amount billed, that would say that Level 3

25  properly billed, 7 million dollars of end office taking into

ALISON MILLER - Direct

1    account the OTT factor.  If I then subtract what AT&T paid

2    towards end office the 2.9 million from that 7 million dollars,

3    the resulting 4.12 million is the additional payment AT&T would

4    owe for end office based on the 21 percent OTT factor.

5    Q    Thank you Ms. Miller I have got one more topic, that I

6    would like to cover with you.  Earlier, you mentioned notices

7    dispute notices that are generated through the mechanized bill

8    payment system, do you recall in general that testimony?

9    A    I do.

10   Q    Can we look at -- can we look at Exhibit 79, please.

11   Ms. Miller what is exhibit 79?

12   A    So this is one example of a dispute notice that would have

13   been generated from the mechanized system, and that was emailed

14   by a company billing manager to Level 3.

15   Q    And what states does this cover?

16   A    This covers OCN -- company code 6121 and the states of

17   Idaho Oregon and Washington.

18   Q    That's for Level 3 communications LLC, correct?

19   A    Correct.

20   Q    And there are some reasons for the disputed charges, in the

21   bottom of this first page, correct?

22   A    Correct.

23   Q    And then can we go to the second page, please P and what is

24   reflected on this second page?

25   A    So, the mechanized system when there is a correct pay or

ALISON MILLER – Direct

1    offset activity generates the details of the withholding, at a

2    bill date BAN, state, jurisdiction, and direction level, so

3    what this show, the usage disputed amount which that would have

4    been the amount that was withheld totals 3300 dollars for this

5    particular notice.

6            *MR. WARDEN:*  I would offer 79.

7            *MR. STEESE:*  It's in.

8            *THE COURT:*  It's already in.

9            *MR. WARDEN:*  Okay.

10   Q    (By Mr. Warden) Can we go to 78, please.  And is

11   Exhibit 78, a similar notice for the same time period for the

12   states of Iowa and South Dakota

13           *MR. STEESE:*  Your Honor before the answer to that, I

14   know 79 is in and I am not making a record of that, but these

15   other exhibits were literally given to us, less than two weeks

16   ago and not disclosed in discovery, so we would object to late

17   filed and submitted information.

18           *MR. WARDEN:*  Your Honor do I need to be heard?

19           *THE COURT:*  Well, you need to be heard and I need to

20   be heard.  What I'm going to tell you is that, ultimately, if

21   we're looking at examples of dispute notifications, I'm not

22   sure what the difference is between one three, five, seven,

23   nine.  And so I don't really know.  I will let you be heard on

24   it but I'm not really sure what the point of additional

25   examples is.

ALISON MILLER - Direct

1          *MR. WARDEN:*  As long as these are understood to be

2   examples because there are three or examples and it's just that

3   these are regularly generated notices.

4          *THE COURT:*  You got one in the record, I don't -- I

5   don't know why you need to put the others in the record.  Ward

6   war I'm fine with that, Your Honor.

7          Q    (By Mr. Warden) And then can we go to 84 and 84 is in

8   evidence just very quickly can you describe 84

9   *A*   Sure this would be an example of a dispute notice that I

10  sent this one was sent via email, and this one had to do with

11  there was a back bill received from Level 3 in the December

12  2020 timeframe, once I reviewed the back bill, I identified

13  that the billing was inappropriate, and not aligned with the

14  requirements the transforms order and I disputed and we

15  withheld 251,000 dollars associated with this dispute.

16  *Q*   And earlier this year did you send a letter to Craig Davis

17  at Level 3, regarding nonOTT disputes?

18  *A*   I did.

19  *Q*   Can we pull up Exhibit 23, please.  Is this March 12th,

20  2021, letter, the letter that you sent to Mr. Davis?

21  *A*   It is.

22         *MR. STEESE:*  Your Honor I'm going to object to this

23  you can see at the top this was an attempt to get this matter

24  resolved, it specifically states rule 408, and state counter

25  parts.

ALISON MILLER - Direct

1          THE COURT:  Sustained.

2      Q    (By Mr. Warden) Let's pull the exhibit down.

3          In March of 2021, did you provide notice to Level 3 of

4  additional nonOTT disputes.

5          MR. STEESE:  Your Honor I'm going to object again, the

6  notice was provided in this settlement letter and so he is

7  trying to get around the issue by the 408 concern by just not

8  discussing it through the exhibit so it's still a settlement

9  discussion Your Honor.

