Exhibit 3

```
                    0^P|WITNAME                    }  - Cross                    1
```

 1

 2      (In open court at 9:00 a.m.)

 3              THE COURT:  Please be seated.  Good morning to all of

 4      you, and we are prepared to proceed with completing the

 5      cross-examination of Alison Miller.  Ms. Miller I remind you

 6      that you are still subject to the oath that you took yesterday

 7      understood.

 8              THE WITNESS:  Understood.

 9              THE COURT:  All right and Mr. Steese, you may

10      continue.

11                              **CROSS-EXAMINATION**

12      BY MR. STEESE:

13      Q   Good morning, Ms. Miller.

14      A   Good morning.

15      Q   I don't think I'm going to be as long as I thought, I went

16      through my notes last night, so probably good for me to do

17      that, so hopefully we can be focused here and finish.

18              So let's bring up Exhibit 76 which you discussed with

19      your counsel yesterday.  And do you recognize this document,

20      Ms. Miller?

21      A   It's just coming up now.  This looks like my -- yes I do

22      recognize this.

23      Q   Perfect, and if you look at this spreadsheet, if I

24      understand it correctly -- I'm sorry I'm going to have to get

25      my computer, I cannot see the exhibit at the same time.

0^P|WITNAME                    }  - Cross                                    2

1    Normally I can see it on the screen, and I cannot.

2          THE COURT:  I understand.

3          Forgive Ms. Miller, the exhibit is so small.

4      Q    (By Mr. Steese) So if you look at the column,

5    entitled, AT&T withheld end office, do you see that this is

6    column --

7    A    I do.

8    Q    Okay.  Column N is simply a mathematical equation, you took

9    65 percent times column K, which is the end office amount

10   billed, which is simply adding up the common trunk and normal

11   switching amounts billed by Level 3, to AT&T, in the column --

12   in the table at the left, correct?

13   A    Yes but to clarify, there were some months where there was

14   also C C L so that sum would have included the C C L in there.

15   Q    So tiny amounts of C C L when they existed would have been

16   included, as well correct?

17   A    Correct.

18   Q    And this table on the left, columns, through F, can you see

19   that circle around it?

20   A    I do not see a circle, no.

21   Q    That was a curiosity?

22          THE COURT:  No that's fine.  Our computers in here

23   allow you to draw on the screen.  It obviously does not

24   transfer.

25          THE WITNESS:  Translate.

O^P|WITNAME                    } - Cross

1        *THE COURT:*  -- transfer over to where you are.

2        Q    (By Mr. Steese) The column to the left with the green

3    row at the top, all of that was Level 3's damage calculations,

4    correct

5    *A*   Actually my understanding, is columns A through D were

6    Level 3's billed data for the end office elements.  And because

7    my reports, the ADW reports, show --

8    *Q*   I'm not asking you that.  I'm not asking that.  I'm just

9    asking what this table is.

10       *MR. WARDEN:*  Your Honor, if the witness can be allowed

11   to answer the question.

12       *THE COURT:*  No.  Sustained.  I'm sorry overruled,

13   sustained -- there's a disconnect here, ma'am, just answer the

14   question that's put to you.

15       *THE WITNESS:*  Okay.  So can you ask the question

16   again.

17       Q    (By Mr. Steese) The numbers in the table on the left,

18   they came directly from a spreadsheet put forward by Level 3,

19   that contained its damages analysis, correct

20   *A*   Yes, but the source of columns A through D would be the

21   billing information from Level 3, that was rendered to AT&T.

22   *Q*   Perfect.  Thank you.  Now, so when you got this document,

23   you took Level 3's numbers, you added them together, all the

24   end office elements, multiplied by 65 percent, and got the

25   amount withheld.  Simple math to use your words from yesterday,

O^P|WITNAME                    }  - Cross

1    correct?

