# EXHIBIT 1

REALTIME NOT TO BE QUOTED

1    the other factors that need to be subtracted to give you the

2    number that was caused by here, AT&T.  And that's exactly what

3    we've done.  So if you look to the second -- if you see the

4    name each has A, B, C, et cetera, and we will bring that up on

5    the screen when it's -- with witnesses, but you can see each

6    month, and then it says new charges.  These are the charges

7    that Level 3 bills to AT&T on all of those tallied bans, month

8    over month over month, and in these are those switched access

9    charges which are uses saying base so much per minute so much

10   per mile, so much per call depending on what type of charge,

11   and it also includes late payment charges.  So these are the

12   total charges, then if you look at the next several columns

13   over, to the right, there's something for this thing called a

14   DEOT and a couple of there's something for new affiliated

15   tandem dispute what these are, are other disputes that Level 3

16   had with AT&T that they needed to account for.  The DEOT was

17   already taken care of in a settlement and these numbers are

18   stipulated to in those columns.

19        The two couple of columns over to the right new

20   affiliated tandem is new dispute that started in December of

21   2020, and the first number 251,000 and change is an exact

22   number, and after that those are estimates of the values that

23   are associated with that dispute.

24        So what Level 3 is trying do is tally exactly what

25   AT&T has withheld for this OTT dispute.  And so, if you go over

REALTIME NOT TO BE QUOTED

1    Level 3, and we had to reconcile how much money was

2    appropriately withheld, on this end office dispute, this CPN

3    dispute, and importantly, looking at page three, this is a --

4    one of the most important emails Your Honor is going to see in

5    our view, in the case, it's from Alison Miller, of AT&T,

6    entitled withholding, and they start off and they first say,

7    there was no withholding that we've taken so far, on the OTT

8    dispute, so there was no end office withholding for that,

9    instead there's withholding above the current dispute value,

10   for the end office CPN issue, due to Level 3's billing

11   containing both end office and tandem billing on the same BAN,

12   remember those billing account numbers, on those invoices,

13   which complicated the mechanized rate base withholding.

14        In other words, what are they saying?  That in -- in

15   an effort to withhold, on end office charges, they have a

16   mechanized process, that automatically pays and withholds.  And

17   that mechanized system can't tell which of these are end office

18   charges, and which of these are tandem charges, and it causes

19   them to over withhold.

20        How much was that CPN dispute actually worth?  Well

21   AT&T answers that question too.  Same email, just further down.

22   It says, again from Alison Miller, I know that you and Jennifer

23   are working to provide the end office CPN details I requested

24   dot, dot.  I believe the methodology, I used that Alison Miller

25   used to get to the 7.7 million dollar dispute value was solid.

REALTIME NOT TO BE QUOTED

 1   for doing, if they were billing correctly, was there's a tarrif

 2   in place, so you are going to hear a lot of testimony, about

 3   what -- what we d in response to give them notification of

 4   these disputes.  You are going to see examples, this is just --

 5   excuse me ... these are a couple of examples of these DISPUTE

 6   that the machine automatically sends out.  These are just --

 7   Mr. Steese I believe said we have a lot of recent excuses not

 8   to pay.  These are mechanized systems notices that go out all

 9   the time then there's emails between the parties, and we notify

10   them, and we do something called a rack up where we look at our

11   bills we say hey you are charging us for something called you

12   know super tandem we don't see anything in your -- your bills

13   for subpoena peer tandem how are you calling that something

14   different than your tariff what's going on here?  That is the

15   kind of do log that goes on all the time between these parties

16   and it has nothing to do with this OTT dispute over that red X.

17            So, they know we provide regular notice they know that

18   and in fact, as I said this is where the shenanigans this week,

19   we actually got a new damages chart Monday night so less than

20   48 hours ago, that acknowledged that we had sent one of these

21   other notices, so that's why when Mr. Steese said he did the

22   calculation, and he subtracted the disputes that they were

23   aware of, up until Monday night, they had said, the only

24   disputes that we knew of were this thing called DEOT and OTT so

25   that's why Level 3 says it's appropriate for us to take all

REALTIME NOT TO BE QUOTED

1    charges, and just subtract out the amounts for these other

2    disputes that AT&T has identified but that doesn't work,

3    because there were a number of other disputes, and they knew

4    that.

5          Now this is all way, way, way away from the contract.

6    As you know, this is way, way away, but I'm simply saying, a

7    lot of our case will be, frankly giving you comfort that there

8    were no shenanigans going on with these other charges, the way

9    they were handling our processes is appropriate.  That's why

10   each of their other theories, just doesn't fly, don't fly.

11         The parties did not refer to end office switching

12   charges generic click.  These are people that in the industry

13   who very specific technical terms we have all learned that

14   through the litigation.  The -- the argument that we heard a

15   little bit -- actually we heard it a lot about was this

16   mechanized bill payment system Mr. Steese went way, way, way

17   down in the weeds of a totally different dispute, a CPN dispute

18   and he was trying to make some sort of mathematical status at

19   this shall not type of match between other charges.  That is --

20   that is just not true.  AT&T has the ability to determine end

21   office charges, that Level 3 levied on AT&T and AT&T has done

22   that.

23         So -- but because we're here and we have to rebut the

24   things they are saying, you going to see a lot of charts like

25   this, this is our mechanized payment system it's going to tell

MELISSA KELLOW – Cross

1  didn't mean to cut you off?

2  *A*   That's okay.

3  *Q*   Your conclusion, you said was based on the disputes that

4  you said AT&T has identified; is that right?

5  *A*   Correct.

6  *Q*   Okay.  And you -- did you tell the Court on direct

7  examination, that the only disputes that AT&T has identified

8  during the the relevant time period were the on the on the

9  dispute, the DEOT dispute and this recent I think you described

10  it as back billing of tandem charges?

