# EXHIBIT 2

1   *Q*   DEOT, OTT only, right?
2   *A*   Correct.
3   *Q*   And then, I think you also looked at A 53, with Mr. Steese,
4   yesterday. Can we go to A 53. So, are you aware that there
5   are actually two versions of A 53, one from July 7th, do you
6   remember this being revised?
7   *A*   Yes.
8   *Q*   The July 7th one, again, that's DEOT, OTT only, right?
9   *A*   Correct.
10   *Q*   And then for the one we got on Monday night, 53, that has
11   another dispute in it, right?
12   *A*   Correct.
13   *Q*   And that is an affiliated tandem dispute, as you
14   characterized it, correct?
15   *A*   Correct as Ms. Kellow said yesterday we were made aware
16   that that was missing on Friday, by AT&T and we corrected it by
17   Monday.
18   *Q*   I'm glad you mentioned what she said because, you were here
19   for her testimony, right?
20   *A*   I was.
21   *Q*   And do you recall that she was asked, what happened to lead
22   you to create a new damages spreadsheet, in July of 2021?
23   *A*   Yes.
24   *Q*   And she said in effect AT&T brought to our attention that
25   we had not taken into account the tandem dispute. Do you

1  recall in general, that testimony?
2  A    I do.
3  Q    And do you recall Mr. Steese, said, when did AT&T provide
4  us with that information and your colleague said Friday, July
5  9th, right?
6  A    Correct.
7  Q    That's not quite right, is it?
8  A    Well we get the dispute letter prior to Friday, yes, we
9  were just made aware Friday that our damages wasn't including
10 it, and so we wanted to make sure that we corrected it.
11 Q    So as a matter of fact, Level 3, is notified of this
12 January 4th, 2021, not July 9th 2021, correct?
13 A    That these were filed previously, yes.
14 Q    Can we pull up Exhibit 84, please.  And can we just go to
15 the second page.  Do you know Diane wood?
16 A    I don't know her personally.
17 Q    But, you know she works for Level 3, right?
18 A    Yes.
19 Q    And do you see that this is an email from AT&T to Diane
20 wood, January 4th, 2021?
21 A    I do.
22 Q    And it refers to December bills, which include back billing
23 charges, do you see that?
24 A    Yes.
25 Q    And then, on the bottom of page one, do you see that

Jennifer Torres – Cross

1   there's a response, from Ms. Wood?  The bottom, please.  There
2   we go.  Do you see the response?
3   A    I do.
4   Q    And then if you go to the top, there's February 8th, email
5   from Alison Miller to Diane wood, about the back billing, and
6   at the end, of the large paragraph it reads, therefore, I ask
7   that you provide a credit of $251,727.25 associated with the
8   billing for these C L L I all caps, codes, on the December
9   invoice, and not issue any additional billing for this traffic.
10  Do you see that?
11  A    I do.
12  Q    And your damage study, that you provided on Monday includes
13  that 251,000 dollar figure, right?
14  A    Correct.
15  Q    It includes credits for subsequent months, right?
16  A    Correct.
17  Q    And so, Level 3, continued to issue billing,
18  notwithstanding this dispute letter?
19  A    I don't know that it's been resolved or that we agreed,
20  that a credit was due.
21  Q    I assume you took some effort to identify all potential
22  disputes before you and Level 3 represented that the only two
23  disputes were OTT and DEOT?
24  A    Yes.
25  Q    You missed one, right?

1    *A*    I did miss one.

2    *Q*    How many others?

3    *A*    None that I know of.

4    *Q*    And you didn't know about this until AT&T marked it as an

5    exhibit for use at this trial?

6    *A*    Yes.

7    *Q*    So, let's look at some of the components of your damage

8    claim if I may, Your Honor?

9        *THE COURT:* Yes. We've established that this 57 I

10    will call it point five million dollar number is everything,

11    right?

12    *A*    Yes.

13       Q    (By Mr. Warden) And how much is the -- of that 57.5,

14    how much is late payment charges

15    *A*    I believe the number was a 2.17 million dollar number.

16    *Q*    I'm sorry.

17        *MR. STEESE:* I'm going to object on vagueness grounds.

