# EXHIBIT 3

1    August, of 2017, Ms. Miller made some changes, to the

2    mechanized process, as of that point in time, and it's at 35

3    percent MOU, and put a bunch of other calculations about ratios

4    in.

5           So why was it that they changed the mechanized process

6    at that moment in time?  Because they were going to withhold

7    dollars on OTT.  The very reason they modified the mechanized

8    process was to withhold money from Level 3, on OTT charges.

9    The reason.  That's what they said.

10          So now let's look at the numbers.  And now we're

11   separating out the two damages periods bring up -- not that

12   one, no.  Bring up the spreadsheet.  Yes right here.  And this

13   is the interesting part.  Let's look at this, this is AT&T's

14   damages summary.  Under their calculation, before the FCC's

15   decision went into effect, and this is all without late payment

16   charges they withheld 2.412 million after the decision went

17   into effect, they withheld 1.708.  Okay.  By it's not

18   interesting.  Let's look at the next chart however.  The next

19   chart this is Level 3's damages.  Before the FCC's decision

20   went into effect, they withheld 5.525 million after the

21   decision went into effect, 1.671.  Now let's put up that other

22   chart, that shows the comparison side by side.  This one, look

23   here, Your Honor, after the decision the numbers are almost

24   identical.  Ms. Miller said that she ran numbers, and the

25   difference was about 30 grand.  Now admittedly that was total

1  usage if you multiply by 65 percent it would be about 20 grand.

2  Those numbers are almost within the -- almost identical if you

3  factor in this Delta, before, however three million dollars of

4  difference.  Why and what do you think was going on?  I don't

5  think it takes even a logical leap of faith, to know that they

6  changed the mechanized payment process, in August of 2017, and

7  it was withholding way too much, and then the FCC's decision

8  comes down and they go, let's look.  And when they actually

9  managed it, look what happens.  You heard Ms. Miller say she

10 went in quarterly she didn't say when she started to do that.

11       This is revealing.

12       Now why is this particularly important?  If you look

13 as provisions A 2, A 3, and A 4 of the Settlement Agreement, A

14 2 says, you shall pay all access charges off OTT calls, before

15 that decision went into effect that included end office, must

16 pay all.  Romanette three, romanette three on nonOTT calls must

17 pay all switched access charges fits a Level 3 telephone

18 number.  Romanette four, only after the decision becomes final,

19 do the rules of the game change.

20       That means before February, 2020, get back to that

21 page, the summary page with holding any of that money, violated

22 the contract.  Their withholding of any charges, violated the

23 contract.

24       The real dispute here, Your Honor, is not about after

25 the FCC issued its decision.  The parties our damages are less,

ALISON MILLER – Redirect

1    than theirs.  It's all about before.  All about before.  About.

2         Now the mechanized payment process we know withheld

3    more and if you look at Exhibit 82, Exhibit 82, right there,

4    and this is so hard to see, I don't think if theres ease a way

5    you can blow that up just little bigger there we go.  They gave

6    us one state, in all of this time they gave us one state, one

7    month.  I guess it was three states because one didn't have

8    tandem charges, but, one exhibit, and it says right here,

9    January 2020, they should have withheld 4600 dollars they over

10   withheld by 892.  So we know the mechanized process was

11   withholding too much.  And that is why we -- we can look at

12   Exhibit A 7, A 8, A 18 I have them all in here but Your Honor

13   knows them I don't need to belabor this.  A 7 says the

14   mechanized payment process is causing us to over withhold, A 8

15   says, yep our right number is 7.7 million, but we actually

16   withheld $4,056,000 too much, and then you look at A 18.  And A

17   18 spells out those and says yep we over with hell, we're going

18   to attribute this to OTT, but that really was a CPN dispute.

19        And why does that matter?  Because AT&T acknowledges

20   it uses the same mechanized system now, as it did then.  We

21   know they are over withholding now.  And, if you look at

22   Exhibit A 56, Ms. Torres' demonstrative exhibit, it shows why

23   this is significant.  If you look at the mechanized process,

24   that they used, they over withheld in a ratio -- if you use the

25   same ratio, from the CPN dispute apply it to OTT dispute, you

1   would have expected them to over withhold by 2.573 million, you

2   had those together and by January of 2021, it's almost

3   identical.

4        We did the same thing, one to one, from April, and for

5   June.  And while AT&T tried to say should have been stress

6   tests -- tested, Ms. Torres conclusively established that

7   picking individual elements out of that, is inappropriate, and

8   would cause bad data.

9        Your Honor said is perfectly it doesn't require quote

10   a great leap of faith quote/unquote to see that one measure of

11   damages supports the other.

12        Now AT&T tries to come up with an explanation, and say

13   it wasn't withholding only for OTT.  But what was actually with

14   holding for other dispute that had arisen between the parties,

15   and here we know that is just not true.  When AT&T tries to

16   identify other disputes, there's problems, are there usage

17   disputes which is all that matters here be, is it actually a

18   dispute or just one making an inquiry, to ask a question?  But

19   we can discard all of that, because it really doesn't matter.

20        Exhibit A 3, the tariff sets forth the language of how

21   one is to dispute, has to be written notice, give details,

22   spell out the amount being disputed, spell out why it's being

23   disputed, challenge the language in the tariff et cetera, we

24   heard Ms. Kellow testify to that no one disputed it, the

25   language is plain.

1          That process wasn't followed on this -- these

2    documents, or this document that they put forward from March of

3    2020.  But that's the key point.  Remember, what matters here

4    is before the FCC's decision was decided, through February of

5    2020, and there were three disputes, that were raised by AT&T

6    or things they claimed were disputes, the first was Exhibit 95,

7    and we only had a hard copy of that, so I can't put it on the

8    screen, but the date of that was March 2020.  So the earliest

9    document they put forward, for a dispute is March 2020, the

10   month after the decision becomes final.  Then there's Exhibit

11   79, this mechanized billing thing, again Ms. Kellow said it's

12   not a dispute but the dates are December of 2020.  And then,

13   when you look at Exhibit 84, this document that Level 3

14   actually did account for, admittedly at the end of the process,

15   to make sure it was being as accurate as possible that dispute

16   was raised in February of 2021.  And with calculation of

17   damages, there is not a difference, after the FCC's decision.

18   So none of these disputes impacted the before P.

19          Let's look now back to the contract, Exhibit A 2.

20   Because AT&T says, wait a minute, you are not being fair,

21   because, for avoidance of doubt, this doesn't keep AT&T from

22   disputing for other reasons.  Fair point.  They have the right

23   to dispute.  Guess what, those disputes don't take place until

24   after February of 2020, and so, the fact that our numbers are

25   almost identical after that, sure look to say America as