1    IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLORADO
2

Civil Action No. 18-cv-112-RM
3

AT&T Corporation,
4

      Plaintiff,
5

vs.
6

Level 3 Communications, LLC,
7

      Defendants.
8
_____
9
                  REPORTER'S TRANSCRIPT
10                  TRIAL TO THE COURT

11
_____
12          Proceedings before the HONORABLE RAYMOND MOORE,
    Judge, United States District Court for the District of
13  Colorado, commencing at 9 a.m., on the 14th day of July, 2021,
    in Courtroom A601, United States Courthouse, Denver, Colorado.
14
                         APPEARANCES
15

16

17  Rebecca B. DeCook, and Michael D. Warden, Moye White LLP, 1400
    16th Street, 6th Floor, Suite 600, Denver, CO 80202-1486,
18  Angela C. Zambrano, Sidley Austin LLP-Dallas, 2021 McKinney
    Avenue, Suite 2000, Dallas, TX 75201, appearing for AT&T
19  Corporation.

20

21  Charles Walter Steese and Douglas Nelson Marsh, Armstrong
    Teasdale LLP-Denver, 4643 South Ulster Street, Suite 800,
22  Denver, CO 80237, appearing for Level 3 Communications, LLC,

23
          TAMMY HOFFSCHILDT, FCRR, CRR, RMR Official Reporter
24             901 19th Street, Denver, Colorado 80294
          Proceedings Reported by Mechanical Stenography
25             Transcription Produced via Computer

2

```
 1                      P R O C E E D I N G S

 2        (In open court at 9:03 a.m.)

 3            THE COURT:  Please be seated.  All right.  So, I'm

 4   smiling because I was expecting a fewer number, and it's -- I

 5   have got a jury's worth of people in here.  It's -- it is what

 6   it is.

 7            Anyway, we're here on 18-cv-112, AT&T versus Level 3.

 8   I'm going to take appearances, shortly.  I just want to make

 9   sure that we -- that I have the right understanding.  Where --

10   because we've got...

11            MR. STEESE:  Level 3 on this side.

12            THE COURT:  That's what I'm trying to figure out,

13   because we've got the, quote, original defendant proceeding as

14   plaintiff for purposes of this damages trial.

15            So, all right.  Let me get appearances, starting with

16   Level 3, and I will probably use that nomenclature throughout

17   rather than plaintiff, defendant, counterclaimant and all of

18   the rest of it.

19            MR. STEESE:  That's perfect, Your Honor.  Chuck Steese

20   on behalf of Level 3.  With me is client representative

21   Jennifer Torres.  In the back we also have in-house counsel

22   Carmel Gill.  We have our paralegal Vanessa Sanchez, as well.

23            MR. MARSH:  Good morning, Your Honor.  Doug Marsh,

24   also on behalf of Level 3.

25            THE COURT:  Good morning to all of you. For AT&T?
```

1          *MS. ZAMBRANO:*  Good morning, Your Honor.  It's nice to

2    see you in person, and the Level 3 lawyers here.

3          I am here -- my name is Angela Zambrano.  I'm here

4    with my partner, Mike Warden, who is seated next to me, as well

5    as Rebecca DeCook, present on behalf of AT&T.  We are here with

6    our clients, Mark Lewis, who is counsel, internal counsel for

7    AT&T, and Kim Meola who is going to be AT&T's client

8    representative.

9          We also have part of our team, paralegal Nancy Roberts

10   can work the fancy-schmancy technology.  I wanted to comment on

11   filling up the room, because federal court trials don't come

12   around every day, especially during COVID, we arranged --

13         *THE COURT:*  It's okay.

14         *MS. ZAMBRANO:*  -- to have our associates get to watch,

15   so yeah.

16         *THE COURT:*  The only thing that I do want to ask you

17   about, and it may be that I'm really focusing on Ms. Meola, is

18   whether or not you are comfortable where you are seated?  And

19   again, look, I'm not trying to get behind the masks, and I am

20   not intending to inquire of anyone whether, you know, what

21   their status is or isn't or anything like that.  I suppose,

22   what I'm saying to you, is, I don't know how or where I would

23   put another chair somewhere else, but if you are uncomfortable

24   with the population of your table.

25         *MS. MEOLA:*  I'm not uncomfortable at all.  I'm

4

1   completely comfortable.  I would not be comfortable without a

2   mask.

3           THE COURT:  No, that's fine.  I just wanted to make

4   sure that I at least addressed the point.

5           And then, the other thing that I would say is this,

6   before we begin, three things; one, I have read the

7   depositions, I don't have the names, because I don't intend to

8   roll back and get the names that were -- that have been

9   designated for this trial.  I have read them.  I know there are

10  objections.  I have looked at the objections, they tend to go

11  to the same issue, and I am just sort of overruling them all,

12  and I will decide on the basis of the designated testimony,

13  what weight to give what testimony.  Again, the depositions

14  aren't terribly extensive to begin with.

15          All right.  Number two, I'm aware of the fact that

16  there has been this continuing discussion about matters that

17  would be proffered in connection with the Summary Judgment

18  motion, and there has been a proffer and some designations and

19  all of the rest of it.  I consider the proffer made, I consider

20  the proffer -- and beyond that -- I'm not reversing direction

21  of the trial, and to be blunt about it, I've not looked at the

22  substance of the information that's been provided in the

23  proffer, because my understanding of the proffer is that there

24  is some -- it is a protective mechanism, because there's some

25  belief that may be different than my own, but there's some

1    belief that this may be material or matters the Circuit would

2    want to have available to it in trying to decide some Summary

3    Judgment issue.  So it's in the record, the proffer has been

4    deemed made.  It has been accepted as a proffer, in the spirit

5    in which it was offered; which is, it goes to the Summary

6    Judgment issues and appeal, rather than something for purposes

7    of this trial.  And I don't think I'm misunderstanding anything

8    there.

9         Okay.  And then the final thing is, I have all of

10   these people that I'm sure I'm going to hear about, all of

11   these numbers, and to the point where I don't know what will

12   happen to the top of my head, whether it will reach the ceiling

13   or not, but I did want to tell you both that I have a little

14   bit of a bias towards the visual, and so I'm not directing or

15   asking or ordering that anybody use that thing over there, but

16   I brought it in here, so that if, in the course of openings,

17   and perhaps even more importantly in closings, we can get some

18   you know -- this is your version of this number, this is your

19   version of this number, and I can get these number inability

20   front of me in a way that I'm looking at, at the same time that

21   I'm discussing with you.

22        Again, there's lots of ways to do this.  You have got

23   both, tech equipment and tech people and I am not trying to

24   dictate how your presentation goes forward.

25        So, with those being what I consider to be preliminary

1    matters, let me ask if there's anything else preliminary on

2    behalf of Level 3?

3         MR. STEESE:  Your Honor, I have one question.

4    Normally, in a jury trial, I am reluctant to use any exhibits

5    that have not already been stipulated and aren't in evidence.

6    Given that this is is a bench trial, I presume that both sides

7    would be able to use exhibits in their opening statements --

8         THE COURT:  Yeah.  Yeah.

9         MR. STEESE:  -- and that's not an issue?

10        THE COURT:  I will straighten all of that out on the

11   back end.

12        MR. STEESE:  Perfect.  That was my only question,

13   Your Honor.

14        MS. ZAMBRANO:  Nothing else, Your Honor.  Thank you.

15        THE COURT:  Let's go.  Let me get openings.

16                      **OPENING STATEMENT**

17        MR. STEESE:  Good morning, Your Honor.  May it please

18   the the Court.  Good to finally be here to present evidence on

19   behalf of Level 3.

20        Now, the Court is already very familiar with the key

21   elements of this dispute.  In May of 2015, Level 3 and AT&T

22   entered into a contract to resolve a longstanding dispute

23   between the parties about over-the-top, voice over Internet

24   protocol traffic.  What the witnesses in this case will call

25   OTT traffic.

1          Now, just a few months before that contract was

2   executed in February of 2015, the FCC had issued a decision,

3   and in that decision it said that carriers, like Level 3, could

4   assess all switched-access-rate elements, including end-office

5   elements on OTT calls.

6          Digress for a moment.  What are switched-access

7   charges?  Switched-access charges are a simple mechanism

8   because when you make a long-distance call, the long-distance

9   carrier is required to use the network of the local carrier to

10  complete the call, and so what switched-access charges are is

11  the fee paid to the local carrier for use of its network.

12         One more detail, switched-access charges have

13  individual rate elements, and you get to assess those elements

14  based upon the function your network performs.  If you perform

15  that function, you get to assess the charge.

16         Finally, when you look at switched-access charges,

17  high level, there are end-office charges and there are tandem

18  charges.  End-office charges, at again a high level, for use of

19  the end-office switch and tandem charges are those associated

20  with use of the tandem switch.

21         So, back to the main facts.  In the Settlement

22  Agreement, AT&T agreed that it would pay Level 3 100 percent of

23  the switched-access charges on certain calls.  So, let's bring

24  up pages from the Settlement Agreement, which will be Exhibit

25  A1, in this case.  Section A (ii) says *AT&T shall pay Level 3*

1  *it's applicable switched-access tariffed rates for OTT traffic*;

2  that's on the OTT calls.

3          If you look at A (iii), there was a separate question,

4  and the separate question was in order to assess any end-office

5  charges at all, it had to be a telephone call that was from or

6  to a Level 3 telephone number; what you will hear called CPN,

7  or TN or LRN, in this case.  And for avoidance of doubt, what

8  the parties agreed was that AT&T would pay Level 3, 100 percent

9  of the switched-access charges on all telephone calls

10  associated with a Level 3 telephone number.

11          So, there was a caveat, however, Section (iv), and

12  this is where Your Honor comes in, if the FCC issued a new

13  decision, changing the rates that one could assess on OTT

14  calls, then from the effective date forward what Level 3 could

15  charge would change, and the Court found that the FCC issued

16  such a decision in February of 2019 -- excuse me -- December of

17  2019, and that it became effective, as the parties have

18  stipulated, on February 19th of 2020.

19          Now, that decision, at a high level, says that local

20  carriers, like AT&T -- excuse me -- like Level 3, cannot assess

21  end-office charges on OTT calls, and the FCC reasoned that they

22  could not assess these calls because in an over-the-top call,

23  the end-office switch, while its involved, isn't performing

24  traditional end-office functions, and remember you can only

25  assess charges for the functions you perform, but the FCC said

1    one other thing, the FCC also said, we know you are performing

2    a switching function here.  If your tariff permits it, instead

3    of those end-office charges, you can assess tandem switching,

4    instead, for use of the end-office switch.

5         Now, given that FCC decision, Level 3 has calculated

6    appropriate credits, based on 21 percent of its calls being

7    OTT, which again Your Honor decided, and those appropriate

8    credits are $935,000.  However, instead of withholding -- and

9    that's through June of 2021.  However, instead of withholding

10   $935,000, AT&T withheld millions and millions.

11        Now, nothing I just said, not one word, is in dispute.

12   Nothing.  AT&T knows they owe us millions of dollars.  So what

13   is the disagreement?  The disagreement is about how many

14   millions they owe us.

15        Now, an exhibit that we're going to talk about at

16   length in this case is Exhibit A53, which is the current

17   damages analysis through June of 2021.  And the first tab,

18   there's three tabs in this Excel spreadsheet that we provided

19   and gave to Your Honor, is entitled Level 3 billing to AT&T,

20   and you see some of it on the screen, and there's two tables,

21   the one on the left is all about the end-office charges that

22   Level 3 assessed starting in February of 2019.  Why?  The

23   parties entered into a settlement, through December 31 of 2018,

24   and so we have to begin January of 2019 for our damages

25   analysis.

1    So why February?  Usage charges are always billed the

2    month after they are exchanged, and so the billing in February

3    is for traffic in January and so on and so on, and what you see

4    is, every single month Level 3 incurs additional damages from

5    AT&T's overwithholding, and this chart continues to reflect

6    that.

7    So if you look on the left, again, we provide all of

8    the end-office credits.  You can see the OTT percentage is

9    consistently 21 percent, and you can see over in the right-hand

10   side of the column on the left, it says *through February 1st*

11   *through 18th of 2020*, and before that date, as the contract

12   required, we give AT&T a 50 percent credit.  After that date,

13   when the FCC's decision became final and effective, we give

14   AT&T a hundred percent credit.

15   Now, off to the right, that table at the right, what

16   you see is, instead of the end-office charges, remember we can

17   bill tandem switching, and so we get to bill this

18   tandem-switching offset in lieu of end office, and the total of

19   that, through June, is $341,207.53, and the parties have

20   stipulated that that number, 341,000 gets to be added to Level

21   3's damages.

22   If you look at all of this tab, what's in dispute?

23   Nothing.  The facts will show, nothing.

24   So now we look at the second tab of that spreadsheet,

25   and this is going to be the focus of the case, and the second

11

1    tab of that spreadsheet shows, in the lower right-hand column,

2    right above the red number, that the damages Level 3 is

3    claiming is $9.375 million.   And Level 3 will present two

4    witnesses, to talk about this.   The first will be Mellisa

5    Kellow.   Ms. Kellow was a billing manager for Level 3, where

6    she has been employed for many, many years, and she gathered

7    most of the information in this spreadsheet directly from Level

8    3 systems; indeed, the very systems that generated the AT&T

9    invoices.

10         So virtually every number -- not every number, but

11   virtually every number on this chart comes directly from an

12   AT&T invoice.

13         So why aren't we bringing in the invoices?   And this

14   is one of the wonderful things about the telecommunications

15   industry.   If we were to bring in the invoices they would be a

16   thousand pages long and it would be very convoluted and

17   complicated and it's not just one invoice.   There's invoices by

18   states, there's invoices by carriers, obtain, purchase other

19   carriers and they grow, and each one of those carriers has a

20   separate number associated with them, and so there's many,

21   many, many invoices that Level 3 sends to AT&T each month, each

22   of which are huge.

23         So this is a tally of all of the invoices, and they

24   are submitted on what are called billing account numbers or

25   BANs, and you are going to hear that term BAN over the course

1    of the next few days.

2          The second witness that Level 3 is going to present is

3    Jennifer Torres, sitting right here to my right.  Ms. Torres is

4    both a fact witness and an expert witness.  She helped to

5    negotiate the Settlement Agreement that forms the very basis of

6    the dispute.  Over the many years she has had many interactions

7    with AT&T, which she will testify to, and she will also testify

8    to the damages that Level 3 is entitled to.

9          So how did Level 3 calculate its damages?  It's

10   actually pretty -- despite all of these numbers, which look

11   complicated, it's actually not that hard.  If you think about

12   any commercial case, the way you calculate damage is you make

13   sure you are taking into account the other factors that need to

14   be subtracted to give you the number that was caused by, here,

15   AT&T, and that's exactly what we've done.

16         So if you look to the second -- if you see the name,

17   each has A, B, C, et cetera, and we will bring that up on the

18   screen when it's with witnesses.  But you can see each month,

19   and then it says new charges.  These are the charges that Level

20   3 bills to AT&T on all of those tallied BANs, month over month

21   over month, and in these are those switched-access charges,

22   which are usage based, so much per minute, so much per mile, so

23   much per call, depending on what type of charge, and it also

24   includes late payment charges.  So these are the total charges.

25         Then, if you look at the next several columns over, to

1    the right, there's something for this thing called a DEOT, and

2    a couple of, there's something for new affiliated tandem

3    dispute.  What these are, are other disputes that Level 3 had

4    with AT&T that they needed to account for.

5          The DEOT was already taken care of in a settlement,

6    and these numbers are stipulated to in those columns.

7          The two -- couple of columns over to the right, new

8    affiliated tandem is a brand new dispute that started in

9    December of 2020, and the first number 251,000 and change, is

10   an exact number, and after that, those are estimates of the

11   values that are associated with that dispute.

12         So what Level 3 is trying do, is tally exactly what

13   AT&T has withheld for this OTT dispute.  And so, if you go over

14   to two columns from the right, it says *balance due less late*

15   *payment charges* -- LPC is late payment charges -- *from column*

16   *I*.  That column is the amounts that AT&T withheld from Level 3,

17   due to the OTT dispute, not counting late payment charges.

18         So, you can look at that column, and you can see those

19   numbers.  They withheld $7.992 million, not 935,000, and at the

20   end, Your Honor, briefly, we're going to have a summary chart,

21   that will have, what each of these columns are.  We too are

22   visual, so that way if you want to refresh, you will be able to

23   look and you will be able to see what each of these columns

24   are, to make it simple.

25         *THE COURT:*  That's making it simpler?  Okay.  Good

1    one.  Go ahead.

2         *MR. STEESE:*  We're doing our best, Your Honor.

3         Okay.  Back to the other page.  There we go.  Now,

4    there's a third spreadsheet, and I am not going to bring that

5    out, but briefly, AT&T's affiliate, TCG was billing Level 3 and

6    its affiliates, end-office charges on OTT calls in violation of

7    law.  At the time AT&T filed this lawsuit, AT&T and its

8    affiliate TCG were unaware that they were doing this.  It was

9    billing Level 3 these charges, Level 3 was paying these

10   charges, and Level 3 brought a counterclaim to collect these

11   illegal charges.  However, because of Level 3's efforts, TCG

12   has corrected the situation and started to issue credits to

13   Level 3 and its affiliates.

14        Now given that we were withholding and they started

15   issuing credits simultaneously, it put us in this credit where

16   we owed them, so we stopped withholding anything in September

17   of last year, but it left us in a position where we owed TCG

18   $517,000, and so we recognized that, and the parties have

19   stipulated that that number needs to be subtracted from the

20   Level 3 damages.

21        So in sum, the evidence will show that Level 3's

22   damages are 9.375 million.  There's this -- the amount billed,

23   subtracting the amount AT&T actually paid, subtracting out the

24   other disputes and subtracting out the OTT credit, leaving

25   exactly what AT&T withheld as a dispute in this case.

1        So what is the disagreement?  Two fold, first the

2   evidence will show that AT&T significantly understates the

3   amount it withheld from Level 3 on its own OTT dispute; and

4   second, AT&T claims that Level 3 should not be able to recover

5   late payment charges.  The evidence will show, on these

6   subjects, both of these subjects, that the facts overwhelmingly

7   support Level 3's damages request.

8        I will talk about each of the two real points of

9   disagreement and the facts surrounding those now.  The first

10  point of disagreement concerns the amount AT&T withheld on this

11  OTT dispute, and the comparison of two exhibits shows the

12  monetary difference.  First, you have already seen, on this

13  document, which is Exhibit A53, 7.992 million, is the amount

14  that Level 3 claims AT&T withheld through June of 2021.  AT&T's

15  exhibit is Exhibit 76, and Exhibit 76 shows, at the bottom,

16  that AT&T claims to have withheld $5.365 million, instead of

17  7.992, but if you look at the top, in that column, it's

18  entitled *AT&T withheld end office*, their title.  To get this

19  number, what does AT&T do?  There's another chart here that we

20  don't show, so we could be a little larger on the screen, that

21  goes along with this.  What they did is they took our

22  end-office charges, they multiplied by 65 percent, and they

23  came up with this number, and they want the Court to think that

24  that's exactly what they did, and the facts will show that AT&T

25  did not withhold as this exhibit suggests.

1      What facts show this?  Thankfully this is not the

2   first time that the parties have had a disagreement about

3   end-office charges, it's a second.  And if you look at Exhibit

4   A1, we talked about this before, there's a provision in the

5   contract which says, *Level 3 cannot assess end-office*

6   *switched-access elements on calls that don't have a Level 3*

7   *telephone number associated with it*.  And in 2016, some of the

8   calls that Level 3 was charging end office on, actually did not

9   have a Level 3 telephone number associated with it, and AT&T

10  legitimately raised a concern, and again, I think I said this,

11  they did that in 2017.  And if you bring up Exhibit A8, this

12  dispute goes by various names, CPA, LRN, sometimes it says EO,

13  for end office, and according to the Settlement Agreement, when

14  the parties were looking at this, the parties had to reconcile,

15  because AT&T was withholding money from Level 3, and we had to

16  reconcile how much money was appropriately withheld on this

17  end-office dispute, this CPN dispute.  And importantly, looking

18  at page three, this is a -- one of the most important emails

19  Your Honor is going to see, in our view, in the case.  It's

20  from Alison Miller, of AT&T, entitled *Withholding*, and they

21  start off and they first say there was no withholding that

22  we've taken so far on the OTT dispute.  So there was no

23  end-office withholding for that; instead, there's withholding

24  above the current dispute value for the end-office CPN issue,

25  due to Level 3's billing containing both end-office and tandem

1    billing on the same BAN, remember those billing account

2    numbers, on those invoices, which complicated the

3    mechanized-rate-base withholding.

4         In other words, what are they saying?  That in -- in

5    an effort to withhold on end-office charges, they have a

6    mechanized process that automatically pays and withholds, and

7    that mechanized system can't tell which of these are end-office

8    charges and which of these are tandem charges and it causes

9    them to overwithhold.

10        How much was that CPN dispute actually worth?  Well,

11   AT&T answers that question too.  Same email, just further down.

12   It says, again, from Alison Miller, *I know that you and*

13   *Jennifer are working to provide the end-office CPN details I*

14   *requested* dot, dot.  *I believe the methodology, I used*, that

15   Alison Miller used, *to get to the $7.7 million dispute value*

16   *was solid*.  So she calculated this dispute as worth 7.7

17   million.  We assessed end-office charges of $7.7 million on

18   telephone numbers -- excuse me -- on calls that do not have a

19   Level 3 telephone number, which we should not have.  But how

20   much was overwithheld?  AT&T answers that question too.

21   Exhibit A18.  Another critical exhibit.  And you can see, in

22   the right-hand column, it says *AT&T notes*, and you can see the

23   CPN dispute.  We've highlighted it for Your Honor; that's the

24   value; $7.7 million.  How much had they withheld on the OTT

25   dispute?  They admitted zero.  They had not withheld anything.

18

1    But the additional offsets, caused by our billing format, have

2    been allocated towards the OTT dispute.  So they took the

3    amounts that they overwithheld, and attributed them to the OTT

4    dispute.  So, in a dispute over $7.7 million, they had withheld

5    $4,056,000 too much.

6          Just using simple math, a demonstrative exhibit,

7    that's 53 percent too much.  So what you have in this chart, is

8    the OTT dispute, and we're using January 2021 as an example,

9    this has additional months, but I'm just going to put this one

10   in front of Your Honor.  At that point in time, AT&T claimed it

11   had withheld 4.884 million, but if you apply the same

12   overwithholding ratio that you had in the LRN/CPN dispute, to

13   this dispute, they actually overwithheld $2.573 million more

14   than that, which gives you a total withholding $7.457 million.

15         How does that compare to our numbers?  Our damages

16   analysis would show that AT&T withheld $7.55 million, at that

17   point in time.  A 98.7 percent match.  Basically a lock.

18         And do we know this is still happening?  Yes.  They

19   have been sending us emails and letters, trying to still get us

20   to change our billing systems.  Billing systems that are

21   industry standard, by the way.  Billing systems that have

22   tandem and end office on the same BAN, and you know who else

23   uses the same vendor?  TCG.  And TCG, their own affiliate,

24   bills tandem and end office on the same BANs.

25         And so the very thing they are asking us to do -- and

1    we go to our vendor and say, *Can you change it*, and they go,

2    *No.  We can't fix this.  This is the way our systems are*

3    *designated*.  They continue to do the very thing, and that

4    supports our damages number.

5            So, what are AT&T's -- what are the facts that AT&T is

6    going to talk about.  AT&T is going to focus on the first --

7    excuse me, the second whereas clause in the contract, that

8    says, *AT&T has disputed and not paid certain Level 3 end-office*

9    *switching charges as set forth in more detail in Exhibit A.*

10   And they are going to say, you are only entitled to the

11   end-office piece that we withheld.  You are not entitled to all

12   that we withheld.  Just those that had -- were associated with

13   end-office charges; that's why we do the 65 percent.  But you

14   will hear from Level 3 witnesses.  What does this contract go

15   to?  It says, what is being focused on is what was disputed and

16   not paid.  And what AT&T is doing is saying, because we believe

17   65 percent of your calls are OTT, we are withholding -- we are

18   withholding what we believe are the end-office charges.  It's

19   just our systems can't tell you.  And so, what Level 3 seeks is

20   everything that they withheld, under the guise of withholding

21   on end-office charges.  This includes the withholding for the

22   mechanized overstatement in their systems.

23           Now, in addition, briefly, AT&T presumed that 65

24   percent of Level 3's calling was OTT, when, in reality, as

25   Your Honor found, it's only 21 percent.  In other words, AT&T

1   was withholding payment of tariff charges on non-OTT calls.

2          Back to Exhibit -- excuse me -- Section A (iii) of the

3   contract, *for avoidance of doubt, AT&T agrees that they will*

4   *continue to bill and pay* AT&T will pay, *switched-access charges*

5   *on any telephone call associated with the Level 3 telephone*

6   *number*, which is all of those calls.

7          And AT&T will present facts to make one additional

8   point, as I stated above, the facts will show that we have done

9   our best to account for every dispute -- known dispute between

10  the parties, and Level 3's tariff which is Exhibit A3, has a

11  process for disputing tariff charges, and it has to be in

12  writing, and it has to contain certain things.  It has to be

13  submitted within 90 days.  It has to spell out the billing

14  account number, the amount being challenged.  The specifics of

15  the dispute.  It has to say, *This rate is wrong because...*  Or

16  *You are billing me this rate, but there's a different rate in*

17  *your tariff*, things like that.  We have accounted for every

18  single known dispute.

19         Now, AT&T, in the last few months, has started to

20  raise new disputes to try to justify its massive

21  overwithholding, but these were only raised very recently.

22  Certainly couldn't have, in any way, impacted all of the

23  withholdings before this timeframe in the last couple of

24  months, when they started to identify new disputes.  That's

25  point one of the disagreements.

1       The second is about late payment charges.  It appears

2  that AT&T witnesses are going to claim that the contract does

3  not authorize these charges.  Well, if you look at page two of

4  that Settlement Agreement, late payment charges have always

5  been a part of this contract and this dispute.  AT&T paid them,

6  or at least a portion of them, when they settled.

7       In addition, if you look at the next page, this is

8  that provision that we looked at a couple times.  It says, *AT&T*

9  *shall pay Level 3 its applicable switched-access tariffed*

10 *rates*.  Well, what are switched-access tariff rates?  Level 3

11 has a tariff, Exhibit A3; this is the coversheet.  It is a

12 switched-access tariff.  Every single rate, contained in this

13 document, is a switched-access rate.  It is a switched-access

14 tariff.  The rates are a switched-access tariff rates.  And if

15 you look at Section 4.2.6 of this tariff, it specifically

16 includes the late payment charges; *1.5 percent per month on any*

17 *amount, that was withheld that should not have been*.

18      As such, under the plain language of the contract,

19 under the plain language of the tariff, we believe that late

20 payments charges will be obligated.

21      Sidenote, even if Level 3 could not get late payment

22 charges, the contract is governed by New York law, which is

23 Section 5 of the contract, and under New York law prejudgment

24 interest is mandatory at 9 percent.

25      So, at the end of the day, on its Breach of Contract

22

 1    counterclaim, Level 3 will ask this Court to award it $9.375

 2    million in damages, which is 7.2 million in usage charges and

 3    2.2 million in late payment charges.  This is not only

 4    justified by the facts, but also by the evidence.  The facts

 5    will show that AT&T withheld payments from Level 3 before a

 6    final decision issued, in violation of the contract.

 7         AT&T withheld charges, knowingly, that its mechanized

 8    process would overwithhold by millions of dollars.  AT&T paid

 9    late payment charges in the past when it withheld on OTT

10    dispute, showing that late payments charges are appropriate.

11         For years, years, Level 3 has told AT&T that it was

12    badly overwithholding, and certainly withholding far in excess

13    of Level 3's end-office charges.  Level 3 asks the Court to

14    give Level 3 the dollars AT&T withheld, due to this OTT dispute

15    and put this behind us, once and for all.

16         Briefly, as to Level 3's communications counterclaim?

17    As I described, the facts will show that TCG was assessing

18    end-office charges to Level 3 and its affiliates on OTT calls

19    in violation of law.  AT&T brought this lawsuit before checking

20    to see if it was doing the very thing it was accusing us of

21    doing, and we had to go through discovery, we had to point this

22    out, we had to bring this to their attention in order to get

23    them to change.  And while TCG eventually fixed this issue, to

24    its credit, it was us, in this litigation, that was necessary

25    to bring that to their attention, and given the damage we

1    incurred, we ask that we get our attorneys' fees for that

2    portion -- for litigating that portion of the case.

3           And, Your Honor, unless you have questions, thank you

4    very much.  I look forward to presenting our evidence.

5           THE COURT:  Counsel, please.

6           MS. ZAMBRANO:  Thank you Your Honor.

7                         **OPENING STATEMENT**

8           MS. ZAMBRANO:  Angela Zambrano on behalf of AT&T and

9    TCG, today.

10          As Your Honor said, we're here on a damages trial, and

11   the Court has already determined that there was a contract that

12   has been breached.  So the question is simply, what damages

13   flow from that breach?  And as we all know from our first year

14   of law school, they are not damages in the abstract.  They are

15   damages that were proximately caused by the particular breach

16   of the particular contract.  So here, the breach that was

17   alleged, and that Your Honor has concluded in his order,

18   Summary Judgment order, was that there was a failure to pay

19   end-office switching charges; that's the breach that was

20   alleged; that is the breach that was determined; so that is

21   where we start on liability.

22          Now, determining damages, from a breach, from a

23   failure to pay end-office charges, should be a straightforward

24   exercise.  Excuse me, I have a PowerPoint we're going to put

25   up.  Do you have it up?  I just dove right in.  I didn't give

 1   notice.  Do we have it up?

 2          THE COURT:  Hold on.  We will get there.

 3          MS. ZAMBRANO:  Yeah.  I will talk for a little bit

 4   before I use this anyways, so I will just continue.

 5          THE COURT:  I think we may be warming up here.

 6          MS. ZAMBRANO:  Okay.  So -- I have got several

 7   minutes.  I will continue.  So damages have to be -- have to

 8   flow from the particular contract, the particular breach that

 9   was alleged.  And Your Honor has concluded that that breach was

10   a failure to pay end-office charges pursuant to that Settlement

11   Agreement that we looked at parts of, in Mr. Steese's

12   presentation, and I am going to show you the whole thing.

13          So it should be easy, and I am not a math person, so I

14   hate when I say math is easy, because this is maybe a little

15   bit more complicated than easy math.  But at least we should

16   agree on the principle, that if there's been a breach of a

17   contract for failure to pay a particular kind of charge,

18   end-office charges, then the damages should be the charge --

19   that type of charges that were not paid.

20          So here we have an agreement, Level 3 and AT&T agree

21   that the amount that was charged, in end office, the total, was

22   $8.2 million, approximately.  Those were the end-office charges

23   that were made, by Level 3, to AT&T, in the relevant time

24   period, because as you know the parties settled a period of

25   these damages.

25

1    So up until very recently, the parties had also --

2    they were both asserting that AT&T had been withholding 65

3    percent of those charges, and I think Your Honor is very

4    familiar with that dispute, the 21 percent, the 65, what's

5    appropriate?  That was the dispute.  How much of those

6    end-office charges was AT&T appropriately withholding?  Now,

7    AT&T asserted that 65 was appropriate.  Level 3 said no, no,

8    it -- that was not appropriate.  The Court sided with Level 3.

9    It determined a 21 percent factor.  So what does that say then

10   about damages?  Well, the damages from a failure-to-pay

11   end-office charges should be, when you apply that OTT factor,

12   that Your Honor has determined, in his order, should be what is

13   65 percent of 8.2 million in end-off charges that weren't paid,

14   which I'm going to do in a moment.  The result, when you do

15   that math, is that Level 3 is owed approximately $4.1 million

16   in end-office switching charges; again, end-office switching

17   charges.  But Level 3 wants to collect, I heard today, a new

18   number of $9.3 million.

