1        IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-112-RM
3
AT&T Corporation,
4
      Plaintiff,
5
vs.
6
Level 3 Communications, LLC,
7
      Defendants.
8
_____
9
                  REPORTER'S TRANSCRIPT
10                 TRIAL TO THE COURT

11
_____
12        Proceedings before the HONORABLE RAYMOND MOORE,
   Judge, United States District Court for the District of
13 Colorado, commencing at 8:45 a.m., on the 15th day of July,
   2021, in Courtroom A601, United States Courthouse, Denver,
14 Colorado.

15                      APPEARANCES

16

17 Rebecca B. DeCook, Moye White LLP, 1400 16th Street, 6th Floor,
   Suite 600, Denver, CO 80202-1486, Angela C. Zambrano and
18 Michael D. WardenSidley Austin LLP-Dallas, 2021 McKinney
   Avenue, Suite 2000, Dallas, TX 75201, appearing for AT&T
19 Corporation.

20

21 Charles Walter Steese and Douglas Nelson Marsh, Armstrong
   Teasdale LLP-Denver, 4643 South Ulster Street, Suite 800,
22 Denver, CO 80237, appearing for Level 3 Communications, LLC,

23
           TAMMY HOFFSCHILDT, FCRR, CRR, RMR Official Reporter
24             901 19th Street, Denver, Colorado 80294
           Proceedings Reported by Mechanical Stenography
25            Transcription Produced via Computer

Jennifer Torres – Cross

 1           P R O C E E D I N G S

 2       (In open court at 8:45 a.m.)

 3            THE COURT:  Please be seated.  All right.  Let's see

 4   where we are now.

 5            Mr. Warden, you are ready to continue.  Let me remind

 6   Ms. Torres that you are still subject to the oath that you took

 7   yesterday.  With that, please.

 8            MR. WARDEN:  Thank you Your Honor.

 9                         **CROSS–EXAMINATION**

10   BY MR. WARDEN:

11   Q   Good morning Ms. Torres.

12   A   Good morning.

13   Q   I want to follow up on one of the things that you said

14   yesterday.

15            Do you recall testifying that we want to be paid back

16   everything that has been withheld under the claim?

17   A   I do.

18   Q   But you understand that that's not Level 3's claim, right?

19   Not to be paid back everything?

20   A   Our claim was to be paid back everything that is not having

21   a valid dispute against it, currently -- or a dispute against

22   it currently for other reasons.  Everything outside of that, we

23   would like to be paid back.

24   Q   Can we pull up Level 3's amended counterclaims, **ECF Number**

25   **124**, please, and can we go to page 14, please.  And can you go

Jennifer Torres - Cross

1   to the Breach of Contract section?

2          Do you understand, Ms. Torres, that principally this

3   claim, this Count 1, Breach of Contract, that brings us to

4   court today?

5   A   Yes.  Yes.

6   Q   And do you see, in paragraph 64, where it says AT&T is and

7   remains obligated to pay Level 3 end-office switching access

8   charges at tariffed rates for all calls, including over-the-top

9   calls; do you see that?

10  A   I do.

11  Q   And that refers to end-office switching rates, correct?

12  A   Those are the words used in that paragraph.  Yes.

13         MR. WARDEN:  Your Honor, if I may, I would like to

14  move the flip chart over here, so if I use it, I'm not kind of

15  hovering over the witness.  I will do whatever --

16         THE COURT:  I think it's fine where it is, to be

17  honest with you.

18         MR. WARDEN:  Okay.

19      Q   (By Mr. Warden) That number --

20         THE COURT:  You can get a little closer -- ma'am, are

21  you intimidated by him?

22         THE WITNESS:  No, I'm fine.  You can use the board.

23         THE COURT:  Why don't you step up here.

24         MR. WARDEN:  Thank you.  Thank you, both.

25      Q   (By Mr. Warden) Ms. Torres, this 57.464 figure is

Jennifer Torres - Cross

 1   everything, right?

 2   A    It is everything that we billed.

 3   Q    And that's where your damages start with everything?

 4   A    They do.

 5   Q    They don't start with end-office switching, right?

 6   A    Correct.  Our goal of the damages was to determine an

 7   amount that was withheld under the end-office switching

 8   dispute.

 9   Q    That may be your goal, but let's look at your company's

10   claim, again.  Can we look at paragraph 68, and that says, in

11   part, that -- I think there's a typo.  It says AT&T withholds

12   payment on 65 percent of the end-office switching charges, even

13   to this day, right?

14   A    Correct.

15   Q    And then, 69.  Sixty-nine, let me read it, *AT&T's failure*

16   *to pay these end-office switching charges* -- I'm sorry, let me

17   do that again, *AT&T's failure to pay these end-office switching*

18   *access charges directly and proximately caused and continues to*

19   *cause Level 3 to suffer damage and loss*.  Did I read that

20   correctly?

21   A    You did.

22   Q    That refers to end-office switching access charges, right?

23   A    Yes.

24   Q    And then paragraph 70 reads in part, *Level 3 is entitled to*

25   *damages, in an amount to be determined at trial, for payment in*

Jennifer Torres - Cross

1   *full of all end-office --*

2   A   That finishes, *As well as traditional traffic on which AT&T*

3   *is withholding payment.*

4   Q   Right.  That's in a parenthetical; that's fair.

5   A   Okay, yes.

6   Q   But it says *Damages in an amount to be determined at trial*

7   *for payment of end-office switching charges*, right?

8   A   Yes.  And the amount determined for payment is in our

9   Exhibit A53.

10  Q   The everything?

11  A   Yes.  Well the -- the 7.19 remaining, is what we are

12  looking for; not the everything.

13  Q   But you start with the everything?

14  A   We do.

15  Q   Can we go to Exhibit 34.  So Exhibit 34 are Level 3's

16  objections and responses to interrogatories.  Do you see that?

17  A   I do.

18  Q   And can we go to the very last page.  And this is signed by

19  Edwin Stocker, on behalf of Level 3.

20  A   Yes.

21  Q   He is a former colleague of yours, at Level 3, right?

22  A   Correct.

23  Q   And can we go to page 10 of 13.  Ten of 13, please, sorry.

24  Do you see that interrogatory number seven asks, *Identify and*

25  *explain the basis of Level 3's damages*, and then there's some

Jennifer Torres – Cross

1    lawyering, including some objections, and a sentence that then

2    reads, *Level 3 further states that its damages consists of the*

3    *end-office switching access charges AT&T has wrongful withheld,*

4    *and for which AT&T improperly claims a right to refund.*   Did I

5    read that correctly?

6    *A*    You did.

7    *Q*    And that refers to end-office switching access charges,

8    just like the counterclaim, right?

9    *A*    It does, in alignment with the Settlement Agreement

10   language.

11   *Q*    Where is that in alignment with the Settlement Agreement

12   language?

13   *A*    The end-office switching charges.

14   *Q*    That in line with the Settlement Agreement, doesn't appear

15   in the interrogatory answers, does it?

16   *A*    No.

17   *Q*    Okay.  Okay.

18        *MR. WARDEN:*  I would offer 34, Your Honor.

19        *MR. STEESE:*  No objection, Your Honor.

20        *THE COURT:*  Received.

21     *Q*    (By Mr. Warden) Can we go to 25, please, Exhibit 25.

22   And, Ms. Torres, this is -- Exhibit 25, it is defendant's, so

23   it's Level 3's initial disclosures, under a certain set of

24   rules, and if I can just go to page four of six, please.  And

25   can you go to section that says Computation of Damages.  And do

219

Jennifer Torres - Cross

1   you see under Computation of Damages, it reads, *Level 3 seeks*

2   *payment of end-office switching access charges on all minutes*

3   *of OTT-VoIP traffic, delivered to Level 3 by AT&T since the*

4   *execution of the parties' Settlement Agreement.*  Did I read

5   that correctly?

6          *MR. STEESE:*  Your Honor, I think in this context it's

7   critical to read the entire section, because it -- it excludes

8   other information, which is subsequently included in the

9   damages disclosures, which we believe is encapsulated in this

10  paragraph.

11         *THE COURT:*  Well, you can get to that on Cross.  I

12  mean, ultimately, I understand your position.  He can point out

13  what parts of it he wants me to focus on, you can point out

14  what parts you want me to focus on.  Go ahead.  And I have

15  forgotten the question.

16         Q    (By Mr. Warden) Did I read that correctly?

17  *A*    Yes.

18  *Q*    And that first sentence says -- refers to end-office

19  switching access charges, right?

20  *A*    Yes.

21  *Q*    And it doesn't say anything there about recovering

22  everything, does it?

23  *A*    Let me read the full paragraph real quick.  I'm sorry, can

24  you ask the question again?

25  *Q*    That doesn't say anything about recovering everything, does

Jennifer Torres - Cross

1   it?

2   A   It does not say the words everything, but it does discuss

3   that the further discovery is necessary to identify and

4   calculate the damages.

5   Q   Can we go to the last page, to get the date of this.  I

6   believe it's April 30th of 2018.  This is dated April 30th of

7   2018, right?

8   A   Yes.

9          MR. WARDEN:  I would offer 25.

10         MR. STEESE:  No objection, Your Honor.

11         THE COURT:  Received.

12      Q    (By Mr. Warden) Can we go to 35, please.  And can you

13   scroll down a little bit so we can see what this is.  Do you

14   see that this is a Defendant's Supplemental Rule 30 -- I'm

15   sorry -- Rule 26(a)(1) Initial Disclosure?

16   A   Yes.

17   Q   And this is, if you go to the last page, it's dated January

18   3rd of 2020?

19   A   Yes.

20   Q   And that was -- do you know whether that was right around

21   the time that fact discovery had closed?

22   A   I don't recall the timeline of that.

23   Q   Do you remember you were deposed twice in this case?

24   A   Yes.

25   Q   Once in August?

Jennifer Torres - Cross

1    A    Okay.

2    Q    Of 2019, does that sound about right?

3    A    Yes.

4    Q    And then a second time around the holidays, December 19th

5    of 2019?

6    A    Yes.

7    Q    And you don't know whether -- whether fact discovery was

8    closing on or around January 3rd of 2020?

9    A    I guess.  I'm just -- I don't know the legal definitions of

10   those things.

11   Q    That's fine.  That's fine.  Can we go to page five of

12   seven, please.

13            So, in this January 3rd, 2020, document, disclosure,

14   it has the same first sentence, *Level 3 seeks payment of*

15   *end-office switching access charges, on all minutes of OTT-VoIP*

16   *traffic delivered to Level 3 by AT&T since the execution of the*

17   *parties' Settlement Agreement.*  Did I read that correctly?

18   A    Yes.

19   Q    That's the same sentence as we read -- that I read before?

20   A    Yes, with the statement of further discovery.

21   Q    And that sentence refers to end-office switching access

22   charge, and does not refer to everything?

23   A    Well, it does mention that we need to do further discovery

24   to identify the damages.

25   Q    Okay.  Let me move to another topic.  Can you take that

Jennifer Torres - Cross

1   tab -- let me offer 35?

2         THE COURT:  It's stipulated.  It was admitted

3   yesterday.

4         MR. WARDEN:  Okay.  Thanks.

5      Q   (By Mr. Warden) Let me move to another topic about

6   your everything damages study.  Until this week, till Monday of

7   this week, Level 3 and you have taken the position that other

8   than the OTT dispute, the only other dispute was the DEOT

9   dispute, correct?

10  A   Correct.

11  Q   And do you know whether Level 3 filed finding -- proposed

12  findings of fact, on June 25th of this year, that said because

13  the DEOT dispute and the OTT dispute were the only usage-based

14  disputes, AT&T had raised with Level 3, this balance, the

15  amount that you testified to was the amounts AT&T withheld

16  associated with the OTT dispute?  Do you recall that or are you

17  aware of that?

18  A   Yes.

19  Q   And that -- that was incorrect?

20  A   Yes.  It was an error that we fixed this week.

21  Q   And Level 3 filed a trial brief, just last week, just a

22  week ago, with a statement to the same effect; is that right?

23  A   I believe so.  I don't know the dates of the filings.

24  Q   I will represent to you that it's **ECF 269,** filed July 7th,

25  but it contained a similar statement that DEOT and OTT were the

Jennifer Torres - Cross

1    only dispute?

2    A    Okay.

3    Q    And you have filed a Declaration, at one point, with the

4    Court, that said the same thing, that DEOT and OTT were the

5    only disputes?

6         MR. STEESE:  I'm going to object that this is improper

7    impeachment.  The witness has said she found this out, it was

8    corrected, there's nothing to impeach.

9         THE COURT:  Overruled.

10        THE WITNESS:  I don't remember the exact language of

11   the -- the document you just referenced.  But I do know that we

12   believed those were the usage disputes, prior to last week,

13   when AT&T raised our attention we missed one, and as soon as we

14   realized we missed one we added it in.

15   Q    (By Mr. Warden) Can we go to, it's the -- well, do

16   you recall saying, in your Declaration, that was filed on May

17   18th, of this year that *because the only usage-based disputes*

18   *AT&T raised with Level 3, were the DEOT dispute, and the OTT*

19   *dispute, and because I factored in the impact of the DEOT*

20   *dispute, I understand that all of these $8,114,076 in*

21   *withholding are attributable to the OTT dispute.*  Do you

22   remember writing that in your Declaration?

23   A    Yes.

24   Q    And that was incorrect?

25   A    Yes.

Jennifer Torres – Cross

1   Q   And you have done a number of damage studies, some of which

2   you went through with Mr. Steese, yesterday, right?

3   A   Correct.

4   Q   I think it was Exhibit A24, is that in evidence?  A-24.

5   Can we pull up A24?  A24, in evidence.  Do you remember

6   reviewing this with Mr. Steese, yesterday?

7   A   I do.

8   Q   And this, I believe, was revised March 2nd, 2021.  Does

9   that sound about right?

10  A   The timeframe would make sense.

11  Q   And then, you did another one, A25.  Can we pull that up?

12  Well, let me ask you -- before we do that, the -- the only

13  dispute referenced in A24 was a DEOT dispute, right?

14  A   And the OTT dispute.

15  Q   And the OTT dispute, fair enough.

16  A   I believe so, if you look at two.

17  Q   The two disputes were OTT and DEOT?

18  A   Correct.

19  Q   And can we go to A25, please.  So I think this was revised

20  around May 17th of this year.  Does that sound about right?

21  A   Yes.

22  Q   And this, likewise, refers to two disputes, OTT and DEOT,

23  correct?

24  A   Correct.  Because we fixed it this week.  This is prior to

25  this week.

Jennifer Torres - Cross

1   Q   And then, A52, did you revise around June 16th, about a

2   month ago, does that sound right?

3   A   Yes.

4   Q   DEOT, OTT only, right?

5   A   Correct.

6   Q   And then, I think you also looked at A53, with Mr. Steese,

7   yesterday.  Can we go to A53?  So, are you aware that there are

8   actually two versions of A53, one from July 7th.  Do you

9   remember this being revised?

10   A   Yes.

11   Q   The July 7th one, again, that's DEOT, OTT only, right?

12   A   Correct.

13   Q   And then for the one we got on Monday night, 53, that has

14   another dispute in it, right?

15   A   Correct.

16   Q   And that is an affiliated tandem dispute, as you

17   characterized it, correct?

18   A   Correct.  As Ms. Kellow said yesterday, we were made aware

19   that that was missing on Friday, by AT&T, and we corrected it

20   by Monday.

21   Q   I'm glad you mentioned what she said, because you were here

22   for her testimony, right?

23   A   I was.

24   Q   And do you recall that she was asked what happened, to lead

25   you to create a new damages spreadsheet, in July of 2021?

Jennifer Torres – Cross

1    *A*    Yes.

2    *Q*    And she said in effect AT&T brought to our attention that

3    we had not taken into account the tandem dispute.  Do you

4    recall, in general, that testimony?

5    *A*    I do.

6    *Q*    And do you recall Mr. Steese said, when did AT&T provide us

7    with that information and your colleague said Friday, July 9th,

8    right?

9    *A*    Correct.

10   *Q*    That's not quite right, is it?

11   *A*    Well, we got the dispute letter prior to Friday, yes.  We

12   were just made aware, Friday, that our damages wasn't including

13   it, and so we wanted to make sure that we corrected it.

14   *Q*    So, as a matter of fact, Level 3 is notified of this

15   January 4th, 2021, not July 9th 2021, correct?

16   *A*    That these were filed, previously, yes.

17   *Q*    Can we pull up Exhibit 84, please?  And can we just go to

18   the second page.  Do you know Diane Wood?

19   *A*    I don't know her personally.

20   *Q*    But you know she works for Level 3, right?

21   *A*    Yes.

22   *Q*    And do you see that this is an email from AT&T to Diane

23   Wood, January 4th, 2021?

24   *A*    I do.

25   *Q*    And it refers to December bills, which include back billing

Jennifer Torres – Cross

1    charges.  Do you see that?

2    A    Yes.

3    Q    And then, on the bottom of page one, do you see that

4    there's a response from Ms. Wood?  The bottom, please.  There

5    we go.  Do you see the response?

6    A    I do.

7    Q    And then if you go to the top, there's February 8th, email

8    from Alison Miller to Diane Wood, about the back billing, and

9    at the end of the large paragraph it reads, *Therefore, I ask*

10   *that you provide a credit of $251,727.25 associated with the*

11   *billing for these CLLI*, all caps, *codes, on the December*

12   *invoice, and not issue any additional billing for this traffic.*

13   Do you see that?

14   A    I do.

15   Q    And your damage study that you provided on Monday includes

16   that $251,000 figure, right?

17   A    Correct.

18   Q    It includes credits for subsequent months, right?

19   A    Correct.

20   Q    And so, Level 3 continued to issue billing, notwithstanding

21   this dispute letter?

22   A    I don't know that it's been resolved or that we agreed that

23   a credit was due.

24   Q    I assume you took some effort to identify all potential

25   disputes before you, and Level 3 represented that the only two

228

Jennifer Torres - Cross

1  disputes were OTT and DEOT?

2  A   Yes.

3  Q   You missed one, right?

4  A   I did miss one.

5  Q   How many others?

6  A   None that I know of.

7  Q   And you didn't know about this until AT&T marked it as an

8  exhibit for use at this trial?

9  A   Yes.

10  Q   So, let's look at some of the components of your damage

11  claim.

12         MR. WARDEN:  If I may, Your Honor?

13         THE COURT:  Yes.

14  Q   We've established that this 57 I will call it the

15  point-five-million-dollar number is everything, right?

16  A   Yes.

17  Q   And how much is the -- of that 57.5, how much is late

18  payment charges

19  A   I believe the number was a $2.17 million number.

20  Q   I'm sorry.

21         MR. STEESE:  I'm going to object on vagueness grounds.

22  How much was in the everything, that's the late payment charges

23  or how much is the damage calculation that is a late payment

24  charge, that's two different questions and it creates

25  vagueness.

Jennifer Torres - Cross

1           THE COURT:  Overruled.

2       Q    (By Mr. Warden) I'm sorry.  What did you say about

3   2.--

4   A   Well, so the appropriate calculated LPCs, put in the damage

5   claim is a different number than what we billed, because we

6   showed that we reduced late payment charges that were wrong by

7   4.6 million.

8   Q   Oh, that's right.  You overbilled -- Level 3 overbilled

9   AT&T by $4.6 million, in late payment charges?

10  A   Correct.  Which is why we removed it from what we're asking

11  for.

12  Q   And -- and that overbilling was the result of a breach, by

13  Level 3, of the 2019 Settlement Agreement, right?

14  A   I believe it was -- I believe it was the 2019 Settlement

15  Agreement.

16  Q   And the whole EO/CPN/LRN dispute, that was a result of a

17  breach by Level 3 of a different provision of the 2015

18  Settlement Agreement, right?

19  A   We had billed incorrectly.

20  Q   Yeah.  Breached the agreement?

21  A   Again --

22          THE COURT:  Let's go back to our home base there.

23      Q    (By Mr. Warden) Breached the agreement, violated the

24  agreement?

25  A   Yes.

Jennifer Torres - Cross

1   Q   And so when you were talking yesterday, about how Level 3

2   should get these late payment charges, and other things, you

3   weren't suggesting that Level 3 somehow had the moral high

4   ground over AT&T, were you?

5   A   I was just saying that for the appropriate withheld

6   balances, late payment charges as per tariff are valid.

7          MR. WARDEN:   May I approach, Your Honor, and use the

8   easel?

9          THE COURT:   All right.

10      Q    (By Mr. Warden) So late payment charges, in total,

11   should be deducted from that?

12   A   I believe it was 4.6 million.  There's actually two columns

13   that have a reduction in late payment charges.  So let's make

14   sure we're --

15   Q   Do you want to look --

16          THE WITNESS:   If we can look at -- yeah.

17      Q    (By Mr. Warden) It's 53 -- A53.

18   A   Yeah.  So it's -- would be 1.17 or 1.18 plus the 4.6, were

19   the two late payment balances, that we removed from the total

20   amendment of damages.

21   Q   And what's that total, do you need your phone?

22   A   It would be 5.8.

23   Q   So I will try this again, 57.5 is everything, right?

24   A   Correct.

25   Q   And 5.8 is late payment charges, LPCs.  I have to do math

Jennifer Torres - Cross                                          231

1    on the fly, that's seven... 51.7.

2            And how much of that 51.7 is for switched-access

3    charges?

4    A   If you the removed --

5    Q   Let me withdraw the question.  The 51.7 is all

6    switched-access charges, right?

7    A   Correct.

8    Q   How much of that 51.7 is for end-office switching?

9    A   I believe the number we discussed yesterday was 8.4.

10           MR. STEESE:  And, Your Honor, I'm having a hard time

11   hearing counsel.

12           THE COURT:  Yeah.  Here's what we can do.  Let's go

13   back to the podium.  You want her to write something, she can

14   write it.

15           MR. WARDEN:  Thank you, Your Honor.

16      Q    (By Mr. Warden) So the 8.4 is end-office switching

17   charges?

18   A   They are the end-office elements, per the tariff

19   definition.

20   Q   We call that end-office switching?

21   A   Yes.  The charge to end-office switching.

22   Q   And so it looks to me like it's 43.3 million.  Can you

23   write that down, please?

24   A   Sure.

25   Q   If I did that math correctly.  And 43.3 million is for

232

Jennifer Torres - Cross

1  other-access services, right?

2  A    Yes.

3  Q    Yeah, I think -- ?

4         THE COURT:  Cathy, would you get a microphone?

5         THE COURTROOM DEPUTY:  Yes.

6    Q    (By Mr. Warden) And so that 43.3 million includes,

7  for example, tandem switching, right?

8  A    Correct.  It would be all other switched access services.

9  Q    Level 3 offers at least two different kinds of tandem

10 switching, right?

11 A    How do you mean?

12 Q    Well, let me -- let me ask it -- try it another way.  Have

13 you ever heard of a product called tandem connect?

14 A    Yes.

15 Q    And tandem connect is sometimes known as a competitive or

16 third-party tandem; is that right?

17 A    I have heard of the third party.

18 Q    You have heard of the third party?

19 A    Yes.

20 Q    Okay.  And so, when you saw the diagram that my partner

21 used, during her opening yesterday, you saw kind of a

22 traditional call flow, where the call went through -- from the

23 end-office switch to the tandem switch, and then on to AT&T,

24 right?

25 A    Correct.

Jennifer Torres - Cross

1   Q   And this third-party tandem, or tandem connect, is a

2   different kind of tandem service, in that the calls don't go

3   through Level 3's end-office switch, but go directly to Level

4   3's tandem, right?

5   A   Correct.

6   Q   And from big customers, like Comcast?

7   A   Yes.

8   Q   Millions of minutes?

9   A   I would assume the number is high, but I don't know the

10  particular number.

11          MR. STEESE:  Your Honor, can we have the witness sit

12  down now, if we are done with the chart?

13          THE COURT:  Are we done with the chart?

14          MR. WARDEN:  For now.  For now, Your Honor.  Thank

15  you.

16          THE COURT:  Just do me a favor, hand the microphone

17  back to Ms. Pearson.  Thank you.

18      Q    (By Mr. Warden) And so -- let me wait until you get

19  settled.  And the kind of traditional calls, through the tandem

20  and the third-party tandem calls, the fees for those are

21  included within that 43.3, right?

22  A   Yes.

23  Q   And there -- there is also transport in the 43.3?

24  A   Correct.

25  Q   And just in general, what is transport?

Jennifer Torres - Cross

1   A   It's part of the tandem switching or the tandem elements.

2   Q   And those elements, in that A20 document that Mr. Steese

3   used yesterday, TMOU, TMOUD, those are third-party tandem

4   elements, right?

5   A   I would have to refer to Melissa on the exact definition of

6   what's within the rates.  I believe that's what she said.

7   Q   I don't think she knew either, but in any event that's

8   fine.

9        MR. STEESE:  I'm going to ask to move to -- strike to

10   move that commentary.

11       THE COURT:  That's fine.  Strike.  It's not considered

12   evidence anyway.

13       MR. STEESE:  We've just had several comments over the

14   course of two days, that are, in my view, unprofessional and

15   unnecessary.

16       THE COURT:  Let's not go there.  Go ahead with your

17   examination, counsel, please.

18    Q   (By Mr. Warden) There's also toll free database query

19   charges in there?

20   A   Correct.

21   Q   And when we looked at the counterclaim, you didn't see

22   anything about tandem or transport or database queries, did

23   you?

24   A   Those words were not used.

25   Q   There's another way to look at damages, in this case,

235

Jennifer Torres - Cross

1  right?

2  A   I'm sure there would be multiple ways.

3  Q   And one of the things that you did, in that little kind of

4  correlation study, is you relied on AT&T, Exhibit 76, right?

5  A   I don't recall which exhibit that is.

6  Q   Can we go to A56, please.  The OTT dispute amount in the

7  right-hand box, there's a reference to Exhibit 76, column N

8  rows 5 through 29.  Do you see that?

9  A   I do.

10 Q   And does that refresh your recollection that you relied on

11 AT&T, Exhibit 76?

12 A   It does.

13 Q   Can we pull up Exhibit 76, please.  You have seen Exhibit

14 76 before, right?

15 A   Yes, I have.

16 Q   And you have seen this in the native, Excel file, correct?

17 A   Yes.

18 Q   Did you check the math?

19 A   Yes.  Yes.  Sorry.

20 Q   Find any mathematical errors.

21 A   No.

22 Q   Can we blow up the box in the middle, and also capture

23 those lines on the right, please.  And so you checked that this

24 document, which goes February 19 of 2019 through May of 2021,

25 that the amounts billed totaled 8.5 -- I'm sorry -- 8.253, that

236

Jennifer Torres - Cross

1    that was correct?

2    A    Those were the end-office elements billed during that time.

3    Yes.

4    Q    And now it's up to about 8.4, correct?

5    A    Correct.

6    Q    And this Level 3 end-office overcharge, at 1.244, that's a

7    number from -- same numbers in your damage study, right?

8    A    I believe so.

9    Q    And then, you understand that the next column is just the

10   difference between the two.  So, the 8.2, minus the overcharge

11   of 21 percent, the 1.2, a little more than $7 million?

12   A    Yes.

13   Q    So, if you look at it that way, starting with the

14   end-office charges, rather than everything, the amount that

15   Level 3 properly billed, at 21 percent, is the difference

16   between those two, were 7-million dollars, right?

17   A    For end-office elements, yes.

18   Q    And then AT&T paid about $2.9 million, right?

19   A    Yes.

20   Q    That's 35 percent?

21   A    That -- yes.  That's what the equation shows in the

22   spreadsheet.

23   Q    So, that's withholding 65 percent, paying 35 percent,

24   right?

25   A    On the end-office elements, yes.

Jennifer Torres - Cross

1   *Q*   And that leaves an additional end-office payment as of May,

2   of this year, of $4.1 million, right?

3   *A*   Yes.  If -- if that's truly what was only withheld -- well,

4   this is truly just the end-office charges, and I have no

5   disputes that AT&T is withholding 65 percent of end-office

6   charges.  It's just that they are withholding more than that on

7   other charges, as well.

8   *Q*   And have you ever heard of a factor, as applied to rates?

9   *A*   Yes.

10  *Q*   And can you tell us what a factor is?

11  *A*   Well, if I'm thinking of it the same way you are, we have

12  got different factors that will sway how we bill particular

13  minutes.  So there will be like a PLU factor, a PIU factor, a

14  PVU factor.  It puts minutes in buckets according to

15  regulation.

16  *Q*   It can be a percentage, right?

17  *A*   Yes.

18  *Q*   You testified, yesterday, about some emails that Mr. Steese

19  showed you.  Do you recall those, about the -- the mechanized

20  billing and bill validation system?

21  *A*   Yes.

22  *Q*   You don't have any experience with that system, do you?

23  *A*   Only what AT&T tells us in email.

24  *Q*   So, all you are doing is interpreting the emails, correct?

25  *A*   Correct.

Jennifer Torres - Cross

1   Q    And you don't know whether AT&T applied a percentage or

2   factor within that mechanized billing system, to pay 35 percent

3   of end-office charges as reflected in this chart?

4   A    I do not -- I do not know their process.

5   Q    You don't know their process?

6   A    Correct.

7   Q    Do you know if AT&T has something called an access data

8   warehouse or ADW?

9   A    I have seen it on their Exhibits.

10  Q    In the last few weeks?

11  A    Correct.

12  Q    And do you know whether that data warehouse or ADW,

13  contains all of the information that you said you would offer

14  AT&T about the billing details?

15  A    I don't know the system.

16  Q    So you don't know if AT&T declined your offer because it

17  already had that information?

18  A    I don't know.

19  Q    And you don't know whether AT&T applies a 35 percent factor

20  through it's mechanized billing system, to withhold 65 percent

21  of end-office switching?

22  A    All I know is what they told me in email, which was that

23  their system can't do that.

24  Q    I will get to that.  Wait a minute, did the email say, we

25  can't apply a 35 percent factor?

Jennifer Torres - Cross

1   A   No.   It said it cannot differentiate between end office and

2   tandem.

3   Q   Let me see if I can ask the question again; and that is,

4   you don't know whether AT&T applied a 35 percent payment

5   factor, 65 percent withholding, through its mechanized billing

6   system, do you?

7   A   I do not know.

8   Q   And if it did, and if we started and ended with end-office

9   switching, the amount overwithheld, by AT&T, is $4.1 million,

10  right?

11  A   Yes.

12          MR. WARDEN:  Bear with me, please.

13          THE COURT:  Before you get to where you were going

14  next, with regard to 76, which is, I believe what's in front of

15  me now, my understanding is that we talked about it yesterday,

16  now we've talked about it again today, but it's never been

17  admitted.

18          MR. WARDEN:  I offer 76, Your Honor.

19          MR. STEESE:  No objection, Your Honor.

20          THE COURT:  Received.

21      Q   (By Mr. Warden) Let's -- let's talk about what I will

22  call your comparison, A56, comparing the the CPN dispute and

23  the OTT dispute.  CPN dispute is because Level 3 had breached a

24  portion -- violated a portion of that 2015 Agreement, right?

25  A   We had billed incorrectly, yes.

Jennifer Torres – Cross

1   Q   Can we pull up 56, please.

2        THE COURT:  Let me just say that, it's not just you

3   that I'm commenting on this, Mr. Warden, it's not just you, I

4   want you to be clear about that.  Counsel, all of you, have

5   kind of a state-court wander that goes on, where you move back

6   and forth.

7        I'm told by my court reporter that your voice drops

8   off and she has trouble hearing you, when you move away from

9   the microphone.  I have got hearing aids.  She is too young for

10  them.  So, I think we need to accommodate her.  So, if you can,

11  I understand, habit takes over, but if you can, if you can stay

12  more tethered to that microphone it will help her greatly.

13       MR. WARDEN:  I will do my best.  At some point I might

14  have to pull out my magnifying glass.

15       THE COURT:  Well, I can -- I can put landmines up to

16  your immediate left, but let's not go there yet.

17       MR. WARDEN:  Fair enough.  Thank you, Your Honor.

18       THE COURT:  All right.

19  Q   (By Mr. Warden) So, this A56, it has three pages,

20  right?

21  A   Yes.

22  Q   And you make some comparisons, and calculate some

23  percentages, right?

24  A   I do.

25  Q   Have you ever heard of the phrase correlation is not

Jennifer Torres - Cross

1    causation?

2    A    Yes.

3    Q    In this four-million figure, 4.056, that was applied to the

4    OTT dispute, correct?

5    A    We were told that what they overwithheld on that dispute,

6    was to be applied to the OTT dispute.

7    Q    And you -- you didn't do any analysis of that $4 million,

8    did you?

9    A    There's not much analysis that you can do.  If they tell

10   you they withheld that much --

11   Q    Well, oftentimes, and there are -- there are, oftentimes,

12   when Level 3 and AT&T have disputes, right?

13   A    Correct.

14   Q    And they can reconcile the numbers and agree, right?

15   A    That's the goal.

16   Q    And that happened in 2015?

17   A    Yes.

18   Q    Happened in -- October of 2017?

19   A    I don't recall that date.

20   Q    And it happened in 2019, with a bunch of disputes?

21   A    Yes.

22   Q    So, it is possible for AT&T and Level 3 to have reconciled

23   this $4 million number, if they tried?

