IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-112-RM

AT&T Corporation,

    Plaintiff,

vs.

Level 3 Communications, LLC,

    Defendants.

_____

REPORTER'S TRANSCRIPT
TRIAL TO THE COURT

_____

        Proceedings before the HONORABLE RAYMOND MOORE,
Judge, United States District Court for the District of
Colorado, commencing at 9:00 a.m., on the 16th day of July,
2021, in Courtroom A601, United States Courthouse, Denver,
Colorado.

APPEARANCES

Rebecca B. DeCook, Moye White LLP, 1400 16th Street, 6th Floor,
Suite 600, Denver, CO 80202-1486, Angela C. Zambrano, and
Michael D. Warden, Sidley Austin LLP-Dallas, 2021 McKinney
Avenue, Suite 2000, Dallas, TX 75201, appearing for AT&T
Corporation.

Charles Walter Steese and Douglas Nelson Marsh, Armstrong
Teasdale LLP-Denver, 4643 South Ulster Street, Suite 800,
Denver, CO 80237, appearing for Level 3 Communications, LLC.

TAMMY HOFFSCHILDT, FCRR, CRR, RMR Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

ALISON MILLER - Cross

1          P R O C E E D I N G S

2      (In open court at 9:00 a.m.)

3          THE COURT:  Please be seated.  Good morning to all of

4    you, and we are prepared to proceed with completing the

5    Cross-examination of Alison Miller.

6          Ms. Miller, I remind you that you are still subject to

7    the oath that you took yesterday.  Understood?

8          THE WITNESS:  Understood.

9          THE COURT:  All right.  And Mr. Steese, you may

10   continue.

11                      **CROSS-EXAMINATION**

12   BY MR. STEESE:

13   Q    Good morning, Ms. Miller.

14   A    Good morning.

15   Q    I don't think I'm going to be as long as I thought.  I went

16   through my notes last night, so probably good for me to do

17   that, so hopefully we can be focused here and finish.

18          So, let's bring up Exhibit 76, which you discussed

19   with your counsel yesterday.  And do you recognize this

20   document, Ms. Miller?

21   A    It's just coming up now.  This looks like my -- yes, I do

22   recognize this.

23   Q    Perfect.  And if you look at this spreadsheet, if I

24   understand it correctly -- I'm sorry, I'm going to have to get

25   my computer.  I cannot see the exhibit at the same time.

ALISON MILLER - Cross

1    Normally I can see it on the screen and I cannot.

2          THE COURT:  I understand.

3    Q    Forgive me, Ms. Miller.  The exhibit is so small.  So if

4    you look at the column entitled, AT&T withheld end office.  Do

5    you see that.  This is column --

6    A    I do.

7    Q    Okay.  Column N is simply a mathematical equation.  You

8    took 65 percent times column K, which is the end-office amount

9    billed, which is simply adding up the common trunk port and

10   local switching amounts billed by Level 3, to AT&T, in the

11   column -- in the table at the left, correct?

12   A    Yes.  But to clarify, there were some months where there

13   was also CCL.  So that sum would have included the CCL in

14   there.

15   Q    So tiny amounts of CCL, when they existed, would have been

16   included, as well, correct?

17   A    Correct.

18   Q    And this table on the left, columns A through F, can you

19   see that circle around it?

20   A    I do not see a circle, no.

21   Q    That was a curiosity?

22         THE COURT:  No, that's fine.  Our computers in here

23   allow you to draw on the screen.  It obviously does not

24   transfer.

25         THE WITNESS:  Translate.

ALISON MILLER - Cross

1          THE COURT:  -- transfer over to where you are.

2          Q    (By Mr. Steese) Perfect.  But the column to the left

3     with the green row, at the top, all of that was Level 3's

4     damage calculations, correct?

5     A    Actually, my understanding is columns A through D were

6     Level 3's billed data for the end-office elements, and because

7     my reports, the ADW reports, show --

8     Q    I'm not asking you that.  I'm not asking that.  I'm just

9     asking what this table is.

10         MR. WARDEN:  Your Honor, if the witness can be allowed

11    to answer the question.

12         THE COURT:  No.  Sustained.  I'm sorry.  Overruled,

13    sustained -- there's a disconnect here, ma'am.  Just answer the

14    question that's put to you.

15         THE WITNESS:  Okay.  So can you ask the question

16    again?

17         Q    (By Mr. Steese) The numbers in the table on the left,

18    they came directly from a spreadsheet put forward by Level 3,

19    that contained its damages analysis, correct?

20    A    Yes.  But the source of Columns A through D would be the

21    billing information from Level 3, that was rendered to AT&T.

22    Q    Perfect.  Thank you.  Now, so when you got this document,

23    you took Level 3's numbers, you added them together, all the

24    end-office elements, multiplied by 65 percent, and got the

25    amount withheld.  Simple math, to use your words from

ALISON MILLER - Cross

1   yesterday, correct?

2   A    After validating the information matched what I showed

3   Level 3 billed, yes, I did then do simple math, using the first

4   reflected in columns A through D to determine the end-office

5   amounts billed by bill date.

6   Q    Can you bring up Exhibit A22, please.  I realize that you

7   have not been in court the last few days, but this is damages

8   analysis that Level 3 put forward in March of 2020, and my

9   question is, have you ever seen this document before?  And why

10  don't you click on the the first tab, credit and debit, and I

11  am going to highlight a few things for you, just before you

12  answer, so you can see it, this is based an an OTT percentage

13  of 16 percent.  Do you see that?

14  A    The screen is getting blurry in and out.  Now I see column

15  F reflects 16 percent.

16  Q    If you scroll down, do you see that the damages -- the

17  timeframe ends in March of 2020?  Do you see that?

18  A    I do see that, yes.

19  Q    And if you go to the AR summary, do you see, at the top,

20  that it's a little bit different than the current numbers,

21  because you can see it just has the DEOT.  Do you see that

22  there it doesn't --

23  A    I see a DEOT column.

24  Q    The DEOT.  And there it shows total damages, but it doesn't

25  show the $517,000 credit down below, to AT&T, that number

ALISON MILLER - Cross

1    that's on the current analysis.  I'm just pointing out some

2    differences.

3            So my question now, to you is, have you ever seen this

4    document before?

5    A   I cannot speak to this document in particular.  There were

6    several documents in a similar format that were shared where --

7    when AT&T and Level 3 were trying to reconcile the total

8    balances view.

9    Q   So that would have been last year that you might have seen

10   it?

11   A   There was lots of back and forth where Level 3 shared

12   spreadsheets in this such format, where AT&T requested the

13   supporting information, such as the billing details behind the

14   data, because we were looking at our own information to try to

15   align with the balances, and we were unable to align with

16   anything in these example spreadsheets outside of column B, the

17   total -- the new charges here, which reflected the total

18   charges.

19   Q   So let's bring up Exhibit 13.  Do you see Exhibit 13 is a

20   letter from AT&T's counsel, Mr. Hunseder, to myself, dated May

21   15 of 2020, attaching various materials in this lawsuit?  Do

22   you see that?

23   A   Is there any way to zoom?  I can see the May 15, but if I

24   am expected to read anything in here, I can't.

25   Q   Is that better now?

441

ALISON MILLER - Cross

1   A   Yes, yes.  Thank you.  I do see this appears to be a -- a

2   message sent from Mike Hunseder to you.

3          MR. STEESE:  I move 13.

4          MR. WARDEN:  No objection.

5          THE COURT:  Received.

6   Q   Have you seen this letter before, Ms. Miller?  Just take

7   your time, read it to yourself, tell me if you have seen it

8   before?

9   A   I honestly cannot remember if I saw this one.  It's not --

10  as I'm reading through it, doesn't seem familiar to me, but

11  there's a chance I did.

12  Q   Do you see where Mr. Hunseder says, in the letter, *The*

13  *differences between the parties' positions reflect legal or*

14  *factual issues*.  Do you see that?

15  A   I see that, yes.

16  Q   So now let's look at Exhibit 10.  And Exhibit 10 is

17  entitled AT&T and TCG's Supplemental Disclosure.  And if you go

18  to the very bottom to get a date, entitled May 15, 2020.  Do

19  you see that?

20  A   Oh, I see the date now.  Yes, I do see the date.

21          MR. STEESE:  Move admission of Exhibit 10.

22          MR. WARDEN:  No objection.

23          THE COURT:  Received.

24      Q   (By Mr. Steese) So, I realize that you are there, and

25  there's a lag time, so I'm going to scroll through this a

442

ALISON MILLER - Cross

1    little bit, to see if -- my question is, have you seen this

2    document before?  I just want to scroll through and let you

3    look at it.

4          Can you tell yet, Ms. Miller?

5    A   It -- there were many documents shared back and forth

6    during the time of this.  Likely, yes, I did see this.  I

7    don't -- once again, I don't have a strong recollection of

8    this.

9    Q   So, let's go back to A22 for just a moment.  And why don't

10   you look at the debit-and-credit section.  Do you recall an

11   instance where Level 3 was making a formal claim in this

12   lawsuit that its OTT percentage was 16 percent?  Do you recall

13   that?

14   A   I do recall 16 percent was a value Level 3 had identified

15   as OTT, at one point in time.  Yes.

16   Q   All right.  And if you look -- highlight the tandem add

17   back -- no, just an individual cell.  All right.

18          Do you recall a time when the tandem add back, before

19   February of 2020, when the FCC's decision had not yet taken

20   effect, was not yet divided by two.  Do you recall that?

21   A   I'm sorry, are you asking if I remember when there was an

22   issue with the formula, it sounds like?

23   Q   Exactly.  On the tandem add back, before February of 2020.

24   A   I do not recall that, no.

25   Q   Let's go to the AR summary.  And if you look at the AR

ALISON MILLER - Cross

1   summary, the way Level 3 is calculating its damages, in March

2   of 2020, is to take total usage charges, subtract out the DEOT,

3   add -- utilize late payment charges, get an OTT credit, and

4   come up with total damages.  Do you see that?

5   A   I see that is what Level 3 did, and we had all expressed a

6   problem with trying to align with this spreadsheet, in what I

7   would call the backwards engineering, to get to the value.

8   Q   Okay.  You think you have always raised that issue?

9   A   Yes.  Ever since we were trying to reconcile this, and we

10  had, in fact, shared, our view of the balances, and our own

11  format, including all of the back-up detail, the billing

12  details at the bill-date level.

13  Q   So, let's look at page two -- excuse me, Exhibit 10, page

14  two.

15       MR. WARDEN:  Your Honor, I'm going -- I'm going to

16  object to this testimony, under Rule 408, as these discussions

17  were in the context of an attempt to reconcile and settle the

18  litigation.

19       THE COURT:  I think we're too far down the rabbit hole

20  to stop now.

21       MR. STEESE:  I truly am not trying to ask about the

22  reconciliation.  She has brought it up a few times.

23       THE COURT:  That's what I mean.  We've discussed

24  what's gone back and forth and what she has known and what she

25  has not.  At this juncture, I'm going to let it flesh it out.

ALISON MILLER – Cross

1    Obviously, I don't mean to suggest that formal offers and this,

2    that and the other thing are going to be admitted.

3         MR. STEESE:  And I was not even trying to go there.

4         THE COURT:  Understood.  No accusations.  Let's just

5    go.

6         MR. STEESE:  Fair enough.

7    Q    (By Mr. Steese) So, let's look at Exhibit 10, page

8    two.  No, let's start on page one.  Do you see where it says,

9    and I quote, *AT&T TCG, collectively AT&T, state that in*

10   *response to the disclosure of the testimony of Jennifer Torres,*

11   *previously submitted by Level 3, they do not plan to submit any*

12   *testimony they consider to be admissible, based upon these*

13   *rules*.  Do you see that?

14   A    I see that.  I can't state that I understand what that

15   means, but I do see that.

16   Q    I don't want you to think I'm not providing some piece of

17   this document to you.

18        Then it says, *For the avoidance of doubt, AT&T does*

19   *not accept all of Ms. Torres' assumptions, calculations and*

20   *conclusions*.  Do you see that?

21   A    I do see that.

22   Q    It says, *AT&T does not intend to dispute the entries in*

23   *columns A and D, in the second tab of Mrs. Torres' spreadsheet*

24   *entitled AR summary.*  Do you see that?

25   A    I do.

ALISON MILLER - Cross

1    Q   So let's bring up Exhibit A22.  And you look at columns A

2    and D, and it says *it's not intending to* -- this is the second

3    tab, it says, *It's not intending to challenge what's there*.  Do

4    you see that?

5    A   Is this the spreadsheet that was aligned with that letter?

6    Q   Yes.

7    A   Okay.

8    Q   So now, let's go to the next paragraph of Exhibit 10.  Do

9    you see where it says, *As to the new charges* -- and I am going

10   back and forth between exhibits, and so if you don't have an

11   exhibit yet, please tell me.  It's hard for me to tell.  So I

12   want to make sure you are seeing as I go?

13   A   I'm on the letter now.

14   Q   Perfect.  Now -- on the disclosure, right?  It says, *As to*

15   *the new charges, Level 3's column B, appears to include usage*

16   *charges and late payment charges.  AT&T's records regarding the*

17   *amounts billed for usage only during the time period show the*

18   *correct amount to be $26 million and change*.  Do you see that?

19   A   I do see that.

20   Q   And then it says, *AT&T disagrees with the application of*

21   *late payment charges, as further described below.*  Do you see

22   that?

23   A   I do see that.

24   Q   So -- so there is a question, at this point, has Level 3

25   tallied its total usage charges accurately, correct?

446

ALISON MILLER - Cross

1    A    Yes.  This paragraph, specific paragraph, is speaking to

2    the total usage amounts billed, and the value that Level 3 has,

3    includes LPCs in that new charges column.

4    Q    Then you go to column C -- excuse me, the letter.  It says,

5    *AT&T disputes the figures in column C of the AR summary,*

6    *because its records show the appropriate amount to be*, and I am

7    paraphrasing, *2.99 million*.  Do you see that?

8    A    I do.

9    Q    So now, let's go back to Exhibit A22.  And do you see that

10   that relates to the DEOT usage and instead of 2.6 million, AT&T

11   thought it should be 2.99 million.  Do you see that?

12   A    Correct.  Numbers or the credit amounts did not align.

13   Q    Okay.  So, go back to Exhibit 10.  And the next paragraph

14   says, *AT&T disputes the figure used in column E.  According to*

15   *AT&T's records, AT&T paid*, and again I'm paraphrasing, *19.26*

16   *million*.  Do you see that?

17   A    I do see the payment amount that was made towards the total

18   billing.  Yes.

19   Q    And so then, you go and also say, *As a matter of written*

20   *arithmetic, this adjustment impacts the balance in column F*.

21   Do you see that?

22   A    I do see that.

23   Q    So, let's go back to A22.  You can see total payments.  You

24   had thought it was 19 million, at this point, Level 3 had 15

25   million.  Do you see that?

ALISON MILLER - Cross

1    A    I do see.

2    Q    Which impacts the total balance in column F, correct?

3    A    Correct.  So our numbers for payments that were made

4    towards all the charges associated with these bill dates, did

5    not align with the numbers Level 3 reflected in their damages

6    summary.