10         MR. WARDEN:  Your Honor --

11         THE COURT:  Overruled.

12     Q    (By Mr. Warden) Did you provide notice of nonOTT

13  disputes to Level 3, in March of this year

14  A    I did.

15  Q    And do you recall what those disputes were?

16  A    Um there were several issues identified in the letter.

17         MR. STEESE:  Just one moment.

18         THE COURT:  Hold on hold on.

19         MR. STEESE:  If we can get some foundation of how it

20  was provided.

21         THE COURT:  Overruled.

22     Q    (By Mr. Warden) What were those disputes

23  A    One of them was the -- the one that we had discussed

24  numerous times with Level 3, related to the fact that there is

25  a combined billing we requested competitive tandem, and end

ALISON MILLER – Direct

1    office to be separated there was also issues with nonstandard

2    and nontariff element that Level 3 had begun to bill and at one

3    point in time, and we spent time and money with our systems to

4    be able to recognize that element, and then in March of 2020

5    there was a new element rendered, that once again was not

6    nonstandard, and was not aligned with any element identified in

7    their tariff.  As well as there were several benchmarking

8    issues, identified such as inappropriate rates or you know

9    rates not aligned to jurisdiction.

10   Q    And did you do anything to investigate the issue regarding

11   improperly billing intrastate tandem switching at end office

12   rates?

13   A    I did.

14   Q    And what did you do?

15   A    So for one particular state -- one OCN that covers two

16   states of billing I did a detailed review of the incorrect

17   rate.

18   Q    And --

19   A    And identified that the -- the dollar amount associated

20   with that incorrect billing.

21   Q    Can we go to Exhibit 85, please.  And what is Exhibit 85

22   let's start with the about second page?

23   A    So this is a bit of an --

24          THE COURT:  Hold on again.

25          MR. STEESE:  Your Honor this again was literally

ALISON MILLER - Direct

1    disclosed Friday, last week, and this is another analysis that

2    is done for purposes of this litigation.

3            THE COURT:  Sustained.

4            MR. WARDEN:  Your Honor may I be heard.

5            THE COURT:  Briefly.

6            MR. WARDEN:  Your Honor, we conducted discovery on one

7    case, we're trying another case, and we have both parties have

8    been providing supplemental information over the last -- the

9    course of the last couple of months, this the kind of work that

10   she does the regular course of her business to investigate

11   disputes.  There are allegations and suggestions that the --

12   that the withholdings are arbitrary and this will show that it

13   is not.

14           THE COURT:  I sustain the objection.

15           MR. WARDEN:  Okay.

16           THE COURT:  Look honestly, I think to some extent both

17   sides are a little further into the forest than I think I need

18   to go.  Ultimately, the question is, whether or not there's a

19   breach, that's not a question, that's been resolved.  But what

20   are the damages flowing from the breach, the two companies seem

21   to have some respective axes to grind as to why certain

22   payments weren't made I'm not sure I care why certain payments

23   were made or not made.  They either were made or they were not

24   made.  They either constitute damages or they do not.  If they

25   were innocent or malicious, doesn't change the number, so

ALISON MILLER - Cross

1    that's why ultimately, I think we're now delving down the

2    motivation for -- and it goes back to this thing that was said

3    earlier suggesting that AT&T's has a practice of over

4    withholding, for this motivation and that motivation, the two

5    of you are way more interested in that issue, than I am.

6            So, sustained.  Ward war well Your Honor we have our

7    Exhibit 76 in --

8            THE COURT:  I don't need an answer from you, I don't

9    need an explanation I don't need anything, sustained.  Move on.

10   War war I pass the witness.

11           THE COURT:  Thank you.

12           MR. WARDEN:  Thank you Ms. Miller.  Oh could I have

13   one minute.  Oh can I offer 93.

14           MR. STEESE:  If I can find 93.

15           THE COURT:  It's demonstrative.

16           MR. STEESE:  No objection Your Honor.

17           THE COURT:  All right.  Received.  And, can I

18   anticipate, you're asking me do you want to start now, or do

19   you want to --

20           MR. STEESE:  Your Honor there's one or two things that

21   I would like to clear up as we're getting ready for closing

22   tomorrow I want to make sure I understand a couple of

23   fundamental things.