2    *A*    After validating the information matched what I showed

3    Level 3 billed, yes I did then do simple math, using the first

4    reflected in columns A through D, to determine the end office

5    amounts billed by bill date.

6    *Q*    Can you bring up Exhibit A 22, please.  I realize that you

7    have not been in court the last few days, but this is damages

8    analysis that Level 3 put forward in March of 2020 and my

9    question is have you ever seen this document before, and why

10   don't you click on the the first tab, credited debit, and I am

11   going to highlight a few things four, just before you answer,

12   so you can see it, this is based an OTT percentage of 16

13   percent, do you see that?

14   *A*    The screen is getting blurry in and out.  Now I see column

15   F reflects 16 percent.

16   *Q*    If you scroll down do you see that the damages -- the

17   timeframe ends in March of 2020, do you see that?

18   *A*    I do see take, yes.

19   *Q*    And if you go to the A R summary, do you see at the top,

20   that it's a little bit different than the current numbers,

21   because you can see it just has the DEOT, do you see that there

22   it doesn't --

23   *A*    I see a DEOT column.

24   *Q*    The DEOT, and there it shows total damages, but it doesn't

25   show the 517,000 dollar credit, down below, to AT&T, that

O^P|WITNAME                    }  - Cross

1    number that's on the current analysis.  I'm just pointing out

2    some differences.

3              So my question now, to you is, have you ever seen this

4    document before?

5    A   I cannot speak to this document in particular, there were

6    several documents in a similar format, that were shared

7    where -- when AT&T and Level 3 were trying to reconcile the

8    total balances view.

9    Q   So that would have been last year that you might have seen

10   it?

11   A   There was lots of back and forth where Level 3 shared

12   spreadsheets in this such format, where AT&T requested the

13   supporting information, such as the billing details behind the

14   data, because we were looking at our own information to try to

15   align with the balances, and we were enable to align with

16   anything in these example spreadsheet outside of column B, the

17   total -- the new charges here which reflect the total charges.

18   Q   So let's bring up Exhibit 13.  Do you see Exhibit 13 is a

19   letter from AT&T's counsel Mr. Hunseder to myself, dated May 15

20   of 2020, attaching various materials in this lawsuit, do you

21   see that?

22   A   Is there any way to zoom, I can see the May 15, but if I am

23   expected to read anything in here, I can't.

24   Q   Is that better now?

25   A   Yes yes.  Thank you.  I do see this appears to be a -- a

O^P|WITNAME                    }  - Cross                           6

1   message send from Mike Hunseder to you.

2          MR. STEESE:  I move 13.

3          MR. WARDEN:  No objection.

4          THE COURT:  Received.

5   Q   Have you seen this letter before, Ms. Miller?  Just take

6   your time, read it to yourself, tell me if you have seen it

7   before?

8   A   I honestly cannot remember if I saw this one.  It's not as

9   I'm reading through it.  Doesn't seem familiar to me, but

10  there's a chance I did.

11  Q   Do you see where Mr. Hunseder says in the letter, the

12  differences between the parties' positions reflect legal or

13  factual issues.  Do you see that?

14  A   I see that, yes.

15  Q   So now let's look at Exhibit 10.  And Exhibit 10 is

16  entitled AT&T and TCG's supplemental disclosure, and if you go

17  to the very bottom, to get a date.  Entitled May 15, 2020, do

18  you see that?

19  A   Oh I see the date now, yes I do see the date.

20          MR. STEESE:  Move admission of Exhibit 10.

21          MR. WARDEN:  No objection.

22          THE COURT:  Received.

23      Q   (By Mr. Steese) So I realize that you are there, and

24  there's a lag time, so -- I'm going to scroll through this a

25  little bit, to see if if -- my question is have you seen this

```
                    O^P|WITNAME                } - Cross
```

1    document before, I just want to scroll through and let you look

2    at it.