11  *A*   Correct.

12  *Q*   That's basically what you just said a moment ago right?

13  *A*   Correct.

14  *Q*   You are positive that AT&T has never once provided any one

15  in your company, Level 3, any other disputes during this

16  relevant time period?

17  *A*   Correct.

18  *Q*   That's your testimony?

19  *A*   Yes.

20  *Q*   Not just from Ms. Miller, for ever one?

21  *A*   For who.

22  *Q*   I'm sorry for Ms. Kellow this is not your personal

23  testimony this is for Level 3, AT&T never provided another --

24  any other notice of a dispute from January 1, as we sit here

25  today that's your testimony?

MELISSA KELLOW - Cross

 1   *A*   Related to these charges, no.

 2   *Q*   Well these are all charges, right?

 3   *A*   Correct.

 4   *Q*   Correct.  You said they were all usage charges and there's

 5   been no other identified dispute?

 6   *A*   Correct.

 7   *Q*   Okay.  I'm going to introduce Exhibit number -- this is

 8   Exhibit number 95, Your Honor.  This is a -- an impeachment

 9   evidence -- impeachment exhibit.

10        Let's pull it up on the screen then.  Chuck I'm happy

11   to give you this copy, if you like.  Are you pulling it up.

12        All right.  So this is an email -- well first of all

13   do you know Rob Hayes?

14   *A*   Yes.

15   *Q*   Bob Hayes is in AT&T the department that plays Level 3's

16   bills, correct?

17   *A*   Correct.

18   *Q*   And you have dealt with him on AT&T and Level 3 billing

19   disputes, correct.?

20   *A*   Correct.

21   *Q*   So this is an email from April 15th, 2020 that's in

22   relevant time period, correct?

23   *A*   Correct.

24   *Q*   And it is referring to a significant uptick in rate

25   disputes associated with Level 3's switched access invoices

MELISSA KELLOW – Cross

1    starting in March of this year.  Do you see that?

2    *A*    In March of this year?

3    *Q*    Um, the email says March of this year did I read that

4    correctly?  Okay.  Let me start again.  Do you have any reason

5    to believe that you didn't get this email from Mr. Hayes on

6    April 15th, 2020, Ms. Kellow?

7    *A*    No.

8    *Q*    And, so, Mr. Hayes wrote you, that we observed a

9    significant uptick in rate disputes associated with Level 3's

10   switched access invoices starting in March of this year.  Did

11   ride that correctly?

12   *A*    You did, yes.

13   *Q*    Okay.  All right.  I want to talk about a different subject

14   then.  I want to talk about OTT traffic, and the FCC

15   declaratory rulings.

16         You are aware that the FCC had decided in February of

17   15, that end office switching charges -- you can take that

18   down, thank you.  That end office switching charges could be

19   charged, on OTT traffic, do you recall that?  I know you are

20   not a lawyer but do you recall that ruling generally?

21   *A*    I recall it in general terms.

22   *Q*    Bus you work in billing so you know about these things

23   right?

24   *A*    Right.  I have an understanding, but I'm not the expert.

25   *Q*    Did you understand that the rules on billing had -- at

1   *A*   Yes.

2   *Q*   Is the 8 YY disputes resolved?

3   *A*   Yes.

4   *Q*   So all that's left of these disputes unresolved is what

5   *A*   OTT.

6   *MR. STEESE:*  Just one moment, Your Honor, I think I'm

7   finished.

8   *MR. STEESE:*  Your Honor that's all the questions that

9   I have.

10   *THE COURT:*  All right.  You are excused thank you.

11   *MS. ZAMBRANO:*  Your Honor I had a couple of recross

12   questions may I do so.

13   *THE COURT:*  Go ahead.

14   *MS. ZAMBRANO:*  Okay.  Thank you Your Honor.

15                    **RECROSS–EXAMINATION**

16   *BY MS. ZAMBRANO:*

17   *Q*   Will you please put up Exhibit 79 Ms. Kellow, you were just

18   testifying about the competitive tandem billing dispute.  And

19   you -- and we read an email how AT&T described it to you, do

20   you recall that just a few minutes ago?

21   *A*   Yes.

22   *Q*   Okay.  Had AT&T ever described that combined billing issue

23   to you, in any way, that suggested that there was a competitive

24   tandem billing, and local switching billing issue, and that

25   was --  let me start again.  Had AT&T ever, outside of the

1  email that you just testified about, had they ever explained

2  that combined billing issue to you anywhere else?

3  *A*    No.

4  *Q*    Okay.  Let's look at Exhibit 79.  Exhibit 79 is an email

5  from an Anna dot, I don't know how to say her last name, S Y V

6  O K H I N A at AT&T dot com, and it's sent to an ICC billing to

7  Level 3 dot com.  Is that a Level 3 billing email address?

8  *A*    Yes.

9  *Q*    So this is Level 3, the company receiving something from

10  AT&T correct?

11  *A*    Correct.

12  *Q*    And the something the title is AT&T connectivity billing

13  management dispute notification.  Do you see that?

14  *A*    Yes.

15  *Q*    So that's a dispute notification from AT&T to Level 3,

16  correct?

17  *A*    It's a title saying that there's a dispute notification.

18  *Q*    Okay.  You don't think that sending an email that says it's

19  a dispute notification qualifies as a dispute notification to

20  Level 3?

21  *A*    It depends on the detail contained in the email.

22  *Q*    Okay.  You said -- I'm going to ask you about -- can you go

23  away from the email for just a moment that was the next subject

24  I was going to ask you about.  You said it wouldn't be valid

25  dispute if it didn't have all of the information, like it was