18    How much was in the everything that's the is the late payment,

19    how much is the calculation is the late payment, it's two

20    different questions and it creates vagueness.

21        *THE COURT:* Overruled.

22       Q    (By Mr. Warden) I'm sorry what did you say about 2.--

23    *A*    Well so the appropriate calculated LPCs, put in the damage

24    claim is a different number than what we billed, because we

25    showed that we reduced late payment charges that were wrong, by

1   develops the paid unit cost and the 35 percent to say pay at 35

2   percent and thereby withhold 65 percent.

3   Q   Can we pull up Exhibit 36, please.  Ms. Miller what is

4   Exhibit 36 actually if you go to the second page, so you are

5   aware where the emails begin.

6           So what is Exhibit 36?

7   A   I have to just see which one this is, because I remember

8   this as a -- um ... okay.  So this is the May 2017 email at

9   this point in time I had spoken end office --

10          *THE COURT:*  Hold on one moment please.  Go ahead.

11          *MR. STEESE:*  I realize that the issue is being

12  discussed here.  This is an internal email, it is hearsay, and

13  so, at this point in time, we would move to have her discuss

14  the issue, if she needs refreshing that's one thing, but it is

15  hearsay, and we would object as such.

16          *THE COURT:*  All right.  Let's just discuss the issue,

17  and if we need to get to the exhibit -- well --

18          *MR. WARDEN:*  She authored -- did you author this email

19  at or around the time of May, May and August of 2017.

20  A   Yes these were my emails with my directions to the price

21  sheet team.

22          *THE COURT:*  I'm going to allow it.  Go ahead.

23          *MR. WARDEN:*  I offer 36.

24          *THE COURT:*  He has got an objection hearsay, I

25  overrule it, I'm allowing it.

| | |
|---|---|
| 1 | Q    (By Mr. Warden) Okay, so let's start with the May 8th |
| 2 | email at the bottom of the first page, what is that |
| 3 | A    Sure.  So, this email -- as I mentioned previously, had an |
| 4 | end office CPN dispute that was close to resolution, in May |
| 5 | timeframe, I -- we had determined that that issue had been |
| 6 | corrected, so this is the email where I directed the price |
| 7 | sheet team to remove the factor that had been applied to the |
| 8 | end office for that end office CPN dispute. |
| 9 | Q    And let me just ask who these people are, I hope I get |
| 10 | these names right.  Is sandy mull lick, swam pill calm ably, |
| 11 | and arrest del bur guess who are these? |
| 12 | A    Well arrest del is my manager, the other members, you |
| 13 | mentioned are what I would call the price sheet team, they deal |
| 14 | with the price sheets. |
| 15 | Q    And let me -- |
| 16 | MR. STEESE:  I just didn't hear that answer because |
| 17 | she cut out for a moment. |
| 18 | THE WITNESS:  I'm sorry. |
| 19 | Q    (By Mr. Warden) Did you end your answer with price |
| 20 | sheet team |
| 21 | A    Yes I ended with price sheet -- swab nil, Gerry and Sandeep |
| 22 | are part of price sheet team. |
| 23 | Q    And directing your attention to the August 7th, email, |
| 24 | August 7th, 2017, and this is to the the San deep I need to |
| 25 | request another up date to the L ... price sheet to input the |

1     EO per ten saying field as 35 percent for all states slash

2     OCNs, in order to care for our OTT dispute.  Attached is the

3     same file as last time, with a new changes, and office

4     percentage highlighted in blue.  Did I read those two sentences

5     accurately.

6  *A*   Yes, you did.

7  *Q*   And so what were you telling the price sheet team to do?

8  *A*   So, this -- this direction as I previously mentioned was

9     related to the OTT dispute where 65 percent of the traffic was

10    associated with OTT, and so this direction was to pay or add a

11    factor into the price sheet for the paid unit cost calculation,

12    that applied at 35 percent towards the end of office elements.

13 *Q*   And does that therefore withhold -- strike that.  Does that

14    therefore withhold 65 percent from those elements?

15 *A*   Correct.

16 *Q*   And there's -- the last sentence refers to an effective

17    date of June 1st, 2015.  What does that mean?