19   How does Level 3 possibly come up with damages of 9.3

20   million, when they only charged 8.2 million in the first place?

21   How do you get more than you charged?  That's an interesting

22   contract.  The answer is that they have changed their theory,

23   when we've -- now -- now that it's time to do damages, now that

24   they prevailed on Summary Judgment, they are pushing the

25   envelope and saying, we -- this is actually about more.

1            So instead of asserting now, that AT&T withheld 65

2    percent of end-office charges, they argue they can recover

3    million of other switched-access charges; tandem charges,

4    transport charges.  They, literally, are saying, *We can recover*

5    *anything that we charged you, and that you haven't paid for*

6    *these two-and-a-half years*, approximately.

7            And as Your Honor knows, and has learned some of the

8    technology here, this case has always been about a particular

9    kind of traffic, OTT traffic, on VoIP calls; that's what this

10   case is about; hasn't been about on all phone calls that Level

11   3 has provided services for, for AT&T.

12           You will hear that nonpayment of those charges, which

13   AT&T admits, it didn't pay some of those charges, they were

14   inappropriate, but that is not for today.  That's not for

15   today.  Those are, to the extent those are breach of anything,

16   it's not of this contract.  We're here a particular Settlement

17   Agreement that Your Honor has already determined liability on.

18   Liability was for a failure to pay certain end-office charges.

19           Now, the problem with changing your theory midstream

20   is that you said a lot of things that now you can't take back,

21   and they are now on the record.  Any award of damages here,

22   beyond end-office charges, would never withstand appeal,

23   because their damages are beyond their own pleadings.  They are

24   beyond the Summary Judgment ruling on liability.

25           They've litigated the case for three years asking for

1    end-office charges.  You can't change the damages portion and

2    ask for more than that.  And as I have said, I don't even think

3    that they've established liability on any of these other

4    charges.  They haven't shown, and you certainly haven't found,

5    that we have breached a contract, our Settlement Agreement, for

6    failure to pay for access charges for other calls, other than

7    OTT; that was the technology, those were the calls that we were

8    talking about.

9         So I need to take a step back now and focus on what

10   are these end-office charges?  And why, when the parties talked

11   about the, you know, shorthand, OTT dispute, why do I think --

12   why do we think, why did we all know that it was end-office

13   charges and not other kinds of switch-access charges?

14        Now the Court is familiar, of course, with the concept

15   of switched-access services.  This is very technical area, but

16   I know Your Honor has become familiar with it.  I won't belabor

17   this, but this diagram --

18        THE COURT:  You can do a little belaboring.

19        MS. ZAMBRANO:  It's been a few months.  Yes.  Okay.

20   This is a call flow for a traditional phone call.  So there on

21   the left, that's the caller.  This is, by the way, like a

22   landline.  I'm still a little old school in that way.  That's a

23   landline phone call.  What is it doing?  Somebody picks up the

24   phone, that call goes over that blue line -- or that yellow

25   line that has the blue arrow, that is called the local loop.

1    You are getting then on that to the end office.  LEC stands for

2    local exchange carrier.  It's like the telephone lines and all

3    of that on the traditional call.

4         So what happens after that, what happens after you get

5    to the switch for your local provider?  Well, it can do one of

6    two things.  There could be a direct connection, straight, to

7    the inner-exchange carrier, so AT&T or it could go to a tandem.

8    And Level 3 owns some tandems where they are also the

9    end-office switch and it's their tandem, and they get charges,

10   as you see in the chart.  They get that first charge for end

11   office, they get that second charge for transporting the call,

12   they get that third call -- third charge for a -- that tandem.

13        Now, what you don't see in this, is that above that

14   red line, there would be a bunch of other lines coming into

15   there from other local exchange carriers.  But that's the

16   kind -- that's the hub, if you will, for a bunch of local

17   exchange carriers.  Then it goes to the carrier --

18   long-distance carrier through the line number four.

19        So, I displayed this, but the upshot of all of this is

20   that that local exchange switching function, it's compensable

21   to the LEC, because they are actually providing a service.

22   They are providing that local loop for that call to go through.

23   They may or may not do the tandem.  They may or may not

24   transport it, directly -- through a direct connect.  Those are

25   all different types of charges; that's the upshot of this.

1    Level 3 has basically started calling all of these

2    access charges, generically, end-office switching charges, and

3    that was in their trial brief.  I didn't hear Mr. Steese say

4    that, maybe they are walking that back at this point, but this

5    is a very distinct service, end-office switching, and that's

6    why the parties had a fight about it in the VoIP context.

7    So, if you could put up the VoIP diagram now.  So now

8    this is one of these voice over Internet protocols.  This is --

9    there's a facilities based and there's an over-the-top based.

10   So, the top one you see, this looks like -- just like the one

11   we just saw, right?  The only change is that the Internet

12   service provider is doing that local loop.  So if an Internet

13   service provider is providing the equivalent of the local loop

14   that's facilities based; they get paid that local end-office

15   switched charge, because they are doing something.  Okay.

16   The fight was, where the red X is below, the fight was

17   *Well wait a minute, if in an over-the-top technology, you are*

18   *not the Internet service provider*.  Level 3 is using somebody

19   else's Internet connection, they are going over the top of that

20   Internet connection to connect the phone call.  *So you*

21   *shouldn't get the end-office charge*, AT&T said, and AT&T was

22   right, eventually, because you are not performing a service.

23   You are not doing anything for that end-office switching.

24   Now, of course, once it gets to the LEC, if they

25   switch through a tandem, if there's transport, all of those

1   services are compensable, provided they are billed correctly,

2   and this is an important point, but provided they are billed

3   correctly, the end-office switch is the only thing that was in

4   dispute when we talk about the OTT dispute, and the beef was,

5   you know, really, essentially, you are not doing anything, so

6   you don't get that end-office switch.  None of these other

7   access charges were at issue.

8         Now, that is the landscape of what we call the OTT

9   dispute.  Now, let's talk about how the parties dealt with that

10  when the FCC decision had just come out, and instead of saying,

11  at the red X there, the first FCC decision, actually there was

12  no red X, that was compensable.  AT&T appealed that, said, *No.*

13  *We think there should be a red X.  There we don't think that's*

14  *compensable*.  So they appealed that decision.  So in May of

15  2015, you have got the FCC saying you can charge number one,

16  you have AT&T saying, we're appealing that, but, you know,

17  we've kind of got a mess here because your billing is every

18  month for a bunch of these charges, we are on appeal, what do

19  we do?  Well, we reach an agreement.

20        And you know, I litigate a lot of breach of contract

21  cases, I'm sure you have read a lot of contracts, Your Honor,

22  the entire OTT dispute in this case is three pages.  We can

23  all -- I have faith that Your Honor can read these three pages.

24  This entire trial0 can be dealt with on these three pages.  So

25  this is how the parties resolved the OTT dispute.

1          Okay.  So the first thing to notice about this

2     contract, or part of the OTT dispute on these pages, how did

3     the parties define the OTT dispute?  Okay.  Here is the full

4     definition of the OTT dispute.  Now Mr. Steese, in shorthand

5     said, *Well, this provision says whatever is being disputed and*

6     *not paid, you have to pay*.  Okay.  That's not what this says.

7     Let's read all of the words.  *In the course of Level 3's*

8     *providing of switched-access services, to AT&T*.  Okay.  That

9     means everything, that means that entire call flow, in the

10    course of doing all of that, *AT&T has disputed*, what have they

11    disputed and not paid, this is critical, *certain Level 3*

12    *end-office switching charges*.  Okay.  And why are they

13    disputing that?  Because we don't think that red -- we think

14    there should be a red X in that call flow, right there.  Okay

15    then it says, *As set in more detail in Exhibit A*, I'm going to

16    come to that and I am going to show you why that was

17    referenced, *on traffic originating and or terminated to the LEC*

18    *served by providers of OTT VoIP calls*.  So this is basically

19    saying, we withheld charges, some of them are and -- other

20    charges are in Exhibit A, and it served -- it's on OTT and VoIP

21    calls.  Okay.  That's what -- that's how the parties defined

22    the OTT dispute.

23          Now, there are three aspects, though, of what they had

24    to deal with.  How do you deal with we've got some charges that

25    have not been paid, because we're in May, right, and you have

1   got this decision in February, and then you have got a time

2   period that we all know is going to be while the appeal is

3   pending.  What are we going to do then?  How are we going to

4   make a deal, so we are not at -- at loggerheads again.  How are

5   we going to deal with the time period while the dispute is on

6   appeal?  And then if we are successful, and we kind of thought

7   we would be, then what is going to happen after that?  Okay.

8   What's going to happen after that is I'm just going to call it

9   the last stage, the third stage.

10          So, first of all, here is the parties' agreement.

11   It's actually not all of it.  There were two different

12   payments.  We call this the retro provision.  It's 1A, i.  It's

13   making a payment for calls that are already made.  Traffic that

14   had already gone, as they sat there and negotiated and signed

15   an agreement in May of 2015.  So we've got a retro payment.

16   They obviously had to spent a lot of time negotiating what that

17   would be.  Okay.  And they -- then they put -- to put a number

18   on that, that is an Exhibit A.  This is what we are going to

19   close out, not going to have any more fights about traffic,

20   that's already passed, any of that, we're closing out, that's

21   retro payment.

22          Section B, so 1 A, little I B, they also dealt with a

23   payment that would be because of that billing is not

24   instantaneous.  They don't get a bill and pay the bill all in

25   the same month; had to be catch-up payment.  I think Mr. Steese

1   referred to this.  So the B was another kind of quasi retro

2   payment.  So you have got retro payments for traffic that's at

3   least already flowed through the lines, or over the Internet, I

4   should say, and then you have that second time period that is

5   when the appeal is pending.  So what did the parties agree to

6   with respect to that, and this is critical.  This is critical.

7   It's the bottom portion that I have highlighted here, *for*

8   *switched-access traffic, exchanged by the parties beginning on*

9   *June 1, 2015*, that's not an accident why we have that date.

10  It's because the parties signed the agreement one of the last

11  days in May.  They said, *on June 1, AT&T shall pay Level 3, its*

12  *applicable switched-access tariffed rate for OTT traffic*.  OTT

13  traffic.  Okay.  Not all traffic.

14          I believe Mr. Steese said that this provision required

15  us to pay all charges on all traffic, and you will see from

16  their damages calculation that's what -- that's what they are

17  asking for.  All charges on all traffic.  No, no, that's not

18  what it says.  It says *on OTT traffic*.  Okay.  Your Honor has

19  already determined what portion of their traffic that is,

20  right?

21          Then it says, and this is also critical, and

22  Mr. Steese actually didn't read this part, you will see in the

23  transcript.  He just blew right past this.  *Charges that AT&T*

24  *would pay pursuant to the terms of the OTT Declaratory Order*.

25  What is the OTT Declaratory Order?  Well, it's also defined;

1    that's the top box there.  It's in the third whereas clause in

2    the first page of The Agreement.  It says, *The question of the*

3    *applicability of* -- which charges -- *end-office charges, on O T*

4    *T traffic, was addressed by the FCC, in a declaratory ruling,*

5    *released on February 11, 2015*, gives title of the case.  It

6    names that as the OTT Declaratory Order.

7            So let's go back to our definition in Section 2.  This

8    is what we were supposed to do during the appeal.  This is what

9    we did.  We were supposed pay -- see where it starts *for*

10   *switched-access traffic exchange*, so that's on all traffic

11   exchanged by the parties beginning on June 1, what will AT&T

12   do?  Well, *AT&T shall pay Level 3 it's applicable*

13   *switched-access tariffed rate for OTT traffic*, pursuant to the

14   terms of that order, which had just come out, which said that

15   we had to pay end-office charges; that's what we agreed to do;

16   that's what Section 2 is; and that's what this entire case

17   should rest on.  That's what Your Honor made a Summary Judgment

18   on, end-office charges that were paid during this appellate

19   time period.

20           So if there has been a breach of this section, the

21   damages are the end-office charges that weren't paid, during

22   that time period.  Those are the applicable switched-access

23   tariffed rates.

24           Now, how do we know that?  We know that because it's

25   the only interpretation of the Settlement Agreement that makes

1    sense of all of the provisions in these three pages.  So,

2    here's the Declaratory Order -- oops, sorry.  This is page --

3    this is paragraph two of the Declaratory Order.  So Your Honor

4    can read the Declaratory Order, it's very long, but I think

5    it's instructive what the second paragraph of that says, this

6    is the dispute, according to the FCC, *This declaratory ruling*

7    *terminates a controversy*, the fight that the parties were

8    having, *surrounding the assessment of end-office switching*

9    *charges*.

10        So when the parties refer to AT&T's obligation, in

11    this paragraph, to pay the applicable switched-access tariffed

12    rates for OTT traffic, pursuant to the terms of this order, the

13    conclusion of that order was that they did have to be paid.

14    Those are the charges that they were talking about.

15        Finally, we get to the period of time after all of

16    this is over, and again Your Honor is very familiar with that

17    because it determined when is the final time period?  AT&T had

18    taken the position that the D.C. Circuit's order, that was

19    final, and at that point we should not have to pay anymore of

20    those end-office switching charges.  In other words, the red X

21    went up on the switching charges, we thought, at the time of

22    the D.C. Circuit's order.  Level 3 took the position that was

23    not right, that it was on remand, when the FCC actually issued

24    a new Declaratory Order.  Your Honor decided that was the right

25    time period.  Okay.

1        So, when is that then?  Your Honor determined it was

2   February 20th, 2020.  So we're not here on a damages time

3   period.  They are asking for damages for -- for a time period

4   that spans both of these provisions.  The first part of the

5   provision is (ii), January 1, 2019, till it hits that final

6   time period, when the law changed, that's February 2020, and

7   then we have February 2020, till, you know, the trial.  And so

8   these are the two provisions -- I'm sorry, I meant to actually

9   show you that provision.  These are the two provisions that are

10  at issue, when we talk about a breach of a contract.  Breach of

11  a contract has to come back to the language in the contract.

12  This is what it says, *The parties agree that any billing and*

13  *payments for OTT traffic exchanged after the final appellate*

14  *order,* I don't have that up here, but final appellate order --

15  well, you know what the final appellate order is, *when that*

16  *becomes final shall be in compliance with terms of the order.*

17  I read this to basically say after it's final, you've got a

18  bill and you have got to pay according to the law of the land;

19  that's what this says to me.  And as you are going to hear,

20  they were never billing, according to the lay of the land,

21  until May of this year.  Of course we were not paying them.

22  They were not billing us correctly.  They continued to bill

23  that number one charge on my diagram, the red X, even though,

24  for over a year, a year and a half, going on, the law was that

25  they weren't supposed to be doing it.  So they actually

1     breached this provision.

2          So -- but for purposes of this trial, just the

3     takeaway in this provision, is that there's no way you can

4     interpret this provision, so half of the damages period that

5     we're talking about, February 2020, to the trial, how on earth

6     does this say that we have to pay all access charges on all

7     traffic that Level 3 bills us, period.  And that is what

8     they're asking for.  That big chart that the three tabs that

9     they put up, there's a number on there for 54-million dollars.

10    We are going to their witnesses -- you can ask their witnesses,

11    does that have to do with OTT traffic?  Is that 54 million all

12    OTT traffic?  No.  It is every phone call that flowed through,

13    that's what they're asking you for.  How could that be our

14    requirement under this provision?  It specifically references

15    OTT traffic, and Your Honor has determined the percentage of

16    traffic that should be OTT traffic.

17         So there's just no way to read this provision to

18    require us to pay other switched-access charges.

19         Now, Level 3 tries to brush past, and you heard it

20    today, you will hear it throughout this, all of this

21    contractual language when it makes its argument.  But the

22    beginning at the end of the inquiry needs to be on the

23    contractual provisions at issue.

24         Now, this is incredible though.  I think the best

25    evidence of the phrase applicable switched-access tariffed

38

1   rates is actually what Level 3 has done when they have

2   interpreted this provision.  Okay.  And again, you will

3   remember this 50 percent issue.  The other part of the parties'

4   agreement, during that interim time period was, *Well, hey, if*

5   *we end up being right on the appeal, well, we want a refund on*

6   *some of that, because we thought we were right in the first*

7   *place, and so we get a refund on the charges that we were*

8   *disputing and that we were litigating.  They were part of that*

9   *Declaratory Order that the FCC had the appeal, all of that we*

10  *want a refund of those charges,* and so the parties agreed

11  that -- and Your Honor will -- you know, when we were supposed

12  to get that refund was part of the finality issue, where you

13  are supposed to get it after the FCC circuit, we were supposed

14  to get it after the second FCC opinion, that was all litigated,

15  and Your Honor decided that the appropriate time was in

16  February of 2020.

17         Okay.  So how does Level 3 calculate that 50 percent?

18  Do they take all of the charges that they have made for this

19  entire time period, and do they say you get half of that back?

20  No, no.  What they do is they say, 50 percent of the -- I have

21  it highlighted -- disputed OTT charges, they gave us a credit

22  for 50 percent of the end-office charges.  Why did they do

23  that?  Because those were the disputed charges.  We all know

24  that.  That's what was disputed in the litigation, in the FCC

25  order and before the D.C. Circuit.

1          So, this interpretation makes sense, the way they

2    calculated our -- once Your Honor set the final date, being

3    February 20th.  Once they -- then they calculate it on those

4    end-office charges.  They never suggested that we were supposed

5    to get 50 percent back of everything we paid during that time

6    period.

7          So I think that is the best evidence that this new

8    contractual reading they have, it can't -- it doesn't work.

9    It's three pages of text.  You can read it.  There's no way to

10   harmonize these provisions.

11         So, there's another reason, though, that this

12   interpretation is just wrong, and you can't square it with the

13   rest of the language in the contract, and that is and

14   Mr. Steese did touch on this briefly, that that is -- I'm

15   sorry, there's one other thing I need to say about this.

16         One of Level 3's witnesses actually submitted a

17   Declaration about this dispute.  So we can't wiggle during this

18   proceeding, and say, *No, no, maybe it was 50 percent of all*

19   *charges*.  This was how they said, in a Declaration, under oath,

20   for Summary Judgment that that refund should be calculated.

21   What did they say?  Fifty percent of end-office charges on OTT

22   calls.  Why?  Because those were the disputed OTT charges that

23   we paid during the time period, those end-office charges, we

24   paid those end-office charges, you get 50 percent of those

25   end-office charges back.  Under their interpretation they would

1    say, *No, no, you paid all of these charges for this time*

2    *period, so you get 50 percent of all charges*.  That doesn't

3    work.  It's the same universe of charges.  If -- you can't get

4    50 percent of a different universe of charges.

5           So now there's a second reason, though, why this is

6    wrong.  And I am sorry -- I'm contrasting, on these slides, the

7    two different arguments.  You see how it says -- here is the

8    last provision, *For that avoidance of doubt, this Settlement*

9    *Agreement shall not prohibit AT&T from disputing Level 3's*

10   *billing for switched-access traffic for reasons unrelated to*

11   *the requirements of the Declaratory Order, including, but not*

12   *limited to, disputes over volumes and applicable rates*; which

13   there were many.  Okay.

14          So, under Level 3's arguments, remember they have two

15   provisions they can find a breach on, one of them is Section --

16   (ii), the other one is (iv).  We have got the appeal appeared,

17   the final period.  Under their reading this contract, they

18   would say sentence one means that you have to pay, at the top,

19   for all switched-access traffic exchanged, *beginning on June 1,*

20   *AT&T shall pay its applicable switched-access tariffed rate*,

21   they are saying that means all charges, not just the applicable

22   end-office rate, all charges, pursuant to the terms of that

23   order, and then the next sentence says, but we all agree that

24   you could continue to dispute Level 3's billing for

25   switched-access traffic.  You can't reconcile those two

1   sentences.  If we have the ability to object for reasons

2   unrelated to the requirements of the Declaratory Order, it

3   means that we don't have to pay all charges, if they don't have

4   anything to do with the Declaratory Order.  You can't have it

5   both ways.  This is the provision, the very provision that

6   allows us to have other billing disputes in the normal course,

7   in which we had many of and which they got notice of many of

8   them.  So you can't read those two sentences.

9        The reason that's important is that we are not talking

10  about different parts of page one of a contract and page 25 and

11  how you harmonize them?  This is in the very same section.

12  They need to show a breach of this provision, and you can't

13  harmonize those two provisions.   So, they got to avoid this

14  language in the contract.  So what do they do?  They have

15  recently developed a new argument that says that the parties

16  were referring to these end-office charges generically, and I

17  mentioned that, and they did that because they said the

18  balances, in Exhibit A, include charges on that traffic that

19  had flowed before the parties sat down and wrote their contract

20  in May, they were going to make a retrospective payment, so

21  they had to figure out what the retrospective payment was, so

22  they got to a number and they put it in an exhibit and they

23  closed out all disputes relating to that.  All of them.  And so

24  what do they do?  That number -- excuse me -- that was in

25  Exhibit A.  It's referenced in -- excuse me -- it's referenced

1    in the definition.  See that Exhibit A?

2          So what they're saying now, and I didn't hear it this

3    morning, so maybe they are not saying it, but it's in their

4    trial brief, very clearly, I almost took a quote from it.  They

5    are saying, because we put Exhibit A, into the back of the

6    contract, that had -- that totaled up all of the charges that

7    was going to help us calculate the retro payment, because some

8    of those charges in that big long list were for things other

9    than end-office charges, oops, that means, now that the OTT

10   dispute was about all charges.

11         Now ask yourself, does that -- does that make any

12   sense, if you are referring to end-office charges,

13   specifically?  Or does it make more sense that the parties were

14   trying to come to a number, and that when they came to a

15   number, they needed to -- they needed to have a number to come

16   to, to reach an agreement?  We didn't hear it, maybe they have

17   abandoned this argument, but end-office switching charges are

18   very specific type of charges and they are referenced

19   specifically.  There's no reason you would have to go to an

20   exhibit, figure out what kinds of charges there are and then

21   come up with a definition of what the OTT dispute was.

22         So, what's going on here is that Level 3 has changed

23   their theory, that's what's happening.  Now, Level 3 has always

24   claimed that it was suing for end-office charges.  So if you

25   are scratching your head and saying how did we get here --

1    oops -- how did we get here?  I thought we were talking about

2    end-office charges, it's because we were.  Level 3's Breach of

3    Contract, counterclaim, does not seek any damages, other than

4    end-office charges.  Here is Level 3's claim, filed on October

5    7, 2019.  So, going way back, what did they say?  Level 3

6    claims that AT&T remains obligated to pay Level 3 end-office

7    switching access charges at tariffed rates for all calls,

8    including over-the-top calls.

9         So they are saying, we have got to get end-office

10   charges.  In their own counterclaim, acknowledges *that  AT&*T --

11   this is in paragraph 68 -- *withholds payment 65 percent of*

12   *end-office switching charges*.  Level 3 alleged that AT&T's

13   failure to pay these end-office switching charges directly and

14   proximately caused and continues to cause Level 3 to suffer

15   damages and loss.  That's what we're here about.  We are here

16   on this counterclaim to resolve damages.  Level 3 has to be

17   held to this pleading, and that's -- this is how they defined

18   damages.

19        And they -- again, they claimed that they were

20   entitled to damages, in an amount to be determined at trial,

21   for payment in full of all end-office switching charges owed

22   by -- on OTT calls.

23        Now, similarly, it's not just their pleadings, for two

24   years, throughout the course of all fact discovery in this

25   case, how -- what did they say they would get damages for, for

1    this breach of failing to pay end-office charges?  Well, they

2    said they were supposed to get more end-office charges.  So, on

3    April 30th, 2018, Level 3 made it's Rule 26(a) initial

4    disclosures, in the computation damages section, Level 3 made

5    clear that it was seeking payment of end-office charges,

6    end-office switching charges, on all minutes of VoIP traffic

7    delivered to Level 3 by AT&T, since they signed that agreement

8    that we just looked at, that's what they told us they were

9    seeking.

10         Couple months later we sent them an interrogatory, we

11   say, what are your damages, they refer to this, and then they

12   say, again, Level 3 further states that all damages, all

13   damages consist of the end-office switching access charges,

14   that AT&T has wrongfully withheld, in their view, and for which

15   AT&T improperly claims a refund.  There you see, they are

16   linking the two concepts, it's end-office charges that they

17   claim they should have got and we think we have a refund on.

18   It's same universe of charges.  It's end-office charges, they

19   just admitted in their damages disclosure.  In their

20   interrogatory response.

21         Now again, this is after fact discovery, Your Honor,

22   this is in an amended or supplemental Rule 26(a) disclosure, in

23   a section entitled Computation of Damages, Level 3 again made

24   it clear that it seeks payment of end-office switching access

25   charges on all minutes of end -- excuse me -- of all minutes

1    VoIP traffic delivered to Level 3, by AT&T since the execution

2    of the parties' Settlement Agreement.  What is that?  That's

3    the red X, that's what they want.  They are saying we want that

4    money.  We think we get that money, under the contract.  They

5    are not asking for all-access charges, but that's what they're

6    asking you for today.  That's what the 54 million is.  When you

7    take 54 million, you start doing all of this subtraction, and

8    you get to the bottom, they are saying we get payments from all

9    charges, not just charges -- end-office switching charges on

10   VoIP traffic.  And it was not just that Level 3 was seeking

11   only end-office charges.  The other consistent allegation that

12   I'm sure Your Honor will recall, is that AT&T was saying we are

13   withholding 65 percent of end-office charges.  Mr. Steese asked

14   all of our witnesses, *What are you withholding?  Sixty-five*

15   *percent end-office charges.  Sixty-five percent of end office*

16   *charges*, that's how the depositions went in this case.

17          Indeed, Level 3's own motion for Summary Judgment,

18   which I have on the screen, this is what they assert, despite

19   the lack of clarity, in 2017, AT&T took matters into its own

20   hands and started to withhold payment of 65 percent of Level

21   3's end-office charges.  That is why, Your Honor, that's the

22   motion they filed for you, and that you ruled on it, and that's

23   why, when you issued an order, your order, this is the last

24   page of your order, you were granting their motion for Summary

25   Judgment, why?  You ruled that, *Pursuant to to the Settlement*

1    *Agreement, plaintiff was entitled*, that's us, *to a 50 percent*

2    *refund for end-office switching charges assessed during the*

3    *relevant time period*.  Okay.  And it continued, of course, on

4    we're talking about the OTT traffic.  That's what we're talking

5    about always, end-office charges.  There's been no finding, in

6    that Summary Judgment order, that we violated the contract,

7    that we breached the contract, by doing anything other than

8    failing to pay certain end-office charges.  They don't have a

9    Summary Judgment motion on file on that.  Your Honor hasn't

10   ruled on that, so you can't get damages for that.  Breach has

11   not been established.

12          So, in the words of the contract, together with their

13   own pleadings and multiple discovery, this should be shut down,

14   at, basically, after their case, because they can't -- they

15   can't meet their burden of putting on evidence, just to

16   establish that.  But we're going to put on evidence from two

17   witnesses, Ms. Meola, is in the courtroom.  Ms. Meola is going

18   to testify that the relevant time period, in that August of

19   2017 time period -- and why is this relevant, I should say?  In

20   August of 2017, the parties that we had the -- the D.C. Circuit

21   opinion, and as you know at Level 3 -- AT&T had said, *Okay.*

22   *We've got a new order.  We have to go to phase three of the*

23   *parties' Agreement.  We are just going to pay according to the*

24   *order*, and Level 3 said, *No*.  They tried work it out.  They

25   couldn't get into an agreement and all of that, that's what was

1   happening, at that stage of the dispute.  And so what did we

2   do?  What were the instructions?  What does the evidence show?

3   We said, not that we were going to start disputing all of these

4   other charges.  We started disputing 65 percent of end-office

5   charges, that's what Ms. Meola is going to testify, that she

6   instructed her team to do.

7            Then you are going to hear from Ms. Miller.  And

8   Ms. Miller is going to testify that she was responsible for

9   carrying out that instruction.  How did she carry it out?  She

10  gave specific instructions to a team at AT&T that's responsible

11  for putting instructions into this, we call it the

12  mechanized-bill validation system.  We get thousands of

13  these -- I agree with Mr. Steese.  They are very complicated

14  phone records, complicated billing back and forth, that goes

15  into a mechanized system, and in that system, it's a computer.

16  You have to tell the computer what to do, what to pay, and what

17  Ms. Miller did, at that stage, in August, when we couldn't

18  reach an agreement about these end-office switching charges,

19  even though the D.C. Circuit had ruled, Ms. Meola instructed,

20  Ms. Miller carries out, tells the billing people, when their

21  bills come in, program the computer so that we pay 35 percent

22  of end-office charges.

23            There is no evidence, no evidence, from any of their

24  witnesses.  They don't have personal knowledge of any

25  instructions in our system to pay anything less than -- or

1    anything on the OTT dispute, other than that withholding of the

2    65 percent on end-office charges.  They cannot meet their

3    burden of proving that.

4         Now, this is not some convenient testimony, that these

5    witnesses are going to come before you to testify about.  This

6    is a contemporaneous email.  This is an email from August of

7    2017.  It's exactly what I just told you was happening.  It's

8    contemporaneous evidence of Ms. Miller, Alison Miller --

9    instructing this gentleman named Sandeep Mulik at AT&T.  Now

10   Mr. Mulik is on the price-sheet team, responsible for inputting

11   the instructions, essentially.  Ms. Miller, here, is telling

12   Mr. Mulik to adjust the EO percentage field to 35 percent.  So

13   what does that mean?  She is saying, she is telling the people

14   that were charged with programming the computer, at AT&T, when

15   Level 3's billings come in, change the payment from hundred

16   percent to 35 percent of end office.  That's what EO stands

17   for, I agree with Mr. Steese.  EO is end office.  That's what

18   the contemporaneous documentation says.  The date is exactly

19   consistent with the testimony.  It's consistent with the

20   parties' negotiations.  After the D.C. Circuit came out, they

21   could not reach an agreement, so then we took action, whether

22   it was too soon or not, Your Honor has decided it was a bit too

23   soon, but what Your Honor has not decided and what they can't

24   prove is that we took action beyond withholding of end-office

25   switching charges.  That's what they're alleging and they don't

1   have any evidence to respond to this.  They don't know anything

2   about our systems.  They don't know what we did.  There's

3   nobody that can -- that can rebut this contemporaneous evidence

4   of the instruction only on end-office charges.

5        So, just like they can't explain, today, why their

6   Complaint doesn't match the theory.  They have nothing to say

7   about this evidence.  They certainly have not documentary

8   evidence.

9        In sum, the only remaining issue should be decided in

10  this proceeding, should be the amount of damages that were

11  proximately caused by AT&T's failure to pay end-office

12  switching charges during the relevant time period.  Those

13  charges are end-office charges that were unpaid, and no other

14  unpaid access charges.  Nothing else in that call flow that we

15  looked at.

16        Now, as I said, I don't find math easy particularly,

17  how I got selected for a damages trial?  Here is a very simple

18  calculation.  You have got total end-office charges billed.

19  I'm going to give Level 3's numbers here in a moment, but to

20  start with, you have got to start with the breach, and that

21  was, end-office charges.  Now, you actually make a subtraction,

22  because what Your Honor determined is that not all of those

23  end-office charges should be assessed.  It should be less 21

24  percent.  Because the 21 percent is that red X in the flow,

25  that represents the part that should come out, because they

 1    were not providing the local loops service; that number one.