24   A    Yes.

25   Q    Did you perform any stress tests of your analysis?

Jennifer Torres - Cross                                              242

1    A    How do you mean by stress tests?

2    Q    Change some inputs and see how it might affect the results?

3    A    No.  I was simply just trying to validate our damages

4    through some different means, and I used patterns we had seen

5    before and applied that to the current damage.

6    Q    So you just did the math?

7    A    Correct.  It was just high-level math.

8    Q    And you just use the inputs?

9    A    Correct.

10   Q    Can we go to A8, please.  A8, in evidence.  Can you go to

11   page three, please.  And there's a sentence in the withholding

12   paragraph that begins the -- that reads, *This withholding was a*

13   *result* -- I'm sorry.  Let me start over again.  The next

14   sentence, *There was no withholding action taken for the OTT*

15   *dispute, but there is withholding above the current dispute*

16   *value for the EO/CPN issue due to, one, Level 3's billing*

17   *containing both end-office and tandem billing on the same BAN,*

18   *which complicated the mechanized-rate-based withholding.*  Do

19   you see that?

20   A    I do.

21   Q    And Level 3's counsel has asked about that part of that

22   sentence a few times, right?

23   A    Yes.

24   Q    Hasn't asked about part two, which let me read that, *and*

25   *two, AT&T and Level 3, ie, Steve Ross, agreeing that the EO/CPN*

Jennifer Torres – Cross

1   *withholding would not be corrected in our payment systems until*

2   *such time as the issue was fully corrected.*  Do you see that?

3   *A*   I do.

4   *Q*   Did I read that correctly?

5   *A*   Yes.

6   *Q*   And so is it your understanding, based on this email, that

7   you interpreted yesterday, that AT&T was withholding on the

8   EO/CPN dispute, at least through the date of this email, June

9   29th, 2017?

10   *A*   Yes.

11   *Q*   Who is Steve Ross?

12   *A*   He was an account -- or is an account director at Level 3.

13   *Q*   And do you know when that $7.7 million dispute amount, that

14   you used in your calculation was first derived at?

15   *A*   I don't know -- I don't recall the date it was first

16   arrived at.

17   *Q*   Can we go to Exhibit 17 -- I'm sorry.  Exhibit 3, please.

18   Do you see that this is an email exchange, looks like it's

19   April and then March of 2017, between Steve Ross and

20   Alison Miller, among others?

21   *A*   Yes.

22        *MR. WARDEN:*  I offer Exhibit 3, please.

23        *MR. STEESE:*  No objection.

24        *THE COURT:*  Received.

25        Q    (By Mr. Warden) And then, can we go to the page

Jennifer Torres - Cross

1    three, right at the bottom, just to get the date of the email.

2    So this is -- do you see this is March 21st, 2017?

3    A   I do.  And then can we go to the next page.  Do you see

4    where it says, *Please see a counter offer*?

5    A   Yes.  Yes.

6    Q   And then, let's go to the next page and flip one more page,

7    and can you -- this is the LRN dispute, right?

8    A   Yes.

9    Q   Same dispute?

10   A   Yes.

11   Q   Can you blow up that number, the box.  So, do you see the

12   total dispute amount, in the right column -- right-hand column

13   of 7.7 million?

14   A   I do.

15   Q   And do you see that there's no dispute filed for February

16   of 2017?

17   A   I do.

18   Q   And so we saw that earlier email, that withholding on this

19   was continuing through June, right?

20   A   Correct.

21   Q   So we've got February, March, April, May, June; five

22   months, right?

23   A   Yes.

24   Q   And the withholding continued for at least those five

25   months?

Jennifer Torres - Cross

1   A   We were told, yes.

2   Q   And how much of the $4 million have you used in Exhibit 56,

3   was withheld during that five-month period?

4   A   We don't know, because we never had specific detail from

5   AT&T on what was withheld by month disputed.  So, we didn't

6   have that level of detail.

7   Q   Okay.  But you don't have any doubt that because of that

8   withholding that continued for five months, that some of that

9   $4 million, was withheld, because of the EO/CPN dispute on

10  end-office switching?

11  A   It could have been, but the reason there's no dispute in

12  February, is because we corrected it in February.  So, if they

13  were continuing to withhold through June, that was on months

14  that were already corrected.

15  Q   Right.  But the withholding continued?

16  A   The withholding continued on charges that weren't being

17  billed.

18  Q   There's still some charges down here, aren't there?

19  A   Yeah.  That would be the invoices, in February, were for

20  prior months' usage.  It most likely would be for the prior

21  month's usage that hadn't been corrected yet.

22  Q   And you saw, in Ms. Miller's email, that item number two,

23  that the issue had not yet been corrected?

24  A   Correct.  They asked for verification of when it was, and I

25  told them it had been corrected in February of 2017.

Jennifer Torres - Cross

1   Q   Let's look at another aspect of A56.  If we can go back to

2   that, please.  So, I want to make sure that I understand what

3   the purpose was of A56.  Is the purpose to establish a

4   relationship between what you claim is overwithholding on the

5   2017 LRN/CPN dispute and overwithholding on the OTT dispute?

6   A   Yes.

7   Q   And on the LRN dispute, you calculated an overwithholding

8   of about 52 percent, right?

9   A   Correct.

10  Q   And you attribute that overwithholding to AT&T's mechanized

11  billing system, right?

12  A   I attribute it to that because that's what they told us.

13  Q   Okay.  But that's what you attribute it to?

14  A   Yes.

15  Q   And so, this 52 percent, in this relationship -- withdrawn.

16         So you applied that 52 percent to the OTT dispute

17  amount, from AT&T, Exhibit 76 column N, right?

18  A   I'm sorry.  Can you ask that again?

19  Q   Sure.  You get the OTT dispute amount from column N, as in

20  Nancy, of Exhibit 76?

21  A   I see, yes.

22  Q   And then, you get the total Level 3 damages, it says A59.

23  I actually think that is supposed to be A53.  Do you see that?

24  A   I do.

25  Q   Okay.  And that's column K, right?

247
Jennifer Torres - Cross

1   A   Yes.

2   Q   And you looked at three time periods?

3   A   Yes.

4   Q   You looked at February of 2019 through January of this

5   year, right?

6   A   Correct.

7   Q   You looked at February of '19, through April of this year?

8   A   Yes.

9   Q   And you looked at February of '19, through June of this

10  year, right?

11  A   Yes.

12  Q   And you found a correlation of about one-to-one?

13  A   Yes.

14  Q   Right.  And so, given that the correlation was one-to-one,

15  for each of those periods, and given your belief that this was

16  caused by AT&T's mechanized billing system, you would expect

17  that correlation to exist over any period within that window,

18  right?

19  A   Yes.

20  Q   Did you test that?

21  A   We tested.  We felt three was sufficient.

22  Q   No, I'm sorry, did you test it?

23  A   Did I test?

24  Q   Let me ask you a different question.  Did you select any

25  other interim period, year, six months, three months, one

Jennifer Torres - Cross

1   month, to test your theory?

2   A   No.

3   Q   Let's look at a month.  Can we go to Exhibit AT&T 76

4   please.  And I believe what you used, was column N.  And

5   maybe -- if I could ask, Ms. Torres, if you can use the flip

6   chart and the -- and the microphone, please.

7   A   Okay.

8   Q   So, February, column N, is the amount withhold -- withheld,

9   is 257,600 -- I'm sorry.  Do you want to flip the chart so we

10  have a clean one to begin with?  Thank you very much.

11        So that -- that February amount --

12        THE COURT:  Where are you?  Put a finger to the

13  screen.

14        MR. WARDEN:  I'm right here.

15    Q    (By Mr. Warden) For the column of February '19, can

16  you just write 257,665.  And can we -- can we flip, quickly, to

17  Exhibit 56, please.  And so that would be the end-office charge

18  dispute in the OTT dispute column, for February, rather than

19  the 4.9 million, it would be the 257,000, right?

20  A   Yes, for that one month.

21  Q   Okay.  And then -- and then you would apply 52 percent to

22  that 257,000, and that, by my math, is 133,986.  And so then

23  you would add those two, to get the amount overwithheld, right?

24  A   Yes.

25  Q   Yes?

Jennifer Torres - Cross

1   A   Yes.

2   Q   My math is 391,652, and that would be in this box, in the

3   lower right, instead of the 7.4 million, right?

4   A   Instead of the 7.5, I believe -- oh no.  The -- yeah, the

5   7.4.

6   Q   The 7.45.  So that number for the month of February is

7   391,652, right?

8   A   Yes.

9   Q   And now let's go to, I believe, it's Exhibit A53.  And

10   that's tab two, and the balance due -- so that -- well, on 56,

11   what you did is you looked to A53, to -- for column K, in

12   various rows, right?

13   A   Correct.

14   Q   And column K for -- it's the ... can you take this ...

15   column K is here.  Oops, there you go.  Right?

16   A   Yes.

17   Q   And so, for this, in your A56, the total Level 3 damages

18   less LPCs, would be that -- can you write that 552,598?

19   A   Yes.

20   Q   And then what you did, applying the same formula, you would

21   divide the 391 by the 552; is that right?

22   A   Let me think about what we're looking at again.  I believe

23   so, yes.

24   Q   Okay.  Would you mind if I do the math?

25   A   I can't do that in my head.

250

Jennifer Torres - Cross

1    Q    I'm going to round 391 divided by 552, is about 71 percent.

2    And that's not the same correlation that you would expect to

3    find, if your hypothesis were correct, right?

4    A    Um, correct, that's why we look at more than one month at a

5    time, because you can see the payments fluctuate quite a bit.

6              MR. STEESE:  Your Honor, can she answer the question

7    instead of having interruption, please?

8              THE COURT:  Yes, yes.  Let her answer the question.

9    Please, go ahead, finish your answer.

10             THE WITNESS:  So generally, we were looking at time

11   periods, so you could normalize out spikes and -- and payments,

12   and all of the other columns that lead up to that.  So, you

13   look at large ranges of time, to normalize out any fluctuations

14   versus a month-over-month-over-month.

15       Q    (By Mr. Warden) And you -- but you didn't look at any

16   interim period?

17   A    We looked at three interim periods.  Up to -- up to

18   January, up to April.

19   Q    But you didn't look at any three-month period or one

20   month-period, right?

21   A    No.  We normalized everything up through those months.

22   Q    So, let's look at another month.  Let's go to November of

23   2019?

24   A    And again, looking at any single month, is just not going

25   to normalize the variances that occur.

Jennifer Torres - Cross

1   *Q*   The -- if we did this calculation for November, I will

2   represent to you that the number is 28 percent.  That's way

3   different from your almost perfect match, right?

4   *A*   Correct.  Because a month-over-month view is not going to

5   be normalized.

6   *Q*   And you didn't test a month, three months, six months,

7   right?

8   *A*   No.  We tested the three periods of time, that we showed.

9          MR. WARDEN:  I'm finished with this.  You can sit

10   down, please.  Thank you very much for your assistance.

11          Q    (By Mr. Warden) I want to move to another topic, and

12   ask you about late payment charges.

13   *A*   Okay.

14   *Q*   Let's go to Exhibit A1, please.  And can you go to page

15   two, and can you blow up that big paragraph A, please.  In this

16   paragraph, there are two references to late payment charges,

17   correct?

18   *A*   Yes.

19          THE COURT:  We need to pick up the pace.  Let's go.

20          MR. WARDEN:  I'm sorry.

21          Q    (By Mr. Warden) And then in the paragraph regarding

22   paragraph number four -- I'm sorry it's (iv), do you see at

23   the -- in that paragraph, is there any reference to late

24   payment charges.  No.  It's the next -- it's ... in that

25   paragraph.  Is there any reference to late payment charges?

Jennifer Torres - Cross

1   *A*   Let me read it.

2        *MR. STEESE:*  Your Honor, I think that asking what is

3   and is not in the document is unnecessary.

4        *THE COURT:*  Well, I engage -- let me put it this way.

5   I allowed you to do it to some extent.  I'm going to allow you

6   to do it to some extent, but it's pretty obvious what is there

7   and not there by way of words, and I really don't need any

8   particular witness to go into this at any detail.  I understand

9   you are making points that you want me to be aware of.  I just

10  think we can make them a little more quickly, and I don't think

11  there's any dispute as to what it says.  It says what it says.

12  I'm going to hear all of this in closing argument, again.  I'm

13  simply not that dense; not that you were suggesting that I am.

14       *MR. WARDEN:*  I was going to say, I certainly didn't

15  hope to suggest that in any way.

16       *THE COURT:*  No, I understand.

17     *Q*    (By Mr. Warden) Let me ask you something else about

18  late payment charges then.  Late payment charges aren't

19  mandatory, are they?

20  *A*   They are an applicable tariff rate per our tariff.

21  *Q*   But they aren't mandatory, are they?

22       *MR. STEESE:*  I'm going to object as to calling for a

23  legal conclusion.

24       *THE COURT:*  I'm going to sustain.

25  *Q*   Late payment charges can be forgiven?

Jennifer Torres - Cross

1   A   They can be.

2   Q   And sometimes Level 3 does that, right?

3   A   Typically, as part of a Settlement Agreement, not just

4   willingly.

5   Q   Can we go to A18, and page five.  It says in this email,

6   this is in evidence, *Late payment charges and attorneys' fees*

7   *will be forgiven.*  So you were agreeing, on behalf of Level 3,

8   to forgive late payment charges, correct?

9   A   Let me read the first part of this email, please.

10  Q   Sure.

11          *MR. STEESE:*  Your Honor, this seems like a clear 408

12  issue having to do with the settlement of a prior dispute and

13  therefore inappropriate.

14          *THE COURT:*  Whatever it is, A18 --

15          *MR. WARDEN:*  Is in evidence.

16          *THE COURT:*  -- is in evidence.  What's the question?

17      Q    (By Mr. Warden) The question is, on -- on behalf of

18  Level 3, you were agreeing to forgive late payment charges,

19  right?

20  A   We were.

21  Q   And so they aren't necessarily mandatory in that sense?

22  A   This was in relation to another dispute that both parties

23  were withholding against each other, I believe.  Or we were

24  disputing with each other.  So this -- in this instance, we

25  were not applying the late payment charges to what AT&T had

254

Jennifer Torres - Cross

1   withheld, on an active discussion between the two of us.

2   Q   Okay.  And then you mentioned resolving disputes, I

3   believe, you referred earlier to the 2019 Settlement Agreement.

4   Well, let me do one more thing on late payment charges, please.

5   Can you pull up Level 3's tariff, please.  A3.

6           Level 3's counsel has shown the cover of this, and

7   then also shown various provisions, including a provision in

8   paragraph four about late payment charges, or section four.

9   It's page 38 of the document.  Can you go down to 4.2.6.  So

10  that's the late payment charge provision that was looked at

11  yesterday?

12  A   Correct.

13  Q   And under the Settlement Agreement, AT&T agreed to pay

14  switched-access rates, right?

15  A   Yes.

16  Q   And let's go to page 100 -- or 99 of the Agreement -- or

17  the tariff.  And this is the section of the tariff, Section 15,

18  that relates to rates, correct?

19  A   Well, the whole tariff relates to all switched-access

20  charges.  This is where we detailed the rates by each one of

21  those functions that can occur in a call flow.

22  Q   Can you go -- do you see at the top where it says 15, Rates

23  and Charges?

24  A   I do.

25  Q   And then, 15.1, is Rates For Switched Access Minutes.

Jennifer Torres - Cross

1   A   I do see that.

2   Q   And then, can you go to page 102, please.  And this is

3   rates for local end-office switching, right?

4   A   Yes.

5   Q   And there's a different rate for every state, right?

6   A   Yes.

7   Q   And so, Level 3 sends bills for every state to AT&T, right?

8   A   Correct.

9   Q   And it sends bills for originating traffic and terminated

10  traffic and intrastate and interstate, right?

11  A   Those are included in the bill.  Yes.

12  Q   Do you know how many bills Level 3 sends to AT&T for each

13  month?

14  A   We send it by state and by -- or by CIC, so the carrier

15  identification code.  So if AT&T has more than one CIC code,

16  they get one for every state and CIC combination, and I don't

17  know the number of bills a month.  It would be quite a bit.  I

18  mean 50ish at least.  There's one for every state.

19  Q   Fifty, hundred, more than a hundred?

20          THE COURT:  Let's settle on lots and move on.

21          THE WITNESS:  A lot.

22      Q   (By Mr. Warden) This is a section of the tariff about

23  local and end-office switching rates, correct?

24  A   Yes.  These are the elements that we would bill for that

25  function in the call flow.

256

Jennifer Torres - Cross

1   Q   One of the things that you did in your damage study, was

2   you calculated an amount -- I'm finished with the tariff.  You

3   calculated an amount that Level 3 overwithheld from TCG, AT&T's

4   affiliate, right?

5   A   Yes.

6   Q   And that was about $517,000?

7   A   Yes.

8   Q   And did you look in TCG's tariff, to see if there was a

9   late payment charge provision?

10  A   I did not personally look.

11  Q   And did you apply late payment charges to that $517,000?

12  A   Don't believe so.

13  Q   And you understand that as a result of that dispute, where

14  Level 3 owes AT&T $517,000, Level 3 isn't going to recover

15  anything.  It's AT&T that will, in effect, recover, right?

16  A   Correct.

17  Q   So, can we pull up Exhibit 15, please?  Exhibit 15 is the

18  2019 Settlement Agreement about which there's been some

19  testimony; is that right?

20  A   It -- yes, it is.

21          MR. WARDEN:  I offer 15.  It's stipulated.

22          THE COURT:  It's in.

23      Q    (By Mr. Warden) And there were a number of disputes

24  that were resolved in this Agreement between Level 3 and AT&T,

25  correct?

Jennifer Torres - Cross

1   A   I am not an expert on this Agreement.  I settled -- I was

2   part of the 2015 Agreement, so I don't have a lot of experience

3   with this Agreement.

4   Q   Okay.  Let's go to page three.  And the whereas clauses at

5   the bottom.  And do you see those last two whereas clauses?

6   A   I see them, yes.

7   Q   And that's -- that's -- those claims were settled through

8   December 31st, 2018, correct?

9   A   Yes.

10  Q   And that's why our starting point in this case is

11  February -- I'm sorry, January 1st, 2019, right?

12  A   Correct.

13       MR. STEESE:  Your Honor, I'm just going to object to

14  use -- foundation for this witness.  She is just not

15  familiar --

16       THE COURT:  Well, I'm not going to -- I'm going to

17  overrule the objection up to now.  I don't know what we're

18  doing with this, but when we get to a point where she is asked

19  to conclude something meaningful, fine, I will entertain the

20  objection.  Right now, it says this, it says that, it's up to

21  this date.  There's no ... I understand your objection.  Up to

22  now, I'm overruling it, but it's not going to take much more to

23  get into it for me to sustained.

24       MR. WARDEN:  I don't have much more, Your Honor.

25       Q    (By Mr. Warden) Can we go to page four, please.  And

Jennifer Torres - Cross

1    the whereas clause is at the bottom of the last two.  So, in

2    this first whereas clause, there are a whole series of

3    disputes, listed as fully closed disputes.  Do you see that?

4    A    I see that.

5    Q    And then in the next whereas clause, there are another

6    whole series of disputes.  And can we go to the next page,

7    please.  Right there, that are settled through December 31st

8    2018, right?

9    A    I believe so.

10   Q    And those are listed as ongoing disputes?

11           MR. STEESE:  I'm going to raise my objection.

12           THE COURT:  Sustained.  Let's move on with something

13   else.  We're done with this document.  You want to tell me

14   something in closing or point to something, fine.  We're done

15   with this document.

16           MR. WARDEN:  I have one question on this document for

17   the witness.

18           THE COURT:  No, we're done.

19      Q    (By Mr. Warden) So, do you know of -- other than that

20   the DEOT dispute, the back-bill dispute and the OTT dispute, do

21   you know of any other disputes ongoing, or otherwise, where

22   there's withholding?

23   A    No.

24           MR. WARDEN:  Can I have one moment, Your Honor?  Thank

25   you very much.

1        THE WITNESS:  Can I -- okay.  Thank you.

2        MR. STEESE:  Your Honor, can we take a morning break

3   now, to give me time to organize my questions.  I probably have

4   15 or 20 minutes.

5        THE COURT:  All right.  Till 10:30.

6        MR. STEESE:  Thank you.

7        THE COURTROOM DEPUTY:  All rise.  Court is in recess.

8    (Recess at 10:13 a.m.)

9    (In open court at 10:30 a.m.)

10        THE COURT:  Please be seated.

11        THE COURT:  You may Cross -- Redirect.  I'm sorry.

12        MR. STEESE:  Thank you, Your Honor.

13                    **REDIRECT EXAMINATION**

14   BY MR. STEESE:

15   Q   Ms. Torres, I understand there was one correction that you

16   wanted to make to testimony on Cross?

17   A   Yes.  I believe the last question, you asked if there was

18   any of -- if the DEOT and OTT were the only ongoing disputes

19   that I knew of, and I forgot to add in the tandem back-billing

20   one, that was just brought up, that was the other ongoing one.

21   I just want to make sure that I put that on record.

22   Q   All right.  Let's bring up Exhibit A53, please.  And do you

23   recall looking at the -- or the questions from counsel,

24   Mr. Warden, about did you look at this on a month-by-month

25   basis?  Do you recall those questions?

Jennifer Torres - Redirect

1   A   I do.

2   Q   And the focus is this particular column, column K, on

3   Exhibit A53, that's one of the inputs into your demonstrative

4   Exhibit A56, correct?

5   A   Correct.

6   Q   And do you see -- scroll -- I'm sorry.  I'm trying to

7   scroll down.  Right there.  Do you see that some of these

8   numbers are negative?

9   A   I do see that.

10  Q   And so if you were to look on a month-by-month basis, would

11  that, in any way, create accurate results?

12  A   It would not.

13  Q   And why?

14  A   There's just a lot of -- it fluctuates month over month

15  when payments come in.  How they are applied.  So looking at it

16  on a month-over-month basis can't normalize for all of those

17  events.

18  Q   So when there's a presidential election, do you pay

19  attention and watch the returns coming in?

20  A   Yes.

21  Q   Have you noticed that there's time when candidate A is

22  winning by 50 percent of the day, by the end of the day

23  candidate B wins by 20 percent?

24  A   Yes.

25  Q   And does the same analogy work here?  You look at a really

Jennifer Torres - Redirect

261

1    focused period of time, it's going to create bad data?

2    A    Correct.

3    Q    And you said that you needed to normalize; just explain

4    what you meant by that?

5    A    Just when there's fluctuations on a month over month, if

6    you look at the aggregate, you can get the full picture versus

7    looking at that month-over-month input.

8    Q    So, if you look at data at three months, towards the end of

9    the process, what, if anything, does that do, in your mind, to

10   the accuracy of the data you are getting?

11   A    It -- as much as you can normalize, it's going to give you

12   a much more accurate view of what's happening.

13   Q    To continue with my analogy, by 10 p.m. on election night,

14   if someone is up by a few percentage points, it means a lot

15   more than at the beginning of the night?

16   A    Absolutely.

17   Q    Now, there was a lot of questions, both by Mr. Warden and

18   yesterday with Ms. Kellow, about you start with everything.

19   They keep using this word, your damages are everything.  Do you

20   remember those questions?

21   A    I do.

22   Q    Does AT&T tell Level 3 how much it is withholding for OTT

23   charges?

24   A    It claims that they don't believe 60 percent are due, but

25   it does not tell us how much they are withholding.

Jennifer Torres – Redirect                                    262

1   *Q*   Is that something that they should be telling you, under

2   the dispute process?

3   *A*   Yes.

4   *Q*   And so, if AT&T doesn't tell you, I'm withholding this

5   month $332,412.18, hypothetically?

6   *A*   Hm-hm.

7   *Q*   If you don't start with everything, how can you figure out

8   how much they withheld on the OTT dispute?  Is there any other

9   way that you can think of?

10  *A*   No.

11  *Q*   So, in order to figure out how much they withheld on the

12  OTT dispute, must you start with everything?

13  *A*   Yes.

14  *Q*   Now, let's look at **ECF 124**, the Complaint in this case, and

15  let's focus on paragraph 69.  Can you get rid of that X?  Thank

16  you.

17          And do you see where it says, *AT&T's failure to pay*

18  *end-office switching access charges directly proximately caused*

19  *and continues to cause Level 3 to suffer damage and loss*.  Do

20  you see that?

21  *A*   I do.

22  *Q*   If AT&T did not withhold any end-office switching charges,

23  it had a zero, instead -- it's factor was zero, instead of 65

24  percent, it withheld nothing, what other charges would have

25  been paid, as well?

Jennifer Torres - Redirect                                      263

1  A    The --

2          MR. WARDEN:  Objection, calls for speculation.

3          THE COURT:  Overruled.

4          THE WITNESS:  Every other charge on the invoice.  So

5  every other special-access charge.

6      Q    (By Mr. Steese) And so their failure to pay the

7  end-office switching charges is what caused the AT&T's failure

8  to pay all of the other damages, as well, correct?

9  A    Correct.

10  Q   Now, let's take a look at Exhibit A53, again, for just a

11  moment.  Under the Settlement Agreement, AT&T was required to

12  pay full-switched access charges on OTT calls until when?

13  A    Till the -- the change became final.

14  Q   All right.  And that change became final, you stipulated,

15  in February of 2020.  Take balance -- take column K, and add up

16  all of those withholdings, through February of 2020.  Zoom in a

17  little bit.  Right there.  How much have they withheld in

18  violation of the contract as of this point in time?

19  A    It's 5.85 million.

20  Q   And so, if AT&T had simply abided by the contract, and paid

21  full-switched access, all of those charges would have been

22  paid, right?

23  A    Correct.

24  Q   Now, take the next month, beginning with the 84,000 -- no,

25  no.  I'm sorry.  Strike that.

264
Jennifer Torres - Redirect

1          Go to Level 3 billing to AT&T.  And now start with

2   March of 2020, and do the tally of all of the end-office

3   charges, from that moment forward.

4          *MR. STEESE:*  And, Your Honor, I like when she does the

5   math instead of me.  Do you mind if I hand her a calculated?

6          *THE COURT:*  I do not.

7          *THE WITNESS:*  Thank you.

8     *Q*    (By Mr. Steese) What is the total amount of

9   end-office charges that Level 3 has billed since then?

10  *A*   It's 3.98 million.

11  *Q*   Okay, 3.98 million.  Now, let's assume that they withhold

12  65 percent of those.  How much would they have withheld as of

13  that point in time?

14  *A*   Two and a half million.

15  *Q*   Two and a half million.  And do you remember that number

16  from before, 5.8 million?

17  *A*   Yes.

18  *Q*   So add those two numbers together, and what do you get?

19  *A*   It's 8.38 million.

20  *Q*   Now, go back to Exhibit A53, and if you look at the balance

21  due, before we give them net credits, the tally of column K, if

22  they had just done that, our number's actually smaller, isn't

23  it?

24  *A*   It is.

25  *Q*   And so had they just abided by the Settlement Agreement, we

Jennifer Torres - Redirect

1    would have had no damages, right?

2    A    Agreed.

3    Q    Let's now go back to the legal documents, here, and look

4    at -- I'm on my computer.  I was about to tell you to scroll

5    down, that was my scroll down.

6         Look at paragraph 70.  And do you see it says, *Level 3*

7    *is entitled to damages in an amount to be determined at trial*

8    *for payment in full of all end-office switching charges owed by*

9    *AT&T on over-the-top VoIP call, as well as the traditional*

10   *traffic on which AT&T is withholding payment*.  Do you see that?

11   A    I do.

12   Q    And so, is it just -- is the request just limited to

13   end-office switching?

14   A    It is not.

15   Q    Let's now look at -- at paragraph 71.  Do you see that

16   paragraph 71 also includes demand for late payment charges?

17   A    I see that, yes.

18   Q    And do you see paragraph 71 also says, for all amounts due

19   under the Agreement?

20   A    I do.

21   Q    And now, let's go to ... to Exhibit 34.  Exhibit 34, if you

22   could highlight the entire *Level 3 hereby incorporates*... on

23   down.  There you go.

24        Do you see where *Level 3 incorporates it's 26(a)(1)*

25   *disclosures*?  I know that's a legal term, but do you see that

Jennifer Torres – Redirect

1  in this response?

2  A   I do see that.

3  Q   And so, it then says *Level 3 further states that its*

4  *damages,* does it say limited or does it say another word?  Its

5  damages -- does it say the damages are limited to end-office

6  charges?

7  A   No.

8  Q   It says consist of, and so includes, right?

9  A   Correct.

10  Q   And then it says, as of this point, Level 3 expects its

11  damages are in excess of 4,000,000.  Do you see that?

12  A   Yes.

13  Q   Now, go to Exhibit A18.  And do you see that the amount

14  that AT&T had knowingly withheld and attributed to OTT was

15  what?

16  A   $4,056,000.

17  Q   And were these end-office charges that had been withheld?

18  A   Yes.

19  Q   No.  The 4,000,000 was what, the excess?

20  A   They were the excess overwithholdings from the CPN/LRN

21  dispute.

22  Q   Were those end-office charges that had been withheld?

23  A   Well, the dispute was for end-office charges, but I can't

24  tell you what was withheld.

25  Q   Well, if -- but the dispute on LRN was over zero percent?

Jennifer Torres - Redirect

1    Fifty percent?  Hundred percent?  How much of the end-office

2    charges on those?

3    A   Hundred percent of the end-office charges.

4    Q   So, if you were giving them credit for a hundred percent of

5    the end-office charges in the 7.7 million, were those

6    4,056,000, and that number right here, on Exhibit A18, could

7    they have possibly been end-office charges that they withheld?

8    A   Not for the -- not for the -- that traffic.

9    Q   And given that this $4 million, is incorporated into that

10   answer, the amount we knew about, that Level 3 knew about, then

11   are these truly limited to end-office charges or is it just --

12   or is it the amounts attributable to this dispute?

13          MR. WARDEN:  Objection, vague.

14          THE COURT:  Overruled.

15   A   Amounts attributable to the dispute.

16   Q   So now let's continue, let's look at those disclosures.

17   Exhibit -- let's pull A35.  Just use one of them.  I'm sorry.

18   I did say A35.  Exhibit 35, no A.  And it says further -- *AT&T*

19   *has been with holding payment of these charges since mid 2017*?

20   Do you see that?

21   A   Sorry, where are you at?  I do, I see.

22   Q   Then it says, *Further discovery is necessary, to identify*

23   *and calculate the damages due to Level 3*.  Do you see that?

24   A   I do.

25   Q   Then it says, *Such discovery will concern, at a minimum,*

Jennifer Torres - Redirect

1   *the methods AT&T has used to determine the amounts to withhold*

2   *from Level 3 on the purported basis that all or part of its*

3   *traffic constituted OTT VoIP calls.*  Do you see that?

4   *A*   I do.

5   *Q*   And is Level 3 seeking from AT&T the amounts it withheld on

6   the purported basis that all or part of its traffic constituted

7   OTT VoIP calls?

8   *A*   Yes.

9   *Q*   And so the interrogatory response you referred to, that

10  earlier exhibit, it incorporated this document, right?

11  *A*   Yes.

12  *Q*   And so is it plain to you that we are telling Level --

13  Level 3 is telling AT&T, that the damages it seeks, is

14  everything it is withholding, on the basis of whatever reason

15  for OTT calls?

16  *A*   Yes.

17  *Q*   And so when they use the term everything, in their

18  questioning, and you are answering with the term everything, in

19  your answers, what everything are you referring to?

20  *A*   Everything that is being withheld under the OTT dispute.

21  *Q*   Go to Exhibit A1 for a moment, please, the Settlement

22  Agreement.  Page one, fourth, fifth -- fourth whereas clause.

23  Highlight that, please.  Do you recall questions from

24  Mr. Warden, talking about this facility thing?

25  *A*   I do.

269

Jennifer Torres - Redirect

1   Q   Are tandem facilities and tandem usage-based charges the

2   same thing?

3   A   They are not.

4   Q   Are they billed on the same BANs?

5   A   They are not.

6   Q   What are tandem facilities?

7   A   Tandem facilities are the monthly recurring fees.  So it's

8   a set fee for an order facility that culled out in the call

9   cell that they put up yesterday.  I feel like there was

10  something in there from a facilities charge, but it's really

11  the fixed charges on the actual physical architecture we have

12  between our companies.

13  Q   Let's break that down to make sure there's no lack of

14  communication.

15          First of all, usage charges, what's the difference

16  between a usage charge and fixed charge?  You just used that

17  term?

18  A   Okay.  So a usage charge is based on the amount of traffic.

19  So the minute of use.  It would be a usage charge, and those

20  files are sent daily from our switches to our billing vendor,

21  and then these fixed charges are for the physical network that

22  we have in place, and it's the monthly recurring fee cost for

23  that network.