7    Q    So, so far, what Level -- excuse me -- what AT&T has

8    challenged is, they have taken issue with the numbers in the

9    total-usage column and the numbers in the DEOT credit column,

10   and the numbers in the total payment column, which impacted the

11   balance, correct?

12   A    Correct.  Because the first step in any process is to

13   reconcile the total balances.

14   Q    Okay.

15   A    And you know, obviously, in order to do so, the payments

16   need to be reflected correctly, and the credits need to be

17   reflected correctly, too.

18   Q    All right.  And that gets to the next paragraph of

19   paragraph 10 -- excuse me, Exhibit 10.  So, if we get back now

20   to Exhibit 10, the next page, and that's what you say.  *AT&T's*

21   *contentions* -- strike that.  *AT&T's contentions regarding these*

22   *amounts are based upon business records maintained by AT&T, and*

23   *the amounts billed and credited*.  So exactly what you said.

24   You need to reconcile to make sure they were accurate, correct?

25   A    Correct.

448
ALISON MILLER - Cross

1   Q   Then you go down to the next paragraph, and scroll down a

2   little so she can see that whole paragraph.  Okay.  Perfect.

3   That's good.

4          The next paragraph says, additionally, AT&T contends

5   that the issue of whether any prejudgment interest or late

6   payment penalty amounts are owed is one for the Court to decide

7   in its discretion.  It cites some cases, and then, after the

8   cases, it says *AT&T reserves its rights to contend and present*

9   *argument to the Court that no pre-adjustment interest and/or*

10  *late payment penalty amounts are appropriate, assuming damages*

11  *are awarded*.  Do you see that?

12  A   I do.

13  Q   I'm not intending to keep you from looking at the next

14  sentence, so read it to yourself, but I'm going to go to the

15  last sentence, if that's okay, of that paragraph.

16         *On that basis, AT&T disputes the inclusion of the*

17  *amounts included in column G and as noted any late payment*

18  *charges included in column B*.  Do you see that?

19  A   I do see that.

20  Q   So go back to Exhibit A22.  And A22 then shows the balance

21  due -- excuse me -- the late payment charges -- excuse me -- in

22  column G, that AT&T thought there should be nothing in that

23  column, correct?

24  A   Yes.  I believe we were disputing the LPCs, correct.

25  Q   Then we go back to Exhibit 10, the next paragraph, and it

ALISON MILLER - Cross

1    says, *Further, AT&T contends that the OTT net credit, shown in*

2    *column I and calculated on the tab credit and debit is to too*

3    *low, and therefore disputes the entries in that column.  As*

4    *AT&T maintains in its other expert disclosures, and in other*

5    *testimony in this case, the 16 percent OTT factor used by Level*

6    *3 has methodological flaws, and cannot be relied upon.*  I'm

7    going to start there.  Do you see that?

8    *A*   Yes.

9    *Q*   And so, go to -- back to Exhibit A22, and you can go to the

10   credit and debit.  We looked at this.  The other tab.  You can

11   see 16 percent OTT, and if you -- it comes out to -- scroll

12   down to the bottom to a total credit of 900 -- and I can't see

13   that.  I'm sorry.  $376,000, based on that 16 percent.  Do you

14   see that?

15   *A*   I see that value, yes.

16   *Q*   And what AT&T was saying is that 16 percent number is too

17   low, correct?

18          *MR. WARDEN:*  Objection, foundation.

19          *THE COURT:*  Overruled.

20      Q    (By Mr. Steese) I'm sorry.  I didn't hear your

21   answer, Ms. Miller.

22   *A*   Yeah.  The heart of this matter, and what we're discussing

23   here, was AT&T and Level 3's disagreement on what percentage

24   and how they should apply to OTT.  So, yes, we disagreed with

25   the 16 percent.

ALISON MILLER - Cross

1    *Q*   And then, going back to Exhibit 10, the next sentence of

2    that same paragraph says, *The recent order of the FCC provided*

3    *that its holding applied retroactively, and nothing in the*

4    *parties' 2015 Settlement Agreement allows Level 3 to retain*

5    *half of its charges that are unlawful under the FCC's rules and*

6    *order.*  Do you see that?

7    *A*   I do.

8    *Q*   So now I go back to Exhibit A22, that same tab.  Just click

9    on one of the columns at the top -- excuse me -- one of the

10   cells at the top, to the far right, one more -- not far right.

11   I'm sorry.  Right there.

12            Can you see -- can you see that formula okay,

13   Ms. Miller?  I just can't tell because of the screen.

14   *A*   Yes, I can see the figure.

15   *Q*   You can see that Level 3 is dividing the OTT credit by two,

16   at least as of this month.  Do you see that?

17   *A*   I do.

18   *Q*   And AT&T was saying that shouldn't happen, correct?

19   *A*   That was the -- you know, part of, as stated, the OTT and

20   what AT&T felt was appropriate, at that point in time.  Yes.

21   *Q*   So now let's go back to Exhibit 10, next paragraph.  It

22   says, *AT&T also disputes Level 3's contention that it is*

23   *entitled to the tandem add back debit shown in column I through*

24   *N, of the credit and debit tab, and included in the calculation*

25   *of the OTT net credit in column I, of the AR tab.  Level 3 may*

ALISON MILLER - Cross

1   *only charge a single tandem, not two tandem charges, for the*

2   *functions it and its VoIP partners perform in completing OTT*

3   *VoIP calls.*  Do you see that?

4   *A*   I do.

5   *Q*   So now go back to Exhibit A22?

6   *A*   And look at the -- that same credit and debt tab, columns I

7   through N.  Level 3 was calculating a tandem switching credit

8   of $209,000 and AT&T was saying none of that should come back

9   in, correct?

10  *A*   Correct.

11  *Q*   Go back to Exhibit 10, and then the last sentence says

12  *Collectively, AT&T's disputes on the various figures relied*

13  *upon by Ms. Torres, impact her calculations shown in columns F,*

14  *H and J, which AT&T accordingly disputes.*  Do you see that?

15  *A*   I do.

16  *Q*   And do you see that's the end of the AT&T challenge with

17  Ms. Torres' damages analysis, as of May 15 of -- excuse me,

18  2020?

19  *A*   I do, and I see, from reading through this, that this

20  pretty much aligns with what I had previously stated, where we

21  had problems with the data being shown, and we could not align

22  with the data being shown.

23  *Q*   So, there is nothing in this disclosure saying that AT&T

24  believes there are additional disputes between AT&T and Level

25  3, that should be taken into account in this damage analysis,

ALISON MILLER - Cross

1    does it?

2              MR. WARDEN:  Object to the form of the question.

3              THE COURT:  Overruled.  Go ahead.

4    A   Um, there's nothing that states that in this letter,

5    however, this analysis, I would have viewed as reconciling the

6    total balances, once both parties agree on total balances,

7    that's when the additional steps to determine what all the

8    inputs to those total balances would be.

9        Q    (By Mr. Steese) Were you aware, Ms. Miller, that this

10   was the time, May of 2020, for AT&T to identify its challenges

11   to Level 3's damage analysis?  Did you understand that?

12             MR. WARDEN:  Objection, argumentative.

13             THE COURT:  Sustained.

14       Q    (By Mr. Steese) Did you have an understanding of the

15   purpose of this document?

16             MR. WARDEN:  Objection, foundation.

17             THE COURT:  Overruled.

18   A   I'm sorry, does that mean I can answer then?  I'm having

19   trouble hearing you say what --

20             THE COURT:  Yes.

21             THE WITNESS:  Okay.  Thank you.  No.  My understanding

22   is communication, at this point in time, was in regards to the

23   OTT dispute, specifically.

24       Q    (By Mr. Steese) I don't know if you answered my

25   question.  Make sure that you understand the question I'm

ALISON MILLER - Cross

1    asking.  In this lawsuit, did you have an understanding of what

2    the purpose of this document was?

3    A   My understanding is the lawsuit was related to the OTT

4    dispute.  So this document would have been related to the OTT

5    dispute.

6    Q   My question is slightly different, and I appreciate your

7    answer, so I will phrase it differently.  Did you have an

8    understanding, at this point in time, May of 2015, of the level

9    of analysis that was expected of AT&T to put forward

10   challenging Ms. Torres' damages calculation?

11            MR. WARDEN:  Objection.

12            THE COURT:  Hold on a minute.

13            MR. WARDEN:  Objection, foundation, argumentative.

14            THE COURT:  Overruled.

15            THE WITNESS:  And I am not sure I understand the

16   question.  Maybe it's just me.

17        Q    (By Mr. Steese) Fair enough.  I will try it again.

18   Did you have -- did you have an understanding, in May of 2020,

19   when AT&T put this document forward, whether -- what the

20   purpose of this document was, in the context of this lawsuit

21   A   I don't know if I had a full understanding of that.  This

22   was submitted by the attorneys.  I may have provided inputs

23   into the values put in here but --

24   Q   So --

25   A   -- it was not --

454

ALISON MILLER - Cross

1   Q   I'm sorry.  Let you finish.  Please continue.  I apologize.

2   A   No, no, no.  I was just going to say, it sounds like you

3   are asking me, did I know what, legally, was required, at this

4   point in time, and...

5   Q   I'm truly just trying to ask if you had an understanding.

6   But I think you have answered that.

7           MR. WARDEN:  Asked and answered.

8           THE COURT:  I agree.  I think we're done.

9           MR. STEESE:  I'm moving on to the next point.

10      Q     (By Mr. Steese) There's nothing in this document,

11  Exhibit 10, that says Level 3's claims are limited to tariffed

12  and end-office charges, is there?

13          MR. WARDEN:  Objection, argumentative.  At some point,

14  Your Honor --

15          THE COURT:  At this point, as I did with you, or AT&T,

16  now we are at the point of what a document says, and

17  ultimately, it says what it says.  I don't need her to agree

18  with what it says or it doesn't say.  I can make my own

19  conclusions in that regard.

20          MR. STEESE:  I will move on, then, Your Honor.

21      Q     (By Mr. Steese) Now, let's bring up Exhibit 17.

22  Exhibit 17 -- scroll down so Ms. Miller can see it.  This says

23  AT&T's Rule 26(a)(2) Disclosure.  And it says, *AT&T has*

24  *disclosed employee, Alison Miller, may offer testimony at trial*

25  *regarding ... amounts billed by Level 3 for end-office*

455

ALISON MILLER - Cross

| 1 | *switching charges*, and it continues.  Do you see that |
|---|---|
| 2 | *A*   I do see that. |
| 3 | *Q*   Did you see this document at the time it was -- around the |
| 4 | time it was created and submitted to the Court, which was April |
| 5 | 23, of 2021? |
| 6 | *A*   It was probably -- actually I'm not sure.  It was probably |
| 7 | shared with me, but ... |
| 8 | *Q*   If you look at Exhibit 18 -- |
| 9 | *A*   Not positive. |
| 10 | *Q*   And if you look at Exhibit 18 it says, *AT&T and TCG,* |
| 11 | *incorporate*, scroll down, I want to make sure ... it says *AT&T* |
| 12 | *states that in response to the damages analysis, provided by* |
| 13 | *Level 3, it does not plan to submit any testimony that it* |
| 14 | *considers to be*, and that's all legal stuff.  *For avoidance of* |
| 15 | *doubt AT&T does not accept the assumptions*, et cetera.  Did you |
| 16 | see this document at around the time it was submitted? |
| 17 | THE COURT:  Hold on. |
| 18 | MR. WARDEN:  Your Honor, we are the point where we are |
| 19 | not really asking questions.  We're just having counsel read |
| 20 | into the record. |
| 21 | THE COURT:  I agree, and we're reading into the record |
| 22 | things that haven't been admitted.  I don't know what the point |
| 23 | of any of this is.  If you want to move it, fine. |
| 24 | MR. STEESE:  Okay.  Fair enough, Your Honor. |
| 25 | THE COURT:  If you want to move it, and then have me |

456

ALISON MILLER - Cross

1    read it, obviously I can do that.  So are you moving 18?

2              MR. STEESE:  AT&T 17 and 18, yes, Your Honor.  I

3    should have done that.

4              MR. WARDEN:  No objection.

5              THE COURT:  All right.  They are admitted.

6         Q    (By Mr. Steese) I'm just asking you, did you see this

7    document around the time that it was submitted?

8              MR. WARDEN:  Objection, asked and answered.

9              THE COURT:  I will let it -- I will let it be

10   answered.  Go ahead.

11   A    I honestly don't recall.

12        Q    (By Mr. Steese) So, it was April 23, 2021, when AT&T,

13   for the first time, disclosed to Level 3, that its damages

14   calculations were attempting to limit Level 3's damages to

15   end-office switch -- percentage of end-office switching

16   charges; isn't that true?

17             MR. WARDEN:  Objection foundation.

18             THE COURT:  Sustained.

19             MR. STEESE:  Your Honor, I don't understand that

20   objection or foundation point.  She is their person that's

21   putting forward the information.

22             THE COURT:  She is not their legal person.

23        Q    (By Mr. Steese) Are you aware of whether or not there

24   was any time, before April 23 of 2021, where, in this lawsuit,

25   AT&T informed Level 3 that it was attempting to limit Level 3's

ALISON MILLER - Redirect

1    damages to a percentage of its end-office switching charges?

2           MR. WARDEN:  Objection, foundation.

3           THE COURT:  I will -- no.  I will let her answer that.

4    Overruled.

5           THE WITNESS:  I'm not aware what may or may not have

6    been shared by legal.  I am aware, during this entire time,

7    reviewing OTT information, the percentages and applications

8    have always applied to end-office billing.

9           MR. STEESE:  Your Honor, that's all of the questions

10   that I have.

11                      **REDIRECT EXAMINATION**

12   BY MR. WARDEN:

13   Q   Good morning, Ms. Miller.

14   A   I'm sorry.  Caught me drinking.  Good morning.

15   Q   That's fine.  Can we go to Exhibit 76, please, in evidence.

16   And you testified about Exhibit 76 yesterday, and the columns

17   on the left, A through F, are replicated from Level 3's

18   analysis; is that right?

19   A   That is correct.

20   Q   And were you able to reconcile those numbers with AT&T's

21   records?

22   A   What column?  I'm sorry.  If you could zoom in a little

23   bit.  E and F were calculations, but I did verify columns A

24   through D, the bill date, elements, minutes and revenue matched

25   what ADW reflected for those same periods.  It would be expense

ALISON MILLER - Redirect

1    to me; revenue for Level 3.

2    Q    Thank you.  Can we go to -- let me ask one more question

3    about this.  So you used these numbers, in your calculation on

4    the right, with the yellow headings; is that correct?

5    A    Because I had verified that these numbers aligned, with

6    what the ADW data showed with the exception of the roughly

7    $30,000 I mentioned, I did use, you know, Level 3's format, and

8    the specific, you know, as shown here, and applied that to my

9    mathematical calculations.

10   Q    And can we go to A22, please.  Can we go to the -- oh, I'm

11   sorry.  Is this the first page of A22?  Okay.

12        Mr. Steese asked you a whole series of questions about

13   this document a few minutes ago.  You remember, in general,

14   those questions, right?