24           THE COURT:  That's fine.  That's fine.

25                         **CROSS-EXAMINATION**

ALISON MILLER - Cross

1    *BY MR. STEESE:*

2    Q   Bear with me in finding the exhibit numbers for -- there

3    you are Ms. Miller I'm trying to look over at the other

4    computer just one moment, Ms. Miller we've met before, correct?

5    A   Yes.

6    Q   All right.  So, what I would like to bring up is Exhibit

7    number 92, please.

8           *THE COURTROOM DEPUTY:*  I'm trying.

9    Q   Let's do this before 92, let's bring up Exhibit 88 then I

10   will get right to 92.

11          Can you see it Ms. Miller.

12   A   I cannot it's a black screen for me oh there it is.

13   Q   Perfect thank you.  All right.  I think that I understood,

14   but I want to make sure I did.  So, let's presume you have a

15   carrier that is either has no competitive tandem products or is

16   billing their competitive tandem product on a separate BAN.

17   Are you with me?

18   A   Yes.

19   Q   And let's assume that you have this hypothetical on Exhibit

20   88, and you have five minutes flowing through the end office

21   and five minutes throwing through the tandem, your mechanized

22   bill system will bill all of that because the number of minutes

23   you are seeing both end office and tandem match, and are and

24   expected, true?

25   A   Can you restate the question, because I thought you said if

ALISON MILLER - Cross

1   you have a scenario where the competitive tandem billing is

2   just billing their tandem separately.  What billing

3   specifically are you asking about.

4   Q   I'm focusing now on, this is a situation where you have he

5   LEC who has end office and tandem there's no competitive tandem

6   in the billing at all, are you with me?

7   A   Yes.

8   Q   All right.  And you see the example on Exhibit 88 I have

9   here five minutes throwing through the end office witch five

10  minutes flowing throughout tandem switch, and a result of that

11  the number of minutes that you see in each match, so that bill

12  through the mechanized system will be paid in full, correct?

13  A   Correct.  And that's the scenario you are providing is

14  where the company also owns the tandem switch but that is

15  correct, yes.

16  Q   And all of these will be the scenario where the company

17  owns the tandem switch too.  So assume that.  Now let's assume

18  the following, let's assume that instead, in example number 88

19  you see five minutes, in the end office column, at 8 minutes --

20  let's say ten just because the math will be easier, ten minutes

21  in the tandem column, because there are more minutes in tandem

22  than end office, your mechanized process will say that's too

23  much tandem, I'm going to withhold and dispute on five minutes

24  of tandem switching termination into facility because the

25  number of minutes don't align with the number of end office

ALISON MILLER – Cross

1   minutes, true?

2   *A*   No.   What would happen is the ten minutes applied to

3   tandem, would result in the total billed unit cost, being

4   higher than the cost that was calculated based on a one for one

5   relationship, and the withholding would be the differential of

6   that unit -- unit cost as applied to the local switching

7   volumes.

8   *Q*   Which under my hypothetical was five minutes tandem

9   switching because they bill ten minutes there and five minutes

10  on the end office, so that would be the amount that was

11  disputed and withheld, correct?

12  *A*   Assuming everything else aligned correctly, yes.

13  *Q*   And all -- perfect, so now let's go to Exhibit number 92.

14  And I am going to use your minutes and I know that the

15  likelihood of having 17 minutes and 71 minutes on a BAN is not

16  logical, but I'm going to use those minutes, just to illustrate

17  the point.   Are you with me?

18  *A*   Yep.

19  *Q*   All right.   So in this situation, this was is a situation

20  where I will say Level 3, has both tandem switching associated

21  with its own customer and competitive tandem on the same band

22  correct?

23  *A*   Correct.

24  *Q*   And you have put in a expected formula expect 418 percent

25  higher tandem minutes than end office minutes, and if you get

ALISON MILLER - Cross

1    418 percent or less, don't dispute and withhold, but if you get

2    more than 418 percent, dispute and withhold on those excess

3    minutes, correct?

4    A    That would be the result of the billed versus payment

5    calculation in that scenario, yes.

6    Q    So if for example, 81 minutes, of tandem was billed, again

7    I know these numbers are tiny, you meaning AT&T would dispute

8    in the hold of ten minutes of tandem switching termination in

9    facility, correct automatically?