3              Can you tell yet Ms. Miller?

4    *A*   It -- there were many documents shared back and forth

5    during the time of this.  Likely yes, I did see this.  I

6    don't -- once again I don't have a strong recollection of this.

7    *Q*   So, let's go back to A 22 for just a moment.  And why don't

8    you look at the debit and credit section do you recall an

9    instance where Level 3 was making a formal claim in this

10   lawsuit, that is OTT percentage was 16 percent.  Do you recall

11   that?

12   *A*   I do recall 16 percent was a value Level 3 had identified

13   as OTT at one point in time, yes.

14   *Q*   All right.  And if you look highlight the tandem add

15   back -- no just an individual cell.  All right.  Do you recall

16   a time when the tandem add back before February of 2020, when

17   the FCC's decision had not yet taken effect was not yet divided

18   by two.  Do you recall that?

19   *A*   I'm sorry are you asking if I remember when there was an

20   issue with the formula it sounds like.

21   *Q*   Exactly.  On the tandem add back, before February of 2020.

22   *A*   I do not recall that, no.

23   *Q*   Let's go to the A R summary.  And if you look at the A R

24   summary, the way Level 3 is calculating its damages, in March

25   of 2020, is to take total usage charges, subtract out the DEOT,

O^P|WITNAME                    }  - Cross

1    add -- utilize late payment charges, get an OTT credit, and

2    come up with total damages.  Do you see that?

3    A   He he I see that is what Level 3 d and we had -- all

4    expressed a problem with trying to align with this spreadsheet

5    what I would call the backwards engineering to get to the

6    value.

7    Q   Okay.  You think you have always raised that issue?

8    A   Yes, ever since we were trying to reconcile this, and we

9    had, in fact, shared, our view of the balances, and our own

10   format, including all of the back-up detail, bill detail.

11   Q   So let's look at page two -- excuse me, Exhibit 10, page

12   two.

13        MR. WARDEN:  Your Honor I'm going -- I'm going to

14   object to this testimony under rule 408, as these discussions

15   were in the context of an attempt to reconcile and settle the

16   litigation.

17        THE COURT:  I think we're too far down the rabbit hole

18   to stop now.

19        MR. STEESE:  I truly am not trying to ask about the

20   reconciliation she has brought it up a few times.

21        THE COURT:  That's what I mean we've discussed what's

22   gone back and forth and what she as known and what she has not

23   at this juncture I'm going to let it flesh it out, obviously I

24   don't mean to suggest that formal offers and this that and the

25   other they think are going to be admitted.

O^P|WITNAME                    }  - Cross

1              MR. STEESE:  And I was not even trying to go there.

2              THE COURT:  Understood.  No accusations, let's just

3    go.

4              MR. STEESE:  Fair enough.

5         Q    (By Mr. Steese) So let's look at Exhibit 10, page

6    two.  No, let's start on page one do you see where it says and

7    I quote AT&T TCG, collectively state that in response to the

8    disclosure of the testimony of Jennifer Torres, previously

9    submitted by Level 3, they do not plan to submit any testimony

10   they consider to be admissible based upon these rules.  Do you

11   see that?

12   A   I see that, I can't state that I understand what that means

13   but do I see that.

14   Q   I don't want you to think I'm not providing some piece of

15   this document to you.  Then it says, the avoidance of doubt

16   AT&T does not accept all of Ms. Torres' assumptions

17   calculations and conclusions, do you see that?

18   A   I do see that.

19   Q   It says AT&T does not intend to dispute the entries in

20   columns A and D in the second tab of Ms. Torres' spreadsheet

21   entitled AR summary.  Do you see that?

22   A   I do.

23   Q   So let's bring up Exhibit A 22.  And you look at columns A

24   and D, and it says it's not intending to -- this is the second

25   tab, it says it's not intending to challenge what's there.  Do

O^P|WITNAME                    }  - Cross

1    you see that?