18 *A*   So sometimes a company might render -- usually when we

19    receive bills from a company in the case of Level 3, their bill

20    will be for the months prior usage however sometimes a company

21    may bill us for usage periods that go back much further, and I

22    think we would call that a back bill.  So what this did was

23    establish that should Level 3 render us billing that had usage

24    up to and including the effective date of the Settlement

25    Agreement, that that 35 percent calculation would be applied or

ALISON MILLER - Direct

1   that -- the unit -- the paid unit cost resulting from that 35
2   percent application would also apply to that -- that billing,
3   for that usage period.
4   Q   Can we go to the attachment A 36, page one of five.  So if
5   you go to the bottom page five he have five it looks like there
6   are 177 rows in this file.  What do those rows represent?
7   A   So these represent the individual inputs for each state
8   direction jurisdiction.  Because it is less than early
9   calculated 200, I believe at this point in time, the inputs
10  that I were providing were for the states that had the top 90
11  percent of the expense.  Sorry I will stop there.
12  Q   And let's look -- is there a way to below up the top row,
13  row number one, and maybe capture that first California entry?
14  Q   Can you see that okay, Ms. Miller?
15  A   Yes.  Thank you.
16  Q   And your email indicated that there was a highlighted
17  column.  What column is that?
18  A   That would be column N.
19  Q   And what does column N represent?
20  A   So column N represents the end office factor of 35 percent,
21  that I had directed in that email.
22  Q   And do any of the other columns represent end office
23  categories let me ask -- let me state that better?
24  A   Okay.
25  Q   Do any of these other columns fall within the end office

1    Q    (By Mr. Warden) Now, I would like to look at -- can
2  you look at Exhibit 82, please.  Can we below that up a little
3  bit.
4  A    Thank you.  Any way to make that a little bigger, Robb?
5  You know what, let -- let me try it this way.  82 is in
6  evidence and do we have what was demonstrative 8 at one point
7  in time.
8  A    You can't see that because I can see that.
9  Q    The thing is --
10        *THE COURT:*  I have got a book.
11        *MR. WARDEN:*  Okay.
12        *THE COURT:*  I can come close to the screen to see it
13  as long as she can see it, I'm fine I assume that each of the
14  lawyers' table have books they can open up the book.  All right
15  we're on the same page.
16        *THE WITNESS:*  As long as you don't mind my leaning in,
17  I can see it.
18    Q    (By Mr. Warden) What is Exhibit 82
19  A    So this is just three states that show the example of the
20  OTT percentage as applied to a noncombined bill and then a
21  combined bill by Level 3.
22  Q    And what time period does it represent?
23  A    So this is for the January 2020 bill date.
24  Q    And what states are reflected here?
25  A    So for the noncombined bill, the states are Alaska and

1  Hawaii, and for the combined bill, it's the state of North
2  Carolina.
3  Q   Now, you said Alaska and Hawaii are noncombined bills, is
4  that why you selected them?
5  A   Yes.  Alaska -- excuse me Alaska and Hawaii are a bit of an
6  anomaly, in that Level 3 only bills end office in those states
7  there's no tandem billing.
8  Q   And can you walk us through the Alaska row, please?
9  A   Sure.  The first column B, is the OCN which is operating
10 company number, the second column, C is the state, column D is
11 the jurisdiction, and it states all, because this data is
12 consolidate forked the interstate and intrastate jurisdiction
13 on it includes all of it.  Column E is the bill date.  January
14 2020.  Column F and G are both from A D W report, with column
15 F, reflecting the billed originating usage dollars for each of
16 the states.  And column G reflecting the paid originating usage
17 dollars for each of its states.  Column H, calculates the total
18 originating usage that was withheld, by subtracting column G,
19 from column F.
20 Q   Let me -- let me stop you there, Ms. Miller.  So, F is the
21 amount that Level 3 billed AT&T?
22 A   For the originating usage those would include database
23 query, yes column F is the amount that Level 3 billed AT&T for
24 this bill date.
25 Q   And is that an actual number that you pulled from the