 2    You take that out, and you get amount properly billed.  That's

 3    what they should have charged us in end-office charges, and

 4    then you have to give us credit, the bottom portion is, you

 5    have got to give us credit for the amount that we've actually

 6    paid, and we did pay 35 percent, that's what Ms. Meola and

 7    Ms. Miller are going to testify, that's what that document we

 8    just looked at, the email, shows, that AT&T's computer systems

 9    were told to do.  When you do that math, then, the properly

10    amount billed, you subtract what we actually paid, then you get

11    what we overly withheld.

12           Now, I'm going to put Level 3's billing data in.  Now,

13    these numbers have moved all over the place.  They have moved

14    all over the place for two reasons.  First, we keep getting new

15    damages charts from them.  We got, Monday night, a new damages

16    chart.  We are going to talk about why in a moment.  But the

17    other reason that it moves all over the place, is that we

18    have -- they continue to bill, and we continue.  Now, they've

19    continued to bill wrongfully, remember, until May of this year,

20    they continued to bill that red X, when they were not supposed

21    to.

22           So, we -- we're going to start with an 8.2 number,

23    because that is charges through May of 2021.  So, to extent

24    that you need apples to apples, to do your the work of

25    determining damages, that's what our number is; 8.2 is the

1  starting place for total end-office charges during the relevant

2  time period, for -- I said end office.  Okay.  So that's where

3  you start.

4        What do you do next?  Okay.  Well, you have got to get

5  to that properly billed number.  So the properly billed number,

6  is the end-office overcharge.  Your Honor determined it was 21

7  percent.  You take their total end-office charges, you multiply

8  that by 21 percent.  This is the portion that's the red X, that

9  shouldn't have been billed, that's approximate $1.2 million.

10        So, you have to do that math, to get to this number.

11  It's about $7 million.  So, that's what they should have billed

12  us for end-office charges, during the relevant time period.

13  Remember, the relevant time period straddles some of the time

14  when there was an appeal and some of the time when there was a

15  final decision that they weren't supposed to be charging this.

16        So when you look at the charts, you will see that --

17  that the numbers change as of February of 2020, that's a

18  detail, but this is what it turns out to be, 7 million was

19  properly billed.

20        What do you do next?  Well you have to give AT&T

21  credit for the amount that it actually paid on end-office

22  charges, that's 35 percent; that's what the evidence is going

23  to show.  And that is the roughly $2.9 million.  How do you get

24  that number?  You can do it yourself by taking the 8.2, the

25  top, it's 35 percent of that number.  So that's what we paid.

52

1    So, to get to damages, you take what they properly billed, not

2    that OTT traffic, that wasn't supposed to be billed, that's the

3    red X, you get the 7 million, then you subtract what we have

4    actually paid, around $2.9 million, that is how you get to $4.1

5    million, and that's, under the Court's order, this is the

6    correct damages calculation.

7            So why did Level 3 tell you that AT&T withheld, I

8    believe the number was $7.992 million, based on the OTT

9    dispute?  That's not what this shows.  It's -- it would be

10   almost as much as their total.  Again, when you look at their

11   chart, go back and look at their exhibit, their starting place

12   is not 8 million.  It's 54 million, for all phone calls,

13   everything, all calls that they did and all charges that they

14   did.

15           So Level 3 is not satisfied, and that's what they want

16   to expand this case, at this stage to be, is about something

17   other than end-office charges.

18           Now, we're curious people as lawyers.  You may say,

19   well, regardless of why Level 3 -- or AT&T didn't pay this,

20   like, what was going on?  Why didn't AT&T pay these other

21   charges?  Because we admit that we did not pay other access

22   charges beyond end-office charges.  You may say what was going

23   on?  Well, Ms. Meola will testify that she has managed the

24   Level 3 relationship for nearly a decade, and there have been

25   error after error and problems with their billing more than any

53

1    other vendor they deal with.

2         In fact, you heard this week, they finally figured out

3    another problem that they had with their billing, and he

4    acknowledged it was wrong, what we did.  All of this ends up

5    with repeated objections and back and forth with their billing

6    all the time, that's going on, that has nothing to do with that

7    red X and the OTT dispute.  That is, unfortunately, between

8    these two parties, giving their billing and our system, which

9    actually makes sure that billing is appropriate, under tariffs,

10   that creates a lot of disputes, and it does create withholdings

11   and that's what happened.

12        Now, what was Level 3 supposed to do then, if they had

13   other charges that they think were properly billed that we

14   didn't pay?  What were they supposed to do?  Well, there's a

15   federal cause of action for a brief of tariff.  They are

16   supposed to file that, and they are supposed to then prove that

17   this it what we charged AT&T, this is our tariff, these were

18   our services that we provided, and they didn't pay those.  You

19   don't have a tariff action, that's not what they -- that's not

20   what they told you, that's not what they filed here, and they

21   make a lot of excuses about why they didn't.

22        First, they say, *Well, the contract is broad enough*,

23   because the contract says anything you withheld, because of

24   OTT -- that OTT dispute, we get to subtract that.  Well that's

25   not true.  We looked at the contract.  There are two different

54

1    provisions that deal with the time period, that we're talking

2    about.  Neither one of those charges -- excuse me -- neither

3    one of those provisions say that we have to pay, and that they

4    should be compensated for all switched-access charges.  No.

5    They are very specific obligations in that contract.  So that

6    goes out of the way quickly.

7           They also argue that we couldn't file a tariff claim

8    because we didn't know that AT&T was withholding other access

9    charges because of the OTT dispute.  Well, that assumes away

10   the problem.  They don't have any evidence that we withheld

11   other access charges because of the OTT dispute.  In fact, the

12   evidence, Ms. Meola and Ms. Miller will testify that they

13   didn't.  And so that doesn't work either.

14          And finally, they -- they just don't explain to you

15   why.  They are the biller.  As you know, if you ever performed

16   a service, you send a bill out.  You are the biller.  You are

17   supposed to know how much you charge, and then when somebody

18   doesn't pay you, they short pay you, you are responsible for

19   figuring out why, and if you need to file a tariff action, in

20   this one, then you go do that.

21          Now, I'm going to talk about the tariff in a moment,

22   but if they would have just done simple math, they would have

23   said, *Oh, it's clearly not just the 65 percent of our*

24   *end-office switching charges.  It had to be more, because we*

25   *billed for things, and they are withholding more than that 65*

1   *percent.*  They didn't do that, and they don't explain to you

2   why.  Their witnesses won't explain to you why they wouldn't

3   have been responsible for doing that.  What we were responsible

4   for doing, if they were billing correctly, was there's a tariff

5   in place.

6          So, you are going to hear a lot of testimony about

7   what -- what we did, in response, to give them notification of

8   these disputes.  You are going to see examples.  This is

9   just -- excuse me ... these are a couple of examples of these

10  dispute notices that the machine automatically sends out.

11  These are just -- Mr. Steese, I believe, said we have a lot of

12  recent excuses not to pay.  These are mechanized system notices

13  that go out all the time.  Then there's emails between the

14  parties, and we notify them, and we do something called a rack

15  up, where we look at our bills, we say, *Hey, you are charging*

16  *us for something called, you know, super tandem.  We don't see*

17  *anything in your bills for super tandem.  Help us understand.*

18  *Are you calling that something different than your tariff?*

19  *What's going on here*?  That is the kind of dialogue that goes

20  on all the time between these parties and it has nothing to do

21  with this OTT dispute over that red X.

22          So, they know we provide regularly notice.  They know

23  that.  And in fact, as I said, this is where -- the shenanigans

24  this week.  We actually got a new damages chart on Monday

25  night.  So less than 48 hours ago, that acknowledged that we

56

 1    had sent one of these other notices.  So that's why, when

 2    Mr. Steese said he did the calculation, and he subtracted the

 3    disputes that they were aware of, up until Monday night, they

 4    had said, the only disputes that we knew of were this thing

 5    called DEOT and OTT.  So that's why Level 3 says it's

 6    appropriate for us to take all charges and just subtract out

 7    the amounts for these other disputes that AT&T has identified,

 8    but that doesn't work, because there were a number of other

 9    disputes, and they knew that.

10         Now this is all way, way, way away from the contract.

11    As you know, this is way, way away, but I'm simply saying, a

12    lot of our case will be, frankly, giving you comfort that there

13    were no shenanigans going on with these other charges.  The way

14    they were handling our processes is appropriate.  That's why

15    each of their other theories just doesn't fly -- don't fly.

16         The parties did not refer to end-office switching

17    charges generically.  These are people that, in the industry,

18    who use very specific, technical terms.  We have all learned

19    that through the litigation.  The -- the argument that we heard

20    a little bit -- actually we heard a lot about, was this

21    mechanized bill payment system.  Mr. Steese went way, way, way

22    down in the weeds of a totally different dispute, a CPN

23    dispute, and he was trying to make some sort of a mathematical

24    statistician kind of match between other charges.  That is --

25    that is just not true.  AT&T has the ability to determine

57

1    end-office charges that Level 3 levied on AT&T, and AT&T has

2    done that.

3         So -- but because we're here and we have to rebut the

4    things they are saying, you are going to see a lot of charts

5    like this.  This is our mechanized payment system.  It's going

6    to tell you basically, you know, how the sausage is made,

7    and -- and the takeaway here, again, is that AT&T has the

8    ability to identify the end-office component of their billings.

9         Now, in sum, because Level 3 has no other claim for

10   charges or damages, other than end-office switching charges on

11   VoIP calls, Level 3 cannot obtain damages in this damages trial

12   for any other access charges; rather, they are stuck with the

13   claim that they brought.

14        This is the formula that I went over.  Will provide

15   you a written copy.  My handwriting is so bad I'm not going to

16   try to use your chart.  This is basically the formula.  There

17   are some additions and subtractions.  One of the additions to

18   the number will be the TCG credit, that you heard about.

19        So, TCG is AT&T's affiliate.  Okay.  When the -- in

20   the course of this litigation, they filed a claim saying, *Hey,*

21   *we are owed money, because, we were overcharged on the same red*

22   *X*, essentially.  Okay.  Well, no, that's not true.  What

23   happened was they actually overwithheld.  So they didn't

24   recover anything on that, and there will be, in addition, we

25   are owed about half-a-million dollars on that, and the parties

1    have actually stipulated to that.

2           So, there's no recovery of damages from them, but it

3    is some addition.  So, we will have a little bit more that we

4    will put on the whiteboard on that.

5           I'm going to cover real briefly the other two

6    components of their damages.  Late payment charges.  Level 3

7    again makes a claim that is not derived from the contract.

8    This is -- this is Section 2.  There are no late payment

9    charges referenced in this provision, and this is the one they

10   have to show a breach on.  Late payment charges, where are they

11   referenced?  Well, they are referenced in the provision that

12   talked about the retro payment.  And you are going to hear

13   testimony about why they are in there, but it doesn't really

14   matter, because they are not in the provision they are suing

15   on, because they are suing on that appeal-time period.  They

16   are certainly not on the time period that, after the final

17   order, that (iv), and remember, how could they ever get late

18   payment charges, after there was, the federal law was that they

19   should not have been billing switched-access -- excuse me --

20   end-office charges on OTT calls and they continued to do it,

21   and so we continued to withhold.  Now they say they get late

22   payment charges for that.  That doesn't fly, under the

23   contract -- or any reading of the contract I should say.

24          And then they also seek attorneys' fees, and again,

25   this is the stipulation that we have on this point.  They did

1  not, under the Communications Act, the only time you can get

2  attorneys' fees for any portion of a Communications Act claim,

3  is when you have recovered damages.  That is not what happened.

4  They did not recover damages.  They are paying us damages.

5  They overwithheld.

6         So, just like they are complaining about AT&T

7  overwithheld.  They overwithheld.  So they can't get attorneys'

8  fees when they actually owe us money under the calculation.

9         In summary, the Court has determined that AT&T was

10  liable for breaching the 2015 Agreement, for not paying a

11  particular kind of charge, end-office charges.  There's no

12  basis for any award beyond that.  In fact, the contract, as we

13  saw, says exactly the opposite.  AT&T had every right to rely

14  on this provision of the contract, which said we could continue

15  to object, or dispute any of their billing for switched-access

16  traffic for reasons unrelated to the requirements of the OTT

17  Declaratory Order; that's what this case should be about.

18         In summary, the Court should adopt AT&T's damages

19  calculation that I showed you in light of the Court's Summary

20  Judgment ruling.  Thank you, Your Honor.

21         THE COURT:  All right.  Let's take 15 minutes, until

22  five of, to give my court reporter a break.  Recess.

23         THE COURTROOM DEPUTY:  All rise.  Court is in recess.

24     (Recess at 10:41 a.m.)

25     (In open court at 10:56 a.m.)

MELISSA KELLOW – Direct

1          THE COURT:  Please be seated.  Level 3, please, call

2    your first witness.

3          MR. STEESE:  Level 3 calls its first witnesses,

4    Melissa Kellow.

5          THE COURTROOM DEPUTY:  Come right up here, ma'am, and

6    be sworn.  Raise your right hand, please.

7      (**MELISSA KELLOW** was sworn.)

8          THE WITNESS:  I do.

9          THE COURTROOM DEPUTY:  Please have a seat.  State your

10    name and spell your last name for the court reporter.

11          THE WITNESS:  Melissa Kellow, K E L L O W.

12                      **DIRECT EXAMINATION**

13    BY MR. STEESE:

14    Q   Ms. Kellow, pull yourself into that microphone so everyone

15    can hear you, okay?

16    A   Okay.

17    Q   Good morning, Ms. Kellow.  Ms. Kellow, where do you work?

18    A   Level 3 Communications, which is now Lumen.

19    Q   What is your title a Lumen?

20    A   I'm a manager in billing.

21    Q   How long have you held a job as a manager in billing?

22    A   Seven years.

23          THE COURT:  Hold on one minute.  Tammy, I seem to have

24    disconnected somehow.

25      Q   (By Mr. Steese) And again, how long have you held the

MELISSA KELLOW – Direct

1   position as a manager in billing?

2   A   Seven years.

3   Q   Do you have college degree?

4   A   Yes, I do.

5   Q   And when did you get that degree?

6   A   June of this year.

7   Q   Congratulations.

8   A   Thank you.

9   Q   Where and what university and what degree did you get?

10  A   Colorado State University, Golden campus.  The degree is in

11  business management.

12  Q   As a manager in billing, what are your job

13  responsibilities?

14  A   I manage a team of people who work all disputes and

15  collections for invoices that we send out to customers.

16  Q   And what role, if any -- is AT&T one of your account

17  customers?

18  A   Yes, they are.

19  Q   And what role do you have with the AT&T account?

20  A   I have a few people that I manage that actually handled all

21  of the disputes for AT&T, as well as collections on those

22  accounts.

23  Q   And how long have you had a role in working on the AT&T

24  account?

25  A   I worked on the AT&T account for over ten years.

MELISSA KELLOW - Direct

1  Q   Are your duties any different for the AT&T account as they

2  are for your other customers?

3  A   No.

4  Q   So, does Level 3 issue invoices to AT&T?

5  A   Yes.

6  Q   And when Level 3 issues invoice to AT&T, when do you get

7  involved?

8  A   I get involved when they file disputes or do not submit

9  payment on time.

10 Q   Now, does Level 3 issue just one invoice to AT&T each

11 month?

12 A   No.

13 Q   How does Level 3 keep track of all of the different

14 invoices it submits?

15 A   We have a system that manages all of the invoicing.

16 Q   And these different invoices, do they have things

17 associated with them called billing account numbers or BANs?

18 A   Yes, they do.  Those identify which state and customer

19 we're billing.

20 Q   And the kinds of invoices that you send -- Level 3 sends to

21 AT&T, that you managed, what kinds of charges are on those

22 invoices?

23 A   Switched-access charges.

24 Q   At a high level, what are switched-access charges?

25 A   When a company, like Level 3, charges AT&T for use of its

MELISSA KELLOW - Direct

1   network.

2   Q   Before we get into switched-access charges -- strike that.

3         We will just focus on switched-access charges.  Let's

4   look at Exhibit A20.  If we can put that up on the screen.  Do

5   you recognize Exhibit A20?

6   A   Yes.

7   Q   And, high level, what is it?

8   A   It's a summary of all of the switch-access charges that we

9   billed, different months and amounts.

10        MR. STEESE:  Move admission of Exhibit A20.

11        THE COURT:  It's a trial to the bench.  I'm not really

12  going to be pushing real hard against this.  Is there any

13  objection or not?

14        MR. WARDEN:  No objection, Your Honor.

15        THE COURT:  All right.  A20 is received.

16        MR. STEESE:  So, Your Honor, sidenote then for a

17  moment.  How do you want us to -- because there will be some

18  foundational issues that we can dispense with, if we just -- if

19  things just come into evidence, should we act accordingly --

20        THE COURT:  Well, here is what I will say, I don't

21  need you to belabor the foundational issues.  If the other side

22  wants to object to it, then we can go back and drill down into

23  it.

24        I suppose what I'm saying to you is this, as a matter

25  of *proper lawyering*, I'm not interested in watching people

MELISSA KELLOW - Direct

 1   *properly lawyer*, so to speak, on matters as to which everybody

 2   knows the foundation is going to be laid.  I just as soon get

 3   to the exhibit.

 4          If there's truly a concern that the witness does not

 5   have, I don't know, the qualifications, the knowledge, the

 6   whatever it may be, there's foundation objection that's made,

 7   then you should go back --

 8          *MR. STEESE:*  And lay a foundation.

 9          *THE COURT:*  -- and lay the foundation, and we will see

10   where we are.  So, to some extent I'm letting the opponent

11   decide when and where we need to do what I have considered to

12   be, perhaps, frequently unnecessary stuff.

13          *MR. STEESE:*  I think I understood, Your Honor.  I'm

14   sure as we get moving here --

15          *THE COURT:*  We'll see.

16          *MR. STEESE:*  -- we'll see the process.

17          *THE COURT:*  For whatever it's worth, beyond that,

18   anything that's been stipulated to I'm considering admitted.

19          *MR. STEESE:*  Perfect.

20   *BY MR. STEESE:*

21   *Q*   All right.  Ms. Kellow, back to you.  If you look in column

22   D, as in David, there's something called a journal -- excuse

23   me -- journal rate IDs.  Do you see that column?

24   *A*   Yes.

25   *Q*   And if you look at the acronyms that go under that, what

MELISSA KELLOW - Direct

1    are those?

2    A    Those are all different rate elements.

3    Q    Are you familiar with those rate elements?

4    A    Yes.

5    Q    And how?

6    A    They are in our tariff.

7    Q    And are they usage based, all of them?

8    A    Yes.

9    Q    And can usage be per minutes?

10   A    Yes.

11   Q    Can it be per mile?

12   A    Sometimes.

13   Q    And can it be per call?

14   A    Yes.

15   Q    Thank you.  And do you see that some of these rate elements

16   begin with EO and some begin with LT?

17   A    Yes.

18   Q    What's the difference between those.

19   A    EO signifies end-office rate elements, LT signifies

20   tandem-rate elements.

21   Q    High end, what is the difference between end office and

22   tandem?

23   A    End office is where the call routes directly to our end

24   office, and tandem is where the charges go through our tandem.

25   Sorry, the call goes through our tandem.

MELISSA KELLOW - Direct

1   Q   What is your role with these usage-based charges, when they

2   were billed to AT&T?

3   A   I work to help resolve disputes and collect the balances

4   due.

5   Q   Are there times that carriers dispute some of the billings

6   associated with the usage-based elements contained in Exhibit

7   A20?

8   A   Yes.

9   Q   Why don't you, generally, describe the dispute process?

10   A   The dispute process is the customer is to notify us, in

11   writing, within a certain timeframe, that they have a dispute

12   on a particular invoice and the date, along with documentation

13   to support their claim and the amount of the dispute.

14   Q   So let's bring up Exhibit A3.  Which I believe is our

15   tariff, and I belief is actually stipulated into evidence.

16        Do you recognize this document?

17   A   Yes.

18   Q   And if you look at pages 54 to 55 of the PDF, which is

19   Exhibit -- excuse me -- Section 4.9.  Do you see where it says

20   disputed bills?

21   A   Yes.

22   Q   Are you familiar with this, and then scroll down one page,

23   please, 4.91 and 4.92 of the tariff?

24   A   Yes.

25   Q   And what do these sections show?

MELISSA KELLOW - Direct

 1   A    It states the -- that if there's dispute on the invoice,

 2   there's a timeframe for the customer to file a dispute, in

 3   writing, to Level 3, along with specific detail of what is

 4   required.

 5   Q    So let's look back at -- page up one page, please, 4.9, 1.

 6   How quickly is carrier supposed to levy a dispute according to

 7   the tariff?

 8   A    Within 90 days of receiving the invoice.

 9   Q    And what kinds of details -- now, go down to the next page.

10   What kinds of details is a carrier customer supposed to

11   identify, if they have a dispute?

12   A    The account number, the date of the bill, the invoice

13   number, the exact dollar amount, and any other detail that

14   supports the claim.

15   Q    Has AT&T raised disputes with Level 3 about usage-based

16   charges over the years?

17   A    Yes.

18   Q    And if AT&T raises a dispute, as a manager in the dispute

19   section, is it brought to your attention?

20   A    Yes.

21   Q    And why is that?

22   A    Because I'm in charge of all of the disputes that any

23   customer along with AT&T raises.

24   Q    Are you familiar with the disputes that AT&T has raised

25   about Level 3's usage-based charges since January of 2019?

MELISSA KELLOW - Direct

1    A    Yes.

2    Q    And what are they?

3    A    They are against -- sorry.  Excuse me.  Can you repeat the

4    question?

5    Q    Sorry.  I asked, are you familiar with the disputes AT&T

6    has raised?

7    A    Hm-hm.

8    Q    And you said?

9    A    Yes.

10   Q    And what are those usage-based disputes that AT&T has

11   raised?

12   A    The OTT disputes and the DEOT disputes and another small

13   one, for a back billing.

14   Q    And the back billing dispute, why don't we bring up,

15   quickly, I believe it's 84.  To make sure you are -- this is

16   AT&T Exhibit 84.  Is this the dispute that you are talking

17   about?

18   A    Yes.

19   Q    And what's the date of this dispute?

20   A    February of 2021, February 8.

21   Q    I move admission of AT&T Exhibit 84.

22        MS. ZAMBRANO:  No objection, Your Honor.

23        THE COURT:  Received.

24   BY MR. STEESE:

25   Q    And is this the other recent dispute that you are talking

MELISSA KELLOW - Direct

1    about?

2    A    Yes.

3    Q    And you said had to do with what?

4    A    Back billing of tandem charges.

5    Q    And if you look at this particular dispute, does AT&T

6    identify the specific amount --

7    A    Yes.

8    Q    -- associated with this dispute?

9    A    Yes, they do.

10   Q    What is the specific amount?

11   A    $251,727.25.

12   Q    And that was as of what period of time?

13   A    That was on the December invoice, December 2020 invoice.

14   Q    Other than the DEOT dispute and the OTT dispute and this

15   very recent February 8, 2021 tandem dispute, has AT&T raised

16   any other usage-based disputes with Level 3, since January 1,

17   of 2019?

18   A    No.

19   Q    Now, let's look at one other recent set of materials, that

20   AT&T has provided, and we will bring up AT&T Exhibit 79.  And

21   do you see that this is December 22, 2020, January 4, 2021,

22   exchange?

23   A    Yes.

24         MR. STEESE:  Move admission of Exhibit AT&T 79.

25         MS. ZAMBRANO:  No objection, Your Honor.

MELISSA KELLOW – Direct

1          *THE COURT:*  Received.

2     *BY MR. STEESE:*

3     *Q*    And what is this?

4     *A*    It's an email from AT&T, making us aware of a potential

5     dispute on a particular BAN and invoice date.

6     *Q*    And what is this exchange.  What does it concern?

7     *A*    It concerns that AT&T's mechanized validation process, sees

8     an unexpected fluctuation, as well as requests to separate out

9     end-office and tandem charges to separate BANs.

10    *Q*    Now, is this a traditional, quote, dispute, closed quote,

11    as defined in Tariff Section 4.9 that we looked at a minute

12    ago?

13    *A*    No.

14    *Q*    And why not?

15    *A*    They are not disputing any particular charge or rate.

16    *Q*    What are they actually asking Level 3 to do?

17    *A*    To separate out the two different traffic types to separate

18    billing account numbers or BANs.

19    *Q*    And who is Level 3's billing vendor?

20    *A*    CDG.

21    *Q*    Has AT&T raised this issue about -- no.  Does CDG submit

22    invoices for BANs that have tandem charges and end-office

23    charges both on the same BAN?

24    *A*    Yes.

25    *Q*    How long has it done so?

MELISSA KELLOW - Direct

1   *A*   Um, ever since we have been a customer of theirs, use them

2   as a vendor.

3   *Q*   And how long is that?  As long as you have been in that

4   position?

5   *A*   Yeah.  Probably ten years.

6   *Q*   And have you asked CDG if they can separate out the tandem

7   and end-office charges and put them on separate BANs?

8   *A*   Yes.

9   *Q*   And what were you told?

10  *A*   They were unable to do so.

11  *Q*   Does Level 3 use CDG to send invoices to other carrier

12  customers?

13  *A*   Yes.

14  *Q*   What other carrier customers are you aware of that have

15  asked Level 3 to separate out end-office charges and tandem

16  charges?

17  *A*   No other customer has requested this.

18  *Q*   Does CDG exist just to serve Level 3?

19  *A*   No.

20  *Q*   Do they serve other carrier customers?

21  *A*   I assume so, yes.

22  *Q*   Are you aware of any other carrier customers that they

23  serve?

24  *A*   TCG.

25  *Q*   And who is TCG?

MELISSA KELLOW - Direct

1   A   Affiliate of AT&T.

2   Q   And does TCG submit BANs that have end-office and tandem

3   charges on the same billing account number?

4         MS. ZAMBRANO:  Your Honor, I have an objection to

5   that, this witness doesn't have foundation --

6         THE COURT:  Sustained.  Sustained.

7         MS. ZAMBRANO:  Thank you.

8   BY MR. STEESE:

9   Q   Have you seen -- does Level 3 also receive invoices from

10  TCG?

11  A   Yes.

12  Q   And does -- when Level 3 receives invoices from TCG, does

13  it assess tandem charges, end-office charges on the same BAN?

14  A   Yes.

15  Q   Are you aware that -- so Level 3 is both a long-distance

16  carrier, correct?

17  A   Yes.

18  Q   And a local carrier?

19  A   Yes.

20  Q   And so, it, both, pays access charges and, um, gets paid

21  access charges, right?

22  A   Yes.

23  Q   You are aware that Level 3 employee, Jennifer Torres, is

24  offering opinions in this case about the amount of withholdings

25  that Level 3 attributed to the OTT dispute, correct?

MELISSA KELLOW - Direct

1   A   Correct.

2   Q   Did you do anything to assist Ms. Torres in preparing for

3   her opinions?

4   A   Yes.

5   Q   And what was your role in the process?

6   A   I pulled together details and did spreadsheets for her.

7   Q   All right.  Let's bring up Exhibit A22.  Can you see that

8   on your screen?

9   A   Yes.

10  Q   Is this a version of the spreadsheet that you created?

11  A   Yes.

12  Q   And what is the timeframe for this particular spreadsheet?

13  A   Goes from February of 2019 through March of 2020, invoice

14  date.

15  Q   All right.

16          MR. STEESE:  Move admission of A22.

17          MS. ZAMBRANO:  No objection, Your Honor.

18          THE COURT:  Received.

19      Q    (By Mr. Steese) Before we get into the details,

20  when -- did you give a date of when you prepared this?  Please

21  do so.

22  A   Um, I prepared this some time in late March or early April

23  of 2020.

24  Q   By late March or early April of 2020, if you go to the

25  credit and debit tab, are you identifying a credit that is due

MELISSA KELLOW - Direct

1   to AT&T for OTT calling?

2   A   Yes.

3        MR. STEESE:   And I would like the Court to take

4   judicial notice of the fact that this is one month after the

5   FCC issued its decision -- one month after its decision became

6   final, excuse me, on the OTT charges.

7        Q    (By Mr. Steese) How quickly could Level 3 put in

8   place a credit to account for February 2020 invoices?

9   A   We would -- for February of 2020 invoices, we would process

10  the credit likely in the March 2020 timeframe, on the April

11  2020 invoice.

12  Q   So, as of the very month that the FCC decision becomes

13  final, Level 3 is already identifying credits owed to Level 3

14  on OTT calling, correct?

15  A   Correct.

16  Q   Now, what is the source -- go back to the AR Summary,

17  please, of Exhibit A22.  What is the source of the data in the

18  spreadsheet?

19  A   Level 3 billing systems.

20  Q   How frequently do you use those systems?

21  A   Every week.

22  Q   I'm sorry?

23  A   Every week.

24  Q   And what else are these systems used for?

25  A   Billing other customers, switched-access charges.

MELISSA KELLOW – Direct

1   Q   And so, how -- do these systems have any connection to the

2   AT&T invoices themselves?

3   A   Yes.

4   Q   And what connection is there?

5   A   This is how we generate our invoices to AT&T for

6   switched-access charges.

7   Q   So, the items in Exhibit A22, would come directly from AT&T

8   invoices?

9   A   Yes.

10  Q   Over the course of time, have you updated this spreadsheet?

11  A   Yes.

12  Q   So what was the reason why you updated the spreadsheet?

13  A   To account for additional months, and to see the overall

14  amount due, withholding amount.

15  Q   And were there any changes to the spreadsheet or later

16  versions of the spreadsheets as you were creating them?

17  A   Yes.

18  Q   And broadly speaking, what was the purposes of the changes?

19  A   We found some additional items that either AT&T brought to

20  our attention, and we accounted for those in future updates.

21  Q   So, the reasons for changes were, additional months

22  bringing additional charges to the mix; one, correct?

23  A   Correct.

24  Q   And two, if AT&T identified something that it thought

25  needed to be changed, you would look at it and determine

MELISSA KELLOW - Direct

1  whether it belonged?

2  A   Yes.

3  Q   Did the overall methodology for calculating damages stay

4  the same or did it change?

5  A   It stayed the same.

6  Q   Let's just bring in these other spreadsheets, just quickly,

7  from different timeframes.  Let's look at Exhibit A24.  Is this

8  from the spreadsheets that you created?

9  A   Yes.

10 Q   And this is through what timeframe?

11 A   January 2021 invoice date.

12        MR. STEESE:  Move admission.

13        MS. ZAMBRANO:  No objection, Your Honor.

14        THE COURT:  Received.

15    Q    (By Mr. Steese) Let's look at Exhibit A25.  Is this

16 an another spreadsheet that you created?

17 A   Yes.

18 Q   And this is through what timeframe?

19 A   It's at the bottom of the spreadsheet.  Sorry, through

20 April 2021, invoice date.

21        MR. STEESE:  Move admission.

22        MS. ZAMBRANO:  No objection, Your Honor.

23        THE COURT:  Received.

24    Q    (By Mr. Steese) Let's look at Exhibit A52.  Scroll

25 down.  Is that one of the -- one of the spreadsheets that you

MELISSA KELLOW - Direct

1    created?

2    A    Yes.

3    Q    And that's through what timeframe?

4    A    June 2021, invoice date.

5    Q    And look at the asterisks on the right.  The all amounts on

6    this row, et cetera, do you see that?

7    A    Yes, I do.

8    Q    So, was there -- was it through June?  Explain what was

9    here in this particular exhibit?

10   A    The full data is through actually May of 2021, because we

11   have payments that were received towards a May invoice.  This

12   was made early enough that the June invoice payment was not due

13   yet, so it does not include June invoice payments.

14            MR. STEESE:  Move admission of A52.

15            MS. ZAMBRANO:  No objection, Your Honor.

16            THE COURT:  Received.

17        Q    (By Mr. Steese) And finally, let's look at A53.  A53.

18   Did you create this spreadsheet?

19   A    Yes, I did.

20   Q    And scroll down so she can see the full timeframe.  What is

21   this timeframe through?