24  Q   And so, would it be usage based?

25  A   No.

Jennifer Torres - Redirect

1    Q    What would it be?

2    A    It's a fixed recurring charge.

3    Q    Okay.  So now let's -- let's pretend there's a wire running

4    between you and me.  We are playing the game of telephone and

5    we're each holding a cup.

6    A    Okay.

7    Q    The usage charges are the minutes that the call is

8    traversing the wire, right?

9    A    Yes.

10   Q    And the facility charge is I'm making this wire available

11   to you; pay me for this wire?

12   A    Correct.

13   Q    Correct.  And so is there any connection, even in the

14   remotest sense, between a facility charge and a usage-base

15   charge?

16   A    No.

17   Q    Now, do you recall a number of questions from Mr. Warden

18   about you added this new tandem -- affiliated tandem dispute in

19   just this week.  Do you recall that?

20   A    I do.

21   Q    Why did you add this to the analysis, on Monday of this

22   week?

23   A    We recognized there was an error.  We wanted to make sure

24   to fix it.

25   Q    Is Level 3 trying to get a windfall here?

Jennifer Torres - Redirect

1  A   Absolutely not.  We wanted to make sure we corrected what

2  we made an error on.

3  Q   Is Level 3, you, in your analysis, simply trying to be as

4  accurate as possible about the dollars AT&T withheld on the OTT

5  dispute?

6  A   Absolutely.

7  Q   Is there anything more than that?

8  A   No.

9  Q   Let's look at Exhibit A8, please.  And go down to, right

10  there.  And do you remember Mr. Warden asking you questions

11  about the comparison that you used, the 4.056 million as the

12  one input into your comparison that you were using to validate

13  your damages.  Do you recall that?

14  A   I do.

15  Q   And do you see the last sentence from Ms. Miller, at AT&T,

16  that says, *I used that consistent volumes as the amount by*

17  *which to determine the overbilling, and by using this*

18  *methodology, the analysis did care for the fact that the*

19  *incorrectly billed third-party volumes reduced over time*.  Do

20  you see that?

21  A   I do.

22  Q   And so her calculation is based on this recognition that it

23  reduced over time.  Do you see that?

24  A   Yes.

25  Q   So, let's bring up Exhibit 3, please.  Not A3.  Three,

Jennifer Torres - Redirect                                    272

1    please.  And see if you can make that even bigger, just so we

2    can see the numbers on the screen.  There we go.  The numbers

3    on that table is all I'm trying to get to.  Thank you.  And --

4    perfect.  Now scroll down to the bottom.  No -- no -- okay.

5    Even farther.  Okay.  Make that a little bit smaller, please.

6    There we go.  Now scroll so we can see the bottom -- and the

7    amounts that AT&T is attributing to the LRN disputes, at the

8    end.  How much is it?

9    A    It's 7.7 million.

10   Q    And when you look at the LRN insertion charges, you say 7.7

11   million, I'm talking how much, you see monthly amounts, that

12   they are attributing, do you see that?

13   A    Yes.

14   Q    And do you see at the end it's 16,783, 19,601, 19,692, do

15   you see the amounts at the very end?

16   A    Yes.

17   Q    Are these de minimis amounts in the scheme of 7.7 million?

18   A    Yes.

19   Q    And -- and Mr. Warden said that this went on for an

20   additional few months.  Do you recall that?

21   A    Yes.

22   Q    And if Ms. Miller cared for the fact, to use her term, that

23   the amounts at the end were significantly less, would you have

24   expected her, if she was doing an analysis appropriately, to

25   have small amounts taken into consideration in the last few

273
Jennifer Torres - Redirect

1    months?

2    A    Yes.

3    Q    If you had an additional 80 grand that was subtracted, and

4    now you did -- just under 4,000,000, would it change your

5    analysis in any meaningful way?

6    A    No.

7    Q    As you stand here today, Ms. Torres, do you stand behind

8    the $9.375 million that Level 3 seeks in damages?

9    A    I do.

10   Q    Do you believe this is the most accurate information you

11   have that identifies -- strike that.  I will say it better.

12        Do you believe that that is an accurate representation

13   of the amount AT&T withheld on this OTT dispute, which includes

14   late payment charges, admittedly?

15   A    Yes.

16        MR. STEESE:  That's all of the questions I have,

17   Your Honor.

18        THE COURT:  You are excused.  Next witness.  And I

19   recognize that you designated three depositions.

20        MR. STEESE:  Correct.

21        THE COURT:  And as I said, I have looked at those, so

22   let's consider those witnesses called and completed, in terms

23   of their testimony, and again, just to make it overly clear,

24   we're speaking of Burgess, Gallagher and Cathy, if I'm saying

25   it right.  Correct.

1          MR. STEESE:  That's fine, yes, Your Honor.

2          THE COURTROOM DEPUTY:  Can this go away?

3          THE COURT:  Yes.

4          MR. STEESE:  Oh, Your Honor, one last thing, at least

5     to the first page of that.  We wanted to mark that as Exhibit

6     A59.  I think that's the first page, enter that, if that's

7     helpful, at all, to Your Honor, to have it at least available

8     to you.

9          THE COURT:  All right.  It is -- here we go.  You each

10    want all of your pages, right.

11         MR. WARDEN:  I just want to look at the other pages to

12    see --

13         THE COURT:  Go ahead.  Short of that, what I would

14    say, Mr. Warden, is that you will, obviously, have someone

15    testifying with regard to AT&T's view of damages.  You can make

16    your number summary and mark it the same way that we're doing

17    here.  I'm not sure that any of these other things were to the

18    point where marking them is particularly helpful, in terms of

19    being broad summary.

20         MR. WARDEN:  Understood, Your Honor.  Thank you.

21         THE COURT:  All right.  So what did we do here?  We

22    called this A ...

23         MR. STEESE:  Fifty-nine, Your Honor.

24         THE COURT:  A59, admitted.

25         THE COURTROOM DEPUTY:  Just the first page, correct?

1              THE COURT:  Right.

2              THE COURTROOM DEPUTY:  Okay.

3              MR. STEESE:  And then, Your Honor, Burgess, Cathy, and

4    Gallagher, are considered in?

5              THE COURT:  Correct.

6              MR. STEESE:  Thank you, and Your Honor, other than

7    rebuttal exhibits, Level 3 rests.

8              THE COURT:  All right.

9              MS. ZAMBRANO:  Your Honor, may I be heard?

10             THE COURT:  Yes.

11             MS. ZAMBRANO:  At this time, AT&T moves for judgment

12   under Rule 52(c).  Your Honor, we well recognize that this is a

13   bench trial and we well recognize that you said that all of the

14   evidence is going to come in, but at this point, I think I have

15   heard testimony not from one but two witnesses, that we have

16   agreement that AT&T's Exhibit 76, to the extent that we're just

17   talking about end-office charges, and Your Honor can read the

18   contract and determine that, that we have an agreement on all

19   of those numbers.

20             So while billing systems are very interesting and

21   reading contracts and we could do under oath all day long, we

22   do not think that Level 3 has met their burden at this time,

23   and that Your Honor can issue judgment on -- at this time, on

24   damages, without any further evidence.  Obviously, this is

25   completely at your discretion, but I would note that the

1    standard of review is of use of discretion, and we do not

2    believe it would be, at this time.

3         THE COURT:  All right.  And I understand everything

4    you are saying, and fully expect you to be highlighting to me

5    quote/unquote, agreed upon or non-disputed numbers, but I'm

6    going to deny the motion and go forward.

7         MS. ZAMBRANO:  Thank you, Your Honor.

8         THE COURT:  All right.

9         MS. ZAMBRANO:  Should we call our first witness, at

10   this time?

11        THE COURT:  Yes, you should.

12        MS. ZAMBRANO:  We call Ms. Kimberly Meola.

13        THE COURTROOM DEPUTY:  Raise your right hand please.

14       (**Kimberly Meola** was sworn.)

15        THE WITNESS:  Yes.

16        THE COURTROOM DEPUTY:  Please have a seat.  State your

17   name and spell your last name for the court reporter, please.

18        THE WITNESS:  Kimberly Meola, M, as in Mary, E O L A.

19                        **DIRECT EXAMINATION**

20   BY MS. ZAMBRANO:

21   Q   Ms. Meola, can you describe your educational background for

22   the Court, please?

23   A   Yes.  I received my undergraduate from -- excuse me.

24   There's no wheels.

25        I received my undergraduate from William Patterson

1    College for Business Management, and I received my Masters from

2    Stevens Institute of Technology, in Business Management, as

3    well.

4    Q    My understanding is that you have worked your entire career

5    at AT&T?

6    A    Yes, I have, my whole professional career.

7    Q    How many years?

8    A    Roughly 27 years.

9    Q    Could you give just a high-level overview, that's a lot of

10   positions within 27 years, but at a high level, please, for the

11   Court?

12   A    Yeah, absolutely.  I started in field ops, with AT&T

13   straight out of college.  I did a number of operational jobs,

14   managing operations, planning, managing large work centers,

15   provisioning, maintenance, engineering.  I worked on merger

16   teams, project management teams.  I worked in finance.  I moved

17   into the access management organization, as we call it, over

18   ten years ago, and I have had a number of positions within

19   access management.  I had roles that supported, purely, network

20   optimization.  I had a number of roles over the years.  I will

21   slow down.

22        THE COURT:  It's okay.  She is used the pattern of my

23   voice, not to the pattern of yours.  Try to slow it down just a

24   little bit, please.

25        MR. STEESE:  Your Honor, if I can ask a question, and

1    this is admittedly, the first trial I have had post COVID, as

2    many of us I'm sure.  It is hard to see facial expressions

3    without (sic) a mask.  I'm trying to be as -- as respectful as

4    possible.  I don't know what the current protocols are.  I

5    don't know if Ms. Meola is wearing it because that's what she

6    wants to do, which I will totally respect, or if there's some

7    protocol in the courtroom.  It's just harder to --

8              *MS. ZAMBRANO:*  Your Honor --

9              *THE COURT:*  No, let me address this.  I grant you that

10   masks can cause some degree of difficulty.  Over the last year,

11   however, I have gotten somewhat -- I'm not going to say that

12   you can ever get face equivalent behind a mask versus no mask;

13   that being said, I think what we're largely talking about here

14   is a numbers case, and I'm less concerned, perhaps, than I

15   would be if we were talking about, I don't know, some

16   credibility as to whether the person really did or did not

17   commit act X, and we can create whatever case around that we

18   want to.

19             In terms of the Court's rules and protocols, here's

20   the way it goes.  If you are fully vaccinated, you are not

21   required to, but may, wear a mask, and so I'm not inquiring of

22   anybody as to whether or not they are or are not fully

23   vaccinated, and I am not going to require anybody to remove the

24   mask.

25             I understand your concern.  I think that I can go

 1     forward and assess the credibility on the issues we're talking

 2     about, notwithstanding the mask.

 3              So, to be more blunt about it, I'm not going to order

 4     her to remove it.  It's that simple.

 5              MS. ZAMBRANO:  Thank you, Your Honor.  Go ahead.

 6         Q    (By Ms. Zambrano) Ms. Meola, I think you were

 7     discussing the various roles that you had at the company --

 8              THE COURT:  I will say this.  I'm sorry to interrupt,

 9     that chair does move.  It is heavy, and so it appears as if it

10     doesn't.

11              THE WITNESS:  Okay.

12              THE COURT:  The mask does tend to muffle a little bit.

13     So would you pull that chair forward and get a little closer?

14              THE WITNESS:  I moved a little bit.

15              THE COURT:  It's okay.  I would rather that you be

16     more loud than less loud.  Go ahead.

17              MS. ZAMBRANO:  Thank you, Your Honor.

18         Q    (By Ms. Zambrano) I believe you were discussing the

19     various roles that you have had at AT&T over the last 27 years,

20     and I think you were talking, specifically, about access

21     management.  And so to move this along I'm actually going to

22     talk to you about what the switched-access management group

23     does, and your management of that group?

24     A    That's my current role today.  I manage all of the AT&T's

25     voice services, both domestic and international.  This case is

1    domestic, and our primary responsibilities are to manage the

2    voice network by managing network optimization activities that

3    might be utilizing alternate suppliers to get better services

4    or better rates, that would include regulatory affairs.  Over

5    the course of many years, the access regime that was put in

6    place after divestiture has changed drastically, and so we work

7    to help reform and modernize the access regulatory orders.

8         And my team also has some responsibility for managing

9    arbitrage activities, trying to mitigate.  There's also been

10   what's described many times here, the billing and the elements

11   and the number of carriers included in the call flow are very

12   complex, and it's a little bit hard to follow the bouncing ball

13   in some situations, and where there's money, there's been a lot

14   of schemes in the access space that the FCC has been trying to

15   address over the years, and so my team helps to understand what

16   those schemes are and put controls in place to try to monitor

17   whether or not we're being billed properly.  And then my team

18   also has responsibility for all of the interconnection between

19   AT&T and other carriers that make phone calls work.

20   Q   How large is your team?

21   A   I have about 16 people domestically, and I have 13 people

22   internationally, and I have a few contractors.

23   Q   How large is the budget for your group?

24   A   Roughly 400,000,000.

25   Q   Does the work -- does the work that your group does, does

1    it effect consumers?

2    A    Inadvertently, yes.  I mean, when we provide a better

3    quality service, that would provide benefit to the customer.

4    When we ensure that we are paying properly, that would ensure

5    that rates aren't inflated to consumers.  So yes,

6    inadvertently.

7    Q    I'm going to show you now a demonstrative exhibit that I

8    presented during the opening statement, and we've had a lot of

9    discussion about these terms during the -- the course of the

10   last two days, so I'm going to ask you some high-level

11   questions.

12        The first one, when we get Exhibit -- I believe it's a

13   AT&T 87.  If we can get that up.  Can you just describe this,

14   at a high level?

15   A    Yes.  This is a traditional telephone call.  So this is a

16   wire line, think of your home phone on the wall, connected.

17   Basically, the customer on the left side is the customer that's

18   making the phone call.  It goes over a local loop.  The

19   telephone lines outside, would be an example.  It goes to the

20   first switching office, which is the LEC end office, stands for

21   local exchange carrier as we discussed.  There's two paths, you

22   can go on the bottom path, directly to AT&T's IXC, using

23   transport, as Jennifer spoke about, that would be fixed, or the

24   call could go to the tandem, which is an aggregation point,

25   where multiple end offices would feed into that tandem as an

1    alternate path to get to the AT&T network.  And then on the

2    right-hand side, you have the call terminating, and it

3    basically follows the same path.  It could go direct, it could

4    do to the tandem.  But each of these elements would be

5    separate, depending on the call flow.

6    Q    I want to talk to you about which parts of this typical --

7    at least traditional phone call AT&T would be charged for and

8    by whom.

9           So let's start with that, end-office switching.  The

10   Court has heard a lot about end-office switching.  My question

11   to you is what -- what does that end-office switching charge

12   for?

13   A    So the end-office switching charge is to care for the

14   connection from the customer into that first switching point.

15   It would cover the costs associated with the equipment in the

16   local loop.  AT&T would be charged for that, for the use of

17   that portion of the exchange networks, for their -- for their

18   network in a traditional telephone call.

19   Q    All right.  Let's go to the tandem switching, red circle

20   that you described.  There's a three about -- three above that.

21   It's defined as tandem switching charge.  What is that charge

22   for?

23   A    So if there's not enough capacity to justify connection

24   directly to the AT&T network, and for other reasons as well,

25   the call could go to the tandem.  Again, there's a switching

283

 1    fee associated with the tandem.  These are the high-level

 2    elements.  There's a number of sub elements that have been

 3    discussed.  I don't think we need to go to that level, but

 4    there's a switching fee that would be applicable, if in fact

 5    the call went through the tandem.

 6    Q    Okay.  So tandem is a separate charge than end office.

 7    Then I want to ask you about numbers -- number four.  I think

 8    you have already described it a little bit, but what is the

 9    charge transport that's labeled on the diagram, as four.  What

10    is that -- what is the purpose behind that charge?

11    A    So those would be more fixed elements associated for

12    getting the call from the tandem or the end-office to the the

13    facilities that carry the call versus the usage.

14    Q    It's hauling the call?

15    A    Yes.

16    Q    You have been in the industry nearly 30 years, correct?

17    A    Yes.

18    Q    You have worked in switched access for how long?

19    A    Over ten.

20    Q    Do you ever refer to end-office switching charges

21    generically as meeting any of these other tandem or transport

22    charges?

23    A    No.

24    Q    Why not?

25    A    Because they are separate billing elements.  They do

1    different things and in different call flows, some of the

2    charges would be applicable, and others they would not.  So

3    they are very distinct.

4    Q    Depending upon the call flow?

5    A    Depending on the call flow, yes.

6    Q    I want to talk to you now -- I want to shift gears just a

7    bit, talk to you about something that the Court heard a lot

8    about yesterday and some today, called competitive tandem

9    services.  What is a competitive tandem service?

10   A    So, let me take a half a step back.  I spoke about local

11   exchange carriers.  There are ILECs, incumbent local exchange

12   carriers.  Could be more, but I will speak about two.  One is

13   the ILEC, incumbent local exchange carrier, that would be like

14   a CenturyLink here in Denver, Verizon in New Jersey, the oldest

15   BC PacBell, those types of companies.

16        Second would be competitive local exchange carrier.

In this situation Level 3 is a competitive local exchange

17   carrier, and at some juncture, I think it was in 1996, the FCC

18   determined that there could be competition in this market, they

19   allowed CLEC to enter into the market, and there was an

20   opportunity to provide a competitive tandem service.  So

21   carriers primarily would have the option of not going to the

22   ILEC and utilizing a competitive tandem service.

23

24        Level 3 entered this business before 2015.  I'm going

25   to say maybe 2010-ish.  They created five super tandems, and

1    they are a competitive tandem provider.

2    Q    I want to put up Exhibit 89, AT&T 89.  This is similar, the

3    Court will note, to Exhibit 87, but we've added a couple of

4    additional items.  Now we have two more phones, at the top.  We

5    have a cable company X and carrier Y.  What are these new items

6    showing in diagram -- excuse me -- in Exhibit 89?

7    A    So, I use the words competitive tandem.  The words on here

8    are third-party tandem, which, in essence, are interchangeable,

9    in my opinion.  The carrier Y or the cable company X would be a

10   company like Comcast, who is a cable company, who might choose

11   to send their traffic to Level 3's competitive tandem service,

12   and so different from the call flow that we spoke about

13   earlier, where there's a local exchange carrier customer, that

14   goes to the Level 3 end-office switch, these cable companies,

15   and carriers that would use Level 3's competitive tandem

16   service, would send their traffic directly to the tandem.

17   Q    So, some of the calls that are going through Level 3's

18   tandem switch, have gone to Level 3's own end office switch,

19   and others that are for competitive tandem services do not; is

20   that correct?

21   A    That's correct.

22   Q    Are services billed different -- are tandem services billed

23   differently when the service is a competitive tandem service

24   versus the call flow being through the LEC's own end office?

25   A    I wouldn't say the tandem services are billed differently,

 1   I would say different elements apply to the two different call

 2   types.

 3   *Q*   Why?

 4   *A*   So, in the third-party tandem switching, there's no use of

 5   the end office, and as Mr. Steese spoke about yesterday,

 6   there's no functional equivalent for that end-office switching

 7   function, so the only charges that would be applicable to bill

 8   AT&T on a third-party tandem switching minute would be the

 9   tandem switching elements.

10   *Q*   Because the call is not flowing through Level 3's end

11   office?

12   *A*   Correct.

13   *Q*   Is it important to AT&T, that if a LEC is operating as a

14   competitive tandem -- excuse me.  Let me start again.  Is it

15   important to AT&T, that if a LEC is offering competitive tandem

16   services, as well as traditional end-office traffic, that it

17   distinguish on its billing which is which?

18        *MR. STEESE:*  I'm going to object that this is calling

19   for opinion testimony.  She was not disclosed as an expert.

20   This is certainly not fact testimony.

21        *MS. ZAMBRANO:*  Your Honor, may I respond?

22        *THE COURT:*  No.  I'm going to overrule the objection.

23   Go ahead.

24        Q   (By Ms. Zambrano) Thank you.  And my question is

25   simply for AT&T, Ms. Meola.

1    A    Yes.   In this situation, where there's a competitive tandem

2    service being provided, there would be many more minutes that

3    would be tandem rated, and so if you didn't have the

4    competitive-tandem situation, you would have a one-for-one

5    ratio, one tandem, one end office, it would be very easy to

6    distinguish.   However, when you overlay a third-party tandem

7    switching and don't differentiate that and combine it

8    altogether, it makes it very challenging and requires manual

9    intervention to interpret what calls should really be providing

10   only the tandem rate versus what calls should be getting both

11   the end office and the tandem rate applied.

12   Q    Okay.   I'm going to see if I can translate that.   So, on

13   Exhibit 9, these two charges one and two, that I'm circling,

14   those should both be assessed to AT&T, if the call had gone

15   through Level 3's end offices, correct?

16   A    Yes.   From their local exchange customer.   Yes.

17   Q    But for competitive tandem services, only this charge

18   should be assessed on that traffic, correct?

19   A    Yes, that's correct.

20   Q    Okay.   And are you saying that on certain bills, all of

21   this is billed together?

22   A    Yes, I am.

23   Q    And to be clear, Level 3's bills are like that?

24   A    And I think the better way would be the BAN versus the

25   bill; but yes, Level 3's bills encompass all of that on similar

 1   BANs.

 2   *Q*   Now, you have described why that's a problem for AT&T.

 3   Have you ever communicated with Level 3, anyone at Level 3,

 4   about this issue?

 5   *A*   Yes, I did.

 6   *Q*   Who did you speak to?

 7   *A*   I spoke with Shaun Andrews, who was an executive at Level

 8   3 -- is still, in a different role, but was an executive at

 9   Level 3, supporting these -- these services.

10   *Q*   And after you raised this issue with Mr. Andrews, what did

11   he say?

12   *A*   I basically shared with him, and he is very knowledgeable,

13   he is one of the most knowledgeable that I have worked with at

14   Level 3 on switch-access services, and I shared with them that

15   their competitive tandem services were creating an issue that

16   was making it very difficult for other mechanized systems to

17   differentiate the bills, and he was surprised to hear that.  He

18   was like, oh, I didn't realize that was happening.  Let me look

19   into that.  And then there was some follow up.  I think his

20   expectation was that his team --

21          *MR. STEESE:*  Objection, in terms of expectations,

22   speculation.

23          *THE COURT:*  Sustained.

24      *Q*   (By Ms. Zambrano) Ms. Meola, can you just tell the

25   Court what he said to you, in response, when you raised this

1    issue?

2    *A*   He said to me he would investigate it and that we would

3    look to find a resolution.  We were working on a number of

4    disputes at the time, this was one of the items that we

5    documented and were trying to resolve.

6    *Q*   Do you remember where you were when you had that

7    conversation?

8    *A*   I specifically remember I was in the airport in Minnesota.

9    I don't know why.  But he was on the road, at the time, and I

10   was on the road.  We got together to discuss a number of

11   disputes, these being one of the items that I brought to his

12   attention.

13   *Q*   And, roughly, what time period?

14   *A*   I think it was, roughly, 2017.

15   *Q*   I'm going to show you an exhibit now.  This is Exhibit A7.

16   A7 is an email string, and so I'm going to just show the part

17   that you wrote, which I believe starts on page three of the

18   exhibit.  So can you scroll down just a bit?  Can you please

19   scroll down?  Right here.  Okay.

20        Ms. Meola, this email is dated August 9, 2017, it's to

21   Ms. Torres.  Do you see that?

22   *A*   Yes, I do.

23   *Q*   Now, the record may or may not reflect this, but there is

24   blue type and black type and red type in this exhibit, A7.  Do

25   you see that?

1   *A*   Yes, I do.

2   *Q*   My interpretation of this is that the blue writing is

3   yours, that starts *Jennifer, thank you for your reply*.  Do you

4   see that?

5   *A*   Yes.  I reviewed this in advance, and that's how I

6   interpreted that.

7   *Q*   Okay.  I want to go down to the second page of your email.

8   So just scroll down just a bit here, please.  Okay.  Right

9   there.  There's a line that says, *There were a few other items*

10  *that Shaun was going to follow up on.  I know he was in the*

11  *car, so may have been lost*.  Do you see that?

12  *A*   Yes.

13  *Q*   Do you know what that is in reference to?

14  *A*   Yes.  He was on the road and I wanted to be sure that he

15  had documented -- I had documented the items that we discussed

16  because he was looking to have his team follow up on these

17  issues.

18  *Q*   I'm going to come back to the team.  Can you take that

19  down?

20        The first issue, that the team was going to work on,

21  it says, *To avoid future disputes, AT&T is requesting EO*

22  *billing*, and EO is capitalized, *and tandem billing on separate*

23  *BANs*.  What does that mean, Ms. Meola?

24  *A*   It means that, as I have just described earlier, there was

25  a different ratio of end-office billing to tandem billing and

 1   we couldn't differentiate it, as it all was combined, and so we

 2   were requesting that they differentiate the end-office billing

 3   from the tandem billing, separately, so that AT&T didn't have

 4   to manually interpret that every month as their business

 5   fluctuated and the bills fluctuated.

 6   Q   You said, just a moment ago, that we couldn't

 7   differentiate.  Did you mean that as a company you couldn't

 8   differentiate or the mechanized system?

 9   A   The mechanized testimony couldn't differentiate.  It was

10   not a one-for-one ratio.  So it requires manual evaluation that

11   my team would do, going into the details out of the ADW system

12   that was mentioned earlier today.

13   Q   And your team does, in fact, do that work?

14   A   Yes, they do.

15   Q   You were here to observe Ms. Torres' testimony, yesterday,

16   and some day, correct?

17   A   Yes.

18   Q   She testified in words to this effect, the record reflected

19   exactly what she said, but essentially that she was unaware of

20   AT&T ever complaining about this competitive tandem issue to

21   anyone at Level 3.  Do you recall that?

22   A   Yes, I do.

23   Q   Is that correct in your view?

24   A   No, I don't --

25           MR. STEESE:  I'm going to object, in that she is

292

1    calling for speculation about what Ms. Torres knew and didn't

2    know.

3              THE COURT:  Overruled.

4              THE WITNESS:  I was just suggesting Jennifer was on

5    this email, this -- Shaun had directed Jennifer to address

6    these issues.  So being the expert at Level 3 on billing, I had

7    assumed she was aware and understood the item that was being

8    addressed by her involvement and response here.

9    Q    So to sum, would there be a problem with Level 3 bills, for

10   AT&T's mechanized system, if they did not -- well, actually,

11   let me turn to something slightly different.

12             Would there be any problem in AT&T's mechanized

13   system, if Level 3's bills did not -- if Level 3 did not sell

14   competitive tandem services?

15   A    No.  We would be able to see there's one tandem for each

16   call, one end office for each call, and we would be able to

17   quickly validate that the bill was proper, and the mechanized

18   system would do that one-for-one match and provide payment.

19   Q    One last question, we've heard a lot of testimony about

20   TCG, correct?

21   A    Yes.

22   Q    And you don't work for TCG?

23   A    I do not.

24   Q    Okay.  But are you aware of whether TCG has competitive

25   tandem services?

 1   *A*   I am aware that they do not provide competitive tandem

 2   services.

 3   *Q*   Why are you aware of that, in your role, if you don't work

 4   for TCG?

 5   *A*   Because one of my roles is optimize our call flows and I

 6   use other alternate tandem providers, because we don't have our

 7   own.

 8   *Q*   So TCG's -- strike that.  I want to turn and talk about --

 9   not about a traditional phone call, but instead about a

10   particular kind of phone call that we've all become familiar

11   with known as voice over internet protocol call, or a VoIP

12   call, V O I P?

13   *A*   Yes.

14   *Q*   A VoIP call uses the Internet to complete a call opposed to

15   a telephone line, correct?

16   *A*   Yes.

17   *Q*   I'm going to show you a different diagram, Exhibit 87, and

18   because we have presented a lot of testimony on these subjects

19   I'm just going to ask you if you can describe the call flow on

20   the top of the exhibit, that says facilities-based VoIP access?

21   *A*   The facility-based -- excuse me -- VoIP access, is a call

22   flow where the Internet service provider is the same or an

23   affiliated entity of the end-office switching provider, so the

24   green, kind of, square and the yellow circle, and in that

25   situation the end-office switching function is being provided

294

1    by the same company.  There's costs associated with that, and

2    end-office switching is applicable to be charged on a

3    facility-based VoIP call.

4    Q    There's costs associated with that yellow line?

5    A    Yes.

6    Q    Okay.  Well, let's now look at an over the top, or an OTT,

7    VoIP call.  Can you describe that flow, which is on the bottom

8    half of Exhibit ...  80  -- excuse me, for the record --

9              THE COURT:  Seven.

10             MS. ZAMBRANO:  Eighty-seven.  Thank you, Your Honor.

11   A    Different from a facility-based VoIP call.  In the bottom

12   situation, the Internet services provider that's being

13   utilized, for me I have Comcast in New Jersey, if I used

14   Comcast's internet service and it went to a Level 3 end office,

15   there's no functional equivalent or any costs associated with

16   that local loop.  There's no outside plant, and therefore, in

17   an over-the-top call, the end-office switching charges have

18   been in dispute for a long time but are now declared

19   inappropriate form OTT call.

20        Q    (By Ms. Zambrano) I'm going to come back to that,

21   present-day ruling, that they're inappropriate for an OTT call.

22             Is that why the yellow line on the bottom is dotted,

23   is because there's no -- well, describe why the bottom line is

24   dotted?

25   A    There's no association with the service provider.  It's a

1    third-party broadband provider where the yellow line is flowing

2    versus the Level 3, in this example, end-office function.

3    Q    Okay.  And at this point in time that the LEC then cannot

4    recover end-office switching charges, for a VoIP call that uses

5    OTT technology, as we sit here in July of 2021, correct?

6    A    Yes.

7    Q    So that's the red X on the one, correct?

8    A    Yes.

9    Q    I know there's a lot of history, so I hesitate to ask you

10   this, but in a nutshell, can you describe the history of this

11   dispute about whether that one, with the red X, should have a

12   red X or not; ie, whether it should be compensable, please.

13   A    Yes.  I first became involved --

14          THE COURT:  Short version.

15          THE WITNESS:  I first became involved with the concept

16   of the OTT dispute in 2009.  AT&T took a complaint to the FCC

17   against a company named YMax.  They had an over-the-top

18   service.  The outcome was that they violated their tariff, and

19   so although AT&T won, it did not resolve the issue.

20          In 2011, roughly, the transformation order came out

21   and there was a VoIP symmetry rule in there.  YMax actually

22   asked for clarification of that rule, and in 2012, the FCC

23   issued a declaratory order that basically clarified end-office

24   switching was not applicable on OTT charges, and AT&T, at that

25   time, believed that that was settled law, and AT&T disputed

1   charges from companies like Level 3, in the 2012 timeframe.

2   AT&T and Level 3 had a settlement in 2013.

3           AT&T and Level 3 -- fast forward to 2015, that was

4   when the D.C. Circuit -- there's a lot of things that

5   transpired.  The D.C. Circuit overruled what was decided in

6   2012, and said end-office switch charges do apply.  Shortly

7   after that AT&T and Level 3 sat down to talk about how we would

8   address that.

9   Q   I'm going to stop you there, because I'm going to go into

10  Level 3.

11  A   A lot of history.

12  Q   I want to focus specifically on Level 3?

13  A   Yes.

14  Q   So, for purposes of this litigation, Level 3 is a LEC that

15  provides switch-access services to AT&T, as an inner-exchange

16  carrier, correct?

17  A   Yes.

18  Q   And certain of the calls that Level 3 hands off, to AT&T's

19  network, are VoIP calls that uses OTT technology, correct?

20  A   Yes.

21  Q   And are there... excuse me.  You described that the parties

22  had a dispute about charges on these OTT calls.  The Court has

23  heard a lot about it, correct?

24  A   Yes.  Regarding the end-office switching charges.

25  Q   That's what I was going to ask you.  Which charge has been

1    in dispute?

2    *A*    Always the end-office switching charges.

3    *Q*    Why?

4    *A*    It was the same concept right from day one.  In the YMax

5    complaint, it was one of the first OTT devices.  It's a little

6    dongle that went into your computer, you used your Internet

7    services, and AT&T's position was I'm using my Internet

8    services, there's no local loop, there's no local switching,

9    that's what started the concept of the dispute, and so if you

10   look at all of the legal proceedings, it's always been about

11   end-office charges.  All of our disputes and settlements have

12   been about end-office charges.  Tandem has never been in

13   dispute.

14   *Q*    Are there any other switched-access charges that have been

15   at issue in the parties' dispute regarding OTT calls?

16   *A*    Not regarding OTT calls, no.

17   *Q*    Well, did you hear Ms. Torres testify that, in her view,

18   that this dispute has been about everything?

19   *A*    Yes, I did.

20   *Q*    Was the OTT dispute about all switched-access services,

21   from your perspective?

22   *A*    No.  It was only end-office switching.

23   *Q*    Well, have the parties had other disputes about Level 3's

24   billing of other services?

25   *A*    Yes, many.