15   A    Yes.

16   Q    So let's go to -- I believe it's page eight of the

17   document.  I think is A22.  And, Ms. Miller, from time to time,

18   you have seen Level 3's analysis of billings and withholdings

19   in this case; is that right?

20   A    Yes.

21   Q    And do you recognize this as tab one of those analyzes?

22   A    I -- I recognize this as being the format of the

23   information provided by Level 3.  Do I remember this particular

24   one?  Can't say I do.  But it's in the familiar format of what

25   I reviewed.

ALISON MILLER - Redirect                                          459

1   *Q*   Let me try it a different way, Ms. Miller.

2         So, do you believe that this is one tab of a

3   spreadsheet?

4   *A*   Yes.

5   *Q*   Can we turn to the next page, please, and this is another

6   tab of the spreadsheet?

7   *A*   Correct.  If I recall there were three tabs.

8   *Q*   And all of the questions that Mr. Steese asked you, were

9   about this tab, right?

10  *A*   Correct.

11  *Q*   Can we go back one more?

12        *MR. STEESE:*  I'm going to object, that misstates the

13  record.  I asked about both tabs.

14        *THE COURT:*  Sustained.

15     Q   (By Mr. Warden) Can we go back one more?  And

16  Mr. Steese also asked you, in this page eight, about the

17  percentage of 16 percent, right?

18  *A*   You are correct, he did ask about the 16, and there was a

19  question about the formula and something with tandem add back

20  in this file here.

21  *Q*   And when, from time to time, you saw spreadsheets like this

22  Exhibit 22, were you generally able to reconcile the bill

23  dates, the minutes of use and the revenue?

24  *A*   Yes.  As I believe I stated in my testimony yesterday, this

25  is reflective of Level 3's billing to AT&T.  My ADW reports

ALISON MILLER - Redirect

1   matched -- should match exactly what Level 3 billed, because it

2   is a records -- our records or our warehouse that contains the

3   details of those bills.  So I did reconcile that we received

4   this our ADW information.

5        MR. WARDEN:  May I have one moment, Your Honor?

6        THE COURT:  Yes.

7        MR. WARDEN:  No further questions.  Thank you,

8   Ms. Miller.

9        THE COURT:  You are excused.  Thank you.  We can break

10  the connection.  Next witness.

11       MR. WARDEN:  We have no further witnesses.

12       THE COURT:  All right.

13       MR. WARDEN:  We have some deposition, and we would

14  like to doublecheck our exhibit list, just to make sure there

15  are exhibits that we would want to move into evidence that have

16  not yet been moved, but maybe we can --

17       THE COURT:  Okay.  Let me take five minutes.  You can

18  look at some things.  I don't know what you are talking about,

19  in terms of some depositions.

20       MR. WARDEN:  We did designations.  We did not.  I

21  thought we counter designated.

22       THE COURT:  I'm sorry, when I say I reviewed the

23  depositions, I reviewed both sides' and the objections, which I

24  overruled.  So all of that which has been, quote/unquote,

25  designated, regardless of whether it came from Level 3 or AT&T,

1    was and has been considered.

2              *MR. WARDEN:*  Sorry for the confusion.

3              *THE COURT:*  No, that's fine.  You still need the five

4    minutes?

5              *MR. WARDEN:*  Yes, please, Your Honor.

6              *THE COURT:*  All right.

7              *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

8         (Recess at 9:44 a.m.)

9         (In open court at 9:51 a.m.)

10             *THE COURT:*  Please be seated.

11             *MR. WARDEN:*  AT&T rests Your Honor.

12             *THE COURT:*  Any rebuttal?

13             *MR. STEESE:*  No, Your Honor.

14             *THE COURT:*  Any additional motions?  I'm not

15   suggesting there should be.  All right.  Then the evidence is

16   closed.  Let's talk about where we go from here.

17             *MR. STEESE:*  We talked about closing in the afternoon.

18   I saw that Ms. Zambrano had a flight she would like to catch.

19   We don't mind starting at 1 o'clock to try to see if there's a

20   way we can help her make that flight, if that works for

21   Your Honor.

22             *THE COURT:*  It works for me, knowing that I have got

23   some things on the -- some time on the front end.  As far as

24   I'm concerned we could start at 12:30.  I don't know whether

25   you need --

462

1          *MS. ZAMBRANO:*  Ms. Zambrano changed her flight.

2          *THE COURT:*  Did she now?

3          *MR. WARDEN:*  As did Mr. Warden.  I may need some

4    suggestions.

5          *THE COURT:*  1 o'clock, 1 o'clock.

6          *THE COURT:*  All right.  Recess.

7          *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

8      (Recess at 9:53 a.m.)

9

10     (In open court at 12:59 p.m.)

11         *THE COURT:*  Please be seated.  One minute.  I left

12   something.  Don't bother getting up.

13         All right.  Mr. Steese, I'm assuming you are ready to

14   proceed?

15         *MR. STEESE:*  I am, Your Honor.  Thank you.

16                         **CLOSING ARGUMENT**

17         *MR. STEESE:*  May it please the the Court, and before

18   beginning, on behalf of both myself, my colleagues, and Level

19   3, we want to thank the Court for your time and attention, not

20   only over the last few days, but over the years with the case.

21   Thank you for that.

22         And I would like to have a few minutes for rebuttal,

23   not much, but a little bit?

24         *THE COURT:*  All right.

25         *MR. STEESE:*  Now, Your Honor, in my opening statement,

1    I started with major points that are uncontested, and I think

2    it important to start there again, because these facts will

3    impact many different legal arguments that I will discuss

4    later.

5          First, as Your Honor has already found, AT&T breached

6    the 2015 Agreement by withholding payment on access charges to

7    Level 3, for February '19, 2020, the date the FCC decision

8    became final.

9          Two, while AT&T claims it intended to withhold 65

10   percent of end-office charges, AT&T's mechanized payment

11   process withheld far more than that.

12         Three, while AT&T has argued it regularly has disputes

13   with Level 3, Melissa Kellow testified that AT&T did not raise

14   any usage-based disputes with Level 3, other than the three

15   mentioned in the damages document; the OTT, DEOT and December

16   2020, affiliated tandem dispute.

17         It's true that AT&T did present some evidence that it

18   wants the Court to believe that there are additional disputes,

19   but the evidence is uncontested.  The very first dispute, other

20   than these, that they want the Court to think was a dispute,

21   and we disagreed, was from March of 2020, shortly after the

22   FCC's decision became final.

23         Four, by February 2020, the date the FCC's decision

24   had become final, AT&T had withheld, indeed overwithheld $5.525

25   million from Level 3 on usage-based charges, and that does not

1   include late payment charges.

2       And finally, AT&T admits that Level 3 has

3   appropriately calculated and credited to AT&T for its 21

4   percent of OTT traffic.

5       These few undisputed facts, in and of themselves,

6   justify 100 percent of the award that we seek here.  Now, the

7   focus of the breach of contract claim, centers on three

8   provisions in the Settlement Agreement.  You know this well,

9   it's A1, page three, sections (ii), (iii) (iv).  I didn't use

10  romanette.

11      *THE COURT:*  You can say romanette.  I won't be

12  offended.

13      *MR. STEESE:*  And throughout this trial, AT&T has

14  argued that the words end-office switching are the foundation

15  of the case, but notably the words end-office switching don't

16  appear in a single one of these provisions.  Not one.

17  Paragraph two states that *AT&T must pay Level 3 its applicable*

18  *switched-access tariff rates for OTT traffic.*  Until February

19  of 2020, AT&T was required to pay everything, including end

20  office.  After February of 2020, AT&T was required to pay

21  everything, except the end-office elements.  Notably, even

22  Ms. Meola testified that at all times on OTT traffic, Level 3

23  was entitled to assess and collect tandem charges.

24      There's absolutely no question that AT&T's mechanized

25  payment process withheld payment of the tandem elements from

1    AT&T -- from Level 3, in violation of this provision of the

2    contract.

3         Paragraph A (iii) required AT&T to pay full

4    switched-access charges on all calls with a Level 3 telephone

5    number or CPN, and it's undisputed, Ms. Miller admitted, that

6    Level 3 stopped assessing end-office charges on calls without a

7    telephone number in mid 2017.  AT&T failed to pay end-office

8    charges on 44 percent of non-OTT calls, that's 65 less 21

9    percent, in violation of this provision of the contract.

10        Importantly, again, as Ms. Meola testified, Level 3

11   was entitled to assess tandem charges on these calls too.  And

12   once again, there's no question, that the mechanized payment

13   process withheld tandem charges on these calls too.

14        The issue under these three provisions of the contract

15   has never been limited to end-office switching charges.  And

16   that's because the dispute was never limited to end-office

17   charges.  The contract obligates AT&T to pay all applicable

18   switched-access charges, and the language of these contract

19   provisions are plain.

20        And this is validated by Exhibit A to the Settlement

21   Agreement.  And you know this testimony too, Your Honor, as

22   Ms. Kellow testified, and Ms. Torres described, if you look at

23   the first whereas clause, in the contract, it says, *AT&T has*

24   *disputed and not paid certain Level 3 end-office switching*

25   *charges as set forth in more detail in Exhibit A.*  And that

1    Exhibit A contained end-office charges, tandem charges and late

2    payment charges.

3            No one even contradicted this from AT&T. The language

4    of the second whereas clause says that *AT&T has disputed and*

5    *not paid these*. The contract has always been about what AT&T

6    has withheld and not paid, not just end-office switching

7    charges, as they define the term.

8            So now let's get into details. We are going to use

9    Your Honor's framework. Your Honor suggested yesterday, how

10   they breached the contract and how that ties to the damages;

11   number one; two, what are Level 3's damages; number three, the

12   exhibits supporting our calculations; number four, the damages,

13   over two specific timeframes, up until the time of the FCC's

14   decision and thereafter, and finally, the TCG Communications

15   Act Violations.

16           So, I'm going to address each one of those in order.

17   So, let's start with Section A (iii), go to the next page.

18   There you go. A (iii), which says, *Level 3 cannot bill AT&T*

19   *for end-office traffic on a Level 3 telephone number*, but then

20   it says, *For avoidance of doubt, the parties agree that Level 3*

21   *will continue to bill AT&T full switched-access charges on*

22   *domestic traffic that originates with or terminates to a Level*

23   *3 assigned CPN or telephone number*.

24           You heard Ms. Meola's interpretation. She said, yes,

25   we get to bill, but we, AT&T, don't have to pay. So her view

1    of the world is, this gives us the right to bill, but doesn't

2    obligate AT&T to pay.  Of course, that contradicts every

3    concept of contract law.

4          If you look at number two, number two says that *AT&T*

5    *shall pay Level 3 its applicable switched-access tariff rates*

6    *for OTT traffic, pursuant to the terms of the OTT Declaratory*

7    *Order*.

8          Again, AT&T tries to limit this to end-office

9    switching, but it isn't so limited.

10         The second point that AT&T tries to argue, is we have

11   ignored this language of the OTT Declaratory Order.  Not true.

12   Notably, they have never put forward the language of that

13   order.  They've just said that order was about end-office

14   charges.  Again, not true.

15         If you look at the Declaratory Order, on page seven,

16   it talks about the VoIP Symmetry Rule, as codified in 51.913(b)

17   of the Commission's rules.  And it specifically says, 51.913(b)

18   provides that a LEC is entitled to assess and collect access

19   charges for services defined in 51.903.

20         So let's look at 51.903.  51.903 doesn't have language

21   about obligation to pay end office, sure.  That's in Subsection

22   (d).  Let's look at Subsection (i).  Subsection (i) is entitled

23   Tandem Switched Transport Access, which includes tandem

24   switching and transport.  The very obligations of the order,

25   obligate the payment of tandem charges, not just end office.

468

1            Now, Your Honor heard some arguments, over the course

2      of the trial, about this end-office-switching issue, and

3      specifically they say, you're limited to the recovery of

4      end-office switching on OTT traffic, that's what they've said,

5      but even AT&T doesn't believe that is true.  If that were true,

6      they would say, you're only entitled to damages on the 21

7      percent of the traffic that is OTT.  Of course they don't do

8      that.  They recognize that the traffic that is non-OTT, they

9      are also obligated to pay on, because otherwise you have

10     breached the Agreement, which is exactly Subsection (i) --

11     three I of the Contract.  Deep down, everyone knows that this

12     case is about what AT&T withheld on the OTT dispute.

13           Now, you also heard AT&T argue that Level 3's theories

14     are inconsistent.  That we want to include all, when we are

15     we're talking about pieces, and little when we're talking about

16     Subsection (iv), romanette four.

17           But if you look at (iv), (iv) had -- is very specific.

18     It says, Level 3 will only be required to refund OTT charges,

19     to the extent they should not have been billed.  So the whole

20     point is, you have to find out, out of the whole, what should

21     not have been billed.

22           THE COURT:  Is it your position that the OTT

23     Declaratory Order was only overturned in part?

24           MR. STEESE:  The OTT order -- at which point in time,

25     Your Honor?

1         THE COURT:  Well, I'm looking at (iv), and there's two

2    separate sections, or what I'm calling sections.  The first is

3    that if the OTT Declaratory Order is overturned, and I am

4    recognizing that it says in whole or in part, Level 3 will

5    refund 50 percent...

6         MR. STEESE:  Are you finished, Your Honor?

7         THE COURT:  Fifty percent of the OTT charges, but that

8    presumably applies if it's overturned in full, and if it's

9    overturned in part, then you will figure out the ratio.

10        MR. STEESE:  Your Honor, that's why I asked, at what

11   point in time?  As of the time of the D.C. Circuit opinion, it

12   was not overturned in full.  By the time the FCC ruled, as of

13   December of '19, with an effective date of December -- excuse

14   me -- February 19, of 2020, they had overturned the decision

15   and we acted accordingly.

16        THE COURT:  Okay.

17        MR. STEESE:  Did that answer your question,

18   Your Honor?

19        THE COURT:  Okay.  I think so.

20        MR. STEESE:  You heard -- again, AT&T argued that the

21   OTT dispute included only certain charges, and in reality, we

22   have refunded exactly what we were required to, and AT&T

23   doesn't even dispute that.  There's no inconsistency between

24   (ii) and (iii) say pay all, and (iv) saying, refund the portion

25   that should not have been billed.

1    Now, in opening statement, Your Honor also heard AT&T

2    argue that Level 3's story is changing, and the specific claim

3    was that Level 3 had one story before Summary Judgment and then

4    changed its story to something different after Summary

5    Judgment.  And the claim that Level 3 is changing its story is

6    demonstrably not true.  There's not a fact that has been put

7    forward in case to support that.  Indeed, the evidence at trial

8    shows that it's AT&T, who changed its theories, and not only

9    changed its theory, but it has engaged, over the course of the

10   last year, of a game -- and more -- of hide the ball, which I

11   will get into.