10   A    Yes, assuming everything else was aligned, yes.

11   Q    All right.  So in other words, let's assume that Level 3

12   gets a new customer.  A new cable company, is using Level 3 to

13   provide competitive tandem services.  Those tandem switching

14   termination facility minutes might be totally legitimate, but

15   AT&T is going to dispute and withhold simply because its ratio

16   that it put into its mechanized system is 1 percentage, and the

17   number of minutes that you saw was something different, true?

18   A    Yes, but that is why we repeatedly explained the issue to

19   Level 3, and told them or expressed the desire to have those

20   services billed separately knowing that there's no way with the

21   combined billing to adjust and care for the fluidity at this of

22   competitive tandem service when it's combined with a local

23   switching -- a stable local switching service.

24   Q    So in other words, there might be a host of dollars,

25   thousands of dollars, hundreds of thousands of dollars maybe

ALISON MILLER - Cross

1    even millions of dollars that AT&T has withheld and not paid

2    simply because of its ratios in its system without having a

3    legitimate reason for withholding a dispute, true?

4    A   Yes, but you are losing sight if you go the other way too,

5    where we wouldn't --

6    Q   If you could just answer my question.

7              THE COURT:  Hold on.

8              MR. WARDEN:  Your Honor the witness should be allowed

9    to answer the question.

10             MR. STEESE:  I only asked one scenario, not the other.

11             THE COURT:  I understand.  I think that the objection

12   is overruled, and look, go ahead..

13        Q    (By Mr. Steese) So, when -- so the point is that you

14   say that you have repeatedly told Level 3, when you say

15   repeatedly told Level 3, are those in those emails from 2017

16   and some notice in March of 20 um ... 21 are those the notices

17   that you are talking about as being repeatedly

18   A   That -- some of them.  It's been -- a common issue

19   throughout this full time period I have been working with legal

20   three.

21   Q   But the example that you are talking about are those emails

22   that you looked at earlier from mid 2017, correct?

23   A   Those are the exhibits that were provided that show that,

24   yes.

25             THE COURT:  Wait, wait, wait.  Is that the only manner

ALISON MILLER - Cross

1    in which you expressed this issue

2           MR. STEESE:  Did you understand the judge's question.

3           THE WITNESS:  I did.  I believe during the course of

4    my five years of working with Level 3, there was more

5    communication regarding the issue beyond those 2017 emails that

6    were put in the exhibits and beyond just those -- dispute

7    notices that have been at issue.

8           THE COURT:  Okay.

9       Q    (By The Court) Can you point to any specific one

10   other than those (Have been issued)

11   A    No.  Not off the top of my head no.

12          MR. STEESE:  Your Honor I think that's what I needed

13   today.

14          THE COURT:  That's fine.

15          THE COURT:  All right.  So, I don't know where the

16   witness is.  I'm assuming by her accent it's the east coast.

17          MR. WARDEN:  That would be new jersey to be precise

18   Your Honor.

19          THE COURT:  I didn't mean to suggest she is out to

20   walk somebody or anything.  It's just there is an accent that I

21   grew up on the east coast and so I'm reasonably familiar with

22   it.  All right.  We will pick it up at 9 o'clock tomorrow which

23   is 11 o'clock your time, again ma'am if you could be ready say

24   five minutes before, so that Ms. Pearson can get the

25   connections up and going, so that we can continue, and make

ALISON MILLER - Cross

1    sure that before we start, we ironed out whatever bugs if there

2    are appear in the system.  All right?

3          THE WITNESS:  So 11 tomorrow five minutes before,.

4          THE COURT:  Correct, 10:55 your time be ready to come

5    back.

6          THE WITNESS:  Got you I will be ready.

7          THE COURT:  We can disconnect her now.

8          MR. STEESE:  I do have one question about how closings

9    will work.  I had kind of hoped that we would be done with

10   Ms. Miller, and I would like to hear more of what Ms. Miller

11   has to say to integrate it into my closing so is it possible to

12   not have closing tomorrow.

13         THE COURT:  No.

14         MR. STEESE:  Is it possible to have closing tomorrow

15   afternoon.

16         THE COURT:  Yes.

17         MR. STEESE:  Okay.

18         MS. ZAMBRANO:  Okay.  Could we -- earlier in the

19   afternoon so one might catch flights home if we live in other

20   places.

21         THE COURT:  Sounds cruel I don't mean it that way,

22   let's see where we end up, in terms of the exam and the cross

23   exam I'm not trying to get you to miss flights, but it's not at

24   the top of my concern's list and I am sorry about that.  The

25   reason I'm not going to move it, is I have got another trial

ALISON MILLER - Cross

1    starting next week and I don't want to push closings so far

2    removed from the evidence that it makes -- that it looses it's

3    impact.