2    A   Is this the spreadsheet that was aligned with that letter?

3    Q   Yes.

4    A   Okay.

5    Q   So, now let's go to the next paragraph, of Exhibit 10.  Do

6    you see where it says, as to the new charges and I am going

7    back and forth between exhibits and so if you don't have an

8    exhibit yet please tell me it's hard for me to tell, so I want

9    to make sure you are seeing as I go?

10   A   I'm on the letter now.

11   Q   Perfect.  Now -- on the disclosure.  Right.  It says, as to

12   the new charges, Level 3's column B, appears to include usage

13   charges and late payment charges.  AT&T's records regarding the

14   amounts billed for usage only during the time period show the

15   correct amount to be $26 million and change, do you see that?

16   A   Do I see that.

17   Q   And then it says AT&T disagrees with the application of

18   late payment charges, as further described below.  Do you see

19   that?

20   A   I do see that.

21   Q   So -- so there is a question, at this point has Level 3

22   tallied its total usage charges accurately, correct?

23   A   Yes, this paragraph, specific paragraph is speaking to the

24   total usage amounts billed, and the value that Level 3 has,

25   includes LPCs in that new charges column.

0^P|WITNAME                            }  - Cross

1    Q    Then you go to column C -- excuse me, the letter, it says,

2    AT&T disputes the figures in column C of the AR summary,

3    because its records show the appropriate amount to be and I am

4    paraphrasing, 2.99 million, do you see that?

5    A    I do.

6    Q    So now let's go back to Exhibit A 22, and do you see that

7    that relates to the DEOT usage and instead of 2.6 million, AT&T

8    thought it should be 2.99 million, do you see that?

9    A    Correct numbers credit amounts did not align.

10   Q    Okay.  So go back to Exhibit 10.  And the next paragraph

11   says, AT&T disputes the figure used in column E.  According to

12   AT&T's records, AT&T paid and again I'm paraphrasing, 19.26

13   million, do you see that?

14   A    I do see the payment amount, that was made towards the

15   total billing, yes.

16   Q    And so then, you go and also say as a matter of written

17   arrest thigh make particular this adjustment impacts the

18   balance in column F do you see that?

19   A    I do see that.

20   Q    So let's go back to A 22, you can see total payments.  You

21   had thought it was 19 million, at this point, Level 3 had 15

22   million.  Do you see that?

23   A    I do see.

24   Q    Which impacts the total balance in column F, correct?

25   A    Correct.  So our numbers were payments that were made

0^P|WITNAME                    }  - Cross

1   towards all the charges associated with these bill dates, did

2   not align with the numbers Level 3 reflected in their damages

3   summary.

4   Q   So so far -- excuse me what AT&T has challenged is they

5   have taken issue with the numbers, in the total usage column

6   and the numbers in the DEOT credit column, and the numbers in

7   the total payment column, which impacted the balance, correct?

8   A   Correct because the first step in any process is to

9   reconcile the total balances.

10  Q   Okay.

11  A   And you know obviously in order to do so the payments need

12  to be reflected correctly, and the credits need to be reflected

13  correctly, too.

14  Q   All right.  And that gets to the next paragraph of

15  paragraph 10 -- excuse me, Exhibit 10.  So if we get back now

16  to Exhibit 10, the next page and that's what you say AT&T's

17  contentions strike that.  AT&T contentions regarding these

18  amounts are based upon business records maintained by AT&T, and

19  the amounts billed and credited so exactly what you said, you

20  need to reconcile to make sure they were accurate, correct?

21  A   Correct.

22  Q   Then, you go down to the next paragraph, and scroll down a

23  little so she can see that whole paragraph.  Okay.  Perfect

24  that's good.  The next paragraph says, additionally, AT&T

25  contends that the issue of whether any prejudgment interest or

O^P|WITNAME                    }  - Cross

1   late payment penalty amounts are owed, is one for the Court to

2   decide in its discretion.  It cites some cases, and then, after

3   the cases, it says AT&T reserves its rights to contend and

4   present argument to the Court that no preadjustment interest

5   and or late payment penalty amounts are appropriate, assuming

6   damages are awarded.  Do you see that?