1  access data warehouse?
2  A  Correct that I -- it comes straight from one of the reports
3  I pulled from the A D W.
4  Q  And then G is the amount of the bill paid, by AT&T, is that
5  correct?
6  A  Correct.
7  Q  And then H is just column F, minus column G?
8  A  Correct. Billed minus paid so F minus G results in column
9  H which is amount withheld for that bill.
10 Q  And then what is column I?
11 A  So column I is another calculation it's column H divided by
12 column F. So it calculates the percentage holding as compared
13 to the total amount billed.
14 Q  So that -- in that 65 percent for both Alaska and Hawaii,
15 correct?
16 A  Correct.
17 Q  And that's 65 percent is a calculation of the -- that's
18 derived from the actual amount billed by Level 3 and the actual
19 amount paid by AT&T; is that correct?
20 A  That is correct.
21 Q  Now let's look at North Carolina. Why did you select North
22 Carolina?
23 A  I just picked one state that was a combined bill.
24 Q  And so can you walk us through, let's take F through H for
25 North Carolina?

1  *A*   Okay.  Sure.  So once again, the source of F and G, were
2  from an A D W report, so the amount Level 3 billed for
3  originating usage for North Carolina, was about 34,000 dollars,
4  the amount AT&T paid was about 28,000 dollars, so the
5  difference between those two, is the amount AT&T withheld, that
6  was about 5,500 dollars.
7  *Q*   And then, what is the calculation in column I?
8  *A*   So in column I, it's the amount withheld, as compared to
9  the total billed.  So the -- 5,500 dollars divide by 34,000,
10 resulted in us with holding 16 percent of the total billing.
11 *Q*   And then, there's originating end office billed and
12 originating tandem billed, and then a tandem to end office
13 ratio.  Can you -- end office billing ratio.  Can you explain
14 those three columns please?
15 *A*   Sure.  Column J column K once again or both from the A D W
16 report, so this now breaks down what the amounts were billed,
17 that 33,000 broken out by what was billed towards end office
18 and what was billed for tandem and transport.  And so there was
19 about 7,000 billed for end office and about 27,000 billed for
20 tandem.  And so, if I did the rash I don't expenses, it shows
21 that the expense for tandem was about four to one, that of the
22 was billed for end office.
23 *Q*   And that's the equivalent of that rash I don't that's the
24 factor in mechanized billing?
25 *A*   It's not an exact equivalent because this based on expenses

1  and that factor is based on volumes, but it's -- it's like the

2  same calculation, or similar.

3  Q   And then once column M, for North Carolina?

4  A   So (What's ease) 8 based on the 65 -- or the 35 percent

5  payment, 65 percent withholding being applied to end office

6  this calculates 65 percent of the end office billing as 4600

7  dollars, roughly, and then.

8  Q   Go ahead I didn't mean to interrupt?

9  A   Sorry.  Column N, the difference between the total withheld

10 and the end office withhold inning column M, and that's called

11 the tandem withholding, or with holding before 65 percent of

12 end office that was about 892 dollars.

13 Q   And is that withholding of 892 dollars caused by the 65

14 percent withholding or the 35 percent payment for OTT dispute?

15 A   No.  That 35 percent only impacts the end office billing.

16 Q   And so that 892.06, is not caused by the OTT dispute?

17 A   That would be -- would have been caused by some other issue

18 or something else that called -- caused the build unit cost to

19 be higher be the paid unit cost but it would not be due to the

20 65 percent -- or 35 percent factor.

21 Q   Let me ask you a couple other questions.  Did AT&T at some

22 point stop withholding on end office charges?

23 A   For OTT, yes.

24 Q   Yes for the OTT dispute.

25 A   Yes.

1   bill date BAN, state, jurisdiction, and direction level, so

2   what this show, the usage disputed amount which that would have

3   been the amount that was withheld totals 3300 dollars for this

4   particular notice.

5           *MR. WARDEN:*  I would offer 79.

6           *MR. STEESE:*  It's in.

7           *THE COURT:*  It's already in.

8           *MR. WARDEN:*  Okay.

9       Q   (By Mr. Warden) Can we go to 78, please.  And is

10  Exhibit 78, a similar notice for the same time period for the

11  states of Iowa and South Dakota

12          *MR. STEESE:*  Your Honor before the answer to that, I

13  know 79 is in and I am not making a record of that, but these

14  other exhibits were literally given to us, less than two weeks

15  ago and not disclosed in discovery, so we would object to late

16  filed and submitted information.