22   A    This is through the June 2021 invoice.

23   Q    Now, when was this particular spreadsheet created?

24   A    This was created in July.

25   Q    Do you remember the date?

MELISSA KELLOW - Direct

1    A   July 12th, 2021.

2    Q   So, what date was that?  I think we can -- I think that was

3    Monday; is that right?

4    A   Yes, Monday.

5    Q   Okay.  Monday.  And what had happened that led you to

6    create a new damages spreadsheet in July of 2021?

7    A   AT&T brought to our attention that we had not taken into

8    account the tandem dispute against these particular invoices

9    starting --

10   Q   I'm sorry.  Let you finish.  Please.

11   A   Starting with the December 2020 invoice.

12   Q   And when did AT&T provide us with that information?

13   A   Friday, July 9th.

14   Q   And so how quickly after AT&T brought that to your

15   attention, did you account for that?

16   A   The very next business day.

17   Q   Let's look at Exhibit A53 in some detail.

18           Scroll down a little so we can see the top.  The other

19   way.  There we go.  Scrolling down and up is all in the eye of

20   the beholder, doesn't it?

21           Move admission of Exhibit A53?

22           *MS. ZAMBRANO:*  No objection, Your Honor.

23           *THE COURT:*  Received.

24       Q   (By Mr. Steese) So let's look at column A, entitled

25   Invoice Date.  Do you see that?

MELISSA KELLOW - Direct

1    A    Yes.

2    Q    And what is in column A?

3    A    The date of the invoice to be sent to AT&T.

4    Q    And I can see the first invoice says, February of 2019.  Do

5    you see that?

6    A    Yes.

7    Q    And what type of usage charges would be in the February

8    2019 invoice?

9    A    January usage charges.

10   Q    And why did you start your analysis with February of 2019?

11   A    It's due to a settlement that was executed between Level 3

12   and AT&T in June of 2019.

13   Q    So, is that pattern consistent, the usage charges are

14   always billed the month after the usage takes place?

15   A    Yes.

16   Q    Let's look at column B.  New charges.  What does the new

17   charges reflect?

18   A    All switch-access charges and late payment charges we

19   billed for that month to AT&T.

20   Q    And if you scroll down to the bottom of that, so we can see

21   the total there is 57-million dollars, correct?

22   A    Correct.

23   Q    And let's look back, briefly, at Exhibit A20.  Those rate

24   elements that you talked about in A20, in column D, are those

25   the rate elements that are contained in those usage charges?

MELISSA KELLOW – Direct

1   A   Yes.

2   Q   Okay.  Perfect.  Let's go back to Exhibit A53.  Where did

3   the number in column B come from?

4   A   Through the billing system.

5   Q   Again, the same things that are on the AT&T invoices?

6   A   Yes.

7   Q   Is this data manipulated in any way?

8   A   No.

9   Q   Let's look at columns C and D.  What are they?

10  A   These are credits that we issued per settlement between

11  Level 3 and AT&T, to resolve outstanding disputes related to

12  direct and office or DEOT-usage charges.

13  Q   And what did you do to gather those numbers?

14  A   Those numbers were in the Settlement.

15  Q   In the Settlement Agreement?

16  A   Yes.

17  Q   That Settlement Agreement was executed approximately when?

18  A   February 3rd of 2020.

19  Q   And after February 3 of 2020, there's additional credits

20  that are shown in column C.  Where do those numbers come from?

21  A   Those come from -- per the Agreement.  We were to issue

22  monthly credits for this particular dispute, going forward.

23  Q   And do those numbers also cover Level 3 systems?

24  A   Yes.

25  Q   Are those exact numbers placed on AT&T invoices?

MELISSA KELLOW - Direct

1    A    Yes.

2    Q    Let's skip column E for a moment, and let's look at column

3    F.  Are you there?

4    A    Sorry.  Would you repeat your question?

5    Q    Skip column E for a moment and look at column F.  Are you

6    there?

7    A    Yes.

8    Q    What is column F?

9    A    This contains the newer dispute for tandem charges,

10   starting with December 2020 invoice.

11   Q    And if we look back at Exhibit A48, briefly, that's now in

12   evidence.  Do you see that number $251,727.25.  Do you see

13   that?

14   A    Yes.

15   Q    Is that number in your spreadsheet?

16   A    Yes.

17   Q    Let's bring back up Exhibit A53.  And then there are

18   additional credits in January 2021 and after; what is that?

19   A    Those are the go-forward estimated dispute amounts related

20   to that dispute.

21   Q    Do you know whether those assumed credits are high or low?

22   A    I believe they are a little high.

23   Q    Are you trying to be conservative?

24   A    Yes.

25   Q    So, this spreadsheet addresses the DEOT dispute, correct?

MELISSA KELLOW - Direct

1    A    Correct.

2    Q    It also addresses this tandem dispute from February of

3    2021, correct?

4    A    Correct.

5    Q    Are you aware of any other usage-based disputes beyond --

6    excuse me -- besides the OTT dispute, that AT&T has raised

7    about usage charges, that is not contained in this spreadsheet?

8    A    No.

9    Q    Now, let's go to column G.  What is column G?

10    A    This is the total payments received from AT&T, towards that

11    particular invoice date.

12    Q    And where did you go to gather that information?

13    A    The invoice.

14    Q    Are those numbers also in the systems too?

15    A    Yes.

16    Q    Are those numbers manipulated or changed in any way?

17    A    No.

18    Q    Let's look at column H.  What is column H?

19    A    Column H is the balance due, after taking all of the

20    different credit amounts and payments from the new charges.

21    Q    And does it also include late payment charges that have

22    been billed?

23    A    Yes.

24    Q    And why are they included?

25    A    Because they are considered part of the charges that we

MELISSA KELLOW – Direct

1   billed, and are unpaid in the balance due.

2   Q   Just a reminder.  So column B, does it include late payment

3   charges?

4   A   Yes.

5   Q   And so column H -- I think I said G.  I think I meant H --

6   no, I did say H.  Column H is out of those new charges, here

7   is -- after their payments and after the credits, for

8   additional disputes that we are told about.  This is everything

9   else, correct?

10  A   Correct.

11  Q   Then let's look at column I.  What is column I?

12  A   That is the late payment charge that we billed on that

13  particular invoice date.

14  Q   And did you find that there was a problem with those late

15  payment charges, that were historically on the invoices?

16  A   Yes.

17  Q   And what was that?

18  A   That they were overstated.

19  Q   And why were they overstated?

20  A   It was due to the Settlement that we executed in June of

21  2019, an additional late payment charges accrued on those

22  balances in amounts that were resolved in the Settlement.

23  Q   So, in other words, there's a Settlement in middle of 2019,

24  yes?

25  A   Yes.

MELISSA KELLOW - Direct

1   *Q*   And it dealt with charges through December of 2018?

2   *A*   Yes.

3   *Q*   And there were late payment charges that accrued, during

4   that timeframe on balances that were removed?

5   *A*   Yes.

6   *Q*   And you had to remove them as a result?

7   *A*   Yes.

8   *Q*   Did you do that?

9   *A*   Yes.

10  *Q*   And if you look at column K.  Column K, is that -- what is

11  column K?

12  *A*   Column K is the balance due in column H, less the amount of

13  the late payment charge in column I.

14  *Q*   And so what does column K represent?

15  *A*   Unpaid usage charges.

16  *Q*   So, let's now look at -- since you took out late payment

17  charges that had been billed, what is column I -- no, excuse

18  me, column J?

19  *A*   Column J is the late payment charge that we calculated,

20  that would be due against the balance due of the unpaid usage

21  charges in column K.

22  *Q*   Now, we're going to get to columns L and E in a moment, but

23  when looking at late payment charges, is Level 3 asking AT&T to

24  pay less -- strike that.  Start again.

25          Is the number in column J asking AT&T to pay late

MELISSA KELLOW – Direct

1   payment charges on the credits that it knows it needs to give

2   for OTT calling?  In other words, is column L included in those

3   late payment charges?

4   A   No.

5   Q   So we'll get back to columns L and E, but I would like to

6   transition to Level 3 billing to AT&T.  If you can pull up that

7   tab, please, of Exhibit A53.  And what was the purpose of this

8   tab?

9   A   To account for the end-office and tandem charges billed

10  each month to AT&T.

11  Q   To find out how much credit Level 3 needed to provide on

12  OTT calling?

13  A   Yes.

14  Q   So, let's look at column A.  What is column A?

15  A   This is the bill date or invoice date.

16  Q   Does this bill date marry up to the bill date on the other

17  tab, AT&T balances owed?

18  A   Yes.

19  Q   And let's look at column B.  What is column B?

20  A   Those are the rate IDs.

21  Q   What type of charges are listed under column B?

22  A   End-office rate IDs.

23  Q   And finally, column D, what is column D?

24  A   Column D is the amount billed for those particular rate

25  IDs.

MELISSA KELLOW - Direct

1   *Q*   And if you look at columns B, C and D, what is the source

2   of all of those -- all of that data?

3   *A*   The billing system and the invoice.

4   *Q*   Okay.  Let's move off that table on the left and move to

5   the table on the right.  Columns I through N.  What is the

6   purpose of that table?

7   *A*   To calculate the tandem debit.

8        *MR. STEESE:*  And, Your Honor, for -- I would like the

9   Court to take notice of the fact that the parties have entered

10  into a stipulation and it reads, *For purposes of calculation of*

11  *damages and in order to narrow the issues to be tried, AT&T*

12  *will not contest the inclusion of $341,207.53 through May 2021,*

13  *represented on Level 3's disclosures as tandem add-back debit*

14  *and any final amount of damages awarded to Level* 3, and that is

15  stipulation number 16.

16        *MS. ZAMBRANO:*  Your Honor, I'm not sure that's the

17  entirety of the stipulation, and so we don't object, to the

18  extent that the entire stipulation is taken by Your Honor.

19        *THE COURT:*  All right.

20        *MR. STEESE:*  I thought I copied it.  If I missed

21  something... but that was all of it.

22        *MS. ZAMBRANO:*  That's not.

23        *THE COURT:*  Let -- let me just -- I don't have all of

24  these various books open, because I would begin cutting myself

25  if I did, but that aside, where is the stipulation that we're

MELISSA KELLOW - Direct

1  referring to, because I don't want to be in a posture where he

2  is saying one thing and you are saying something else and we

3  think we have an agreement and we don't.

4          MR. STEESE:  It's in the amended pretrial order that

5  was filed a couple of weeks ago, Your Honor.

6          THE COURT:  Okay.  All right.  Go ahead.

7          MS. ZAMBRANO:  Paragraph number, for the Court?

8          MR. STEESE:  I said 16.

9          MS. ZAMBRANO:  Sixteen.  Thank you.

10          THE COURT:  Go ahead.

11      Q    (By Mr. Steese) All right.  So, this tab, do you see

12  the final number, difference credit $935,493.34?

13  A    Yes.

14  Q    All right.  Going back to AT&T balances owed, is that

15  935,000 and change reflected in this spreadsheet?

16  A    Yes.

17  Q    And where and how?

18  A    It is the total of column L, 795,297 and total of column B.

19  Q    You are a little quiet.  If you can get closer to the mic?

20  A    Sorry.  It's the total amount listed in column L, of

21  795,279 and the total amount in column E, of 140,214.

22  Q    And you can see that column L provides credits through

23  January of 2021, and column E provides credits from February of

24  2021 and after.  Why the date distinction?

25  A    Because we received an order from the courts on the OTT

MELISSA KELLOW - Direct

1    amount.

2    Q    And that allowed us to assess 21 percent OTT?

3    A    Yes.

4    Q    And so when did these credits start showing on up the AT&T

5    invoices themselves?

6    A    They started showing on the May 2021 invoice.

7    Q    The May 2021 invoice.  And if that decision issued in March

8    of 2021, when is the soonest that the credit could have shown

9    up on an AT&T invoice?

10   A    May of 2021.

11   Q    So, again, did Level 3 take prompt action, once the set

12   amount of OTT was set, to start providing billing credits

13   directly on the invoices?

14   A    Yes.

15   Q    Let's look at Exhibit A55.  And what is Exhibit A55?

16   A    This is an explanation of the spreadsheet.  The balances

17   owed by AT&T to Level 3.

18   Q    Does it accurately describe what each of the columns are

19   for in the spreadsheet, Exhibit A53?

20   A    Yes.

21        MR. STEESE:  Move admission.

22        MS. ZAMBRANO:  Your Honor, this is a demonstrative and

23   I thought that we understood was going to be used with an

24   expert witness.  We don't object to the extent that she has

25   testified about the items in particular columns, but I think

MELISSA KELLOW - Direct

1    there's some conclusions that are either expressly -- the

2    writing is a little small -- either expressly made or are

3    implied with respect to AT&T's withholdings, and we would

4    object to that, because she has no personal knowledge of that,

5    but otherwise we have no objection.

6         THE COURT:  All right.  I will admit the exhibit,

7    recognize the objection and not consider any conclusion in what

8    is the various yellow boxes surrounding, but just focus on the

9    descriptives.

10        MS. ZAMBRANO:  Thank you, Your Honor.

11        THE COURT:  All right.  And what number?

12        MR. STEESE:  A55.

13        THE COURT:  Subject to that descriptive of mine,

14   admitted.

15        Q    (By Mr. Steese) Let's go back now to Exhibit A53,

16   Level 3 billing to AT&T, tab.  The first tab.  Thank you.  And

17   tally up all of the end-office charges that Level 3 has

18   assessed between February of 2019 and June of 2021.  What is

19   the total amount?

20   A    $8,409,152.89.

21   Q    All right.  So now let's look back at the AT&T balances

22   owed to Level 3, and let's sum up -- scroll to the top, please.

23   Column K, balance due from less late payment charges from

24   column I.  So this is the amount not paid on usage-based

25   charge, what you testified earlier.  What is the total amount

MELISSA KELLOW - Direct

1   of that?

2   A   $7,992,515.11.

3   Q   And what does this show you?  These two comparisons.  The

4   8.4-million billed end-office charges to the 7.992 million

5   withheld on usage charges?

6   A   It almost totals the entire amount of end-office charges

7   billed.

8   Q   Have you experienced a similar problem in the past, where

9   AT&T significantly overwithheld payments to Level 3 in a

10  dispute over end-office charges?

11  A   Yes.

12  Q   Describe that dispute?

13  A   This was an end-office LRN/CPN dispute where AT&T was

14  disputing that we were billing end-office charges for numbers

15  that were not Level 3.

16  Q   And what was the dispute called?

17  A   The CPN/LRN dispute.

18  Q   Did AT&T overwithhold in that situation?

19  A   Yes.

20  Q   By a small amount?  By a large amount?

21  A   Several million dollars.

22  Q   Did AT&T tell you why it had overwithheld?

23  A   Yes.

24  Q   And what did AT&T tell you?

25  A   That their mechanized process could not differentiate

MELISSA KELLOW - Direct

 1    between end-office charges and tandem charges on the same bill.

 2    Q    And as a result, what happened?

 3    A    They were withheld.

 4    Q    Before this lawsuit was filed, as a part of this dispute,

 5    did you have communications with AT&T about this issue?

 6    A    Yes.

 7    Q    Were these communications documented?

 8    A    Yes.

 9    Q    Let's go through two of these documents, and we will start

10    with Exhibit A8.  Scroll down a little bit so Ms. Kellow can

11    see.  That's too fast.  Let her get an idea of what's there.

12    Are you familiar with this exhibit?

13    A    Yes.

14    Q    Were you a participant in these email communications?

15    A    Yes.

16    Q    Was this created contemporaneously in 20 -- 2017, and is it

17    an accurately reflection of email exchanges with AT&T?

18    A    Yes.

19              MR. STEESE:  Move admission of A8.

20              MS. ZAMBRANO:  No objection, Your Honor.

21              THE COURT:  Received.

22         Q    (By Mr. Steese) Let's look at page three.  Do you see

23    an email from Alison Miller, dated June 29, 2017?

24    A    Yes.

25    Q    And who is Ms. Miller?

MELISSA KELLOW - Direct

 1   A   She is an employee of AT&T.

 2   Q   Is she someone that you have dealt with in disputes with

 3   AT&T?

 4   A   Yes.

 5   Q   Okay.  Now, let's go down to page 13 of this exhibit.

 6   Okay.  Frame the issue here.  What's happening at this point in

 7   time?

 8   A   Level 3 is trying to assess a difference in dispute amount

 9   versus withheld amount.

10   Q   What does that mean?

11   A   There was a discrepancy between the amount that we have on

12   file from AT&T in disputes, versus the amount that we show as

13   the balance due on their invoices for the same time period.

14   Q   And did it seem like there was a lot withheld that was

15   unaccounted for?

16   A   Yes.

17           MS. ZAMBRANO:  Objection.

18           THE COURT:  Overruled.

19       Q    (By Mr. Steese) Let's turn to pages 10 to 11.  It's

20   an email that carries over both pages.  Who is this email from?

21   A   It's from myself.

22   Q   And then page down one.  And again, frame the issue.  What

23   are you asking AT&T for?

24   A   To explain the difference between what we show as withheld

25   versus what we have in disputes.  The difference is $2.6

MELISSA KELLOW – Direct

1    million.

2    Q    All right.   Now, turn to page eight.   Blow that up a little

3    larger please.   The bottom one.   Who is this email from?

4    A    Myself.

5    Q    Date?

6    A    June 1st, 2017.

7    Q    And is there a particular amount that you are trying to now

8    reconcile, as of June 1, of 2017?

9    A    Yes.

10   Q    How much?

11   A    $4,461,031.

12   Q    So, what dispute was this issue concerning?

13   A    It was concerning the -- sorry, the end-office CPN/LRN

14   dispute.

15   Q    You see right above it *EO/CPN/LRN*.   Is that one dispute or

16   many disputes?

17   A    It's one dispute.

18   Q    That went by many names?

19   A    Yes.

20   Q    Now, turn to page three, please.   Okay.   Make it bigger.

21   Again, this is an email from Alison Miller -- wait.   Scroll

22   down.   Let's get the date.   Do you see this June 29 of 2017?

23   A    Yes.

24   Q    And do you see where Ms. Miller says, and I quote, *There*

25   *was no withholding action taken for the OTT dispute, but there*

MELISSA KELLOW – Direct

1   *is withholding above the current dispute value for the EO/CPN*

2   *issue due to; one, Level 3's billing containing both end-office*

3   *and tandem billing on the same BAN, which complicated the*

4   *mechanized rate-based withholding.*   Do you see that?

5   A    Yes.

6   Q    What was AT&T telling you here?

7   A    That they have overwithheld on the end-office CPN/LRN

8   dispute.

9   Q    And how can you tell they are overwithholding?

10  A    There's the discrepancy between the amounts, and they

11  stated that they did overwithhold.

12  Q    Now, scroll down a little farther.  How much did AT&T

13  attribute to the CPN dispute?

14  A    Sorry.  $7.7 million.

15  Q    And who performed that calculation?

16  A    Alison Miller.

17  Q    How do you know that?

18  A    She details that in the email.

19  Q    Does it say, *I believe the methodology I used to get to the*

20  *7.7-million dispute value was solid*?

21  A    Yes.

22  Q    Now, in the paragraph above that, do you see where it says

23  quote, *It does not make sense to spend more time trying to*

24  *breakdown the withholding value, and our efforts should,*

25  *instead, be on reconciling the dispute values.*  Do you see

MELISSA KELLOW - Direct

1   that?

2   A   Yes.

3   Q   What did that mean to you?

4   A   That we need to work on resolving the dispute and not

5   reconciling the balances that were overwithheld.

6   Q   Did you think you needed to work on the overwithholding

7   too?

8   A   Yes.

9   Q   Now, the 7.7 million, did you agree with that number?  Was

10  that a correct number to assign to the LRN/CPN dispute?

11  A   Yes.

12  Q   Okay.  So now let's go up a little bit, right there.

13  Perfect.  They are saying, and I quote, *We had previously*

14  *requested Level 3 separate tandem and end-office billing, in*

15  *order to try to avoid the complication noted in number one*.  Do

16  you see that?

17  A   Yes.

18  Q   And what complication is being referenced in number one?

19  A   That they overwithheld, because the charges are on the same

20  BAN.

21  Q   Are Level 3's tandem and end-office charges still on the

22  same BAN?

23  A   Yes.

24  Q   Have they been on the same BAN ever since 2017?

25  A   Yes.

MELISSA KELLOW - Direct

1   Q   Has AT&T continued to ask you to separate out end-office

2   and tandem charges from the same BAN?

3   A   Yes.

4   Q   Have they told you why they want you to separate out the

5   end-office and tandem charges on the same BAN?

6   A   Because mechanized process can't distinguish between the

7   two different types, if they are on the same BAN.

8   Q   When they asked you to separate out, did you do anything to

9   try and see if you could?

10  A   Yes.

11  Q   And what did you do?

12  A   Reached out to our billing vendor to see if it was possible

13  for them to do that.

14  Q   And I know you said this earlier, what did they tell you?

15  A   They told us no.

16  Q   No, won't do it?

17  A   No.  They are not able to actually do that.

18  Q   Is the billing format that Level 3 uses an industry

19  standard format?

20  A   Yes.

21  Q   Explain.

22  A   Um, it's an industry standard, other carriers have used the

23  same industry standard format, as well.  It's not something

24  unique.

25  Q   Let's look at Exhibit A18.  Do you see this is an email

MELISSA KELLOW - Direct

1   exchange between Level 3 and AT&T, from the August 2017

2   timeframe?

3   A    Yes.

4   Q    Is this an email that you saw in the ordinary course of

5   business, as the billing manager overseeing disputes with AT&T?

6   A    Yes.

7   Q    So, did you see it in the 2017 timeframe, when it was sent?

8   A    Yes.

9          MR. STEESE:  Move admission of A18.

10         MS. ZAMBRANO:  No objection, Your Honor.

11         THE COURT:  Received.

12         MR. STEESE:  One moment, Your Honor.

13  BY MR. STEESE:

14  Q    Look at the column entitled AT&T notes -- no.  Before we

15  get there.  Do you see that there are lines -- or rows

16  associated with the CPN dispute, and a row associated with the

17  OTT dispute?

18  A    Yes.

19  Q    And how much is attributed to the CPN dispute?

20  A    The total dispute value is $16,931,995.

21  Q    In the -- I think you are looking at the wrong column.  I'm

22  saying how much is associated with the CPN dispute?

23  A    I'm sorry.  $7.7 million.

24  Q    Is that the amount that you and Ms. Miller had both agreed

25  was the appropriate amount?

MELISSA KELLOW - Direct

1   *A*   Yes.

2   *Q*   Then look over at the -- in the OTT row, under the AT&T

3   notes.  Do you see where it says, please highlight this,

4   *Additional offsets, caused by Level 3 bill format, have been*

5   *allocated towards the OTT dispute*.  Do you see that?

6   *A*   Yes.

7   *Q*   And who is this email from?

8   *A*   Alison Miller.

9   *Q*   And when you see those words *additional offsets caused by*

10  *the Level 3 bill format, have been allocated towards the OTT*

11  *dispute*, what did that mean to you?

12  *A*   That they were using the overwithholding amount on the CPN

13  dispute, applying it to withheld amounts against OTT.

14  *Q*   And how much did they take from the CPN dispute and apply

15  to the OTT dispute?

16  *A*   $4,056,496.

17  *Q*   Let's look at Exhibit A1.  Are you familiar with the

18  Settlement Agreement that the parties executed in this case?

19  *A*   Yes.

20       *MR. STEESE:*  And, Your Honor, Exhibit A1 is already in

21  evidence.

22       *Q*   (By Mr. Steese) What role did you have with this

23  Agreement?

24  *A*   I supplied the balances related to the Settlement.

25  *Q*   And do you see in the second whereas clause, it says, it

MELISSA KELLOW - Direct

1   refers to an Exhibit A?

2   A   Yes.

3   Q   All right.  Turn to page 11 of Exhibit A1.  Do you see

4   Exhibit A there?

5   A   Yes.

6   Q   And if you scroll down a couple of pages to the end, where

7   it says *OTT dispute*, and make that bigger, because I can't see

8   that on my screen.  Thank you.  20,483,000 and change, do you

9   see that?

10   A   Yes.

11   Q   Where did all of those numbers that tally up to -- excuse

12   me 20,483,000 come from?

13   A   The balance due on invoices.

14   Q   And what role did you have in -- in getting that number

15   20.483 million, I pulled that detail.

16   Q   Now, if you scroll down to page 11 again, so we can see.

17   Blow that up at the top.  It's a little small.  There we go.

18   Do you see where it says, *BAN* at the top?

19   A   Yes.

20   Q   Those numbers underneath the BAN, what are those?

21   A   Those are the building account numbers that we send for

22   invoices that we billed to AT&T.

23   Q   And if you scroll down, you see scores and scores of these.

24   Does this give the Court an idea of how many invoices Level 3

25   sends monthly.

MELISSA KELLOW - Direct

1   A   To AT&T, yes.

2   Q   Perfect.  And the numbers that were outstanding, where did

3   they come from?

4   A   The Level 3 system's invoice --

5   Q   I'm sorry?

6   A   The invoice.

7   Q   And were they usage-based charges?

8   A   Yes.

9   Q   Was there any other charges included in those numbers?

10  A   Yes.

11  Q   What else?

12  A   Late payment charges.

13  Q   So, if you go back to Exhibit A53, column B, it came from a

14  subset of those charges, equivalent at an earlier point in

15  time?

16  A   Yes.

17  Q   Thank you.  Now let's go back to Exhibit A1.  At the time

18  that this was generated, did these BANs include both end-office

19  and tandem charges on the same billing account numbers?

20  A   Yes.

21  Q   Did Level 3 have a billing vendor used in 2015?

22  A   Yes.

23  Q   Who was that?

24  A   CDG.

25  Q   Is there anything different about the process Level 3 and

MELISSA KELLOW – Direct

1   CDG use, to send invoices to AT&T, in 2015, versus what they

2   are sending to AT&T in 2017?

3   A   No.

4   Q   Has AT&T ever indicated to you that it uses a different

5   process to dispute and withhold charges now, than it used in

6   2015?

7   A   No.

8   Q   That it used in 2017?

9   A   No.

10  Q   If you look at the charges, in the total, in the column on

11  the right, what types of charges are included in those?

12  A   Usage charges, end-office, tandem and late payment charges.

13  Q   When you looked at the numbers, did those numbers reflect,

14  simply, a withholding of 65 percent of end-office charges plus

15  late payment charges?

16  A   No.

17  Q   What -- what did you find?

18  A   That it was more than 65 percent in end-office charges.

19  Q   Has AT&T continued to tell you that it cannot differentiate

20  between end-office charges and tandem charges, when disputing

21  invoices?

22  A   Yes.

23  Q   Look at Exhibit 79, we talked about, earlier, in evidence.

24  Is this document, from January of 2021, just one example of

25  them raising this point?

MELISSA KELLOW - Direct

1    *A*    Yes.

2    *Q*    What has Level 3 offered to do to help AT&T better be able

3    to identify the -- the amounts of end office and tandems

4    separately, so it can accurately dispute charges on end office

5    only?

6    *A*    We offered reporting.

7    *Q*    And if they provided reporting, when would that reporting

8    get to AT&T?  Would it be years after the fact?

9    *A*    No.  It would be after the bills were generated each month.

10   *Q*    And how could this help AT&T?

11              *MS. ZAMBRANO:*  Objection, lack of foundation.

12              *THE COURT:*  Overruled.

13   *Q*    You can answer.

14   *A*    Can you ask the question again?

15   *Q*    How could this help AT&T accurately calculate withheld

16   amounts on end-office charges?

17   *A*    It would help them to split out, see the amounts billed

18   between the two different types of charges.

19   *Q*    And if they did that, could they -- if they wanted to

20   withhold 65 percent of end-office charges, could they do so

21   with precision?

22   *A*    Yes.

23   *Q*    But with their mechanized process in place, when they are

24   disputing end-office charges what is the net effect?

25              *MS. ZAMBRANO:*  Again, I'm going to object to

MELISSA KELLOW - Direct

1    anything -- she is testifying about a mechanized system.  She

2    has testified about what people said, but she can't testify

3    about the system.

4          THE COURT:  Sustained.

5          MR. STEESE:  Your Honor, may I be heard on that,

6    please?

7          THE COURT:  Yes.

8          MR. STEESE:  She has had communications directly with

9    AT&T about their use of the mechanized system and that when

10   they use a mechanized system it causes overwithholding on

11   end-office disputes, because they can't differentiate between

12   end office and tandem.  So she has direct knowledge --

13         THE COURT:  What is the question again?

14         MR. STEESE:  -- party opponent of the impact that it

15   has, and that's all that she is talking about.

16         THE COURT:  Well, if that's the case, it's already

17   been said, and I understand what the answer is or what the

18   point is that you want me to take home from that.

19         MR. STEESE:  Okay.  Perfect.

20         MR. STEESE:  Then, Your Honor, I have no more

21   questions.

22         THE COURT:  Perfect timing, I suppose.  Let's take

23   until 1:15, for lunch break.

24         MS. ZAMBRANO:  Thank you, Your Honor.

25         MR. STEESE:  Your Honor, is it -- we are a 15-minute

MELISSA KELLOW – Cross

1    walk away.  Is it possible --

2         *THE COURT:*  1:30.

3         *MS. ZAMBRANO:*  And, Your Honor, one more thing.  We

4    assume that when witnesses have or are in the middle of

5    examination, that they shouldn't be questioned about their

6    testimony.

7         *THE COURT:*  Correct.  There shouldn't be any

8    communication about discussion of what's gone on, cleaning it

9    up, anything else.  Just leave them hermetically sealed.

10        *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

11        (Recess at 11:59 a.m )

12        (In open court at 1:32 p.m.)

13        *THE COURT:*  Please be seated.

14        *MS. ZAMBRANO:*  Your Honor, may I proceed?

15        *THE COURT:*  You may.

16        *MS. ZAMBRANO:*  Thank you.

17        *THE COURT:*  Let me remind the witness that you are

18   still subject to the oath that you took earlier this morning.

19   Okay?

20        *THE WITNESS:*  Thank you, Your Honor.

21                        **CROSS-EXAMINATION**

22   *BY MS. ZAMBRANO:*

23   *Q*   Good afternoon, Ms. Kellow?

24   *A*   Good afternoon.

25   *Q*   We have not met.  My name is Angela Zambrano.  I represent

105

MELISSA KELLOW - Cross

 1    AT&T in this matter.  Ms. Kellow, I believe you testified on

 2    Direct that Level 3 bills from its tariff by rate element; is

 3    that correct?

 4    A    Correct.

 5    Q    Okay.  I'm going to show you an exhibit, I think you saw it

 6    on the Direct, but I will give you a minute if you didn't.

 7    It's A20.  If we could put that up on the screen.  You have one

 8    where you are sitting too.

 9         Okay.  All right.  So -- okay.  I'm sorry I set my

10    glasses down somewhere.  Glasses.  Excuse me, thank you.

11    Q    Spreadsheets require glasses?

12         THE COURT:  They require more than that.

13         MS. ZAMBRANO:  All right.

14    Q    (By Ms. Zambrano) Ms. Kellow, could you please, in

15    the, sort of, I would say it's the fourth column over.  It

16    starts with Journal Rate ID, and I think it's 800B.  Do you see

17    that?

18    A    Yes.

19    Q    Okay.  Could you please identify for the Court -- well,

20    first of all, are these rate elements; is that what you

21    testified on Direct?

22    A    Yes.

23    Q    So this whole column, these are rate elements, correct?

24    A    Correct.

25    Q    Okay.  Could you identify for the Court --

MELISSA KELLOW – Cross

1          THE COURT:  Are we talking about this column?  And I

2    am doing that for two reasons; one, just to make sure; but two,

3    to make sure you and the witness knows that you can draw on

4    that screen.