298

1  *Q*   Okay.  And we've heard about some of those, so I won't

2  belabor this, but have you been involved in some of these

3  disputes?

4  *A*   Yes, many.

5  *Q*   Give the Court a sense of the volume of the disputes that

6  AT&T has had with Level 3?

7         *MR. STEESE:*  I'm going to object on foundation.  I

8  think timing here matters --

9         *THE COURT:*  Sustained.

10         *MR. STEESE:*  -- and if you are going back ten years.

11         *THE COURT:*  Sustained.

12         Q    (By Ms. Zambrano) Okay.  So, why don't we start then

13  for the relevant time period, January 1, 2015 forward.  Can you

14  give the sense of the volume of disputes that Level 3 and AT&T

15  have had?

16         *MR. STEESE:*  I'm going to object on foundation, again

17  the damages period is January 1 of '19 to the present, so that

18  should be the focus.

19         *MS. ZAMBRANO:*  I would like to respond if Your Honor

20  is going to sustain it.

21         *THE COURT:*  Please.

22         *MS. ZAMBRANO:*  Excuse me?

23         *THE COURT:*  Please.

24         *MS. ZAMBRANO:*  Yes.  We heard a lot of testimony about

25  why prior disputes that AT&T and Level 3 had, should be used as

1    a proxy in this process, to determine whether and how much

2    AT&T's withholding.  I think this is fair game.

3         THE COURT:  It's fair game.  Having said that, I'm --

4    my assumption is that we're not going to go into the history of

5    all of these --

6         MS. ZAMBRANO:  We are not.

7         THE COURT:  -- exchanges between these companies.  All

8    right.  Go ahead.  Make your approximation.

9         THE WITNESS:  Okay.  I guess the easiest way to do

10   that, I'm going to work backwards.  There was a settlement this

11   year in 2021.  There were roughly 25 disputes that were

12   addressed in that settlement.  Level 3 --

13        MR. STEESE:  Your Honor, I think -- let me -- I think

14   this is going to create confusion.  Very respectfully, if I can

15   be heard.  Again, there are facility's disputes and there are

16   usage-based disputes, and the only thing at issue here is

17   usage-based charges, and so if she talking about something that

18   resolves 25 issues, when it could be both ways --

19        THE COURT:  Well, you can do some Cross on this.  I

20   think we're putting a lot of air into a balloon that I don't

21   think is a terribly important balloon for me, but go ahead.

22        Q    (By Ms. Zambrano) Why don't you limit your testimony

23   to usage based -- usage-based disputes, okay?

24   A   So, in 2015 we had three items that we saw were settled.

25   In 2017, I'm going to say roughly five.  I don't have the

1    number.  In 2019, there were 11 switched-access disputes that

2    were settled.  So there has been -- and then in 2021 there

3    were, I'm going to say, five, seven.  Um, there have been a

4    number of disputes, continual disputes at any given time.  The

5    billing is very complex and that's been kind of the routine.

6    Q   Okay.  Cognizant of the Court's remarks regarding these

7    other disputes, okay, generally, how have you been able to work

8    through and resolve disputes with Level 3, please?

9    A   Generally.  The parties would get together, the billing

10    organizations, both on my team and would do what we call rack

11    up, I think somebody referred to that, try to reconcile what

12    the disputed amount is, what charges were billed, what charges

13    were paid, and then come to some resolution on how to resolve

14    the situation.  It's always our preference to try to resolve

15    the retro period full and final, close it out, put it behind

16    us, and find a resolution going forward.  However, this dispute

17    we haven't found the resolution going forward.  So, although we

18    had a number of settlements on OTT, that closed out the past

19    period, we have continued to perpetuate the dispute going

20    forward.

21    Q   How does that compare with disputes with other carriers,

22    Ms. Meola?

23    A   We certainly don't have as many disputes or discrepancies

24    with billing with other carriers.  There are issues.  There are

25    schemes that I spoke about, very specific, but there's just a

1    number of different things, Level 3 -- between Level 3 and AT&T

2    that make it a little bit more complex, but it doesn't seem to

3    be -- there's some things that happen very quickly and can get

4    resolved and then there are other things that are very

5    challenging.

6    Q   Well, I was going to ask you about that word, because

7    that's how Ms. Torres, yesterday, described the relationship.

8    Do you agree that the relationship has been challenging?

9    A   Yes, I do.

10   Q   And from AT&T's perspective, why?

11   A   Well, from AT&T's perspective we're the customer.  Just

12   from a switched-access perspective, we pay tens of millions of

13   dollars a year to Level 3, and we expect to get a bill that is

14   proper and that we can interpret and that we can quickly pay

15   without having to spend an inordinate amount of time to

16   validate, in an effort to try to resolve disputes.

17   Q   All right.  I want to focus in on Level 3, and I want to

18   focus in on the time period right before 2015 -- excuse me --

19   the settlement was agreed to between the parties in 2015.  So

20   you said in 2013, that OTT -- on OTT calls, end-office charges

21   were not compensable, according to the FCC.  Was that your

22   understanding?

23   A   The YMax Clarification Order, yes.

24   Q   Was Level 3 billing you for end-office charges on OTT

25   calls?

302

1   *A*   Yes.

2   *Q*   So, the FCC has not said that wasn't allowed.  How about in

3   2014?  Did Level 3 bill for that -- the one in the bottom chart

4   on those OTT calls?

5   *A*   Yes, they did.

6   *Q*   Was AT&T disputing those calls?  Disputing those charges,

7   excuse me?

8   *A*   Yes.  There was a clause in the 2013 Settlement, I don't

9   recall exactly, but there was like interim period, where the

10   parties were supposed to work towards trying to resolve the

11   issue going forward, but they continued to bill the end-office

12   switching charges, at that period.

13   *Q*   Were you withholding, based on the FCC's decision?

14   *A*   We were withholding not only on the FCC's decision of

15   end-office switching, but in the 2013 Agreement there was a

16   factor of 65 percent that was identified.

17   *Q*   All right.  Let's talk about February time period.  The FCC

18   issued a new decision, which allowed the LEC to bill, you

19   testified about that, that the law had changed, essentially,

20   correct?

21   *A*   Yes, it did.

22   *Q*   And AT&T appealed that.  The Court is aware of that,

23   correct?

24   *A*   Yes.

25   *Q*   Okay.  So I'm just setting the stage.  The state of play

1    between AT&T and Level 3, as you were negotiating the 2015

2    Agreement, was that AT&T's position was that those end-office

3    charges were not appropriate on OTT calls, and Level 3's

4    position was that they were; is that a fair summary, Ms. Meola?

5    A    Yes.  We were appealing the -- the current decision.  So

6    our position was still that they were not appropriate.

7    Q    What was not appropriate?  What's the *they*?

8    A    The end-office switching charges were not appropriate, that

9    is what we were appealing.

10   Q    Okay.  What about other switched-access charges on this

11   call?  There's a bunch of other charges on the OTT flow.

12   A    No.  That was not part of our appeal.  It was just the

13   end-office switching charges and whether or not they were

14   appropriate.

15   Q    Did you ever refer to the OTT dispute as a dispute

16   regarding any other switched-access services?

17   A    No.  I don't believe I did.

18   Q    I'm going to show you another demonstrative exhibit; this

19   is 91.  And I am going to move through this fairly quickly,

20   Ms. Meola.  It's simply to put these dates that you have talked

21   about on a time here.  So on the far left, you see the FCC's

22   Decision, correct?

23   A    Yes, I do.

24   Q    That's the 2015 Decision, I should say, for the record?

25   A    Yes.

304

1   *Q*   The Settlement Agreement then is after the appeal, in May

2   of 2015?

3   *A*   Yes, it is.

4   *Q*   Okay.  I want to talk to you about that Agreement.  What

5   was your role related to the 2015 Settlement Agreement?

6   *A*   I was the primary business negotiator for AT&T, on the

7   issues in that Settlement.

8   *Q*   Who did you negotiate with at Level 3?

9   *A*   Primarily, Shaun Andrews.

10  *Q*   Did you hear Ms. Torres, yesterday, describing herself as

11  having a role in the creation of the Settlement Agreement?

12  *A*   Yes.

13  *Q*   Did you ever negotiate with Ms. Torres?

14  *A*   Not during that time, no.

15  *Q*   Did you ever have meeting or call that you can recall that

16  Ms. Torres participated in, with respect to this Settlement

17  Agreement?

18  *A*   I don't recall.  I think everything went through Shaun, to

19  me, at that time.

20  *Q*   Let's go to Exhibit A1, and I want to simply ask you to

21  identify, this is the parties' Settlement Agreement for the

22  record, please.

23  *A*   Yes, that's the Agreement, 2015 Agreement.

24  *Q*   And you executed this on behalf of AT&T.

25  *A*   Yes, I did.

305

1    Q   Let's talk -- let me ask you this, broadly speaking

2    categories of disputes.  You said Level 3 and AT&T had several

3    disputes in this time period.  Which of those disputes are

4    dealt with in Settlement Agreement that's Exhibit A1?

5    A   The OTT dispute, which addressed Level 3.  You can see in

6    the second whereas clause, *Level 3 end-office switching*

7    *charges*.  The second item that was addressed in here was a

8    preventative clause.

9         Actually, can you go down to the next page?  Where the

10   romanettes are.  One more.  Yeah.  Maybe there.  The second

11   item was in (iii) here, it talks about the calling party

12   number.

13   Q   So, (iii) please.

14   A   And this -- in the 2015 order, there was a footnote that

15   spoke about if a carrier owned the calling party number, the

16   LRN, then they could charge end office, and that's kind of, we

17   have been hearing those three things synonymously, LRN, CPN,

18   end office, the footnote in the 2015 Declaratory Order

19   basically said if you owned the end office, you could charge

20   end-office switching, and so this particular clause was put in

21   here to try to avoid disputes in the future, to say if you

22   don't own the end office -- or the LRN or CPN or end office, as

23   was the example with the competitive tandem, that you cannot

24   bill, and so that's what this was trying to prevent.  It wasn't

25   a dispute at the time, but because Level 3 had a competitive

1    tandem service, we wanted to be sure that we could avoid the

2    dispute.

3    Q   Can I translate that real quick?

4    A   Yeah.

5    Q   Does that mean that AT&T wanted to make sure that Level 3

6    was not billing for end-office services when they didn't own

7    the phone numbers?

8    A   That's correct.

9    Q   Okay.  All right.  So we've got the end-office dispute --

10   or excuse me -- we have got the OTT dispute, and then the

11   second -- the third whereas clause, I believe, if you go back

12   to page one, it reference as tandem dispute and then there's a

13   DEOT dispute.  Are these the big buckets, if you will, of the

14   disputes that were resolved?

15   A   There was tandem dispute and there was a DEOT dispute also

16   that settled.

17   Q   And the OTT dispute had, sort of, two aspects, which we

18   will get to.  And I want to talk about that first.  This is the

19   OTT dispute, this is the dispute that you have testified about

20   that the parties had a disagreement about, that's referenced

21   here in the whereas clause?

22   A   Yes, this is the dispute.

23   Q   I want to talk to you about Exhibit A, that is referenced

24   in this whereas clause.  Okay.  Ms. Torres testified that some

25   of the balances in Exhibit A, that were included in the $20

307

1    million total, for the OTT dispute in Exhibit A were charges

2    for other switched-access services not for end office.  I'm not

3    going to pull it up.  The Court is familiar with that page.

4    But my question is simply this, at the time you were

5    negotiating this Agreement, did you understand that there were

6    switched-access services other than end-office switching

7    charges that were included in these balances?

8         *MR. STEESE:*  I'm going to object on foundation.  We

9    had a witness that was here to testify about she calculated

10   those numbers.  I think we need to find out if Ms. Meola was

11   actually the person gathering the numbers, finding that out

12   before she can answer what question.

13        *THE COURT:*  Overruled.

14   Q    (By Ms. Zambrano) Would you like me to ask the

15   question again?

16   *A*   No.  I think I know the question.  I was not aware of the

17   fact that there were additional charges.  The dispute was about

18   end office.  The Exhibit A was titled OTT, and so I would have

19   expected those to be end-office switching charges.  The Exhibit

20   A also has tandem and DEOT separately identified in that

21   exhibit, as well.  But that was Level 3's exhibit, as they

22   provided that guidance, that was not ours.

23   *Q*   So then, if this dispute was only about end-office charges,

24   had AT&T been withholding other switched-access charges, based

25   on the OTT dispute, at that time?

308

1      MR. STEESE:  I'm going to object, again, on

2  foundation, and I think that there has to be some other

3  questions about how the basis of the withholding is done, and

4  what the mechanized process actually withholds before she can

5  just give us a statement on that question.

6      THE COURT:  I will sustain it.  I want some more

7  background.

8      MS. ZAMBRANO:  Thank you, Your Honor.

9      Q    (By Ms. Zambrano) Are you familiar with the history

10  of the parties' OTT dispute.

11  A    Yes, very.

12  Q    Did you -- are you aware of which charges were being

13  withheld in AT&T's mechanized system as a result of the OTT

14  dispute?

15  A    Yes, I executed the changes.

16  Q    Okay.

17  A    I initiated them.

18  Q    And I am talking about before 2015 Settlement Agreement.

19  Were you aware what kinds of switched access services AT&T,

20  just from our perspective -- AT&T's perspective, which charges

21  were being withheld?  Do you have knowledge of that, ma'am?

22  A    For the OTT dispute it always only end-office switching

23  charges.

24  Q    So, then my question is, had AT&T withheld any other

25  switched-access charges, based on the OTT dispute, at the time

1  this was executed?

2  *A*   No.

3          *MR. STEESE:*  Again, Your Honor, I would like to ask

4  some foundation.

5          *THE COURT:*  You can have Cross.  Go ahead.

6          *MS. ZAMBRANO:*  Thank you, Your Honor.

7      Q    (By Ms. Zambrano) Let's go to Section I of the

8  Settlement Agreement.  Big picture, big picture, Ms. Meola, how

9  was the OTT dispute resolved in the Agreement?  I don't want

10  you to read it.  I want you to explain it, as one of the

11  negotiators, how did you resolve this dispute?

12  *A*   So there was a retro payment that AT&T made to Level 3 for

13  75 percent of the end-office switching charges, or so we

14  thought, that was roughly $15 million, and then there was a

15  supplemental payment that AT&T paid for another $2 million,

16  reconciliations still needed to be done for the current period

17  so the parties agreed to take that offline and figure that out

18  after the Settlement, and then it basically determined that

19  going forward AT&T would pay 100 percent of the end-office

20  switching charges associated with OTT calls, based on the fact

21  that the 2015 D.C. Circuit decision that that was the current

22  law, and then if you scroll down, if you don't mind.

23  *Q*   Sure.

24  *A*   And then the third component of this was, because AT&T had

25  appealed the decision, at that point, the parties had

1    discussed, and both of the companies were pretty invested in

2    this issue, at the time, the parties agreed that if, in fact,

3    the decision was overturned and there was a final appellate

4    order, that within 30 days, Level 3 would credit AT&T back 50

5    percent of the end-office switching charges associated with the

6    OTT dispute.

7    Q    I want to ask you then about that second aspect that you

8    testified about, about paying one hundred percent of end-office

9    switching charges while the FCC's Declaratory Order was

10   appealed.

11        Why do you refer to that as only an obligation to pay

12   end-office switching charges and not all-access charges on OTT

13   traffic?

14   A    I misspoke.  I again, tandem has never been in dispute.

15   There's always been an obligation.  AT&T has always paid those.

16   So the change, at this juncture, was that we now had to pay

17   end-office switching charges on OTT calls, as well.  I should

18   have clarified that.

19   Q    No problem.  And do you understand that Level 3, though, is

20   saying that what AT&T agreed to do, in this time period, in

21   section -- (ii) was to pay all switched-access charges on all

22   OTT traffic?  Do you understand that from being in the

23   courtroom?

24   A    Yes.

25   Q    Okay.  Was that your negotiation or agreement with Level 3?

311

1   A   No.  That, in the second half of (ii) it specifically talks

2   about AT&T is not prohibitive from disputing other things

3   unrelated to the charges in the OTT Declaratory Order, and that

4   was basically because we had so many different issues that were

5   still outstanding, at that time.

6   Q   I want to talk to you then about the refund that has been

7   testified about, and that's in (iv).  Again, I don't want -- I

8   don't want you to read the language.  I want you to -- I want

9   to ask you, what was the relationship between the refund, in

10  this paragraph, (iv) -- if you could make it small again -- and

11  the payment obligation in (ii), if any?

12  A   There weren't any; (ii) was to address --

13  Q   Let me strike that.  I will ask you a better question.

14  Where the end-office charges were being -- were what you were

15  agreeing to pay on OTT traffic, under (ii); that's your

16  testimony?

17  A   Yes.  The Declaratory Order basically said that OTT charges

18  were eligible for end-office switching, at that time, so, yes,

19  we were agreeing to follow the law.

20  Q   Now, I want to ask about (iv) and I want to specifically

21  ask you about the sentence that talks about the 50 percent

22  refund.  I think it's five or six down; 50 percent of the

23  disputed OTT charges being the refund.

24         Okay.  Is the disputed charges, all access charges?

25  Would AT&T get those back, or some subset of access charges

312

1   that AT&T paid?

2   *A*   The disputed charges were only the end-office charges.  So

3   it would not be all.  It would be the subset of end office.

4   *Q*   Why?

5   *A*   Because those were the only issues that were -- or the only

6   charges that were part of this dispute.  It was the only thing

7   that was being appealed, at that time.

8        MS. ZAMBRANO:  Sorry.  I'm going to cut a few things

9   out, Your Honor.  Bear with me.

10  *Q*   I want to talk to you about late payment charges, very

11  briefly.  Late payment charges are referenced in Section 1 A

12  (i).  Could you pull that up on page two?

13       Why?  Why are late payments referred to in this

14  section?  In this section?

15  *A*   What we didn't talk about, here, is that at the time that

16  this settlement was being negotiated between AT&T and Level 3,

17  I think we heard the name Mike Riederer yesterday, there were

18  disputes that Level 3 had with AT&T that were being negotiated

19  at the same time, that were executed under a different

20  agreement, and late payment charges have not been all that

21  customary for the access organization to pay, however, there

22  was a number that we were trying to solve for, on the retro.

23  We had provided the opportunity to pay late payment charges, as

24  part of the payment, and there was also, on the other side of

25  the settlement, at that time, there were late payment charges

313

 1   that AT&T was requesting of Level 3, and so it was reciprocal,

 2   in the way that that was executed.  I forget what the

 3   percentage was, but we did agree that the late payment charges,

 4   as part of the total value in this particular settlement.

 5   Q   And they are referred to in Section 1 A (i) A,

 6   specifically?

 7   A   Yes, they are.

 8   Q   All right.  What about with respect to (ii), and AT&T's

 9   obligation to pay late charges going forward.  Again, I don't

10   want you to read the language to the Court.  I want to ask you,

11   as a negotiator, did you discuss, did you agree to pay any late

12   payment, charges pursuant to the tariff in this section?

13   A   No.  The only thing that AT&T was agreeing to pay, is Level

14   3's applicable switched-access tariffed rates for the OTT

15   traffic, and the reason that we worded it that way, is because,

16   at the time, the FCC had reform that was stepping down, the

17   rates were changing every six months, and so rather than

18   amending this contract, we agreed that AT&T would pay the then

19   current tariffed rate, to ensure that we were being properly

20   billed, and paying the proper amount, based on the step downs

21   that were already planned through reform.

22          So, that was the only thing that we were agreeing to,

23   is to pay the applicable switched-access tariffed rate for OTT,

24   knowing it was going to change during this period of this

25   contract.

314

1   Q    What was the applicable switched -- excuse me -- what was

2   the applicable switched-access tariffed rate that you were

3   agreeing to pay for the OTT traffic?

4   A    Well, pursuant to the terms of the OTT Declaratory Order,

5   which is the next part of that sentence, it was the end-office

6   switching charges.

7   Q    All right.  I want to go back to the timeline really quick.

8   This is Exhibit 91.  We just looked at the Settlement

9   Agreement, and we look at how the FCC's decision was going --

10  FCC's Declaratory Order was dealt with in the Agreement.

11       The Court is familiar with the fact that the D.C.

12  Circuit then did issue an order on November 18th, 2016.  I'm

13  going to move through this quickly.  You understand that the

14  Court has issued an order that AT&T -- excuse me, that -- that

15  for purposes of this litigation, that it was full and final as

16  of February 20th of -- February 2020.  But I want to ask you

17  just about the time period right after the D.C. Circuit issued

18  its opinion.

19       How did -- how did AT&T react, with respect to Level

20  3, when that decision came out?

21  A    So, I just want to make sure we're talking about November

22  of 2016?

23  Q    Correct.

24  A    Okay.  So, at that time, AT&T had reached out to Level 3,

25  and had -- because of (iv) that we just discussed, the decision

315

1   was overturned.  We had reached out to Level 3 to see what

2   their plan was.  Did they plan to appeal?  At that time, they

3   did ask for reconsideration.  I think they also asked for an

4   appeal, both of those paths were exhausted, and that's why some

5   time passed, here, where AT&T continued to pay hundred percent

6   of the end-office switching charges, from November until

7   August, waiting to see whether or not there was a final

8   appellate order, and when Level 3 did not appeal to the Supreme

9   Court.  Which was the next interval, on May 8th, we had reached

10  out to Level 3, believing that we had fulfilled the obligation

11  in the settlement and that 50 percent of the OTT charges back

12  to the June 2015 timeframe were owed to AT&T.

13  Q   Level 3 did not agree, correct?

14  A   They did not agree.

15  Q   We had a dispute, okay, in the summer, then, of 2017, about

16  whether the Agreement had become final.  The Court is well

17  aware of that.

18          My question to you is simply, what did AT&T do, in

19  August of 2017, when Level 3, then, was refusing to give a

20  refund?  What did AT&T do, internally, with respect to

21  end-office charges?

22  A   AT&T started to withhold 65 percent of the end-office

23  switching charges, and pay 35 percent of the end-office

24  switching charges.

25  Q   Were you personally involved in the process of changing the

 1    payment to 35 percent for end-office charges for OTT calls?

 2    A    I directed it, that was what I was referring to earlier.

 3    Yes.  Based on our belief of the Settlement language and my

 4    involvement in that.  Yes.

 5    Q    So, when did AT&T actually start to withhold that 65

 6    percent of end-office charges?

 7    A    It was August of 2017, so nine months after the decision

 8    was made.

 9    Q    Did AT&T withhold any other forms of access charges, based

10    on the OTT dispute?

11         MR. STEESE:  I'm going to object and ask about

12    foundation and the mechanized process and how she is aware of

13    whether it was or wasn't withheld before she answers that

14    question.

15         THE COURT:  Overruled.

16         MS. ZAMBRANO:  You may answer.

17    A    No, we did not withhold.  I directed my team.  My team

18    directed another subset of my team that manages our price

19    sheets to make the adjustment to the end-office switching

20    charges, and that was validated.  We saw that in an exhibit

21    yesterday.

22    Q    (By Ms. Zambrano) And have you since confirmed that

23    your instructions were carried out?

24    A    Yes.

25         MR. STEESE:  I'm going to object to foundation to find

317

 1   out when she says confirmed, what she did, et cetera.

 2          THE COURT:  Overruled.

 3      Q    (By Ms. Zambrano) Okay.  I want to fast forward then

 4   to 2019.  Okay.  So we've got another Settlement Agreement, in

 5   2019, between the parties.  My understanding is that was

 6   executed in June, but it was -- the effective date was January

 7   1 of 2019; is that correct?

 8   A   Yes, it was backdated.

 9   Q   Okay.  I'm just going to have you identify Exhibit 15.

10   Could you identify that please, for the record?  This should be

11   Exhibit 15.

12   A   Can I see the signature on this?

13          MS. ZAMBRANO:  Can you go down to the signature page,

14   please.  Thank you.

15   A   Yes.  This is the 2019 Settlement Agreement.

16      Q    (By Ms. Zambrano) Again, very high level, what

17   disputes did Level 3 and AT&T have that led to the execution of

18   the parties' 2019 Settlement Agreement, which has been

19   identified for the record as Exhibit 15?

20   A   There were 25 issues in total.  I'm not going to go through

21   those.  There were 11 switched-access disputes, one of them

22   being the OTT dispute.  We settled on a retro basis only, and

23   agreed that this -- this dispute would continue beyond the

24   execution date of the settlement, and so this closed out the

25   end-office switching charge dispute on OTT through January 1st

1    or December 31st of '18.

2    Q    Is that why the damages trial before Your Honor is -- is

3    only relating to January 1, 2019, going forward?

4    A    Yes.  The prior period was closed out with this particular

5    settlement, with all of the other issues.

6    Q    Let's go back to the timeline then, after the parties

7    reached a Settlement Agreement, in 2019, the FCC issued a

8    second order following that D.C. opinion, then, on December

9    19th, 2019; is that correct?

10   A    Yes.

11   Q    And the FCC ruling became final in February of 2020,

12   correct?

13   A    Yes; that's correct.

14   Q    Now, do you understand that Level 3 has taken the position,

15   in this litigation, that the FCC's ruling became final in

16   February 2020, for purposes of the parties' Agreement, and the

17   refund and so forth?

18   A    Yes, I believe so.

19   Q    Well, did Level 3's billing change, with respect to

20   end-office charges on OTT traffic, following the effectiveness

21   of this ruling in February 2020?

22   A    No.  They continued to bill AT&T a hundred percent of the

23   end-office switching charges.

24   Q    Well, we heard that there have been some credits.  Did they

25   offer you credits, in the course of your business relationship

1    on this traffic?

2    *A*    The credits were just issued in May of this year, but from

3    February 2020, through May of 2021, no.  There were no credits

4    provided or offered.

5    *Q*    When you say the credits were issued in May, do you mean

6    that Level 3 has given you a credit for all of the end-office

7    charges from February 2020, going forward, or just that there

8    was a credit on the May bill?

9    *A*    There was a credit on the May bill, and I can't tell you

10   what period that was for.  I'm not sure.

11   *Q*    Okay.

12   *A*    We can find that out.

13   *Q*    But they were billing you for all of their OTT traffic

14   between February 2020 to April of 2021, for end office,

15   correct?

16   *A*    Yes.  For all of the end-office switching charges.  Yes.

17   *Q*    Well, how about that 21 percent of the traffic that they

18   had agreed was OTT traffic, how about on those charges, were

19   they billing you?

20   *A*    They were billing us on end-office switching even on the 21

21   percent during that period of time it was a hundred percent.

22   *Q*    Okay.  I'm going to come back to the dispute between the --

23   we've established it's January 1, 2019.  On the demonstrative

24   exhibit, it's Plaintiff's 19, there's a blue line.  Can you

25   tell the Court what the blue line is reflecting, please?

1    *A*    The blue line is on the bottom right, it's billed AT&T

2    roughly $8.2 million in end-office switching charges during the

3    dispute period, which is January 1st, 2019 to present, and AT&T

4    paid roughly $2.9 million between that same dispute period.

5    *Q*    Were you here for opening statements, Ms. Meola?

6    *A*    Yes, I was.

7    *Q*    Are these the same numbers that AT&T is using in its

8    damages calculation, that we presented to the Court?

9    *A*    Yes, I believe so.

10           THE COURT:  All right.  We're going to shut it down,

11   take a recess for lunch.  I will give you an hour and a half.

12           MS. ZAMBRANO:  Your Honor?

13           THE COURT:  Yes.

14           MS. ZAMBRANO:  I only have two questions, if you want

15   me to continue?

16           THE COURT:  Okay.

17           MS. ZAMBRANO:  I'm on the clock.  Okay.

18           THE COURT:  Let see if you can do this.

19           MS. ZAMBRANO:  I can do it.

20   *Q*    You are aware that Level 3 is seeking a little over $9

21   million in this case?

22   *A*    Yes.

23   *Q*    Okay.  My question for you is this, has -- has AT&T

24   withheld $9 million, based on the OTT dispute?

25   *A*    No.  AT&T has not withheld $9 million based on the OTT

1    dispute.

2              MS. ZAMBRANO:  Thank you.

3              THE COURT:  You get a gold star for whatever -- for

4    whatever it's worth.  Okay.  Take a lunch break and come back

5    at 1:30.

6              THE COURTROOM DEPUTY:  All rise.  Court is in recess.

7         (Recess at 12:02 p.m.)

8         (In open court at 1:30 p.m.)

9              THE COURT:  Please be seated.

10             MS. ZAMBRANO:  Before we begin, Mr. Steese.

11   Your Honor, I neglected to offer our exhibits -- I neglected to

12   offer the exhibits I used into evidence.  If I could do that

13   now, please.

14             THE COURT:  Go ahead.

15             MS. ZAMBRANO:  AT&T offers Exhibit 95.  I'm sorry,

16   Exhibit 95 was the exhibit that I used on impeachment yesterday

17   in efficiency.  I'm doing it now.

18             MR. STEESE:  No objection to 95.

19             THE COURT:  I think 95 is already in.

20             MS. ZAMBRANO:  Okay.  Thank you.  Today, we used

21   Exhibit 87, 89 and 91 and we are moving for admission, at this

22   time.

23             THE COURT:  Eighty-seven, 89, and 91?

24             MS. ZAMBRANO:  Correct.

25             MR. STEESE:  No objection.  Eighty-seven, 89, 91 we

1    have an objection to the timeline, because it says to the

2    present certain things that happened, and the present is

3    actually inaccurate, and makes representations that are

4    factually inaccurate, at least as of this point in time.  Until

5    they establish the facts for that, we believe it's inaccurate.

6    We don't think that should be in evidence, yet.

7             MS. ZAMBRANO:  It was a demonstrative, Your Honor.

8             THE COURT:  Yeah.  I'm going to allow it in, and you

9    can tell me what you need to tell me about it, either in

10   this --

11            MR. STEESE:  Now.

12            THE COURT:  Or with?  Can we bring it up?  I don't

13   have it captured in my mind.  So it's hard for me to know what

14   we're talking about.  I don't want to lift these books.  What

15   number is it?

16            MS. ZAMBRANO:  Ninety-one, Your Honor.  We're bringing

17   it up, too.

18            THE COURT:  All right.  So what's the problem with 91?

19            MR. STEESE:  Can you make it a littler larger?  I'm

20   sorry.  Thank you.  If you look at the right, *Present, Level 3*

21   *issues credit, AT&T pays full end-office switching charges*.

22   Those did not happen simultaneously.  We stopped in May, not

23   the present.  Present is July, and then we don't have any

24   evidence, whatsoever, that they've stopped withholdings, and if

25   they have, it certainly wasn't as of the June invoice.  So, to

 1   me, that just is not a factually accurate point.

 2          THE COURT:  Okay.  And which -- I'm listening to you,

 3   and I am confusing myself, because I'm bouncing between the

 4   screen and what I have in front of me.  What is the portion

 5   that's on the screen?

 6          MR. STEESE:  The red line, that goes across the very

 7   top, *Level 3 bills 100 percent of end-office switching charges.*

 8   *No credit for OTT calls, all the way to the present*, and that's

 9   just not accurate.

10          THE COURT:  And I will exclude that --

11          MS. ZAMBRANO:  Your Honor, I think this demonstrative

12   could be taken into evidence, and you can evaluate, in light of

13   the witness' testimony, and if you think --

14          THE COURT:  I think that's right, but what I'm telling

15   you is that I'm not going to consider the top, speaking

16   portion, as being factually established, that's all that I'm

17   really saying, with regard to this, in terms of the rest of it.

18   In terms of the sequence of events, I don't think anybody is

19   disagreeing with the sequence.  It's just that one line.

20          MR. STEESE:  The sequence at the bottom and the -- it

21   also says *AT&T pays full-end switching charges*.  We have not

22   established that.  No one said that.

23          THE COURT:  Then I will consider --

24          MS. ZAMBRANO:  Your Honor, I'm not --

25          THE COURT:  I will consider it in accordance with the

324

1    evidence.  It's just a demonstrative.  I'm not going to go any

2    further than that.

3              MR. STEESE:  Fair enough.

4              THE COURT:  Let me just take it as admitted.  Let me

5    not bother with the exceptions.  I will consider it to the

6    extent that it is consistent with the evidence, and obviously

7    if there's no evidence to support certain facts, I'm not going

8    to accept those as facts, because it's on somebody's chart.

9              MR. MARSH:  Nor do we expect that.  Thank you,

10   Your Honor.

11             MR. MARSH:  This relates to our motion in limine that

12   concerned AT&T's proffer.  Your Honor instructed AT&T to file

13   it's proffer, give us an opportunity to file, any response we

14   have.  I just want to let Your Honor know we don't plan to do

15   so.  We think our Summary Judgment materials, our limine motion

16   covers the grounds, just so no one is surprised.

17             THE COURT:  All right.  Thank you.  You are still

18   subject to the oath that you took this morning understood?