12   Let's start with the Amended Complaint, which is **ECF**

13   **124**, paragraph 66 says, *A vast percentage of AT&T's withholding*

14   *is on traditional traffic, not over-the-top traffic.*

15   Paragraph 69, *AT&T's failure to pay end-office*

16   *switching charges directly and proximately caused and continues*

17   *to cause Level 3 to suffer damage and loss.*

18   Paragraph 70, Level 3 is entitled to damages in an

19   amount to be determined at trial for payment in full of all

20   end-office switching charges owed, as well as the traditional

21   traffic on which AT&T is withholding payment.

22   That is what we've said from the beginning.  Exhibit

23   35, the supplemental disclosures talk about further discovery

24   is needed to be able to put forth the total damages.  If this

25   case was about looking at the total end-office billings, and

1    saying it's 21 percent, and then looking at withholding 65

2    percent of the charges, as you heard Ms. Miller say, that is a

3    simple mathematical exercise.  No discovery is needed on that.

4    Let alone additional discovery.  The whole point was discovery

5    was needed to determine what the true damages were, and that

6    was put forward beginning in March of 2020, in detail, in an

7    expert disclosure, and those disclosures, as Ms. Torres and

8    Ms. Kellow testified, were consistent, always based upon the

9    amounts that AT&T had withheld, not just end-office switching.

10           If you look at Exhibit A22, I'm making it hard on my

11   poor colleague here.

12           THE COURT:  It's okay.  It's okay.  Your colleague is

13   well paid.  She can suffer.  Go ahead.

14           MR. STEESE:  And if you look at the total damages,

15   total damages, show $9.076 million, as of March of 2022, and at

16   the same time, if you look at the credit and debit, the credit

17   and debit showed total end-office charges of 4.7 million.  From

18   the beginning Level 3 was seeking far more than pure end-office

19   switching damages, and AT&T has pointed out or tried to point

20   out, language in that Declaration in Summary Judgment, our

21   language in Summary Judgment said one thing, and now we're

22   saying something different.  That too is demonstrably false.

23           If you look at **ECF Number 151-2,** page eight, the same

24   Summary Judgment motion they claim talked about, it says, *AT&T,*

25   at the bottom sentence, *has withheld more than Level 3's total*

1    *end-office billings.*

2         If you look at the Declaration cited by Ms. Kellow,

3    which they cite to, it says, *AT&T has withheld more than the*

4    *total end-office charges Level 3 has invoiced to AT&T.*

5         From the beginning this has been made, throughout the

6    case, this has been stated.  In addition, just this morning, we

7    went through this, I won't belabor it, it's in Your Honor's

8    mind, Ms. Torres gave her initial disclosure on damages in

9    March of 2020, that's Exhibit A22.  How did AT&T react?

10   Exhibit 13.  *The differences between the parties' positions*

11   *reflect legal or factual issues.  AT&T is providing a*

12   *supplemental disclosure that sets forth the areas of*

13   *disagreement.*

14        So, what were the areas of disagreement?  You heard

15   them earlier today.  They looked at the total charges.  Go past

16   this page, Exhibit 10.  Sorry.  Scroll down one page.  They

17   went through the various calculations, in the spreadsheet, and

18   they said, *Your usage charges are too low.  Your payments are*

19   *too low, and so that makes your math wrong.  We think your OTT*

20   *percentage is off, and we don't think that you should be*

21   *dividing by two, because we think that decision is already*

22   *final.*

23        What they're talking about is the most basic points

24   about this.  Never did they say our damages were limited to

25   end-office switching.  It is AT&T's theory, that has changed,

1    after the Summary Judgment motion in April of 2021.

2         AT&T concealed, indeed its true intention, and

3    withheld information that was required for disclosure under

4    Rule 26.  Your Honor, in the motions in limine, said you would

5    consider them as part of the evidence.  It is now, in our view,

6    patently plain that there has been a Rule 26 violation for

7    failure to provide information required by the Rule, and at

8    this point in time, Your Honor would be fully within your

9    rights to strike all of the information that was provided for

10   the first time in April of 2021.

11        One other thing that bears mention about this morning,

12   throughout this case, we've heard AT&T's counsel try and make a

13   big deal about Ms. Torres, starting with, and they said the

14   word *everything*, I don't know how many times they would do

15   that, and Ms. Torres said, on the stand, you can't find out how

16   much is associated with the OTT dispute unless you start with

17   everything, but guess what we heard Ms. Miller say this

18   morning?  The same thing she said, you can't reconcile, you

19   can't figure out what's what unless you start with the

20   total-usage charges and make sure they're right.  She said the

21   same thing, and now they're backing away from the very thing

22   that they recognized you had to do in the middle of 2020, and

23   that their own witness said today, should have been done.

24        And then, Ms. Miller said something interesting too,

25   she said, *Yeah, those things aren't in this disclosure, but I*

1    *knew them all along*.  So she knew this information that they

2    were going to use, and they didn't turn it over; that is

3    exactly the game of hide the ball.

4         In addition, yesterday, at the end of Mr.-- excuse me,

5    Ms. Miller's direct there was a statement by Mr. Warden that

6    was really intriguing to me.  He said, and I think this is a

7    quote, *We did discovery on one case, and we are trying another*.

8    What does that mean?  That means we're trying the new case that

9    they are trying to put in after the Summary Judgment motion,

10   that they never disclosed, and then, in my view, it seems so

11   hypocritical, they stand up to us, and in our view, take our

12   pleadings and disclosures out of context, and they try and hold

13   us to language from earlier, and say, *See, this is what you*

14   *said, this is what you said*, but ignore the facts that they

15   didn't disclose anything, and they try and hold us responsible.

16   Heads I win, tails you lose.  That is exactly the problem.

17        And the point is, from the beginning, we have been

18   consistent.  Everything that has been withheld, that's what

19   we're entitled to.  It is AT&T that has changed theories, after

20   Summary Judgment, when they realized, finally, that they were

21   going to have to pay Level 3 back money that was owed.

22        All that said, the late evidence and disclosures don't

23   change the fundamental facts.  Level 3 has been clear, from the

24   beginning, that AT&T was breaching the Settlement Agreement by

25   holding too much and withholding too early and AT&T's attempt

1    to limit the scope of the Agreement is inconsistent with the

2    plain language of the contract.

3            Now second, what are Level 3's damages numbers and

4    what can the Court use to refer to those numbers?  Now, over

5    the course of this trial, there have been a few things, and I

6    think that what you are going to see here is going to be

7    incredibly interesting and revealing, but I'm going to start

8    with the legal principles.  The first legal principle, again,

9    New York law governs this contract.  The general principle of

10   contracts is that recovery, for breach of contract, should put

11   the injured party, here Level 3, in as good a position as would

12   have occupied, had the contract been kept.  Standard law.

13           In addition, next slide, a plaintiff seeking general

14   damages, when he tries to recover the value of the very

15   performance promised, but we're also entitled to consequential

16   damages.  Those damages which were reasonably foreseen or

17   contemplated by the parties, during their negotiations or at

18   the time the contract was executed.

19           Next slide.  Now, here's an important point.  It says,

20   the burden of uncertainty as to the amount of damage is upon

21   the wrongdoer.  The plaintiff need only show a stable

22   foundation for a reasonable estimate of the damage incurred as

23   a result of the breach.  Doesn't have to require perfection,

24   and the rule of certainty, as applied to recovery of damages,

25   doesn't require mathematical precision, only a reasonable

 1    basis.  And if a party, the party causing the breach, if they

 2    create uncertainty then it is them that bears the burden to

 3    eliminate the uncertainty.

 4          Here they are claiming we raised all kinds of

 5    disputes.  You didn't take care of or raise enough issues of

 6    dispute, and they have this generic statement that they want

 7    the Court to think there's dispute, dispute, dispute, so it's

 8    just wrong.  But it's them that bears the burden of coming

 9    forward and saying this dispute is this much, this dispute is

10    this much, et cetera, and they do no such thing.

11          So, now, to the interesting part, the damage

12    calculations.  Exhibit A53, we went through this, I won't

13    belabor it.  It spells out our damages in detail.  We go

14    through the usage charges, we account for the other disputes

15    that were known and calculated; DEOT and the tandem dispute.

16    We eliminate late payment balance, because that was overstated.

17    We come up with an OTT credit that no one questions, and we

18    calculate the total damages -- scroll down -- $9.375 million.

19          THE COURT:  That's the what you referred to earlier?

20          MR. STEESE:  The 517?

21          THE COURT:  No.  What is this credit?

22          MR. STEESE:  Oh yes.  Thank you, Your Honor.  This is,

23    in column L, this is the credits that were identified in

24    damages disclosures starting in March 2020, when they were

25    overwithholding, and so we told them, *We know we owe you a*

1   *credit we know, we owe you a credit, but we're disagreeing on*

2   *the OTT percentage*.   And then, scroll up a little bit, once

3   Your Honor ruled on 21 percent, we knew the OTT percentage, we

4   started putting it on their bills, and this is what's on their

5   bills, right there, Your Honor, that circled amount.

6        Okay.   Now we know, at this point, AT&T played hide

7   the ball again.   Withheld millions of dollars through this

8   mechanized payment process.   Now, at trial, Ms. Meola testified

9   that Level 3 should have known that what we were talking about,

10  we AT&T here, was that we're talking about the difference

11  between competitive tandem and tandem that -- tandem that is

12  done with our own customers.   She claims she told Shaun Andrews

13  this, as he was driving to the airport.   However the documents

14  say something very different.   If you look at Exhibit A7, A7

15  says that she, Ms. Meola, knows Shaun was in the car, so this

16  may have been lost.   To avoid future disputes, AT&T is

17  requesting that end-office billing and tandem billing be on

18  separate BANs.   We've heard numerous witnesses say, end-office

19  charges are one thing, tandem charges are another.   What she is

20  saying is competitive tandem and end office and tandem with

21  Level 3 customers be separated.   Doesn't say that here.

22        If you look at Exhibit 79, Exhibit 79 is this dispute

23  notice, that's in the record, that came to Level 3, in late

24  December early January, depending on which date you are looking

25  at here, of 2021, and it says, *Relate to the unexpected*

1    *fluctuation of ratio of local switching and tandem switching.*

2    And then down here, it says, *End office and local and tandem*

3    *slash tandem switching.*  It doesn't say competitive tandem

4    anywhere.  The only point of testimony about competitive tandem

5    is Ms. Meola saying to Mr. Andrews, as he was driving in the

6    car.

7            They never described the mechanized process, until

8    trial.  And at trial, Ms. Miller said, yeah, that mechanized

9    process can result in us withholding charges for no legitimate

10   reason, that was the end of her testimony yesterday.  The ratio

11   is just off, so we're withholding it for no reason.  And on

12   this point, I thought a lot about this last night, because I

13   finally understood this mechanized process, and when you look

14   at Exhibit 36, this document, that shows, you know, as of

15   August of 2017, Ms. Miller made some changes, to the mechanized

16   process, as of that point in time, and it's at 35 percent MOU,

17   and put a bunch of other calculations about ratios in.

18           So why was it that they changed the mechanized process

19   at that moment in time?  Because they were going to withhold

20   dollars on OTT.  The very reason they modified the mechanized

21   process was to withhold money from Level 3, on OTT charges.

22   The reason.  That's what they said.

23           So now let's look at the numbers.  And now we're

24   separating out the two damages periods.  Bring up -- not that

25   one, no.  Bring up the spreadsheet.  Yes, right here.  And this

1    is the interesting part.  Let's look at this.  This is AT&T's

2    damages summary.  Under their calculation, before the FCC's

3    decision went into effect, and this is all without late payment

4    charges, they withheld 2.412 million, after the decision went

5    into effect, they withheld 1.708.  Okay.  By itself, not

6    interesting.

7         Let's look at the next chart, however.  The next

8    chart, this is Level 3's damages, before the FCC's decision

9    went into effect, they withheld 5.525 million, after the

10   decision went into effect, 1.671.  Now, let's put up that other

11   chart, that shows the comparison side by side.  This one, look

12   here, Your Honor.  After the decision, the numbers are almost

13   identical.  Ms. Miller said that she ran numbers, and the

14   difference was about 30 grand.  Now, admittedly that was total

15   usage.  If you multiply by 65 percent, it would be about 20

16   grand.  Those numbers are almost within the -- almost

17   identical, if you factor in this Delta, before, however;

18   $300,000,000 of difference.  Why?  And what do you think was

19   going on?  I don't think it takes even a logical leap of faith

20   to know that they changed the mechanized payment process in

21   August of 2017, and it was withholding way too much, and then

22   the FCC's decision comes down, and they go, let's look, and

23   when they actually managed it, look what happens.  You heard

24   Ms. Miller say she went in quarterly, but she didn't say when

25   she started to do that.  This is revealing.

1          Now, why is this particularly important?  If you look

2     as provisions A (ii), A (iii) and A (iv) of the Settlement

3     Agreement, A (ii) says, You *shall pay all access charges on OTT*

4     *calls*, before that decision went into effect that included end

5     office, must pay all.  (iii), (iii) on non-OTT calls, *Must pay*

6     *all switched access charges if it's a Level 3 telephone number*.

7     (iv), *Only after the decision becomes final, do the rules of*

8     *the game change*.

9          That means before February, 2020, get back to that

10    page, the summary page, withholding any of that money, violated

11    the contract.  Their withholding of any charges, violated the

12    contract.

13         The real dispute here, Your Honor, is not about after

14    the FCC issued its decision.  The parties, our damages are less

15    than theirs.  It's all about before.  All about before.

16         Now, the mechanized payment process we know withheld

17    more, and if you look at Exhibit 82, Exhibit 82, right there,

18    and this is so hard to see.  I don't think if there's a way you

19    can blow that up just little bigger?  There we go.

20         They gave us one state, in all of this time, they gave

21    us one state, one month.  I guess it was three states, because

22    one didn't have tandem charges, but one exhibit, and it says

23    right here, *January 2020, they should have withheld $4600, they*

24    *overwithheld by 892*.  So we know the mechanized process was

25    withholding too much.  And that is why we -- we can look at

1    Exhibit A7, A8, A18.  I have them all in here, but Your Honor

2    knows them.  I don't need to belabor this.  A7 says, *The*

3    *mechanized payment process is causing us to overwithhold*.  A8

4    says, *Yep, our right number is 7.7 million, but we actually*

5    *withheld $4,056,000 too much*, and then you look at A18, and A18

6    spells out those and says, *Yep, we overwithheld, we're going to*

7    *attribute this to OTT, but that really was a CPN dispute*.  And

8    why does that matter?  Because AT&T acknowledges it uses the

9    same mechanized system now as it did then.  We know they are

10   overwithholding now.  And if you look at Exhibit A56,

11   Ms. Torres' demonstrative exhibit, it shows why this is

12   significant.  If you look at the mechanized process, that they

13   used, they overwithheld in a ratio -- if you use the same ratio

14   from the CPN dispute, and apply it to OTT dispute, you would

15   have expected them to overwithhold by 2.573 million.  You add

16   those together, and by January of 2021 it's almost identical.

17        We did the same thing, one to one, from April and for

18   June, and while AT&T tried to say they should have been stress

19   tests -- tested, Ms. Torres conclusively established that

20   picking individual elements out of that is inappropriate and

21   would cause bad data.

22        Your Honor said is perfectly, it doesn't require,

23   quote, a great leap of faith, quote/unquote, to see that one

24   measure of damages supports the other.