4           *MR. STEESE:*  I understand Your Honor.

5           *THE COURT:*  Let me tell you with regard to closing, a

6    couple of things, from my perspective.  It would be helpful to

7    me, now I'm not telling you, you have to do it this way, or

8    bullet point it, and I am not telling you structure it,

9    according to these things.  But somewhere in there, I would

10   like to be able to clearly follow the theory, as to breach, how

11   that theory ties to the damages that are being sought, and I am

12   not trying to weigh in as saying, for example that I believe or

13   don't believe, or concluded anything.  But, just to harken back

14   to some things what were said in openings, what I expect to

15   hear from AT&T is essentially the breach was the failure to

16   pay, the amounts due on the end office within a certain time

17   period, and the damages are essentially what should have been

18   paid.  It's a little more complicated on the L 3 side, because

19   I think it's less than clear -- well it's clear that you don't

20   agree to that, that it's a broader concept, that has to do with

21   additional amounts that were over withheld, how the -- the

22   breach in terms of the failure to -- and in fact it may even be

23   that the breach is more than in terms of the contract, the

24   failure to pay the end office.  I'm not trying to settle right

25   now.  I'm just trying to say, this is not just about numbers

ALISON MILLER - Cross

1   this is about theory, as well, and I want it -- I want to be

2   very clear, as to what each side's theory is, because it

3   matters as much if not more than the numbers.

4        Number two, then I want to understand the numbers,

5   after I understand the theory.

6        Number three, I want to know what exhibit best

7   captures, and by that, I suppose I'm asking for and I can dig

8   through here and find it, it's basically going to be your

9   individual calculations.  Number four, I want all of this on

10  two different time blocks, January 1, 2019 -- I'm sorry -- yeah

11  the time period that was anticipated in the summary judgment

12  motion I want to see that, and then I want to see after that.

13  And I want to understand, if there -- because there's a lot of

14  things that are being talked about, about things that happened

15  past February 19, 20 20, they billed they didn't bill they did

16  this, they did that, back and forth.  If there is some claim

17  for moneys, that go beyond 2019 -- excuse me February 19, 2020,

18  I just want it separately discussed so -- because the theory

19  might be a little different, for one block as to the other.

20  And then finally, we can talk about the affiliate.  Somewhere

21  in there -- you know what I'm talking about.

22        *MR. STEESE:*  TCG.

23        *THE COURT:*  Yeah.  And then somewhere in there about,

24  I suppose I will look to you, to explain to me, now it's late

25  in the day and I am being more playful than helpful, but I had

ALISON MILLER - Cross

1    Jesuits drill me with four years of Latin, and then I took a

2    number of years of Greek, as well.  You have introduced me to

3    the term romanette.  Okay.  The Jesuits missed it I don't know

4    what else to say, but, in any event, in the Settlement

5    Agreement, section 1, I think iv, there is a discussion about a

6    50 percent return.  The way it's supposed to work is there's a

7    50 percent return, in other words, during the period that you

8    are waiting for the FCC to rule, or the appeal to become final

9    I should say, there's a 50 percent return, it's not clear to

10   me, as I'm sitting here right now, that I have got fully ...

11   captured in my mind, how each side is dealing with that, or if

12   it's relevant at all to be dealt with.  Those are my little

13   comments, you can factor them in, again I'm not saying come out

14   here going here you go, boy you missed the boat on this.

15   Number one, number two, number three, number four, but I'm just

16   saying touch on these things because they matter in my head,

17   and before going back through everything, which will obviously

18   happen after the closing arguments.

19        MR. STEESE:  Amount of time that each one of us should

20   shoot for.

21        THE COURT:  Kind of depends on what we're talking

22   about I would like it to say be an hour, but I don't know what

23   you are looking at.

24        MR. STEESE:  An hour per side.

25        THE COURT:  Yeah.

ALISON MILLER – Cross

1          MR. STEESE:  That's certainly achievable Your Honor.

2          MS. ZAMBRANO:  Yes.

3          THE COURT:  Anything else.

4          MS. ZAMBRANO:  No thank you for that Your Honor.

5          THE COURT:  All right.

6          THE COURTROOM DEPUTY:  All rise court is in recess.

7      (Recess at 5:07 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25