7   A   I do.

8   Q   I'm not intending to keep you from looking at the next

9   sentence, so read it to yourself.  But I'm going to go to the

10  last sentence if that's okay of that paragraph, on that basis,

11  AT&T disputes the inclusion of the amounts included in column G

12  and as noted any late payment charges included in column B.  Do

13  you see that?

14  A   I do see that.

15  Q   So go back to Exhibit A 22, and A 22 then shows the balance

16  due -- excuse me the late payment charges, excuse me in column

17  G, that AT&T thought there should be nothing in that column,

18  correct?

19  A   Yes I believe we were disputing the LPCs, correct.

20  Q   Then we go back to Exhibit 10, the next paragraph and it

21  says, further, AT&T contends that the OTT net credit, shown in

22  column I and calculated on the tab credit and debit is to too

23  low, and therefore disputes the entries in that column.  As

24  AT&T maintains in its other expert disclosures, and in other

25  testimony in this case, the 16 percent OTT factor used by Level

0^P|WITNAME                    }  - Cross                    14

1   3 has methodological flaws, and cannot be relied upon.  I'm

2   going to start there.  Do you see that?

3   *A*   Yes.

4   *Q*   And so, go to -- back to Exhibit A 22.  And, you can go to

5   the credit and debit, we looked at this, the other tab.  You

6   can see 16 percent, OTT, and if you -- it comes out to --

7   scroll down to the bottom to a total credit of 9 hundred -- and

8   I can't see that I'm sorry.  376,000 dollars, based on that 16

9   percent, do you see that?

10  *A*   I see that value, yes.

11  *Q*   And what AT&T was saying is that 16 percent number is too

12  low correct.

13          *MR. WARDEN:*  Objection foundation.

14          *THE COURT:*  Overruled.

15      Q    (By Mr. Steese) I'm sorry.  I didn't hear your

16  answer, Ms. Miller

17  *A*   The heart of this matter, what we're discussing here was

18  AT&T and Level 3's disagreement on what per ten takes and how

19  they should apply to OTT so yes we disagreed with the 16

20  percent.

21  *Q*   And then, going back to Exhibit 10, the next sentence, of

22  that same paragraph, says the recent order of the FCC provided

23  that its holding applied retroactively, and nothing in the

24  parties' 2015 Settlement Agreement allows Level 3 to retain

25  half of its charges that are unlawful under the FCC's rules and

O^P|WITNAME                    }  - Cross

1    order.  Do you see that?

2    A    I do.

3    Q    So now I go back to Exhibit A 22, that same tab.  Just

4    click on one of the columns at the top -- excuse me one of the

5    cell at the top, to the far right, one more not far right.  I'm

6    sorry.  Right there.  Can you see -- can you see that formula

7    okay Ms. Miller I just can't tell because of the screen?

8    A    Yes I can see the figure.

9    Q    You can see that Level 3 is dividing the OTT credit by two,

10   at least as of this month, do you see that?

11   A    I do.

12   Q    And AT&T was saying, that shouldn't happen, correct?

13   A    That was the -- you know part of as stated the OTT and what

14   at at felt was appropriate at that point in time, yes.

15   Q    So now let's go back to Exhibit 10.  Next paragraph.  It

16   says AT&T also disputes Level 3's contention that it is

17   entitled to the tandem add back debit shown in column I through

18   N, of the credit and debit tab, and included in the calculation

19   of the OTT net credit in column I, of the A R tab.  Level 3 may

20   only charge a single tandem, not two tandem charges, for the

21   functions it and it's VoIP partners perform in completing OTT

22   VoIP calls.  Do you see that?

23   A    I do.

24   Q    So now go back to Exhibit A 22?

25   A    And look at the -- that same credit and debt tab columns I

                    O^P|WITNAME                  }  - Cross                    16

1    through N Level 3 was calculating a tandem switching credit of

2    $209,000 and AT&T was saying none of that should come back in,

3    correct.