17          *MR. WARDEN:*  Your Honor do I need to be heard?

18          *THE COURT:*  Well, you need to be heard and I need to

19  be heard.  What I'm going to tell you is that, ultimately, if

20  we're looking at examples of dispute notifications, I'm not

21  sure what the difference is between one three, five, seven,

22  nine.  And so I don't really know.  I will let you be heard on

23  it but I'm not really sure what the point of additional

24  examples is.

25          *MR. WARDEN:*  As long as these are understood to be

1  examples because there are three or examples and it's just that

2  these are regularly generated notices.

3      *THE COURT:* You got one in the record, I don't -- I

4  don't know why you need to put the others in the record. Ward

5  war I'm fine with that, Your Honor.

6    Q  (By Mr. Warden) And then can we go to 84 and 84 is in

7  evidence just very quickly can you describe 84

8  *A*  Sure this would be an example of a dispute notice that I

9  sent this one was sent via email, and this one had to do with

10 there was a back bill received from Level 3 in the December

11 2020 timeframe, once I reviewed the back bill, I identified

12 that the billing was inappropriate, and not aligned with the

13 requirements the transforms order and I disputed and we

14 withheld 251,000 dollars associated with this dispute.

15 *Q*  And earlier this year did you send a letter to Craig Davis

16 at Level 3, regarding nonOTT disputes?

17 *A*  I did.

18 *Q*  Can we pull up Exhibit 23, please. Is this March 12th,

19 2021, letter, the letter that you sent to Mr. Davis?

20 *A*  It is.

21     *MR. STEESE:* Your Honor I'm going to object to this

22 you can see at the top this was an attempt to get this matter

23 resolved, it specifically states rule 408, and state counter

24 parts.

25     *THE COURT:* Sustained.

1   and nontariff element that Level 3 had begun to bill and at one
2   point in time, and we spent time and money with our systems to
3   be able to recognize that element, and then in March of 2020
4   there was a new element rendered, that once again was not
5   nonstandard, and was not aligned with any element identified in
6   their tariff.  As well as there were several benchmarking
7   issues, identified such as inappropriate rates or you know
8   rates not aligned to jurisdiction.
9   Q   And did you do anything to investigate the issue regarding
10  improperly billing intrastate tandem switching at end office
11  rates?
12  A   I did.
13  Q   And what did you do?
14  A   So for one particular state -- one OCN that covers two
15  states of billing I did a detailed review of the incorrect
16  rate.
17  Q   And --
18  A   And identified that the -- the dollar amount associated
19  with that incorrect billing.
20  Q   Can we go to Exhibit 85, please.  And what is Exhibit 85
21  let's start with the about second page?
22  A   So this is a bit of an --
23          *THE COURT:*  Hold on again.
24          *MR. STEESE:*  Your Honor this again was literally
25  disclosed Friday, last week, and this is another analysis that

1   is done for purposes of this litigation.

2   　　　　*THE COURT:* Sustained.

3   　　　　*MR. WARDEN:* Your Honor may I be heard.

4   　　　　*THE COURT:* Briefly.

5   　　　　*MR. WARDEN:* Your Honor, we conducted discovery on one
6   case, we're trying another case, and we have both parties have
7   been providing supplemental information over the last -- the
8   course of the last couple of months, this the kind of work that
9   she does the regular course of her business to investigate
10  disputes.  There are allegations and suggestions that the --
11  that the withholdings are arbitrary and this will show that it
12  is not.

13  　　　　*THE COURT:* I sustain the objection.

14  　　　　*MR. WARDEN:* Okay.

15  　　　　*THE COURT:* Look honestly, I think to some extent both
16  sides are a little further into the forest than I think I need
17  to go.  Ultimately, the question is, whether or not there's a
18  breach, that's not a question, that's been resolved.  But what
19  are the damages flowing from the breach, the two companies seem
20  to have some respective axes to grind as to why certain
21  payments weren't made I'm not sure I care why certain payments
22  were made or not made.  They either were made or they were not
23  made.  They either constitute damages or they do not.  If they
24  were innocent or malicious, doesn't change the number, so
25  that's why ultimately, I think we're now delving down the