5          MS. ZAMBRANO:  Okay.  Thank you.

6     Q    (By Ms. Zambrano) I'm going to try it.  Thank you.

7    Oh, yes this is great.  Okay.

8          So I'm going to circle this column that I was talking

9    about, and ask you, Ms. Kellow, if you could, identify for the

10   Court all of the rate elements in the circle area that are

11   end-office rate elements, please.

12   A    EOCTP and EOLS2, and -- yep.

13   Q    Now, can you tell the Court what these other numbers and

14   letters are.  We've got 800B, what is that?

15   A    That's the 800 database query charge.

16   Q    That doesn't have anything to do with any of this?

17   A    Correct.

18   Q    And the LTF, what is that, ma'am?

19   A    Local transport facility.

20   Q    So that's a transport charge?

21   A    Yes.

22   Q    Okay.  Doesn't have anything to do with end office,

23   correct?

24   A    Correct.

25   Q    All right.  Let's go to LTMUXE.  What is that?

MELISSA KELLOW - Cross

1   A   LTMUXE.  I'm sorry, but I'm not overly familiar with the

2   charges that make up LTMUXE.

3   Q   Is it an end-office charge?

4   A   No.

5   Q   Okay.  We are on the same page.  How about LTT?  What is

6   that charge for?

7   A   Local tandem transport.

8   Q   Okay.  So it's transport, correct?

9   A   Yes.

10  Q   Okay.  Not end office?

11  A   Correct.

12  Q   All right.  Let's go to LTTAN, is that tandem-related

13  charge?

14  A   Yes.

15  Q   Okay.  Not end office?

16  A   Correct.

17  Q   Okay.  All right.  Then I think the last two, I think the

18  last two that we haven't talked about are TMOU and TMOUD.  Can

19  you tell the Court what those two rate elements are?

20  A   I believe those are transit minutes of use, one is for --

21  the TMOU is for the non-- TMOUD is direct-routed traffic, TMOU

22  is for not.

23  Q   Okay.  Are those called -- something called competitive

24  tandem charges?

25  A   That I don't know.

MELISSA KELLOW – Cross

1    Q   Okay.  Do you know what competitive tandem charges are?

2    A   No.

3    Q   Okay.  Let me ask this way.  Do you -- are you aware that

4    one of the services that Level 3 provides is to third parties

5    to use its tandem, even if Level 3 is not routing the calls

6    through their own end offices; is that fair?

7    A   Yes.

8    Q   Okay.  All right.  That's what I understood.  I actually am

9    going to put up a chart, so we could see if we're on the same

10   page.

11        Could you put up Exhibit 89?  So, this is a diagram.

12   I'm a visual person, so I have to kind of see this.

13        THE COURT:  You are just copying me.  You are going to

14   have to tap to clear.  Lower left.  I will do it.

15        MS. ZAMBRANO:  Thank you, Your Honor.

16        THE COURT:  There you go.

17        MS. ZAMBRANO:  Now, it's kind of fuzzy.  I think

18   that's your doing, not the screen's.

19        MS. ZAMBRANO:  Okay.  All right.

20   Q   So, earlier this morning, and I don't recognize that you

21   were in courtroom.  I don't think you were in the courtroom,

22   were you, for opening statements?

23   A   No.

24   Q   Okay.  So during -- in our opening statement, we tried to

25   explain to the Court, the best we could as lawyers, sort of how

MELISSA KELLOW – Cross

1    call flow works, and the call flow being -- going through

2    end-office switch always if you own -- if they are your

3    customers, correct?

4    A    Can you repeat the question?

5    Q    Yeah.  That was a bad question.

6         If it's a Level 3 customer, so that little phone,

7    Level 3 customer, LEC, the call always routes through the

8    end-office switch, that's the yellow circle, correct?

9    A    I believe so, but I'm not an expert in call flows.

10   Q    Okay.  So what I'm going to ask you about then is a

11   different kind of call flow, and I will see if you know it.

12   Sometimes my understanding is that -- see Level 3 tandem switch

13   circle?

14   A    Yes.

15   Q    My understanding is that sometimes Level 3 sort of sells

16   its tandem services to cable companies or other carriers and

17   they use Level 3's tandem.  Are you familiar with that?

18   A    Yes.

19   Q    Okay.  Is that what's called competitive tandem or

20   third-party tandem services?

21   A    I don't -- I don't know the answer to that.

22   Q    Okay.  In the diagram that I'm showing you, if a call came

23   in, in the line number two or three, would -- would those calls

24   that came in from a cable company or carrier, would those be

25   eligible for end-office charges?

MELISSA KELLOW - Cross

1          *MR. STEESE:*  Your Honor, I'm going to object on

2     foundation.  This is beyond the scope of this witness'

3     testimony and expertise.

4          *THE COURT:*  Sustained.

5     Q    (By Ms. Zambrano) The fact of the matter is, you

6     don't understand competitive tandem billing, correct?

7     A    Correct.

8     Q    And so if I asked you more questions about the issues that

9     are created when tandem -- competitive tandem billing is

10    combined with Level 3's billing of its own customer's tandem

11    usage, you don't understand that; is that fair?

12    A    Correct, I would not.

13    Q    Okay.  We will have an AT&T witness talk about that.  Okay.

14         Okay.  So, do you -- you talked about the complaints

15    with the combined billing, and that's why I asked you about

16    this subject to start with.

17         So, do you understand that AT&T has complained about

18    Level 3's billing of competitive tandem billing services with

19    their own -- with their non-third party tandem, with end-office

20    charges?  Do you understand that?

21         *MR. STEESE:*  I'm going to object as confusing, and --

22    and --

23         *MS. ZAMBRANO:*  I can restate.

24         *THE COURT:*  I will sustain it, if for no other reason

25    have you reask it, because, frankly, I was confused, as well.

MELISSA KELLOW – Cross

1        Q     (By Ms. Zambrano) Do you understand that the

2   complaint that AT&T has had, with Level 3's billing, that you

3   testified about, a lot, on Direct and we showed some emails, do

4   you understand that that complaint, by AT&T, relates to Level

5   3's combining on one billing number of competitive tandem

6   billing and its own tandem usage -- it's own customer's usage.

7   Do you understand that to be the case

8   A     Yes.

9   Q     But you don't understand competitive tandem billing,

10  correct?

11  A     Correct.

12  Q     So, maybe you don't understand AT&T's complaint?

13  A     No.  I think I do understand the complaint.

14  Q     Well what do you understand the complaint to be?

15  A     That the complaint was, that we received, is that we bill

16  both end-office and tandem charges on the same bill.

17  Q     Okay.  You don't understand that it's a competitive tandem

18  issue; is that what you are testifying?

19  A     Correct.

20  Q     Okay.  We will look at those emails.  And in that process,

21  AT&T has told you -- in that complaints process, they've told

22  you that their mechanized system has trouble with bills when

23  you don't separate out competitive tandem billing and Level 3's

24  own tandem billing, haven't they?

25  A     No.  No.

MELISSA KELLOW - Cross

1   Q   That's not true?

2   A   The emails that we received stated that we needed to split

3   out end-office charges and tandem charges.  There was no

4   mention of competitive charges.

5          MS. ZAMBRANO:  One second.

6      Q    (By Ms. Zambrano) So we will look at the emails.

7   Okay.  But this is my question to you, has anyone at AT&T said,

8   AT&T, as a company, we are not talking about mechanized

9   systems; we are just talking AT&T, as a company, they can't

10  determine the amount of end office versus tandem minutes on a

11  bill, has -- AT&T has told you that?

12  A   Yes.

13  Q   Who told you that?

14  A   Alison Miller.

15  Q   And was that statement that she made in reference to the

16  mechanized system or the entire company at AT&T?

17  A   The mechanized process.

18  Q   The mechanized process.  And that's my question.  So you

19  have just been told about a system within AT&T, correct?

20  A   Correct.

21  Q   And you never worked at AT&T correct?

22  A   Correct.

23  Q   And you have never worked with this system, correct?

24  A   Correct.

25  Q   You have no personal knowledge of this system, correct?

MELISSA KELLOW - Cross

1    A    Correct.

2    Q    And you have no personal knowledge of any other way that

3    AT&T may, as a company, have exactly that information, do you?

4    A    Correct.

5    Q    Okay.  Now, I want to ask you about TCG.  TCG doesn't have

6    competitive tandem billing, does it?

7    A    I don't know.

8    Q    Well, you testified about TCG's billing on Direct.  So you

9    don't know -- let me try that one again.  You are not aware

10   that TCG does not have competitive tandems that they sell in

11   the marketplace?

12   A    Correct, I'm not aware.

13   Q    Okay.  Let's talk about end-office charges.  I want to look

14   at Exhibit 53, tab one.  I think it's 53.  Let's make sure,

15   because my notes are --

16            MR. STEESE:  That's correct.

17            MS. ZAMBRANO:  Okay.  It's not this.

18            THE COURT:  What are we up to, 53?

19            MS. ZAMBRANO:  I believe it's A53.  I need my glasses

20   again.

21   Q    Okay.  I believe that, on Direct, you testified that total

22   end-office charges from Level 3 to AT&T, between February 2019

23   and June 2021 was approximately $8.4 million.  Do you remember

24   that testimony?

25   A    Yes.

MELISSA KELLOW - Cross

1   *Q*   I think you -- you might have summed it, and it was a

2   native exhibit.  Does that sound right?

3   *A*   Yes.

4   *Q*   That's the total of end-office charges by Level 3 to AT&T,

5   during our relevant time period, correct?

6   *A*   Correct.

7   *Q*   We have no dispute on that point, correct, between the

8   parties?

9   *A*   Correct.

10  *Q*   Okay.

11  *A*   Correct.

12  *Q*   But you testified about other charges that were well beyond

13  the $8.4 million, that's in A53, correct?  You testified about

14  other-types-of-usage charges, correct?

15  *A*   Correct.

16  *Q*   Why don't we look at those.  Let's look at A24.

17          THE COURT:  Before -- before you move on, just for my

18  sake, in terms of this approximately 8.4 that you are saying is

19  end-office charges, and as to which there's apparently no

20  dispute, is that to be extracted from these numbers that are in

21  front of me in A53 in some way?

22          MS. ZAMBRANO:  I think it's a summing of the columns.

23  Do we have a native --

24          MR. STEESE:  Your Honor, can I answer that?

25          THE COURT:  Yeah, you can.

MELISSA KELLOW - Cross

1          *MR. STEESE:*  I don't want to take away -- if you -- we

2    have this provided to you in native format, on flash drive, and

3    if you were to sum all of the -- the dollars in column, I

4    believe it's, D of the first tab; not the tab that's up there

5    now, it will add up to $8.4 million, and those are all of the

6    end-office elements.  I apologize for the interruption.

7          *THE COURT:*  Okay.  All right.

8          *MS. ZAMBRANO:*  And we have no --

9          *THE COURT:*  No, no, that's fine.  I just wanted to

10   make sure there wasn't some portion of that that I was looking

11   at or not focused on, and instead it's just that I can't add

12   automatically.

13         *MS. ZAMBRANO:*  Neither can I.

14    Q    (By Ms. Zambrano) And I would say that the 8.2 that I

15   referenced in my opening statement, you weren't here, but I

16   will just say that the 8.2 was as of the end of May,

17   Your Honor, that's why it's different than 8.4.

18         *THE COURT:*  Okay.

19    Q    (By Ms. Zambrano) All right.  So now I'm going to

20   talk to you about, kind of, the sequential worksheets that you

21   did.

22         This one, I think this is Exhibit 24; is that correct?

23   I'm looking for your spreadsheet of your calculations that you

24   did in January of 2021.  Can you make it a little bit bigger?

25   I can't see the total.  Scroll down, please.

MELISSA KELLOW – Cross

 1          *MR. STEESE:*  It doesn't have the total at the bottom.

 2          *MS. ZAMBRANO:*  Could you scroll down, please?

 3  *Q*   Why don't we –– why don't we go to the –– let me just ask

 4  you, do you recall your testimony, that you calculated the

 5  total charges billed by Level 3, to AT&T, for the period of

 6  January 1 through January of 2021?

 7  *A*   Yes.

 8  *Q*   Okay.  Could you put the exhibit that you had up, just a

 9  moment ago.

10          I think I am just going to go on to Exhibit 25.  I'm

11  sorry, go ahead.  Okay.  Tab three.  I'm sorry.  I don't see

12  the tabs at the bottom.  Can you put up tab three.  Okay.

13  That's what I was looking for.  Thank you.

14          Okay.  I want to talk to you about that 57 number, 57

15  million.  So, and this is Exhibit –– this is tab three of

16  Exhibit 53, for the record, Your Honor.  Okay.  It's tab two of

17  Exhibit 53.

18          Is this showing that from the invoices dated February

19  of 2019, through June of 2021, that AT&T was charged a total of

20  $57 million –– a total of 57 million; is that correct,

21  approximately?

22  *A*   Correct.

23  *Q*   And that total includes end-office charges, correct?

24  *A*   Correct.

25  *Q*   It includes tandem charges?

117

MELISSA KELLOW – Cross

1    A   Correct.

2    Q   It includes all of those elements that you went through,

3    correct?

4    A   Correct.

5    Q   It's the whole enchilada, if you will.  Does it include for

6    all traffic that Level 3 sent to AT&T?

7    A   Correct.

8    Q   Okay.  It's not just OTT traffic, it's all traffic?

9    A   Yes.

10   Q   This is everything that Level 3 sent to AT&T, correct?

11   A   Correct.

12   Q   That's what 57-million dollars is.  Okay.  And only roughly

13   of these charges, 8 million, I think we agreed, just a moment

14   ago, of 8.4 million, was end-office charges, correct?

15   A   Correct.

16   Q   Now, you have, in your chart, that AT&T has paid, I believe

17   the total payments column is $38.7 million; is that correct?

18   A   Correct.

19   Q   Okay.  So the same time period, AT&T paid $37 million.

20   Okay.  Now, there's a total withheld.  I think the column, you

21   have it as balance due; that 12.599; is that right?

22   A   Correct.

23   Q   And you don't -- you, Ms. Kellow, cannot testify why AT&T

24   has decided not to pay that amount, can you?

25   A   No, I cannot.

MELISSA KELLOW – Cross

1   *Q*   You did submit a Declaration, however, in connection with

2   the motion for Summary Judgment.  Do you recall that?  It's

3   been awhile.  It was in June of 2020?

4   *A*   Vaguely.

5   *Q*   Okay.  Well, you testified under oath, right, if you were

6   submit it go to the Court?

7           *MR. STEESE:*  Your Honor, this is –– if they want to

8   ask a question, fine, but this is impeachment without a

9   question.  So I would ask that she ask the question, and if

10  it's proper to impeach her with a Declaration, at that point.

11          *MS. ZAMBRANO:*  Your Honor, I'm setting up the

12  foundation.

13          *THE COURT:*  Go ahead.

14          *MS. ZAMBRANO:*  Thank you.

15      *Q*    (By Ms. Zambrano) You testified under oath in the

16  Declaration, and you testified that you had personal knowledge

17  of the information, correct?

18  *A*   I'm sorry.  Can you repeat the question?

19  *Q*   Yeah.  Let me ask you something else.  I want to talk about

20  personal knowledge.  You testified that –– when you submitted a

21  Declaration, in June, that AT&T had withheld from –– more from

22  Level 3 than the total end-office charges that Level 3 had

23  invoiced to AT&T at that time.  Do you recall that testimony?

24  *A*   Yes.

25  *Q*   Okay.  In fact, you testified pretty much the same thing

MELISSA KELLOW – Cross

1  today?

2  A   Yes.

3  Q   Okay.  All right.  And you testified, however, that AT&T

4  had not historically told you why they were withholding any

5  particular amount, correct?

6  A   Correct.

7  Q   Just like you can't tell the Court why AT&T was withholding

8  this 12.599, correct?

9  A   Correct.  But we believed that 12 million dollars is

10  related to the OTT dispute.

11  Q   That's what I want to talk to you about, that belief okay.

12  Because it's not personal knowledge, is it?

13  A   No.

14  Q   No, it's not.  Because, you don't have any personal

15  knowledge about why AT&T is withholding amounts, and you

16  certainly can't testify, under oath, to the Court, that AT&T is

17  withholding this amount or any amount based on the OTT dispute,

18  can you?

19  A   Not specifically, no.

20  Q   No.  So now let's put your Declaration up.  This is Exhibit

21  21, on AT&T's list.

22       MR. STEESE:  Your Honor, again, you should impeach

23  with prior statements based on inconsistency --

24       THE COURT:  At this time I'm going to agree.  I mean,

25  what is it that we're doing?  I'm not just going to take

MELISSA KELLOW – Cross

 1   statements calling it foundation, just to get in prior

 2   statements, when the witness is here.

 3           MS. ZAMBRANO:  Sure.

 4           THE COURT:  Ask her if she knows.  If she doesn't,

 5   maybe we can proceed in terms of whether she ever did, maybe we

 6   can go at it that way.

 7           MS. ZAMBRANO:  Thank you, Your Honor.

 8       Q    (By Ms. Zambrano) Could you put the exhibit back up

 9   again.  I'll ask the same question and see if your testimony is

10   consistent.

11           So when we're talking about that 12.99, I believe it's

12   Exhibit ... my question to you is simply this.  I'm talking

13   about the amount that AT&T withheld then.

14   A    Hm-hm.

15   Q    This is a conclusion that you are drawing, correct?  You

16   are concluding about what was withheld, based on the OTT

17   dispute, correct?

18   A    Correct.

19   Q    Okay.  Because -- but all Level 3's traffic is not OTT

20   traffic, is it?

21   A    No.

22   Q    Yeah.  And you haven't made any conclusions about what AT&T

23   has withheld, based on OTT traffic, correct?

24   A    Could you repeat the question?

25   Q    Yeah.  You made a conclusion about why AT&T withheld this

MELISSA KELLOW – Cross

1    $12 million, from the overall 57 million that Level 3 billed,

2    correct?

3    A    Correct.

4    Q    Okay.  And that's on all traffic.  It's not just OTT

5    traffic, right?

6    A    Correct.

7    Q    You haven't made any effort to even determine what level of

8    OTT traffic there was, and what level AT&T withheld from that

9    traffic, have you?

10   A    I'm sorry.  Can you repeat that again?

11   Q    Yes, I will.  You have not made any effort to take this $57

12   million, and figure out, from those charges, which charges were

13   associated with OTT traffic, correct?

14   A    I have not, no.

15   Q    Correct.  And so, you then, have not made any conclusions

16   about just on the OTT portion of this traffic, what AT&T was --

17   has withheld?

18   A    We don't have any significant disputes --

19   Q    We're going to get that.

20        MR. STEESE:  Can she please finish her answer?

21   A    We don't have any other significant disputes, and the only

22   other dispute, besides what's here, is OTT.

23   Q    (By Ms. Zambrano) And that's why you are making a

24   conclusion, right?  A conclusion that's not based on any

25   personal knowledge.

MELISSA KELLOW - Cross

1        So, this is my question to you, of that $57 million,

2   how much of it is based on OTT traffic?  Can you tell the

3   Court?

4   A    Of the -- of the new charges?

5   Q    The whole thing.  The whole enchilada.  The whole 57

6   million, how much is OTT traffic?

7        MR. STEESE:  I'm going to object because how much of

8   OTT is a minute-of-use question.  She is asking a

9   dollar-of-value question.

10       THE COURT:  Overruled.

11       Q    (By Ms. Zambrano) You were aware that the Court has

12  determined that the -- that the factor, on Level 3's traffic,

13  is 21 percent?  The Court has determined that, correct?

14  A    Correct.

15  Q    That's all of the questions I have.  You haven't done any

16  calculation, and you can't tell the Court why -- or excuse me.

17  Okay.  You said -- I said we're going to come back to this.  I

18  didn't mean to cut you off?

19  A    That's okay.

20  Q    Your conclusion, you said, was based on the disputes that

21  you said AT&T has identified; is that right?

22  A    Correct.

23  Q    Okay.  And you -- did you tell the Court, on Direct

24  Examination, that the only disputes that AT&T has identified,

25  during the the relevant time period, were the OTT dispute, the

123

MELISSA KELLOW - Cross

1   DEOT dispute and this recent, I think you described it as back

2   billing, of tandem charges?

3   A    Correct.

4   Q    That's, basically, what you just said a moment ago, right?

5   A    Correct.

6   Q    You are positive that AT&T has never once provided any one

7   in your company, Level 3, any other disputes during this

8   relevant time period?

9   A    Correct.

10  Q    That's your testimony?

11  A    Yes.

12  Q    Not just from Ms. Kellow, for everyone?

13  A    For who?

14  Q    I'm sorry.  For Ms. Kellow.  This is not your personal

15  testimony.  This is for Level 3.  AT&T never provided

16  another -- any other notice of a dispute, from January 1, as we

17  sit here today, that's your testimony?

18  A    Related to these charges, no.

19  Q    Well these are all charges, right?

20  A    Correct.

21  Q    Correct.  You said they were all usage charges, and there's

22  been no other identified dispute?

23  A    Correct.

24        MS. ZAMBRANO:  Okay.  I'm going to introduce Exhibit

25  Number -- this is Exhibit Number 95, Your Honor.  This is a --

124

MELISSA KELLOW - Cross

1    an impeachment evidence -- impeachment exhibit.

2            Let's pull it up on the screen then.  Chuck, I'm happy

3    to give you this copy, if you like.  Are you pulling it up?

4            All right.  So this is an email -- well, first of all,

5    do you know Rob Hayes?

6    A    Yes.

7    Q    Bob Hayes is in AT&T's -- the department that pays Level

8    3's bills, correct?

9    A    Correct.

10   Q    And you have dealt with him on AT&T and Level 3 billing

11   disputes, correct?

12   A    Correct.

13   Q    So this is an email from April 15th, 2020, that's in

14   relevant time period, correct?

15   A    Correct.

16   Q    And it is referring to a *significant uptick in rate*

17   *disputes associated with Level 3's switched-access invoices*

18   *starting in March of this year.*  Do you see that?

19   A    In March of this year?

20   Q    Um, the email says *March of this year*.  Did I read that

21   correctly?

22           Okay.  Let me start again.  Do you have any reason to

23   believe that you didn't get this email from Mr. Hayes on April

24   15th, 2020, Ms. Kellow?

25   A    No.

MELISSA KELLOW - Cross

1  Q   And so Mr. Hayes wrote you, that, *We observed a significant*

2  *uptick in rate disputes associated with Level 3's*

3  *switched-access invoices starting in March of this year.*  Did I

4  read that correctly?

5  A   You did, yes.

6  Q   Okay.  All right.  I want to talk about a different subject

7  then.  I want to talk about OTT traffic, and the FCC

8  declaratory rulings.

9       You are aware that the FCC had decided, in February of

10  '15, that end-office switching charges -- you can take that

11  down.  Thank you.  That end-office switching charges could be

12  charged on OTT traffic.  Do you recall that?  I know you are

13  not a lawyer, but do you recall that ruling, generally?

14  A   I recall it in general terms.

15  Q   Because you work in billing, so you know about these

16  things, right?

17  A   Right.  I have an understanding, but I'm not the expert.

18  Q   Did you understand that the rules on billing had -- at

19  least according to the FCC, in February of 2015, had changed?

20  A   Yes.

21  Q   And that change was that LEC could bill that end-office

22  charge on OTT calls, right?

23  A   Um, that's not knowledge that I have, that would be

24  something that Ms. Torres could answer.

25  Q   You don't know whether Level 3, as a billing manager, you

MELISSA KELLOW - Cross

1   could bill end-office charges in February of 2015; is that your

2   testimony?

3   A    No.  I -- I managed disputes in collections.  I don't

4   create the bills.

5   Q    Okay.  Well, let's look at the Settlement Agreement,

6   because I believe you testified on Direct you were familiar

7   with the Settlement Agreement, correct?

8   A    Correct.

9   Q    Okay.  Well, let's look at the Settlement Agreement.  This

10  is Level 3, Exhibit A1, and this is where the FCC's Declaratory

11  Order in the third whereas clause is defined, and I am just

12  asking you, is your understanding and your role, with respect

13  to disputes that the parties had, because the OTT dispute was a

14  dispute between Level 3 and AT&T, right?

15  A    Yes.

16  Q    It was within your jurisdiction, if you will, at Level 3,

17  right?

18  A    Yes.

19  Q    Okay.  AT&T had appealed that Declaratory Order; that's

20  what this says, correct?

21       MR. STEESE:  Your Honor, I'm going to object on

22  foundation, in terms of the terms.  Miss Kellow testified she

23  only created Exhibit A.  She is not going to be familiar with

24  the terms.  So foundation as to knowledge of the terms.

25       MS. ZAMBRANO:  Your Honor, may I respond?

MELISSA KELLOW - Cross

1          THE COURT:  No.  What I'm going to do is I'm going to

2     tell you this.  I will let you go for a little bit, but really

3     what you are doing is you are using her to tell -- to show me

4     what to read, and I don't really need her, to understand what

5     to read.

6          So a lot of this is going to arguments that are

7     subsequently going to be billed.  I'm not sure that I need to

8     walk through it, line by line, with her.  If all we're going to

9     say is, *Does it say this, does it say this, does it say the*

10    *other*, well, what's the point?

11         MS. ZAMBRANO:  I'm actually not.  I have some

12    substantive questions.

13         THE COURT:  All right.  We will see how it goes.

14    Q    Okay.  The FCC's order, in your role at Level 3, did you

15    change any other switched-access usage-charged billing, other

16    than end-office charges when that came out?

17    A    I'm sorry.  I don't understand your question.

18    Q    Do you understand that the FCC's ruling, in February of

19    2015, changed the rules, and it allowed the LEC to bill for

20    end-office switching charges?  Do you understand that?

21    A    I understand that.

22    Q    And in your role in the company, that was one of the things

23    that you could then supervise disputes around getting paid for

24    those, correct?

25    A    Correct.

128

MELISSA KELLOW - Cross

1   Q   You had a dispute for getting paid for those with AT&T,

2   correct?

3   A   Correct.

4   Q   And -- but that dispute, with respect to the FCC and the

5   OTT traffic and all of that, it didn't relate to any other

6   usage charges, did it?

7   A   No.

8   Q   Now, are you aware of -- well, I was going to show the

9   FCC's decision, but I won't.

10          THE COURT:  Good.

11          MS. ZAMBRANO:  We will save that.

12      Q    (By Ms. Zambrano) I do want to talk about the 2019

13  ruling then, and see if you are familiar with this.

14          Did you -- do you understand that the rules changed,

15  if you will; that the D.C. Circuit issued an opinion, in at

16  least in '19 -- pardon me, that the FCC issued a second ruling,

17  in 2019?

18  A   I'm vaguely familiar with it.

19  Q   Okay.  Do you understand, in your role in the company, that

20  those switched-access charges on OTT calls could no longer be

21  billed by LEC?

22  A   Correct.

23  Q   Now, you testified, on Direct, that after that order came

24  out, and you showed the Judge, in -- you might not have tied

25  this to the order, so let me ask it differently.  You showed

MELISSA KELLOW - Cross

1    the Judge some credits in a spreadsheet that started after the

2    FCC's rulings with respect to paying for switched-access

3    charges changed, and you showed that there were credits based

4    on end-office charges.  Do you recall that testimony?

5    A    Yes.

6    Q    Okay.  And I won't pull up the exhibit.  I'm just asking

7    about, you know, what you showed him.  Okay.

8            You continued to bill -- Level 3 continued to bill

9    AT&T for switched-access -- excuse me -- Level 3 continued to

10   bill end-office charges to AT&T after February of 2020,

11   correct?

12   A    Correct.

13   Q    And those credits that you showed the Court, when

14   Mr. Steese was talking with you, you never actually gave those

15   credits to AT&T, right?  You didn't take anything off the bill

16   that they were charged, right?

17   A    Correct.

18   Q    You just kept on billing end-office charges, correct?

19   A    Correct.

20   Q    All the way through May of this year?

21   A    Correct.

22   Q    Let's go to Exhibit A8.  And you testified quite a lot on

23   this CPN/LRN dispute.  Do you recall that testimony?

24   A    Yes.

25   Q    I just have a few questions on it.  Okay?

MELISSA KELLOW - Cross

1    A    Okay.

2    Q    All right.  I want to look at the very bottom email.  This

3    is the first in the chain.

4    Q    To the very bottom email.  Hm-hm.  Right there is good.

5    Okay.

6          So, this is an email by -- from Diane Wood, at Level

7    3, to Bob Hayes and some other -- I guess Teresa Ozwald, at

8    AT&T, correct?

9    A    Correct.

10   Q    It's dated in May of 2017.

11   A    Correct.

12   Q    And if you go all the way to the top of this email, did I

13   hear you, on Direct testify that, essentially, by the end of

14   this string, that you all had resolved the CPN/LRN dispute by

15   August of 2017?

16   A    I believe it was around that time.

17   Q    Okay.  So, it took between May-ish and August-ish to get

18   this resolved, correct?

19   A    Correct.

20   Q    But it actually wasn't resolved, there was a settlement

21   later, too, correct?

22   A    Yes.  That's how it was resolved.

23   Q    So months and months to get this dealt with?

24   A    Hm-hm.

25   Q    Okay.  I'm going to go to Exhibit A18.  You testified about

MELISSA KELLOW – Cross

1   Exhibit A18 on Direct, as well, correct?

2   A   Correct.

3   Q   And I just want to ask you about the box on the far left

4   that says *Dispute*.  Let's see -- uh-huh, I got it.  I'm going

5   to ask you about these disputes?

6   A   Okay.

7   Q   So this is an email from Ms. Miller to Ms. Torres that

8   works at Level 3, correct?

9   A   Correct.

10  Q   And it's reflecting a number of disputes between AT&T and

11  Level 3, as of August of 2017, correct?

12  A   Correct.

13  Q   We've got something called an intraMTA dispute, correct?

14  A   Yes.

15  Q   We've got the DEOT tandem-usage dispute, correct?

16  A   Yes.

17  Q   We've got 8YY dip back bill dispute?

18  A   Yes.

19  Q   We've got 8 YY dip double billing dispute?

20  A   Correct.

21  Q   We've got a bunch of connectivity disputes, that's EOCPN,

22  OTT, BAU, business as usual, is that what that stands for?

23  A   Correct.

24  Q   Bunch of disputes in that bucket.  All of those are

25  disputes that the parties had at that time, correct?

132

MELISSA KELLOW – Cross

1    *A*   Correct.

2          *MS. ZAMBRANO:*  Now -- one second, Your Honor.

3    *Q*   Now, I want to look at the Settlement Agreement again, and

4    that is Exhibit A, that you did testify about, very

5    specifically about this.

6          Do you -- you said, I believe, so this is Exhibit A1

7    if that helps.  Thank you.  Thank you very much.  Let me get

8    rid of this.

9          *THE COURT:*  Lower left.

10         *THE COURTROOM DEPUTY:*  In the very, very corner.

11         *MS. ZAMBRANO:*  Thank you.

12     *Q*    (By Ms. Zambrano) I want to talk to you about Exhibit

13   A, that you testified about.  Okay.  I think you said that you

14   were responsible for pulling Exhibit A together.  I think it's

15   on page 11, or at least that was the page you were questioned

16   about.

17         Could you scroll down to page 11 of Exhibit A1?  Okay.

18   This is the exhibit that you talked about on Direct and you

19   testified about preparing yourself?

20   *A*   Yes.

21   *Q*   Okay.  And if you get to the totals.  I think you have to

22   scroll down just a couple more pages.  Keep going.  Okay.

23   There's a total for OTT disputes of approximately $20.4

24   million, correct?

25   *A*   Correct.