19             THE WITNESS:  Yes, I understand.

20             THE COURT:  Go ahead, Mr. Steese.

21                        **CROSS-EXAMINATION**

22   BY MR. STEESE:

23   Q    Thank you, Your Honor.  Mr. Marsh, can you bring up Exhibit

24   A1, Section (iii).  And I won't belabor this.  We've looked at

25   this a few times.  Just to orient you though, blow up the

325

1    (iii).  This has to do with the CPN language.  Do you see that,

2    Ms. Meola?

3    A    Yes, I do.

4    Q    And we've met before, correct?

5    A    Yes, we have, Mr. Steese.  Nice to see you.

6    Q    Good to see you too.  And if you look at (iii) it says, *For*

7    *avoidance of doubt, the parties agree that Level 3 will*

8    *continue to bill AT&T full-switch-access charges on domestic*

9    *traffic that originates with or terminates to Level 3's*

10   *assigned CPN*.  Do you see that?

11   A    Yes, I do.

12   Q    In other words, Level 3, has the authority to assess

13   full-switched-access charges on calls with its own telephone

14   number, excluding OTT for a minute.  I'm not talking about OTT

15   calls.  Let's just say not OTT calls.  Are you with me?

16   A    Yes, generally, yes, that's correct.

17   Q    And to the extent that AT&T withheld payment on any

18   traditional non-OTT calls, of any kind, for switched-access

19   elements, that would be a breach of its contract, correct?

20   A    No, it would not, because we didn't look at the first half

21   of that sentence.  First half of that bullet.  So, the first

22   half of that talks, *Beginning in June, that Level 3 shall not*

23   *bill for any end-office switched access elements that don't*

24   *originate from the calling party number,* and then it says, in

25   the converse, *For avoidance of doubt, the parties agree that*

1    *Level 3 will continue to bill AT&T full switched-access charges*

2    *on domestic traffic that originates or terminates with Level 3*

3    *CPN*, but it doesn't have any obligation of AT&T.

4    *Q*   You remember me deposing you, correct?

5    *A*   Yes, I do.

6    *Q*   Can we get the Ms. Meola deposition transcript, please

7    Ms. Sanchez?

8            *THE COURT:*  We're getting it.  I hope.

9            *MR. STEESE:*  It's over here.  Thank you.

10           *THE COURTROOM DEPUTY:*  The one, February 7th, 2019?

11           *MR. STEESE:*  Yes.  Can I turn the ELMO on?

12           *THE COURT:*  You can.

13           *MR. STEESE:*  I don't know how to transition.

14           *THE COURT:*  You can't do anything with it until

15    Ms. Pearson switches it over, and she is not able to be in more

16    than one place at once.

17           *THE COURTROOM DEPUTY:*  I'm sorry.  You need the ELMO?

18           *MR. STEESE:*  I'm sorry, I didn't hear that.

19           *THE COURTROOM DEPUTY:*  Do you need the ELMO?

20           *MR. STEESE:*  Yes, please.

21           *THE COURT:*  It's on, but I'm not sure what -- it's

22    not -- hold on.

23       Q    (By Mr. Steese) Do you remember me deposing you,

24    don't you, Ms. Meola?

25    *A*   Yes, I do.

 1   *Q*   And you were trying to be as truthful as possible during

 2   that time?

 3   *A*   Yes, I was.

 4   *Q*   So, let's look at page 211, lines 13 through 24.  And you

 5   can see it on the screen, but you certainly can pull it up

 6   there, too.

 7   *A*   If you don't mind, 211.

 8   *Q*   Lines 13 through 24?

 9   *A*   Yes.

10   *Q*   And it says, *So, based on what you said before, if traffic*

11   *is traditional non-OTT traffic, Level 3 gets to bill full*

12   *access and AT&T will pay full access for non-OTT*?

13          *ANSWER: Yes, that was not disputed, correct.*

14          *QUESTION:  But whatever ends up to be* -- oh, I will

15   end there.

16          Correct?  So it says Level 3 can bill and AT&T will

17   pay on non-OTT traffic, correct?

18   *A*   Yes.  If it's not disputed, correct, but that -- yes.

19   *Q*   Thank you.  And on non-OTT calls that means Level 3 can

20   assess tandem charges, correct?  No, strike that.  On non-OTT

21   calls, at the Level 3 telephone number, that's what I'm talking

22   about.  Are you with me?

23   *A*   Yes, I think so.

24   *Q*   Thank you.  On that type of traffic, Level 3 can bill

25   tandem causes, correct?

1            MS. ZAMBRANO:  Your Honor, I'm going to have to

2     object.  There's been improper impeachment.  He needs to read

3     the same sentences of the Agreement that he asks Ms. Meola

4     about in the deposition, when asking that question.  He read

5     her a different sentence of the Agreement.  It's clear on page

6     211 of the transcript.

7            THE COURT:  I will give you an opportunity for

8     Redirect --

9            MS. ZAMBRANO:  Thank you, Your Honor.

10           THE COURT:  -- to clear that up.  Go ahead.

11      Q     (By Mr. Steese) And so, Ms. Meola, if it's non-OTT

12    traffic, with a Level 3 telephone number associated with it,

13    are you with me in concept?

14    A    Yes.

15    Q    If the call goes through the end-office switch, they get to

16    assess charges?

17    A    Yes.

18    Q    If the call goes through tandem switch, they get to assess

19    tandem charges, correct?

20    A    Yes.

21    Q    And in this particular case, the Court found that 21

22    percent of Level 3's calls were OTT, correct?

23    A    Yes.  That is what the Court said in the Summary Judgment.

24    Yes.

25    Q    And that means, AT&T was withholding access charges on 44

329

1   percent of calls, according to the Court, that were not OTT,

2   correct.   Sixty-five minus 21?

3   A   Yes, that would be correct.

4   Q   And AT&T was required to pay 100 percent of these access

5   charges, correct, on these non-OTT calls?

6   A   Where in the ... we were not obligated to pay, Level 3 will

7   continue to bill, is what (iii) says; is that what you are

8   asking me to refer to?

9   Q   But you think AT&T has the option of paying; is that what

10  you are saying?

11  A   No.   I'm saying it's applicable to bill it, but that

12  doesn't mean that it doesn't get disputed, or AT&T would

13  automatically have to pay that.   There's many disputes between

14  the companies and the application was to bill it properly.

15  Q   I thought you were finished.   I apologize.

16  A   Sorry.

17  Q   I just said that the call goes through the

18  end-office-switching?

19  A   Yes.

20  Q   And the call goes through the tandem?

21  A   Yes.

22  Q   With a Level 3 telephone number, then AT&T should pay those

23  charges, correct?

24  A   Yes.   AT&T should.

25  Q   Now, if you can bring up, I believe it's Exhibit 79, but it

330

1    might be 77, Mr. Marsh, call flow chart.  I'm sorry, 89.

2    Forgive me.  That works, perfect.

3            So, now, let's think about this, and assume this is an

4    OTT call.  Maybe would be better to bring up the next one,

5    90 -- 87 or 91 -- no, it's ... it is -- just bring up 89.

6    Eighty-nine is fine.  And I am going to ask you to assume now

7    it's an OTT call.  Are you with me, Ms. Meola?  The chart just

8    depicts a traditional line, but assume this is OTT right here.

9    A    Sure.

10   Q    Are you with me?

11   A    Yes.

12   Q    And so now the call flows through the end-office switch, to

13   the tandem switch, to AT&T.  Are you with me?

14   A    Yes.

15   Q    In that OTT call, Level 3 is entitled to charge for the

16   tandem charges on that OTT call, correct?

17   A    Yes.

18   Q    And here, for the end-office switch, Level 3 cannot assess

19   end-office elements, because it's an OTT call, currently,

20   correct?

21   A    Correct.

22   Q    But it can assess tandem switching in lieu, for use of that

23   end-office switch, correct?

24   A    I don't know that that's a settled matter, but I do know,

25   in this case, we stipulated the $300,000 to re-rate the -- the

331

1   elements.

2   Q   Are you aware that's what TCG is doing?  TCG is assessing

3   tandem switching in lieu for using the TCG tandem -- end-office

4   switch?

5   A   I am not aware what they're doing.

6   Q   Very well.  And the debate -- you can bring that exhibit

7   down now.  The debate over OTT, was whether LEC, TCG, frankly,

8   could assess end-office charges on OTT calls; that was the

9   debate, correct?

10  A   Yes.

11  Q   And initially, the FCC said yes you can, true assessments

12  on OTT calls, at one point in time?

13  A   I think it started, they said they couldn't with the 2012

14  Declaratory Order, and then they said that you could in 2015,

15  but yes, it did flip flop.

16  Q   And then in 2019 they said you cannot, true?

17  A   Yes.

18  Q   And before the 2015 Declaratory Ruling Order, there was a

19  debate about what the FCC's prior orders had actually meant,

20  whether end-office charges did apply or end-office charges did

21  not apply in OTT calls, true?

22  A   There were disagreements in the industry.  Yes.

23  Q   Okay.

24  A   AT&T's position was that the Declaratory Order or

25  Clarification Order from 2012, was settled law; that it was not

 1    applicable, at that time.

 2    *Q*   So, now in -- you talked about, on Direct, a 2013 Agreement

      where you say the parties agreed to a 65 percent factor.  Do

 3    

 4    you recall that?

 5    *A*   Yes, I do.

 6          *MR. STEESE:*  So, if I can mark this as an exhibit.  I

 7    think it's A60.  Can I approach, Your Honor?

 8          *THE COURT:*  Yes.

 9          *MR. STEESE:*  Can I -- would you like one too?

10          *MS. ZAMBRANO:*  You can give me the exhibits.  Yeah.

11    No problem.  You can hand me the exhibits.

12          *MR. STEESE:*  I apologize.  He just reached out.  I

13    have an extra one; you care for it?

14          *MS. ZAMBRANO:*  Nope.

15          *THE COURT:*  What is this being marked as?

16          *MR. STEESE:*  A60, Your Honor.

17     *Q*    (By Mr. Steese) And if you look at Section 2.16 on

18    page eight, and if -- can you pull up that.  Okay.  If you can

19    put the ELMO back on, please?

20          *THE COURTROOM DEPUTY:*  Yes.

21          *MR. STEESE:*  Thank you.

22     *Q*    (By Mr. Steese) The language says --

23          *THE COURT:*  It's the wheel.  The wheel drives you in

24    and out.  There you go.

25          *MR. STEESE:*  Different buttons.  This one is a little

1   unique.

2   *Q*   It says, *Because the parties have been unable to determine,*

3   *the volume of Level 3 traffic that was OTT, prior to the*

4   *effective date of this Settlement Agreement, Level 3 and AT&T*

5   *agree that for the period January 13 through December 2013, 65*

6   *percent of the end-office traffic billed to AT&T Corporate by*

7   *Level 3 is OTT-provider traffic.*   Do you see that?

8   *A*   Yes, I see that.

9   *Q*   (By Mr. Steese) So, the parties had not agreed, that

10  Level 3's traffic was 65 percent OTT.   They just agreed to put

11  a factor in, true?

12  *A*   No.   It says, before the parties had been unable to

13  determine the volume of Level 3 traffic that was OTT prior to

14  the effective date, of this settlement --

15  *Q*   Is it doesn't say --

16          *MS. ZAMBRANO:*   Let the witness answer.

17          *MR. STEESE:*   I'm going to interrupt.   I'm sorry.   You

18  read the word wrong.   It doesn't say before, it says because.

19  Do you see that?

20  *A*   It says because, yes, the parties, but then it says -- let

21  me start over.   *Because the parties have been unable to*

22  *determine the volume of Level 3 traffic that was OTT, prior to*

23  *the effective date of this Settlement Agreement, Level 3 and*

24  *AT&T agree that for this period, through January 2013, through*

25  *December, 65 percent of the end-office traffic billed to AT&T*

1    *corporate by Level 3 is OTT provider traffic.*

2              So, prior to the Settlement, there was an inability to

3    determine what, during this period that was just described, the

4    parties were agreeing to 65 percent.

5    *Q*   I will get back to that.  Now, AT&T told Level 3 that its

6    withholding was 65 percent of end-office charges, correct?

7    *A*   At what period?

8    *Q*   That it was withholding, at points in time, where it was

9    withholding it, said it was withholding 65 percent of

10   end-office charges, correct?

11   *A*   I think, generally, but I can't validate at all periods in

12   time, but during the period that we're talking about, in this

13   dispute, yes, for certain.

14   *Q*   And should Level 3 be able to rely on AT&T's -- statements

15   of what AT&T says it's doing?

16   *A*   Yes.

17   *Q*   And on Direct you said AT&T was withholding 65 percent of

18   end-office charges because you directed someone to withhold 65

19   percent of end-office charges, correct?

20   *A*   Yes; that's correct.

21   *Q*   And then, though, AT&T uses it' mechanized payment process

22   to withhold and pay a portion of the invoices, true?

23   *A*   Partially true.

24   *Q*   It uses a mechanized payment process to withhold?

25   *A*   So, I'm not the expert on the mechanized system, but the

1    mechanized system is -- there's a factor that can be put in,

2    for certain elements, and for end office it was put in at 35

3    percent to pay.  There has been a need to do manual

4    reconciliation of Level 3's bills, to help facilitate some of

5    the challenges with the combined billing.  So when you say,

6    does the mechanized system do it all, it needs some manual

7    manipulation, which has been part of our challenges.

8    Q    And the mechanized process automatically withholds more

9    than on the OTT dispute, than 65 percent of end-office charges;

10   isn't that true?

11   A    No, that's not true.

12   Q    Bring up Exhibit 82, please.  Do you recognize Exhibit 82?

13   A    Vaguely.  This was not one of the exhibits that I was --

14   had any hand in putting together.

15   Q    Are you aware that this is an AT&T exhibit?

16   A    Yes.  I browsed through the exhibits.

17   Q    And you can see *offsets for OTT Percentage Applied To Level*

18   *3 Non-Combined Bill*.  Do you see that heading?

19          MS. ZAMBRANO:  Your Honor, I'm going to object to the

20   foundation here.  This witness has not testified that she is

21   familiar.  It is a demonstrative aid, as well.

22          THE COURT:  It's not listed as a demonstrative.

23          MS. ZAMBRANO:  It's not.  Pardon me.  I'm trying to

24   look across the screen.  There's no foundation to ask this

25   witness these questions.  It's beyond the scope of her Direct.

1    She did not testify about this.

2            *MR. STEESE:*  Your Honor, if I can respond briefly?

3            *THE COURT:*  Go ahead.

4            *MR. STEESE:*  She has talked about --

5            *THE COURT:*  I'm going to let you allow her to read it,

6    but I'm not going to go into much more depth than that, because

7    it's not her document.  She doesn't know anything.

8            *MR. STEESE:*  She testified that the mechanized process

9    only withholds 65 percent of end-office charges.  This is an

10   AT&T document showing that --

11           *THE COURT:*  As I said, I'm going to allow you to have

12   her read whatever it is you want to bring to my attention.

13           *MR. STEESE:*  Okay.  Thank you, Your Honor.

14   *Q*   And you -- do you see the words *offsets for OTT percentage,*

15   *to a Level 3 combined bill* on the bottom line?

16   *A*   Yes, I see that.

17   *Q*   And do you see, where it says, *end-office withholding 65*

18   *percent originating end office billed*, it has 46-- I mean 48 --

19   *$4640*.  Do you see that?

20           *THE COURT:*  Help me.

21   *A*   Yes.  *End-office withholding, 65 percent originating*

22   *end-office billed*, yes, I see that.

23       Q    (By Mr. Steese) And then you say *tandem withholding,*

24   *withholding above 65 percent, end office*.  Do you see that?

25   *A*   Yes, I see that.

1   Q   And there's an amount, do you see that?

2   A   Yes, I see that.

3   Q   Do you know, for a fact, whether the mechanized billing

4   process did or did not withhold more than 65 percent of the

5   end-office charges on the OTT dispute?

6   A   I do not know.  I don't know a thing about these numbers.

7         MS. ZAMBRANO:  Objection.  Was -- that testimony was

8   that -- it wasn't clear whether that question was about this

9   document or in general.

10        THE COURT:  The question was in general.  I have the

11  answer, and we're done with this document.

12        MR. STEESE:  And I am finished.  Thank you,

13  Your Honor.

14     Q    (By Mr. Steese) Now, let us look at Exhibit 87, and

15  focus on page two.  And do you see there's an email from

16  Ms. Miller copying you from August 11, 2017.  And I am only

17  pointing this out to say, *Kim is out of the office today, so*

18  *she asked me to provide the following feedback*, in red.  Do you

19  see that?

20  A   Yes.

21  Q   Now, let's go back to the feedback in red that you were

22  talking about on page four in your Direct Examination, and you

23  testified to the blue being your language, correct?

24  A   Yes.

25  Q   And you say, *To avoid future disputes, AT&T is requesting*

1   *end-office billing and tandem billing on separate BANs*, do you

2   see that?

3   *A*   Yes.

4   *Q*   Doesn't say competitive tandem, does it?

5   *A*   No, it didn't need to.

6   *Q*   You under -- it didn't need to?

7   *A*   No.  When you have -- what I have explained earlier, when

8   you have more tandem billing than you do end-office, because

9   you have competitive tandem minutes there, you can

10  differentiate them.  If there are a hundred tandem minutes and

11  ten end-office minutes, if you separated them, it would be very

12  clear, there's a hundred tandem, ten end-office, when you put

13  110 together you could differentiate that without

14  interpretation and manipulation.

15  *Q*   So Level 3 was supposed to divine your intent that it was

16  competitive, based on the way your process worked?

17  *A*   No.  That was the discussion that Shaun and I had, about

18  what was causing the issue, and it was the fact that we're now

19  a competitive-tandem provider without causing differentiation

20  in the billing.

21  *Q*   You thought that was communicated to Shaun, and so --

22  strike that.  Because Shaun was in the car, you wanted to make

23  sure that the message was communicated directly, in this email,

24  correct?

25  *A*   I wanted to make sure that it wasn't lost, and that there

1    would be followup on it, and it would prompt him to followup on

2    the items that I had brought to his attention, so that we could

3    move forward in settlement.  I did that on many occasions with

4    Level 3.

5    Q    There is a difference between -- strike that.  I will ask

6    it this way.  When a call originates from a Level 3 end user,

7    and goes to end-office switch and tandem switch, are you with

8    me, in concept?

9    A    Yes.

10   Q    That is end-user billing, correct?

11   A    Yes, I guess you would call it that.

12   Q    And that end-user billing as end-office elements and tandem

13   elements, correct?

14   A    Yes.

15   Q    Here you didn't say is requesting a separation of end-user

16   billing from competitive tandem billing.  You said end office

17   versus tandem correct?

18   A    It didn't need to.

19   Q    If you can just answer my question.

20   A    Yes.  No, I did not.

21   Q    Did you have any discussions with anyone, other than

22   Mr. Andrews, about this issue?

23   A    I don't --

24   Q    -- at Level 3?

25   A    I don't know.  Jennifer had said she and I spoke, but I

1    don't recall having a discussion with her about this, but at

2    this point, Alison and Jennifer had started to engage on the

3    issues.

4    Q    Now, look at Exhibit A9, please, page one.  And do you see

5    this is an email from you, from June 29, of 2017?

6    A    Yes, I do.

7    Q    And you say, and I quote, *I spoke with Alison about OTT*

8    *withholding and we did not withhold*.  Do you see that?

9    A    Yes, I do.

10   Q    And I think earlier today, on Direct, you said that

11   withholding started in August, I believe you said, correct me

12   if I'm wrong, of 2017?

13   A    Yes, I believe that's correct.

14   Q    Perfect.  Thank you.  And you -- then continue, I think

15   there was a thought that the overwithholding for CPN, that we

16   discussed, should not be adjusted as it would apply to the OTT

17   dispute value.  Do you see that?

18   A    Yes.

19   Q    And the reason that there had been overwithholding, on the

20   CPN dispute, was because of the mechanized payment process,

21   correct?

22   A    I don't know exactly what caused the overwithholding on the

23   CPN issue.

24   Q    Okay.  Very well.  All right.  Let's go to A16.

25              *MR. STEESE:*  I don't believe this is in evidence yet,

1    Your Honor, so I will do -- this is an email from -- between

2    yourself -- can you blow that up a little larger, please.

3    Thank you.

4    Q   An email between Ms. Miller and yourself from September 25,

5    2017.  Do you see that?

6    A   Yes, I do.

7    Q   And I'm happy -- it's two pages.  Just turn the page,

8    quickly.  There's a -- there's additional bullets underneath

9    that.  Is this an email that you sent or exchanged with

10   Ms. Miller, during that timeframe?

11   A   I think she sent it to me.

12           MR. STEESE:  Move admission of A16.

13           MS. ZAMBRANO:  No objection, Your Honor.

14           THE COURT:  Received.

15       Q    (By Mr. Steese) And if you look at the fifth bullet,

16   it says, *Level 3 offered 7.6 million to settle OTT*, et cetera.

17   Then the second bullet says, *Level 3's offer covers full OTT*

18   *withholding, approximately $4 million through June*.  Do you see

19   that?

20   A   Yes.

21   Q   But you hadn't withheld anything for OTT, as of that point

22   in time, had you?

23   A   No.  It was assigned from the overwithholding as I was

24   describing in the email to Shaun, that we had spoken about.

25   Q   So, the overwithholding for the CPN issue, was assigned to

1    the OTT dispute, correct?

2    A    Yes.  I think that's what all of these documents have

3    shown.

4    Q    And that was -- I can look at -- you have seen it enough

5    times, formerly 56,000 in that range?

6    A    Yes, in that range.

7    Q    I didn't hear you?

8    A    Yes, in that range.

9    Q    And the rate elements at issue in the CPN dispute are

10   end-office elements, correct?

11   A    Yes, I believe so.

12   Q    And the rate elements at issue in the OTT case are

13   end-office elements, correct?

14   A    Yes, I believe so.

15   Q    You have been in the industry quite a long time, true?

16   A    Yes.

17   Q    And on Direct you were talking about a number of various

18   FCC decisions, and how you tried to track them, things of that

19   kind, correct?

20   A    Yes.

21   Q    And in all of those years, from a lay person's perspective,

22   at least; not asking you a lawyer question, have you come to

23   understand that the Filed-Rate Doctrine obligates hearings to

24   follow the terms of their tariff?

25            *MS. ZAMBRANO:*  Objection.

343

1       *THE COURT:*  Sustained.

2       Q    (By Mr. Steese) Now, in July of 2017,

3   terminating-switched access went to zero, correct?

4   *A*   July of 2016.

5   *Q*   Seventeen?

6   *A*   Seventeen.  Ask me that again.  What went to zero?

7   *Q*   Terminating end-office charges went to zero?

8   *A*   Yes, I believe that's correct.

9   *Q*   And just to make sure that we're framing this for His

10  Honor, if you look at the 2015 Settlement Agreement, it was

11  talking about OTT calling, whether the call was going to Level

12  3 and they were terminating the call, correct?

13  *A*   Yes.  It was both originating and terminating; if that's

14  what you are describing.

15  *Q*   I just want to make sure that this it understood or that

16  the call originates from a Level 3 side, and it's going to

17  AT&T, it would -- it was both directions, correct?

18  *A*   There were charges, end-office charges, that were in place

19  in 2015 for both originating and terminating.

20  *Q*   Exactly.  And in mid-2017, while originating -- strike

21  that.  One more question.

22        This end office going to zero, was not a unique OTT

23  issue; this was on all calls, correct?

24  *A*   Yes; that's correct.  Yes.

25  *Q*   I just didn't hear you.  If you can scooch into that

344

1    microphone just a little bit.  I apologize.  I thought I saw a

2    head nod, but I didn't hear any words.  Thank you.

3              And so as of mid-2017, the only charges, end-office

4    switched-access charges, that could possibly apply, would be on

5    the originating side, true?

6    A    Yes.

7    Q    And AT&T had taken the position that 65 percent of Level

8    3's calling was OTT in 2015, correct --

9    A    Um, well, in 2015 we had agreed to pay a hundred percent,

10   but yes, that was the position before, and that was the 65

11   percent was referenced in the 2015 Agreement, as historical,

12   and then beyond 2015, when the D.C. Circuit decision came out,

13   AT&T used that 65 percent that was referenced in the 2015

14   Agreement.  So there's a period in between where it was less --

15   it was a hundred percent paid, end-office switching.

16   Q    You are guessing what my question is going to be.

17   A    Okay.  Sorry.

18   Q    I'm only asking the position that AT&T thought it had on

19   the percentage of Level 3's OTT traffic?  That's all I'm

20   asking.

21   A    Sixty-five was the last agreed-upon number between the

22   companies.  Yes.

23   Q    Bring up Exhibit A19.  And as that's coming up, I'm just

24   going to ask a couple of questions, before I get to this

25   exhibit.  After the D.C. Circuit opinion issued, Level 3 was

1  providing information to AT&T in an effort to try and show AT&T

2  what its percent of OTT was?

3          MS. ZAMBRANO:  Your Honor, I object.  We have been

4  through this.  We've had a Summary Judgment on the factor.  I

5  tried to give a little latitude here.  We are going well beyond

6  the damages issue.

7          THE COURT:  I'm going to allow him to go a little

8  further and see where we're trying to land, but go ahead.

9          MS. ZAMBRANO:  Thank you.

10         THE COURT:  And I am assuring you, counsel, I'm not

11 opening up the 21 percent, whatever.

12         MR. STEESE:  I'm not trying to get anywhere near that.

13         THE COURT:  I don't think you are either, but let's go

14 ahead and see where you -- where you go.  Sometimes one's toes

15 are on the line.

16         MR. STEESE:  I think I am well behind it, but we will

17 see.

18         THE COURT:  Fair enough.

19         MR. STEESE:  So if you can scroll down a little bit?

20    Q    (By Mr. Steese) And one of the documents that Level 3

21 provided to AT&T was this document, that showed that its

22 percentage of OTT -- what it believed its percentage of OTT

23 was, separating out originating traffic and terminating

24 traffic, true?

25 A  I don't know this document.

1          *MS. ZAMBRANO:*  This is Exhibit 19.

2          *THE WITNESS:*  Is this the right one?

3          *MR. STEESE:*  A19.

4      Q    (By Mr. Steese) So, as information is provided to

5   AT&T --

6          *MS. ZAMBRANO:*  I'm sorry.  I really apologize, but

7   this is not ... it's not A19.

8          *THE WITNESS:*  I think this is a Level 3 document

9   because it has a termed IBLD.  I think that's a Level 3 term.

10         *MS. ZAMBRANO:*  Pardon me.  I'm sorry.

11     Q    (By Mr. Steese) So, as Level 3 is providing

12  information to your team, about its percent, what it believes

13  its percent of OTT traffic is, they don't forward it to you?

14  A    Your question earlier, which I didn't answer was, *Did they*

15  *provide information?*  Can I answer that first?  There was

16  factor numbers provided.  My team had tried to work with Level

17  3 on some of the details, but I was not involved with the

18  evaluation or trying to reconcile the huge variance between

19  AT&T's view and Level 3's view.

20  Q    So, you were unaware that Level 3 was providing information

21  to AT&T, saying that its OTT percentage on the originating side

22  was more than 50 percent lower than on the terminating side?

23  A    I was aware that Level 3 provided information to AT&T.  I

24  was just aware there were a lot of realities with it, and the

25  parties were not reconciling to -- weren't able to reconcile, I

 1    should say.  So yes, there was information.  I wasn't looking

 2    at those documents regularly.

 3            MR. STEESE:  Your Honor, she is not answering my

 4    questions.

 5            MS. ZAMBRANO:  Your Honor, I --

 6            THE COURT:  Well, I don't think she can, anymore than

 7    she has, and I think I understand the point that you are trying

 8    to make, why you want to extract it from her, in anymore

 9    detail.  There were discussions and information exchanges where

10    Level 3 took a position with respect to terminating versus

11    originating charges.  She is aware of that fact, generally, and

12    can't get any deeper than that; that's what you want me to

13    understand.  I get it.

14       Q    (By Mr. Steese) And after Level 3 provided AT&T with

15    information showing that its OTT percentage originating was

16    less, and given that --

17    A   At what timeframe is this?  I'm sorry.  Level 3 told us it

18    was 95 percent at one point.  I'm not sure what you are

19    referencing.

20            THE COURT:  Let him just ask the question.

21            THE WITNESS:  Okay.

22       Q    (By Mr. Steese) I'm talking about after the D.C.

23    Circuit opinion issues, and the parties are trying to get

24    issues resolved, are you with me, timeframe wise?

25    A   Yes.

1  Q   After Level 3 provided AT&T with information, saying that

2  its percent of OTT was substantially less on the originating

3  side than the terminating side, and given that terminating

4  access had gone to zero, did AT&T do any investigation to

5  determine whether to continue to withhold 65 percent on OTT,

6  from Level 3?

7  A   I believe the team did.

8  Q   You believe or they did?

9  A   I -- I did not do the work, Mr. Steese, so I -- I cannot

10 say, but that would have been part of my team's responsibility

11 to validate the information that came, consider all of the

12 facts, terminating went to zero that would have an impact.  So,

13 yes, I believe the team would have done that.

14 Q   You just don't know if they did or not?

15 A   I don't know.  I don't have those documents.

16 Q   And you did not ask them if they did, you just assumed they

17 would?

18 A   I know that there was a valuation done on all of the

19 documents -- or all of the feedback that Level 3 had given us,

20 which bounced around from 45 to 13 to 26, and there were a

21 number of issues along the way that were being identified,

22 mobility traffic being included.  Those evaluations were being

23 done.  I can't speak to what was found or what was determined.

24 Q   Carriers routinely complain to AT&T, that AT&T is

25 overwithholding, don't they?

1    *A*   No.  I would not say carriers routinely complain to that.

2    *Q*   And they claim that AT&T does not identify disputes with

3    specificity, don't they?

4    *A*   I don't know who you are referring to as *they*.

5    *Q*   Carriers, many carriers, on a regular basis?

6    *A*   I do not get that on a regular basis.  No.

7    *Q*   They complain that AT&T is withholding far more than what

8    the dispute would justify; isn't that true?

9    *A*   They do not complain that to me.

10   *Q*   Do they complain to your team?

11   *A*   Not that I'm aware of.  No.

12   *Q*   And AT&T's goal is to withhold money from carriers, so that

13   way they can try and negotiate a resolution for paying less

14   than what is legitimately owed; isn't that true?

15        *MS. ZAMBRANO:*  Okay.  I think counsel has testified

16   about four times here.

17        *THE COURT:*  I -- I agree with you.  The objection is

18   sustained.  Not that he is unique in that respect.  But the

19   objection is sustained.

20        *MR. STEESE:*  I -- I understand.

21        *THE COURT:*  All right.

22   Q    (By Mr. Steese) Are you aware that the FCC has

23   specifically found that AT&T has withheld money in an effort to

24   try and gain leverage in negotiations with carriers?

25   *A*   No.  I'm not familiar with that.

1        MS. ZAMBRANO:  I'm going to object, well outside of

2   this proceeding.  If this -- does it relate to Level 3?  Does

3   this relate to any of the access charges we are talking about?

4        THE COURT:  In light of the fact that she doesn't know

5   what is -- it means, there's nothing really that's in evidence

6   that's worth sustaining the objection to.

7        Q    (By Mr. Steese) Bring up Exhibit A3, please -- excuse

8   me, A53, please.  AT&T was obligated to pay one hundred percent

9   of access charges on OTT calls, until a decision issued

10  deciding -- a final decision issued, and I know there's been a

11  disagreement about what final means, but I'm referring to that

12  (iv) language.  You are familiar with that, correct?

13  A    Yes.

14  Q    And the Court found that that final decision became

15  effective February of 2020, correct?

16  A    The -- yes.  In the Summary Judgment from April of this

17  year.  Yes, they found that.

18  Q    And so, AT&T breached the Agreement, by withholding any

19  charges on OTT calls before that February 2020 date, correct?

20  A    I believe that's what the Summary Judgment said.

21  Q    And if you tally up the withholdings that AT&T withheld

22  from Level 3, on the OTT dispute, before that date, so from

23  February '19 through February of 2020, that's $5.6 million,

24  correct?

25  A    I don't know these numbers.  I know Jennifer went through

1    them, and there was discussion about everything, versus just

2    the end office.  So I don't know what the end office would be

3    in here.  So, the other withholdings would have nothing to do

4    with the OTT dispute.  So, no, I don't believe it's $5.3

5    million.

6    Q   Earlier you said you didn't know how mechanized process

7    worked, and what actually was withheld, true?

8    A   Yes.  I don't manage the mechanized system itself.

9    Q   So, you really do not know how much was withheld on the OTT

10   dispute, correct?

11   A   I know that 65 percent of the end-office elements were

12   initiated in the system for the OTT dispute.  The rest of the

13   withholdings were independent, on other elements and different

14   issues.

15   Q   Respectfully, you didn't answer my question, ma'am.  I

16   said, you don't know how much was actually withheld on a

17   dollar-level basis from Level 3 for the OTT dispute, do you?

18   A   Yes, I do.  Those were the numbers that were in --

19        THE COURT:  Timeout.  Timeout.  Are you asking her for

20   the numbers, not in terms of percentages, but the total dollar

21   amounts, as if I had a pile o' money, was counting one, two,

22   three, four, and this is the amount, the monetary cumulative

23   amount?  You are asking her if she knows that figure?