25        Now, AT&T tries to come up with an explanation, and

1    say it wasn't withholding only for OTT, but what was actually

2    withholding for other disputes that had arisen between the

3    parties, and here we know that is just not true.  When AT&T

4    tries to identify other disputes, there's problems.  Are they

5    usage disputes, which is all that matters here?  Is it actually

6    a dispute, or just one making an inquiry to ask a question?

7    But we can discard all of that, because it really doesn't

8    matter.

9        Exhibit A3, the tariff, sets forth the language of how

10   one is to dispute, has to be written notice, give details,

11   spell out the amount being disputed, spell out why it's being

12   disputed, challenge the rate element, challenge the language in

13   the tariff, et cetera.  We heard Ms. Kellow testify to that.

14   No one disputed it.  The language is plain.  That process

15   wasn't followed on this -- these documents -- or this document

16   that they put forward from March of 2020, but that's the key

17   point.  Remember, what matters here is before the FCC's

18   decision was decided, through February of 2020, and there were

19   three disputes, that were raised by AT&T or things they claimed

20   were disputes.  The first was Exhibit 95, and we only had a

21   hard copy of that, so I can't put it on the screen, but the

22   date of that was March 2020.  So the earliest document they put

23   forward, for a dispute is March 2020, the month after the

24   decision becomes final.

25       Then there's Exhibit 79, this mechanized-billing

1    thing.  Again, Ms. Kellow said it's not a dispute, but the

2    dates are December of 2020, and then, when you look at Exhibit

3    84, this document that Level 3 actually did account for,

4    admittedly at the end of the process, to make sure it was being

5    as accurate as possible, that dispute was raised in February of

6    2021, and with calculation of damages, there is not a

7    difference after the FCC's decision.  So none of these disputes

8    impacted the before.

9        Let's look, now, back to the contract, Exhibit A2.

10   Because AT&T says, *Wait a minute, you are not being fair,*

11   *because, for avoidance of doubt, this doesn't keep AT&T from*

12   *disputing for other reasons.*  Fair point.  They have the right

13   to dispute.  Guess what?  Those disputes don't take place until

14   after February of 2020.  And so, the fact that our numbers are

15   almost identical after that, sure looks to me as though, the

16   disputes that were there, we've accounted for pretty

17   accurately, and those that predated it -- excuse me I said that

18   poorly.  Start that paragraph again.

19       In terms of those disputes, could AT&T have withheld

20   some money from a dispute that took place after March, and have

21   related it back to before March?  This is why I asked Ms. Meola

22   that question yesterday, about this thing called clawback.  *Do*

23   *you ever withhold money from a dispute on a date certain, and*

24   *then pull back damages from an earlier timeframe?*  And she

25   said, we haven't done that for years, for at least five years.

1    So none of this is impacted by that.

2         So we know that the facts show all $5.5 million, get

3    back to this summary sheet, all of that 5.5, the only

4    usage-based disputes, as of that point in time, were DEOT,

5    which we've accounted for, and OTT.  So all of those numbers,

6    by definition, are due to the OTT dispute.

7         Now, if AT&T argues, and I don't know if they will,

8    that we don't have to raise disputes; we don't have to.  We

9    don't have to tell you why we're withholding.  The entire

10   industry would crumble, if they could do that.  And indeed, the

11   tariff, Exhibit A3, sets forth the clear process for disputing,

12   that tariff language is mandatory.  It is under the Filed-Rate

13   Doctrine, terms that must be followed.  It is not a choice it

14   is an obligation.  And I will talk about about the Filed-Rate

15   Doctrine in a moment.

16        Before moving to TCG, I'm going to discuss late

17   payment charges, which Your Honor didn't mention in your

18   outline, but I think we should mention anyway.  The plain

19   language of the Settlement Agreement, without question,

20   included late payment charges.  There was $20.4, and I am

21   rounding, million, that totaled the OTT dispute.  You multiply

22   that by .75, which is this 75 percent, and you come up exactly

23   with the 15.362 million, and it's no question late payment

24   charges are included, they are listed there.

25        In addition, late payment charges as you heard

485

 1    Ms. Torres say are a rate in a switched-back-access tariff, all

 2    of the rates in that tariff are switched-access rates, and so,

 3    as a result mandatory to pay.

 4         And if you look at the formula, the formula is 1.5

 5    percent per month, not compounded, that's exactly how the

 6    calculations work, in Ms. Torres' damages analysis.  AT&T

 7    hasn't challenged that.  No facts otherwise.

 8         But now, most important point, AT&T says Your Honor

 9    doesn't have to follow this.  The law says otherwise.  The

10    tariff, itself, is embedded into the contract.  The tariff and

11    the Filed-Rate Doctrine require, because all of the charges,

12    every one of them being billed and charged, comes from the

13    tariff.  The contract and the tariff are one in working

14    together.  There's no question about that.  Every rate element

15    AT&T disputed, every rate element AT&T didn't pay, was a tariff

16    charge, and all of those rates were required to be paid by

17    Sections (ii) and (iii); A (ii), A (iii).  And so the

18    Filed-Rate Doctrine specifically says, these charges must be

19    paid.

20         If you look at just a couple of cases, the Filed-Rate

21    Doctrine provides that, *The rate of the carrier duly filed is*

22    *the only lawful charge, and deviation from it is not permitted,*

23    *upon any pretext*.  The Filed-Rate Doctrine makes clear that the

24    tariff on file sets the rate that is to be charged.  Indeed, if

25    we put in a provision into this contract, that was contrary to

1     the tariff, that provision would be unenforceable and illegal.

2     The tariff has to be, by law, working hand-in-hand with the

3     contract.

4          Go to the next case.  In the alternative, AT&T has

5     argued that prejudgment interest is discretionary, or at least

6     it appears that they are.  Even if late payment charges were

7     not applicable in the Filed-Rate Doctrine says otherwise.  New

8     York law makes the assessment of prejudgment interest

9     mandatory, *Interest shall be recovered, upon a sum award*

10    *because of the performance -- breach of performance of a*

11    *contract*.  It is mandatory.  And the percent that New York law

12    applies is 9 percent, unless something different is set forth

13    in the contract.

14         So, we think that the mandatory is 1.5 percent per

15    month, because the contract must work hand-in-hand with the

16    tariff, but at a minimum, it has to be 9 percent.

17         The other important point about late payment charges,

18    is this, Level 3, has literally been trying for years, years to

19    get paid.  The whole point of late payment charges is to ensure

20    that a customer, here AT&T, doesn't not pay charges they are

21    required to pay.  There has to be a consequence, and when you

22    look at the consequence here, the consequence is AT&T has been

23    withholding this money, interesting question, Your Honor, they

24    know they should have paid us from their number, we disagree,

25    $4.1 million, right?  Why didn't they pay it?  Why haven't they

1    paid it yet?  Because they want to hold that money as long as

2    possible.  They want to keep that money out of Level 3's

3    pockets.  The whole point of late payment charges is to prevent

4    the very type of conduct that's being displayed here.

5          The whole point of me asking, the other day, of

6    Ms. Meola, did you do any investigation to determine the 65

7    percent after it just became on the originating side where our

8    data showed it was less than 20 percent?  They did nothing.

9    They had nothing, no reason to withhold 65 percent.

10         You saw, in your Summary Judgment papers, they had no

11   evidence.  It was more than 21 percent, but they continued to

12   withhold 65.  Why do you think that is?  The whole point is

13   they withhold, and the only way someone like that can be taught

14   to do the right thing, is by paying things like late payment

15   charges, which are required anyway.

16         Now, one small point bears mention.  We have

17   calculated late payment charges, and we have calculated them

18   through June, and if you can bring up Exhibit A 53, and you can

19   see, with A53, the late payment charges are this $2.177-million

20   number, but, that number continues to grow, as long as Level 3

21   is not paid, that continues to grow.  And as a result, we

22   encourage Your Honor to ask, at the end, with your order,

23   because the question is how much is owed, not whether money is

24   owed, that late payment charges be brought to the date of the

25   order, whatever date that might be.

 1          Now, the interesting thing is, in the alternative,

 2    looking at this document, you actually can take our late

 3    payment charges, if you agree with our damages, and just pretty

 4    much apply them, because, you know, after the FCC's decision,

 5    our number is less.  Our number is less than that.  So, if you

 6    agree with this number right here, the 5.525, you know our late

 7    payment charge calculation is fair, because going forward our

 8    late payment charges will actually be less than if we inserted

 9    AT&T's numbers in after that.

10          To my last point, Your Honor, and this is TCG and

11    payment of attorneys' fees, and the facts of this claim are,

12    basically undisputed.  To summarize them, AT&T's affiliate,

13    TCG, assessed end-office charges to Level 3 and its affiliates,

14    and its traffic for a long time.  They paid those charges.  By

15    paying those charges, Level 3 was damaged.  There's no question

16    that that's true.  And Level 3 brought claims against TCG, and

17    started withholding payments, and TCG, basically, simultaneous

18    started to issue credits, and at the end of the day, since we

19    were withholding and they started to credit, the two

20    overlapped.  And it is true, we are now in a position where we

21    owe money, and we don't say -- or try and argue around the

22    point.  We say, *Yep, we owe that money.  We need to pay that*

23    *back*, and that amount is $517,147.  We need to pay that back.

24    We immediately recognized it and started putting it in our

25    damages analysis.

1            Did we agree with the percentage of OTT of AT&T?  No.

2    Did we pay this amount anyway, because we couldn't prove it

3    otherwise?  Yes.  Very different than the conduct that you have

4    seen on the other side of the table.

5            Under the Communications Act -- strike that.  One more

6    fact.  The only reason, and you saw this in the depositions of

7    Arnel Burgess and Janice Gallagher, the only reason that TCG

8    slash AT&T learned that they were doing this very thing is

9    because we made them do it in discovery.  We brought it to

10   their attention.  We challenged them.  We pushed them.  We

11   finally got them to say, *You are right*, and they, to their

12   credit, adapted.  But we had to expend attorneys' fees, after

13   we had been damaged, to get that done.

14           And the Communications Act makes payment of attorneys'

15   fees mandatory.  Now AT&T's argument is that, *But wait, you*

16   *only pay attorneys' fees if you're damaged.  And, you weren't*

17   *damaged, because in the end you are in a net obligation to pay*

18   *TCG*.  That doesn't mean we were not damaged.  That means, at

19   the end of the day, there was a net coming to AT&T, because of

20   how the credits worked, but we were paying those charges for

21   years, and had to bring it to their attention to get them to

22   change.

23           Are these attorneys' fees going to be huge?  No.  But

24   again, this is not something that we should be forced to bring

25   to their attention.  This is something that they should do on

1    their own.  They should calculate an OTT percentage

2    affirmatively, like we did, instead of waiting to be brought to

3    the table.

4          In sum, Your Honor, Level 3 respectfully requests that

5    the Court require AT&T to, at last, abide by the terms of the

6    Settlement Agreement and pay Level 3 the amounts it's been

7    withholding under the guise of what it wasn't supposed to pay

8    for OTT charges; $5.5 million before February 2020 decision;

9    $1.7 million afterwards, plus late payment charges.

10         The simple fact is that AT&T has dramatically

11   overwithheld well in excess of the amount that's owed.  Excess

12   withholdings that it knew it was withholding.  It knew it had

13   no basis to withhold, and now is saying, *Oh, bring a new*

14   *lawsuit; that's what your recourse should be.*

15         No, Your Honor.  We're entitled to the dollars that

16   they withheld, when the only dispute between the parties that's

17   not been accounted for is OTT.  The only one.

18         And with that, Your Honor, we ask that you award

19   $9.375 million.  We understand from that 517,000 will go to

20   AT&T, as the parties have stipulated.

21         Unless you have questions, Your Honor, I have

22   concluded, but reserving a little for rebuttal.

23         THE COURT:  If I have questions, I will do it in

24   rebuttal.

25         MR. STEESE:  Thank you, Your Honor.

1

**CLOSING ARGUMENT**

2          *MR. WARDEN:*  Good afternoon, Your Honor.  On behalf of

3    AT&T and its legal team, we very much appreciate having the

4    opportunity to be before you this week to try this case, and

5    Your Honor's work on it.

6          We also would certainly like to acknowledge the

7    assistance of the court staff, especially, with the remote

8    testimony of Ms. Miller.

9          Can we go to the first slide, please.  So, Your Honor

10   asked five questions yesterday.  We've taken the liberty of

11   reordering them slightly.

12         *THE COURT:*  That's fine.

13         *MR. WARDEN:*  And combining them some.  But this is

14   what we want to cover today, and you know, we have taken

15   Your Honor's questions seriously.  I hope we answered those

16   questions.  We want to walk through the theory of breach, and I

17   believe the theory was the Court's word, deal with the two

18   periods; the refund period, which I think has also been called

19   the appeal period, so that January 1, 2019, through finality,

20   and today, this afternoon, I'm going to call it the refund

21   period, and then the finality period, which is post-FCC

22   decision.  In the course of doing that, we will address the

23   language of the contract, and frankly, then, we're going to

24   cover what we view as Level 3's, kind of, tortured reading of

25   the Settlement Agreement.  We will also cover damages and then

 1   TCG as well.

 2           So, in preparing for today, and frankly in preparing

 3   for this week, you know we came in to prepare -- to try a

 4   damages case, based on over-the-top and end-office switching,

 5   and we've certainly attempted to do that, Your Honor.

 6           Can we go to the next slide, please.  And one of the

 7   things that we did, and looked at again last night, was look at

 8   the Court's ruling on Summary Judgment, and to -- and consider

 9   that, in light of Your Honor's questions, and the evidence that

10   has come in over the last three days, and there are the

11   elements of a breach of contract claim, under New York law, the

12   existence of an Agreement, no dispute; number two, its own

13   adequate performance; and then, Your Honor observed and quoted

14   from a Second Circuit case about a parties' performance under a

15   contract is excused where the other party has substantially

16   failed to perform its side of the bargain, or synonymously,

17   where that party has committed a material breach, and so in

18   looking at those two periods, the refund period and the

19   finality period, and the evidence that has come in, the refund

20   period in particular, we do not think that Level 3 has

21   sustained its burden of proving its own adequate performance.

22           So, let's look at the language of the contract, and

23   start with the whereas clauses.  Next clause please.

24   Your Honor has, obviously, read these clauses, we have had

25   witnesses read them, counsel has read them in questions, but I

1   do think it's important to look at these whereas clauses.  AT&T

2   has disputed and not paid certain Level 3 end-office switching

3   charges.  End-office switching charges.  And then it goes on to

4   talk about over-the-top VoIP.  And then number two, the second

5   whereas clause, again, the question of the applicability of

6   end-office switching charges on OTT traffic was addressed in

7   this 2015 order, and I don't have a slide on that order,

8   Your Honor, and Mr. Steese quoted from part of it, but it is

9   Exhibit A4, in evidence, and I think when Your Honor quoted, in

10  Summary Judgment, the later FCC order, Your Honor quoted from

11  paragraph two, because that's kind of the way the FCC writes

12  these things, kind of says, *Hey, here is what we're doing*,

13  paragraph two, they summarize what they're doing.