4    A   Correct.

5    Q   Go back to Exhibit 10, and then the last sentence, says

6    collectively, AT&T's disputes on the various figures relied

7    upon by Ms. Torres, impact her calculations shown in columns F,

8    H and J, which AT&T accordingly disputes.  Do you see that?

9    A   I do.

10   Q   And do you see that's the end of the AT&T challenge, with

11   Ms. Torres' damages analysis, as of May 15 of -- excuse me,

12   2020?

13   A   I do and I see from reading through this, that this pretty

14   much aligns with what I had previously stated, where we had

15   problems with the data being shown, and we could not align with

16   the data being shown.

17   Q   So, there is nothing in this disclosure saying that AT&T

18   believes there are additional disputes between AT&T and Level

19   3, that should be taken into account in this damage analysis,

20   does it.

21            MR. WARDEN:  Object to the form of the question.

22            THE COURT:  Overruled.  Go ahead.

23   A   Um, there's nothing that states that in this letter,

24   however, this analysis, I would have viewed as reconciling the

25   total balances, once both parties agree on total balances,

0^P|WITNAME                    }  - Cross

1   that's when the additional steps to determine what all the

2   inputs to those total balances would be.

3        Q    (By Mr. Steese) Were you aware, Ms. Miller, that this

4   was the time, May of 2020, for AT&T to identify its challenges

5   to Level 3's damage analysis, did you understand that.

6             MR. WARDEN:  Objection argumentative.

7             THE COURT:  Sustained.

8        Q    (By Mr. Steese) Did you have an understanding of the

9   purpose of this document?

10            MR. WARDEN:  Objection foundation.

11            THE COURT:  Overruled.

12  A   I'm sorry does that mean I can answer then.  I'm having

13  trouble hearing you say what.

14            THE COURT:  Yes.

15            THE WITNESS:  Okay thank you, no my understanding is

16  communication at this point in time was in regards to the OTT

17  dispute specifically.

18       Q    (By Mr. Steese) I don't know if you answered my

19  question make sure that you understand the question I'm asking,

20  in this lawsuit, did you have an understanding of what the

21  purpose of this document was

22  A   My understanding is the lawsuit was related to the OTT

23  dispute, so this document would have been related to the OTT

24  dispute.

25  Q   My question is slightly different and I appreciate your

O^P|WITNAME                    }  - Cross

1   answer, so I will phrase it differently.  Did you have an

2   understanding at this point in time, May of 2015, of the level

3   of analysis that was expected of AT&T to put forward challenge

4   Ms. Torres' damages calculation?

5            *MR. WARDEN:*  Objection.

6            *THE COURT:*  Hold on a minute.

7            *MR. WARDEN:*  Objection foundation argumentative.

8            *THE COURT:*  Overruled.

9            *THE WITNESS:*  And I am not sure I understand the

10  question, maybe it's just me.

11       Q    (By Mr. Steese) Fair enough.  I will try it again.

12  Did you have -- did you have an understanding in May of 2020,

13  when AT&T put this document forward, whether -- what the

14  purpose of this document was in the context of this lawsuit

15  *A*   I don't know if I had a full understanding of that.  This

16  was submitted by the attorneys.  I may have inputs into the

17  values, in here.

18  *Q*   So --

19  *A*   It was not --

20  *Q*   I'm sorry let you finish, please continue, I apologize.

21  *A*   No, no, no, I was just going to say it sounds like you are

22  asking me did I know what legally was required at this point in

23  time, and.

24  *Q*   I'm truly just trying to ask if you had an understanding

25  but I think you have answered that?