MELISSA KELLOW – Cross

1   Q   And then there was another dispute that had to do with a

2   different access service, the tandem dispute that was also

3   dealt with in this Agreement, correct?

4   A   Correct.

5   Q   And that one was about 11 million, correct?

6   A   Correct.

7   Q   And that DEOT dispute was three-or-so-hundred-thousand

8   dollars?

9   A   Correct.

10  Q   Okay.  You prepared all of this, correct?

11  A   Yes.

12  Q   Okay.  And you did that prior to -- can you go back up to

13  page 10, please?

14          I just want to check the date of this Agreement.  I

15  think it's May 27th.  May 27th, yes.

16          So you did all of that work prior to May of 2015,

17  correct?

18  A   Correct.

19  Q   Okay.  Now, that exhibit and those totals, at least for the

20  OTT dispute, that was used to provide a payment by Level 3 --

21  excuse me -- by AT&T to Level 3, correct?

22  A   Correct.

23  Q   Okay.  So let's go in the -- in the exhibit, A1, let's go

24  to page two.  I'm going to ask you about -- yeah, right here.

25  This is 1A i and large A.  Okay.  It says, *within 15 business*

MELISSA KELLOW - Cross

1    *days of the effective date, $15,362,638.80 and that is 75*

2    *percent of the usage and late payment charges billed by Level*

3    *3.*  Do you see that?

4    *A*   Yes.

5    *Q*   Okay.  And that was the total, that's 75 percent of the

6    total that you just saw, correct?

7    *A*   Correct.  Oop.

8    *Q*   So, that's the -- we call this the retrospective payment

9    that AT&T paid to Level 3 for traffic that was prior to March

10   of 2015.  Are you familiar with that term, or could we use that

11   term?

12   *A*   I'm -- I'm somewhat familiar, yes.

13   *Q*   So, that retrospective $15 million payment was money that

14   they were getting from AT&T, correct?

15   *A*   Correct.

16   *Q*   You were responsible for putting together the $20 million,

17   correct?

18   *A*   Correct.

19   *Q*   That exhibit.  And that was the whole purpose of Exhibit A,

20   was to come to a number, close out disputes and get a retro

21   payment, correct?

22   *A*   Correct.

23   *Q*   All right.  Now, I want to talk to you about the 50 percent

24   calculation that you did.  You -- you did a calculation of the

25   amount of the refund that AT&T -- we can take that down.  That

MELISSA KELLOW - Cross

1    and the -- actually, I'm sorry, keep that up.  It might help

2    you.  On page three, (iv), same Settlement Agreement.  And I

3    will ask it this way, Ms. Kellow, because I'm not sure you

4    remember this, so let me make sure.

5            Do you recall doing a calculation of the refund that

6    AT&T was due under this Settlement Agreement?

7    A    No, I don't recall.

8    Q    Okay.  So then, I need to show you your Declaration and

9    remind you.  So, let's pull the -- yeah, the Declaration up,

10   that you did in connection with the Summary Judgment.

11           Can you go to page two?  Might be two, might be three.

12   Can you scroll down just a bit?  Okay.

13           Ms. Kellow, I just want to ask you, do you recall

14   doing the calculation where Level 3 was going to refund 50

15   percent of end-office charges on OTT calls?

16   A    Correct.

17           MR. STEESE:  Your Honor, I would object to the

18   Declaration being on the screen.  She can ask the questions.  I

19   thought the last question was, was there some refund in 2015

20   and I think that --

21           THE COURT:  Sustained.

22   Q    (By Ms. Zambrano) Ms. Kellow, do you recall doing a

23   refund to AT&T -- or pardon me -- a calculation of a refund

24   that Level 3 was going to make to AT&T, in connection with the

25   Settlement Agreement?

MELISSA KELLOW - Cross

1    A    Not with the 2015 Settlement Agreement.

2    Q    Are you aware that -- I'm sorry.  You are aware, aren't

3    you, that Level 3 was required to refund, within 30 days, 50

4    percent of the disputed OTT charges to AT&T, if the FCC's

5    Declaratory Order was overturned, aren't you?

6    A    Um, not exactly.  I don't think so.

7    Q    Ms. Kellow, did you do a calculation of AT&T's refund,

8    based on the FCC's Declaratory Order?

9    A    Yes.

10   Q    You did do that calculation?

11   A    Yes, I did.  I'm getting confused with the question,

12   between 2015 and now.

13   Q    Got it.  It's the 2015 Settlement Agreement?

14   A    Okay.

15   Q    And the calculation was done later, because the FCC's order

16   was overturned.  Okay.  So AT&T made the end-office charges and

17   then later, Level 3 was supposed to make a refund.  Are we on

18   the same page now?

19   A    Yes.

20   Q    Okay.  And you calculated that refund, correct?

21   A    Correct.

22   Q    And you calculated that as 50 percent of the charges that

23   AT&T had paid for end-office services, correct?

24   A    Correct.

25   Q    You did not calculate that payment as 50 percent of all the

MELISSA KELLOW – Redirect

1    usage charges that AT&T had paid, during the relevant time

2    period, did you?

3    *A*    No.

4    *Q*    In the exhibit that we looked at, it looked like, during

5    the relevant time period, AT&T paid for all of those charges

6    roughly, $37 million, correct?  Do you recall that?

7    *A*    Correct.

8    *Q*    And Level 3 did not calculate AT&T's refund as half of that

9    37 million, did it?

10   *A*    No.

11   *Q*    Because it was only supposed to be on the disputed charges,

12   correct?

13   *A*    It was the end-office settlements.

14   *Q*    Which is what was disputed in the FCC's litigation,

15   correct?

16   *A*    Correct.

17          *MS. ZAMBRANO:*  Those are all of the questions I have,

18   Your Honor.

19          *THE COURT:*  All right.  Briefly.

20          *MR. STEESE:*  Can you give us just one moment,

21   Your Honor?

22          *THE COURT:*  Yes.

23                         **REDIRECT EXAMINATION**

24   *BY MR. STEESE:*

25   *Q*    All right.  Ms. Kellow, do you recall questions by counsel

MELISSA KELLOW - Redirect

1   saying words to the effect of, *You are not AT&T, you don't know*

2   *why AT&T withheld money.*   Do you recall that?

3   *A*   Yes.

4   *Q*   So if AT&T said *I want to withhold for no reason, I want to*

5   *withhold $2 million,* and have no justification at all, you

6   wouldn't know that, would you?

7   *A*   No.

8   *Q*   You wouldn't know if they were being completely irrational.

9   You just know how much they pay and don't pay, right?

10  *A*   Correct.

11  *Q*   So you can't say the specific reasons why they withheld, at

12  all?

13  *A*   Correct.

14  *Q*   You just know what they don't pay, right?

15  *A*   Correct.

16  *Q*   You have to answer?

17  *A*   Correct.

18  *Q*   Okay.   So, what is the process in the industry for raising

19  disputes?

20  *A*   The process to provide a written notification, within a

21  specific timeframe from the date of the invoice, outlining the

22  BAN, the invoice date, the amount and the dispute type and any

23  supporting documentation relevant to the claim.

24  *Q*   And if you give a dispute, and say, I'm disputing, is this

25  something that you can just do one time, or are you supposed to

MELISSA KELLOW – Redirect

1  do it month after month after month?

2  A   Supposed to do it each month.

3  Q   And why is that?

4  A   So that we have record that the dispute is ongoing, and we

5  can calculate the total amount of the dispute.

6  Q   And if AT&T, Ms. Miller calls up someone at Level 3 and

7  says you know, I have this concern, why are you doing X,

8  whatever the X is, is that a valid dispute?

9  A   No.

10  Q   Why?

11  A   It's an inquiry.  It's a question.

12  Q   And so, if AT&T does not consistently provide documentation

13  saying we're disputing this charge, then what does -- how did

14  Level 3 treat it?

15  A   Undisputed charges.

16  Q   Undisputed charges, right?

17  A   Hm-hm.

18  Q   So, in your actual spreadsheet that you created, Exhibit

19  A53, what are you trying to do?

20  A   Show the amount of undisputed charges.

21  Q   And you know that with respect to the other disputes?  The

22  DEOT dispute, have you accounted for that to the penny?

23  A   Yes.

24  Q   The competitive tandem, have you accounted for that?

25  A   Yes.

140

MELISSA KELLOW - Redirect

1    *Q*    And if I can approach with this, since -- and I think it

2    was Exhibit 95; is that correct?

3            *MR. STEESE:*   Thank you.  I just wanted to make sure.

4    Exhibit 95.  And is it okay if I look over her shoulder,

5    because we only have the one copy

6            *THE COURT:*   Go ahead.

7            *MR. STEESE:*   Thank you.

8       *Q*    (By Mr. Steese) And I will try and talk up.  I'm not

9    yelling.  Just so the court reporter and everyone can hear me.

10           Is this a traditional dispute notice or is it an

11   inquiry?

12   *A*    It's an inquiry.

13   *Q*    And why do you say that?

14   *A*    Because it doesn't give details, specific amount or

15   specific invoices.  It's really a question asking what's

16   happened.

17   *Q*    And what's the last words on the email from Mr. Hayes?

18   *A*    Can this charge be -- can this charge be reversed.

19   *Q*    And so have you considered this to be a ongoing dispute?

20   *A*    No.

21           *MR. STEESE:*   I'm going to go back now, if that's all

22   right.

23      *Q*    (By Mr. Steese) Has AT&T sent consistent dispute

24   notices about this, saying*, We are disputing these charges on*

25   *these BANs in this amounts for these months?*

MELISSA KELLOW - Redirect                                    141

1    *A*   Can you repeat the question?

2    *Q*   On this transit issue, which is referenced in 95, has AT&T

3    monthly sent dispute notices, saying *We're disputing this*

4    *amount, for this BAN*, *et cetera, in accordance with the tariff*?

5    *A*   No.

6    *Q*   Now, opposing council, Ms. Zambrano, I'm not sure of the

7    right way to say it, asked you questions about, *Did Level 3*

8    *continue to bill end-office charges, to AT&T, after February of*

9    *2020, and did it stop in May of 2021.*  Do you recall those

10   questions?

11   *A*   Yes.

12   *Q*   As of February of 2020, what was AT&T claiming our

13   percentage of OTT was?

14   *A*   Sixty-five percent.

15   *Q*   And what was -- what was Level 3 saying it's percentage of

16   OTT was at a maximum?

17   *A*   Twenty-one percent.

18   *Q*   So how much should you have credited, did you know?

19   *A*   Yes.  The 21 percent.

20   *Q*   The 21 percent.  But if you -- did you know there was a

21   dispute about how much the OTT -- actual OTT percentage was,

22   when it was in front of His Honor?

23   *A*   Yes.

24   *Q*   So, in terms of showing credits, did you show it on the

25   invoice of AT&T?  The credits, in -- until May of 2021?

142

MELISSA KELLOW – Redirect

1    *A*    Not until May of 2021.

2    *Q*    But did you show the credits in the damages analysis that

3    was being provided to AT&T?

4    *A*    Yes.

5    *Q*    So was there ever any question that Level 3 was telling

6    AT&T we're giving you this credit?

7    *A*    No.

8    *Q*    Let's bring up Exhibit A8, page three.  Email at the top

9    blow it up.  The yellow highlights.  Bigger.  So I can see it.

10        Do you remember counsel saying, *Isn't the dispute*

11   *about competitive tandem, not tandem*?  Do you remember saying

12   that?

13   *A*    Yes.

14   *Q*    What does this email say, from Ms. Miller, to among others,

15   you, on that subject?

16   *A*    Nothing about competitive tandem.

17   *Q*    What does it actually say?

18   *A*    Says there's no withholding for OTT.

19   *Q*    Read the whole sentence out loud, what she says?

20   *A*    *There was no withholding action taken for the OTT dispute,*

21   *but there is withholding above the current dispute value for*

22   *the EOCPN issue, due to; one, Level 3's billing containing both*

23   *EO and tandem billing on the same BAN, which complicated the*

24   *mechanized rate based withholding*, and two --

25   *Q*    You can end there?

MELISSA KELLOW - Redirect

1   A   Okay.

2   Q   So, does it say *between end user and competitive tandem*

3   *billing*?

4   A   No.

5   Q   It says *end-office and tandem billing*, correct?

6   A   Correct.

7   Q   Let's look at Exhibit A18.  Right there.  Perfect.  And you

8   see the connectivity disputes in yellow.  Do you see that?

9   A   Yes.

10  Q   And that Ms. Zambrano said there's a whole host of disputes

11  there.  Do you see -- do you remember her saying that?

12  A   Yes.

13  Q   In the table below, does it break those connectivity

14  disputes out?

15  A   Yes.

16  Q   And what are they?

17  A   OTT, CPN, and BAU, business as usual rate, disputes.

18  Q   So if we look at the intraMTA dispute, is it resolved?

19  A   Are you referring to this email?

20  Q   The top -- this IntraMTA dispute referenced here at the

21  top, is that resolved?

22  A   Yes.

23  Q   Is the DEOT dispute resolved?

24  A   Yes.

25  Q   Is the 8 YY disputes resolved?

MELISSA KELLOW - Recross

1    A    Yes.

2    Q    So all that's left of these disputes unresolved is what?

3    A    OTT.

4         MR. STEESE:  Just one moment, Your Honor.  I think I'm

5    finished.  Your Honor, that's all the questions that I have.

6         THE COURT:  All right.  You are excused.  Thank you.

7         MS. ZAMBRANO:  Your Honor, I had a couple of Recross

8    questions.  May I do so?

9         THE COURT:  Go ahead.

10        MS. ZAMBRANO:  Okay.  Thank you Your Honor.

11                    **RECROSS-EXAMINATION**

12   BY MS. ZAMBRANO:

13   Q    Will you please put up Exhibit 79.  Ms. Kellow, you were

14   just testifying about the competitive tandem billing dispute.

15   And you -- and we read an email how AT&T described it to you,

16   do you recall that just a few minutes ago?

17   A    Yes.

18   Q    Okay.  Had AT&T ever described that combined billing issue

19   to you, in any way, that suggested that there was a competitive

20   tandem billing and local switching billing issue, and that

21   was --  let me start again.

22        Had AT&T ever, outside of the email that you just

23   testified about, had they ever explained that combined billing

24   issue to you, anywhere else?

25   A    No.

MELISSA KELLOW - Recross

1  Q   Okay.  Let's look at Exhibit 79.  Exhibit 79 is an email

2  from an Anna dot.... I don't know how to say her last name,

3  S Y V O K H I N A at AT&T dot com.  And it's sent to an ICC

4  billing to at Level 3 dot com.  Is that a Level 3 billing email

5  address?

6  A   Yes.

7  Q   So this is Level 3, the company, receiving something from

8  AT&T, correct?

9  A   Correct.

10 Q   And the something, the title is AT&T Connectivity Billing

11 Management Dispute Notification.  Do you see that?

12 A   Yes.

13 Q   So that's a dispute notification from AT&T to Level 3,

14 correct?

15 A   It's a title saying that there's a dispute notification.

16 Q   Okay.  You don't think that sending an email that says it's

17 a dispute notification, qualifies as a dispute notification to

18 Level 3?

19 A   It depends on the detail contained in the email.

20 Q   Okay.  You said -- I'm going to ask you about -- can you go

21 away from the email for just a moment, that was the next

22 subject I was going to ask you about.  You said it wouldn't be

23 a valid dispute if it didn't have all of the information; like,

24 it was within 90 days, it had the BAN number and all of that.

25 It's not valid, correct?

146

MELISSA KELLOW - Recross

1    *A*   Correct.

2    *Q*   Is that why you think that this is not a valid dispute

3    notification, from Level 3's perspective?

4    *A*   It's also not valid because it doesn't really contain any

5    detail as to what in the tariff is incorrect.

6    *Q*   So, that's what I was going to ask you.  Valid or invalid,

7    to you, means that it's complying with the tariff, correct?

8    *A*   Correct.

9    *Q*   The tariff is not attached to the parties Settlement

10   Agreement, is it?

11          *MR. STEESE:*  I'm going to object.

12          *MS. ZAMBRANO:*  I will withdraw the question.

13   Your Honor can note that it's not.

14      *Q*    (By Ms. Zambrano) So the question that I had, at the

15   bottom of this is, do you see number one, might have to make

16   this bigger.  I'm having trouble reading it too.  Do you see

17   where it says ID -- above that ID, Oregon, Washington.  I need

18   the whole.  There you go.  There you go.  Thank you.  Okay.

19          Intrastate, number one says, *Disputed charges relate*

20   *to the effect of unexpected fluctuation in the ratio of local*

21   *tandem to tandem switches MOU has on AT&T's mechanized rate*

22   *validation process.  Separate BANs for end office, local*

23   *switching and tandem, tandem switching would care for this type*

24   *of dispute, rather than periodic manual traffic studies.*  Do

25   you see that?

MELISSA KELLOW – Recross

1  A   Yes.

2         MR. STEESE:   Your Honor, this is far outside the scope

3  of my short Redirect.

4         THE COURT:   I'm beginning to agree.   If, ultimately --

5  well, it's also way more than a couple, but the counting part I

6  don't care about so much..

7         MS. ZAMBRANO:   This is my last question.

8         THE COURT:   Go ahead.

9     Q   (By Ms. Zambrano) Do you know what that means,

10  Ms. Kellow?

11  A   Sorry.   Could you repeat that question?

12  Q   It's just, do you know what number one means?

13  A   Yes.

14  Q   What does it mean to you, Ms. Kellow?

15  A   That AT&T is asking us to separate out the different

16  traffic types, to separate BANs, to cure for the unexpected

17  fluctuation in the ratio between the two traffic types.

18  Q   Between the two traffic types, correct?

19  A   Correct.

20         MS. ZAMBRANO:   Those are all of the questions I have.

21  Thank you.

22         MR. STEESE:   I have nothing further, Your Honor.

23         THE COURT:   You are excused.

24         THE WITNESS:   Thank you.

25         THE COURT:   Next.

JENNIFER TORRES - Direct

1        MR. STEESE:  Your Honor, Level 3 calls

2   Jennifer Torres.  And as Ms. Torres is taking the stand, I will

3   ask, Your Honor, what the process is for timing, because I try

4   and end on the breaks, as it -- I try to end on good locations.

5        THE COURT:  Don't worry about it.

6        MR. STEESE:  Fair enough.  Thank you.

7        THE COURT:  I mean, look, all that I mean by that is,

8   you're flexible and I am flexible as well, trying to see where

9   we are, but I would tell you is somewhere in the vicinity of

10  3:00 to 3:15 is when I expect to take a break.

11       MR. STEESE:  That's fair, Your Honor.

12     (**JENNIFER TORRES** was sworn.)

13       THE WITNESS:  I do.

14       THE COURTROOM DEPUTY:  Please have a seat.  State your

15  name and spell your last name for the court reporter, please.

16       THE WITNESS:  Jennifer Torres, T O R R E S.

17                    **DIRECT EXAMINATION**

18  BY MR. STEESE:

19  Q   Good afternoon, Ms. Torres.

20  A   Hello.

21  Q   Where do you work?

22  A   Lumen, which was formerly called Level 3.

23  Q   How long have you worked -- I'm just going to call it Level

24  3; is that okay?

25  A   Yes.

JENNIFER TORRES - Direct

1   *Q*   How long have you worked at Level 3?

2   *A*   Seventeen years.

3   *Q*   And what is your current title at Level 3?

4   *A*   Senior director of business operations.

5   *Q*   And how long have you held that particular job?

6   *A*   Since January of this year.

7   *Q*   And why don't you give a brief description of those

8   responsibilities, in your current job?

9   *A*   So, my team is responsible for improving the -- the working

10   experience for our professionals who are focused on improving

11   our customer experience.

12   *Q*   And do you have a college degree?

13   *A*   Yes.

14   *Q*   And when and where what?

15   *A*   It was 2004, from Colorado State University, and it was for

16   Bachelor's in Human Development and Family Studies.

17   *Q*   All right.  Let's look at Exhibit A54, please.  Attach it

18   to our side of the house?

19        *THE COURTROOM DEPUTY:*  It's attaching.

20        Q    (By Mr. Steese) There we go.  And what is Exhibit

21   A54?

22   *A*   This is my resume'.

23   *Q*   Is it current?

24   *A*   Yes.

25   *Q*   Accurate?

JENNIFER TORRES – Direct

1   *A*   Yes.

2   *Q*   Move admission of A54?

3          *THE COURT:*  There's no objection, I assume?

4          *MR. WARDEN:*  No objection.

5          *MR. STEESE:*  And, Your Honor, given your practice

6   standards, since she is also an expert, we have included that,

7   at the -- your request, but I still like to get into a few

8   prior positions.

9          *MR. WARDEN:*  Your Honor, if I may, and I don't mean to

10  interrupt, but counsel just referred to her as an expert, and I

11  think there is an issue as to the scope of her testimony.

12  Certainly, the math that she does, we believe, is lay-opinion

13  testimony or fact-opinion testimony, but there were undisclosed

14  expert opinions offered in opposition to our motion in limine,

15  in May of this year, and so I'm not sure what counsel intends

16  to do, as to qualifying the expert.  Again, I think it's lay

17  opinion testimony, but I can explain to the Court what my issue

18  is.

19         *THE COURT:*  Go ahead.

20         *MR. STEESE:*  Your Honor, if I can, I might be able to

21  cut this off.  I'm not exactly sure where counsel is going, but

22  it might be that if he is not opposed to simple math, we are

23  not going to get into the issues that he is concerned about, so

24  why don't we wait to see if we get into those issues before

25  having a debate about whether or not she should or should not

JENNIFER TORRES - Direct

1  testify about subjects that she might not be actually

2  testifying about.

3         THE COURT:  All right.  All right.  Let's just see

4  where we go, and bring it up on an as-it-arises basis.

5         MR. WARDEN:  Thank you, Your Honor.

6    Q    (By Mr. Steese) So let's look at a few of your prior

7  positions.  From 2017 through 2019, what was your focus at

8  Level 3?

9  A    I was really focused on improving operations through

10  different -- a few different organizations -- or functions

11  within Level 3, but improving operations, internally, while

12  also improving our customer experience.

13  Q    And let's now go all the way to your time when you started

14  at Level 3 from 2004, 2008 what was your focus?

15  A    My focus was billing and collections on our intercarrier

16  billing, our switched-access billing.

17  Q    Did you interact with AT&T during 2004 through 2008 years?

18  A    Yes.

19  Q    At a high level how -- what would you describe your focus

20  of your tenure at Level 3 to be?

21  A    It was focused around -- the first part of it was really

22  focused around the collections, the billing-type-of-activities,

23  then I moved into focusing on improving business operations and

24  improving customer experience.

25  Q    Now, let's focus on a very specific timeframe.  What were

152

JENNIFER TORRES - Direct

 1   your responsibilities in the first half of 2015?

 2   A   The first half of 2015 I was working in our product team

 3   and partnership with our network planning teams, our finance

 4   teams, our regulatory teams and legal teams, and finding the

 5   most cost-effective network for our voice traffic, and also

 6   supporting interpreting FCC regulations and negotiating carrier

 7   settlements.

 8   Q   In that role, did you have any responsibilities for

 9   interacting with AT&T?

10   A   Yes.

11   Q   And what was your experience in the first half of 2015?

12   A   I was supporting our principal negotiators in helping

13   develop the framework for the settlement negotiations.

14   Q   And if you bring up Exhibit A1.  Is -- there we go, first

15   page there, please.  There we go.  Is this the Agreement that

16   you are talking about?

17   A   Yes.

18   Q   Before looking at the Settlement Agreement itself, you said

19   that your emphasis, at Level 3, was the customer experience?

20   A   Yes.

21   Q   Is AT&T a customer of Level 3?

22   A   Yes.

23   Q   How would you describe AT&T as a customer?

24   A   I would say it's a challenging relationship.

25   Q   Why do you say that?

JENNIFER TORRES – Direct

1  A   Well, since the beginning of when I first started with

2  Level 3, or with AT&T, we always have amounts that were

3  withheld for more than we knew what they were withheld for.

4  The the disputes that we had received didn't ever match up to

5  the amounts that were withheld.  So, constantly feel like we're

6  in this circle of searching for why are more amounts withheld,

7  and disputed, begging for money, begging for explanations, and

8  you know, feels like it's just a way to get us to come to a

9  settlement every few years, by settling they get to pay us

10  lesser than the dollars we have billed.

11  Q   How does your experience -- did you have experience with

12  other customers at Level 3, as well, other carrier customers?

13  A   Yes.

14  Q   How does your experience with AT&T compare with your

15  experience to other carrier customers?

16  A   Our other carrier customers, it was -- it was more

17  expected, I guess.  We would receive disputes, we would resolve

18  disputes, they would remit charges for things that they are not

19  disputing, and it was never a guessing game with them.

20  Q   So let's look at switched-access charges, generally.  What

21  are they?

22  A   Well, switched-access charges are when carriers have

23  customers on each other's networks, they have to be able to

24  call the customers on other networks and so when those calls

25  need to trigger networks, you have a switched-access network in

154

JENNIFER TORRES - Direct

 1  place, on that network there are events that happen during the

 2  call flow, and each one of those events have a different

 3  switched-access rate element that can be applied during that

 4  call flow.  So those are what switched-access charges are.

 5  Q   Okay.  Let's turn to Exhibit A1.  You talked about what

 6  your role was, supporting the principal negotiators.  What had

 7  AT&T told Level 3 that it was doing on OTT calling?  What was

 8  it challenging?

 9  A   Well, it was challenging two things; A, they didn't think

10  that end-office elements were due on OTT calls, and that they

11  believed that 65 percent of our traffic was OTT.

12  Q   Let's look at the second whereas clause of the contract.

13  And do you see where it says, and I quote -- blow that up a

14  little larger.  I'm sorry.  I can't quite see it.  Okay.  Thank

15  you.  *AT&T has disputed, not paid, certain Level 3 end-office*

16  *switching charges as set forth in more detail on Exhibit A.*  Do

17  you see those words?

18  A   Yes.

19  Q   Please explain for the Court what those words meant to

20  Level 3, in the context of this Agreement?

21  A   Well, what Level 3 was seeking to resolve here, was

22  everything disputed and not paid under the claim that

23  end-office switching charges didn't apply, and that's what we

24  have when we've put up Exhibit A, is everything disputed and

25  not paid, that's what we're defining as end-office switching

JENNIFER TORRES - Direct

1   charges, which are defined as the OTT disputes.

2   *Q*   So, because AT&T was claiming 65 percent of the calls were

3   OTT, and because they were claiming end-office charges were not

4   applicable to OTT calls, whatever they were withholding,

5   because they were making those assertions, that is the OTT

6   dispute?

7   *A*   Correct.  So, if they were -- they were saying, we think 65

8   percent of your traffic is OTT, that's what they were claiming,

9   but then when they were withholding, that's not what they were

10   withholding.  So their claim was different than what their

11   withholding patterns under that claim were actually reflecting.

12   *Q*   So, let's -- let's look now at -- there's a little i and a

13   little (ii).  We've heard them as romanette one and two; (ii)

14   says *Question the applicability of have charges on nonlevel 3*

15   *CPN.*  Do you see that?

16   *A*   I do.

17   *Q*   So let's look at Section A (iii), on page three of the

18   contract, and if you can below that up, please.  All right.  In

19   this paragraph, what did Level 3 agree to do?

20   *A*   Level 3 was agreeing that if there was a call that involved

21   a Level 3 telephone number that we would be billing full

22   switched-access and if there was a call that did not involve a

23   Level 3 telephone number, we could only bill the tandem charges

24   and not the end-office charges.

25   *Q*   And if you look at the last sentence of sub -- of (iii), on

156

JENNIFER TORRES - Direct

1    page three, it says, *for avoidance of doubt, the parties agree*

2    *that Level 3 will continue to bill AT&T full switched-access*

3    *charges to domestic traffic that originates with or terminates*

4    *to Level 3 assigned CPN.*  Do you see that.

5    *A*    I do.

6    *Q*    What does that mean?

7    *A*    It means if there are calls involving a Level 3 telephone

8    number, that we will bill full switched-access on those calls.

9    *Q*    What if it's an OTT call, what are we going to do?

10   *A*    Bill full switched-access.

11   *Q*    What if it's non-OTT, what will Level 3 do?

12   *A*    Bill switched-access.

13   *Q*    Looking back to the little romanette i, page one, in the

14   whereas clause.  Now it's talking about disputed and not paid,

15   and this is the OTT calling, just getting you back there.  Do

16   you see that?

17   *A*    I do.

18   *Q*    So now let's go back to page three, and look at Section A

19   romanette two.  What did AT&T agree to do under this provision?

20   *A*    AT&T, is agreeing to pay the applicable switched-access

21   tariffed rates.

22   *Q*    For OTT?

23   *A*    For OTT traffic.

24   *Q*    Yep.  And do tandem charges apply on OTT calls, even today?

25   *A*    Yes.

JENNIFER TORRES - Direct

1    Q    Before the new decision, did end-office charges also apply?

2    A    Yes.

3    Q    Since the new decision, do end charges apply?

4    A    No.

5    Q    Okay.  So, if Level 3 billed tandem charges on an OTT call,

6    what was AT&T agreeing to do?

7    A    Pay them.

8    Q    Let's look at Exhibit A3, please.  What is A3?

9    A    This is our FCC tariff.

10   Q    And what tariff, what type of tariff, specifically?

11   A    Switched-access services.

12   Q    Is there anything in here, other than switched-access

13   services, in this particular tariff?

14   A    No.

15   Q    So what rates are switched-access rates, within this

16   tariff?

17   A    All of the rates within here would be our switched-access

18   rates.

19   Q    Now, let's go back to Exhibit A1, page three, romanette

20   four.  How did this particular section impact paragraph 2,

21   above, (ii) above?

22   A    So this -- this would impact by, up above, in number (ii),

23   we saw that it mentioned applicable tariff rates.  So what this

24   number (iv) was saying, that is there's a change in rule, on

25   what elements are applicable, that we would change our billing

JENNIFER TORRES - Direct

1   in accordance with that, and we would credit 50 percent of what

2   we shouldn't have billed, from the time period that we're

3   settling here, up until the rule became final, and then we

4   would credit all of it, after that rule was final.

5   Q   Let's look at page 11 of Exhibit A1, which is the very

6   first part of Exhibit A (ii), the Settlement Agreement, which

7   is Exhibit A1.  What do the numbers depict in that box that go

8   down several pages?

9   A   This was the outstanding accounts receivable with the

10  withheld amounts.

11  Q   And when you say withheld amounts, what -- in layman's

12  terms, what does that mean?

13  A   The balance is not paid for invoices that we had rendered.

14  Q   At the time, 2015, you are involved in the creation of this

15  document, correct?

16  A   Yes.

17  Q   Did you know why AT&T had historically withheld so much?

18  A   We -- we had -- no detail -- well, we had detail that they

19  didn't think that end-office charges applied on OTT traffic,

20  and that 65 percent -- they thought 65 percent of our traffic

21  was OTT, but outside of that, we didn't understand the full

22  withheld balance, because it didn't add up to 65 percent of

23  end-office charges.

24  Q   And overall, what was Level 3's goal?  What was it trying

25  to achieve with the OTT aspect of this Settlement Agreement?

JENNIFER TORRES - Direct

1   A   We were trying to achieve being able to recover all moneys

2   withheld under the claim, that end-office charges weren't

3   applicable.

4   Q   So what is Level 3 seeking here, as damages?

5   A   We want to be paid back everything that has been withheld,

6   under the claim, that end-office elements aren't due.  We're

7   looking -- our number is $9.3 million figure that we're looking

8   to recover, everything withheld under this OTT claim.

9   Q   So, whatever AT&T withheld, because it was claiming that 65

10  percent of Level 3's traffic is OTT, that's what level is

11  seeking?