24        MR. STEESE:  That's what I have been trying to ask

25   her, Your Honor.

352

1          THE WITNESS:  I believe that's the 4.1 million that

2    was in the exhibit that Ms. Zambrano used in the opening

3    comments.

4          THE COURT:  Do you know, for yourself, what the total

5    monetary amount was, independent of what anyone else is saying

6    here?

7          THE WITNESS:  I know that the total end office, times

8    65 percent was the number, with simple math.

9          THE COURT:  And whatever that number comes out to be,

10   is the extent of your knowledge?

11         THE WITNESS:  Yes; that's correct.

12     Q     (By Mr. Steese) Have you gone into the mechanized

13   system to try and look to see how much was withheld?

14   A    No.  That would not be within any responsibilities.

15   Q    Have you looked at the mechanized system as adjusted by any

16   manual process to see how much was withheld from the Level 3 on

17   the OTT dispute?

18   A    I haven't, but my team would have.

19   Q    I'm asking you.

20   A    No, I have not.  I don't work in the mechanized system.

21   Q    Does Ms. Miller work in the mechanized system?

22   A    I can't speak to whether or not she is working in the

23   mechanized system, what that would mean to her.

24   Q    Have you looked at the internal workings of the mechanized

25   system to see that what was identified as being withheld was

353

1   actually what you intended to be withheld?

2   A   I have never logged into the mechanized system.

3   Q   Have you asked for a printout to see what elements were

4   actually being impacted, at all, for the OTT dispute?

5   A   No, personally, I did not.

6   Q   Have you seen any printout, of that to see what actually is

7   being withheld from the mechanized system?

8   A   I -- when you are saying from the mechanized system, AT&T

9   has had to manually adjust their bills.

10   Q   I'm asking about the mechanized system.

11   A   I don't know the answer to that.

12   Q   Have you seen the mechanized system adjusted by the

13   withheld -- have you seen the manual process, to see what

14   actual monetary was being withheld in a document or a report?

15   A   On occasion Alison shared those types of documents with me.

16   Q   Then why haven't they been produced in this question?

17        MS. ZAMBRANO:   Your Honor, that's a question at

18   discovery.  We had significant issues in this case, with

19   respect to when these issues have come up before or after fact

20   discovery.

21        THE COURT:   You can -- to the extent that you want --

22   okay.  To the extent that's an objection, it's overruled.  Let

23   me just clean this up in some respect, by asking this question,

24   is there a document that you can point to that shows the amount

25   withheld, either in total, or on a month-by-month basis, for

354

1  the OTT dispute?  By that I mean not a document that

2  extrapolates, but a document that is some report that is

3  independent of what may be produced by some expert, some

4  internal AT&T document that says, *for the OTT dispute, here's*

5  *what was withheld in January, February, March*, whatever it

6  might be?

7        Is there such a document in existence, to your

8  knowledge?

9        *THE WITNESS:*  I don't believe so.  No.  What I was

10  referring to are things that were created by Alison; not a

11  report.

12        *MR. STEESE:*  Thank you, Your Honor.

13    Q    (By Mr. Steese) Do you know what the term clawback

14  means, in the industry?

15  *A*  Yes.

16  *Q*  And clawback means that I am being billed charges today

17  that I think is improper, and then I look back in time and I

18  say, *Wow, you were billing me improperly historically too*, *and*

19  *I am going to withhold an amount now --*

20  *A*  Hm-hm.

21  *Q*  *To collect all of those historical amounts that I thought*

22  *you should not have billed*, fair?

23  *A*  I understand the concept, yes.

24  *Q*  Does your group utilize clawback at all?

25  *A*  No, not in recent years.  I can't talk about in the far --

355

1    you know five-plus-years ago, but in the last five years, no.

2    Q   So, 2019 to the present?  So, 2019 to the present, no

3    clawback?

4    A   No, legal would not allow that.

5              MR. STEESE:  Just one moment, Your Honor.

6         Q    (By Mr. Steese) oh, yes, one last point.  I believe.

7              THE WITNESS:  Can I just clarify?

8              THE COURT:  No.

9              THE WITNESS:  Oh, sorry.

10        Q    (By Mr. Steese) You said that Level 3 had not issued

11   any credits to AT&T until May of 2021, or words to that effect.

12   Do you recall that?

13   A   Associated with the OTT dispute?

14   Q   Correct.

15   A   Yes, that's my belief.

16   Q   And by that, you meant credits were not placed on invoices,

17   correct?

18   A   I -- I don't know what the technicality is, but there was

19   no -- there were outstanding balances for the total amount,

20   during that period of time, until the credit was applied or

21   provided in May.

22   Q   And you knew that AT&T was withholding, based on a 65

23   percent factor, correct?

24   A   Yes.

25   Q   And -- and again, I'm just looking, 2020 -- February 2020

356

1    forward.  Are you with me?

2    A    Yes.

3    Q    2020, forward.

4    A    Yeah.

5    Q    Okay.  Because February 2020 is when that decision became

6    final according to the Court correct?

7    A    That's correct.

8    Q    And so, if you look as of that point in time, AT&T is

9    withholding based on the 65 percent ratio, correct?

10   A    Yes.  We were still in dispute about the factor.

11   Q    And Level 3 is claiming, initially, 16, and eventually 21

12   percent of its calling is OTT?

13   A    Yes, that's what Level 3 is claiming.

14   Q    So the amount that -- excuse me -- that AT&T is

15   withholding, is more than three times greater than what Level 3

16   claims is OTT, correct?

17   A    Yes, during the dispute period.

18   Q    And if you bring up Exhibit A22.  Have you ever seen any --

19   before trial today -- not yesterday and today -- I will even

20   ask it better.  Before the last week or so, as you are getting

21   ready for trial.

22   A    Hm-hm.

23   Q    Have you seen the damages analyzes that Level 3 was

24   producing in this case?

25   A    I did.  I didn't spend much time on the damages.  My team

1    was evaluating those.

2    *Q*   And are you aware that as of around March 15 to 20 of 2020,

3    that Level 3 provided AT&T with documentation showing that it

4    owed a credit on what it thought its OTT percentage was; were

5    you aware of that?

6    *A*   Meaning, Level 3 quantified what a credit would be if you

7    issued a credit to us, what that value would be?

8    *Q*   Correct.

9    *A*   I don't know that for sure in March of 2020, but --

10   *Q*   I'm sorry, I thought you were done.

11   *A*   -- but that's possible.

12   *Q*   And so the issue was, it wasn't being placed on an invoice,

13   not that Level 3 wasn't recognizing the credits that it owed,

14   correct?

15   *A*   I'm not sure what that means.  Didn't see it on an invoice,

16   so, I don't know how that's recognizing it, if we didn't

17   realize it.

18   *Q*   So, you needed to see it on an invoice, for you to see it

19   as being a credit, so you could bring it down in your books and

20   calculate the credit?

21   *A*   I think so.  I think that's probably right.

22   *Q*   Okay.

23           *MR. STEESE:*  Just one moment.

24           *MR. STEESE:*  Your Honor, that's all of the questions

25   that I have.

1          THE COURT:  Redirect?

2          MS. ZAMBRANO:  Yes.  Thank you, Your Honor.

3                    **REDIRECT EXAMINATION**

4    BY MS. ZAMBRANO:

5    Q   I first need to pull up that page of the deposition, if you

6    have that.  I'm going to put it back up on the ELMO.

7          MR. STEESE:  Sure.

8          MS. ZAMBRANO:  Thank you very much.

9    Q   Ms. Meola, on Cross-examination I believe you were asked

10   some questions about the Agreement, and how you testified about

11   the Agreement in your deposition.  Do you recall that

12   testimony?

13   A   Yes, I do.

14   Q   Okay.  And I think, specifically, you were asked about the

15   page of testimony that I have up on the ELMO, and the question

16   that was read to you, I believe was, *So, based on what you said*

17   *before, if traffic is traditional non-OTT traffic, Level 3 gets*

18   *to bill full access, and AT&T will pay full access.  Yes, that*

19   *was not disputed.*  Is that -- is that your testimony, and is it

20   in relation to the part of the Agreement that he asked you

21   about?

22   A   So, I was not looking at the question that was really being

23   asked of me, when I answered, and if you go up to the question,

24   it's talking about a different part of the Settlement.  It

25   says, *In the event the OTT declaratory order is overturned,*

1    *either in whole or in part, and the applicable order on appeal*

2    *becomes final and is no longer subject to further appeal; Level*

3    *3 will refund within 30 days, 50 percent of the disputed*

4    *charges*?  And I said *Yes* and it continues.  So it's under --

5    Q    Section (iv)?

6    A    It's Section (iv) not Section (iii), which I was being

7    asked about.

8    Q    I'm going pull that up now, so you can explain that to the

9    Court.

10          MS. ZAMBRANO:  Could you pull up A (i), in particular,

11   page three.  I would like to see -- A 1 (iii), sir.  I would

12   like to be able to see -- on page three both (iii), that you

13   were asked about, in your testimony, and paragraph (iv), that

14   you were testifying about in your deposition.  It's the

15   Agreement, page three.  The Settlement Agreement.  Okay.  I

16   want you to blow up sections  (iii) and (iv) so she can see

17   both.

18   Q    (By Ms. Zambrano) Okay.  Now, can you explain, within these

19   two sections, which portion your testimony, on Direct, related

20   to with respect to the CPN obligation?

21   A    On Direct, it was (iii).

22   Q    And what was the import of what you were saying, in terms

23   of AT&T and Level 3's obligations in (iv), as you understand

24   them?

25   A    So in (iii), I had spoken about the footnote Declaratory

360

1    Order, that basically, it was clarifying that if you owned the

2    end office, LPN, that you could charge end office for those

3    calls, and then in this paragraph it had the converse for when

4    in doubt the parties agree Level 3 will continue to bill on

5    domestic traffic.  So this was providing for what Level 3 would

6    do and bill.  It did not obligate AT&T to anything.

7    Q    Okay.  And you were asked about that question on

8    Cross-examination?

9    A    Yes, I was.

10   Q    And then, you were shown this portion of your --

11        MS. ZAMBRANO:  You can take that down now.  I'm going

12   to show the ELMO now.

13   Q    And then you were asked about this question, and this

14   answer in your deposition, correct?

15   A    Yes.  I was.  Specifically, line 13 I was asked about.

16   Q    And do those -- were you asked on Cross-examination about

17   the same thing that you were asked about in your deposition?

18   A    No.  That answers a different question.

19   Q    Okay.  I want to cull up Exhibit 79 now.

20        MS. ZAMBRANO:  I need the ELMO down again.  Thank you.

21   Q    And this is a small point, but I think it's important.  On

22   the call flow, Exhibit 79.  The question that you were asked --

23   you were asked a question about the call flow, and we're going

24   to put that up, but specifically, it was about an OTT call

25   flow.  Here we go.

361

1          You were asked a question about a call flow in

2    relation to an OTT call, okay.  And it's -- the call -- the

3    question suggested that an OTT call goes through a switch; is

4    that correct?

5    A    A tandem switch, yes.

6    Q    How about an end-office switch?

7    A    An OTT call would not go through an end-office switch as we

8    said earlier.  It's a third-party broadband connection, and

9    like a Comcast cable service that's utilized, to provide the

10   functionality that was the functional equivalent of the

11   end-office switch.

12   Q    Okay.

13        MS. ZAMBRANO:  Your Honor, would it be okay if I asked

14   a question from the table?  I need to ask her about something

15   that the -- the record seems to suggest.  Thank you,

16   Your Honor.

17        Q    (By Ms. Zambrano) We're going pretty fast, and I know

18   that you and I both talk too -- talk fast and so I need to make

19   sure that later, when we review this transcript, that it is not

20   an error.

21        THE COURT:  This sounds like you are speaking into the

22   record.  I'm not really sure why.

23        MS. ZAMBRANO:  I am trying to find the right pages.

24   Q    Ms. Meola, was AT&T obligated to pay 100 percent of all

25   access charges on OTT calls, based on the FCC's original

1   decision or did it only deal with the end-office charges?

2           *MR. STEESE:*  I am sorry, I could not hear that.

3           *MS. ZAMBRANO:*  I can say it again.  I apologize.

4   *Q*   Ms. Meola, was AT&T obligated to pay 100 percent of all

5   access charges on OTT calls, as a result of the FCC's

6   declaratory ruling in February of 2015?

7   *A*   No.

8   *Q*   Which access charges were at issue and were required to be

9   paid because of the FCC's ruling?

10  *A*   The end office, which is the only elements that were in

11  that ruling.  There was no other obligation.

12  *Q*   And I believe you were asked, on Cross-examination, if AT&T

13  breached the Agreement by withholding any charges on OTT calls,

14  before that, and you testified about what the Summary Judgment

15  order says.

16          Should we look at the Summary Judgment ruling, with

17  respect to what the Court found or do you --

18          *THE COURT:*  No, we should not.

19      *Q*   (By Ms. Zambrano) Do you know whether -- in your

20  opinion, did AT&T breach the Agreement by withholding charges,

21  other than end-office charges?

22  *A*   No.  We did not withhold any charges other than end-office

23  charges on the OTT dispute.

24          *THE COURT:*  That's not an answer to the question, but

25  I understand the point you are trying to make.

1          *MS. ZAMBRANO:*  Thank you, Your Honor.

2          Q    (By Ms. Zambrano) You were asked a series of

3    questions, including some -- at least one, by the Judge, about

4    the mechanized system, and I believe that your testimony was

5    that you could not -- well, let me ask you this.  Are you aware

6    of -- do you have the ability to push a button and get a

7    printout of exactly what AT&T has withheld, with respect to the

8    65 percent of end-office charges on Level 3's bills?

9    A    Me, personally?

10   Q    Well, anyone at AT&T, based on the status of their bills?

11   A    I'm not sure what the billing team can see.

12   Q    Okay.  Does the state -- does the -- the way that Level 3

13   bills, on their billing account numbers, complicate the

14   mechanized system's review of those bills?

15   A    Yes.

16   Q    Okay.  And you were asked about, on Direct, a variety of --

17   on Cross-examination, a variety of questions about the

18   mechanized bill system, and I think you said I'm not the

19   expert; is that fair?

20   A    Yeah, that's fair.

21   Q    Okay.  But do you, in the course of your work, have some

22   understanding of what the mechanized bill system does?

23   A    Yes.

24   Q    And why?

25   A    Well, first of all, my team establishes the price sheets.

364

1    We have over a thousand carriers, that there's multiple

2    entities, multiple states.  It's very complex, very large.  So

3    we put together price sheets that establish what the

4    appropriate rates should be.  Those are loaded into the system,

5    and if the rates come in and they match, automatic payment is

6    made.  If the rates do not match, there will -- it will

7    identify a dispute, our billing system will generate a

8    mechanized bill dispute notice, which we've seen a couple of

9    them here, and then the billing team would help to resolve the

10   issue and I might call on my team to assist.

11   Q    Ms. Meola, you testified about a variety of different

12   problems with Level 3's bills.  Do you recall that?

13   A    Yes, I do.

14   Q    Okay.  Has AT&T tried to pay Level 3's bills accurately?

15   A    Yes.  We have paid what we believe was rightfully owed for

16   the period of time of what was going on at that time, and have

17   made adjustments accordingly.  When the law changed, we have

18   paid.  We had had disputes about that.  Like in 2012, when we

19   believed that it was a settled matter, Level 3 disagreed, and

20   others, and that was overturned, and therefore in 2015 we

21   agreed we would pay going forward.  So we have agreed, yes.

22   Tried to pay according to what is appropriate.

23   Q    And what have you done when you can't -- when there's a

24   dispute with Level 3?  How have you tried to resolve the

25   dispute?

1    *A*    The billing teams have gotten together, tried to identify

2    exactly what the dispute is, identify what was paid, withheld.

3    The business people, hopefully, can help to influence what the

4    right answer is.  In many, if not all of our settlements, they

5    were put into one big bucket and resolved.  For instance, in

6    the 2019 Settlement, Level 3 --

7            *MR. STEESE:*  Your Honor, this is far beyond the scope

8    of Cross.

9            *THE COURT:*  I tend to agree.

10   Q    (By Ms. Zambrano) Okay.  I just have -- I just have

11   one last question then.  Do you need any assistance for

12   cooperation with Level 3 to reach a resolution on billing

13   disputes?

14   *A*    Absolutely.

15           *MS. ZAMBRANO:*  Thank you.

16           *THE COURT:*  All right.  You are excused.

17           *THE WITNESS:*  Thank you.

18           *THE COURT:*  All right.  I think I know what's coming

19   next.

20           *MR. WARDEN:*  Your Honor, we will be calling

21   Alison Miller, who will be testifying remotely.  We did a test

22   drive on Tuesday, afternoon.

23           *THE COURT:*  I don't really care.  All that I mean by

24   that is, it worked on Tuesday, it worked to Tuesday, doesn't

25   help me on Thursday.  But what I would tell you is this, I know

         1    we started at 1:30, what I want to do is take a break.  I want

         2    you to go until -- what we're going -- what I'm going do is I'm

         3    going to go until 3 o'clock.  I want you back at five of 3.

         4    And, Ms. Pearson, in that five minutes, between five of 3 and 3

         5    o'clock you can try and get the witness on the video.  You can

         6    try a little earlier.  I just don't want her kind of hanging

         7    around looking at an empty courtroom wondering why are all of

         8    those people wandering around?

         9           So, if we can, kind of, be back in place, we get her

        10    on the line.  When you get her on the line, I come out at 3

        11    o'clock, then we will start going from there.

        12           MR. STEESE:  One question, Your Honor, if you don't

        13    mind.  I know how this works with Zoom.  Is the witness going

        14    to be able to see exhibits on the screen?  I just don't know.

        15           THE COURT:  I have been told that the answer is yes.

        16    I have also been told that it might glitch, because you never

        17    know.  So, the hope and the expectation is yes.

        18           MR. WARDEN:  And, Your Honor, the witness also has

        19    clean exhibit books with her.

        20           THE COURT:  Okay.  All right.  Recess.

        21           THE COURTROOM DEPUTY:  All rise.  Court is in recess.

        22       (Recess at 2:40 p.m.)

        23       (In open court at 3:05 p.m.)

        24           THE COURT:  Please be seated.  I don't have her on my

        25    screen.  Okay.  We're back.  Before we proceed, I understand,

```
 1    counsel, you want to raise something with me.  Let me just deal

 2    with a couple of things; and that is, to get on the record my

 3    understanding.  My understanding is that, obviously, I can see

 4    the witness.  My understanding is that the witness can see us,

 5    however, when an exhibit is put on the screen, she will then

 6    not be able to see us, that is not important to me, in the

 7    sense of I'm not sure that that poses some impediment going

 8    forward.  My understanding is that both sides are aware of

 9    this, and I don't have any reason to view this as an issue,

10    unless somebody else does.

11         MR. STEESE:  Your Honor, I was made aware that she

12    would not be able to see us just moments ago from Mr. Warden.

13    Thank you to him for him explaining it to me.  I much prefer

14    that the person see me, and I interact with her in this

15    instance, but this is the COVID age and I will and we will live

16    with it as is.

17         THE COURT:  Was that what you were standing for?

18         MR. STEESE:  No, Your Honor.  I forgot to move the

19    admission of Exhibit 82 into evidence, and I would like to move

20    the admission of 82.

21         MR. WARDEN:  No objection.

22         THE COURT:  All right.  Eighty-two is admitted.

23         THE COURT:  Now, Mr. Warden -- I'm sorry, let's go

24    through this as if they were here.  Call your next witness.

25         MR. WARDEN:  AT&T calls Alison Miller.
```

1    THE COURT:  All right.  And that is Ms. Miller, who is

2  on screen?

3    THE WITNESS:  Yes, it is.

4    THE COURT:  All right.  And, Ms. Miller, if you would

5  please take the oath.  Ms. Pearson is not on your screen, but

6  you will hear her voice administering the oath to you.  So if

7  you would, please.

8    THE COURTROOM DEPUTY:  Raise your right hand, please.

9    (**ALISON MILLER** was sworn.)

10    THE WITNESS:  I do.

11    THE COURT:  All right.  Before we continue, I just

12  want to be clear, counsel should all take great caution to make

13  sure that they give about a one-second delay before moving on

14  to the next -- there's a lag here.  It's not tremendous, but

15  there's a little lag.  If we are not cognizant of it, what's

16  going to end up happening is we're going to get lost in the

17  lag.  So if we have to make adjustments, let's do it.  I'm not

18  criticizing anybody or anything else.  We will just try and

19  deal with it.  But I was trying to see how much lag there was

20  between when Ms. Pearson was finished and when Ms. Miller

21  answered, and I put it at half second to a second, something

22  like that.

23    All right.  All of that is interesting and doesn't

24  advance the ball.  Mr. Warden, please proceed.

25    MR. WARDEN:  Thank you Your Honor.

1          **DIRECT EXAMINATION**

2     *BY MR. WARDEN:*

3     Q    Ms. Miller, where you did to go college?

4     A    I received my Bachelors of Chemical Engineering at Rutgers

5     College of Engineering, and I received my Masters of

6     Telecommunications Management at Stevens Institute of

7     Technology.

8     Q    Where do you work?

9     A    I work at AT&T.

10    Q    How long have you worked there?

11    A    About 22 years.

12    Q    And what is your current position at AT&T?

13    A    Lead carrier relations manager.

14    Q    And how long have you been in that role?

15    A    About 15 years.

16    Q    And in general, what are your duties and responsibilities

17    as lead carrier relations manager?

18    A    So, my responsibilities are to manage the domestic

19    switched-access expenses, associated with calls to and from

20    AT&T, the IXC, or AT&T the long distance portion.  Two main

21    functions, the first is that I review and negotiate commercial

22    arrangements for alternative routing, and the second is that I

23    review and validate bill information against other sources, to

24    verify that companies are billing AT&T appropriately.

25              If I identify issues with the bills, I will open a

1    dispute with the company, and my responsibility includes

2    managing that dispute through resolution.

3    Q    There's been a lot of testimony already about AT&T's

4    mechanized bill payment invalidation system, so I would like to

5    start there.

6         Does AT&T receive invoices for switched-access charges

7    from carriers like Level 3?

8    A    Yes.

9    Q    And how many carriers, like Level 3, send invoices to AT&T?

10   A    Over a thousand.

11   Q    And does AT&T have a system to validate and pay all of the

12   invoices it receives?

13   A    Yes, we have a mechanized billing validation system.

14   Q    And are you, generally, familiar with how that system

15   works?

16   A    Yes.

17   Q    And can you just briefly explain it to the Court, please?

18   A    At a very high level --

19         MR. STEESE:  Your Honor, if you will recall,

20   Your Honor ruled she cannot be an expert.  She has to be a fact

21   witness, and I think it's important to find out how she knows

22   about the mechanized system, and if she truly has personal

23   knowledge, or if someone else has just told her how it works,

24   and she is just regurgitating what someone else has said.

25         THE COURT:  All right.  Let's get some more

371

 1   foundation.

 2       Q     (By Mr. Warden) Do you have personal knowledge of how

 3   the AT&T bill, that validation system works?

 4   A   Yes.  As part -- as I mentioned, as part of my role, I'm

 5   responsible for reviewing and validating billing, and part of

 6   the way I do -- or one of the means to do this is working

 7   closely with understanding both the inputs to that mechanized

 8   system, as wells the outputs to that system, and you know, how

 9   those both work, the -- the inputs and outputs.

10   Q   So, can you briefly explain that system and how it works

11   for the Court?

12   A   Sure.  So, when a bill is rendered to AT&T, the mechanized

13   system will calculate a billed unit cost, compare that to a

14   paid unit cost and if the billed unit cost is less than or

15   equal to the paid unit cost, that bill will be paid in full.

16   If the billed unit cost is higher than the paid unit cost,

17   there will be a correct pay action; whereby, the portion above

18   the paid unit cost will be offset.

19   Q   So, I would like to show you Exhibit 86, please.

20   A   I just -- it's not the full screen, but I can see it okay.

21   Q   Okay.  And I just have an inquiry, if I may?

22   A   It works.

23   Q   Okay.  Thank you.  You can see Exhibit 86, Ms. Miller?

24   A   Yes.  Now that is the only thing on my screen; that is

25   correct.

372

 1   *Q*   And is this a fair depiction of how AT&T calculates paid

 2   unit costs?

 3   *A*   Yes.  This is an example of how AT&T would calculate a paid

 4   unit cost for an end-office billing, where a company also owns

 5   the tandem switch.

 6   *Q*   And can you explain to the Court the bucket on the left and

 7   it's components?

 8   *A*   Sure.  So, as I said, this is an example of an end-office

 9   call or the paid unit cost calculation based on that.

10        So, when you have an end-office call, the volumes that

11   can be billed for each element are based on the local switching

12   volumes.  So, in this instance, the end office would be

13   associated with -- or the elements for end-office billing would

14   be local switching, common trunk port and CCL.  Those are the

15   elements in green.  As I said if this company owns the tandem

16   switch, for the same end-office or local-switching minute, you

17   can have billing for tandem transport of tandem switching,

18   transport termination and transport facility.  The elements in

19   red.  And for an end-office call, there would be a one-to-one

20   relationship for all of these elements, to the volumes of local

21   switching minutes.

22   *Q*   There is a box in the upper right-hand corner, on paid unit

23   costs, can you explain that, please?

24   *A*   Sure.  So, as I just mentioned, if it's an end-office call,

25   there's a one-to-one ratio based on the local switching

373

1   volumes.  So paid unit cost is calculated for this end-office

2   call, as being the sum of the individual unit costs for each of

3   the elements that I just described in the bucket.  So you have

4   the local switching unit cost, plus common trunk port unit

5   cost, plus CCL cost, plus tandem switching unit costs, plus

6   transport termination, plus transport facility unit cost.

7   Q   What is a unit cost?

8   A   Unit cost is an expense per minute.

9   Q   And then there are inputs in the lower right-hand corner.

10  What are those inputs and how are they used?

11  A   So, when a company bills, the rates or the unit costs that

12  are appropriate for the billing, have many different inputs to

13  determine the appropriate rates.  The rates can depend on

14  whether AT&T might have a commercial agreement with the

15  company, or if the -- we don't have a commercial agreement then

16  the rates are based on tariff rates.

17          There are different rates, depending on the state,

18  depending on the jurisdiction, whether it be interstate,

19  depending on the direction, whether originating or terminating

20  and depending on the functionality.  Like I said, this example

21  is an end-office paid unit cost.  You could have a company who

22  bills tandem only, and that would only be the elements -- the

23  functionality would be billed, would be the elements in red,

24  where the volumes would be dependent on the tandem switching

25  volumes.

1          And then you could also have inputs like factors, like

2     a percent VoIP utilization or percent interstate usage.  So all

3     of these inputs go in to determining which unit costs are input

4     into the -- the paid unit cost total.

5     Q    And based on that, how are bills validated and paid?

6     A    The bills are -- the bills come in and there is a billed

7     unit cost calculated for the billing.  As I stated, if it's an

8     end-office call, the volumes are dependent upon the local

9     switching volumes.  So it would be total expense, divided by

10    local switching volumes would be the calculation for the billed

11    unit cost for an end-office call.

12    Q    And is a paid unit cost calculated for each of those

13    thousand-plus carriers?

14    A    Yes.  For each of the thousand-plus carriers, for each of

15    the states, for each of the jurisdictions, for each of the

16    directions, et cetera.  Yes.

17    Q    What are some of the things that can cause the billed unit

18    cost to be higher than the paid unit cost?

19    A    You can have a scenario where the billing is for the state

20    of Florida, but the company might incorrectly apply the rate

21    associated with a higher market.

22          You could have where the company applies a higher

23    intrastate rate to an interstate jurisdiction, or you could

24    have a scenario -- there's FCC guidelines and perform

25    activities that determine what is appropriate to be billed.

375

1          So, like current -- right now, companies cannot bill

2     terminating end office.  So, you might have a company bill

3     something that is not aligned with the -- the current

4     regulation.

5     Q    And -- and what happens if that occurs?

6     A    If that occurs, and it resulted in a billed unit cost

7     higher than the paid unit cost, there would be a correct pay

8     action, and what that would mean is the portion of the bill

9     that is equal to the paid unit cost would be paid.  The portion

10    that is above the paid unit cost would be withheld, based on

11    that differential of the unit costs times the local switching

12    volumes.

13    Q    And if there's an offset or a withholding, does AT&T

14    provide notice to the carrier?

15    A    Yes.  So what the mechanized system does for a bill month,

16    if any BAN results in a correct pay action, resulting in

17    withholding, an automated dispute notice is generated and that

18    dispute notice would then be emailed to the company from an

19    AT&T billing company manager.

20    Q    Okay.  We will look at some of those later.  Can we look,

21    quickly, at Exhibit 87.  Others in the courtroom have already

22    seen it, but I just want to orient you to it, Ms. Miller.  I'm

23    sorry, the first page of 87.

24          MS. ZAMBRANO:  Eighty-six, I believe.

25    Q    (By Mr. Warden) There we go.  So, Ms. Miller, do you

376

1    recognize this as a diagram of a traditional telephone call?

2    A    I do.

3    Q    So, if the LEC owns the end user telephone number and the

4    tandem switch, can you just walk the Court through an example

5    of a five-minute call?

6    A    Sure.  And I will walk the example on the originating

7    access side of the call.  If you have a call that's originating

8    from the LEC customer, and it's five minutes, you would have

9    those five minutes going through the LEC end, end-office

10   switch.  You would have five minutes of all of the elements

11   associated with end office, of billing, then you would have the

12   five minutes going through number two on here, which is the

13   tandem transport.  You would have five minutes billed for those

14   elements.  Then you would have the five minutes going through

15   number three, which is the tandem office switch, and you would

16   have five minutes there, then the call would be routed to AT&T

17   to terminate.

18        MR. WARDEN:  And can we look at Exhibit 88, please.

19   And before I move on, I would like to offer 86, Your Honor?

20        MR. STEESE:  No objection, Your Honor.

21        THE COURT:  Received.

22   Q    (By Mr. Warden) Ms. Miller what does Exhibit 88

23   depict?

24   A    So this shows the -- as I mentioned earlier, on the first

25   slide, when you have an end-user call or end-office call

377

1   there's a one-for-one relationship between the local switching

2   volumes and the other elements that can be billed in this

3   end-office call.

4          So, for that five-minute call, you see the -- each of

5   elements, both the green ones, the end office, and the red

6   ones, tandem transport, there's a multiplier of five, to

7   account for the five minutes being billed for each of those

8   elements.

9   Q   And the billed-unit-costs box on the right, can you explain

10  that please?

11  A   Sure.  As I explained when you have -- when the mechanized

12  system sees a bill with local switching, it assumes it's an

13  end-office call, and so the bill is -- the billed-unit cost is

14  calculated as total expense, divided by local switching

15  minutes.  So, this is just an example showing, when you have

16  the end-office call and it's five minutes, the five minutes

17  would be applied to the expense per minute or otherwise known

18  as unit costs, for all of the end-office elements and the

19  tandem-transport elements, and then it would be divided by the

20  five minutes associated with the local switching.

21  Q   And in this example, how much of the bill would be paid?

22  A   In this example, the full bill would be paid.

23  Q   And now, let's look at Exhibit 89, please.  And we've seen

24  this in the courtroom earlier, Ms. Miller, but just, generally,

25  what does Exhibit 89 depict?

1   A   So, Exhibit 89 depicts the example of a competitive tandem

2   switch.  In this scenario it's showing it as Level 3, who does

3   provide competitive tandem service, but there are others in the

4   market that do the same, such as Inteliquent is one of them.

5   So what a competitive tandem does is they put rates in the

6   market and try --

7       THE COURT:  All right.  Hold on.  Hold on you.  You

8   cut out for just one second.  Could you go back and -- let's

9   just take it from the the top, rather than me trying to give

10  you a start point.  Go ahead and tell us what I'm looking at in

11  this example.  It was just a brief period.

12      THE WITNESS:  I apologize.  Okay.  So let -- start

13  from the beginning again, right?

14      Q   (By Mr. Warden) What's 89?

15      THE COURT:  Yeah.

16      THE WITNESS:  Okay.  So, this is a diagram that

17  reflects competitive tandem routing arrangement, and in this

18  particular example, it shows Level 3, as the example of the

19  competitive tandem.  There are other competitive tandem service

20  providers out there.  Inteliquent is an example of one of

21  those.  And what a competitive tandem company does is provide

22  rates in the market where they are trying to win the business

23  of other companies, so that they send their end-user traffic

24  through the Level 3 tandem to get to AT&T.

25          In this particular scenario, showing the example a

1    cable company X and carrier Y.  So it is the end-user customers

2    of cable company X or carrier Y, that would route their

3    traffic -- well, the companies would route that end-user

4    traffic through the Level 3 tandem switch to get to AT&T, the

5    IXA.

6    Q   Would those telephone calls traverse Level 3 end-office

7    switch; that is, of cable company X and carrier Y, in this

8    example?

9    A   They would not.

10    Q   And what does that do with respect to the volume of -- of

11    minutes that traverse over the tandem versus the end office?