14          First sentence, specifically, *This Declaratory Ruling*

15  *terminates a controversy surrounding the assessment of*

16  *end-office switching charges under the VoIP symmetry rule.*

17          This Order, this Agreement, has always been about

18  end-office switching.  It's at paragraph two, on the second

19  page.

20          Now there's also another whereas ... there's also

21  another whereas clause that comes into play.

22          THE COURT:  Don't stop just because you see me moving,

23  otherwise you are requiring me to sit here and be dead.  I

24  choose not to.

25          MR. WARDEN:  Fair enough, Your Honor.  There's another

1  whereas clause that comes into play, and that's the one about

2  the tandem dispute, and, yeah, whether it's a tandem facilities

3  or tandem usage, the point is, the parties use different terms

4  to mean different things in this Agreement, and the --

5  Ms. Torres testified, yeah, these are industry terms,

6  end-office switching, end-office dispute -- I'm sorry -- tandem

7  switching.

8          So, let's go to the next slide, please.  And one of

9  the things we want to focus on, about the refund period, is I

10  will get to the obligation in a second, but what is conceded

11  and acknowledged are disputed OTT charges, and both Ms. Torres

12  and Ms. Kellow testified that the disputed OTT charges are

13  end-office switching, and that is -- let's -- it's three

14  different times, we've quoted it here.  And the other thing is

15  when they calculate -- when Level 3 calculates the 50 percent

16  refund, and I will talk more about that in a second, it applies

17  that 50 percent to end-office switching, not everything.  Not

18  everything.

19          So now let's look at the language of that provision in

20  the next slide.  And so, again, Your Honor, what we've tried to

21  do is break this up into the two time periods, the refund

22  period covering January 1st, 2019, through finality, and the

23  contract is structured in, kind of, an interesting way, because

24  there are really two provisions that come into play here.  The

25  first is (ii), which says, *Beginning on June 1st, 2015, AT&T*

1    *shall pay its applicable switch access tariff rate for OTT*

2    *traffic, pursuant to the terms of the OTT Declaratory Order,*

3    and we've looked at what that means, and then it goes on from

4    there.  So that's (ii), but then -- that covers part of the

5    period, until finality, but something happens at finality, and

6    so that's in, really, paragraph (iv), which says, *Therefore, in*

7    *the event that the Declaratory Order,* that 2015 order, *is*

8    *overturned, either in whole or in part, and the applicable*

9    *order on appeal becomes final and is no longer subject to*

10   *further appeal or other judicial review, Level 3 will refund,*

11   *within 30 days, 50 percent of the disputed OTT charges*

12   *beginning with June 15.*  So 30 days, we -- (ii) governs how --

13   what AT&T is going to pay until finality, and then (iv), in

14   that sentence in the middle, governs what happens or should

15   have happened 30 days after finality.

16        And so what Level 3 is, essentially, saying, is that

17   this sentence that I have underlined, embedded in the middle of

18   these various romanettes, and embedded in -- in this (iv),

19   means end-office switching, but the other, the dispute OTT, but

20   for other purposes, the Agreement is about much, much more, not

21   limited to end-office switching and not limited to OTT.

22        Now, if -- I didn't -- I don't have it on this slide,

23   because I really don't think it's -- it's relevant to the

24   issues that I want to focus on, and Your Honor asked about, but

25   Mr. Steese did mention (iii), I believe it is, which is the CPN

1    issue, which is really another dispute.  So that's different

2    from end office, itself.  It's really those minutes that are

3    coming in, not from Level 3 end users, but at Level 3 is still

4    charging those end-office calls.  The only evidence that I

5    remember, about a breach of that provision was Ms. Torres'

6    admission that it was Level 3 that breached it.  So I don't

7    think it's relevant to the overall resolution here, but the

8    only evidence of breach is a breach by Level 3.

9          Now, the other thing -- next slide, please.  You know

10   Your Honor, obviously, in His Summary Judgment ruling has

11   addressed this (iv), at least a portion of it, and concluded

12   that plaintiff is entitled to 50 percent refund, for end-office

13   switching charges during the, what I will call, the refund

14   period, and at this stage.  The plaintiff was AT&T, so, you

15   know, we are entitled to that refund.

16         Can we go to the next slide, please.  And here is

17   the -- the final FCC, 2019 Declaratory Order.  And here, what

18   we want -- what I want to address is how the Court has -- has

19   addressed it on Summary Judgment, which, as a result it is now

20   clear that a LEC, such as Level 3, can assess end-office-access

21   charges from long-distance carriers, such as Level 3.

22         So, can we go to the next slide, please.  Well, in

23   our -- in our effort to be prepared for today, I think we have

24   a wrong heading on this slide, but in any event, I want to

25   focus back on this particular language, in (iv), about 30 days

1    after finality.  So that's March of 2020.

2            Can we go to the timeline, please.  So on the

3    timeline, and Your Honor is familiar with these dates, you

4    asked about the D.C. Circuit opinion earlier, that's back in

5    November, the ruling becomes final in May of 2017, and then I

6    want to focus on this February 2d -- I'm sorry -- February 2020

7    date, where the order becomes final, and so what's the

8    obligation of Level 3 under (iv), and for the refund period?

9    The obligation is to refund 50 percent of the -- of the

10   disputed OTT charges by March of 2020.  By March.  And so,

11   there's an exhibit that we looked at this morning.  Next slide,

12   please.  And I will come to the procedural issue a little bit

13   later, when I talk a little bit about what we think this case

14   is not about.  But this A22, is a document that Mr. Steese used

15   this morning, and one of the points, that was made, with

16   Alison Miller, was, *Oh, there's a divide by two in this*

17   *document*, *and that divide by two is the 50 percent*

18   *implementation, or the attempt to implement, the 50 percent, in*

19   *(iv)*.

20           So in March of 2020, Level 3 knew how much it needed

21   to -- to refund, under the 50 percent provision, under its view

22   of damages.

23           Let's go to the next slide, please.  And so here's

24   where we are today, in Exhibit A53, on the refund.  There is no

25   refund.  They have not made a refund.  We're in July of 2021,

1    when their obligation to make the refund was March of 2020, and

2    so, as, you know, I indicated, thinking about Your Honor's

3    questions, and the time period, and looking at today, the 50

4    percent is dealt with through some offset on a bunch of

5    credits, in a damages study, and it was never credited back in

6    March of 2020, and it hasn't been credited today, other than in

7    this spreadsheet.  We think that there's a significant issue,

8    in this case, as to whether or not Level 3 has met its burden

9    of showing its own adequate performance, and whether, under New

10   York law, that excuses AT&T's performance, with respect to that

11   portion of the period.

12          Now, let's go to the next period, which is finality,

13   in the next slide, please.  So again, looking at this period,

14   it's the last sentence of (iv) that governs this provision --

15   or this period.  *Further the parties agree that any billing and*

16   *payments for OTT traffic exchanged after such final order*

17   *becomes final shall be in compliance with the terms of that*

18   *order*, and so that order is pretty clear.

19          Can we go to the -- next slide, please.  So it's

20   really that bottom slide that -- that over-the-top VoIP and an

21   X that can't be charged anymore, which is the end-office

22   switching, and I want to pause here for a moment, Your Honor,

23   and in this context talk about the traditional and the OTT

24   calls, and the distinction that Mr. Steese attempted to draw

25   earlier this afternoon.

1          It's still end-office switching.  That's still the

2     issue, in that the traditional call, there's the other diagram

3     that was used in opening, and Ms. Meola; goes through that

4     switch, goes from, you know, the call party, through the

5     end-office call, through the tandem switch, that is a

6     traditional call.  Use of the phrase traditional call does not

7     change that Agreement from -- somehow from end-office switching

8     to have every element in Level 3's network.

9          So let's look at this finality period on the timeline.

10    So this period is from February of 2020, through the present.

11    And on finality, again, we -- in that period, we think it's

12    end-office switching only, for the reasons that we've talked

13    about, and it's the OTT dispute.

14         And let's look at the counterclaim for a second.  And

15    we didn't include 66, but that's one of the provisions that

16    Mr. Steese cited in attempting to draw this distinction, with

17    respect to traditional traffic, and I will get to this in a

18    minute, but this is, when I said yesterday, the parties

19    conducted discovery on one case and are trying a different

20    case, it's because this case has always been about end-office

21    switching and over-the-top VoIP, and it's because everyone

22    knows that the withholding percentage was 65 percent.

23         Now, I understand there's some noise, I will call it

24    noise, as to implementation of that, we think there's

25    un-rebutted testimony.  But there was -- Level 3, itself,

1  alleged in its counterclaim that it was 65 percent.

2  So, theory of the breach, the finality period, let's

3  go to the next slide.  It's that same sentence, and here it's,

4  you know, that last sentence, imposes mutual obligations.

5  Obviously, it's Level 3 that's doing the billing.  It's AT&T

6  that's making the payments.

7  You know, the one thing that is clear, if we can go to

8  the next slide, please, is that you know Level 3 has not

9  made -- adjusted its bills to be in compliance with the final

10  order, until May of this year, and this is Ms. Kellow's

11  examination, *Level 3 continued to bill end-office charges to*

12  *AT&T after February of 2020.  So that's the finality period,*

13  *correct?*

14  *Correct.*

15  *And those credits, that you showed the Court, when*

16  *Mr. Steese was talking with you, you never actually gave those*

17  *credits to AT&T, and didn't adjust the billing until May.*

18  Now that's -- we have an obligation of payment, they

19  have an obligation of billing, and I just like to, you know,

20  just raise that point for Your Honor.

21  And again, Your Honor asked this question, the next

22  slide, please, of Ms. Miller, yesterday.

23  *THE COURT: Let me just make sure I understand, ma'am,*

24  *in terms of this credit that appeared in May, that you just*

25  *testified to, what months or period, whenever of those temporal*

1    *factors is better for you, did it cover*?

2           And then Ms. Miller, *I believe it was issued to us in*

3    *May, or I received the notification from Diane Wood at Level 3,*

4    *in May, and I believe the credit went back to the February bill*

5    *date.  I'm not a hundred percent sure, but I believe it was*

6    *back to February*.

7           And then the Court clarified that this was *February of*

8    *this year* with Ms. Miller.

9           So, in the course of -- of raising this point, we just

10   wanted to make sure that we were responsive to the questions

11   that the Court raised yesterday.

12          So, let's go to the next slide.  So, we think, and

13   this really kind of summarizes where we -- what we think about

14   the contract, and AT&T's reading of the contract.  First, it's

15   based on the plain language of the Agreement.  It defines the

16   OTT dispute with reference to end-office switching charges.

17          Second, our reading harmonizes the contract's language

18   and doesn't rely on extrinsic evidence.  Tandem means one thing

19   under our reading, end-office means another thing, and I will

20   talk, in a minute, about extrinsic evidence.

21          And then -- and this is the point I just made, that it

22   does differentiate OTT dispute from tandem.  The OTT

23   Declaratory Order that we looked at in paragraph two, that only

24   addressed the question of end-office switching, and whether

25   they were compensable for OTT calls.

1           And then the final appellate order, which Your Honor

2   has interpreted to be that order from late 2019, that became

3   final in February of 2020, again, addressed OTT calls, and

4   end-office switching, and then last, but certainly not least,

5   you know, Your Honor has already determined that the 50 percent

6   refund provision in (iv) is applicable to end-office switching.

7           So, let's look at OTT -- I'm sorry, in Level 3's

8   reading of the contract.  Next slide, please.  So, they take a

9   different reading.  And everything is not my words, Your Honor.

10  Everything is Ms. Torres' word, and so it's -- it's not

11  end-office switching, it's not the OTT dispute, it's as

12  Ms. Torres was asked on Direct, *Please explain what these --*

13  *what these words mean.  Well, what Level 3 was seeking to*

14  *receive here was everything disputed, everything disputed, and*

15  *not paid under the claim.  The end-office switching didn't*

16  *apply*.  And then she goes on to Exhibit A, *everything disputed*

17  *and not paid that's what we're defining as an end-office*

18  *switching*, and then, on Cross, I again asked her, I asked her,

19  about her use of the word everything, and it's her testimony

20  that *this clause allows everything to be recovered by Level 3,*

21  *that was disputed and withheld*.  That reading of the contract

22  finds no support in its plain language.

23          Ms. Torres acknowledged that she wasn't a negotiator

24  on the contract.  We don't think extrinsic evidence is

25  necessary, but let's look at the extrinsic evidence that Level

1    3 offers on slide 22.  The next slide, please.  And I -- I

2    asked three or four questions about this.  *So, is it your*

3    *testimony that in order to understand the meaning of the OTT*

4    *dispute, for purposes of this Agreement, one needs to know*

5    *what's in the accounts receivable in Exhibit A*?

6         Now, let's go to the next slide.  So, we can't

7    interpret this contract, Your Honor, because we don't know what

8    the components are of each of these BANs.  These are the BANs

9    or invoices.  That reading of the contract makes no sense.

10   Your Honor would never be able to adjudicate the meaning of the

11   contract if that were required.

12        This is extrinsic evidence.  I'm not even sure if it

13   supports the proposition for which it -- it's advanced, but --

14   but Level 3 cannot say, although they do, that you have to know

15   what's in Exhibit A, to adopt their reading of the contract.

16        So, let's turn to damages, and I think that the place

17   to begin on damages is really the 65 percent.  As we saw from

18   Level 3's counterclaim, they have alleged, throughout, that

19   AT&T has withheld it's 65 percent.  AT&T told them that they

20   were withholding at 65 percent, really not in dispute.

21        Ms. Miller testified, yesterday, about AT&T Exhibit

22   36, which is the August 27th -- I'm sorry, August 7th, 2017

23   direction that she gave to the pricing team to withhold at 65

24   percent, or to pay at 35 percent, un-rebutted testimony that

25   this 35 percent applied only to end-office switching.  What

1    we're -- what we're faced with is this kind of speculation

2    about, *Oh, these numbers may match, therefore, the mechanized*

3    *billing system must have done something different*.  Well,

4    although Ms. Meola testified a little bit about the mechanized

5    billing system, she wasn't that familiar with it, but

6    Ms. Miller was, and she testified, consistent with what Level 3

7    alleged, that it was withholding at 65 percent, and we know

8    that.  And how do we know it?  That's Exhibit -- well, we know

9    it because it's the way that that 35 percent factor was applied

10   in the mechanized billing to only the end-office switching

11   elements, but then we also know it, because Ms. Miller pulled

12   some data for two states Alaska and Hawaii, and if we can go to

13   the next slide please, where is there is no tandem switching,

14   and, you know, I know that that whole competitive tandem issue

15   and the ratios, you know, is complicated, but I don't think

16   that that's really at issue here, but the way to confirm, in

17   fact, it is 65 percent withholding on end-office only, is to

18   look at these two states without tandem, and this -- it's

19   Exhibit -- I'm sorry, it's column I, where 65 percent is not a

20   factor or component of a calculation.  It is the output of

21   comparing the amount withheld and the total amount of

22   end-office switching.  So when you apply that simple formula,

23   comes up with 65 percent, that confirms that, in fact, it was

24   pay at 35, withhold at 65.  And then there are -- there are

25   some withholdings on tandem, as well.