O^P|WITNAME                           } - Cross

1            MR. WARDEN:  Asked and answered.

2            THE COURT:  I agree I think we're done.

3            MR. STEESE:  I'm moving on to the next point.

4       Q    (By Mr. Steese) There's nothing in this document,

5   Exhibit 10, that says Level 3's claims are limited to tariffed

6   and end office charges, is there

7            MR. WARDEN:  Objection argumentative, at some point

8   Your Honor --

9            THE COURT:  At this point, as I did with you, or AT&T

10  now we are at the point of what a document says, and

11  ultimately, it says what it says, I don't need her to agree

12  with what it says or it doesn't say.  I can make my own

13  conclusions, in that regard.

14           MR. STEESE:  I will move on, then, Your Honor.

15      Q    (By Mr. Steese) Now, let's bring up Exhibit 17

16  Exhibit 17, scroll down on Ms. Miller can see it.  This says

17  AT&T's Rule 26(a) 2 disclosure.  And it says AT&T has disclosed

18  employ Alison Miller may offer testimony at trial regarding ...

19  amounts billed by Level 3 for end office switching charges and

20  it continues, do you see that

21  A    I do see that.

22  Q    Did you see this document at the time it was -- around the

23  time it was created and submit to the Court which was April 23,

24  of 2021?

25  A    It was probably -- actually I'm not sure.  It was probably

O^P|WITNAME                    }  - Cross

1   shared with me, but ...

2   Q   If you look at Exhibit 18?

3   A   Not positive.

4   Q   And if you look at Exhibit 18 it says, AT&T and TCG,

5   incorporate, scroll down, I want to make sure ... it says AT&T

6   states that in response to the damages analysis, provided by

7   Level 3, it does not plan to submit any testimony that it

8   considers to be and that's all legal stuff, for avoidance of

9   doubt AT&T does not accept the assumptions, et cetera.  Did you

10  see this document at around the time it was submitted.

11          THE COURT:  Hold on.

12          MR. WARDEN:  Your Honor what the point we are not

13  really asking questions, we're just having counsel read into

14  the record.

15          THE COURT:  I agree, and we're reading into the record

16  things that haven't been admitted.  I don't know what the point

17  of any of this is, if you want to move it, fine.

18          MR. STEESE:  Okay.  Fair enough Your Honor.

19          THE COURT:  If you want to move it and then have me

20  read it, obviously I can do that.  So are you moving 18?

21          MR. STEESE:  AT&T 17 and 18, yes Your Honor, I should

22  have done that.

23          MR. WARDEN:  No objection.

24          THE COURT:  All right.  They are admitted.

25      Q   (By Mr. Steese) I'm just asking you did you see this

21

O^P|WITNAME                    }  - Cross

1    document around the time that have it was submitted

2              MR. WARDEN:  Objection asked and answered.

3              THE COURT:  I will let it -- I will let it be answered

4    go ahead.

5    A   I honestly don't recall.

6         Q    (By Mr. Steese) So, it was April 23, 2021, when AT&T,

7    for the first time disclosed to Level 3, that its damages

8    calculations were attempting to limit Level 3's damages to end

9    office switch -- percentage of end office switching charges

10   isn't that true.

11             MR. WARDEN:  Objection foundation.

12             THE COURT:  Sustained.

13             MR. STEESE:  Your Honor I don't understand that

14   objection or foundation point, she is their person that's

15   putting forward the information.

16             THE COURT:  She is not their legal person.

17        Q    (By Mr. Steese) Are you aware of whether or not there

18   was any time before April 23 of 2021, where, in this lawsuit,

19   AT&T informed Level 3, that it was attempting to limit Level

20   3's damages to a percentage of it's end office switching

21   charges

22             MR. WARDEN:  Objection foundation.

23             THE COURT:  I will -- no I will let her answer that.

24   Overruled.

25             THE WITNESS:  I'm not aware what may or may not have

ALISON MILLER - Redirect

1    been shared by legal.  I am aware, during this entire time

2    reviewing OTT information, the percentages and applications

3    have always applied to end office billing.