12  A   Yes.

13  Q   Less the credits on OTT?

14  A   Yes.

15  Q   Let's look at Exhibit A53.  And what is this?

16  A   So, this is the total calculation of damages.

17  Q   And before going into the details, how much is Level 3

18  seeking in damages?  Scroll down, please.

19  A   Thank you.  $9,375,195.

20  Q   All right.  You were here during opening statements,

21  correct?

22  A   Yes.

23  Q   And do you recall Ms. Zambrano saying Level 3's theories of

24  damages have changed since the Court issued its decision on

25  Summary Judgment.  Do you remember that?

JENNIFER TORRES – Direct

1   A   I do.

2   Q   Is that true?

3   A   No.

4   Q   Let's look at Exhibit A22.  A22 is damages through March of

5   2020.  And how much was Level 3 seeking in total damages there?

6   A   $9,076,618.

7   Q   Now, let's go to the credit and debit, and tally up the

8   total of end office charges that had been assessed as of that

9   point in time.  Can you see that number on the bottom?

10  A   Yes.

11  Q   How much had been assessed in end-office charges, at that

12  point in time?

13  A   $4,710,120.

14  Q   So, as of March/April of 2020, what was Level 3's claim

15  about how much was owed by AT&T?

16  A   Our claim was that it owed far more than the charges we had

17  been billed and our number we are looking for was that $9

18  million number.

19  Q   And what -- why did you, Level 3, believe that this was the

20  appropriate number, in March of 2020?

21  A   We had cared for all disputes that we knew about at the

22  time.  We knew the new ruling.  You can see the date on here

23  was right after the new ruling came out, so there was no other

24  reasonable explanation that the withholdings were for anything

25  other than OTT.

161

JENNIFER TORRES – Direct

1  *Q*   And after that initial damages, did AT&T raise some

2  concerns about issues that Level 3 should take into

3  consideration?

4  *A*   I believe so.

5  *Q*   And did those -- were those taken into consideration?

6  *A*   Yes.

7  *Q*   So let's look at Exhibit A24.  And what timeframe is this

8  damages spreadsheet through?

9  *A*   So, this is using the same methodology you saw before, just

10  bringing it forward to January of 2021, and taking into account

11  the DEOT issue that you can see there in column C and D.

12  *Q*   And so, if you look at the total, the Level 3 billing to

13  AT&T column, the tab, excuse me, and you tally up the

14  end-office charges in that timeframe, how much in end-office

15  charges have they assessed -- has Level 3 assessed to AT&T as

16  of January of 2021?

17  *A*   $7,514,047.

18  *Q*   And then look at the damages, that Level 3 seeks, just look

19  at the balance due, less late payment charges, column I?

20  *A*   Okay.

21  *Q*   Do you see that?

22  *A*   I do.

23  *Q*   And how much is being asked for in withholdings on

24  usage-based charges as of that point in time?

25  *A*   So the total withheld balances less than known disputes at

JENNIFER TORRES - Direct

1    the time were $7,820.075.

2    Q   So, I promptly forgot.  How much was in the other one?  Go

3    back, it's 7.5.  So more in usage charges than Level 3's total

4    end-office charges, correct?

5    A   Correct.

6    Q   So, has Level 3's theory, that the amount AT&T is

7    withholding, based upon the OTT dispute, being far more than 65

8    percent of end-office charges, is that new?

9    A   No.

10   Q   Is this something that Level 3 has claimed throughout this

11   lawsuit?

12   A   Yes.

13   Q   Okay.  Let's go back to Exhibit A53.  Now, describe, at a

14   high level -- strike that.  Let me say this, you were here when

15   Ms. Kellow testified, correct?

16   A   Yes.

17   Q   I'm not going to ask the same questions I asked her.  Was

18   Ms. Kellow generating data for you?

19   A   Yes.

20   Q   What was your overall goal in calculating damages in this

21   case, as an example, Exhibit A53?

22   A   We were trying to calculate what the total was that was

23   withheld for the OTT dispute.

24   Q   So, anything AT&T withheld for the OTT dispute, that's what

25   we're seeking here?

JENNIFER TORRES – Direct

1    *A*    Yes.

2    *Q*    Now, how did you go about doing that?  How did you do your

3    calculations?

4    *A*    Well, I will keep it very high level.  So, we wanted to

5    make sure that we pulled the charges, the new charges that were

6    billed, which you can see there in column B, column C, D, E and

7    F, that's reducing it by known disputes that we have.  We are

8    not going to include that as part of our damages.  We are

9    reducing it by payments that AT&T has made, and then we're

10   adding inappropriate late payment charges per our

11   switched-access tariff.  We're crediting what we know we have

12   to credit for the OTT percent up until the time we were putting

13   them on the bills, which is as of -- it was on the May bill,

14   but started in February timeframe.  So we've reduced the amount

15   that we owe for OTT credit.  You can see the total remaining

16   damages there in column M.

17   *Q*    All right.  I'm going to do something risky here.  I'm

18   going to ask you to step over to the whiteboard.

19   *A*    Okay.

20        *MR. STEESE:*  And, Your Honor, can we pull the

21   whiteboard a little closer, because these numbers -- so she can

22   see the screen at the same time?

23        *THE COURT:*  Cathy, you know where to put it.  Put it

24   between you and her.  We'll take care of it.  Let us move it.

25        *THE COURTROOM DEPUTY:*  I got it.  I got.  Oh, no.

JENNIFER TORRES - Direct

1    Don't get up.

2           THE COURT:  And a little more.  Are you good?  Do you

3    want to switch seats?

4           MS. ZAMBRANO:  Let's switch.  Thank you, Your Honor.

5           THE COURT:  Frankly, why don't you just roll up to the

6    head of the table, rather than switching seats.

7           MR. STEESE:  And, Your Honor, do you mind if I stand

8    over here, so I can see too?  I can see my screen.

9           THE COURT:  No.  I don't mind.  Are you good?

10          MR. WARDEN:  Yes, Your Honor.

11       Q    (By Mr. Steese) So, Ms. Kellow, can you see --

12   Ms. Kellow.  Ms. Torres.  Sorry.  I knew I said that wrong.

13   Can you see the screen okay?

14          THE WITNESS:  Yes.

15       Q    (By Mr. Steese) Okay.  So, what was the total amount

16   in usage-based charges, as of this point in time?

17   A    So, it's 57, million..  .46479.  So this was the total

18   charges.

19   Q    And if you tally up rows C, D, E and F, for other disputes,

20   for credits given, what's the total amount for that?

21   A    So, 6,152,502.

22   Q    That was impressive.  I would have had to look back a

23   couple times.

24   A    So, this is -- I'm just going to mark what this is.  So

25   we're reducing it by the disputes or the credits.

JENNIFER TORRES – Direct

1  Q   And then how much did AT&T actually pay?  How about if I

2  read that one to you.  I think everyone can see this, since

3  it's tallied $38,713,045.

4          So now we subtract out the late payment charges that

5  should not have been there, correct?

6  A   Correct.

7  Q   So, that's column I, and the total amount there, again,

8  listed, is what?

9  A   $4,606,717?

10  Q   Yes, that's correct.

11  A   So these were from LECs.

12  Q   And then you also need to give AT&T a credit for the OTT

13  end-office charges, subtracting that tandem charges, correct?

14  A   Yes.

15  Q   And how much is that?

16  A   $795,279.

17          MR. STEESE:  If it's okay, Your Honor, I'm going to

18  give her her phone, because it has a calculator on it?

19          THE COURT:  That's fine.

20          THE WITNESS:  You don't want to watch me do math?

21  A   All right.  So, 57 million, reducing that by ... so if I

22  take the total charges, we've had, we remove any known

23  disputes, any known credits, what we know we need to credit on

24  OTT.  What we know we billed incorrectly, as late payment

25  charges, and take out the money that we know AT&T has paid,

JENNIFER TORRES - Direct

1    then our remaining overwithheld amount, for end-office OTT

2    disputes, would be, 7197236, so, $7,197,266 (sic) dollars.  Did

3    I do that right?

4              THE COURT:  Or thereabouts.  Nobody is disputing,

5    whatever the math is, is what the math is.

6              THE WITNESS:  So, this is the number that we would say

7    is total for overwithheld for the end-office charges.

8         Q    (By Mr. Steese) All right.  I'm just going -- you can

9    go back to your chair.

10              I'm going to ask a question, maybe there is something

11    that I forgot to ask, because column K is 7.992 million.

12    What's the reason -- what did I forget to ask?

13    A    You need to subtract column L, which is the OTT dispute we

14    know we have to give them.  So the 7.9 million is everything,

15    less the OTT credit.  So add in that OTT credit.

16    Q    So if you take column K and subtract column L, you end up

17    with 7197?

18    A    So, if you do the formula, in there, Doug, if you do K34 to

19    L34, on the bottom, you can see it's 7197236, I said 266.

20    Q    Okay.  Fair enough.  Thank you.

21    A    Just to make clear, the difference between this number and

22    the number we see, and number column M, for the total damages

23    would then be the late payment charges.  This isn't inclusive

24    of that.

25    Q    Okay.  All right.  That was helpful, but now let's talk and

JENNIFER TORRES - Direct

 1   make sure that we walk through a few things here.  Do you

 2   recall that Section A (iv), of the Settlement Agreement, states

 3   that there's a change in how much Level 3 can assess on end

 4   office -- strike that.

 5          If there's a change in how much the FCC says Level 3

 6   can assess on OTT traffic, then there will be a 50 percent

 7   reduction up until the time that the damages are final, and --

 8   damages -- the decision is final, hundred percent thereafter?

 9   A   Yes.

10   Q   Okay.  Let's look at the first tab -- no.  Let's look at

11   Exhibit A6, first.  And I'm not going to get into the decision,

12   the content of the decision, but what is this?

13   A   This was the order that informed us how to will OTT, going

14   forward.

15   Q   And we will let the record reflect that the parties have

16   stipulated that the decision became final February 19 of 2020.

17          In this decision, what types of charges or category of

18   charges did the FCC say LEC could not assess on OTT case?

19   A   End-office settlements.

20   Q   And looking at Exhibit A53, tab one, under Level 3 billing

21   to AT&T, is there a column that reflects those end-office

22   elements?

23   A   Yes.

24   Q   And which column was that, the amounts charged?

25   A   Column B.

JENNIFER TORRES - Direct

1    Q   Are the elements in the amounts charged under those

2    elements?

3    A   Oh, sorry.  Column B are the elements, the amounts charged

4    is under column D.

5    Q   Okay.  What, if anything, did the FCC say a carrier could

6    assess on OTT calling in lieu of end-office elements --

7    A   Tandem switching charges.

8    Q   If?

9    A   If our tariff said that we could.

10   Q   Look at A53, the damages disclosure, the table on the left,

11   that table.

12   A   Okay.

13   Q   What did you do to ensure that Level 3 gave AT&T 50 percent

14   credit, up until the time the decision was final and hundred

15   percent credit thereafter?

16   A   So, if you go to any of the sales in column F, say towards

17   the high part of it, you will see that every one of those

18   formulas in those cells are going to have that divide-by-two

19   logic in there, until you get down to where you see in column

20   G.  Column G is showing us where the decision became final.  So

21   you will see the change of having that divided by two, drop

22   off.  So, the divide by two was in place, until it became

23   final, that divide by two falls off, and the time period after

24   it's final.  So we are giving them the full credit.

25   Q   So does the table on the left-hand side, account for all of

169

JENNIFER TORRES - Direct

1    the end -- strike that.  One more thing.

2            What percentage of OTT did you assume in your damages

3    analysis, in A53?

4    A   We assumed 21 percent of our traffic was OTT.

5    Q   And why?

6    A   That was the agreement that was made in March of this year.

7    Q   Agreements, why?  Did you know that the Court issued a

8    decision saying 21 percent?

9    A   Yes.

10   Q   All right.  Let's focus on the table to the right.  What is

11   that table?

12   A   So, because our tandem allows us to bill tandem

13   switching -- tariff allows us to bill tandem switching, this is

14   taking the end-office minutes and applying the tandem switching

15   rate to know what we could charge in place of those end-office

16   elements.

17   Q   And once again, on the tandem switching, in lieu of

18   charges, did you factor in the 50 percent before the decision

19   became final at 100 percent thereafter?

20   A   Yes, we did.

21   Q   Can you show the Court how you did that?

22   A   So the same thing in column N, if you look at the cells,

23   you will see the divide by two in the formula there, down to

24   the point in time it becomes final, where that divide by two

25   falls off.

JENNIFER TORRES - Direct

1   *Q*   And what is the total amount that Level 3 is seeking as

2   replacement tandem switching charges through June of 2021?

3   *A*   $341,207.53.

4   *Q*   And is it your understanding that the parties have

5   stipulated to the addition of that number to Level 3's damages?

6   *A*   Yes.

7   *Q*   Did AT&T -- let me ask it this way.  We've heard AT&T say

8   that Level 3 breached the agreement by not giving credits to

9   AT&T per the requirements of the contract.  Do you recall

10  hearing that?

11  *A*   Yes.

12  *Q*   Is that true?

13  *A*   No.

14  *Q*   Please explain?

15  *A*   Well, as soon as we knew that the order that we looked at

16  before, had become final in 2020, we started giving the

17  calculations, the spreadsheet, at that point in time, to the

18  OTT percentage that we felt was appropriate, but we knew there

19  was a disagreement of what AT&T felt the OTT percentage was, so

20  we -- until we had an agreement on what that OTT percentage

21  was, there was no point in issuing a credit, but we were, on

22  the invoices, because we were giving AT&T the calculations of

23  what the credits would be at the 16 percent, and then it was

24  March 25th of this year where it was stipulated to be the 21

25  percent.  So then, as soon as we possibly could, because the

JENNIFER TORRES - Direct                                      171

 1   March 25th stipulation date, that really couldn't go on an

 2   invoice until May anyway because the May invoice is April

 3   usage.  So that May invoice had that 21 percent of OTT, the

 4   credits starting to go on it, as soon as we were able to put an

 5   agreed amount of OTT credit on the invoices.

 6   Q   Was Level 3 trying to make plain to AT&T, from the

 7   effective date of the the FCC's decision, on February 19 of

 8   2020, plain, that it was going to get credit on the OTT aspect

 9   of the calling?

10   A   Absolutely.  The -- the very first version of this

11   spreadsheet that we produced, I believe, was in the April

12   timeframe of 2020 -- or March timeframe of 2020, which was

13   immediately after that decision became final.

14   Q   Does -- looking at this tab, Level 3 billing to AT&T, and

15   now I'm looking at the whole enchilada, are you aware of AT&T

16   disputing any aspect of any portion of that tab?

17   A   No.

18   Q   So, what is it that AT&T is challenging?

19   A   They are challenging the total amounts that have been

20   withheld for this dispute, along with the LPC, the late payment

21   charges.

22   Q   Let's get back into this.  Let's look at Exhibit 76.  And

23   you are going to need to make that a little smaller so she can

24   see the numbers at the bottom.  The tab.  There we go.  Scroll

25   down.  Perfect.  Right there.

172

JENNIFER TORRES - Direct

1        How much is AT&T stating that it withheld on the

2   end-office charges for the OTT disputes?

3   *A*   You can see in column N, their row 35, that they are

4   stating they withheld, $5,364,905.13.

5   *Q*   And look back at A53, how much is -- excuse me.  Is Level 3

6   saying that AT&T withheld on the OTT dispute?

7   *A*   Well, we're going to have to sum K, L and 34.  So we're

8   going to come to this $7,197,236.

9   *Q*   In order to calculate -- go back to Exhibit 76.  In order

10  to calculate this number 5.364 million, what did AT&T -- before

11  I get there.  In Exhibit 76, do you see the table on the left?

12  *A*   I do.

13  *Q*   Do you recognize that?

14  *A*   Yes.

15  *Q*   Whose table is that?

16  *A*   That's the Level 3 table.

17  *Q*   The table that you and Ms. Kellow created?

18  *A*   Correct.

19  *Q*   And how does AT&T sum up the amounts that it withheld?

20  *A*   So if you put the curser there in column N 5, for example,

21  you can see the total amount they we billed, which is from

22  their column K in their table, which if you put the curser on

23  column K, it's a sum of our column F over in our other table --

24  I'm sorry.  Column D in the other table.

25        If you go back to column N and put the curser there,

JENNIFER TORRES - Direct                                    173

1   you can see they are saying that of the end-office charges, we

2   billed they are assuming that they withheld 65 percent of

3   those, and they are just doing a standard calculation of 65

4   percent of the end-office charges billed.

5   Q   So they are saying they disputed and withheld 65 percent to

6   the penny of the end-office charges in column D on this Exhibit

7   76?

8   A   Correct.

9   Q   Do you agree with AT&T's assessment that this is what AT&T

10  withheld on the OTT dispute?

11  A   I do not.

12  Q   Okay.  Let's look at one month, and we will focus on

13  February of 2019.  How much did AT&T say it withheld in

14  February of '19 for the OTT dispute?

15  A   $257,665.84.

16  Q   Let's look at Exhibit A53, at the exact same timeframe.

17  How much did AT&T -- excuse me -- how much did Level 3

18  calculate that AT&T withheld in this month, from Level 3, for

19  the OTT dispute?

20  A   $552,598.

21  Q   Large difference, right?

22  A   Correct.

23  Q   Now, the difference -- but that is not a static number.

24  It's not the same amount every month, is it?

25  A   No.

174

JENNIFER TORRES - Direct

1    *Q*   And why is that?

2    *A*   Well, minutes-of-use volumes fluctuate month over month.

3    So the total amount billed will fluctuate month over month.

4              THE COURT:  This is going to be a good time.

5              MR. STEESE:  Perfect.  I just turned the page.

6              THE COURT:  Let's say 25 of.

7              THE COURTROOM DEPUTY:  All rise.  Court is in recess.

8         (Recess at 3:17 p.m.)

9         (In open court at 3:36 p.m.)

10             THE COURT:  Please be seated.  You may begin at the

11   top of your next page, counsel.

12             MR. STEESE:  That's exactly it, the top of my page

13   perfect.  Thank you.

14             THE COURT:  Thank you.  It's a Post-it® note, right?

15             MR. STEESE:  It says start here, exactly.

16             THE COURT:  I was hoping it said end here, but go

17   ahead.

18        Q    (By Mr. Steese) All right.  Just to recap where we

19   were when we left off, you had just identified the amounts that

20   AT&T and Level 3 had both identified as being overwithheld on

21   OTT charges.  Do you recall that?

22   *A*   I do.

23   *Q*   Let's pick up there?

24   *A*   Okay.

25   *Q*   What do you know about AT&T's withholding practices when

JENNIFER TORRES - Direct

1    AT&T is challenging an end-office dispute with Level 3?

2    A    Well, we have been told by AT&T, on multiple occasions,

3    that their mechanized payment process cannot differentiate

4    between end office and tandem, and so therefore they will be

5    withholding or overwithholding whenever there is an end-office

6    dispute.

7    Q    Now, you were here when Ms. Kellow was Cross-examined?

8    A    Yes.

9    Q    And there was this question about tandem charges, when the

10   call goes through Level 3 end user -- starts with Level 3 end

11   user, goes through end-office switch versus competitive tandem

12   charges.  Were you here for that?

13   A    I was.

14   Q    Has AT&T ever made plain to Level 3 that the concern  is

15   competitive tandem charges as compared to other types of types

16   of tandem charges?

17   A    I have never seen the competitive tandem discussion in

18   writing, and I have not had the discussion with them about it.

19   Q    Did you personally have communications with AT&T about this

20   issue?

21   A    Yes -- well, about the separate BAN issue with end-office

22   and tandem elements, not about competitive.

23   Q    Perfect.  Thank you for the clarification.  And when did

24   you have this communication?

25   A    They started in the 2017 timeframe.  I think it was May,

JENNIFER TORRES - Direct

 1   middle of 2017.

 2   Q   So let's look back at Exhibit -- and just high level, what

 3   did this particular subject, what type of end-office dispute

 4   was it, at the time in 2017?

 5   A   At the time it was the CPN/LRN dispute.

 6   Q   Let's look at A 1, page three, Section A (iii).  We talked

 7   about this.  So briefly, again, what did this provision Level 3

 8   agree not to do?

 9   A   Level 3 was agreeing not to bill end-office charges when

10   there was a phone call without a Level 3 TN in it.

11   Q   And did -- in 2017 -- strike that.  In 2016 calling, but in

12   2017, was there a dispute that related to this paragraph?

13   A   Yes.

14   Q   And describe that dispute?

15   A   AT&T was disputing that we were billing it, and we should

16   not have been billing it.

17   Q   Billing on what types of call?

18   A   We were billing end-office elements on these calls without

19   a Level 3 TN in it, telephone number.

20   Q   And let's look at Exhibit A8.

21   Q   And go to page six.  Why don't you just do this, Mr. Marsh,

22   if you could just search on the term, LRN.  Do you see here,

23   Ms. Miller, how is she describing this dispute?  With what

24   acronyms?

25   A   EO/CPN/LRN.

177

JENNIFER TORRES – Direct

1   *Q*   Search one more time, and, again, go one more time.  One

2   more.  And in an email from Ms. Kellow, how did she describe

3   the dispute?

4   *A*   EO/CPN/LRN.

5   *Q*   So any time anyone sees this EO/CPN/LRN dispute, is it the

6   same thing?

7   *A*   It is.

8   *Q*   So let's stick in Exhibit A8, page three.  Email from

9   Ms. Miller.  And I know this is somewhat repetitive with what

10  Ms. Kellow did, and I will be brief, but I will get to some

11  points because Ms. Torres was involved at the same time.

12         Do you see where Ms. Miller says there was no

13  withholding action taken for the OTT dispute?  Do you see that?

14  *A*   I do.

15  *Q*   And what did that mean to you?

16  *A*   That means that they were not withholding for the OTT

17  dispute, at this time.

18  *Q*   And why is that?  From a reconciliation perspective, why is

19  that important?

20  *A*   Well, we need to know what they are withholding and why, so

21  we can understand what the open balances are towards, so we can

22  start to reconcile.

23  *Q*   All right.  After that, it says, *But there is withholding*

24  *above the current dispute value for the EO/CPN issue, due to*

25  *Level 3's billing containing both end-office and tandem billing*

JENNIFER TORRES - Direct

1    *on the same BAN, which complicated the mechanized rate base*

2    *withholding.*  Do you see that?

3    *A*   I do.

4    *Q*   And what did that mean to you?

5    *A*   It meant that they were overwithholding for a particular

6    dispute, because our invoices weren't separating out those

7    particular charges, end-office and tandem billing charges were

8    putting them on the same BAN, so they were knowingly

9    overwithholding for that dispute.

10   *Q*   All right.  Now, go back, briefly, to Exhibit A1, that same

11   page, what types of charges in A (iii) -- A (iii), what types

12   of charges did Level 3 agree it would not assess on these calls

13   without a Level 3 telephone number?

14   *A*   We would not assess end-office elements.

15   *Q*   You can see right there, *end-office, switched-access charge*

16   *elements*, do you see that?

17   *A*   I do.

18   *Q*   Now, back to Exhibit A8, please.  And so when -- so

19   describe the LRN dispute.  What types of charges is AT&T

20   telling Level 3 it's disputing and holding?

21   *A*   End-office elements.

22   *Q*   And what is it telling you here in Exhibit A3, its

23   mechanized process was doing?

24   *A*   Overwithholding for the LRN dispute on these elements, on

25   these end-office elements.

179

JENNIFER TORRES - Direct

 1   Q   So, as of this point in time, mid 2017, what did AT&T know

 2   its mechanized process would do to a Level 3 dispute over

 3   end-office charges?

 4           MR. WARDEN:  Objection, foundation.

 5           THE COURT:  Sustained.

 6       Q    (By Mr. Steese) Let's look at page three of -- a

 7   little farther down.  Right there.  It says note, *We have*

 8   *previously requested Level 3 to separate tandem and end-office*

 9   *billing in order to try to avoid the complication noted in*

10   *number one.  It would be great if Level 3 could separate*

11   *end-office and tandem billing on a prospective basis to*

12   *mitigate issues in the future.*  Do you see that?

13   A   I do.

14   Q   What did that mean to you?

15   A    It meant that unless we were able to put the end-office

16   elements and the tandem elements on separate BANs, that this

17   issue was going to continue to happen.  That there would be an

18   overwithholding when there was end-office disputes.

19   Q   Looking, scrolling up just a little bit, depending -- I

20   meant down.  There we go.  That's up to me.  And you see here,

21   at the bottom of this page, it says, *I know you and Jennifer --*

22   is Jennifer you?

23   A   Yes.

24   Q   *I know you and Jennifer are working to provide the EO/CPN*

25   *details I requested, so hopefully we will be able to reconcile*

JENNIFER TORRES - Direct                                      180

1   *that dispute shortly.  I believe the methodology I used to get*

2   *the $7.7 million dispute was solid, since it was based on the*

3   *data showing that the Level 3 end user TN volumes stayed at a*

4   *consistent level over the period.*  Do you see that?

5   *A*   I do.

6   *Q*   And so what had -- what did AT&T say about who had

7   calculated the correct amount of the dispute for the LRN/CPN

8   dispute?

9   *A*   Allison Miller at AT&T had calculated it.

10  *Q*   And let's look at Exhibit A7.  Blow it up just a little

11  bit.  Okay.  Do you see that this is an email exchange that

12  comes to you from the August 2017 timeframe, and it's exchanged

13  with you, between Level 3 and AT&T?

14  *A*   I do.

15           *MR. STEESE:*  Move admission of A7.

16           *MR. WARDEN:*  No objection.

17           *THE COURT:*  Received.

18      *Q*    (By Mr. Steese) Let's look at pages three to four of

19  Exhibit A7.  Scooch down a little.  Do you see there's an email

20  there from Ms. Meola, dated August 9, 2017?

21  *A*   I do.

22  *Q*   Do you see there's all kinds of different colors, there's

23  blue, there's black, there's red.  Do you see that?

24  *A*   I do.

25  *Q*   Pause for a moment, let's move up to page two.  Right

JENNIFER TORRES - Direct

1   there.  Do you see there's an email from Ms. Miller dated

2   August 11 of 2017, to you?

3   A    Yes, from Alison.

4   Q    What does Ms. Miller tell you about the color in that

5   email?

6   A    That her feedback is in red, below.

7   Q    And who had she talked to, to insert information that was

8   put into that email?

9   A    She had talked to Ms. Meola.

10  Q    So let's page down again to page four.  And so, let's look

11  at the paragraph one, on page four of this email, from mid

12  August of 2017.  What does -- do you see where it says, in red,

13  *AT&T's mechanized payment system does not have the ability to*

14  *recognize the difference between Level 3's billing that is*

15  *associated with Level 3 operating as a tandem versus associated*

16  *with Level 3 operating as an end-office when both are included*

17  *on the same BAN*?

18  A    I do.

19  Q    And so what did that mean to you?

20  A    It meant that their payment process cannot understand the

21  difference of end-office and tandem charges, when they are on

22  the same BAN.

23  Q    And they call it the mechanized what?

24  A    The mechanized payment process.

25  Q    And so the amount that Level 3 is getting paid by AT&T,

JENNIFER TORRES - Direct

1    through a mechanized system, gets confused, according to AT&T,

2    why?

3    A    Because we are billing the same charges on the same BAN.

4    Q    Now, look further up in paragraph one.  It -- there's a

5    language in -- it looks blue to me, maybe it's green, but maybe

6    that's the yellow doing it to it.

7        *To avoid future disputes, AT&T is requesting*

8    *end-office billing and tandem billing on separate BANs.  Can*

9    *Level 3 support this?*  Do you see that?

10   A    I do.

11   Q    Was that their question?

12   A    Yes.

13   Q    And does this say competitive tandem?

14   A    No.

15   Q    Just our end-office and our tandem billings or elements on

16   different BANs.

17   Q    And what do you tell AT&T about your ability to separate

18   out end-office and tandem charges and put them on separate

19   BANs?

20   A    We couldn't separate it out at the invoice level, but we

21   could give them very detailed reports that has all of those

22   rate elements that you saw on the other page, the minutes,

23   direction, jurisdiction, the rates applied.  So you get a very

24   detailed report, so that you can absolutely know what is an

25   end-office element versus a tandem element.

183

JENNIFER TORRES - Direct

1   Q   How did you know that your vendor couldn't make the change

2   and bill end-office on one BAN and tandem on another BAN?

3   A   We asked them.

4   Q   So Level 3 -- before we get there, what did AT&T -- did

5   AT&T accept your offer of detailed reporting so you could have

6   this detail?  You could find this detail reporting?

7   A   No.  It was not an acceptable resolution for them.

8   Q   And do you see where they say, in red again, *The Excel file*

9   *unfortunately will not help fix this issue for the mechanized*

10  *payment process in order to prevent additional offsets in the*

11  *future.*  Do you see that?

12  A   I do.

13  Q   What does that mean -- what did that mean to you?

14  A   To me, it means that unless we can switch out our invoices,

15  they will continue to overwithhold when they have disputes on

16  end-office elements.

17  Q   Now, if you would have given them -- strike that.  If

18  AT&T -- strike that.  I will ask it this way.  If Level 3

19  provided a detailed spreadsheet that had all of the charges,

20  directionality, et cetera on it, what could you do with that

21  spreadsheet, if you had it?

22  A   I could really slice and dice the information anyway I

23  wanted.  I could look at direction, the types of elements, to

24  what the rate elements were, how many minutes were in there,

25  the revenue bill.  So really, if there was anything that I

184

JENNIFER TORRES – Direct

1   needed to look at, I would be able to do it.

2   Q   If you had that spreadsheet and wanted to calculate 65

3   percent of end-office charges, would you be able to do that?

4   A   Yes.

5   Q   Would you be able to dispute, to the penny, the end-office

6   charges?

7   A   Yes.

8   Q   Scroll up to page one of this exhibit, please, A1, down a

9   little.  So, you see here, this August 11 email, from

10  Ms. Alison Miller, saying, *As you can see, 7.7 million was*

11  *allocated to the end-office CPN claim, and 400,000 for BAU rate*

12  *disputes.  We had not taken action to withhold for the OTT*

13  *dispute, but we did have additional offsets due to the format*

14  *of the Level 3 invoices that were allocated towards the $8.3*

15  *million OTT dispute.  This same logic would also be applied to*

16  *the updated withholding amounts through June.*  Do you see that?

17  A   I do.

18  Q   What did that mean to you?

19  A   This meant to me that they knew they were overwithholding

20  on that EO/CPN/LRN dispute, instead of paying back what they

21  knew they had overwithheld, which was a little over $4,000,000.

22  Instead of paying that back, they were going to apply that

23  withheld amount to their OTT dispute.

24       *MR. WARDEN:*  Your Honor, I move to strike as to AT&T's

25  knowledge and what it knew.

JENNIFER TORRES – Direct

185

1          THE COURT:  Overruled.  She is only telling me what

2     she thinks, and frankly, that's only what she thinks.

3          Q    (By Mr. Steese) Let's look at the Exhibit A9.  And do

4     you see, this is an email exchange that is forwarded to you,

5     email between AT&T and Level 3, from the June -- late June

6     early July 2017 timeframe?

7     A    I do.

8          MR. STEESE:  Move admission of A9.

9          MR. WARDEN:  No objection.

10         THE COURT:  Received.

11         Q    (By Mr. Steese) All right.  There's an email from

12    Ms. Meola.  In the middle of this email which says, quote, *I*

13    *spoke with Alison about OTT withholding, and we did not*

14    *withhold.  However, I think there was a thought that the*

15    *overwithholding for CPN that we discussed, should not be*

16    *adjusted as it would apply to the OTT dispute value*.  Do you

17    see that?

18    A    I do.

19    Q    Again, what are you interpreting AT&T to be telling you?

20    A    Same thing with the prior email that we saw, that they know

21    there's overwithholding, they are not going to pay it back,

22    they're going to apply it to the OTT dispute.