12    A   Because the tandem has multiple CLECs, cable companies,

13    carrier, etc., connected to it, it is receiving all of that

14    end-user traffic, the volumes are much larger than what one

15    would see with just Level 3 and office volumes.  Additionally,

16    because this is a competitive service, the volumes can vary

17    tremendously from month to month, depending upon if Level 3

18    might have new customers, route through their tandem, or have

19    customers move off of their tandem onto a different tandem.

20    Q   Can we look at Exhibit 90, please.  And, Ms. Miller, can

21    you describe to the Court, Exhibit 90, and what it depicts?

22    A   Sure.  This is an oversimplified view using the buckets,

23    showing what I just mentioned where, when you have -- a

24    combined billing scenario, when there's five minutes from an

25    end-user customer, and there's also the tandem billing thrown

 1   in.  In this case, it would be a hundred minutes of third-party

 2   calls.  So a total of 105 minutes.

 3            So this is an example of a combined bill where the

 4   end-office elements would have five minutes applied to them,

 5   and the tandem-transport elements, in red, would have 105

 6   minutes applied to them, based on the combined tandem switching

 7   from the end-user customer and from the tandem billing

 8   associated with third-party tandem calls.

 9   Q   So, the five is from the end user and the hundred is from

10   the third-party tandem calls?

11   A   Right.  From the end users of the company sending their

12   calls through the third-party tandem, correct.

13   Q   And how do most carriers bill AT&T for end user and

14   competitive tandem?

15   A   For those companies that have both an end-office service

16   and a competitive-tandem service, they bill that on separate

17   bills -- or they bill those two services, separately.

18   Q   Is that on separate BANs, billing account numbers?

19   A   Yes.

20   Q   And how does Level 3 do it?

21   A   Level 3 bills it as it is shown in this example bucket; in

22   that, both the end-office billing and the third-party tandem

23   billing is all included on the same BAN or billing account

24   number.

25   Q   And does that combined billing create issues for AT&T's

1    mechanized system?

2    *A*    Yes.  As I had previously mentioned, when the mechanized

3    system see an -- (connection breaking up) it assumes that it's

4    an end-office call.  So it calculates --

5           *MR. STEESE:*  Excuse me --

6       Q    (By Mr. Warden) Excuse me, Ms. Miller.  I think it

7    cut out again.  If you can start again.  Let me re-ask the

8    question.  Does the combined billing create issues for AT&T's

9    mechanized system?

10   *A*    Yes, it does.  As I have mentioned previously, when the

11   mechanized system sees local switching in the billing, it

12   assumes the call is an end-office call and the billed unit cost

13   is calculated as total expense, divided by the volumes of local

14   switching.

15           So when you look at the billed-unit-cost calculation

16   for this combined billing, that would, in the numerator, you

17   would have the expense associated with the five minutes applied

18   to the end office, and you would have the hundred five minutes

19   applied to the unit costs for the tandem transport expense, but

20   the denominator would still be based on the five local

21   switching minutes.

22           So what this, in fact, does, is result in a much

23   higher billed-unit cost than what would be seen with an

24   end-office bill.

25   *Q*    And so if -- does AT&T make adjustments to account for

1    that?

2    *A*    Yes.  So what I do -- I'm sorry.

3    *Q*    No.  Go ahead.

4    *A*    Yes.  So, in realizing that there's combined billing, that

5    leads to this increased unit cost, there's an adjustment

6    applied to the paid unit cost calculation, to care for the

7    increase of tandem minutes, and so what I do is periodically

8    calculate the average billing at each state, jurisdiction,

9    direction of tandem and local switching volumes, and calculate

10   a tandem to end-office factor.

11           In this example, that factor would be the 105 tandem

12   minutes, divided by the five local switching minutes.  So

13   there's 21 to 1 ratio of tandem volumes to local switching

14   volumes, and that's 2100 percent factor.

15           To care for that and to try to -- and to align the

16   paid unit costs to the higher unit costs, based on the combined

17   billing, the paid unit costs applies that 2100 percent to the

18   tandem and transport related elements, those that are in red.

19   *Q*    And is that in the box that says *paid unit cost equal local*

20   *switching* and then there's 21 -- 2100 percent, is that what you

21   are referring to?  I think it's right there.

22   *A*    Correct.  Correct, that's the paid unit cost calculation as

23   we saw previously -- or I explained previously, but with an

24   adjustment to apply a 2100 percent factor to the tandem

25   switching billing.

383

1    Q    And is that --

2    A    Tandem and transport.

3    Q    Is that an actual calculation, and how is it done?

4    A    The -- the factor is calculated based on actual billing

5    information.  It's an average of the prior quarter.

6    Q    And is it -- is the ratio -- let me -- strike that.

7         So what are the inputs -- let me do this again.

8    For -- how many entries need to be made, for this calculation?

9    A    The calculation needs to be done at the -- for each state,

10   each direction, at each jurisdiction.  So Level 3, you know, 50

11   states, two directions, two jurisdictions, so 200.  Sorry.

12   It's 200 entries -- or calculations.

13   Q    So, if AT&T did not make that adjustment, with the 2100

14   percent ratio, what would be the result?

15   A    If we did not make that adjustment, the billed unit cost

16   would be far higher than the paid unit cost, and so that would

17   result in the correct pay action withholding a lot more against

18   the bill.

19   Q    And why is that?

20   A    Because the -- the billed unit costs -- billed unit cost is

21   much higher due to the tandem transport expense.

22   Q    Now, you mentioned earlier that the minutes vary monthly.

23   Does that contribute to withholding the tandem -- the tandem

24   minutes I should say?

25   A    It can actually go either way.  If Level 3 was to win the

1    business of a new customer, which would increase the tandem

2    volumes, that could make the ratio in the paid unit costs too

3    low and could result in withholding, but, you know,

4    correspondingly, if the Level 3 was to have a customer move

5    away, and have the volumes drop, and be lower than the

6    percentage in there, that could lead us to not correct paying

7    or not withholding enough.

8            MR. WARDEN:  Your Honor, I would like to offer 88 and

9    90.

10           MR. STEESE:  One moment.  No objection, Your Honor.

11           THE COURT:  Received.

12       Q    (By Mr. Warden) Ms. Miller, does this calculation

13   need to be done for any other carriers?

14   A    No.

15   Q    Have you communicated with Level 3 regarding the issues

16   that are created by Level 3's combined bills?

17   A    I have.

18   Q    What was Level 3's response?

19   A    They had responded that they use a billing vendor, and that

20   billing vendor would not be able to separate out the

21   competitive tandem from their end-office billing.

22   Q    So, we've talked a little bit about the mechanized billing

23   system.  Outside of the context of that system, does AT&T know

24   the exact amount of Level 3's switched-access charges?

25   A    Yes.  After -- once the bills go through the mechanized

385

 1    process, all of the records and details of the bills, the bill

 2    date, direction, jurisdiction, elements are housed in an access

 3    data warehouse, or otherwise known as ADW.

 4    Q    And do you retrieve data from the ADW system?

 5    A    I do.

 6    Q    And how often do you do that?

 7    A    Very often, as part of my role of managing switched-access

 8    expense.

 9    Q    So, let's move on, a little bit, to another topic.  I

10    think, earlier, you mentioned one of your responsibilities

11    included dispute management.  What, in general, is that?

12    A    So, that is to review billing information and verifying

13    that a company is billing aligned with reform activities,

14    aligned with state and federal regulations, aligned with how

15    the traffic is actually being routed, and just really looking

16    at the -- the billing and making sure AT&T is being billed

17    appropriately, and if any issues are identified, that's when I

18    would issue a dispute and provide a dispute notification to the

19    company.

20    Q    And are there specific carriers for which you managed

21    disputes on behalf of AT&T?

22    A    Yes.

23    Q    And is Level 3 one of those carriers?

24    A    Yes.

25    Q    And how long have you managed AT&T's disputes with Level 3?

386

1    *A*    About five years.

2    *Q*    And when you picked up the Level 3 account, what was the

3    status of the OTT dispute?

4    *A*    When I picked up the account, we were paying the OTT

5    billing in full.

6    *Q*    And why was AT&T doing that?

7    *A*    That was -- when I picked up the account, it was after the

8    2015 Agreement, and that Agreement that stated that well --

9    while the appeal was ongoing, AT&T would pay OTT in full.

10   *Q*    And so, at some point, after that time, and after you took

11   on the account, did the AT&T -- I'm sorry -- did the OTT

12   dispute become active?

13   *A*    Yes, it did.

14   *Q*    And when was that?

15   *A*    It was around May of 2017.

16   *Q*    And why did it become active, at that point?

17   *A*    At that point in time, AT&T believed that the appeal had

18   been overturned.

19   *Q*    The D.C. Circuit decision, is that what you are referring

20   to?

21   *A*    Yes.  Yes.

22   *Q*    Okay.  And at that point in time, was AT&T withholding any

23   end-office charges, based on the OTT dispute?

24   *A*    AT&T was not withholding any end-office charges based on

25   the OTT dispute.

1    *Q*   Let me --

2         *MR. WARDEN:*  Can we pull up Exhibit A8, please.  And

3    can we go to page three.  Can we just go down a little bit so

4    we can see the -- there we go.

5    *Q*   So, Ms. Miller, do you see that this is a June 29th, 2017,

6    email from you to Melissa Kellow, copying others?

7    *A*   I do.

8    *Q*   And what, in general, is this series of emails about?

9    *A*   As is the case often with Level 3, there were multiple open

10   and ongoing disputes, but during this period in time, there

11   were several that we were -- that we were in the process of

12   reconciling and closing, and so what this -- these email

13   exchanges was our companies working to reconcile the balances,

14   identify what the balances were associated with the disputes

15   that were being closed and what would remain open.

16   *Q*   There's been testimony about a sentence in your email, to

17   Ms. Kellow, in the withholding paragraph, that reads, *There was*

18   *no withholding action taken for the OTT dispute, but there is a*

19   *withholding above the current dispute value for the EO/CPN*

20   *issue, due to; one, Level 3's billing containing both*

21   *end-office EO and tandem billing on the same BAN, which*

22   *complicated the mechanized base rate withholding, and two, AT&T*

23   *and Level 3, ie Steve Ross, agreeing that the EO/CPN issue*

24   *would not be corrected in our payment systems until such time*

25   *as the issue was fully corrected*.  Did I read that accurately?

1  A   Yes, you did.

2  Q   So, what did you mean when you wrote *There is withholding*

3  *above the current dispute value, for the EO/CPN issue, due to*

4  *these two issues*?

5  A   Well, breaking them into separate.  So, the first one goes

6  back to the example I just provided of the billed unit cost to

7  the paid unit cost.  So because Level 3's billing is combined,

8  the mechanized process, when it identifies a billed unit cost

9  higher than a paid unit cost and correct pays, that just

10  results in a dollar figure that's withheld.  It cannot and does

11  not align or identify that withholding to any specific dispute.

12  And so there's multiple underlying reasons or multiple -- I

13  discussed the multiple inputs.  So the withholding could have

14  been based on any number of issues that caused that billed unit

15  cost to be higher than the paid unit cost.

16       And then the second explanation, one of the disputes

17  we were resolving, at that time, was the end-office CPN

18  dispute.  When that was still an issue, I applied a factor to

19  have the price sheets, to implement withholding on this issue,

20  based on call detail records we had received from Level 3.

21       Level 3 had believed they corrected the issue, however

22  when we received additional call detail records, it was

23  determined that the issue was only partially fixed.

24       So, as noted here, the conversation I had with Level

25  3, and they agreed with, was that I was not going to remove the

1    factor that was being applied to the price sheet, until such

2    time as Level 3 fully corrected the issue.

3    Q    And when you say factor, what do you mean by that?

4    A    A factor is a percentage that can be applied to a certain

5    portion of the billing.  My earlier example, I talked about the

6    tandem-to-end-office ratio, I would call that a factor too.

7    It's a factor that's applying to tandem and transport.  In this

8    scenario, the end-office CPN was a factor that was being

9    applied to end-office billing.

10   Q    So it's a percentage of all end-office billing?

11   A    Correct.  It was a percentage that was applied to the

12   end-office billing.

13   Q    And so each of the underlying issues were corrected in one

14   month, if the factor still applied, would it result in

15   withholding?

16   A    It would.

17   Q    Now, can you --

18        MR. WARDEN:  Can we go to ... Exhibit A18, please.

19   Q    And, Ms. Miller, there's been some testimony about your

20   email of August 29th, 2017, to Ms. Torres, who is in the

21   courtroom today, as Level 3's corporate representative, but my

22   question for you is what are these disputes, in general, in the

23   left-hand side, just very briefly?

24   A    Yeah.  So, as I mentioned, there were multiple disputes

25   being reconciled at this point in time, IntraMTA was -- it was

1    not even housed with me, but it was some incorrect billing

2    associated with IntraMTA.  DEOT was tandem billing associated

3    with direct and office, 8YY did back bill -- Level 3 had billed

4    us for a back bill and then double billing.  Level 3 was

5    billing database queries that the other company was already

6    billing us database queries for.  And then connectivity

7    disputes were various disputes associated with the Level 3

8    communications billing, and actually the other entities, Global

9    Crossing, Broadwing, et cetera.

10   Q    There's connectivity disputes, OTT disputes, there's a

11   dispute value of about 8.64 million, a withheld value of

12   $4,056,496, and then a paid and disputed amount.  What was that

13   withheld amount?

14   A    So, as previous email had discussed, we had the end-office

15   CPN dispute, and there was withholding that was above that

16   dispute, attributed to the factor being applied, as well as

17   attributed to a billed versus paid unit cost, resulting in

18   offsets.  At this point in time, because we had identified the

19   new OTT dispute, it was determined that we would assign that

20   withholding above the end-office CPN to the OTT dispute.

21   Q    If you needed to reconcile or determine that $4 million

22   amount, could you do that?

23   A    Yes.  But it would take a long time, and I would use that

24   ADW data that I talked about, I would and I would basically

25   have to look at all of the inputs for the full period of the

1     dispute for all of the multiple states, jurisdictions,

2     directions, et cetera.

3     *Q*   And then there's a sentence in the AT&T notes that says

4     *Additional offsets caused by Level 3 billed format had been*

5     *allocated indicated towards OTT disputes.*  What does that mean?

6     *A*   That's, basically, restating what I had just said, was that

7     those offsets that 4,000,000 that was above the end-office CPN,

8     we then took those dollars, instead of going through and trying

9     to find out exactly what caused the withholding, which there

10    were valid disputes in there, instead, decided we have this

11    large dispute where we believed Level 3 owed us, you know,

12    credits, and said we would assign that withholding dollars

13    towards that new dispute.

14    *Q*   And so around this point in time -- well, withdrawn.  So,

15    up to August of 2017, had AT&T withheld anything based on the

16    OTT dispute?

17    *A*   We had not.

18    *Q*   And around this point in time, did AT&T begin withholding?

19    *A*   Yes.  I directed the withholding to begin in, I believe it

20    was, August 2017.

21    *Q*   And did you receive the instruction to withhold from

22    someone else at AT&T?

23    *A*   No.  That was part of my -- owning the relationship, and

24    seeing that Level 3 was not crediting us at the 65 percent, so

25    it was determined to ... I'm sorry.

1    Q    Did you discuss that with Ms. Meola?

2    A    Yes.  Anytime when -- I apologize.  (Phone ringing) Anytime

3    when there are disputes or large issues, it is part of the

4    process to, you know, have discussions with my management,

5    Ardell Burgess, Kim Meola, as well as with legal, prior to

6    taking any large withholding actions.

7    Q    Can you describe the process for withholding on end-office

8    charges, based on the OTT dispute, just in general?

9    A    Sure.  So I had previously discussed a factor, and so,

10   because the OTT percentage was believed to be 65 percent for

11   Level 3's traffic, I applied a factor of 35 percent to the

12   end-office elements in the price sheet -- in the price sheet

13   that develops the paid unit cost, and the 35 percent, to say,

14   pay at 35 percent and thereby withhold 65 percent.

15           MR. WARDEN:  Can we pull up Exhibit 36, please.

16   Q    Ms. Miller, what is Exhibit 36?  Actually, if you go to the

17   second page.  So you are aware where the emails begin.  So what

18   is Exhibit 36?

19   A    I have to just see which one this is, because I remember

20   this as a -- um ... okay.  So, this is the May 2017 email.  At

21   this point in time I had spoken about that end office --

22           THE COURT:  Hold on one moment please.  Go ahead.

23           MR. STEESE:  I realize that the issue is being

24   discussed here.  This is an internal email, it is hearsay, and

25   so, at this point in time, we would move to have her discuss

 1   the issue.  If she needs refreshing, that's one thing, but it

 2   is hearsay, and we would object as such.

 3          THE COURT:  All right.  Let's just discuss the issue,

 4   and if we need to get to the exhibit -- well --

 5          MR. WARDEN:  She authored -- did you author this email

 6   at or around the time of May, May and August of 2017?

 7   A   Yes.  These were my emails, with my directions to the

 8   price-sheet team.

 9          THE COURT:  I'm going to allow it.  Go ahead.

10          MR. WARDEN:  I offer 36.

11          THE COURT:  He has got an objection, hearsay, I

12   overrule it.  I'm allowing it.

13   Q   Okay.  So let's start with the May 8th email at the bottom

14   of the first page.  What is that?

15   A   Sure.  So, this email, as I mentioned previously, had an

16   end-office CPN dispute that was close to resolution, in May

17   timeframe, I -- we had determined that that issue had been

18   corrected.  So this is the email where I directed the

19   price-sheet team to remove the factor that had been applied to

20   the end office for that end-office CPN dispute.

21   Q   And let me just ask who these people are.  I hope I get

22   these names right, Sandeep, Mullick, Swapnill, Conley, Gerry

23   Porter and Ardel Burgess, who are these?

24   A   Well, Ardel is my manager.  The other members you mentioned

25   are what I would call the price-sheet team.  They deal with the

1   price sheets.

2   Q   And let me --

3         MR. STEESE:  I just didn't hear that answer because

4   she cut out for a moment.

5         THE WITNESS:  I'm sorry.

6   Q   (By Mr. Warden) Did you end your answer with price

7   sheet team?

8   A   Yes.  I ended with price sheet -- Swapnil, Gerry and

9   Sandeep are part of price-sheet team.

10  Q   And directing your attention to the August 7th email.

11  August 7th, 2017.  And this is to the the Sandeep, *I need to*

12  *request another update to the L3 price sheet to input the EO*

13  *percentage field as 35 percent for all states/OCNs, in order to*

14  *care for our OTT dispute.  Attached is the same file as last*

15  *time with the new changes and end-office percentage highlighted*

16  *in blue.*  Did I read those two sentences accurately?

17  A   Yes, you did.

18  Q   And so what were you telling the price-sheet team to do?

19  A   So this -- this direction, as I previously mentioned, was

20  related to the OTT dispute, where 65 percent of the traffic was

21  associated with OTT, and so this direction was to pay or add a

22  factor into the price sheet for the paid unit cost calculation,

23  that applied at 35 percent towards the end-office elements.

24  Q   And does that therefore withhold -- strike that.  Does that

25  therefore withhold 65 percent on those elements?

1    *A*   Correct.

2    *Q*   And there's -- the last sentence refers to an effective

3    date of June 1st, 2015.  What does that mean?

4    *A*   So, sometimes a company might render -- usually when we

5    receive bills from a company, in the case of Level 3, their

6    bill will be for the month's prior usage, however, sometimes a

7    company may bill us for usage periods that go back much

8    further, and I think we would call that a back bill.  So what

9    this did was establish that should Level 3 render us billing

10   that had usage up to and including the effective date of the

11   Settlement Agreement, that that 35 percent calculation would be

12   applied or that -- the unit -- the paid unit cost resulting

13   from that 35 percent application would also apply to that --

14   that billing for that usage period.

15            *MR. WARDEN:*  Can we go to the attachment A36, page one

16   of five?

17   *Q*   So, if you go to the bottom of page five.  It looks like

18   there are 177 rows in this file.  What do those rows represent?

19   *A*   So these represent the individual inputs for each state

20   direction jurisdiction, because it is less than early

21   calculated 200, I believe, at this point in time, the inputs

22   that I were providing were for the states that had the top 90

23   percent of the expense.  Sorry, I will stop there.

24   *Q*   And let's look --

25            *MR. WARDEN:*  Is there a way to blow up the top row;

396

 1   row number one, and maybe capture that first California entry?

 2   Q   Can you see that okay, Ms. Miller?

 3   A   Yes.   Thank you.

 4   Q   And your email indicated that there was a highlighted

 5   column.   What column is that?

 6   A   That would be column N.

 7   Q   And what does column N represent?

 8   A   So, column N represents the end-office factor of 35 percent

 9   that I had directed in that email.

10   Q   And do any of the other columns represent end-office

11   categories?   Let me ask -- let me state that better?

12   A   Okay.

13   Q   Do any of these other columns fall within the end-office

14   category?

15   A   Yes.   So what the end-office category does, is it says the

16   35 percent would be applied to the end-office elements.   So

17   looking at this example, the end-office elements would fall in

18   columns D through H, and so those would be the CCL, LS, is

19   local switching, info surcharge and common port, and you will

20   see there's no information in several of these and that has to

21   do with over the years, with the Regulation and Reform

22   Activities, a lot of these elements have where they are no

23   longer billed but they are still in the price sheets.

24   Q   So, did the 35 percent apply to those fact -- those columns

25   and elements D through H?

397

 1    A    Correct.  That 35 percent would apply to those columns only

 2    in the unit cost calculation.

 3    Q    And what are columns I through M?  Can you just walk us

 4    through those, please?

 5    A    Sure.  Those would be aligned with the -- we looked at the

 6    buckets, the ones that are in red, the tandem and transport,

 7    and so with columns I through M, starting with I, that's KMUX,

 8    then you have tandem facility, then you tandem-facility miles,

 9    because tandem facility is actually a per minute, per mile.

10    Then you have tandem termination and tandem switching.

11    Q    Was the 35 percent applied to any of those tandem elements?

12    A    It was not.

13    Q    In column O there's a transport slash tandem overflow

14    percentage.  Do you see that?

15    A    I do.

16    Q    And it looks like on this first page those percentages

17    range from 2 to 13,166 percent.  What are those?

18    A    So, these are, as I have reviewed or discussed in one

19    exhibit that had -- this is the tandem-to-end-office ratio.

20    So, this is the resulting output of the calculation to

21    determine the tandem volumes as compared to the local switching

22    volumes for this particular state, jurisdiction and direction.

23    Q    And what is it for row two, California, interstate

24    originating?

25    A    That -- that tandem-to-end-office percentage was 418

1   percent.

2   Q   I would like to look at another bucket, if we can.  This is

3   Exhibit 92, please.  So, using the California example, and

4   Exhibit 92, can you explain to the Court how these inputs go

5   into the paid-unit-cost calculation?  Let's start with the 35

6   percent?

7   A   Sure.  If you look in that top right you have the

8   paid-unit-cost-ratio to adjust for combined billing, and then

9   you have the paid-unit-cost calculation that we looked at

10  previously.  But in this case, that 35 percent end-office

11  factor that I mentioned is applied and multiplied by the

12  elements that are in the green, the end-office elements.  So,

13  the 35 percent is applied -- multiplied by the local switching

14  unit cost, the common-trunk-port cost and CCL unit cost.

15  Q   And is that 35 percent applied to any tandem or transport

16  elements?

17  A   It is not.

18  Q   And then there's a 418 percent, in that same box.  Can you

19  just explain to the Court what that -- what that is and what

20  that does?

21  A   Sure.  So, this is an example of -- in this particular

22  case, the numbers were 71 tandem minutes to 17 local switching

23  minutes, which roughly four to one or 418 percent of tandem to

24  end-office factor for this.  So, that 418 percent would be

25  applied to the elements of the tandem-transport element in the

1    paid-unit-cost calculation.  So the paid-unit cost then, in

2    addition to the 35 percent times the end office, then would add

3    the 418 percent times the tandem switching unit cost, transport

4    termination unit cost, and transport facility unit cost.

5    Q   And then on this, it looks like there's an example of 17

6    minutes from end user customer's calls, and 54 minutes of

7    third-party calls.  Are those just numbers that you calculated,

8    to match the 418 percent?

9    A   Yeah.  These are purely as an example to show numbers that

10   could get you to the 418 percent.

11   Q   Okay.  Thank you.

12           MR. WARDEN:  I offer 92?

13           MR. STEESE:  No objection.

14           THE COURT:  Received.

15       Q   (By Mr. Warden) Now, I would like to look at -- can

16   you look at Exhibit 82, please.  Can we blow that up a little

17   bit?

18   A   Thank you.

19           MR. WARDEN:  Anyway to make that a little bigger, Rob?

20   You know, what let -- let me try it this way.  Eighty-two is in

21   evidence, and do we have, what was, demonstrative 8, at one

22   point in time?

23   A   You can't see that because I can see that.

24   Q   The thing is --

25           THE COURT:  I have got a book.

1      *MR. WARDEN:*  Okay.

2          *THE COURT:*  I can come close to the screen to see it.

3   As long as she can see it, I'm fine.  I assume that each of the

4   lawyers' table have books, they can open up the book.  All

5   right, we're on the same page.

6          *THE WITNESS:*  As long as you don't mind my leaning in,

7   I can see it.

8      Q    (By Mr. Warden) What is Exhibit 82?

9   A    So, this is just three states that show the example of the

10  OTT percentage as applied to a non-combined bill, and then a

11  combined bill by Level 3.

12  Q    And what time period does it represent?

13  A    So, this is for the January 2020 bill date.

14  Q    And what states are reflected here?

15  A    So for the non-combined bill, the states are Alaska and

16  Hawaii, and for the combined bill, it's the state of North

17  Carolina.

18  Q    Now, you said Alaska and Hawaii are non-combined bills; is

19  that why you selected them?

20  A    Yes.  Alaska -- excuse me -- Alaska and Hawaii are a bit of

21  an anomaly, in that, Level 3 only bills end office in those

22  states.  There's no tandem billing.

23  Q    And can you walk us through the Alaska row, please?

24  A    Sure.  The first column B is the OCN, which is operating

25  company number.  The second column, C is the state.  Column D

1    is the jurisdiction.  And it states *all*, because this data is

2    consolidated for the interstate and intrastate jurisdiction, so

3    it includes all of it.  Column E is the bill date, January

4    2020.  Column F and G are both from an ADW report; with column

5    F reflecting the billed originating usage dollars for each of

6    the states, and column G reflecting the paid originating usage

7    dollars for each of its states.  Column H, calculates the total

8    originating usage that was withheld by subtracting column G,

9    from column F.

10   *Q*   Let me -- let me stop you there, Ms. Miller.  So, F is the

11   amount that Level 3 billed AT&T?

12   *A*   For the originating usage those would include database

13   query, yes.  Column F is the amount that Level 3 billed AT&T

14   for this bill date.

15   *Q*   And is that an actual number that you pulled from the

16   access data warehouse?

17   *A*   Correct.  That I -- it comes straight from one of the

18   reports I pulled from the ADW.

19   *Q*   And then G is the amount of the bill paid by AT&T; is that

20   correct?

21   *A*   Correct.

22   *Q*   And then H is just column F, minus column G?

23   *A*   Correct.  Billed, minus paid, so F minus G, results in

24   column H, which is amount withheld for that bill.

25   *Q*   And then what is column I?

1   *A*   So, column I is another calculation.  It's column H divided

2   by column F.  So it calculates the percentage holding as

3   compared to the total amount billed.

4   *Q*   So that -- in that 65 percent for both Alaska and Hawaii,

5   correct?

6   *A*   Correct.

7   *Q*   And that 65 percent is a calculation of the -- that's

8   derived from the actual amount billed by Level 3 and the actual

9   amount paid by AT&T; is that correct?

10  *A*   That is correct.

11  *Q*   Now, let's look at North Carolina.  Why did you select

12  North Carolina?

13  *A*   I just picked one state that was a combined bill.

14  *Q*   And so, can you walk us through, let's take F through H,

15  for North Carolina?

16  *A*   Okay.  Sure.  So, once again, the source of F and G were

17  from an ADW report.  So the amount Level 3 billed for

18  originating usage for North Carolina, was about $34,000.  The

19  amount AT&T paid was about $28,000.  So the difference between

20  those two, is the amount AT&T withheld; that was about $5,500.

21  *Q*   And then, what is the calculation in column I?

22  *A*   So, in column I, it's the amount withheld as compared to

23  the total billed.  So, the -- $5,500 divided by 34,000,

24  resulted in us withholding 16 percent of the total billing.

25  *Q*   And then there's originating end-office billed and

1   originating tandem billed, and then a tandem-to-end-office

2   ratio, can you -- end-office-billing ratio.  Can you explain

3   those three columns please?

4   *A*   Sure.  Column J column K, once again, are both from the ADW

5   report.  So this now breaks down what the amounts were billed,

6   that 33,000 broken out by what was billed towards end office

7   and what was billed for tandem and transport, and so there was

8   about 7,000 billed for end office and about 27,000 billed for

9   tandem.  And so, if I did the ratio via expenses, it shows that

10  the expense for tandem was about four to one, that was billed

11  for end-office.

12  *Q*   And that's the equivalent of that ratio, that's the factor

13  in mechanized billing?

14  *A*   It's not an exact equivalent, because this is based on

15  expenses, and that factor is based on volumes, but it's -- it's

16  like the same calculation, or similar.

17  *Q*   And then what's column M, for North Carolina?

18  *A*   So based on the 65 -- or the 35 percent payment, 65 percent

19  withholding, being applied to end office, this calculates 65

20  percent of the end-office billing as $4600, roughly, and

21  then --

22  *Q*   Go ahead.  I didn't mean to interrupt.

23  *A*   Sorry.  Column N, the difference between the total withheld

24  and the end-office withholding column M, and that's called the

25  tandem withholding or withholding above 65 percent of end

 1   office, that was about $892.

 2   Q   And is that withholding of $892 caused by the 65 percent

 3   withholding or the 35 percent payment for OTT dispute?

 4   A   No.  That 35 percent only impacts the end-office billing.

 5   Q   And so that 892.06, is not caused by the OTT dispute?

 6   A   That would be -- would have been caused by some other issue

 7   or something else that called -- caused the billed-unit cost to

 8   be higher than the paid-unit cost, but it would not be due to

 9   the 65 percent -- or 35 percent factor.

10   Q   Let me ask you a couple other questions.  Did AT&T, at some

11   point, stop withholding on end-office charges?

12   A   For OTT, yes.

13   Q   Yes.  For the OTT dispute?

14   A   Yes.

15   Q   And when did it do that?

16   A   It was in effect for the June 2021 invoices.

17   Q   And why did AT&T stop withholding the 65 percent?

18   A   During this -- during this entire OTT dispute, Level 3

19   continued to bill a hundred percent of the OTT traffic at no

20   point in time did they adjust their bill or provide a credit

21   for any portion of the OTT traffic.  That was up until it was

22   May of this year, when we received a credit for OTT, I believe

23   it went back to the February invoice, and subsequently received

24   credits in arrears for additional months.

25           So once I confirmed that the credits were aligned with

405

1   the 21 percent OTT, and it appeared that Level 3 was now

2   providing the credit due for OTT, that was -- then I directed

3   the factor to be removed, and end office to be paid in full.

4   Q   And so there is no withholding based on the OTT dispute by

5   AT&T, now; is that correct?

6   A   That is correct.

7   Q   Let's switch topics a little bit and take a look at Exhibit

8   A52?

9        THE COURT:  Let me just make sure I understand

10  something, ma'am.  In terms of this credit that appeared in

11  May, that you just testified to, what months or period,

12  whichever of those temporal factors is better for you, did it

13  cover?

14       THE WITNESS:  I believe it was issued to us in May, or

15  I received the notification from Diane Wood at Level 3 in May,

16  and I believe the credit went back to the February bill date.

17  I'm not a hundred percent sure, but I believe it was back to

18  February bill date.

19       THE COURT:  Of what year?

20       THE WITNESS:  Sorry, 2021.

21       THE COURT:  Okay.  That is right.

22    Q   (By Mr. Warden) Ms. Miller, I should have asked you

23  another question about Exhibit 82, and that's $892.06 of tandem

24  withholding.  If you needed to determine what caused that

25  withholding, could you do it?

406

1    *A*   Yes.  As I had discussed for one or the other examples, I

2    could, but I would have to look for North Carolina -- for this

3    particular bill date, and every element billed, compare it to

4    what the appropriate rates would be and all of the other inputs

5    and determine what led to the billed units costs being above

6    the paid-unit costs.

7    *Q*   So, let's go to Exhibit A52, please.  You have seen Exhibit

8    A52 before.  It's a document prepared by Level 3; is that

9    right?

10   *A*   Yes.

11   *Q*   And did you try to reconcile some -- actually, can we go to

12   tab two, please.  I'm sorry.  Let's stick on one.  Did you try

13   to reconcile some of the data on this document with AT&T's own

14   records?

15          *MR. STEESE:*  Your Honor, I --

16          *THE COURT:*  Hold on.  Hold on.

17          *MR. STEESE:*  At this point, Your Honor, if she is

18   conducting analysis of our material, this is no longer fact

19   evidence.  This is something that she is doing as an expert to

20   testify at trial.  This is no longer fact, this is expert

21   testimony, which Your Honor excluded.