505

1        And I will talk about what I call the other disputes,

2   in a minute, but I asked Ms. Miller, *Is that withholding of*

3   *$892 and so that's the amount for North Carolina, in line ten,*

4   *on under tandem withholding, in column N.  So is that*

5   *withholding of $892 caused by the 65 percent withholding or the*

6   *35 percent payment for OTT dispute?  No.  That 35 percent only*

7   *impacts the end-office billing.*

8        *And so now, is that caused by the OTT dispute?  That*

9   *would have been -- would have been caused by some other issue*

10  *or something else that caused the build-unit cost to be higher*

11  *than the paid-unit cost, but it would not be due to the 65*

12  *percent -- or 35 percent factor.*

13       So, as I indicated, what are we left with, next slide

14  please, from Level 3?  Level 3's witnesses could only guess or

15  conclude as to how AT&T implemented the withholding.  It's

16  really not, you know, substantive evidence.  They don't know

17  how AT&T did this withholding.  You know, they relied on a

18  couple of emails about the mechanized billing system, and have

19  come up with this whole theory that there must have been, could

20  have been, should have been, might have been been; that's

21  really just speculative.

22       So, we think that that's the first issue, that we put

23  in the damages question that Your Honor asked, and we think

24  it's -- it's 65 percent withholding on end-office switching

25  only.

1      So, can we go to the next slide, 76, please.  So,

2  Your Honor asked about damages, and we want -- we want to

3  address damages.  Our damages are addressed in AT&T Exhibit 76,

4  we think that its application of the the percentages to that

5  $8.5 million, the overall withholding that we come up with is

6  4.2.

7      I would like to -- to just kind of pause here about

8  these issues that were raised earlier today during Ms. Miller's

9  Cross-examination, and then by counsel in his closing argument.

10     Exhibit 76 is in evidence.  It came into evidence in

11 Level 3's case in chief.  It's no surprise.  That $8.5 million

12 number is Level 3's number.  Sure, Ms. Miller compared it to

13 AT&T's records, and it was off about 20 or $30,000 dollars, but

14 it's -- it's Level 3's number.  The percentages, simple math.

15 The, what had happened here is that there is math done on this,

16 nothing more, nothing less, and that's what we disclosed when

17 we said in our -- in our initial response that there are some

18 things that were contested.  There are some aspects that we are

19 contesting, but what we said is that the issue here is not --

20 is not an issue of expert testimony.  We said, in Exhibit 10,

21 that we don't plan to submit any testimony that we considered

22 to be admissible under 702, 703 or 705, and that's exactly what

23 we did, Your Honor.  It was 701, lay opinion testimony, and it

24 came in.  The disputed issues don't have anything to do with

25 the tab in Level 3's spreadsheet that Ms. Miller used to apply

1    her simple mathematical calculation; that's that everything

2    spreadsheet, that we indicated that we would be disputing.

3         Can we go to the next exhibit please or the next

4    slide.  So, the other -- the final point I would like to make

5    on 76 is that Ms. Torres acknowledged that the math work.

6    Well, this is truly just the end-office charges, and I have no

7    disputes that AT&T is withholding 65 percent of end-office

8    charges.  It's just that they are withholding more than that on

9    other charges, as well.  And then I asked her again, about, *And

10   if we started and ended, with end-office switching, and that's*

11   *where we believe this case starts and should end, the amount is*

12   *$4.1 million, right?*

13        *ANSWER:  Yes.*

14        So can we go to the next slide, please.  This is the

15   demonstrative that we went through with the Court.  It's,

16   again, it's just math, to get from that 8.2 million of total

17   end-office charges, the end-office overcharge at 21 percent and

18   then that leaves the $7 million and change, improperly billed.

19   You subtract what AT&T, in fact, paid, and then, you end up

20   with 4.1 million.

21        Now, in the next slide we -- we did what Your Honor

22   requested, and we split the refund period and the finality

23   period, and allocated them between the two, and the total of

24   the refund period from 4.1 is about 2.5, and the total for the

25   finality period is 1.5 -- $1,581,558.  I think that's a little

1    different from what Mr. Steese said, but I would like to talk

2    about the arguments that Level 3 made earlier this afternoon,

3    about, *Oh, there must have been some change, look at these*

4    *numbers.  The number is much bigger in one period, than the*

5    *other period, AT&T must have somehow gone in and adjusted*

6    *things after the FCC's ruling*.  There's no evidence of that.

7    No evidence.   That is pure speculation.  Could be any number of

8    reasons why that happened.  Could be declining minute volume

9    could be that people are using their cell phones more than

10   their landlines.  Could be any number of reasons, but there's

11   no evidence before Your Honor on that point.

12            Can we go to the next slide, please.  I want to try to

13   address, as best I can, the damage theory of Level 3, and this

14   is from Mr. Steese's opening.  It's not much different from

15   what he said today, and I think that, you know, he cited some

16   case law and talked about some other things, but it's really

17   the same thing he said in opening, if you think about any

18   commercial case, the way you calculate damage is you make sure

19   that you are taking into account the other factors that need to

20   be subtracted to give you the number that was caused by here,

21   AT&T, and that's exactly what we've done, but that's not the

22   law.  That's not what's required.  It's what's caused by the

23   breach of the contract.  Not any harm you might have sustained

24   or believed you might have sustained or could have sustained.

25   It's what damages flow directly from the breach, and we know

1    what their theory is.

2          Let's go to the next slide, please.  We want to be

3    paid everything.  They're not shy about it.  I will give them

4    credit for that.  They are upfront in what they're asking the

5    Court to do.  We want to be paid for everything.  We want to be

6    paid for the OTT dispute on end-office switching.  We want to

7    be paid on every other withholding that AT&T has made, since

8    January 1st, 2019.  That's what we want Your Honor to do.

9    That's what they are asking this Court to do, and that's

10   where -- the next slide, please, that's where their damage

11   calculations starts.  It starts -- this is 53, again, with that

12   $57 million, in total charges.  Not end-office charges, not

13   charges related to OTT.  It's everything.  And this is from

14   Ms. Kellow, when she was shown this document, *That the total*

15   *includes end-office charges?  Correct, tandem charges?*

16   *Correct.  All the elements that you went through?  Correct.*

17   *It's the whole enchilada, if you will.  Does it include it for*

18   *all traffic that Level 3 sent to AT&T?  Correct.  It's not just*

19   *OTT traffic?  Right, yes.  This is everything -- this is*

20   *everything you think that Level 3 sent to AT&T?  Correct.*

21          And let's go to the next slide, please.  So here's --

22   and I will talk about why tariff is not relevant in a second,

23   but here is what Level 3 does.  It says what -- what we, Level

24   3, get to do, is unilaterally pick and choose what disputes are

25   legitimate and what disputes are not, and if we think that they

1    are legitimate, we will -- we will include them in the damage

2    calculation, but if we don't like them, we don't want to

3    include them, we're not going to include them.

4           So what they're doing is deciding, unilaterally, what

5    goes into the damages, in terms of disputes.

6           So, Exhibit 53, that new column L, that showed up last

7    week, new affiliated tandem disputes, starting December 2020.

8    So they decide, okay, we want to include -- we think that this

9    dispute complies with our tariff, merits inclusion, is a

10   legitimate dispute, so we will include it.

11          Let's go to the next slide, 79.  As you will remember,

12   Your Honor, this is one example of the -- what Ms. Miller

13   testified were the regularly generated dispute notices.  And

14   there's an amount on this.  It's Exhibit 79.  It's actually on

15   the second page, but Level 3 has decided this dispute, this

16   isn't any good.  It doesn't comply with our tariff.  We're

17   not -- we're not going to include it in the damages study.

18   What we're going to do is try to seek recovery for this amount,

19   because we're seeking everything, and what they're asking

20   Your Honor to do is to bless their judgment, say, *Yeah that's*

21   *okay* say, *Doesn't matter whether the dispute is valid or*

22   *invalid, Level 3 has excluded it, so they can recover damages*

23   *on that amount*.  It's not how it works.  If they have a problem

24   with that, with this dispute, they can raise it appropriately,

25   but what they can't do is unilaterally, tack it on here.

1        So if you go to the next slide.  This -- this is the

2   one, Exhibit 84, from back in February or so of January 2021,

3   that Level 3 says, *Oh, this dispute is good enough to include*

4   *or exclude the amount of, in the damages study*, and we saw that

5   directly because $251,000 that is credited in the damage study.

6        Go to the next slide please.  There was some

7   suggestion that was made that somehow, *Oh, we just learned*

8   *about this.  We, Level 3, just learned about this last week*,

9   but on Cross, Ms. Torres said -- I asked her, *As a matter of*

10  *fact Level 3 is notified of this on January 4th, 2021 not last*

11  *week, not July 9th, 2021, correct?  Yes these were previously*

12  *filed*.

13       So what Level 3 did, and Ms. Torres acknowledged that

14  they did it, they missed it.  And look, you know -- the

15  question is what else did they miss?  What else did they miss?

16  That's why this *everything theory* is a theory of damages, just

17  can't work and doesn't work.

18       So let's go to late payment charges.  Mr. Steese

19  talked about this, again.  We don't think that Your Honor needs

20  to go outside of the four corners of the contract to decide

21  this issue, paragraph (ii) or romanette two, I'm not quite used

22  to that either, refers to applicable switched tariffed rate for

23  OTT traffic, and then in (iv), parties agree that any billing

24  and payments for OTT traffic exchanged after the Final Order,

25  will be in compliance with the terms of that Order.

1           And so, Mr. Steese, and Level 3, say well, you ought

2    to read some late payment charge language into these provisions

3    in the contract.  Well, let's look at each of the retroactive

4    provisions.  I think they have been called the retro

5    provisions, and there's focus on the OTT one, but can you go to

6    the next slide, please.

7           So, it's -- in the OTT dispute, again, retroactive,

8    AT&T owes Level 3 money, they are going to settle at a certain

9    percentage of what's been paid, including late payment charges,

10   there's a discount.  Late payment charges appears in three

11   different provisions of the contract.  The OTT dispute, the

12   tandem dispute and the DEOT billing dispute, and it's in each

13   one, and just as a matter of elementary contract construction,

14   can't be read into other provisions of the contract.  These are

15   sophisticated parties.

16           *THE COURT:*  Let me just ask you one thing.

17           *MR. WARDEN:*  Yep.

18           *THE COURT:*  In terms of a way, I'm not going my way, a

19   way of looking at the contract.  What the contract -- the

20   Agreement I should say -- did, was say, all right, we've got

21   ongoing disputes, we're going to look at it and resolve those

22   aspects of the disputes which are retro, if we can use that

23   word, and it says whatever it says with regard to those, late

24   payment fees are included, aren't included, whatever.  Because

25   in terms of retro, presumably those fees have been already

1    billed or assessed or something along that lines.

2         With respect to the going-forward period, why should

3    anybody expect that it says you should -- that late payment

4    fees will apply if you don't pay as you have agreed to pay?

5    I'm not -- I'm not sure that I'm landing there, but I'm just

6    sort of saying you are telling me that the words aren't there,

7    why would they be there?

8         MR. WARDEN:  Well, I mean, Your Honor, these are

9    sophisticated parties, and the parties agreed to pay

10   switched-access rates, not to be subject to the tariff.  This

11   is -- you know, Mr. Steese --

12        THE COURT:  So -- so if I'm getting this right, as of

13   the date that's signed, you don't have to pay for, I don't

14   know, until the Court makes you?  Or you know, somewhere

15   forever down the line?  Or -- or if you do, whenever you have

16   to pay, there's no penalty?

17        MR. WARDEN:  Your Honor, the -- yes.  Your Honor,

18   the -- the parties, and especially sophisticated parties, agree

19   all the time to liquidated damages provisions, venue

20   provisions, to provisions on interest that may apply in the

21   event of a breach.  The parties know how to do that if they

22   want to do that, and these are, regardless of the relationship

23   between them --

24        THE COURT:  The relationship is crap, but I mean, you

25   know that isn't really deciding anything.  I just wanted to

1  ask.

2        MR. WARDEN:  Thanks, Your Honor.  Well let me look at

3  the tariff for one second.  If we can look at the next slide,

4  and again rates for switched access is 15, and the late payment

5  penalty is in a separate provision of the tariff.  There's also

6  a suggestion that, well, a contract has to file a tariff, and I

7  know that we've briefed this before, Your Honor, but you can

8  obtain services through a contract or through a tariff.

9        Let me talk about prejudgment interest briefly,

10  Your Honor.  Under New York law, if -- if it were to apply --

11  if prejudgment interest is discretionary, as I mentioned

12  earlier, there are issues as to perhaps breaches on both sides,

13  and so whether, in this circumstance, prejudgment interest were

14  appropriate, we would suggest that it is not.

15        Now, I want to go to the next slide, talk for a

16  moment, and I almost -- almost hate to put this slide up,

17  because we spent a lot of time on these issues, and talked

18  about what this case is not about, because when I said that we

19  did discovery on one case, and we were trying another case, we

20  really did do discovery on the issues that Your Honor ruled

21  upon; meaning of the contract, and that whole final appellate

22  order and, you know, whether the percentage was something less

23  than 65, and that's -- and where we are now is after the close

24  of fact discovery, Level 3 proffers a damages analysis, that

25  includes other disputes, and so we've had to spend time before

515

1    Your Honor addressing the other disputes between the parties,

2    but the disputes unrelated to OTT are not before the Court.

3         The withholding of switched-access charges other than

4    end-office switching on the OTT dispute, again, not before the

5    Court; not withstanding the time that the parties have spent on

6    that.  Whether Level 3's combined billing or AT&T's mechanized

7    bill payment validation system, whether those systems work

8    together or don't talk to each other, again, that's not in the

9    breach of contract claim.

10        And then finally, and I touched on the compliance with

11   the tariff and the dispute notices, is not in the -- in this

12   breach of contract claim.

13        Let me just close, quickly, with TCG in the next

14   slide.  So this is the stipulation.  What happened, generally,

15   how Mr. Steese accounted for, but the key issue is the timing,

16   that we made these credits, and we made these credits promptly,

17   after -- after the -- the ruling, and this is what the parties

18   have agreed to.  So we didn't litigate this issue.  It's a

19   $517,000 in payments in excess of the credit that TCG extended.

20        So let's look at the language of the Communications

21   Act.  It's obviously the starting point for the analysis, and

22   this is not kind of your typical prevailing party-type

23   analysis.  It provides, and that's in Section 206, that

24   reasonable counsel or attorneys' fees is to be fixed by the

25   Court in every case of recovery, and there's this *AT&T vs*

1   *United Artists*, Judge Leisure opinion out of the Southern

2   District, where the Court applies that plain language, and

3   concludes that this is not a case of recovery, because no

4   damages have been awarded.

5        So let's look at the next slide, please.  And this

6   again is Ms. Torres, *And you understand as a result of that*

7   *dispute, TCG dispute, where Level 3 owes AT&T $517,000, Level 3*

8   *isn't going to recover anything it's AT&T that will in effect*

9   *recover, right?  Correct.*

10       So, we appreciate the Court's time, and attention,

11  unless, Your Honor has any questions for me?