4            MR. STEESE:  Your Honor that's all of the questions

5    that I have.

6                        **REDIRECT EXAMINATION**

7    BY MR. WARDEN:

8    Q    Good morning, Ms. Miller.

9    A    I'm sorry.  Caught me drinking.  Good morning.

10   Q    That's fine.  Can we go to Exhibit 76 please, in evidence.

11   And you testified about Exhibit 76 yesterday, and the columns

12   on the left, A through F, are replicated from Level 3's

13   analysis; is that right?

14   A    That is correct.

15   Q    And were you able to reconcile those numbers, with AT&T's

16   records?

17   A    What column I'm sorry if you could zoom in a little bit.  E

18   and F were calculations, but I did verify columns A through D,

19   the bill date, elements, minutes and revenue matched what ADW

20   reflected for those same periods.  It would be expense to me,

21   revenue for Level 3.

22   Q    Thank you.  Can we go to -- let me ask one more question

23   about this.  So you used these numbers, in your calculation on

24   the right with the yellow headings; is that correct?

25   A    Because I had verified that these numbers aligned, with

ALISON MILLER - Redirect

1   what the ADW data showed with the exception of the roughly

2   30,000 dollars I mentioned, I did use you know Level 3's

3   format, and the specific you know as shown here, and applied

4   that to my mathematical calculations.

5   Q   And can we go to A 22, please.  Can we go to the -- oh I'm

6   sorry.  Is this the first page of A 22 okay.  Mr. Steese asked

7   you a whole series of questions about this document, a few

8   minutes ago, you remember in general those questions, right?

9   A   Yes.

10  Q   So let's go to -- I believe it's page eight of the

11  document, I think is A 22, and, Ms. Miller from time to time,

12  you have seen Level 3's analysis of billings, and withholdings

13  in this case; is that right?

14  A   Yes.

15  Q   And do you recognize this as tab one, of those analyzes?

16  A   I -- I recognize this as being the format of the

17  information provided by Level 3.  Do I remember this particular

18  one?  Can't say I do, but, it's in the familiar format of what

19  I reviewed.

20  Q   Let me try it a different way, Ms. Miller.

21          So, do you believe that this is one tab of a

22  spreadsheet?

23  A   Yes.

24  Q   Can we turn to the next page, please and this is another

25  tab of the spreadsheet?

ALISON MILLER - Redirect

1   *A*   Correct, if I recall there were three tabs.

2   *Q*   And all of the questions that Mr. Steese asked you, were

3   about this tab, right?

4   *A*   Correct.

5   *Q*   Can we go back one more?

6           *MR. STEESE:*  I'm going to object that miss states the

7   record.  I asked about both tabs.

8           *THE COURT:*  Sustained.

9      *Q*   (By Mr. Warden) Can we go back one more.  And

10  Mr. Steese also asked you, in this page eight about the

11  percentage of 16 percent, right

12  *A*   You are correct he did ask about the 16, and there was a

13  question about the the formula, and something with tandem back

14  in this file here.

15  *Q*   And when, from time to time, you saw a spreadsheets like

16  this Exhibit 22, were you generally able to reconcile the bill

17  dates, the minutes of use and the revenue?

18  *A*   Yes as I believe I stated in my testimony yesterday this is

19  reflective of Level 3's billing to AT&T.  My ADW reports,

20  matched -- should match exactly what Level 3 billed, because it

21  is a records -- our records are our warehouse that contains the

22  detail of those bills, so did I reconcile, that we received

23  this our ADW information.

24          *MR. WARDEN:*  May I have one moment, Your Honor?

25          *THE COURT:*  Yes.

25

ALISON MILLER - Redirect

1           MR. WARDEN:  No further questions, thank you

2     Ms. Miller.

3           THE COURT:  You are excused thank you.  We can break

4     the connection.  Next witness.