23    Q    Now, let's look at Exhibit A18.  And this is already in

24    evidence from Ms. Kellow's deposition -- excuse me --

25    examination.  And first of all, high level, did you -- scroll

JENNIFER TORRES - Direct

1    up so we can see who this went to.  Who did this email go to?

2    A   It came to me.

3    Q   What was your reaction when you saw this?

4    A   I was really excited.  We hadn't seen this level of detail

5    of what was being disputed, by dispute, of what was being

6    withheld on those disputes.  So this was a level of information

7    that we had been begging for, for years.  So when we saw this,

8    I just -- I remember, at that time, I was like, oh my gosh,

9    really excited that we had this level of detail.

10   Q   Now, looking at -- scroll down one page.  One page, right

11   there.  Now, this -- scroll up just a little bit.  A little

12   more, so we can see who the email is.

13           Do you see, at the bottom, it says from

14   Jennifer Torres.  Scroll down to Alison Miller.  Do you see

15   that?

16   A   Yes.

17   Q   And do you see that there are not identical but similar

18   charts that are going back and forth between the parties?

19   A   Yes.

20   Q   All right.  So, if we look at the chart, on page two of

21   Exhibit A18, was that chart that you put together?

22   A   No.  This was a chart that we received from AT&T.

23   Q   Got it.  And how much is identified as the amount

24   associated with the CPN dispute in this email?

25   A   7.7 million.

JENNIFER TORRES - Direct

1   *Q*   And then scroll up, because it gets cut off a little here,

2   to page one, where you can see the words now.  In the AT&T

3   notes section it says, *Additional offsets caused by Level 3*

4   *have been allocated towards OTT*.  Do you see that?

5   *A*   Yes.

6   *Q*   Did that have a meaning to you?

7   *A*   It meant that the overwithholding that we saw in those

8   prior emails, the overwithholding from the CPN dispute, was

9   being allocated towards this OTT dispute.  So instead of paying

10  what they knew they were overwithholding, they applied it to

11  another dispute, which they were supposed to be paying full

12  switched-access on until there was a change of law.

13  *Q*   How much did AT&T tell you that it overwithheld on the

14  CPN/LRN dispute?

15  *A*   $4,056,496.

16  *Q*   And the reasons that AT&T gave you for the overwithholding?

17  *A*   Their mechanized payment system was unable to differentiate

18  between the two billings of end-office and tandem and so they

19  couldn't only dispute on one set of elements.

20  *Q*   Let's look at Exhibit A56.  Is this a -- is this a document

21  that you put together?

22  *A*   Yes.

23         *MR. STEESE:*  Move admission of A56.

24         *MR. WARDEN:*  I'm going to object to the conclusion at

25  the bottom, that's, I believe, undisclosed expert testimony.  I

JENNIFER TORRES - Direct

1   have no objection to the math, but I do have an objection to

2   the conclusion.

3          THE COURT:  Fine, I will draw my own conclusions.  I

4   will consider -- I will admit the exhibit, leaving aside the,

5   quote, opinion, unquote, that is said to constitute the last

6   comment.

7          MR. WARDEN:  Thank you, Your Honor.

8      Q    (By Mr. Steese) So let's look at Exhibit A56.  Did

9   you create a ratio to determine how much AT&T had overwithheld

10  in the LRN/CPN dispute?  I said that poorly.  I'm going to

11  start again.  Did you create a ratio to determine how much AT&T

12  had overwithheld in the LRN/CPN dispute?

13  A    Yes.

14  Q    And what was the ratio?

15  A    It was about 53 percent.

16  Q    And do you have it on this document .52681766; many digits?

17  A    Yes.  So the top chart, the bottom row there.

18         MR. STEESE:  If, counsel, you could highlight on the

19  bottom chart is 4884 number.  Highlight in a different color,

20  please.

21  Q    That 4884 number -- you know what, I will do it this way,

22  that 4884 number right there, how did you come up with that

23  number?

24  A    That would be from the -- the damage calculations that we

25  saw in those prior exhibits.  So it's taking the -- we're

JENNIFER TORRES – Direct

1   looking at the end-office elements that were billed during this

2   timeframe, to see what we would have expected for the OTT

3   dispute.

4   Q   If AT&T withheld 65 percent?

5   A   Yeah.  So if you withheld 65 percent, we would have assumed

6   that they would have withheld $4.8 million.

7   Q   And if you -- this 2.573 number, do you see that?

8   A   Yes.

9   Q   What is that?

10  A   So if I use the ratio that they overwithheld from that

11  prior time period that we see on top, the CPN dispute, if I use

12  that ratio that they overwithheld by about 53 percent, then

13  this would be my anticipated amount that they would have

14  overwithheld, during this timeframe, because we knew their

15  mechanized payment system was still in place, and that would be

16  the amount of overwithholdings.

17  Q   And so this 7.457 number, the final number, what is that?

18  A   That would be the estimated 65 percent of end-office, plus

19  what I was guessing they were continuing to overwithhold,

20  because we had not changed our invoicing.  So that would come

21  to that total 7.457 million.

22  Q   You just used the word guessing.  Did you mean that

23  literally or is that calculated?

24  A   I'm sorry.  I don't recall where I used the word guessing.

25  Q   You said you were guessing the 2.573, is that a calculated

JENNIFER TORRES - Direct

1    number?

2    A    That is a calculated number.  So I was using the 53 percent

3    ratio on the billings during that time, to come up with that

4    2.573 million.

5    Q    And how much -- this is as of January 2021, correct?

6    A    Yes.

7    Q    And how much did Level 3 calculate had been withheld by

8    AT&T on the billing dispute, as of this point -- on the OTT

9    dispute, excuse me, as of this point in time?

10   A    So our calculation was 7.555 million there, that

11   highlighted number below the two charts.

12   Q    And if you compared those two numbers, 7.55 to 7.47, how

13   close is the match?

14   A    Nearly a hundred percent.  We are just over 1 percent

15   variance.

16   Q    And how, if at all, does this support your damages number?

17   A    It gives me a high confidence that what we're calling short

18   pay, because of end-office switching disputes --

19        MR. WARDEN:  I object, Your Honor.  This again, is

20   going into undisclosed expert testimony.  This part was not

21   disclosed until the motion in limine, and the -- opposition,

22   and the calculation are fine.  It's these --

23        THE COURT:  Sustained.  I mean, at the end of the day,

24   I think we're disputing things that are facially obvious any

25   way, but nonetheless, I sustain the objection.

JENNIFER TORRES - Direct

1          MR. STEESE:  Your Honor, if I can just put something

2     on the record --

3          THE COURT:  Go ahead.

4          MR. STEESE:  -- briefly?  And that is, AT&T, in the

5     middle of 2020, we laid out that these were the only disputes

6     that -- and AT&T raised nary a point.  In April of 2021, they

7     first raised, for the first time, their damages analysis, and

8     within weeks, we raised this issue, and according to Rule 26,

9     if we raise a supplemental report to newly disclosed

10    information, we have 30 days to do so, and we were well within

11    our 30 days to do that, and so according to Rule 26, this is a

12    timely supplement.  And in addition, it is not anything other

13    than simple math and easy to see.  So that's -- I'm just

14    putting that on the record.

15         THE COURT:  No, that's fine.  And, ultimately, what

16    I'm saying to you is that it is not a remarkable leap of faith

17    for me to say, all right, calculate the numbers this way, it's

18    within this percentage of that, and that leads to some degree

19    of confidence.  If their concern is having her say those words,

20    fine.

21         MR. STEESE:  Okay.

22    Q    (By Mr. Steese) Let's turn to page two of Exhibit

23    A56.

24         Did you perform the same analysis for damages through

25    April of 2021?

JENNIFER TORRES - Direct

1   A   Yes.  The same methodology.  We were just pulling the

2   numbers forward through to April.

3   Q   And if you do the same analysis, simply through April data,

4   what level of confidence were you able to find, mathematically?

5   A   That darn near a hundred percent again.  This time we were

6   slightly over, so 102 percent match.

7   Q   And then look at page three of Exhibit A56.  Did you do the

8   same thing through June of 2021?

9   A   Yes.

10  Q   And same question, what level of confidence did your

11  mathematical comparison show?

12  A   High level of confidence.  We are 104 percent match.  So

13  looking at the three different time periods, the methodology

14  seemed to continue to validate our damages analysis.

15  Q   Turn back to Exhibit A53, please.  Scroll down a little,

16  please.  And you said the total damages you seek are 9.375

17  million, and I am rounding, correct?

18  A   Yes.

19  Q   What about going forward?

20  A   Going forward, since we have the OTT disputes going on the

21  invoices -- or I'm sorry, the OTT credits going on the

22  invoices, I would expect that we receive payment in full for

23  all charges.  I mean, if there's disputes, obviously, raise

24  disputes, give us enough information that we can do something

25  with the dispute, either correct our billing or defend our

JENNIFER TORRES - Direct

1    invoices but I would expect payment in full going forward.

2    Q   And as of at least the June 2021 payment, was AT&T still

3    withholding -- does your analysis show that AT&T is still

4    withholding on the OTT dispute?

5    A   Yes.

6    Q   Even after the Court ruled that 21 percent of OTT calls are

7    AT&T, what is AT&T doing?

8    A   We're still withholding more than that.

9    Q   And even after AT&T -- strike that.  Even after Level 3 put

10   billing credits on AT&T's invoices, what is AT&T continuing to

11   do?

12        MR. WARDEN:  I'm going to object as vague as to

13   timeframe.  It's June 2021 when -- when are those payments due?

14   Have they be received?  Have they been analyzed?

15        THE COURT:  It's Cross.  Overruled.

16    Q   (By Mr. Steese) Even as of -- even after Level 3

17   starts putting billing credits for OTT, charges on the

18   invoices, what does AT&T continuing to do?

19   A   We still have short paid invoices, withheld charges on the

20   invoices month after month.

21   Q   Now, let's look at this number at the bottom, $517,147.  Do

22   you see that?

23   A   I do.

24   Q   And where does that number come from?

25   A   So that is the number that Level 3 overwithheld to AT&T on

JENNIFER TORRES - Direct

1    OTT traffic.

2    Q   It says AT&T, but was it an AT&T affiliate?

3    A   It was for TCG.

4    Q   Now, turn to tab three, AT&T billing, to Level 3.  When did

5    AT&T start providing credits for OTT -- strike that.  When did

6    TCG start providing credits to Level 3 for OTT calling?

7    A   In the 2019 timeframe.

8    Q   And before they started providing credits, was -- was TCG

9    billing Level 3, and its affiliates, end-office charges on OTT

10   calls?

11   A   Yes.

12   Q   And was Level 3 paying those invoices?

13   A   Yes, they were.

14   Q   Is Level 3 still withholding anything from TCG for OTT

15   calling?

16   A   No.  We stopped withholding in September timeframe of last

17   year, when we realized what the credits on the invoices were

18   for.

19   Q   What was -- were you able to look at the invoices and see,

20   clearly, that it was a credit for OTT calling?

21   A   No.  There was confusion as to why there were credits on

22   the invoices, and then when they understood it was for OTT

23   charges, we -- we stopped withholding.  We saw that we were

24   getting those OTT credits, which is why we're agreeing that we

25   need to pay back the 517; we overwithheld, we owe it.

JENNIFER TORRES - Direct

1  Q   Let's transition to late payment charges.  Is there an

2  acronym that you use for these?

3  A   Yes, LPCs.

4  Q   And what is the source of late payment charges?

5  A   It's switched-access rate from our tariff.

6  Q   And if you turn to Exhibit A3, which is already in

7  evidence, page 38 of the PDF, Section 4.2.6, please.  Blow it

8  up a little larger.  Thank you.  What is this provision?

9  A   This is saying that we can bill one and a half percent for

10  amounts withheld that are -- to be paid on a monthly basis.

11  Q   And is the language of the late payment charge section of

12  the tariff permissive or mandatory?

13  A   Mandatory.

14  Q   How do you know that?

15  A   The statement that says the late payment penalty shall --

16  I'm sorry, above that.  *Late payment penalty shall be due to*

17  *the company*.

18  Q   The amounts that AT&T has not paid, withheld, short paid,

19  whatever term you want to use, what is the source of those

20  rates?

21  A   The switched tax tariff.

22  Q   Whose switch tax tariff?

23  A   Level 3, CenturyLink.  I'm not sure of the titles they are

24  all under, at this point.

25  Q   And given that AT&T overwithheld payment on tariff charges,

196

JENNIFER TORRES – Direct

1   does Section 4.2.6 of the tariff apply?

2   A    Yes.

3           MR. WARDEN:  Objection, calls for a legal conclusion.

4           THE COURT:  Sustained.

5           MR. STEESE:  Your Honor, if I can respond briefly?

6           THE COURT:  Go ahead.

7           MR. STEESE:  Ms. Torres has been in the collection

8   department of AT&T and has been working with these issues, this

9   is a document that she uses for purposes of her job, and so

10  this is not asking for a legal conclusion.  This is asking for,

11  in her -- in her capacity as an actual employee, is this

12  something that is mandatory, given that it's tariff-based

13  charges.

14          THE COURT:  From her perspective.

15          MR. STEESE:  Fair enough.

16      Q    (By Mr. Steese) From your perspective, do -- does

17  Section 4.2.6 of the tariff apply, when a carrier disputes and

18  refuses to pay tariff rate elements?

19  A    Yes.  This is a standard tax rate.

20  Q    Look back at Exhibit A53, column... I believe it's I.  No,

21  it's column J.  What is column J?

22  A    Column J is the calculated amount of LPCs for these

23  balances.

24  Q    And so if you were to click on, let's say, the first box

25  right there, the 12,176?

JENNIFER TORRES – Direct

1    *A*    Hm-hm.

2    *Q*    What -- how are you calculating these late payment charges?

3    *A*    We are taking the total charges, removing all disputes,

4    credits, removing that OTT credit, making sure that we're

5    reducing it by that amount.  So we're making sure we are taking

6    all of that into account, so that we're truly only applying

7    that 1.5 percent on a monthly basis to the withheld amounts

8    that are owed.

9    *Q*    And does the formula you use track the tariff itself?

10   *A*    Yes.  It has that 1.5 percent there in the formula.

11   *Q*    Right there.

12   *A*    Yes.

13   *Q*    As I circled it, the .015?

14   *A*    Correct.

15   *Q*    Now looking at this damages exhibit, I see that there are

16   no late payment charges identified for February of 2019.  Why

17   is that the case?

18   *A*    Well, the February invoice isn't late until March.  So, we

19   can't charge late payment charges until it's actually late.

20   *Q*    Has AT&T raised any challenges, to your knowledge, with

21   respect to the calculations identified in column J, of Exhibit

22   5 -- A53?

23   *A*    They have not raised issues with how it's calculated, just

24   raised issues that they don't believe that they owe them.

25   *Q*    What is your response to AT&T's claim that late payment

JENNIFER TORRES - Direct

1    charges do not apply here?

2    *A*   I would say that it's consistent with behavior that we've

3    seen in the past with AT&T.  We -- we constantly have withheld

4    charges, overwithheld charges, we -- they overwithheld, with no

5    reason.  They know they are overwithholding.  These late

6    payment charges are really our only recourse that we have to

7    get people to pay on time, and if these late payment charges

8    aren't due, then it's just giving an excuse for AT&T to

9    continue to overwithhold for no reason, and it's giving them

10   assurance that their behavior is okay, and it's -- it's time

11   that these are paid.

12   *Q*   Is this the first time that late payment charges have been

13   applied to the OTT dispute between Level 3 and AT&T?

14   *A*   No.

15   *Q*   Let's look at Exhibit A1, to the Settlement Agreement.  And

16   let's go down to page 11 of this exhibit.  I guess it's --

17   scroll down to the tally 20 million and change.  Do you still

18   have your phone there with your calculator?

19   *A*   I don't.

20         *MR. STEESE:*  May I bring it to her, Your Honor?

21         *THE COURT:*  You may.

22         *THE WITNESS:*  Thank you.

23         *MR. STEESE:*  You are welcome.

24       Q   (By Mr. Steese) Do you see the total amount of the

25   OTT dispute is $20,483,518.40?

JENNIFER TORRES – Direct

1    A    Yes.

2    Q    Can you multiply that by .75, please, or 75 percent.

3    A    Okay.

4    Q    And what number did you come up with?

5    A    $15,362,638.80.

6    Q    Scroll to page two, please, of Exhibit A1.  Say that number

7    again?

8    A    $15,362,638.80.

9    Q    The exact number found on page two, correct?

10   A    Yes.

11   Q    So, when you look at the tally of what has been withheld,

12   pursuant to Exhibit A, does that include late payment charges?

13   A    Yes.

14   Q    And how do you know?

15   A    It says it right here, in the -- in the paragraph, and it's

16   being a standard switched-access tariff rate I would apply it

17   to the outstanding balances.

18   Q    Were late payment charges appropriate then?

19   A    Yes.

20   Q    Were late payment charges appropriate now?

21   A    Yes.

22   Q    So, let's sum up your damages.  How much does Level 3 seek

23   in damages for improper withholdings?  I think you can look to

24   your right.

25   A    Yeah.  So it's going to be $7,197,236 versus 66.

JENNIFER TORRES - Cross

1   *Q*   How much does Level 3 seek in late payment charges through

2   June?

3   *A*   $2,177.959

4   *Q*   Will Level 3's damages continue to accrue as time goes on?

5   *A*   Yes, it will.  For any -- for any overwithheld amounts.

6   *Q*   And so, does Level 3 continue to request whatever

7   additional withholdings apply to OTT traffic going forward, and

8   late payment charges going forward?

9   *A*   Yes.

10  *Q*   As of June of 2021, what is Level 3's total request in

11  damages?

12  *A*   $9,375,195.

13  *Q*   And why are the total damages that Level 3 seeks

14  appropriate to award in this case?

15  *A*   Well, I mean AT&T, we heard, has no objection that they owe

16  us a little over $4,000,000, and it's -- it's time that we

17  recognize that they say their dispute is of 65 percent of

18  end-office elements only, but their payment patterns do not

19  reflect that dispute.  It's time that these full charges are

20  paid, that late payments charges are paid, as well, because

21  they knowingly overwithhold, and it's time that we can put this

22  OTT matter behind us, for once and for all.

23          *MR. STEESE:*  No more questions, Your Honor.

24                         **CROSS-EXAMINATION**

25

JENNIFER TORRES - Cross

1   *BY MR. WARDEN:*

2   *Q*   Mike Warden from Sidley Austin on behalf of AT&T.   Good

3   afternoon Ms. Torres.   I believe we met once in Denver when my

4   colleague was taking your deposition; is that right?

5   *A*   Yes, it is.

6   *Q*   Do you think AT&T would agree that the relationship between

7   AT&T and Level 3 is challenging?

8   *A*   Probably.

9   *Q*   Would it surprise you to learn that AT&T has turned off the

10  withholding?

11  *A*   Yes.

12  *Q*   Let's talk a little bit about the Settlement Agreement.

13  The 2015 Settlement Agreement.   So, I hope I got this right, I

14  believe you testified that you were -- have a role of

15  supporting the principal negotiators; is that correct?

16  *A*   Yes.   So I help the principal negotiators have the

17  framework that went into the settlement documents, so I wasn't

18  on the phone negotiating with AT&T.   I was helping them create

19  the documents for the negotiation.

20  *Q*   And the principal negotiators for Level 3 were Mike

21  Riederer and Shaun Anders, right?

22  *A*   Yes.

23  *Q*   And during the course of those negotiations, while you were

24  providing support, did you ever talk to Kim Meola about the

25  agreement?

JENNIFER TORRES – Cross

1   *A*   Um, I know we had emails back and forth.  I don't recall,

2   at the time, if we had direct conversations.  I know we have

3   had them in the past.

4   *Q*   So you talked to her but don't remember talking to her

5   about the 2015 Settlement Agreement?

6   *A*   I don't recall.

7   *Q*   Thank you.  Can we pull up Exhibit A1, please.  And can we

8   go to that second whereas clause on the first page.  Great.  If

9   you could blow that up.  Thanks.

10         So, Mr. Steese asked you some questions about this

11  clause.  Do you recall being asked those questions?

12  *A*   I do.

13  *Q*   And I hope I got this right too, I believe you testified

14  that this allowed AT&T -- I'm sorry.  This allowed Level 3 to

15  get everything that was disputed and not paid.  Everything was

16  your word, right?

17  *A*   This allowed us to recover everything withheld, under the

18  claim that end-office switching charges weren't due, but as

19  we've seen, the payment patterns don't align with that claim.

20  *Q*   My question was, everything?

21  *A*   Everything withheld.

22  *Q*   It's your testimony that this clause allows everything to

23  be recovered by Level 3, that was disputed and withheld?

24  *A*   Yes.

25  *Q*   And you use that same word, everything, to describe Level

JENNIFER TORRES - Cross

1   3's claim, right, that allowed Level 3 to recover everything?

2   A   I'm not sure I understand your question.  Can you -- ask it

3   a different way?

4   Q   Sure.  Mr. Steese asked you, various times, about the

5   Agreement.  He asked you about the claim of Level 3, with

6   respect to the Agreement.  You acknowledge, you said, it allows

7   you to recover -- Level 3 to recover everything.  You said that

8   same thing about the claim that this Court is adjudicating that

9   allows Level 3 to recover everything?

10  A   Okay.  Yes.

11  Q   Let's look at the language of this whereas clause.  It

12  says, *whereas, in the course of Level 3's provision of*

13  *switched-access services*, let's pause there.  You understand

14  what switched-access services are, don't you?

15  A   I do.

16  Q   And that's a common term in the telecommunications

17  industry, right?

18  A   Yes.

19  Q   And then it goes on to say, *AT&T has, 1, disputed and not*

20  *paid certain Level 3 end-office switching charges*, and then it

21  goes on to -- beyond that, *as set forth in more detail in*

22  *Exhibit A*.  Did I read that part correctly?

23  A   Yes.

24  Q   And you would agree that -- you understand what end-office

25  switching charges are, don't you?

JENNIFER TORRES – Cross

1    *A*    Yes.

2    *Q*    And you agree that's a common term and well understood in

3    the telecommunications industry, right?

4    *A*    Yes.

5    *Q*    And end-office switching charges are a subset of

6    switched-access services, right?

7    *A*    Typically from a tariff definition perspective, it would

8    be.

9    *Q*    So, for purposes of this agreement, are you saying it

10   should be read differently than people in the industry would

11   understand it?

12   *A*    Yes.  So, in this whereas clause, we were saying everything

13   that was being withheld, under the claim that end-office

14   charges weren't owed, is what we were seeking to be recovered.

15   They were disputed, they were not paid, it was claimed that

16   end-office switching charges weren't owed, but the payment

17   patterns don't follow that claim.

18   *Q*    Well, we'll get to the payment patterns.  I want to ask you

19   about this Agreement?

20   *A*    Hm-hm.

21   *Q*    The word everything doesn't appear in there, right?

22   *A*    Correct.

23   *Q*    And the term switched-access services is well understood,

24   right?

25   *A*    Correct.

JENNIFER TORRES – Cross

1   Q   And the term end-office switching charges is well

2   understood, right?

3   A   Typically, but I don't think that they are well understood

4   in this document.

5   Q   That's your opinion.  You didn't negotiate the document.

6   You are just reading it, as all of could, right?

7   A   Correct.  But I understood that when we were developing

8   this, because I was part of the framework, that we were

9   defining end-office switching charges as everything withheld,

10   under that claim, and we were defining that as the OTT dispute.

11   Q   Okay.  So everything in your reading, includes tandem

12   charges, right?

13   A   If that was what was withheld under that claim, then yes.

14   Q   Okay.  Let's look at the fourth whereas clause, please.  I

15   will just read the whole thing, *Whereas in the course of Level*

16   *3's provision, switched-access services to AT&T, AT&T has also*

17   *disputed and not paid certain charges Level 3 has assessed AT&T*

18   *for tandem facilities, as set forth in the more detail in*

19   *Exhibit A, paren, the tandem dispute, closed paren.*  Do you see

20   that?

21   A   I do see that.

22   Q   And tandem is different from end-office switching, right?

23   A   Correct.

24   Q   There's no reference to tandem in this second whereas

25   clause, right?

JENNIFER TORRES - Cross

1    *A*   There is no reference to the word tandem, but to the point

2    that it is overwithheld, under the claim of end-office

3    switching charges, then it would be included in there.

4    *Q*   Answer my question, that the word tandem doesn't appear in

5    there; isn't that right?  It doesn't appear in there?

6    *A*   The word tandem does not.

7    *Q*   As a matter of fact, there's no reference to tandem in that

8    definition, in the whereas clause, defining the OTT dispute,

9    correct?

10   *A*   There's no word tandem.

11   *Q*   And --

12         *THE WITNESS:*  Am I allowed to ask a quick question?

13         *THE COURT:*  No.

14         *THE WITNESS:*  No.

15         *THE COURT:*  No.

16         *THE WITNESS:*  Okay.

17         *Q*   (By Mr. Warden) Let me -- if we can go to page three

18   of the document.

19         If we go to, I guess I will call it romanette, too,

20   (iv), and this is the paragraph Level 3's counsel, Mr. Steese,

21   reviewed this with you, that has to do with the 50 percent

22   payment after the final appellate order; is that right?

23   *A*   The -- the 50 percent was due up till the order, and then

24   hundred percent after.

25   *Q*   Okay.  And what -- right after final appellate order, in

207

JENNIFER TORRES - Cross

 1   that parenthetical, it says, *Level 3 will refund within 30*

 2   *days, 50 percent of the disputed OTT charges, beginning with*

 3   *June 2015 traffic, through the date on which such final*

 4   *appellate order becomes final,* and then it goes on from there.

 5   Did I read that correctly?

 6   *A*   Yes.

 7   *Q*   And there's a phrase in this Agreement, and in this

 8   paragraph, disputed OTT charges, correct?

 9   *A*   Yes.

10   *Q*   And when Level 3 calculated the damages and assessed that

11   credit at 50 percent credit?

12   *A*   Hm-hm.

13   *Q*   It assessed that only on end-office switching, right?

14   *A*   Yes.

15   *Q*   And so, for purposes of this Agreement, disputed OTT

16   charges are only end-office switching, right?

17   *A*   Disputed OTT charges, in this paragraph, yes, that's a

18   different definition than the OTT dispute in the second whereas

19   clause.

20   *Q*   It means different things in different places?

21   *A*   Yeah.  There is OTT dispute, as defined in the clause, and

22   this is disputed OTT charges.

23   *Q*   But OTT dispute here doesn't mean everything, right?

24   *A*   Are you talking about the second whereas clause?

25   *Q*   The same way -- no.  In the (iv)?

JENNIFER TORRES - Cross

1   *A*   Okay.  (IV) this is saying that -- OTT should be end-office

2   elements only, I don't disagree, that if we were truly only

3   talking about withholding -- you guys withholding -- AT&T

4   withholding only 65 percent of end-office charges, we wouldn't

5   be here, that's not what we're talking about.

6        We're talking about the fact that more than 65 percent

7   of just end-office charges were withheld under the claim

8   end-office switching disputes, that OTT dispute.

9        *MR. WARDEN:*  Move to strike, Your Honor.  My

10  question -- move to strike.

11       *THE COURT:*  Overruled.  Again, there's no jury.  I

12  have heard it.  I don't want to get too particular about this.

13       *Q*   (By Mr. Warden) Just to be clear, you don't interpret

14  OTT disputed -- disputed OTT charges for purposes of paragraph

15  (iv), to be everything disputed, right?

16  *A*   Correct.

17  *Q*   There's been some testimony, both from your colleague,

18  Ms. Kellow, and also from you, I believe, about this Exhibit A.

19  Do you know what I'm referring to?  I believe it's on page 11?

20  *A*   Yes.

21  *Q*   Thank you.  So, is it your testimony that in order to

22  understand the meaning of OTT dispute, for purposes of this

23  Agreement, one needs to know what's in the accounts receivable

24  in Exhibit A?

25  *A*   Yes.

JENNIFER TORRES - Cross

1    Q   So, no reader, no human being, His Honor, me, unless we

2    knew what was in there, we wouldn't know how to interpret the

3    phrase OTT dispute?

4        MR. STEESE:  Objection, calls for speculation, asking

5    for everyone else's state of mind.

6        THE COURT:  Overruled.

7        THE WITNESS:  The title of this was chart is

8    Outstanding AR, through a certain date.  The title of the chart

9    does not say 65 percent of end-office charges through a certain

10   date.  So this implies that this is all outstanding charges

11   through this point in time.

12       Q   (By Mr. Warden) And not quite my question.  So, my

13   question is, no reader of the Agreement would know how to

14   interpret the phrase OTT dispute unless he or she knew the

15   contents of the accounts receivable on Exhibit A; is that your

16   testimony, yes or no?

17   A   No.

18   Q   So the contents of Exhibit A don't inform the meaning of

19   OTT dispute?

20   A   I think I'm getting confused by your question, but if we

21   use the second whereas clause, the second whereas clause says

22   everything disputed and not paid, in this exhibit, so this

23   exhibit is everything disputed and not paid.

24   Q   Do we need to look at the second whereas clause for the

25   everything word, again?  My question is, in order -- in order

JENNIFER TORRES – Cross

1   to adopt your view of OTT dispute, one needs to understand the

2   contents of the accounts receivable in Exhibit A?

3   A   Perhaps.  I mean, Exhibit A says it's disputed and not

4   paid, and we're giving you a list of what's not paid and

5   disputed.

6         THE COURT:  Hold on one minute.  All right.  Here is

7   where we are.  I'm no longer getting a transcript, and I don't

8   like that.  So I know it's a little early.  I don't like

9   watching you try and solve an IT issue, you don't like watching

10  me try and solve an IT issue, especially when I have already

11  demonstrated that my way of solving it is to call for help.  So

12  I think what we'll do is just break for the evening, let us get

13  this straightened out and then we will pick it up at, let's

14  say -- let me make it up by saying quarter to nine tomorrow

15  morning.  We will save that 15 minutes that way.

16         MR. WARDEN:  Thank you, Your Honor.

17         THE COURT:  And the same rule applies, as to counsel

18  consult withing the witness while she is on the --

19         MR. STEESE:  Yes,  absolutely.

20         THE COURT:  Recess.

21         THE COURTROOM DEPUTY:  All rise.  Court is in recess.

22     (Recess at 4:40 p.m.)

23  OPENING STATEMENTS

24     By Mr. Steese                                        6

25     By Ms. Zambrano                                     23

JENNIFER TORRES - Cross

```
 1      MELISSA KELLOW

 2              Direct Examination By Mr. Steese              60

 3              Cross-examination By Ms. Zambrano            105

 4              Redirect Examination By Mr. Steese           138

 5              Recross-examination By Ms. Zambrano          144

 6      JENNIFER TORRES

 7              Direct Examination By Mr. Steese             148

 8              Cross-examination By Mr. Warden              201
```

| EXHIBIT | OFFERED | RECEIVED | REFUSED | RESERVED |
|---|---|---|---|---|
| A20 | | 63 | | |
| 84 | | 69 | | |
| 79 | | 70 | | |
| A22 | | 73 | | |
| A24 | | 76 | | |
| A25 | | 77 | | |
| A52 | | 77 | | |
| A53 | | 79 | | |
| A54 | | 150 | | |
| A55 | | 89 | | |
| A8 | | 92 | | |
| A18 | | 97 | | |
| A7 | | 180 | | |
| A9 | | 185 | | |
| A56 | | 188 | | |

REPORTER'S CERTIFICATE

JENNIFER TORRES – Cross

1

2        I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.
3

4        Dated at Denver, Colorado, this 10th day of September,

5  2021.

6                              s/Tammy Hoffschildt

7                              _____

8                              Tammy Hoffschildt, FCRR,RMR,CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25