22          *THE COURT:*  I'm inclined to agree.

23          *MR. WARDEN:*  Your Honor?

24          *THE COURT:*  Yes.

25          *MR. WARDEN:*  May I be heard?

1          THE COURT:  Yes.

2          MR. WARDEN:  And make a proffer, as well?

3          THE COURT:  You may.

4          MR. WARDEN:  So in *James River Insurance* Tenth

5    Circuit, *Bryant vs. Farmers*, and then Your Honor's decision

6    that quotes *Bryant Broad Music*, what she is going to do is

7    elementary mathematical operations that are appropriate for lay

8    opinions, and she will say that these records match AT&T's

9    records.  So, yes, the calculation is done on this number, but

10   of the $8.2-million difference, there's approximately a $20,000

11   immaterial gap.

12          So, she is doing it -- a simple mathematical

13   calculation that results in a document that's already in

14   evidence.

15          THE COURT:  All right.  All right.  I will allow it.

16   Go ahead.

17          MR. STEESE:  Your Honor, if I can, just briefly,

18   because the whole point here is this is analysis.  This is not

19   something done in the ordinary course of her employment, and

20   this is something that was disclosed to us in April of 2021,

21   almost a year after it had -- should have been disclosed, and

22   so, for her to say she was doing analysis two months before

23   trial and -- this is not part of her normal job, and this is

24   true traditional expert testimony and inappropriate.

25          THE COURT:  Well, it depends on what offer -- what

1    opinions flow from it, whether it is or it isn't, but,

2    ultimately, if she is going to say that she looked at

3    documents, I will let her look at documents and they either are

4    the same or they are different.  I'm not saying I'm going to

5    let her go on from there and draw all kinds of opinions and

6    conclusions as to anything.

7         MR. WARDEN:  It's simple math, analogous to what --

8         THE COURT:  Let's see if it's simple math.  I'm

9    overruling.  Go ahead.

10        MR. STEESE:  Your Honor, since I don't stand up

11   constantly, can I have a standing objection to this?

12        THE COURT:  Absolutely.  Absolutely.

13   Q    (By Mr. Warden) So, back to Exhibit A92.  Did you try

14   to reconcile some of the data in this with AT&T's records?

15   A    Sure.  Columns -- and I can't see the columns, but the bill

16   date per revenue.  So this is reflective--

17        MR. STEESE:  Your Honor, I'm going to object.  Did she

18   reconcile -- this is no longer math.  This isn't saying one

19   equals one.  This is doing a reconciliation, and I renew my

20   objection at this point.

21        MR. WARDEN:  Do you want me to use the word

22   comparison?

23        THE COURT:  Yes, that's exactly right.

24   Q    (By Mr. Warden) Did you compare these entries on

25   Exhibit 52, with AT&T's own records?

1    *A*   Yes.  So, what I did, as I stated, I have ADW reporting

2    capabilities that can pull up information based on a bill date,

3    element, direction level.  So what I did is I used my own ADW

4    report --

5            *MR. STEESE:*  I'm going to interrupt again.  This is

6    not something that a *high schooler* could do.  This is something

7    that has requires special knowledge, special expertise, special

8    capabilities, special data; exactly what Rules 701 through 703

9    say.

10           *THE COURT:*  Overrule.  Go ahead.

11           *THE WITNESS:*  Sorry.  So, I looked at ADW reports,

12   which I do almost daily as part of my role here at AT&T, and I

13   compared my report information, which -- to what is shown here,

14   and because our ADW data --

15           *THE COURT:*  All right.  All right. Hold on.

16           *MR. STEESE:*  One last thing, they have not provided us

17   with any of this data, either.  We don't have any of the data

18   that she allegedly even compared it to, so we can't even

19   challenge her on this, Your Honor.

20           *MR. WARDEN:*  Your Honor --

21           *THE COURT:*  Go ahead.

22           *MR. WARDEN:*  Ms. Kellow didn't bring their database in

23   either.  I mean, there is huge volumes of data that are stored

24   and system generated.

25           *THE COURT:*  Let's just get to the lack of explanation,

1    because -- what's happening here is the more we talk, and I

2    don't mean this to be critical of the witness, she is trying to

3    shape her testimony in -- in a way to pick up the things that

4    are going on, that she actually does this every day and things

5    like that.  What you are asking her is a very simple question

6    did she compare the numbers on this chart with AT&T's numbers?

7    I want to know the answer to that question, and then did they

8    match or not?  I want to know the answer to that question.  And

9    if there's a difference, what it was, I want to know the answer

10   to that question and then we're done.

11        So, I guess I have asked them.  Did you compare the

12   numbers on the Exhibit in front of you with AT&T's numbers?

13        *THE WITNESS:*  I compared the volumes at the element

14   level and the revenue, which, in our report, is expense, and

15   the totals, and it aligned with the data from ADW with the

16   exception of about $30,000.

17        *THE COURT:*  Okay.

18        Q    (By Mr. Warden) So, did you total up the -- the

19   column D revenue?

20   *A*    I did, through May 2021, sorry, 2021.

21   *Q*    And did you just do that using the Excel function?

22   *A*    Correct.  It's a sum.

23   *Q*    And then did you do -- was that for all invoices or just

24   through May?

25   *A*    For the ... it was for the dispute period in question, the

411

1  February 2019 through May 2021 period.

2  Q   And did it include June 2021?

3  A   No.

4  Q   Why not?

5  A   The -- well the June -- the last report, or the damages we

6  saw that we were reviewing, the paid information wasn't even

7  out yet, plus, as I stated, we paid end office in full,

8  starting with the June invoices.

9  Q   And did that $8.2-million total match AT&T's records?

10  A   Yes.  With the exception of the roughly $30,000 that did

11  not match.

12  Q   And what does that number represent?

13  A   The $8.2 million represents the total end-office billing

14  from Level 3 for the February 2019 bill date through May 2021

15  bill date.

16        THE COURT:  Do you want to put an objection on the

17  record?

18        MR. STEESE:  Your Honor, I find all of this to be

19  expert testimony, and absolutely, at this point in time, I'm

20  asking that you strike this testimony and not consider this

21  testimony, because, clearly, what has been done is much more

22  than simple math, and especially given that they are doing it

23  with data that was never disclosed.  And counsel said, well,

24  they didn't have their data warehouse.  We had summaries of our

25  data.  We have not seen summaries of their data.  They gave us

412

 1   no data.  So we have no ability to Cross-examine on something

 2   that was disclosed in April that concerns expert testimony --

 3            THE COURT:  What is the area of disagreement or

 4   concern or dispute?

 5            MR. STEESE:  I don't know if I don't have the data.

 6            MR. WARDEN:  Your Honor, may I?

 7            THE COURT:  You may.

 8            MR. WARDEN:  There is none, because Level 3 had

 9   already offered Exhibit 76 and it is in evidence and -- this

10   witness prepared it, she can testify to it.  It's simple math.

11   It's not --

12            THE COURT:  Enough.  We're done.  Ask a question,

13   we're done, and let's move on.

14       Q    (By Mr. Warden) Okay.  Let's just go to Exhibit 76,

15   in evidence.  Ms. Miller, can you explain what this portion of

16   Exhibit 76 is -- well, let me ask you this, did you perform

17   these calculations

18   A    Yes.

19   Q    And how did you prepare this?

20   A    This is purely a mathematical calculation using the volumes

21   and billing amount for end office as based on what Level 3

22   billed.

23   Q    Can we look at that first grid table, please.  What -- what

24   are these columns?

25   A    The one -- so, this is reflective of what Level 3 billed to

1   AT&T for end-office traffic.  This is Level 3's own billing

2   data of which, when it goes through our system, the outputs in

3   my ADW sees this same data.  We would expect both to match,

4   because this is Level 3's bill data for the end-office billing.

5   Q   And then can we -- can you explain what -- I can't see the

6   columns.  There's revenue and then an OTT.  What is the revenue

7   column?

8   A   The revenue is what I would call expense, but that is the

9   amount billed, and it's broken out by bill date and end-office

10  element.

11  Q   And then there's OTT percentage of 21 percent, and then the

12  OTT credit on the right-hand column, correct?

13  A   Yes.

14  Q   And can you -- can we blow up the chart on the right?  And

15  so there's bill date, L3 end-office minutes of use, Level 3

16  amount billed.  Did you calculate that Level 3 amount billed?

17  A   Yes.  That is the sum of -- in the green, if there were

18  multiple elements, on that bill date, it's the sum of those

19  elements, the revenue.

20  Q   So those are the sum of the end-office revenue elements --

21  end-office element revenues?

22  A   Right, which in -- is the local switching, the common trunk

23  port and the CCL.

24  Q   And what is column L?

25  A   So column L is a calculation, and -- for the period -- see

1    there's two March 20ths there.  For the first March 20th,

2    through February 19, it calculates 21 percent, as applied to

3    column K, the end-office amount billed, and taking into account

4    the full and finality issue, it cuts that value in half.

5         From the second March 20, down to May 21, it takes the

6    21 percent OTT factor and applies it to the end-office amount

7    in column K.

8    Q    And then what is the Level 3 end-office properly billed?

9    A    So, this is the calculation that takes the difference

10   between the amount billed and what was -- column K, and what

11   was overcharged 20 percent OTT charge, column L.

12   Q    And then column N, AT&T withheld EO, end office, what is

13   that?

14   A    So, as discussed, the withholding for OTT, was based on the

15   35 percent payment factor, or 65 percent withholding, applied

16   to the end-office billing.  So this is a calculation, 65

17   percent, times column K; the end-office amount billed.

18   Q    And then what is column O, AT&T paid EO?

19   A    So, this is, once again, a calculation, the difference

20   between the amount billed, column K, and the amount withheld,

21   for end office, column N.  So, that's the amount paid for end

22   office.

23   Q    And then the final column, column P, what is that?

24   A    That's, one again, a calculation, that calculates the

25   difference between column M, Level 3 end-office amount properly

1   billed at 21 percent OTT, and column O, what was already paid

2   by AT&T for end office.

3   Q   And then there are some totals at the bottom of that chart;

4   is that correct?

5   A   Correct.  Those are sums of all of the entries from

6   February 2019 through May 2021.

7   Q   And can I get Exhibit 93, please.  And can you just -- are

8   those the totals from Exhibit 76?

9   A   Yes.  These are the sums that were on the bottom just

10  brought into a different visual.

11  Q   And using this document, can you, just very quickly, walk

12  the Court through the -- the math that you did here?

13  A   Sure.  So for the period the February 2019 through May

14  2021, Level 3 billed roughly $8.2 million for end-office

15  switching.  The overcharged, taking into account the 21 percent

16  and the finality issue, was $1.2 million.  If I subtract the

17  1.2 from the amount billed, that would say that Level 3

18  properly billed, $7 million of end office, taking into account

19  the OTT factor.

20         If I then subtract what AT&T paid towards end office,

21  the 2.9 million from that $7 million, the resulting 4.12

22  million is the additional payment AT&T would owe for end

23  office, based on the 21 percent OTT factor.

24  Q   Thank you, Ms. Miller.  I have got one more topic that I

25  would like to cover with you.  Earlier, you mentioned

416

1   notices -- dispute notices that are generated through the

2   mechanized bill payment system.  Do you recall, in general,

3   that testimony?

4   A   I do.

5   Q   Can we look at -- can we look at Exhibit 79, please.

6   Ms. Miller, what is Exhibit 79?

7   A   So, this is one example of a dispute notice that would have

8   been generated from the mechanized system, and that was emailed

9   by a company billing manager to Level 3.

10  Q   And what states does this cover?

11  A   This covers OCN -- company code 6121, and the states of

12  Idaho, Oregon and Washington.

13  Q   That's for Level 3 communications, LLC, correct?

14  A   Correct.

15  Q   And there are some reasons for the disputed charges, in the

16  bottom of this first page, correct?

17  A   Correct.

18  Q   And then can we go to the second page, please.  And what is

19  reflected on this second page?

20  A   So, the mechanized system, when there is a correct pay or

21  offset activity, generates the details of the withholding at a

22  bill date BAN, state, jurisdiction and direction level.  So

23  what this shows, the usage disputed amount, which that would

24  have been the amount that was withheld, totals $3300 for this

25  particular notice.

1          *MR. WARDEN:*  I would offer 79.

2          *MR. STEESE:*  It's in.

3          *THE COURT:*  It's already in.

4          *MR. WARDEN:*  Okay.

5      Q    (By Mr. Warden) Can we go to 78, please.  And is

6  Exhibit 78 a similar notice for the same time period for the

7  states of Iowa and South Dakota?

8          *MR. STEESE:*  Your Honor, before the answer to that, I

9  know 79 is in, and I am not making a record of that, but these

10 other exhibits were literally given to us less than two weeks

11 ago and not disclosed in discovery, so we would object to late

12 filed and submitted information.

13         *MR. WARDEN:*  Your Honor, do I need to be heard?

14         *THE COURT:*  Well, you need to be heard and I need to

15 be heard.  What I'm going to tell you is that, ultimately, if

16 we're looking at examples of dispute notifications, I'm not

17 sure what the difference is between one, three, five, seven,

18 nine, and so I don't really know.  I will let you be heard on

19 it, but I'm not really sure what the point of additional

20 examples is.

21         *MR. WARDEN:*  As long as these are understood to be

22 examples, because there are three other examples, and it's just

23 that these are regularly generated notices.

24         *THE COURT:*  You got one in the record.  I don't -- I

25 don't know why you need to put the others in the record.

1          *MR. WARDEN:*  I'm fine with that, Your Honor.

2          Q    (By Mr. Warden) And then can we go to 84?  And 84 is

3     in evidence.  Just very quickly, can you describe 84?

4     *A*   Sure.  This would be an example of a dispute notice that I

5     sent.  This one was sent via email.  And what this one had to

6     do with, there was a back bill received from Level 3 in the

7     December 2020 timeframe, once I reviewed the back bill, I

8     identified that the billing was inappropriate and not aligned

9     with the requirements of the transformation order, and I

10    disputed and we withheld $251,000 associated with this dispute.

11    *Q*   And earlier this year did you send a letter to Craig Davis

12    at Level 3, regarding non-OTT disputes?

13    *A*   I did.

14    *Q*   Can we pull up Exhibit 23, please.  Is this March 12th,

15    2021, letter, the letter that you sent to Mr. Davis?

16    *A*   It is.

17         *MR. STEESE:*  Your Honor, I'm going to object to this.

18    You can see at the top, this was an attempt to get this matter

19    resolved.  It specifically states Rule 408 and state

20    counterparts.

21         *THE COURT:*  Sustained.

22         Q    (By Mr. Warden) Let's pull the exhibit down.

23         In March of 2021, did you provide notice to Level 3 of

24    additional non-OTT disputes?

25         *MR. STEESE:*  Your Honor, I'm going to object again.

1    The notice was provided in this Settlement Letter, and so he is

2    trying to get around the issue by -- the 408 concern, by just

3    not discussing it through the exhibit.  So it's still a

4    settlement discussion, Your Honor.

5            MR. WARDEN:  Your Honor --

6            THE COURT:  Overruled.

7        Q    (By Mr. Warden) Did you provide notice of non-OTT

8    disputes to Level 3, in March of this year?

9    A    I did.

10   Q    And do you recall what those disputes were?

11   A    Um, there were several issues identified in the letter.

12           MR. STEESE:  Just one moment.

13           THE COURT:  Hold on, hold on.

14           MR. STEESE:  If we can get some foundation of how it

15   was provided.

16           THE COURT:  Overruled.

17       Q    (By Mr. Warden) What were those disputes?

18   A    One of them was the -- the one that we had discussed

19   numerous times with Level 3, related to the fact that there is

20   a combined billing.  We requested competitive tandem, and end

21   office to be separated.  There was also issues with nonstandard

22   and nontariff element that Level 3 had begun to bill, and -- at

23   one point in time, and we spent time and money with our systems

24   to be able to recognize that element, and then in March of 2020

25   there was a new element rendered, that, once again, was not

1    nonstandard, and was not aligned with any element identified in

2    their tariff.  As well as there were several benchmarking

3    issues identified, such as inappropriate rates or, you know,

4    rates not aligned to jurisdiction.

5    Q   And did you do anything to investigate the issue regarding

6    improperly billing intrastate tandem switching at end-office

7    rates?

8    A   I did.

9    Q   And what did you do?

10   A   So, for one particular state -- one OCN that covers two

11   states of billing, I did a detailed review of the incorrect

12   rate.

13   Q   And --

14   A   And identified that the -- the dollar amount associated

15   with that incorrect billing.

16   Q   Can we go to Exhibit 85, please.  And what is Exhibit 85?

17   Let's start with the second page?

18   A   So this is a bit of an --

19          THE COURT:  Hold on again.

20          MR. STEESE:  Your Honor, this, again, was literally

21   disclosed Friday, last week, and this is another analysis that

22   is done for purposes of this litigation.

23          THE COURT:  Sustained.

24          MR. WARDEN:  Your Honor, may I be heard?

25          THE COURT:  Briefly.

1            MR. WARDEN:  Your Honor, we conducted discovery on one

2    case, we're trying another case, and we have -- both parties

3    have been providing supplemental information over the last --

4    the course of the last couple of months.  This the kind of work

5    that she does in the regular course of her business to

6    investigate disputes.  There are allegations and suggestions

7    that the -- that the withholdings are arbitrary, and this will

8    show that it is not.

9            THE COURT:  I sustain the objection.

10           MR. WARDEN:  Okay.

11           THE COURT:  Look, honestly, I think, to some extent,

12   both sides are a little further into the forest than I think I

13   need to go.  Ultimately, the question is whether or not there's

14   a breach.  That's not a question that's been resolved.  But

15   what are the damages flowing from the breach?  The two

16   companies seem to have some respective axes to grind as to why

17   certain payments weren't made I'm not sure I care why certain

18   payments were made or not made.  They either were made or they

19   were not made.  They either constitute damages or they do not.

20   If they were innocent or malicious, doesn't change the number.

21           So that's why, ultimately, I think we're now delving

22   down the motivation for -- and it goes back to this thing that

23   was said earlier, suggesting that AT&T's has a practice of

24   overwithholding for this motivation and that motivation.  The

25   two of you are way more interested in that issue, than I am.

1          So, sustained.

2          MR. WARDEN:  Well, Your Honor, we have our Exhibit 76

3  in --

4          THE COURT:  I don't need an answer from you.  I don't

5  need an explanation.  I don't need anything.  Sustained.  Move

6  on.

7          MR. WARDEN:  I pass the witness.

8          THE COURT:  Thank you.

9          MR. WARDEN:  Thank you Ms. Miller.  Oh, could I have

10  one minute.  Oh, can I offer 93?

11          MR. STEESE:  If I can find 93.

12          THE COURT:  It's demonstrative.

13          MR. STEESE:  No objection, Your Honor.

14          THE COURT:  All right.  Received.

15          THE COURT:  And, can I anticipate, you're asking me,

16  do you want to start now or do you want to --

17          MR. STEESE:  Your Honor, there's one or two things

18  that I would like to clear up, as we're getting ready for

19  closing tomorrow.  I want to make sure I understand a couple of

20  fundamental things.

21          THE COURT:  That's fine.  That's fine.

22                          **CROSS-EXAMINATION**

23  BY MR. STEESE:

24  Q   Bear with me in finding the exhibit numbers for -- there

25  you are.  Ms. Miller, I'm trying to look over at the other

1    computer.  Just one moment.

2              Ms. Miller, we've met before, correct?

3    A    Yes.

4    Q    All right.  So, what I would like to bring up is Exhibit

5    number 92, please.

6              THE COURTROOM DEPUTY:  I'm trying.

7    Q    Let's do this, before 92.  Let's bring up Exhibit 88.  Then

8    I will get right to 92.

9              Can you see it, Ms. Miller?

10   A    I cannot.  It's a black screen for me -- oh, there it is.

11   Q    Perfect.  Thank you.  All right.  I think that I

12   understood, but I want to make sure I did.  So, let's presume

13   you have a carrier that is -- either has no competitive tandem

14   products or is billing their competitive tandem product on a

15   separate BAN.  Are you with me?

16   A    Yes.

17   Q    And let's assume that you have this hypothetical on Exhibit

18   88, and you have five minutes flowing through the end-office

19   and five minutes flowing through the tandem.  Your mechanized

20   bill system will bill all of that, because the number of

21   minutes you are seeing, both end office and tandem match and

22   are and expected, true?

23   A    Can you restate the question, because I thought you said if

24   you have a scenario where the competitive tandem billing is

25   just billing their tandem separately.  What billing,

1   specifically, are you asking about?

2   Q   I'm focusing now on, this is a situation where you have a

3   LEC, who has an end office and a tandem and there's no

4   competitive tandem billing in the BAN at all.  Are you with me?

5   A   Yes.

6   Q   All right.  And you see the example on Exhibit 88, I have

7   here five minutes throwing through the end office switch, five

8   minutes flowing throughout tandem switch, and as a result of

9   that, the number of minutes that you see in each match, so that

10  bill, through the mechanized system, will be paid in full,

11  correct?

12  A   Correct.  And that's the scenario you are providing, is

13  where the company also owns the tandem switch; but that is

14  correct, yes.

15  Q   And all of these will be the scenario where the company

16  owns the tandem switch too.  So assume that.

17          Now let's assume the following, let's assume that

18  instead, in example number 88, you see five minutes, in the

19  end-office column, at 8 minutes -- let's say 10 just because

20  the math will be easier -- 10 minutes in the tandem column,

21  because there are more minutes in tandem than end office, your

22  mechanized process will say that's too much tandem, I'm going

23  to withhold and dispute on five minutes of tandem switching

24  termination into facility, because the number of minutes don't

25  align with the number of end-office minutes, true?

425

1    *A*    No.   What would happen is the ten minutes applied to

2    tandem, would result in the total billed unit cost being higher

3    than the cost that was calculated, based on a one-for-one

4    relationship, and the withholding would be the differential of

5    that unit -- unit cost as applied to the local switching

6    volumes.

7    *Q*    Which, under my hypothetical, was five minutes of tandem

8    switching termination and facility because they bill ten

9    minutes there and five minutes on the end office.  So that

10   would be the amount that was disputed and withheld, correct?

11   *A*    Assuming everything else aligned correctly.  Yes.

12   *Q*    And all -- perfect.  So now let's go to Exhibit Number 92,

13   and I am going to use your minutes, and I know that the

14   likelihood of having 17 minutes and 71 minutes on a BAN is not

15   logical, but I'm going to use those minutes, just to illustrate

16   the point.  Are you with me?

17   *A*    Yep.

18   *Q*    All right.  So, in this situation, this is a situation

19   where, I will say Level 3, has both tandem switching associated

20   with its own customer and competitive tandem on the same band,

21   correct?

22   *A*    Correct.

23   *Q*    And you have put in an expected formula, expect 418 percent

24   higher tandem minutes than end-office minutes, and if you get

25   418 percent or less, don't dispute and withhold, but if you get

1   more than 418 percent, dispute and withhold on those excess

2   minutes, correct?

3   A   That would be the result of the billed versus payment

4   calculation in that scenario.  Yes.

5   Q   So if, for example, 81 minutes of tandem was billed, again

6   I know these numbers are tiny, you, meaning AT&T, would dispute

7   and withhold ten minutes of tandem-switching termination, in

8   facility, correct, automatically?

9   A   Yes.  Assuming everything else was aligned.  Yes.

10  Q   All right.  So, in other words, let's assume that Level 3

11  gets a new customer, a new cable company is using Level 3 to

12  provide competitive tandem services.  Those tandem-switching

13  termination facility minutes might be totally legitimate, but

14  AT&T is going to dispute and withhold, simply because its ratio

15  that it put into its mechanized system is 1 percentage and the

16  number of minutes that you saw was something different, true?

17  A   Yes.  But that is why we repeatedly explained the issue to

18  Level 3, and told them or expressed the desire to have those

19  services billed separately, knowing that there's no way, with

20  the combined billing, to adjust and care for the fluidity of

21  competitive-tandem service when it's combined with a local

22  switching -- a stable, local switching service.

23  Q   So, in other words, there might be a host of dollars,

24  thousands of dollars, hundreds of thousands of dollars, maybe

25  even millions of dollars that AT&T has withheld and not paid,

 1   simply because of its ratios in its system without having a

 2   legitimate reason for withholding a dispute, true?

 3   A   Yes.  But you are losing sight of it could go the other way

 4   too, where we wouldn't --

 5   Q   If you could just answer my question.

 6           THE COURT:  Hold on.

 7           MR. WARDEN:  Your Honor, the witness should be allowed

 8   to answer the question.

 9           MR. STEESE:  I only asked one scenario, not the other.

10           THE COURT:  I understand.  I think that the objection

11   is overruled, and look, go ahead..

12       Q    (By Mr. Steese) So when -- so, the point is that you

13   say that you have repeatedly told Level 3, when you say

14   repeatedly told Level 3, are those in those emails from 2017

15   and some notice in March of 20, um ... '21?  Are those the

16   notices that you are talking about as being repeatedly?

17   A   That -- some of them.  It's been a common issue throughout

18   this full time period I have been working with Level 3.

19   Q   But the examples that you are talking about are those

20   emails that you looked at earlier from mid 2017, correct?

21   A   Those are the exhibits that were provided that show that.

22   Yes.

23           THE COURT:  Wait, wait, wait.  Is that the only manner

24   in which you expressed this issue?

25           MR. STEESE:  Did you understand the Judge's question.

1          THE WITNESS:  I did.  I believe during the course of

2     my five years of working with Level 3, there was more

3     communication regarding the issue beyond those 2017 emails that

4     were put in the exhibits and beyond just those -- the dispute

5     notices that note that issue.

6          THE COURT:  Okay.

7     Q   Can you point to any specific one, other than those?

8     A   No.  Not off the top of my head.  No.

9          MR. STEESE:  Your Honor, I think that's what I needed

10    today.

11         THE COURT:  That's fine.

12         THE COURT:  All right.  So, I don't know where the

13    witness is.  I'm assuming by her accent it's the East Coast.

14         MR. WARDEN:  That would be New Jersey to be precise,

15    Your Honor.

16         THE COURT:  I didn't mean to suggest she is out to

17    whack somebody or anything like that; it's just there is an

18    accent that I grew up on the East Coast, and so I'm reasonably

19    familiar with it.

20         All right.  We will pick it up at 9 o'clock tomorrow,

21    which is 11 o'clock your time.  Again, ma'am, if you could be

22    ready, say, five minutes before, so that Ms. Pearson can get

23    the connections up and going, so that we can continue and make

24    sure that, before we start, we ironed out whatever bugs, if

25    there are, appear in the system.  All right?

1          THE WITNESS:  So 11 tomorrow, five minutes before?

2          THE COURT:  Correct, 10:55 your time, be ready to come

3     back.

4          THE WITNESS:  Got you.  I will be ready.

5          THE COURT:  We can disconnect her now.

6          MR. STEESE:  I do have one question about how closings

7     will work.  I had kind of hoped that we would be done with

8     Ms. Miller, and I would like to hear more of what Ms. Miller

9     has to say to integrate it into my closing, so is it possible

10    to not have closing tomorrow?

11         THE COURT:  No.

12         MR. STEESE:  Is it possible to have closing tomorrow

13    afternoon?

14         THE COURT:  Yes.

15         MR. STEESE:  Okay.

16         MS. ZAMBRANO:  Okay.  Could we -- earlier in the

17    afternoon, so one might catch flights home, if we live in other

18    places?

19         THE COURT:  Sounds cruel, I don't mean it that way,

20    let's see where we end up in terms of the exam and the

21    Cross-exam.  I'm not trying to get you to miss flights, but

22    it's not at the top of my concern's list, and I am sorry about

23    that.  The reason I'm not going to move it, is I have got

24    another trial starting next week, and I don't want to push

25    closings so far removed from the evidence that it makes -- that

430

 1  it loses its impact.

 2          *MR. STEESE:*  I understand, Your Honor.

 3          *THE COURT:*  Let me tell you, with regard to closing, a

 4  couple of things, from my perspective, it would be helpful, to

 5  me, now I'm not telling you you have to do it this way or

 6  bullet point it, and I am not telling you structure it

 7  according to these things, but somewhere in there, I would like

 8  to be able to clearly follow the theory, as to breach, how that

 9  theory ties to the damages that are being sought, and I am not

10  trying to weigh in as saying, for example, that I believe or

11  don't believe or concluded anything, but just to harken back to

12  some things what were said in openings, what I expect to hear

13  from AT&T is essentially the breach was the failure to pay the

14  amounts due on the end office, within a certain time period,

15  and the damages are, essentially, what should have been paid.

16  It's a little more complicated on the L3 side, because I think

17  it's less than clear -- well, it's clear that you don't agree

18  with that, that it's a broader concept, that has to do with

19  additional amounts that were overwithheld, how the -- the

20  breach, in terms of the failure to -- and in fact, it may even

21  be that the breach is more than, in terms of the contract, the

22  failure to pay the end office.  I'm not trying to settle that

23  right now.  I'm just trying to say, this is not just about

24  numbers, this is about theory, as well, and I want it -- I want

25  to be very clear as to what each side's theory is, because it

1    matters as much, if not more, than the numbers.

2           Number two, then, I want to understand the numbers,

3    after I understand the theory.

4           Number three, I want to know what exhibit best

5    captures, and by that, I suppose I'm asking for, and I can dig

6    through here and find it, it's basically going to be your

7    individual calculations.

8           Number four, I want all of this on two different time

9    blocks, January 1, 2019 -- I'm sorry -- yeah.  The time period

10   that was anticipated in the Summary Judgment motion, I want to

11   see that, and then I want to see after that.  And I want to

12   understand, if there -- because there's a lot of things that

13   are being talked about, about things that happened past

14   February 19, 2020.  They billed, they didn't bill, they did

15   this, they did that, back and forth.  If there is some claim

16   for moneys that go beyond 2019 -- excuse me -- February 19,

17   2020, I just want it separately discussed so -- because the

18   theory might be a little different for one block as to the

19   other.

20          And then finally, we can talk about the affiliate.

21   Somewhere -- you know, who I'm talking about?

22          *MR. STEESE:*  TCG.

23          *THE COURT:*  Yeah.  And then somewhere in there, I

24   suppose I will look to you to explain to me -- now, it's late

25   in the day and I am being more playful than helpful, but I had

 1    Jesuits drill me with four years of Latin, and then I took a

 2    number of years of Greek, as well.  You have introduced me to

 3    the term romanette.  Okay.  The Jesuits missed it.  I don't

 4    know what else to say, but, in any event, in the Settlement

 5    Agreement, Section 1, I think (iv), there is a discussion about

 6    a 50 percent return.  The way it's supposed to work is there's

 7    a 50 percent return.  In other words, during the period that

 8    you are waiting for the FCC to rule -- or the appeal to become

 9    final, I should say, there's a 50 percent return.  It's not

10    clear to me, as I'm sitting here right now, that I have got

11    fully ... captured in my mind, how each side is dealing with

12    that, or if it's relevant at all to be dealt with.

13         Those are my little comments.  You can factor them in.

14    Again, I'm not saying come out here, going here you go, boy,

15    you missed the boat on this, number one, number two, number

16    three, number four, but I'm just saying touch on these things

17    because they matter, in my head, before going back through

18    everything, which will obviously happen after the closing

19    arguments.

20         MR. STEESE:  Amount of time that each one of us should

21    shoot for?

22         THE COURT:  Kind of depends on what we're talking

23    about.  I would like it to say be an hour, but I don't know

24    what you are looking at.

25         MR. STEESE:  An hour per side?

 1              THE COURT:  Yeah.

 2              MR. STEESE:  That's certainly achievable, Your Honor.

 3              MS. ZAMBRANO:  Yes.

 4              THE COURT:  Anything else?

 5              MS. ZAMBRANO:  No.  Thank you for that, Your Honor.

 6              THE COURT:  All right.

 7              THE COURTROOM DEPUTY:  All rise court is in recess.

 8         (Recess at 5:07 p.m.)

 9      Jennifer Torres

10              Cross-examination By Mr. Warden              214

11              Redirect Examination By Mr. Steese           259

12      Kimberly Meola

13              Direct Examination By Ms. Zambrano           276

14              Cross-examination By Mr. Steese              324

15              Redirect Examination By Ms. Zambrano         358

16       ALISON MILLER

17              Direct Examination By Mr. Warden             369

18              Cross-examination By Mr. Steese              422

19      EXHIBIT        OFFERED    RECEIVED    REFUSED    RESERVED

20      34                          218

21      25                          220

22      76                          239

23      3                           244

24      A16                         341

25      82                          367

1    86                          376

2    88 & 90                     384

3    36                          393

4    92                          399

5    93                          422

6                    REPORTER'S CERTIFICATE

7

8         I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

9

10        Dated at Denver, Colorado, this 10th day of September,

11   2021.

12                        s/Tammy Hoffschildt

13                   _____

                     Tammy Hoffschildt, FCRR,RMR,CRR
14

15

16

17

18

19

20

21

22

23

24

25