12            *THE COURT:*  No.

13            *MR. WARDEN:*  Thank you, Your Honor.

14            *THE COURT:*  Let me do this -- I know Mr. Steese,

15  promised that he would be brief.  I'm not trying to suggest

16  that he is doing -- going to do anything other than that, but I

17  do get a little concerned about my court reporter needing a

18  break.  So, let's me just take ten minutes, and then pick right

19  back up from there.

20            *MR. STEESE:*  That's totally fine, Your Honor.  I will

21  be brief.

22            *THE COURT:*  Especially since you changed your flight.

23            *MS. ZAMBRANO:*  Thank you.

24            *THE COURT:*  Recess.

25            *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

1      (Recess at 3:01 p.m.)

2      (In open court at 3:10 p.m.)

3           THE COURT:  Please be seated.

4           MR. STEESE:  Thank you, Your Honor.  And I will try

5      and wrap it up and in a brief fashion.

6                        **REBUTTAL ARGUMENT**

7           MR. STEESE:  So, Mr. Warden talked about (iv) and his

8      focus was on the refund of disputed OTT charges, and he

9      conflates the amount disputed and withheld to that which was

10     disputed.  If one says, I am disputing the payment of $20, but

11     then withholds $40 out of that, that doesn't mean that the

12     amount disputed is the total amount withheld.  This is exactly

13     what Ms. Kellow -- excuse me, Ms. Torres testified to.  What

14     they claim to be disputing, does not match what they withhold,

15     and so there's no question, they have acknowledged, AT&T has,

16     that what is truly disputed are end-office charges on OTT

17     calls, and so, what needs to be credited, and I will get to the

18     refund point in a minute, is 50 percent of that which truly is

19     in dispute.  Now that does not mean that AT&T didn't withhold

20     far more than that on the OTT dispute.

21          So, let's talk about the refund for a moment.

22     Mr. Warden suggested that Level 3 breached the contract,

23     because it did not refund money to AT&T after the February

24     decision.  You cannot refund what has not been paid.  Refund

25     means give back.  Had this -- there had not been an interim

518

1    2019 Settlement Agreement, where we were trying to resolve

2    dollars all the way back to May of 201... I guess it's June of

3    2015, AT&T would have paid something that merited refund.

4         However, in this particular situation, AT&T has

5    withheld far more than the OTT percentage of Level 3.  So there

6    is nothing to refund.  Indeed, when Ms. Meola was on the stand,

7    she didn't even say a refund is appropriate.  She said credit.

8    What she said is the credit needed to be on the invoice, and

9    what Level 3 has done is put the credit in its damages

10   calculations, and as both Ms. Torres and Ms. Kellow testified,

11   there was a dispute about whether -- what the OTT percentage

12   was, and so once the percentage was clarified, so they knew

13   what to credit.  They immediately placed it on the invoice, but

14   from the very month after that decision, in March of 2020, for

15   the February 2020 amounts, credits were identified with

16   specificity, based upon what Level 3 thought its OTT percentage

17   was.  There can be no breach in that circumstance when there is

18   nothing to refund.

19        In terms of what -- and I am just going in order of

20   his presentation.  Mr. Warden said this has always been about

21   end-office switching and that simply cannot be true, because if

22   that were true, in May of 2020, when they were doing their

23   damages analysis they would have not said this is what we take

24   issue with, with Ms. Torres' calculations.  They would have

25   said all of this is irrelevant, all that matters is the

1    end-office charges.  All that matters is tab one.  Get rid of

2    tab two.  It is irrelevant.  But instead, their issues were

3    challenging various aspects of tab two and they said this is

4    all that we're taking issue with.

5           And so the simple fact is, their own conduct is

6    contradict -- strike that.  Their own statement, that its

7    always been about end-office charges is contradicted by their

8    own conduct.

9           In terms of Exhibit 36, Mr. Warden said, on his

10   closing that you can see, based on Hawaii and Alaska, that its

11   only 35 percent of end-office charges, because you can see

12   there is nothing but the end-office charges withheld.  However,

13   Ms. Miller testified that that there were no tandem charges at

14   all in those states.  How are you going to withhold something

15   more than 35 percent of end office if there's nothing else

16   there?

17          The whole point is, Ms. Miller testified, and I'm

18   going to get the wording wrong, I don't have a copy of the

19   transcript but it is words to the effect of the weighted

20   average of all of these elements added together, and if they

21   get out of whack, we withhold more, and those inputs included

22   end office, and when they put that process in place was August

23   of 2017, as a direct result of implementing OTT withholding.

24   The OTT dispute.  So the mechanized process and the reason for

25   the overwithholding, this very point we're disputing X and

1    withholding more, is because their implementation of the

2    mechanized possess to implement withholding on the OTT case or

3    dispute, in violation of the contract, because they were

4    entitled to withhold zero, based on Your Honor's order.  Had

5    they not done that, we would have been in a position where none

6    of these dollars were withheld.  All of that 5.5 million,

7    before February 20 -- February 19 of 2020.

8            Yes.  In terms of one important point that I want to

9    raise, when you talk about Rule 26, and I know that I'm going

10   there, and this is related to the expert disclosures what is

11   the impact of AT&T's failure to identify what its damages

12   methodology was then?  Which they are claiming they didn't need

13   to disclose, because it's only facts.  If that's the case, they

14   should have said nothing in response, instead of saying this is

15   what we're challenging.  Now their argument is, in -- I will

16   say, in April of 2021, because that's when they first put this

17   forward, we withheld all of these other dollars, and we didn't

18   tell you any other disputes, other than the OTT dispute that we

19   were withholding on, and now the Communications Act, two-year

20   statute of limitations for January 20 -- excuse me -- January

21   2019, February 2019, March 2019, and April 2019 has run, and so

22   all of those dollars that we withheld for, according to

23   Ms. Miller, no justifiable reason, all of those dollars now you

24   can't recover them.  That's a pretty darn good motivation to

25   not follow the rules, and that's the whole point.

1     We're sitting here in this position where they

2   disclose late, and it causes harm, and that is the whole reason

3   that one is required to disclose.  Level 3 has thought all

4   along, as it said in every paper, every damages disclosure,

5   that all of these dollars were withheld because of the OTT

6   dispute.  Why?  Because that was the only known dispute.

7     Now, Mr. Warden says, we pick and choose.  We included

8   every single dispute with every single date given by AT&T, and

9   all of them are March of 2020 and after, and he says *Guess*.

10  They might have missed another.  If there was another that

11  predated that, we would have seen that in this case.  There are

12  none.

13     And this is was an interesting point, he says, when I

14  am saying, look at the before and after, and after February

15  2020, the mechanized process seems to not be withholding more

16  than 65 percent, before that it is.

17     We know that that mechanized process was in place the

18  entire time.  Why the match afterwards?  And he says, you can't

19  take logical leaps.  Well, Your Honor certainly can.  Fact

20  finders do that all the time.  He asked you to assume in one

21  hand, with no evidence, that there are disputes that predate

22  March of 2020, and at the same time he says, it's improper to

23  assume that there were changes made to the mechanized process,

24  when it's almost perfect withholding after February of 2020 and

25  completely out of whack before.

1              The simple fact is he is right.  Until the other day,

2      that -- that mechanized process was a black hole.  No one

3      explained it.  However, we have no control over that.  We had

4      to ask Ms. Miller to find out, but the dispute notices, if they

5      sent them, that's wholly in AT&T's control.  If they were

6      there, we would have seen them.

7              And, Your Honor, with that, I will wrap up, unless you

8      have any additional questions.

9          THE COURT:  I don't, in the context of the close,

10     which I understand is confusing, but you can return.  Let me

11     just ask, I have a question of both sides.

12         MR. STEESE:  Okay.

13         THE COURT:  And I suspect that I'm not going to be

14     artful enough to be able to say this properly off the top of my

15     head.  Clearly, I -- there's a dispute about the methodology,

16     but within the methodology, it does not appear that one side is

17     challenging the math of the other side.  What I mean by that

18     is, if the AT&T approach, for lack of a better term, is

19     correct, there's no argument about the math, and the damage

20     number that kicks out at the bottom.  Late payment fee aside.

21         MR. STEESE:  That was going to be my comment.

22         THE COURT:  Okay.  And similarly, if the L3 approach

23     applies, there's no -- there may be some quarrels about ... and

24     I am not trying to disregard the quarrels, but there -- but if

25     the approach applies, correctly, that you start with this and

523

1    you take away that, and you take away the other, there's no

2    dispute as to the -- as to the numbers that they have come up

3    with, and nobody is suggesting that there is some item, whether

4    it be refund, credit, whatever, of the OTT dispute, that is not

5    built into the other side's calculations.  I'm not sure that I

6    have said that quite correctly, but that's -- that's where I'm

7    coming away, is that the fight is about whose approach is

8    right, not about some disagreement with the numbers or the

9    percentages or other things?

10          *MR. WARDEN:*  Generally, correct, Your Honor.  And you

11   will remember, from Ms. Miller's testimony, that -- I just want

12   to say she validated the starting point, at $57 million, and

13   didn't necessarily validate the others, in that one tab, but

14   was able to validate the OTT tab that she used.

15          *THE COURT:*  All right.

16          *MR. WARDEN:*  So I think that's more a footnote to what

17   Your Honor said.

18          *MR. STEESE:*  Your Honor, can I add one more comment?

19          *THE COURT:*  Yeah.

20          *MR. STEESE:*  The only thing that cannot be lost is,

21   the parties have stipulated to two numbers.  The 341,000 tandem

22   add back and the 517 of reduction.  The Level 3 numbers,

23   include the 314 and the a 517.  So you see that in tab two, all

24   in one location.  The AT&T numbers, the 4.1 and change does not

25   include interest or late payment charges, does not include the

 1   341, it does not include the 517.

 2          THE COURT:  Right.  But those refinements aside, is it

 3   a fair comment?

 4          MR. STEESE:  Yes.

 5          MR. WARDEN:  Yes, Your Honor.

 6          THE COURT:  All right.  What -- one of the things that

 7   I do not want to do -- well, two things.  Number one, simply

 8   because I don't want want to lose whatever value the closing

 9   argument has, and don't want to be, if I'm reviewing it, saying

10   wait what were we looking at?  What is he pointing at.  Not a

11   trial to the jury.  Give me a PowerPoint presentations, and I

12   will just have them.  I'm not suggesting that they

13   independently constitute evidence or anything else.  Just

14   saying.

15          MR. STEESE:  We would like you to consider ours as

16   evidence; but not theirs.

17          THE COURT:  Absolutely.

18          (Laughter)

19          MR. WARDEN:  I only have one question, Your Honor.

20   How would you like them delivered?  Do you want us to -- file

21   them?

22          THE COURT:  Unicorn.

23          MR. WARDEN:  Pardon me?

24          THE COURT:  Unicorn.  No, don't file them, that's not

25   necessary.  They can be -- well, I know the difficulty is you

1    are going back.  I don't care if they are mailed.

2           THE COURT:  I don't want to do an email, because I

3    don't know what size they are, and our -- the court's email

4    system gets wonky when things exceed a certain limit, size

5    limit, I don't know the size limits off the top of my head, and

6    I don't know what size your things are.

7           So, if you could deliver them on a thumb drive or

8    flash drive that's fine, and it doesn't have to be right away,

9    within a week.  I told you I'm going to be in trial next week.

10   Okay.

11          The only other they think that I would ask for is

12   this, I think it's easy, and again if I'm wrong, correct me, I

13   think it's easy to figure out what the Level 3 numbers --

14   damages calculations would be if I were to conclude that late

15   payment charges did not apply.  There's a number at the bottom

16   of a column, I subtract that and move on our merry way.  I know

17   everybody is taking what I'm saying as indicating some outcome,

18   and I don't mean it that way.  If I were to apply --

19   conversely, if I were to apply late payment charges, it is not

20   obvious to me -- I'm sorry, if I were to apply them to the AT&T

21   numbers, it's not obvious to me what those numbers would be,

22   and I trust you both, since there's no dispute about math that

23   you could give me those numbers.

24          MR. STEESE:  Can the parties work together to exchange

25   things?

1          THE COURT:  Yeah.

2          MR. STEESE:  I think that would be acceptable to us.

3  Is that okay with Ms. Zambrano and Mr. Warden?

4          THE COURT:  Again, I'm not, by this saying --

5          MS. ZAMBRANO:  Yes.  I think we understand.  Our

6  damage calculations doesn't have the contingency of the late

7  payments.

8          THE COURT:  And I just want to be able to understand

9  what the -- when I ultimately decide what I'm doing, not have

10  to be sitting here going, if it turns out a particular way, and

11  I know you don't want me to -- don't want me to, think it's

12  incorrect, and I get all of that.  As I said, I'm not trying to

13  tip my hand here, because there's nothing to tip.  How much

14  time do you need to work together?

15          MR. STEESE:  End of next week.

16          THE COURT:  That's absolutely fine.  Is that

17  acceptable to AT&T?  Frankly, have it the Monday following.

18          MR. MARSH:  I think what might make sense, I'm not

19  sure what timeline Your Honor has for in line, how long it's

20  going to issue its decision.  I think one way or the other

21  numbers would need to be supplemented anyway.  So what we might

22  do is allow Your Honor to make the order we could supplement in

23  turn.

24          MR. WARDEN:  Your Honor, I'm sorry, I didn't mean to

25  interrupt Mr. Marsh.  I object to this ongoing supplementation.

 1    I mean I don't think that's appropriate.  The record is closed.

 2    I understand Your Honor's request, as to the late payment fee.

 3    We're happening to you know work with Level 3 to do that.

 4              THE COURT:  All right.  Give me what I asked for.

 5              MS. ZAMBRANO:  Thank you, Your Honor.

 6              THE COURT:  Beyond that I'm done.  I want to thank you

 7    both.  My earlier lighthearted comment about the nature of the

 8    relationship being what it is, it's not as if counsel from both

 9    sides hasn't detected where the nerves are on the counsel on

10    the other side, but notwithstanding that, overall, I appreciate

11    the work, I appreciate the professionalism.  The matter has

12    been submitted.

13              MR. STEESE:  Thank you, Your Honor.

14              MR. WARDEN:  Thank you Your Honor.

15              THE COURTROOM DEPUTY:  All rise.  Court is in recess.

16        (Recess at 3:30 p.m.)

17         Alison Miller

18              Cross-examination By Mr. Steese               436

19              Redirect Examination By Mr. Warden            457

20    EXHIBIT       OFFERED    RECEIVED    REFUSED    RESERVED

21    13                      441

22    10                      441

23    17 & 18                 456

24    CLOSING ARGUMENTS

25        By Mr. Steese                                       462

1    By Mr. Warden                                    491

2    By Mr. Steese                                    517

3                    REPORTER'S CERTIFICATE

4

5        I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

6

7        Dated at Denver, Colorado, this 10th day of September,

8    2021.

9                         s/Tammy Hoffschildt

10
                         _____

11                       Tammy Hoffschildt, FCRR,RMR,CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25